# Exhibit D

ORIGINAL

FILED
Superior Court of California
County of Los Angeles

SEP 17 2020

Sherri R. Carter, Executive Officer/Clerk of Court
By _____ Deputy
Kristina Vargas

1  LUIS LI (State Bar No. 156081)
   luis.li@mto.com
2  CRAIG JENNINGS LAVOIE (State Bar No. 293079)
   Craig.Lavoie@mto.com
3  MARI T. SAIGAL (State Bar No. 318556)
   Mari.Saigal@mto.com
4  MUNGER, TOLLES & OLSON LLP
   350 South Grand Avenue
5  Los Angeles, California 90071-3426
   Telephone:    (213) 683-9100
6  Facsimile:    (213) 687-3702

7  Attorneys for Plaintiff Vanessa Bryant

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                   COUNTY OF LOS ANGELES

10  Vanessa Bryant, a California Resident,        Case No. 20STCV35884

11              Plaintiff,                        COMPLAINT FOR:

12       vs.                                      1.  **Violation of Fourteenth Amendment**
                                                     **(42 U.S.C. § 1983)**
13  COUNTY OF LOS ANGELES, a public
    entity; LOS ANGELES COUNTY               2.  **Violation of Fourteenth Amendment**
14  SHERIFF'S DEPARTMENT, a public entity;       **(42 U.S.C. § 1983 - *Monell*)**
    ALEX VILLANUEVA, as Sheriff of the
15  County of Los Angeles and as an individual;  3.  **Negligence**
    and DOES 1-100, INCLUSIVE,
16                                            4.  **Invasion of Privacy**
                Defendant.
17                                           5.  **Intentional Infliction of Emotional**
                                                 **Distress**
18
                                             **DEMAND FOR JURY TRIAL**
19

20

21

22

23

24

25

26

27

28

COMPLAINT

1    Plaintiff Vanessa Bryant ("Plaintiff"), through her undersigned counsel, hereby brings this

2  action against defendants County of Los Angeles (the "County"), the Los Angeles County

3  Sheriff's Department (the "Sheriff's Department" or "the Department"), Alex Villanueva, in his

4  individual and official capacity as the Sheriff of Los Angeles County, and Does 1-100 (the "Doe

5  Defendants" and, collectively with the County, the Sheriff's Department, and Alex Villanueva, the

6  "Defendants"), seeking damages to remedy violations of her civil rights and for negligence,

7  intentional infliction of emotional distress, and invasion of privacy pursuant to California law.

8    Plaintiff alleges, on personal knowledge as to herself and information and belief as to

9  others, as follows:

10                                    **INTRODUCTION**

11    1.    On the morning of Sunday, January 26, 2020, three eighth-grade girls, joined by

12  parents and coaches, left their homes in Orange County to play in a youth basketball tournament in

13  Thousand Oaks.  Making their way by helicopter, they encountered dense fog.  Rather than land or

14  turn around, the pilot pushed into the fog and became disoriented.  The helicopter descended

15  rapidly and crashed into the foothills of the Santa Monica Mountains, killing everyone onboard.

16  Vanessa Bryant's thirteen year-old daughter, Gianna Bryant, and husband of nearly twenty years,

17  Kobe Bryant, were among those who died.

18    2.    In the aftermath of the crash, several of the victims' family members gathered at

19  the L.A. County Sheriff's station in Lost Hills, devastated and distraught.  Sheriff Alex Villanueva

20  met with them and assured Mrs. Bryant that his deputies were securing the crash site.  Based on a

21  leak by law enforcement, the gossip and celebrity news site TMZ had reported that Kobe, a

22  singular figure in Southern California culture and a hero to millions around the world, had died,

23  and onlookers were flocking to the accident scene.

24    3.    But the biggest threat to the sanctity of the victims' remains proved to be the

25  Sheriff's Department itself.  Faced with a scene of unimaginable loss, no fewer than eight sheriff's

26  deputies at the crash site pulled out their personal cell phones and snapped photos of the dead

27  children, parents, and coaches.  The deputies took these photos for their own personal

28

_____

COMPLAINT

1    gratification.  As the Sheriff's Department would later admit, there was no investigatory reason for

2    deputies to be taking pictures of the victims' remains.

3        4.    The gratuitous images soon became talked about within the Department, as

4    deputies displayed them to colleagues in settings that had nothing to do with investigating the

5    accident.  One deputy even used his photos of the victims to try to impress a woman at a bar,

6    bragging about how he had been at the crash site.  A bartender overheard this interaction and filed

7    a written complaint with the Sheriff's Department.

8        5.    Upon learning that his deputies had taken and shared the gratuitous photos, which

9    plainly violated the victims' families' constitutional rights to control images of their loved ones'

10   remains, Sheriff Villanueva did not inform the families, initiate an investigation, or inspect the

11   deputies' phones to determine whether and how the photos had been shared.  He instead directed a

12   cover-up, summoning the deputies to the Lost Hills station and telling them that, if they deleted

13   the photos, they would face no discipline.  The deputies purported to accept the Sheriff's offer,

14   receiving a free pass in exchange for destroying evidence of their misconduct.

15       6.    For one month, the Department's cover-up worked.  But on February 27 and 28,

16   2020, the *Los Angeles Times* reported on the deputies' photos and the Department's effort to hide

17   its wrongdoing.  Following the reports, Sheriff Villanueva admitted that his deputies took "illicit

18   photos" of the victims' remains and that he informally ordered their destruction to avoid the "usual

19   routine" of a formal investigation in which everyone "lawyers up."

20       7.    Shocked and devastated by the *Los Angeles Times* reports, Mrs. Bryant privately

21   sought information from the Sheriff's Department to assess whether she should brace for pictures

22   of her loved ones' remains to surface on the internet.  Mrs. Bryant asked the Department to

23   explain the steps it had taken to determine the scope of the misconduct and ensure that all photos

24   of the crash site had been secured.  The Department responded that it needed extra time to respond

25   due to the "unusual circumstance" of needing to consult documents, then sent a letter saying it was

26   "unable to assist" with any of the inquiries and had no legal obligation to do so.

27       8.    The Sheriff's Department's outrageous actions have caused Mrs. Bryant severe

28   emotional distress and compounded the trauma of losing Kobe and Gianna.  Mrs. Bryant feels ill

- 2 -
COMPLAINT

**Exhibit D, Page 22**

1   at the thought of strangers gawking at images of her deceased husband and child, and she lives in

2   fear that she or her children will one day confront horrific images of their loved ones online.

3   Many social media users have claimed to have seen photos of the victims' remains, and their

4   accounts are plausible given the number of deputies who took photos, the ease with which cell-

5   phone pictures are transmitted and saved in cloud storage, and the Sheriff's Department's

6   egregious failure to take reasonable steps to prevent dissemination of the photos.

7          9.     In taking these photographs and at several points thereafter, the Sheriff's

8   Department has chosen to act reprehensibly, and it continues to demonstrate that it either does not

9   understand or does not care about the pain it has caused. This lawsuit seeks to impose

10   accountability for that.

11                           **JURISDICTION AND VENUE**

12          10.     This Court has jurisdiction over all causes of action asserted in this complaint

13   pursuant to the California Constitution Article VI, section 10, and California Code of Civil

14   Procedure section 410.10, because no cause of action contained herein is given by statute to other

15   trial courts and the amount in controversy exceeds $25,000.

16          11.     Venue in this Court is proper pursuant to California Code of Civil Procedure

17   sections 393, 394, and 395, because Defendants in this action are public officers and public

18   agencies situated in Los Angeles County and because, on information and belief, all of the acts or

19   omissions complained of in this Complaint took place in Los Angeles County.

20                                 **THE PARTIES**

21          12.     Plaintiff Vanessa Bryant, a California resident, is the wife of Kobe Bryant and

22   mother of Gianna Bryant.

23          13.     Defendant County of Los Angeles is a municipal corporation duly authorized to

24   operate under the laws of the State of California. The Los Angeles County Sheriff's Department

25   is a department of the County.

26          14.     Defendant Los Angeles County Sheriff's Department is a local government entity

27   created under the laws of the State of California and a department of Defendant County. The

28   Sheriff's Department provides general law enforcement services to certain contract cities,

- 3 -

COMPLAINT

1   including Calabasas, California.  The Department's work is directed by, among others, Sheriff

2   Alex Villanueva.

3        15.    Defendants County and the Sheriff's Department are "persons" subject to suit

4   within the meaning of 42 U.S.C. § 1983.  *See Monell v. New York Department of Social Services*,

5   436 U.S. 658, 691 (1978).

6        16.    Pursuant to California Government Code § 815.2(a), Defendants County and the

7   Sheriff's Department are liable for any and all wrongful acts in violation of state law hereinafter

8   complained of and committed by their employees acting within the course and scope of their

9   employment.

10       17.    Defendant Alex Villanueva is an individual and was, at all times relevant herein,

11  the Sheriff of Los Angeles County.  He is an elected official of the County with responsibility for

12  overseeing the Sheriff's Department and making and implementing its policy.  Sheriff Villanueva

13  is sued in his individual capacity and as a representative of the County.  Upon information and

14  belief, Sheriff Villanueva resides in Los Angeles County.

15       18.    Does 1 through 100, inclusive, are sued herein under fictitious names because their

16  true names and capacities are presently unknown to Plaintiff.  In a letter to the Sheriff's

17  Department on March 8, 2020, Plaintiff requested the names of the Sheriff's Department

18  personnel who took or possessed photos of the crash site, but the Sheriff's Department has refused

19  to provide names.  Plaintiff will amend this complaint to substitute the true names and capacities

20  of these parties when they become known.  The Doe defendants include Sheriff's Department

21  personnel who (i) took or shared photos of the accident scene or one of the Bryants' remains; or

22  (ii) participated in the failure to take reasonable steps to prevent dissemination of the photos that

23  were in their constructive possession.  Plaintiff is informed and believes, and on that basis alleges,

24  that Does 1 through 100, inclusive, were employees or agents of the Sheriff's Department.

### GENERAL ALLEGATIONS

26       19.    The acts described herein follow years of misconduct at the L.A. County Sheriff's

27  Department, which has demonstrated over the past decade that it is among the least disciplined law

28  enforcement organizations in the country.  Examples abound, with the most notable being that the

Exhibit D, Page 24



1    former Sheriff, his second-in-command, and other senior Department leaders were convicted and

2    sentenced to federal prison for obstructing an FBI investigation into widespread beatings of

3    inmates in the Department-run jail system, which concluded with federal charges and prison

4    sentences for more than a dozen Sheriff's Department personnel. That there has been a long-term

5    failure of training and discipline at the Sheriff's Department is clear. And it is not surprising that,

6    when forced into a role of responding to an accident scene involving a major international

7    celebrity, numerous deputies would abuse that position of trust.

8              **Sheriff's Deputies Took and Shared Photos of the Victims' Remains**

9         20.     On the morning of January 26, 2020, a helicopter carrying Kobe Bryant and his

10   thirteen-year-old daughter, Gianna, crashed into the foothills of the Santa Monica Mountains near

11   Calabasas, California. The pilot and all passengers died on impact.

12        21.     The hours after the crash were filled with confusion. Mrs. Bryant learned of the

13   crash from an employee of Kobe, Inc., but was told there were survivors. She then began

14   receiving Instagram messages expressing sympathy for her loss. Based on a leak by law

15   enforcement, TMZ had reported that Kobe had died in a helicopter accident. Having heard

16   nothing from law enforcement herself, Mrs. Bryant was confused and distraught. Ultimately,

17   other news outlets confirmed that Kobe and Gianna had perished in the accident.

18        22.     Paparazzi, members of the public, and a significant number of unauthorized drones

19   flocked to the crash site. The Sheriff's Department closed multiple roads and freeway off-ramps

20   leading to the site to discourage onlookers, and the Federal Aviation Administration imposed a

21   five-mile no-fly zone overhead at Mrs. Bryant's request. An emergency ordinance prohibited

22   unauthorized access to the site, and Sheriff Villanueva announced that trespassers would be

23   arrested and charged with a misdemeanor.

24        23.     Meanwhile, Mrs. Bryant and other family members of the victims gathered at the

25   nearby Sheriff's station in Lost Hills. Mrs. Bryant spoke with Sheriff Alex Villanueva and

26   expressed concern that the crash site was unprotected from photographers. Sheriff Villanueva

27   assured her that his deputies were securing the scene.

28

**Exhibit D, Page 25**

1    24.    But Sheriff Villanueva took no steps to deliver on these assurances with respect to

2  the conduct of his own deputies.  Indeed, at or around the time Sheriff Villanueva was assuring

3  Mrs. Bryant that his deputies were securing the accident scene, no fewer than eight deputies were

4  at the crash site snapping gratuitous cell-phone photos of the dead children, parents, and coaches.

5    25.    In the days after the accident, deputies showed off photos of the victims' remains to

6  colleagues in settings that had nothing to do with investigating the crash—an investigation that

7  was being handled by the National Transportation Safety Board ("NTSB"), not the Sheriff's

8  Department—and the photos became talked about within the Department.

9    26.    The photos were also shared outside the Department.  In the week following the

10  accident, a trainee deputy showed off photos of the victims' remains at the Baja California Bar &

11  Grill in Norwalk, California—nearly fifty miles from the crash site.  On or around January 29,

12  2020, a bartender at the restaurant filed a written complaint with the Department about the

13  deputy's misconduct.  "He was working the day the helicopter went down and took pictures of the

14  crash site and bodies," the bartender wrote.

15    **Sheriff's Department Attempts a Cover-Up and Destroys Evidence**

16    27.    Under normal protocol, this complaint would have triggered a formal inquiry

17  and/or an internal affairs investigation.  But Sheriff Villanueva did not follow protocol.  He did

18  not conduct a standard investigation or collect, inspect, or search the offending deputies' cell

19  phones to determine how many photos existed, whether and how they had been transmitted, or

20  whether they were stored on the cloud.  He did not inform the L.A. County Office of the Inspector

21  General.  Most importantly, he did not alert the victims' families of the deputies' misconduct or

22  the existence of the photos.

23    28.    Instead, sometime in late January 2020, Sheriff Villanueva summoned his deputies

24  to the Lost Hills station and told them that if they came clean and deleted the photos, they would

25  not face any discipline.  The deputies responded by claiming that they had deleted the photos and,

26  to the extent they had transmitted the photos to others, those persons had also deleted them.

27  Sheriff Villanueva abided by his offer and did not discipline the deputies for violating the

28  constitutional right of the victims' families.  For nearly a month, until their hands were forced by

- 6 -
COMPLAINT

**Exhibit D, Page 26**

1  public reports about the photos, Sheriff Villanueva and the Department took no further action to

2  investigate or contain the spread of the photos.

3  **The Department's Misconduct Is Exposed and Admitted**

4     29.     On February 28 and 29, 2020, the *Los Angeles Times* reported that several sheriff's

5  deputies had taken and shared photos of the victims' remains and that the Sheriff's Department

6  had been aware of the misconduct for nearly a month.  Soon thereafter, the *Times* also exposed the

7  Department's attempted cover-up, reporting that it "tried to keep a lid on the episode instead of

8  following normal investigative protocols."

9     30.     Faced with its misconduct becoming public, the Department decided to lie.  In an

10  interview with the *Los Angeles Times* on February 26, 2020, Captain Jorge Valdez stated the he

11  was "unaware of any complaint" regarding crash-scene photos and that "there was no order given

12  to delete any photographs."  Both statements were false.  Valdez had been personally involved in

13  responding to the citizen complaint, and Sheriff Villanueva has since made numerous admissions

14  about deputies taking photos of the victims' remains and his orders to destroy them without any

15  meaningful investigation.

16     31.     Through statements made by Sheriff Alex Villanueva in his official capacity, the

17  Department and the County have admitted the facts showing Defendants' tortious conduct and

18  violation of Mrs. Bryant's constitutional rights.

19         a.     In media appearances in late February and early March 2020, Sheriff

20  Villanueva admitted that at least eight deputies took photos of the victims' remains and

21  acknowledged that the conduct was "disgusting," "wildly inappropriate," "inexcusable," and

22  "unconscionable."  Sheriff Villanueva further admitted that the improper photos "harm[ed] people

23  [who] have suffered a tragedy already" by creating the possibility of "a public display of their

24  loved ones' remains."

25         b.     Sheriff Villanueva has also admitted that the deputies' photos of the

26  victims' bodies were not taken for any law enforcement purpose.  In response to questions from

27  reporters on March 2, 2020, Sheriff Villanueva admitted: "[I]n this type of scene, which is an

28  accident, there's only two groups of people that should be taking photos: that is the NTSB and the

1  coroner's office.  No one else has . . . any reason to take any photos . . . Anybody outside of [the

2  NTSB and coroner's office] would be unauthorized.  It'd be illicit photos."  In another interview

3  the same day, Sheriff Villanueva admitted: "[T]he deputies had no place to be taking any

4  photographs of anything.  Only, in this case, it would have been NTSB investigators, coroner's

5  investigators, and that's about it.  Nobody else."

6          c.      The Department has also admitted to destroying evidence of the unlawful

7  photos.  In an interview with NBC-4 Los Angeles on March 2, 2020, Sheriff Villanueva stated that

8  he learned within days of the crash that a trainee deputy had allegedly showed off crash-scene

9  photos at a bar and, in response, the Department ordered the trainee and seven other deputies to

10  delete the photos.  Villanueva stated that his "number one priority" was to "make sure those

11  photos no longer existed."  According to Villanueva, the Department "identified what we thought

12  were the eight individuals" who took the images and "they deleted all the pictures they had, and

13  they acknowledged that, if they transmitted them, that they were deleted."

14  **The Department Knew That Law Enforcement Officers Taking Improper**

15  **Photos of Human Remains Was a Long-Standing Problem**

16       32.    On and before the date of the helicopter crash, the Sheriff's Department knew that

17  unnecessarily taking and sharing photos of victims' remains had been a long-running problem for

18  law enforcement.  Addressing reporters on March 2, 2020, Sheriff Villanueva stated:

19  "[U]nfortunately, ever since they invented the Polaroid camera, this has been a problem in law

20  enforcement across the nation, probably across the world, because it just makes it so much easier.

21  And then there's—there's cops—they keep death books, for example, where . . . they have photos

22  from crime scenes throughout their careers."  In an interview with the *Los Angeles Times* on

23  February 26, 2020, Sheriff Villanueva exhibited similar awareness of the problem: "Every police

24  department struggles with the same thing, where people take photos and they're not evidence . . .

25  So that's a practice we have to make sure that everyone walks away, and there is no evidence

26  other than the official photos of evidence that are taken for criminal purposes."

27       33.    In addition, the Department was aware prior to the helicopter crash that abusing

28  access to celebrity-related information has long been a problem in the Los Angeles law

**Exhibit D, Page 28**

1 enforcement community.  Examples include a sheriff's deputy unlawfully leaking the arrest report

2 of a prominent actor and the Los Angeles Police Department improperly disclosing photos of a

3 famous recording artist depicting injuries from a domestic assault.  With respect to the helicopter

4 crash, Sheriff Villanueva has acknowledged that the involvement of someone like Kobe Bryant, a

5 singular figure in Southern California culture and a hero to millions around the world, creates

6 "much more interest" among deputies.

7 **The Department Had No Policy to Prevent Violations of the Constitutional Right to**
**Control the Death Images and Remains of Deceased Family Members**

8

9       34.     Since at least 2012, it has been clear in the Ninth Circuit that individuals have a

10 substantive due process right under the United States Constitution to control the death images and

11 physical remains of deceased family members.  *See Marsh v. Cnty. of San Diego*, 680 F.3d 1148

12 (9th Cir. 2012).  Nonetheless, and despite the Department's awareness that improper death images

13 are "a problem in law enforcement across the nation," the Sheriff's Department had no policy at

14 the time of the accident regarding the taking or sharing of photos of human remains.

15       35.     Following the *Los Angeles Times* reports, the Sheriff's Department issued a

16 statement that the allegations regarding the accident-scene photos "are currently under

17 investigation, as are the effectiveness of existing policies and procedures."  (**Exhibit 1**.)  Days

18 later, in a letter to the L.A. County Inspector General, Sheriff Villanueva admitted: "It is evident

19 our photograph policy is deficient and this incident has identified a need for me to direct the

20 creation of a new policy."  Similarly, in an interview with NBC-4 in March 2020, Sheriff

21 Villanueva stated that the Department was "creating new [policies] that are very specific, with

22 teeth in 'em, up to and including a penalty of discharge for violation of these policies."

23       36.     In the following months, the Sheriff's Department added an entirely new section to

24 its Manual of Policies and Procedures, titled: "Photographs/Recordings at Scenes Where Human

25 Remains Are Present."  (**Exhibit 2**.)  The new policy dictates that, "[i]n order to preserve the

26 dignity and privacy of the deceased and their families, scenes where human remains are present

27 shall only be photographed/recorded by Scientific Services Bureau or the Department of Medical

28 Examiner (DME) personnel."  (**Ex. 2 at 1**.)  The new policy further provides: "Any photograph,

1   recording, or record produced by a Department member . . . shall be considered the sole property

2   of the Department" and "[a]ny unauthorized release or sharing is strictly prohibited." (**Ex. 2 at 1.**)

3   **The Department Failed to Train Its Employees on the Department's Policy**
4   **Regarding Photographs of Work-Related Scenes on Personal Cell Phones**

5        37.      In addition to failing to establish a policy regarding the treatment and

6   photographing of human remains, the Sheriff's Department also did not follow or enforce its

7   policy regarding deputies' use of personal cell phones to capture work-related environments.  That

8   policy provides:

9             Members shall not use a personal cellular telephone or any other similar personal
             communication or recording device to record, store, document, catalog, transmit,
10            and/or forward any image, document, scene, or environment captured as a result of
             their employment and/or while performing official Department business that is not
11            available or accessible to the general public.

12   (**Exhibit 3 at 5.**)  According to the Sheriff's Department's Manual of Policies and Procedures,

13   supervisors must investigate reports of violations of the policy and "will be held accountable for

14   and evaluated on" their enforcement of the policy.  (**Ex. 3 at 2.**)  Members of the Department who

15   violate the policy "shall be subject to disciplinary action," which could include "reprimand,"

16   "suspension without pay," "reduction in rank," and/or "dismissal from the Department." (**Ex. 3 at**

17   **3-4.**)

18        38.      Sheriff Villanueva did not discipline the deputies who took cell-phone photos of

19   the crash site and has stated publicly that the Department's policies at the time did not prohibit the

20   deputies' actions.  These statements and actions, combined with the significant number of deputies

21   who took cell-phone photos of the accident site, demonstrate that the Department failed to

22   adequately train, supervise, and discipline its personnel regarding its policy related to the use of

23   personal cell phones to photograph work-related scenes.

24        **The Department Refuses to Provide Any Information to Mrs. Bryant**

25        39.      After learning of the existence of the photos, attorneys for Mrs. Bryant sent a letter

26   to the Sheriff's Department requesting that the Department take immediate action to secure all

27   photos and videos of the crash in the Department's possession, "including any photos or videos in

28   the possession of or disseminated by Sheriff's Department personnel." (**Exhibit 4.**)  Mrs. Bryant

1 further requested that the Sheriff's Department conduct an internal affairs investigation "to

2 determine the extent of the unauthorized taking and dissemination of photos and the identities of

3 the deputies or other personnel involved." (**Ex. 4 at 2.**)

4      40.    On March 8, 2020, following news reports regarding the number of deputies who

5 took improper photos, attorneys for Mrs. Bryant sent a follow up letter requesting more

6 information about the Sheriff's Department's investigation of the deputies' misconduct, including

7 the identity of all personnel who took photos of the victims' remains; the steps the Department had

8 taken to identify all personnel who had the photos on their personal devices; the steps the

9 Department had taken to determine whether and to what extent personnel who had such photos or

10 recordings shared them with other members of the Department or third parties; and the steps the

11 Department had taken to secure all photos or recordings of the victims' remains in the possession

12 of its personnel. (**Exhibit 5**.)

13      41.    On March 26 and April 2, 2020, nearly a month after Mrs. Bryant first inquired

14 about the misconduct, an attorney for the Sheriff's Department wrote to Mrs. Bryant that the

15 Department had no legal obligation to respond to her questions and would not do so. (**Exhibits 6-**

16 **7.**) To date, the Department has not provided a single piece of substantive information in response

17 to Mrs. Bryant's private requests.

18     <u>**Mrs. Bryant Served a Notice of Claims in Accordance with the Government Claims Act**</u>

19      42.    On May 8, 2020, pursuant to California Government Code section 900 et seq., Mrs.

20 Bryant filed a written notice of claims against the Sheriff's Department, Sheriff Villanueva, and

21 unknown deputies, based on the same underlying facts and issues alleged in this complaint. As of

22 this filing, the County has not substantively responded to Mrs. Bryant's notice of claim or

23 provided a concrete timeline for when it will respond. Per statute, the County's failure to act on

24 Mrs. Bryant's claims within the time prescribed by the California Government Code constitutes a

25 denial, such that Mrs. Bryant's claims are ripe for review by this Court.

26               **<u>Mrs. Bryant Has Suffered Severe Emotional Distress</u>**

27      43.    Mrs. Bryant has suffered (and continues to suffer) severe emotional distress from

28 the knowledge that images of her husband's and daughter's remains were taken and shared for the

1  perverse gratification of law enforcement officers, and she fears that she and her family may

2  confront the appalling photos at any moment on the internet.  This fear is eminently reasonable in

3  light of the prevalence of cloud storage (such as Google Photos), text messaging, and social-media

4  applications, through which photos can be stored and shared almost instantaneously (and

5  sometimes inadvertently).  When Mrs. Bryant sought assurances from the Sheriff's Department

6  that it had taken reasonable measures to control the spread of the photos, including whether it had

7  "confiscated and/or inspected the electronic devices of the personnel who had or have photographs

8  of the crash scene or victims' remains," the Department refused to offer any response whatsoever.

9  And at no point has the Department informed Mrs. Bryant that it has taken even the basic

10  investigatory step of collecting a forensic image of the offending deputies' electronic devices.

11         44.  Mrs. Bryant's fear has been exacerbated by the fact that, despite knowing about the

12  photos within days of the crash, Sheriff Villanueva took none of the steps that a reasonable

13  supervisor (let alone a highly-trained professional investigator) would take to prevent

14  dissemination of harmful photos in his constructive possession.  As a result of Sheriff Villanueva's

15  offer to his deputies that they could avoid investigation and discipline by deleting the evidence of

16  their misconduct, Mrs. Bryant must live with uncertainty regarding how many photos were taken,

17  whether they remain stored on the cloud, whether and how they were shared via text message,

18  email, or social media applications, and whether people to whom the deputies transmitted the

19  photos continue to possess them.  Absent this information, it is impossible to rule out that the

20  photos will surface and go viral online.  This uncertainty has caused Mrs. Bryant severe stress and

21  anguish.

22         45.  Mrs. Bryant's anxiety has been reinforced by widespread discussion of the photos

23  online.  In March 2020, Mrs. Bryant encountered an Instagram user who stated that she had seen

24  pictures of Kobe and Gianna's bodies at the accident scene, and numerous Twitter users have

25  made similar statements.  Other online commenters, along with the *National Enquirer* tabloid

26  publication, have claimed that images of Kobe and Gianna's remains are being bought, shared,

27  and/or sold on the dark web.

28

- 12 -
COMPLAINT

46.     The number of deputies who took photos, the fact that the deputies shared the photos with others, and the Department's grossly inadequate steps to prevent dissemination of the photos have made the above accounts plausible, which has compounded Mrs. Bryant's emotional distress.  For the foreseeable future, Mrs. Bryant and her family will almost certainly continue to encounter claims that photos of their loved ones' remains are circulating online, and they will have no way of knowing whether such claims are true or false.

47.     In response to public shock and outrage following the *Los Angeles Times* reports, as well as scrutiny from the Sheriff's Department's Civilian Oversight Board, the Department now claims it is conducting an investigation into the improper photos.  In discussing his Department's inexcusably belated investigation, Sheriff Villanueva stated on March 2, 2020: "All [photos of remains] that we know of that were in the possession of the eight individuals were deleted, and we're **hoping** that that is the outcome of this—that there is no photos to be circulated anywhere." (Emphasis added.)

48.     Hope is not a plan and it is no comfort to Mrs. Bryant.  At the moment the deputies snapped photos of Kobe and Gianna's remains, they created a harm that cannot be undone, and the Department's response has only exacerbated that harm.  A grieving widow and parent should never have to worry that the public servants charged with protecting her would abuse access to her loved ones' remains for their own personal gratification, and the Sheriff's Department's breach of this basic human duty has caused Mrs. Bryant severe pain.

### FIRST CAUSE OF ACTION

#### 42 U.S.C. § 1983, Violation of Fourteenth Amendment

#### (Against Does 1-100)

49.     Plaintiff incorporates herein and realleges the allegations in paragraphs 1 through 47, inclusive, as if fully set forth herein.

50.     By taking photos of Kobe Bryant's and Gianna Bryant's remains and/or sharing such photos with the public, the Doe Defendants deprived (and continue to deprive) Plaintiff of her right to control the physical remains, memory, and death images of her deceased husband and daughter.  As the United States Court of Appeals for the Ninth Circuit has affirmed, this right

- 13 -
COMPLAINT

1  flows from the substantive due process rights to privacy and family integrity guaranteed by the

2  Fourteenth Amendment to the United States Constitution.  *See Marsh v. Cnty. of San Diego*, 680

3  F.3d 1148 (9th Cir. 2012).

4       51.    The Doe Defendants knew or should have known that taking and/or sharing photos

5  of Kobe and Gianna Bryant's remains for personal, non-law-enforcement purposes violated the

6  law.

7       52.    The Doe Defendants were acting under color of state law at the time of their

8  actions.  The Doe Defendants took photos of the Bryants' remains while in uniform, on duty, and

9  in an area where public access was prohibited and only first responders (such as sheriff's deputies)

10  were allowed.  After the photos were taken, the Doe Defendants possessed and shared them while

11  in uniform and/or on duty, or otherwise in connection with or by virtue of their employment with

12  the Sheriff's Department.

13       53.    As a direct and proximate result of the Doe Defendants taking and sharing death

14  images of Kobe and Gianna Bryant, Plaintiff has suffered (and continues to suffer) severe

15  emotional distress in an amount to be proven at trial.

16       54.    The Doe Defendants committed the acts alleged recklessly and with callous

17  disregard for Plaintiff's rights, entitling Plaintiff to punitive damages in an amount appropriate to

18  punish the Doe Defendants and to make an example of them to the community.

19  <div align="center">**SECOND CAUSE OF ACTION**</div>

20  <div align="center">**42 U.S.C. § 1983 (*Monell*), Violation of Fourteenth Amendment**</div>

21  <div align="center">**(Against Sheriff Villanueva, in his official capacity,**</div>
22  <div align="center">**the Sheriff's Department, and the County)**</div>

23       55.    Plaintiff incorporates herein and realleges the allegations in paragraphs 1 through

24  53, inclusive, as if fully set forth herein.

25       56.    Pursuant to 42 U.S.C. § 1983, public entities are liable for constitutional violations

26  when execution of their official policy or custom deprives an individual of her constitutional

27  rights.  A public entity is also liable for constitutional violations when its failure to establish a

28

<div align="center">- 14 -

COMPLAINT</div>

1   policy or procedure or to properly train, supervise, and/or discipline its employees amounts to

2   deliberate indifference to the rights of persons with whom its employees come into contact.

3        57.    Upon information and belief, Sheriff Villanueva, the Sheriff's Department, and the

4   County acted with deliberate indifference to the constitutional rights of Plaintiff and others

5   similarly situated through the conduct and omissions set forth above, which consist of the

6   following customs, policies, and/or patterns of practice:

7          a.    Failing to adequately train and supervise Sheriff's Department personnel to

8   ensure they do not take or share photographs of human remains for personal, non-law-enforcement

9   purposes;

10         b.    Failing to establish a policy or procedure addressing the treatment of human

11  remains, including the taking or sharing of photographs of human remains;

12         c.    Failing to adequately investigate and discipline Sheriff's Department

13  personnel who have unnecessarily taken and/or shared photographs of human remains.

14       58.    Given the frequency with which Sheriff's Department personnel work at crime and

15  accident scenes involving fatalities, it was obvious that some would be tempted to take photos of

16  victims' remains on their personal cell phones.  Sheriff Villanueva and the Department knew that

17  some law enforcement officers keep "death books" containing photos of victims' remains and that

18  officers taking pictures for non-law-enforcement purposes is a problem "across the nation."  The

19  Department was also aware that, on account of the large number of celebrities that live or work in

20  the Los Angeles area, its personnel often work at accident and crime scenes that are the subject of

21  intense public interest.  Notwithstanding this knowledge and awareness, Sheriff Villanueva, the

22  Sheriff's Department, and the County failed to establish a policy regarding photographs of human

23  remains or to train, supervise, investigate, or discipline Department personnel related to the taking

24  and sharing of photos of human remains for personal, non-law-enforcement purposes.

25       59.    Based on the facts set forth above, the Sheriff's Department was on actual and/or

26  constructive notice that the absence of a policy regarding photographs of human remains or

27  accident scenes would likely result in violations of community members' constitutional rights.

28

- 15 -
COMPLAINT

60.     The actions of the Doe Defendants reflect the pattern of practice and/or custom of the Department, as evidenced by the fact that the misconduct was not limited to a lone employee.  Rather, no fewer than eight deputies took photos of the Bryants' remains for personal purposes.  In addition, Sheriff Villanueva, whose entire career in law enforcement has been with the Sheriff's Department, has stated based on personal knowledge that unnecessary death images are a widespread problem in law enforcement.

61.     As a direct and proximate result of Sheriff Villanueva's, the Sheriff's Department's, and the County's failure to establish a policy regarding photographs of human remains or to train, supervise, investigate, or discipline its employees regarding unnecessary death images, as well as the Department's pattern of practice and/or custom of unnecessarily taking and sharing death images, Plaintiff has suffered (and continue to suffer) severe emotional distress in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**

**Negligence**

**(Against Does 1-100; Alex Villanueva, in his personal capacity;
the Sheriff's Department; and the County)**

62.     Plaintiff incorporates herein and realleges the allegations in paragraphs 1 through 60, inclusive, as if fully set forth herein.

63.     Pursuant to California Government Code section 820(a), public employees are liable for injuries caused by their acts or omissions to the same extent as a private person.

64.     The Doe Defendants owed a duty to Plaintiff to use ordinary care in their treatment of the Bryants' physical remains, including an obligation to refrain from taking or sharing images of them for personal, non-law-enforcement purposes.  Cal. Civ. Code § 1714.

65.     The Doe Defendants and Sheriff Villanueva owed a duty to Plaintiff to use ordinary care in preventing dissemination of any unnecessary images of the Bryants' remains once the images were created and/or were within their control.

66.     The Sheriff's Department, the County, Sheriff Villanueva, and the Doe Defendants routinely undertake the care, custody, and control of human remains at crime and accident scenes,

- 16 -
COMPLAINT

1  and each did so with respect to the Bryants' remains at the crash site.  By virtue of this, they owed

2  a duty of care to Plaintiff to exercise ordinary care in their treatment of the remains.

3       67.    Following the crash, Sheriff Villanueva assured Plaintiff that the Sheriff's

4  Department was securing the crash site to ensure privacy.  Accordingly, he owed a duty to

5  Plaintiff to supervise his employees to ensure they conducted themselves with reasonable care and

6  in a manner that preserved, rather than violated, the privacy of the victims and their families.

7       68.    Based on her conversation with Sheriff Villanueva, Plaintiff believed the Sheriff's

8  Department would secure the crash site, and she did not take steps, either personally or through a

9  representative, to observe or monitor conduct at the crash site, knowing it would be traumatic.

10      69.    The Doe Defendants breached their duties to Plaintiff by taking and/or sharing

11  photos of the Bryants' physical remains for personal, non-law-enforcement purposes.

12      70.    Defendant Villanueva breached his duty to Plaintiff by failing to adequately

13  supervise, either directly or through instructions to on-site supervisors, his deputies' conduct at the

14  crash site.

15      71.    Sheriff Villanueva and Doe Defendants in supervisory capacities in the Department

16  breached their duties to Plaintiff by failing to take reasonable steps to prevent dissemination of the

17  unnecessary images of the Bryants' remains after the images were created and in their constructive

18  possession.

19      72.    Defendants foresaw or should have foreseen that their conduct described above

20  would injure Plaintiff.

21      73.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered (and

22  continues to suffer) severe emotional distress in an amount to be proven at trial.

23      74.    In committing the acts alleged herein, the Doe Defendants and Sheriff Villanueva

24  are guilty of oppression, fraud, and/or malice within the meaning of California Civil Code section

25  3294, entitling Plaintiff to punitive or exemplary damages in an amount appropriate to punish the

26  Doe Defendants and to make an example of them to the community.

27      75.    Pursuant to California Government Code section 815.2, the Sheriff's Department

28  and the County are liable for injuries proximately caused by acts or omissions of their employees

within the scope of their employment.  Upon information and belief, at all times material, Defendant Villanueva and the Doe Defendants were employed by the Sheriff's Department and were under the Department's direction and control when they engaged in the conduct described above.  The Doe Defendants were able to take photos of the Bryants' physical remains by virtue of their access to the crash site while on duty, and Sheriff's Department personnel who shared the photos had access to them by virtue of their employment with the Department.  The acts of Defendant Villanueva and the Doe Defendants were committed within the course and scope of their employment, and the Sheriff's Department and the County are liable for their negligent and wrongful conduct.

## FOURTH CAUSE OF ACTION

### Invasion of Privacy

### (Against Does 1-100, the Sheriff's Department, and the County)

76.     Plaintiff incorporates herein and realleges the allegations in paragraphs 1 through 74, inclusive, as if fully set forth herein.

77.     Plaintiff has a privacy interest in the physical remains of her loved ones, Kobe and Gianna Bryant.

78.     The Doe Defendants publicly disclosed photos of the Bryants' remains, both in person and electronically.

79.     Sharing photos of accident victims' physical remains without any law-enforcement purpose is offensive and objectionable to a reasonable person of ordinary sensibilities.

80.     At the time the deputies shared the photos of the Bryants' remains, no photos of their remains had otherwise been made public, and details about the state of the victims' remains were not public knowledge.  Sharing the graphic facts disclosed by the photos served no legitimate public purpose.

81.     As a direct and proximate result of the conduct of the Doe Defendants, Plaintiff has suffered (and continues to suffer) severe emotional distress in an amount to be proven at trial.

82.     Pursuant to California Government Code section 820(a), the Doe Defendants are liable for injuries caused by their acts or omissions to the same extent as a private person.

- 18 -
COMPLAINT

83.     In committing the acts alleged herein, the Doe Defendants are guilty of oppression, fraud, and/or malice within the meaning of California Civil Code section 3294, entitling Plaintiff to punitive or exemplary damages in an amount appropriate to punish the Doe Defendants and to make an example of them to the community.

84.     Pursuant to California Government Code section 815.2, the Sheriff's Department and the County are liable for injuries proximately caused by acts or omissions of their employees within the scope of their employment.  Upon information and belief, at all times material, the Doe Defendants were employed by the Sheriff's Department and were under the Department's direction and control when they engaged in the conduct described above.  The Doe Defendants were able to take photos of Kobe and Gianna Bryant's physical remains by virtue of their access to the crash site while on duty, and Sheriff's Department personnel who shared the photos had access to them by virtue of their employment with the Department.  The acts of the Doe Defendants were committed within the course and scope of their employment, and the Sheriff's Department and County are liable for their negligent and wrongful conduct.

### FIFTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

### (Against Does 1-100, the Sheriff's Department, and the County)

85.     Plaintiff incorporates herein and realleges the allegations in paragraphs 1 through 83, inclusive, as if fully set forth herein.

86.     The taking and/or sharing of photos of victims' physical remains for no official purpose constitutes extreme and outrageous conduct exceeding all bounds of what is usually tolerated in a civilized community.

87.     The Doe Defendants took and/or shared (both in person and electronically) photos of the Bryants' physical remains without any official or law enforcement purpose.

88.     At the time they shared photos of the Bryants' remains, the Doe Defendants were aware that Kobe and Gianna Bryant had surviving immediate family members.

- 19 -
COMPLAINT

89.     The Doe Defendants disclosed the photos with the intention of causing, or with reckless disregard of the probability of causing, emotional distress to the family members of the victims, including Plaintiff.

90.     As a direct and proximate result of the deputies' conduct, Plaintiff has suffered (and continues to suffer) severe emotional distress in an amount to be proven at trial.

91.     Pursuant to California Government Code section 820(a), the Doe Defendants are liable for injuries caused by their acts or omissions to the same extent as a private person.

92.     In committing the acts alleged herein, the Doe Defendants are guilty of oppression, fraud, and/or malice within the meaning of California Civil Code section 3294, entitling Plaintiff to punitive or exemplary damages in an amount appropriate to punish the Doe Defendants and to make an example of them to the community.

93.     Pursuant to California Government Code section 815.2, the Sheriff's Department and the County are liable for injuries proximately caused by acts or omissions of their employees within the scope of their employment.  Upon information and belief, at all times material, Defendant Villanueva and the Doe Defendants were employed by the Sheriff's Department and were under the Department's direction and control when they engaged in the conduct described above.  The Doe Defendants were able to take photos of Kobe and Gianna Bryant's physical remains by virtue of their access to the crash site while on duty, and Sheriff's Department personnel who shared the photos had access to them by virtue of their employment with the Department.  The acts of the Doe Defendants were committed within the course and scope of their employment, and the Sheriff's Department and County are liable for the Doe Defendants' negligent and wrongful conduct.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following relief against all Defendants as follows:

1.     For compensatory damages in an amount to be proven at trial;

2.     For any additional general, specific, consequential, or incidental damages in an amount to be proven at trial;

- 20 -
COMPLAINT

**Exhibit D, Page 40**

1    3.    For nominal damages;

2    4.    For punitive damages in an amount appropriate to punish the defendants and make

3    an example of the defendants to the community;

4    5.    For an award that defendants pay all of Plaintiff's costs and attorneys' fees;

5    6.    For all interest, as permitted by law; and

6    7.    For such other relief as the Court deems just and proper.

7                          **DEMAND FOR JURY TRIAL**

8    Plaintiff demands a trial by jury on all issues triable by jury.

9

10   DATED:  September 17, 2020              Respectfully submitted,
                                            MUNGER, TOLLES & OLSON LLP
11

12

13                                          By: _____
                                                        LUIS LI
14

15                                          Attorneys for Plaintiff Vanessa Bryant

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    - 21 -
                                  COMPLAINT

**EXHIBIT 1**



BY SIB STAFF / FEBRUARY 28, 2020

The Sheriff's Department is aware of recent media reports alleging deputies shared images from the January 26th, 2020 helicopter crash, which tragically claimed the lives of nine people. The facts surrounding these allegations are currently under investigation, as are the effectiveness of existing policies and procedures. The Sheriff is deeply disturbed at the thought deputies could allegedly engage in such an insensitive act. A thorough investigation will be conducted by the Department, with the number one priority of protecting the dignity and privacy of the victims and their families.

-Los Angeles County Sheriff's Department

Ask LASD Bot

**Exhibit D, Page 43**

**EXHIBIT 2**

# 5-09/475.00 Photographs/Recordings at Scenes Where Human Remains are Present

In the performance of their daily duties, Department members are entrusted to respond to scenes that are not accessible to the general public, often times where human remains are present, such as:

- Mass casualty incidents;
- Natural disasters;
- Homicides;
- Deputy/officer-involved shootings;
- Suicides;
- Traffic collisions;
- Train deaths; and
- Other non-criminal deaths.

The response by Department members is a valued and vital component of public safety in ongoing investigations. Information learned at these scenes, including any photographs/recordings taken, shall only be shared with or disclosed to the lead investigators or the investigator's supervisors, unless otherwise required by law.

In order to preserve the dignity and privacy of the deceased and their families, scenes where human remains are present shall only be photographed/recorded by Scientific Services Bureau or the Department of Medical Examiner (DME) personnel. Only when extenuating circumstances exist may Department members take photographs/recordings at the direction of the lead investigators or the investigator's supervisors. All photographs/recordings shall be taken on a Department-issued device, unless a personal device is used exclusively to photograph or record legitimate Department business (see MPP section 3-01/100.46, Use of Communication Devices).

Fatal traffic collisions investigated by Traffic Services Detail and/or station traffic investigators assigned to investigate fatal traffic collisions are allowed to photograph collisions scenes during the course of the investigation; however, the photographs shall be safeguarded in compliance with this policy, and/or any policies mentioned herein.

Any photograph, recording, or record produced by a Department member, whether captured on a Department issued device or personal device, shall be considered the sole property of the Department. Any unauthorized release or sharing is strictly prohibited.

Any digitally captured photographs/recordings, shall be disclosed to the assigned investigator or the investigator's supervisors. The Department member shall preserved the photographs/recordings pending the transfer of all related images for evidence storage by a trained Department member from the Fraud and Cyber Crimes Bureau, Technical Operations Crew, or Homicide Bureau, Body Worn Camera Unit.

Scene photographs/recordings taken or captured by Department members shall not, under any circumstances, be disclosed to anyone other than the lead investigators or the investigator's supervisors, unless otherwise required by law. If the investigation is being handled by an outside authority such as a

**Exhibit D, Page 45**

Manual of Policy and Procedures : 5-09/475.00 Photographs/Recordings at Scenes Where
Human Remains are Present

federal or state agency, photographs/recordings should be given to that agency only with the concurrence of
the Department's lead investigator.  The unauthorized sharing of photographs/recordings and/or scene
information not only violates public trust but it also may subject the individual and the Department to civil
liability.  Scene information, especially photographs/recordings shall be guarded with the utmost respect to
protect the integrity of the investigation.

Nothing in this policy precludes a Department member's obligation to activate their Department issued body
worn camera pursuant to MPP section 3-06/200.08, Body Worn Cameras – Activation.

Exhibit D, Page 46

**EXHIBIT  3**

**VOLUME 3   -   CHAPTER 1**

**POLICY AND ETHICS**

**3-01/000.00  POLICY AND ETHICS**

The function of this Department involves the responsibility for the protection of life and property and enforcement of the law.   Toward this end, all employees have an obligation to the public we serve to develop and maintain the highest ethical standards in both personal and official conduct.

The Policy and Ethics chapter outlines the Department's policies in these matters.   All employees shall conform with the provisions contained herein.

**3-01/000.10  PROFESSIONAL CONDUCT**

All Department members shall be held accountable for their utterances, writings, conduct, and visual representations, including electronic and web-based communications, when they conflict with Our Core Values, Our Mission, or Our Creed and personnel can reasonably be identified as Department members.   Personnel who cause undue embarrassment or damage the reputation of and/or erode the public's confidence in the Department shall be deemed to have violated this policy and shall be subject to counseling and/or discipline.

Unit commanders shall ensure copies of Our Mission, Our Core Values, and Our Creed are clearly and prominently displayed and maintained in the public lobbies of all Sheriff's Department facilities.

Unit Commanders shall ensure copies of Our Mission, Our Core Values, and Our Creed are clearly and prominently displayed and maintained within a high-traffic work area in all Sheriff's Department's facilities (e.g., briefing room) for viewing by assigned personnel.

Unit commanders shall routinely express to the members of their staff their expectations of acceptable conduct, including the tenets of the Core Values.   The message that shall be conveyed to each employee is, "You are part of something greater than yourself. Don't dishonor it!"

**3-01/000.13  PROFESSIONAL CONDUCT - CORE VALUES**

Members shall conduct themselves in a manner consistent with the Department's Core Values.   Members shall not ignore nor contradict the Department's Core Values. Examples of conduct inconsistent with the Department's Core Values include, but are not limited to, the following:

1

1. Conduct or behavior resulting from a situational outburst of emotion including, but not limited to, the use of profanity and/or other inappropriate, inconsiderate, and/or insensitive language, phrases, or terms of speech;
2. Conduct or behavior that demonstrates a bias, prejudice, and/or intolerance, or demonstrates a trend or pattern of undesirable and/or unprofessional behavior; and/or,
3. Conduct or behavior so egregious that it constitutes a severe and immediate threat to the integrity of the Department and/or jeopardizes the health, safety, and/or welfare of the public including, but not limited to, criminal misconduct of members, and/or the misuse of Department assets, resources, or intellectual property.

## 3-01/000.15  ELECTRONIC AND WEB-BASED COMMUNICATIONS

Electronic and web-based communications include any medium used to deliver information electronically or digitally.   Examples of electronic and web-based communications include, but are not limited to, websites, "smart" phone technologies, text messaging, Nixle, electronic mail (email) and "social media" sites such Facebook, Myspace, Pinterest, and Twitter; photo sharing websites such as Flickr; video sharing websites such as YouTube; and/or any other similar electronic or digital delivery system.

"Social media" includes any electronic medium where users may create, share, and view user-generated content, including uploading or downloading videos or still photographs, blogs, video blogs, podcasts, or instant messages, or online social networking content.

## 3-01/005.00  ACCOUNTABILITY

All Department members shall be held accountable to the Sheriff through the defined chain of command.

- accountability is the absolute obligation that all members be personally answerable for their individual actions.   It is the responsibility of all members to meet the standards of performance established for their positions.   Accountability is also a commitment to the Department and the public we serve;
- all members will be evaluated on their compliance with the Department's Manual of Policy and Procedures, all Division Directives in support of the Manual, statutory and case law, Our Mission Statement, Our Core Values statement and the Law Enforcement Code of Ethics; and
- supervisors, managers, Directors, and executives, both sworn and professional staff, will be held accountable for and evaluated on enforcement of the aforementioned areas as well as the procedures outlined in the Los Angeles County Fiscal Manual and the Los Angeles County Purchasing Policy Manual. Failure to adhere may subject violators to discipline.

**Exhibit D, Page 49**

**3-01/030.10  OBEDIENCE TO LAWS, REGULATIONS, AND ORDERS**

a) Members shall not willfully violate any federal statute, state law or local ordinance;

b) Members shall conform to and abide by the following:
   - Charter of Los Angeles County;
   - Los Angeles County Code; and
   - Rules of the Department of Human Resources;

c) Members shall obey and properly execute all lawful orders issued by any supervisor of higher rank or classification or who is officially acting in such capacity;

d) When assigned to duty with another member of the Department, an employee shall be subject to disciplinary action for any violation by the other member of any provision of this chapter unless the employee was unaware of the violation or unless the employee, if the situation permits safe and prudent action, attempts in good faith to prevent the violation and, at the earliest reasonable time, reports the violation to his supervisor;

e) Members who violate any rules, regulations, or policies of the Department or the County, shall be subject to disciplinary action.   The commission or omission of any other act contrary to good order and discipline shall also be the subject of disciplinary action;

f) Members who are arrested or detained for any offense, or named as a suspect, other than an infraction under the Vehicle Code, shall immediately notify their immediate supervisor or Watch Commander of the facts of the arrest or detention or allegation.

After business hours, if the member is unable to contact their immediate supervisor or Watch Commander at the Unit of Assignment, the member shall contact Sheriff's Headquarters Bureau and request immediate notification to their Unit Commander. The member shall provide details of the arrest or detention to Sheriff's Headquarters Bureau, including alleged charge(s), location, police agency jurisdiction, and return phone number where the member can be reached, for relay to the Unit Commander.   The Sheriff's Headquarters Bureau member receiving notification shall immediately notify the employee's Unit Commander.

The Unit Commander shall immediately notify Internal Affairs Bureau.   The employee's Unit Commander shall immediately respond to the member's location if the member is arrested and taken into custody.

According to the nature of the offense and in conformance with the rules of the Department of Human Resources, disciplinary action may result and may include, but is not limited to, the following:

- a reprimand (written);
- suspension without pay;
- reduction in rank; and/or

3

- dismissal from the Department.

NOTE:     For purposes of this section, any reference to "members" hall include any member of the Department, both sworn and professional staff.

## 3-01/030.13  RELATIONSHIPS AND MENTORING

The Los Angeles County Sheriff's Department believes our members are our most valuable investment and precious resource.

Our Department's Core Values are intrinsic principles designed to underscore our belief that regardless of rank or position, our members are, first and foremost, leaders in our society.

As a community leader, our members assume a significant responsibility in protecting and serving the public.   Consequently, high standards and high expectations are placed upon the conduct of our members.   As a result, our members enjoy a considerable level of trust.   In order to remain beneficiaries of the public trust, we must balance the rights of our members with the responsibility to maintain the highest standards of professional and personal conduct.

As a leader in the Los Angeles County Sheriff's Department, it is a fundamental responsibility of every Department executive, manager, and/or supervisor to take an active role in the performance of subordinates and develop ongoing strategies to enhance their professional performance.

The Department and its members have an affirmative duty to intervene in the professional performance of another member (or when a personal issue or behavior exposes the Department or the member to risk) when it is determined to be in the best interest of the member or the organization.   It is the intuitive, empathetic, and courageous leader who is prepared to provide guidance, wisdom, and counsel to a colleague whose performance or behavior demonstrates the need for intervention.

Intervention can take many forms.   We are fortunate to have the services of a wide range of professionals who are ready to assist Department members. Employee Support Services Bureau (ESSB), including the Chaplain Program, Peer Support Program, and Counseling and Consulting Services, provides the foundation for early intervention services.

The Performance Mentoring Program (PMP) is another proactive, early intervention program designed to enhance a member's professional performance through guidance and supervision when it is determined the member may benefit from a more structured plan.   Supervisors and managers carefully monitor the employee's progress to ensure they remain effective and productive members of the Department.

4

the General Public and the Media" and "Dissemination of Criminal Record Information" as detailed in the Miscellaneous Administrative Procedures chapter.

### 3-01/100.46   USE OF PERSONAL COMMUNICATION DEVICES

Absent extenuating circumstances, members shall not use a personal cellular telephone or other similar personal communication/recording device for a Department-related business purpose (i.e., coordinating field units to a radio call, contacting a victim or witness) when an established, Department-authorized communication device/system is available and/or a Department-authorized regulation/protocol has been established (e.g., Department radio/communications systems, field supervisor's cellular telephone, Station telephone, etc.).

NOTE:       This prohibition shall apply to the use of the cellular telephone for both voice communications as well as data (text) communications.

Members shall not use a personal cellular telephone or any other similar personal communication or recording device to record, store, document, catalog, transmit, and/or forward any image, document, scene, or environment captured as a result of their employment and/or while performing official Department business that is not available or accessible to the general public.   Official Department business shall include, but is not limited to, confidential, sensitive, or copyrighted information that is printed, audio recorded, photographed, or video recorded; information related to any past, present, or anticipated criminal, civil, or administrative investigation, including reports, declarations, evidence, photographs, videos, or audio recordings; and/or, photographs of suspects, arrestees, defendants, evidence, or crime scenes.

NOTE:       A personal cellular telephone or any other similar personal communication or recording device used exclusively to record contacts with members of the public during legitimate Department business (e.g., traffic stops, etc.) are exempt from the provisions of this section.

### 3-01/100.50   DIVISION OR UNIT MANUAL

Unit Commanders shall establish procedural manuals for their respective commands. These manuals shall not be in conflict with the Department manual and the subject matter shall be limited to procedures involving only the specific command or Division.

### 3-01/100.55   UNIT COMMANDERS' CHANGE OF COMMAND RESPONSIBILITIES

Unit Commanders shall complete the Department Change of Command (SH-AD-601) when assuming a new or transfer of command situation.   During a transfer of command, it shall be the responsibility of both the outgoing and incoming Unit Commander to be

5

**EXHIBIT** 4

MUNGER, TOLLES & OLSON LLP

350 SOUTH GRAND AVENUE

FIFTIETH FLOOR

LOS ANGELES, CALIFORNIA 90071-3426

TELEPHONE (213) 683-9100

FACSIMILE (213) 687-3702

560 MISSION STREET

TWENTY-SEVENTH FLOOR

SAN FRANCISCO, CALIFORNIA 94105-3089

TELEPHONE (415) 512-4000

FACSIMILE (415) 512-4077

1155 F STREET N.W.

SEVENTH FLOOR

WASHINGTON, D.C. 20004-1361

TELEPHONE (202) 220-1100

FACSIMILE (202) 220-2300

March 2, 2020

Writer's Direct Contact
(213) 683-9205
(213) 683-4005 FAX
luis.li@mto.com

**Via FedEx and Electronic Mail**

Sheriff Alex Villanueva
c/o Elizabeth D. Miller, Assistant County Counsel
Office of the County Counsel
County of Los Angeles
Kenneth Hahn Hall of Administration
500 West Temple Street #648
Los Angeles, CA 90012
emiller@counsel.lacounty.gov

Re:     Dissemination of Photos of January 26, 2020 Helicopter Crash Scene

Dear Sheriff Villanueva:

We, along with Robb & Robb LLC, represent Vanessa Bryant in all of her legal claims arising out of the helicopter crash that killed her husband, Kobe, and her daughter, Gianna. We write in regards to disturbing and distressing reports that Los Angeles County sheriff deputies have shared graphic photos of the January 26, 2020 helicopter crash that killed nine victims, including Kobe and Gianna Bryant. These reports indicate that photos of the crash scene and the victims' remains have been shared by sheriff deputies in settings "that had nothing to do with the investigation of the crash," and that the sharing of these photos was "a topic of discussion" among first responders in the days following the crash. (*See* Alene Tchekmedyian & Paul Pringle, *L.A. County deputies shared graphic photos of Kobe Bryant crash scene, sources say*, L.A. Times (Feb. 28, 2020), *available at* https://www.latimes.com/california/story/2020-02-27/kobe-bryant-photos-lost-hills-sheriff-deputies.)

**Exhibit D, Page 54**

MUNGER, TOLLES & OLSON LLP

Los Angeles County Sheriff's Department
March 2, 2020
Page 2

Additional reporting has indicated that, upon becoming aware that unauthorized crash-scene photographs had been taken and shared for no official purpose, the Sheriff's Office offered informal immunity to the transgressors, potentially tainting a proper review of this matter. (*See* TMZ.com, *Kobe Bryant Crash Site Pics; Sheriff's Dept. Attempted Cover-Up; Come Clean & You're Safe* (Feb. 29, 2020), *available at* https://www.tmz.com/2020/02/29/kobe-bryant-crash-pictures-remains-deputies-delete-cover-up-sheriffs-department/.)

These reports are deeply distressing to Mrs. Bryant and her family, who have already endured the unimaginable loss of their loved ones. The public dissemination of photos of the victims' remains would only worsen the family's pain and suffering.

We formally request that the Sheriff's Department take immediate action to secure all photos and videos of the January 26, 2020 crash scene in the Sheriff's Department's possession, whether taken in official capacity or not, including any photos or videos in the possession of or disseminated by Sheriff's Department personnel. We further request that the Sheriff's Department conduct an Internal Affairs investigation to determine the extent of the unauthorized taking and dissemination of photos and the identities of the deputies or other personnel involved.

In addition, please promptly provide us a copy of any and all complaints received by your Office regarding the unauthorized taking or sharing of crash-scene photos[1] and provide answers in writing regarding (i) all steps the Sheriff's Department has taken to ensure all photos of the crash scene have been secured; (ii) whether the Department has initiated an investigation into this matter and when the investigation is expected to conclude; (iii) the names of all Sheriff's Department personnel who shared photos of the crash scene; and (iv) whether the Sheriff's Department has terminated, suspended, or otherwise disciplined said personnel for their actions. We expect that such egregious violations of policy and decency will result in the most severe discipline.

The Sheriff's Department and its personnel owe a duty of care to victims' families to refrain from publicly disseminating photos of victims' remains, given the potential for exploitation, Internet sensationalism, and the foreseeable agony such dissemination would inflict. *Catsouras v. Dept. of Cal. Highway Patrol*, 181 Cal. App. 4th 856, 886, 888 (2010). The unauthorized dissemination of photos of victims' remains could give rise to liability for, among other things, invasion of privacy, negligence, negligent or intentional infliction of emotional distress, and negligent supervision or retention. We fully intend to hold the Sheriff's Department and its personnel accountable for any harm caused by the unauthorized taking or dissemination of photos.

---

[1] *See* TMZ.com, *Kobe Bryant Helicopter Crash; Irate Bartender Busts Sheriff's Deputies… Who Shared Gruesome Crash Photos* (Feb. 28, 2020), *available at* https://www.tmz.com/2020/02/28/la-county-sheriff-kobe-bryant-crash-site-photos/.

MUNGER, TOLLES & OLSON LLP

Los Angeles County Sheriff's Department
March 2, 2020
Page 3

Our client and we are presently evaluating all of her legal options relative to this matter.
She reserves all rights.

Sincerely,

Luis Li

cc:   Brad D. Brian
      Gary Robb
      Anita Robb

**EXHIBIT  5**

MUNGER, TOLLES & OLSON LLP

350 SOUTH GRAND AVENUE
FIFTIETH FLOOR
LOS ANGELES, CALIFORNIA 90071-3426
TELEPHONE (213) 683-9100
FACSIMILE (213) 687-3702

560 MISSION STREET
TWENTY-SEVENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-3089
TELEPHONE (415) 512-4000
FACSIMILE (415) 512-4077

1155 F STREET N.W.
SEVENTH FLOOR
WASHINGTON, D.C. 20004-1361
TELEPHONE (202) 220-1100
FACSIMILE (202) 220-2300

RONALD L. OLSON
ROBERT E. DENHAM
JEFFREY I. WEINBERGER
CARY B. LERMAN
GREGORY P. STONE
BRAD D. BRIAN
BRADLEY S. PHILLIPS
GEORGE M. GARVEY
WILLIAM D. TEMKO
JOHN W. SPIEGEL
DONALD B. VERRILLI, JR.*
TERRY E. SANCHEZ
STEVEN M. PERRY
MARK B. HELM
JOSEPH D. LEE
MICHAEL R. DOYEN
MICHAEL E. SOLOFF
GREGORY D. PHILLIPS
KATHLEEN M. M<sup>c</sup>DOWELL
GLENN D. POMERANTZ
THOMAS B. WALPER
HENRY WEISSMANN
KEVIN S. ALLRED
JEFFREY A. HEINTZ
JUDITH T. KITANO
JEROME C. ROTH
GARTH T. VINCENT
TED DANE
STUART N. SENATOR
MARTIN D. BERN
ROBERT L. DELL ANGELO
BRUCE A. ABBOTT
JONATHAN E. ALTMAN
KELLY M. KLAUS
DAVID B. GOLDMAN
DAVID H. FRY
LISA J. DEMSKY
MALCOLM A. HEINICKE
TAMERLIN J. GODLEY
JAMES C. RUTTEN
RICHARD ST. JOHN
ROHIT K. SINGLA
LUIS LI
CAROLYN HOECKER LUEDTKE
C. DAVID LEE
MARK H. KIM
BRETT J. RODDA
FRED A. ROWLEY, JR.
KATHERINE M. FORSTER
BLANCA FROMM YOUNG
ROSEMARIE T. RING
MELINDA EADES LEMOINE
SETH GOLDMAN
GRANT A. DAVIS-DENNY
JONATHAN H. BLAVIN
DANIEL B. LEVIN
MIRIAM KIM
MISTY M. SANFORD
HAILYN J. CHEN
BETHANY W. KRISTOVICH
JACOB S. KREILKAMP
JEFFREY Y. WU
LAURA D. SMOLOWE
ANJAN CHOUDHURY
KYLE W. MACH
HEATHER E. TAKAHASHI
ERIN J. COX
BENJAMIN J. HORWICH
E. MARTIN ESTRADA
MATTHEW A. MACDONALD
BRYAN H. HECKENLIVELY
ELAINE J. GOLDENBERG*
MARK R. YOHALEM
CHAD GOLDER*
GINGER D. ANDERS*
MARGARET G. MARASCHINO
JOHN M. GILDERSLEEVE
ADAM B. WEISS
GEORGE CLAYTON FATHEREE, III
KELLY L.C. KRIEBS
JEREMY A. LAWRENCE
LAURA K. LIN
ACHYUT J. PHADKE
ZACHARY M. BRIERS
JENNIFER M. BRODER
KURUVILLA J. OLASA
JUSTIN P. RAPHAEL
ROSE LEDA EHLER
ERIC P. TUTTLE
JOHN W. BERRY
ROBYN K. BACON
KENNETH M. TRUJILLO-JAMISON
JORDAN D. SEGALL
WESLEY T.L. BURRELL
KAREN A. LORANG
CRAIG A. LAVOIE
JOSHUA S. MELTZER
ADAM P. BARRY
JENNIFER L. BRYANT
ANDREW CATH RUBENSTEIN
HANNAH L. DUBINA
NICHOLAS D. FRAM
JOHN L. SCHWAB
ASHLEY D. KAPLAN
JESSICA REICH BARIL
JULIANA M. YEE
JEREMY K. BEECHER
MATTHEW K. DONOHUE
EMILY CURRAN-HUBERTY
JORDAN X. NAVARETTE
JOHN B. MAJOR
LAUREN C. BARNETT
C. HUNTER HAYES
TREVOR N. TEMPLETON
SKYLAR D. BROOKS
ELIZABETH R. DYER
SARAH S. LEE
ELIZABETH A. KIM
LAURA M. LOPEZ
MICHAEL C. BAKER
SARAH G. BOYCE*
ADELE M. EL-KHOURI*
COLIN A. DEVINE
DANE P. SHIKMAN
LEXI PEACOCK
MAGGIE THOMPSON
SAMUEL H. ALLEN
ALLISON M. DAY
GIOVANNI S. SAARMAN GONZÁLEZ
JONATHAN S. MELTZER*
SAMUEL JOSÉ DÍAZ
LAUREN M. HARDING
NEFI D. ACOSTA
STEPHANIE G. HERRERA
TERESA REED DIPPO
DANIEL BENYAMIN
SARA A. MCDERMOTT
J. MAX ROSEN
RACHEL G. MILLER-ZIEGLER*
ALISON F. KAROL SIGURDSSON
ANNE K. CONLEY
GRAHAM B. COLE
KATHERINE G. INCANTALUPO
DAVID P. THORESON
DAVID W. MORESHEAD
ANDRE W. BREWSTER III
TERRA D. LAUGHTON
ROWLEY J. RICE
JEREMY S. KREISBERG*
JOHN D. MAHER
GINA F. ELLIOTT
BRANDON R. TEACHOUT
SEGUN I. BABATUNDE II
CARSON C. ZHENG
LUCAS J. ARTAIZ
USHA CHILUKURI VANCE
BRIAN J. SPRINGER
TYLER HILTON
VINCENT LING
ALEXANDER S. GORIN
BRENDAN GANTS*
MARKUS BRAZILL
MARI T. SAIGAL
LAUREN T. ROSS*
ZOE BEDELL*
BEN BAROKH
ABE DYK
MICHELE C. NIELSEN
MARIANNA MAO
OMAR H. NOURELDIN
STEPHEN NYLAS
ARIEL TESHUVA
SHANNON GALVIN AMINIRAD
NATALIE KARL
BRANDON MARTINEZ
ANTHONY J. RAMIREZ
ANDREW LEWIS
CARRIE C. LITTEN
ESTALYN S. MARQUIS

OF COUNSEL

ROBERT K. JOHNSON
PATRICK J. CAFFERTY, JR.
PETER A. DETRE
ALLISON B. STEIN
BRAD SCHNEIDER
PETER E. GRATZINGER
JENNY H. HONG
KIMBERLY A. CHI
DAVID S. HONG
ADAM R. LAWTON
MATTHEW S. SCHONHOLZ
MICHAEL E. GREANEY

E. LEROY TOLLES
(1922-2008)

*ADMITTED IN DC
ALL OTHERS ADMITTED IN CA

March 8, 2020

Writer's Direct Contact
(213) 683-9205
(213) 683-4005 FAX
luis.li@mto.com

**Via FedEx and Electronic Mail**

Sheriff Alex Villanueva
c/o Elizabeth D. Miller, Assistant County Counsel
Office of the County Counsel
County of Los Angeles
Kenneth Hahn Hall of Administration
500 West Temple Street #648
Los Angeles, CA 90012
emiller@counsel.lacounty.gov

Re: Dissemination of Photos of January 26, 2020 Helicopter Crash Scene

Dear Sheriff Villanueva:

We write to follow up on our March 2 letter, to which we have not yet received a response.

Since we last wrote, additional disturbing reports have emerged regarding sheriff's deputies sharing unauthorized photographs of the crash scene and the victims' remains. You have publicly stated that at least *eight* deputies took illicit photos, and news outlets have reported that the photos have been sent to people outside the Sheriff's Department. Reports also indicate that the Department knew of its deputies' misconduct as early as January 29, when a citizen filed a complaint notifying the Department. Yet the Department did not inform the victims' families until the L.A. Times was poised to report on the misconduct nearly five weeks later.

MUNGER, TOLLES & OLSON LLP

Los Angeles County Sheriff's Department
March 8, 2020
Page 2

The Department's response to the misconduct also has been deeply troubling. According to reports by the L.A. Times, Department leadership "tried to keep a lid" on the potential scandal by deviating from "normal investigative protocols."[1] Reports further indicate that, rather than formally investigate, Department leadership told the deputies that if they "came clean and deleted the photos, they would not face any discipline."[2] Indeed, the Department appears to have initiated a formal investigation only *after* news of the deputies' misconduct became public. Once news of the misconduct broke, you told news outlets that the Department does not have a policy addressing deputies using their personal cellphones to take photos of accident scenes, even though the Department's policy on use of communication devices prohibits precisely that. (Policy 3-01/100.46, Los Angeles County Sheriff's Department Manual of Policy and Procedures, *available at* http://pars.lasd.org/Viewer/Manuals/10008/Content/10426 ("Members shall not use a personal cellular telephone . . . to record, store, document, catalog, transmit, and/or forward any image . . . captured as a result of their employment and/or while performing official Department business that is not available or accessible to the general public.").)

All of this leaves Mrs. Bryant with substantial uncertainty as to whether the misconduct was truly limited to eight deputies and whether the photographs of her husband's and daughter's remains (or copies of them that may have been shared with others or stored online) will become public. Mrs. Bryant deserves to know whatever the Department knows regarding these questions. To that end, we ask on Mrs. Bryant's behalf that you respond to the below requests no later than close of business on <u>Tuesday, March 10</u>.

- Describe what steps, if any, the Sheriff's Department has taken to identify all personnel who had or have photographs or recordings of the crash scene or victims' remains on their electronic devices (including cellphones) or cloud accounts.

- Describe what steps, if any, the Sheriff's Department has taken to determine whether and to what extent personnel who had such photographs or recordings shared them with other members of the Department or third parties.

- Describe what steps, if any, the Sheriff's Department has taken to secure all unauthorized photographs or recordings in the possession of its personnel such that they are not subject to further sharing.

---

[1] Alene Tchekmedyian & Paul Pringle, *A deputy allegedly showed off gruesome Kobe Bryant crash photos at bar. A cover-up scandal ensued*, L.A. Times (Mar. 3, 2020), *available at* https://www.latimes.com/california/story/2020-03-03/kobe-bryant-crash-photos-sheriffs-department-tried-to-keep-quiet.

[2] *Id.*

MUNGER, TOLLES & OLSON LLP

Los Angeles County Sheriff's Department
March 8, 2020
Page 3

- Identify by name all personnel who had or have photographs or recordings of the crash scene or victims' remains on their electronic devices.

- State whether the Sheriff's Department confiscated and/or inspected the electronic devices of the personnel who had or have photographs or recordings of the crash scene or victims' remains.

- Describe what steps, if any, the Sheriff's Department has taken to secure all photographs of the crash scene or victims' remains that its personnel sent to people outside of the crash investigation.

- Describe what steps, if any, the Sheriff's Department has taken to review photographs of the crash scene or victims' remains on its personnel's electronic devices to determine their investigative value, and whether the Sheriff's Department has turned images with investigative value over to the National Transportation Safety Board.

As we noted in our March 2 letter, our client is evaluating all of her legal options and reserves all rights.

Sincerely,

/s/ Luis Li

Luis Li

CC:   Brad D. Brian
      Gary Robb
      Anita Robb

Exhibit D, Page 60

09/21/2020

**EXHIBIT 6**



IVIE McNEILL WYATT
PURCELL & DIGGS

Jack F. Altura, Esq.
jaltura@imwlaw.com
(213) 489-0028, ext. 154

March 26, 2020

Luis Li
Munger, Tolles & Olson
350 South Grand Avenue, Fiftieth Floor
Los Angeles, CA  90071
Luis.li@mto.com

Re:    Response to March 2, 2020 Letter to Sheriff Villanueva

Dear Mr. Li:

This is a follow up to my letter dated March 10, 2020, responding to your Public Records Act
request, dated and received by the County of Los Angeles on March 2, 2020, whereby you
requested "a copy of any and all complaints received by your Office regarding the unauthorized
taking or sharing of crash-scene photos and provide answers in writing regarding (i) all steps the
Sheriff's Department has taken to ensure all photos of the crash scene have been secured; (ii)
whether the Department has initiated an investigation into this matter and when the investigation
is expected to conclude; (iii) the names of all Sheriff's Department personnel who shared photos
of the crash scene; and (iv) whether the Sheriff's Department has terminated, suspended, or
otherwise disciplined said personnel for their actions."

With respect to your request for "a copy of any and all complaints" as described above, pursuant
to the California Public Records Act, records of complaints to, or investigations conducted by, a
local police agency are specifically exempt from disclosure.  Government Code § 6254(f).
However, pursuant to Government Code §§ 6254(f)(2), 6255(a), we can provide the following
information:

> At 12: 21 a.m. on January 29, 2020, a complaint was emailed to the LASD
> Sheriff's Information Bureau.  The complaint stated that an LASD deputy
> was at a restaurant showing photos of the Kobe Bryant helicopter crash site
> and bodies.  The deputy was not identified in the complaint.

With respect to your request for "answers in writing regarding" the subjects listed above, we are
unfortunately unable to assist you with your request.  Your request does not ask for "identifiable" public
records, but specific "information" in the form of interrogatories.  The Public Records Act, Government
Code § 6253(b), does not require that a public entity create a record in order to respond to a request for
information, only that certain non-exempt records already in existence be made available.  The Act does
not require the public entity to answer interrogatories.

Further, even if such responsive identifiable records existed, such records and any information contained
within those records would be exempt from disclosure pursuant to Government Code §§ 6254(c) and (k)
and Penal Code § 832.7, as they are part of an ongoing and active internal investigation.
/ / /

Luis Li
**Re: Response to March 2, 2020 Letter to Sheriff Villanueva**
March 26, 2020
Page 2

Please do not hesitate to contact me if there is anything else you would like to discuss.

Sincerely,

Jack F. Altura

cc:     Sheriff Alex Villanueva
        Elizabeth Miller, Assistant County Counsel

09/21/2020

**EXHIBIT 7**



**IVIE McNEILL WYATT**
**PURCELL & DIGGS**

Jack F. Altura, Esq.
jaltura@imwlaw.com
(213) 489-0028, ext. 154

Luis Li
Munger, Tolles & Olson
350 South Grand Avenue, Fiftieth Floor
Los Angeles, CA 90071
Luis.li@mto.com

April 2, 2020

Re:    Response to March 8, 2020 Letter to Sheriff Villanueva

Dear Mr. Li:

This is a follow up to my letter dated March 11, 2020, responding to your Public Records Act request, dated and received by the County of Los Angeles on March 8, 2020, whereby you requested the following:

1.    Describe what steps, if any, the Sheriff's Department has taken to identify all personnel who had or have photographs or recordings of the crash scene or victims' remains on their electronic devices (including cellphones) or cloud accounts.

2.    Describe what steps, if any, the Sheriff's Department has taken to determine whether and to what extent personnel who had such photographs or recordings shared them with other members of the Department or third parties

3.    Describe what steps, if any, the Sheriff's Department has taken to secure all unauthorized photographs or recordings in the possession of its personnel such that they are not subject to further sharing.

4.    Identify by name all personnel who had or have photographs or recordings of the crash scene or victims' remains on their electronic devices.

5.    State whether the Sheriff's Department confiscated and/or inspected the electronic devices of the personnel who had or have photographs or recordings of the crash scene or victims' remains.

6.    Describe what steps, if any, the Sheriff's Department has taken to secure all photographs of the crash scene or victims' remains that its personnel sent to people outside of the crash investigation.

7.    Describe what steps, if any, the Sheriff's Department has taken to review photographs of the crash scene or victims' remains on its personnel's electronic devices to determine their investigative value, and whether the Sheriff's Department has turned images with investigative value over to the National Transportation Safety Board.

Luis Li
**Re: Response to March 8, 2020 Letter to Sheriff Villanueva**
April 2, 2020
Page 2

Unfortunately, we are unable to assist you with the above requests. Your requests do not ask for "identifiable" public records, but specific information in the form of interrogatories. The Public Records Act, Government Code § 6253(b), does not require that a public entity create a record in order to respond to a request for information, only that certain non-exempt records already in existence be made available. The Act does not require the public entity to answer interrogatories.

Further, even if such responsive identifiable records existed, such records and any information contained within those records would be exempt from disclosure pursuant to Government Code §§ 6254(c), (k), 6255(a) and Penal Code § 832.7, as they are part of an ongoing and active internal investigation and are exempt or prohibited under federal or state law from disclosure because the public interest served by not disclosing such records clearly outweighs the public interest served by disclosure of such records.

Please do not hesitate to contact me if there is anything else you would like to discuss.

Sincerely,

Jack F. Altura

cc:    Sheriff Alex Villanueva
       Elizabeth Miller, Assistant County Counsel

**Exhibit D, Page 66**