LUIS LI (State Bar No. 156081)
luis.li@mto.com
CRAIG JENNINGS LAVOIE (State Bar No. 293079)
Craig.Lavoie@mto.com
JENNIFER L. BRYANT (State Bar No. 293371)
Jennifer.Bryant@mto.com
MARI T. SAIGAL (State Bar No. 318556)
Mari.Saigal@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Los Angeles, California 90071-3426
Telephone:   (213) 683-9100
Facsimile:   (213) 687-3702

Attorneys for Plaintiff Vanessa Bryant

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| VANESSA BRYANT, | Case No. 2:20-cv-09582-JFW-E |
| Plaintiff, | **FIRST AMENDED COMPLAINT FOR:** |
| vs. | |
| COUNTY OF LOS ANGELES; LOS ANGELES COUNTY SHERIFF'S DEPARTMENT; LOS ANGELES COUNTY FIRE DEPARTMENT; ▇▇▇▇▇▇▇▇▇▇▇▇ | **1. Violation of Fourteenth Amendment – 42 U.S.C. § 1983** |
| | **2. Negligence** |
| | **3. Negligence** |
| Defendants. | **4. Invasion of Privacy** |
| | **5. Invasion of Privacy** |
| | **DEMAND FOR JURY TRIAL** |
| | **[REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL]** |

Plaintiff Vanessa Bryant ("Plaintiff"), through her undersigned counsel, hereby brings this action against defendants County of Los Angeles (the "County"), the Los Angeles County Sheriff's Department (the "Sheriff's Department"), the Los Angeles County Fire Department (the "Fire Department," and, collectively with the County and the Sheriff's Department, the "Entity Defendants"), ███████████████ ██████████████████████████████ (collectively, the "Deputy Defendants," and, collectively with the County, the Sheriff's Department, and the Fire Department, the "Defendants") seeking damages to remedy violations of rights under the United States Constitution and for negligence and invasion of privacy pursuant to California law.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. sections 1331 and 1343.

Plaintiff alleges, on personal knowledge as to herself and information and belief as to others, as follows:

## INTRODUCTION

1.     On the morning of Sunday, January 26, 2020, three eighth-grade girls, joined by parents and coaches, left their homes in Orange County to play in a youth basketball tournament in Thousand Oaks.  Making their way by helicopter, they encountered dense fog.  Rather than land or turn around, the pilot pushed into the fog and became disoriented.  The helicopter descended rapidly and crashed into the foothills of the Santa Monica Mountains, killing everyone onboard.  Vanessa Bryant's thirteen year-old daughter, Gianna Bryant, and husband of nearly twenty years, Kobe Bryant, were among those who died.

2.     In the aftermath of the crash, several of the victims' family members gathered at the L.A. County Sheriff's station in Lost Hills, devastated and distraught.  Sheriff Alex Villanueva met with them and assured Mrs. Bryant that his deputies were securing the crash site.  Based on a leak by law enforcement, the gossip and celebrity news site *TMZ* had reported that Kobe, a singular figure in

Southern California culture and a hero to millions around the world, had died, and onlookers were flocking to the accident scene.

3.     But the biggest threat to the sanctity of the victims' remains proved to be the Sheriff's Department itself.  Faced with a scene of unimaginable loss, Sheriff's Department personnel abused their access to the crash site by taking and sharing gratuitous photos of the dead children, parents, and coaches.  As the Sheriff's Department would later admit, there was no investigatory reason for Department personnel to take pictures of the victims' remains.

4.     Within forty-eight hours, at least ten members of the Department obtained and possessed images of the victims' remains on their personal cell phones without any legitimate reason for having them.  The gratuitous images also became a subject of gossip within the Department, as deputies shared them in settings that had nothing to do with investigating the accident.  One deputy even showed off photos of the victims at a bar, identifying one of the individuals depicted as Kobe Bryant and bragging about how he had been at the crash site.  Shocked and appalled, one of the bar patrons filed a written complaint with the Sheriff's Department.

5.     Upon learning that his deputies had taken and shared the gratuitous photos, which plainly violated the victims' families' constitutional rights to control images of their loved ones' remains, Sheriff Villanueva did not inform the victims' families, initiate an internal affairs investigation, or inspect the deputies' phones to determine whether and how the photos had been shared.  He instead directed a cover-up, summoning the deputies to the Lost Hills station and telling them that, if they deleted the photos, they would face no discipline.  The deputies purported to accept the Sheriff's offer, receiving a free pass in exchange for destroying evidence of their misconduct.

6.     For one month, the Department's cover-up worked.  But on February 27 and 28, 2020, the *Los Angeles Times* reported on the deputies' photos and the Department's effort to hide its wrongdoing.  Following the reports, Sheriff

Villanueva admitted that his deputies took "illicit photos" of the victims' remains and that he informally ordered their destruction to avoid the "usual routine" of a formal investigation in which everyone "lawyers up."

7.     Following the *Los Angeles Times* reports, other news outlets began reporting that the misconduct was not limited to the Sheriff's Department—Fire Department personnel had taken and shared improper photos of the victims' remains as well.  Like the Sheriff's Department, the Fire Department had been aware of the egregious conduct for several weeks and responded by directing employees to destroy evidence of their wrongdoing without ever informing the victims' families.

8.     Devastated by these reports, Mrs. Bryant privately sought information from the Sheriff's Department and Fire Department to assess whether she should brace for pictures of her loved ones' remains to surface on the internet.  Mrs. Bryant asked the departments to explain the steps they had taken to determine the scope of the misconduct and ensure that all photos of the crash site had been secured.  Both responded that they needed extra time to respond due to the "unusual circumstance" of needing to consult documents, then sent letters in which they refused to respond to all but one of Mrs. Bryant's questions and asserted that they had no legal obligation to assist.

9.     The Sheriff's and Fire Departments' outrageous actions have caused Mrs. Bryant severe emotional distress and compounded the trauma of losing Kobe and Gianna.  Mrs. Bryant feels ill at the thought that sheriff's deputies, firefighters, and members of the public have gawked at gratuitous images of her deceased husband and child, and she lives in fear that she or her children will one day confront horrific images of their loved ones online.  Many social media users and internet trolls have claimed to have seen photos of the victims' remains, and their accounts are plausible given the number of individuals who took and transmitted improper photos, the ease with which cell phone photos are electronically shared and saved in cloud storage, and the egregious failure to take reasonable steps to

1    prevent dissemination of the photos.

2    10.    In taking these photographs and at several points thereafter, members

3    of the Sheriff's and Fire Departments have chosen to act reprehensibly, and the

4    departments' responses to their employees' conduct has demonstrated that they

5    either do not understand or do not care about the pain they have caused.  This

6    lawsuit seeks to impose accountability for that.

7                        **JURISDICTION AND VENUE**

8    11.    The County removed this action, which was commenced in the

9    Superior Court of the State of California for the County of Los Angeles, pursuant to

10   28 U.S.C. sections 1331, 1441, and 1446.  This Court has jurisdiction over this

11   action pursuant to 28 U.S.C. sections 1331 and 1343 because Plaintiff brings a claim

12   for violation of the Fourteenth Amendment of the United States Constitution under

13   42 U.S.C. section 1983, and this Court has supplemental jurisdiction over Plaintiff's

14   state law claims under 28 U.S.C. section 1367(a).

15   12.    Venue is proper in this District pursuant to 28 U.S.C. section 1391(b),

16   because Defendants in this action are individuals and public agencies situated in Los

17   Angeles County and because, on information and belief, all of the acts or omissions

18   giving rise to this Complaint occurred in the Central District of California.

19                          **THE PARTIES**

20   13.    Plaintiff Vanessa Bryant, a California resident, is the wife of Kobe

21   Bryant and mother of Gianna Bryant.

22   14.    Defendant County of Los Angeles is a municipal corporation duly

23   authorized to operate under the laws of the State of California.  The Los Angeles

24   County Sheriff's Department is a department of the County.

25   15.    Defendant Los Angeles County Sheriff's Department is a local

26   government entity created under the laws of the State of California and a department

27   of Defendant County.  The Sheriff's Department provides general law enforcement

28

services to certain contract cities, including Calabasas, California.  The Department's work is directed by, among others, Sheriff Alex Villanueva.

16.     Defendant Los Angeles County Fire Department is a local government entity created under the laws of the State of California and a department of Defendant County.  The Fire Department provides fire suppression and prevention services under contract with the city of Calabasas, California.

17.     Defendants County, Sheriff's Department, and Fire Department are "persons" subject to suit within the meaning of 42 U.S.C. § 1983.  *See Monell v. New York Department of Social Services*, 436 U.S. 658, 691 (1978).

18.     Pursuant to California Government Code § 815.2(a), Defendants County, Sheriff's Department, and Fire Department are liable for any and all wrongful acts in violation of state law hereinafter complained of and committed by their employees acting within the course and scope of their employment.

19.     Defendant ███████ is an individual and currently a sheriff's deputy in the Los Angeles County Sheriff's Department.  ███ is sued in his individual capacity.  On information and belief, Defendant ███ is a resident of California.

20.     Defendant ████████ is an individual and currently a Sheriff's deputy in the Los Angeles County Sheriff's Department.  ███ is sued in his individual capacity.  On information and belief, ███ is a resident of California.

21.     Defendant █████████ is an individual and currently a Sheriff's deputy in the Los Angeles County Sheriff's Department.  ███ is sued in his individual capacity.  On information and belief, ███ is a resident of California.

22.     Defendant ████████ is an individual and currently a Sheriff's deputy in the Los Angeles County Sheriff's Department.  ███ is sued in his individual capacity.  On information and belief, ███ is a resident of California.

**GENERAL ALLEGATIONS**

**Sheriff's and Fire Department Personnel Took and
Shared Unnecessary Photos of the Victims' Remains**

23.     On the morning of January 26, 2020, a helicopter carrying Kobe Bryant and his thirteen-year-old daughter, Gianna, crashed into the foothills of the Santa Monica Mountains near Calabasas, California.  The pilot and all passengers died on impact.

24.     The hours after the crash were filled with confusion.  Mrs. Bryant learned of the crash from an employee of Kobe, Inc., but was told there were survivors.  She then began receiving Instagram messages expressing sympathy for her loss.  Based on a leak by law enforcement, *TMZ* had reported that Kobe had died in a helicopter accident.  Having heard nothing from law enforcement herself, Mrs. Bryant was confused and distraught.  Ultimately, other news outlets confirmed that Kobe and Gianna had perished in the accident.

25.     Paparazzi, members of the public, and a significant number of unauthorized drones flocked to the crash site.  The Sheriff's Department closed multiple roads and freeway off-ramps leading to the site to discourage onlookers, and the Federal Aviation Administration imposed a five-mile no-fly zone overhead at Mrs. Bryant's request.  An emergency ordinance prohibited unauthorized access to the site, and Sheriff Villanueva announced that trespassers would be arrested and charged with a misdemeanor.

26.     Meanwhile, Mrs. Bryant and other family members of the victims gathered at the nearby Sheriff's station in Lost Hills.  Mrs. Bryant spoke with Sheriff Alex Villanueva and expressed concern that the crash site was unprotected from photographers.  Sheriff Villanueva assured her that his deputies were securing the scene.

27.     This assurance was hollow.  Notwithstanding Sheriff Villanueva's later acknowledgement that Sheriff's Department personnel "had no place to be taking

photographs of anything," deputies who responded to the crash scene used personal cell phones to take and share gratuitous photos of the dead children, parents, and coaches.  According to the Sheriff's Department's subsequent investigatory report, one deputy in particular took between 25 and 100 photos of the crash scene on his personal cell phone, many of which had no conceivable investigatory purpose and were focused directly on the victims' remains.

28.     Photos of the remains quickly spread within the Sheriff's Department as deputies transmitted them to one another via text message and AirDrop.  Within forty-eight hours, at least ten members of the Sheriff's Department obtained and possessed photos of the victims' remains on their personal cell phones despite having no legitimate governmental use for the photos.  Making matters worse, Sheriff's Department personnel showed off the photos of the victims' remains to colleagues in settings that had nothing to do with investigating the crash—an investigation that was being handled by the National Transportation Safety Board ("NTSB"), not the Sheriff's Department—and the photos became the subject of gossip within the Department.

29.     Members of the Fire Department engaged in similar misconduct.  While working the crash site on January 26, 2020, several members of the Fire Department abused their access to take graphic photos of the victims' remains without any legitimate governmental purpose.  One such instance occurred at approximately 2:00 p.m. on January 26, 2020—long after the downed helicopter had been identified—when a sheriff's deputy observed a firefighter taking multiple pictures of the accident scene.  ███████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████  In addition, according to a complaint filed in Los Angeles County Superior Court in November 2020 by Tony Imbrenda, a public information officer in the Fire Department who responded to the crash scene on the day of the accident but was not

1    involved in investigating the accident, multiple firefighters electronically

2    transmitted photos of the crash scene to him.  Based on the foregoing, Plaintiff

3    believes and thereon alleges that, in the hours and days that followed the crash,

4    several members of the Fire Department electronically shared and/or displayed the

5    graphic images of her loved ones' remains to colleagues without any legitimate

6    governmental purpose.

**Deputy** █████████

8        30.      █████████, a deputy with the Sheriff's Department, responded to the

9    general proximity of the accident scene on January 26, 2020 and stationed himself at

10   the Department's makeshift command post at the Los Virgenes Water District.

11   While there, ██████ obtained multiple photographs of the Bryants' remains and

12   stored them on his personal cell phone.

13       31.      Shortly after obtaining photos of the Bryants' remains, ██████ shared

14   them with at least two individuals without any legitimate governmental purpose.

15           a.      At some point on January 26, 2020—after ██████ and others had

16   learned that the victims of the helicopter accident included Kobe and Gianna

17   Bryant—██████ walked 100 feet from his position at the makeshift command post to

18   chat with a female deputy who was controlling traffic in and out of the Las Virgenes

19   Water District.  ██████ told the deputy that he had photos of the accident scene and,

20   for no reason other than morbid gossip, proceeded to send the photos of the Bryants'

21   remains to her personal cell phone.  The deputy had no role in investigating the

22   accident or identifying those who perished, and later acknowledged in an interview

23   with Department investigators that she had no legitimate governmental purpose for

24   the photos.  Similarly, ██████ admitted to investigators that the deputy did not need

25   the photos for any reason and that it was inappropriate to send them to her.  In

26   explaining his actions to investigators, ██████ could only say that "curiosity got the

27   best of [them]" and that such curiosity was "in [their] nature" as deputies.

28

- 8 -
FIRST AMENDED COMPLAINT

b.      At a separate point on January 26, 2020—and again, with knowledge that Kobe and Gianna Bryant were among those who perished in the crash— ███ electronically transmitted photos of the Bryants' remains to another deputy, ██████. ███ had responded to the general proximity of the accident scene along with ███ but he had no role in investigating the accident or identifying those who perished. ███ sent photos of the Bryants' remains to ███ personal cell phone without any legitimate governmental purpose.

32.     Following the above actions, ███ learned that a complaint had been filed with the Sheriff's Department regarding improper sharing of photos of the crash victims' remains. ███ then negligently and/or willfully destroyed evidence of his wrongdoing by deleting photos of the victims' remains and other evidence from his personal cell phone. At the time, ███ had an obligation to preserve this evidence of his wrongdoing, including any associated metadata, and, as a trained law enforcement officer, knew or should have known that the evidence may be relevant to future litigation or investigations. By committing this spoliation, ███ severely undermined the ability to verify any of his claims regarding his handling and dissemination of the photos.

**Deputy ███████**

33.     ███████ a trainee deputy with the Sheriff's Department, responded to the general proximity of the accident scene on January 26, 2020. While there, ███ was posted at the base of the hillside, where he monitored entry to a trailhead that led to the downed helicopter. At no point on the day of the accident or at any time thereafter did ███ have a role in investigating the accident or identifying those who perished. Nonetheless, at some point during his shift, ███ obtained multiple photographs of the Bryants' remains on his personal cell phone.

34.     After obtaining photos of the Bryants' remains, ███ shared them with multiple individuals without any legitimate governmental purpose, including several members of the public.

- 9 -

a.     While at the Lost Hills Sheriff's station on the evening of January 26, 2020—long after ███ and others had learned that the victims of the helicopter accident included Kobe and Gianna Bryant—███ told another deputy, ████████, that he had photos of the accident scene. ████ asked to see the photos, and ███ texted photos of the Bryants' remains to █████ personal cell phone. There was no legitimate governmental purpose for ███ to transmit the photos to █████ because, like ████ ████ had no role in investigating the accident or identifying those who perished.

b.     On January 28, 2020, while at his mother's house in West Covina, California, ███ showed photos of the Bryants' remains to his niece. Before displaying the photos, ███ made a crude remark about the state of the victims' remains.

c.     While at the Baja California Bar and Grill in Norwalk, California on January 28, 2020, ███ boasted that he had worked at the scene of the accident where Kobe Bryant had died. ███ then showed photos of the Bryants' remains to a fellow bar patron and the restaurant's bartender, and he is seen on the bar's security camera zooming in and out of the images while displaying them to the bartender. One of the photos showed the body of a girl, and ███ remarked that another showed the remains of Kobe Bryant. Shortly after seeing the photos, the bartender loudly boasted to restaurant employees and patrons that he had just seen a photo of Kobe Bryant's body and described the image in graphic detail.

35.     Following the above actions, ███ learned that a complaint had been filed with the Sheriff's Department regarding improper sharing of photos of the crash victims' remains. ███ then negligently and/or willfully destroyed evidence of his wrongdoing by deleting photos of the victims' remains from his personal cell phone and deleting the text messages he had sent ███ that contained photos of the victims' remains. At the time, ███ had an obligation to preserve this evidence of his wrongdoing, including any associated metadata, and, as a trained law

1  enforcement officer, knew or should have known that the evidence may be relevant

2  to future litigation or investigations.  By committing this spoliation, ████ severely

3  undermined the ability to verify any of his claims regarding his handling and

4  dissemination of the photos.

5  **Deputy** ████████

6      36.    Deputy ████████ responded to the general proximity of the

7  accident scene on January 26, 2020, and was staffed to a checkpoint at the base of a

8  hillside that led to the downed helicopter.  Throughout the day, ████ heard

9  rumors that photos of the accident scene were circulating among other deputies, and

10  he was curious to see them himself.  While at the Lost Hills Sheriff's station that

11  evening, ████ asked ████ to send him the photos, and ████ sent him photos of the

12  Bryants' remains.  ████ saved the photos to an album on his personal cell phone

13  so that he did not have to keep going into the text message to view them.

14      37.    At no point did ████ play any role in investigating the accident or

15  identifying those who perished.  In an interview with Department investigators,

16  ████ admitted that there was no investigative purpose for him to obtain the photos

17  and that it was inappropriate for him to take possession of them.

18      38.    Nonetheless, on or around January 28, 2020, ████ shared the photos

19  with a personal friend with whom ████ plays video games nightly.  Although the

20  friend is a sheriff's deputy, he was assigned to the Santa Clarita station, not the Lost

21  Hills station, and had no involvement whatsoever in the response to the helicopter

22  accident.  In a text exchange initiated by ████ ████ told the friend that he had

23  pictures of the accident scene.  ████ then texted photos of the Bryants' remains to

24  his friend's personal cell phone, noting that one of the victims depicted was Kobe

25  Bryant.  In a later interview with Department investigators, ████ friend

26  indicated that one of the photos showed the remains of a child and that the remains

27  appeared to be the primary focus of the photo.

28

39.     Following the above actions, ███ negligently and/or willfully destroyed evidence of his wrongdoing by deleting photos of the victims' remains and other evidence from his personal cell phone.  At the time, ███ had an obligation to preserve this evidence of his wrongdoing, including any associated metadata, and, as a trained law enforcement officer, knew or should have known that the evidence may be relevant to future litigation or investigations.  By committing this spoliation, ███ severely undermined the ability to verify any of his claims regarding his handling and dissemination of the photos.

**Deputy ███**

40.     ███, a deputy with the Sheriff's Department, responded to the general proximity of the accident scene on January 26, 2020 and stationed himself at the makeshift command post established at the Los Virgenes Water District.  While there, ███ obtained multiple photographs of the Bryants' remains, stored them on his personal cell phone, and shared them with several other Department personnel, including ███

41.     On the evening of January 26, 2020—long after ███ learned that the victims of the helicopter accident included Kobe and Gianna Bryant—███ sent photos of the Bryants' remains to a detective for the Department without any legitimate governmental purpose.  The detective had responded to the general proximity of the accident scene earlier in the day, but had no role in investigating the accident or identifying those who perished.  As the detective admitted to Department investigators, he did not use the photos for any official purpose and there was no reason for him to receive them.  As an indication of how casually the photos were shared within the Department, the detective could not even identify the name of the deputy who sent him the photos during an interview with Department investigators.  Following his shift on January 26, 2020, the detective asked his wife,

who is not a law enforcement officer and had no reason to view the photos, whether she wanted to see the photos of the victims' remains.

42.     Following the above actions, ██████ negligently and/or willfully destroyed evidence of his wrongdoing by deleting photos of the victims' remains and other evidence from his personal cell phone.  At the time, ██████ had an obligation to preserve this evidence of his wrongdoing, including any associated metadata, and, as a trained law enforcement officer, knew or should have known that the evidence may be relevant to future litigation or investigations.  By committing this spoliation, ██████ severely undermined the ability to verify any of his claims regarding his handling and dissemination of the photos.

**The Defendants Attempt a Cover-Up and Destroy Evidence**

43.     Minutes after ████ left the Baja California Bar and Grill on the evening of January 28, 2020, the bartender approached a table of four patrons and excitedly stated that a sheriff's deputy had just shown him graphic photos of Kobe Bryant's remains.  The bartender described specific characteristics of Mr. Bryant's remains, explained how the remains could be linked to Mr. Bryant, and indicated he found the situation humorous.  The bartender was poised to divulge additional details, but the patrons expressed that they did not want to hear anything further.

44.     ████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████

45.     Under normal protocol, this complaint would have triggered a formal inquiry and/or an internal affairs investigation.  But Sheriff Villanueva did not follow protocol.  He did not conduct a standard investigation or collect, inspect, or search cell phones to determine how many photos existed, whether and how they had been transmitted, or whether they were stored on the cloud.  He did not inform the L.A. County Office of the Inspector General.  Most importantly, he did not alert the victims' families of the misconduct or the existence of the photos.

46.     Instead, sometime in late January 2020, Sheriff Villanueva summoned his deputies to the Lost Hills station and told them that if they "came clean" and deleted the photos, they would not face any discipline.  The deputies responded by claiming that they had deleted the photos and, to the extent they had transmitted the photos to others, those persons had also deleted them.  Sheriff Villanueva abided by his offer and did not discipline the deputies for violating the constitutional right of the victims' families.  For nearly a month, until their hands were forced by public reports about the photos, Sheriff Villanueva and the Department took no further action to investigate or contain the spread of the photos.

47.     The above actions were taken to avoid the consequences of misconduct by Department personnel or, at a minimum, in reckless disregard of the risk that destruction of evidence would render a complete investigation impossible.  At the time that Department leadership ordered deletion of the photos without conducting any meaningful investigation, the Department and the County knew or should have known that the actions of Department personnel, including ███ conduct at the bar in Norwalk, California, constituted tortious conduct under California law and a violation of the constitutional rights of the victims' families under the United States Constitution.  Hence, the Department and the County had an obligation to preserve evidence of the Department's wrongdoing, including any associated metadata, and,

as trained law enforcement officers, Department leadership knew or should have known that the evidence may be relevant to future litigation and investigations.

## **The Misconduct Is Exposed**

48.     On February 27 and 28, 2020, the *Los Angeles Times* reported that several sheriff's deputies had taken and shared photos of the victims' remains and that the Sheriff's Department had been aware of the misconduct for nearly a month. Soon thereafter, the *Times* also exposed the Department's attempted cover-up, reporting that it "tried to keep a lid on the episode instead of following normal investigative protocols."  Around the same time, it was reported that Fire Department personnel were sharing graphic photos of the victims' remains and that the Department responded by telling its members to destroy the photos.

49.     In an interview with the *Los Angeles Times* on February 26, 2020, Captain Jorge Valdez stated that he was "unaware of any complaint" regarding crash-scene photos and that "there was no order given to delete any photographs." Both statements were false.  Valdez was personally involved in responding to the citizen complaint, having spoken to the complainant himself, and Sheriff Villanueva has since made numerous admissions about deputies taking photos of the victims' remains and his orders to destroy them without any meaningful investigation.

50.     Through statements made by Sheriff Alex Villanueva in his official capacity, the Sheriff's Department and the County have admitted the facts showing their tortious conduct and violation of Mrs. Bryant's constitutional rights.

a.     In media appearances in late February and early March 2020, Sheriff Villanueva admitted that at least eight deputies took and/or shared photos of the victims' remains and acknowledged that the conduct was "disgusting," "wildly inappropriate," "inexcusable," and "unconscionable."  Sheriff Villanueva further admitted that the improper photos "harm[ed] people [who] have suffered a tragedy

already" by creating the possibility of "a public display of their loved ones' remains."

b.      Sheriff Villanueva has also admitted that the photos of the victims' bodies were not taken for any law enforcement purpose.  In response to questions from reporters on March 2, 2020, Sheriff Villanueva admitted: "[I]n this type of scene, which is an accident, there's only two groups of people that should be taking photos: that is the NTSB and the coroner's office.  No one else has . . . any reason to take any photos . . . Anybody outside of [the NTSB and coroner's office] would be unauthorized.  It'd be illicit photos."  In another interview the same day, Sheriff Villanueva admitted: "[T]he deputies had no place to be taking any photographs of anything.  Only, in this case, it would have been NTSB investigators, coroner's investigators, and that's about it.  Nobody else."

c.      The Sheriff's Department has also admitted to destroying evidence of the unlawful photos.  In an interview with NBC-4 Los Angeles on March 2, 2020, Sheriff Villanueva stated that he learned within days of the crash that a trainee deputy had allegedly showed off crash-scene photos at a bar and, in response, the Department ordered the trainee and seven other deputies to delete the photos.  Villanueva stated that his "number one priority" was to "make sure those photos no longer existed."  According to Villanueva, the Department "identified what we thought were the eight individuals" who took the images and "they deleted all the pictures they had, and they acknowledged that, if they transmitted them, that they were deleted."

**The Sheriff's and Fire Departments Knew or Should Have Known That First Responders Taking Photos of Human Remains Is a Long-Standing Problem**

51.     On and before the date of the helicopter crash, the Sheriff's Department knew that unnecessarily taking, possessing, and sharing photos of victims' remains had been a long-running problem for law enforcement.  Addressing reporters on March 2, 2020, Sheriff Villanueva stated: "[U]nfortunately, ever since they invented

the Polaroid camera, this has been a problem in law enforcement across the nation, probably across the world, because it just makes it so much easier.  And then there's—there's cops—they keep death books, for example, where . . . they have photos from crime scenes throughout their careers."  In an interview with the *Los Angeles Times* on February 26, 2020, Sheriff Villanueva exhibited similar awareness of the problem: "Every police department struggles with the same thing, where people take photos and they're not evidence . . .  So that's a practice we have to make sure that everyone walks away, and there is no evidence other than the official photos of evidence that are taken for criminal purposes."

52.     In addition, the Sheriff's and Fire Departments knew prior to the helicopter crash that government employees abusing access to celebrity-related information has long been a problem in Los Angeles.  Examples include a sheriff's deputy unlawfully leaking the arrest report of a prominent actor and the Los Angeles Police Department improperly disclosing photos of a famous recording artist depicting injuries from a domestic assault.  With respect to the helicopter crash, Sheriff Villanueva has acknowledged that the involvement of a celebrity like Kobe Bryant, a singular figure in Southern California culture and a hero to millions around the world, creates "much more interest" among deputies.

53.     Notwithstanding the above knowledge and his assurances to Mrs. Bryant, Sheriff Villanueva said nothing in his briefings with first responders at the accident scene regarding photography or respecting privacy.

**The Sheriff's and Fire Departments Had No Policies to Prevent Violations of the Constitutional Right to Control the Death Images of Deceased Loved Ones**

54.     Since at least 2012, it has been clear in the Ninth Circuit that individuals have a substantive due process right under the United States Constitution to control the death images and physical remains of deceased family members.  *See Marsh v. Cnty. of San Diego*, 680 F.3d 1148 (9th Cir. 2012).  Nonetheless, and despite the Department's awareness that improper death images are "a problem in

law enforcement across the nation," neither the Sheriff's Department nor the Fire Department had a policy at the time of the accident regarding the taking or sharing of photos of human remains.

55.     Following the *Los Angeles Times* reports, the Sheriff's Department issued a statement that the allegations regarding the accident-scene photos "are currently under investigation, as are the effectiveness of existing policies and procedures." (**Exhibit 1**.)  Days later, in a letter to the L.A. County Inspector General, Sheriff Villanueva admitted: "It is evident our photograph policy is deficient and this incident has identified a need for me to direct the creation of a new policy."  Similarly, in an interview with NBC-4 in March 2020, Sheriff Villanueva stated that the Department was "creating new [policies] that are very specific, with teeth in 'em, up to and including a penalty of discharge for violation of these policies."

56.     In the following months, the Sheriff's Department added an entirely new section to its Manual of Policies and Procedures, titled: "Photographs/Recordings at Scenes Where Human Remains Are Present." (**Exhibit 2**.)  The new policy dictates that, "[i]n order to preserve the dignity and privacy of the deceased and their families, scenes where human remains are present shall only be photographed/recorded by Scientific Services Bureau or the Department of Medical Examiner (DME) personnel." (**Ex. 2 at 1**.)  The new policy further provides: "Any photograph, recording, or record produced by a Department member . . . shall be considered the sole property of the Department" and "[a]ny unauthorized release or sharing is strictly prohibited." (**Ex. 2 at 1**.)

57.     In interviews with Sheriff's Department investigators regarding the improper photos, personnel throughout the chain of command confirmed that the Sheriff's Department had no clear policy and had provided no training or instruction regarding photographs of human remains prior to the accident.

a.      Numerous deputies who responded to the accident scene on January 26, 2020, including ███████████████, and others, told Department investigators there was no instruction or briefing on the day of the accident regarding photography of the crash site or human remains.

b.      Although many of the Sheriff's Department personnel who obtained photos of the victims' remains were in the midst of training to become sheriff's deputies, had recently completed such training, or were themselves training officers, none demonstrated any awareness of a Department policy regarding the propriety of taking, possessing, or sharing photos of human remains, nor did they report having received any training on the subject prior to the *Los Angeles Times* reports in February 2020.

c.      A captain for the Sheriff's Department who was the senior-most supervisor at the makeshift command post on the day of the accident demonstrated no awareness of the Sheriff's Department's policy regarding use of personal cell phones to capture work-related environments, telling investigators that it was "absolutely" appropriate for department personnel to use personal cell phones to photograph accident scenes.  The captain further implied that using personal cell phones to take photos of human remains would be appropriate to memorialize a scene, so long as the cell phone photos are provided to the Department's homicide department.  In interviews with investigators, the captain displayed no awareness of any department policy related to taking, possessing, or sharing photos of human remains, nor did he report having received any training on the subject.

d.      A sergeant for the Sheriff's Department who was second-in-command at the makeshift command post on the day of the accident told investigators that, even with the benefit of hindsight, there is nothing he would do differently regarding the way he supervised the deputies on the day of the accident.

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████,

- 19 -

1   ███████████████████████   The sergeant demonstrated no awareness of the

2   Sheriff's Department's policy regarding use of personal cell phones to capture

3   work-related environments, telling investigators that he believed it was appropriate

4   for deputies at the crash site to use their cell phones to take photos of the scene.  At

5   one point in an interview with Department investigators, the sergeant stated: ████████

6   ████████████████████████████████████████████████████

7   ████████████████████████████████████████████████

8   ████████████████████

9          e.      As of September 29, 2020, as discussed below in paragraph 70, it

10  is a crime in California for a first responder to take photos of deceased individuals

11  without a valid purpose.

12         58.     Similarly, according to a lawsuit recently filed in Los Angeles Superior

13  Court by a former Public Information Officer for the Fire Department who

14  responded to the crash scene, Tony Imbrenda, the Fire Department had no policy at

15  the time of the accident regarding photography at emergency incidents.

16  **The Sheriff's Department Failed to Train Its Employees on the Department's**

17  **Policy Regarding Photos of Work-Related Scenes on Personal Cell Phones**

18         59.     In addition to failing to establish a specific policy regarding the

19  treatment and photographing of human remains, the Sheriff's Department also did

20  not follow or enforce its policy regarding deputies' use of personal cell phones to

21  capture work-related environments.  That policy provides:

22         Members shall not use a personal cellular telephone or any other similar
       personal communication or recording device to record, store,
23         document, catalog, transmit, and/or forward any image, document,
       scene, or environment captured as a result of their employment and/or
24         while performing official Department business that is not available or
       accessible to the general public.

25  (**Exhibit 3 at 5**.)  According to the Sheriff's Department's Manual of Policies and

26  Procedures, supervisors must investigate reports of violations of the policy and "will

27  be held accountable for and evaluated on" their enforcement of the policy.  (**Ex. 3 at**

28

**2.**)  Members of the Department who violate the policy "shall be subject to disciplinary action," which could include "reprimand," "suspension without pay," "reduction in rank," and/or "dismissal from the Department."  (**Ex. 3 at 3-4**.)

60.     In direct contravention of this policy, the sergeant who was second-in-command at the Department's command post on the day of the accident told Department investigators that the Lost Hills station had a policy and/or custom of *encouraging* Department personnel to photograph accident scenes using their personal cell phones so that the images could be posted on the station's social media accounts, including Twitter and Facebook.  The sergeant explained that, at the time he received the call to respond to the helicopter crash, he was at the scene of an automobile crash taking pictures on his personal cell phone.  According to the sergeant, ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████

61.     Sheriff Villanueva did not discipline the deputies who took cell-phone photos of the crash site and has stated publicly that the Department's policies at the time did not prohibit the deputies' actions.  These statements and actions, combined with the significant number of deputies who took and/or shared cell-phone photos of the accident site, demonstrate that the Department failed to adequately train, supervise, and discipline its personnel regarding its policy related to the use of personal cell phones to photograph work-related scenes.

**The Sheriff's Department and Fire Department
Refuse to Provide Information to Mrs. Bryant**

62.     After learning of the existence of the photos, attorneys for Mrs. Bryant sent letters to the Sheriff's and Fire Department requesting that they take immediate action to secure all photos and videos of the crash in their possession, "including any photos or videos in the possession of or disseminated by Sheriff's Department

1   personnel." (**Exhibit 4.**)  Mrs. Bryant further requested that the Sheriff's

2   Department and Fire Department conduct internal affairs investigations "to

3   determine the extent of the unauthorized taking and dissemination of photos" and

4   the identities of the deputies and firefighters involved.  (**Ex. 4 at 2, Ex. 5 at 2**.)

5       63.    On March 8, 2020, following news reports regarding the number of

6   deputies who took improper photos, attorneys for Mrs. Bryant sent a follow up letter

7   requesting more information about the Sheriff's Department's investigation of the

8   deputies' misconduct, including the identity of all personnel who took photos of the

9   victims' remains; the steps the department had taken to identify all personnel who

10  had the photos on their personal devices; the steps the department had taken to

11  determine whether and to what extent personnel who had such photos or recordings

12  shared them with other members of the department or third parties; and the steps the

13  department had taken to secure all photos or recordings of the victims' remains in

14  the possession of its personnel.  (**Exhibit 6**.)

15      64.    On March 26 and April 2, 2020, nearly a month after Mrs. Bryant first

16  inquired about the misconduct, an attorney for the Sheriff's Department wrote to

17  Mrs. Bryant that the Department had no legal obligation to respond to her questions

18  and would not do so.  (**Exhibits 7-8**.)  Mrs. Bryant received a nearly identical

19  response from an attorney for the Fire Department in letters dated March 10 and 26,

20  2020.  (**Exhibits 9-10**.)

21          **The Sheriff's Department Conducts a Belated, Deficient Investigation**

22      65.    In response to public shock and outrage following the *Los Angeles*

23  *Times* reports, as well as scrutiny from the Sheriff's Department's Civilian

24  Oversight Board, the Department announced that it would conduct an internal affairs

25  investigation of the improper photos.  In discussing his Department's inexcusably

26  belated investigation, Sheriff Villanueva stated on March 2, 2020: "All [photos of

27  remains] *that we know of* that were in the possession of the eight individuals were

28  deleted, and we're *hoping* that that is the outcome of this—that there is no photos to

- 22 -

be circulated anywhere." (Emphasis added.)  Two months later, in May 2020,
Sheriff Villanueva stated that the Department was "going through the final stages"
of its investigation of the improper photos and, "once the information is developed
and it's done . . . we're going to make the entire investigation public so everybody
can read it for themselves."

66.     The Department has yet to deliver on Sheriff Villanueva's promise of
publicly reporting the results of the Department's investigation, but Mrs. Bryant
obtained the Department's final investigative report via a motion to compel in
January 2021.  Substantively, the report reveals that the Sheriff's Department has
failed to take basic steps to ensure all copies of the improper photos are tracked
down and sequestered.

a. ████████████████████████████████
████████████████████████████████████
██████████████████████████████████████
██████████████████

b. ███████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████████████████████████
██████████████████████████
████████████████



**The Deputy Defendants Exhibit Consciousness of Guilt by Making
False Exculpatory Statements to Department Investigators**

67.    Each of the Deputy Defendants made false exculpatory statements to Department investigators in the wake of the citizen complaint.  Their decision to hide the facts strongly suggests that their misconduct was more extensive than they have admitted.





1

2

3

### The *Los Angeles Times* Reveals Additional
### Details Regarding a Deputy's Misconduct

68.    Although nowhere mentioned in the Department's investigative report, in November 2020 the *Los Angeles Times* reported that the Sheriff's Department had moved to discipline an unnamed deputy for broadly sharing photos of the victims' remains on his personal cell phone.  The reporting cited the Sheriff's Department disciplinary summary for the third quarter of 2020, which states that a deputy "[s]tored confidential photographs of a multi-agency investigation on a personal cellular phone, and shared the photographs with friends, family members, and co-workers on multiple occasions."

### The Deputy Defendants Shared Photos of the Bryants' Remains with Multiple
### People, Including Members of the Public, Without Any Legitimate Purpose

69.    As detailed above, each of the Deputy Defendants (i) showed a willingness to take and/or retain possession of photos of the Bryants' remains on their personal cell phones without any legitimate governmental purpose; (ii) demonstrated a morbid curiosity in the photos; (iii) exhibited a willingness to share the photos with others, including through electronic transmission, without any legitimate governmental purpose; (iv) displayed consciousness of guilt by making false exculpatory statements regarding the photos; and (v) destroyed evidence of their possession and sharing of the photos despite an obligation to preserve it. Based on the foregoing, Plaintiff is informed and believes, and thereon alleges, that—in addition to the specific instances of improper sharing detailed above—the Deputy Defendants each shared photos of the Bryants' remains with multiple people, including members of the public, without any legitimate governmental purpose.

1
2

### California Enacts a Criminal Law Against
### Improper Photos of Human Remains

3   70.   In September 2020, responding to the Sheriff's Department's gratuitous

4   taking and sharing of photos of the crash victims' remains, the California state

5   government enacted Assembly Bill 2655.  *See* 2020 Cal. Stat. Ch. 219.  Known

6   informally as The Kobe Bryant Act of 2020, the law makes it a misdemeanor for a

7   first responder, including a law enforcement officer, to photograph the remains of a

8   crime or accident victim "for any purpose other than an official law enforcement

9   purpose or a genuine public interest."  Cal. Pen. Code § 647.9(a), (c).  As explained

10  by the California legislator who authored the new law, "[o]ur first responders, when

11  responding to an emergency, should not be taking very sensitive photographs . . . for

12  their own pleasure."

13  ### Mrs. Bryant Has Suffered Severe Emotional Distress

14  71.   Mrs. Bryant has suffered (and continues to suffer) severe emotional

15  distress from the knowledge that images of her husband's and daughter's remains

16  were taken and shared for the perverse gratification of law enforcement officers, and

17  she fears that she and her family may confront the appalling photos at any moment

18  on the internet.  This fear is eminently reasonable in light of the prevalence of cloud

19  storage (such as iCloud and Google Photos), text messaging, and social-media

20  applications, through which photos can be stored and shared almost instantaneously

21  (and sometimes inadvertently).  When Mrs. Bryant sought assurances from the

22  Sheriff's Department that it had taken reasonable measures to control the spread of

23  the photos, including whether it had "confiscated and/or inspected the electronic

24  devices of the personnel who had or have photographs of the crash scene or victims'

25  remains," the Department refused to offer any response whatsoever.  And at no

26  point has the Department taken even the basic investigatory step of collecting a

27  forensic image of the offending individuals' electronic devices.

28

72.     Mrs. Bryant's fear has been exacerbated by the fact that, despite knowing about the photos within days of the crash, Sheriff Villanueva took none of the steps that a reasonable supervisor (let alone a highly-trained professional investigator) would take to prevent dissemination of harmful photos in his constructive possession.  As a result of Sheriff Villanueva's offer to his deputies that they could avoid investigation and discipline by deleting the evidence of their misconduct, Mrs. Bryant must live with uncertainty regarding how many photos were taken, whether they remain stored on the cloud, whether and how they were shared via text message, email, or social media applications, and whether people to whom the deputies transmitted the photos continue to possess them.  Absent this information, it is impossible to rule out that the photos will surface and go viral online.  This uncertainty has caused Mrs. Bryant severe stress and anguish.

73.     Mrs. Bryant's anxiety has been reinforced by widespread discussion of the photos online.  In March 2020, Mrs. Bryant encountered an Instagram user who stated that she had seen pictures of Kobe and Gianna's bodies at the accident scene, and numerous Twitter users made similar statements even before the *Los Angeles Times* publicized that Department personnel had taken and shared improper photos of the victims' remains.  Other online commenters, along with the *National Enquirer* tabloid publication, have claimed that images of Kobe and Gianna's remains are being bought, shared, and/or sold on the dark web.

74.     These accounts are eminently plausible in light of the sheer number of deputies who took and shared photos of the Bryants' remains and the Department's grossly inadequate steps to prevent their dissemination.  For the foreseeable future, Mrs. Bryant and her family will almost certainly continue to encounter claims that photos of their loved ones' remains are circulating online, and they will have no way of knowing whether such claims are true or false.

75.     Avoiding thoughts of the Sheriff's Departments' misconduct has been impossible, as Mrs. Bryant is repeatedly reminded of it online.  Online trolls have

exploited the tragic circumstances and the Sheriff's Department misconduct for the purpose of taunting and hurting Mrs. Bryant.  These experiences provide a constant reminder that photos of her husband's and daughter's remains may be circulating in the public realm as a result of the Sheriff's Department's gross misconduct.

## Mrs. Bryant Served a Notice of Claims in Accordance with the Government Claims Act

76.     On May 8, 2020, pursuant to California Government Code section 900 et seq., Mrs. Bryant filed a written notice of claims against the Sheriff's Department, Sheriff Villanueva, and unknown deputies, based on the same underlying facts and issues alleged in this complaint.  As of this filing, the County has not substantively responded to Mrs. Bryant's notice of claim or provided a concrete timeline for when it will respond.  Per statute, the County's failure to act on Mrs. Bryant's claims within the time prescribed by the California Government Code constitutes a denial, such that Mrs. Bryant's claims are ripe for review by this Court.

77.     On July 20, 2020, pursuant to California Government Code section 900 et seq., Mrs. Bryant filed a written notice of claims against the Fire Department and unknown members of the Fire Department, based on the same underlying facts and issues alleged in this complaint.  As of this filing, the County has not substantively responded to Mrs. Bryant's notice of claim or provided a concrete timeline for when it will respond.  Per statute, the County's failure to act on Mrs. Bryant's claims within the time prescribed by the California Government Code constitutes a denial, such that Mrs. Bryant's claims are ripe for review by this Court.

## FIRST CAUSE OF ACTION

## 42 U.S.C. § 1983 (*Monell*), Violation of Fourteenth Amendment
## (Against the Sheriff's Department, the Fire Department, and the County)

78.     Plaintiff incorporates herein and realleges the allegations in paragraphs 1 through 77, inclusive, as if fully set forth herein.

79.     By taking and sharing photos of Kobe and Gianna Bryants' remains without any legitimate governmental purpose, members of the Sheriff's Department, including but not limited to the Deputy Defendants, and members of the Fire Department deprived Plaintiff of her substantive due process right to control the physical remains, memory, and death images of her deceased husband and child. *See Marsh v. Cnty. of San Diego*, 680 F.3d 1148 (9th Cir. 2012).  In taking these actions, members of the Sheriff's Department and Fire Department acted in a manner that shocks the conscience and offends the community's sense of fair play and decency.

80.     Members of the Sheriff's Department, including but not limited to the Deputy Defendants, and members of the Fire Department were acting under color of state law at the time of their actions.  Sheriff's and Fire Department personnel took photos of the Bryants' remains while in uniform, on duty, and in an area where public access was prohibited and only first responders (such as Sheriff's and Fire Department personnel) were allowed.  After the photos were taken, Sheriff's and Fire Department personnel possessed and shared them while in uniform and/or on duty, or otherwise in connection with or by virtue of their employment with the Sheriff's or Fire Department.

81.     Pursuant to 42 U.S.C. § 1983, public entities are liable for constitutional violations when execution of their official policy or custom deprives an individual of her constitutional rights.  A public entity is also liable for constitutional violations when its failure to establish a policy or procedure or to properly train, supervise, and/or discipline its employees amounts to deliberate indifference to the rights of persons with whom its employees come into contact.

82.     The Sheriff's Department, the Fire Department, and the County acted with deliberate indifference to the constitutional rights of Plaintiff and others similarly situated through the conduct and omissions set forth above, which consist of the following customs, policies, and/or patterns of practice:

a.      Failing to adequately train and supervise Sheriff's Department and Fire Department personnel to ensure they do not take or share photographs of human remains without any legitimate governmental purpose;

b.      Failing to establish a policy or procedure addressing the treatment of human remains, including the taking or sharing of photographs of human remains without any legitimate governmental purpose;

c.      Failing to adequately investigate and discipline Sheriff's Department and Fire Department personnel who have taken and/or shared photographs of human remains without any legitimate governmental purpose.

83.     Given the frequency with which Sheriff's and Fire Department personnel work at crime and accident scenes involving fatalities, it was obvious that some would be tempted to take photos of victims' remains on their personal cell phones.  Sheriff Alex Villanueva and the Sheriff's Department knew that some law enforcement officers keep "death books" containing photos of victims' remains and that officers taking pictures for non-law-enforcement purposes is a problem "across the nation."  The Sheriff's and Fire Departments were also aware that, on account of the large number of celebrities that live or work in the Los Angeles area, their personnel often work at accident and crime scenes that are the subject of intense public interest.  Notwithstanding this knowledge and awareness, the Sheriff's Department, the Fire Department, and the County failed to establish a policy regarding photographs of human remains or to train, supervise, investigate, or discipline personnel related to the taking and sharing of photos of human remains without any legitimate governmental purpose.

84.     Based on the facts set forth above, the Sheriff's Department and Fire Department were on actual and/or constructive notice that the absence of a policy regarding photographs of human remains would likely result in violations of community members' constitutional rights.

85.     The actions of Sheriff's Department and Fire Department personnel, including but not limited to the Deputy Defendants, reflect the pattern of practice and/or custom of the Sheriff's Department and Fire Department, as evidenced by the fact that the misconduct was not limited to a lone employee.  Rather, multiple members of the Sheriff's Department and Fire Department took and shared photos of the Bryants' remains without any legitimate governmental purpose.  In addition, Sheriff Villanueva, whose entire career in law enforcement has been with the Sheriff's Department, has stated based on personal knowledge that unnecessary death images are a widespread problem in law enforcement.

86.     As a direct and proximate result of the Sheriff's Department's, Fire Department's, and the County's failure to establish a policy regarding photographs of human remains or to train, supervise, investigate, or discipline its employees regarding unnecessary death images, as well as the Sheriff's and Fire Departments' pattern of practice and/or custom of unnecessarily taking and sharing death images, Plaintiff has suffered (and continues to suffer) severe emotional distress in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### Negligence

### (Against the Deputy Defendants)

87.     Plaintiff incorporates herein and realleges the allegations in paragraphs 1 through 86, inclusive, as if fully set forth herein.

88.     Pursuant to California Government Code section 820(a), public employees are liable for injuries caused by their acts or omissions to the same extent as a private person.

89.     The Deputy Defendants owed a duty to Plaintiff to use ordinary care in their treatment of the Bryants' physical remains, including an obligation to refrain from taking and/or sharing images of them for personal, non-law-enforcement

- 33 -

purposes. Cal. Civ. Code § 1714. The Deputy Defendants additionally owed a duty to Plaintiff to use ordinary care in preventing dissemination of any images of the Bryants' remains once the images were created and/or were within their possession.

90. The Deputy Defendants breached their duties to Plaintiff by sharing photos of the Bryants' physical remains for personal, non-law-enforcement purposes, including by electronic transmission and with members of the public.

91. The Deputy Defendants foresaw or should have foreseen that their conduct described above would injure Plaintiff.

92. As a direct and proximate result of the Deputy Defendants' conduct, Plaintiff has suffered (and continues to suffer) severe emotional distress in an amount to be proven at trial.

93. In committing the acts alleged herein, the Deputy Defendants are guilty of oppression, fraud, and/or malice within the meaning of California Civil Code section 3294, entitling Plaintiff to punitive or exemplary damages in an amount appropriate to punish the Doe Defendants and to make an example of them to the community.

### THIRD CAUSE OF ACTION

### Negligence

### (Against the Entity Defendants)

94. Plaintiff incorporates herein and realleges the allegations in paragraphs 1 through 93, inclusive, as if fully set forth herein.

95. Members of the Sheriff's Department, including but not limited to the Deputy Defendants, and members of the Fire Department owed a duty to Plaintiff to use ordinary care in their treatment of the Bryants' physical remains, including an obligation to refrain from taking and/or sharing images of them for personal, non-law-enforcement purposes. Cal. Civ. Code § 1714. Members of the Sheriff's Department, including but not limited to the Deputy Defendants, and members of the Fire Department also owed a duty to Plaintiff to use ordinary care in preventing

dissemination of any images of the Bryants' remains once the images were created and/or were within their possession.

96.     Multiple members of the Sheriff's Department, including but not limited to the Deputy Defendants, breached their duties to Plaintiff by taking and/or sharing photos of the Bryants' physical remains for personal, non-law-enforcement purposes, including by electronic transmission and with members of the public. These members of the Sheriff's Department foresaw or should have foreseen that their conduct would injure Plaintiff.

97.     Similarly, multiple members of the Fire Department breached their duties to Plaintiff by taking and/or sharing photos of the Bryants' physical remains without any legitimate governmental purpose.  These members of the Fire Department foresaw or should have foreseen that their conduct would injure Plaintiff.

98.     As a direct and proximate result of the conduct described above, Plaintiff has suffered (and continues to suffer) severe emotional distress in an amount to be proven at trial.

99.     Pursuant to California Government Code section 815.2, the Sheriff's Department, the Fire Department, and the County are liable for injuries proximately caused by acts or omissions of their employees within the scope of their employment.  At all times material, the Deputy Defendants and other members of the Sheriff's Department who took and/or shared photos of the Bryants' remains for personal, non-law-enforcement purposes were employed by the Sheriff's Department and were under the Department's direction and control when they engaged in the conduct described above.  Further, at all times material, members of the Fire Department who took and/or shared photos of the Bryants' remains without any legitimate governmental purpose were employed by the Fire Department and were under the Fire Department's direction and control when they engaged in the conduct described above.  These members of the Sheriff's and Fire Departments

were able to take photos of the Bryants' physical remains by virtue of their access to the crash site while on duty, and Sheriff's and Fire Department personnel who shared the photos without any legitimate purpose had access to them by virtue of their employment with the Sheriff's and Fire Departments, respectively.  Hence, the actions described above were taken within the course and scope of the individuals' employment, and the Sheriff's Department, the Fire Department, and the County are liable for their negligent and wrongful conduct.

## FOURTH CAUSE OF ACTION

### Invasion of Privacy

### (Against ▇▇▇▇▇▇)

100.   Plaintiff incorporates herein and realleges the allegations in paragraphs 1 through 99, inclusive, as if fully set forth herein.

101.   Plaintiff has a privacy interest in the physical remains of her loved ones, Kobe and Gianna Bryant.

102.   Upon information and believe, Defendant ▇▇▇▇▇ disclosed photos of the Bryants' remains to multiple members of the public, both in person and electronically.

103.   Sharing photos of accident victims' physical remains without any legitimate governmental purpose is offensive and objectionable to a reasonable person of ordinary sensibilities.

104.   At the time Defendant ▇▇▇ shared the photos of the Bryants' remains, no photos of their remains had otherwise been made public, and details about the state of the victims' remains were not public knowledge.  Sharing the graphic facts disclosed by the photos served no legitimate public purpose.

105.   As a direct and proximate result of the conduct of Defendant ▇▇▇ Plaintiff has suffered (and continues to suffer) severe emotional distress in an amount to be proven at trial.

106.   Pursuant to California Government Code section 820(a), Deputy ███ is liable for injuries caused by their acts or omissions to the same extent as a private person.

107.   In committing the acts alleged herein, Deputy ███ is guilty of oppression, fraud, and/or malice within the meaning of California Civil Code section 3294, entitling Plaintiff to punitive or exemplary damages in an amount appropriate to punish Defendant ███ and to make an example of him to the community.

## FIFTH CAUSE OF ACTION

### Invasion of Privacy

### (Against the Entity Defendants)

108.   Plaintiff incorporates herein and realleges the allegations in paragraphs 1 through 107, inclusive, as if fully set forth herein.

109.   Plaintiff has a privacy interest in the physical remains of her loved ones, Kobe and Gianna Bryant.

110.   Upon information and believe, members of the Sheriff's Department, including but not limited to the Deputy Defendants, disclosed photos of the Bryants' remains to multiple members of the public, both in person and electronically.

111.   Sharing photos of accident victims' physical remains without any legitimate governmental purpose is offensive and objectionable to a reasonable person of ordinary sensibilities.

112.   At the time that members of the Sheriff's Department, including but not limited to the Deputy Defendants, shared the photos of the Bryants' remains, no photos of their remains had otherwise been made public, and details about the state of the victims' remains were not public knowledge.  Sharing the graphic facts disclosed by the photos served no legitimate public purpose.

113.   As a direct and proximate result of members of the Sheriff's Department publicly disclosing photos of the Bryants' remains without any

legitimate governmental purpose, Plaintiff has suffered (and continues to suffer) severe emotional distress in an amount to be proven at trial.

114.   Pursuant to California Government Code section 815.2, the Sheriff's Department and the County are liable for injuries proximately caused by acts or omissions of their employees within the scope of their employment.  At all times material, the Deputy Defendants and other members of the Sheriff's Department who publicly disclosed photos of the Bryants' remains were employed by the Sheriff's Department and were under the Department's direction and control when they engaged in the conduct described above.  These members of the Department were able to take photos of Kobe and Gianna Bryant's physical remains by virtue of their access to the crash site while on duty, and Sheriff's Department personnel who shared the photos had access to them by virtue of their employment with the Department.  The acts of these members of the Department were committed within the course and scope of their employment, and the Sheriff's Department and County are liable for their negligent and wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following relief:

1.   For compensatory damages in an amount to be proven at trial;

2.   For any additional general, specific, consequential, or incidental damages in an amount to be proven at trial;

3.   For nominal damages;

4.   For punitive damages against the Deputy Defendants in an amount appropriate to punish them and make an example of them to the community;

5.   For an award that Defendants pay all of Plaintiff's costs and attorneys' fees;

6.   For all interest, as permitted by law; and

7.   For such other relief as the Court deems just and proper.

DATED:  February <mark>XX</mark>, 2021

Respectfully submitted,
MUNGER, TOLLES & OLSON LLP

By: _____
                    LUIS LI

Attorneys for Plaintiff Vanessa Bryant

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff demands a trial by jury on all issues triable by jury.

DATED:  February XX, 2021

Respectfully submitted,
MUNGER, TOLLES & OLSON LLP


By: _____
                          LUIS LI

Attorneys for Plaintiff Vanessa Bryant

Case No. 2:20-cv-09582-JFW-E

# Exhibit 1



CTPS-110-11-00000-Tube 8　Coordinate 49-3　8496-1000412　9486-43 N 80　9486-30 X 128

BY SIB STAFF / FEBRUARY 28, 2020

The Sheriff's Department is aware of recent media reports alleging deputies shared images from the January 26th, 2020 helicopter crash, which tragically claimed the lives of nine people. The facts surrounding these allegations are currently under investigation, as are the effectiveness of existing policies and procedures. The Sheriff is deeply disturbed at the thought deputies could allegedly engage in such an insensitive act. A thorough investigation will be conducted by the Department, with the number one priority of protecting the dignity and privacy of the victims and their families.

-Los Angeles County Sheriff's Department

Ask LASD Bot

# Exhibit 2

# 5-09/475.00 Photographs/Recordings at Scenes Where Human Remains are Present

In the performance of their daily duties, Department members are entrusted to respond to scenes that are not accessible to the general public, often times where human remains are present, such as:

- Mass casualty incidents;
- Natural disasters;
- Homicides;
- Deputy/officer-involved shootings;
- Suicides;
- Traffic collisions;
- Train deaths; and
- Other non-criminal deaths.

The response by Department members is a valued and vital component of public safety in ongoing investigations. Information learned at these scenes, including any photographs/recordings taken, shall only be shared with or disclosed to the lead investigators or the investigator's supervisors, unless otherwise required by law.

In order to preserve the dignity and privacy of the deceased and their families, scenes where human remains are present shall only be photographed/recorded by Scientific Services Bureau or the Department of Medical Examiner (DME) personnel. Only when extenuating circumstances exist may Department members take photographs/recordings at the direction of the lead investigators or the investigator's supervisors. All photographs/recordings shall be taken on a Department-issued device, unless a personal device is used exclusively to photograph or record legitimate Department business (see MPP section 3-01/100.46, Use of Communication Devices).

Fatal traffic collisions investigated by Traffic Services Detail and/or station traffic investigators assigned to investigate fatal traffic collisions are allowed to photograph collisions scenes during the course of the investigation; however, the photographs shall be safeguarded in compliance with this policy, and/or any policies mentioned herein.

Any photograph, recording, or record produced by a Department member, whether captured on a Department issued device or personal device, shall be considered the sole property of the Department. Any unauthorized release or sharing is strictly prohibited.

Any digitally captured photographs/recordings, shall be disclosed to the assigned investigator or the investigator's supervisors. The Department member shall preserved the photographs/recordings pending the transfer of all related images for evidence storage by a trained Department member from the Fraud and Cyber Crimes Bureau, Technical Operations Crew, or Homicide Bureau, Body Worn Camera Unit.

Scene photographs/recordings taken or captured by Department members shall not, under any circumstances, be disclosed to anyone other than the lead investigators or the investigator's supervisors, unless otherwise required by law. If the investigation is being handled by an outside authority such as a

federal or state agency, photographs/recordings should be given to that agency only with the concurrence of the Department's lead investigator. The unauthorized sharing of photographs/recordings and/or scene information not only violates public trust but it also may subject the individual and the Department to civil liability. Scene information, especially photographs/recordings shall be guarded with the utmost respect to protect the integrity of the investigation.

Nothing in this policy precludes a Department member's obligation to activate their Department issued body worn camera pursuant to MPP section 3-06/200.08, Body Worn Cameras – Activation.

# Exhibit 3

## VOLUME 3   -   CHAPTER 1

## POLICY AND ETHICS

### 3-01/000.00  POLICY AND ETHICS

The function of this Department involves the responsibility for the protection of life and property and enforcement of the law.   Toward this end, all employees have an obligation to the public we serve to develop and maintain the highest ethical standards in both personal and official conduct.

The Policy and Ethics chapter outlines the Department's policies in these matters.   All employees shall conform with the provisions contained herein.

### 3-01/000.10  PROFESSIONAL CONDUCT

All Department members shall be held accountable for their utterances, writings, conduct, and visual representations, including electronic and web-based communications, when they conflict with Our Core Values, Our Mission, or Our Creed and personnel can reasonably be identified as Department members.   Personnel who cause undue embarrassment or damage the reputation of and/or erode the public's confidence in the Department shall be deemed to have violated this policy and shall be subject to counseling and/or discipline.

Unit commanders shall ensure copies of Our Mission, Our Core Values, and Our Creed are clearly and prominently displayed and maintained in the public lobbies of all Sheriff's Department facilities.

Unit Commanders shall ensure copies of Our Mission, Our Core Values, and Our Creed are clearly and prominently displayed and maintained within a high-traffic work area in all Sheriff's Department's facilities (e.g., briefing room) for viewing by assigned personnel.

Unit commanders shall routinely express to the members of their staff their expectations of acceptable conduct, including the tenets of the Core Values.   The message that shall be conveyed to each employee is, "You are part of something greater than yourself. Don't dishonor it!"

### 3-01/000.13  PROFESSIONAL CONDUCT - CORE VALUES

Members shall conduct themselves in a manner consistent with the Department's Core Values.   Members shall not ignore nor contradict the Department's Core Values. Examples of conduct inconsistent with the Department's Core Values include, but are not limited to, the following:

1. Conduct or behavior resulting from a situational outburst of emotion including, but not limited to, the use of profanity and/or other inappropriate, inconsiderate, and/or insensitive language, phrases, or terms of speech;
2. Conduct or behavior that demonstrates a bias, prejudice, and/or intolerance, or demonstrates a trend or pattern of undesirable and/or unprofessional behavior; and/or,
3. Conduct or behavior so egregious that it constitutes a severe and immediate threat to the integrity of the Department and/or jeopardizes the health, safety, and/or welfare of the public including, but not limited to, criminal misconduct of members, and/or the misuse of Department assets, resources, or intellectual property.

## 3-01/000.15  ELECTRONIC AND WEB-BASED COMMUNICATIONS

Electronic and web-based communications include any medium used to deliver information electronically or digitally.   Examples of electronic and web-based communications include, but are not limited to, websites, "smart" phone technologies, text messaging, Nixle, electronic mail (email) and "social media" sites such Facebook, Myspace, Pinterest, and Twitter; photo sharing websites such as Flickr; video sharing websites such as YouTube; and/or any other similar electronic or digital delivery system.

"Social media" includes any electronic medium where users may create, share, and view user-generated content, including uploading or downloading videos or still photographs, blogs, video blogs, podcasts, or instant messages, or online social networking content.

## 3-01/005.00  ACCOUNTABILITY

All Department members shall be held accountable to the Sheriff through the defined chain of command.

- accountability is the absolute obligation that all members be personally answerable for their individual actions.   It is the responsibility of all members to meet the standards of performance established for their positions.   Accountability is also a commitment to the Department and the public we serve;
- all members will be evaluated on their compliance with the Department's Manual of Policy and Procedures, all Division Directives in support of the Manual, statutory and case law, Our Mission Statement, Our Core Values statement and the Law Enforcement Code of Ethics; and
- supervisors, managers, Directors, and executives, both sworn and professional staff, will be held accountable for and evaluated on enforcement of the aforementioned areas as well as the procedures outlined in the Los Angeles County Fiscal Manual and the Los Angeles County Purchasing Policy Manual. Failure to adhere may subject violators to discipline.

**3-01/030.10  OBEDIENCE TO LAWS, REGULATIONS, AND ORDERS**

a) Members shall not willfully violate any federal statute, state law or local ordinance;
b) Members shall conform to and abide by the following:
   - Charter of Los Angeles County;
   - Los Angeles County Code; and
   - Rules of the Department of Human Resources;
c) Members shall obey and properly execute all lawful orders issued by any supervisor of higher rank or classification or who is officially acting in such capacity;
d) When assigned to duty with another member of the Department, an employee shall be subject to disciplinary action for any violation by the other member of any provision of this chapter unless the employee was unaware of the violation or unless the employee, if the situation permits safe and prudent action, attempts in good faith to prevent the violation and, at the earliest reasonable time, reports the violation to his supervisor;
e) Members who violate any rules, regulations, or policies of the Department or the County, shall be subject to disciplinary action.   The commission or omission of any other act contrary to good order and discipline shall also be the subject of disciplinary action;
f) Members who are arrested or detained for any offense, or named as a suspect, other than an infraction under the Vehicle Code, shall immediately notify their immediate supervisor or Watch Commander of the facts of the arrest or detention or allegation.

After business hours, if the member is unable to contact their immediate supervisor or Watch Commander at the Unit of Assignment, the member shall contact Sheriff's Headquarters Bureau and request immediate notification to their Unit Commander. The member shall provide details of the arrest or detention to Sheriff's Headquarters Bureau, including alleged charge(s), location, police agency jurisdiction, and return phone number where the member can be reached, for relay to the Unit Commander.   The Sheriff's Headquarters Bureau member receiving notification shall immediately notify the employee's Unit Commander.

The Unit Commander shall immediately notify Internal Affairs Bureau.   The employee's Unit Commander shall immediately respond to the member's location if the member is arrested and taken into custody.

According to the nature of the offense and in conformance with the rules of the Department of Human Resources, disciplinary action may result and may include, but is not limited to, the following:

- a reprimand (written);
- suspension without pay;
- reduction in rank; and/or

- dismissal from the Department.

NOTE:       For purposes of this section, any reference to "members" hall include any
            member of the Department, both sworn and professional staff.

## 3-01/030.13  RELATIONSHIPS AND MENTORING

The Los Angeles County Sheriff's Department believes our members are our most
valuable investment and precious resource.

Our Department's Core Values are intrinsic principles designed to underscore our belief
that regardless of rank or position, our members are, first and foremost, leaders in our
society.

As a community leader, our members assume a significant responsibility in protecting and
serving the public.   Consequently, high standards and high expectations are placed
upon the conduct of our members.   As a result, our members enjoy a considerable level
of trust.   In order to remain beneficiaries of the public trust, we must balance the rights of
our members with the responsibility to maintain the highest standards of professional and
personal conduct.

As a leader in the Los Angeles County Sheriff's Department, it is a fundamental
responsibility of every Department executive, manager, and/or supervisor to take an
active role in the performance of subordinates and develop ongoing strategies to
enhance their professional performance.

The Department and its members have an affirmative duty to intervene in the professional
performance of another member (or when a personal issue or behavior exposes the
Department or the member to risk) when it is determined to be in the best interest of the
member or the organization.   It is the intuitive, empathetic, and courageous leader who is
prepared to provide guidance, wisdom, and counsel to a colleague whose performance or
behavior demonstrates the need for intervention.

Intervention can take many forms.   We are fortunate to have the services of a wide range
of professionals who are ready to assist Department members. Employee Support
Services Bureau (ESSB), including the Chaplain Program, Peer Support Program, and
Counseling and Consulting Services, provides the foundation for early intervention
services.

The Performance Mentoring Program (PMP) is another proactive, early intervention
program designed to enhance a member's professional performance through guidance
and supervision when it is determined the member may benefit from a more structured
plan.   Supervisors and managers carefully monitor the employee's progress to ensure
they remain effective and productive members of the Department.

the General Public and the Media" and "Dissemination of Criminal Record Information" as detailed in the Miscellaneous Administrative Procedures chapter.


### 3-01/100.46   USE OF PERSONAL COMMUNICATION DEVICES

Absent extenuating circumstances, members shall not use a personal cellular telephone or other similar personal communication/recording device for a Department-related business purpose (i.e., coordinating field units to a radio call, contacting a victim or witness) when an established, Department-authorized communication device/system is available and/or a Department-authorized regulation/protocol has been established (e.g., Department radio/communications systems, field supervisor's cellular telephone, Station telephone, etc.).

NOTE:        This prohibition shall apply to the use of the cellular telephone for both voice communications as well as data (text) communications.

Members shall not use a personal cellular telephone or any other similar personal communication or recording device to record, store, document, catalog, transmit, and/or forward any image, document, scene, or environment captured as a result of their employment and/or while performing official Department business that is not available or accessible to the general public.   Official Department business shall include, but is not limited to, confidential, sensitive, or copyrighted information that is printed, audio recorded, photographed, or video recorded; information related to any past, present, or anticipated criminal, civil, or administrative investigation, including reports, declarations, evidence, photographs, videos, or audio recordings; and/or, photographs of suspects, arrestees, defendants, evidence, or crime scenes.

NOTE:        A personal cellular telephone or any other similar personal communication or recording device used exclusively to record contacts with members of the public during legitimate Department business (e.g., traffic stops, etc.) are exempt from the provisions of this section.


### 3-01/100.50   DIVISION OR UNIT MANUAL

Unit Commanders shall establish procedural manuals for their respective commands. These manuals shall not be in conflict with the Department manual and the subject matter shall be limited to procedures involving only the specific command or Division.


### 3-01/100.55   UNIT COMMANDERS' CHANGE OF COMMAND RESPONSIBILITIES

Unit Commanders shall complete the Department Change of Command (SH-AD-601) when assuming a new or transfer of command situation.   During a transfer of command, it shall be the responsibility of both the outgoing and incoming Unit Commander to be

# Exhibit 4

# MUNGER, TOLLES & OLSON LLP

RONALD L. OLSON
ROBERT E. DENHAM
CARY B. LERMAN
GREGORY P. STONE
BRAD D. BRIAN
BRADLEY S. PHILLIPS
GEORGE M. GARVEY
WILLIAM D. TEMKO
JOHN W. SPIEGEL
DONALD B. VERRILLI, JR. *
TERRY E. SANCHEZ
STEVEN M. PERRY
MARK B. HELM
JOSEPH D. LEE
MICHAEL R. DOYEN
MICHAEL E. SOLOFF
GREGORY D. PHILLIPS
KATHLEEN M. M°DOWELL
GLENN D. POMERANTZ
THOMAS B. WALPER
HENRY WEISSMANN
KEVIN S. ALLRED
JEFFREY A. HEINTZ
JUDITH T. KITANO
JEROME C. ROTH
GARTH T. VINCENT
TED DANE
STUART N. SENATOR
MARTIN D. BERN
ROBERT L. DELL ANGELO
BRUCE A. ABBOTT
JONATHAN E. ALTMAN
KELLY M. KLAUS
DAVID B. GOLDMAN
DAVID H. FRY
LISA J. DEMSKY
MALCOLM A. HEINICKE
TAMERLIN J. GODLEY
JAMES C. RUTTEN
RICHARD ST. JOHN
ROHIT K. SINGLA
LUIS LI
CAROLYN HOECKER LUEDTKE
C. DAVID LEE
MARK H. KIM
BRETT J. RODDA
FRED A. ROWLEY, JR
KATHERINE M. FORSTER
BLANCA FROMM YOUNG
ROSEMARIE T. RING
MELINDA EADES LEMOINE

SETH GOLDMAN
GRANT A. DAVIS-DENNY
JONATHAN H. BLAVIN
DANIEL B. LEVIN
MIRIAM KIM
MISTY M. SANFORD
HAILYN J. CHEN
BETHANY W. KRISTOVICH
JACOB S. KREILKAMP
JEFFREY Y. WU
LAURA D. SMOLOWE
ANJAN CHOUDHURY
KYLE W. MACH
HEATHER E. TAKAHASHI
ERIN J. COX
BENJAMIN J. HORWICH
E. MARTIN ESTRADA
MATTHEW A. MACDONALD
BRYAN H. HECKENLIVELY
ELAINE J. GOLDENBERG·
MARK R. YOHALEM
CHAD GOLDER°
GINGER D. ANDERS·
MARGARET G. MARASCHINO
JOHN M. GILDERSLEEVE
ADAM B. WEISS
GEORGE CLAYTON FATHEREE, III
KELLY L. C. KRIEBS
JEREMY A. LAWRENCE
LAURA K. LIN
ACHYUT J. PHADKE
ZACHARY M. BRIERS
JENNIFER M. BROSOR
KURUVILLA J. OLASA
JUSTIN P. RAPHAEL
ROSE LEDA EHLER
ERIC P. TUTTLE
JOHN W. BERRY
ROBYN K. BACON
KENNETH H. TRUJILLO-JAMSON
JORDAN D. SEGALL
WESLEY T. L. BURRELL
KAREN A. LORANG
CRAIG A. LAVOIE
JOSHUA S. MELTZER
ADAM P BARRY
JENNIFER L. BRYANT
ANDREW CATH RUBENSTEIN
HANNAH L. DUBINA

350 SOUTH GRAND AVENUE
FIFTIETH FLOOR
LOS ANGELES, CALIFORNIA 90071-3426
TELEPHONE (213) 683-9100
FACSIMILE (213) 687-3702

———

560 MISSION STREET
TWENTY-SEVENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-3089
TELEPHONE (415) 512-4000
FACSIMILE (415) 512-4077

———

1155 F STREET N.W.
SEVENTH FLOOR
WASHINGTON, D.C. 20004-1361
TELEPHONE (202) 220-1100
FACSIMILE (202) 220-2300

NICHOLAS D. FRAM
JOHN L. SCHWAB
ASHLEY D. KAPLAN
JESSICA REICH BARIL
JULIANA M. YEE
JEREMY K. BEECHER
MATTHEW K. DONOHUE
EMILY CURRAN-HUBERTY
JORDAN X. NAVARETTE
JOHN B. MAJOR
LAUREN C. BARNETT
C. HUNTER HAYES
TREVOR N. TEMPLETON
SHYLAH D. BROOKS
ELIZABETH R. DYER
SARAH S. LEE
ELIZABETH A. KIM
LAURA M. LOPEZ
MICHAEL C. BAKER
SARAH G. BOYCE·
ADELE M. EL-KHOURI·
COLIN A. DEVINE
DANE P. SHIKMAN
LEXI PEACOCK
MAGGIE THOMPSON
SAMUEL H. ALLEN
ALLISON M. DAY
GIOVANNI S. SAARMAN GONZÁLEZ
JONATHAN S. MELTZER·
SAMUEL JOSÉ DÍAZ
LAUREN M. HARDING
NEFI D. ACOSTA
STEPHANIE G. HERRERA
TERESA RECIO DIPPO
DANIEL BENYAMIN
SARA A. MCDERMOTT
J. MAX ROSEN
RACHEL G. MILLER-ZIEGLER°
ALISON F. KAROL SIGURDSSON
ANNE K. CONLEY
GRAHAM B. COLE
KATHERINE G. INCANTALUPO
DAVID P. THORESON
DAVID W. MORESHEAD
ANDRE W. BREWSTER III

TERRA D. LAUGHTON
ROWLEY J. RICE
JEREMY S. KREISBERG°
JOHN D. MAHER
GINA F. ELLIOTT
BRANDON R. TEACHOUT
SEGUN I. BABATUNDE II
CARSON C. ZHENG
LUCAS J. ARTAIZ
USHA CHILUKURI VANCE
BRIAN J. SPRINGER
TYLER HILTON
VINCENT LING
ALEXANDER S. GORIN
BRENDAN GANTS°
MARKUS BRAZILL
MARI T. SAIGAL
LAUREN T. ROSS*
ZOE BEDELL*
BEN BARDKHI
ABE DYK
MICHELE C. NIELSEN
MARIANNA MAO
OMAR H. NOURELDIN
STEPHEN MYLAS
ARIEL TESHUVA
SHANNON GALVIN AMINIRAD
NATALIE KARL
BRANDON MARTINEZ
ANTHONY J. RAMIREZ
ANDREW LEWIS
CARRIE C. LITTEN
ESTALYN S. MARQUIS

OF COUNSEL

ROBERT K. JOHNSON
PATRICK J. CAFFERTY, JR.
PETER A. DETRE
ALLISON B. STEIN
BRAD SCHNEIDER
PETER E. GRATZINGER
JENNY H. HONG
KIMBERLY A. CHI
DAVID S. HONG
ADAM R. LAWTON
MATTHEW S. SCHONHOLZ
MICHAEL E. GREANEY

———

E. LEROY TOLLES
(1922-2008)

*ADMITTED IN D.C.
ALL OTHERS ADMITTED IN CA

March 2, 2020

Writer's Direct Contact
(213) 683-9205
(213) 683-4005 FAX
luis.li@mto.com

**Via FedEx and Electronic Mail**

Sheriff Alex Villanueva
c/o Elizabeth D. Miller, Assistant County Counsel
Office of the County Counsel
County of Los Angeles
Kenneth Hahn Hall of Administration
500 West Temple Street #648
Los Angeles, CA 90012
emiller@counsel.lacounty.gov

Re:     Dissemination of Photos of January 26, 2020 Helicopter Crash Scene

Dear Sheriff Villanueva:

We, along with Robb & Robb LLC, represent Vanessa Bryant in all of her legal claims arising out of the helicopter crash that killed her husband, Kobe, and her daughter, Gianna. We write in regards to disturbing and distressing reports that Los Angeles County sheriff deputies have shared graphic photos of the January 26, 2020 helicopter crash that killed nine victims, including Kobe and Gianna Bryant. These reports indicate that photos of the crash scene and the victims' remains have been shared by sheriff deputies in settings "that had nothing to do with the investigation of the crash," and that the sharing of these photos was "a topic of discussion" among first responders in the days following the crash. (*See* Alene Tchekmedyian & Paul Pringle, *L.A. County deputies shared graphic photos of Kobe Bryant crash scene, sources say*, L.A. Times (Feb. 28, 2020), *available at* https://www.latimes. com/california/story/2020-02-27/kobe-bryant-photos-lost-hills-sheriff-deputies.)

Additional reporting has indicated that, upon becoming aware that unauthorized crash-scene photographs had been taken and shared for no official purpose, the Sheriff's Office offered informal immunity to the transgressors, potentially tainting a proper review of this matter. (*See* TMZ.com, *Kobe Bryant Crash Site Pics; Sheriff's Dept. Attempted Cover-Up; Come Clean & You're Safe* (Feb. 29, 2020), *available at* https://www.tmz.com/2020/02/29/kobe-bryant-crash-pictures-remains-deputies-delete-cover-up-sheriffs-department/.)

These reports are deeply distressing to Mrs. Bryant and her family, who have already endured the unimaginable loss of their loved ones. The public dissemination of photos of the victims' remains would only worsen the family's pain and suffering.

We formally request that the Sheriff's Department take immediate action to secure all photos and videos of the January 26, 2020 crash scene in the Sheriff's Department's possession, whether taken in official capacity or not, including any photos or videos in the possession of or disseminated by Sheriff's Department personnel. We further request that the Sheriff's Department conduct an Internal Affairs investigation to determine the extent of the unauthorized taking and dissemination of photos and the identities of the deputies or other personnel involved.

In addition, please promptly provide us a copy of any and all complaints received by your Office regarding the unauthorized taking or sharing of crash-scene photos[1] and provide answers in writing regarding (i) all steps the Sheriff's Department has taken to ensure all photos of the crash scene have been secured; (ii) whether the Department has initiated an investigation into this matter and when the investigation is expected to conclude; (iii) the names of all Sheriff's Department personnel who shared photos of the crash scene; and (iv) whether the Sheriff's Department has terminated, suspended, or otherwise disciplined said personnel for their actions. We expect that such egregious violations of policy and decency will result in the most severe discipline.

The Sheriff's Department and its personnel owe a duty of care to victims' families to refrain from publicly disseminating photos of victims' remains, given the potential for exploitation, Internet sensationalism, and the foreseeable agony such dissemination would inflict. *Catsouras v. Dept. of Cal. Highway Patrol*, 181 Cal. App. 4th 856, 886, 888 (2010). The unauthorized dissemination of photos of victims' remains could give rise to liability for, among other things, invasion of privacy, negligence, negligent or intentional infliction of emotional distress, and negligent supervision or retention. We fully intend to hold the Sheriff's Department and its personnel accountable for any harm caused by the unauthorized taking or dissemination of photos.

---

[1] *See* TMZ.com, *Kobe Bryant Helicopter Crash; Irate Bartender Busts Sheriff's Deputies… Who Shared Gruesome Crash Photos* (Feb. 28, 2020), *available at* https://www.tmz.com/2020/02/28/la-county-sheriff-kobe-bryant-crash-site-photos/.

Los Angeles County Sheriff's Department
March 2, 2020
Page 3

     Our client and we are presently evaluating all of her legal options relative to this matter. She reserves all rights.

Sincerely,

Luis Li

cc:    Brad D. Brian
       Gary Robb
       Anita Robb

# Exhibit 5

RONALD L. OLSON
ROBERT E DENHAM
JEFFREY I. WEINBERGER
CARY B. LERMAN
GREGORY P. STONE
BRAD D. BRIAN
BRADLEY S. PHILLIPS
GEORGE M. GARVEY
WILLIAM D. TEMKO
JOHN W. SPIEGEL
DONALD B. VERRILLI, JR. *
TERRY E. SANCHEZ
STEVEN M. PERRY
MARK B. HELM
JOSEPH D. LEE
MICHAEL R. DOYEN
MICHAEL E. SOLOFF
GREGORY D. PHILLIPS
KATHLEEN M. MCDOWELL
GLENN D. POMERANTZ
THOMAS B. WALPER
HENRY WEISSMANN
KEVIN S. ALLRED
JEFFREY A. HEINTZ
JUDITH T. KITANO
JEROME C. ROTH
GARTH T. VINCENT
TED DANE
STUART N. SENATOR
MARTIN D. BERN
ROBERT L. DELL ANGELO
BRUCE A. ABBOTT
JONATHAN E. ALTMAN
KELLY M. KLAUS
DAVID B. GOLDMAN
DAVID H. FRY
LISA J. DEMSKY
MALCOLM A. HEINICKE
TAMERLIN J. GODLEY
JAMES C. RUTTEN
RICHARD ST. JOHN
ROHIT K. SINGLA
LUIS LI
CAROLYN HOECKER LUEDTKE
C. DAVID LEE
MARK H. KIM
BRETT J. RODDA
FRED A. ROWLEY, JR
KATHERINE M. FORSTER
BLANCA FROMM YOUNG
ROSEMARIE T. RING
MELINDA EADES LEMOINE

SETH GOLDMAN
GRANT A. DAVIS-DENNY
JONATHAN H. BLAVIN
DANIEL B. LEVIN
MIRIAM KIM
MISTY M. SANFORD
HAILYN J. CHEN
BETHANY W. KRISTOVICH
JACOB S. KREILKAMP
JEFFREY Y. WU
LAURA D. SMOLOWE
ANJAN CHOUDHURY
KYLE W. MACH
HEATHER E. TAKAHASHI
ERIN J. COX
BENJAMIN J. HORWICH
E. MARTIN ESTRADA
MATTHEW A. MACDONALD
BRYAN H. HECKENLIVELY
ELAINE J. GOLDENBERG*
MARK R. YOHALEM
CHAD GOLDER*
GINGER D. ANDERS*
MARGARET G. MARASCHINO
JOHN M. GILDERSLEEVE
ADAM B. WEISS
GEORGE CLAYTON FATHEREE, III
KELLY L. C. KRIEBS
JEREMY A. LAWRENCE
LAURA K. LIN
ACHYUT J. PHADKE
ZACHARY M. BRIERS
JENNIFER M. BRIDGER
KURUVILLA J. OLASA
JUSTIN P. RAPHAEL
ROSE LEDA EHLER
ERIC P. TUTTLE
JOHN W. BERRY
ROBYN K. BACON
KENNETH M. TRUJILLO-JAMISON
JORDAN D. SEGALL
WESLEY T. L. BURRELL
KAREN A. LORANG
CRAIG A. LAVOIE
JOSHUA S. MELTZER
ADAM P. BARRY
JENNIFER L. BRYANT
ANDREW CATH RUBENSTEIN
HANNAH L. DUBINA

NICHOLAS D. FRAM
JOHN L. SCHWAB
ASHLEY D. KAPLAN
JESSICA REICH BARIL
JULIANA M. YEE
JEREMY K. BEECHER
MATTHEW K. DONOHUE
EMILY CURRAN-HUBERTY
JORDAN X. NAVARETTE
JOHN B. MAJOR
LAUREN C. BARNETT
C. HUNTER HAYES
TREVOR N. TEMPLETON
SKYLAR D. BROOKS
ELIZABETH R. DYER
SARAH S. LEE
ELIZABETH A. KIM
LAURA H. LOPEZ
MICHAEL C. BAKER
SARAH G. BOYCE*
ADELE M. EL-KHOURI*
COLIN A. DEVINE
DANE P. SHIKMAN
LEXI PEACOCK
MAGGIE THOMPSON
SAMUEL H. ALLEN
ALLISON M. DAY
GIOVANNI S. SAARMAN GONZÁLEZ
JONATHAN S. MELTZER*
SAMUEL JOSÉ DÍAZ
LAUREN M. HARDING
NEFI D. ACOSTA
STEPHANIE G. HERRERA
TERESA REED IPPEN
DANIEL BENYAMIN
SARA A. MCDERMOTT
J. MAX ROSEN
RACHEL G. MILLER-ZIEGLER*
ALISON F. KAROL SIGURDSSON
ANNE K. CONLEY
GRAHAM B. COLE
KATHERINE G. INCANTALUPO
DAVID P. THORESON
DAVID W. MOREsHEAD
ANDREW W. BREWSTER III

TERRA D. LAUGHTON
ROWLEY J. RICE
JEREMY S. KREISBERG*
JOHN D. MAHER
GINA T. ELLIOTT
BRANDON R. TEACHOUT
SEGUN BABATUNDE II
CARSON C. ZHENG
LUCAS J. ARTIAZ
USHA CHILUKURI VANCE
BRIAN J. SPRINGER
TYLER HILTON
VINCENT LING
ALEXANDER S. GORIN
BRENDAN GANTS*
MARKUS BRAZILL
MARI T. SAIGAL
LAUREN T. ROSS*
ZOE BEDELL*
BEN BAROKH
ABE DYK
MICHELE C. NIELSEN
MARIANNA MAO
OMAR H. NOURELDIN
STEPHEN HYLAS
ARIEL TESHUVA
SHANNON GALVIN AMINIRAD
NATALIE KARL
BRANDON MARTINEZ
ANTHONY J. RAMIREZ
ANDREW LEWIS
CARRIE C. LITTEN
ESTALYN S. MARQUIS

OF COUNSEL

ROBERT K. JOHNSON
PATRICK J. CAFFERTY, JR.
PETER A. DETRE
ALLISON B. STEIN
BRAD SCHNEIDER
PETER E. GRATZINGER
JENNY H. HONG
KIMBERLY A. CHI
DAVID S. HONG
ADAM R. LAWTON
MATTHEW S. SCHONHOLZ
MICHAEL E. GREANEY

E. LEROY TOLLES
(1922-2008)

*ADMITTED IN DC
ALL OTHERS ADMITTED IN CA

350 SOUTH GRAND AVENUE

FIFTIETH FLOOR

LOS ANGELES, CALIFORNIA 90071-3426

TELEPHONE (213) 683-9100

FACSIMILE (213) 687-3702

———

560 MISSION STREET

TWENTY-SEVENTH FLOOR

SAN FRANCISCO, CALIFORNIA 94105-3089

TELEPHONE (415) 512-4000

FACSIMILE (415) 512-4077

———

1155 F STREET N.W.

SEVENTH FLOOR

WASHINGTON, D.C. 20004-1361

TELEPHONE (202) 220-1100

FACSIMILE (202) 220-2300

March 2, 2020

Writer's Direct Contact
(213) 683-9205
(213) 683-4005 FAX
luis.li@mto.com

**Via FedEx and Electronic Mail**

Daryl L. Osby, Fire Chief
Los Angeles County Fire Department
c/o Mary Wickham, Los Angeles County Counsel
Office of the County Counsel
County of Los Angeles
Kenneth Hahn Hall of Administration
500 West Temple Street #648
Los Angeles, CA 90012
mwickham@counsel.lacounty.gov

  Re: Dissemination of Photos of January 26, 2020 Helicopter Crash Scene

Dear Chief Osby:

  We, along with Robb & Robb LLC, represent Vanessa Bryant in all of her legal claims arising out of the helicopter crash that killed her husband, Kobe, and her daughter, Gianna. We write in regards to disturbing and distressing reports that Los Angeles County firefighters have shared graphic photos of the January 26, 2020 helicopter crash that killed nine victims, including Kobe and Gianna Bryant. These reports indicate that photos of the crash scene have been "passed around" by firefighters for no official purpose. (*See* CBS Los Angeles, *Report: Firefighters Also Shared Graphic Images From Scene of Helicopter Crash That Killed Kobe Bryant* (Feb. 28, 2020), *available at* https://losangeles.cbslocal.com/video/4467516-report-firefighters-also-shared-graphic-images-from-scene-of-helicopter-crash-that-killed-kobe-bryant/;

TMZ.com, *Kobe Bryant Helicopter Crash; Irate Bartender Busts Sheriff's Deputies… Who Shared Gruesome Crash Photos* (Feb. 28, 2020), *available at* https://www.tmz.com/2020/02/28/la-county-sheriff-kobe-bryant-crash-site-photos/.)

These reports are deeply distressing to Mrs. Bryant and her family, who have already endured the unimaginable loss of their loved ones. The public dissemination of photos of the victims' remains would only worsen the family's pain and suffering.

We formally request that the Fire Department take immediate action to secure all photos and videos of the January 26, 2020 crash scene in the Fire Department's possession, whether taken in official capacity or not, including any photos or videos in the possession of or disseminated by Fire Department personnel. We further request that the Fire Department conduct an investigation to determine the extent of the unauthorized taking and dissemination of photos and the identities of the firefighters or other personnel involved.

In addition, please promptly provide us a copy of any and all complaints received by your Office regarding the unauthorized taking or sharing of crash-scene photos and provide answers in writing regarding (i) all steps the Fire Department has taken to ensure all photos of the crash scene have been secured; (ii) whether the Department has initiated an investigation into this matter and when the investigation is expected to conclude; (iii) the names of all Fire Department personnel who shared photos of the crash scene; and (iv) whether the Fire Department has terminated, suspended, or otherwise disciplined said personnel for their actions. We expect that such egregious violations of policy and decency will result in the most severe discipline.

The Fire Department and its personnel owe a duty of care to victims' families to refrain from publicly disseminating photos of victims' remains, given the potential for exploitation, Internet sensationalism, and the foreseeable agony such dissemination would inflict. *Catsouras v. Dept. of Cal. Highway Patrol*, 181 Cal. App. 4th 856, 886, 888 (2010). The unauthorized dissemination of photos of victims' remains could give rise to liability for, among other things, invasion of privacy, negligence, negligent or intentional infliction of emotional distress, and negligent supervision or retention. We fully intend to hold the Fire Department and its personnel accountable for any harm caused by the unauthorized taking or dissemination of photos.

Our client and we are presently evaluating all of her legal options relative to this matter. She reserves all rights.

Sincerely,

Luis Li

CC:    Brad D. Brian
       Gary Robb
       Anita Robb

# Exhibit 6

MUNGER, TOLLES & OLSON LLP

350 SOUTH GRAND AVENUE
FIFTIETH FLOOR
LOS ANGELES, CALIFORNIA 90071-3426
TELEPHONE (213) 683-9100
FACSIMILE (213) 687-3702

———

560 MISSION STREET
TWENTY-SEVENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-3089
TELEPHONE (415) 512-4000
FACSIMILE (415) 512-4077

———

1155 F STREET N.W.
SEVENTH FLOOR
WASHINGTON, D.C. 20004-1361
TELEPHONE (202) 220-1100
FACSIMILE (202) 220-2300

March 8, 2020

Writer's Direct Contact
(213) 683-9205
(213) 683-4005 FAX
luis.li@mto.com

**Via FedEx and Electronic Mail**

Sheriff Alex Villanueva
c/o Elizabeth D. Miller, Assistant County Counsel
Office of the County Counsel
County of Los Angeles
Kenneth Hahn Hall of Administration
500 West Temple Street #648
Los Angeles, CA 90012
emiller@counsel.lacounty.gov

Re:   Dissemination of Photos of January 26, 2020 Helicopter Crash Scene

Dear Sheriff Villanueva:

We write to follow up on our March 2 letter, to which we have not yet received a response.

Since we last wrote, additional disturbing reports have emerged regarding sheriff's deputies sharing unauthorized photographs of the crash scene and the victims' remains. You have publicly stated that at least *eight* deputies took illicit photos, and news outlets have reported that the photos have been sent to people outside the Sheriff's Department. Reports also indicate that the Department knew of its deputies' misconduct as early as January 29, when a citizen filed a complaint notifying the Department. Yet the Department did not inform the victims' families until the L.A. Times was poised to report on the misconduct nearly five weeks later.

MUNGER, TOLLES & OLSON LLP

Los Angeles County Sheriff's Department
March 8, 2020
Page 2

The Department's response to the misconduct also has been deeply troubling.  According to reports by the L.A. Times, Department leadership "tried to keep a lid" on the potential scandal by deviating from "normal investigative protocols."[1]  Reports further indicate that, rather than formally investigate, Department leadership told the deputies that if they "came clean and deleted the photos, they would not face any discipline."[2]  Indeed, the Department appears to have initiated a formal investigation only *after* news of the deputies' misconduct became public.  Once news of the misconduct broke, you told news outlets that the Department does not have a policy addressing deputies using their personal cellphones to take photos of accident scenes, even though the Department's policy on use of communication devices prohibits precisely that.  (Policy 3-01/100.46, Los Angeles County Sheriff's Department Manual of Policy and Procedures, *available at* http://pars.lasd.org/Viewer/Manuals/10008/Content/10426 ("Members shall not use a personal cellular telephone . . . to record, store, document, catalog, transmit, and/or forward any image . . .  captured as a result of their employment and/or while performing official Department business that is not available or accessible to the general public.").)

All of this leaves Mrs. Bryant with substantial uncertainty as to whether the misconduct was truly limited to eight deputies and whether the photographs of her husband's and daughter's remains (or copies of them that may have been shared with others or stored online) will become public.  Mrs. Bryant deserves to know whatever the Department knows regarding these questions.  To that end, we ask on Mrs. Bryant's behalf that you respond to the below requests no later than close of business on <u>Tuesday, March 10</u>.

- Describe what steps, if any, the Sheriff's Department has taken to identify all personnel who had or have photographs or recordings of the crash scene or victims' remains on their electronic devices (including cellphones) or cloud accounts.

- Describe what steps, if any, the Sheriff's Department has taken to determine whether and to what extent personnel who had such photographs or recordings shared them with other members of the Department or third parties.

- Describe what steps, if any, the Sheriff's Department has taken to secure all unauthorized photographs or recordings in the possession of its personnel such that they are not subject to further sharing.

---

[1] Alene Tchekmedyian & Paul Pringle, *A deputy allegedly showed off gruesome Kobe Bryant crash photos at bar. A cover-up scandal ensued*, L.A. Times (Mar. 3, 2020), *available at* https://www.latimes.com/california/story/2020-03-03/kobe-bryant-crash-photos-sheriffs-department-tried-to-keep-quiet.

[2] *Id.*

MUNGER, TOLLES & OLSON LLP

Los Angeles County Sheriff's Department
March 8, 2020
Page 3

- Identify by name all personnel who had or have photographs or recordings of the crash scene or victims' remains on their electronic devices.

- State whether the Sheriff's Department confiscated and/or inspected the electronic devices of the personnel who had or have photographs or recordings of the crash scene or victims' remains.

- Describe what steps, if any, the Sheriff's Department has taken to secure all photographs of the crash scene or victims' remains that its personnel sent to people outside of the crash investigation.

- Describe what steps, if any, the Sheriff's Department has taken to review photographs of the crash scene or victims' remains on its personnel's electronic devices to determine their investigative value, and whether the Sheriff's Department has turned images with investigative value over to the National Transportation Safety Board.

As we noted in our March 2 letter, our client is evaluating all of her legal options and reserves all rights.

Sincerely,

*/s/ Luis Li*

Luis Li

CC:   Brad D. Brian
      Gary Robb
      Anita Robb

# Exhibit 7



IVIE McNEILL WYATT
PURCELL & DIGGS

Jack F. Altura, Esq.
jaltura@imwlaw.com
(213) 489-0028, ext. 154

Luis Li
Munger, Tolles & Olson
350 South Grand Avenue, Fiftieth Floor
Los Angeles, CA  90071
Luis.li@mto.com

March 26, 2020

Re:     Response to March 2, 2020 Letter to Sheriff Villanueva

Dear Mr. Li:

This is a follow up to my letter dated March 10, 2020, responding to your Public Records Act
request, dated and received by the County of Los Angeles on March 2, 2020, whereby you
requested "a copy of any and all complaints received by your Office regarding the unauthorized
taking or sharing of crash-scene photos and provide answers in writing regarding (i) all steps the
Sheriff's Department has taken to ensure all photos of the crash scene have been secured; (ii)
whether the Department has initiated an investigation into this matter and when the investigation
is expected to conclude; (iii) the names of all Sheriff's Department personnel who shared photos
of the crash scene; and (iv) whether the Sheriff's Department has terminated, suspended, or
otherwise disciplined said personnel for their actions."

With respect to your request for "a copy of any and all complaints" as described above, pursuant
to the California Public Records Act, records of complaints to, or investigations conducted by, a
local police agency are specifically exempt from disclosure.  Government Code § 6254(f).
However, pursuant to Government Code §§ 6254(f)(2), 6255(a), we can provide the following
information:

> At 12: 21 a.m. on January 29, 2020, a complaint was emailed to the LASD
> Sheriff's Information Bureau.  The complaint stated that an LASD deputy
> was at a restaurant showing photos of the Kobe Bryant helicopter crash site
> and bodies.  The deputy was not identified in the complaint.

With respect to your request for "answers in writing regarding" the subjects listed above, we are
unfortunately unable to assist you with your request.  Your request does not ask for "identifiable" public
records, but specific "information" in the form of interrogatories.  The Public Records Act, Government
Code § 6253(b), does not require that a public entity create a record in order to respond to a request for
information, only that certain non-exempt records already in existence be made available.  The Act does
not require the public entity to answer interrogatories.

Further, even if such responsive identifiable records existed, such records and any information contained
within those records would be exempt from disclosure pursuant to Government Code §§ 6254(c) and (k)
and Penal Code § 832.7, as they are part of an ongoing and active internal investigation.
/ / /

Luis Li
**Re: Response to March 2, 2020 Letter to Sheriff Villanueva**
March 26, 2020
Page 2

Please do not hesitate to contact me if there is anything else you would like to discuss.

Sincerely,

Jack F. Altura

cc:     Sheriff Alex Villanueva
        Elizabeth Miller, Assistant County Counsel

# Exhibit 8



## IVIE McNEILL WYATT
## PURCELL & DIGGS

Jack F. Altura, Esq.
jaltura@imwlaw.com
(213) 489-0028, ext. 154

Luis Li
Munger, Tolles & Olson
350 South Grand Avenue, Fiftieth Floor
Los Angeles, CA 90071
Luis.li@mto.com

April 2, 2020

Re:    Response to March 8, 2020 Letter to Sheriff Villanueva

Dear Mr. Li:

This is a follow up to my letter dated March 11, 2020, responding to your Public Records Act request, dated and received by the County of Los Angeles on March 8, 2020, whereby you requested the following:

      1.     Describe what steps, if any, the Sheriff's Department has taken to identify all personnel who had or have photographs or recordings of the crash scene or victims' remains on their electronic devices (including cellphones) or cloud accounts.

      2.     Describe what steps, if any, the Sheriff's Department has taken to determine whether and to what extent personnel who had such photographs or recordings shared them with other members of the Department or third parties

      3.     Describe what steps, if any, the Sheriff's Department has taken to secure all unauthorized photographs or recordings in the possession of its personnel such that they are not subject to further sharing.

      4.     Identify by name all personnel who had or have photographs or recordings of the crash scene or victims' remains on their electronic devices.

      5.     State whether the Sheriff's Department confiscated and/or inspected the electronic devices of the personnel who had or have photographs or recordings of the crash scene or victims' remains.

      6.     Describe what steps, if any, the Sheriff's Department has taken to secure all photographs of the crash scene or victims' remains that its personnel sent to people outside of the crash investigation.

      7.     Describe what steps, if any, the Sheriff's Department has taken to review photographs of the crash scene or victims' remains on its personnel's electronic devices to determine their investigative value, and whether the Sheriff's Department has turned images with investigative value over to the National Transportation Safety Board.

Luis Li
**Re: Response to March 8, 2020 Letter to Sheriff Villanueva**
April 2, 2020
Page 2

Unfortunately, we are unable to assist you with the above requests.  Your requests do not ask for "identifiable" public records, but specific information in the form of interrogatories.  The Public Records Act, Government Code § 6253(b), does not require that a public entity create a record in order to respond to a request for information, only that certain non-exempt records already in existence be made available. The Act does not require the public entity to answer interrogatories.

Further, even if such responsive identifiable records existed, such records and any information contained within those records would be exempt from disclosure pursuant to Government Code §§ 6254(c), (k), 6255(a) and Penal Code § 832.7, as they are part of an ongoing and active internal investigation and are exempt or prohibited under federal or state law from disclosure because the public interest served by not disclosing such records clearly outweighs the public interest served by disclosure of such records.

Please do not hesitate to contact me if there is anything else you would like to discuss.

Sincerely,

Jack F. Altura

cc:   Sheriff Alex Villanueva
      Elizabeth Miller, Assistant County Counsel

Exhibit 9



IVIE McNEILL WYATT
PURCELL & DIGGS

Jack F. Altura, Esq.
jaltura@imwlaw.com
(213) 489-0028, ext. 154

Luis Li                                                                                                    March 10, 2020
Munger, Tolles & Olson
350 South Grand Avenue, Fiftieth Floor
Los Angeles, CA 90071
luis.li@mto.com

**Re:**          **Response to March 2, 2020 letter to Chief Osby**

Dear Mr. Li:

I am writing in response to your letter dated and received by the County of Los Angeles on
March 2, 2020.  Your letter is being construed as a request for records pursuant to the California
Public Records Act.

I would first like to express that the County shares your concerns regarding reports that Los
Angeles County Fire Department personnel may have taken and shared unauthorized
photographs of the January 26, 2020 helicopter crash scene.  The crash and the deaths of all nine
victims are a terrible tragedy and we offer our sincerest sympathies to the families of all of the
victims.

In your letter of March 2, you requested "a copy of any and all complaints received by your
Office regarding the unauthorized taking or sharing of crash-scene photos and provide answers
in writing regarding (i) all steps the Fire Department has taken to ensure all photos of the crash
scene have been secured; (ii) whether the Department has initiated an investigation into this
matter and when the investigation is expected to conclude; (iii) the names of all Fire Department
personnel who shared photos of the crash scene; and (iv) whether the Fire Department has
terminated, suspended, or otherwise disciplined said personnel for their actions."

Please be advised that pursuant to Government Code 6253, subdivision(c), the time to respond to
your request must be extended by an additional fourteen (14) days due to the existence of
unusual circumstances.  The unusual circumstances include the need to search for, collect, and
appropriately review potentially responsive records.  The County estimates that it will be able to
provide you with a further response by March 26, 2020.

Please be assured that Chief Osby takes this matter very seriously and we sincerely regret the
distress that the news reports have caused your client.

/ / /

/ / /

/ / /

Luis Li
**Re: Response to March 2, 2020 Letter to Chief Osby**
March 10, 2020
Page 2

Please do not hesitate to contact me if there is anything else you would like to discuss.


Respectfully,

Jack F. Altura

CC:    Chief Daryl Osby
       Julia Kim, Risk Manager, Los Angeles County Fire Department

Exhibit 10



IVIE McNEILL WYATT

PURCELL & DIGGS

Jack F. Altura, Esq.
jaltura@imwlaw.com
(213) 489-0028, ext. 154

Luis Li
Munger, Tolles & Olson
350 South Grand Avenue, Fiftieth Floor
Los Angeles, CA 90071
Luis.li@mto.com

March 26, 2020

Re:    Response to March 2, 2020 Letter to Chief Osby

Dear Mr. Li:

This is a follow up to my letter dated March 10, 2020, responding to your Public Records Act request, dated and received by the County of Los Angeles on March 2, 2020, whereby you requested "a copy of any and all complaints received by your Office regarding the unauthorized taking or sharing of crash-scene photos and provide answers in writing regarding (i) all steps the Fire Department has taken to ensure all photos of the crash scene have been secured; (ii) whether the Department has initiated an investigation into this matter and when the investigation is expected to conclude; (iii) the names of all Fire Department personnel who shared photos of the crash scene; and (iv) whether the Fire Department has terminated, suspended, or otherwise disciplined said personnel for their actions."

Please find attached a copy of all complaints received by the Fire Department regarding the alleged unauthorized taking or sharing of crash-scene photos. The names and contact information of the complainants have been redacted pursuant to California Constitution, Article 1, Section 1, and Government Code §§ 6254(k) and 6255(a).

With respect to your request for "answers in writing regarding" the subjects listed above, we are unfortunately unable to assist you with your request. Your request does not ask for "identifiable" public records, but specific "information" in the form of interrogatories. The Public Records Act, Government Code § 6253(b), does not require that a public entity create a record in order to respond to a request for information, only that certain non-exempt records already in existence be made available. The Act does not require the public entity to answer interrogatories.

Further, even if such responsive identifiable records existed, such records and any information contained within those records would be exempt from disclosure pursuant to Government Code §§ 6254(c), 3520-3262 (Firefighters Procedural Bill of Rights), and potentially Penal Code § 832.7, as they are part of an ongoing and active internal investigation.

/ / /

/ / /

/ / /

/ / /

Luis Li
**Re: Response to March 2, 2020 Letter to Chief Osby**
March 26, 2020
Page 2

Please do not hesitate to contact me if there is anything else you would like to discuss.

Sincerely,

Jack F. Altura

cc:     Chief Daryl Osby
        Julia Kim, Risk Manager, Los Angeles County Fire Department

General Info

Wed 3/4/2020 8:31 AM

**To:** FIRE-LA-County Fire Information and Newsroom <Info@fire.lacounty.gov>

From:

Subject: [your-subject]

Message Body:
Los Angeles County Fire Department, ,

I would first like to sincerely thank you for your courageous service.
I am at a loss of words hearing how this department handled the fatal helicopter crash on January 27, 2020. As a citizen I am putting my trust in the hands of law enforcement to protect and serve with unwavering integrity but at the very least, I expect basic human decency. On January 27, 2020 The Los fire department intentionally abused their power, rights and ultimately violated the privacy of John Altobelli, Keri Altobelli, Alyssa Altobelli, Payton Chester, Sarah Chester, Kobe Bryant, Gianna Bryant and Arya Zobayan. I am utterly disgusted with the inhuman actions of the multiple firefighters in this department that used their personal cell devices to photograph and circulate the images of the lifeless victims in this tragic accident. The detrimental loss that the loved ones of the victims have endured is unfathomable. Does the Los Angeles County Fire Department understand that? Does this department understand that their actions significantly impact the victims families, friends & the entire community? What the world knew as a tragedy, your officers saw as an opportunity. I am sickened, I am saddened and I am beyond disappointed by the Los Angeles firefighters that were unable to preform their trusted duties correctly and humanely. I am aware that it was not every firefighter in the Los Angeles County Fire Department that violated the 9 victims of the crash but as a department you are a unit. Therefore, the actions of more than a few firemen reflects on the entire department. To the firemen who willingly participated in taking, sending, receiving and/or knew about the photos and did not immediately reporting it. The thought of trusted emergency personnel committing such an unfathomable act is extremely disheartening and inexcusable. It is your duty to protect the privacy of the victims. As a Firefighter you are holding a leadership position in society. Captain- I am asking that you handle this situation as if these victims were your loved ones and this situation was now one that you would have to deal with on top of the unrelenting grief. I ask that you look past the fear of public scrutiny and take responsibility for your department and make it right. I ask that you hold yourself accountable to undo the wrongs that have been done under your authority. It is not the easy thing to do but it is the right thing to do.

Please look pasts the inconveniences and extra work of further investigating into the department and the personal photos of the victims and crash.

Thank you for taking the time to read my frustrations and concerns. I am praying for the safety and health of all of the firemen and women in the Los Angeles County Department. I hope to see this department turn this situation into something positive and learn from it. I also ask that you review with your station the abuse of power, human decency and most of all, integrity. As a citizen you are held to a standard of integrity but even more so as a firefighter. Hold yourself and the rest of your department to a standard of excellence. I ask that you hold each other accountable and let nothing of this sort occur in this Department in the future. God bless.

I have a question for Fire

████████████████████████ >
Mon 3/2/2020 10:23 AM

**To:** FIRE-LA-County Fire Information and Newsroom <Info@fire.lacounty.gov>

From: ████████████████████████ m>
Subject: [your-subject]

Message Body:
YOU MUST FIRE ANYONE WHO TOOK PHOTOS OF KOBE BRYANT'S CRASH.

--

This e-mail was sent from a contact form on Los Angeles County Fire Department
(http://www.fire.lacounty.gov)

Thank you,

--

This e-mail was sent from a contact form on Los Angeles County Fire Department
([http://www.fire.lacounty.gov](http://www.fire.lacounty.gov))

Case 2:20-cv-09582-JFW-E   Document 48-3   Filed 02/24/21   Page 80 of 80   Page ID #:795

## Kobe Bryant Photos



Sun 3/1/2020 9:04 PM

**To:** FIRE-LA-County Fire Information and Newsroom <Info@fire.lacounty.gov>
**Cc:** Sheila <Sheila@bos.lacounty.gov>; Barger, Kathryn <Kathryn@bos.lacounty.gov>; The Office of Mark Ridley-Thomas <MarkRidley-Thomas@bos.lacounty.gov>; Los Angeles County <info@bos.lacounty.gov>; executiveoffice@bos.lacounty.gov <executiveoffice@bos.lacounty.gov>; firstdistrict@bos.lacounty.gov <firstdistrict@bos.lacounty.gov>; Los Angeles County <fourthdistrict@bos.lacounty.gov>

CAUTION: External Email. Proceed Responsibly.

To whom it may concern.

It is with great concern that I am writing regarding the photos that were released of the Kobe Bryant wreckage by members of the Los Angeles County Fire Department and the Los Angeles County Sheriff's department. The blatant disregard for the lives that were lost and their loved ones on the part of those who are charged with providing a public service is despicable. As a private citizen I not only rely on the good judgement of those who provide for the safety of the public, but I also assume that this service would be conducted in a manner that respects the sanctity of humans in life and in death.

To that end, I would like to gain some insight into how this matter will be dealt with in regards to the reprimand of those involved in disseminating the photos. Additionally, I would like to be informed as to how those in command of the Los Angeles County Sheriff Department (Sheriff Alex Villanueva) and the Los Angeles County Fire Department (Daryl Osby) will address this issue with regards to policy and procedures.

I have some concern that the focus has been on the focus of this has been on the LASD deputies and not those members of the fire department. To not openly hold the fire department openly responsible for their actions. as the sheriff's department has been openly reprimanded, which is problematic as the public will not understand the enormity of the issue which is that all first responders in any capacity has a duty to protect the privacy of the lives of those who they serve and that the public must trust that they will comport themselves in a manner which respects the public trust. to the board of supervisors as you have called out he sheriff, so should you also publicly address those from the fire department and any other public entity involved in disimmentating the photos to send a message that not only is this unacceptable from the sheriff's department. it is also unacceptable from and department. As the fire chief is an appointed position you have the duty to address this issue with the fire chief swiftly, directly and publicly as you with the elected sheriff.



This message and any attachments are sent from a psychological office and may contain information that is confidential and protected by privacy rights. If you are not the intended recipient of this email please delete the message and its