LUIS LI (State Bar No. 156081)
luis.li@mto.com
CRAIG JENNINGS LAVOIE (State Bar No. 293079)
Craig.Lavoie@mto.com
JENNIFER L. BRYANT (State Bar No. 293371)
Jennifer.Bryant@mto.com
MARI T. SAIGAL (State Bar No. 318556)
Mari.Saigal@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

Attorneys for Plaintiff Vanessa Bryant

~~SUPERIOR~~UNITED STATES DISTRICT COURT ~~OF THE STATE~~

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

~~COUNTY OF LOS ANGELES~~

~~Vanessa Bryant, a California Resident,~~ VANESSA BRYANT,

Plaintiff,

vs.

COUNTY OF LOS ANGELES~~, a public entity~~; LOS ANGELES COUNTY SHERIFF'S DEPARTMENT~~, a public entity; ALEX VILLANUEVA, as Sheriff of the County of Los Angeles and as an individual; and DOES 1-100, INCLUSIVE~~; LOS ANGELES COUNTY FIRE DEPARTMENT; [REDACTED],

~~Defendant.~~ Defendants.

Case No. 2:20-cv-09582-JFW-E

**FIRST AMENDED COMPLAINT FOR:**

1. **Violation of Fourteenth Amendment ~~(~~– 42 U.S.C. § 1983~~)~~**
~~2. Violation of Fourteenth Amendment (42 U.S.C. § 1983 – *Monell*)~~
2. ~~3.~~ **Negligence**
3. **Negligence**
4. **Invasion of Privacy**
5. **~~Intentional Infliction of Emotional Distress~~ Invasion of Privacy**

**DEMAND FOR JURY TRIAL**

**[REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL]**

Plaintiff Vanessa Bryant ("Plaintiff"), through her undersigned counsel, hereby brings this action against defendants County of Los Angeles (the "County"), the Los Angeles County Sheriff's Department (the "Sheriff's Department" or "the Department"), Alex Villanueva, in his individual and official capacity as), the Sheriff of Los Angeles County Fire Department (the "Fire Department,") and Does 1-100 (, collectively with the County and the Sheriff's Department, the "Entity Defendants"), [redacted] (collectively, the "DoeDeputy Defendants,") and, collectively with the County, the Sheriff's Department, and Alex Villanuevathe Fire Department, the "Defendants"), seeking damages to remedy violations of her civil rights under the United States Constitution and for negligence, intentional infliction of emotional distress, and invasion of privacy pursuant to California law. This Court has subject matter jurisdiction pursuant to 28 U.S.C. sections 1331 and 1343.

Plaintiff alleges, on personal knowledge as to herself and information and belief as to others, as follows:

## INTRODUCTION

1. On the morning of Sunday, January 26, 2020, three eighth-grade girls, joined by parents and coaches, left their homes in Orange County to play in a youth basketball tournament in Thousand Oaks. Making their way by helicopter, they encountered dense fog. Rather than land or turn around, the pilot pushed into the fog and became disoriented. The helicopter descended rapidly and crashed into the foothills of the Santa Monica Mountains, killing everyone onboard. Vanessa Bryant's thirteen year-old daughter, Gianna Bryant, and husband of nearly twenty years, Kobe Bryant, were among those who died.

2. In the aftermath of the crash, several of the victims' family members gathered at the L.A. County Sheriff's station in Lost Hills, devastated and distraught. Sheriff Alex Villanueva met with them and assured Mrs. Bryant that his deputies were securing the crash site. Based on a leak by law enforcement, the

gossip and celebrity news site *TMZ* had reported that Kobe, a singular figure in Southern California culture and a hero to millions around the world, had died, and onlookers were flocking to the accident scene.

3. But the biggest threat to the sanctity of the victims' remains proved to be the Sheriff's Department itself. Faced with a scene of unimaginable loss, ~~no fewer than eight sheriff's deputies at~~Sheriff's Department personnel abused their access to the crash site ~~pulled out their personal cell phones and snapped~~by taking and sharing gratuitous photos of the dead children, parents, and coaches. ~~The deputies took these photos for their own personal gratification.~~ As the Sheriff's Department would later admit, there was no investigatory reason for ~~deputies~~Department personnel to ~~be taking~~take pictures of the victims' remains.

4. Within forty-eight hours, at least ten members of the Department obtained and possessed images of the victims' remains on their personal cell phones without any legitimate reason for having them. The gratuitous images ~~soon~~also became ~~talked about~~a subject of gossip within the Department, as deputies ~~displayed~~shared them ~~to colleagues~~ in settings that had nothing to do with investigating the accident. One deputy even ~~used his~~showed off photos of the victims ~~to try to impress a woman~~ at a bar, identifying one of the individuals depicted as Kobe Bryant and bragging about how he had been at the crash site. ~~A bartender overheard this interaction and~~Shocked and appalled, one of the bar patrons filed a written complaint with the Sheriff's Department.

5. Upon learning that his deputies had taken and shared the gratuitous photos, which plainly violated the victims' families' constitutional rights to control images of their loved ones' remains, Sheriff Villanueva did not inform the victims' families, initiate an internal affairs investigation, or inspect the deputies' phones to determine whether and how the photos had been shared. He instead directed a cover-up, summoning the deputies to the Lost Hills station and telling them that, if they deleted the photos, they would face no discipline. The deputies purported to

accept the Sheriff's offer, receiving a free pass in exchange for destroying evidence of their misconduct.

6. For one month, the Department's cover-up worked. But on February 27 and 28, 2020, the *Los Angeles Times* reported on the deputies' photos and the Department's effort to hide its wrongdoing. Following the reports, Sheriff Villanueva admitted that his deputies took "illicit photos" of the victims' remains and that he informally ordered their destruction to avoid the "usual routine" of a formal investigation in which everyone "lawyers up."

7. Following the *Los Angeles Times* reports, other news outlets began reporting that the misconduct was not limited to the Sheriff's Department—Fire Department personnel had taken and shared improper photos of the victims' remains as well. Like the Sheriff's Department, the Fire Department had been aware of the egregious conduct for several weeks and responded by directing employees to destroy evidence of their wrongdoing without ever informing the victims' families.

8. ~~7. Shocked and devastated by the *Los Angeles Times*~~Devastated by these reports, Mrs. Bryant privately sought information from the Sheriff's Department and Fire Department to assess whether she should brace for pictures of her loved ones' remains to surface on the internet. Mrs. Bryant asked the ~~Department~~departments to explain the steps ~~it~~they had taken to determine the scope of the misconduct and ensure that all photos of the crash site had been secured. ~~The Department~~Both responded that ~~it~~they needed extra time to respond due to the "unusual circumstance" of needing to consult documents, then sent ~~a letter saying it was "unable to assist" with any of the inquiries~~letters in which they refused to respond to all but one of Mrs. Bryant's questions and asserted that they had no legal obligation to ~~do so~~assist.

9. ~~8.~~ The Sheriff's ~~Department~~and Fire Departments'~~s~~ outrageous actions have caused Mrs. Bryant severe emotional distress and compounded the trauma of losing Kobe and Gianna. Mrs. Bryant feels ill at the thought ~~of strangers gawking~~that sheriff's deputies, firefighters, and members of the public have gawked at gratuitous

images of her deceased husband and child, and she lives in fear that she or her children will one day confront horrific images of their loved ones online. Many social media users and internet trolls have claimed to have seen photos of the victims' remains, and their accounts are plausible given the number of ~~deputies~~individuals who took and transmitted improper photos, the ease with which cell~~-~~ phone ~~pictures~~photos are ~~transmitted~~electronically shared and saved in cloud storage, and the ~~Sheriff's Department's~~ egregious failure to take reasonable steps to prevent dissemination of the photos.

10. ~~9.~~ In taking these photographs and at several points thereafter, members of the Sheriff's ~~Department has~~and Fire Departments have chosen to act reprehensibly, and ~~it continues to demonstrate~~the departments' responses to their employees' conduct has demonstrated that ~~it~~they either ~~does~~do not understand or ~~does~~do not care about the pain ~~it has~~they have caused. This lawsuit seeks to impose accountability for that.

**JURISDICTION AND VENUE**

~~10.~~

11. The County removed this action, which was commenced in the Superior Court of the State of California for the County of Los Angeles, pursuant to 28 U.S.C. sections 1331, 1441, and 1446. This Court has jurisdiction over ~~all causes of~~this action ~~asserted in this complaint~~ pursuant to ~~the California~~28 U.S.C. sections 1331 and 1343 because Plaintiff brings a claim for violation of the Fourteenth Amendment of the United States Constitution ~~Article VI,~~under 42 U.S.C. section ~~10~~1983, and ~~California Code of Civil Procedure section 410.10, because no cause of action contained herein is given by statute to other trial courts and the amount in controversy exceeds $25,000~~this Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. section 1367(a).

12. ~~11.~~ Venue ~~in this Court~~ is proper in this District pursuant to ~~California Code of Civil Procedure sections 393, 394, and 395~~28 U.S.C. section 1391(b), because

Defendants in this action are ~~public officers~~individuals and public agencies situated in Los Angeles County and because, on information and belief, all of the acts or omissions ~~complained of in~~giving rise to this Complaint ~~took place~~occurred in ~~Los Angeles County~~the Central District of California.

**THE PARTIES**

13. ~~12.~~ Plaintiff Vanessa Bryant, a California resident, is the wife of Kobe Bryant and mother of Gianna Bryant.

14. ~~13.~~ Defendant County of Los Angeles is a municipal corporation duly authorized to operate under the laws of the State of California. The Los Angeles County Sheriff's Department is a department of the County.

15. ~~14.~~ Defendant Los Angeles County Sheriff's Department is a local government entity created under the laws of the State of California and a department of Defendant County. The Sheriff's Department provides general law enforcement services to certain contract cities, including Calabasas, California. The Department's work is directed by, among others, Sheriff Alex Villanueva.

16. Defendant Los Angeles County Fire Department is a local government entity created under the laws of the State of California and a department of Defendant County. The Fire Department provides fire suppression and prevention services under contract with the city of Calabasas, California.

17. ~~15.~~ Defendants County~~ and the~~, Sheriff's Department, and Fire Department are "persons" subject to suit within the meaning of 42 U.S.C. § 1983. *See Monell v. New York Department of Social Services*, 436 U.S. 658, 691 (1978).

18. ~~16.~~ Pursuant to California Government Code § 815.2(a), Defendants County~~ and the~~, Sheriff's Department, and Fire Department are liable for any and all wrongful acts in violation of state law hereinafter complained of and committed by their employees acting within the course and scope of their employment.

19. Defendant ████ is an individual and currently a sheriff's deputy in the Los Angeles County Sheriff's Department. ████ is sued in his individual capacity. On information and belief, Defendant ████ is a resident of California.

20. ~~17.~~ Defendant ~~Alex Villanueva~~ ████ is an individual and ~~was, at all times relevant herein, the~~currently a Sheriff~~ of~~'s deputy in the Los Angeles County~~. He is an elected official of the County with responsibility for overseeing the~~ Sheriff's Department ~~and making and implementing its policy. Sheriff Villanueva~~, ████ is sued in his individual capacity ~~and as a representative of the County~~. ~~Upon~~On information and belief, ~~Sheriff Villanueva resides in Los Angeles County~~ ████ is a resident of California.

~~18. Does 1 through 100, inclusive, are sued herein under fictitious names because their true names and capacities are presently unknown to Plaintiff. In a letter to the Sheriff's Department on March 8, 2020, Plaintiff requested the names of the Sheriff's Department personnel who took or possessed photos of the crash site, but the Sheriff's Department has refused to provide names. Plaintiff will amend this complaint to substitute the true names and capacities of these parties when they become known. The Doe defendants include Sheriff's Department personnel who (i) took or shared photos of the accident scene or one of the Bryants' remains; or (ii) participated in the failure to take reasonable steps to prevent dissemination of the photos that were in their constructive possession. Plaintiff is informed and believes, and on that basis alleges, that Does 1 through 100, inclusive, were employees or agents of the Sheriff's Department.~~

21. Defendant ████ is an individual and currently a Sheriff's deputy in the Los Angeles County Sheriff's Department. ████ is sued in his individual capacity. On information and belief, ████ is a resident of California.

22. Defendant ████ is an individual and currently a Sheriff's deputy in the Los Angeles County Sheriff's Department. ████ is sued in his individual capacity. On information and belief, ████ is a resident of California.

## GENERAL ALLEGATIONS

~~19. The acts described herein follow years of misconduct at the L.A. County Sheriff's Department, which has demonstrated over the past decade that it is among the least disciplined law~~

~~enforcement organizations in the country. Examples abound, with the most notable being that the former Sheriff, his second-in-command, and other senior Department leaders were convicted and sentenced to federal prison for obstructing an FBI investigation into widespread beatings of inmates in the Department-run jail system, which concluded with federal charges and prison sentences for more than a dozen Sheriff's Department personnel. That there has been a long-term failure of training and discipline at the Sheriff's Department is clear. And it is not surprising that, when forced into a role of responding to an accident scene involving a major international celebrity, numerous deputies would abuse that position of trust.~~

**~~Sheriff's Deputies~~**

**Sheriff's and Fire Department Personnel Took and Shared Unnecessary Photos of the Victims' Remains**

23. ~~20.~~ On the morning of January 26, 2020, a helicopter carrying Kobe Bryant and his thirteen-year-old daughter, Gianna, crashed into the foothills of the Santa Monica Mountains near Calabasas, California. The pilot and all passengers died on impact.

24. ~~21.~~ The hours after the crash were filled with confusion. Mrs. Bryant learned of the crash from an employee of Kobe, Inc., but was told there were survivors. She then began receiving Instagram messages expressing sympathy for her loss. Based on a leak by law enforcement, *TMZ* had reported that Kobe had died in a helicopter accident. Having heard nothing from law enforcement herself, Mrs. Bryant was confused and distraught. Ultimately, other news outlets confirmed that Kobe and Gianna had perished in the accident.

25. ~~22.~~ Paparazzi, members of the public, and a significant number of unauthorized drones flocked to the crash site. The Sheriff's Department closed multiple roads and freeway off-ramps leading to the site to discourage onlookers, and the Federal Aviation Administration imposed a five-mile no-fly zone overhead at Mrs. Bryant's request. An emergency ordinance prohibited unauthorized access

to the site, and Sheriff Villanueva announced that trespassers would be arrested and charged with a misdemeanor.

26. ~~23.~~ Meanwhile, Mrs. Bryant and other family members of the victims gathered at the nearby Sheriff's station in Lost Hills. Mrs. Bryant spoke with Sheriff Alex Villanueva and expressed concern that the crash site was unprotected from photographers. Sheriff Villanueva assured her that his deputies were securing the scene.

27. ~~24. But Sheriff Villanueva took no steps to deliver on these assurances with respect to the conduct of his own deputies. Indeed, at or around the time Sheriff Villanueva was assuring Mrs. Bryant that his deputies were securing the accident scene, no fewer than eight~~This assurance was hollow. Notwithstanding Sheriff Villanueva's later acknowledgement that Sheriff's Department personnel "had no place to be taking photographs of anything," deputies ~~were at~~who responded to the crash ~~site snapping~~scene used personal cell phones to take and share gratuitous ~~cell phone~~ photos of the dead children, parents, and coaches.

~~25. In~~ According to the ~~days after the accident, deputies~~Sheriff's Department's subsequent investigatory report, one deputy in particular took between 25 and 100 photos of the crash scene on his personal cell phone, many of which had no conceivable investigatory purpose and were focused directly on the victims' remains.

28. Photos of the remains quickly spread within the Sheriff's Department as deputies transmitted them to one another via text message and AirDrop. Within forty-eight hours, at least ten members of the Sheriff's Department obtained and possessed photos of the victims' remains on their personal cell phones despite having no legitimate governmental use for the photos. Making matters worse, Sheriff's Department personnel showed off the photos of the victims' remains to colleagues in settings that had nothing to do with investigating the crash—an investigation that was being handled by the National Transportation Safety Board

("NTSB"), not the Sheriff's Department—and the photos became ~~talked about~~the subject of gossip within the Department.

29. Members of the Fire Department engaged in similar misconduct. While working the crash site on January 26, 2020, several members of the Fire Department abused their access to take graphic photos of the victims' remains without any legitimate governmental purpose. One such instance occurred at approximately 2:00 p.m. on January 26, 2020—long after the downed helicopter had been identified—when a sheriff's deputy observed a firefighter taking multiple pictures of the accident scene. [REDACTED] In addition, according to a complaint filed in Los Angeles County Superior Court in November 2020 by Tony Imbrenda, a public information officer in the Fire Department who responded to the crash scene on the day of the accident but was not involved in investigating the accident, multiple firefighters electronically transmitted photos of the crash scene to him. Based on the foregoing, Plaintiff believes and thereon alleges that, in the hours and days that followed the crash, several members of the Fire Department electronically shared and/or displayed the graphic images of her loved ones' remains to colleagues without any legitimate governmental purpose.

**Deputy [REDACTED]**

30. [REDACTED] a deputy with the Sheriff's Department, responded to the general proximity of the accident scene on January 26, 2020 and stationed himself at the Department's makeshift command post at the Los Virgenes Water District. While there, [REDACTED] obtained multiple photographs of the Bryants' remains and stored them on his personal cell phone.

31. Shortly after obtaining photos of the Bryants' remains, [REDACTED] shared them with at least two individuals without any legitimate governmental purpose.

a. At some point on January 26, 2020—after ████ and others had learned that the victims of the helicopter accident included Kobe and Gianna Bryant—████ walked 100 feet from his position at the makeshift command post to chat with a female deputy who was controlling traffic in and out of the Las Virgenes Water District. ████ told the deputy that he had photos of the accident scene and, for no reason other than morbid gossip, proceeded to send the photos of the Bryants' remains to her personal cell phone. The deputy had no role in investigating the accident or identifying those who perished, and later acknowledged in an interview with Department investigators that she had no legitimate governmental purpose for the photos. Similarly, ████ admitted to investigators that the deputy did not need the photos for any reason and that it was inappropriate to send them to her. In explaining his actions to investigators, ████ could only say that "curiosity got the best of [them]" and that such curiosity was "in [their] nature" as deputies.

b. At a separate point on January 26, 2020—and again, with knowledge that Kobe and Gianna Bryant were among those who perished in the crash—████ electronically transmitted photos of the Bryants' remains to another deputy, ██████. ████ had responded to the general proximity of the accident scene along with ████ but he had no role in investigating the accident or identifying those who perished. ████ sent photos of the Bryants' remains to ████ personal cell phone without any legitimate governmental purpose.

~~26. The photos were also shared outside the Department. In the week following the accident, a trainee deputy showed off photos of the victims' remains at the Baja California Bar & Grill in Norwalk, California—nearly fifty miles from the crash site. On or around January 29, 2020, a bartender at the restaurant filed a written~~

32. Following the above actions, ████ learned that a complaint had been filed with the Sheriff's Department regarding improper sharing of photos of the crash victims' remains. ████ then negligently and/or willfully destroyed evidence

of his wrongdoing by deleting photos of the victims' remains and other evidence from his personal cell phone. At the time, [REDACTED] had an obligation to preserve this evidence of his wrongdoing, including any associated metadata, and, as a trained law enforcement officer, knew or should have known that the evidence may be relevant to future litigation or investigations. By committing this spoliation, [REDACTED] severely undermined the ability to verify any of his claims regarding his handling and dissemination of the photos.

**Deputy [REDACTED]**

33. [REDACTED], a trainee deputy with the Sheriff's Department, responded to the general proximity of the accident scene on January 26, 2020. While there, [REDACTED] was posted at the base of the hillside, where he monitored entry to a trailhead that led to the downed helicopter. At no point on the day of the accident or at any time thereafter did [REDACTED] have a role in investigating the accident or identifying those who perished. Nonetheless, at some point during his shift, [REDACTED] obtained multiple photographs of the Bryants' remains on his personal cell phone.

34. After obtaining photos of the Bryants' remains, [REDACTED] shared them with multiple individuals without any legitimate governmental purpose, including several members of the public.

a. While at the Lost Hills Sheriff's station on the evening of January 26, 2020—long after [REDACTED] and others had learned that the victims of the helicopter accident included Kobe and Gianna Bryant—[REDACTED] told another deputy, [REDACTED], that he had photos of the accident scene. [REDACTED] asked to see the photos, and [REDACTED] texted photos of the Bryants' remains to [REDACTED] personal cell phone. There was no legitimate governmental purpose for [REDACTED] to transmit the photos to [REDACTED] because, like [REDACTED], [REDACTED] had no role in investigating the accident or identifying those who perished.

b. On January 28, 2020, while at his mother's house in West Covina, California, [REDACTED] showed photos of the Bryants' remains to his niece.

Before displaying the photos, [REDACTED] made a crude remark about the state of the victims' remains.

c. While at the Baja California Bar and Grill in Norwalk, California on January 28, 2020, [REDACTED] boasted that he had worked at the scene of the accident where Kobe Bryant had died. [REDACTED] then showed photos of the Bryants' remains to a fellow bar patron and the restaurant's bartender, and he is seen on the bar's security camera zooming in and out of the images while displaying them to the bartender. One of the photos showed the body of a girl, and [REDACTED] remarked that another showed the remains of Kobe Bryant. Shortly after seeing the photos, the bartender loudly boasted to restaurant employees and patrons that he had just seen a photo of Kobe Bryant's body and described the image in graphic detail.

35. Following the above actions, [REDACTED] learned that a complaint had been filed with the Sheriff's Department regarding improper sharing of photos of the crash victims' remains. [REDACTED] then negligently and/or willfully destroyed evidence of his wrongdoing by deleting photos of the victims' remains from his personal cell phone and deleting the text messages he had sent [REDACTED] that contained photos of the victims' remains. At the time, [REDACTED] had an obligation to preserve this evidence of his wrongdoing, including any associated metadata, and, as a trained law enforcement officer, knew or should have known that the evidence may be relevant to future litigation or investigations. By committing this spoliation, [REDACTED] severely undermined the ability to verify any of his claims regarding his handling and dissemination of the photos.

**Deputy [REDACTED]**

36. Deputy [REDACTED] responded to the general proximity of the accident scene on January 26, 2020, and was staffed to a checkpoint at the base of a hillside that led to the downed helicopter. Throughout the day, [REDACTED] heard rumors that photos of the accident scene were circulating among other deputies, and he was curious to see them himself. While at the Lost Hills Sheriff's station that

evening, [redacted] asked [redacted] to send him the photos, and [redacted] sent him photos of the Bryants' remains. [redacted] saved the photos to an album on his personal cell phone so that he did not have to keep going into the text message to view them.

37. At no point did [redacted] play any role in investigating the accident or identifying those who perished. In an interview with Department investigators, [redacted] admitted that there was no investigative purpose for him to obtain the photos and that it was inappropriate for him to take possession of them.

38. Nonetheless, on or around January 28, 2020, [redacted] shared the photos with a personal friend with whom [redacted] plays video games nightly. Although the friend is a sheriff's deputy, he was assigned to the Santa Clarita station, not the Lost Hills station, and had no involvement whatsoever in the response to the helicopter accident. In a text exchange initiated by [redacted] [redacted] told the friend that he had pictures of the accident scene. [redacted] then texted photos of the Bryants' remains to his friend's personal cell phone, noting that one of the victims depicted was Kobe Bryant. In a later interview with Department investigators, [redacted] friend indicated that one of the photos showed the remains of a child and that the remains appeared to be the primary focus of the photo.

39. Following the above actions, [redacted] negligently and/or willfully destroyed evidence of his wrongdoing by deleting photos of the victims' remains and other evidence from his personal cell phone. At the time, [redacted] had an obligation to preserve this evidence of his wrongdoing, including any associated metadata, and, as a trained law enforcement officer, knew or should have known that the evidence may be relevant to future litigation or investigations. By committing this spoliation, [redacted] severely undermined the ability to verify any of his claims regarding his handling and dissemination of the photos.

**Deputy [redacted]**

40. [redacted], a deputy with the Sheriff's Department, responded to the general proximity of the accident scene on January 26, 2020 and stationed

himself at the makeshift command post established at the Los Virgenes Water District. While there, [REDACTED] obtained multiple photographs of the Bryants' remains, stored them on his personal cell phone, and shared them with several other Department personnel, including [REDACTED]

41. On the evening of January 26, 2020—long after [REDACTED] learned that the victims of the helicopter accident included Kobe and Gianna Bryant—[REDACTED] sent photos of the Bryants' remains to a detective for the Department without any legitimate governmental purpose. The detective had responded to the general proximity of the accident scene earlier in the day, but had no role in investigating the accident or identifying those who perished. As the detective admitted to Department investigators, he did not use the photos for any official purpose and there was no reason for him to receive them. As an indication of how casually the photos were shared within the Department, the detective could not even identify the name of the deputy who sent him the photos during an interview with Department investigators. Following his shift on January 26, 2020, the detective asked his wife, who is not a law enforcement officer and had no reason to view the photos, whether she wanted to see the photos of the victims' remains.

42. Following the above actions, [REDACTED] negligently and/or willfully destroyed evidence of his wrongdoing by deleting photos of the victims' remains and other evidence from his personal cell phone. At the time, [REDACTED] had an obligation to preserve this evidence of his wrongdoing, including any associated metadata, and, as a trained law enforcement officer, knew or should have known that the evidence may be relevant to future litigation or investigations. By committing this spoliation, [REDACTED] severely undermined the ability to verify any of his claims regarding his handling and dissemination of the photos.

**The Defendants Attempt a Cover-Up and Destroy Evidence**

43. Minutes after [REDACTED] left the Baja California Bar and Grill on the evening of January 28, 2020, the bartender approached a table of four patrons and

excitedly stated that a sheriff's deputy had just shown him graphic photos of Kobe Bryant's remains. The bartender described specific characteristics of Mr. Bryant's remains, explained how the remains could be linked to Mr. Bryant, and indicated he found the situation humorous. The bartender was poised to divulge additional details, but the patrons expressed that they did not want to hear anything further.

44.

45. ~~27.~~ Under normal protocol, this complaint would have triggered a formal inquiry and/or an internal affairs investigation. But Sheriff Villanueva did not follow protocol. He did not conduct a standard investigation or collect, inspect, or search ~~the offending deputies'~~ cell phones to determine how many photos existed, whether and how they had been transmitted, or whether they were stored on the cloud. He did not inform the L.A. County Office of the Inspector General. Most importantly, he did not alert the victims' families of the ~~deputies'~~ misconduct or the existence of the photos.

46. ~~28.~~ Instead, sometime in late January 2020, Sheriff Villanueva summoned his deputies to the Lost Hills station and told them that if they "came clean" and deleted the photos, they would not face any discipline. The deputies responded by claiming that they had deleted the photos and, to the extent they had transmitted the photos to others, those persons had also deleted them. Sheriff Villanueva abided by his offer and did not discipline the deputies for violating the constitutional right of the victims' families. For nearly a month, until their hands were forced by public reports about the photos, Sheriff Villanueva and the Department took no further action to investigate or contain the spread of the photos.

47. The ~~Department's~~ above actions were taken to avoid the consequences of misconduct by Department personnel or, at a minimum, in reckless disregard of the risk that destruction of evidence would render a complete investigation impossible. At the time that Department leadership ordered deletion of the photos without conducting any meaningful investigation, the Department and the County knew or should have known that the actions of Department personnel, including [redacted] conduct at the bar in Norwalk, California, constituted tortious conduct under California law and a violation of the constitutional rights of the victims' families under the United States Constitution. Hence, the Department and the County had an obligation to preserve evidence of the Department's wrongdoing, including any associated metadata, and, as trained law enforcement officers, Department leadership knew or should have known that the evidence may be relevant to future litigation and investigations.

**The Misconduct Is Exposed ~~and Admitted~~**

48. ~~29.~~ On February ~~28~~27 and ~~29~~28, 2020, the *Los Angeles Times* reported that several sheriff's deputies had taken and shared photos of the victims' remains and that the Sheriff's Department had been aware of the misconduct for nearly a month. Soon thereafter, the *Times* also exposed the Department's attempted

cover-up, reporting that it "tried to keep a lid on the episode instead of following normal investigative protocols."

~~30. Faced with its misconduct becoming public, the~~ Around the same time, it was reported that Fire Department ~~decided to lie~~personnel were sharing graphic photos of the victims' remains and that the Department responded by telling its members to destroy the photos.

49. In an interview with the *Los Angeles Times* on February 26, 2020, Captain Jorge Valdez stated ~~the~~that he was "unaware of any complaint" regarding crash-scene photos and that "there was no order given to delete any photographs." Both statements were false. Valdez ~~had been~~was personally involved in responding to the citizen complaint, having spoken to the complainant himself, and Sheriff Villanueva has since made numerous admissions about deputies taking photos of the victims' remains and his orders to destroy them without any meaningful investigation.

50. ~~31.~~ Through statements made by Sheriff Alex Villanueva in his official capacity, the Sheriff's Department and the County have admitted the facts showing ~~Defendants'~~their tortious conduct and violation of Mrs. Bryant's constitutional rights.

a. In media appearances in late February and early March 2020, Sheriff Villanueva admitted that at least eight deputies took and/or shared photos of the victims' remains and acknowledged that the conduct was "disgusting," "wildly inappropriate," "inexcusable," and "unconscionable." Sheriff Villanueva further admitted that the improper photos "harm[ed] people [who] have suffered a tragedy already" by creating the possibility of "a public display of their loved ones' remains."

b. Sheriff Villanueva has also admitted that the ~~deputies'~~ photos of the victims' bodies were not taken for any law enforcement purpose. In response to questions from reporters on March 2, 2020, Sheriff Villanueva admitted: "[I]n this type of scene, which is an accident, there's only two groups of people that should be taking photos: that is the NTSB and the coroner's office. No one else has . . . any

reason to take any photos . . . Anybody outside of [the NTSB and coroner's office] would be unauthorized.  It'd be illicit photos." In another interview the same day, Sheriff Villanueva admitted: "[T]he deputies had no place to be taking any photographs of anything.  Only, in this case, it would have been NTSB investigators, coroner's investigators, and that's about it.  Nobody else."

c.    The Sheriff's Department has also admitted to destroying evidence of the unlawful photos.  In an interview with NBC-4 Los Angeles on March 2, 2020, Sheriff Villanueva stated that he learned within days of the crash that a trainee deputy had allegedly showed off crash-scene photos at a bar and, in response, the Department ordered the trainee and seven other deputies to delete the photos.  Villanueva stated that his "number one priority"was to "make sure those photos no longer existed." According to Villanueva, the Department "identified what we thought were the eight individuals"who took the images and "they deleted all the pictures they had, and they acknowledged that, if they transmitted them, that they were deleted."

**The ~~Department~~Sheriff's and Fire Departments Knew or Should Have Known That ~~Law Enforcement Officers~~First Responders Taking ~~Improper~~Photos of Human Remains ~~Was~~Is a Long-Standing Problem**

51. ~~32.~~ On and before the date of the helicopter crash, the Sheriff's Department knew that unnecessarily taking, possessing, and sharing photos of victims' remains had been a long-running problem for law enforcement.  Addressing reporters on March 2, 2020, Sheriff Villanueva stated: "[U]nfortunately, ever since they invented the Polaroid camera, this has been a problem in law enforcement across the nation, probably across the world, because it just makes it so much easier.  And then there's—there's cops—they keep death books, for example, where . . . they have photos from crime scenes throughout their careers." In an interview with the *Los Angeles Times* on February 26, 2020, Sheriff Villanueva exhibited similar awareness of the problem: "Every police department struggles with the same

thing, where people take photos and they're not evidence . . . So that's a practice we have to make sure that everyone walks away, and there is no evidence other than the official photos of evidence that are taken for criminal purposes."

52. ~~33.~~ In addition, the ~~Department was aware~~Sheriff's and Fire Departments knew prior to the helicopter crash that government employees abusing access to celebrity-related information has long been a problem in ~~the~~ Los Angeles ~~law enforcement community~~. Examples include a sheriff's deputy unlawfully leaking the arrest report of a prominent actor and the Los Angeles Police Department improperly disclosing photos of a famous recording artist depicting injuries from a domestic assault. With respect to the helicopter crash, Sheriff Villanueva has acknowledged that the involvement of ~~someone~~a celebrity like Kobe Bryant, a singular figure in Southern California culture and a hero to millions around the world, creates "much more interest" among deputies.

53. Notwithstanding the above knowledge and his assurances to Mrs. Bryant, Sheriff Villanueva said nothing in his briefings with first responders at the accident scene regarding photography or respecting privacy.

**The ~~Department~~Sheriff's and Fire Departments Had No ~~Policy~~Policies to Prevent Violations of the Constitutional Right to Control the Death Images ~~and Remains~~ of Deceased ~~Family Members~~Loved Ones**

54. ~~34.~~ Since at least 2012, it has been clear in the Ninth Circuit that individuals have a substantive due process right under the United States Constitution to control the death images and physical remains of deceased family members. *See Marsh v. Cnty. of San Diego*, 680 F.3d 1148 (9th Cir. 2012). Nonetheless, and despite the Department's awareness that improper death images are "a problem in law enforcement across the nation," neither the Sheriff's Department nor the Fire Department had ~~no~~a policy at the time of the accident regarding the taking or sharing of photos of human remains.

55. ~~35.~~ Following the *Los Angeles Times* reports, the Sheriff's Department issued a statement that the allegations regarding the accident-scene photos "are currently under investigation, as are the effectiveness of existing policies and procedures." (**Exhibit 1**.) Days later, in a letter to the L.A. County Inspector General, Sheriff Villanueva admitted: "It is evident our photograph policy is deficient and this incident has identified a need for me to direct the creation of a new policy." Similarly, in an interview with NBC-4 in March 2020, Sheriff Villanueva stated that the Department was "creating new [policies] that are very specific, with teeth in 'em, up to and including a penalty of discharge for violation of these policies."

56. ~~36.~~ In the following months, the Sheriff's Department added an entirely new section to its Manual of Policies and Procedures, titled: "Photographs/Recordings at Scenes Where Human Remains Are Present." (**Exhibit 2**.) The new policy dictates that, "[i]n order to preserve the dignity and privacy of the deceased and their families, scenes where human remains are present shall only be photographed/recorded by Scientific Services Bureau or the Department of Medical Examiner (DME) personnel." (**Ex. 2 at 1**.) The new policy further provides: "Any photograph, recording, or record produced by a Department member . . . shall be considered the sole property of the Department"and "[a]ny unauthorized release or sharing is strictly prohibited." (**Ex. 2 at 1**.)

~~The~~

57 In interviews with Sheriff's Department investigators regarding the improper photos, personnel throughout the chain of command confirmed that the Sheriff's Department had no clear policy and had provided no training or instruction regarding photographs of human remains prior to the accident.

a Numerous deputies who responded to the accident scene on January 26, 2020, including [REDACTED], and others, told Department

investigators there was no instruction or briefing on the day of the accident regarding photography of the crash site or human remains.

b. Although many of the Sheriff's Department personnel who obtained photos of the victims' remains were in the midst of training to become sheriff's deputies, had recently completed such training, or were themselves training officers, none demonstrated any awareness of a Department policy regarding the propriety of taking, possessing, or sharing photos of human remains, nor did they report having received any training on the subject prior to the *Los Angeles Times* reports in February 2020.

c. A captain for the Sheriff's Department who was the senior-most supervisor at the makeshift command post on the day of the accident demonstrated no awareness of the Sheriff's Department's policy regarding use of personal cell phones to capture work-related environments, telling investigators that it was "absolutely" appropriate for department personnel to use personal cell phones to photograph accident scenes. The captain further implied that using personal cell phones to take photos of human remains would be appropriate to memorialize a scene, so long as the cell phone photos are provided to the Department's homicide department. In interviews with investigators, the captain displayed no awareness of any department policy related to taking, possessing, or sharing photos of human remains, nor did he report having received any training on the subject.

d. A sergeant for the Sheriff's Department who was second-in-command at the makeshift command post on the day of the accident told investigators that, even with the benefit of hindsight, there is nothing he would do differently regarding the way he supervised the deputies on the day of the accident. [REDACTED] The sergeant demonstrated no awareness of the Sheriff's Department's policy regarding use of personal cell phones to capture

work-related environments, telling investigators that he believed it was appropriate for deputies at the crash site to use their cell phones to take photos of the scene. At one point in an interview with Department investigators, the sergeant stated: [redacted]

e. As of September 29, 2020, as discussed below in paragraph 70, it is a crime in California for a first responder to take photos of deceased individuals without a valid purpose.

58. Similarly, according to a lawsuit recently filed in Los Angeles Superior Court by a former Public Information Officer for the Fire Department who responded to the crash scene, Tony Imbrenda, the Fire Department had no policy at the time of the accident regarding photography at emergency incidents.

**The Sheriff's Department Failed to Train Its Employees on the Department's Policy Regarding ~~Photographs~~Photos of Work-Related Scenes on Personal Cell Phones**

59. ~~37.~~ In addition to failing to establish a specific policy regarding the treatment and photographing of human remains, the Sheriff's Department also did not follow or enforce its policy regarding deputies' use of personal cell phones to capture work-related environments. That policy provides:

> Members shall not use a personal cellular telephone or any other similar personal communication or recording device to record, store, document, catalog, transmit, and/or forward any image, document, scene, or environment captured as a result of their employment and/or while performing official Department business that is not available or accessible to the general public.

(**Exhibit 3 at 5**.) According to the Sheriff's Department's Manual of Policies and Procedures, supervisors must investigate reports of violations of the policy and "will be held accountable for and evaluated on" their enforcement of the policy. (**Ex. 3 at 2.**) Members of the Department who violate the policy "shall be subject to

disciplinary action," which could include "reprimand," "suspension without pay," "reduction in rank," and/or "dismissal from the Department." (**Ex. 3 at 3-4**.)

60. In direct contravention of this policy, the sergeant who was second-in-command at the Department's command post on the day of the accident told Department investigators that the Lost Hills station had a policy and/or custom of *encouraging* Department personnel to photograph accident scenes using their personal cell phones so that the images could be posted on the station's social media accounts, including Twitter and Facebook. The sergeant explained that, at the time he received the call to respond to the helicopter crash, he was at the scene of an automobile crash taking pictures on his personal cell phone. According to the sergeant, [redacted]

61. ~~38.~~ Sheriff Villanueva did not discipline the deputies who took cell-phone photos of the crash site and has stated publicly that the Department's policies at the time did not prohibit the deputies' actions. These statements and actions, combined with the significant number of deputies who took and/or shared cell-phone photos of the accident site, demonstrate that the Department failed to adequately train, supervise, and discipline its personnel regarding its policy related to the use of personal cell phones to photograph work-related scenes.

**The Sheriff's Department ~~Refuses~~and Fire Department Refuse to Provide ~~Any~~ Information to Mrs. Bryant**

62. ~~39.~~ After learning of the existence of the photos, attorneys for Mrs. Bryant sent ~~a letter~~letters to the Sheriff's and Fire Department requesting that ~~the Department~~they take immediate action to secure all photos and videos of the crash in ~~the Department's~~their possession, "including any photos or videos in the possession of or disseminated by Sheriff's Department personnel." (**Exhibit 4.**) Mrs. Bryant

further requested that the Sheriff's Department and Fire Department conduct ~~an~~ internal affairs ~~investigation~~investigations "to determine the extent of the unauthorized taking and dissemination of photos" and the identities of the deputies ~~or other personnel~~and firefighters involved.~~"~~ (**Ex. 4 at 2, Ex. 5 at 2**.)

63. ~~40.~~ On March 8, 2020, following news reports regarding the number of deputies who took improper photos, attorneys for Mrs. Bryant sent a follow up letter requesting more information about the Sheriff's Department's investigation of the deputies' misconduct, including the identity of all personnel who took photos of the victims' remains; the steps the ~~Department~~department had taken to identify all personnel who had the photos on their personal devices; the steps the ~~Department~~department had taken to determine whether and to what extent personnel who had such photos or recordings shared them with other members of the ~~Department~~department or third parties; and the steps the ~~Department~~department had taken to secure all photos or recordings of the victims' remains in the possession of its personnel. (**Exhibit ~~5~~6**.)

64. ~~41.~~ On March 26 and April 2, 2020, nearly a month after Mrs. Bryant first inquired about the misconduct, an attorney for the Sheriff's Department wrote to Mrs. Bryant that the Department had no legal obligation to respond to her questions and would not do so. (**Exhibits ~~6~~7-~~7~~8**.) ~~To date, the Department has not provided a single piece of substantive information in response to Mrs. Bryant's private requests.~~Mrs. Bryant ~~**Served a Notice of Claims in Accordance with the Government Claims Act**~~received a nearly identical response from an attorney for the Fire Department in letters dated March 10 and 26, 2020. (**Exhibits 9-10**.)

~~42. On May 8, 2020, pursuant to California Government Code section 900 et seq., Mrs. Bryant filed a written notice of claims against the Sheriff's Department, Sheriff Villanueva, and unknown deputies, based on the same underlying facts and issues alleged in this complaint. As of this filing, the County has not substantively responded to Mrs. Bryant's notice of claim or provided a concrete timeline for when it will respond. Per statute, the County's failure to act on Mrs.~~

~~Bryant's claims within the time prescribed by the California Government Code constitutes a denial, such that Mrs. Bryant's claims are ripe for review by this Court.~~

**The Sheriff's Department Conducts a Belated, Deficient Investigation**

65. In response to public shock and outrage following the *Los Angeles Times* reports, as well as scrutiny from the Sheriff's Department's Civilian Oversight Board, the Department announced that it would conduct an internal affairs investigation of the improper photos. In discussing his Department's inexcusably belated investigation, Sheriff Villanueva stated on March 2, 2020: "All [photos of remains] *that we know of* that were in the possession of the eight individuals were deleted, and we're *hoping* that that is the outcome of this—that there is no photos to be circulated anywhere." (Emphasis added.) Two months later, in May 2020, Sheriff Villanueva stated that the Department was "going through the final stages" of its investigation of the improper photos and, "once the information is developed and it's done . . . we're going to make the entire investigation public so everybody can read it for themselves."

66. The Department has yet to deliver on Sheriff Villanueva's promise of publicly reporting the results of the Department's investigation, but Mrs. Bryant obtained the Department's final investigative report via a motion to compel in January 2021. Substantively, the report reveals that the Sheriff's Department has failed to take basic steps to ensure all copies of the improper photos are tracked down and sequestered.

a. [REDACTED]

b. [REDACTED]

c.

d.

e.





**The Deputy Defendants Exhibit Consciousness of Guilt by Making False Exculpatory Statements to Department Investigators**

67.    Each of the Deputy Defendants made false exculpatory statements to Department investigators in the wake of the citizen complaint.  Their decision to hide the facts strongly suggests that their misconduct was more extensive than they have admitted.

a.

b.

c.

d.

**The *Los Angeles Times* Reveals Additional
Details Regarding a Deputy's Misconduct**

68.     Although nowhere mentioned in the Department's investigative report, in November 2020 the *Los Angeles Times* reported that the Sheriff's Department had moved to discipline an unnamed deputy for broadly sharing photos of the victims' remains on his personal cell phone.  The reporting cited the Sheriff's Department disciplinary summary for the third quarter of 2020, which states that a deputy "[s]tored confidential photographs of a multi-agency investigation on a personal cellular phone, and shared the photographs with friends, family members, and co-workers on multiple occasions."

**The Deputy Defendants Shared Photos of the Bryants' Remains with Multiple People, Including Members of the Public, Without Any Legitimate Purpose**

69     As detailed above, each of the Deputy Defendants (i) showed a willingness to take and/or retain possession of photos of the Bryants' remains on their personal cell phones without any legitimate governmental purpose; (ii)

demonstrated a morbid curiosity in the photos; (iii) exhibited a willingness to share the photos with others, including through electronic transmission, without any legitimate governmental purpose; (iv) displayed consciousness of guilt by making false exculpatory statements regarding the photos; and (v) destroyed evidence of their possession and sharing of the photos despite an obligation to preserve it. Based on the foregoing, Plaintiff is informed and believes, and thereon alleges, that—in addition to the specific instances of improper sharing detailed above—the Deputy Defendants each shared photos of the Bryants' remains with multiple people, including members of the public, without any legitimate governmental purpose.

**California Enacts a Criminal Law Against Improper Photos of Human Remains**

70. In September 2020, responding to the Sheriff's Department's gratuitous taking and sharing of photos of the crash victims' remains, the California state government enacted Assembly Bill 2655. *See* 2020 Cal. Stat. Ch. 219. Known informally as The Kobe Bryant Act of 2020, the law makes it a misdemeanor for a first responder, including a law enforcement officer, to photograph the remains of a crime or accident victim "for any purpose other than an official law enforcement purpose or a genuine public interest." Cal. Pen. Code § 647.9(a), (c). As explained by the California legislator who authored the new law, "[o]ur first responders, when responding to an emergency, should not be taking very sensitive photographs . . . for their own pleasure."

**Mrs. Bryant Has Suffered Severe Emotional Distress**

71. ~~43.~~ Mrs. Bryant has suffered (and continues to suffer) severe emotional distress from the knowledge that images of her husband's and daughter's remains were taken and shared for the perverse gratification of law enforcement officers, and she fears that she and her family may confront the appalling photos at any moment on the internet. This fear is eminently reasonable in light of the prevalence

of cloud storage (such as iCloud and Google Photos), text messaging, and social-media applications, through which photos can be stored and shared almost instantaneously (and sometimes inadvertently). When Mrs. Bryant sought assurances from the Sheriff's Department that it had taken reasonable measures to control the spread of the photos, including whether it had "confiscated and/or inspected the electronic devices of the personnel who had or have photographs of the crash scene or victims' remains," the Department refused to offer any response whatsoever. And at no point has the Department ~~informed Mrs. Bryant that it has~~ taken even the basic investigatory step of collecting a forensic image of the offending ~~deputies~~individuals' electronic devices.

72. ~~44.~~ Mrs. Bryant's fear has been exacerbated by the fact that, despite knowing about the photos within days of the crash, Sheriff Villanueva took none of the steps that a reasonable supervisor (let alone a highly-trained professional investigator) would take to prevent dissemination of harmful photos in his constructive possession. As a result of Sheriff Villanueva's offer to his deputies that they could avoid investigation and discipline by deleting the evidence of their misconduct, Mrs. Bryant must live with uncertainty regarding how many photos were taken, whether they remain stored on the cloud, whether and how they were shared via text message, email, or social media applications, and whether people to whom the deputies transmitted the photos continue to possess them. Absent this information, it is impossible to rule out that the photos will surface and go viral online. This uncertainty has caused Mrs. Bryant severe stress and anguish.

73. ~~45.~~ Mrs. Bryant's anxiety has been reinforced by widespread discussion of the photos online. In March 2020, Mrs. Bryant encountered an Instagram user who stated that she had seen pictures of Kobe and Gianna's bodies at the accident scene, and numerous Twitter users ~~have~~ made similar statements even before the *Los Angeles Times* publicized that Department personnel had taken and shared improper photos of the victims' remains. Other online commenters, along with the *National*

*Enquirer* tabloid publication, have claimed that images of Kobe and Gianna's remains are being bought, shared, and/or sold on the dark web.

74. ~~46. The~~These accounts are eminently plausible in light of the sheer number of deputies who took ~~photos, the fact that the deputies~~and shared ~~the~~ photos ~~with others,~~of the Bryants' remains and the Department's grossly inadequate steps to prevent their dissemination~~ of the photos have made the above accounts plausible, which has compounded Mrs. Bryant's emotional distress~~. For the foreseeable future, Mrs. Bryant and her family will almost certainly continue to encounter claims that photos of their loved ones' remains are circulating online, and they will have no way of knowing whether such claims are true or false.

~~47. In response to public shock and outrage following the *Los Angeles Times* reports, as well as scrutiny from the Sheriff's Department's Civilian Oversight Board, the Department now claims it is conducting an investigation into the improper photos. In discussing his Department's inexcusably belated investigation, Sheriff Villanueva stated on March 2, 2020: "All [photos of remains] that we know of that were in the possession of the eight individuals were deleted, and we're **hoping** that that is the outcome of this – that there is no photos to be circulated anywhere." (Emphasis added.)~~

~~48. Hope is not a plan and it is no comfort to Mrs. Bryant. At the moment the deputies snapped photos of Kobe and Gianna's remains, they created a harm that cannot be undone, and the Department's response has only exacerbated that harm. A grieving widow and parent should never have to worry that the public servants charged with protecting her would abuse access to her loved ones' remains for their own personal gratification, and the Sheriff's Department's breach of this basic human duty has caused Mrs. Bryant severe pain.~~

75. Avoiding thoughts of the Sheriff's Departments' misconduct has been impossible, as Mrs. Bryant is repeatedly reminded of it online. Online trolls have exploited the tragic circumstances and the Sheriff's Department misconduct for the purpose of taunting and hurting Mrs. Bryant. These experiences provide a constant

reminder that photos of her husband's and daughter's remains may be circulating in the public realm as a result of the Sheriff's Department's gross misconduct.

**Mrs. Bryant Served a Notice of Claims in Accordance with the Government Claims Act**

76. On May 8, 2020, pursuant to California Government Code section 900 et seq., Mrs. Bryant filed a written notice of claims against the Sheriff's Department, Sheriff Villanueva, and unknown deputies, based on the same underlying facts and issues alleged in this complaint. As of this filing, the County has not substantively responded to Mrs. Bryant's notice of claim or provided a concrete timeline for when it will respond. Per statute, the County's failure to act on Mrs. Bryant's claims within the time prescribed by the California Government Code constitutes a denial, such that Mrs. Bryant's claims are ripe for review by this Court.

77. On July 20, 2020, pursuant to California Government Code section 900 et seq., Mrs. Bryant filed a written notice of claims against the Fire Department and unknown members of the Fire Department, based on the same underlying facts and issues alleged in this complaint. As of this filing, the County has not substantively responded to Mrs. Bryant's notice of claim or provided a concrete timeline for when it will respond. Per statute, the County's failure to act on Mrs. Bryant's claims within the time prescribed by the California Government Code constitutes a denial, such that Mrs. Bryant's claims are ripe for review by this Court.

**FIRST CAUSE OF ACTION**

~~**42 U.S.C. § 1983, Violation of Fourteenth Amendment**~~

~~**(Against Does 1-100)**~~

**42 U.S.C § 1983 (*Monell*), Violation of Fourteenth Amendment**

**(Against the Sheriff's Department, the Fire Department, and the County)**

78. ~~49.~~ Plaintiff incorporates herein and realleges the allegations in paragraphs 1 through ~~47~~77, inclusive, as if fully set forth herein.

79. ~~50.~~ By taking and sharing photos of Kobe ~~Bryant's~~ and Gianna ~~Bryant~~Bryants'~~s~~ remains ~~and/or sharing such photos with the public, the Doe~~without any legitimate governmental purpose, members of the Sheriff's Department, including but not limited to the Deputy Defendants, and members of the Fire Department deprived ~~(and continue to deprive)~~ Plaintiff of her substantive due process right to control the physical remains, memory, and death images of her deceased husband and ~~daughter. As the United States Court of Appeals for the Ninth Circuit has affirmed, this right flows from the substantive due process rights to privacy and family integrity guaranteed by the Fourteenth Amendment to the United States Constitution~~child. *See Marsh v. Cnty. of San Diego*, 680 F.3d 1148 (9th Cir. 2012).

~~51. The Doe Defendants knew or should have known that taking and/or sharing photos of Kobe and Gianna Bryant's remains for personal, non-law-enforcement purposes violated the law.~~ In taking these actions, members of the Sheriff's Department and Fire Department acted in a manner that shocks the conscience and offends the community's sense of fair play and decency.

80. ~~52. The Doe~~Members of the Sheriff's Department, including but not limited to the Deputy Defendants, and members of the Fire Department were acting under color of state law at the time of their actions. ~~The Doe Defendants~~Sheriff's and Fire Department personnel took photos of the Bryants' remains while in uniform, on duty, and in an area where public access was prohibited and only first responders (such as ~~sheriff~~Sheriff's ~~deputies~~and Fire Department personnel) were allowed. After the photos were taken, ~~the Doe Defendants~~Sheriff's and Fire Department personnel possessed and shared them while in uniform and/or on duty, or otherwise in connection with or by virtue of their employment with the Sheriff's or Fire Department.

~~53. As a direct and proximate result of the Doe Defendants taking and sharing death images of Kobe and Gianna Bryant, Plaintiff has suffered (and continues to suffer) severe emotional distress in an amount to be proven at trial.~~

54. The Doe Defendants committed the acts alleged recklessly and with callous disregard for Plaintiff's rights, entitling Plaintiff to punitive damages in an amount appropriate to punish the Doe Defendants and to make an example of them to the community.

**SECOND CAUSE OF ACTION**

**42 U.S.C. § 1983 (*Monell*), Violation of Fourteenth Amendment**

**(Against Sheriff Villanueva, in his official capacity, the Sheriff's Department, and the County)**

55. Plaintiff incorporates herein and realleges the allegations in paragraphs 1 through 53, inclusive, as if fully set forth herein.

81. 56. Pursuant to 42 U.S.C. § 1983, public entities are liable for constitutional violations when execution of their official policy or custom deprives an individual of her constitutional rights. A public entity is also liable for constitutional violations when its failure to establish a policy or procedure or to properly train, supervise, and/or discipline its employees amounts to deliberate indifference to the rights of persons with whom its employees come into contact.

82. 57. Upon information and belief, Sheriff Villanueva, theThe Sheriff's Department, the Fire Department, and the County acted with deliberate indifference to the constitutional rights of Plaintiff and others similarly situated through the conduct and omissions set forth above, which consist of the following customs, policies, and/or patterns of practice:

a. Failing to adequately train and supervise Sheriff's Department and Fire Department personnel to ensure they do not take or share photographs of human remains for personal, non-law-enforcement purposeswithout any legitimate governmental purpose;

b. Failing to establish a policy or procedure addressing the treatment of human remains, including the taking or sharing of photographs of human remains without any legitimate governmental purpose;

c. Failing to adequately investigate and discipline Sheriff's Department and Fire Department personnel who have ~~unnecessarily~~ taken and/or shared photographs of human remains without any legitimate governmental purpose.

83. ~~58.~~ Given the frequency with which Sheriff's and Fire Department personnel work at crime and accident scenes involving fatalities, it was obvious that some would be tempted to take photos of victims' remains on their personal cell phones. Sheriff Alex Villanueva and the Sheriff's Department knew that some law enforcement officers keep "death books" containing photos of victims' remains and that officers taking pictures for non-law-enforcement purposes is a problem "across the nation." The ~~Department was~~Sheriff's and Fire Departments were also aware that, on account of the large number of celebrities that live or work in the Los Angeles area, ~~its~~their personnel often work at accident and crime scenes that are the subject of intense public interest. Notwithstanding this knowledge and awareness, ~~Sheriff Villanueva,~~ the Sheriff's Department, the Fire Department, and the County failed to establish a policy regarding photographs of human remains or to train, supervise, investigate, or discipline ~~Department~~ personnel related to the taking and sharing of photos of human remains ~~for personal, non-law-enforcement purposes~~without any legitimate governmental purpose.

84. ~~59.~~ Based on the facts set forth above, the Sheriff's Department ~~was~~and Fire Department were on actual and/or constructive notice that the absence of a policy regarding photographs of human remains ~~or accident scenes~~ would likely result in violations of community members' constitutional rights.

85. ~~60.~~ The actions of Sheriff's Department and Fire Department personnel, including but not limited to the ~~Doe~~Deputy Defendants, reflect the pattern of practice and/or custom of the Sheriff's Department and Fire Department, as evidenced by the fact that the misconduct was not limited to a lone employee. Rather, ~~no fewer than eight deputies~~multiple members of the Sheriff's Department and

Fire Department took and shared photos of the Bryants' remains ~~for personal purposes~~without any legitimate governmental purpose. In addition, Sheriff Villanueva, whose entire career in law enforcement has been with the Sheriff's Department, has stated based on personal knowledge that unnecessary death images are a widespread problem in law enforcement.

86. ~~61.~~ As a direct and proximate result of ~~Sheriff Villanueva's,~~ the Sheriff's Department's, Fire Department's, and the County's failure to establish a policy regarding photographs of human remains or to train, supervise, investigate, or discipline its employees regarding unnecessary death images, as well as the ~~Department's~~Sheriff's and Fire Departments' pattern of practice and/or custom of unnecessarily taking and sharing death images, Plaintiff has suffered (and ~~continue~~continues to suffer) severe emotional distress in an amount to be proven at trial.

## ~~THIRD~~SECOND CAUSE OF ACTION

## Negligence

**(Against ~~Does 1-100; Alex Villanueva, in his personal capacity;~~ the ~~Sheriff's Department; and the County)~~Deputy Defendants)**

87. ~~62.~~ Plaintiff incorporates herein and realleges the allegations in paragraphs 1 through ~~60~~86, inclusive, as if fully set forth herein.

88. ~~63.~~ Pursuant to California Government Code section 820(a), public employees are liable for injuries caused by their acts or omissions to the same extent as a private person.

89. ~~64.~~ The ~~Doe~~Deputy Defendants owed a duty to Plaintiff to use ordinary care in their treatment of the Bryants' physical remains, including an obligation to refrain from taking and/or sharing images of them for personal, non-law-enforcement purposes. Cal. Civ. Code § 1714. ~~65.~~ The ~~Doe~~Deputy Defendants ~~and Sheriff Villanueva~~additionally owed a duty to Plaintiff to use ordinary care in preventing dissemination of any

~~unnecessary~~ images of the Bryants' remains once the images were created and/or were within their ~~control~~possession.

~~66. The Sheriff's Department, the County, Sheriff Villanueva, and the Doe Defendants routinely undertake the care, custody, and control of human remains at crime and accident scenes, and each did so with respect to the Bryants' remains at the crash site. By virtue of this, they owed a duty of care to Plaintiff to exercise ordinary care in their treatment of the remains.~~

~~67. Following the crash, Sheriff Villanueva assured Plaintiff that the Sheriff's Department was securing the crash site to ensure privacy. Accordingly, he owed a duty to Plaintiff to supervise his employees to ensure they conducted themselves with reasonable care and in a manner that preserved, rather than violated, the privacy of the victims and their families.~~

~~68. Based on her conversation with Sheriff Villanueva, Plaintiff believed the Sheriff's Department would secure the crash site, and she did not take steps, either personally or through a representative, to observe or monitor conduct at the crash site, knowing it would be traumatic.~~

90. The Deputy Defendants breached their duties to Plaintiff by sharing photos of the Bryants' physical remains for personal, non-law-enforcement purposes, including by electronic transmission and with members of the public.

91. ~~69.~~ The ~~Doe Defendants breached their duties to Plaintiff by taking and/or sharing photos of the Bryants' physical remains for personal, non-law-enforcement purposes.~~

~~70. Defendant Villanueva breached his duty to Plaintiff by failing to adequately supervise, either directly or through instructions to on-site supervisors, his deputies' conduct at the crash site.~~

~~71. Sheriff Villanueva and Doe Defendants in supervisory capacities in the Department breached their duties to Plaintiff by failing to take reasonable steps to prevent dissemination of the unnecessary images of the Bryants' remains after the images were created and in their constructive possession.72.~~ Deputy Defendants foresaw or should have foreseen that their conduct described above would injure Plaintiff.

92. ~~73.~~ As a direct and proximate result of the Deputy Defendants' conduct, Plaintiff has suffered (and continues to suffer) severe emotional distress in an amount to be proven at trial.

93. ~~74.~~ In committing the acts alleged herein, the ~~Doe~~Deputy Defendants ~~and Sheriff Villanueva~~ are guilty of oppression, fraud, and/or malice within the meaning of California Civil Code section 3294, entitling Plaintiff to punitive or exemplary damages in an amount appropriate to punish the Doe Defendants and to make an example of them to the community.

**THIRD CAUSE OF ACTION**

**Negligence**

**(Against the Entity Defendants)**

94. Plaintiff incorporates herein and realleges the allegations in paragraphs 1 through 93, inclusive, as if fully set forth herein.

95. Members of the Sheriff's Department, including but not limited to the Deputy Defendants, and members of the Fire Department owed a duty to Plaintiff to use ordinary care in their treatment of the Bryants' physical remains, including an obligation to refrain from taking and/or sharing images of them for personal, non-law-enforcement purposes. Cal. Civ. Code § 1714. Members of the Sheriff's Department, including but not limited to the Deputy Defendants, and members of the Fire Department also owed a duty to Plaintiff to use ordinary care in preventing dissemination of any images of the Bryants' remains once the images were created and/or were within their possession.

96. Multiple members of the Sheriff's Department, including but not limited to the Deputy Defendants, breached their duties to Plaintiff by taking and/or sharing photos of the Bryants' physical remains for personal, non-law-enforcement purposes, including by electronic transmission and with members of the public. These members of the Sheriff's Department foresaw or should have foreseen that their conduct would injure Plaintiff.

97. Similarly, multiple members of the Fire Department breached their duties to Plaintiff by taking and/or sharing photos of the Bryants' physical remains without any legitimate governmental purpose. These members of the Fire Department foresaw or should have foreseen that their conduct would injure Plaintiff.

98. As a direct and proximate result of the conduct described above, Plaintiff has suffered (and continues to suffer) severe emotional distress in an amount to be proven at trial.

99. ~~75.~~ Pursuant to California Government Code section 815.2, the Sheriff's Department, the Fire Department, and the County are liable for injuries proximately caused by acts or omissions of their employees within the scope of their employment. ~~Upon information and belief, at~~At all times material, ~~Defendant Villanueva and~~ the ~~Doe~~Deputy Defendants and other members of the Sheriff's Department who took and/or shared photos of the Bryants' remains for personal, non-law-enforcement purposes were employed by the Sheriff's Department and were under the Department's direction and control when they engaged in the conduct described above. ~~The Doe Defendants~~Further, at all times material, members of the Fire Department who took and/or shared photos of the Bryants' remains without any legitimate governmental purpose were employed by the Fire Department and were under the Fire Department's direction and control when they engaged in the conduct described above. These members of the Sheriff's and Fire Departments were able to take photos of the Bryants' physical remains by virtue of their access to the crash site while on duty, and Sheriff's and Fire Department personnel who shared the photos without any legitimate purpose had access to them by virtue of their employment with the ~~Department. The acts of Defendant Villanueva and the Doe Defendants~~Sheriff's and Fire Departments, respectively. Hence, the actions described above were ~~committed~~taken within the course and scope of ~~their~~the

individuals' employment, and the Sheriff's Department, the Fire Department, and the County are liable for their negligent and wrongful conduct.

## FOURTH CAUSE OF ACTION

### Invasion of Privacy

**(Against ~~Does 1-100, the Sheriff's Department, and the County~~[redacted]**

100. ~~76.~~ Plaintiff incorporates herein and realleges the allegations in paragraphs 1 through ~~74~~99, inclusive, as if fully set forth herein.

101. ~~77.~~ Plaintiff has a privacy interest in the physical remains of her loved ones, Kobe and Gianna Bryant.

102. ~~78. The Doe Defendants publicly~~Upon information and believe, Defendant [redacted] disclosed photos of the Bryants' remains to multiple members of the public, both in person and electronically.

103. ~~79.~~ Sharing photos of accident victims' physical remains without any ~~law enforcement~~legitimate governmental purpose is offensive and objectionable to a reasonable person of ordinary sensibilities.

104. ~~80.~~ At the time ~~the deputies~~Defendant [redacted] shared the photos of the Bryants' remains, no photos of their remains had otherwise been made public, and details about the state of the victims' remains were not public knowledge. Sharing the graphic facts disclosed by the photos served no legitimate public purpose.

105. ~~81.~~ As a direct and proximate result of the conduct of ~~the Doe Defendants~~Defendant [redacted] Plaintiff has suffered (and continues to suffer) severe emotional distress in an amount to be proven at trial.

106. ~~82.~~ Pursuant to California Government Code section 820(a), ~~the Doe Defendants are~~Deputy [redacted] is liable for injuries caused by their acts or omissions to the same extent as a private person.

107. ~~83.~~ In committing the acts alleged herein, ~~the Doe Defendants are~~Deputy [redacted] is guilty of oppression, fraud, and/or malice within the meaning of California

Civil Code section 3294, entitling Plaintiff to punitive or exemplary damages in an amount appropriate to punish ~~the Doe Defendants~~Defendant [redacted] and to make an example of ~~them~~him to the community.

~~84. Pursuant to California Government Code section 815.2, the Sheriff's Department and the County are liable for injuries proximately caused by acts or omissions of their employees within the scope of their employment. Upon information and belief, at all times material, the Doe Defendants were employed by the Sheriff's Department and were under the Department's direction and control when they engaged in the conduct described above. The Doe Defendants were able to take photos of Kobe and Gianna Bryant's physical remains by virtue of their access to the crash site while on duty, and Sheriff's Department personnel who shared the photos had access to them by virtue of their employment with the Department. The acts of the Doe Defendants were committed within the course and scope of their employment, and the Sheriff's Department and County are liable for their negligent and wrongful conduct.~~

## FIFTH CAUSE OF ACTION

~~**Intentional Infliction of Emotional Distress**~~

**Invasion of Privacy**

**(Against ~~Does 1-100,~~ the ~~Sheriff's Department, and the County~~Entity Defendants)**

108 ~~85.~~ Plaintiff incorporates herein and realleges the allegations in paragraphs 1 through ~~83~~107, inclusive, as if fully set forth herein.

109 Plaintiff has a privacy interest in the physical remains of her loved ones, Kobe and Gianna Bryant.

110 Upon information and believe, members of the Sheriff's Department, including but not limited to the Deputy Defendants, disclosed photos of the Bryants' remains to multiple members of the public, both in person and electronically.

111 ~~86. The taking and/or sharing of~~Sharing photos of accident victims' physical remains ~~for no official purpose constitutes extreme and outrageous conduct exceeding all bounds of what is usually tolerated in a civilized community.~~

~~87. The Doe Defendants took and/or shared (both in person and electronically) photos of the Bryants' physical remains without any official or law enforcement purpose.~~without any legitimate governmental purpose is offensive and objectionable to a reasonable person of ordinary sensibilities.

112. ~~88.~~ At the time ~~they shared photos of the Bryants' remains, the Doe Defendants were aware that Kobe and Gianna Bryant had surviving immediate family members.~~that members of the Sheriff's Department, including but not limited to the Deputy Defendants, shared the photos of the Bryants' remains, no photos of their remains had otherwise been made public, and details about the state of the victims' remains were not public knowledge. Sharing the graphic facts disclosed by the photos served no legitimate public purpose.

~~89. The Doe Defendants disclosed the photos with the intention of causing, or with reckless disregard of the probability of causing, emotional distress to the family members of the victims, including Plaintiff.~~

113. ~~90.~~ As a direct and proximate result of members of the ~~deputies' conduct~~Sheriff's Department publicly disclosing photos of the Bryants' remains without any legitimate governmental purpose, Plaintiff has suffered (and continues to suffer) severe emotional distress in an amount to be proven at trial.

~~91. Pursuant to California Government Code section 820(a), the Doe Defendants are liable for injuries caused by their acts or omissions to the same extent as a private person.~~

~~92. In committing the acts alleged herein, the Doe Defendants are guilty of oppression, fraud, and/or malice within the meaning of California Civil Code section 3294, entitling Plaintiff to punitive or exemplary damages in an amount appropriate to punish the Doe Defendants and to make an example of them to the community.~~

114. ~~93.~~ Pursuant to California Government Code section 815.2, the Sheriff's Department and the County are liable for injuries proximately caused by acts or omissions of their employees within the scope of their employment. ~~Upon information and belief, at~~At all times material, ~~Defendant Villanueva and~~ the ~~Doe~~Deputy Defendants

and other members of the Sheriff's Department who publicly disclosed photos of the Bryants' remains were employed by the Sheriff's Department and were under the Department's direction and control when they engaged in the conduct described above. ~~The Doe Defendants~~These members of the Department were able to take photos of Kobe and Gianna Bryant's physical remains by virtue of their access to the crash site while on duty, and Sheriff's Department personnel who shared the photos had access to them by virtue of their employment with the Department. The acts of these members of the ~~Doe Defendants~~Department were committed within the course and scope of their employment, and the Sheriff's Department and County are liable for ~~the Doe Defendants'~~their negligent and wrongful conduct.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for the following relief ~~against all Defendants as follows~~:

1. For compensatory damages in an amount to be proven at trial;

2. For any additional general, specific, consequential, or incidental damages in an amount to be proven at trial;

3. For nominal damages;

4. For punitive damages against the Deputy Defendants in an amount appropriate to punish ~~the defendants~~them and make an example of ~~the defendants~~them to the community;

5. For an award that ~~defendants~~Defendants pay all of Plaintiff's costs and attorneys' fees;

6. For all interest, as permitted by law; and

7. For such other relief as the Court deems just and proper.

DATED: February XX, 2021

Respectfully submitted,

MUNGER, TOLLES & OLSON LLP

By: ______________________

LUIS LI

Attorneys for Plaintiff Vanessa Bryant

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues triable by jury.

DATED: ~~September~~February ~~17, 2020~~XX, 2021

Respectfully submitted,

MUNGER, TOLLES & OLSON LLP

By: ______________________________
LUIS LI

Attorneys for Plaintiff Vanessa Bryant