LUIS LI (State Bar No. 156081)
luis.li@mto.com
CRAIG JENNINGS LAVOIE (State Bar No. 293079)
Craig.Lavoie@mto.com
JENNIFER L. BRYANT (State Bar No. 293371)
Jennifer.Bryant@mto.com
MARI T. SAIGAL (State Bar No. 318556)
Mari.Saigal@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Los Angeles, California 90071-3426
Telephone:   (213) 683-9100
Facsimile:   (213) 687-3702

Attorneys for Plaintiff Vanessa Bryant

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| VANESSA BRYANT,<br><br>          Plaintiff,<br><br>     vs.<br><br>COUNTY OF LOS ANGELES; LOS ANGELES COUNTY SHERIFF'S DEPARTMENT; LOS ANGELES COUNTY FIRE DEPARTMENT; JOEY CRUZ; RAFAEL MEJIA; MICHAEL RUSSELL; and RAUL VERSALES,<br><br>          Defendants. | Case No. 2:20-cv-09582-JFW-E<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>1.  **Violation of Fourteenth Amendment – 42 U.S.C. § 1983**<br>2.  **Negligence**<br>3.  **Negligence**<br>4.  **Invasion of Privacy**<br>5.  **Invasion of Privacy**<br><br>**DEMAND FOR JURY TRIAL** |

1    Plaintiff Vanessa Bryant ("Plaintiff"), through her undersigned counsel,

2    hereby brings this action against defendants County of Los Angeles (the "County"),

3    the Los Angeles County Sheriff's Department (the "Sheriff's Department"), the Los

4    Angeles County Fire Department (the "Fire Department," and, collectively with the

5    County and the Sheriff's Department, the "Entity Defendants"), Joey Cruz, Rafael

6    Mejia, Michael Russell, and Raul Versales (collectively, the "Deputy Defendants,"

7    and, collectively with the County, the Sheriff's Department, and the Fire

8    Department, the "Defendants") seeking damages to remedy violations of rights

9    under the United States Constitution and for negligence and invasion of privacy

10    pursuant to California law.  This Court has subject matter jurisdiction pursuant to 28

11    U.S.C. sections 1331 and 1343.

12    Plaintiff alleges, on personal knowledge as to herself and information and

13    belief as to others, as follows:

14    <u>**INTRODUCTION**</u>

15    1.    On the morning of Sunday, January 26, 2020, three eighth-grade girls,

16    joined by parents and coaches, left their homes in Orange County to play in a youth

17    basketball tournament in Thousand Oaks.  Making their way by helicopter, they

18    encountered dense fog.  Rather than land or turn around, the pilot pushed into the

19    fog and became disoriented.  The helicopter descended rapidly and crashed into the

20    foothills of the Santa Monica Mountains, killing everyone onboard.  Vanessa

21    Bryant's thirteen year-old daughter, Gianna Bryant, and husband of nearly twenty

22    years, Kobe Bryant, were among those who died.

23    2.    In the aftermath of the crash, several of the victims' family members

24    gathered at the L.A. County Sheriff's station in Lost Hills, devastated and

25    distraught.  Sheriff Alex Villanueva met with them and assured Mrs. Bryant that his

26    deputies were securing the crash site.  Based on a leak by law enforcement, the

27    gossip and celebrity news site *TMZ* had reported that Kobe, a singular figure in

28

1  Southern California culture and a hero to millions around the world, had died, and
2  onlookers were flocking to the accident scene.

3       3.       But the biggest threat to the sanctity of the victims' remains proved to
4  be the Sheriff's Department itself.  Faced with a scene of unimaginable loss,
5  Sheriff's Department personnel abused their access to the crash site by taking and
6  sharing gratuitous photos of the dead children, parents, and coaches.  As the
7  Sheriff's Department would later admit, there was no investigatory reason for
8  Department personnel to take pictures of the victims' remains.

9       4.       Within forty-eight hours, at least ten members of the Department
10 obtained and possessed images of the victims' remains on their personal cell phones
11 without any legitimate reason for having them.  The gratuitous images also became
12 a subject of gossip within the Department, as deputies shared them in settings that
13 had nothing to do with investigating the accident.  One deputy even showed off
14 photos of the victims at a bar, identifying one of the individuals depicted as Kobe
15 Bryant and bragging about how he had been at the crash site.  Shocked and appalled,
16 one of the bar patrons filed a written complaint with the Sheriff's Department.

17      5.       Upon learning that his deputies had taken and shared the gratuitous
18 photos, which plainly violated the victims' families' constitutional rights to control
19 images of their loved ones' remains, Sheriff Villanueva did not inform the victims'
20 families, initiate an internal affairs investigation, or inspect the deputies' phones to
21 determine whether and how the photos had been shared.  He instead directed a
22 cover-up, summoning the deputies to the Lost Hills station and telling them that, if
23 they deleted the photos, they would face no discipline.  The deputies purported to
24 accept the Sheriff's offer, receiving a free pass in exchange for destroying evidence
25 of their misconduct.

26      6.       For one month, the Department's cover-up worked.  But on February
27 27 and 28, 2020, the *Los Angeles Times* reported on the deputies' photos and the
28 Department's effort to hide its wrongdoing.  Following the reports, Sheriff

Villanueva admitted that his deputies took "illicit photos" of the victims' remains and that he informally ordered their destruction to avoid the "usual routine" of a formal investigation in which everyone "lawyers up."

7.    Following the *Los Angeles Times* reports, other news outlets began reporting that the misconduct was not limited to the Sheriff's Department—Fire Department personnel had taken and shared improper photos of the victims' remains as well.  Like the Sheriff's Department, the Fire Department had been aware of the egregious conduct for several weeks and responded by directing employees to destroy evidence of their wrongdoing without ever informing the victims' families.

8.    Devastated by these reports, Mrs. Bryant privately sought information from the Sheriff's Department and Fire Department to assess whether she should brace for pictures of her loved ones' remains to surface on the internet.  Mrs. Bryant asked the departments to explain the steps they had taken to determine the scope of the misconduct and ensure that all photos of the crash site had been secured.  Both responded that they needed extra time to respond due to the "unusual circumstance" of needing to consult documents, then sent letters in which they refused to respond to all but one of Mrs. Bryant's questions and asserted that they had no legal obligation to assist.

9.    The Sheriff's and Fire Departments' outrageous actions have caused Mrs. Bryant severe emotional distress and compounded the trauma of losing Kobe and Gianna.  Mrs. Bryant feels ill at the thought that sheriff's deputies, firefighters, and members of the public have gawked at gratuitous images of her deceased husband and child, and she lives in fear that she or her children will one day confront horrific images of their loved ones online.  Many social media users and internet trolls have claimed to have seen photos of the victims' remains, and their accounts are plausible given the number of individuals who took and transmitted improper photos, the ease with which cell phone photos are electronically shared and saved in cloud storage, and the egregious failure to take reasonable steps to

- 3 -

1   prevent dissemination of the photos.

2        10.    In taking these photographs and at several points thereafter, members

3   of the Sheriff's and Fire Departments have chosen to act reprehensibly, and the

4   departments' responses to their employees' conduct has demonstrated that they

5   either do not understand or do not care about the pain they have caused. This

6   lawsuit seeks to impose accountability for that.

7                   **JURISDICTION AND VENUE**

8        11.    The County removed this action, which was commenced in the

9   Superior Court of the State of California for the County of Los Angeles, pursuant to

10   28 U.S.C. sections 1331, 1441, and 1446. This Court has jurisdiction over this

11   action pursuant to 28 U.S.C. sections 1331 and 1343 because Plaintiff brings a claim

12   for violation of the Fourteenth Amendment of the United States Constitution under

13   42 U.S.C. section 1983, and this Court has supplemental jurisdiction over Plaintiff's

14   state law claims under 28 U.S.C. section 1367(a).

15        12.    Venue is proper in this District pursuant to 28 U.S.C. section 1391(b),

16   because Defendants in this action are individuals and public agencies situated in Los

17   Angeles County and because, on information and belief, all of the acts or omissions

18   giving rise to this Complaint occurred in the Central District of California.

19                      **THE PARTIES**

20        13.    Plaintiff Vanessa Bryant, a California resident, is the wife of Kobe

21   Bryant and mother of Gianna Bryant.

22        14.    Defendant County of Los Angeles is a municipal corporation duly

23   authorized to operate under the laws of the State of California. The Los Angeles

24   County Sheriff's Department is a department of the County.

25        15.    Defendant Los Angeles County Sheriff's Department is a local

26   government entity created under the laws of the State of California and a department

27   of Defendant County. The Sheriff's Department provides general law enforcement

28

services to certain contract cities, including Calabasas, California. The Department's work is directed by, among others, Sheriff Alex Villanueva.

16.    Defendant Los Angeles County Fire Department is a local government entity created under the laws of the State of California and a department of Defendant County. The Fire Department provides fire suppression and prevention services under contract with the city of Calabasas, California.

17.    Defendants County, Sheriff's Department, and Fire Department are "persons" subject to suit within the meaning of 42 U.S.C. § 1983. *See Monell v. New York Department of Social Services*, 436 U.S. 658, 691 (1978).

18.    Pursuant to California Government Code § 815.2(a), Defendants County, Sheriff's Department, and Fire Department are liable for any and all wrongful acts in violation of state law hereinafter complained of and committed by their employees acting within the course and scope of their employment.

19.     Defendant Joey Cruz is an individual and currently a sheriff's deputy in the Los Angeles County Sheriff's Department. Cruz is sued in his individual capacity. On information and belief, Defendant Cruz is a resident of California.

20.    Defendant Rafael Mejia is an individual and currently a Sheriff's deputy in the Los Angeles County Sheriff's Department. Mejia is sued in his individual capacity. On information and belief, Mejia is a resident of California.

21.    Defendant Michael Russell is an individual and currently a Sheriff's deputy in the Los Angeles County Sheriff's Department. Russell is sued in his individual capacity. On information and belief, Russell is a resident of California.

22.    Defendant Raul Versales is an individual and currently a Sheriff's deputy in the Los Angeles County Sheriff's Department. Versales is sued in his individual capacity. On information and belief, Versales is a resident of California.

## GENERAL ALLEGATIONS

### Sheriff's and Fire Department Personnel Took and Shared Unnecessary Photos of the Victims' Remains

23.     On the morning of January 26, 2020, a helicopter carrying Kobe Bryant and his thirteen-year-old daughter, Gianna, crashed into the foothills of the Santa Monica Mountains near Calabasas, California.  The pilot and all passengers died on impact.

24.     The hours after the crash were filled with confusion.  Mrs. Bryant learned of the crash from an employee of Kobe, Inc., but was told there were survivors.  She then began receiving Instagram messages expressing sympathy for her loss.  Based on a leak by law enforcement, *TMZ* had reported that Kobe had died in a helicopter accident.  Having heard nothing from law enforcement herself, Mrs. Bryant was confused and distraught.  Ultimately, other news outlets confirmed that Kobe and Gianna had perished in the accident.

25.     Paparazzi, members of the public, and a significant number of unauthorized drones flocked to the crash site.  The Sheriff's Department closed multiple roads and freeway off-ramps leading to the site to discourage onlookers, and the Federal Aviation Administration imposed a five-mile no-fly zone overhead at Mrs. Bryant's request.  An emergency ordinance prohibited unauthorized access to the site, and Sheriff Villanueva announced that trespassers would be arrested and charged with a misdemeanor.

26.     Meanwhile, Mrs. Bryant and other family members of the victims gathered at the nearby Sheriff's station in Lost Hills.  Mrs. Bryant spoke with Sheriff Alex Villanueva and expressed concern that the crash site was unprotected from photographers.  Sheriff Villanueva assured her that his deputies were securing the scene.

27.     This assurance was hollow.  Notwithstanding Sheriff Villanueva's later acknowledgement that Sheriff's Department personnel "had no place to be taking

photographs of anything," deputies who responded to the crash scene used personal cell phones to take and share gratuitous photos of the dead children, parents, and coaches.  According to the Sheriff's Department's subsequent investigatory report, one deputy in particular took between 25 and 100 photos of the crash scene on his personal cell phone, many of which had no conceivable investigatory purpose and were focused directly on the victims' remains.

28.    Photos of the remains quickly spread within the Sheriff's Department as deputies transmitted them to one another via text message and AirDrop.  Within forty-eight hours, at least ten members of the Sheriff's Department obtained and possessed photos of the victims' remains on their personal cell phones despite having no legitimate governmental use for the photos.  Making matters worse, Sheriff's Department personnel showed off the photos of the victims' remains to colleagues in settings that had nothing to do with investigating the crash—an investigation that was being handled by the National Transportation Safety Board ("NTSB"), not the Sheriff's Department—and the photos became the subject of gossip within the Department.

29.    Members of the Fire Department engaged in similar misconduct. While working the crash site on January 26, 2020, several members of the Fire Department abused their access to take graphic photos of the victims' remains without any legitimate governmental purpose.  One such instance occurred at approximately 2:00 p.m. on January 26, 2020—long after the downed helicopter had been identified—when a sheriff's deputy observed a firefighter taking multiple pictures of the accident scene.  As the deputy later explained to Sheriff's Department investigators, the firefighter "wasn't one of the first responder[s]," but rather "showed up after the fact, and then started taking pictures as well."  In addition, according to a complaint filed in Los Angeles County Superior Court in November 2020 by Tony Imbrenda, a public information officer in the Fire Department who responded to the crash scene on the day of the accident but was not

involved in investigating the accident, multiple firefighters electronically transmitted photos of the crash scene to him.  Based on the foregoing, Plaintiff believes and thereon alleges that, in the hours and days that followed the crash, several members of the Fire Department electronically shared and/or displayed the graphic images of her loved ones' remains to colleagues without any legitimate governmental purpose.

### Deputy Rafael Mejia

30.     Rafael Mejia, a deputy with the Sheriff's Department, responded to the general proximity of the accident scene on January 26, 2020 and stationed himself at the Department's makeshift command post at the Los Virgenes Water District. While there, Mejia obtained multiple photographs of the Bryants' remains and stored them on his personal cell phone.

31.     Shortly after obtaining photos of the Bryants' remains, Mejia shared them with at least two individuals without any legitimate governmental purpose.

a.     At some point on January 26, 2020—after Mejia and others had learned that the victims of the helicopter accident included Kobe and Gianna Bryant—Mejia walked 100 feet from his position at the makeshift command post to chat with a female deputy who was controlling traffic in and out of the Las Virgenes Water District.  Mejia told the deputy that he had photos of the accident scene and, for no reason other than morbid gossip, proceeded to send the photos of the Bryants' remains to her personal cell phone.  The deputy had no role in investigating the accident or identifying those who perished, and later acknowledged in an interview with Department investigators that she had no legitimate governmental purpose for the photos.  Similarly, Mejia admitted to investigators that the deputy did not need the photos for any reason and that it was inappropriate to send them to her.  In explaining his actions to investigators, Mejia could only say that "curiosity got the best of [them]" and that such curiosity was "in [their] nature" as deputies.

b.      At a separate point on January 26, 2020—and again, with knowledge that Kobe and Gianna Bryant were among those who perished in the crash—Mejia electronically transmitted photos of the Bryants' remains to another deputy, Joey Cruz.  Cruz had responded to the general proximity of the accident scene along with Mejia, but he had no role in investigating the accident or identifying those who perished.  Mejia sent photos of the Bryants' remains to Cruz's personal cell phone without any legitimate governmental purpose.

32.     Following the above actions, Mejia learned that a complaint had been filed with the Sheriff's Department regarding improper sharing of photos of the crash victims' remains.  Mejia then negligently and/or willfully destroyed evidence of his wrongdoing by deleting photos of the victims' remains and other evidence from his personal cell phone.  At the time, Mejia had an obligation to preserve this evidence of his wrongdoing, including any associated metadata, and, as a trained law enforcement officer, knew or should have known that the evidence may be relevant to future litigation or investigations.  By committing this spoliation, Mejia severely undermined the ability to verify any of his claims regarding his handling and dissemination of the photos.

**Deputy Joey Cruz**

33.     Joey Cruz, a trainee deputy with the Sheriff's Department, responded to the general proximity of the accident scene on January 26, 2020.  While there, Cruz was posted at the base of the hillside, where he monitored entry to a trailhead that led to the downed helicopter.  At no point on the day of the accident or at any time thereafter did Cruz have a role in investigating the accident or identifying those who perished.  Nonetheless, at some point during his shift, Cruz obtained multiple photographs of the Bryants' remains on his personal cell phone.

34.     After obtaining photos of the Bryants' remains, Cruz shared them with multiple individuals without any legitimate governmental purpose, including several members of the public.

- 9 -
FIRST AMENDED COMPLAINT

a.      While at the Lost Hills Sheriff's station on the evening of January 26, 2020—long after Cruz and others had learned that the victims of the helicopter accident included Kobe and Gianna Bryant—Cruz told another deputy, Michael Russell, that he had photos of the accident scene.  Russell asked to see the photos, and Cruz texted photos of the Bryants' remains to Russell's personal cell phone.  There was no legitimate governmental purpose for Cruz to transmit the photos to Russell because, like Cruz, Russell had no role in investigating the accident or identifying those who perished.

b.      On January 28, 2020, while at his mother's house in West Covina, California, Cruz showed photos of the Bryants' remains to his niece.  Before displaying the photos, Cruz made a crude remark about the state of the victims' remains.

c.      While at the Baja California Bar and Grill in Norwalk, California on January 28, 2020, Cruz boasted that he had worked at the scene of the accident where Kobe Bryant had died.  Cruz then showed photos of the Bryants' remains to a fellow bar patron and the restaurant's bartender, and he is seen on the bar's security camera zooming in and out of the images while displaying them to the bartender.  One of the photos showed the body of a girl, and Cruz remarked that another showed the remains of Kobe Bryant.  Shortly after seeing the photos, the bartender loudly boasted to restaurant employees and patrons that he had just seen a photo of Kobe Bryant's body and described the image in graphic detail.

35.     Following the above actions, Cruz learned that a complaint had been filed with the Sheriff's Department regarding improper sharing of photos of the crash victims' remains.  Cruz then negligently and/or willfully destroyed evidence of his wrongdoing by deleting photos of the victims' remains from his personal cell phone and deleting the text messages he had sent Russell that contained photos of the victims' remains.  At the time, Cruz had an obligation to preserve this evidence of his wrongdoing, including any associated metadata, and, as a trained law

enforcement officer, knew or should have known that the evidence may be relevant to future litigation or investigations.  By committing this spoliation, Cruz severely undermined the ability to verify any of his claims regarding his handling and dissemination of the photos.

### Deputy Michael Russell

36.    Deputy Michael Russell responded to the general proximity of the accident scene on January 26, 2020, and was staffed to a checkpoint at the base of a hillside that led to the downed helicopter.  Throughout the day, Russell heard rumors that photos of the accident scene were circulating among other deputies, and he was curious to see them himself.  While at the Lost Hills Sheriff's station that evening, Russell asked Cruz to send him the photos, and Cruz sent him photos of the Bryants' remains.  Russell saved the photos to an album on his personal cell phone so that he did not have to keep going into the text message to view them.

37.    At no point did Russell play any role in investigating the accident or identifying those who perished.  In an interview with Department investigators, Russell admitted that there was no investigative purpose for him to obtain the photos and that it was inappropriate for him to take possession of them.

38.    Nonetheless, on or around January 28, 2020, Russell shared the photos with a personal friend with whom Russell plays video games nightly.  Although the friend is a sheriff's deputy, he was assigned to the Santa Clarita station, not the Lost Hills station, and had no involvement whatsoever in the response to the helicopter accident.  In a text exchange initiated by Russell, Russell told the friend that he had pictures of the accident scene.  Russell then texted photos of the Bryants' remains to his friend's personal cell phone, noting that one of the victims depicted was Kobe Bryant.  In a later interview with Department investigators, Russell's friend indicated that one of the photos showed the remains of a child and that the remains appeared to be the primary focus of the photo.

39.     Following the above actions, Russell negligently and/or willfully destroyed evidence of his wrongdoing by deleting photos of the victims' remains and other evidence from his personal cell phone.  At the time, Russell had an obligation to preserve this evidence of his wrongdoing, including any associated metadata, and, as a trained law enforcement officer, knew or should have known that the evidence may be relevant to future litigation or investigations.  By committing this spoliation, Russell severely undermined the ability to verify any of his claims regarding his handling and dissemination of the photos.

### Deputy Raul Versales

40.     Raul Versales, a deputy with the Sheriff's Department, responded to the general proximity of the accident scene on January 26, 2020 and stationed himself at the makeshift command post established at the Los Virgenes Water District.  While there, Versales obtained multiple photographs of the Bryants' remains, stored them on his personal cell phone, and shared them with several other Department personnel, including Mejia.

41.     On the evening of January 26, 2020—long after Versales learned that the victims of the helicopter accident included Kobe and Gianna Bryant—Versales sent photos of the Bryants' remains to a detective for the Department without any legitimate governmental purpose.  The detective had responded to the general proximity of the accident scene earlier in the day, but had no role in investigating the accident or identifying those who perished.  As the detective admitted to Department investigators, he did not use the photos for any official purpose and there was no reason for him to receive them.  As an indication of how casually the photos were shared within the Department, the detective could not even identify the name of the deputy who sent him the photos during an interview with Department investigators.  Following his shift on January 26, 2020, the detective asked his wife,

who is not a law enforcement officer and had no reason to view the photos, whether she wanted to see the photos of the victims' remains.

42.    Following the above actions, Versales negligently and/or willfully destroyed evidence of his wrongdoing by deleting photos of the victims' remains and other evidence from his personal cell phone.  At the time, Versales had an obligation to preserve this evidence of his wrongdoing, including any associated metadata, and, as a trained law enforcement officer, knew or should have known that the evidence may be relevant to future litigation or investigations.  By committing this spoliation, Versales severely undermined the ability to verify any of his claims regarding his handling and dissemination of the photos.

## The Defendants Attempt a Cover-Up and Destroy Evidence

43.    Minutes after Cruz left the Baja California Bar and Grill on the evening of January 28, 2020, the bartender approached a table of four patrons and excitedly stated that a sheriff's deputy had just shown him graphic photos of Kobe Bryant's remains.  The bartender described specific characteristics of Mr. Bryant's remains, explained how the remains could be linked to Mr. Bryant, and indicated he found the situation humorous.  The bartender was poised to divulge additional details, but the patrons expressed that they did not want to hear anything further.

44.    In a later interview with Department investigators, one of the patrons explained that he found the situation "very, very disturbing," such that it "bothered [him] that entire night, even [on] [his] drive home."  The patron believed it was "very inappropriate for that deputy to be there at that environment, showing those pictures to other individuals," and the situation "did not sit well with [him] at all."  Upon arriving home, the patron emailed a complaint to the Sheriff's Department while sitting in his car in his driveway: "There was a deputy at Baja California Bar and Grill in Norwalk who was at the Kobe Bryant crash site showing pictures of his [i.e., Kobe Bryant's] . . . body.  He was working the day the helicopter went down and took pictures of the crash site and bodies.  He is a young deputy, shaved head

with tatoos [sic] on his arm.  From what I know[,] [h]e's been on the field for 4 months[.]"

45.    Under normal protocol, this complaint would have triggered a formal inquiry and/or an internal affairs investigation.  But Sheriff Villanueva did not follow protocol.  He did not conduct a standard investigation or collect, inspect, or search cell phones to determine how many photos existed, whether and how they had been transmitted, or whether they were stored on the cloud.  He did not inform the L.A. County Office of the Inspector General.  Most importantly, he did not alert the victims' families of the misconduct or the existence of the photos.

46.    Instead, sometime in late January 2020, Sheriff Villanueva summoned his deputies to the Lost Hills station and told them that if they "came clean" and deleted the photos, they would not face any discipline.  The deputies responded by claiming that they had deleted the photos and, to the extent they had transmitted the photos to others, those persons had also deleted them.  Sheriff Villanueva abided by his offer and did not discipline the deputies for violating the constitutional right of the victims' families.  For nearly a month, until their hands were forced by public reports about the photos, Sheriff Villanueva and the Department took no further action to investigate or contain the spread of the photos.

47.    The above actions were taken to avoid the consequences of misconduct by Department personnel or, at a minimum, in reckless disregard of the risk that destruction of evidence would render a complete investigation impossible.  At the time that Department leadership ordered deletion of the photos without conducting any meaningful investigation, the Department and the County knew or should have known that the actions of Department personnel, including Cruz's conduct at the bar in Norwalk, California, constituted tortious conduct under California law and a violation of the constitutional rights of the victims' families under the United States Constitution.  Hence, the Department and the County had an obligation to preserve evidence of the Department's wrongdoing, including any associated metadata, and,

as trained law enforcement officers, Department leadership knew or should have known that the evidence may be relevant to future litigation and investigations.

## The Misconduct Is Exposed

48.     On February 27 and 28, 2020, the *Los Angeles Times* reported that several sheriff's deputies had taken and shared photos of the victims' remains and that the Sheriff's Department had been aware of the misconduct for nearly a month. Soon thereafter, the *Times* also exposed the Department's attempted cover-up, reporting that it "tried to keep a lid on the episode instead of following normal investigative protocols."  Around the same time, it was reported that Fire Department personnel were sharing graphic photos of the victims' remains and that the Department responded by telling its members to destroy the photos.

49.     In an interview with the *Los Angeles Times* on February 26, 2020, Captain Jorge Valdez stated that he was "unaware of any complaint" regarding crash-scene photos and that "there was no order given to delete any photographs." Both statements were false.  Valdez was personally involved in responding to the citizen complaint, having spoken to the complainant himself, and Sheriff Villanueva has since made numerous admissions about deputies taking photos of the victims' remains and his orders to destroy them without any meaningful investigation.

50.     Through statements made by Sheriff Alex Villanueva in his official capacity, the Sheriff's Department and the County have admitted the facts showing their tortious conduct and violation of Mrs. Bryant's constitutional rights.

a.     In media appearances in late February and early March 2020, Sheriff Villanueva admitted that at least eight deputies took and/or shared photos of the victims' remains and acknowledged that the conduct was "disgusting," "wildly inappropriate," "inexcusable," and "unconscionable."  Sheriff Villanueva further admitted that the improper photos "harm[ed] people [who] have suffered a tragedy

already" by creating the possibility of "a public display of their loved ones' remains."

b.      Sheriff Villanueva has also admitted that the photos of the victims' bodies were not taken for any law enforcement purpose.  In response to questions from reporters on March 2, 2020, Sheriff Villanueva admitted: "[I]n this type of scene, which is an accident, there's only two groups of people that should be taking photos: that is the NTSB and the coroner's office.  No one else has . . . any reason to take any photos . . . Anybody outside of [the NTSB and coroner's office] would be unauthorized.  It'd be illicit photos."  In another interview the same day, Sheriff Villanueva admitted: "[T]he deputies had no place to be taking any photographs of anything.  Only, in this case, it would have been NTSB investigators, coroner's investigators, and that's about it.  Nobody else."

c.      The Sheriff's Department has also admitted to destroying evidence of the unlawful photos.  In an interview with NBC-4 Los Angeles on March 2, 2020, Sheriff Villanueva stated that he learned within days of the crash that a trainee deputy had allegedly showed off crash-scene photos at a bar and, in response, the Department ordered the trainee and seven other deputies to delete the photos.  Villanueva stated that his "number one priority" was to "make sure those photos no longer existed."  According to Villanueva, the Department "identified what we thought were the eight individuals" who took the images and "they deleted all the pictures they had, and they acknowledged that, if they transmitted them, that they were deleted."

**The Sheriff's and Fire Departments Knew or Should Have Known That First Responders Taking Photos of Human Remains Is a Long-Standing Problem**

51.      On and before the date of the helicopter crash, the Sheriff's Department knew that unnecessarily taking, possessing, and sharing photos of victims' remains had been a long-running problem for law enforcement.  Addressing reporters on March 2, 2020, Sheriff Villanueva stated: "[U]nfortunately, ever since they invented

the Polaroid camera, this has been a problem in law enforcement across the nation, probably across the world, because it just makes it so much easier.  And then there's—there's cops—they keep death books, for example, where . . . they have photos from crime scenes throughout their careers."  In an interview with the *Los Angeles Times* on February 26, 2020, Sheriff Villanueva exhibited similar awareness of the problem: "Every police department struggles with the same thing, where people take photos and they're not evidence . . .  So that's a practice we have to make sure that everyone walks away, and there is no evidence other than the official photos of evidence that are taken for criminal purposes."

52.     In addition, the Sheriff's and Fire Departments knew prior to the helicopter crash that government employees abusing access to celebrity-related information has long been a problem in Los Angeles.  Examples include a sheriff's deputy unlawfully leaking the arrest report of a prominent actor and the Los Angeles Police Department improperly disclosing photos of a famous recording artist depicting injuries from a domestic assault.  With respect to the helicopter crash, Sheriff Villanueva has acknowledged that the involvement of a celebrity like Kobe Bryant, a singular figure in Southern California culture and a hero to millions around the world, creates "much more interest" among deputies.

53.     Notwithstanding the above knowledge and his assurances to Mrs. Bryant, Sheriff Villanueva said nothing in his briefings with first responders at the accident scene regarding photography or respecting privacy.

**The Sheriff's and Fire Departments Had No Policies to Prevent Violations of the Constitutional Right to Control the Death Images of Deceased Loved Ones**

54.     Since at least 2012, it has been clear in the Ninth Circuit that individuals have a substantive due process right under the United States Constitution to control the death images and physical remains of deceased family members.  *See Marsh v. Cnty. of San Diego*, 680 F.3d 1148 (9th Cir. 2012).  Nonetheless, and despite the Department's awareness that improper death images are "a problem in

law enforcement across the nation," neither the Sheriff's Department nor the Fire Department had a policy at the time of the accident regarding the taking or sharing of photos of human remains.

55.     Following the *Los Angeles Times* reports, the Sheriff's Department issued a statement that the allegations regarding the accident-scene photos "are currently under investigation, as are the effectiveness of existing policies and procedures."  (**Exhibit 1**.)  Days later, in a letter to the L.A. County Inspector General, Sheriff Villanueva admitted: "It is evident our photograph policy is deficient and this incident has identified a need for me to direct the creation of a new policy."  Similarly, in an interview with NBC-4 in March 2020, Sheriff Villanueva stated that the Department was "creating new [policies] that are very specific, with teeth in 'em, up to and including a penalty of discharge for violation of these policies."

56.     In the following months, the Sheriff's Department added an entirely new section to its Manual of Policies and Procedures, titled: "Photographs/Recordings at Scenes Where Human Remains Are Present."  (**Exhibit 2**.)  The new policy dictates that, "[i]n order to preserve the dignity and privacy of the deceased and their families, scenes where human remains are present shall only be photographed/recorded by Scientific Services Bureau or the Department of Medical Examiner (DME) personnel."  (**Ex. 2 at 1**.)  The new policy further provides: "Any photograph, recording, or record produced by a Department member . . . shall be considered the sole property of the Department" and "[a]ny unauthorized release or sharing is strictly prohibited."  (**Ex. 2 at 1**.)

57.     In interviews with Sheriff's Department investigators regarding the improper photos, personnel throughout the chain of command confirmed that the Sheriff's Department had no clear policy and had provided no training or instruction regarding photographs of human remains prior to the accident.

a.      Numerous deputies who responded to the accident scene on January 26, 2020, including Mejia, Russell, Versales, and others, told Department investigators there was no instruction or briefing on the day of the accident regarding photography of the crash site or human remains.

b.      Although many of the Sheriff's Department personnel who obtained photos of the victims' remains were in the midst of training to become sheriff's deputies, had recently completed such training, or were themselves training officers, none demonstrated any awareness of a Department policy regarding the propriety of taking, possessing, or sharing photos of human remains, nor did they report having received any training on the subject prior to the *Los Angeles Times* reports in February 2020.

c.      A captain for the Sheriff's Department who was the senior-most supervisor at the makeshift command post on the day of the accident demonstrated no awareness of the Sheriff's Department's policy regarding use of personal cell phones to capture work-related environments, telling investigators that it was "absolutely" appropriate for department personnel to use personal cell phones to photograph accident scenes.  The captain further implied that using personal cell phones to take photos of human remains would be appropriate to memorialize a scene, so long as the cell phone photos are provided to the Department's homicide department.  In interviews with investigators, the captain displayed no awareness of any department policy related to taking, possessing, or sharing photos of human remains, nor did he report having received any training on the subject.

d.      A sergeant for the Sheriff's Department who was second-in-command at the makeshift command post on the day of the accident told investigators that, even with the benefit of hindsight, there is nothing he would do differently regarding the way he supervised the deputies on the day of the accident. The sergeant added that he thought that the accident scene "was handled great" by the Sheriff's Department and remarked that "it's just one person," presumably Cruz,

who "screwed it up for everybody."  The sergeant demonstrated no awareness of the Sheriff's Department's policy regarding use of personal cell phones to capture work-related environments, telling investigators that he believed it was appropriate for deputies at the crash site to use their cell phones to take photos of the scene.  At one point in an interview with Department investigators, the sergeant stated: "[I]f it happened again I guess I – if there was [a] policy that specifically said on how to – I don't know.  I guess how to handle any type of video or – or pictures and – then it would be brought up, but I don't know."

e.      As of September 29, 2020, as discussed below in paragraph 70, it is a crime in California for a first responder to take photos of deceased individuals without a valid purpose.

58.      Similarly, according to a lawsuit recently filed in Los Angeles Superior Court by a former Public Information Officer for the Fire Department who responded to the crash scene, Tony Imbrenda, the Fire Department had no policy at the time of the accident regarding photography at emergency incidents.

**The Sheriff's Department Failed to Train Its Employees on the Department's Policy Regarding Photos of Work-Related Scenes on Personal Cell Phones**

59.      In addition to failing to establish a specific policy regarding the treatment and photographing of human remains, the Sheriff's Department also did not follow or enforce its policy regarding deputies' use of personal cell phones to capture work-related environments.  That policy provides:

> Members shall not use a personal cellular telephone or any other similar personal communication or recording device to record, store, document, catalog, transmit, and/or forward any image, document, scene, or environment captured as a result of their employment and/or while performing official Department business that is not available or accessible to the general public.

(**Exhibit 3 at 5**.)  According to the Sheriff's Department's Manual of Policies and Procedures, supervisors must investigate reports of violations of the policy and "will be held accountable for and evaluated on" their enforcement of the policy.  (**Ex. 3 at**

**2.**)  Members of the Department who violate the policy "shall be subject to disciplinary action," which could include "reprimand," "suspension without pay," "reduction in rank," and/or "dismissal from the Department."  (**Ex. 3 at 3-4**.)

60.    In direct contravention of this policy, the sergeant who was second-in-command at the Department's command post on the day of the accident told Department investigators that the Lost Hills station had a policy and/or custom of *encouraging* Department personnel to photograph accident scenes using their personal cell phones so that the images could be posted on the station's social media accounts, including Twitter and Facebook.  The sergeant explained that, at the time he received the call to respond to the helicopter crash, he was at the scene of an automobile crash taking pictures on his personal cell phone.  According to the sergeant, he had taken a class regarding social media and was "told to take pictures of deputies in action."  The sergeant added that the Lost Hills station "is really big on tweeting stuff out" and "they're really pushing this social media . . . showing us in action or whatever."

61.    Sheriff Villanueva did not discipline the deputies who took cell-phone photos of the crash site and has stated publicly that the Department's policies at the time did not prohibit the deputies' actions.  These statements and actions, combined with the significant number of deputies who took and/or shared cell-phone photos of the accident site, demonstrate that the Department failed to adequately train, supervise, and discipline its personnel regarding its policy related to the use of personal cell phones to photograph work-related scenes.

### The Sheriff's Department and Fire Department Refuse to Provide Information to Mrs. Bryant

62.    After learning of the existence of the photos, attorneys for Mrs. Bryant sent letters to the Sheriff's and Fire Department requesting that they take immediate action to secure all photos and videos of the crash in their possession, "including any photos or videos in the possession of or disseminated by Sheriff's Department

personnel." (**Exhibit 4.**)  Mrs. Bryant further requested that the Sheriff's Department and Fire Department conduct internal affairs investigations "to determine the extent of the unauthorized taking and dissemination of photos" and the identities of the deputies and firefighters involved.  (**Ex. 4 at 2, Ex. 5 at 2**.)

63.  On March 8, 2020, following news reports regarding the number of deputies who took improper photos, attorneys for Mrs. Bryant sent a follow up letter requesting more information about the Sheriff's Department's investigation of the deputies' misconduct, including the identity of all personnel who took photos of the victims' remains; the steps the department had taken to identify all personnel who had the photos on their personal devices; the steps the department had taken to determine whether and to what extent personnel who had such photos or recordings shared them with other members of the department or third parties; and the steps the department had taken to secure all photos or recordings of the victims' remains in the possession of its personnel.  (**Exhibit 6**.)

64.  On March 26 and April 2, 2020, nearly a month after Mrs. Bryant first inquired about the misconduct, an attorney for the Sheriff's Department wrote to Mrs. Bryant that the Department had no legal obligation to respond to her questions and would not do so.  (**Exhibits 7-8**.)  Mrs. Bryant received a nearly identical response from an attorney for the Fire Department in letters dated March 10 and 26, 2020.  (**Exhibits 9-10**.)

**The Sheriff's Department Conducts a Belated, Deficient Investigation**

65.  In response to public shock and outrage following the *Los Angeles Times* reports, as well as scrutiny from the Sheriff's Department's Civilian Oversight Board, the Department announced that it would conduct an internal affairs investigation of the improper photos.  In discussing his Department's inexcusably belated investigation, Sheriff Villanueva stated on March 2, 2020: "All [photos of remains] *that we know of* that were in the possession of the eight individuals were deleted, and we're *hoping* that that is the outcome of this—that there is no photos to

be circulated anywhere." (Emphasis added.) Two months later, in May 2020, Sheriff Villanueva stated that the Department was "going through the final stages" of its investigation of the improper photos and, "once the information is developed and it's done . . . we're going to make the entire investigation public so everybody can read it for themselves."

66.     The Department has yet to deliver on Sheriff Villanueva's promise of publicly reporting the results of the Department's investigation, but Mrs. Bryant obtained the Department's final investigative report via a motion to compel in January 2021. Substantively, the report reveals that the Sheriff's Department has failed to take basic steps to ensure all copies of the improper photos are tracked down and sequestered.

a.     The Department's interviews of the offending personnel were notably brief. For example, Defendant Russell was interviewed for a mere thirty-eight minutes, and another individual known to have possessed the improper photos was questioned for only fourteen minutes.

b.     In the transcribed interviews, the Department's investigators revealed that they were unfamiliar with fundamental concepts regarding how photos are stored and transmitted on cell phones. For example, during Defendant Versales' interview, the Department's lead investigator stated: "I don't know how iPhones work." And when another officer who had received photos of the victims' remains stated in his interview that he didn't understand how his phone worked and had "to ask my kids how to do most of the stuff," the lead investigator responded: "Right. I'm the same way. I really don't, I'm not familiar with phones like that." Several deputies told the Department's investigators that they had transmitted the improper photos to one another using iPhone's AirDrop feature, to which the lead investigator responded, "I'm not too familiar with AirDrop," and "I've come to learn that AirDrop is an iPhone feature? Is that exclusive to iPhone?" No apparent investigative follow-up occurred.

c.      Several subjects of the investigation were themselves unsure of how their cell phones operated and whether photos of the victims' remains still remained in storage.  For example, when asked whether he had checked his cloud account to determine whether the improper photos were stored there, one member of the Department who had received the photos responded: "I don't know how to.  I don't know how to get into the cloud."  No apparent investigative follow-up occurred.

d.      Indeed, at no point during the investigation did Department investigators forensically examine the phones of personnel known to have possessed and/or shared photos of the crash victims' remains using their personal cell phones. Instead, the report's conclusions rest almost entirely on unverified, unsworn statements made by the offending personnel in interviews with Department investigators.

e.      Predictably, Defendants' earlier spoliation of evidence inhibited the investigation.  A large portion of the interviews involved having the witnesses describe from recollection how many photos they received and what they depicted. When one interview subject expressed difficulty remembering, the Department's lead investigator responded: "[T]his is what makes it difficult.  We don't have [the] pictures."  Without photos and text messages to examine, and without having conducted a forensic examination of the deputies' cell phones, the Department's purported investigatory findings amount to a regurgitation of the wrongdoers' self-serving, unsworn accounts of their own conduct.

### The Deputy Defendants Exhibit Consciousness of Guilt by Making False Exculpatory Statements to Department Investigators

67.      Each of the Deputy Defendants made false exculpatory statements to Department investigators in the wake of the citizen complaint.  Their decision to hide the facts strongly suggests that their misconduct was more extensive than they have admitted.

a.      In an interview with Department investigators on March 30, 2020, Defendant Mejia claimed that only one of the crash scene photos he shared contained victims' remains.  In reality, the number was at least five, as the deputy to whom Mejia sent the photos told investigators that approximately five of them showed human remains.   Defendant Mejia similarly made false statements in a memo he wrote to the head of the Lost Hills station on January 30, 2020.  In the memo, Mejia wrote that "[t]he purpose of me sending/receiving the [crash scene] photographs was to answer some questions regarding the color, numbers and identifying features of the aircraft as well as crash scene details."  Mejia also wrote: "The photographs were immediately erased after the incident from my cell phone."  Both of these statements were false.  In an interview with Department investigators on March 30, 2020, Mejia admitted that there was no need to send the crash scene photos to another deputy, but he did so because "curiosity got the best of us."  Mejia also acknowledged that he did not delete the photos until January 30, 2020—four days after the accident—when a supervisor told him to report to the Lost Hills station for questioning about the photos.

b.      In an interview with Department investigators on March 30, 2020, Defendant Cruz claimed that: (i) he did not show his phone to anyone other than the bartender at the Baja California Bar & Grill; (ii) he never zoomed-in on any of the photographs; (iii) he did not recall human remains being in any of the images he showed the bartender; and (iv) he did not tell the bartender that one of the bodies depicted in the photos was Kobe Bryant's.  All of these statements were false.  Security footage reveals Cruz showing his phone to a fellow bar patron and using his fingers to zoom-in on his phone while showing the photos to the bartender.  And, contrary to Cruz's claims, the bartender explained to Department investigators that Cruz showed him two photos containing victims' remains and specifically noted

1 certain details in the picture as proof that one of them reflected Kobe Bryant's

2 remains.

3          c.      In an interview with Department investigators on March 30,

4 2020, Defendant Russell claimed that he had "no idea" whether any of the human

5 remains in the photos belonged to Kobe Bryant.  However, the deputy to whom

6 Russell sent the photos told investigators that, when sending the photos via text,

7 Russell stated that he believed one of the individuals depicted was Kobe Bryant.

8 Defendant Russell similarly made false statements in a memo he wrote to the head

9 of the Lost Hills station on January 30, 2020.  In the memo, Russell wrote: "On 01-

10 26-2020, while working as unit 224T1, I shared photographs of the helicopter crash

11 crime scene with other law enforcement personnel.  I received the photographs from

12 Deputy Joey Cruz . . . who was also working this incident via text.  I sent two photos

13 of the aircraft crash to [a deputy] (Santa Clarita Station)."  These statements implied

14 that Russell shared the photos on the day of the accident with others who were

15 working at the scene.  However, Russell did not share photos with the deputy from

16 the Santa Clarita station "while working" on the day of the accident, January 26,

17 2020.  Rather, Russell later admitted in an interview with Department investigators

18 that he texted photos of the victims' remains to the deputy who works at the Santa

19 Clarita station (a personal friend of Russell's who had no involvement in responding

20 to the crash scene) while off duty on January 28, 2020, two days after the accident.

21          d.      In a memo addressed to the head of the Lost Hills station dated

22 January 30, 2020, Defendant Versales acknowledged that he sent crash-scene photos

23 to another member of the Department but claimed that "[t]he purpose of [his]

24 sending/receiving the [crash scene] photographs was to answer some questions

25 regarding the color, numbers and identifying features of the aircraft as well as crash

26 scene details."  Versales doubled down on this position in a later interview with

27 Department investigators, stating that he shared the photos for purposes of

28 identifying the helicopter.  This was false.  In an interview with Department

investigators, the officer to whom Versales sent the photos stated that he received them during the evening of January 26, 2020—long after the helicopter had been identified—and there was no reason for him to receive them.

### The *Los Angeles Times* Reveals Additional Details Regarding a Deputy's Misconduct

68.     Although nowhere mentioned in the Department's investigative report, in November 2020 the *Los Angeles Times* reported that the Sheriff's Department had moved to discipline an unnamed deputy for broadly sharing photos of the victims' remains on his personal cell phone.  The reporting cited the Sheriff's Department disciplinary summary for the third quarter of 2020, which states that a deputy "[s]tored confidential photographs of a multi-agency investigation on a personal cellular phone, and shared the photographs with friends, family members, and co-workers on multiple occasions."

### The Deputy Defendants Shared Photos of the Bryants' Remains with Multiple People, Including Members of the Public, Without Any Legitimate Purpose

69.     As detailed above, each of the Deputy Defendants (i) showed a willingness to take and/or retain possession of photos of the Bryants' remains on their personal cell phones without any legitimate governmental purpose; (ii) demonstrated a morbid curiosity in the photos; (iii) exhibited a willingness to share the photos with others, including through electronic transmission, without any legitimate governmental purpose; (iv) displayed consciousness of guilt by making false exculpatory statements regarding the photos; and (v) destroyed evidence of their possession and sharing of the photos despite an obligation to preserve it. Based on the foregoing, Plaintiff is informed and believes, and thereon alleges, that—in addition to the specific instances of improper sharing detailed above—the Deputy Defendants each shared photos of the Bryants' remains with multiple people, including members of the public, without any legitimate governmental purpose.

1

2

**California Enacts a Criminal Law Against
Improper Photos of Human Remains**

3     70.     In September 2020, responding to the Sheriff's Department's gratuitous

4   taking and sharing of photos of the crash victims' remains, the California state

5   government enacted Assembly Bill 2655.  *See* 2020 Cal. Stat. Ch. 219.  Known

6   informally as The Kobe Bryant Act of 2020, the law makes it a misdemeanor for a

7   first responder, including a law enforcement officer, to photograph the remains of a

8   crime or accident victim "for any purpose other than an official law enforcement

9   purpose or a genuine public interest."  Cal. Pen. Code § 647.9(a), (c).  As explained

10  by the California legislator who authored the new law, "[o]ur first responders, when

11  responding to an emergency, should not be taking very sensitive photographs . . . for

12  their own pleasure."

**Mrs. Bryant Has Suffered Severe Emotional Distress**

14     71.     Mrs. Bryant has suffered (and continues to suffer) severe emotional

15  distress from the knowledge that images of her husband's and daughter's remains

16  were taken and shared for the perverse gratification of law enforcement officers, and

17  she fears that she and her family may confront the appalling photos at any moment

18  on the internet.  This fear is eminently reasonable in light of the prevalence of cloud

19  storage (such as iCloud and Google Photos), text messaging, and social-media

20  applications, through which photos can be stored and shared almost instantaneously

21  (and sometimes inadvertently).  When Mrs. Bryant sought assurances from the

22  Sheriff's Department that it had taken reasonable measures to control the spread of

23  the photos, including whether it had "confiscated and/or inspected the electronic

24  devices of the personnel who had or have photographs of the crash scene or victims'

25  remains," the Department refused to offer any response whatsoever.  And at no

26  point has the Department taken even the basic investigatory step of collecting a

27  forensic image of the offending individuals' electronic devices.

28

72.     Mrs. Bryant's fear has been exacerbated by the fact that, despite knowing about the photos within days of the crash, Sheriff Villanueva took none of the steps that a reasonable supervisor (let alone a highly-trained professional investigator) would take to prevent dissemination of harmful photos in his constructive possession.  As a result of Sheriff Villanueva's offer to his deputies that they could avoid investigation and discipline by deleting the evidence of their misconduct, Mrs. Bryant must live with uncertainty regarding how many photos were taken, whether they remain stored on the cloud, whether and how they were shared via text message, email, or social media applications, and whether people to whom the deputies transmitted the photos continue to possess them.  Absent this information, it is impossible to rule out that the photos will surface and go viral online.  This uncertainty has caused Mrs. Bryant severe stress and anguish.

73.     Mrs. Bryant's anxiety has been reinforced by widespread discussion of the photos online.  In March 2020, Mrs. Bryant encountered an Instagram user who stated that she had seen pictures of Kobe and Gianna's bodies at the accident scene, and numerous Twitter users made similar statements even before the *Los Angeles Times* publicized that Department personnel had taken and shared improper photos of the victims' remains.  Other online commenters, along with the *National Enquirer* tabloid publication, have claimed that images of Kobe and Gianna's remains are being bought, shared, and/or sold on the dark web.

74.     These accounts are eminently plausible in light of the sheer number of deputies who took and shared photos of the Bryants' remains and the Department's grossly inadequate steps to prevent their dissemination.  For the foreseeable future, Mrs. Bryant and her family will almost certainly continue to encounter claims that photos of their loved ones' remains are circulating online, and they will have no way of knowing whether such claims are true or false.

75.     Avoiding thoughts of the Sheriff's Departments' misconduct has been impossible, as Mrs. Bryant is repeatedly reminded of it online.  Online trolls have

exploited the tragic circumstances and the Sheriff's Department misconduct for the purpose of taunting and hurting Mrs. Bryant.  These experiences provide a constant reminder that photos of her husband's and daughter's remains may be circulating in the public realm as a result of the Sheriff's Department's gross misconduct.

### Mrs. Bryant Served a Notice of Claims in Accordance with the Government Claims Act

76.     On May 8, 2020, pursuant to California Government Code section 900 et seq., Mrs. Bryant filed a written notice of claims against the Sheriff's Department, Sheriff Villanueva, and unknown deputies, based on the same underlying facts and issues alleged in this complaint.  As of this filing, the County has not substantively responded to Mrs. Bryant's notice of claim or provided a concrete timeline for when it will respond.  Per statute, the County's failure to act on Mrs. Bryant's claims within the time prescribed by the California Government Code constitutes a denial, such that Mrs. Bryant's claims are ripe for review by this Court.

77.     On July 20, 2020, pursuant to California Government Code section 900 et seq., Mrs. Bryant filed a written notice of claims against the Fire Department and unknown members of the Fire Department, based on the same underlying facts and issues alleged in this complaint.  As of this filing, the County has not substantively responded to Mrs. Bryant's notice of claim or provided a concrete timeline for when it will respond.  Per statute, the County's failure to act on Mrs. Bryant's claims within the time prescribed by the California Government Code constitutes a denial, such that Mrs. Bryant's claims are ripe for review by this Court.

### FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983 (*Monell*), Violation of Fourteenth Amendment

### (Against the Sheriff's Department, the Fire Department, and the County)

78.     Plaintiff incorporates herein and realleges the allegations in paragraphs 1 through 77, inclusive, as if fully set forth herein.

79.     By taking and sharing photos of Kobe and Gianna Bryants' remains without any legitimate governmental purpose, members of the Sheriff's Department, including but not limited to the Deputy Defendants, and members of the Fire Department deprived Plaintiff of her substantive due process right to control the physical remains, memory, and death images of her deceased husband and child. *See Marsh v. Cnty. of San Diego*, 680 F.3d 1148 (9th Cir. 2012).  In taking these actions, members of the Sheriff's Department and Fire Department acted in a manner that shocks the conscience and offends the community's sense of fair play and decency.

80.     Members of the Sheriff's Department, including but not limited to the Deputy Defendants, and members of the Fire Department were acting under color of state law at the time of their actions.  Sheriff's and Fire Department personnel took photos of the Bryants' remains while in uniform, on duty, and in an area where public access was prohibited and only first responders (such as Sheriff's and Fire Department personnel) were allowed.  After the photos were taken, Sheriff's and Fire Department personnel possessed and shared them while in uniform and/or on duty, or otherwise in connection with or by virtue of their employment with the Sheriff's or Fire Department.

81.     Pursuant to 42 U.S.C. § 1983, public entities are liable for constitutional violations when execution of their official policy or custom deprives an individual of her constitutional rights.  A public entity is also liable for constitutional violations when its failure to establish a policy or procedure or to properly train, supervise, and/or discipline its employees amounts to deliberate indifference to the rights of persons with whom its employees come into contact.

82.     The Sheriff's Department, the Fire Department, and the County acted with deliberate indifference to the constitutional rights of Plaintiff and others similarly situated through the conduct and omissions set forth above, which consist of the following customs, policies, and/or patterns of practice:

a.     Failing to adequately train and supervise Sheriff's Department and Fire Department personnel to ensure they do not take or share photographs of human remains without any legitimate governmental purpose;

b.     Failing to establish a policy or procedure addressing the treatment of human remains, including the taking or sharing of photographs of human remains without any legitimate governmental purpose;

c.     Failing to adequately investigate and discipline Sheriff's Department and Fire Department personnel who have taken and/or shared photographs of human remains without any legitimate governmental purpose.

83.     Given the frequency with which Sheriff's and Fire Department personnel work at crime and accident scenes involving fatalities, it was obvious that some would be tempted to take photos of victims' remains on their personal cell phones.  Sheriff Alex Villanueva and the Sheriff's Department knew that some law enforcement officers keep "death books" containing photos of victims' remains and that officers taking pictures for non-law-enforcement purposes is a problem "across the nation."  The Sheriff's and Fire Departments were also aware that, on account of the large number of celebrities that live or work in the Los Angeles area, their personnel often work at accident and crime scenes that are the subject of intense public interest.  Notwithstanding this knowledge and awareness, the Sheriff's Department, the Fire Department, and the County failed to establish a policy regarding photographs of human remains or to train, supervise, investigate, or discipline personnel related to the taking and sharing of photos of human remains without any legitimate governmental purpose.

84.     Based on the facts set forth above, the Sheriff's Department and Fire Department were on actual and/or constructive notice that the absence of a policy regarding photographs of human remains would likely result in violations of community members' constitutional rights.

85.     The actions of Sheriff's Department and Fire Department personnel, including but not limited to the Deputy Defendants, reflect the pattern of practice and/or custom of the Sheriff's Department and Fire Department, as evidenced by the fact that the misconduct was not limited to a lone employee.  Rather, multiple members of the Sheriff's Department and Fire Department took and shared photos of the Bryants' remains without any legitimate governmental purpose.  In addition, Sheriff Villanueva, whose entire career in law enforcement has been with the Sheriff's Department, has stated based on personal knowledge that unnecessary death images are a widespread problem in law enforcement.

86.     As a direct and proximate result of the Sheriff's Department's, Fire Department's, and the County's failure to establish a policy regarding photographs of human remains or to train, supervise, investigate, or discipline its employees regarding unnecessary death images, as well as the Sheriff's and Fire Departments' pattern of practice and/or custom of unnecessarily taking and sharing death images, Plaintiff has suffered (and continues to suffer) severe emotional distress in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### Negligence

### (Against the Deputy Defendants)

87.     Plaintiff incorporates herein and realleges the allegations in paragraphs 1 through 86, inclusive, as if fully set forth herein.

88.     Pursuant to California Government Code section 820(a), public employees are liable for injuries caused by their acts or omissions to the same extent as a private person.

89.     The Deputy Defendants owed a duty to Plaintiff to use ordinary care in their treatment of the Bryants' physical remains, including an obligation to refrain from taking and/or sharing images of them for personal, non-law-enforcement

purposes.  Cal. Civ. Code § 1714.  The Deputy Defendants additionally owed a duty to Plaintiff to use ordinary care in preventing dissemination of any images of the Bryants' remains once the images were created and/or were within their possession.

90.     The Deputy Defendants breached their duties to Plaintiff by sharing photos of the Bryants' physical remains for personal, non-law-enforcement purposes, including by electronic transmission and with members of the public.

91.     The Deputy Defendants foresaw or should have foreseen that their conduct described above would injure Plaintiff.

92.     As a direct and proximate result of the Deputy Defendants' conduct, Plaintiff has suffered (and continues to suffer) severe emotional distress in an amount to be proven at trial.

93.     In committing the acts alleged herein, the Deputy Defendants are guilty of oppression, fraud, and/or malice within the meaning of California Civil Code section 3294, entitling Plaintiff to punitive or exemplary damages in an amount appropriate to punish the Doe Defendants and to make an example of them to the community.

### THIRD CAUSE OF ACTION

### Negligence

### (Against the Entity Defendants)

94.     Plaintiff incorporates herein and realleges the allegations in paragraphs 1 through 93, inclusive, as if fully set forth herein.

95.     Members of the Sheriff's Department, including but not limited to the Deputy Defendants, and members of the Fire Department owed a duty to Plaintiff to use ordinary care in their treatment of the Bryants' physical remains, including an obligation to refrain from taking and/or sharing images of them for personal, non-law-enforcement purposes.  Cal. Civ. Code § 1714.  Members of the Sheriff's Department, including but not limited to the Deputy Defendants, and members of the Fire Department also owed a duty to Plaintiff to use ordinary care in preventing

- 34 -

dissemination of any images of the Bryants' remains once the images were created and/or were within their possession.

96.     Multiple members of the Sheriff's Department, including but not limited to the Deputy Defendants, breached their duties to Plaintiff by taking and/or sharing photos of the Bryants' physical remains for personal, non-law-enforcement purposes, including by electronic transmission and with members of the public. These members of the Sheriff's Department foresaw or should have foreseen that their conduct would injure Plaintiff.

97.     Similarly, multiple members of the Fire Department breached their duties to Plaintiff by taking and/or sharing photos of the Bryants' physical remains without any legitimate governmental purpose.  These members of the Fire Department foresaw or should have foreseen that their conduct would injure Plaintiff.

98.     As a direct and proximate result of the conduct described above, Plaintiff has suffered (and continues to suffer) severe emotional distress in an amount to be proven at trial.

99.     Pursuant to California Government Code section 815.2, the Sheriff's Department, the Fire Department, and the County are liable for injuries proximately caused by acts or omissions of their employees within the scope of their employment.  At all times material, the Deputy Defendants and other members of the Sheriff's Department who took and/or shared photos of the Bryants' remains for personal, non-law-enforcement purposes were employed by the Sheriff's Department and were under the Department's direction and control when they engaged in the conduct described above.  Further, at all times material, members of the Fire Department who took and/or shared photos of the Bryants' remains without any legitimate governmental purpose were employed by the Fire Department and were under the Fire Department's direction and control when they engaged in the conduct described above.  These members of the Sheriff's and Fire Departments

were able to take photos of the Bryants' physical remains by virtue of their access to the crash site while on duty, and Sheriff's and Fire Department personnel who shared the photos without any legitimate purpose had access to them by virtue of their employment with the Sheriff's and Fire Departments, respectively. Hence, the actions described above were taken within the course and scope of the individuals' employment, and the Sheriff's Department, the Fire Department, and the County are liable for their negligent and wrongful conduct.

## FOURTH CAUSE OF ACTION

### Invasion of Privacy

### (Against Joey Cruz)

100.   Plaintiff incorporates herein and realleges the allegations in paragraphs 1 through 99, inclusive, as if fully set forth herein.

101.   Plaintiff has a privacy interest in the physical remains of her loved ones, Kobe and Gianna Bryant.

102.   Upon information and believe, Defendant Joey Cruz disclosed photos of the Bryants' remains to multiple members of the public, both in person and electronically.

103.   Sharing photos of accident victims' physical remains without any legitimate governmental purpose is offensive and objectionable to a reasonable person of ordinary sensibilities.

104.   At the time Defendant Cruz shared the photos of the Bryants' remains, no photos of their remains had otherwise been made public, and details about the state of the victims' remains were not public knowledge. Sharing the graphic facts disclosed by the photos served no legitimate public purpose.

105.   As a direct and proximate result of the conduct of Defendant Cruz, Plaintiff has suffered (and continues to suffer) severe emotional distress in an amount to be proven at trial.

1    106.   Pursuant to California Government Code section 820(a), Deputy Cruz
2  is liable for injuries caused by their acts or omissions to the same extent as a private
3  person.

4    107.   In committing the acts alleged herein, Deputy Cruz is guilty of
5  oppression, fraud, and/or malice within the meaning of California Civil Code
6  section 3294, entitling Plaintiff to punitive or exemplary damages in an amount
7  appropriate to punish Defendant Cruz and to make an example of him to the
8  community.

9                          **FIFTH CAUSE OF ACTION**
10                            **Invasion of Privacy**
11                      **(Against the Entity Defendants)**

12    108.   Plaintiff incorporates herein and realleges the allegations in paragraphs
13  1 through 107, inclusive, as if fully set forth herein.

14    109.   Plaintiff has a privacy interest in the physical remains of her loved
15  ones, Kobe and Gianna Bryant.

16    110.   Upon information and believe, members of the Sheriff's Department,
17  including but not limited to the Deputy Defendants, disclosed photos of the Bryants'
18  remains to multiple members of the public, both in person and electronically.

19    111.   Sharing photos of accident victims' physical remains without any
20  legitimate governmental purpose is offensive and objectionable to a reasonable
21  person of ordinary sensibilities.

22    112.   At the time that members of the Sheriff's Department, including but not
23  limited to the Deputy Defendants, shared the photos of the Bryants' remains, no
24  photos of their remains had otherwise been made public, and details about the state
25  of the victims' remains were not public knowledge.  Sharing the graphic facts
26  disclosed by the photos served no legitimate public purpose.

27    113.   As a direct and proximate result of members of the Sheriff's
28  Department publicly disclosing photos of the Bryants' remains without any

legitimate governmental purpose, Plaintiff has suffered (and continues to suffer) severe emotional distress in an amount to be proven at trial.

114.   Pursuant to California Government Code section 815.2, the Sheriff's Department and the County are liable for injuries proximately caused by acts or omissions of their employees within the scope of their employment.  At all times material, the Deputy Defendants and other members of the Sheriff's Department who publicly disclosed photos of the Bryants' remains were employed by the Sheriff's Department and were under the Department's direction and control when they engaged in the conduct described above.  These members of the Department were able to take photos of Kobe and Gianna Bryant's physical remains by virtue of their access to the crash site while on duty, and Sheriff's Department personnel who shared the photos had access to them by virtue of their employment with the Department.  The acts of these members of the Department were committed within the course and scope of their employment, and the Sheriff's Department and County are liable for their negligent and wrongful conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for the following relief:

1.   For compensatory damages in an amount to be proven at trial;

2.   For any additional general, specific, consequential, or incidental damages in an amount to be proven at trial;

3.   For nominal damages;

4.   For punitive damages against the Deputy Defendants in an amount appropriate to punish them and make an example of them to the community;

5.   For an award that Defendants pay all of Plaintiff's costs and attorneys' fees;

6.   For all interest, as permitted by law; and

7.   For such other relief as the Court deems just and proper.

1  DATED:  March 17, 2021

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,
MUNGER, TOLLES & OLSON LLP


By: _____
                    */s/ Luis Li*
                    LUIS LI

Attorneys for Plaintiff Vanessa Bryant

1

## **DEMAND FOR JURY TRIAL**

2
Plaintiff demands a trial by jury on all issues triable by jury.

3

4
DATED:  March 17, 2021

Respectfully submitted,

5
MUNGER, TOLLES & OLSON LLP

6

7
By:           */s/ Luis Li*

8
LUIS LI

9

10
Attorneys for Plaintiff Vanessa Bryant

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28