LUIS LI (State Bar No. 156081)
Luis.Li@mto.com
CRAIG JENNINGS LAVOIE (State Bar No. 293079)
Craig.Lavoie@mto.com
JENNIFER L. BRYANT (State Bar No. 293371)
Jennifer.Bryant@mto.com
MARI T. SAIGAL (State Bar No. 318556)
Mari.Saigal@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071-3426
Telephone:  (213) 683-9100
Facsimile:   (213) 687-3702

Attorneys for Plaintiff Vanessa Bryant

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| VANESSA BRYANT,<br><br>    Plaintiff,<br><br>    vs.<br><br>COUNTY OF LOS ANGELES, et al.,<br><br>    Defendants. | Case No.  2:20-cv-09582-JFW-E<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO MODIFY THE COURT'S SCHEDULING ORDER**<br><br>[Declaration of Jennifer L. Bryant filed concurrently herewith]<br><br>Date:         June 7, 2021<br>Time:         1:30 p.m.<br>Courtroom: 7A<br>Judge:        Hon. John F. Walter<br><br>Pre-Trial Conf.: October 29, 2021<br>Trial Date: November 16, 2021 |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................ 1

II. ARGUMENT ....................................................................................................... 4

    A. Mrs. Bryant Diligently Brought This Motion as Soon as She Learned a Motion Would Be Necessary ................................................... 4

    B. Like Plaintiff, Defendants Anticipate Many Depositions ....................... 5

    C. Mrs. Bryant Has Been Relentlessly Diligent in Pursing Discovery, Notwithstanding Defendants' Ongoing Obstruction and Delays ............................................................................................... 7

    D. The Facts Are Disputed, and Defendants' Destruction of Evidence Makes It More Difficult for Mrs. Bryant to Discover the Truth ................................................................................................... 10

    E. Accountability Is Not Prejudicial ........................................................... 12

III. CONCLUSION ................................................................................................. 12

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*City of Rialto v. Dep't of Def.*,
   2008 WL 11343315 (C.D. Cal. Mar. 18, 2008) ..................................................... 6

*Ortega v. County of Los Angeles*,
   2006 WL 8434703 (C.D. Cal. Jan. 31, 2006) ......................................................... 6

*Premier Constr. & Remodel, Inc. v. Mesa Underwriters Specialty Ins. Co.*,
   2019 WL 8138041 (C.D. Cal. Nov. 14, 2019) ....................................................... 5

**STATE STATUTES**

California Penal Code § 135 ................................................................................... 12

**FEDERAL RULES**

Local Rule 7-3 ........................................................................................................... 4

Rule 16 .................................................................................................................. 4, 6

Rule 26(a)(1)(A)(iv) ................................................................................................... 8

**OTHER AUTHORITIES**

IG's Report Back on Unlawful Conduct of the Los Angeles County Sheriff's Department (Dec. 14, 2020), *available at* https://oig.lacounty.gov/Portals/OIG/Reports/UnlawfulConductOfLASD.pdf?ver=Jjfutlhult-8GTivHQ08sg%3D%3D ......................................... 2, 12

## I. INTRODUCTION

Just a few weeks ago, Defendants stipulated that good cause existed to move the discovery cutoff in this case from August 16, 2021 to February 11, 2022. (ECF No. 71 ¶ 6.) In that prior stipulation, Defendants acknowledged and agreed that substantial discovery remains to be done, including (i) voluminous document discovery, which will not be complete until "sometime this summer," at the earliest (*id.* ¶ 8); (ii) a "time-intensive" forensic examination by a neutral third-party firm that "may identify areas for further discovery" (*id.* ¶ 9); and (iii) "a significant number of depositions" given that sixty-six County agents or employees and at least eight civilian witnesses have relevant knowledge (*id.* ¶ 7).[1] None of this has changed.

Despite their prior stipulation, Defendants forced Plaintiff to bring a motion to request the same modification of the scheduling order that Defendants' lead counsel previously agreed was reasonable, appropriate, and supported by good cause. (ECF 71 ¶¶ 6–10.) Defendants now apparently want to double down on their prior efforts to conceal their wrongdoing by denying Mrs. Bryant a reasonable opportunity to conduct discovery and uncover the truth. Like so many others who have sought to wrest accountability from the County—including the other families who lost loved ones on January 26, 2020—Mrs. Bryant is being stonewalled.

That the County has chosen this course of action is not surprising. In the past few years, at least 21 members of the Sheriff's Department were convicted for their role in a plot by Sheriff's personnel to obstruct a federal civil rights and public corruption investigation.[2] As a result of that obstruction, the then-Sheriff, his second-in-command, and additional members of the command staff are now serving federal

---

[1] Unless otherwise indicated, defined terms used herein have the same meaning set forth in Plaintiff's opening Motion.

[2] https://www.justice.gov/usao-cdca/pr/paul-tanaka-former-no-2-los-angeles-sheriff-s-department-sentenced-five-years-federal.

prison sentences. Under current leadership, the Sheriff's Department appears to be continuing this tradition of obstruction. Earlier this year, the California Attorney General announced an investigation into a possible pattern of unconstitutional law enforcement by LASD.[3] In December 2020, the Office of the Inspector General for the County of Los Angeles (the "IG") issued a report that found "the Sheriff's Department consistently obstructs investigations into its conduct," "[d]espite clear legal authority requiring oversight."[4] A few months prior, Sheriff Civilian Oversight Commissioner Robert Bonner, former United States Attorney for the Central District of California and former DEA Administrator, called for the Sheriff's resignation based on his refusal to accept oversight, among other reasons.[5]

In this sordid context, Mrs. Bryant finds little comfort in Defendants' bold claim that she can simply rely on the Sheriff's Department's internal affairs report (Opp. at 5)—a document that was only produced after a motion to compel and upon court order (Lavoie Decl. ¶¶ 6–7). As Defendants would have it, Mrs. Bryant should sit back and accept the Sheriff's Department's assurance that there is nothing to worry about. But recent events have underscored that the Sheriff's Department cannot be trusted to police itself or act transparently. In fact, the IG recently called the purported oversight of the Sheriff's internal investigation in this very case "a sham."[6]

While Defendants may prefer to keep Mrs. Bryant in the dark about the

---

[3] https://www.nbcnews.com/news/us-news/california-launches-civil-rights-investigation-los-angeles-county-sheriff-s-n1255370

[4] *See* IG's Report Back on Unlawful Conduct of the Los Angeles County Sheriff's Department (Dec. 14, 2020) at 2, *available at* https://oig.lacounty.gov/Portals/OIG/Reports/UnlawfulConductOfLASD.pdf?ver=Jjfutlhult-8GTivHQ08sg%3D%3D (hereafter, the "IG's Report").

[5] https://www.latimes.com/california/story/2020-09-19/critics-want-sheriff-alex-villanueva-to-resign-but-they-have-little-power-to-force-him-out-after-new-level-of-animosity-can-relations-between-the-sheriff-and-his-critics-ever-recover.

[6] https://www.nytimes.com/2021/04/19/sports/basketball/vanessa-bryant-kobe-crash-photos.html.

1  circumstances surrounding the Sheriff's departure from standard protocol in
2  responding to the misconduct by his deputies (Mot. at 3), the Sheriff's order to destroy
3  evidence is squarely relevant to this dispute. The significance of the Sheriff's
4  destruction of evidence was not lost on the former Captain of the Lost Hills Sheriff's
5  station, who noted that the "last time our deputies got instructions from our
6  executives" of a similar nature, "they were arrested and tried for crimes." (Lavoie
7  Decl. ¶ 25.) A few weeks after raising his concerns to his supervisor, the Captain was
8  demoted and transferred to Men's Central Jail. Then, when the *Los Angeles Times*
9  found out about the deletion order, the Sheriff's Department denied there was any
10 such order (FAC ¶ 49) and tried to discourage the reporter from publishing her story
11 (*see* J. Bryant Decl. ¶ 2, Ex. A)—a surprising response if the Sheriff's actions were
12 as beneficent as Defendants now claim.

13    Respectfully, Defendants' characterization of this case as "straightforward"
14 and based on "undisputed facts" is not accurate. (Opp. at 18.) There are many facts
15 in dispute. And, contrary to the Opposition's claims about Mrs. Bryant's purported
16 lack of diligence and a limited need for discovery, substantial discovery remains to
17 be done through no fault of Mrs. Bryant. As Defendants previously stipulated, "a
18 discovery cutoff of February 11, 2022 would provide a reasonable timeframe within
19 which to complete the substantial discovery that is currently in progress." (ECF No.
20 71 ¶ 10.) This remains true if for no other reason than to facilitate coordinated, and
21 possibly consolidated, discovery for the Related Cases: the *Chester* action (Case No.
22 2:20-cv-10844-JFW-E), filed on November 30, 2020; the *Mauser* action (Case No.
23 2:21-cv-00497-JFW-E), removed to this court on January 21, 2021; and, most
24 recently, the *Altobelli* action (Case No. 21STCV17693), filed on May 11, 2021.[7]

25    Mrs. Bryant has exercised tireless diligence. In the interest of fairness,

---

[7] While the *Altobelli* action was filed in Los Angeles Superior Court, Plaintiff expects that Defendants will soon remove it to this Court, as they did in this case.

efficiency, and coordination with the cases brought by the Altobelli, Chester, and Mauser families, Mrs. Bryant respectfully requests a continuance of the discovery cutoff until February 11, 2022, and an adjustment of the other remaining pre-trial and trial dates as set forth in her Motion.

## II.  ARGUMENT

### A.  Mrs. Bryant Diligently Brought This Motion as Soon as She Learned a Motion Would Be Necessary

Even though Plaintiff brings this motion months before the current discovery deadline,[8] Defendants accuse Plaintiff of undue delay. (Opp. at 17.) But not once do they acknowledge that a couple months ago, Defendants *stipulated* to the very relief Plaintiff seeks by this Motion. For reasons that remain unexplained, over the course of a few weeks, Defendants have gone from agreeing that there is good cause to continue the discovery cutoff to February 11, 2022, to opposing that very same relief and launching a full-scale attack on Mrs. Bryant for having the audacity to request more time to complete her investigation.

The sequence of events demonstrates that any delay in the filing of this Motion was entirely of Defendants' making. On April 7, 2021, Defendants informed Plaintiff's counsel that they agreed that Plaintiff's proposed schedule is reasonable and supported by good cause. (J. Bryant Decl. ¶ 4.) Defendants' lead counsel then signed and filed the stipulation to that effect. (*Id.*) Plaintiff had no reason to suspect that Defendants were hiding their true position, or that motion practice would be necessary. On April 19, as soon as Plaintiff's counsel learned Defendants had reversed course on their prior position, Plaintiff's counsel promptly scheduled the required Local Rule 7-3 conference and moved forward with this

---

[8] Defendants do not cite any cases resembling this scenario. Instead, they cite various cases denying Rule 16 motions where the movant sought to *re-open* expired deadlines and an inapt ruling on a motion to amend invalidity contentions under the local patent rules. (Opp. at 12, 17.)

1  Motion.[9] (*Id.* ¶ 5.)  In short, Plaintiff acted as quickly as she possibly could.

## B. Like Plaintiff, Defendants Anticipate Many Depositions

A few weeks ago, Defendants "anticipated a significant number of depositions." (ECF No. 71 ¶ 7.) They acknowledged that "a substantial number of depositions" would be necessary in light of the large number of witnesses (74 and counting) who have already been identified. (*Id.*) Defendants now ask the Court to believe that Mrs. Bryant should expect a modest number of depositions, perhaps as few as 10. (Opp. at 14.) That putative 10-deposition limit would be exhausted by just the witnesses to the public display of the photos at the awards show at the Hilton Hotel. (*See* Lavoie Decl. ¶ 22.) As additional incidents like this one continue to come to light as Mrs. Bryant's investigation progresses, the number of critical depositions will only continue to grow. Even assuming Mrs. Bryant limited her list of deponents to County personnel, the number of depositions would still be "significant"—*by Defendants' own admission*. (ECF No. 71 ¶ 7.)

Defendants also chide Mrs. Bryant for not yet seeking leave to exceed the default 10-deposition limit. But such a motion is premature until the limit has actually been exhausted. *See, e.g., Premier Constr. & Remodel, Inc. v. Mesa Underwriters Specialty Ins. Co.*, 2019 WL 8138041, at *4 (C.D. Cal. Nov. 14, 2019) (collecting cases). In any event, given Defendants' prior stipulation that they anticipated "a substantial number of depositions" (*id.*), Plaintiff had no reason to think that motion practice would be necessary on this issue. Similarly, Defendants' passing assertion that Plaintiff should have raised this issue at the November 2020 scheduling conference is not well taken. (Opp. at 14–15.) As Plaintiff explained in her opening Motion, at the time of the scheduling conference, she had no way of knowing that

---

[9] Defendants did their best to delay the Motion's filing even further by obstructing Plaintiff's efforts to meet and confer regarding Defendants' confidentiality designations to avoid the need to file a sealing application in connection with the Motion. (J. Bryant Decl. ¶ 6.)

sixty-six County personnel have relevant knowledge. (Mot. at 2, 7, 9.)

Defendants also suggest Plaintiff should have immediately commenced depositions of County personnel as soon as she obtained names of witnesses with relevant knowledge from the IA Report. But waiting for a substantially complete production of a party's documents before deposing their witnesses does not show any lack of diligence on Mrs. Bryant's part. Rather, it is the only sensible way to sequence discovery. This should not be a controversial proposition. Defendants' proposal that Plaintiff rush into depositions before obtaining the witnesses' documents would only leave those witnesses vulnerable to having to sit for deposition a second time. *See, e.g.*, *City of Rialto v. Dep't of Def.*, 2008 WL 11343315, at *4 (C.D. Cal. Mar. 18, 2008) (re-opening depositions where documents were produced afterwards).

In support of their argument, Defendants rely on an inapposite ruling by this Court in *Ortega v. County of Los Angeles*, 2006 WL 8434703, at *3 (C.D. Cal. Jan. 31, 2006). Contrary to Defendants' representation, the Court did not suggest it would be inappropriate—or show a lack of diligence—for a party to await a substantially complete production of documents before proceeding with depositions. Rather, in that case, after the plaintiffs' deadline to amend their complaint had already lapsed, the Court denied a Rule 16 motion to move that deadline. The Court explained the plaintiffs had not been diligent in attempting to identify potential Doe defendants because they had relied solely on document productions and had not noticed a 30(b)(6) deposition or promptly served interrogatories. The issues presented in *Ortega* are not remotely similar to the relief requested by this Motion.[10]

---

[10] In fact, Plaintiff has pursued certain depositions of County personnel that are not dependent on a substantially complete document production by noticing 30(b)(6) depositions of the Fire Department and the Coroner's Office on February 18, 2021 and March 5, 2021, respectively. (J. Bryant Decl. ¶ 13.) It took two and a half months for the County's lawyers to obtain dates for the deposition of the Coroner's Office. (*Id.*) While Plaintiff understands that it can be difficult for witnesses to find a convenient time to sit for a deposition, the two and a half month holding pattern

According to Defendants, their document production will not be complete until "sometime this summer." (ECF No. 71 ¶ 8.) But based on the progress to date, even late summer appears to be an optimistic estimate. As of today, Defendants' document production remains in the early stages. In their brief, Defendants emphasize the "8,000 new records" they have produced since March (Opp. at 15), but they cannot deny that those productions were a document dump consisting largely of Google Alerts and press clippings (Mot. at 10). Their productions thus far have certainly not been sufficient to equip Plaintiff to start deposing County personnel. Among other patent gaps in the production, Defendants have not yet produced a single text message, notwithstanding evidence that indicates highly probative text messages exist. (J. Bryant Decl. ¶ 11.) Defendants are also refusing to produce the cell phone records of the County personnel who sent and/or received the photos. (*Id.* ¶ 12.) Given the Sheriff's deletion order and failure to preserve evidence, these records may be the only way for Mrs. Bryant to investigate the electronic dissemination of the photos. Plaintiff needs these documents—as well as the rest of Defendants' documents due "sometime this summer"—before she can competently depose County personnel.

### C. Mrs. Bryant Has Been Relentlessly Diligent in Pursing Discovery, Notwithstanding Defendants' Ongoing Obstruction and Delays

None of Defendants' misleading and scattershot criticisms of Plaintiff's conduct in discovery demonstrate a lack of diligence. As an initial matter, Plaintiff's efforts to hold Defendants to their obligations in discovery have not been "absurd." (Opp. at 10.) They have been appropriate and necessary responses to address Defendants' use of boilerplate objections and, in some cases, their refusal to provide any responses to discovery at all. (*See* J. Bryant Decl. ¶ 17.) In any event, Defendants' potshots at Plaintiff's meet-and-confer efforts are irrelevant to this Motion. They can raise their putative grievances with the Magistrate Judge if they

was nonetheless yet another delay entirely outside of Plaintiff's control.

wish. Defendants' other arguments fare no better.

*First*, Defendants' claim that they have been "transparent" and "forthcoming" in discovery is disingenuous at best. (Opp. at 6.) The facts speak for themselves. Defendants do not and cannot deny that they failed to disclose *any* witnesses in their initial disclosures.[11] (Mot. at 7–8.) They do not and cannot deny that they did not disclose *any* information from the IA Report until ordered to do so by the magistrate judge on January 6, 2021, and that they did not produce the complete exhibits to the IA Report until March 26, 2021. (*Id.* at 9.) And Defendants also do not and cannot deny that they flouted their commitment to complete their initial document production within forty-five days and instead produced just *one* document within forty-five days and a mere sixty-one documents over the first four months of this case. (*Id.* at 9–10.)

Defendants offer one primary example of their purported "transparency" and "cooperation" in discovery: a draft forensic examination protocol that they sent to Plaintiff's counsel on November 16, 2020. (Opp. at 13.) But that protocol was an empty gesture. As the County's attorneys have repeatedly told Plaintiff, "We don't have the devices in our possession. They are personal cell phones, not County property; and their production needs to be compelled by subpena [*sic*]." (J. Bryant Decl. ¶ 14, Ex. C.) Plaintiff proceeded to comply with this instruction by subpoenaing the devices of the LASD personnel known to have had possession of the photos. (*Id.* at ¶ 15.) In response, the County's attorneys, who also represent the subpoenaed LASD personnel, served objections a week after they were due and refused to make *any* of the subpoenaed personnel's devices available for inspection, inexplicably asserting the devices were not in the individuals' possession, custody, or control. (*Id.*) The County's attorneys now claim they intended for their proposed November 16,

---

[11] In addition, Defendants did not disclose the insurance agreements required by Rule 26(a)(1)(A)(iv) until <u>May 18, 2021</u>—and only after Plaintiff served an RFP seeking the very same agreements and then threatening to move to compel. (J. Bryant Decl. ¶ 10.)

2020 protocol to apply to only a limited number of devices used by the Deputy Defendants, a curious explanation given that the Deputy Defendants were not added to this case until March 17, 2021. (J. Bryant Decl. ¶ 16.) Whatever their motivation, Defendants' sending of the protocol when they were simultaneously unwilling to turn over any devices for inspection was not a "transparent" offer, and it has left Plaintiff in the position of having to move to compel numerous inspections (*id.*)—a process that would leave the neutral forensic examiner very little time, if any, to complete those examinations prior to the discovery cutoff under the current schedule.

*Second*, the County cannot credibly defend its decision to wait until March 22, 2021 to produce the Fire Department's internal investigation reports, which are dated August 21, 2020. (Mot. at 15–16.) Defendants claim that Plaintiff had not asked for them. But that of course is not true. Even setting aside Mrs. Bryant's informal requests for information from the Fire Department dating back to March 2, 2020, on November 16, 2020, Mrs. Bryant expressly asked the County for "all documents and communications relating to any taking or sharing of photos of the accident scene or victims' remains by any person who is not an employee of the Coroner's Office or NTSB." (Lavoie Decl. ¶ 3.) The Fire Department reports fall squarely within the plain terms of this request. Defendants have no legitimate justification for waiting to produce them on the eve of Plaintiff's deadline to amend her complaint.[12]

*Third*, Defendants similarly claim, without elaboration, that the recent addition of the Deputy Defendants to this lawsuit is somehow Plaintiff's fault. (Opp. at 16.) Plaintiff's opening Motion described the delays she encountered in getting her amended complaint on file after fighting for months to obtain a copy of the IA Report.

---

[12] Defendants note that Plaintiff subpoenaed an LAFD employee in February of this year. That does not help them. That witness was identified through publicly available information, not as a result of any "transparency" by the County. Now that Plaintiff has learned the subpoenaed employee was involved in the misconduct, she is reasonably waiting for the County to produce his documents and make his devices available for examination before proceeding with his deposition.

(Mot. at 11, 15.)  Defendants do not respond to any of this but nonetheless point the finger at Mrs. Bryant, and profess confusion as to why she cannot complete her discovery against the Deputy Defendants by August 16, 2021.  The reason is simple: the Deputy Defendants have yet to produce a single document and are actively resisting document discovery. (J. Bryant Decl. ¶ 8.)  On top of this, a "time-intensive" forensic examination of the Deputy Defendants' phones and other devices remains to be done (ECF No. 71 ¶ 9)—discovery the County was unwilling to provide until she named the deputies as defendants.  By the time the parties' disputes are resolved by Judge Eick and this discovery is complete, Mrs. Bryant would be left with practically no time at all to depose the Deputy Defendants.

*Fourth*, Defendants show no sign of abandoning their delay tactics any time soon.  In the short time since Plaintiff's opening Motion, Defendants have engaged in even further obstruction and delay, which has only compounded the impact of the prior delays and made the need for a continuance of the discovery cutoff even more acute.  Just minutes after Plaintiff filed her Motion, Defendants' counsel asked for more time to serve responses to the RFPs Plaintiff promptly propounded on the Deputy Defendants upon adding them to this lawsuit. (J. Bryant Decl. ¶ 7.)  With only a couple of hours' notice that Defendants were unprepared to meet their deadline, Plaintiff's counsel agreed to the extension as a professional courtesy. (*Id.*)  When the Deputy Defendants served their responses a few days later, they refused to produce documents for the vast majority of the requests. (*Id.* ¶ 8.)  This has become an all too familiar pattern.  The subpoenaed LASD personnel known to have possessed copies of the photos have refused to produce a single document. (*Id.* ¶ 9.)

### D. The Facts Are Disputed, and Defendants' Destruction of Evidence Makes It More Difficult for Mrs. Bryant to Discover the Truth

According to the County, Mrs. Bryant's modest request for a reasonable opportunity to investigate leads and depose the relevant County personnel after she finally receives a substantially complete production of documents "sometime this

summer" (ECF No. 71 ¶ 8) amounts to a demand for "scorched earth discovery" (Opp. at 11). Defendants' argument rests on the premise that the facts in this case are established and undisputed. (*Id.* at 5, 11, 18.) But that could not be further from the truth. Mrs. Bryant vigorously disputes the County's claim that the misconduct was a single isolated incident, and that there was no "lurid titillation" involved in Defendants' actions. (*Id.* at 5–6, 9, 11.) Mrs. Bryant also takes issue with the County's suggestion that the harm Defendants have inflicted is merely "hypothetical." (*Id.* at 12.) The discomfort and distress she has suffered from government personnel using graphic photos of her deceased loved ones as gossip fodder is very real. The County's downplaying of what happened only confirms that Mrs. Bryant cannot trust the County's internal investigations and must complete an investigation of her own.

Even the limited facts that have been adduced in discovery to date contradict the County's narrative. Those facts indicate that the illicit photos spread quickly both within and beyond the Sheriff's Department and Fire Department, and for no legitimate governmental purpose. (FAC ¶¶ 29–30; Lavoie Decl. ¶ 22.) After one Sheriff's deputy alone took between 25 and 100 photos of the scene and at least two LAFD personnel snapped even more photos focused on the victims' remains (FAC ¶ 27; Lavoie Decl. ¶ 22), the photos quickly made their way into the hands of numerous County employees who had no involvement in investigating the accident, including a trainee monitoring the entry to a trailhead (FAC ¶ 33), a video-game buddy (*id.* ¶ 38), and an LAFD media relations officer (Lavoie Decl. ¶ 22). It comes as no surprise that this indiscriminate sharing amongst County personnel resulted in the photos almost immediately creeping into the public domain. Bar surveillance footage shows Defendant Cruz smiling as he eagerly displayed his phone to a bartender friend and an apparent stranger seated next to him at a bar just two days after the accident. (*Id.* ¶ 11.) That scene played out on the same day Cruz showed the photos to his niece after making a crude remark about the state of the victims' remains. (FAC ¶ 34.) Then, a witness reported that a group of off-duty LAFD

personnel casually looked at the photos and discussed them with their wives and girlfriends during an awards show amongst the general public. (Lavoie Decl. ¶ 22.) Mrs. Bryant contends that these incidents—which have come to light only because citizen complainants blew the whistle—are almost certainly just the tip of the iceberg.

Investigating the full extent of the photos' spread is inordinately more difficult and time-intensive because Defendants deleted the photos prior to preserving evidence of their electronic dissemination. The IG's Report expressly notes that this deletion "may have constituted destruction of evidence" in violation of California Penal Code section 135. (IG's Report at 13.) Defendants insist that Mrs. Bryant should be grateful for the Sheriff's deletion order,[13] but Mrs. Bryant is entitled to test that in discovery—especially given the recent facts that have cast even more doubt on the Sheriff's purportedly altruistic motivation. (*See supra* at 3; Mot. at 3.)

### E. Accountability Is Not Prejudicial

Defendants claim they are being victimized by Mrs. Bryant's prosecution and public disclosure of this lawsuit. (Opp. at 18.) But Mrs. Bryant of course has every right to pursue discovery to find out how and why Sheriff's Department personnel took and shared pictures of her daughter and husband's remains. She has every right to seek to hold Defendants accountable for their actions and to file her lawsuit in the public record, as this Court expressly ruled. (*See* ECF No. 53.) And she has every right to post a filing from the Court's public docket on her personal Instagram account. None of this is cognizable prejudice that could justify denying Mrs. Bryant's Motion.

### III. CONCLUSION

Mrs. Bryant respectfully requests that the Court grant her Motion in full.

---

[13] As the IG's Report implicitly recognizes, the proper approach would have been to secure the phones, forensically examine them, determine to whom and to which other devices the photos may have been sent, obtain any such photos, notify the families, and discipline the wrongdoers. The photos could have then been destroyed in a controlled setting and the harm mitigated. The County took none of these steps. Instead, it expects the families to believe all is well based only on LASD's say-so.

| | | |
|---|---|---|
| 1 | DATED: May 24, 2021 | MUNGER, TOLLES & OLSON LLP |

By: */s/ Luis Li*
    Luis Li

Attorneys for Plaintiff Vanessa Bryant