1  LUIS LI (State Bar No. 156081)
   Luis.Li@wsgr.com
2  WILSON SONSINI GOODRICH & ROSATI
   633 West Fifth Street, Suite 1550
3  Los Angeles, California 90071
   Telephone:  (323) 210-2900
4  Facsimile:   (866) 974-7329

5  CRAIG JENNINGS LAVOIE (State Bar No. 293079)
   Craig.Lavoie@mto.com
6  JENNIFER L. BRYANT (State Bar No. 293371)
   Jennifer.Bryant@mto.com
7  MUNGER, TOLLES & OLSON LLP
   350 South Grand Avenue, Fiftieth Floor
8  Los Angeles, California 90071-3426
   Telephone:  (213) 683-9100
9  Facsimile:   (213) 687-3702

10 Attorneys for Plaintiff Vanessa Bryant

11                 UNITED STATES DISTRICT COURT

12        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

13

| 14 | VANESSA BRYANT, et al., | Case No. 2:20-cv-09582-JFW-E |
| 15 | Plaintiffs, | **DISCOVERY MATTER** |
| 16 | vs. | **NOTICE OF MOTION AND JOINT STIPULATION RE: PLAINTIFFS' MOTION FOR SPOLIATION SANCTIONS** |
| 17 | COUNTY OF LOS ANGELES, et al., | |
| 18 | Defendants. | Judge:  Hon. John F. Walter |
| 19 | | Magistrate Judge:  Hon. Charles F. Eick |
| 20 | | Hearing:  November 29, 2021 |
| 21 | | Time:  9:30 a.m.  Place:  Courtroom 750 |
| 22 | | Discovery Cutoff:  November 29, 2021 |
| 23 | | Pretrial Conference:  February 4, 2022  Trial:  February 22, 2022 |
| 24 | | |

25

26

27

28

TO ALL INTERESTED PARTIES AND THEIR ATTORNEYS OF
RECORD:

PLEASE TAKE NOTICE that on November 29, 2021, at 9:30 a.m., or as
soon thereafter as this matter may be heard in Courtroom 750, 7th Floor, of the
above-captioned Court, located at 255 E. Temple St., Los Angeles, California
90012, Plaintiffs Vanessa Bryant and Christopher L. Chester (collectively,
"Plaintiffs") will and hereby do move for an order granting sanctions under Rule
37(e) of the Federal Rules of Civil Procedure against Defendants County of Los
Angeles (the "County"); Los Angeles County Sheriff's Department (the "Sheriff's
Department" or "LASD"); Los Angeles County Fire Department (the "Fire
Department"); LASD Deputies Rafael Mejia, Joey Cruz, Raul Versales, and
Michael Russell (the "Deputy Defendants"); and Fire Department employees Tony
Imbrenda and Arlin Kahan ("Firefighter Defendants"[1] and, collectively with the
County, Sheriff's Department, Fire Department, and Deputy Defendants,
"Defendants") for their spoliation of electronic devices and the electronically stored
information contained therein.

Pursuant to Federal Rule of Civil Procedure 37(a) and Local Rule 37-2, the
parties respectfully submit this joint stipulation setting forth their contentions.

This Motion is based upon this Notice of Motion, the Joint Stipulation, the
Declarations of Craig Jennings Lavoie, Jennifer L. Bryant, and David J. Freskos,
and exhibits thereto, and any other papers or argument of counsel that may be filed
or submitted in connection with this Motion.

In accordance with Local Rule 37-1, Plaintiffs sent Defendants a letter that set

---

[1] The Firefighter Defendants are only named as defendants in Mr. Chester's lawsuit.
The omission of the Firefighter Defendants from the *Bryant* suit reflects nothing
more than that Defendants did not produce the internal investigation reports that
revealed the details of the misconduct within the Fire Department until the eve of
Mrs. Bryant's deadline to amend her complaint.

forth Plaintiffs' position regarding Defendants' spoliation and the relief to be sought by this Motion.  (Bryant Decl. ¶ 2, Ex. 1).  Counsel for Plaintiff Vanessa Bryant and Defendants met and conferred regarding these discovery disputes by videoconference on October 21, 2021, but were unable to reach agreement regarding the subject matter of this Motion.  Plaintiffs consider the participation by Mrs. Bryant's counsel at the videoconference to have been on behalf of all Plaintiffs given the consolidation of discovery (ECF No. 91), the commonality of the issues, and the fact that the Local Rule 37-1 letter was sent on behalf of all Plaintiffs. Defendants disagree and believe that this motion relates to Plaintiff Vanessa Bryant only.

DATED:  November 8, 2021          MUNGER, TOLLES & OLSON LLP


                                  By:  _____ /s/ Jennifer L. Bryant _____
                                               Jennifer L. Bryant

                                  Attorneys for Plaintiff Vanessa Bryant

DATED:  November 8, 2021          JEROME M. JACKSON LAW OFFICES


                                  By:  _____ /s/ Jerome M. Jackson _____
                                               JEROME M. JACKSON

                                  Attorneys for Plaintiff Christopher L. Chester

# **<u>TABLE OF CONTENTS</u>**

I.     INTRODUCTORY STATEMENTS ................................................................. 1

    A.     Plaintiffs' Statement.................................................................................. 1

    B.     Defendants' Statement ............................................................................. 3

II.    ISSUES IN DISPUTE ...................................................................................... 8

    A.     Factual Background ................................................................................... 8

        1.     Rather Than Secure the Devices or Forensically Preserve Their Contents, LASD and the Deputy Defendants Intentionally Deleted All Photos and Related Communications ..................................................................... 8

        2.     LASD and the Deputy Defendants Took No Steps to Preserve Evidence Relevant to Its Internal Investigation or This Litigation .............................................................. 11

        3.     The Fire Department Sat on Its Hands, Allowing Brian Jordan and the Firefighter Defendants to Delete Their Photos and Related Communications .......................................... 12

        4.     LASD Personnel, Including the Deputy Defendants, Discarded and Wiped Their Devices ........................................... 15

        5.     Document Discovery Has Confirmed Defendants' Spoliation ..................................................................................... 16

    B.     Defendants Spoliated Extensive Evidence of Their Misconduct ......... 16

        1.     Defendants' Preservation Duty Attached in Late January 2020 Upon Learning of the Unauthorized Photos of Human Remains.................................................................. 17

        2.     Defendants Failed to Take Reasonable Steps to Preserve the Devices, and Instead Proactively Took Steps to Delete Material Evidence ......................................................... 21

        3.     The Lost Evidence Cannot Be Restored or Replaced Through Additional Discovery .................................................... 22

    C.     Defendants' Spoliation Merits Sanctions ............................................. 23

        1.     Defendants Intended to Deprive Others of the Devices and Their Contents in Litigation, Meriting an Adverse Inference at Summary Judgment and an Adverse-Inference Instruction to the Jury at Trial ...................................................... 24

        2.     At the Very Least, The Court Should Issue an Instruction that the Jury Should Make an Adverse Inference if it Finds that Defendants Acted with Improper Intent .............................. 30

3.  Defendants' Spoliation of Evidence Has Prejudiced
    Plaintiffs, Meriting Additional Sanctions Under Rule
    37(e)(1) .................................................................... 33

A.  Facts ........................................................................... 40

    1.  The January 26, 2020 Accident ................................ 40
    2.  The LASD Crash Site Photos ................................... 41
    3.  The LACFD Crash Site Photos ................................ 43
    4.  Bryant's Letters and Tort Claims ............................. 44
    5.  LASD's Preservation Efforts .................................... 45
    6.  LACFD's Preservation Efforts ................................. 47
    7.  LACFD's Direct Orders ........................................... 48
    8.  Defendants Have Complied with Their Discovery
        Obligations .............................................................. 49
    9.  The Forensic Examination ....................................... 51
    10. Procedural Status ..................................................... 52

B.  Legal Standard ............................................................ 52

C.  Defendants' Duty To Preserve Did Not Begin In January 2020 ......... 53

    1.  The January 29, 2020 Citizen Complaint Did Not Trigger
        a Duty to Preserve ................................................... 54
    2.  An Internal Investigation Does Not Trigger a Duty to
        Preserve ................................................................... 55
    3.  Bryant's March 2020 Letters Did Not Provide Notice of
        Probable Litigation .................................................. 57

D.  Defendants Have Not Spoliated Any Evidence ................................ 59

    1.  Deletions That Predate Tort Claims Are Not Spoliation ............ 61
    2.  Upgrading Your Cellphone Is Not Spoliation ..................... 62
    3.  LASD Did Not Have Control over Personal Cellphones ......... 63

E.  Bryant Cannot Show Loss Of Relevant Evidence ............................. 64

F.  Defendants Have Not Acted With Intent To Deprive Bryant Of
    Information, And Bryant Has Not Been Prejudiced ......................... 65

    1.  Bryant Is Not Entitled to Adverse-Inference Sanctions ........... 66

2.    The Request for Alternative Sanctions Is Not Supported by the Record or the Law .......................................................... 67

3.    Bryant Has Not Been Prejudiced ................................................. 69

4.    If Anything, Both Parties Will Suffer Prejudice ........................ 71

1

**JOINT STIPULATION**

2    **I.    INTRODUCTORY STATEMENTS**

3         **A.    Plaintiffs' Statement**

4         The Los Angeles County Sheriff's Department and Fire Department defaulted

5    in their duty to preserve the dignity of the dead.  This case is about holding them

6    accountable for their misconduct.  Defendants, however, have thwarted that goal by

7    defaulting in their duty to preserve evidence as well.  In fact, the truth is worse:  the

8    Sheriff's Department and Fire Department took affirmative steps to destroy

9    evidence that would enable Plaintiffs to discover the full scope of their misconduct

10   and to protect themselves from the risk that photos of their family members' corpses

11   will appear without warning, forcing them to relive their trauma all over again.

12         Law enforcement officials whose job is to investigate wrongdoing know that

13   the first step in investigating a complaint is to preserve evidence and that destroying

14   evidence is improper.  Yet that is exactly what Sheriff Villanueva himself ordered

15   Department personnel to do after the Department received a citizen's complaint that

16   a Sheriff's deputy was showing photos of the crash site at a bar in Norwalk.  That

17   order was highly irregular—unprecedented in deputies' experience—and out of the

18   chain of command.  When a Captain complained, the Sheriff demoted him.

19         After the *Los Angeles Times* broke the news that photos had been improperly

20   taken and shared, a Fire Department Captain who had shared the photos at the

21   cocktail hour of an awards dinner rushed to delete evidence on his phone and

22   instructed numerous others to do the same.  The Fire Department itself has admitted

23   that this was a "primarily self-serving" "attempt to cover up [the Captain's] role in

24   the reported misuse of the photos."  (Bryant Decl. Ex. 31 [COLA001384 at 1388];

25   Ex. 15 [McCloud Dep. 159:20-161:21].)

26         Things only got worse from there.  For example, the County never issued any

27   preservation notice directly to the Sheriff's Department employees known to have

28   possessed photos, which is the most basic obligation of a party facing potential

litigation.  As a result, *after this litigation* had begun, nine Sheriff's deputies discarded or wiped devices that they used to take, share, or view photos of Plaintiffs' loved ones.  By doing so, those public officials deprived this Court, the jury, and the community they have promised to protect the ability to learn who they texted pictures to, whether photos were uploaded to the cloud, downloaded to other devices, shared by Airdrop, sent by instant messaging, or transferred by any of the many other ways photos can be shared.  And those actions broke the investigative chain, making it impossible to determine who else may have received and then forwarded those photos.

Defendants' cover up goes to the heart of this matter.  Defendants have steadfastly maintained that they secured all of the improper photos of Plaintiffs' loved ones' dead bodies.  Even the meager evidence that has survived has shown that this is not true.  By destroying evidence instead of preserving it to conduct a proper investigation, Defendants have prevented Plaintiffs from discovering how many other people saw graphic photos of their loved ones' dead bodies.

In these circumstances, it is simply unfair to let Defendants argue that the photos were contained and that the risk of trauma is illusory.  That would let Defendants profit from compounding law enforcement misconduct with litigation misconduct.  The Court should order sanctions as the Rules expressly provide. Plaintiffs respectfully request, among other remedies: (1) an adverse inference at summary judgment and trial that the lost evidence would have been unfavorable to Defendants and shown, among other things, further electronic dissemination of photos of Plaintiffs' deceased loved ones by the Sheriff's Department, Fire Department, Deputy Defendants, and Tony Imbrenda, and (2) an order precluding Defendants from presenting any theory denying electronic dissemination of the photos or disputing that the photos depicted each of the victims.  To the extent there is any possible doubt of Defendants' ill intent in carrying out their broad-scale destruction of evidence, Plaintiffs respectfully request the opportunity to present

1  Defendants' spoliation to the jury.

2  **B.   Defendants' Statement**

3       The County of Los Angeles (the "County") and its governing Board of

4  Supervisors have great sympathy for Plaintiff Vanessa Bryant ("Bryant")[2] and her

5  tragic loss.  They reiterate their condolences.  It was a horrific accident that took

6  nine innocent lives.  But the County did not cause the accident.

7       The facts of what occurred are not in dispute.  On January 26, 2020, a

8  helicopter crashed into a remote, fog-shrouded hillside in Calabasas, creating a

9  chaotic scene of burning wreckage.  Los Angeles County Sheriff's Department

10  ("LASD") deputies and Los Angeles County Fire Department ("LACFD")

11  firefighters were first on the scene, working together to identify any survivors,

12  determine who the victims were, and put out a magnesium fire.

13       Due to the dangerous terrain, only two deputies made it to the actual crash site

14  that morning.  After they secured the perimeter and directed hikers and cyclists

15  away, one of them, Deputy Doug Johnson, started his standard investigation

16  process, as he had been trained to do.  At that time, no one knew who the helicopter

17  belonged to, who was on board, and what had happened.

18       Deputy Johnson took photos of the crash to document the accident, identify

19  the downed aircraft and victims, and to communicate to the command post what

20  resources were needed.  Following standard procedure, he sent the photos to the

21

22  ───────────────

  [2] This motion is signed by Plaintiff Christopher Chester ("Chester").  Chester never
23  informed Defendants that he was joining this motion and did not participate in the
requisite Local Rule 37 conference.  (Declaration of Emily Rodriguez-Sanchirico
24  ("Rodriguez-Sanchirico Decl.") ¶ 36.)  The motion is clearly tethered to *Bryant's*
complaint and letters *Bryant's* attorneys wrote.  It seeks relief that impacts summary
25  judgment and trial.  These cases were not consolidated for all purposes, and the
cases are now proceeding on separate tracks.  Chester is not entitled to belatedly
26  "join" this motion.  Accordingly, Defendants' statement addresses Bryant, not
Chester.
27

28

1  officer running the command post, Deputy Raul Versales.  When Deputy Versales
2  then, as is routine, forwarded the photos to the other personnel at the command post,
3  no one knew what had happened or who had been on board.

4      It was later that morning that the first responders learned that basketball
5  legend Kobe Bryant and his daughter Gianna were on the flight.  As hordes of
6  reporters and fans started flocking to the site, deputies expanded the perimeter and
7  started closing down the surrounding areas, restricting it only to authorized
8  emergency personnel.  By afternoon, multiple agencies were on scene: National
9  Transportation Safety Board ("NTSB"), Federal Aviation Administration ("FAA"),
10  Federal Bureau of Investigation ("FBI"), County Department of Medical Examiner-
11  Coroner ("DMEC"), Malibu Search & Rescue ("Malibu SAR"), LACFD, and
12  LASD.  Every agency took photos to document the crash site.  NTSB's crash site
13  photos appeared in the L.A. Times on February 28, 2020 and October 23, 2021.

14      Meanwhile, Bryant drove to LASD's Malibu/Lost Hills Station and asked to
15  meet with Sheriff Villanueva.  After learning her husband and daughter had died,
16  she had one request: make sure the area is secure.  She testified in deposition that
17  she asked Sheriff Villanueva to make sure there were no photos of her family: "If
18  you can't bring my husband and baby back, please make sure no one takes
19  photographs of them.  Please secure the area."  Sheriff Villanueva complied,
20  declaring a no-fly zone and redoubling efforts to keep the media away.

21      DMEC's Special Operations Response Team arrived early the next morning
22  and took photos of the victims before removing the remains.  In the case of three of
23  them, DMEC had to rappel into a ravine with the help of Malibu SAR volunteer
24  deputies.  Meanwhile, LACFD firefighters stayed on site to make sure emergency
25  personnel were safe, especially from the toxic fumes.  Three LACFD captains who
26  were at the crash site that day took photos of the scene.  The photos were sent to the
27  LACFD Public Information Officer ("PIO"), the contact for all media requests.

28      County personnel worked tirelessly to secure a massive crash site, identify the

1    victims, and notify the families—and, as Bryant herself requested, to make sure

2    none of their photos ever became public.  And none have.

3         LASD was shocked when, on January 29, 2020, a citizen reported that he

4    heard a deputy trainee had shown crash site photos on his phone to someone in a

5    bar.  Sheriff Villanueva thereupon directed his personnel to launch an immediate

6    inquiry and make sure *no* photos got outside the department.  Sheriff Villanueva was

7    keeping his promise to Bryant by making sure no photos got out.  The deputies, on

8    and before January 30, 2020, deleted the photos from their phones—months before

9    this dispute.

10        Within two days, LASD interviewed 28 deputies, reserve deputies, sergeants,

11   and civilian volunteers.  The department determined that all personnel who had

12   taken, shared, or received crash site photos had, in fact, deleted them.  No one had

13   sent a photo to anyone outside LASD.  To this day, and despite media hyperbole

14   about "leaked" photos, no County crash site photos have ever been publicly

15   disseminated.

16        LACFD was similarly distressed when it learned that its PIO had shown crash

17   site photos on his phone to other fire department personnel in an off-duty setting (an

18   awards event for first responders).  LACFD hired an outside investigator and

19   directed the three LACFD captains who took photos to turn over their cellphones

20   and laptops.  Like LASD, LACFD determined that (i) all crash site photos had been

21   deleted; and (ii) no one had sent a photo to anyone outside LACFD.

22        The County had reason to anticipate litigation when Bryant submitted tort

23   claims on May 8, 2020 (LASD) and July 20, 2020 (LACFD).  Both departments

24   issued litigation holds.  At that point, both departments had known for months that

25   all the photos had been deleted—as did Bryant.

26        Bryant filed her initial complaint in state court on September 17, 2020.  It

27   alleged that the photos had been deleted.  (Compl. ¶¶ 28, 31.)  This lawsuit is thus

28   premised on two inconsistent claims: (i) the photos were deleted and Bryant will

1   never be able to track them down; and (ii) Bryant lives in fear that the photos she
2   has never seen and cannot find will one day be publicly disseminated.

3   Defendants, to address Bryant's fear, proposed a neutral forensic
4   examination.  Bryant agreed.  The parties selected Kroll's Forensic Investigations
5   and Intelligence team ("Kroll").  After reviewing over 20 LASD and LACFD
6   devices, Kroll confirmed that there are *no* photos containing victims' remains and
7   *no* evidence of public dissemination.  Bryant's own expert, in support of this
8   motion, opines that when photos are deleted they are, in fact, deleted.

9   Left with a speculative lawsuit about nonexistent photos, Bryant seeks
10  spoliation sanctions based on something she specifically requested and has known
11  about since March 2020.  Bryant cannot show spoliation.  She cannot show a
12  "culpable state of mind"; she cannot establish, based on "concrete evidence rather
13  than a fertile imagination," that the photos would have "favored" her; and she
14  cannot show "prejudice."  *Galicia v. Nat'l R.R. Passenger Corp.*, No. CV 17-8020-
15  JFW (JCx), 2018 WL 6314191, at *4 (C.D. Cal. July 20, 2018) (Walter, J.)
16  (citations omitted) (denying motion for spoliation sanctions).

17  Sheriff Villanueva did not have a "culpable state of mind" when a few days
18  after the crash he acted—per Bryant's request—to make sure the photos did not get
19  out and were deleted.  He did what he thought was necessary to protect Bryant.  The
20  same is true of LACFD.  The deletions were not for a "culpable" purpose.  They
21  were what Bryant asked for and were intended to, and did, benefit her.

22  Spoliation also requires the destruction of "favorable evidence" and
23  "prejudice."  Neither occurred here.  Bryant got what she wanted by virtue of the
24  deletions: no publication.  As this Court concluded in dismissing the Sheriff:
25  "Although Plaintiff claims that Sheriff Villanueva's conduct [ordering the deletions]
26  was a 'self-serving attempt to avoid embarrassment and legal headaches,' Sheriff
27  Villanueva's conduct may have benefitted Plaintiff by making it less likely that
28  those photos would be disseminated."  [Dkt. 46 at 7.]

Bryant asks this Court for an adverse inference—at summary judgment and trial—that the "lost evidence" would have shown "further electronic dissemination of photos of Plaintiffs' deceased loved ones."  She also seeks an order precluding Defendants from arguing that the photos were not electronically disseminated.

In other words, Bryant wants the Court to give her the element that is missing from her case, *public dissemination*, so that she can stave off summary judgment and win the case at trial.  The sanctions Bryant seeks are unwarranted and in conflict with the actual facts—she has admitted that there is no evidence of public dissemination and that she has never seen the subject photos.

There has been exhaustive discovery in this case: close to 50 depositions; over 35,000 pages of documents; verified interrogatory responses; and a neutral forensic examination.  There is *no* evidence of public dissemination of LASD or LACFD crash site photos, not on the internet, not in the media, not anywhere.

The bases for this extraordinary request are misstatements of law and misrepresentations of the record.  For example:

- Bryant contends there were no litigation holds.  There were.  LACFD issued theirs on March 3, 2020; LASD's followed on July 24, 2020.

- According to Bryant, upgrading personal cellphones that have no photos or texts relating to the crash is spoliation.  That is not the law.

This motion is a misguided attempt to punish Defendants for trying, and succeeding, to keep the photos out of the public domain.[3]

---

[3] Because Bryant is seeking a merits ruling, this motion should go to the district judge, who will rule on Defendants' motion for summary judgment.  Defendants are filing their motion for summary judgment on November 22, 2021.  [Dkt. 141.] Bryant's opposition is due on December 6, 2021.  [*Id.*]  Waiting until the last possible moment to file this "discovery" motion is Bryant's attempt to interfere with an adjudication of the merits.

## II.   ISSUES IN DISPUTE

### PLAINTIFFS' CONTENTIONS

#### A.   Factual Background

##### 1.   Rather Than Secure the Devices or Forensically Preserve Their Contents, LASD and the Deputy Defendants Intentionally Deleted All Photos and Related Communications

On January 29, 2020, shortly after midnight, a citizen submitted a complaint through the "Contact Us" page on the LASD website.  The complaint informed the Sheriff's Department that a deputy who responded to the crash site had been showing graphic pictures of Kobe Bryant's deceased body at a bar in Norwalk. (Bryant Decl. Ex. 30.)  The complaint was forwarded to the Malibu/Lost Hills Station first thing in the morning.  (*Id.*)  The Captain of that Station, Matthew Vander Horck, immediately alerted his supervisors and launched a standard inquiry. (*Id.* Ex. 29.)  On January 30, 2020, LASD identified Deputy Joey Cruz as the person described in the citizen's complaint.  Based on this information, Captain Vander Horck intended to request a full investigation.  (*Id.* Ex. 34 at 609.)  But because the Captain had been awake for 32 hours straight, Vander Horck left work early that afternoon.  (*Id.*)

Then Sheriff Villanueva got involved.  While Captain Vander Horck was sleeping, the Sheriff's public relations staff—Captain Jorge Valdez and Lieutenant John Satterfield—intervened on direct orders from the Sheriff.  Vander Horck and other LASD personnel have testified that involvement by the Sheriff's PR staff in responding to allegations of personnel misconduct was "extremely unorthodox, out of the ordinary, [and] outside the chain of command."  (*Id.* Ex. 13 at 201, 218-219 [Vander Horck Dep. 112:17-19, 129:15-130:8]; Ex. 11 at 164 [Mancinas Dep. 46:8-12]; Ex. 12 at 181 [Valdez Dep. 41:18-23]; Ex. 17 at 302 [Satterfield Dep. 94:9-17].)

At Sheriff Villanueva's direction, his public relations staff instructed the Lost

-8-

Hills operations lieutenant to order Lost Hills personnel into the station and take action to delete photos of the crash site. (*Id.* Ex. 11 at 165 [Mancinas Dep. 49:6-19].) The PR staff also conveyed a directive from the Sheriff that if the personnel came clean and deleted photos in their possession, they would receive no discipline but would instead merely have an entry recorded in their performance log. (*Id.* Ex. 11 at 167 [Mancinas Dep. 53:19-54:1]; Ex. 12 at 182 [Valdez Dep. 52:22-25 (performance log entry is not a form of discipline)].) This too was unconventional. (*Id.* Ex. 13 at 234 [Vander Horck Dep. 206:3-9].) The Sheriff's personnel who carried out the deletion order have testified that they had never before ordered a subject or witness to delete or destroy material relevant to an investigation. (*E.g., id.* Ex. 12 at 188 [Valdez Dep. 202:7-17]; Ex. 17 at 304 [Satterfield Dep. 137:7-138:1].) Nor had any of the personnel who conveyed the Sheriff's orders ever previously offered immunity from discipline in exchange for cooperation in an interview. (*Id.* Ex. 12 at 187 [Valdez Dep. 200:9-19].)

That evening, Captain Vander Horck awoke to a text message from his operations lieutenant that read "please call me." (*Id.*, Ex. 34 at 609.) During an ensuing phone call, Vander Horck learned that his lieutenant was carrying out the deletion order received from the Sheriff's public relations staff. (*Id.*) Vander Horck was immediately concerned and instructed his lieutenant to stop what he was doing. (*Id.*; *see also* Bryant Decl. Ex. 13 at 191-192 [Vander Horck Dep. 102:16-103:9].) Vander Horck then called his supervisor and "bombarded him with questions." (*Id.* Ex. 13 at 194, 223-224 [Vander Horck Dep. 105:8-25, 134:11-135:16].) The Captain expressed serious concerns that deleting the photos might be unlawful, noting that deputies were convicted of federal crimes for following improper orders from former Sheriff Lee Baca. (*Id.* Ex. 13 at 198-199, 212-218, 220-224 [Vander Horck Dep. 109:17-110:15; 123:13-126:22; 127:8-129:8; 131:17-133:16; 134:11-135:12].) Vander Horck's supervisor spoke to the Sheriff and then called the Captain back, saying: "[T]he Sheriff says he has the authority to do this and this [is]

the direction that we [are] going in."   (*Id.* Ex. 13 at 229-230 [Vander Horck Dep. 140:8-141:8].)

The "direction" the matter went in was that the Sheriff's Department oversaw the mass deletion of evidence related to a complaint of misconduct by the Department without any effort to preserve or inspect the devices that contained the crash-site photos, to secure the photos themselves, or to trace the photos' spread. (Bryant Decl. Ex. 11 at 166, 169-170, 175 [Mancinas Dep. 52:6-19, 79:9-80:22, 112:5-20]; Ex. 14 at 255-256 [Phillips Dep. 80:4-81:14].)   LASD personnel conducted a series of off-the-record "interviews" that lasted approximately five minutes apiece and consisted of little more than a promise of no discipline if personnel deleted the photos.  (*Id.* Ex. 14 at 260, 263 [Phillips Dep. 85:16-18, 88:5-13]; Ex. 11 at 171 [Mancinas Dep. 87:1-2].)  By January 31, numerous deputies, including all of the Deputy Defendants, represented to LASD that they had deleted the photos.  (*Id.* Ex. 8 at 109-110, 113-114 [Russell Dep. 201:1-7, 205:1-15, 278:9-279:1]; Ex. 9 at 119-120 [Versales Dep. 123:20-24, 217:3-5]; Ex. 7 at 90, 92-93 [Mejia Dep. 124:2-7, 169:23-170:16]; Ex. 6 at 82-83 [Cruz Dep. 171:22-172:14].)

Approximately three weeks later, Vander Horck's supervisors informed him that the Sheriff "no longer had confidence in [him]" and that, effective at midnight that day, he would be demoted from captain to lieutenant and stripped of his assignment leading the Lost Hills station.  (Bryant Decl. Ex. 13 at 236 [Vander Horck Dep. 222:3-14].)  Vander Horck pressed his supervisors for reasons why the Sheriff had lost confidence in him and whether the supervisors agreed with the Sheriff's decision, but they refused to respond.  (*Id.* at 235-240 [221:6-226:1].)  Two days later, Vander Horck forwarded from his work email account to his personal Gmail account a copy of his email exchange with supervisors related to the citizen complaint about improper accident scene photos.  (*Id.* Ex. 45.)  Sometime later, the Sheriff called Vander Horck and stated that Vander Horck could "keep [his] bars"—*i.e.*, remain a captain—but would be transferred to Men's Central Jail, a "dumping

ground" for those who "fall out of favor with the Sheriff." (*Id.* Ex. 13 at 244-245, 241-242 [248:6-249:9, 235:24-236:20].)  The Sheriff offered no reason whatsoever for the reassignment or his prior attempt to demote Vander Horck in rank.

**2.     LASD and the Deputy Defendants Took No Steps to Preserve Evidence Relevant to Its Internal Investigation or This Litigation**

After the *Los Angeles Times* reported on Sheriff Villanueva's deletion order and LASD's effort to "keep a lid on the episode instead of following normal investigative protocols,"[4] the Sheriff's Department launched an internal investigation in March 2020.  Around the same time, on March 2, 2020, Mrs. Bryant's attorneys sent correspondence to the Sheriff's Department formally requesting that the Department take immediate action to secure all photos and videos of the crash scene.  (Bryant Decl. Ex. 21.)  Mrs. Bryant's attorneys reiterated the request in further correspondence on March 8, 2020.  (*Id.* Ex. 22.)  The Sheriff's Department ignored the request.

During the belated investigation by LASD's Internal Affairs Bureau ("IAB"), which concluded in the summer of 2020, the IAB investigators did not forensically examine a single device.  (*See, e.g.*, Bryant Decl. Ex. 9 at 127 [Versales Dep. 264:19-21.]; Ex. 8 at 115 [Russell Dep. 286:7-13.)  Nor did they take any steps to preserve the relevant devices or even instruct the personnel they interviewed to preserve their devices.  (*See, e.g.*, Bryant Decl. Ex. 35 [Transcript of IA Interview of Joey Cruz (no mention of preserving device)]; Ex. 34 [Transcript of IA Interview of Raul Versales (same)].)

In the subsequent weeks and months, the Sheriff's Department and the County never made any effort to preserve the cell phones that took, obtained, stored, possessed, or shared photos of the victims' remains.  (Bryant Decl. Ex. 23 at 343-

---

[4] https://www.latimes.com/california/story/2020-05-08/vanessa-bryant-kobe-crash-photos-claim-sheriffs-department

344.)  Witness after witness has testified that the Deputy Defendants never received any instruction to preserve their devices or other evidence related to the photos.  (*Id.* Ex. 8 at 111-112 [Russell Dep. 223:13-19, 266:15-22], Ex. 9 at 124-126, 130, 132 [Versales Dep. 239:3-15, 240:23-241:12, 293:10-24, 298:1-10]; Ex. 7 at 94, 100 [Mejia Dep. 197:7-11, 240:22-241:4]; Ex. 6 at 84-85, 86-87 [Cruz Dep. 191:24-192:6, 281:24-282:6].)

Soon after Mrs. Bryant filed her lawsuit on September 17, 2020, her attorneys had a phone call with the County's lawyers on September 29, 2020.  (Lavoie Decl. ¶ 2.)  During that call, counsel for the County stated that the deputies' cell phones should be "obtained, confiscated, and forensically examined," adding: "I want to get the devices and give them to our forensic guy." (*Id.*)  The County's counsel further stated that he understood prior counsel for the County to have tried to obtain the relevant cell phones, but was "shut down by the [deputies'] union and told to buzz off by the deputies." (*Id.*)

### 3. The Fire Department Sat on Its Hands, Allowing Brian Jordan and the Firefighter Defendants to Delete Their Photos and Related Communications

The Fire Department also failed to preserve evidence.  Following the mass deletion by LASD personnel, Captain Vander Horck called the Fire Department on January 31, 2020 to advise that one of his deputies had witnessed a senior Fire Department officer taking photos at the crash site, and that the deputy had sent his own crash-site photos to a second Fire Department employee at the scene.  (Bryant Decl. Ex. 15 at 268-269 [McCloud Dep. at 58:7-59:16].)  That same day, this information was conveyed directly to Fire Chief Osby and the head of the Fire Department's Leadership and Professional Standards Bureau, Chief William McCloud.  (*Id.* Ex. 15 at 268-272 [McCloud Dep. 58:7-59:16, 64:4-65:11, 72:3-23].)  Chief Osby also had a one-on-one conversation with Sheriff Villanueva about the situation.  (*Id.* Ex. 15 at 269, 291-292 [McCloud Dep. 59:13-16, 201:2-202:18].)

Yet the Fire Department did not interview—or even identify—the Sheriff's

1   deputy with direct knowledge of the firefighters who possessed crash-site photos.

2   (*Id.* Ex. 15 at 270-271, 282 [McCloud Dep. 64:22-65:3, 84:2-25].)  Nor did the Fire

3   Department make any effort to interview the roughly 50 Fire Department personnel

4   who had responded to the crash site on January 26 or inspect any of their devices.

5   (*Id.* Ex. 15 at 278-279 [McCloud Dep. 80:14-81:23].)  The Department did not even

6   send an email to those 50 personnel.  (*Id.* Ex. 15 at 291-296 [McCloud Dep. 201:17-

7   206:16].)

8        Instead, Chief McCloud made an admittedly "cursory assessment" to try to

9   identify the two responders who matched LASD's general description of the

10  individuals who took and received photos at the scene.  (*Id.* Ex. 15 at 272-273

11  [McCloud Dep. 72:19-73:14].)  His "cursory assessment" consisted of two brief

12  phone calls with two responders who matched LASD's general description of the

13  individuals who took and received photos at the scene.  (*Id.* Ex. 15 at 272-276

14  [McCloud Dep. 72:24-74:15, 76:8-77:11].)  The Fire Department ultimately

15  concluded that neither of the two individuals who were contacted during the

16  "cursory assessment" were the officers described by the Sheriff's Department.  (*Id.*

17  Ex. 15 at 280-281 [McCloud Dep. 82:17-83:7.)  During the phone calls with these

18  individuals, Chief McCloud instructed them not to delete any photos in their

19  possession because he "was anticipating that there might be an investigation" and he

20  recognized that "it's important to preserve evidence that might be related to the

21  investigation."  (*Id.* Ex. 15 at 274-275 [McCloud Dep. 74:23-75:6].)  But the Fire

22  Department did not instruct any other personnel who responded to the scene to

23  preserve evidence of crash-site photos in their possession.  (*Id.* Ex. 15 at 295-296

24  [McCloud Dep. 205:12-206:16]; Ex. 10 at 156 [Imbrenda Dep. 199:6-10]; Ex. 16 at

25  299 [Kahan Dep. 95:7-12].)

26       Around February 28, 2020, the *Los Angeles Times* and other media outlets

27  began reporting that both Sheriff's Department personnel and Fire Department

28  personnel had taken and shared photos of the victims' remains.  After that news

broke, Imbrenda instructed eight to ten of his subordinates, friends, and acquaintances to delete all graphic photos from the crash, and to pass on the deletion order "to everybody that they knew." (*Id.* Ex. 10 at 146-148 [Imbrenda Dep. 162:13-163:23, 164:15-23].)  Captain Arlin Kahan and then-Captain Brian Jordan were among the individuals Imbrenda told to "get rid of" inappropriate photos in their possession.  (*Id.* Ex. 10 at 146-147, 149-150 [Imbrenda Dep. 162:20-163:1, 165:11-166:14].)  According to Imbrenda, he gave this instruction to "very connected people" within the Department who "extrapolate[d]" the deletion order to "many, many people."  (*Id.* Ex. 10 at 147 [Imbrenda Dep. 163:8-23].)  Imbrenda also personally deleted approximately 45 photos from the crash site that he had on both his personal cell phone and his work cell phone.  (*Id.* Ex. 10 at 144-145, 151- [Imbrenda Dep. 116:15-117:3, 192:12-196:5].)  Following an internal investigation, the Fire Department concluded Imbrenda's deletion was a "primarily self-serving" "attempt to cover up his role in the reported misuse of the photos."  (*Id.* Ex. 31 at 564; Ex. 15 at 288-290 [McCloud Dep. 159:14-161:21.)

A week later, on March 6, 2020, a citizen submitted a complaint that Captain Imbrenda had been discussing and sharing crash-site photos with a group of off-duty firefighters and their dates at a public awards show.  (*Id.* Ex. 15 at 283-287 [McCloud Dep. 85:5-89:25].)  Only then—a month after Chief Osby spoke with Sheriff Villanueva—did the Fire Department finally launch an internal investigation. Imbrenda surrendered his Department-issued devices as part of that investigation, and they were forensically imaged.  (*Id.* Ex. 10 at 157-158 [Imbrenda Dep. 206:8-207:5].)  But the Fire Department never forensically preserved or inspected Imbrenda's personal cell phone, which Imbrenda refused to turn over and continued using over the next year and a half.  (*Id.* Ex. 10 at 158-159 [Imbrenda Dep. 207:11-208:20].)  The Department-issued devices used by other personnel known to have possessed crash-site photos containing human remains—Arlin Kahan and Brian Jordan—were not preserved until May 29, 2020 and June 29, 2020, respectively.

(Bryant Decl. Ex. 37.)  By the time Imbrenda's, Kahan's, and Jordan's Department-issued devices were finally preserved, the files they had deleted had already been overwritten and permanently destroyed.  (*See* Freskos Decl. ¶ 25.)

### 4.  LASD Personnel, Including the Deputy Defendants, Discarded and Wiped Their Devices

By October 2020, this lawsuit had been pending for weeks.  Yet that month, Defendant Versales discarded the phone on which he had received photos of the crash site without making any effort to preserve the evidence on the phone that pertained to this litigation.  (Bryant Decl. Ex. 9 at 128-129, 131 [Versales Dep. 291:15-292:23, 295:4-15].)  The other Deputy Defendants soon followed suit.

In or around March 2021, after he learned he would was going to be named as an individual defendant in this litigation, Defendant Mejia discarded the phone on which he had received photos of victims' remains.  (*Id.* Ex. 7 at 95-99 [Mejia Dep. 235:1-239:17].)  The following month, in or around April 2021, Defendant Russell did the same.  (*Id.* Ex. 8 at 107-108 [Russell Dep. 72:16-73:10].)  Between April 2020 and August 2021, six additional LASD personnel who possessed photos from the crash site likewise disposed of the devices on which they received and stored the illicit photos.  (*Id.* Ex. 38.)  While Defendant Cruz ostensibly remained in possession of the phone he used on January 26, 2020, he permanently deleted all of the data on the device by resetting it to its factory default settings.  (*Id.* Ex. 5 at 61.)

As the Deputy Defendants and other LASD personnel were getting rid of their phones, their counsel were actively negotiating a protocol for a forensic examination of those discarded devices with Plaintiffs' counsel.  (Bryant Decl. ¶ 5.)  Despite repeated inquiries by Plaintiffs' counsel, Defendants' counsel did not come clean about the lost devices until near the conclusion of negotiations regarding the forensic protocol.  (*Id.* ¶¶ 5-7.)  Ultimately, on October 4, 2021, Defendants' counsel wrote to Plaintiffs with a list of LASD personnel who had discarded the phones on which they had previously possessed the illicit crash-site photos.

Counsel's email included the following table:

| Custodian | Date Device Replaced / Upgraded |
|---|---|
| Stephanie Shrout | August 2021 |
| Scott Miller | February 2021 |
| Rafael Mejia | March 2021 |
| Michael Russell | April 2021 |
| Raul Versales | October 2020 |
| Benjamin Sanchez | April 2020 |
| Ruby Cable | November 2020 |
| Christopher Jauregui | July 2021 |
| Doug Johnson | January 2021 |

(Bryant Decl. Ex. 38.)  Because the above personnel got rid of the devices on which they took or received accident scene photos in January 2020, none of those phones were submitted to the neutral forensic examiner in this case.

     **5.**     **Document Discovery Has Confirmed Defendants' Spoliation**

Plaintiffs have served requests for production seeking all documents and communications, including text messages, related to the victims of the crash, the photos, related media reports, and the departments' internal investigations.  (Bryant Decl. ¶ 29.)  In response, neither the Defendants nor the other LASD personnel in possession of crash-site photos who were subpoenaed for such documents have produced a single text message during this litigation.  (*Id.*)  The Deputy Defendants have not produced any documents whatsoever.  (*Id.*)

**B.**    **Defendants Spoliated Extensive Evidence of Their Misconduct**

The foregoing facts show that Defendants have engaged in spoliation:  "the destruction or significant alteration of evidence, or the failure to preserve evidence,

in pending or reasonably foreseeable litigation." *Spencer v. Lunada Bay Boys*, 2017 WL 11527978, at *6 (C.D. Cal. Nov. 29, 2017).  Federal Rule of Civil Procedure 37(e) authorizes sanctions for a party's failure to preserve "electronically stored information," when it is shown (1) that information "should have been preserved in the anticipation or conduct of litigation"; (2) that information "is lost because a party failed to take reasonable steps to preserve it"; and (3) the information "cannot be restored or replaced through additional discovery."  Fed. R. Civ. P. 37(e).  As explained below, each of these three elements is satisfied here.

### 1. Defendants' Preservation Duty Attached in Late January 2020 Upon Learning of the Unauthorized Photos of Human Remains

Defendants had a duty to preserve the evidence that they spoliated at the time that it was destroyed.  "The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *CTC Glob. Corp. v. Huang*, 2019 WL 6357271, at *2 (C.D. Cal. July 3, 2019) (citations omitted).  The point at which litigation is reasonably foreseeable is "an objective standard that asks not whether the party in fact reasonably foresaw litigation, but whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation." *Spencer*, 2017 WL 11527978, at *6 (citation omitted).

#### (a) *Sheriff's Department*

Here, the Sheriff's Department should have anticipated litigation—and in fact *did* anticipate litigation—almost immediately upon receiving the citizen complaint on January 29, 2020 that a deputy was showing graphic photos of Kobe Bryant's remains at a bar.  *See Mazloun*, 530 F. Supp. 2d at 292 (court had "no difficulty concluding" defendants incurred an obligation to preserve evidence upon learning of complaint alleging police misconduct).  The citizen complaint made its way to the Sheriff on the same day it was submitted.  (Bryant Decl. Ex. 29.)  As a general

matter, "[i]t is common knowledge that citizen complaints alleging police misconduct frequently form the basis of subsequent lawsuits." *Mazloun v. Dist. of Columbia Metro. Police Dep't*, 530 F. Supp. 2d 282, 291–92 (D.D.C. 2008); *see also Perkins v. City of Modesto*, 2020 WL 1333109, at *16 (E.D. Cal. Mar. 23, 2020) (police department had duty to preserve officer's cell phone upon receiving citizen complaint alleging officer misconduct).  There was nothing about this particular citizen complaint that would have given the Sheriff's Department reason to think this general principle would not apply.  If anything, the underlying facts—a graphic, disturbing show-and-tell of a local hero's dead body over drinks at a bar— made litigation even *more* reasonably likely here than in the case of the usual citizen complaint.

Sheriff Villanueva recognized that the "the usual routine" in such situations is that "everybody lawyers up."  (Bryant Decl. Ex. 19.)  The lieutenant who carried out the Sheriff's deletion order likewise recognized that his inquiry into the photos was inevitably going to "snowball into bigger things," including an internal affairs investigation, at a minimum.  (*Id.* Ex. 11 at 172-174 [Mancinas Dep. 104:20-24, 105:17-106:7].)  When asked at deposition whether it occurred to him after learning of the citizen complaint that the Department might get sued, Captain Vander Horck testified: "I'm sure it crossed my mind."  (*Id.* Ex. 13 at 220 [Vander Horck Dep. 131:1-13].)  Indeed, Captain Vander Horck forcefully expressed to his supervisor at the time that deleting the photos could constitute destruction of evidence.  (*Id.* Ex. 34 at 610 [Vander Horck IAB Interview].)  Under these circumstances, it "defies reason" to suggest the Sheriff's Department was unaware that the photos and related communications could be relevant in potential litigation.  *See Mazloun*, 530 F. Supp. 2d at 292.

### (b)  Fire Department

The Fire Department's preservation duty arose at the latest on January 31, 2020, when it was informed that firefighters were implicated in the illicit photo

taking and sharing.  The County's privilege log in this case reflects that on that very day, the Department was preparing correspondence to the County's Board of Supervisors "in anticipation of litigation."  (Bryant Decl. Ex. 24 [County of Los Angeles Privilege Log].)  And during the 30(b)(6) deposition of the Fire Department, its representative conceded that as of January 31—or very soon thereafter—the Department anticipated an investigation and recognized the importance of evidence preservation in light of that likely investigation.  (*Id.* Ex. 15 at 274-275 [McCloud Dep. 74:5-75:6].)

A reasonably foreseeable internal investigation—a common precursor to litigation—is sufficient to trigger a preservation duty.  *See, e.g.*, *Gerlich v. U.S. Dep't of Justice*, 711 F.3d 161, 171 (D.C. Cir. 2013); *Musse v. King Cnty.*, 2021 WL 4709875, at *3 (W.D. Wash. Oct. 8, 2021) ("[A] defendant's decision to open an investigation can indicate that it was reasonable to expect a lawsuit." (citation omitted)); *Stanbro v. Westchester Cnty. Health Care Corp.*, 2021 WL 3863396, at *11 (S.D.N.Y. Aug. 27, 2021) ("In circumstances where a department of corrections internally investigates an incident within a prison, the department is obligated to preserve all relevant evidence . . . ." (internal quotation marks omitted)); *Zbylski v. Douglas Cnty. Sch. Dist.*, 154 F. Supp. 3d 1146, 1163 (D. Colo. 2015) (collecting cases).  Otherwise, "parties would have an incentive, or at least the opportunity, to destroy evidence while avoiding undertaking any investigation that might confirm suspicions of wrongdoing.  That simply cannot be." *Zbylski*, 154 F. Supp. at 1166–67 (footnote omitted).

Letters from Mrs. Bryant's lawyers to both the Sheriff's Department and the Fire Department in early March 2020 made the likelihood of litigation impossible to ignore.  *See, e.g.*, *Apple, Inc. v. Samsung Elecs. Co.*, 881 F. Supp. 2d 1132, 1145 (N.D. Cal. 2012).  The letters from Mrs. Bryant's lawyers explained in detail that the "unauthorized taking or dissemination of photos" of human remains by Sheriff's Department and Fire Department personnel could give rise to liability for invasion

of privacy and negligence, and Mrs. Bryant demanded that both departments "take immediate action to secure all photos and videos of the January 26, 2020 crash scene," "including any photos or videos in the possession of or disseminated by" Sheriff's Department or Fire Department personnel.  (Bryant Decl. Exs. 20-22.)  This was more than enough to make the instant litigation reasonably foreseeable.  *Fanning v. HSBC Card Servs. Inc.*, 2014 WL 12783362, at *3 (C.D. Cal. May 5, 2014) ("Courts in the Ninth Circuit generally agree that this [preservation] duty is triggered as soon as a potential claim is identified.").

*          *          *          *

Neither the Sheriff's Department nor the Fire Department can disclaim an obligation to preserve ESI contained on their employees' devices.  Once triggered, the preservation duty extends to relevant information in the possession of employees who are "'key players' in the case," *Apple*, 881 F. Supp. 2d at 1137 (footnote collecting cases omitted), and "[n]umerous courts have found that corporations have control over their officers and employees" for purposes of discovery, *Miniace v. Pac. Mar. Ass'n*, 2006 WL 335389, at *2 (N.D. Cal. Feb. 13, 2006) (citation omitted).  The same holds true with respect to information on employees' personal devices where, as here, those devices are routinely used for work,[5] "[e]ven absent a formal policy giving the company control over work-related information on the phone."  *United States v. Cameron-Ehlen Grp.*, 2020 WL 9209366, at *12 (D. Minn. July 10, 2020), *affirmed in relevant part and overruled in part on other grounds*, 2021 WL 101193 (D. Minn. Jan. 12, 2021), at *25-28.[6]  "To hold to the contrary

---

[5] (Ex. 8 at 104-106 [Russell Dep. 52:23-53:4, 54:7-24]; Ex. 9 at 118 [Versales Dep. 69:17-21]; Ex. 47 at 849, 852 [Mejia Dep. 75:5-8, 78:1-23]; Ex. 6 at 80-81 [Cruz Dep. 44:21-45:1]; Ex. 10 at 135-138 [Imbrenda Dep. 52:25-53:19, 58:11-59:1].)

[6] *See also, e.g.*, *Paisley Park Enters., Inc. v. Boxill*, 330 F.R.D. 226, 235 (D. Minn. 2019) ("The Court will not permit the . . . Defendants to claim that it was reasonable to assume data on their personal cell phones would not be subject to discovery when

1   would create an obvious loophole for businesses to exploit during litigation."

2   *Cameron-Ehlen*, 2020 WL 9209366, at *12, n. 10.

3         **2.    Defendants Failed to Take Reasonable Steps to Preserve the**
          **Devices, and Instead Proactively Took Steps to Delete**
4         **Material Evidence**

5         The foregoing establishes that Defendants had a duty to take reasonable steps

6   to preserve relevant ESI in the days following the crash.  Fed. R. Civ. P. 37(e).

7   Defendants did the opposite.  They took unreasonable steps to *erase* relevant ESI.

8   As noted, Sheriff Villanueva and Fire Captain Imbrenda carried out mass deletion

9   campaigns within their respective departments.

10        In fact, the Sheriff's Department failed to take the most fundamental steps to

11  preserve ESI.  (*See* Bryant Decl. Ex. 23 at 343-344 [Defendant County of Los

12  Angeles' Responses to Plaintiff Vanessa Bryant's Third Set of Interrogatories].)  "A

13  litigation hold, or preservation order, is often the most appropriate mechanism to

14  ensure potentially relevant documents and information are not lost deliberately or

15  unintentionally."  *Colonies Partners, L.P. v. Cnty. of San Bernardino*, 2020 WL

16  1496444, at *8 (C.D. Cal. Feb. 27, 2020).  The Sheriff's Department did not issue a

17  litigation hold directly to the Deputy Defendants or other LASD personnel known to

18  have possessed the photos even after this litigation was filed.  While the Department

19  "had an obligation to contact the key players involved . . . to ensure that they

20  preserved evidence in their possession and on their [devices]," *Montoya v. Orange*

21  _____

22  the record clearly shows that they used their phones for work purposes."); *Alter v.*
    *Rocky Point Sch. Dist.*, 2014 WL 4966119, at *10 (E.D.N.Y. Sept. 30, 2014) (entity
23  defendants were obligated to preserve work-related ESI "on whatever devices
    contained the information," including "cellphones" and "any personal digital
24  devices capable of ESI storage"); *In re Pradaxa (Dabigatran Etexilate) Prods. Liab.*
    *Litig.*, 2013 WL 6486921, at *18 (S.D.N.Y. Dec. 9, 2013) (defendants' preservation
25  and discovery obligations, "without question, appl[y] to that space on employees[']
26  cell phones dedicated to the business which is relevant to this litigation"), *order*
    *rescinded sub nom*, 745 F.3d 216 (7th Cir. 2014).
27

28

*Cnty. Sheriff's Dep't*, 2013 WL 12347292, at *8 (C.D. Cal. Oct. 15, 2013), none of the Deputy Defendants were made aware of their preservation obligations, which paved the way for their wholesale disposal of their devices.[7]

The Fire Department did not make any effort to preserve the ESI on Department-issued devices used by Imbrenda and others known to have possessed photos until *after* Imbrenda had already issued widespread deletion instructions and weeks *after* it had received notice that the improper photos were in circulation within the Department.  Given the volatility of mobile data and the speed which deleted data is overwritten and permanently destroyed (Freskos Decl. ¶¶ 5-8), the Department's belated, post-deletion preservation efforts came far too late (*see id.* ¶ 25).  The Fire Department's five-week delay in contacting relevant employees and taking steps to preserve ESI breached its obligation under Rule 37(e).

### 3. The Lost Evidence Cannot Be Restored or Replaced Through Additional Discovery

Neither the evidence deleted when the misconduct first came to light nor the

---

[7] Bryant Decl. Ex. 6 at 86-87 [Cruz Dep. 281:20-282:2 (Q: "Have you ever received a written notice to preserve documents and communications related to the subject matter of this lawsuit?"  A: "No, I haven't."  Q: "Have you ever been orally instructed or advised to preserve documents and communications related to the subject matter of this lawsuit?"  A: "No.")]; *id.* Ex. 7 at 100-101 [Mejia Dep. 240:22-241:4 (Q: "Have you ever received a written notice to preserve documents and communications related to the subject matter of this lawsuit?" A: "I did not receive any."  Q: "Have you ever been orally instructed or advised to preserve documents and communications related to the subject matter of this lawsuit?" A: "No.")]; *id.* Ex. 9 at 132 [Versales Dep. 298:2-10 (Q: "[H]ave you ever received a written notice instructing you to preserve documents and communications related to the subject matter of this lawsuit?" A: "None that I can recall." Q: "Have you ever been orally instructed or advised to preserve documents and communications related to the subject matter of this lawsuit?" A: "None that I can recall.")]; *id.* Ex. 8 at 112 [Russell Dep. 266:15-22 (Q: "Have you ever received a written notice to preserve documents and communications related to the subject matter of this lawsuit?" A: "No." Q: "Have you ever been orally instructed or advised to preserve documents and communications related to the subject matter of this lawsuit?" A: "No.")].

---

LASD personnel's discarded devices can be restored or replaced with additional discovery.  This is not a situation where the destroyed ESI "exists in multiple locations."  Fed. R. Civ. P. Rule 37 advisory committee notes to 2015 amendment. Each photo, each message transmitting a photo, and each related communication would have been uniquely and materially probative of Defendants' misconduct. Without that direct evidence, Plaintiffs have no feasible way to reconstruct the photos' distribution or identify all of the individuals who received copies of the photos.

The permanence of Defendants' spoliation has been confirmed by a forensic analysis conducted by a third-party neutral examiner jointly retained by the parties. The Forensic Examiner analyzed 21 mobile devices pursuant to a stipulated protocol entered by this Court on September 8, 2021.  (Bryant Decl. Ex. 5.)  Given that the devices continued to be used for days and in most cases months after the relevant ESI was deleted—not to mention the fact that virtually every LASD custodian had gotten rid of the devices they were using on January 26, 2020—the Forensic Examiner was unsurprisingly unable to recover any of the photos and related communications known to have been in the custodians' possession in late January 2020.  (*See* Freskos Decl. ¶ 21.)  The Forensic Examiner's analysis also revealed that Defendant Cruz's factory reset of his iPhone permanently deleted all of the device's data and rendered all of his ESI forensically unrecoverable.  (Bryant Decl. Ex. 5 at 61 [Kroll Summary Report].)  The discarded devices are also irretrievably lost and "[g]etting rid of the device[s] . . . robbed Plaintiffs of an opportunity to attempt to recover" any deleted data or forensic artifacts that remained on the devices used in January 2020.  *Aramark Mgmt., LLC v. Borgquist*, 2021 WL 864067, at *18 (C.D. Cal. Jan. 27, 2021).

## C.  Defendants' Spoliation Merits Sanctions

"[T]wo tiers of sanctions" for spoliation are authorized under Rule 37(e). *Spencer*, 2017 WL 11527978, at *7.  First, where the loss of information has

-23-

prejudiced the moving party, the court may order "measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Second, where the offending party "acted with the intent to deprive another party of the information's use in the litigation," the court may "presume the lost information was unfavorable to the party," "instruct the jury that it may or must presume the information was unfavorable to the party," dismiss the case, or enter default judgment. Fed. R. Civ. P. 37(e)(2).

Plaintiffs are entitled to sanctions under both 37(e)(1) and (e)(2). "On considering a motion for [spoliation] sanctions, a district court may make factual findings and assess the credibility of witnesses." *WeRide Corp. v. Kun Huang*, 2020 WL 1967209, at *9 (N.D. Cal. Apr. 24, 2020) (citations omitted). A party need only prove its entitlement to spoliation sanctions by a preponderance of the evidence. *See, e.g.*, *id.* at *9.

### 1. Defendants Intended to Deprive Others of the Devices and Their Contents in Litigation, Meriting an Adverse Inference at Summary Judgment and an Adverse-Inference Instruction to the Jury at Trial

Given Defendants' persistent, widespread, and egregious spoliation, under Rule 37(e)(2), the jury should be instructed that it may presume that the evidence Defendants spoliated—both the photos County personnel took and shared and the devices on which they did so—was unfavorable to Defendants with respect to the content, number, and spread of the photos, and the Court should make the same inference in ruling on any motion by Defendants for summary judgment.

#### (a) The Sheriff's Department intended to deprive Plaintiffs of information about its personnel taking, sharing, and possessing the improper photos.

Defendants began this case by asserting that Sheriff Villanueva ordered Sheriff's Department personnel to delete photos taken at the crash site for beneficent purposes. (*See* Bryant Decl., Ex. 28 (Defs.' Mem. Supp. Mot. Dismiss) at 539 ("Sheriff Villanueva's goal was to promptly ensure that no photographs would be

disseminated beyond their official Department use.").)  The evidence has proven

Defendants' narrative to be false.  Abundant evidence indicates that Defendants'

motivation was to destroy evidence.  *See, e.g.*, *NuVasive*, 2019 WL 1171486, at *12

("Intent rarely is proved by direct evidence, and a fact-finder has substantial leeway

to determine intent through consideration of circumstantial evidence, witness

credibility, motives of the witnesses in a particular case, and other factors.  There

need not be a 'smoking gun' to prove intent under Rule 37(e)(2)." (citation omitted;

Court's alterations adopted)).

      *First*, the Sheriff's Department has "been subject to multiple civil actions in

the past and thus [is] well aware of [its] obligations to issue a litigation hold and

preserve evidence." *Perkins*, 2020 WL 1333109, at *17.  More specifically, the

Malibu/Lost Hills officials who carried out the Sheriff's deletion order—Mancinas

and Phillips—testified that they were aware at the time that evidence of serious

misconduct by department personnel, including the photos, could be relevant to

future proceedings, including internal investigations, disciplinary proceedings, and

civil litigation.  (Bryant Decl., Exs. 11 at 172-174 [Mancinas Dep. 104:15-106:10],

Ex. 14 at 248-252 [Phillips Dep. 25:17-29:5].)  Both they and the PR staff that

served as the Sheriff's middlemen—Valdez and Satterfield—testified that they

knew that materials relevant to such proceedings ought to be secured and preserved.

(Bryant Decl., Ex. 11 at 162-163, 172-174 [Mancinas Dep. 22:12-23:12, 104:15-

106:10]; Ex. 14 at 248-250 [Phillips Dep. 25:17-26:25, 27:16-29:5]; Ex. 12 at 183-

185 [Valdez Dep. 86:24-88:16]; Ex. 17 at 304-306 [Satterfield Dep. 137:13-138:18,

139:22-140:2].)  Mancinas even acknowledged under oath that he knew at the time

that the scandal of Sheriff's Department personnel taking and distributing gratuitous

photos of human remains was going to "snowball" into "bigger things" and that his

and Phillips's deletion project would not be the "end" of the matter.  (Bryant Decl.,

Exs. 11 at 172-174 [Mancinas Dep. 104:15-106:10].)  But he and Phillips

nonetheless failed to secure or preserve the photos or even discuss how to do so,

1   instead explicitly commanding their subordinates to delete the photos en masse in

2   exchange for no or minimal discipline.  (Bryant Decl., Exs. 11 at 166 [Mancinas

3   Dep. 52:10-19], Ex. 14 at 248-252 [Phillips Dep. 25:17-29:5].)

4       *Second*, the willingness of senior Department personnel to direct the rapid and

5   unceremonious deletion of evidence in disregard of investigative norms and of the

6   obvious likelihood of future proceedings points inexorably to the Department's

7   intent to deprive other parties of that evidence in any future litigation.  (See Bryant

8   Decl. Ex. 11 at 166, 169-170, 171, 175 [Mancinas Dep. 52:6-19, 79:9-80:22, 87:1-2,

9   112:5-20]; Ex. 14 at 255-256, 260, 263 [Phillips Dep. 80:4-81:14, 85:16-18, 88:5-

10  13].)

11      *Third*, neither Mancinas nor Phillips took any serious steps to verify whether

12  in fact the Sheriff's deputies they interviewed had actually deleted all crash-site

13  photos in their possession and disclosed the full extent of their dissemination of the

14  photos to others.  That omission is flatly at odds with Defendants' characterization

15  that the Department's motivation for the deletion effort was to prevent further

16  dissemination of the photos.

17      *Fourth*, Defendants and their personnel have offered bizarrely conflicting

18  narratives regarding the circumstances under which the photos of the crash site

19  taken and shared by Department personnel came to be deleted.  Phillips testified at

20  deposition that, pursuant to the Sheriff's directive, he ordered Lost Hills personnel

21  to delete photos in their possession and that Mancinas did so, too.  Similarly, the

22  County has admitted in interrogatory responses that "LASD told everyone involved

23  that if they were truthful, deleted the photos, and had not shared photos publicly,

24  they would receive a performance log entry ('PLE') in lieu of discipline."  (Bryant

25  Decl. Ex. 23 at 344.)  Contemporaneous documents confirm this.  For example, a

26  January 31, 2020 memorandum to Mancinas written by a deputy stated that he

27  "deleted all photos as requested by departmental administration."  (Bryant Decl., Ex.

28  32.)

But several Sheriff's Department witnesses deny or claim to not remember the deletion order. For example, Lt. Mancinas declined to testify one way or another whether he ordered anyone to delete photos. And the Sheriff's middlemen for conveying orders to Lost Hills station, Captain Jorge Valdez and Detective John Satterfield, were similarly evasive. When asked whether the word "delete" was ever uttered during their conversations with the Sheriff, both responded the same way: "I don't recall." (Bryant Decl. Ex. 12 at 186 [Valdez Dep. 160:3-5]; Ex. 17 at 303 [Satterfield Dep. 103:16-20].)

These abundant and flagrant inconsistencies in Defendants' account of the events are not the product of some collective mixed memory but rather evidence of a deliberate effort by senior Department leadership to destroy evidence of constitutional and tortious liability and conceal that fact from future litigants. *See, e.g.*, *NuVasive*, 2019 WL 1171486, at *13-15 (noting that a "shift in [a defendant's] account" regarding spoliation of text messages "raise[d] a legitimate question about the credibility of his current explanation for the loss of text messages" and was relevant to determination of his intent under Rule 37(e)(2)).

*Finally*, the off-the-books nature of the Department's actions also casts suspicion on the entire enterprise. Mancinas and Phillips did not record any of their interviews or prepare transcripts. (Bryant Decl. Ex. 11 at 176-177 [Mancinas Dep. 126:25-127:8]; Ex. 14 at 262-263 [Phillips Dep. 87:22-88:1].) There is scarcely any email traffic regarding the inquiry. The performance log entries were only two sentences long, conspicuously omitted the term "photo," and were not actually issued until weeks after the "inquiry" concluded, when the *Los Angeles Times* reached out to the Department for comment before breaking the story on the improper photos. (Bryant Decl. Ex. 46 [February 26, 2020 email from *Los Angeles Times* reporter Alene Tchekmedyian to Captain Jorge Valdez, asking for Department comment on forthcoming story regarding improper accident scene photos]; Bryant Decl. Ex. 41 [performance log entries for the Deputy Defendants,

dated February 27, 2020].)  Neither Valdez, Mancinas, nor Satterfield documented anything about their involvement in the investigation until after the *Los Angeles Times* story broke.  (Bryant Decl. Ex. 42 [Mancinas memo dated March 3, 2020]; *id.* Ex. 44 [Valdez memo dated March 4, 2020]; *id.* Ex. 43 [Satterfield memo dated March 4, 2020].)  And Valdez assured the *Los Angeles Times* that there was no order given to delete any photographs, which the County now acknowledges is untrue.  (Bryant Decl. Ex. 18.)  Such secrecy would have been unnecessary if the Department's motivations were as beneficent as Defendants now claim.

> **(b)** *Tony Imbrenda intended to deprive Plaintiffs of evidence of his misconduct, and his conduct should be imputed to the Fire Department.*

A couple of weeks after Imbrenda displayed his personal collection of crash-site photos at a public awards show, word got out to the media that the Fire Department had graphic photos of the victims.  Imbrenda acted quickly, not only scrambling to delete his own 45-50 photos but also spreading the word far and wide within the Department that his colleagues should do the same, with the goal of keeping his involvement in the photo-sharing under wraps.  Like Sheriff Villanueva, Imbrenda now tries to paint his actions as altruistic.  But the Fire Department saw Imbrenda's deletion for what it really was:  an "attempt to cover up [his] role in the reported misuse of the photos."  (*Id.* Ex. 31 at 564; Ex. 15 at 288-290 [McCloud Dep. 159:20-161:21].)

"An entity and employee defendants can both be under a duty of preserve, and therefore culpable for spoliation of ESI, even if one or the other is directly responsible for the destruction of evidence."  *Colonies Partners*, 2020 WL 1496444, at *7 (collecting cases); *see also Dykes v. BNSF Ry. Co.*, 2019 WL 1128521, at *6 (W.D. Wash. Mar. 12, 2019) (where defendant principal "exercises control and authority over its third-party agent who possesses the spoliated evidence," the agent's spoliation is properly imputed to the principal).  Because Imbrenda carried out his deletion campaign as a senior Fire Department official acting within the

scope of his employment at a time when the Fire Department had taken no steps to preserve evidence in his possession, his spoliation should be attributed to his employer.

### (c) The Deputy Defendants intended to deprive Plaintiffs of evidence of their misconduct.

Defendants Versales, Russell, and Mejia each replaced the phones they were using on January 26, 2020 after this litigation had already commenced and, in the case of Russell and Mejia, after they knew they were being named as individual defendants. At the time they discarded their phones, each of them were keenly aware that the devices were relevant to this litigation. The County's counsel had already requested access to the phones to submit them to a forensic examination, and the Deputy Defendants had refused. This sequence of events raises just one plausible inference: the Deputy Defendants did not want their January 2020 phones to be inspected for purposes of this litigation. Under these circumstances, "getting a new phone . . . evince[s] the kind of deliberate behavior that sanctions are intended to prevent." *Ronnie Van Zant, Inc. v. Pyle*, 270 F. Supp. 3d 656, 670 (S.D.N.Y. 2017), *rev'd on other grounds sub nom. Ronnie Van Zant, Inc. v. Cleopatra Records, Inc.*, 906 F.3d 253 (2d Cir. 2018); *see also, e.g.*, *Paisley Park Enterprises, Inc. v. Boxill*, 330 F.R.D. 226, 233 (D. Minn. 2019) (fact that defendants "wiped and destroyed their phones" after they had been sued was "egregious" and "troubling"); *First Mariner Bank v. Resol. Law Grp., P.C.*, 2014 WL 1652550, at *11 (D. Md. Apr. 22, 2014) (finding willful spoliation where custodian purposefully and intentionally disposed of his smartphone despite knowledge of the lawsuit).

Similarly, while the timing of Defendant Cruz's factory reset of his phone has yet to be determined,[8] it is not difficult to deduce his intent in resetting the device

---

[8] At the time of Cruz's deposition, he was representing that he had made his January 2020 phone available for inspection by the Forensic Examiner. (*See* Bryant Decl. ¶ 7, Ex. 38 at 701-702.) It was only after his deposition, when the Forensic

and permanently erasing all of its contents.  In most situations, such a reset can only

be accomplished through deliberate action by the user.  (*See* Freskos Decl. ¶¶ 22-

23.)  Deliberate action to deprive Plaintiffs of the content of the phone is the only

plausible explanation for Cruz's data wipe.

**2.  At the Very Least, The Court Should Issue an Instruction that the Jury Should Make an Adverse Inference if it Finds that Defendants Acted with Improper Intent**

Based on this record, Plaintiffs submit that the Court should find that

Defendants destroyed material evidence with intent to deprive Plaintiffs of that

evidence in litigation.  But if the Court is not inclined to make such a finding, the

Court should issue an instruction that the jury should make an adverse inference if it

finds that Defendants acted with improper intent.  *See* Fed. R. Civ. P. 37(e) advisory

committee notes to 2015 amendment (noting that rule empowers courts to decide

that Rule 37(e)(2)'s "intent finding should be made by a jury" and that, if court so

decides, "the court's instruction should make clear that the jury may infer from the

loss of the information that it was unfavorable to the party that lost it only if the jury

first finds that the party acted with the intent to deprive another party of the

information's use in the litigation").  Case are legion in which courts finding factual

issues related to intent have submitted spoliation issues to the jury.[9]  To the extent

_____

Examiner produced his report, that Plaintiffs learned Cruz had produced a phone
wiped of all data.  (*Id.* Ex. 5 at 61.)

[9] *See, e.g.*, *Aramark*, 2021 WL 864067, at *18-19 (concluding "reasonable jurors
could disagree as to whether [custodian] intentionally spoliated his iPhone" when
suspicious timing weighed against custodian's innocent explanation; submitting
question to the jury to decide); *Cahill v. Dart*, 2016 WL 7034139, at *4 (N.D. Ill.
Dec. 2, 2016) ("[T]he jurors will be instructed that, if they are persuaded that the
destruction [of a video potentially depicting planting of evidence] was intended to
deprive [plaintiff] of the evidence, they must presume the lost evidence would have
been unfavorable to Defendants."); *Coan v. Dunne*, 602 B.R. 429, 442 (D. Conn.
2019) (similar); *Sosa v. Carnival Corp.*, 2019 WL 330865, at *3 (S.D. Fla. Jan. 25,
2019) (collecting cases in which courts "have opted for the procedure discussed in

1    that the Court cannot determine Defendants' intent, submitting the issue to the jury

2    would make legal and practical sense for two reasons.

3        *First*, to the extent the Court is not inclined to impose adverse-inference

4    sanctions under 37(e)(2), the question of intent is sufficiently fact- and credibility-

5    bound, and the record of mal-intent sufficiently robust, to merit resolution by the

6    jury.  The question of Defendants' "mental state" turns "on a credibility analysis" of

7    the parties' competing explanations for Defendants' spoliation and is thus

8    quintessentially the kind of dispute that a jury is well equipped to resolve.  *Hunting*

9    *Energy Servs., Inc. v. Kavadas*, 2018 WL 4539818, at *11 (N.D. Ind. Sept. 20,

10   2018) ("This issue [of intent under Rule 37(e)(2)] thus depends on a credibility

11   analysis and a finding as to the defendants' mental state.  Those are prototypical

12   functions of a jury and questions that the jury will be able to fairly evaluate and

13   resolve."); *see also, e.g.*, *Epicor Software Corp. v. Alternative Tech. Sols., Inc.*, 2015

14   WL 12734011, at *2 (C.D. Cal. Dec. 17, 2015) (submitting Rule 37(e)(2) intent

15   question to jury where plaintiff had assembled "a substantial amount of evidence

16   that could lead a reasonable trier of fact to conclude that [defendant] destroyed

17   evidence with the intent of depriving [plaintiff] of that evidence in this litigation,"

18   the defendant's "filing in opposition, however, may cause a reasonable trier of fact

19   to conclude otherwise," and the issue of defendant's intent "with regard to the

20   destroyed evidence" was thus "an open question of fact . . . suitable for resolution by

21   the jury").

22       *Second*, motivations for Defendants' spoliation are tied intimately to the

23   merits of Plaintiffs' claims and the veracity of Defendants' counter-narratives.  In

24   their defense of these actions (both in this Court and in the media), Defendants have

25   made the self-serving, unverifiable assertions that the photos mostly depicted

26

27   the Advisory Committee Notes and have entered orders establishing that the *jury*

28   would decide the intent issue").

helicopter debris rather than human remains; that the photos were taken for some legitimate law-enforcement purpose; that the photos taken were few in number; that the photos were not distributed to members of the public; and that Defendants were successful in containing the spread of the photos, among other arguments.  But the circumstances under which County personnel destroyed evidence that would bear on these questions, and their motivations for doing so, bear directly on the truthfulness of these contentions and vice versa.

If the jury does not credit Defendants' witnesses on these contentions and concludes instead that the photos prominently depicted human remains, were many in number, were taken and shared by numerous personnel on many devices, or were distributed farther and wider than Defendants have admitted, then those findings will make it more likely that Defendants and their personnel willfully deleted the photos and wiped or disposed of their phones with intent to deprive Plaintiffs of the benefit of evidence of their wrongdoing.  Similarly, if the jury credits Plaintiffs' evidence of Defendants' bad-faith spoliation, then those findings make it more likely that the photos depicted the remains of Mrs. Bryant and Mr. Chester's loved ones; that Defendants' taking and widespread distribution of many such photos invaded Mrs. Bryant and Mr. Chester's privacy; and that Defendants' misconduct was shocking to the conscience and violated Mrs. Bryant and Mr. Chester's substantive-due-process rights—issues that the jury will have to consider in deciding Plaintiffs' claims.

Courts have submitted the question of a spoliator's intent to the jury under Rule 37(e)(2) in similar circumstances.  In *Cahill v. Dart*, 2016 WL 7034139, at *4 (N.D. Ill. Dec. 2, 2016), for instance, the court held that the jury should decide the defendants' mental state in destroying video of the plaintiff's treatment at a police station.  The plaintiff had sued several sheriff's deputies for (among other claims) false arrest and malicious prosecution, contending that, while he was being processed at a sheriff's station after having been arrested for driving without a

license, one of the deputies dropped a package of cocaine in his holding cell and then caused the plaintiff to be falsely charged with felony possession of cocaine. *Id.* at *1. Surveillance video that would either have proved or disproved the plaintiff's version of events was initially preserved but then deleted under suspicious circumstances. *Id.* at *2. The district court submitted the question of the spoliator's intent to the jury. *Id.* at *4. The court noted that "the destruction of the video in [the] case [was] closely tied" to the merits of the plaintiff's "malicious prosecution claim" because, "[i]f the video would have proven [the plaintiff's] innocence" of the cocaine charge, "and Defendants intentionally allowed it to be destroyed during his prosecution, the video's destruction would be part of their plot to frame him." *Id.* In other words, "evidence not directly tied to the fate of the video could nevertheless illuminate Defendants' intent regarding the video." *Id.*

So too here. The question of whether Defendants destroyed evidence of the photos with ill-intent in turn sheds light on the veracity of Defendants' self-serving assertions about what those photos depicted, how numerous those photos were, the persons by whom they were taken, and the extent to which they were shared. *See also, e.g.*, *BankDirect Cap. Fin., LLC v. Cap. Premium Fin., Inc.*, 2018 WL 1616725, at *2, 12 (N.D. Ill. Apr. 4, 2018) (recommending submission of Rule 37(e)(2) intent issue to jury because "analysis and resolution" of plaintiff's intent in deleting plainly relevant emails would "be pertinent to the jury's consideration of and decision on" plaintiff's breach-of-contract claim and defendant's argument that plaintiff negotiated the contract "in bad faith," and "a fully informed judgment will depend upon the jury's assessment of the evidence and the witnesses"); *NuVasive, Inc. v. Kormanis*, 2019 WL 1171486, at *15 (M.D.N.C. Mar. 13, 2019) (recommending same approach for similar reasons).

### 3. Defendants' Spoliation of Evidence Has Prejudiced Plaintiffs, Meriting Additional Sanctions Under Rule 37(e)(1)

Sanctions are also warranted because Defendants' deletion and destruction of

evidence in this case has irreparably impeded Plaintiffs' ability to obtain reassurance that photos of their loved ones' remains have been contained and will not someday become public.  The spoliation has also hampered Plaintiffs' ability to hold Defendants accountable for their wrongdoing.  Separate from and in addition to an adverse-inference instruction under Rule 37(e)(2), Plaintiffs respectfully request that the Court impose measures "to cure the prejudice" that Defendants' spoliation has worked on Plaintiffs in this litigation.  Fed. R. Civ. P. 37(e)(1); *see also, e.g.*, *Cahill*, 2016 WL 7034139, at *4 (in addition to submitting question of intent under Rule 37(e)(2) to jury, affirming magistrate judge's recommendation under Rule 37(e)(1) that defendants be precluded at trial from "[p]resenting their theory about" the content of "the missing video" they spoliated); *Coan*, 602 B.R. at 439-40, 442 (in addition to submitting intent under Rule 37(e)(2) to jury, granting moving party's request to "overrule any authenticity challenge" to deleted emails obtained from third parties under Rule 37(e)(1)).

       (a)    *Defendants' Spoliation Has Prejudiced Plaintiffs by Limiting Their Ability to Prove the Full Extent of Defendants' Wrongdoing*

"Once spoliation is established, upon a showing of prejudice to another party from the loss of ESI that cannot be restored or replaced through additional discovery, Rule 37(e)(1) provides that the Court may order measures no greater than necessary to cure the prejudice."  *Mfg. Automation & Software Sys., Inc. v. Hughes*, 2018 WL 5914238, at *11 (C.D. Cal. Aug. 20, 2018) (citation omitted).  "An evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation."  Fed. R. Civ. P. 37(e) advisory committee notes to 2015 amendment.

"When, as here, spoliation is shown, the burden shifts to the guilty party to demonstrate that no prejudice resulted from the spoliation," particularly if the spoliation was intentional.  *Hughes*, 2018 WL 5914238, at *11 (quoting *Czuchaj v. Conair Corp.*, 2016 WL 4130946, at *2 (S.D. Cal. May 3, 2016); *see also, e.g.*,

1  *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 998 (N.D. Cal. 2012).  "The

2  prejudiced party must not be held 'to too strict a standard of proof regarding the

3  likely contents of the destroyed or unavailable evidence,' because doing so 'would

4  allow parties who have destroyed evidence to profit from that destruction.'"

5  *Aramark*, 2021 WL 864067, at *5 (quoting *Ottoson v. SMBC Leasing & Fin., Inc.*,

6  268 F. Supp. 3d 570, 580 (S.D.N.Y. 2017)); *see also, e.g.*, *Leon v. IDX Sys. Corp.*,

7  464 F.3d 951, 959 (9th Cir. 2006) ("[B]ecause the relevance of destroyed documents

8  cannot be clearly ascertained because the documents no longer exist, a party can

9  hardly assert any presumption of irrelevance as to the destroyed documents."

10  (internal quotation marks omitted; Court's alterations adopted)).

11        By any standard, Defendants' spoliation has prejudiced Plaintiffs in this

12  lawsuit.  With the direct evidence of Defendants' photos of the crash-site destroyed,

13  Plaintiffs cannot definitively establish what those photos depicted; which victims

14  were photographed; how many photos were taken and shared; how far and wide

15  those photos were stored and disseminated; or even what Defendants wrote about

16  the photos as they passed them around.  And without information of this most basic

17  kind, Plaintiffs have no hope of containing the photos' spread.  Imbrenda testified,

18  for instance, that he received crash-site photos from approximately seven to nine

19  different phone numbers.  (Bryant Decl. Ex. 10 at 139-143 [Imbrenda Dep. 72:15-

20  74:5, 98:8-99:23].)  He could recall and identify only *two* of the seven to nine

21  individuals who sent him photos.  (*See id.*)  Because Imbrenda's texts and photos

22  from that day have been destroyed, the additional five to seven Fire Department

23  personnel who sent him photos of the crash cannot be identified, and their copies of

24  the photos remain unsecured and at-risk of release at any moment.

25        Nor can Plaintiffs know the full extent of Defendants' invasion of their

26  privacy or the full degree to which their misconduct shocks the conscience—issues

27  that go to the heart of Plaintiffs' claims.  The information that Plaintiffs have

28  managed to discover on these issues—despite Defendants' best efforts to conceal

their conduct—supplies strong reason to suspect that the spoliated evidence would have further shown that Defendants gratuitously took and widely shared graphic photos of the victims' remains.  To take just one example, Defendant Russell has admitted he texted photos containing human remains to a fellow Sheriff's deputy from another station with whom he regularly plays the video game Call of Duty.  (Lavoie Decl. ¶ 6.)  Russell's cell phone records show that after the crash he was sending picture messages to *three* other video game buddies—some from as far away as Louisiana—at the same time he was texting photos to the Sheriff's deputy.  (*Id.*)  It strains credulity to think Russell sent the photos to just one of the members of his Call of Duty group chat.  But because the texts have all been deleted, Plaintiffs have no way to determine the content of the pictures Russell was texting to his friends in the days following the crash.

Given this evidence that Plaintiffs have managed to obtain in discovery, it is reasonable to infer that the deleted evidence and timely forensic examinations of the devices at issue would have revealed even more dissemination and other facts that would have advanced Plaintiffs' case.  But Defendants' spoliation has prevented Plaintiffs from obtaining this evidence—the precise kind of prejudice Rule 37(e)(1)'s curative sanctions are designed to address.  *See, e.g.*, *GN Netcom, Inc. v. Plantronics, Inc.*, 930 F.3d 76, 83 (3d Cir. 2019) (affirming finding of prejudice resulting from party's spoliation of relevant emails because, although "[w]e will never know whether" the emails contained information "damning" to the spoliator and how integral those emails would have been to the movant's case, movant had "provided plausible, concrete suggestions as to what that evidence" in those emails "might have been"); *see also, e.g.*, *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 2021 WL 4190628, at *17 (S.D.N.Y. Aug. 18, 2021) (finding prejudice because, as a result of spoliation, "Plaintiffs' case against Defendants is weaker when it cannot present the overwhelming quantity of evidence it otherwise would have to support its case" (internal quotation marks omitted)).

(b)   *In Addition to an Adverse Inference Instruction Under 37(e)(2), Plaintiff's Prejudicial Spoliation Merits Sanctions Under 37(e)(1)*

While an adverse-inference instruction under Rule 37(e)(2) is warranted for the reasons set forth above, additional and alternative sanctions are also warranted under Rule 37(e)(1) to cure the prejudice Defendants' spoliation has caused.

*First*, Defendants should be precluded from arguing at summary judgment or trial that (1) the photos did not depict human remains; (2) the photos depicted the remains of only certain crash victims; and (3) the photos were not publicly disseminated. *See* Fed. R. Civ. P. 37(e) advisory committee notes to 2015 amendment (noting that Rule 37(e)(1) authorizes court "to exclude a specific item of evidence to offset prejudice caused by failure to preserve other evidence that might contradict the excluded item of evidence"); *see also, e.g.*, *Cahill*, 2016 WL 7034139, at *4 (affirming magistrate judge's recommendation that spoliating parties be precluded from offering any testimony that spoliated "video would have backed up [their] version of events").  Allowing Defendants to make these arguments would permit them to exploit the evidentiary imbalance they created and which, as a result of Defendants' spoliation, Plaintiffs cannot fairly rebut.  The Court should not permit Defendants to advance arguments that "tak[e] unfair advantage of an evidentiary gap" they "created . . . themselves."  *Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 68 (S.D.N.Y. 2020); *see also, e.g.*, *Edwards v. Junior State of Am. Found.*, 2021 WL 1600282, at *9-10 (E.D. Tex. Apr. 23, 2021) (precluding plaintiffs from offering evidence or argument regarding content of alleged racist Facebook messages "that Plaintiffs manifestly knew or should have known [were] critical to th[e] case" because plaintiffs' deletion of Facebook account "deprived" defendant "of the opportunity to . . . potentially rebut" the messages as fraudulent and created an "unfair imbalance between [the parties'] ability to procure, examine, and present evidence"); *Mule*, 2021 WL 2788432, at *17 (precluding spoliators "from offering testimony at trial regarding the coding and characterization

of transactions in . . . discarded" bookkeeping records to "contradict" the coding or characterizations in the records they maintained, "including any testimony suggesting that certain transactions were properly coded . . . as personal expenses").

*Second*, Defendants should be ordered to reimburse Plaintiffs for their portions of the cost of the neutral forensic examination.  Long touted by Defendants' counsel as a panacea to Plaintiffs' lawsuits, that exam's primary objective was to determine, among other things, precisely what was depicted in the images Defendants took and shared, including which crash victims were depicted and how prominently, and the extent to which Defendants and their personnel disseminated those gratuitous photos.  But the deletion of the photos and the disposal or wiping of virtually every phone on which an LASD employee is known to have taken or possessed photos of the crash site has largely thwarted that objective, leaving Plaintiffs with only a shadow of the evidence and peace of mind the exam was intended to provide.  Defendants, moreover, did not disclose the extent of their spoliation of the phones until well after the parties' forensic protocol was agreed to and the examination itself well under way.  (Bryant Decl. ¶ 7.)  Because Defendants' spoliation has frustrated the forensic examination's purpose, Defendants—not Plaintiffs—should bear the full cost for the exam.

*Third*, Defendants should reimburse Plaintiffs for the fees and costs they have incurred in filing and briefing this motion for spoliation sanctions—expenses they would not have had to incur but for Defendants' discovery misconduct.  *See, e.g.*, *Spencer v. Lunada Bay Boys*, 2017 WL 10518023, at *12 (C.D. Cal. Dec. 13, 2017) (in addition to other remedies, awarding "monetary sanctions in the form of reasonable attorneys' fees incurred by Plaintiffs in bringing their Motion" for spoliation); *Garit v. City of Chicago*, 2018 WL 11199008, at *4 (N.D. Ill. Mar. 6, 2018) (awarding movants fees and expenses for the "considerable amount of time" they spent "briefing the motions and preparing for the evidentiary hearing related to [spoliating party's] failure to preserve the phone").

*Finally*, in the alternative to an adverse inference under Rule 37(e)(2), at a minimum, Plaintiffs should be given the opportunity to present evidence of Defendants' spoliation to the jury, and the jury should be permitted to consider that evidence in evaluating the strength of Plaintiffs' claims and Defendants' defenses. *See* Fed. R. Civ. P. 37(e) advisory committee notes to 2015 amendment (noting that Rule 37(e)(2) governs only "jury instructions that permit or require the jury to presume or infer that lost information was unfavorable to the party that lost it" but does "not prohibit a court from allowing the parties to present evidence to the jury concerning the loss and likely relevance of information and instructing the jury that it may consider that evidence, along with all the other evidence in the case, in making its decision," a measure "available under subdivision (e)(1)"); *see also, e.g.*, *NuVasive*, 2019 WL 1171486, at *2 (as Rule 37(e)(1) remedy, allowing parties "to present evidence to the jury concerning the loss" of electronically stored information and instructing the jury that it "may consider [such] evidence . . . in making its decision"); *Stanbro v. Westchester Cnty. Health Care Corp.*, 2021 WL 3863396, at *16 (S.D.N.Y. Aug. 27, 2021) (under Rule 37(e)(1), authorizing plaintiff "to adduce evidence at trial" regarding "the creation of the Video" spoliated by defendants; defendants' "obligation to preserve the Video"; "the absence of the Video"; and "the Video's likely relevance to Plaintiff's deliberate indifference claim"); *Franklin v. Howard Brown Health Ctr.*, 2018 WL 4784668, at *7 (N.D. Ill. Oct. 4, 2018) (recommending that, as a Rule 37(e)(1) remedy, "parties be allowed to present evidence and argument to the jury regarding the defendant's destruction/failure to preserve electronic evidence in this case, and that the jury be instructed as the trial judge deems appropriate").

Allowing Plaintiffs to put on evidence and argument regarding the extent and motives for Defendants' spoliation will help "'rectify the evidentiary imbalance'" that Defendants have "created by spoliating relevant *ESI*" and will "provide[] the jury, as finder of fact, with context for that evidentiary imbalance." *Karsch v. Blink*

1   *Health Ltd.*, 2019 WL 2708125, at \*27 (S.D.N.Y. June 20, 2019) (quoting *Linde v.*

2   *Arab Bank, PLC*, 706 F.3d 92, 102 (2d Cir. 2013)).  Moreover, evidence that

3   Defendants willfully spoliated relevant evidence "is itself relevant evidence going to

4   the parties' credibility" that should be presented to the jury.  *Karsch*, 2019 WL

5   2708125, at \*27; *see also, e.g.*, *Lewis v. Erfe*, 2020 WL 4581724, at \*4 (D. Conn.

6   Aug. 10, 2020) (authorizing parties under Rule 37(e)(1) "to present evidence and

7   argument regarding the loss of [spoliated] surveillance footage" in part because "the

8   failure to preserve the video may" bear "on the credibility of the Defendants to the

9   extent they had the ability to affect its preservation and failed to make a reasonable

10  attempt to assure its preservation"); *Charlestown*, 337 F.R.D. at 68-69 (allowing

11  movant "to present evidence to the finder of fact regarding the loss of [important]

12  emails" so that jury could "consider the loss of that evidence, and the circumstances

13  under which it was lost, in evaluating witness credibility and making other factual

14  determinations").

## DEFENDANTS' CONTENTIONS

### A.   Facts

#### 1.    The January 26, 2020 Accident

18  On the morning of Sunday, January 26, 2020, a helicopter crashed with nine

19  individuals, including Bryant's husband and daughter, onboard.  (Rodriguez-

20  Sanchirico Decl. Ex. O [FAC ¶ 2].)  The crash occurred in Calabasas, not far from

21  hiking and mountain biking trails.  (*Id*. Ex. F [Marrone Dep. 43:20-25].)  Civilian

22  cyclists called 911 and took photos of the scene.  (*Id*. Ex. R [IAB Investigative

23  Summary at 8] and Ex. O [LA Times Article]; Doug Johnson Decl. ¶ 7.)

24  Multiple agencies, including the NTSB, FBI, FAA, DMEC, LACFD, LASD,

25  and Malibu SAR, reported to the scene.  (Rodriguez-Sanchirico Decl. Ex. R. [IAB

26  Investigative Summary at 3] & Exs. F-G [Bryant Dep. 20:14-21:5; Tauscher Dep.

27  39:22-40:21].)  By mid-morning, media outlets had reported that Kobe Bryant had

28  been one of the passengers.  (*Id*. Ex. H [Mejia Dep. 128:6-129:14].)  Onlookers and

1    reporters rushed to Calabasas to access the crash site.  (*Id*. [Mejia Dep. 129:15-

2    130:11].)  It was chaos.  (*Id*.)

3         LASD worked to secure the scene, even implementing a no-fly zone, while

4    LACFD tended to the brush and chemical fires.  (Rodriguez-Sanchirico Decl. Ex. I

5    [Vander Horck Dep. 43:5-14]; Ex. F [Marrone Dep. 85:18-86:25].)  DMEC's

6    Special Operations Response Team took photos, made identifications, and gathered

7    the victims and their remains.  (*Id*. Ex. G [Tauscher Dep. 39:22-40:21].)  Every

8    agency on site took crash site photos.  (*Id*. [Tauscher Dep. 54:16-24].)

9                   **2.      The LASD Crash Site Photos**

10                  *(a)      LASD Receives a Complaint*

11        On January 29, 2020, the Sheriff's Information Bureau ("SIB") received an

12   email from a concerned citizen.  (Scott Johnson Decl. ¶ 3.)  The email stated that a

13   deputy had shown crash site photos on his phone to someone at the Baja California

14   Bar and Grill in Norwalk.  (*Id*.)  SIB shared the email with LASD command staff,

15   who launched an immediate inquiry.  (*Id*.)

16        By the next day, LASD had identified Deputy Joey Cruz as the deputy and

17   learned that he had shown photos on his cellphone to one of his friends, Victor

18   Gutierrez, the bartender in Norwalk.  (Cruz Decl. ¶¶ 19-20.)  Deputy Cruz was a

19   young deputy trainee who had been at LASD for less than a year.  (*Id*. ¶ 2.)

20        According to Victor Gutierrez, he saw between one and three photos, which

21   Deputy Cruz swiped through while holding his phone.  (Rodriguez-Sanchirico Decl.

22   Ex. J [Gutierrez Dep. 20:24-21:8]; Cruz Decl. ¶ 14.)  He recalled seeing various

23   body parts in the debris field.  (Rodriguez-Sanchirico Decl. Ex. J [Gutierrez Dep.

24   30:9-13].)  Deputy Cruz did not show the photos to anyone else at the bar, but he did

25   try to show scene photos to his niece, who refused to look at them.  (Cruz Decl.

26   ¶ 13.)

27                  *(b)      LASD Takes Immediate Action*

28        In her deposition, Bryant testified that she asked Sheriff Villanueva to make

1  sure no photos of her husband and daughter got out.  (Rodriguez-Sanchirico Decl.

2  Ex. F [Bryant Dep. 19:10-15].)  As a result, when Sheriff Villanueva learned about

3  the potential showing of crash site photos, he directed his personnel to launch an

4  immediate inquiry and make sure *no* photos got outside the department.  (*Id*. Ex. R

5  [IAB Investigative Summary at 3].)  He said if everyone was honest, and did not

6  publicly disseminate any photos, they would receive a performance log entry in their

7  personnel file in lieu of more severe discipline.  (*Id*.)

8      Malibu/Lost Hills Station Lieutenant Hector Mancinas and Sergeant Marcus

9  Phillips interviewed 28 deputies, reserve deputies, sergeants and civilian volunteers.

10  (Scott Johnson Decl. ¶ 5.)  They determined that all LASD personnel who had

11  taken, shared or received crash site photos had deleted them.  (*Id*. ¶ 6.)  Only Deputy

12  Cruz had shown a photo to anyone outside LASD.  (*Id*. ¶ 8.)  By the conclusion of

13  the initial inquiry, all of the LASD employees who had possessed photos of the

14  crash site had deleted them.[10]

15          *(c)    The Internal Affairs Bureau Investigates*

16      Once the initial inquiry was complete, IAB conducted a comprehensive

17  investigation.  (Scott Johnson Decl. ¶¶ 4-8.)  That is the standard operating

18  procedure at LASD.  (*Id*. ¶ 4.)  IAB interviewed 41 witnesses and compiled a

19  comprehensive 1,140-page report.  (*Id*. ¶ 7.)

20      The investigation revealed that the photos came from the first deputy on

21  scene, Deputy Johnson, who is not named as a defendant.  (Rodriguez-Sanchirico

22  Decl. Ex. R [IAB Investigative Summary at 4].)  He took crash site photos to

23  explain to the command post what he was seeing.  (Doug Johnson Decl. ¶ 10.)

24  Deputy Johnson sent the photos to Deputy Raul Versales, who was handling

25

26  ──────────────────
   [10] Cruz Decl. ¶¶ 15-18; Russell Decl. ¶¶ 9-12; Mejia Decl. ¶¶ 17-20; Versales Decl.
27  ¶¶ 13-16; Miller Decl. ¶¶ 10-12; Cable Decl. ¶¶ 11-14; Jauregui Decl. ¶¶ 13-15;
   Kelly Decl. ¶¶ 12-15.
28

1    communications at the command post.  (*Id*.)  Deputy Versales sent the scene photos

2    to Deputy Rafael Mejia, who was working with dispatch to help identify the

3    helicopter, and to the other personnel at the command post.  (Versales Decl. ¶ 12;

4    Mejia Decl. ¶ 10.)

5          Deputy Mejia sent the photos to two deputies who were also on scene,

6    including his trainee, Deputy Cruz.  (Mejia Decl. ¶ 14.)  Deputy Cruz sent the

7    photos to Deputy Michael Russell, who was at the bottom of the command post

8    helping to keep unauthorized individuals, and the media, away.  (Cruz Decl. ¶ 12;

9    Russell Decl. ¶ 4.)  Deputy Russell sent the photos to a deputy who was working at

10   another station but planned on responding to the scene the following day.  (Russell

11   Decl. ¶ 8; Sanchez Decl. ¶ 3.)

12                 **3.      The LACFD Crash Site Photos**

13                      *(a)      LACFD Receives a Call from LASD*

14         On January 31, 2020, LASD Captain Matthew Vander Horck[11] called

15   LACFD Deputy Fire Chief Anthony Marrone.  (Rodriguez-Sanchirico Decl. Ex. E

16   [Marrone Dep. 154:12-19].)  He told Chief Marrone that there was a complaint

17   about a deputy sharing crash site photos containing victim remains.  (Kim Decl. ¶

18   4.)  He advised Chief Marrone that there were two LACFD employees at the crash

19   site on January 26, 2020.  (*Id*.)

20         Chief Marrone notified Deputy Fire Chief William McCloud, who oversaw

21   the Leadership and Professional Standards Bureau at that time.  (Rodriguez-

22   Sanchirico Decl. Ex. E [Marrone Dep. 155:16-156:2].)  LACFD worked to identify

23   the personnel who had been present on the first day of the crash site investigation.

24

25   _____
     [11] Captain Vander Horck is now a Captain at Men's Central Jail.  As he testified,

26   that transfer had nothing to do with this incident.  (Rodriguez-Sanchirico Decl. Ex. I
     [Vander Horck Dep. 321:21-232:4]; Vander Horck Decl. ¶¶ 4-7.)  Bryant's

27   insistence on alleging otherwise, despite having the same deposition transcript, is
     misleading.

28

1   (*Id*. Ex. K [McCloud Dep. 77:12-79:22].)  At that time, there were no allegations

2   that LACFD personnel had shared photos improperly.  (*Id*. [McCloud Dep. 57:6-

3   10]; Ex. E [Marrone Dep. 163:11-18]; Kim Decl. ¶ 4.)

4                      *(b)      LACFD Learns of Potential Photo Sharing and Starts an*

5                               *Investigation*

6         On or around March 6, 2020, a civilian witness reported to LACFD that a

7   LACFD employee had been showing crash site photos on his phone at a first

8   responders awards event on February 15, 2020.  (Kim Decl. ¶ 5.)  The LACFD PIO

9   team received the 2020 Freedom of Information Award at the event.  (*Id*.)

10        LACFD hired an outside law firm to investigate the allegations.  (*Id*. ¶ 6.)

11  The investigation revealed that then-PIO Captain Imbrenda had shown crash site

12  photos on his phone to one LACFD employee and two Los Angeles Fire

13  Department Captains who had worked the incident.  (*Id*.; Imbrenda Decl. ¶ 13.)

14                   **4.      Bryant's Letters and Tort Claims**

15        On March 2, 2020, Bryant's attorney sent letters to LASD and LACFD.

16  (Bryant Decl. Exs. 20, 21.)  The letters asked the departments to "take immediate

17  action to secure all photos and videos of the January 26, 2020 crash scene" in their

18  possession, "including any photos or videos in the possession of or disseminated by

19  [the departments'] personnel."  (*Id.*)

20        Bryant's letters alleged that LASD and LACFD owed a duty of care to

21  victims' families "*to refrain from publicly disseminating photos of victims'*

22  *remains*."  (*Id.* (emphasis added).)  The letters did not threaten litigation or identify

23  any legal claims against either department.  (*Id.*)  The only potential liability the

24  letters referenced was for the public dissemination of photos, which had not

25  occurred.  Indeed, it has now been almost two years since the crash and there has

26  still been no public dissemination.

27        On March 8, 2020, Bryant's attorney sent LASD another letter.  (*Id.* Ex. 23.)

28  The letter acknowledged Bryant's awareness that LASD employees had deleted

1  photos of the crash site.  (*Id.*)  There was no objection to the deletion of photos or

2  request that LASD refrain from deleting photos.  The letter did not demand that

3  LASD preserve any documents or materials related to the January 26, 2020 crash.

4  No potential claim against LASD was identified.

5        Two months later, on May 8, 2020, Bryant submitted a tort claim against

6  LASD.  (Rodriguez-Sanchirico Decl. Ex. P.)  It addressed the deletion of photos in

7  response to reports of an unauthorized showing of the crash site photos.  (*Id.*)  A

8  LACFD tort claim followed on July 20, 2020.  (*Id.* Ex. Q.)

9          **5.**    **LASD's Preservation Efforts**

10        LASD bureaus/divisions and personnel are aware that the County's general

11  retention policy is to retain documents for five years after completion of any

12  investigation or litigation.  (Scott Johnson Decl. ¶¶ 9-10.)

13        On May 11, 2020, Captain Albert Maldonado of the Risk Management

14  Bureau notified Captain Salvador Becerra of the Malibu/Lost Hills Station of

15  Bryant's May 8, 2020 tort claim.  (*Id.* ¶ 11.)  The notice stated the relevant

16  personnel at the station needed to "preserve all evidence related to this claim in a

17  location where it can be readily retrieved."  (*Id.*)  On June 23, 2020, Captain

18  Maldonado sent the same notice to Sheriff Villanueva.  (*Id.* ¶ 13.)  The notice again

19  stated that the relevant personnel needed to "preserve all evidence related to this

20  claim in a location where it can be readily retrieved."  (*Id.*)

21        On July 24, 2020, LASD Chief Legal Advisor Elizabeth Miller sent a

22  litigation hold notice to Commander Scott Johnson of the Professional Standards

23  Division, Lieutenant Maxine Kallenberger of the Risk Management Bureau, Captain

24  William Jaeger of IAB, and Captain Matthew Burson of the Professional Standards

25  Division, relating to the alleged sharing of photos involving the January 26, 2020

26  helicopter crash.  (*Id.* ¶ 15.)  The litigation hold notice directed the recipients to

27  "take steps to ensure that all evidence related to the crash, the investigation, photos

28  taken at the scene, etc. – all evidence in any way related to the crash and any related

investigation is preserved." (*Id.* ¶ 16.)  Lieutenant Kallenberger responded and advised Chief Legal Advisor Miller that her office would "notify appropriate involved units." (*Id.* ¶ 17.)  Lieutenant Kallenberger then asked Janel Ramos of the LASD Civil Litigation Unit to "notify all appropriate involved units regarding the Bryant crash," which Ms. Ramos agreed to do.  (*Id.* ¶ 18.)

On July 27, 2020, Ms. Ramos forwarded the litigation hold notice to Captain Becerra, Lieutenant Mancinas, Sergeant Adan Nevarez, and Sergeant Brandon Painter of the Malibu/Lost Hills Station, Commander Jorge Valdez, who was the Captain of SIB at the time, and Lieutenant Anthony Blanchard of the Office of the Sheriff.  (*Id.* ¶ 19.)  Ms. Ramos wrote that the "request for preservation of evidence related to the Bryant crash was sent from Chief Legal Advisor, Elizabeth Miller," and instructed the recipients to "ensure all evidence in any way related to the crash and any related investigation is preserved by your unit/station." (*Id.* ¶ 20.)  That same day, Commander Valdez forwarded the litigation hold notice to Assistant Sheriff Steven Gross, Chief Dennis Kneer of the North Patrol Division, and Constitutional Policy Advisor Georgina Glaciano for the Office of the Sheriff.  (*Id.* ¶ 21.)  Chief Kneer was involved in coordinating the response by the Malibu/Lost Hills Station to the January 26, 2020 helicopter crash, the inquiry into the alleged sharing of crash scene photos, and disciplining certain LASD deputies.  (*Id.*)

Constitutional Policy Advisor Galviano then forwarded the litigation hold notice to Captains Jaeger and Burson, and Lieutenant Shawnee Hinchman.  (*Id.* ¶ 22.)  Captain (now Commander) Jaeger, who also received Chief Legal Advisor Miller's July 24, 2020 litigation hold, was involved in the IAB investigation into the alleged sharing of crash scene photos.  (*Id.*)  The recipients of these litigation hold notices were responsible for notifying the relevant LASD personnel of their obligations to preserve evidence relating to the January 26, 2020 helicopter crash, including all documents relating to the inquiry and IAB investigation into the taking and sharing of crash scene photos.  (*Id.* ¶ 23.)  This included LASD personnel at the

1  Malibu/Lost Hills Station, SIB, and IAB.  (*Id.*)

2      LASD has located and preserved all documents and materials related to this

3  litigation.  (*Id.* ¶ 24.)  LASD has not deleted or destroyed any documents or

4  materials related to the subject matter of this litigation.  (*Id.* ¶ 25.)

5      **6.**    **LACFD's Preservation Efforts**

6      LACFD bureaus/divisions and personnel are aware that the County's general

7  retention policy is to retain documents for five years after completion of any

8  investigation or litigation.  (Kim Decl. ¶¶ 8-9.)

9      On March 3, 2020, LACFD Risk Manager Julia Kim sent a litigation hold

10  related to the January 26, 2020 crash to then-Deputy Fire Chief Anthony Marrone of

11  the Central Operations Bureau, then-Deputy Fire Chief Vince Pena of the North

12  Operations Bureau, Chief of Staff Debbie Aguirre, and Battalion Chief Roland

13  Sprewell.  (*Id.* ¶ 10.)  She also forwarded the litigation hold to now retired Assistant

14  Fire Chief Derek Alkonis of the Air and Wildland Division.  (*Id.*)  Ms. Kim

15  instructed these individuals to "ensure that the appropriate divisions/sections in your

16  respective bureaus have been notified."  (*Id.*)  She also explained that "[a]ny and all

17  existing records, documents, and/or information related to the Willow Incident

18  should be preserved and forwarded to the Risk Management Division . . . as soon as

19  possible."  (*Id.*)  This litigation hold was sent to the aforementioned individuals

20  because it was understood that their bureaus or divisions had LACFD personnel that

21  responded to the helicopter crash.  (*Id.* ¶ 11.)

22      The litigation hold instructed the recipients to "confirm receipt of this

23  notification and identify documents/files you have within your unit."  (*Id.* ¶ 13.)

24  Deputy Fire Chief Marrone, Deputy Fire Chief Pena, Chief of Staff Aguirre, and

25  now retired Assistant Fire Chief Alkonis confirmed receipt of the litigation hold and

26  that the appropriate bureaus/divisions within their respective departments had been

27  notified.  (*Id.* ¶ 14.)  The recipients confirmed that all relevant LACFD personnel,

28  including LACFD personnel who responded to the January 26, 2020 helicopter

crash, received written or verbal notice of the litigation hold.  (*Id.*)  Specifically, Deputy Fire Chief Marrone confirmed to Ms. Kim that he had given verbal notice of the litigation hold to former Fire Captain Brian Jordan and Fire Captain Arlin Kahan.  (*Id.* ¶ 15.)

On July 21, 2020, Ms. Kim sent a revised litigation hold to Deputy Fire Chief Marrone, Deputy Fire Chief Pena, and Chief of Staff Aguirre.  (*Id.* ¶ 16.)  She also sent the revised litigation hold to now retired Assistant Fire Chief Alkonis, Deputy Chief Christopher Anderson of the Administrative Services Bureau, and Deputy Chief Thomas Ewald of the Special Service Bureau.  (*Id.*)  She instructed the recipients to "ensure that any and all records, documents, information have been/are preserved."  (*Id.*)

Deputy Fire Chief Marrone, Deputy Fire Chief Pena, Chief of Staff Aguirre, now retired Assistant Fire Chief Alkonis, Deputy Chief Anderson, and Deputy Chief Ewald confirmed receipt of the litigation hold and that the appropriate divisions/sections within their respective bureaus had been notified.  (*Id.* ¶ 18.)  These confirmations were provided to Ms. Kim in writing and verbally.  (*Id.*)

### 7.    LACFD's Direct Orders

On March 6, 2020, Deputy Fire Chief McCloud ordered then-PIO Captain Imbrenda to return all LACFD electronic devices, including any cellphone, tablet, or laptop, and to provide/show LACFD any photos taken involving the January 26, 2020 helicopter crash.  (Kim Decl. ¶ 19 & Ex. E.)  In response to the direct order, Firefighter Specialist Imbrenda turned over his LACFD devices.  (*Id.*)

On May 29, 2020, Deputy Fire Chief Marrone ordered Fire Captain Kahan to return all LACFD electronic devices, including any cellphone, tablet, or laptop, and to provide/show LACFD any photos taken involving the January 26, 2020 helicopter crash.  (*Id.* ¶ 20 & Ex. F.)  Fire Captain Kahan was also ordered to "[p]reserve all Electronic Media/Photographs involving the Willow Incident" that were in his possession.  (*Id.*)  He complied with the direct order and turned over his LACFD

1  devices.  (*Id.*; Kahan Decl. ¶ 19 & Ex. A.)

2      On May 29, 2020, Deputy Fire Chief Marrone ordered former Fire Captain

3  Jordan to return all LACFD electronic devices, including any cellphone, tablet, or

4  laptop, and to provide/show LACFD any photos taken involving the January 26,

5  2020 helicopter crash.  (*Id.* ¶ 21 & Ex. G.)  Fire Captain Jordan was also ordered to

6  "[p]reserve all Electronic Media/Photographs involving the Willow Incident" that

7  were in his possession.  (*Id.*)  He complied with the direct order and turned over his

8  LACFD devices.  (*Id.*)

9      The LACFD-issued electronic devices returned by Imbrenda, Kahan, and

10  Jordan were forensically imaged by the Office of County Investigations ("OCI").

11  (*Id.* ¶ 22.)  OCI retained possession of the LACFD-issued electronic devices and

12  forensic images until they were turned over to counsel in this case.  (*Id.* ¶ 23.)

13  Those devices have been provided to the independent forensic examiner, Kroll.

14      Ms. Kim reviewed the forensic images of Firefighter Specialist Imbrenda's,

15  Fire Captain Kahan's, and former Fire Captain Jordan's LACFD-issued cellphones,

16  including photos and text messages.  (*Id.*)  She confirmed that the forensic images

17  did not contain any photos depicting human remains from the January 26, 2020

18  helicopter crash.  (*Id.* ¶¶ 25-27.)  She also confirmed that there was no evidence that

19  any of these individuals sent crash site photos to anyone outside of LACFD.  (*Id.*)

20      LACFD has located and preserved all documents and materials related to the

21  subject matter of this litigation.  (*Id.* ¶ 30.)  LACFD has not deleted or destroyed any

22  documents or materials related to the subject matter of this litigation.  (*Id.* ¶ 31.)

23          **8.      Defendants Have Complied with Their Discovery Obligations**

24      In addition to preserving documents related to Bryant's claims *prior* to this

25  litigation, Defendants have been transparent and forthcoming with Plaintiff in

26  discovery in this case.

27      Plaintiffs have served 52 document requests on LASD, LACFD, and the

28  County.  (Rodriguez-Sanchirico Decl. ¶ 3.)  Counsel for Defendants worked with

1   the County to identify relevant custodians, collect electronic and hard copy

2   documents, and produce relevant, responsive materials.  (*Id.*)  This includes

3   collecting documents from over 46 custodians.  (*Id.*)

4        Plaintiffs also served the individual defendants with approximately 50

5   document requests each.  (*Id.* ¶ 5.)  Counsel for Defendants worked with the

6   individual defendants to identify responsive records, collect electronic and hard

7   copy documents, and produce relevant, responsive materials.  (*Id.*)  This process

8   began in April 2021, when Plaintiffs served their first set of requests for production

9   on the individual defendants, and continued throughout this litigation.  (*Id.*)

10       Plaintiffs also served subpoenas on four wireless cellphone providers—

11  AT&T, Verizon, T-Mobile, and Spectrum—seeking cellphone records for the time

12  period between January and March 2020.  (*Id.* ¶ 6 & Ex. A.)  Specifically, Plaintiffs

13  sought the phone numbers associated with phone calls that LASD and LACFD

14  personnel made and text messages that they sent during that time period  (*Id.*)  All of

15  the LASD and LACFD personnel either produced the records themselves or

16  consented to the production of the records by their cellphone provider.  (*Id.*[12])

17       Counsel has collected 500,000 documents from Defendants and reviewed

18  over 150,000 documents to determine responsiveness and relevance.  (*Id.* ¶ 7.)  To

19  date, Defendants have produced over 35,000 pages of documents, including the

20  entire IAB investigation report, which includes witness interview recordings and

21  transcripts, the surveillance video from the Baja California Bar and Grill in

22  Norwalk, and the IAB's findings and conclusions.  (*Id.* ¶ 8 & Ex. B.)  Defendants

23  also produced the LACFD internal investigation, along with the discipline that

24  certain LACFD personnel received.  (*Id.*)

25  _____

26  [12] Brian Jordan is represented by a different law firm.  Regardless, LACFD directed
    him to turn over his work cellphone and laptop, which he did.  (Kim Decl. ¶ 21.)

27  His devices were also part of the neutral forensic examination, which is addressed

28  below.  (Rodriguez-Sanchirico Decl. ¶ 10; *see infra* p. 52.)

Plaintiffs intend to take 40 depositions in this case. As of this filing, Plaintiffs have taken 27 depositions. (*Id.* ¶¶ 14-15.) There are currently eight more depositions set for November that Plaintiffs intend to take. (*Id.* ¶ 16.) Plaintiffs have also noticed the depositions of LASD Sheriff Alex Villanueva, LACFD Fire Chief Daryl Osby, and a 30(b)(6) LASD witness on 18 topics. (*Id.* ¶ 17.) By the time discovery is closed at the end of November, the total number of depositions in this case will likely exceed 50. (*Id.* ¶ 19.)

Plaintiffs have served over 100 written discovery requests on Defendants: 9 interrogatories on the County; 50 requests for admission on the County; 45 requests for admission on LACFD; and 5 requests for admission on LASD. (*Id.* ¶ 27.) Defendants have responded to Plaintiffs' interrogatories with substantive, verified responses. (*Id.* ¶ 28.) Defendants' responses to Plaintiffs' requests for admission are not yet due, but Defendants intend to respond with substantive, verified responses. (*Id.*)

### 9.    The Forensic Examination

After this lawsuit was filed, the parties agreed to have an independent forensic examiner (Kroll) examine the devices of 29 LASD and LACFD employees. (Rodriguez-Sanchirico Decl. ¶ 10.) The parties agreed to an allocation of costs. (*Id.*) Bryant never asked for photos from the civilians, NTSB, or FBI.

In addition to turning over the 29 devices Bryant wanted, Defendants also provided Kroll with the forensic images LACFD had created of the LACFD-issued devices of former Fire Captain Jordan, Fire Captain Kahan, and Firefighter Specialist Imbrenda. (*Id.* at ¶ 11.) The objective of the examination was to determine when "photographs (or video images) of physical remains of victims who perished in the helicopter crash in Calabasas, California on January 26, 2020 . . . were transferred to the Digital Media, how the Photos came to appear on the Digital Media, whether the Photos were subsequently accessed, where the photos were stored on the Digital Media, where and to whom the Photos were copied,

transferred, and/or communicated, and whether and when the Photos were subsequently deleted." (*Id.* ¶ 12.)

The forensic examination is complete. Kroll "identified no photographs or videos of physical remains of the victims who perished in the helicopter crash in Calabasas, California, on January 26, 2020." (*Id.* ¶ 13 & Exs. C-D.) Additionally, Kroll did not identify any evidence of photographs or videos of physical remains of the victims being copied, transferred and/or communicated. (*Id.*) There are no photos and no public dissemination.

### 10. Procedural Status

Bryant gave Defendants her portion of this motion on the last possible day (at 11:59 p.m.). (Rodriguez-Sanchirico Decl. ¶ 35.) The hearing is on the last day of discovery. [Dkt. 86.] November 29 is also only a week before Bryant's opposition to Defendants' motion for summary judgment will be due. [Dkt. 141.]

Bryant knows that she must show public dissemination to defeat summary judgment. *See Marsh v. County of San Diego*, 680 F.3d 1148 (9th Cir. 2012) (dissemination of autopsy photos of deceased child to media); *Catsouras v. Dep't of Cal. Highway Patrol*, 181 Cal. App. 4th 856 (2010) (public dissemination of crash photos published on more than 2,500 websites). She cannot. This motion is her request that the Court give her the missing element in the form of sanctions precluding Defendants from introducing the extensive evidence (and neutral forensic examination Bryant agreed to) showing that there *was no* public dissemination.

### B. <u>Legal Standard</u>

"A party seeking sanctions for spoliation of evidence must prove the following elements: (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a 'culpable state of mind;' and (3) the evidence that was destroyed or altered was 'relevant' to the claims or defenses of the party that sought the

1  discovery of the spoliated evidence[.]" *Galicia*, 2018 WL 6314191, at *4 (alteration

2  in original) (citation omitted).

3       It is the moving party's burden to "establish a reasonable possibility, based on

4  concrete evidence rather than a fertile imagination, that access to the lost material

5  would have produced evidence favorable to its cause." 2018 WL 6314191, at *4

6  (citation omitted). The absence of evidence must be prejudicial to the party alleging

7  spoliation of evidence. *Reinsdorf v. Skechers U.S.A., Inc.*, 296 F.R.D. 604, 627

8  (C.D. Cal. 2013).

9       **C.**    **Defendants' Duty To Preserve Did Not Begin In January 2020**

10       Bryant's entire argument is premised on her claim that Defendants had a duty

11  to preserve evidence relating to crash site photos in January 2020. This is wrong as

12  a matter of law. For a party to be on notice of litigation such that the duty to

13  preserve attaches, the evidence must be relevant to a litigation that has "'more than a

14  possibility' of occurring." *Garcia v. United States*, No. EDCV 13-0112-TJH

15  (DTBx), 2014 WL 12709430, at *1 (C.D. Cal. Sept. 3, 2014) (citation omitted).

16  Specifically, "the fact that a tort might have occurred cannot by itself be sufficient to

17  place a defendant on notice of impending litigation [because] . . . [t]hat is not the

18  law." *Id.* at *2.

19       Instead, the duty requires a higher standard—that the litigation is *probable*.

20  2014 WL 12709430, at *2; *see also Putscher v. Smith's Food & Drug Ctrs., Inc.*,

21  No. 2:13-CV-1509-GMN-VCF, 2014 WL 2835315, at *7 (D. Nev. June 20, 2014)

22  (finding that a defendant supermarket had no duty to preserve surveillance footage

23  of a slip-and-fall, even when an employee contemporaneously completed a report

24  marked "prepared in anticipation of litigation" and a tort action was ultimately

25  filed); *Galicia*, 2018 WL 6314191, at *4 ("[A] general concern over litigation does

26  not trigger a duty to preserve evidence." (citation omitted)).

27       Defendants did not have a duty to preserve evidence until Bryant submitted

28  her tort claims on May 8, 2020 (LASD) and July 20, 2020 (LACFD). Another

district court addressed this exact issue in a case concerning purportedly inappropriate audio and video footage. *Federated Univ. Police Officers' Ass'n v. Regents of Univ. of Cal.*, No. SACV 15-137 JLS (RNBx), 2016 WL 9173457 (C.D. Cal Sept. 8, 2016) (Staton, J.). In that case, the police chief allegedly "ordered the deletion of all audio recordings" and "oversaw the continuing deletion of audio recordings." *Id.* at *2. Plaintiffs sought an adverse inference, to be applied at summary judgment and trial, that the "destroyed evidence" would have shown "that the confidential communications . . . were recorded both within and outside of the UCIPD and accessed by Defendants." *Id.* (alteration in original).

The court held that defendants did not have a duty to preserve at the time the recordings were deleted, rejecting the "attenuated inference" that the police chief "must have known the recordings were illegal and, therefore, must have known of the potential for a claim and the possibility of subsequent litigation." 2016 WL 9173457, at *2. Bryant is making the exact same argument here. At the time the photos were deleted, litigation was *not* probable. Sheriff Villanueva, the deputies, and the LACFD captains were simply trying to avoid the exact harm Bryant is suing over: public dissemination of crash site photos. There was no duty to preserve at the time of deletion, and there is therefore no basis for finding spoliation.

## 1.    The January 29, 2020 Citizen Complaint Did Not Trigger a Duty to Preserve

Although Bryant cites a series of cases for her contention that a citizen complaint triggers a duty to preserve, these cases demonstrate that the County did *not* have a duty to preserve in January 2020. In both *Mazloum* and *Perkins*, the complaints at issue had been submitted by the *plaintiffs* who themselves were alleging an injury as a result of police conduct. *See Mazloum v. D.C. Metro. Police Dep't*, 530 F. Supp. 2d 282, 292 (D.D.C. 2008) ("[D]efendants were aware that plaintiff had filed a police complaint arising out of [the] incident."); *Perkins v. City of Modesto*, No. 1:19-cv-00126-LJO-EPG, 2020 WL 1333109, at *14 (E.D. Cal.

1   Mar. 23, 2020) ("Plaintiff submitted a citizen complaint form to the MPD alleging
2   misconduct in connection with the November 6, 2017, officer-involved shooting of
3   Plaintiff.").

4       Unlike the complaints at issue in those cases, the January 29, 2020 email to
5   LASD did not identify any injury to the *complainant*.  Indeed, the email did not
6   identify any injured party or potential legal claim against LASD at all.  (Rodriguez-
7   Sanchirico Decl. Ex. R [IAB Investigative Summary at 3].)  The email merely
8   reported what the concerned citizen had heard from the bartender.  (*Id*. Ex. R [IAB
9   Investigative Summary at 39].)  The individual who wrote the email had not even
10  seen the photos.  (*Id*.)  He was reporting what the bartender told him.  (*Id*.)

11      The January 29, 2020 email was insufficient to notify LASD that litigation
12  was probable.  *Galicia*, 2018 WL 6314191, at *4; *Garcia*, 2014 WL 12709430, at
13  *2.  Instead, it notified LASD that it should launch an immediate inquiry to
14  determine whether there was a factual basis for the allegations.  That is exactly what
15  LASD did.  Within 24 hours, LASD had identified Deputy Cruz as the deputy at the
16  bar and hailed 28 personnel into the station to answer questions about the crash site
17  photos.  (Scott Johnson Decl. ¶¶ 3-6.)  LASD determined that all LASD personnel
18  who had taken, shared or received crash site photos had deleted them, and only
19  Deputy Cruz had shown a photo to anyone outside LASD.  (*Id*. ¶ 8.)

20          **2.    An Internal Investigation Does Not Trigger a Duty to**
21              **Preserve**

22      Bryant contends that LACFD had a duty to preserve beginning on January 31,
23  2020, because at that time LACFD anticipated a possible internal investigation.
24  This argument also fails as a matter of law.  First, none of the authorities Bryant
25  relies on stand for the proposition that "[a] reasonably foreseeable internal
26  investigation" alone is "sufficient to trigger a preservation duty."  (Plfs. Mot. at 19.)
27  Rather, in each of those cases, courts found that the existence of an internal
28  investigation, *when combined with other facts*, could serve to put defendants on

1   notice of potential litigation.[13]

2          An internal investigation does not always mean that litigation is probable.  As

3   authority from this district (which Bryant cites) makes clear, determining "[w]hen

4   litigation is 'reasonably foreseeable' is a flexible fact-specific standard that allows a

5   district court to exercise the discretion necessary to confront the myriad factual

6   situations inherent in the spoliation inquiry."  *Spencer v. Lunada Bay Boys*, No. CV

7   16-02129-SJO (RAOx), 2017 WL 11527978, at *6 (C.D. Cal. Nov. 29, 2017)

8   (citation omitted).

9          As for the facts, Bryant is blurring them to paint a different picture, because

10  LACFD did everything right:

11      • On January 31, 2020, LACFD learned that a *LASD* deputy might have

12          improperly shown crash site photos to someone at a bar.  (Kim Decl. ¶ 4.)

13          At that time, there were no allegations that anyone from LACFD had

14          improperly shared photos in any way.  (*Id*.)

15      • On March 3, 2020, LACFD issued a litigation hold.  (*Id.* ¶ 10.)

16      • On March 6, 2020, a civilian witness reported to LACFD that an LACFD

17          employee had been showing crash site photos on his phone at the Golden

18  _____

19  [13] *See e.g.*, *Gerlich v. U.S. Dep't of Justice*, 711 F.3d 161, 171 (D.D.C. 2013)

20  ("Department officials . . . were on notice that Department investigation *and future*

21  *litigation* concerning the 2006 Honors Program improprieties were reasonably

    foreseeable." (emphasis added)); *Musse v. King County*, No. C18-1736-JCC, 2021

22  WL 4709875, at *3 (W.D. Wash. Oct. 8, 2021) ("A plaintiff's statements or conduct

    might put a defendant on notice that litigation was likely.  Similarly, a defendant's

23  decision to open an investigation *can indicate* that it was reasonable to expect a

24  lawsuit." (emphasis added) (citation omitted)); *Stanbro v. Westchester Cty. Health

    Care Corp.*, No. 19 Civ. 10857 (KMK)(JCM), 2021 WL 3863396, at *11 (S.D.N.Y

25  Aug. 27, 2021) (regarding circumstances where a department of corrections

26  investigates incident within a prison); *Zbylski v. Douglas Cty. Sch. Dist.*, 154 F.

    Supp. 3d 1146, 1163-65 (D. Colo. 2015) (explaining that an internal investigation

27  can trigger duty to preserve where the investigation provides notice of anticipated

28  litigation).

1   Mike Awards, an awards event for first responders.  (*Id.* ¶ 5.)  Like the

2   LASD complainant, she had not actually seen the photos.  (*Id.* ¶ 6.)

3   • On March 6, 2020, *that same day*, LACFD told Firefighter Specialist

4   Imbrenda he was the subject of an administrative investigation, and

5   LACFD directed him to turn over his electronic devices.  (*Id.* ¶ 19.)

6   LACFD took a proactive approach even though there were no allegations

7   putting it on notice of "reasonably foreseeable" litigation.  (*Id.* ¶ 10.)  Bryant's

8   attempt to malign these efforts is misplaced.

9           **3.      Bryant's March 2020 Letters Did Not Provide Notice of**

10                    **Probable Litigation**

11          Bryant's attorney's March 2 and March 8, 2020 letters did not make "the

12  likelihood of litigation impossible to ignore."  (Plfs. Mot. at 19.)  Plaintiffs cite

13  *Apple Inc. v. Samsung Elecs. Co., Ltd.* for the proposition that any correspondence

14  sent on attorney letterhead is sufficient to make litigation probable.  881 F. Supp. 2d

15  1132, 1145 (N.D. Cal. 2012).  This is wrong.

16          There is a meaningful difference between the correspondence at issue in

17  *Apple* and the March 2020 letters Bryant's attorneys sent LASD and LACFD.  In

18  *Apple*, "Apple presented Samsung with more than just a vague hint that it believed

19  Samsung had violated its intellectual property.  Apple delivered, in person, a

20  comprehensive summary of its specific patent infringement claims against specific

21  Samsung products."  881 F. Supp. 2d at 1145.

22          Bryant's letters were nothing like that.  As opposed to detailing specific

23  claims against LASD and LACFD, the letters only demanded that the departments

24  "take immediate action to secure all photos and videos of the January 26, 2020 crash

25  scene."  (Bryant Decl. Exs. 20, 21.)  Although the letters referenced *possible* claims

26  for "invasion of privacy, negligence, negligent or intentional infliction of emotional

27  distress, and negligent supervision or retention," the letters made clear that all of

28  these claims would be predicated on harm caused by the "unauthorized

-57-

1   dissemination of photos of victims' remains." (*Id*.)  At that time, there was no

2   evidence that any photos had been disseminated.  Indeed, there is *still* no evidence

3   of dissemination—which is why Bryant is asking for an adverse inference saying

4   that there was.  Bryant's letters also acknowledged that the crash site photos had

5   been deleted.

6        Bryant also relies on *Fanning* for the proposition that her March 2020 letters

7   put Defendants on notice of this litigation.  *Fanning v. HSBC Card Servs., Inc.*, No.

8   SACV 12-00885-JVS (RNBx), 2014 WL 12783362, at *3 (C.D. Cal. May 5, 2014).

9   The notice provided in *Fanning* was also far more specific than anything Bryant

10  sent.  Specifically, in *Fanning*, after having already been engaged in litigation over

11  similar issues, "plaintiffs' counsel sent defendants' counsel a letter explaining that

12  they 'anticipate filing a new lawsuit on behalf of other putative class members [in

13  the *Baily* litigation]' and demanding the continued implementation of the *Baily*

14  [preservation] protocol."  *Id.* at *5 (first alteration in original).  Bryant's March 2020

15  letters did not mention that she "anticipated" filing a complaint, nor did they

16  mention anything regarding the preservation of material.

17       Bryant's letters did not make this litigation "reasonably foreseeable" to either

18  LASD or LACFD in March 2020.  *Apple*, 881 F. Supp. 2d at 1145.  At most, that

19  language can be categorized as a "vague hint" of possible litigation.  *Id.* at 1145; *see*

20  *also Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc.*, 264 F.R.D. 517, 526

21  (N.D. Cal. 2009) ("A general concern over litigation does not trigger a duty to

22  preserve evidence.").

23                              *      *      *

24       LASD's duty to preserve arose when the May 8, 2020 tort claim came in.

25  (Rodriguez-Sanchirico Decl. Ex. P [LASD tort claim].)  It issued its litigation hold

26  on May 11, 2020, with follow-up notices in July 2020.  (Scott Johnson Decl. ¶¶ 11-

27  23.)  LACFD's duty to preserve arose on July 20, 2020.  (Rodriguez-Sanchirico

28  Decl. Ex. Q [LACFD tort claim].)  It had already issued its litigation hold months

prior, on March 3, 2020, along with direct orders to turn over electronic devices. (Kim Decl. ¶¶ 19-21.)  By the time Bryant filed her complaint, on September 17, 2020, litigation holds were already in place.[14]

### D.   **Defendants Have Not Spoliated Any Evidence**

Bryant strains to cast the County's efforts to prevent any harm to her or her family as a "cover up."  It is an unfortunate recasting of the steps LASD and LACFD took to make sure no photos of Bryant's family members (or the other seven victims) were ever publicly disseminated.  Bryant again plays fast and loose with the timeline to try to fit pre-litigation actions into a spoliation motion.  The true story is far from nefarious:

- On January 29, 2020, LASD received an email from a concerned citizen who heard that a deputy trainee had shown crash site photos on his phone to a bartender.  (Scott Johnson Decl. ¶ 3.)
- On January 30, 2020, LASD determined that all LASD personnel who had taken, shared or received crash site photos had deleted them.  (Rodriguez-Sanchirico Decl. Ex. R.)
- On March 6, 2020, LACFD heard from a concerned citizen that the department PIO had shown crash site photos on his phone to other first responders.  (Kim Decl. ¶ 5.)
- On March 6, 2020, LACFD directed the PIO to turn over his electronic devices.  (Kim Decl. ¶ 19 & Ex. E; Imbrenda Decl. ¶ 22 & Ex. A.) LACFD forensically examined his phone and determined that he had

---

[14] Bryant's reliance on *Colonies Partners, L.P. v. County of San Bernardino*, No. 5:18-cv-00420-JGB (SHK), 2020 WL 1496444, at *8 (C.D. Cal. Feb. 27, 2020), and *Montoya v. Orange Cty. Sheriff's Dep't*, No. SACV 11-1922 JGB (RNBx), 2013 WL 12347292, at *8 (C.D. Cal. Oct. 15, 2013), is misplaced.  Both involved defendants who failed to take *any* steps to preserve ESI *after* the initiation of litigation.  Here, Defendants issued litigation holds and notified relevant personnel before Bryant's lawsuit was filed.

1    already deleted the crash site photos (which he confirmed).  (Kim Decl.

2    ¶ 25; Imbrenda Decl. ¶¶ 17-21.)

3        Bryant thinks things should have been handled differently.  It appears she

4 thinks the County should have collected *all* the personal cellphones and done an

5 immediate forensic examination.  That is not realistic.  The County did not have

6 control over the majority of these devices, and forensic examinations are not an

7 expense a public entity can undertake any time there is a citizen complaint.

8        But the County did not ignore the complaints.  LASD and LACFD undertook

9 comprehensive investigations to ensure that no photos existed, and that those that

10 *had* existed were never disseminated outside the County.  To date, no County crash

11 site photos have been publicly disseminated.

12        It became clear that Bryant was not satisfied and would file a lawsuit.  The

13 County took its discovery obligations seriously.  LASD and LACFD issued

14 litigation holds months before Bryant filed her initial complaint.  As soon as the

15 litigation started, the County made clear that it would be forthcoming and

16 transparent.  It was the County who proposed a neutral forensic examination.  That

17 examination has now confirmed that there are no crash site photos and there was no

18 public dissemination.  That is why Bryant filed this motion—she wants this Court to

19 give her a sanction that will establish an element of her claim that she cannot prove

20 herself because there is no evidence that supports it.  The Court should decline her

21 invitation to allow her to continue pursuing a speculative lawsuit based on

22 hypothetical harm and unreasonable "fear."

23        The motion is heavy on rhetoric but light on specifics.  To get to spoliation

24 sanctions that amount to terminating sanctions, Bryant points to three things:

25 (i) LASD personnel deleting their crash site photos in January 2020; (ii) LACFD

26 personnel deleting their crash site photos in February 2020; (iii) and involved

27 personnel upgrading their personal cellphones.  Bryant also makes much of

28 individual witnesses being unable to recall preserving and collecting materials for

this litigation during their depositions.  (Plfs. Mot. at 19.)  These depositions took place months after the initial preservation and collection process.  As set forth in the accompanying declarations, all defendants in this case have searched for and produced the relevant materials in their possession.  None of this is spoliation.

Bryant's unfounded accusations do not establish that any relevant evidence has been lost or destroyed, much less that any evidence has been lost or destroyed with a culpable state of mind.  *See Galicia.* 2018 WL 6314191, at *4; Fed. R. Civ. P. 37(e)(2) (finding sanctions for failure to preserve electronic information permissible "only upon finding that the party acted *with the intent to deprive another party of the information's use in the litigation*" (emphasis added)).

### 1.    Deletions That Predate Tort Claims Are Not Spoliation

As explained above, Defendants' duty to preserve ESI did not arise until May 2020 (LASD) and July 2020 (LACFD).  By that time, the photos had been deleted.

- LASD confirmed that the photos had been deleted by January 31, 2020. (Scott Johnson Decl. ¶¶ 3-6.)  All of the individual LASD employees who possessed crash site photos on their phones have declared under oath that they deleted the photos and text messages that contained the photos before there was any prospect of litigation.  (Cruz Decl. ¶¶ 15-18; Russell Decl. ¶¶ 9-12; Mejia Decl. ¶¶ 17-20; Versales Decl. ¶¶ 13-16; Miller Decl. ¶¶ 10-12; Cable Decl. ¶¶ 11-14; Jauregui Decl. ¶¶ 13-15; Kelly Decl. ¶¶ 12-15.)

- LACFD's investigation identified all of the personnel who had taken and possessed photos of the crash site.  (Kim Decl. ¶¶ 6-7.)  The investigation confirmed that all photos had been deleted.  (*Id*. ¶¶ 22-28.)  All three LACFD employees have declared under oath that they deleted the photos and text messages that contained the photos before there was any prospect of litigation.  (Imbrenda Decl. ¶ 18; Kahan Decl. ¶ 13; Jordan Decl. ¶ 11.)

The County, its departments, and its personnel did not have a duty to preserve

in January or February 2020.  (*See supra* Section (B)(1).)  Deletions during that time period were not spoliation; they were efforts to prevent the dissemination Bryant fears.

### 2.    Upgrading Your Cellphone Is Not Spoliation

Despite knowing that all the photos were deleted long before she filed her lawsuit, Bryant contends that upgrading your cellphone is spoliation.  Bryant even makes this argument for non-party witnesses:

- Deputy Ben Sanchez upgraded his personal cellphone in April 2020.  It was part of a routine upgrade, and occurred more than two months after the crash site photos had been deleted.  (Sanchez Decl. ¶ 12.)

- Deputy Ruby Cable upgraded her personal cellphone in November 2020.  It was part of a routine upgrade, and occurred more than nine months after the crash site photos had been deleted.  (Cable Decl. ¶ 19.)

- Deputy Doug Johnson replaced his personal cellphone in January 2021.  The replacement occurred approximately one year after the crash site photos had been deleted.  (Doug Johnson Decl. ¶ 21.)

- Deputy Christopher Jauregui upgraded his personal cellphone in July 2021.  It was part of a routine upgrade, and occurred approximately 18 months after the crash site photos had been deleted.  (Jauregui Decl. ¶ 20.)

Bryant makes the same argument for two detectives (Sergeants Scott Miller and Stephanie Shrout) who were using LASD-issued cellphones.  Both cellphones were replaced as part of routine upgrades at the Homicide Bureau.  (Miller Decl. ¶ 16.[15])  There are no allegations that any of the foregoing individuals shared crash

---

[15] Detective Stephanie Shrout is on medical leave and was unable to submit a declaration.  Defendants explained her routine upgrade to Bryant.  (Bryant Decl. Ex. 38.)  The Kroll report confirmed that there were no photos or evidence of dissemination on Detective Shrout's phone, and she is not a defendant in this lawsuit.  (Rodriguez-Sanchirico Decl. Ex. C at 7; Ex. O.)

site photos with anyone.

As for the individual defendants, Bryant's allegations of destruction are misplaced.  They were all routine upgrades of personal cellphones.  (Versales Decl. ¶ 22; Mejia Decl. ¶ 27; Russell Decl. ¶ 18; Cruz Decl. ¶¶ 24-25.)

All of these individuals, even the witnesses who are not named as defendants and who are not alleged to have done anything wrong, consented to (i) a neutral forensic examination of their devices; and (ii) production of their personal cellphone records.  (Sanchez Decl. ¶ 11; Cable Decl. ¶ 18; Doug Johnson Decl. ¶ 20; Jauregui Decl. ¶ 19; Versales Decl. ¶ 21; Mejia Decl. ¶ 26; Russell Decl. ¶ 17; Cruz Decl. ¶ 23.)  The same is true of the LACFD individuals.  (Imbrenda Decl. ¶ 26; Kahan Decl. ¶ 20.)

### 3.  LASD Did Not Have Control over Personal Cellphones

The majority of these devices were not in Defendants' control at the time they were upgraded.  Six of the devices at issue belonged to non-party LASD employees.  Bryant summarily dismisses this critical point by proclaiming that an employer has control over their employees' personal devices that are routinely used for work.  (Plfs. Mot. at 17.)  That is not the law in this Circuit; Bryant fails to cite a single Ninth Circuit case.[16]

In the Ninth Circuit, "[c]ontrol" is defined "as the legal right to obtain documents upon demand."  *In re Citric Acid Litig.*, 191 F.3d 1090, 1107 (9th Cir. 1999) (citation omitted).  Under this test, a party's practical ability to obtain documents on demand is meaningless without corresponding legal entitlement to

---

[16] Bryant relies on one case from the Northern District of California, *Miniace v. Pacific Maritime Ass'n*, No. C 04-03506 SI, 2006 WL 335389, at *2 (N.D. Cal. Feb. 13, 2006).  *Miniace* stands for the general principle that "corporations have control over their officers and employees and that corporations may be required to produce documents in their possession."  *Id.  Miniace* does not say anything about whether an employer has control over an employee's personal cellphone.

1  that material.  *Id; see also*, *Riddick v. AT&T*, No. 2:12-cv-02033-KJM-AC, 2017

2  WL 2214933, at *17 (E.D. Cal. May 19, 2017) ("[T]he Circuit has agreed that a

3  party to litigation does not have legal control over documents a nonparty maintains

4  where the two are separate entities under the law and have no contract for obtaining

5  the records on demand."); *Dugan v. Lloyds TSB Bank, PLC*, No. 12-cv-02549-WHA

6  (NJV), 2013 WL 4758055, at *2 (N.D. Cal. Sept. 4, 2013).

7         LASD does not have any way of stopping its employees from returning their

8  personal cellphones to their carriers for an upgrade.  This is the case even if its

9  employees used their personal cellphones for work-related purposes.  *See, e.g.,*

10  *Matthew Enter., Inc. v. Chrysler Grp. LLC*, No. 13-cv-04236-BLF, 2015 WL

11  8482256, at *4 (N.D. Cal. Dec. 10, 2015) (denying motion to compel production of

12  employees' personal email accounts and noting that the moving party had not

13  identified any legal authority under which the employer could force its employees to

14  turn over email from personal accounts).  Thus, even if these devices contained

15  relevant evidence (they did not), Defendants had no control over the devices and

16  therefore did not fail to preserve them.

17         This is not to suggest that LASD's employees have not cooperated with

18  discovery in this matter.  As stated above, even witnesses who are not defendants in

19  this litigation offered up their personal cellphones for a forensic examination and

20  turned over their personal cellphone records for Bryant's review.

21         **E.     Bryant Cannot Show Loss Of Relevant Evidence**

22         Bryant has the burden of showing that the upgraded phones would have

23  contained relevant evidence.  *Reinsdorf*, 296 F.R.D. at 631 ("The deletion of

24  irrelevant evidence does not support a spoliation claim." (citing *Centrifugal Force,*

25  *Inc. v. Softnet Commc'n, Inc.*, 783 F. Supp. 2d 736, 750 (S.D.N.Y. 2011) ("[A]

26  discovery sanction cannot be based on a failure to preserve irrelevant evidence"

27  (alteration in original)))).  "Mere speculation that [missing evidence] might be

28  helpful to a party's case is also an insufficient basis for a finding of spoliation."  *Id.*.

The "burden for showing spoliation occurred requires more than a mere suggestion or implication." *Galicia*, 2018 WL 6314191, at *4.

Bryant cannot establish "based on concrete evidence rather than a fertile imagination, that access to the lost [cellphones] would have produced evidence favorable to [her] cause." *United States v. Town of Colorado City, Ariz.*, No. 3:12-cv-8123-HRH, 2014 WL 3724232, at *7 (D. Ariz. July 28, 2014) (citation omitted). Indeed, the actual "concrete" evidence in this case—including the 1,140-page IAB report; LACFD's investigation and forensic examination; and Kroll's neutral forensic examination of over 29 devices—has confirmed that no photos exist and no public dissemination occurred.  As Bryant's own expert opines, once something is deleted, it is actually deleted and cannot be recovered.  (Freskos Decl. ¶ 7.)

### F.    Defendants Have Not Acted With Intent To Deprive Bryant Of Information, And Bryant Has Not Been Prejudiced

Only when a court has found actual spoliation does it proceed to the question of whether the imposition of a sanction is warranted.  *Toppan Photomasks, Inc. v. Park*, No. 13-cv-03323-MMC (JCS), 2014 WL 2567914, at *4 (N.D. Cal. May 29, 2014); Fed. R. Civ. P. 37(e)(1).  Potential sanctions must be assessed on a case-by-case basis and, often times, a finding of spoliation results in the imposition of no sanction whatsoever.  *See, e.g.*, *Reinsdorf*, 296 F.R.D. at 631-32; *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 161-62 (2d Cir. 2012); *In re Hitachi Television Optical Block Cases*, No. 08cv1746 DMS (NLS), 2011 WL 3563781, at *12 (S.D. Cal. Aug. 12, 2011).  If a sanction is warranted, the court must choose "the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim."  *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994) (citation omitted).

Here, Bryant seeks extraordinary relief in the form of two adverse-inference sanctions and four alternative sanctions.  There is no basis for any of them.

1

### 1.    Bryant Is Not Entitled to Adverse-Inference Sanctions

2    Bryant argues that she is entitled to an adverse inference sanction—for both

3  summary judgment and trial—that any deleted photos and any cellphones which are

4  no longer available contained unfavorable evidence with respect to the content,

5  number and dissemination of photos.  (Plfs. Mot. at 21.)  In the alternative, Bryant

6  seeks an instruction that the jury should make an adverse inference if it finds that

7  Defendants acted with improper intent.  (*Id.* at 27.)

8    As Bryant acknowledges, she is not entitled to either instruction unless she

9  establishes that Defendants acted with intent to deprive her of material evidence in

10  this litigation.  She cannot.  This motion attempts to punish Defendants for doing

11  exactly what she wanted: keeping crash site photos out of the public domain.  There

12  was no intent to harm her, only to help her and abide by her request to the Sheriff.

13    Bryant has no facts, beyond her own speculation, showing bad faith or intent

14  to hide the truth.[17]  If any of the Defendants wanted to hide the truth, why did they

15  acknowledge the precise circumstances of taking, sharing, and deleting crash site

16

17  _____

[17] In the first draft of this motion, Bryant relied on one example: Deputy Mejia

18  sending another deputy photos on Facebook Messenger.  (Rodriguez-Sanchirico

19  Decl. ¶ 37.)  Kroll reviewed those messages, and the photos, and confirmed that

none of them contained victim remains.  (*Id.* Ex. D. [Kroll Supplemental Report].)

20  Instead, they showed exactly what witnesses in this case have been describing: a

foggy hillside and helicopter parts.  (Mejia Decl. ¶ 16.)  Realizing the speculation

21  about the photos did not hold up, Bryant switched to a different example: Deputy

22  Russell sending picture messages to friends he plays video games with.  (Plts. Mot.

at 36.)  Bryant has no evidence Deputy Russell sent crash site photos, but says the

23  Court should infer he did.  (*Id.*)  To make this strained argument, Bryant ignores

24  Deputy Russell's sworn deposition testimony explaining the picture messages—

which both predate and postdate the crash.  (Rodriguez-Sanchirico Decl. Ex. T

25  [Russell Tr. 314:20-318:2].)  Tellingly, Bryant has not sought to subpoena for

26  documents or deposition any of the other participants in Deputy Russell's group

text.  Just like the Deputy Mejia example Bryant abandoned, this example does not

27  help her.  It is further confirmation that Bryant has no evidence of public

28  dissemination.

photos?  In any event, each of those events took place months before Bryant filed her lawsuit.  Indeed, deletion of photos is one of the premises of the case.

Bryant knows she has no evidence of intent.  She instead relies on a single case—*NuVasive, Inc. v. Kormanis*—for the proposition that indirect evidence can prove intent under Rule 37(e)(2).  *See* No. 1:18CV282, 2019 WL 1171486, at *12 (M.D.N.C. Mar. 13, 2019).  Bryant's reliance on *NuVasive* is misplaced.  In *NuVasive*, the defendant gave conflicting explanations in sworn statements about why he deleted relevant text messages *after he was under a duty to preserve them*.  *Id.* at *4-6.  The court held that evidence regarding the deletion could be given to the jury so that they could determine the reasons for the non-production of text messages.  *Id.* at *16.

Here, evidence of the Defendants deleting the photos on their phones *long before Bryant initiated this litigation* would already go to a jury (if this case survives summary judgement)—the photos are the alleged harm, and their deletion shows that there is none.  But *NuVasive* does not stand for the proposition that a plaintiff who has no evidence of intentional destruction of evidence is entitled to an adverse instruction under Rule 37(e)(2).

## 2. The Request for Alternative Sanctions Is Not Supported by the Record or the Law

Bryant also seeks additional sanctions under Rule 37(e)(1):

1. Defendants should be precluded from arguing at summary judgment or trial that (1) the photos did not depict human remains; (2) the photos depicted the remains of only certain crash victims; and (3) the photos were not publicly disseminated.

2. Defendants should be ordered to reimburse Plaintiffs for their portions of the cost of the neutral forensic examination.

3. Defendants should reimburse Plaintiffs for the fees and costs they have incurred in filing and briefing this motion for spoliation sanctions.

1        4.   Plaintiffs should be given the opportunity to present evidence of

2            Defendants' spoliation to the jury, and the jury should be permitted to

3            consider that evidence in evaluating the strength of Plaintiffs' claims

4            and Defendants' defenses.

5        The first request is for a merits ruling that contradicts all of the evidence in

6 this case.  Bryant is casting it as a discovery motion to avoid summary judgment (or

7 a loss at trial).  All of Bryant's claims in this litigation (not to mention the threshold

8 question of standing) require her to show public dissemination of photos containing

9 her family members.  *Marsh*, 680 F.3d at 1152 (dissemination of autopsy photos of

10 deceased child to media); *Catsouras*, 181 Cal. App. 4th at 865 (public dissemination

11 of crash photos published on more than 2,500 websites).

12        Because the exhaustive discovery in this case, and Kroll's neutral forensic

13 examination, confirmed that there *are no photos* and *no public dissemination*,

14 Bryant is now asking for this Court to fill in the blanks and give her (i) standing, and

15 (ii) viable legal claims.  This backdoor attempt at avoiding summary judgment is

16 effectively a request for terminating sanctions.  *See Fanning*, 2014 WL 12783362, at

17 *6 (finding that the "requested sanction would essentially constitute summary

18 judgment on an element of [plaintiff's] . . . claim").  There is no support for such

19 drastic relief.

20        In the Ninth Circuit, a terminating sanction is justified only in "extreme

21 circumstances."  *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 380 (9th Cir. 1988)

22 (reversing dismissal sanction); *Ahcom, Ltd. v. Smeding*, No. 07-1139 SC, 2011 WL

23 3443499, at *8-9 (N.D. Cal. Aug. 8, 2011) (imposing only monetary sanctions for

24 intentional destruction of evidence *after* litigation began).  Such circumstances exist

25 only where there are deceptive tactics that demonstrate a pattern of disregard for the

26 court.  *Valley Eng'rs, Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1057 (9th Cir. 1998)

27 (imposing terminating sanctions when "smoking gun" memo destroyed after court

28 order to produce); *Anheuser-Busch, Inc. v. Nat. Beverage Distribs.*, 69 F.3d 337,

348-49 (9th Cir. 1995) (finding dismissal warranted only when "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings").

Courts have refused to impose terminating sanctions even when a party has demonstrated a clear intent to actively destroy evidence *after* it has received notice that such evidence must be preserved for ongoing litigation. *See e.g.*, *In re Hitachi*, 2011 WL 3563781, at *17 (no sanction imposed despite intentional destruction of evidence with knowledge of litigation hold); *Advantacare Health Partners v. Access IV*, No. C 03-04496 JF, 2004 WL 1837997, at *5-7 (N.D. Cal. Aug. 17, 2004) (rejecting terminating sanction even after defendants destroyed crucial evidence after being served with temporary restraining order).

The two requests for monetary sanctions are misplaced. The parties agreed to allocation of costs for the forensic examination. (Rodriguez-Sanchirico Decl. ¶ 10.) Bryant has known since March 2020 that the photos were deleted. She clearly weighed the risks and benefits and decided to proceed with the forensic examination over 29 devices, even though it was an expensive endeavor. Just because Bryant does not like the results—there are no photos, and no public dissemination—does not mean that Defendants should shoulder the full cost of the examination and this unnecessary motion. (*Id*. Exs. C & D.)

### 3. Bryant Has Not Been Prejudiced

Sanctions are not warranted unless the moving party was actually prejudiced. *Reinsdorf*, 296 F.R.D. at 627; Fed. R. Civ. P. 37(e)(1). There must be "concrete evidence" showing that the allegedly destroyed evidence would have been favorable to the moving party. *Hamilton v. Signature Flight Support Corp*., No. C 05-0490 CW (MEJ), 2005 WL 3481423, at *8-9 (N.D. Cal. Dec. 20, 2005) (denying motion for sanctions). Courts also consider (i) whether the moving party has other evidence to prove its case; and (ii) the extent to which the non-moving party is also prejudiced by the missing evidence. *Toppan*, 2014 WL 2567914, at *4; *Hamilton*,

1    2005 WL 3481423, at *8-9.

2         When the moving party fails "to provide any extrinsic evidence that the

3    subject matter of the lost or destroyed materials would have been unfavorable to [the

4    spoliator] or would have been relevant to the issues of this lawsuit," then the claim

5    of prejudice is based on "pure speculation" and sanctions are not warranted.

6    *Hamilton*, 2005 WL 3481423, at *8 (alteration in original) (citation omitted); *see*

7    *also In re Hitachi*, 2011 WL 3563781, at *11 (declining to impose sanctions

8    because there was "no evidence that would lead the Court to conclude [the]

9    spoliation has impaired Plaintiffs' ability to go to trial, threatened to interfere with

10   the rightful decision of the case, or forced Plaintiffs to rely on incomplete and spotty

11   evidence").  Bryant's entire argument that deleted photos and upgraded cellphones

12   "could" have shown relevant evidence is based on "pure speculation."

13        Courts do not impose sanctions when the moving party has alternative

14   evidence available that gives them an opportunity to prove their claim.  *Toppan*,

15   2014 WL 2567914, at *9 ("Where a non-spoliating party has other evidence to

16   prove its case, the degree of prejudice is lower, and a court may decline to impose

17   adverse inference sanctions.").

18        Here, Bryant has had every opportunity to prove her case:

19   •   Bryant has IAB's 1,140-page report, which contains 41 witness interviews

20       and IAB's conclusions and findings.  (Rodriguez-Sanchirico Decl. ¶ 8 &

21       Ex. R.)

22   •   Bryant has the entire investigation file for LACFD's internal investigation,

23       which was conducted by outside counsel.  That includes the forensic

24       examinations of the LACFD-issued devices.  (*Id.*)

25   •   By the time the motion for summary judgment is filed, Bryant will have

26       taken 40 depositions.  (*Id.* ¶ 14.)  In each deposition, Bryant has asked

27       about taking, sharing, and deleting crash site photos.

28   •   Defendants have produced over 35,000 pages of documents.  (*Id.* ¶ 8.)

- Bryant has Kroll's reports on its neutral forensic examination of over 29 devices. (*Id.* ¶¶ 10-13 & Exs. C-D.)

- All Defendants, and even non-defendant witnesses, agreed to the production of their cellphone records—showing everyone who they called and texted during the relevant time period. (*Id.* ¶ 6 & Ex. A.)

Bryant's inability to prove her case has nothing to do with Defendants' actions. It has to do with the fundamental legal deficiencies that were always present in this litigation: Bryant knows no crash site photos have ever been publicly disseminated, she has never seen crash site photos containing her loved ones, and her fear of future dissemination is not reasonable.

If the photos themselves are what Bryant wants, she has other ways of getting them. As Bryant knows, LASD and LACFD are *not* the only ones who took crash site photos. This was a complex accident that required interagency collaboration. Bryant has not sought the photos from the NTSB, the FBI, or any other agency. She has not subpoenaed the civilians and asked for the photos they took and gave to the media. Nor has she availed herself of her statutory right to receive copies of DMEC's photos.

### 4.    If Anything, Both Parties Will Suffer Prejudice

Finally, in evaluating whether to impose sanctions, courts also consider whether the party who allegedly spoliated evidence will also suffer prejudice from the missing evidence. For example, one district court held that *both* parties were prejudiced by missing surveillance footage. *Hamilton*, 2005 WL 3481423, at *8; *see also McGinnity v. Metro-N. Commuter R.R.*, 183 F.R.D. 58, 63 (D. Conn. 1998) ("[A]ll parties are equally prejudiced by the absence of the tape recording, which might have supported plaintiffs' contention … or might have supported defendant's position . . . .").

The same is true here. If Defendants had the photos and all the relevant cellphones, they could conclusively establish that the photos were crash site photos

1    taken for legitimate reasons by hardworking first responders at an extremely

2    challenging scene.  Defendants would also be able to show that the photos were

3    never sent to anyone outside of the County, and that they were deleted.

4         The deleted photos and upgraded cellphones are just as likely to prove

5    Defendants' case as they are to prove Bryant's.  Under these circumstances, there is

6    no basis for the sanctions Bryant is seeking.

7
8    DATED:  November 8, 2021      MUNGER, TOLLES & OLSON LLP

9

10   By:     */s/ Jennifer L. Bryant*
11        JENNIFER L. BRYANT
          Attorneys for Plaintiff VANESSA BRYANT
12
13   DATED:  November 8, 2021      JEROME M. JACKSON LAW OFFICES

14

15

16   By:     */s/ Jerome M. Jackson*
          JEROME M. JACKSON
17        Attorneys for Plaintiff CHRISTOPHER L.
          CHESTER
18

19   DATED:  November 8, 2021      OFFICE OF COUNTY COUNSEL
20

21

22   By:     */s/ Jonathan C. McCaverty*
23        JONATHAN C. McCAVERTY
          Attorneys for Defendant LOS ANGELES
24        COUNTY SHERIFF'S DEPARTMENT

25

26

27

28

1   DATED:  November 8, 2021          MILLER BARONDESS, LLP

2

3

4                                    By:  _____
                                              /s/ Louis R. Miller
5                                            LOUIS R. MILLER
                                     Attorneys for Defendants COUNTY OF LOS
6                                    ANGELES, LOS ANGELES COUNTY FIRE
                                     DEPARTMENT, JOEY CRUZ, RAFAEL
7                                    MEJIA, MICHAEL RUSSELL, RAUL
                                     VERSALES, TONY IMBRENDA, and
8                                    ARLIN KAHAN

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **ATTESTATION CLAUSE**

I, Jennifer L. Bryant, am the ECF User whose ID and password are being used to file this NOTICE OF MOTION AND JOINT STIPULATION RE: PLAINTIFFS' MOTION FOR SPOLIATION SANCTIONS.  In compliance with L.R. 5-4.3.4, I hereby attest that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.


Dated:  November 8, 2021                         /s/ Jennifer L. Bryant
                                                                     Jennifer L. Bryant