LUIS LI (State Bar No. 156081)
Luis.Li@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
633 West Fifth Street, Suite 1550
Los Angeles, California 90071
Telephone: (323) 210-2900
Facsimile: (866) 974-7329

CRAIG JENNINGS LAVOIE (State Bar No. 293079)
Craig.Lavoie@mto.com
JENNIFER L. BRYANT (State Bar No. 293371)
Jennifer.Bryant@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

Attorneys for Plaintiff Vanessa Bryant

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| VANESSA BRYANT, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF LOS ANGELES, et al.,<br><br>Defendants. | Case No. 2:20-cv-09582-JFW-E<br><br>**DISCOVERY MATTER**<br><br>**DECLARATION OF DAVID J. FRESKOS IN SUPPORT OF PLAINTIFFS' MOTION FOR SPOLIATION SANCTIONS**<br><br>Assigned to Hon. John F. Walter and Magistrate Judge Charles F. Eick<br><br>Date: November 29, 2021<br>Time: 9:30 a.m.<br>Courtroom: 750<br><br>Discovery Cutoff: November 29, 2021<br>Pretrial Conference: February 4, 2022<br>Trial: February 22, 2022 |

DECLARATION OF DAVID J. FRESKOS ISO PLAINTIFFS' MOTION FOR SPOLIATION SANCTIONS

# DECLARATION OF DAVID J. FRESKOS

I, David J. Freskos, declare as follows:

1. I submit this declaration on behalf of Plaintiffs Vanessa Bryant and Christopher L. Chester in support of their Motion for Spoliation Sanctions. I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true. If called as a witness, I could and would testify competently to the facts stated herein.

## Background and Experience

2. I possess more than fourteen years of experience in digital forensics, with a specialization in the collection and analysis of data from mobile devices.

3. I am a Managing Director for FTI Consulting ("FTI") and lead FTI's Chicago-based Digital Forensics and Investigations Practice. FTI's Digital Forensics and Investigations Practice provides digital forensics and eDiscovery consulting services to businesses, government entities, and attorneys in support of investigations, litigation, and various other types of matters. As a leader of FTI's Digital Forensics and Investigations Practice, I have assisted with developing tools and techniques used by FTI's forensic experts and have trained FTI's staff on forensic examination techniques. I also have led many electronic data-preservation projects and forensic technology investigations on behalf of our clients and have provided oral and written testimony in support of civil and criminal matters in state and federal courts.

4. I hold a Bachelor of Science in Computer Information Systems and Operations Decision Technology and a Master of Science in Information Systems from Indiana University. I have completed numerous post-graduate training courses in forensics, including mobile device forensics training. By way of example, I have earned a digital forensics certification, known as the EnCE (EnCase Certified Examiner), as well as a mobile forensics certification known as the CCPA

(Cellebrite Certified Physical Analyst). I am also a regular speaker on digital forensics and eDiscovery topics at conferences and continuing legal education classes and have published articles on computer forensics and eDiscovery topics.

### Volatility of Mobile Data and Impact of Deletion

5. Modern mobile devices are designed to be "always on." This means that certain data on a mobile device can be constantly changing. Simply leaving a device powered on is enough to cause material changes to the device, even without any intentional user deletion or interaction.

6. Information about mobile device activity can be found in forensic artifacts. These artifacts often take the form of logs that are used for debugging or metric-gathering purposes. Such artifacts are not developed to persist indefinitely. Due to the short lifecycle of such artifacts, evidence of device activity is ephemeral and can be permanently lost—whether through the deletion of relevant data by the device owner, or simply a routine purging by the device operating system—unless steps are taken to preserve the data. Because a device (and any storage databases) can only store a limited number of records until a system purge occurs, mere usage of a device can result in the loss of relevant artifacts.

7. Any deletion or purge, whether triggered by the system or user, hinders the ability to identify or recover relevant data and artifacts on the device. As mobile device operating systems and securities continue to evolve, the ability to recover deleted records or files becomes increasingly difficult. On modern smartphones, many files become cryptographically inaccessible and non-recoverable as soon as they are deleted. Other times the underlying data may be retained until it is overwritten by the operating system. Once a record or file is overwritten by the operating system, however, it becomes non-recoverable. Records from within databases or logs that are deleted have recovery windows often measured in minutes and hours. Because the operating system automatically overwrites data in the ordinary course, users generally cannot control when the data is overwritten.

Deletion of data from a device, whether purposeful or inadvertent, accelerates the process by which data becomes non-recoverable. Absent timely preservation, relevant evidence can be lost forever. The sooner action is taken to preserve and recover deleted data, the better the chance of recovering that data before it is overwritten and permanently destroyed.

8. Given the inherent volatility of mobile data, to minimize the permanent loss of relevant digital evidence, data on the device must be captured and forensically preserved as soon as possible after the incident, crime, or event at hand.

**Core Forensic Principles for Investigations Involving Digital Evidence**

9. There are certain basic baseline standards for identifying and preserving digital evidence when conducting any investigation involving conduct that occurred on digital media and mobile devices. The most widely recognized set of standards for handling digital media and electronic evidence is outlined by the Electronic Discovery Reference Model ("EDRM").[1]

10. As set forth in the EDRM, at the outset of a digital investigation, investigators must (1) identify the key individuals or custodians likely to possess relevant evidence, and (2) determine what sources of electronically stored information ("ESI") the custodians have access to or utilize on a regular basis.

11. Upon completion of the identification process, the identified ESI must be preserved and acquired. The first step in the preservation process is to issue a preservation notice to the identified custodians in short order. While this can be accomplished in different ways depending on the size of the organization and the nature of the investigation, at a minimum, each custodian should be notified of the pending or ongoing investigation and instructed not to alter or delete any relevant ESI in their possession. The notice provides the investigation team a sufficient amount of time to coordinate the actual acquisition or collection of the ESI from the

---

[1] https://edrm.net/.

digital devices that have been put on hold. Preservation holds are particularly important when dealing with mobile devices, as mobile data can rarely be systematically archived.

12. The standard way to preserve mobile data is to create a forensic image or backup of the device. A forensic image is an exact, sector-by-sector copy of a device that captures both active and deleted content. Traditionally, forensic images refer to acquisitions of computer hard drives, but mobile devices can also be imaged. Because modern day mobile phones do not contain hard drives, a "sector-by-sector" image is not always possible, but various industry leading software companies such as Cellebrite or Oxygen provide imaging options depending on the make, model, and operating system of the phone. Multiple imaging formats are often combined to extract the most complete set of data from a given mobile device.

13. The evidence or information collected from a mobile device during a forensic acquisition includes but is not limited to equipment identifiers, device settings and system-related files, contact or phone book information, call logs, calendar items, text-based communications, photos, multimedia including audio or video recordings, electronic documents, third-party application data, and web browser activity. Many mobile application developers are also increasingly leveraging the cloud to house application data, rather than storing it on the device itself. This means that to fully preserve all data generated by a mobile device, data may also need to be acquired from third-party cloud-hosted sites.

**LASD'S Response to Allegations of Improper Photographs of Crash Victims Violated Fundamental Forensic Principles**

14. Based on statements made by the County of Los Angeles in discovery during this litigation and information in the investigation report prepared by the Los Angeles County Sheriff's Department ("LASD") Internal Affairs Bureau ("IA Report"), it is my understanding that none of the aforementioned basic steps were taken after LASD received information that its personnel were in possession of

unauthorized photographs of human remains of the victims of the January 26, 2020 helicopter crash in Calabasas, California.  Instead, LASD instructed its personnel to delete the photos from their devices and took no action to preserve the relevant devices in the following days, weeks, or even months.

15. Such deletion without first preserving the mobile devices that contained the photos in question undermines any subsequent forensic examination and effort to recover relevant evidence.  First and foremost, the deletion makes it exceedingly difficult—if not impossible—for a forensic examination to determine the content of the photos themselves or analyze the metadata embedded therein, which could reveal the source of the photos, among other information.  Similarly, intentional deletion hamstrings a forensic examiner's ability to reconstruct certain activities involving the photos on the devices (e.g., how the photos were received, where the photos were stored, how the photos were used, the nature and extent of any dissemination, etc.).

16. The impact of such intentional deletion might have been mitigated through prompt preservation of the devices, but that also did not occur here.  Each day that passed without a preservation hold in place and without creating a forensic image or other acceptable preservation of the devices that contained the photos materially increased the risk of permanently losing the relevant data and forensic artifacts.

17. In my professional opinion, LASD violated fundamental forensic principles in responding to allegations that its personnel took, shared, and possessed improper photos.  By failing to (1) issue a preservation hold to custodians in possession of relevant ESI or (2) create a forensic image or backup of those custodians' devices (or acquire any of associated cloud-based data) and instead proactively deleting digital evidence, LASD accelerated the pace of permanent data loss, which compromised the ability to ever recover the deleted data or relevant forensic artifacts.

**The Neutral Examiner's Forensic Analysis Confirms Defendants' Spoliation**

18. It is my understanding that the parties engaged a neutral forensic examiner, Justin Price of Kroll Associates, Inc. (the "Forensic Examiner"), to perform an inspection and analysis of numerous mobile devices of custodians who reported to investigators that they took and/or received photos of the crash site that contained human remains. According to the parties' stipulated protocol, the Forensic Examiner conducted an analysis to determine, among other things, when the photos were received, to whom the photos were subsequently transferred or communicated, and when such photos were deleted.

19. I have reviewed the results of the Forensic Examiner's Investigative Analysis. The Forensic Examiner's report states that no photos of the crash site could be identified, even on the devices of custodians who have admitted to taking and/or receiving photos containing human remains.

20. For example, according to the IA Report, the custodian of the device identified as RR22 by the Forensic Examiner admitted that she received photos from Deputy Mejia on January 26, 2020. No data associated with that transfer was detected in the Forensic Examiner's analysis. The same is true for the ten other LASD personnel who had possession of photos and whose devices were analyzed by the Forensic Examiner. This confirms that LASD's failure to preserve the devices resulted in permanent data loss.

21. These results are not surprising given LASD's failure to preserve the devices before the deletion occurred or immediately thereafter. In addition, I understand that nine of the eleven relevant LASD custodians replaced and disposed of the devices they were using on January 26, 2020 and submitted only their new devices to the Forensic Examiner for inspection, a further violation of fundamental forensic protocols. While it is not uncommon for electronic devices to regularly be replaced, it is standard practice to retain the old device for preservation. The Forensic Examiner's analysis also notably revealed that Defendant Cruz reset his

phone to the factory default settings, which has the effect of permanently deleting all data on the device and making it forensically unrecoverable. The already slim chance of recovering deleted files, text messages, or relevant forensic artifacts was lost when the device was factory reset.

22. There are multiple ways in which an iPhone can be reset to factory settings, most of which are directly initiated by the user. The most common method is to navigate into the Settings application on the phone and to a tab labeled "Reset." From there a user has multiple options, including "Erase All Content and Settings," which will return the phone to the state it was shipped from the manufacturer and erase all user data. A user can also perform the same function through connecting the device to a laptop and using the iTunes software application.[2]

23. Additionally, an iPhone can be set to wipe after 10 incorrect passcode entries are tried. After 6 incorrect tries the phone becomes disabled and a waiting period is implemented before additional tries can be made. This prevents the phone from being wiped if "accidental" login attempts were made. The waiting period increases after each successive incorrect try up to 60 minutes after the ninth try. Given these waiting periods, in my experience, it is difficult for an iPhone to be reset inadvertently.

24. As with the LASD devices, the Forensic Examiner's report states that no evidence of the photos could be identified on the analyzed devices of Los Angeles County Fire Department ("Fire Department") personnel, including those known to have possessed crash-site photos. Again, as with the LASD devices, these findings confirm that the Fire Department did not adequately preserve the devices at issue and that evidence was permanently lost as a result.

25. Based on my review of the Fire Department's internal investigation reports, it is my understanding that at least three Fire Department employees had

---

[2] https://support.apple.com/guide/iphone/erase-iphone-iph7a2a9399b/ios

photos containing human remains in their possession that they later deleted: Tony Imbrenda, Arlin Kahan, and Brian Jordan. According to information provided in discovery, data on Department-issued phones used by these custodians was not extracted until April 17, 2020; May 29, 2020; and June 29, 2020, respectively—after the deletion had occurred—and the custodians' personal devices were never forensically preserved. Due to the volatility of data stored on mobile devices and the constant rate with which deleted data is overwritten, it is my professional opinion—confirmed by the results of the Forensic Examiner's analysis—that the Department's decision to wait months after the event at issue to preserve data on the devices resulted in irreparable data loss on the Department-issued devices, which fatally undermined the ability to gain an accurate picture of what transpired with the photos on those devices. Because the custodians' personal devices were never preserved, any data deleted from those devices was permanently lost as well.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

    Executed on this 29th day of October 2021, at Chicago, Illinois.

David J. Freskos