# EXHIBIT 7

EXHIBIT 7
88

CERTIFIED COPY

```
 1              UNITED STATES DISTRICT COURT

 2     CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4   VANESSA BRYANT, a California )
     Resident,                    )
 5                                )
                Plaintiff,        )
 6                                )
        vs.                       )  No. 2:20-cv-09582-JFW-E
 7                                )
     COUNTY OF LOS ANGELES, a     )
 8   Public entity, et al.,       )
                                  )
 9              Defendants.       )
     _____)
10

11            C O N F I D E N T I A L

12

13       VIDEO-RECORDED DEPOSITION OF RAFAEL MEJIA

14                  October 15, 2021

15

...

24   Theresa JoAnn Phillips-Blackwell, CSR 12700
     476623
25
```

BARKLEY
Court Reporters
barkley.com
SINCE 1972

(310) 207-8000 Los Angeles     (415) 433-5777 San Francisco    (949) 955-0400 Irvine          (858) 455-5444 San Diego
(310) 207-8000 Century City    (408) 885-0550 San Jose         (760) 322-2240 Palm Springs    (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento      (800) 222-1231 Martinez         (702) 366-0500 Las Vegas       (800) 222-1231 Monterey
(951) 686-0606 Riverside       (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson       (516) 277-9494 Garden City
(212) 808-8500 New York City   (347) 821-4611 Brooklyn         (518) 490-1910 Albany          (914) 510-9110 White Plains
(312) 379-5566 Chicago         00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai        001+1+800 222 1231 Hong Kong

**EXHIBIT 7**
**89**

```
12:49  1        Q.   Did you -- well, strike that.
12:49  2             You mentioned that you took photos of the area
12:49  3   and the fog and the media.
12:49  4             Do you still have those photos?
12:49  5        A.   I do not.
12:49  6        Q.   Why not?
12:49  7        A.   No reason to have them.  I erased them.
12:49  8        Q.   You erased them.
12:49  9             Do you know when you erased them?
12:49 10        A.   Maybe a year and a half ago.
12:49 11        Q.   Let's -- let's maybe do it a different way.
12:49 12   Roughly, how long after the accident do you think you
12:50 13   erased -- erased them?
12:50 14        A.   Oh, after the IA investigation.
12:50 15        Q.   After the IA investigation.  Okay.
12:50 16        A.   So I --
12:50 17        Q.   Go ahead.
12:50 18        A.   I -- I don't know what the time period is
12:50 19   between.
12:50 20        Q.   Right.  Yeah.  I -- I have a sense.
12:50 21             After your IA interview?
12:50 22        A.   Yes.
12:50 23        Q.   Did you provide those photos to anyone who was
12:50 24   investigating this whole situation with the accident
12:50 25   scene photos at any point?
```

124

```
01:48  1         Q.  Was there ever a point on January 26 when you
01:48  2    obtained photos of the crash site that included victims'
01:48  3    remains?
01:48  4         A.  No.
01:48  5         Q.  Why do you say "no"?
01:48  6         A.  I don't recall seeing victim remains on the
01:48  7    photos that I received.
01:48  8         Q.  Well, let's -- do you recall receiving some
01:48  9    photos from Raul Versales -- Versales on January 26th?
01:48 10         A.  Yes.
01:48 11         Q.  Can you describe the circumstances under which
01:48 12    you obtained those photos.
01:48 13         A.  Yes.  So when I was working the command post, I
01:49 14    had the desk -- they kept asking me to see if they
01:49 15    had -- if the wreckage of the helicopter contained any
01:49 16    type of identifications number -- identification numbers
01:49 17    on the parts of the helicopter because they wanted the
01:49 18    numbers on there to -- basically, to identify what
01:49 19    helicopter it was and who it belonged to.
01:49 20             I -- I knew that Deputy Versales had the
01:49 21    photos, and so I asked him information to see if the --
01:49 22    if he had a photo with the -- those numbers, you know,
01:49 23    on the -- on the helicopter parts.  And because it was
01:49 24    busy and chaotic, he just text me the photo so I can
01:50 25    look myself.  He picked the ones -- what I believe are
```

133

```
02:47  1        Q.   So in the days after the accident, did you ever
02:48  2   observe any discussion of the photos during a morning
02:48  3   briefing session?
02:48  4        A.   No.
02:48  5        Q.   In the days after the accident, did you ever
02:48  6   hear or participate in any discussion of accident scene
02:48  7   photos while you were out at a call for service?
02:48  8        A.   No.
02:48  9        Q.   In the days after the accident, did you ever
02:48 10   hear or participate in -- participate in any discussion
02:48 11   of the photos while on a break or getting a meal with
02:48 12   colleagues?
02:48 13        A.   No.
02:48 14        Q.   In the days after the accident, did you ever
02:48 15   observe or participate in a discussion of accident scene
02:48 16   photos in the report writing room at Lost Hills?
02:49 17        A.   No.
02:49 18        Q.   In the days after the accident, did you ever
02:49 19   observe or participate in a discussion of the accident
02:49 20   scene photos in the locker room at the Lost Hills
02:49 21   station?
02:49 22        A.   No.
02:49 23        Q.   Do you still have possession of any of the
02:49 24   photos of the accident scene that you received from
02:49 25   Deputy Versales?
```

169

RAFAEL MEJIA - CONFIDENTIAL

BARKLEY
Court Reporters

**EXHIBIT 7**
**92**

```
02:49  1        A.   No, I do not.
02:49  2        Q.   Why not?
02:49  3        A.   Because I -- there is no need for them.  I
02:49  4   erased them.
02:49  5        Q.   Tell me everything that you remember about
02:49  6   erasing these photos of the accident scene that you
02:49  7   obtained on your personal cell phone from Deputy
02:49  8   Versales.
02:50  9        A.   I remember going to the gallery, running my
02:50 10   finger through the photos and hitting "delete," and
02:50 11   immediately after going to -- I went to my deleted files
02:50 12   and/or deleted photos, and I deleted that off my phone.
02:50 13   I also went to the text message I received from Deputy
02:50 14   Versales and erased that.  I erased the photos from --
02:50 15   from Deputy Cable's text message.  And that was pretty
02:50 16   much it.  I just got -- deleted them off my phone.
02:50 17        Q.   Did you look for any text message that you had
02:50 18   had with Joey Cruz?
02:51 19        A.   No.
02:51 20        Q.   Why is that?
02:51 21        A.   I -- I don't recall.
02:51 22        Q.   Do you recall at any point being --
02:51 23        A.   If you don't mind.
02:51 24        Q.   Do you recall at any point being asked to come
02:51 25   in to the Lost Hills station to talk to
```

170

RAFAEL MEJIA - CONFIDENTIAL

BARKLEY
Court Reporters

**EXHIBIT 7**

**93**

| | | |
|---|---|---|
| 03:47 | 1 | Q. Outside of what we've already discussed, is |
| 03:48 | 2 | there anything else at all that you recall happening or |
| 03:48 | 3 | being said during this period of time that you were in |
| 03:48 | 4 | the report writing room with Raul Versales, Michael |
| 03:48 | 5 | Russell, Ruby Cable, and Joey Cruz? |
| 03:48 | 6 | A. No. I don't -- I don't recall anything else. |
| 03:48 | 7 | Q. Did anyone at the Lost Hills station that day |
| 03:48 | 8 | tell you to preserve anything related to the photos, |
| 03:48 | 9 | such as the photos themselves or text messages in which |
| 03:48 | 10 | the photos were shared or discussed? |
| 03:48 | 11 | A. No. |
| 03:48 | 12 | Q. While you were at Lost Hills station on the day |
| 03:48 | 13 | of your meeting with Lieutenant Mancinas, did anyone ask |
| 03:48 | 14 | you if you would consent to a search of your cell phone? |
| 03:48 | 15 | A. No. |
| 03:48 | 16 | Q. While you were at the Lost Hills station for |
| 03:48 | 17 | your meeting with Lieutenant Mancinas, did anyone |
| 03:49 | 18 | inspect your phone in any way? |
| 03:49 | 19 | A. No. |
| 03:49 | 20 | Q. In the weeks following your meeting with |
| 03:49 | 21 | Lieutenant Mancinas, did anyone from the sheriff's |
| 03:49 | 22 | department ask you whether you would consent to a search |
| 03:49 | 23 | of your cell phone? |
| 03:49 | 24 | A. No. |
| 03:49 | 25 | Q. At any time since the accident, has anyone from |

197

```
 1            (Whereupon the document referred to is marked
 2    by the reporter as Plaintiff Exhibit 106 for
 3    identification.)
04:53  4       A.   Correct.
04:53  5       Q.   And it's dated Monday, October 4th; so this is,
04:53  6    like, 11 days ago.  And he writes, "Based" -- Jason
04:53  7    writes, "Based on the information we have to date, here
04:53  8    is the list of devices that are no longer in the
04:53  9    possession of the custodians."
04:53 10            Do you see that?
04:53 11       A.   Yes.
04:53 12       Q.   And it says, "Rafael Mejia, March 2021."
04:53 13            Do you see that?
04:53 14       A.   Yes.
04:53 15       Q.   And it's noted here that that is the date where
04:53 16    your device was replaced or upgraded; correct?
04:54 17       A.   Correct.
04:54 18       Q.   Do you still have the cell phone that you used
04:54 19    to store the photos of the accident scene in January of
04:54 20    2020?
04:54 21       A.   I do not.
04:54 22       Q.   Why do you not have it anymore?
04:54 23       A.   Because it -- it was broken, and I replaced it.
04:54 24    I upgraded my phone.
04:54 25       Q.   And that occurred around March of 2021?
```

235

RAFAEL MEJIA - CONFIDENTIAL

BARKLEY
Court Reporters

**EXHIBIT 7**
**95**

| | | |
|---|---|---|
| 04:54 | 1 | A. It was broken prior to that. |
| 04:54 | 2 | Q. Oh, okay. It was broken prior to that, and you |
| 04:54 | 3 | started using a new phone. |
| 04:54 | 4 | When did you -- do you still -- the phone is |
| 04:54 | 5 | broken. Do you still have it in your possession even |
| 04:54 | 6 | though it doesn't work? |
| 04:54 | 7 | A. No, sir. |
| 04:54 | 8 | Q. Okay. When did you relinquish possession of |
| 04:54 | 9 | that phone that you were using in January of 2020? |
| 04:54 | 10 | A. In -- it would be when I received a new phone |
| 04:54 | 11 | in March. |
| 04:54 | 12 | Q. March 2021? |
| 04:54 | 13 | A. Yes. I'm not sure of the exact date. |
| 04:55 | 14 | Q. Not sure of the exact date within March of |
| 04:55 | 15 | 2021? |
| 04:55 | 16 | A. Yes. |
| 04:55 | 17 | Q. And you had that old cell phone all the way up |
| 04:55 | 18 | until the point that you started using your new cell |
| 04:55 | 19 | phone in March of 2021; correct? |
| 04:55 | 20 | A. Yes. |
| 04:55 | 21 | Q. So at the time that you relinquished possession |
| 04:55 | 22 | of the cell phone that you had been using in January of |
| 04:55 | 23 | 2020 -- that was in March of 2021 -- your testimony |
| 04:55 | 24 | earlier was that you learned in February 2021 on social |
| 04:55 | 25 | media that Vanessa Bryant wanted to name you in her |

236

```
04:55  1   lawsuit.
04:55  2            So would it be fair to say that at the time
04:55  3   that you relinquished your phone from January -- that
04:55  4   you had been using in January of 2020, that you were
04:55  5   aware that you were a potential defendant in a lawsuit
04:56  6   brought by Vanessa Bryant?
04:56  7            MR. TOKORO:  Misstates his prior testimony.
04:56  8            THE WITNESS:  I -- I don't know.
04:56  9   BY MR. LAVOIE:
04:56 10       Q.   At the time that you relinquished possession of
04:56 11   the phone that you had been using in January of 2020,
04:56 12   did you know that the sheriff's department had been sued
04:56 13   by Vanessa Bryant related to accident scene photos?
04:56 14       A.   Yes.
04:56 15       Q.   At the time that you relinquished possession of
04:56 16   your phone that you had been using in January of 2020,
04:56 17   did you know that Vanessa Bryant had filed papers with
04:56 18   the court seeking to publicly name you as a defendant in
04:56 19   her lawsuit?
04:56 20       A.   No, I -- I did not know.
04:56 21       Q.   Didn't know.
04:56 22            Why did you not know?
04:56 23            MR. TOKORO:  Objection.  Vague and ambiguous.
04:56 24   BY MR. LAVOIE:
04:56 25       Q.   So is it -- is it your testimony that you
```

237

```
04:57  1  relinquished possession of your phone and then later
04:57  2  learned that you were -- that Vanessa wanted to name you
04:57  3  in the lawsuit?
04:57  4       A.  No.  I don't have a clear recollection of -- of
04:57  5  the events simply because once IA starting going through
04:57  6  our stuff, I didn't want -- I wanted to detach from it.
04:57  7  I didn't want to -- I didn't want anything about it,
04:57  8  basically.  It's not -- I don't have a clear timeline of
04:57  9  how things went.
04:57 10       Q.  Did it occur to you when you gave up possession
04:57 11  of the phone that you had used to receive these photos
04:57 12  of the accident site, that you might be relinquishing
04:57 13  evidence that was relevant to this lawsuit?
04:57 14           MR. TOKORO:  Objection.  Vague and ambiguous.
04:58 15           THE WITNESS:  I didn't consider those photos to
04:58 16  be evidence or -- or my phone to be evidence.  I was
04:58 17  never told that it would be evidence.
04:58 18  BY MR. LAVOIE:
04:58 19       Q.  You were never told that your phone might be --
04:58 20  might hold evidence that's relevant to this lawsuit?
04:58 21       A.  Again, I didn't consider it to be evidence.
04:58 22       Q.  Not -- not -- sorry.  Not evidence in the -- in
04:58 23  a criminal sense.  I'm talking about evidence in this
04:58 24  lawsuit.  Like, maybe -- maybe using word "evidence" is
04:58 25  throwing you off.
```

238

RAFAEL MEJIA - CONFIDENTIAL

BARKLEY
Court Reporters

**EXHIBIT 7**
**98**

```
04:58  1            But did it ever occur to you at the time
04:58  2   that -- before you handed in -- relinquished possession
04:58  3   of the phone that you had previously used to accept
04:58  4   these accident scene photos, that your phone might hold
04:58  5   material that is relevant to the issues that are at
04:58  6   stake in this lawsuit?
04:59  7            MR. TOKORO:  Objection.  Vague and ambiguous.
04:59  8            THE WITNESS:  No.  I -- I -- I needed a new
04:59  9   phone, and I was eligible for the upgrade.
04:59 10   BY MR. LAVOIE:
04:59 11       Q.   What steps have you taken to preserve documents
04:59 12   and communications related to this lawsuit?
04:59 13       A.   None.  There was -- the only documentation that
04:59 14   I would have was the photos on the phone.  But the
04:59 15   photos were erased, so I didn't have anything.
04:59 16       Q.   Have you made any effort to search for
04:59 17   documents that you might have related to the subject
04:59 18   matter of this lawsuit?
04:59 19       A.   Yes.
04:59 20       Q.   What steps have you taken to search for
04:59 21   documents that might be relevant to this lawsuit?
04:59 22            MR. TOKORO:  I'm just going to caution you --
04:59 23   that you did; but don't disclose any communications
04:59 24   you've had with our office, county counsel, or Amy
04:59 25   regarding anything we've talked to you about.
```

239

RAFAEL MEJIA - CONFIDENTIAL

BARKLEY
Court Reporters

**EXHIBIT 7**
**99**

```
04:59   1  BY MR. LAVOIE:
04:59   2      Q.  Correct.  You can say what you did; but I'm not
05:00   3  asking you what did your lawyers tell you to do, if that
05:00   4  makes sense.
05:00   5      A.  Yeah.  I contacted my cell phone provider and
05:00   6  requested phone records of -- from the time the incident
05:00   7  till now -- or till --
05:00   8      Q.  When --
05:00   9      A.  -- whenever they -- they needed the documents
05:00  10  by.
05:00  11      Q.  When did you reach out to your cell provider to
05:00  12  obtain those records?
05:00  13      A.  I don't recall.  Possibly a month ago.
05:00  14      Q.  Have you received them?
05:00  15      A.  I didn't request them for -- to be mailed to
05:00  16  me.
05:00  17      Q.  Oh, I see.
05:00  18      A.  They were requested to come to my counsel.
05:00  19      Q.  So you don't know whether they've come to your
05:00  20  counsel yet or not?
05:00  21      A.  I don't know.
05:00  22      Q.  Have you ever received a written notice to
05:01  23  preserve documents and communications related to the
05:01  24  subject matter of this lawsuit?
05:01  25      A.  I did not receive any.
```

240

RAFAEL MEJIA - CONFIDENTIAL

BARKLEY
Court Reporters

**EXHIBIT 7**
**100**

```
05:01  1        Q.   Have you ever been orally instructed or advised
05:01  2   to preserve documents and communications related to the
05:01  3   subject matter of this lawsuit?
05:01  4        A.   No.
05:01  5        Q.   Since January 26, 2020, which was the date of
05:01  6   the accident, have you ever texted with Joey Cruz, Raul
05:01  7   Versales, Michael Russell, or Ruby Cable regarding the
05:01  8   accident scene photos or this lawsuit?
05:01  9        A.   No.
05:01 10             MR. LAVOIE:  I'm going to show you a portion of
05:01 11   a video that has been previously marked as Exhibit 77.
05:02 12   So I don't know if I optimized the share for video.  Let
05:02 13   me try that again.
05:02 14             (Video clip playing.)
05:04 15             MR. LAVOIE:  I'm -- I started Exhibit 77 at the
05:04 16   very beginning.  I'm pausing it at 1 minute and
05:04 17   33 seconds.
05:04 18   BY MR. LAVOIE:
05:04 19        Q.   Deputy Mejia, have you ever heard of anything
05:04 20   called a death book?
05:04 21        A.   I've heard of it, yes.
05:04 22        Q.   What does that mean, according to your
05:04 23   understanding?
05:04 24        A.   I think what the sheriff described was keeping
05:04 25   photos of deceased -- deceased people and -- and a
```

241

RAFAEL MEJIA - CONFIDENTIAL

BARKLEY
Court Reporters

**EXHIBIT 7**
**101**