# EXHIBIT 15

EXHIBIT 15
266

**CERTIFIED COPY**

```
 1              UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4   VANESSA BRYANT, a California )
     Resident,                    )
 5                                )
                   Plaintiff,     )
 6                                )
        vs.                       )   No. 2:20-cv-09582-JFW-E
 7                                )
     COUNTY OF LOS ANGELES, a     )
 8   Public entity, et al.,       )
                                  )
 9                 Defendants.    )
     _____)
10

11

12          C O N F I D E N T I A L

13    VIDEO-RECORDED DEPOSITION OF WILLIAM MC CLOUD

14                  June 3, 2021

15

16

17

18

19

20

21

22

23

24   Theresa JoAnn Phillips-Blackwell, CSR 12700
     472981
25
```

SINCE 1972

**BARKLEY**
Court Reporters
barkley.com

(310) 207-8000 Los Angeles        (415) 433-5777 San Francisco        (949) 955-0400 Irvine             (858) 455-5444 San Diego
(310) 207-8000 Century City       (408) 885-0550 San Jose             (760) 322-2240 Palm Springs        (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento         (800) 222-1231 Martinez             (702) 366-0500 Las Vegas           (800) 222-1231 Monterey
(951) 686-0606 Riverside          (818) 702-0202 Woodland Hills       (702) 366-0500 Henderson           (516) 277-9494 Garden City
(212) 808-8500 New York City      (347) 821-4611 Brooklyn             (518) 490-1910 Albany              (914) 510-9110 White Plains
(312) 379-5566 Chicago            00+1+800 222 1231 Paris             00+1+800 222 1231 Dubai            001+1+800 222 1231 Hong Kong

**EXHIBIT 15**
**267**

| | |
|---|---|
| 11:30 | 1 | Marrone that a sheriff's deputy had seen two department |
| 11:30 | 2 | personnel taking photos of the crash site; correct? |
| 11:30 | 3 | A.  Yes.  He -- I believe it was one person taking |
| 11:30 | 4 | photos and another person that the sheriff's deputy |
| 11:30 | 5 | shared photos with. |
| 11:30 | 6 | Q.  That's a helpful clarification. |
| 11:30 | 7 | So Captain Vander Horck reported to Chief |
| 11:31 | 8 | Marrone a sheriff's deputy saw one department personnel |
| 11:31 | 9 | taking photos and he witnessed another member of the |
| 11:31 | 10 | department receiving photos at the crash site; correct? |
| 11:31 | 11 | A.  I believe that's accurate, yes. |
| 11:31 | 12 | Q.  And after Chief Marrone received this |
| 11:31 | 13 | information from Captain Vander Horck, he called you; is |
| 11:31 | 14 | that correct? |
| 11:31 | 15 | A.  Yes. |
| 11:31 | 16 | Q.  And was Chief Marrone's call to you regarding |
| 11:31 | 17 | the information he had just received from Captain |
| 11:31 | 18 | Vander Horck -- was that also on January 31st? |
| 11:31 | 19 | A.  Yes.  I believe it was. |
| 11:31 | 20 | Q.  Do you recall approximately what time you |
| 11:31 | 21 | received that call from Chief Marrone? |
| 11:31 | 22 | A.  Probably around noonish. |
| 11:31 | 23 | Q.  Do you recall approximately how long you were |
| 11:31 | 24 | on the phone with Chief Marrone when you got that first |
| 11:31 | 25 | call about the information from Captain Vander Horck? |

58

WILLIAM MC CLOUD - CONFIDENTIAL

BARKLEY
Court Reporters

**EXHIBIT 15**
**268**

11:32  1      A.  I would -- I don't remember exactly.  I would

11:32  2  say less than five minutes.

11:32  3      Q.  Can you tell me everything you remember that

11:32  4  Chief Marrone told you during that approximate

11:32  5  five-minute phone call.

11:32  6      A.  He made me aware that he had received a phone

11:32  7  call from Captain Vander Horck from the Lost Hills

11:32  8  Sheriff's Department, and he communicated to me that --

11:32  9  that the sheriff's department was aware that one of our

11:32 10  employees may have been taking photos and that another

11:32 11  may have received photos, is -- is what I recall the

11:33 12  general nature of our conversation.

11:33 13      I do remember him mentioning that the

11:33 14  sheriff -- Sheriff Villanueva wanted to speak with Chief

11:33 15  Osby and -- I think that was the crux of our -- of the

11:33 16  phone call.

11:33 17      Q.  And did you say anything in response to what

11:33 18  Chief Marrone was telling you during that phone call?

11:33 19      A.  I'm sure he and I talked about the -- what we

11:33 20  had was a general description, a African-American male,

11:33 21  who appeared to be a chief officer, and a Hispanic male.

11:34 22  So we did not have names.  I'm sure Chief Marrone and I

11:34 23  talked about, you know, who it might have been and --

11:34 24  and -- and tried to figure that out a little bit.  I

11:34 25  don't remember the specific words that we said to each

59

11:40 1    call that day with Chief Marrone or about the same

11:40 2    length?

11:40 3         A.   Maybe about the same.

11:40 4         Q.   So can you tell me everything you remember

11:41 5    about that phone call that you had on January 31st with

11:41 6    Captain Vander Horck.

11:41 7         A.   I don't remember the specifics or the exact

11:41 8    words that he and I exchanged; but he reported really

11:41 9    the same thing that we had reported to Chief Marrone,

11:41 10   that it had been reported within the sheriff's

11:41 11   department that two of our members either took or

11:41 12   received photographs.

11:41 13        I remember asking him if he could provide any

11:41 14   identification or give us a name or anything more

11:41 15   specific about who it might have been; and he gave me

11:41 16   the similar, very vague description of the -- the two

11:41 17   individuals.  And I believe that was the context.  I'm

11:42 18   sure we talked -- we exchanged information so that we

11:42 19   can speak with each other in the future, if the need

11:42 20   arose; and I think that was the context of our phone

11:42 21   call.

11:42 22        Q.   During that initial phone call that you had

11:42 23   with Captain Vander Horck, did he tell you the name of

11:42 24   the deputy who had witnessed the fire department

11:42 25   personnel taking and receiving photos of the crash site?

64

BARKLEY
Court Reporters

**EXHIBIT 15**
**270**

11:42  1          A.  No.  I do not recall that he did.

11:42  2          Q.  Did you ask him for the name of that deputy?

11:42  3          A.  No.  I don't believe I did.

11:42  4          Q.  Did Captain Vander Horck, again, during that

11:42  5     initial call between the two of you on the 31st, provide

11:42  6     any information about the -- the nature of the photos

11:43  7     that were taken or received or their content?

11:43  8          A.  No, he did not.

11:43  9          Q.  Did you ask Captain Vander Horck any questions

11:43 10     about the nature of the photos or their content?

11:43 11          A.  No, I did not.

11:43 12          Q.  And you mentioned that captain -- you had a

11:43 13     little bit more of a conversation with Captain

11:43 14     Vander Horck about the -- his description of the two

11:43 15     department individuals involved.  Can you tell me,

11:43 16     again, to the best of your recollection, everything that

11:43 17     Captain Vander Horck told you in terms of the identity

11:43 18     of the two department personnel during that initial

11:43 19     phone call.

11:43 20          A.  He described one of the individuals as a tall

11:43 21     African-American male who appeared to be a chief

11:44 22     officer.  I remember asking him how he knew -- I don't

11:44 23     know if I remember or I just know that the way that I

11:44 24     work that I would have asked him -- because we work with

11:44 25     the sheriffs often, "How do you know it was a chief

65

BARKLEY
Court Reporters

**EXHIBIT 15**
**271**

11:55  1    faxes, anything in that category.

11:55  2        A.  No.  I do not recall that we did.

11:55  3        Q.  Did -- did you personally, Chief McCloud, or --

11:55  4    or Chief Osby or any of the other people that we've been

11:55  5    talking about who were involved in talking about the

11:55  6    information received from Captain Vander Horck, take any

11:55  7    notes regarding any of those phone calls on

11:55  8    January 31st?

11:56  9        A.  I'm sure that I was probably taking notes

11:56 10    during my phone call with Captain Vander Horck.  I -- I

11:56 11    don't remember specifically; but normally, I would.

11:56 12        Q.  So it's your practice to take notes of

11:56 13    important phone calls like that.  So to the best your

11:56 14    knowledge, you have notes from that phone call?

11:56 15        A.  To the best of my knowledge, I took notes of

11:56 16    that phone call.  I'm not sure that I have those notes.

11:56 17        Q.  That's -- that's an important clarification, so

11:56 18    I appreciate that.

11:56 19            So now let's kind of take a step back.  Can you

11:56 20    tell me everything the department did over the next two

11:56 21    weeks -- so from January 31st to February 15th -- to

11:56 22    address this information the department had received

11:57 23    from Captain Vander Horck.

11:57 24        A.  Okay.  One of the first things that we did was

11:57 25    try and figure out who the individuals were that were

                                  72

BARKLEY
Court Reporters

11:57 1    alleged to have taken or received the photos.  Based on

11:57 2    the information that was provided from the sheriff's

11:57 3    department, we started doing a cursory assessment.  And

11:57 4    at the time Chief Mike Brown, who was assigned to the

11:57 5    Malibu area, fit the general description of -- of the --

11:58 6    the African-American male that we received from the

11:58 7    sheriff's department.

11:58 8         And I contacted Chief Brown and had a

11:58 9    conversation with him about the information we received.

11:58 10   It was very -- a broad-based, I'd say, conversation.

11:58 11   And I gave him a direct order that if he was in the

11:58 12   possession of photographs, whether on his personal or

11:58 13   his work phone, that he was to keep them and not delete

11:58 14   them and that he should just hold on to them.

11:58 15        And I think that was the general nature of my

11:59 16   direct order to him, that if he had them -- I didn't

11:59 17   know whether he or didn't, but he was to hold on to them

11:59 18   if he did.

11:59 19   Q.  And so this -- I think you described it

11:59 20   initially as a cursory assessment of trying to identify

11:59 21   who might fit this description that was provided by

11:59 22   Captain Vander Horck that occurred during this initial

11:59 23   two-week window; is that right?

11:59 24   A.  Yes.

11:59 25   Q.  And based on that preliminary cursory

73

WILLIAM MC CLOUD - CONFIDENTIAL

**BARKLEY**
*Court Reporters*

**EXHIBIT 15**
**273**

11:59  1   assessment during that initial two-week window, you

11:59  2   identified Mike Brown as someone who fits one of the

11:59  3   descriptions; is that right?

11:59  4       A.  Yes.

11:59  5       Q.  And can you place again on the timeline within

11:59  6   that two-week window when you had that communication

11:59  7   with -- with Chief Brown?

12:00  8       A.  It was pretty soon -- I don't have a calendar

12:00  9   in front of me but 31st -- I believe it was pretty soon

12:00 10   after or maybe even on the 31st.  I do remember it was a

12:00 11   Friday because I called him, and I remember it being a

12:00 12   Friday.  So it was probably the first Friday after the

12:00 13   31st.  If the 31st is on a Friday, it would have been

12:00 14   that Friday.  And that's when I made the call to Mike

12:00 15   Brown.

12:00 16       Q.  And was Mike Brown someone who reported or

12:00 17   responded to the Willow incident?

12:00 18       A.  Yes.

12:00 19       Q.  Presumably, that's how you -- you -- that was

12:00 20   the starting point for your assessment, was looking at

12:00 21   folks who -- who responded; right?

12:00 22       A.  Yes.

12:00 23       Q.  And you mentioned that one of the things that

12:00 24   you told Mike Brown during that conversation you had

12:00 25   soon after January 31st was to keep any photos that were

74

BARKLEY
Court Reporters

**EXHIBIT 15**
**274**

12:01   1   in his possession, to the extent he had any; correct?

12:01   2        A.   Yes.

12:01   3        Q.   And why did you give him that instruction?

12:01   4        A.   Because I was anticipating that there might be

12:01   5   an investigation, and it's important to preserve

12:01   6   evidence that might be related to the investigation.

12:01   7             MS. BRYANT:  And I see that we're at the noon

12:01   8   hour.  I -- we're kind of midstream in a topic here, but

12:01   9   I wanted to -- to pause briefly to check in with you,

12:01   10  Chief, about if this is a good time for a lunch break or

12:01   11  if you want to keep going a little longer.

12:01   12            THE WITNESS:  I'm a little hungry.  I would

12:01   13  appreciate a lunch break.

12:01   14            MS. BRYANT:  I read your mind, then.  So why

12:01   15  don't we -- why don't we break for lunch.

12:02   16            THE WITNESS:  Thank you.

12:02   17            THE VIDEOGRAPHER:  We're off the record at

12:02   18  12:02.

12:02   19            (A lunch recess is taken.)

12:36   20            THE VIDEOGRAPHER:  We are back on the record at

12:36   21  2:37 -- or excuse me -- 12:37.

12:37   22  BY MS. BRYANT:

12:37   23       Q.   Welcome back from -- from lunch, Chief McCloud.

12:37   24            So I'd like to jump right back to where we left

12:37   25  off.  So we were talking a little bit about steps the

75

BARKLEY
Court Reporters

**EXHIBIT 15**
**275**

12:37 1    department took between January 31st and February 15th

12:37 2    to respond to the information it had received from

12:37 3    Captain Vander Horck on the 31st.  And so when we

12:37 4    stopped for lunch, you told me that the department made

12:37 5    a cursory assessment in the immediate aftermath of

12:37 6    January 31st to try to identify the two department

12:37 7    personnel.  And you mentioned speaking to a Mike Brown.

12:37 8         Did the department do anything else or take any

12:37 9    other steps in that two-week time span that we're

12:37 10   talking about to try to identify the two department

12:38 11   personnel that Captain Vander Horck had mentioned?

12:38 12        A.  Yes.  There was -- there was one other

12:38 13   additional person that I reached out to.  His name was

12:38 14   Mike Rivera.  And Mike was on duty the day of the

12:38 15   accident.  He was on the engine company that was early

12:38 16   assign -- I think it was unit first in distance, so they

12:38 17   were probably first on scene.

12:38 18        And we felt like he fit the general description

12:38 19   of a male Hispanic and could have possibly been the male

12:38 20   Hispanic that received the photos from the sheriff's

12:38 21   deputy.  So again, it's a little bit of a shot in the

12:38 22   dark.  Male Hispanic is not a lot to go on, but he fit

12:39 23   the description.

12:39 24        So I reached out to him on that same Friday and

12:39 25   gave him the same direct order and instructions that I'd

76

WILLIAM MC CLOUD - CONFIDENTIAL

BARKLEY
Court Reporters

**EXHIBIT 15**
**276**

12:39  1   given Mike Brown, that if he was in possession of any

12:39  2   photos related to the incident either on a personal or

12:39  3   department cell phone or device, that he was to preserve

12:39  4   that information and not delete it but maintain it.

12:39  5          So make that same phone call to Mike Rivera and

12:39  6   Mike Brown.  Again, went through the process to start to

12:39  7   collect as much information as we could regarding

12:39  8   everybody that was on scene the first day of the

12:39  9   accident to try to figure out if there was someway that

12:39 10   we could better identify who these persons might have

12:40 11   been that were identified by the sheriff's deputies.

12:40 12       Q.  Can you tell me a little bit more about what

12:40 13   that process was like -- again, limiting ourselves to

12:40 14   these first couple of weeks after the 31st, what

12:40 15   particular specific steps the department took to collect

12:40 16   information about folks that responded to the Willow

12:40 17   incident.

12:40 18       A.  So we have a couple of internal systems that

12:40 19   lend themselves to this type of search.  We have

12:40 20   something called NFIRS, the letter N, dash, F-I-R-S,

12:40 21   which is an incident tracking system that the department

12:40 22   uses.  And within that incident tracking system, it not

12:40 23   only tracks the incident, but based on the input of the

12:40 24   supervisors, the employees that were assigned -- for

12:41 25   example, if you're assigned on a certain engine company

77

BARKLEY
Court Reporters

**EXHIBIT 15**
**277**

| | |
|---|---|
| 12:44 | 1 | -- in a few moments. |

12:44    1    -- in a few moments.

12:44    2        But first, let me circle back to you noting

12:44    3    that at one point -- some point in time, based on

12:44    4    information that the department had obtained from folks

12:45    5    at the scene, you determined that Mike Brown could not

12:45    6    have been one of the two people Captain Vander Horck had

12:45    7    described.

12:45    8        Can you place on the timeline, again, to the

12:45    9    best of your recollection, your best estimate, of

12:45   10    where -- when the department ruled out Mike Brown?

12:45   11    A.  I would say if it was -- probably within two

12:45   12    weeks after we got the -- the report from the sheriff's

12:45   13    department.

12:45   14    Q.  So you mentioned this process of going through

12:45   15    your -- is it NFIRS system --

12:45   16    A.  The letter N as in Nancy --

12:45   17    Q.  N --

12:45   18    A.  -- dash, F-I-R-S.

12:45   19    Q.  -- to -- to figure out all the folks who

12:46   20    responded to the Willow incident.

12:46   21        Once you got that information what did you do

12:46   22    next?  Did you start interviewing people?

12:46   23    A.  No.  We did not start to interview people.  I

12:46   24    do recall that we had discussions about the possibility

12:46   25    of simply bringing in everybody that was assigned to the

80

12:46  1  incident -- and I think that was somewhere between 40

12:46  2  and 50 people that we would need to bring in

12:46  3  individually -- give notice, comply with the rights,

12:46  4  allow them to have representation.  And we thought that

12:46  5  that probably was not the most prudent use of our

12:46  6  resources.  But it was a consideration as to, Hey, bring

12:46  7  everybody in.  Let's ask everybody and -- and how far

12:46  8  can we go?  And can we ask for or demand personal

12:47  9  devices?  And that -- that was a part of our discussion

12:47  10  as to the strategy about how to move forward.

12:47  11      Q.  That's very helpful.

12:47  12          So again, like, limiting ourselves to the first

12:47  13  couple of weeks -- so through mid-February of 2020 --

12:47  14  did the department interview any of those 40 to 50

12:47  15  people who you determined had responded to the scene?

12:47  16      A.  We did not.

12:47  17      Q.  And you also mentioned it being a consideration

12:47  18  of potentially trying to collect phones or other devices

12:47  19  of folks who had responded to the scene.

12:47  20          Did the department take any steps between

12:47  21  January 31st and mid-February to obtain any devices of

12:47  22  personnel who responded to the Willow incident?

12:47  23      A.  No, we did not.

12:48  24      Q.  Let me circle back to your conversation with

12:48  25  Mike Rivera that I think you testified happened either

BARKLEY
Court Reporters

**EXHIBIT 15**
**279**

12:48  1    on January 31st or shortly thereafter.  Is that right?

12:48  2        A.  Yes.

12:48  3        Q.  Can you tell me what Mike Rivera said in

12:48  4    response to what you said to him?

12:48  5        A.  Yes.  First, I was-- I was very careful not to

12:48  6    ask him questions because our employees, including Mike,

12:48  7    is a Firefighter Bill of Rights-protected employee,

12:48  8    which entitles him to be represented before we

12:48  9    interrogate him, if you will.  And so I called him and

12:48 10    provided him instruction without asking him any

12:48 11    questions or -- or -- or anything like that.

12:49 12            And he volunteered that he was not in

12:49 13    possession of any pictures and did not take any

12:49 14    pictures.  And I reiterated to him that, you know, at

12:49 15    this point my direct order to him was if he had them, to

12:49 16    maintain them.  And that was it.

12:49 17        Q.  And you testified that the department came upon

12:49 18    information that allowed the department to definitively

12:49 19    rule out Mike Brown as being one of the two individuals

12:49 20    based on where he was and when.

12:49 21            Did the department make any -- any kind of

12:49 22    determination ruling out Mike Rivera definitively?

12:49 23        A.  Yes.  Yes.  Again, based on the -- the -- you

12:49 24    know, we started looking -- doing a deeper dive into the

12:49 25    specific of the incident and who was where and when.  We

                                    82

BARKLEY
Court Reporters

**EXHIBIT 15**
**280**

12:50 1    quickly realized that, you know, Mike Rivera was not the

12:50 2    person in question.

12:50 3        Q.  And did that determination happen around the

12:50 4    same general time that you reached that conclusion with

12:50 5    respect to -- to Mike Brown, a couple of weeks into your

12:50 6    inquiry?

12:50 7        A.  Yes.

12:50 8        Q.  And you said that with respect to both of those

12:50 9    determinations, you based your conclusion based on where

12:50 10   Mike Brown and Mike Rivera were at particular times.

12:50 11       Where did you get that information from?

12:50 12       A.  We talked with Chief Marrone; and we looked at,

12:51 13   again, part of the information that we had with regards

12:51 14   to who responded.  But I think it was mostly our

12:51 15   discussions where Chief Marrone actually was there on

12:51 16   that -- that -- that first day and was able to give us a

12:51 17   little bit more in terms of, you know, the specifics

12:51 18   that happened that day.

12:51 19       Q.  And I -- I know you testified a few moments ago

12:51 20   that department didn't get very far in its efforts to

12:51 21   identify the two individuals during that initial

12:51 22   two-week period.

12:51 23       Did the department identify anyone else or

12:51 24   reach out to anyone else other than Mike Brown and Mike

12:51 25   Rivera?

WILLIAM MC CLOUD - CONFIDENTIAL

BARKLEY
Court Reporters

**EXHIBIT 15**
**281**

12:51  1        A.  Not that I recall, no.

12:51  2        Q.  Did the department make any effort in that

12:52  3  first two-week period to speak with the deputy who had

12:52  4  provided the information to Captain Vander Horck?

12:52  5        A.  I believe that we did reach out and were told

12:52  6  that they were not going to be made available to us.

12:52  7        Q.  Can you tell me when approximately the

12:52  8  department reached out to sheriff's department?

12:52  9        A.  It would have been in that two-week window, but

12:52 10  I can't be any more specific than that.

12:52 11        Q.  And so you reached out during that two-week

12:52 12  window and were told that the deputy could not be made

12:52 13  available.

12:52 14            Did the sheriff's department tell you why?

12:53 15        A.  No.  I can't remember specifically why.  I -- I

12:53 16  want to say that it was due to their investigation, but

12:53 17  I cannot remember specifically.  I remember that they

12:53 18  were not going to make him available to us.

12:53 19        Q.  When did the department become aware of the --

12:53 20  the name of that deputy who witnessed the two personnel

12:53 21  involved in the photos?

12:53 22        A.  That would have been sometime later.

12:53 23  Probably -- sometime in June, I think, when I had a

12:53 24  conversation with someone at the sheriff's department

12:54 25  and they gave us an actual name.  And at that point they

                                    84

BARKLEY
Court Reporters

12:54  1    were open to him being interviewed by our department.

12:54  2        Q.  And just for clarity, that deputy is Douglas

12:54  3    Johnson; is that right?

12:54  4        A.  Yes, it was Deputy Johnson.

12:54  5        Q.  Just to make sure I'm clear, did -- did the

12:54  6    department interview anyone else within the fire

12:54  7    department between January 31st and February 15th, 2020,

12:54  8    beyond the two individuals you've already talked about?

12:54  9        A.  No, we did not.

12:54  10       Q.  And did the department speak with anyone at the

12:54  11   sheriff's department during that window beyond the

12:54  12   initial conversations with Captain Vander Horck and your

12:55  13   request to speak with Deputy Johnson?

12:55  14       A.  It's -- we have -- to my knowledge, no.  But we

12:55  15   had about 3,000 -- closer to 4,000 employees.  There may

12:55  16   have been some unofficial conversations that I may not

12:55  17   be aware of that took place with the sheriff's

12:55  18   department.  I -- I could guess that the fire chief may

12:55  19   not have told me every time he spoke with his

12:55  20   counterpart, the sheriff.  And Chief Marrone, working in

12:55  21   that area, may have had some conversations that I may

12:55  22   not have been made aware of.

12:56  23       Q.  To -- that's helpful.  But to the -- the best

12:56  24   of your knowledge, there was no exchange of information

12:56  25   that were on the department's inquiry related to the

                                     85

BARKLEY
Court Reporters

**EXHIBIT 15**
**283**

| | | |
|---|---|---|
| 12:56 | 1 | information provided by Captain Vander Horck beyond what |
| 12:56 | 2 | we talked about; is that correct? |
| 12:56 | 3 | A.  That's correct, yes. |
| 12:56 | 4 | Q.  The department did not retain any outside |
| 12:56 | 5 | investigators or outside counsel to assist with an |
| 12:56 | 6 | inquiry between January 31st and February 15th, 2020; |
| 12:56 | 7 | correct? |
| 12:56 | 8 | A.  Correct. |
| 12:56 | 9 | Q.  But the department did later retain outside |
| 12:56 | 10 | assistance to assist with this investigation; right? |
| 12:56 | 11 | A.  Yes. |
| 12:56 | 12 | Q.  And did that happen on March 5th, 2020? |
| 12:56 | 13 | A.  Thereabout, I believe, yes. |
| 12:57 | 14 | Q.  And was that after there were reports in the |
| 12:57 | 15 | press that fire department personnel were involved in |
| 12:57 | 16 | taking or sharing of photos? |
| 12:57 | 17 | A.  Yes.  I believe that sometime prior to that, |
| 12:57 | 18 | March 6th or 5th.  But yeah.  There were reports in the |
| 12:57 | 19 | press. |
| 12:57 | 20 | Q.  And is that one of the -- one of the events |
| 12:57 | 21 | that prompted the department to retain outside |
| 12:57 | 22 | assistance to conduct investigation? |
| 12:57 | 23 | A.  Yeah.  One of the considerations, yes. |
| 12:57 | 24 | Q.  Did the department consider bringing in outside |
| 12:57 | 25 | assistance prior to that after receiving the information |

86

BARKLEY
Court Reporters

**EXHIBIT 15**
**284**

12:57  1    from Captain Vander Horck?

12:57  2        A.  I believe that we -- with regards to

12:58  3    conversations, I believe that we had some conversations

12:58  4    with some counsel.

12:58  5            MS. HASHMALL:  Chief McCloud, I'm just going to

12:58  6    advise you that the attorney doesn't want to ask you

12:58  7    about your communications involving counsel.  Those are

12:58  8    protected by the attorney-client privilege.  So do the

12:58  9    best to answer the questions without conveying any

12:58 10    information that involved your conversations with

12:58 11    counsel.

12:58 12            THE WITNESS:  Okay.

12:58 13            Then we did not reach out to any outside agency

12:58 14    to assist us with the investigation I think you asked me

12:58 15    about.

12:58 16    BY MS. BRYANT:

12:58 17        Q.  So by -- by March 5th, 2020, we talked about --

12:58 18    at that point the department decided to obtain outside

12:58 19    assistance; correct?

12:58 20        A.  Yes.

12:59 21        Q.  And is that because the department recognized

12:59 22    the seriousness of the allegations and that they called

12:59 23    for urgency?

12:59 24        A.  Yes.  I -- I believe at that point we had been

12:59 25    contacted by Ms. ███████ and that new information was

                                    87

BARKLEY
Court Reporters

**EXHIBIT 15**
**285**

| | | |
|---|---|---|
| 12:59 | 1 | brought to our attention, yes. |
| 12:59 | 2 | Q.  The department didn't open any kind of formal |
| 12:59 | 3 | investigation during that first two-week window after |
| 12:59 | 4 | receiving the information from Captain Vander Horck; is |
| 12:59 | 5 | that correct? |
| 12:59 | 6 | A.  Correct. |
| 12:59 | 7 | Q.  So you mentioned Ms. ██████.  Forgive me. |
| 01:00 | 8 | I'm not certain how to pronounce her name.  And that |
| 01:00 | 9 | information she brought to the department was -- helped |
| 01:00 | 10 | the department recognize the urgency of the need for an |
| 01:00 | 11 | investigation. |
| 01:00 | 12 | Let me -- I have a little bit of confusion |
| 01:00 | 13 | about the timeline, so I'm hoping you can help me |
| 01:00 | 14 | understand.  So I believe you testified earlier that the |
| 01:00 | 15 | department retained outside counsel to handle the |
| 01:00 | 16 | investigation on March 5th, 2020; is that right? |
| 01:00 | 17 | A.  Yes.  I believe that's when we got on our |
| 01:00 | 18 | outside investigator. |
| 01:00 | 19 | Q.  And it's my understanding that Ms. ██████ |
| 01:00 | 20 | came into the department with information on March 6, |
| 01:00 | 21 | 2020; is that right? |
| 01:01 | 22 | A.  Somewhere thereabout.  Yeah, it was March 6. |
| 01:01 | 23 | Q.  So -- I'm sorry. |
| 01:01 | 24 | So fair to say that the primary impetus for the |
| 01:01 | 25 | department opening an informal -- or a formal -- |

88

01:01  1    sorry -- investigation with the assistance of outside

01:01  2    counsel was the media reports about the department's

01:01  3    potential involvement in the taking and sharing of

01:01  4    photos; is that right?

01:01  5         MS. HASHMALL:  Objection.  Misstates the

01:01  6    witness's testimony.

01:01  7    BY MS. BRYANT:

01:01  8         Q.  Let me -- I think my question was a little

01:01  9    garbled, so let me rephrase that.

01:01  10        So Ms. ████████ complained to -- or submitted a

01:01  11   complaint to the department on March 6th, 2020; correct?

01:01  12        A.  Yes.  Somewhere thereabout, yes.

01:01  13        Q.  And the department opened a formal

01:01  14   investigation with assistance of outside counsel on

01:02  15   March 5th, 2020; correct?

01:02  16        MS. HASHMALL:  Objection.  Misstates the

01:02  17   witness's testimony.

01:02  18   BY MS. BRYANT:

01:02  19        Q.  You can answer.

01:02  20        A.  Dates aside, I believe that our decision to

01:02  21   bring in outside counsel was due to the complaint.  I

01:02  22   understand that you -- you're saying that the complaint

01:02  23   came before we brought on counsel.  That aside, my

01:02  24   memory is that that was the impetus for us to bring in

01:02  25   counsel -- or I'm sorry -- an investigator.

                              89

**EXHIBIT 15**
**287**

BARKLEY
Court Reporters

03:22  1    personal, not the business of the fire department.

03:22  2        Q.  And the department concluded that -- that

03:22  3    Captain Imbrenda's deletion of those inappropriate

03:22  4    photos that serve no business purpose was an attempt to

03:22  5    cover up his possession of these inappropriate photos;

03:22  6    correct?

03:22  7        A.  I'm not sure that we reached that conclusion

03:23  8    that his effort to -- I can't remember that specifically

03:23  9    being indicated in the report.  And I'm sure you'll

03:23  10   correct me if I'm wrong, but I don't recall that

03:23  11   specific language being in the report that his deleting

03:23  12   them was attempt to -- I'm sorry.  What was the word you

03:23  13   used?

03:23  14       Q.  So this relates to my -- to my prior question

03:23  15   as well about the department's conclusion that his

03:23  16   decision to delete was primarily self-serving.  The

03:23  17   department's letter to Captain Imbrenda also described

03:23  18   that decision as an attempt to cover up his role in the

03:23  19   reported misuse of the photos.

03:23  20            And so my question is, what made the department

03:23  21   reach the conclusion that his deletion of the photos was

03:23  22   an attempted cover-up that was primarily self-serving?

03:24  23       A.  Well, Captain Imbrenda was in a very unique

03:24  24   position in that we had talked earlier about the

03:24  25   discussions that were had at the executive level with

159

BARKLEY
Court Reporters

**EXHIBIT 15**
**288**

03:24  1    regards to photographs related to this incident and the

03:24  2    conversations that their use was made that our partners

03:24  3    in the sheriff's department were -- had photos and

03:24  4    shared photos.  And he was really at the highest level

03:24  5    of the department, a part of the very strategic

03:24  6    conversations with our department head about the

03:24  7    department's direction, how we were handling it, what

03:25  8    was our best course of action, what was appropriate and

03:25  9    not appropriate.  And that was -- he's in a very unique

03:25 10    position; that he was aware of the department's

03:25 11    intentions, the department's needs, what was

03:25 12    appropriate, and what was not appropriate.  And -- and,

03:25 13    you know, he had an opportunity and we believe that he

03:25 14    had an obligation to communicate to the department that

03:25 15    he was in possession of those photos, that they were out

03:25 16    there and he had them.  And he didn't do that.  He took

03:25 17    it upon himself to not only not communicate but then to

03:25 18    delete them for whatever reasons.  Having them was

03:25 19    inappropriate, sharing them was inappropriate, and sort

03:25 20    of what I hear in the law world is fruit of the

03:26 21    forbidden tree.

03:26 22          DEPOSITION OFFICER:  Can you repeat that.  I

03:26 23    can't hear you.

03:26 24          THE WITNESS:  I'm sorry.

03:26 25          What I hear in the law world is fruit of the

                                  160

WILLIAM MC CLOUD - CONFIDENTIAL

**BARKLEY**
Court Reporters

**EXHIBIT 15**
**289**

03:26   1    forbidden tree.  It was just the whole thing.

03:26   2          But in answer to your question, you know,

03:26   3    whether he deleted them for personal -- we had no reason

03:26   4    for him to have them.  We had no reason for him to

03:26   5    delete them once he did have them.  We certainly weren't

03:26   6    supportive of him sharing them.  Everything he did with

03:26   7    those photos was simply not in the business of the fire

03:26   8    department.  And so that's why we said that it was all

03:26   9    personal because it was not -- it is not the behavior

03:26  10    that the department wants to endorse.

03:26  11    BY MS. BRYANT:

03:26  12          Q.  And that has all very helpful.  And if I could

03:26  13    just try to -- to recap some of what -- what I heard in

03:26  14    your response there to make sure I'm understanding

03:26  15    correctly.

03:27  16          Given Captain Imbrenda's unique role within the

03:27  17    department and his knowledge that these photos were

03:27  18    inappropriate, that led the department to conclude that

03:27  19    his decision to delete the photos was primarily

03:27  20    self-serving; is that right?

03:27  21          A.  Yes.

03:27  22          Q.  And again, in the interest of time I'm going to

03:27  23    try to do some of this without looking at the document;

03:27  24    but if at any point it would be helpful to look at it to

03:27  25    refresh your recollection, I'm happy to do that.  But in

                                  161

WILLIAM MC CLOUD - CONFIDENTIAL

**BARKLEY**
Court Reporters

**EXHIBIT 15**
**290**

04:51  1      A.  Yes, Osby.

04:51  2      Q.  So there was a conversation between Chief Osby

04:51  3  and Sheriff Villanueva that day; correct?

04:51  4      A.  Yes.

04:51  5      Q.  All right.  And one of the reasons the fire

04:51  6  department was concerned by this information was that as

04:51  7  officer -- excuse me -- as Chief Marrone testified a

04:51  8  couple of weeks ago, protecting the dignity of those who

04:51  9  have perished is a concern of the fire department;

04:51 10  correct?

04:51 11      A.  Yes.

04:51 12      Q.  And did the fire department understand that the

04:51 13  dignity of those who perished might be compromised if

04:52 14  such photographs had been taken, shared, and transmitted

04:52 15  by members of the fire department?

04:52 16      A.  Yes.

04:52 17      Q.  And did I also understand you to say that

04:52 18  within a very short period of time or -- or days after

04:52 19  January 31st, you were able to compile a list of 40 to

04:52 20  50 fire department personnel who were at the crash scene

04:52 21  that day?

04:52 22      A.  Yes.

04:52 23      Q.  And it's true, isn't it, that between -- let me

04:52 24  back up.

04:52 25          And on that list of 40 to 50 personnel -- I

                              201

**EXHIBIT 15**
**291**

BARKLEY
Court Reporters

04:52  1    assume that -- that Tony Imbrenda's name was on that

04:52  2    list?

04:52  3        A.  Yes.

04:52  4        Q.  And Arlin Kahan's name was on that list?

04:52  5        A.  Yes.

04:52  6        Q.  And Brian Jordan's name was on that list?

04:53  7        A.  Yes.

04:53  8        Q.  And Mike Velazquez' name was on that list?

04:53  9        A.  Yes.

04:53  10       Q.  And tell me again, how soon after January 31st

04:53  11   were you able to compile that list of people?

04:53  12       A.  It was probably certainly within 48 hours.

04:53  13       Q.  Within two days?

04:53  14       A.  Yes.

04:53  15       Q.  And did I understand you to say that no effort

04:53  16   was made to interview any of these people before

04:53  17   February 15th of 2020?

04:53  18       A.  That's correct.

04:53  19       Q.  And what was the reason that no effort was made

04:53  20   to interview these people prior to February 15th, 2020?

04:53  21       A.  Well, it was a -- there was discussion about

04:54  22   who and how to go about conducting an investigation of

04:54  23   this scope that would involve 40 to 50 people.  And we

04:54  24   didn't have a lot to go on.  We had a very little bit of

04:54  25   information that we received from the sheriff's

                                202

WILLIAM MC CLOUD - CONFIDENTIAL

BARKLEY
Court Reporters

**EXHIBIT 15**
**292**

04:54  1    department.  And we made a decision that it wasn't in

04:54  2    our best interest to sort of bring everybody in as a

04:54  3    group and do a little bit of a fishing expedition, as it

04:54  4    would have been, as to who was there and who did or

04:54  5    didn't take photos.  And it would have involved

04:54  6    certainly a significant amount of time and energy to

04:54  7    bring all 40 to 50 people in.  And --

04:55  8        Q.  Was there -- forgive me for interrupting.

04:55  9    Please finish.

04:55 10        A.  And we just made a decision that that wasn't

04:55 11    the best way to proceed at that time.

04:55 12        Q.  Who's "we" when you say "we made the decision"?

04:55 13        A.  There was discussion with myself; with our risk

04:55 14    manager, who was Julia Kim; with our employee relations

04:55 15    chief, Patricia Chan; our attorney, Jenny Tan.  And we

04:55 16    were -- probably most of all with us having discussions,

04:55 17    the pros and cons, the feasibility of it, how we would

04:55 18    go about conducting such an investigation.

04:56 19        MS. HASHMALL:  Chief McCloud, I just want to

04:56 20    advise you that counsel doesn't want you to testify to

04:56 21    direct communications involving your counsel.

04:56 22        THE WITNESS:  Okay.

04:56 23    BY MR. JACKSON:

04:56 24        Q.  Was this a decision -- this decision not to

04:56 25    interview any of these 40 to 50 people, was the

203

04:56  1   decision -- was it a decision that was made at a

04:56  2   particular time, or was it a decision that was just made

04:56  3   over a course of days or a course of weeks?

04:56  4       A.  I would say it was a course of weeks.

04:56  5       Q.  Is there any other reason why no one was

04:56  6   interviewed prior to February 15th?

04:56  7       A.  I -- I think -- I cannot answer that question

04:57  8   as it violates attorney-client privilege and on the

04:57  9   advice of counsel.

04:57  10      Q.  Now, I believe you said that you were able to

04:57  11  reach out to Mike Rivera and to Mike Brown; correct?

04:57  12      A.  Yes, sir.

04:57  13      Q.  And when you reached out to Mr. Rivera, did you

04:57  14  send him an e-mail; or did you reach out by phone; or

04:57  15  was it face-to-face?

04:57  16      A.  I called him via phone.

04:57  17      Q.  How about with Mike Brown?  How did you reach

04:57  18  out to him?

04:57  19      A.  By way of phone.

04:57  20      Q.  Is there any reason that you couldn't have

04:57  21  placed phone calls to those other 40 or 50 people?

04:58  22      A.  We could have.

04:58  23      Q.  What was the reason you didn't?

04:58  24      A.  I cannot answer that question as it violates

04:58  25  attorney-client privilege.

                                204

BARKLEY
Court Reporters

**EXHIBIT 15**
**294**

04:58  1          Q.  Now, did I also hear you say that you sent

04:58  2  e-mail instructions to Mike Rivera, something to the

04:58  3  effect that "If you have photos, just hold them.  Don't

04:58  4  destroy them"?  Did I hear you say that?

04:58  5          MS. HASHMALL:  Objection.  Misstates the

04:58  6  witness's testimony.

04:58  7          Answer --

04:58  8          MR. JACKSON:  That's why I'm asking the

04:58  9  question, to make sure I understand his testimony.

04:58 10  BY MR. JACKSON:

04:58 11          Q.  Let's break it down.

04:58 12          Did you send an e-mail to Mike Rivera?

04:58 13          A.  No.  It was a phone call.

04:59 14          Q.  All right.  And did you give him instructions

04:59 15  during that phone conversation?

04:59 16          A.  Yes.

04:59 17          Q.  And tell me in substance what those

04:59 18  instructions were.

04:59 19          A.  That if he was in possession of any

04:59 20  photographs, that he was to hold on to them and not

04:59 21  delete them.

04:59 22          Q.  Did you give the same instructions to Mike

04:59 23  Brown?

04:59 24          A.  Yes.

04:59 25          Q.  Is there any reason why those instructions

205

04:59  1    couldn't have been sent out in a bulk e-mail to the 40

04:59  2    to 50 personnel who were identified as being at the

04:59  3    crash scene?

04:59  4        A.  I'm sorry.  Can you just ask me one more time.

04:59  5        Q.  Sure.  Is there any reason, sir, why those very

04:59  6    same instructions couldn't have been given to the 40 to

04:59  7    50 other personnel who were at the crash scene by way of

04:59  8    a bulk e-mail?

05:00  9        A.  I want to try to answer your question.  And I

05:00 10    will say, yes, that we could have sent a bulk e-mail.

05:00 11        Q.  Is there some reason you didn't?

05:00 12        A.  Yes.

05:00 13        Q.  And what was that reason?

05:00 14        A.  I cannot answer that question because that --

05:00 15    that's a privileged conversation that we had with

05:00 16    counsel.

05:00 17        Q.  Okay.  Now, I think I heard you say late in

05:00 18    your examination by Jennifer that -- and I'm quoting --

05:00 19    this is what I wrote down -- that this was not our best

05:00 20    moment.

05:00 21            Do you remember saying that about the fire

05:01 22    department and this whole issue of the photographs being

05:01 23    taken and shared and transmitted?

05:01 24        A.  Yes.

05:01 25        Q.  Would you agree with me that Tony Imbrenda's

206

BARKLEY
Court Reporters

**EXHIBIT 15**
**296**