1  JONATHAN C. McCAVERTY (State Bar No. 210922)
2  Principal Deputy County Counsel
   jmccaverty@counsel.lacounty.gov
3  OFFICE OF COUNTY COUNSEL
   General Litigation Division
4  500 West Temple Street, Suite 468
   Los Angeles, California 90012
5  Telephone:   (213) 974-1828
   Facsimile:   (213) 626-7446
6

7  Attorneys for Defendant
   LOS ANGELES COUNTY SHERIFF'S DEPARTMENT
8
   [Additional counsel continued on next page.]
9

10            **UNITED STATES DISTRICT COURT**

11   **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

12

13  VANESSA BRYANT,                      | **CASE NO. 2:20-cv-09582-JFW(Ex)**

14            Plaintiff,                 | **DEFENDANTS' MEMORANDUM
                                           OF POINTS AND AUTHORITIES
15                                         IN SUPPORT OF MOTION FOR
        v.                                 SUMMARY JUDGMENT**
16
    COUNTY OF LOS ANGELES, et al.,       | Hearing Date:  December 27, 2021
17                                         Time:          1:30 p.m.
            Defendants.
18                                         Pretrial Conf.: February 4, 2022
19                                         Time:           8:00 a.m.
20                                         Trial Date:     February 22, 2022
21                                         Time:           8:30 a.m.
22                                         Assigned to Hon. John F. Walter and
23                                         Magistrate Judge Charles F. Eick
24
25
26
27
28
   498317.6

1  [Additional counsel, continued from previous page:]

2
LOUIS R. MILLER (State Bar No. 54141)

3  smiller@millerbarondess.com
   MIRA HASHMALL (State Bar No. 216842)

4  mhashmall@millerbarondess.com

5  JASON H. TOKORO (State Bar No. 252345)
   jtokoro@millerbarondess.com

6  CASEY B. SYPEK (State Bar No. 291214)

7  csypek@millerbarondess.com
   EMILY A. RODRIGUEZ-SANCHIRICO (State Bar No. 311294)

8  esanchirico@millerbarondess.com

9  MILLER BARONDESS, LLP

10 1999 Avenue of the Stars, Suite 1000
   Los Angeles, California 90067

11 Telephone:  (310) 552-4400

12 Facsimile:  (310) 552-8400

13 Attorneys for Defendants

14 COUNTY OF LOS ANGELES, LOS ANGELES COUNTY FIRE DEPARTMENT,
   JOEY CRUZ, RAFAEL MEJIA, MICHAEL RUSSELL, and RAUL VERSALES

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ............................................................................. 8

II.  UNDISPUTED FACTS .................................................................. 11

   A.  The January 26, 2020 Accident ............................................ 11

   B.  The LASD Crash Site Photos ............................................... 12

      1.  LASD Receives a Complaint ..................................... 12

      2.  LASD Takes Immediate Action ................................ 13

      3.  The Internal Affairs Bureau Investigates and LASD Issues Discipline .............................................. 14

   C.  LACFD Crash Site Photos .................................................... 14

      1.  LACFD Receives a Call from LASD ........................ 14

      2.  LACFD Learns of Potential Photo Sharing and Starts an Investigation ............................................ 15

   D.  The Forensic Examination ..................................................... 15

III.  SUMMARY JUDGMENT STANDARD ..................................... 16

IV.  PLAINTIFF LACKS ARTICLE III STANDING ........................ 16

V.  PLAINTIFF'S *MONELL* CLAIM FAILS ................................... 18

   A.  There Is No Predicate Constitutional Violation .................. 18

   B.  The Entity Defendants Did Not *Cause* A Constitutional Violation ..... 20

      1.  Failure to Train ......................................................... 20

         (a)  Deliberate Indifference ................................... 20

         (b)  There Is No "Pattern of Similar Constitutional Violations" ........................ 21

         (c)  The Entity Defendants Have Extensive Policies .............. 23

      2.  Failure to Adequately Investigate/Discipline ........... 24

      3.  Pattern of Practice or Custom ................................... 25

VI.  THE NEGLIGENCE CLAIMS ARE UNTENABLE ................... 26

   A.  There Is No Duty .................................................................. 26

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

B.  The Deputy Defendants Did Not Breach Any Duty Owed .................. 28

C.  Plaintiff's Harm Is Based On Speculation ............................................ 29

D.  Any Negligence Claim Against The LACFD Employees Would
    Fail For The Same Reasons ..................................................................... 29

VII.  DEPUTY CRUZ DID NOT INVADE PLAINTIFF'S PRIVACY ................ 30

VIII.  CONCLUSION .............................................................................................. 31

# <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

## <u>FEDERAL CASES</u>

*Burgess v. Fischer,*
    735 F.3d 462 (6th Cir. 2013) ............................................................................ 24

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ........................................................................................ 16

*City of Canton, Ohio v. Harris,*
    489 U.S. 378 (1989) ..................................................................... 21, 22, 26, 29

*Connick v. Thompson,*
    563 U.S. 51 (2011) .................................................................................. passim

*Crabbs v. Pitts,*
    No. 2:16-cv-0387, 2018 WL 5262397 (S.D. Ohio Oct. 23, 2018) ................. 24

*Flores v. County of Los Angeles,*
    758 F.3d 1154 (9th Cir. 2014) .................................................................. 21, 22

*Gonzalez v. City of Desert Hot Springs,*
    No. CV 17-01397 TJH (SPx), 2017 WL 10562938 (C.D. Cal. Dec. 20,
    2017) ............................................................................................................... 28

*Hassan v. Facebook, Inc.,*
    No. 19-cv-01003-JST, 2019 WL 3302721 (N.D. Cal. July 23, 2019) ............ 30

*Lamorie v. Davis,*
    485 F. Supp. 3d 1065 (D. Ariz. 2020) ............................................................ 19

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ........................................................................................ 16

*Marsh v. County of San Diego,*
    680 F.3d 1148 (9th Cir. 2012) .................................................................. passim

*McClain v. SBC Sheriff's Dep't,*
    No. ED CV 17-01178-CJC (PLA), 2018 WL 3105248 (C.D. Cal. June
    21, 2018) ......................................................................................................... 24

*Monell v. Dep't of Soc. Servs. of City of N.Y.,*
    436 U.S. 658 (1978) .................................................................................. passim

*Olejnik v. England,*
    147 F. Supp. 3d 763 (W.D. Wis. 2015) ........................................................... 19

*Opperman v. Path, Inc.,*
    87 F. Supp. 3d 1018 (N.D. Cal. 2014) ............................................................ 31

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

*Orff v. City of Imperial*,
No. 17-CV-0116 W (AGS), 2017 WL 5569843 (S.D. Cal. Nov. 17,
2017)..................................................................................................................30

*Probodanu v. Sessions*,
387 F. Supp. 3d 1031 (C.D. Cal. 2019)..........................................................16

*Rizzo v. Goode*,
423 U.S. 362 (1976) ....................................................................................21, 29

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021) ................................................................................16, 17

*Trevino v. Gates*,
99 F.3d 911 (9th Cir. 1996)...............................................................................25

*Tsao v. Desert Palace, Inc.*,
698 F.3d 1128 (9th Cir. 2012)....................................................................18, 24

*Wettstein v. County of Riverside*,
No. EDCV 19-1298 JGB (KKx), 2020 WL 2199005 (C.D. Cal. Jan. 22,
2020)........................................................................................22, 25, 26


**STATE CASES**

*Brown v. USA Taekwondo*,
11 Cal. 5th 204 (2021)............................................................10, 27, 28, 29

*Catsouras v. Dep't of California Highway Patrol*,
181 Cal. App. 4th 856 (2010).........................................10, 27, 28, 30

*Hill v. Nat'l Collegiate Athletic Ass'n*,
7 Cal. 4th 1 (1994).............................................................................30, 31

*Ignat v. Yum! Brands, Inc.*,
214 Cal. App. 4th 808 (2013)............................................................30

*Mezger v. Bick*,
66 Cal. App. 5th 76 (2021)...............................................................30

*Padilla v. Rodas*,
160 Cal. App. 4th 742 (2008).............................................................29

*Rowland v. Christian*,
69 Cal. 2d 108 (1968) .......................................................10, 27, 28

*Williams v. State*,
34 Cal. 3d 18 (1983) ..............................................................................27

**FEDERAL STATUTES**

42 U.S.C. § 1983................................................................................................9, 18

**STATE STATUTES**

Cal. Civ. Code § 1714...........................................................................................27

Cal. Civ. Code § 1714(a).......................................................................................27

Cal. Civ. Proc. Code § 129 ...............................................................................18, 23

Cal. Civ. Proc. Code § 129(a)...............................................................................18

Cal. Gov't Code § 815 .....................................................................................26, 30

Cal. Gov't Code § 815.2(a)............................................................................26, 29, 30

**FEDERAL RULES**

Fed. R. Civ. P. 56(a) .............................................................................................16

**OTHER AUTHORITIES**

RESTATEMENT (SECOND) OF TORTS § 652D cmt. a....................................................30

U.S. Const. art. III........................................................................................8, 16, 17

# I.   __INTRODUCTION__

The County of Los Angeles ("County") and its governing Board of Supervisors have great sympathy for Plaintiff Vanessa Bryant and her tragic loss. They reiterate their condolences.  It was a horrific accident that took nine innocent lives.  But the County did not cause it.  County personnel worked tirelessly to protect the crash site, identify the victims, and notify the families.  As for this lawsuit, it is without legal merit and should be dismissed.

Plaintiff's First Amended Complaint ("FAC") alleges claims for *Monell* liability, negligence, and invasion of privacy.  Plaintiff contends that the County, through the Los Angeles County Sheriff's Department ("LASD") and Los Angeles County Fire Department ("LACFD"), violated her rights by taking and sharing photos of the January 26, 2020 helicopter crash site.

The FAC suffers from a threshold defect.  It is undisputed that the complained-of photos have never been in the media, on the Internet, or otherwise publicly disseminated.  Instead, Plaintiff testified that this case is about her "having to *fear* those photographs surfacing."  But a preemptive, speculative lawsuit about what "may" or "could" happen, as Plaintiff testified, fails as a matter of law.  There is no Article III standing to sue for hypothetical harm.

Plaintiff's fear is also not reasonable.  The FAC alleges that the crash site photos were deleted.  When Plaintiff questioned the deletions, the County sought a neutral forensic examination by an independent examiner.  Plaintiff agreed.  The parties selected Kroll's Forensic Investigations and Intelligence team.  After reviewing over 20 LASD and LACFD devices, Kroll confirmed that there are *no* photos containing victims' remains and *no* evidence of public dissemination.  There is therefore nothing for Plaintiff to fear.  The photos are gone and, according to Kroll and Plaintiff's own expert, cannot be recovered.

The FAC also fails on the merits.  Plaintiff alleges that the County, LASD, and LACFD ("Entity Defendants") are liable under *Monell*.  But there is no

8

1  predicate constitutional violation of Section 1983, which is the "touchstone" of a

2  *Monell* claim.  In fact, Plaintiff dropped her standalone 1983 claim when she filed

3  the FAC.

4         To conjure a constitutional violation, Plaintiff tries to stretch *Marsh v. County*

5  *of San Diego*, 680 F.3d 1148 (9th Cir. 2012), where the analysis—and the facts—

6  involved "publication of death images."  *Id*. at 1154.  There, a former prosecutor

7  sent autopsy photos of the remains of a young child to a newspaper and a television

8  station so they would be released publicly.  *Id*. at 1152.  The Ninth Circuit

9  determined that sending an "autopsy photograph to the press" shocked the

10 conscience because, "given the viral nature of the Internet," the victim's mother

11 "might easily stumble upon photographs of her dead son on news websites, blogs or

12 social media websites."  *Id.* at 1155.

13        It is undisputed that there is nothing like that here.  Instead, Plaintiff is suing

14 based on:  (i) sharing of photos internally among first responders who were working

15 the command post the day of the crash; (ii) one deputy showing a friend photos on

16 his phone; and (iii) one LACFD employee showing other fire department public

17 information officers, who were also at the crash site, photos on his phone.  Plaintiff

18 paints a nefarious picture, but the facts do not support it.

19        Plaintiff cannot satisfy the remaining *Monell* elements.  There is no evidence

20 that County employees "often photocopy and distribute autopsy photographs for

21 illegitimate purposes without the consent of the family," no evidence that the

22 County's training and policies constitute "'deliberate indifference' to her rights,"

23 and no evidence that the purportedly "inadequate training 'actually caused' the

24 deprivation of her rights."  *Marsh*, 680 F.3d at 1159-60 (citation omitted).

25        Nor is there evidence of a "persistent and widespread" practice of sharing

26 "death images" within LASD or LACFD.  This was the first time LASD and

27 LACFD confronted allegations of improper photo sharing, and they took appropriate

28 action.  Every action was aimed at preventing harm, not causing it.

1    The negligence claim against the Deputy Defendants[1] fares no better.
2   Plaintiff cannot establish an applicable duty.  In *Catsouras v. Dep't of California*
3   *Highway Patrol*, 181 Cal. App. 4th 856 (2010), the court held that the "special
4   relationship" doctrine did *not* "provide the underpinnings of a duty of care." *Id.* at
5   881.  Instead, the court used the so-called *Rowland* factors to find a duty "not to
6   place decedent's death images on the Internet for . . . lurid titillation." *Id.* at 886.
7   But the California Supreme Court rejected that analysis earlier this year.  If there is
8   no special relationship, as here, the Court cannot proceed to *Rowland* to find a duty
9   that would not otherwise exist.  *Brown v. USA Taekwondo*, 11 Cal. 5th 204, 212-13
10  (2021).

11    In *Catsouras*, the court found that CHP officers owed a duty not to place
12  photos on the Internet "under the particular circumstances" of that case.  181 Cal.
13  App. 4th at 888.  The breach was that officers emailed photos of the plaintiffs'
14  daughter who died in a car crash "to members of the public," and "more than 2,500
15  Internet Web sites in the United States and the United Kingdom posted the
16  photographs." *Id.* at 865.  The photos "spread across the Internet like a malignant
17  firestorm," and "Internet users at large then taunted [the plaintiffs] with the
18  photographs." *Id.* at 863.

19    The facts here are completely different.  There are no County crash site
20  photos on the Internet, in the media, or anywhere.  The photos were not emailed or
21  texted to any members of the public.  As for Plaintiff's harm, it is based on
22  speculation about what "might" happen.

23    The invasion of privacy claim is alleged against Deputy Cruz, who showed
24  photos on his phone to a friend.  The phone did not leave his hand.  This does not
25  suffice to support a claim for invasion of privacy.  One person does not qualify as

26
27  [1] The Deputy Defendants are Joey Cruz, Michael Russell, Raul Versales, and Rafael Mejia.  The Entity Defendants are included on a companion claim for vicarious liability, along with unnamed "members of the Fire Department."  (FAC ¶ 97.)
28

1   "the public at large," as the law requires, rendering the showing not actionable

2   (albeit inappropriate and the basis for discipline).

3   **II.**     **UNDISPUTED FACTS**

4         **A.**     **The January 26, 2020 Accident**

5         On the morning of Sunday, January 26, 2020, a helicopter crashed with nine

6   individuals, including Plaintiff's husband and daughter, onboard.  (Separate

7   Statement of Undisputed Facts ("SSUF") ¶ 1.)  The crash occurred in Calabasas, not

8   far from hiking and mountain biking trails.  (*Id*. ¶ 2.)  Civilian cyclists called 911

9   and took photos of the scene.  (*Id*. ¶ 3.)

10        Due to the dangerous terrain, only two deputies made it to the actual crash site

11  that morning.  (*Id*. ¶ 4.)  After they secured the perimeter and directed hikers and

12  cyclists away, one of them, Deputy Johnson, started his standard investigation

13  process, as he had been trained to do.  (*Id*. ¶ 5.)  He took photos of the crash to

14  document the accident, identify the downed aircraft, and communicate to the

15  command post what resources were needed.  (*Id*. ¶ 6.)  At that time, no one knew

16  who the helicopter belonged to, who was on board, and what had happened.

17  (*Id*. ¶ 7.)

18        Following standard procedure, Deputy Johnson sent the photos to the officer

19  running the command post, Deputy Versales.  (*Id*. ¶ 8.)  When Deputy Versales

20  forwarded the photos to the other personnel at the command post, no one knew what

21  had happened or who had been on board.  (*Id*. ¶ 9.)

22        By mid-morning, media outlets had reported that Kobe Bryant had been one

23  of the passengers.  (*Id*. ¶ 10.)  As reporters and fans started flocking to the site,

24  deputies expanded the perimeter and started closing down the surrounding areas,

25  restricting it only to authorized emergency personnel.  (*Id*. ¶ 11.)

26        By afternoon, multiple agencies were on scene: the National Transportation

27  Safety Board ("NTSB"), Federal Aviation Administration, Federal Bureau of

28  Investigation, County Department of Medical Examiner-Coroner ("DMEC"),

Malibu Search & Rescue ("Malibu SAR"), LACFD, and LASD.  (*Id*. ¶ 12.)  Every agency took photos to document the crash site.  (*Id*. ¶ 13.)  NTSB's crash site photos appeared in the L.A. Times on February 28, 2020 and October 23, 2021.  (*Id*. ¶ 14.)

Meanwhile, Plaintiff drove to LASD's Malibu/Lost Hills Station and asked to meet with Sheriff Villanueva.  (*Id*. ¶ 15.)  After learning her husband and daughter had died, she had one request: make sure the area is secure.  (*Id*. ¶ 16.)  She testified in deposition that she asked Sheriff Villanueva to make sure there were no photos of her family: "If you can't bring my husband and baby back, please make sure no one takes photographs of them.  Please secure the area." (*Id*. ¶ 17.)  Sheriff Villanueva complied, declaring a no-fly zone and redoubling efforts to keep the media away. (*Id*. ¶ 18.)

DMEC's Special Operations Response Team arrived early the next morning and took photos of the victims before removing the remains.  (*Id*. ¶ 19.)  In the case of three of them, DMEC had to rappel into a ravine with the help of Malibu SAR volunteer deputies.  (*Id*. ¶ 20.)  LACFD firefighters stayed on site to make sure emergency personnel were safe, especially from the toxic fumes.  (*Id*. ¶ 21.)

### B.   The LASD Crash Site Photos

#### 1.   LASD Receives a Complaint

On January 29, 2020, the Sheriff's Information Bureau ("SIB") received an email from a concerned citizen.  (SSUF ¶ 22.)  The email stated that a deputy had shown crash site photos on his phone to someone at the Baja California Bar and Grill in Norwalk.  (*Id*. ¶ 23.)  SIB shared the email with LASD command staff, who launched an immediate inquiry.  (*Id*. ¶ 24.)

By the next day, LASD had identified Deputy Cruz as the deputy and learned that he had shown photos on his cellphone to one of his friends, Victor Gutierrez, the bartender in Norwalk.  (*Id*. ¶ 25.)  Deputy Cruz was a young deputy trainee who had been at LASD for less than a year.  (*Id*. ¶ 26.)  He was working the incident with his training officer, Deputy Mejia.  (*Id*. ¶ 27.)

According to Gutierrez, he saw between one and three photos, which Deputy Cruz swiped through while holding his phone. (*Id*. ¶ 28.)  He recalled seeing various body parts in the debris field. (*Id*. ¶ 29.)  Deputy Cruz did not show the photos to anyone else at the bar; but he did try to show scene photos to his niece, who refused to look at them. (*Id*. ¶¶ 30-31.)

### 2.   LASD Takes Immediate Action

When Sheriff Villanueva learned about the potential showing of crash site photos, he directed his personnel to launch an immediate inquiry and make sure *no* photos got outside the department. (SSUF ¶ 32.)  He said if everyone was honest, did not publicly disseminate any photos, and deleted them, they would receive a performance log entry in their personnel file in lieu of discipline. (*Id*. ¶ 33.)

Lost Hills Station Lieutenant Hector Mancinas and Sergeant Marcus Phillips interviewed 28 deputies, reserve deputies, sergeants and civilian volunteers. (*Id*. ¶ 34.)  By January 31, 2020, they determined that all LASD personnel who had taken, shared or received crash site photos had deleted them. (*Id*. ¶ 35.)  Only Deputy Cruz had shown a photo to anyone outside LASD. (*Id*. ¶ 36.)

Sheriff Villanueva took this action to make sure no photos got out, as Plaintiff requested, and because he believed it was the right thing to do. (*Id*. ¶ 37.)  As the Sheriff testified:

> **Q**: Is there—is it true that there was no order given to delete any photographs?  Is that true or untrue?
>
> **A**: I said that no photograph is ever going to see the light of day.  Cannot.  Do not want to harm these families any further.
>
> **Q**: Sheriff Villanueva, do you think it's fair to say that you encouraged— through your directions, that you encouraged members of the department to delete accident scene photos?
>
> **A**: I can tell you I did exactly what was needed to be done to ensure there was no further harm to the family.  And . . . if I had to do it all over again, I'd probably make the exact same decision. (*Id*. ¶ 38.)

### 3.    The Internal Affairs Bureau Investigates and LASD Issues Discipline

Once the initial inquiry was complete, the Internal Affairs Bureau ("IAB") took over and conducted a comprehensive investigation.  (SSUF ¶ 39.)  That is the standard operating procedure at LASD.  (*Id*. ¶ 40.)  IAB interviewed 41 witnesses and compiled a comprehensive 1,140-page report.  (*Id*. ¶ 41.)

The investigation revealed that the photos came from the first deputy on scene, Deputy Johnson.  (*Id*. ¶¶ 42-43.)  Deputy Johnson sent the photos to Deputy Versales, who was handling communications at the command post.  (*Id*. ¶ 44.)  Deputy Versales sent the scene photos to Deputy Rafael Mejia, who was working with dispatch to help identify the helicopter.  (*Id*. ¶ 45.)

Deputy Mejia sent the photos to two deputies who were also on scene, including his trainee, Deputy Cruz.  (*Id*. ¶ 46.)  Deputy Cruz sent the photos to Deputy Michael Russell, who was at the bottom of the command post helping to keep unauthorized individuals and the media away.  (*Id*. ¶ 47.)  Deputy Russell sent the photos to a deputy who was working at another station but planned on responding to the scene the following day.  (*Id*. ¶ 48.)

IAB thoroughly investigated and concluded that some of the internal sharing of crash site photos could have been handled differently.  (*Id*. ¶ 49.)  Deputy Cruz was suspended for 10 days.  (*Id*. ¶ 50.)

### C.    LACFD Crash Site Photos

#### 1.    LACFD Receives a Call from LASD

On January 31, 2020, LASD Captain Matthew Vander Horck[2] called LACFD Deputy Fire Chief Anthony Marrone.  (SSUF ¶ 51.)  He told Chief Marrone that there was a complaint about a deputy sharing crash site photos containing victim

---

[2] Captain Vander Horck's subsequent transfer to a new assignment had nothing to do with this incident.  (SSUF ¶ 52.)

remains.  (*Id*. ¶ 53.)  He advised Chief Marrone that there were two LACFD employees at the crash site on January 26, 2020 who might have taken or received photos.  (*Id*. ¶ 54.)

Chief Marrone notified Deputy Fire Chief William McCloud, who oversaw the Leadership and Professional Standards Bureau at that time.  (*Id*. ¶ 55.)  LACFD worked to identify the personnel who had been present on the first day of the crash site investigation.  (*Id*. ¶ 56.)  At that time, there were no allegations that LACFD personnel had shared photos improperly.  (*Id*. ¶ 57.)

### 2. LACFD Learns of Potential Photo Sharing and Starts an Investigation

On March 6, 2020, a civilian witness reported to LACFD that an LACFD employee had been showing crash site photos on his phone at a first responders awards event on February 15, 2020.  (SSUF ¶ 58.)

LACFD hired an outside investigator and directed the three LACFD captains who took photos to turn over their cellphones and laptops to be forensically imaged.  (*Id*. ¶ 59.)  Like LASD, LACFD determined that (i) all crash site photos had been deleted; and (ii) no one had sent a photo to anyone outside LACFD.  (*Id*. ¶ 60.)

The investigation revealed that then-PIO Captain Imbrenda had shown crash site photos on his phone to one LACFD employee and two Los Angeles Fire Department Captains.  (*Id*. ¶ 61.)  They had also been working the incident.  (*Id*. ¶ 62.)  Captain Imbrenda was disciplined for violating LACFD's Standards of Behavior and Code of Ethics.  (*Id*. ¶ 63.)  Two other LACFD employees, who had sent photos to Captain Imbrenda, were also disciplined.  (*Id*. ¶ 64.)

### D. The Forensic Examination

After this lawsuit was filed, the parties agreed to have an independent forensic examiner, Kroll's Forensic Investigations and Intelligence team, examine the devices of over 20 LASD and LACFD employees.  (SSUF ¶ 65.)  Because almost two years had passed, many of the individuals had upgraded their phones, but they

made the devices they had available.  (*Id*. ¶ 66.)  Kroll reached the same conclusion the County had: there were no photos on any of the devices.  (*Id*. ¶ 67.)

To date, almost two years after the crash, it is undisputed that no LASD or LACFD photos have been posted on the Internet, released in the media, or otherwise publicly disseminated.  (*Id*. ¶ 68.)  The photos cannot be recovered.  (*Id*. ¶ 69.)

## III.   SUMMARY JUDGMENT STANDARD

A court grants summary judgment where the moving party shows there is no dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The material facts here are not in dispute.

## IV.   PLAINTIFF LACKS ARTICLE III STANDING

Article III standing is a jurisdictional requirement.  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).  A plaintiff must show (i) an injury in fact that is concrete and particularized; (ii) that the injury was caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief.  *Id*.; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 578 (1992) (holding that respondents lacked standing).  The plaintiff bears the burden of establishing standing. *TransUnion*, 141 S. Ct. at 2207-08; *Lujan*, 504 U.S. at 561.

The "concrete-harm requirement" is "essential to the Constitution's separation of powers."  *TransUnion*, 141 S. Ct. at 2207.  To satisfy the requirement, a plaintiff must show an injury that is "real, and not abstract."  *Id*. at 2204 (citation omitted).  A hypothetical injury that *may* or *could* occur does not suffice, because the "mere risk of future harm" is not a *concrete* harm.  *Id*. at 2210-11; *Probodanu v. Sessions*, 387 F. Supp. 3d 1031, 1039 (C.D. Cal. 2019) ("Fear of some hypothetical, future harm is insufficient to satisfy standing's injury-in-fact requirement.").

In *TransUnion*, the class members who *did* have standing had suffered a real harm—misleading credit reports identifying them as potential terrorists *had been publicly disseminated* to third-party businesses.  141 S. Ct. at 2208-09.  The credit

reports of class members who did *not* have standing *were not publicly disseminated*—the reports were still misleading but were maintained internally.  *Id.* at 2210.  The Supreme Court held that "[t]he mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm."  *Id.*  There is a difference, the Court explained, between *intra*-company disclosures and public dissemination.  *Id.* at n.6 (rejecting "internal publication" argument).

The plaintiffs in *TransUnion* pivoted to a separate argument, contending that the "risk of future harm"—that the misleading reports might one day be released to third parties—satisfied Article III.  141 S. Ct. at 2210.  The Court rejected the "risk of future harm" argument, holding that "[i]f the risk of future harm materializes and the individuals suffers a concrete harm, then the harm itself, and not the pre-existing risk, will constitute a basis for the person's injury and for damages."  *Id.* at 2211.

As in *TransUnion*, Plaintiff testified that this lawsuit is about her "risk of future harm" (SSUF ¶ 70):

- Plaintiff testified that "[i]t's possible that one day these will surface." (*Id.* ¶ 71.)  When asked whether any photos had *actually* surfaced, she answered:  "Not to my knowledge.  Not to my knowledge."  (*Id.* ¶ 72.)

- Plaintiff confirmed that she had never seen any photos of her husband or daughter.  (*Id.* ¶ 73.)

- In response to the question "[s]o you have no knowledge one way or the other . . [o]f any photograph of the crash site taken by [LASD or LACFD] personnel being posted on the internet or given to the media.  Is that correct?", Plaintiff testified, "[y]eah, that's correct."  (*Id.* ¶ 74.)

Almost two years since the crash, there are no County-disseminated photos. (*Id.* ¶¶ 75-76.)  A court "cannot simply presume a material risk of concrete harm." *TransUnion*, 141 S. Ct. at 2212 (citation omitted).  Plaintiff does not have standing.[3]

---

[3] Even if photos were to surface one day, Plaintiff would still have hurdles to

## V.      PLAINTIFF'S *MONELL* CLAIM FAILS

Public entities cannot be held responsible for the actions of their employees based on *respondeat superior*.  *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).  A plaintiff must establish that a constitutional violated occurred and that the public entity had a "policy or custom" that: (i) amounted to deliberate indifference of plaintiff's constitutional rights, and (ii) the policy was the moving force behind a constitutional violation.  *Id*.; *see Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1146 (9th Cir. 2012) ("Under *Monell*, a plaintiff must also show that the policy at issue was the 'actionable cause' of the constitutional violation, which requires showing both but for and proximate causation." (citation omitted)) (affirming order granting summary judgment).

### A.      There Is No Predicate Constitutional Violation

Claims under Section 1983 are contingent on a violation of constitutional rights:  "[T]he touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution."  *Monell*, 436 U.S. at 690-91.

Under *Marsh*, sending an autopsy photograph of a plaintiff's family member to the press can violate a plaintiff's substantive due process right to privacy.  680 F.3d at 1153-55.  A violation of California Civil Procedure Code section 129 may also violate a plaintiff's procedural due process rights.  *Id*. at 1155-58.  That statute prohibits the "copy, reproduction, or facsimile" of any photographs "taken by or for the coroner at the scene of death."  Cal. Civ. Proc. Code § 129(a).

---

establish a real, concrete injury—she would have to show that the photos:  (i) came from County employees; and (ii) depicted her family members.  Neither fact is a foregone conclusion.  It is undisputed that at least three non-County agencies were on-site taking photos on the day of the crash; and, in fact, a crash site photo from the NTSB appeared in the Los Angeles Times.  (SSUF ¶¶ 13-14.)  Speculation about crash site photos started before there were any allegations about the County.  (*Id*. ¶ 77.)  And seven other people died in the crash.  (*Id*. ¶ 1.)

Plaintiff does not allege that anyone violated her procedural due process rights, nor could she.  (FAC ¶ 79.)  She testified that she does not have a problem with anything DMEC did; she understands that they needed to take photos of the bodies.  (SSUF ¶ 78.)  It is also undisputed that autopsy photos (or any photos "taken by or for the coroner") were never copied, reproduced, faxed, or otherwise published.  (*Id*. ¶ 79.)  Accordingly, Plaintiff alleges only a violation of her substantive due process rights based on *Marsh*.

In *Marsh*, a former prosecutor sent autopsy photos of the remains of a young child to a newspaper and a television station with the goal of having them released publicly.  680 F.3d at 1152.  The Ninth Circuit determined that sending an "autopsy photograph to the press" shocked the conscience because, "given the viral nature of the Internet," the victim's mother "might easily stumble upon photographs of her dead son on news websites, blogs or social media websites."  *Id.* at 1155.  The decision was based on the "publication of death images."  *Id*. at 1154.  The relevant constitutional right, which the court addressed for the first time, was the "federal privacy right to control public dissemination of a family member's death images."  *Id.* at 1152.

Here, there is no real and concrete possibility that Plaintiff might "stumble upon" the photos, because the photos were, as the County, Kroll and Plaintiff's own expert all confirmed, deleted.  (SSUF ¶ 80.)  Plaintiff has never seen photos of her loved ones.  (*Id*. ¶ 73.)  With respect to purported scene photos third parties sent her, Plaintiff does not know what the photos show or who they came from.  (*Id*. ¶ 81.)

On-point case law negates the claim here:  *see, e.g.*, *Lamorie v. Davis*, 485 F. Supp. 3d 1065, 1073 (D. Ariz. 2020) (holding that conduct failed to shock the conscience as there was "no publication of [the child's] autopsy photos"); *Olejnik v. England*, 147 F. Supp. 3d. 763, 777-78 (W.D. Wis. 2015) (no substantive due process violation because medical examiner "made no public disclosure or display" of the decedent's "death or autopsy").

### B.   The Entity Defendants Did Not *Cause* A Constitutional Violation

In *Marsh*, because the "federal privacy right to control public dissemination of a family member's death images" had never been established, the Ninth Circuit held that the former prosecutor was entitled to qualified immunity.  680 F.3d at 1152, 1159-60.  The court then rejected the *Monell* claim because an "isolated instance" is not evidence of a policy, there was no evidence that county employees "often photocopy and distribute autopsy photographs for illegitimate purposes without the consent of the family," and the plaintiff had not demonstrated that the county's training and policies constituted "'deliberate indifference' to her rights, or that the inadequate training 'actually caused' the deprivation of her rights."  *Id*. at 1159-60 (citation omitted).

Plaintiff's *Monell* claim here has the same problems that made the Ninth Circuit affirm summary judgment for the defense in *Marsh*.  Plaintiff alleges that the Entity Defendants: (i) failed to train their employees regarding photos of human remains (and should have established a specific policy on that issue); (ii) failed to adequately investigate this incident and discipline the involved personnel; and (iii) have a "pattern of practice and/or custom of unnecessarily taking and sharing death images."  (FAC ¶¶ 81-86.)  The undisputed facts negate the claim.

#### 1.   Failure to Train

##### (a)   Deliberate Indifference

*Monell* normally requires an expressly adopted official policy, or a longstanding practice or custom.  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  It is only "[i]n limited circumstances" that "a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."  *Id*.  The inadequacy of training can serve as a basis for liability "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388

(1989); *Connick*, 563 U.S. at 61 ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.").

Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (citation omitted).  There must be evidence of a "deliberate" or "conscious" choice by a municipality to ignore the consequences of not adequately training its employees, and the municipality must have made that conscious choice even though the risk of constitutional violations was "obvious." *Canton*, 489 U.S. at 389-90.

In *Canton*, the Supreme Court explained that a high bar for *Monell* claims against public entities was necessary because "lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983."  489 U.S. at 391.  The Court reasoned that "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident."  *Id*. at 392.  The "endless exercise of second-guessing municipal employee-training programs," the Court held, "is an exercise we believe the federal courts are ill suited to undertake, as well as one that would implicate serious questions of federalism."  *Id*. (citing *Rizzo v. Goode*, 423 U.S. 362, 378-80 (1976)).

**(b)** **There Is No "Pattern of Similar Constitutional Violations"**

A *Monell* claim based on failure to train requires evidence of a "pattern of similar constitutional violations by untrained employees."  *Flores v. County of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014) (citation omitted) (granting motion to dismiss failure to train claim).  The pattern of similar conduct is what puts an entity on notice of the need to provide training.  *Marsh*, 680 F.3d at 1159.  In *Marsh*, the *Monell* claim failed because there was "no evidence that prosecutors—active or

1  retired—often photocopy and distribute autopsy photographs for illegitimate

2  purposes without the consent of the family," and therefore "the county had no notice

3  that training was necessary." *Id.*; *see Flores*, 758 F.3d at 1159 ("The isolated

4  incidents of criminal wrongdoing by one deputy other than Deputy Doe 1 do not

5  suffice to put the County or [Sheriff] on 'notice . . . .'"); *Wettstein v. County of*

6  *Riverside*, No. EDCV 19-1298 JGB (KKx), 2020 WL 2199005, at *5 (C.D. Cal. Jan.

7  22, 2020) (dismissing *Monell* claim and holding that two violations are insufficient

8  to "establish a custom or policy" or to infer "more common and frequent

9  unconstitutional behavior" (citation omitted)).

10      Here, as in *Marsh*, there has never before been a complaint about a LASD or

11  LACFD employee sharing photos of victim remains.  (SSUF ¶ 83.)  Even with this

12  incident, an unprecedented mass fatality involving an international celebrity, there

13  was no public dissemination of the photos.  (*Id.* ¶ 76.)  Under these circumstances,

14  Plaintiff cannot establish that the Entity Defendants made a "deliberate" or

15  "conscious" choice to ignore the "obvious" consequences of not having a specific

16  policy addressing this situation.  *Canton*, 489 U.S. at 389-90.

17      This is also not the "single-incident" exception theorized in *Canton*, where

18  the Supreme Court's hypothetical example was a city giving its officers firearms but

19  failing to train them in the constitutional limitation on the use of deadly force.

20  *Canton*, 489 U.S. at 390 n.10.  Plaintiff contends that it was "obvious" that County

21  employees would disseminate death images.  (FAC ¶ 83.)  Given the extensive

22  training LASD and LACFD personnel receive about professional standards, ethics

23  and confidential information, it was far from "obvious" that employees would

24  violate departmental policies and subject themselves to discipline.  (SSUF ¶¶ 82-

25  90.)  Neither department made a "deliberate" or "conscious" choice to ignore the

26  consequences of not adequately training its employees.  *Canton*, 489 U.S. at 389;

27  *Connick*, 563 U.S. at 63-68.

28

**(c)** <u>**The Entity Defendants Have Extensive Policies**</u>

Plaintiff cannot show a "complete absence of legal training," which is what the law requires. *Connick*, 563 U.S. at 68.  Both LASD and LACFD have codified policies governing standards of behavior for both on- and off-duty conduct, confidentiality and ethics.  (SSUF ¶ 83.[4])  LASD also adheres to the requirements established by the California Commission on Peace Officer Standards and Training. (*Id*. ¶ 85.)

The Entity Defendants cannot have policies and training addressing every situation employees might confront.  (*Id*. ¶ 86.)  Instead, the goal is to have codes of conduct that govern no matter the situation.  (*Id*. ¶ 87.)  Those policies were implicated here, and LASD and LACFD employees were disciplined.  (*Id*. ¶¶ 49-50, 63-64.)  LASD and LACFD have the discretion to decide how to handle training their employees.  *Connick*, 563 U.S. at 68 ("[Section 1983] does not provide plaintiffs or courts *carte blanche* to micromanage local governments throughout the United States.").

Plaintiff will point to LASD's new policy as evidence that it *should have* had a policy on this specific issue.  To the contrary, this incident was the first time LASD had confronted allegations that an employee shared photos internally containing victims' remains.  (SSUF ¶ 82.)  After the incident, LASD responded swiftly.  As Plaintiff concedes, "[w]ithin months, LASD added an entirely new section to its Manual of Policies and Procedures, entitled 'Photographs/Recordings at Scenes Where Human Remains Are Present.'"  (*Id*. ¶ 88.[5])

---

[4] DMEC, which is not a defendant, has its own policies codifying California Code of Civil Procedure section 129, which applies to photos "taken by or for the coroner." (SSUF ¶ 84)

[5] LASD also supported a new law making it a misdemeanor to take photos of victims' remains if those photos are *not* part of an official investigation.  (SSUF ¶ 89.)  LASD and LACFD notified their employees about the change in law.  (*Id*.

### 2.      <u>Failure to Adequately Investigate/Discipline</u>

Plaintiff also alleges that the Entity Defendants failed to adequately investigate the complaints about photo sharing and that the discipline imposed was inadequate.  (FAC ¶¶ 81-84.)  This theory ignores the elements of a *Monell* claim.  The public entity's policy or custom (or here, the alleged absence of a policy) must have *caused* the constitutional violation.  *Tsao*, 698 F.3d at 1146.  Plaintiff must show both "but for" and "proximate" causation.  *Id*.

A *Monell* claim cannot be based on "actions that a government entity took or failed to take *subsequent* to the alleged violations."  *McClain v. SBC Sheriff's Dep't*, No. ED CV 17-01178-CJC (PLA), 2018 WL 3105248, at *7 (C.D. Cal. June 21, 2018) (dismissing *Monell* claim based on actions taken after "the incident that gave rise to plaintiff's claims").  Subsequent actions "cannot give rise to a reasonable inference that the County's actions at the time of the alleged violations of plaintiff's constitutional rights were *caused* by the County's traditional method of carrying out a policy."  *Id*.; *see Crabbs v. Pitts*, No. 2:16-cv-0387, 2018 WL 5262397, at *2 (S.D. Ohio Oct. 23, 2018) (subsequent actions "could not have been 'the "moving force" behind the alleged constitutional violation' because actions that occur 'after an event cannot logically be said to have caused the event that preceded it'" (citation omitted)).

Plaintiff will argue that the Entity Defendants' investigations and disciplinary decisions are evidence that they condoned the conduct at issue.  Courts reject that argument:  *Crabbs*, 2018 WL 5262397, at *2 (explaining that "proving ratification through inadequate investigation does not dispense with the moving force requirement"); *Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013) (Sheriff's "after-the-fact approval of the investigation, which did not itself cause or continue a harm against [Plaintiff], was insufficient to establish the *Monell* claim" because the

¶ 90.)

"course of action must be shown to be the moving force behind or cause of the plaintiff's harm").

The Entity Defendants' efforts to prevent dissemination of crash site photos were not the "moving force" behind any harm Plaintiff suffered.  The County and its departments made prompt discretionary decisions about how to (i) prevent dissemination of the photos, and (ii) handle the related personnel management issues.  (SSUF ¶¶ 32-64.)  The allegations of misconduct were thoroughly investigated, and the involved employees were disciplined.  (*Id*. ¶¶ 49-50, 63-64.)

### 3.      Pattern of Practice or Custom

Plaintiff's final theory is that the Entity Defendants have a "pattern of practice and/or custom of unnecessarily taking and sharing death images."  (FAC ¶ 86.) Plaintiff alleges that the practice or custom is evidenced "by the fact that the misconduct was not limited to a lone employee."  (*Id*. ¶ 85.)

To plead a *Monell* claim through a "longstanding practice or custom," *Wettstein*, 2020 WL 2199005, at *4 (citation omitted), Plaintiff must establish that the Entity Defendants' practice or custom of "unnecessarily taking and sharing death images" (FAC ¶ 86) is "so persistent and widespread as to practically have the force of law," *Connick*, 563 U.S. at 61.  "[I]solated or sporadic incidents" will not support *Monell* liability against local government.  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (affirming summary judgment where undisputed evidence did not establish "persistent and widespread" practice that constituted "permanent and well settled" city policy (citation omitted)).

There is no evidence that there is a "persistent and widespread" practice of sharing death images that has risen to the level of a "permanent and well settled" County policy.  There are no other complaints of LASD or LACFD personnel doing anything similar.  (SSUF ¶ 82.)

Plaintiff tries to rely on Sheriff Villanueva's public comments regarding the issue.  (FAC ¶ 83.)  Those comments are taken out of context—Sheriff Villanueva

1  did not state that LASD had ever dealt with "death images" being shared with

2  anyone, let alone publicly disseminated.  (SSUF ¶ 91.)  Instead, he opined generally

3  on "a problem in law enforcement across the nation" relating to law enforcement

4  officers keeping "photos from crime scenes throughout their careers."  (*Id*. ¶ 92.)

5         That other jurisdictions *might* have dealt with their employees keeping photos

6  from scenes they had encountered does not establish that the Entity Defendants here

7  have any kind of "persistent and widespread" practice of disseminating death

8  images.  *See Wettstein*, 2020 WL 2199005, at *5 (dismissing *Monell* claim where

9  plaintiff failed "to adequately allege a 'longstanding practice or custom' of

10  constitutional violations *on the part of the County*" (emphasis added) (citation

11  omitted)).

12         Plaintiff will argue that the Entity Defendants' investigations and disciplinary

13  decisions are evidence of a policy condoning photo sharing.  To the contrary,

14  creating a policy to address a situation they had never confronted, and supporting a

15  new law making it illegal to take unauthorized photos of victims' remains, shows

16  that the Entity Defendants took seriously the need to prevent future harm.

17         Plaintiff's *Monell* claim is based on her displeasure with how the Entity

18  Defendants enact policies, train and supervise their employees, investigate, and

19  impose discipline.  (FAC ¶¶ 81-84.)  Plaintiff thinks the County should have done

20  things differently.  (*Id*.)  That is the exact type of "second-guessing" the "federal

21  courts are ill suited to undertake."  *Canton*, 489 U.S. at 392.

22  **VI.   THE NEGLIGENCE CLAIMS ARE UNTENABLE**

23         Plaintiff's second and third claims for negligence are against the Deputy

24  Defendants and the Entity Defendants.  (FAC ¶¶ 87-99.)  Because the Entity

25  Defendants cannot be held liable unless their employees are found responsible,

26  Defendants address both claims together.  Cal. Gov't Code §§ 815, 815.2(a).

27         **A.   There Is No Duty**

28         The threshold issue of duty "is a question of law to be resolved by the court."

1  *Brown*, 11 Cal. 5th at 213.  "Duty is not universal; not every defendant owes every

2  plaintiff a duty of care."  *Id*.  A duty exists only if "the plaintiff's interests are

3  entitled to legal protection against the defendant's conduct."  *Id*. (citation omitted).

4       Plaintiff alleges that the Deputy Defendants owed a duty "to use ordinary care

5  in their treatment of the Bryants' physical remains, including an obligation to refrain

6  from taking and/or sharing images of them for personal, non-law-enforcement

7  purposes" and  to "use ordinary care in preventing dissemination of any images of

8  the Bryants' remains once the images were created and/or were within their

9  possession."  (FAC ¶ 89.)

10       Plaintiff invokes California Civil Code section 1714 as the source of the legal

11  duty.  (*Id.*)  Civil Code section 1714 is a general provision that does not confer a

12  duty on every person in every situation.  Cal. Civ. Code § 1714(a).  Instead, "[i]n

13  assessing the question of duty in cases challenging the conduct of law enforcement

14  personnel generally," courts must turn to the "special relationship" doctrine and

15  *Rowland* factors.  *Catsouras*, 181 Cal. App. 4th at 876 (citation omitted).

16       In *Catsouras*, the California Court of Appeal observed that "the

17  interrelationship between the traditional duty analysis and the 'special relationship'

18  doctrine has never been clearly defined."  181 Cal. App. 4th at 876 (citation

19  omitted).  Earlier this year, in *Brown v. USA Taekwondo*, the California Supreme

20  Court addressed that issue by setting out the analytical framework courts are to use

21  in determining whether a duty exists.  11 Cal. 5th at 213.  If there is no special

22  relationship, a court cannot go on to determine that there is a duty based solely on

23  the policy factors set out in *Rowland v. Christian*, 69 Cal. 2d 108 (1968).  *Id*. at 213-

24  22.  Courts may no longer "reduce[] the inquiry to a single step, applying the

25  *Rowland* factors to determine whether a special relationship exists."  *Id*. at 213.

26       With respect to the threshold inquiry of whether a "special relationship"

27  exists, there is none: law enforcement officers are governed by the same rules as

28  other individual defendants.  *Williams v. State*, 34 Cal. 3d 18, 24 n.3 (1983).  It is

27

well established that "[n]o special relationship exists between police officers and private citizens." *Gonzalez v. City of Desert Hot Springs*, No. CV 17-01397 TJH (SPx), 2017 WL 10562938, at *2 (C.D. Cal. Dec. 20, 2017).

*Catsouras*, contrary to *Brown*, "reduced the inquiry to a single step" by answering that threshold question in the negative but going on to use *Rowland* to recognize a narrow duty "not to place decedent's death images on the Internet for . . . lurid titillation." 181 Cal. App. 4th at 886. Had the court proceeded under *Brown*, it would not have gotten past the threshold special relationship inquiry and would not have found a duty. Regardless, the *Catsouras* duty does not apply here.

## B.   The Deputy Defendants Did Not Breach Any Duty Owed

On its merits, *Catsouras* is inapplicable. None of the Deputy Defendants sent photos to members of the public, and none of the photos in their possession ended up on the Internet or elsewhere in the public domain. (SSUF ¶¶ 25-36, 42-58, 68-69.) In *Catsouras*, the plaintiffs received the photos from random members of the public and were subjected to seeing the photos on "more than 2,500 Internet Web sites." 181 Cal. App. 4th at 865.

Even assuming *arguendo* that there is a duty (there is not), the Deputy Defendants did not breach that duty. 181 Cal. App. 4th at 886. The Deputy Defendants did not disseminate the photos to anyone outside the County:

- *None* of the Deputy Defendants sent an accident site photo to a member of the public. (SSUF ¶¶ 25-48.) There is no case holding that law enforcement officers working together at an incident have a duty to not send each other photos of that incident, particularly when they are trying to answer questions, only one deputy is on scene, and they need to know what resources are needed. (*Id*. ¶¶ 42-48.)

- Deputy Cruz showed accident site photos to a single friend. (*Id*. ¶ 25.) His phone did not leave his hand, and the photos did not leave his phone. (*Id*. ¶ 28.) He was disciplined for this. (*Id*. ¶ 50.)

1   LASD felt its policies were violated and disciplined its personnel accordingly,

2   but that does not mean the Deputy Defendants violated the law and breached a duty

3   they owed to *Plaintiff*, a private citizen who they never met.  (*Id*. ¶¶ 49-50.)  A court

4   should not get involved in internal municipal employment matters like deciding

5   when crash site photos can be shared internally and when they cannot.  *Canton*, 489

6   U.S. at 392 (federal courts are ill suited to undertake "an endless exercise of second-

7   guessing" municipal affairs); *Connick*, 563 U.S. at 68 (courts should not

8   "micromanage local governments"); *Rizzo*, 423 U.S. at 378-80 (federal courts do not

9   have authority to supervise functioning of a police department).

10   **C.   <u>Plaintiff's Harm Is Based On Speculation</u>**

11   There is no viable negligence claim unless "the breach was the proximate or

12   legal cause of the resulting injury."  *Brown*, 11 Cal. 5th at 213 (citation omitted).

13   There is no "resulting injury" here.  Plaintiff's alleged harm is her fear that photos

14   might one day be publicly disseminated.  (SSUF ¶¶ 70-76.)  This is speculative.

15   *Padilla v. Rodas*, 160 Cal. App. 4th 742, 752 (2008) (harm "cannot be based on

16   mere speculation, conjecture and inferences drawn from other inferences to reach a

17   conclusion unsupported by any real evidence" (citation omitted)).

18   **D.   <u>Any Negligence Claim Against The LACFD Employees Would Fail</u>**

19   **<u>For The Same Reasons</u>**

20   Plaintiff also alleges that "multiple members of the Fire Department breached

21   their duties to Plaintiff."  (FAC ¶ 97.)  Plaintiff alleges that the County and LACFD

22   are vicariously liable for the actions of these "multiple members."  (*Id*.)  But

23   Plaintiff has not alleged, much less established, that any LACFD employees owed

24   her a duty, breached that duty, and caused her harm.  Because a negligence claim

25   against those individuals would fail, the claim against the Entity Defendants fails

26   too.  Cal. Gov't Code § 815.2(a).

27   Plaintiff will likely point to the three LACFD employees who were

28   disciplined for violating departmental policies.  As with the Deputy Defendants,

29

none of these individuals owed Plaintiff a duty, nor would they have breached it by showing photos to other LACFD personnel, or to two LASD employees who were also working the incident.  (SSUF ¶¶ 60-64.)

## VII.   DEPUTY CRUZ DID NOT INVADE PLAINTIFF'S PRIVACY

Plaintiff's fourth claim alleges invasion of privacy against Deputy Cruz. (FAC ¶¶ 100-07.)  The fifth claim alleges that LASD and the County are vicariously liable.  (*Id*. ¶¶ 108-14.)  Because the claim against Deputy Cruz fails, the claim against the County and LASD fails too.  Cal. Gov't Code §§ 815, 815.2(a).

Invasion of privacy requires a plaintiff to establish: "(1) public disclosure (2) of a private fact (3) which would be offensive and objectionable to the reasonable person and (4) which is not of legitimate public concern." *Catsouras*, 181 Cal. App. 4th at 868 (citation omitted); *see also Mezger v. Bick*, 66 Cal. App. 5th 76, 86 (2021).  "Actionable invasions of privacy must be sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right." *Mezger*, 66 Cal. App. 5th at 87 (citation omitted).

The private facts must be "widely published and not confined to a few persons or limited circumstances." *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 27 (1994) (citing RESTATEMENT (SECOND) OF TORTS § 652D cmt. a).  "Publicity" means "that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge."  RESTATEMENT (SECOND) OF TORTS § 652D cmt. a; *Hassan v. Facebook, Inc.*, No. 19-cv-01003-JST, 2019 WL 3302721, at *3 (N.D. Cal. July 23, 2019) ("Liability for the common-law tort [of public disclosure of private facts] requires publicity; disclosure to a few people in limited circumstances does not violate the right." (alteration in original) (citing *Ignat v. Yum! Brands, Inc.*, 214 Cal. App. 4th 808, 820 (2013))); *Orff v. City of Imperial*, No. 17-CV-0116 W (AGS), 2017 WL 5569843, at *11 (S.D. Cal. Nov. 17, 2017)

1   (holding that disclosure limited in scope to two individuals is not "a communication

2   that reaches, or is sure to reach, the public" (citation omitted)).

3       Plaintiff's claim for invasion of privacy is based on Deputy Cruz showing

4   between one and three photos on his phone to one person—a friend—and trying to

5   show them to his niece, who refused to look at them.  (SSUF ¶¶ 25-31.)  The photos

6   were on Deputy Cruz's phone, and the phone never left his hand.  (*Id*. ¶ 28.)  Only

7   *one person* saw the photos on Deputy Cruz's phone.  (*Id*. ¶ 30.)  Because the photos

8   were not shown to "the public at large" and their content is not "of public

9   knowledge," the "public disclosure" element for invasion of privacy has not been

10  met.  *Hill*, 7 Cal. 4th at 27.

11      Plaintiff's claim is also based on her fear of public dissemination.

12  (SSUF ¶¶ 70-76.)  It is not enough, as a matter of law, to speculate about what may

13  or may not happen in the future.  *Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1062

14  (N.D. Cal. 2014).  It must be "substantially certain" that the photos will "become

15  'public knowledge.'"  *Id*.  There is no evidence showing that it is "substantially

16  certain" that the photos Deputy Cruz had on his phone will become "public

17  knowledge."  Deputy Cruz deleted the photos.  (SSUF ¶¶ 35, 67, 69, 76.)

18      While inappropriate and the basis for discipline—LASD suspended Deputy

19  Cruz—his actions do not rise to the level of a violation of law.  (*Id*. ¶ 50.)  Deputy

20  Cruz had a lapse in judgment, and LASD took prompt action to address it.

21  (*Id*. ¶¶ 22-50.)  There was no invasion of privacy.

22  **VIII.  <u>CONCLUSION</u>**

23      While Plaintiff suffered an unspeakable loss on January 26, 2020, her claims

24  about crash site photos fail as a matter of law.  The County, LASD, LACFD, and the

25  Deputy Defendants did not violate her constitutional rights, breach any legal duties

26  owed her, or invade her privacy.  Defendants respectfully request that the Court

27  grant the motion for summary judgment and enter judgment in their favor.

28

DATED:  November 22, 2021          Respectfully Submitted,

                                   OFFICE OF COUNTY COUNSEL


                                   By:  /s/ Jonathan C. McCaverty
                                        JONATHAN C. McCAVERTY
                                        Attorneys for Defendant
                                        LOS ANGELES COUNTY SHERIFF'S
                                        DEPARTMENT

DATED:  November 22, 2021          Respectfully Submitted,

                                   MILLER BARONDESS, LLP


                                   By:  /s/ Louis R. Miller
                                        LOUIS R. MILLER
                                        Attorneys for Defendants
                                        COUNTY OF LOS ANGELES, LOS
                                        ANGELES COUNTY FIRE
                                        DEPARTMENT, JOEY CRUZ, RAFAEL
                                        MEJIA, MICHAEL RUSSELL, and
                                        RAUL VERSALES