# EXHIBIT 18



**COUNTY OF LOS ANGELES**

**FIRE DEPARTMENT**

1320 NORTH EASTERN AVENUE
LOS ANGELES, CALIFORNIA 90063-3294
(323) 267-7208
www.fire.lacounty.gov

*"Proud Protectors of Life, Property, and the Environment"*

DARYL L. OSBY
FIRE CHIEF
FORESTER & FIRE WARDEN

BOARD OF SUPERVISORS

HILDA L. SOLIS
FIRST DISTRICT

MARK RIDLEY-THOMAS
SECOND DISTRICT

SHEILA KUEHL
THIRD DISTRICT

JANICE HAHN
FOURTH DISTRICT

KATHRYN BARGER
FIFTH DISTRICT

***DELIVERY VIA PROCESS SERVER***

December 2, 2020

Fire Captain Tony Imbrenda
1084 Calle Las Trancas
Thousand Oaks, CA  91360

Dear Fire Captain Imbrenda:

**INTENTION TO DISCHARGE**

This is to inform you of our intention to discharge you from your position of Fire Captain and from County service.  This proposed discharge is due to your misuse and dissemination of confidential Department information, and for your violation of the below listed policy sections of the Department's <u>Standards of Behavior</u>:

| A. | In carrying out their official duties and responsibilities, all employees shall: | |
|---|---|---|
| | 1. | Abide by and conform to the County's and Department's rules, regulations, policies, and procedures. |
| | 3. | Perform all assigned duties and responsibilities. |
| | b. | Exercise good judgment. |
| | 6. | Pursuant to reporting requirements, report to their immediate supervisor any unusual occurrence, or other matter that may adversely affect the operation of the Department, or any violation of County or Department rules, regulations, policies, and/or procedures. |
| | 8. | Secure and protect Department property, vehicles, equipment, and items of identification against damage or loss. |

SERVING THE UNINCORPORATED AREAS OF LOS ANGELES COUNTY AND THE CITIES OF:

| | | | | | | |
|---|---|---|---|---|---|---|
| AGOURA HILLS | CARSON | EL MONTE | INGLEWOOD | LAWNDALE | PICO RIVERA | SIGNAL HILL |
| ARTESIA | CERRITOS | GARDENA | IRWINDALE | LOMITA | POMONA | SOUTH EL MONTE |
| AZUSA | CLAREMONT | GLENDORA | LA CANADA-FLINTRIDGE | LYNWOOD | RANCHO PALOS VERDES | SOUTH GATE |
| BALDWIN PARK | COMMERCE | HAWAIIAN GARDENS | LA HABRA | MALIBU | ROLLING HILLS | TEMPLE CITY |
| BELL | COVINA | HAWTHORNE | LA MIRADA | MAYWOOD | ROLLING HILLS ESTATES | VERNON |
| BELL GARDENS | CUDAHY | HERMOSA BEACH | LA PUENTE | NORWALK | ROSEMEAD | WALNUT |
| BELLFLOWER | DIAMOND BAR | HIDDEN HILLS | LAKEWOOD | PALMDALE | SAN DIMAS | WEST HOLLYWOOD |
| BRADBURY | DUARTE | HUNTINGTON PARK | LANCASTER | PALOS VERDES ESTATES | SANTA CLARITA | WESTLAKE VILLAGE |
| CALABASAS | | INDUSTRY | | PARAMOUNT | | WHITTIER |

CONFIDENTIAL

Fire Captain Tony Imbrenda
December 2, 2020
Page 2 of 9

| | | | |
|---|---|---|---|
| | | b. | Not lend, give away, or appropriate for personal use any Department property, equipment, or items of identification without proper authority. |
| | 11. | | Treat all persons in a respectful and courteous manner while on duty. |
| | 15. | | Not make public statements or provide information to citizens, community groups or the press regarding Department matters, other than those affecting public policy, without specific authorization. |
| | 22. | | Not bring discredit or embarrassment upon the Department through on- or off-duty behavior. |
| B. | | | When in an off-duty or non-Department capacity, employees shall not engage in conduct which impairs, or potentially impairs, their performance of Department duties or which brings discredit to the Department. |

In addition to the Standards of Behavior, this action is taken pursuant to:

- Civil Service Rule 18.031, which states the following:

  Failure of an employee to perform his or her assigned duties so as to meet fully explicitly stated or implied standards of performance may constitute adequate grounds for discharge, reduction or suspension.  Where appropriate, such grounds may include, but are not limited to, qualitative as well as quantitative elements of performance, such as failure to exercise sound judgment, failure to report information accurately and completely, failure to deal effectively with the public, and failure to make productive use of human, financial and other assigned resources.  Grounds for discharge, reduction or suspension may also include any behavior or pattern of behavior which negatively affects an employee's productivity, or which is unbecoming a county employee; or any behavior or condition which impairs an employee's qualifications for his or her position or for continued county employment.

- Department's Code of Ethics, Appendix I

  A. Code of Ethics

  My fundamental responsibility as a firefighter is the saving of life, and the prevention and suppression of fires.  I will never let danger or personal feelings deter me in the performance of my duties.  I will uphold the policies and traditions of my Department, and dedicate myself, before God, to faithfully serve the public, which has placed its faith in me as a protector of life and property.

CONFIDENTIAL

Fire Captain Tony Imbrenda
December 2, 2020
Page 3 of 9

The specific facts upon which this proposed discharge would be based are as follows:

You have been the Department's Public Information Officer (PIO) since September 2018.  As the Department's PIO, you serve as a subject matter expert during emergency incidents and bridge the gap between the Department and the mainstream media.  Due to your visibility as the primary spokesperson for the Department, you are held to a higher standard of conduct.

In your role as the Department's PIO, it is customary for you to receive photos of first responders in action and share some of those photos.  The photos you share are meant to be informative and shared with the public for the purposes of press releases, marketing campaigns, and public education on fire and life safety matters, among other things.  During your time in the Department's Public Information Office, you and other Department personnel received training on the parameters of what photos are appropriate and not appropriate for media use.  You also indicated it is part of your job to advise others on how to handle photos of a graphic nature and to never use them or post them on social media.

On January 26, 2020, Kobe Bryant, his 13-year-old daughter, and seven others were killed in a helicopter crash.  Through your position as PIO, you obtained photographs of the crash site, which you stored on both your personal and Department cell phones.  Some of the photographs were graphic and depicted human remains.

On February 15, 2020, you were off-duty when you attended the Golden Mike Awards as a representative for the Department.  The event was held to acknowledge members of the media for their work and there was a special acknowledgement of first responders for their social media work.  You attended the event with your wife and other members of the Department's Public Information Office.

During the cocktail hour, while surrounded by your colleagues and their dates to the event, you discussed the helicopter crash from January 26, 2020 and remarked on how awful the crash site was.  One of the guests at the event who heard you discussing the incident had lost family members in the highly publicized crash.  As you made your way towards the dining room to take pictures, people began to take their phones out.  You were aware that there were people nearby when you pulled out your phone and showed the group pictures from the crash site which depicted human remains.  You specifically stated that you were aware that there were people trying to see the photos so you kept them away and advised them that it was not something they would be interested in seeing.  Yet the photos you shared depicted feet, shoes, a torso, a person bent in half, and human organs.

After you shared these gruesome photographs, conversation regarding the photographs continued as you and the other guests walked into the dining room.  One of the guests recalled discussions about Kobe Bryant's remains and "bodies."  Another guest who lost family members at the incident heard one of your colleagues make a statement to the effect of, "I just saw pictures of Kobe burned up before I'm about to eat."

CONFIDENTIAL

Fire Captain Tony Imbrenda
December 2, 2020
Page 4 of 9

> You deleted the photos from your phones following reports from the press that people
> were misusing photos.  You stated that you had no need to keep graphic photos that
> were not going to be shared on social media.  Another reason you deleted the photos
> is because your daughter plays with your phone at home and you would not want her
> to see "photos like that."

The mission of the Los Angeles County Fire Department is to protect lives, the environment,
and property by providing prompt, skillful, and cost effective fire protection and life safety
services.   Moreover, the Department's core values include commitment and integrity.  You
failed to show commitment to your job as the Department's PIO when you shared sensitive
photos you obtained through the course of regular business in a public setting with no
apparent business need for doing so.

As the Department's PIO, you hold a highly visible public position.  You are the face of the
Department in matters pertaining to informing the public of incidents whether they are small
or large in nature.  There are aspects of your job that are confidential and the Department
trusted you to use your discernment in not only identifying what information should be shared
with the public, but also recognizing when and where it is appropriate to discuss confidential
matters.  It is your job to be specifically aware of what media and information is and is not
meant for public consumption.  The guests in attendance at the Golden Mike Awards
included members of the public who were not meant to be privy to specific matters of
Department business.  Therefore, any discussion of patients and incident scenes was wholly
inappropriate in that setting.

You failed to exercise good judgment when you discussed confidential Department matters
and shared sensitive pictures in a setting where members of the public could see and hear
you.  There was no business need for sharing those photos with anyone at the Golden Mike
Awards.  You acknowledged that the photos you were sharing were not meant for all to see
when you tried to keep people away from seeing the photos on your phone.  Therefore, you
should have known better than to produce those images in that setting.

Furthermore, you violated the Department's Standards of Behavior when you provided
information to citizens regarding Department matters without specific authorization.  You
obtained the photos because of your position as the Department's PIO.  Once you reviewed
the photos and saw what was depicted, it should have been clear to you that those photos
would not be published to social media or shared with any news source.  Given that those
photos also depicted human remains such as feet, a torso, a person bent in half, and human
organs, you should have immediately reported receiving these photos to your supervisor.
Instead, you chose to keep them and shared those graphic photos at a social event without
authorization.  Had you been approved to share those photos, there would have been no
need for you to shield the images from view.  The actual impact of your decision to share
those photos at a public event is that you discussed and showed images of a horrific and
tragic nature in the presence of a member of the public who lost family members in the crash
you were openly discussing.  Additionally, sharing pictures of deceased patients was
disrespectful to both the patients and their loved ones.

CONFIDENTIAL

Fire Captain Tony Imbrenda
December 2, 2020
Page 5 of 9

Your actions at the Golden Mike Awards also did not honor the Department's Code of Ethics, which entrusts you with "uphold[ing] the policies and traditions of [the] Department" and expects that you will "never let . . . personal feelings deter [you] in the performance of [your] duties." Any personal judgments you made in order to share the graphic photographs to begin with and then justify your actions later neither furthered your duties as a Department employee nor upheld the Department's policies.

The Department does consider mitigating factors in this case, including that your most recent performance evaluations, the latest of your 18-year career with the Department, rated you as "Competent" overall. However, the Department also considers serious aggravating circumstances as well, the foremost of which was your position and proximity to the Fire Chief. You are not only a fire captain but you served as the Department's PIO – essentially, you were the Fire Chief's PIO. As such, you participated and were involved in high-level meetings and conferences with the Fire Chief regarding the Department's position on social media and photography/videography as it related to Department business. Moreover, the Fire Chief entrusted you, as his PIO, to represent the Department's response to the media regarding the allegations that Department members took or shared gruesome photos of the Willow Incident, not knowing that just two weeks prior you willingly shared gruesome photographs of human remains at a social event without any demonstrable regard for the public trust, or the dignity and privacy of the deceased or their families.

Another serious aggravating factor is that you brought discredit and embarrassment to the Department. You acknowledged that it was not until you learned that there were reports to the press of people misusing photos that you subsequently deleted the photos from your phone and told others to do the same. You stated that you realized that you had no need for the graphic photos and that you did not want your daughter to see graphic photos on your phone; however, your realization only came after you misused the photos and harmed multiple people. Furthermore, you admitted to being aware of reports that people were misusing photos from the incident, yet you failed to report that you were in possession of graphic photos that could adversely impact the Department. You failed to report that you were in possession of graphic photos even after the Department became aware of the media reports regarding the allegations that Department members took or shared gruesome photographs of human remains at the Willow Incident. Deleting the photos after the fact served the dual purpose of making sure others would not continue to be harmed but was also an attempt to cover up your role in the reported misuse of the photos. Your delayed decision was primarily self-serving and indicates that you lack integrity. Your refusal to take responsibility for your actions and willingness to let others follow your poor example has left the Department with no choice but to conclude that you are unfit for service in the Department as a fire captain.

Fire Captain Imbrenda, this discharge is being proposed due to your misuse and dissemination of confidential Department information. Your actions are reprehensible, in direct contrast to the values of the Department, and unacceptable based on the fact that:

1. You hold a sensitive position, and you are responsible for tasks related to saving lives and property.

CONFIDENTIAL

Fire Captain Tony Imbrenda
December 2, 2020
Page 6 of 9

    2.  You are a fire captain with 18 years of experience in the Department.

Because of the seriousness and unacceptable nature of your conduct, after careful consideration of it, as well as aggravating and mitigating circumstances, unfortunately you have left the Department with no choice but to discharge you from your position of Fire Captain and from County service.

In deciding to take this proposed action, your record was considered as follows:

- You have been employed with the County since April 16, 1996 and with the Department since April 29, 2002;

- You received a Notice of Suspension for one day, dated March 10, 2020, for your conduct regarding Spark of Love and violating the following Standards of Behavior:

- 

| A. | | In carrying out their official duties and responsibilities, all employees shall: | |
|---|---|---|---|
| | 1. | | Abide by and conform to the County's and Department's rules, regulations, policies, and procedures. |
| | 3. | | Perform all assigned duties and responsibilities. |
| | | b. | Exercise good judgment. |
| | 10. | | Not use their employment or standing in the Department in any commercial or private enterprise for the purpose of personal gain without specific authorization; not accept rewards, fees, or gifts except as authorized by the Fire Chief. |

- You received overall ratings of "Competent" on your 2018 and 2017 performance evaluations.

In addition, please be advised that in accordance with the Countywide Discipline Guidelines: For Employees, which explicitly provides that "an administrative action [may be] *more* or *less* severe than those listed" (emphasis added), the range of penalties are as follows:

| OFFENSE | FIRST OCCURRENCE | SECOND OCCURRENCE | THIRD OCCURRENCE |
|---|---|---|---|
| **II. DISRESPECTFUL CONDUCT / INSUBORDINATION** | | | |
| B. Failure to follow established rules or regulations | Warning to 10-Day Suspension | 15 to 30-Day Suspension; Discharge | Reduction or Discharge |

**CONFIDENTIAL**

Fire Captain Tony Imbrenda
December 2, 2020
Page 7 of 9

| OFFENSE | FIRST OCCURRENCE | SECOND OCCURRENCE | THIRD OCCURRENCE |
|---|---|---|---|
| **III. DISHONESTY, THEFT, MISAPPROPRIATION, AND RELATED MISCONDUCT** | | | |
| H. Withholding information from superiors, fellow employees, subordinates, public clients of the County which could or does result in loss, injury, or damage to those individuals or the County | 15 to 30-Day Suspension; Discharge | Discharge | |
| **V. MISUSE OF COUNTY EQUIPMENT OR PROPERTY** | | | |
| A. Unauthorized use or misuse of County equipment and/or resources such as, postage, telephones, computers, social media technologies and/or photocopy machines for personal use (See, Board Policy 6.101 and 6.105 and DHR PPG 1040) | Warning to 15-Day Suspension; Discharge | 15 to 30-Day Suspension; Discharge | Discharge |
| B. Unauthorized use, operations, or possession of equipment, machines, or tools to which the employee has not been assigned; or unauthorized performance of duties other than those assigned | Warning to 30-Day Suspension; Discharge | 15 to 30-Day Suspension; Discharge | Discharge |
| F. Unauthorized or improper use or disclosure of confidential information, including but not limited to, medical records, personnel records, credential files to self or others | 10 to 30-Day Suspension; Reduction; or Discharge | 30-Day Suspension; Discharge | Discharge |
| **VI. ON- OR OFF-DUTY CRIMINAL OR UNBECOMING CONDUCT** | | | |
| B. Criminal or unbecoming conduct while performing duties, or on County premises, or during working hours, or when such conduct is related to the employee's duties or interest of the Department or County; or promoting such criminal or unbecoming conduct (See, DHR PPG 514 and CSR 18.031) | 30-Day Suspension; Discharge | Discharge | |
| **VII. PERFORMANCE TO STANDARDS OR EXPECTATIONS** | | | |
| C. Discourtesy to the public or clients/patients (See, DHR PPG 1041) | 5 to 15-Day Suspension; Discharge | 30-Day Suspension; Discharge | Discharge |

CONFIDENTIAL

Fire Captain Tony Imbrenda
December 2, 2020
Page 8 of 9

| OFFENSE | | FIRST OCCURRENCE | SECOND OCCURRENCE | THIRD OCCURRENCE |
|---|---|---|---|---|
| F. | Work performance fails to meet job expectations, standards or requirements - whether implied or explicit | Warning to 10-Day Suspension | 15 to 30-Day Suspension; Reduction | Reduction or Discharge |
| H. | Failure to exercise sound judgment which results in loss of, or injury, or damage to persons or property of the County or of County service | Reprimand to 15-Day Suspension; Reduction; Discharge | 20 to 30-Day Suspension; Reduction; Discharge | Discharge |
| K. | Violation of the departmental or externally recognized code of ethics of the professional group of the employee | 5 to 15-Day Suspension; Discharge | Discharge | |

In addition to the penalties listed above, please be advised that in accordance with the Department's Manual of Operations, Volume 2, Chapter 1, Subject 5, Supplemental Discipline Guidelines, the ranges of penalties are as follows:

| X.  Offenses and Ranges of Discipline | | | |
|---|---|---|---|
| OFFENSE | FIRST OCCURRENCE | SECOND OCCURRENCE | THIRD OCCURRENCE |
| 2.  FAILURE TO ABIDE BY DEPARTMENTAL STANDARDS | | | |
| F.  Conduct unbecoming or bringing discredit or embarrassment upon the Department through on-duty or off-duty behavior | Reprimand 3-30 days Reduction Discharge | 10-30 days Reduction Discharge | Discharge |

All written documents upon which this proposed action is based are attached for your review. They include:

- **Investigation Report of Tony Imbrenda dated August 31, 2020**

Please be advised that the Employee Assistance Program (EAP) offers professional consultation and referral service for a broad range of personal and job-related issues.  You may reach EAP at (213) 738-4200.

You have the right to respond to this action orally, in writing, or both.  Please be advised that a deputy chief who is not currently in your chain of command will consider your written and/or oral response.  If you choose to respond in writing, send your response to Thomas Ewald, Deputy Chief, Special Services Bureau at 1320 N. Eastern Avenue Rm. 250-FCCF, Los Angeles, CA 90063.  If you wish to respond orally, a *Skelly* meeting has been scheduled for

Fire Captain Tony Imbrenda
December 2, 2020
Page 9 of 9

you via Microsoft Teams (either video or telephone) on December 21, 2020 at 10:00 a.m. You have ten (10) business days from the date this letter was mailed or hand-delivered to you to submit a written response or to reschedule a meeting with Deputy Chief Ewald at (323) 881-6152.  However, if you have not contacted Deputy Chief Ewald orally or in writing within ten (10) business days from the date this letter was mailed or hand-delivered to you, you will have waived your right to respond at this level.

We understand you are currently off on leave. If you need accommodations (e.g., location, time, etc.) to participate in the *Skelly* meeting, the Department is willing to make reasonable arrangements.  Please provide a doctor's note clearly indicating your restrictions and the accommodation(s) you are requesting to Deputy Chief Ewald by 5:00 p.m. on December 18, 2020.

Sincerely,

DEPUTY CHIEF WILLIAM McCLOUD JR.
LEADERSHIP AND PROFESSIONAL STANDARDS BUREAU

WM:na

c:      Professional Performance Section - Local 1014

Attachment

CONFIDENTIAL

**SheppardMullin**

Sheppard, Mullin, Richter & Hampton LLP
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
310.228.3700 main
310.228.3701 fax
www.sheppardmullin.com

# M E M O R A N D U M

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

| | | | |
|---|---|---|---|
| To: | Deputy Chief William McCloud | Date: | August 31, 2020 |
| From: | Ronda Jamgotchian | File Number: | 0100-922253 |
| Re: | Investigation Report – Complaint Re: Fire Captain Tony Imbrenda | | |

## I.    Description of Project

On March 5, 2020, Sheppard Mullin was retained by the Los Angeles County Fire Department (the "Department") to conduct an investigation into a complaint it had received involving Fire Captain (CA) Tony Imbrenda.  The complaint involved Luella Weireter, a civilian not associated with the Department or the County.  Ms. Weireter alleged that while at a social event, she observed CA Imbrenda showing photographs of a January 26, 2020 helicopter crash site (the "Willow Incident") to others in attendance at the event, with no apparent business reason for doing so.[1]  This was particularly upsetting to Ms. Weireter, as she is related to the Altobelli family who lost three family members in the crash.  Ms. Weireter's complaint came in shortly after news stories broke in late February 2020, regarding deputies from the Los Angeles County Sheriff's Department reportedly sharing photos of the Willow Incident, and subsequent news stories in early March 2020, making similar allegations against members of the Department.

## II.    Summary of Interviews

The following individuals were interviewed as part of this investigation.  The summaries for each reflect the information that has been deemed relevant to this investigation.  Unless otherwise indicated, all interviews were audio recorded, and the recordings have been provided to the Department so that they may be reviewed in conjunction with this report.

---

[1]  The Willow Incident has been highly publicized because all nine passengers perished, including Kobe Bryant and his 13-year old daughter.

SMRH:4846-0416-9913.1                           -1-

CONFIDENTIAL                                                          COLA001394

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

A.   <u>Luella Weireter – Complaining Party</u>

The first witness interviewed was Luella Weireter, the complaining party in this matter. The interview took place telephonically on March 9, 2020, and was audio recorded.

Ms. Weireter began by advising me that the incident about which she was complaining occurred during the Golden Mike Awards, which took place on February 15, 2020, at the Hilton hotel.  The Golden Mike Awards is an event that acknowledges members of the media for their work.  This year, there was a special acknowledgement of first responders for their social media work, so representatives from the Department, the Los Angeles Fire Department ("LAFD"), LASD, LAPD and other agencies were in attendance.  Ms. Weireter and her husband Cody (who is a fire captain with the LAFD) arrived around 6:00 p.m.  The event began with a cocktail hour, followed by dinner and an awards ceremony.  During the evening, the Weireters were primarily socializing with Erik Scott (also a fire captain from the LAFD) and his wife, CA Imbrenda (from the Department) and his wife, Fire Fighter Specialist (FFS) Sky Cornell (also from the Department) and his girlfriend, and the PIO from Cal Fire and his wife.

According to Ms. Weireter, during the cocktail hour, people were discussing the Willow Incident in which Kobe Bryant and several others were killed.  This was not surprising, given that it had occurred only a couple of weeks earlier.  Ms. Weireter tried to avoid these discussions, as she had family members on board the helicopter who also died in the crash.  She recalls Erik Scott expressing his condolences to her during the cocktail hour at the event.  She also recalls CA Imbrenda discussing the crash and saying how awful the crash site was.

Toward the end of cocktail hour, attendees were told to start making their way to the dining room.  As such, she and the rest of the group started walking through a foyer in that direction.  In the foyer, there was an area set up with a backdrop where attendees could take photos.  Ms. Weireter advised me that as the group was preparing to take photos, everyone started taking their phones out.  It was at this point that CA Imbrenda proceeded to start looking at photos from the helicopter crash and showing the photos to others in the group.  Ms. Weireter did not look at the photos, but could deduce what they were looking at based on the prior conversation during the cocktail hour, and by the way they were huddled so as to block others from viewing the photos.  According to Ms. Weireter, the individuals viewing the photos were CA Imbrenda, FFS Cornell and his girlfriend, and Erik Scott and his wife.  Ms. Weireter's husband Cody was not in the huddle, as he had pulled Ms. Weireter to the side to try and shield her from the photos and discussion.  Ms. Weireter was also trying to separate herself from the group and avoid involvement, so she was standing off to the side putting lipstick on.  At this point, CA Imbrenda's wife came up to her and said she wanted to take a group photo.  Ms. Imbrenda also told Ms. Weireter – two separate times – that the huddled individuals were looking at photos from the Willow Incident.  Eventually, Ms. Weireter and the rest of the group took a photo together and then proceeded to the dining area.  While they were walking, FFS Cornell made a comment along the lines of, "I just saw pictures of Kobe burned up before I'm about to eat."

**CONFIDENTIAL**

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

I asked Ms. Weireter if she had any knowledge regarding who took the photos.  She
responded that she assumed CA Imbrenda took them because the photos were on his
phone, but has no actual knowledge of such.  I asked Ms. Weireter if there were any
other discussions about the Willow Incident that evening, or if there were any other
times she observed someone sharing photos of the crash.  Ms. Weireter advised me
that there were no other discussions or incidents, either that night or at any other time.

I asked Ms. Weireter if there was anything else that she felt would be helpful for me to
know.  She replied that she could not think of anything else.

> **B.**    **Fire Captain Cody Weireter, LAFD – Witness**

I interviewed CA Weireter on March 9, 2020.  The interview took place telephonically
and was audio recorded.  CA Weireter works for the LAFD.

I began the interview by asking CA Weireter about the Golden Mike Awards.  CA
Weireter and his wife attended the event, as he is one of the LAFD's on-call PIOs.  The
event took place at the Hilton near Universal Studios.  CA Weireter and his wife arrived
at around 5:00 or 6:00 p.m., as there was a cocktail hour before the dinner.  I asked CA
Weireter to describe the general "agenda" of the evening, and he advised me that it was
the 70th annual awards dinner, which recognizes the media.  He added that there was a
special recognition of fire departments that night.  The event began with cocktails in a
side ballroom, followed by dinner in the main ballroom.

I asked CA Weireter if there had been any discussions about the Willow Incident at any
point during the evening.  CA Weireter responded that there had been such a
discussion with CA Imbrenda, with whom CA Weireter had worked in the past at various
incidents.  The conversation began with a cordial hello, followed by a discussion of the
Weireters living in Agoura Hills, which is not far from Fire Station (FS) 125.  It was this
discussion that led to the topic of the Willow Incident, which had occurred near that
area.  Present during this discussion were CA Weireter and his wife, CA Imbrenda and
his wife, FFS Cornell and his date, and Erik Scott.  Seeing where the conversation was
heading, CA Weireter immediately steered it in a different direction because his wife
had family members on board the helicopter who had died in the crash.

When the cocktail hour ended, the group began making its way from the cocktail area to
the dinner area.  Along the way was a backdrop with a professional photographer,
where attendees could take pictures.  CA Weireter and his wife were walking
approximately 5-10 feet ahead of the rest of the group.  At one point, CA Weireter
noticed that CA Imbrenda and his wife, along with FFS Cornell and his date, had
stopped and were huddled together, discussing pictures of the Willow Incident and the
victims involved.  Hearing this and understanding that photos of the crash site were
being shown, CA Weireter immediately moved his wife along toward the photo area,
given that she had lost family members in the crash as noted above.  Unfortunately,
even though CA Weireter had moved his wife away from the group, both CA Imbrenda's
wife and FFS Cornell came up to them and made mention of the group looking at
photos of the Willow Incident.  CA Weireter could not recall all of the specifics of what

SMRH:4846-0416-9913.1                                    -3-

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

each of them said, but believes it was something along the lines of, "they're looking at the Kobe pictures." CA Weireter could tell that his wife was very upset about the situation.

CA Weireter stated that he never saw the photos that were shown. I asked CA Weireter if he knows whose phone the photos were on, and he replied that he is 95% sure it was CA Imbrenda's phone. CA Weireter believes the whole thing started because everyone was taking their phones out as they approached the photo area at the Golden Mike event. CA Weireter thinks CA Imbrenda's phone may have been a white iPhone. Upon further reflection, CA Weireter remembered that he heard them say that they had a picture of Kobe Bryant, and it is clear as day to him that they were talking about Kobe Bryant's remains. CA Weireter does not know if they mentioned blood, but without a doubt he recalls them mentioning bodies. I asked CA Weireter who specifically was making these statements and describing the photos, and he reiterated that it was CA Imbrenda's wife and FFS Cornell, noting that FFS Cornell also made a comment that it was "gruesome." CA Weireter has no knowledge of who took the photos, nor does he know if anyone else has photos of the crash site.

CA Weireter could not think of any additional information that he felt would be helpful for me to know as part of this investigation.

C.    **Fire Captain Erik Scott, LAFD – Witness**

I interviewed CA Scott on March 9, 2020. The interview took place telephonically and was audio recorded.

I began the interview by asking CA Scott about the Golden Mike Awards. CA Scott and his wife attended the event, after being invited by Steven Gregory from iHeart Radio and KFI. CA Scott is the PIO from the LAFD. The event took place at the Hilton Universal. According to CA Scott, the evening began with a cocktail party, where people were hanging out and chatting. At one point, they were met by the individual who was their "host" for the evening – Rick Martinez, a retired PIO from Anaheim. Mr. Martinez introduced himself to CA Scott and his wife, and CA Weireter and his wife. Following the cocktail hour, they were all seated at their table in the dining room, for dinner and the awards ceremony. At one point after the dinner, CA Scott and others were recognized for their work on recent wildfires and other incidents. After that recognition, the group was escorted to a foyer for photographs in front of a step and repeat backdrop, after which they were taken back to their table. CA Scott and his wife stayed until the end of the event, although others left early.

I asked CA Scott if, at some point during the evening, there were any discussions about the Willow Incident. CA Scott replied that there had been such discussions, although he could not recall the exact conversations or why they had occurred. However, he does recall that he, CA Imbrenda, CA Weireter and FFS Cornell were all discussing it. CA Scott then added that at some point, "they did bring up images of the incident." He went on to explain that the exchange was very brief, and took place while the group was moving towards the photo area on their way to dinner. Specifically, he recalled that as

CONFIDENTIAL                                                                      **COLA001397**

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

they were approaching the photo area, everyone was taking out their phones, and that CA Imbrenda had photos of the Willow Incident crash site on his phone.  CA Scott could not recall if FFS Cornell also had photos on his phone.

I asked CA Scott what the photos depicted.  CA Scott replied that, being colleagues and having similar job duties for similar departments, the LAFD and the Department were in close communications on the day of the event.  He went on to note that the news media did not know whose jurisdiction it was.  He further explained that the two departments often communicate regarding significant incidents.  On the evening of the Golden Mike Awards, the group was "reminiscing" about the accident in general and how horrific it was.  It was at that point that CA Imbrenda showed the group some of the photos from the Willow Incident crash site.  According to CA Scott, it was very obvious that the crash had been high impact, and the photos depicted portions of the helicopter as well as body parts.

I asked CA Scott if anyone stated that it was Kobe Bryant's body parts that were depicted in the photographs.  CA Scott replied that his name was brought up due to being in the crash and references may have been made to him, but he does not recall specifically the body parts being attributed to him.  I asked CA Scott to describe in more detail what was visible in the photographs.  CA Scott responded that he saw feet, shoes, a torso, a person bent in half, and flags on the ground indicating human remains.  He believes a reference was made to one of them being the pilot.  CA Scott then noted that in this profession, they are used to seeing such images, and he believes CA Imbrenda was simply pointing out the extremely high impact of the crash.  He went on to state that they had been receiving inquiries in reference to the fog that day, how high the helicopter was, and how fast it was going, and again noted that this was the context for why CA Imbrenda was showing them the pictures.  CA Scott believes that CA Weireter and FFS Cornell also saw the photos that night, and thinks the entire exchange lasted around 10 seconds.

I asked CA Scott if he knows who took the photos, and he replied that he believes it might have been a safety officer who was on the scene.  He recalls hearing that CA Imbrenda did not take the photos but they were sent to him, possibly by a safety officer.  CA Scott has never seen photos of the Willow Incident crash site at any other time, other than that evening.

Prior to concluding the interview, I asked CA Scott if he could think of anything else that would be helpful for me to know.  He could not think of anything else, so we concluded the interview.

     **D.**    **Fire Fighter Specialist Sky Cornell – Witness**

I interviewed FFS Cornell on March 12, 2020.  Also present at the interview was Kurt Kobler, FFS Cornell's union representative from Local 1014.  The interview took place at the Department's facility on Corporate Center Drive and was audio recorded by both me and Mr. Kobler.  FFS Cornell began working for the County approximately seven

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

years ago as a Probationary Firefighter.  He currently works as an inspector in the Department's PIO office.  He has been in his current assignment for 15 months.

I began the substantive portion of the interview by asking FFS Cornell about the Golden Mike Awards on February 15, 2020.  FFS Cornell confirmed that he was in attendance at the event because he and CA Imbrenda had both been identified to receive awards for exemplary service.  The event took place at the Hilton Universal.  FFS Cornell could not specify what time he arrived, but recalls being the only one from the group who was on time.  I asked FFS Cornell to walk me through the agenda of the event.  He advised me that the event began in a small room that had a couple of no-host bars with bartenders and cocktail tables.  People were greeting one another and mingling during the cocktail hour, after which they all headed into the main "arena" for the event and awards ceremony.  He also noted that there was a photo opportunity in the hallway between the cocktail area and the main arena.

I asked FFS Cornell if he recalled any discussions during the cocktail hour regarding the Willow Incident.  FFS Cornell replied that he did not recall any such discussions during the cocktail hour, but recalls some discussions while the group was near the photo area on the way to the dinner area.  I asked him about the substance of the discussions. FFS Cornell responded that he did not recall specifically what was discussed, other than general comments about the craziness of it all.  Involved in these discussions were FFS Cornell and his girlfriend, CA Imbrenda and his wife, CA Weireter from the LAFD and his wife, and CA Scott from the LAFD and his wife.  I asked FFS Cornell if he recalled any other discussions about the incident.  He responded that he could not recall any other discussions specifically because so many discussions about Kobe Bryant were happening around that time.

FFS Cornell also stated that he recalled seeing some photos of the Willow Incident crash site during the event.  This also took place near the photo area when the group was moving from the cocktail area to the dinner area.  I asked FFS Cornell for specifics, and he advised me that someone (he does not know who) had sent CA Imbrenda some photos of the incident (either during the incident or later on, he did not know), and CA Imbrenda was showing some of those photos to the group while they were near the photo area.  I asked FFS Cornell if just the sworn individuals were viewing the photos or if significant others were also able to see them.  FFS Cornell responded that he did not know, but is confident that his girlfriend did not see them, and recalls CA Imbrenda saying to her, "trust me – you don't want to see anything like this."  FFS Cornell added that he believes CA Imbrenda's decision to share the photos with the sworn members of the LAFD was appropriate, since they are all PIOs and "this is their job."

I asked FFS Cornell what the photos depicted, and he mentioned that he saw plane wreckage and "what not," but that was about it.  FFS Cornell then went on to talk about the "business purpose" of CA Imbrenda showing him the photos, namely, to educate him on how to locate the VIN number on an aircraft.  FFS Cornell noted that it was CA Imbrenda who initially identified whose helicopter it was, and FFS Cornell wanted to know how CA Imbrenda had done that, so he was trying to see the VIN number on the door in the photos CA Imbrenda was showing the group.  FFS Cornell had also hoped

CONFIDENTIAL                                                                      **COLA001399**

Defendants' Summary Judgment Exhibit 18
Page 70

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

to see Kobe Bryant in the photos, and was disappointed that no such images were on CA Imbrenda's phone.  According to FFS Cornell, the time CA Imbrenda spent sharing the photos was very brief, likely spanning only seconds, and definitely not spanning more than a minute.

I then advised FFS Cornell that I had been told by other witnesses (whom I did not identify) that there were human remains visible in some of the photos that CA Imbrenda showed at the Golden Mike event.  Although FFS Cornell had initially stated that the photos basically only showed wreckage and "what not," he then recalled that the photos also included orange cones that marked where human remains were, but he did not recall any body parts.  I then pressed FFS Cornell a bit more, specifically asking him if he recalled seeing feet, legs or a torso in the photos.  FFS Cornell responded that he recalled seeing a foot, but not a torso or anything resembling a figure of a body.  He then repeated that he recalled seeing a foot and a marker (i.e., the orange cone), and that was about it.

> *Investigator Note*:  *At this point during the interview, Mr. Kobler asked to take a break and we went off the record.*

When FFS Cornell and Mr. Kobler returned and we resumed the interview, FFS Cornell clarified that he specifically recalled seeing five photos on CA Imbrenda's phone, which depicted the following images:  (1) a propeller, (2) a wide-span shot in which the orange cones / markers were visible, (3) a foot, (4) something that looked like a human appendix or another organ, and (5) the mountain with smoke on it.

> *Investigator Note*:  *FFS Cornell did not list the door with the VIN number as he had alluded to previously as an image depicted in the photographs.*

FFS Cornell again stated that he was disappointed that there were no photos of Kobe Bryant on CA Imbrenda's phone.  He then reiterated that he did not see any photos of faces or bodies intact.  He also does not recall if the foot in the photo was attached to a body or not.  FFS Cornell recalled that his girlfriend was pressuring him to take a picture with her at the photo area, so the time during which he was viewing photos of the crash site on CA Imbrenda's phone was very brief.

I then asked FFS Cornell for specific information about the phone containing the photos he had just described, and he replied that it was CA Imbrenda's iPhone, which is either red or not.  FFS Cornell also confirmed that the phone was definitely CA Imbrenda's work phone – not his personal phone – since CA Imbrenda is very serious about not mixing the two devices.

FFS Cornell then volunteered some additional information, namely that "on every incident, we want photos."  He explained that a PIO's job deals with social media and the dissemination of information to the media.  He further explained that all such information must be vetted through the PIO's office, so again, it is common for them to

SMRH:4846-0416-9913.1                                    -7-

**CONFIDENTIAL**

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

receive photos or videos of every incident, especially because others often arrive to the scene before they do (volunteer photographers, etc.).

FFS Cornell does not know who took the photos that were on CA Imbrenda's phone, and likewise does not know if those photos were sent to anyone else.  However, FFS Cornell is confident that the photos were not taken by CA Imbrenda because CA Imbrenda stated to him that the photos had been sent to him by someone else.  Other than during this interaction at the Golden Mike Awards, FFS Cornell has never seen any photos of the Willow Incident crash site at any other time, and is not aware of CA Imbrenda sharing those photos with anyone at any other time.

FFS Cornell does not recall making a comment along the lines of, "I just saw Kobe's body before I have to eat."

Before we concluded the interview, I asked FFS Cornell if there was anything else he felt would be helpful for me to know as part of this investigation.  He replied that he was "surprised" by the investigation and "shocked" by the waste of time in conducting such an investigation.  FFS Cornell added that he does not see what CA Imbrenda did wrong by having photos on his phone that he did not even take, and showing them to other PIOs.  FFS Cornell went on to state that nothing in the Department's policies prevent such conduct, and reiterated that when someone wants to send photos of an incident to the Department, they send them to the PIO's office.  He further noted that photos are often used for training purposes.

At this point during the interview, Mr. Kobler asked FFS Cornell what types of things the PIO's office is supposed to be doing.  FFS Cornell replied that CA Imbrenda writes training curriculum for people at all levels.  He also noted that the Fire Chief's directive is that the PIO's office has to do a better job at giving interviews and disseminating information.  FFS Cornell again emphasized that there is training that must be given about how to do a PIO's job.  He noted that there is information that is allowed to be disseminated and other information that is not allowed to be disseminated, such as license plates, the inside of people's homes, and the like.  In order to illustrate these concepts during trainings, the PIO's office has photos – gruesome or not – that they use.  FFS Cornell is of the mindset that he needs photos as part of his job, and there have been incidents in the past in which he has received no photos and has thought to himself, "I can't believe no one has sent anything in."  He again noted that photos are used for trainings and there are "no bad photos."  He then stated that CA Imbrenda is the PIO and, as such, is the exact person who should be privy to everything.  With respect to CA Scott and CA Weireter, they are also the PIOs of their department, and as such, CA Imbrenda was showing his professional colleagues something within the realm of the work they do.

E.    **Fire Captain Tony Imbrenda – Subject of Investigation**

I interviewed CA Imbrenda on March 12, 2020.  Also present at the interview was Lew Currier, CA Imbrenda's union representative from Local 1014.  The interview took place at the Department's facility on Corporate Center Drive and was audio recorded.

SMRH:4846-0416-9913.1                                          -8-

CONFIDENTIAL

COLA001401

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

CA Imbrenda began working for the County in April 1996, as an Environmental Health specialist.  He currently works as a Fire Captain, and was recently removed from his position as the Department's PIO – a position he held since September 2018.

I began the substantive portion of the interview by asking CA Imbrenda about the Golden Mike Awards on February 15, 2020.  CA Imbrenda confirmed that he was in attendance at the event and had been invited by a KFI reporter who invited several PIOs to attend the event and receive a plaque.  CA Imbrenda believes the event took place at either the Sheraton or Hilton Universal.  He arrived to the event during the early evening, around 6:00 p.m.

I asked CA Imbrenda to walk me through the agenda of the evening.  He advised me that the event began with a cocktail hour, after which the group proceeded to a different room for the awards ceremony and dinner.  I asked CA Imbrenda if there had been discussions during the cocktail hour about the Willow Incident.  CA Imbrenda confirmed that such discussions occurred between himself and FFS Cornell, CA Scott and CA Weireter.  According to CA Imbrenda, the conversation began when CA Scott and CA Weireter approached him and asked him what he had been through with respect to the incident.  CA Imbrenda felt that this was pretty typical given the circumstances, noting that he and CA Scott regularly discuss major incidents for learning and training purposes.  CA Imbrenda advised me that there were others standing around during these discussions; however, this was standard PIO stuff and the non-PIOs in attendance were not really interested.  The conversation did not last for long, as the group was being rushed out of the room to an area where photographs could be taken, on the way to the room where dinner would be served.

I then advised CA Imbrenda that at issue in this investigation is a report the Department received that while the group was near the photo area, he showed some or all of them photos of the Willow Incident crash site.  CA Imbrenda confirmed that he had done so, but clarified that the only people he showed the photographs to were his professional colleagues (FFS Cornell, CA Scott and CA Weireter) and not any civilians.  According to CA Imbrenda, there were some civilians nearby who were trying to see the photos, but he advised them that it was not something they would be interested in seeing, and kept them away.

CA Imbrenda heard that there were numerous people who had taken photos at the crash site, but the photos in his possession had been sent to him by CA Arlin Kahan and CA Brian Jordan.  CA Imbrenda does not know if CA Kahan and CA Jordan took the photos themselves.  The majority of the photos were not graphic in nature, and most of them were of the debris, but there were a few that were graphic in nature and showed human remains.  CA Imbrenda also noted that as the PIO, he regularly receives photos of incidents, sometimes of a graphic nature.  He added that it is his job to advise people on how to handle photos of a graphic nature, and to never use them or post them on social media.

I pressed CA Imbrenda for more details on the contents of the photos he had received, including whether they depicted a foot, torso, appendix and things of that nature.  CA

CONFIDENTIAL                                                                                   **COLA001402**

Defendants' Summary Judgment Exhibit 18
Page 73

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

Imbrenda stated that it was possible, but he could not recall specifics and had not spent much time studying the photos. He also advised me that after he received the photos, he got rid of them in pretty short order because he had no use for them, and told others to get rid of them as well, because he had concerns that they could be misused. CA Imbrenda went on to state that it is standard operating procedure for him to receive photos, and he receives hundreds of photos (some from people he does not even know) for any notable incident. For the Willow Incident, there was a flood of photographs that he received, and according to CA Imbrenda, the fact that CA Kahan and CA Jordan sent him photographs was not surprising and was professionally something they would do, given his role as PIO. He also noted that as a former PIO, CA Jordan understood that sending graphic images electronically was not a good practice, so CA Imbrenda thinks that the photographs from CA Jordan depicted only debris.

I then asked CA Imbrenda what was depicted in the photos he shared with CA Scott, CA Weireter and FFS Cornell at the Golden Mike event. He replied that he wanted it to be "purely professional," again noting that there was a clear attempt by the civilian women (the significant others of the sworn members of the group) to come over and look. According to CA Imbrenda, they were "less than pleased" that he did not allow them to view the photos. CA Imbrenda then advised me that he does not recall showing graphic photos to the group and that there would have been no reason for him to show such photos. He stated that he had a collection of photos on his Department phone, he opened it up, had a very short interaction with the group (less than 30 seconds in his opinion) during which he showed them only a few photos, and then "dissolved" the discussion because people were barking at them to "move along" and there were civilians around. Other than during that brief interaction, CA Imbrenda never shared the photos with anyone else at any other point during the Golden Mike Awards, and he does not believe that anyone else shared any such photos that evening.

I then informed CA Imbrenda that I had been advised by others that there were human remains and markers indicating human remains in the photos that he shared. CA Imbrenda responded that although it was possible that such images may have been in the photos, it was not unprofessional or "ghoulish," and was simply from one PIO to another. He then reiterated that he does not recall if human remains were in the photos, but acknowledged that it is possible there had been.

With respect to the phone, the photos were on CA Imbrenda's work iPhone. However, they have since been deleted. Specifically, CA Imbrenda deleted the photos over the course of about a week, within a few weeks of the incident itself. He added that within the last 10 days from the prior Friday (March 6th), they were already gone from his phone. I asked CA Imbrenda why he deleted the photos, and he noted that press reports had started to come out, so he made a concerted effort to get rid of the photos. He added that he had no use for the graphic photos, so he got rid of the photos that depicted "patients," since such photos would not be appropriate to post to social media. CA Imbrenda specifically recalls that photos had become an issue in the media, as some such photos had been misused by certain individuals, so he went back into his phone to make sure that all such photos were gone. The process of deletion took some time, because the photos were in various places in CA Imbrenda's phone (Google drive

CONFIDENTIAL

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

and several other spots). CA Imbrenda again stated that he was very concerned that such photos could be misused, so he deleted them. He also instructed everyone he knew that had been on the incident to do the same. I asked CA Imbrenda when he gave this instruction about deleting the photos, and he responded that he did so every time he spoke to the individuals who had been involved, including CA Kahan and CA Jordan, and also told those individuals to give the same instruction to their own people.

I then asked CA Imbrenda if he ever had any photos of the incident on his personal phone. He responded in the affirmative, noting that the photos he received were sent to both phones. However, like his work phone, the photos have long since been deleted. In fact, CA Imbrenda probably deleted the photos from his personal phone before he deleted them from his work phone because his daughter plays with his personal phone and he would not want her to see photos like that. CA Imbrenda added that had he known there was the potential for something like this to happen, he would not have had the photos for a second. CA Imbrenda then confirmed that he is not currently in possession of any photos whatsoever from the Willow Incident on any of his devices.

I asked CA Imbrenda if, other than the night of the Golden Mike Awards, he ever shared or showed photos of the Willow Incident crash site to anyone else. The only thing Captain Imbrenda recalls was sending a few debris field photos that were non-graphic in nature back to CA Kahan. However, he emphatically stated that he never allowed, and would never allow, photos to go out of his possession where they could end up in hands that would misuse them.

At this point during the interview, I asked CA Imbrenda some broader questions about his involvement in responding to the Willow Incident on January 26, 2020. CA Imbrenda was at home, but was contacted by dispatch to go to the scene. He believes this was around noon or the early afternoon. He reported to the incident and checked in with the incident commander at the staging area, about a mile away from the crash site. He also gave a statement to the media. At that point, CA Imbrenda was not yet aware that Kobe Bryant had been on board. CA Imbrenda was not at the staging area for long, as he had to deal with the media elsewhere. Eventually, he received a call from the LAPD that there may have been a celebrity on the aircraft. In total, he was at the staging area less than 10 minutes, and then spent about 6-7 hours at other locations, including a press conference at the Sheriff's station. CA Imbrenda did not go to the actual crash site that first day, so he could not have taken any photos of the site, but he took some remote photos of the engine companies that were there as well as the aircraft, and put out a tweet that they were on scene for an aircraft down.

I asked CA Imbrenda if he is aware of anyone who took photos at the crash site on January 26, 2020. He responded that he does not know specifically who may have taken them, noting that there were FBI people running around and taking pictures. CA Imbrenda does not know of any specific member of the Department who took photos that day.

I next asked Captain Imbrenda about his involvement the following day, January 27, 2020. CA Imbrenda was on duty that day and reported to the incident command post.

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

There were messages coming to him, stating that there would be a briefing in the morning about what was to occur that day, and he was to go to the briefing.  He advised me that he was at the briefing in the morning, dealing with the media and different chiefs that were coming in, as well as helping the NTSB and the FBI photographer.  Ultimately, he and CA Kahan went in a vehicle to the crash site, to assist an FBI photographer and help her hike around the hill and manage her equipment.  CA Imbrenda was at the crash site for approximately 15 minutes, assessing the site as he would with any incident, since he knew he would be interviewed extensively by the media.  While he was there, he took a few photos of the debris field, which were not graphic in nature.  He noted that by the time he arrived, the vast majority of patients had been removed, and the one or two patients who remained were covered.  He estimates that he took 4-5 photos in total, which were all for the purpose of potential use on social media.  Captain Imbrenda made sure that there were no graphic images in the photos.  He believes these were the photographs he sent to CA Kahan, and again reiterated that he would never send graphic photos electronically to anyone.

I asked CA Imbrenda if there were any other occasions (besides the Golden Mike Awards and the time he sent non-graphic photos to CA Kahan) on which he shared or showed photos of the Willow Incident to anyone else for any other reason.  CA Imbrenda replied that there were not, and that he never ended up posting any photos at all from the crash site to social media.  However, he did put up one photo of the helicopter on the ground that had hoisted up one of the firefighters and the fire engines that were there doing their jobs.  As to the origin of photos of the incident, CA Imbrenda reiterated that he is not aware of any specific member of the Department who took photos of the Willow Incident crash site, noting that he knows where he got them (i.e., from CA Kahan and CA Jordan), but does not know where CA Kahan and CA Jordan got them.

Other than January 27, 2020, CA Imbrenda never went back to the actual scene of the helicopter crash.  The closest he got was several weeks later, during interviews with the media, when he took them to the north side of Las Virgenes Road.  However, the site was not visible from that location.

Prior to concluding the interview, I asked CA Imbrenda if he felt that there was anything else that would be important for me to know, in light of the nature of the investigation.  He replied that had he known that this situation would turn into an embarrassment for the organization, he would have been more aggressive in ensuring that the photographs disappeared immediately, and he would have aggressively made sure they were deleted.  He added that his intentions are 100 percent to protect the Department, and to the extent the Department has been embarrassed, he is horrified and embarrassed.  He went on to state that the Department is in need of a strong policy on issues such as this, for future people who do this kind of work.

CONFIDENTIAL                                                    COLA001405

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

F.    **Battalion Chief Roland Sprewell – Witness**

I interviewed Battalion Chief (BC) Sprewell on April 8, 2020.  Due to the COVID-19 outbreak, the interview took place telephonically.  BC Sprewell did not bring a representative to accompany him during the interview.

BC Sprewell began working for the County in September 1994, as an entry-level Firefighter.  He currently holds the rank of Battalion Chief and serves as the Chief of Public Affairs – a position he has held since December 2019.

I began the interview by asking BC Sprewell about his involvement in the Willow Incident on January 26, 2020.  He was not on duty that day, but when he heard about the enormity of the situation, he put himself on duty and responded to the incident. Specifically, BC Sprewell received reports from the Department's initial PIO on the scene that it was a helicopter crash with several fatalities.  He knew that it would be a major media event and would have a lot of moving parts, so he responded to the scene. He subsequently learned that Kobe Bryant was on board and he knew that he needed to be on site to supervise the coordination of media interviews, set up press conferences, and handle the overall coordination of the incident.  This was in line with BC Sprewell's job duties as Chief of Public Affairs.

I asked BC Sprewell about his physical whereabouts on the day of the crash.  BC Sprewell went to the "command post" location, which was located several hundred feet from the crash, but he never went up to where the actual crash site was.  BC Sprewell did not go to the site of the Willow Incident on any other day.

I next asked BC Sprewell if he is aware of anyone who took photos of the crash site. BC Sprewell initially responded that while he does not have any personal knowledge of anyone taking photos, it is his understanding that CA Imbrenda and CA Jordan took photos of the crash site.  I asked BC Sprewell to explain the basis of this understanding. BC Sprewell explained that CA Imbrenda told him about a training class he had attended with CA Jordan, during which the two of them were discussing having photos of the incident.  This was especially pertinent because the story had just broken about LASD deputies having photos from the crash site.  BC Sprewell also opined that the training class where this discussion between CA Imbrenda and CA Jordan took place had occurred within about a week of the incident.  However, as BC Sprewell continued to discuss this issue with me, he corrected his prior statements, noting that he did not actually recall CA Imbrenda saying that he had taken the photos himself.  Rather, CA Imbrenda advised BC Sprewell that CA Jordan had taken the pictures of the crash site. BC Sprewell also noted that the training class where the discussion took place must have actually occurred more than a week after the incident, because the story about the LASD deputies had broken approximately two weeks or more after the incident.  In sum, BC Sprewell made clear by the end of our discussion of this topic that he does not specifically recall CA Imbrenda stating that he took photos himself, but does recall CA Imbrenda stating that CA Jordan had done so.  BC Sprewell never discussed the nature of the photographs (i.e., graphic vs. non-graphic content) with CA Imbrenda.

CONFIDENTIAL

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

I asked BC Sprewell if he believes that anyone else took photos of the Willow Incident
crash site.  BC Sprewell replied that although he does not have any specific knowledge
of such, he does think that photos were taken.  According to BC Sprewell, it is
unfortunately not a huge jump to think that firefighters took photos, given that they were
on the scene and the crash involved a major public figure.  I then asked BC Sprewell if
taking such photographs would have been appropriate.  He vehemently responded that
doing so would absolutely be inappropriate, and that his first response to hearing that
people had taken graphic photos was "who in the hell does that?"  He went on to
explain that he has been a firefighter since he was 18 or 19 years old, and over the
years there have certainly been photos taken from afar, such as pictures taken from a
command post, pictures of firefighters in action or pulling hose, or even photos of a
crash site from a distance.  Sometimes firefighters will even take a photo on a scene
with another crew member they run into whom they have not seen in a while.  However,
such photos are in sharp contrast to photos taken of decedents at a crash site, which is
completely inappropriate and serves no business purpose whatsoever.  BC Sprewell
went on to note that he has never had a desire to take pictures of dead people, and
when he heard that others may have done so, his response was disbelief and disgust.
To date, BC Sprewell has never personally seen any photographs of the crash site,
other than those that are publicly available through media outlets.

I then had a brief discussion with BC Sprewell about the job duties of a PIO.  BC
Sprewell advised me that the job of a PIO is essentially to be a subject matter expert
who responds to emergency incidents and bridges the gap between the Department
and the mainstream media.  Generally speaking, PIOs talk to the media and the public
about what firefighters do, why they do it, and how they do it.  PIOs have been known to
write articles and press releases, help create marketing campaigns for the Department,
and educate the public on fire and life safety issues, among other things.  With respect
to something like a crash site, BC Sprewell explained that it would be appropriate for a
PIO to go to the scene of a major incident, especially one like the Willow Incident that
was expected to generate a lot of media attention on a local, national and even
international level.  In fact, such a presence is often critical during the initial phases of
such an incident, as the PIO can manage the media while the operational personnel
and incident commander deal with the incident itself.

I next asked BC Sprewell if it would be appropriate for photos of a crash site such as the
Willow Incident to be sent to the PIO.  Chief Sprewell responded that it would depend
on the photo.  For example, photos depicting firefighters in action, captured by someone
who is not directly responsible for being involved in operations, are regularly taken to
present to the public and the media regarding what firefighters are doing.  With respect
to the Willow Incident specifically, BC Sprewell noted that there was a brush fire that
had been caused by the crash, and it would be common for someone to take a photo of
the Department's firefighters at work, cutting a line and pulling hose to address that
brush fire.  However, personnel has been trained by Public Affairs and the Executive
Support Division on the parameters of what is appropriate and not appropriate, and
graphic photos depicting human remains are certainly not appropriate.

SMRH:4846-0416-9913.1                    -14-

CONFIDENTIAL

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

Following up on the issue of personnel being "trained" on the parameters of such photographs by Public Affairs and the Executive Support Division, I asked BC Sprewell if he was aware of anything in writing setting forth such parameters.  He could not identify any written means by which the parameters of "appropriate" versus "inappropriate" photos are explained (other than general language in the current social media policy regarding not posting pictures of patients), and he is not aware of anything that specifically states that Department personnel are not to take photos of graphic images, decedents, and the like.  However, BC Sprewell was emphatic that there is absolutely no need or business purpose for anyone to take graphic photos of an incident or send such photos to the PIO or anyone else, other than possibly as part of an arson investigation (he was not certain if such photos would be appropriate during such an investigation, but opined that they might be).

At this point during the investigation, I turned to the topic of the Golden Mike Awards, and advised BC Sprewell (while reminding him to keep such details confidential) that an allegation had been made regarding CA Imbrenda sharing graphic photos of the Willow Incident with others during a social event.  I asked BC Sprewell if he was aware of these allegations, and he acknowledged that after CA Imbrenda was suspended and removed from his assignment, he heard that photos of the crash site had been shared with some LAFD personnel at the Golden Mike Awards.  I then asked BC Sprewell what his reaction was when he first heard of this alleged conduct.  BC Sprewell responded that it was completely inappropriate, repeating his earlier rhetorical questions of, "who does that?" and "who takes pictures of that?"  BC Sprewell added that he likes CA Imbrenda and has known him for a long time, but again reiterated that even if CA Imbrenda was in possession of photos from the crash site, there would be no purpose in showing them to others (even other PIO staff from the LAFD), and nothing to be gained by doing so.

I then asked BC Sprewell if his position would change if CA Imbrenda had shared the photos not only with LAFD personnel, but also with civilians at the social event.  BC Sprewell responded that it would be even more problematic.  He noted as an aside that firefighters share things and relate to one another in a way that only other firefighters understand.  Yet, even under those circumstances, sharing graphic photos with other firefighters is still inappropriate and unacceptable.  With that in mind, taking it a step further and sharing such images with civilians is worse still, and completely goes against everything he and his staff stand for and try to accomplish in their roles.  BC Sprewell explained that Public Affairs is responsible for promoting the image of fire personnel and presenting them as servants to the public, and for someone to "bask in the glory" of responding to a tragic, horrific incident where people lost fathers, daughters, wives and family members, and parade it around as if it were some sort of "badge of honor," is disgusting and despicable.  He further noted that Department personnel already assume the burdens of seeing so much tragedy and death, and to parade it around in such a manner is conduct unbecoming of a firefighter.

Finally, I asked BC Sprewell if he had ever attended meetings regarding the creation of a new social media policy for the department.  BC Sprewell recalled attending two such meetings – one of which was also attended by FFS Cornell, and the other of which was attended by both FFS Cornell and CA Imbrenda.  I asked BC Sprewell if the issue of

SMRH:4846-0416-9913.1                                   -15-

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

graphic photographs being taken at incidents had been discussed during those meetings.  Chief Sprewell replied that he could not recall such a topic specifically being discussed, but felt that such a discussion should not be necessary in any event, as the impropriety of taking pictures of decedents is a "no-brainer."  Chief Sprewell again questioned who would do such a thing, and why anyone would possibly think that it would be allowed.  He went on to note that a prohibition on taking such photographs is "common sense" and "low-hanging fruit."  BC Sprewell added that he never thought this would be a topic of discussion because it is so obvious, but he is now of the mindset that it should be expressly spelled out in the new social media policy.  He then reiterated a final time that taking graphic photographs at the scene of a crash site or other incident is conduct unbecoming of a firefighter.

* * *

After discussing my preliminary findings with the Department, I was advised of some additional questions that the Department felt would be helpful to ask BC Sprewell.  Thus, on June 11, 2020, I conducted a follow-up interview with BC Sprewell.  Also present at the interview was Julia Kim, the Department's Risk Manager.  Due to the COVID-19 pandemic and the need for social distancing, I conducted the interview via remote Zoom video, which was also audio recorded.

I began the follow-up interview by reminding BC Sprewell of the general topics we discussed during our initial interview, along with the general nature of his responses, and asked if he recalled our discussion.  BC Sprewell confirmed that he did.  I then asked BC Sprewell to walk me though what CA Imbrenda did with respect to the Willow Incident.  BC Sprewell began by stating that it began when he received a message regarding an aircraft crash in Calabasas.  BC Sprewell called dispatch to find out which PIO was being dispatched, but was advised that none had been assigned.  BC Sprewell called CA Imbrenda to advise him of the crash and noted that dispatch would be contacting him as well.  At the time, BC Sprewell also had a brand new PIO inspector in the unit, and wanted him to go to the crash site as well.  CA Imbrenda subsequently arrived at the scene and within a short period of time, he called BC Sprewell to advise him that the incident was a mess, with bodies all over the hillside and reports that Kobe Bryant may have been on board.  BC Sprewell recognized that this was potentially a major international news incident, so he instructed dispatch to add him to the response.  When BC Sprewell arrived, he proceeded to the command post, where he found CA Imbrenda, the new inspector, Deputy Chief (DC) Anthony Marrone and BC Drew Smith.  At that point, CA Imbrenda had already conducted some interviews with the local media.  BC Sprewell received a quick update on the status of the incident, and shortly thereafter, FC Daryl Osby arrived on scene.  When the group concluded at the base of the hill (BC Sprewell had been there for approximately an hour), that was essentially the end of the Department's operation, as it was evolving into the investigation phase.  Sheriff Villanueva was calling for all media to go to the Lost Hills Sheriff's station, so BC Sprewell and the Fire group wrapped up their operations, and he, FC Osby, CA Imbrenda and DC Marrone all proceeded to Lost Hills for the press conference.  Between the prep, the press conference, and the After Action Review, the group was at Lost Hills for approximately three hours.  BC Sprewell does not know if CA Imbrenda

SMRH:4846-0416-9913.1                                    -16-

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

returned to the command post after leaving Lost Hills, and he believes that CA Imbrenda only worked during the first day of the Willow Incident.  BC Sprewell is not aware of any direction given by anyone regarding the taking or deleting of photographs at the Willow Incident.

I pressed BC Sprewell for more details regarding what duties CA Imbrenda performed in connection with the Willow Incident.  BC Sprewell again noted that CA Imbrenda had spoken to at least some of the media outlets before BC Sprewell arrived, and stated that CA Imbrenda may also have issued some press releases as well.  I asked BC Sprewell if CA Imbrenda worked with FC Osby during the incident.  BC Sprewell replied that when FC Osby arrived, CA Imbrenda briefed him on what was going on, and the group then headed over to the Lost Hills station.  When they arrived, CA Imbrenda's primary job was putting together speaking points for FC Osby, with the assistance of one of the community service liaisons.  I asked if CA Imbrenda accompanied FC Osby to briefings and the like, and BC Sprewell replied that he (BC Sprewell) actually worked more closely with FC Osby than CA Imbrenda did, consistent with his role as BC.  So, for example, while CA Imbrenda was putting together the speaking points referenced above, BC Sprewell was briefing FC Osby on what would be happening and in what order, as well as collaborating with Sheriff Villanueva and his people.  BC Sprewell does not recall CA Imbrenda accompanying FC Osby to any other press conferences, nor does he recall CA Imbrenda preparing speaking points for FC Osby, or any other Chief Officers for that matter, in connection with any other press conferences.

I asked BC Sprewell if there were any other specific duties CA Imbrenda performed in connection with the Willow Incident.  BC Sprewell replied that when the Public Records Act requests started to pour in, CA Imbrenda elevated them to BC Sprewell, who provided them to Ms. Kim.

With respect to the number of PIOs at the Department and the profile and responsibilities of CA Imbrenda specifically, BC Sprewell advised that there is a PIO captain and three PIO inspectors, each of whom rotate weekly for after-hours emergency responses.  The PIO captain (formerly CA Imbrenda), for all intents and purposes, is the main spokesperson.  However, when the PIO captain is off his rotation or away, the others step in and provide comment or commentary as needed.  As the Department's PIO, CA Imbrenda was held to a higher standard of conduct and responsibilities, especially given his visibility.  According to BC Sprewell, while serving as the PIO, CA Imbrenda was the main spokesperson for the Department, and was BC Sprewell's lieutenant and right hand person.  He was also the commander of the unit and the "head" of the group, so to speak.  Within the chain of command, the inspectors and other support personnel worked directly for CA Imbrenda.

I next advised BC Sprewell that it was my understanding that there were post-Willow meetings and phone calls, during which the media coverage of the LASD taking photos of the incident was discussed, and asked BC Sprewell if he was involved in those meetings.  BC Sprewell replied that he participated in a conference call on the issue.  He recalls thinking "I hope we were not involved" when he first learned of the allegations against the LASD.  In fact, when the LASD news story broke, the media quickly began

SMRH:4846-0416-9913.1                                    -17-

CONFIDENTIAL                                                          **COLA001410**

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

calling the Department to ask if they knew anything about it.  At some point around that timeframe, there was a conference call with FC Osby, CD Richardson, Ms. Kim, and several others regarding next steps if the Department became involved.  According to BC Sprewell, there were at least two such conference calls, and he recalls being involved in at least one of them.  CA Imbrenda did not participate in the conference calls.  I asked BC Sprewell if the issue of photographs taken by Fire personnel was discussed, and although he could not recall specifics, he does recall there being allegations that firefighters may have taken and/or shared photographs of the Willow Incident.

At this point during the interview, Ms. Kim asked BC Sprewell a number of questions.  First, she again asked BC Sprewell if instructions had been given at the Willow Incident regarding the taking of photographs, and BC Sprewell again replied that he was not personally aware of any such instructions.  Ms. Kim next asked if FC Osby expressed any thoughts during the telephonic meetings regarding what should be done if the Department was accused of taking photographs of the Willow Incident.  BC Sprewell replied that FC Osby obviously hoped that the Department was not involved, but if such conduct had occurred, he wanted to get ahead of the situation.  BC Sprewell also noted that like many other people involved, FC Osby found the notion of people taking graphic photographs of the incident to be reprehensible.  Ms. Kim asked BC Sprewell what he reported to CA Imbrenda regarding the telephone conferences on the issue of photographs.  BC Sprewell replied that he told CA Imbrenda something along the lines of, "who in the hell does that -- takes graphic photographs and shares them?  As if we don't see enough tragedy and death."  BC Sprewell does not recall what CA Imbrenda's response was, but noted that CA Imbrenda appeared to agree with his sentiments.  BC Sprewell does not recall expressing these sentiments to others at the PIO's office because it was beyond his comprehension that anyone would take photographs of human remains.  BC Sprewell does not know if CA Imbrenda expressed BC Sprewell's sentiments to others at the PIO's office.  At the time of these telephonic meetings, there was no confirmation that anyone at the Department had actually taken any such photographs, and everyone was aligned in the hope that no such conduct had occurred.

I next asked BC Sprewell about the social media meetings he attended.  I reminded him that when we spoke previously, I had asked him about those meetings, and whether they included a discussion of a policy prohibiting the taking of photographs at incidents.  With this foundation in place, I asked BC Sprewell for more details about the meetings.  He stated that two social media committee planning meetings had occurred, and reiterated that he did not recall any specific discussions regarding the taking of photographs at incidents.  According to BC Sprewell, there have always been discussions during incidents regarding the kinds of things that should, and should not, be captured in photographs and posted on social media.  BC Sprewell stated that there are differing opinions on what should be posted, but regardless, firefighters should be doing their jobs and not taking their phones out to take photographs.  BC Sprewell added that the Department has stringers and volunteer photographers who take photos that depict what firefighters do.  As to taking photographs of decedents, BC Sprewell does not believe that any such discussion should have been necessary, as anyone should know that doing so is inappropriate.

SMRH:4846-0416-9913.1                                          -18-

CONFIDENTIAL

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

I asked BC Sprewell if CA Imbrenda was present at the social media policy meetings, and he replied that he was at one of the meetings, along with FF Cornell. BC Sprewell recalls that CA Imbrenda provided input, but does not recall specifics. During that meeting, there was a discussion regarding having a process and a framework by which the Department could capture images at incidents, but again, BC Sprewell could not recall specifics. Ms. Kim asked if, following that meeting, BC Sprewell thought that CA Imbrenda and FF Cornell had an understanding of what images were appropriate and not appropriate. BC Sprewell responded that, although there were differing views on several issues, he felt that everyone was clear on what was legal and not legal.

I then reminded BC Sprewell of our prior discussion in which he advised me that after Captain Imbrenda had been suspended and removed from his assignment, BC Sprewell heard that CA Imbrenda had shared photos of the Willow Incident with some LAFD personnel at the Golden Mike Awards. BC Sprewell recalled that discussion. I then asked BC Sprewell if he recalled when he first heard this information. BC Sprewell could not recall where he heard the information or who he heard it from, but he believes that it was after CA Imbrenda had already been removed from his position as PIO. BC Sprewell is not aware of any other incidents in which CA Imbrenda allegedly shared photos of the Willow Incident.

I next advised BC Sprewell that in the regular course of business, the Department had become aware of an email that BC Sprewell sent on February 28, 2020, to CA Imbrenda, FF Cornell, Sean Ferguson, Henry Narvaez, and Marvin Lim, in which there was a link to an article about LASD deputies sharing photos of the Willow Incident. I asked BC Sprewell if he recalls sending the email, and he confirmed doing so. I then asked him why he sent the email. BC Sprewell replied that he believes he sent the email on the day the story broke, to remind everyone to be careful about what they posted on social media, noting that nothing is a secret, especially when it comes to social media. BC Sprewell added that he did not want to be in the position of having to defend the Department.

### G.   Fire Captain Arlin Kahan – Witness

CA Kahan was not in attendance at the Golden Mike Awards, and was not interviewed as part of this investigation. However, he was interviewed in connection with a related investigation regarding certain members of the Department taking and/or sharing photos of the Willow Incident. Given that CA Imbrenda stated that at least some of the photographs that he shared at the Golden Mike Awards had been sent to him by CA Kahan, the summary of CA Kahan's interview from the related investigation is included here.

CA Kahan was interviewed on April 6, 2020. Also present at the interview was Lew Currier, CA Kahan's union representative from Local 1014, and Kurt Kobler, who was present as an observer. Due to the COVID-19 pandemic and the need for social distancing, the interview took place via remote Zoom video on April 6, 2020, and was audio recorded.

SMRH:4846-0416-9913.1                                              -19-

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

CA Kahan started working for the County in January 1992, as a Firefighter.  He
currently serves as a Staff Aid for the Central Region, reporting to DC Marrone.  CA
Kahan has served in this role for three years.

CA Kahan confirmed that he was on duty on January 26, 2020, the first day of the
Willow Incident.  However, he did not have any involvement in responding to, or working
at, the incident, nor did he report to the crash site.  CA Kahan was also on duty the
following day, January 27, 2020, and was involved in the incident that day.  Specifically,
he had been ordered by DC Marrone to be there by 0800, and CA Kahan's assumption
was that DC Marrone wanted him to gather "intel" regarding the incident, take photos,
and see what the crash site looked like.  In other words, CA Kahan would be the eyes
and ears of DC Marrone.  Consistent with that instruction, CA Kahan arrived to the
incident command post at 0800, which was right off Las Virgenes Road, in the parking
lot of the Las Virgenes water district.  At that point, he was briefed on the incident, and
within roughly an hour of arriving on scene was driven up to the crash site.  CA Kahan
advised me that he stayed at the crash site for about an hour or an hour and a half.
While there, CA Kahan walked most of the site, took photos of the debris field, and
watched Malibu search and rescue set up a lowering system.  CA Kahan did not go to
the crash site on any other day.

I pressed CA Kahan for more details about the photos that he took of the Willow
Incident.  In CA Kahan's estimation, he took approximately 10-15 photos in total, for the
purpose of gathering "intel" for the incident.  According to CA Kahan, taking photos is
part of what he does as a staff aid in supporting DC Marrone, and he is DC Marrone's
eyes and ears at an incident site.  CA Kahan added that taking photos at an incident is
standard operating procedure.  I asked CA Kahan if anyone specifically instructed him
to take photographs of the site.  He responded that no one had instructed him to do so,
and he made the decision on his own.

With respect to the contents of the photos, CA Kahan advised me that they depicted the
fuselage or body of the helicopter, the tail rotor, the tail boom, the surrounding brush,
Malibu search and rescue, and other agencies at the crash site.  I asked CA Kahan if
there were orange cones or red flags in the photos.  CA Kahan did not recall any orange
cones, but confirmed that there were red flags or markers indicative of human remains,
and that red flags are commonly used in irrigation to flag areas when teams are going to
lay irrigation lines and sprinklers.  I then asked CA Kahan if there were human remains
visible in the photos that he took.  CA Kahan responded in the affirmative, noting that it
was hard to get around human remains.  Specifically, CA Kahan recalled that the
photos that he took depicted flesh on the ground, the insides of humans splattered on
the brush on the hill, and tarps and blankets covering other human remains.  Nothing in
the photos were identifiable as a specific person, and none of the remains were Kobe
Bryant's, as his remains had already been removed from the site by the time CA Kahan
arrived on day two of the incident.  The photos were taken on CA Kahan's work phone,
which is a black iPhone 7.  No other person ever sent CA Kahan photos from the Willow
Incident, and CA Kahan is not aware of anyone else who took photos of the incident.

SMRH:4846-0416-9913.1                                       -20-

COLA001413
Defendants' Summary Judgment Exhibit 18
Page 84

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

I next asked CA Kahan if he ever shared the photos that he took with anyone else.  CA Kahan replied that he texted all the photos he had taken to CA Imbrenda's work phone the same day he took them.  I asked CA Kahan why he did so, and he replied that CA Imbrenda is the Department PIO, and since CA Kahan heard the incident commander request the PIO on day one of the incident, CA Kahan was helping CA Imbrenda out.  CA Kahan noted that colleagues "help each other out," and he was providing CA Imbrenda with "intel" on the crash site by sending him the photos.  No one instructed CA Kahan to send the photos to CA Imbrenda.

I asked CA Kahan if CA Imbrenda communicated anything to him in response to receiving the photos. CA Kahan replied that there was no written message accompanying the photos he sent, and CA Imbrenda did not communicate anything in response.  However, CA Imbrenda had CA Kahan's number, so he would have known that he was the one who sent the photos.  CA Kahan does not recall if he and CA Imbrenda ever had any discussions about the photos.  CA Kahan never sent the photos to anyone else, and does not know if CA Imbrenda ever shared the photos with anyone.

The photos that CA Kahan took at the Willow Incident site are no longer on his phone.  Although CA Kahan did not identify the specific date that he deleted the photos, he did so once he realized that the incident was going to be wrapped up.  He also deleted the text message he sent to CA Imbrenda (in which he sent the photos) because he tries to keep his phone clean and current.  CA Kahan did this on his own, and no one ever told him to delete the photos from his phone.

Before we concluded the interview, I asked CA Kahan if there was anything else he thought would be helpful for me to know, in light of the nature of the investigation.  CA Kahan stated that the reason he took the photos was for "intel" and also for another purpose, or a "double purpose."  CA Kahan then explained that DC Marrone might have asked him to write a statement for him for a press conference that he may have had to provide, and noted again that he is DC Marrone's eyes and ears, and wants to make sure that DC Marrone does well if he has to do a press conference or provide information to the Fire Chief.

H.    Fire Captain Brian Jordan – Witness

CA Jordan was not in attendance at the Golden Mike Awards, and was not interviewed as part of this investigation.  However, he was interviewed in connection with a related investigation regarding certain members of the Department taking and/or sharing photos of the Willow Incident.  Given that CA Imbrenda stated that at least some of the photographs that he shared at the Golden Mike Awards had been sent to him by CA Jordan, the summary of CA Jordan's interview from the related investigation is included here.

CA Jordan was interviewed on April 6, 2020.  Also present at the interview was Lew Currier, CA Jordan's union representative from Local 1014, and Kurt Kobler, who was present as an observer.  Due to the COVID-19 pandemic and the need for social

CONFIDENTIAL

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

distancing, the interview took place via remote Zoom video on April 6, 2020, and was audio recorded.

CA Jordan started working for the County in 1985, as a Firefighter. He is currently a Captain in the Central Regional Operations Bureau, and serves as the Regional Training and Safety Officer. CA Jordan has been in this assignment since 2012.

CA Jordan was on duty on the first day of the Willow Incident, as the incident safety officer. CA Jordan explained that his job was to arrive on scene and make sure that everyone was safe, adding that if he saw any danger, he was to bring it to the appropriate person's attention and mitigate it. CA Jordan does not recall exactly when he arrived to the incident, but estimates that it was within 30 minutes of the dispatch time. Once he arrived at the command post, CA Jordan hiked into the crash site. I asked CA Jordan how long he was at the crash site, and he said that he was there "forever," and had spent "many hours" and "spent the night" there. After I questioned him further on this issue, CA Jordan stated that he was at the site for a couple of days, and then clarified that he was at the site "overnight" the first day, then left to get some rest and then returned to the incident. I continued to press CA Jordan for clarification, not understanding if he had actually spent the night at the physical crash site. He then stated that he was initially at the incident site for 4-5 hours (which felt like "years"), subsequently went to the command post, and eventually was shuttling people back and forth to a trail that led to crash site. He further clarified that he arrived at the crash site when it was still smoking, and then was there for an additional 4-6 hours after that before returning to the command post. CA Jordan does not recall if he returned to the actual crash site after that, noting that he was up and down the hill a lot. Generally speaking, CA Jordan was at the incident until it concluded. He could not recall the specific date and time that the incident was closed, but whatever that date and time was, that was when he left.

I asked CA Jordan what he did while he was at the actual crash site. CA Jordan replied that at one point he was up there and the other crews were pulled out. When he had been there for approximately two hours, he wanted to come off the hill but was told to stay up there. I again asked CA Jordan what activities he was involved in while he was at the actual crash site. CA Jordan stated that he walked most of the scene along the trail, and at one point he just stayed in one spot, noting that it wasn't a pleasant scene. I continued to press CA Jordan for more specific answers, and he stated that at one point he was standing and observing the scene, as the aircraft was still burning. He added that it was burning to a point where it was clear that it was not going to spread. CA Jordan further stated that his job was to stay at the crash site and be the Department representative until more crews arrived to extinguish what was still burning.

I asked CA Jordan if he took any photos of the crash site at any point while he was at the incident. CA Jordan responded that he took approximately 10-20 photos on the first day of the incident, on his work phone – a black iPhone 8. I asked CA Jordan why he took the photos, and he replied that as the regional training and safety officer, he is to provide "intel" to the incident commander when he arrives on scene. CA Jordan noted that one thing incident commanders or others not at the scene can use are photos, so

SMRH:4846-0416-9913.1                    -22-

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

that they can see what others are talking about with respect to the site.  The Willow Incident was also not easily accessible, as it occurred in a location with only a narrow trail up to the site.  Thus, since personnel could not just drive fire trucks up to the scene, CA Jordan took photos.

I asked CA Jordan if anyone asked him to take the photos.  He responded that he believes someone asked him to take them, but he could not recall who that was, and asked that we come back to this question so that he would have time to think about it.  CA Jordan then noted that he automatically takes photos on most incidents and, in fact, did so at a recent incident.

I next asked CA Jordan what was depicted in the Willow Incident photos that he took.  He replied that some of them had a picture of the hose lay (which was over 4400 feet), and others were of the trail that was used for access, with the crash site in the background.  CA Jordan then stated that as far as anything else that may have been depicted, he is trying to keep what he saw out of his head, and for me to ask him to repeat what he saw would not be good for his mental health.

I then explained to CA Jordan that the issue of photos being taken at the Willow Incident crash site, and the issue of what such photos depicted, is central to this investigation, and as such, I needed to get that information from him.  Having said this, I again asked CA Jordan what was depicted in the photos, and after silence from him, I offered to ask him about specific images.  He replied that I was welcome to do so, but that his mental health is very important.  I told CA Jordan that if, at any time, he felt that we needed to stop the interview and resume at a different time, we could certainly do so.  I then asked CA Jordan if the photos showed the fuselage, or the brush burning.  In response, CA Jordan acknowledged that there were a couple of photos that showed the fuselage, but there were no photos of the brush burning.  I then asked if orange cones or red flags were visible in the photos, and CA Jordan noted that orange cones would not have been in any of his photos, as they would have been placed later in the incident, after he took the photos.  He also does not recall any red flags in any of the pictures.

I asked CA Jordan if there were human remains depicted in any of the photos, and he replied that he "wouldn't care or want to remember that, if there were."  I asked CA Jordan if he knows one way or the other, and he said that "the way it looked up there, you probably didn't really know what you were looking at."  Being of the opinion that CA Jordan was evading my questions and had more information than he was sharing, I advised him that I had received some reports of photos that depicted flesh on the ground, insides of bodies, a torso bent over, a foot, and things of that nature, and that I needed to know if he recalled these images being depicted in the photos that he took.  CA Jordan replied that he recalls seeing all of those things at the scene, but does not remember if they were in the photos or not.  I then attempted to confirm that CA Jordan's statement was that he does not recall one way or the other if any of those images were depicted in the photos.  CA Jordan then replied that he was being respectful, but that I had just brought all of those things back to his head, and he is trying to get them out of his head.  I gently explained that my job is to investigate, and that I regretted having to ask these questions, but that I needed to know what CA

**CONFIDENTIAL**

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

Jordan recalled. CA Jordan said that he really does not recall what was in the photos he took because he "has been trying to get rid of all of that." I then asked CA Jordan if he believes the images I described were in the photos. CA Jordan stated that they could have been, especially since he took pictures of the helicopter, but that those images were in the "news pictures" as well, and people just did not know what they were looking at. CA Jordan noted that he deleted the pictures pretty quickly, and stated that the questions were "messing with [his] brain," because he was now remembering everything he saw, which he was trying to get out of his head.

Before we left this topic, I asked CA Jordan if he took any pictures of Kobe Bryant's body while he was at the crash site. He asked me why I was asking about Kobe Bryant in particular, and why I was not asking about the other nine people. I replied that I had not gotten to them yet. CA Jordan then said that he is the one who covered Kobe Bryant's body up. I again asked CA Jordan if he took any photos of Kobe Bryant's remains, and he replied that Mr. Bryant's remains were probably in the photos that he took, but that he had deleted them from his phone. When I asked him about the other passengers, CA Jordan replied that you couldn't tell who was who. He added that the graphic images were also in the news photos, but people just did not know what they were looking at.

I next asked CA Jordan if anyone had ever sent him photos of the Willow Incident. CA Jordan replied that one of the canine handlers sent him pictures of their dogs resting. Other than that, no one else sent photos of the Willow Incident to CA Jordan. I asked CA Jordan if he ever shared the photos that he took of the Willow Incident with anyone else. He replied that he showed a picture of the hose lay to many people while he was driving people up to the crash site, so that they could see how far they had to walk, and likewise showed the hose lay photo to people at the command post. However, there was nothing of substance visible in the photo. CA Jordan also sent one of the LA Times or Daily News photos to a photographer friend and some family members, because CA Jordan could be seen in the photo. I then asked CA Jordan if he sent any of the photos that he took of the Willow Incident to CA Imbrenda. CA Jordan said no, and quickly asked if someone said that he had. I replied that I had been given the impression that he may have sent some of the photos to CA Imbrenda. He then asked who led me to believe that. I advised CA Jordan that I could not discuss that with him, and again asked if he had sent photos of the Willow Incident to CA Imbrenda. CA Jordan responded that he did not recall sending any pictures to CA Imbrenda or anyone else, and that it is not possible that he did.

I returned to the issue of CA Jordan deleting the photographs from his phone and he confirmed that they had all been deleted. I asked CA Jordan why he deleted the photos and he responded that while at the crash site, he heard someone yell "no more pictures!" "Delete pictures!" So he started to delete the close-up photos from his phone right away. However, he kept the hose lay photo and anything else that was taken from a distance. I asked CA Jordan if the more remote photos were still on his phone. He told me that the photos should not be on his phone any longer, and then checked his phone and confirmed that they were gone.

CONFIDENTIAL                                                         COLA001417

Defendants' Summary Judgment Exhibit 18
Page 88

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

Next, I asked CA Jordan if he is aware of anyone else who took photos of the Willow Incident.  CA Jordan is not aware of anyone from the Department who took photos, but noted that the FBI and NTSB probably took photos at the site.  CA Jordan is likewise not aware of anyone at the Department who sent photos of the Willow Incident to anyone.

I asked CA Jordan if anyone asked him to take photos of the incident (this was the question that he had asked me to come back to).  CA Jordan responded that he does not recall anyone specifically asking him to take the photos, but that there was a lot of discussion regarding what the scene looked like and whose helicopter it was.  However, he does not recall specifically if anyone told him to take the photos.  In an attempt to jog CA Jordan's memory, I asked him if any chief officers asked him to take pictures of the Willow Incident.  Again, CA Jordan replied that there may have been someone who instructed him to do so, but he does not recall specifically.

Before we concluded, I asked CA Jordan if there was anything else he thought would be helpful for me to know, now knowing what I was investigating.  CA Jordan stated that there was nothing specific, other than "the memory jog hurt."

Mr. Currier then asked CA Jordan if he felt that taking the photos of the Willow Incident was part of his job duties as a safety officer.  CA Jordan responded that he did.  Mr. Currier then noted that CA Jordan previously stated that he took the photos in order to provide "intel," and asked CA Jordan if he has done so on other incidents.  CA Jordan responded that he has taken photos on every major incident.  Mr. Currier asked CA Jordan if he has ever been investigated for taking photos before, and CA Jordan replied that he has not.  Mr. Currier then asked if this was the first incident in which he has seen graphic images like he saw at the Willow Incident.  CA Jordan responded that it was not the first, but it was definitely the worst.  Mr. Currier went on to ask CA Jordan if the photos he took were widespan or narrow, and CA Jordan replied that most were wide, but some were narrow.  Finally, Mr. Currier asked if CA Jordan is aware of any Department policy that prohibits taking photos at incidents, and CA Jordan replied that no such policy exists.

\* \* \*

On April 10, 2020, I received a call from Lew Currier, CA Jordan's union representative from Local 1014.  Mr. Currier advised me that CA Jordan had requested a follow-up discussion in order to clarify something from our first conversation.  To that end, on April 13, 2020, I had a follow-up discussion with CA Jordan.  Lew Currier was also present as CA Jordan's representative.  When we began the discussion, CA Jordan stated that he wanted to clarify his answer to my question regarding whether he discussed the Willow Incident with any chief officers, noting that he previously said "no," but actually recalled speaking with several people about the incident.  I advised CA Jordan that I never asked him if he discussed the Willow Incident with anyone, but, rather, had asked him questions about taking and/or sharing photographs of the Willow Incident.  With this clarification, CA Jordan advised me that there was nothing further he wished to add.

SMRH:4846-0416-9913.1                                  -25-

CONFIDENTIAL                                                                                      **COLA001418**

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

III.     <u>Allegations and Findings</u>

The allegations in this investigation were driven by examining both the scope of the
complaint and foundational issues underlying that complaint.  With respect to findings,
where admissions as to allegations were made by the subject, they were accepted as
true.  Consistent and corroborating evidence has also been included.  Where the
evidence was circumstantial or conflicting, a preponderance of the evidence standard
(<u>i.e.</u>, whether the evidence "more likely than not" substantiates the allegation) was used.
This is the industry standard for workplace investigations.  It is also the same standard
that is applied in most civil cases.

***Allegation #1***:

CA Tony Imbrenda took photographs containing images of human remains at the Willow
Incident site.

***Finding #1***:

Unsubstantiated.

During our interview, CA Imbrenda admitted that he took 4-5 photographs at the Willow
Incident site on day two of the incident.  However, the photographs were not graphic in
nature and depicted only the debris field.  By the time these photographs were taken,
the vast majority of human remains had been removed, and the one or two deceased
individuals who remained on the scene had been covered.  I found CA Imbrenda to be
credible on this subject, and no conflicting reports were provided.  There were no
corroborating statements.

* * *

***Allegation #2***:

CA Tony Imbrenda received photographs containing images of human remains that
were taken at the Willow Incident site.

***Finding #2***:

Substantiated.

During our interview, CA Imbrenda admitted that he received a flood of photographs of
the Willow Incident, specifically identifying CA Kahan and CA Jordan as the individuals
who had sent him photographs.  CA Imbrenda stated that the majority of the
photographs were of the debris field, but acknowledged that a few of them were graphic
in nature and showed human remains.  CA Imbrenda also noted that he deleted the
photos from his personal phone relatively quickly because his daughter plays with his
personal phone and he would not want her to see "photos like that."  CA Imbrenda
acknowledged that in his former role as PIO, he regularly received photographs of
incidents, sometimes of a graphic nature.  I found CA Imbrenda to be credible on this

SMRH:4846-0416-9913.1                              -26-

CONFIDENTIAL

COLA001419

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

subject.  On the issue of CA Imbrenda receiving photographs generally, statements by other witnesses in this investigation are consistent with CA Imbrenda's account.  CA Scott recalls CA Imbrenda stating that the photographs were sent to him by a "safety officer," and FFS Cornell recalls CA Imbrenda noting that he had received the photographs that he shared during the Golden Mike Awards from someone else. Corroborating evidence has also been provided.  Specifically, in a related investigation, CA Kahan admitted to sending photographs of the Willow Incident to CA Imbrenda.  In that same related investigation, CA Jordan denied sending photographs to CA Imbrenda.  However, I did not find CA Jordan to be credible in this regard.

* * *

*Allegation #3*:

On or about February 15, 2020, CA Tony Imbrenda attended the Golden Mike Awards, during which he shared with others at the event photographs containing images of human remains that were taken at the Willow Incident site.

*Finding #3*:

Substantiated.

During our interview, CA Imbrenda admitted to showing photographs of the Willow Incident to CA Scott (LAFD), CA Weireter (LAFD) and FFS Cornell during the Golden Mike Awards.  I found CA Imbrenda to be credible on this subject.  The statements by all witnesses in this investigation corroborate that CA Imbrenda shared photographs of the Willow Incident with other attendees.

There is some inconsistency regarding the identities of the individuals with whom the photographs were shared.  CA Scott and FFS Cornell both acknowledge that they viewed the photographs.  CA Weireter denied viewing the photographs, as he was concerned about protecting his wife.  However, CA Imbrenda, CA Scott and FFS Cornell all stated that CA Weireter viewed the photographs along with them.  Given that CA Weireter is married to the complainant, it is reasonable to conclude that he may not want her to know that he viewed the photographs.  Moreover, I cannot identify any motivation for the other witnesses to fabricate CA Weireter's involvement.  With respect to the other attendees, the evidence is less clear.  All agree that Ms. Imbrenda, Ms. Weireter, Ms. Scott and FF Cornell's girlfriend were at the event and in the immediate vicinity of where the photographs were being shown.  However, the statements regarding whether these individuals actually viewed the photographs are inconsistent. Ultimately, the preponderance of the evidence supports a finding that the photographs were shown by CA Imbrenda to CA Weireter, CA Scott, and FFS Cornell, but is insufficient to make a determination regarding whether CA Imbrenda showed the photographs to the other four individuals.

With respect to the contents of the photos, CA Imbrenda stated that he did not specifically recall what the photos depicted, but admitted that it is possible they contained images of body parts or human remains.  However, two of the witnesses who

SMRH:4846-0416-9913.1                                    -27-

CONFIDENTIAL

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

viewed the photos (CA Scott and FFS Cornell) confirmed that the photos depicted human remains and/or body parts.  Specifically, CA Scott stated that he saw feet, shoes, a torso, a person bent in half, and flags on the ground indicating human remains.  FFS Cornell's statements were internally inconsistent, but he ultimately stated that the photos depicted a foot, an appendix or human organ, and flags or cones identifying the location of human remains.  FFS Cornell also recalled CA Imbrenda stating to FFS Cornell's girlfriend, "trust me – you don't want to see anything like this," with respect to the photos he was sharing.  As to CA Weireter, although he denies seeing the photos, he recalls discussions about Kobe Bryant's remains and "bodies," and also stated that FFS Cornell referred to the photos as "gruesome."  Ms. Weireter also recalls FFS Cornell making a statement along the lines of "I just saw pictures of Kobe burned up before I'm about to eat."  Although the witnesses provided varying accounts of the specific contents of the photographs, I find by a preponderance of evidence that the photographs CA Imbrenda showed to others at the Golden Mike Awards contained images of human remains at the Willow Incident.

RDJ

SMRH:4846-0416-9913.1

-28-

CONFIDENTIAL

COLA001421

Defendants' Summary Judgment Exhibit 18
Page 92