# EXHIBIT 19



**COUNTY OF LOS ANGELES**

**FIRE DEPARTMENT**

1320 NORTH EASTERN AVENUE
LOS ANGELES, CALIFORNIA 90063-3294
(323) 267-7205
www.fire.lacounty.gov

*"Proud Protectors of Life, Property, and the Environment"*

BOARD OF SUPERVISORS

HILDA L. SOLIS
FIRST DISTRICT

MARK RIDLEY-THOMAS
SECOND DISTRICT

SHEILA KUEHL
THIRD DISTRICT

JANICE HAHN
FOURTH DISTRICT

KATHRYN BARGER
FIFTH DISTRICT

DARYL L. OSBY
FIRE CHIEF
FORESTER & FIRE WARDEN

I hereby acknowledge receipt of this document

_____
Employee's Signature

12 / 3 / 2020
Date

Hand-delivered by:

ANTHONY  C.  MARRONE
Print Name

_____  12-3-20
Signature                          Date

December 2, 2020

Fire Captain Arlin Kahan
7437 W. 91st Street
Westchester, CA  90045

Dear Fire Captain Kahan:

**INTENTION TO SUSPEND**

This is to advise you of our intention to suspend you for thirty 8-hour days (240 hours total) without pay from your position of Fire Captain.  This suspension would be equal to ten complete 24-hour shifts.  This proposed suspension is due to your: 1) inappropriate photography at the Willow Incident; and 2) inappropriate distribution to others of photographs you took at the Willow Incident.

The basis for this proposed action is your violation of the below listed policy sections of the Department's <u>Standards of Behavior</u>:

    A.    In carrying out their official duties and responsibilities, all employees shall:

        1.    Abide by and conform to the County's and Department's rules, regulations, policies, and procedures.

        3.    Perform all assigned duties and responsibilities.

            b.    Exercise good judgment.

SERVING THE UNINCORPORATED AREAS OF LOS ANGELES COUNTY AND THE CITIES OF:

| | | | | | | |
|---|---|---|---|---|---|---|
| AGOURA HILLS | CALABASAS | EL MONTE | INDUSTRY | LAWNDALE | PARAMOUNT | SIGNAL HILL |
| ARTESIA | CARSON | GARDENA | INGLEWOOD | LOMITA | PICO RIVERA | SOUTH EL MONTE |
| AZUSA | CERRITOS | GLENDORA | IRWINDALE | LYNWOOD | POMONA | SOUTH GATE |
| BALDWIN PARK | CLAREMONT | HAWAIIAN GARDENS | LA CAÑADA-FLINTRIDGE | MALIBU | RANCHO PALOS VERDES | TEMPLE CITY |
| BELL | COMMERCE | HAWTHORNE | LA HABRA | MAYWOOD | ROLLING HILLS | WALNUT |
| BELL GARDENS | COVINA | HERMOSA BEACH | LA MIRADA | NORWALK | ROLLING HILLS ESTATES | WEST HOLLYWOOD |
| BELLFLOWER | CUDAHY | HIDDEN HILLS | LA PUENTE | PALMDALE | ROSEMEAD | WESTLAKE VILLAGE |
| BRADBURY | DIAMOND BAR | HUNTINGTON PARK | LAKEWOOD | PALOS VERDES ESTATES | SAN DIMAS | WHITTIER |
| | DUARTE | | LANCASTER | | SANTA CLARITA | |

CONFIDENTIAL

Fire Captain Arlin Kahan
December 2, 2020
Page 2 of 8

8.   Secure and protect Department property, vehicles, equipment, and items of identification against damage or loss.

b.   Not lend, give away, or appropriate for personal use any Department property, equipment, or items of identification without proper authority.

11.   Treat all persons in a respectful and courteous manner while on duty.

22.   Not bring discredit or embarrassment upon the Department through on- or off-duty behavior.

In addition to the Standards of Behavior, this action is taken pursuant to:

- Civil Service Rule 18.031, which states the following:

   Failure of an employee to perform his or her assigned duties so as to meet fully explicitly stated or implied standards of performance may constitute adequate grounds for discharge, reduction or suspension.  Where appropriate, such grounds may include, but are not limited to, qualitative as well as quantitative elements of performance, such as failure to exercise sound judgment, failure to report information accurately and completely, failure to deal effectively with the public, and failure to make productive use of human, financial and other assigned resources.  Grounds for discharge, reduction or suspension may also include any behavior or pattern of behavior which negatively affects an employee's productivity, or which is unbecoming a county employee; or any behavior or condition which impairs an employee's qualifications for his or her position or for continued county employment.

- Department's Code of Ethics, Appendix I:

   A. Code of Ethics

   My fundamental responsibility as a firefighter is the saving of life, and the prevention and suppression of fires.  I will never let danger or personal feelings deter me in the performance of my duties.  I will uphold the policies and traditions of my Department, and dedicate myself, before God, to faithfully serve the public, which has placed its faith in me as a protector of life and property.

Fire Captain Arlin Kahan
December 2, 2020
Page 3 of 8

The specific facts upon which this proposed suspension would be based are as follows:

On or about January 27, 2020, you responded to a helicopter crash event known as the Willow Incident (Willow Incident).  Your role was that of a Staff Aide to Deputy Fire Chief (DC) Anthony C. Marrone of the Central Regional Operations Bureau.

At your administrative interview on April 6, 2020, you admitted the following: While at the Willow Incident, you took multiple photographs depicting red flags or markers indicative of human remains, and of human remains themselves including: 1) flesh on the ground; 2) the insides of humans splattered on the brush on a hill; 3) and tarps and blankets covering human remains.  You further admitted to using your work phone to take these photographs, and to later distributing these photographs to CA Tony Imbrenda.

Also at your administrative interview on April 6, 2020, you justified your photography using your work-issued iPhone at the Willow Incident by saying that as the "eyes and ears" of DC Marrone, you were gathering "intel."  You claimed that despite no one instructing you to take photographs, you took the photographs on your own accord for "intel" purposes.  You also claimed that because DC Marrone might have asked you to write a press-conference-related statement you wanted to make sure DC Marrone did well if the latter had to do a press conference or provide information to the Fire Chief.  With regards to CA Imbrenda, you indicated that you sent him the photographs for "intel" purposes because he was the Department's Public Information Officer (PIO).

The mission of the Los Angeles County Fire Department is to protect lives, the environment, and property by providing prompt, skillful, and cost effective fire protection and life safety services.  Moreover, the Department's core values include integrity, community and commitment.

The Department can only pursue its mission with certainty if its employees act with the utmost integrity.  This means that a Department employee, when on duty, must act in furtherance of the mission.  But when acting in furtherance of the mission, integrity entails that an employee must commit to demonstrating the appropriate ethics, discretion, and solemnity tailored to any given scenario.  These virtues are necessary because the serve to assure the community that the Department is acting in the community's best interests and honoring the public trust.  When an employee fails to demonstrate these virtues, that employee potentially subjects the Department to embarrassment or censure from the very community it serves.

Your role at the Willow Incident was that of a Staff Aide.  While that role at times requires you to be the "eyes and ears" of a Deputy Fire Chief, at the Willow Incident you were specifically accompanying DC Marrone at the command post, not serving as his

Fire Captain Arlin Kahan
December 2, 2020
Page 4 of 8

remote "eyes and ears." DC Marrone never asked you to take any photographs at the Willow Incident.

Even had you actually been serving as DC Marrone's "eyes and ears," and even if it was possible you might have taken photographs for an after-incident review in that type of role, that would not have necessitated you taking photographs of human remains. There was no legitimate business need for you to take photographs of human remains. Such photographs might have been the concern of the County Coroner, the LASD, the Federal Bureau of Investigation, or the National Transportation Safety Board—you serve none of these agencies.

The photographs you took of the fuselage and human remains at the Willow Incident did not further the Department's mission. Though you justified your actions through your role of providing intel, these human remains had no intel value and, thus, served no business necessity. At best, such photographs only served to appeal to baser instincts and desires for what amounted to visual gossip. Thus, the nature of your photographs reflected neither ethics, nor discretion or solemnity for the deceased or their families. Moreover, your subsequent sharing of such photographs with your colleague, CA Imbrenda, also reflected no ethics, discretion, or solemnity. While emergency situations are often undignified affairs, your actions only eroded what dignity remained of the Willow Incident, to say nothing of the dignity of your public safety colleagues at the incident who were acting in the interest of the mission. Your actions at the Willow Incident did not exemplify the Department's core values of integrity, commitment or community.

Your Fire Captain and Staff Aide position is an indispensable part of the Department's mission of providing prompt and skillful fire protection and life safety services: you are meant to be a trusted steward of the public's welfare. The Department acknowledges that its employees who are responsible for life safety services may encounter death. Such employees—including you—must be able and ready to provide that stewardship of public trust by treating the aspect of death with respect and grace. The Department is distressed by your willingness to capture and disseminate photographs of human remains—photographs which served no business purpose. Accordingly, based on your actions, the Department must concern itself with the public welfare and your suitability as one of its stewards. This is particularly so given that you hold the rank of Fire Captain. While all Department personnel are expected to act exemplary, higher ranks come with higher standards and trust. This means you, as a Fire Captain, are held to a heightened standard.

You failed to abide by and conform to the County's and Department's rules, regulations, policies, and procedures when you photographed the fuselage and human remains at the Willow Incident. You compounded this failure when you shared those photographs with CA Imbrenda. In neither aspect did you exercise good judgment, and in both, your actions discredited the Department.

Fire Captain Arlin Kahan
December 2, 2020
Page 5 of 8

You took photographs of human remains at the Willow Incident on your Department-issued phone only to delete them thereafter.  While you may have deleted these photographs, you did not report to your chain of command that you took such photographs in the first place, even though such actions had the potential to be in violation of County or Department rules, regulations, policies, or procedures.  Moreover, you failed to report to your chain of command that you took graphic photographs even after media reports alleged that Department personnel took or shared graphic photographs of the Willow Incident.

As noted earlier, your photographs had no intel value or legitimate business purpose—they could only be categorized as taken for personal gain or purpose, meaning that the phone which took the photographs was also employed for personal use.  The photographs of human remains that you took at the Willow Incident did not reflect the discretion or solemnity that such an incident called for.  Thus, your photographs paid respect neither to the deceased nor to their families.

The Department does consider mitigating factors in this case, including that your most recent performance evaluations, the latest of your 28-plus-year career with the Department, rated you as "Outstanding" overall.  The Department also genuinely recognizes that you were forthcoming at your administrative interview regarding the contents of the photographs you took as well as your sharing them with CA Imbrenda.  However, the Department also considers serious aggravating circumstances as well, the foremost of which was your willingness to take photographs of human remains and then share them with a colleague in the first place, without any demonstrable regard for the public trust, or the dignity and privacy of the deceased or their families.  Because the Department bears the public's trust, it must be as certain as possible that its employees are ready and able to preserve and not actively erode that trust.  Your actions add to the Department's uncertainty—this, the Department cannot ignore.

Fire Captain Kahan, your capture and subsequent dissemination of photographs of human remains at the Willow Incident are contrary to the Department's mission and core values, and are entirely unacceptable based on explicit Department and County policies.  Your actions are also considered unacceptable in light of the fact that:

1. You hold a sensitive position, and you are responsible for tasks related to saving lives and property.

2. You are a Fire Captain and have over 28 years of experience with the Department.

Because of the seriousness and unacceptable nature of your conduct, after careful consideration of it, as well as aggravating and mitigating circumstances, unfortunately

CONFIDENTIAL

Fire Captain Arlin Kahan
December 2, 2020
Page 6 of 8

you have left the Department with no choice but to suspend you from your position of Fire Captain.

You are hereby advised that any further violation of the County's Policies and Procedures or the Department's <u>Standards of Behavior</u> may be grounds for more serious disciplinary action, including discharge.

In deciding to take this proposed action, your record was considered as follows:

- You have been employed with the Department since January 3, 1992.

- A review of your Official Personnel File indicated:

  - No prior history of administrative actions.

  - Overall ratings of "Outstanding" on your April 2015 through March 2016, April 2016 through March 2017, and April 2017 through March 2018 performance evaluations.

In addition, please be advised that in accordance with the <u>Countywide Discipline Guidelines: For Employees</u>, which explicitly provides that "an administrative action [may be] *more* or less *severe* than those listed" (emphasis added), the ranges of penalties are as follows:

### I. – IX.  COUNTYWIDE DISCIPLINE GUIDELINES

| OFFENSE | | FIRST OCCURRENCE | SECOND OCCURRENCE | THIRD OCCURRENCE |
|---|---|---|---|---|
| **II. DISRESPECTFUL CONDUCT / INSUBORDINATION** | | | | |
| B. | Failure to follow established rules or regulations | Warning to 10-Day Suspension | 15 to 30-Day Suspension; Discharge | Reduction or Discharge |
| **V. MISUSE OF COUNTY EQUIPMENT OR PROPERTY** | | | | |
| A. | Unauthorized use or misuse of County equipment and/or resources such as, postage, telephones, computers, social media technologies and/or photocopy machines for personal use (See, Board Policy 6.101 and 6.105 and DHR PPG 1040) | Warning to 15-Day Suspension; Discharge | 15 to 30-Day Suspension; Discharge | Discharge |

CONFIDENTIAL

Fire Captain Arlin Kahan
December 2, 2020
Page 7 of 8

| B. | Unauthorized use, operations, or possession of equipment, machines, or tools to which the employee has not been assigned; or unauthorized performance of duties other than those assigned | Warning to 30-Day Suspension; Discharge | 15 to 30-Day Suspension; Discharge | Discharge |
|---|---|---|---|---|
| F. | Unauthorized or improper use or disclosure of confidential information, including but not limited to, medical records, personnel records, credential files to self or others | 10 to 30-Day Suspension; Reduction; or Discharge | 30-Day Suspension; Discharge | Discharge |
| **VII.** | **PERFORMANCE TO STANDARDS OR EXPECTATIONS** | | | |
| F. | Work performance fails to meet job expectations, standards or requirements - whether implied or explicit | Warning to 10-Day Suspension | 15 to 30-Day Suspension; Reduction | Reduction or Discharge |
| H. | Failure to exercise sound judgment which results in loss of, or injury, or damage to persons or property of the County or of County service | Reprimand to 15-Day Suspension; Reduction; Discharge | 20 to 30-Day Suspension; Reduction; Discharge | Discharge |
| K. | Violation of the departmental or externally recognized code of ethics of the professional group of the employee | 5 to 15-Day Suspension; Discharge | Discharge | |

In addition to the penalties listed above, please be advised that in accordance with the Department's Manual of Operations, Volume 2, Chapter 1, Subject 5, Supplemental Discipline Guidelines, the ranges of penalties are as follows:

| **X. Offenses and Ranges of Discipline** | | | |
|---|---|---|---|
| **OFFENSE** | **FIRST OCCURRENCE** | **SECOND OCCURRENCE** | **THIRD OCCURRENCE** |
| **2. FAILURE TO ABIDE BY DEPARTMENTAL STANDARDS** | | | |
| F. Conduct unbecoming or bringing discredit or embarrassment upon the Department through on-duty or off-duty behavior | Reprimand 3-30 days Reduction Discharge | 10-30 days Reduction Discharge | Discharge |

**CONFIDENTIAL**

Fire Captain Arlin Kahan
December 2, 2020
Page 8 of 8

All written documents upon which this proposed action is based are attached for your review.  They include:

- Investigation Report - Alleged Taking and Sharing of Photographs from Willow Incident by Fire Captain Arlin Kahan .......................................................................... August 31, 2020

Please be advised that the Employee Assistance Program (EAP) offers professional consultation and referral service for a broad range of personal and job-related issues. You may reach EAP at (213) 738-4200.

You have the right to respond to this action orally, in writing, or both.  Please be advised that a deputy chief who is not currently in your chain of command will consider your written and/or oral response.  If you choose to respond in writing, send your response to Thomas Ewald, Deputy Chief, Special Services Bureau at 1320 N. Eastern Avenue Rm. 250-FCCF, Los Angeles, CA 90063.  If you wish to respond orally, a *Skelly* meeting has been scheduled for you via Microsoft Teams (either video or telephone) on December 21, 2020 at 12:00 p.m.  You have ten (10) business days from the date this letter was mailed or hand-delivered to you to submit a written response or to reschedule a meeting with Deputy Chief Ewald at (323) 881-6152.  However, if you have not contacted Deputy Chief Ewald orally or in writing within ten (10) business days from the date this letter was mailed or hand-delivered to you, you will have waived your right to respond at this level.

Sincerely,

DEPUTY CHIEF WILLIAM McCLOUD JR.
LEADERSHIP AND PROFESSIONAL STANDARDS BUREAU

WMM:ro

c:    Professional Performance Section - Local 1014

Attachment

CONFIDENTIAL

**SheppardMullin**

Sheppard, Mullin, Richter & Hampton LLP
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
310.228.3700 main
310.228.3701 fax
www.sheppardmullin.com

# M E M O R A N D U M

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

To:   Deputy Chief William McCloud          Date:   August 31, 2020

From:   Ronda Jamgotchian          File Number:   0100-922253

Re:   Investigation Report – Alleged Taking and Sharing of Photographs from Willow Incident by Fire Captain Arlin Kahan

## I.   Description of Project

On March 5, 2020, Sheppard Mullin was retained by the Los Angeles County Fire Department (the "Department") to conduct an investigation into media reports that Department personnel reportedly shared photographs of a January 26, 2020 helicopter crash ("Willow Incident"). These news stories first broke in late February 2020, regarding deputies from the Los Angeles County Sheriff's Department reportedly sharing photos of the Willow Incident, and subsequent news stories in early March 2020, making similar allegations against members of the Department. Following those news stories, the Department received intel suggesting that one of the individuals who may have taken the photographs was Fire Captain (CA) Arlin Kahan.

Given the nature and seriousness of the allegations, combined with the urgency of the matter, the decision was made to outsource the investigation to Sheppard Mullin to ensure that it would commence immediately.

## II.   Summary of Interviews

The following individuals were interviewed as part of this investigation. The summaries for each reflect the information that has been deemed relevant to this investigation. Unless otherwise indicated, all interviews were audio recorded, and the recordings have been provided to the Department so that they may be reviewed in conjunction with this report.

### A.   Fire Captain Tony Imbrenda – Witness

One of the individuals identified as potentially having relevant information was CA Tony Imbrenda. I interviewed CA Imbrenda on March 12, 2020. Also present at the interview was Lew Currier, CA Imbrenda's union representative from Local 1014. The interview

SMRH:4812-3722-6427.1                              -1-

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

took place at the Department's facility on Corporate Center Drive and was audio recorded.

CA Imbrenda began working for the County in April 1996, as an Environmental Health specialist. He currently works as a Fire Captain, and served as the Department's PIO from September 2018 to March 2020.

I asked CA Imbrenda about his involvement in responding to the Willow Incident on January 26, 2020. CA Imbrenda was at home, but was contacted by dispatch to go to the scene. He believes this was around noon or the early afternoon. He reported to the incident and checked in with the incident commander at the staging area, about a mile away from the crash site. He also gave a statement to the media. At that point, CA Imbrenda was not yet aware that Kobe Bryant had been on board. CA Imbrenda was not at the staging area for long, as he had to deal with the media elsewhere. Eventually, he received a call from the LAPD that there may have been a celebrity on the aircraft. In total, he was at the staging area less than 10 minutes, and then spent about 6-7 hours at other locations, including a press conference at the Sheriff's station. CA Imbrenda did not go to the actual crash site that first day.

I next asked Captain Imbrenda about his involvement the following day, January 27, 2020. CA Imbrenda was on duty that day and reported to the incident command post. There were messages coming to him, stating that there would be a briefing in the morning about what was to occur that day, and he was to go to the briefing. He advised me that he was at the briefing in the morning, dealing with the media and different chiefs that were coming in, as well as helping the NTSB and the FBI photographer. Ultimately, he and CA Kahan went in a vehicle to the crash site, to assist an FBI photographer and help her hike around the hill and manage her equipment. CA Imbrenda was at the crash site for approximately 15 minutes, assessing the site as he would with any incident, since he knew he would be interviewed extensively by the media. While he was there, he took a few photos of the debris field, which were not graphic in nature, which he later sent to CA Kahan.

I asked CA Imbrenda if he is aware of anyone else who took photos at the crash site. He responded that he heard there were numerous people who had taken photos at the Willow Incident site, but had no personal knowledge of such. I asked CA Imbrenda if he was ever in possession of any photos of the Willow Incident (other than those he had taken). He replied that he had previously been in possession of several photos, which were sent to him by CA Arlin Kahan and CA Brian Jordan. CA Imbrenda does not know if CA Kahan and CA Jordan took the photos themselves or if they had received them from someone else. The majority of the photos were not graphic in nature, and most of them were of the debris, but there were some that were graphic in nature and showed human remains. CA Imbrenda also noted that as the PIO, he regularly receives photos of incidents, sometimes of a graphic nature. He added that it is his job to advise people on how to handle photos of a graphic nature, and to never use them or post them on social media.

SMRH:4812-3722-6427.1                    -2-

CONFIDENTIAL                                                              COLA034991

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

I pressed CA Imbrenda for more details on the contents of the photos he had received from CA Jordan and CA Kahan, including whether they depicted a foot, torso, appendix and things of that nature (I had been advised by other witnesses in a related investigation that these were among the images contained in graphic photos of the Willow Incident). CA Imbrenda stated that it was possible that these images were in the photos sent to him by CA Kahan and CA Jordan, but he could not recall specifics and had not spent much time studying the photos. He also advised me that after he received the photos, he got rid of them in pretty short order because he had no use for them, and told others to get rid of them as well, because he had concerns that they could be misused. CA Imbrenda went on to state that it is standard operating procedure for him to receive photos, and he receives hundreds of photos (some from people he does not even know) for any notable incident. For the Willow Incident, the fact that CA Kahan and CA Jordan sent him photographs was not surprising and was professionally something they would do, given his role as PIO. He also noted that as a former PIO, CA Jordan understood that sending graphic images electronically was not a good practice, so CA Imbrenda thinks that the photographs from CA Jordan depicted only debris.

With respect to the phone, the photos were on CA Imbrenda's work iPhone. However, they have since been deleted. Specifically, CA Imbrenda deleted the photos over the course of about a week, within a few weeks of the incident itself. He added that within the last 10 days from the prior Friday (March 6th), they were already gone from his phone. I asked CA Imbrenda why he deleted the photos, and he noted that press reports had started to come out, so he made a concerted effort to get rid of the photos. He added that he had no use for the graphic photos, so he got rid of the photos that depicted "patients," since such photos would not be appropriate to post to social media. CA Imbrenda specifically recalls that photos had become an issue in the media, as some such photos had been misused by certain individuals, so he went back into his phone to make sure that all such photos were gone. The process of deletion took some time, because the photos were in various places in CA Imbrenda's phone (Google drive and several other spots). CA Imbrenda again stated that he was very concerned that such photos could be misused, so he deleted them. He also instructed everyone he knew that had been on the incident to do the same. I asked CA Imbrenda when he gave this instruction about deleting the photos, and he responded that he did so every time he spoke to the individuals who had been involved, including CA Kahan and CA Jordan, and also told those individuals to give the same instruction to their own people. CA Imbrenda emphatically stated that he never allowed, and would never allow, photos to go out of his possession where they could end up in hands that would misuse them.

**B.   Fire Captain Kahan – Subject of Investigation**

On April 6, 2020, I interviewed CA Arlin Kahan, the Subject of Investigation. Also present at the interview was Lew Currier, CA Kahan's union representative from Local 1014, and Kurt Kobler, who was present as an observer. Due to the COVID-19 pandemic and the need for social distancing, the interview took place via remote Zoom video and was audio recorded.

SMRH:4812-3722-6427.1                              -3-

COLA034992
Defendants' Summary Judgment Exhibit 19
Page 104

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

CA Kahan started working for the County in January 1992, as a Firefighter.  He currently serves as a Staff Aid for the Central Region, reporting to Deputy Fire Chief (DC) Anthony Marrone.  CA Kahan has served in this role for three years.

I advised CA Kahan of the allegations in this investigation and informed him that I wanted to ask him some questions about the Willow Incident.  CA Kahan confirmed that he was on duty on January 26, 2020, the day of the crash.  However, he did not have any involvement in responding to, or working at, the incident, nor did he report to the crash site.  I then asked CA Kahan if he was on duty the following day, January 27, 2020.  CA Kahan confirmed that he was on duty that day.  Specifically, he had been ordered by DC Marrone to be there by 0800, and CA Kahan's assumption was that DC Marrone wanted him to gather "intel" regarding the incident, take photos, and see what the crash site looked like.  In other words, CA Kahan would be the eyes and ears of DC Marrone.  Consistent with that instruction, CA Kahan arrived to the incident command post at 0800, which was right off Las Virgenes Road, in the parking lot of the Las Virgenes water district.  At that point, he was briefed on the incident, and within roughly an hour of arriving on scene was driven up to the crash site.  CA Kahan advised me that he stayed at the crash site for about an hour or an hour and a half.  While there, CA Kahan walked most of the site, took photos of the debris field, and watched Malibu search and rescue set up a lowering system.  CA Kahan did not go to the crash site on any other day.

I pressed CA Kahan for more details about the photos that he took of the Willow Incident.  In CA Kahan's estimation, he took approximately 10-15 photos in total, for the purpose of gathering "intel" for the incident.  According to CA Kahan, taking photos is part of what he does as a staff aid in supporting DC Marrone, and he is DC Marrone's eyes and ears at an incident site.  CA Kahan added that taking photos at an incident is standard operating procedure.  I asked CA Kahan if anyone specifically instructed him to take photographs of the site.  He responded that no one had instructed him to do so, and he made the decision on his own.

With respect to the contents of the photos, CA Kahan advised me that they depicted the fuselage or body of the helicopter, the tail rotor, the tail boom, the surrounding brush, Malibu search and rescue, and other agencies at the crash site.  I asked CA Kahan if there were orange cones or red flags in the photos.  CA Kahan did not recall any orange cones, but confirmed that there were red flags or markers indicative of human remains, and that red flags are commonly used in irrigation to flag such areas when teams are going to lay irrigation lines and sprinklers.  I then asked CA Kahan if there were human remains visible in the photos.  CA Kahan responded in the affirmative, noting that it was hard to get around human remains.  Specifically, CA Kahan recalled that the photos that he took depicted flesh on the ground, the insides of humans splattered on the brush on the hill, and tarps and blankets covering other human remains.  Nothing in the photos were identifiable as a specific person, and none of the remains were Kobe Bryant's, as his remains had already been removed from the site by the time CA Kahan arrived on day two of the incident.  The photos were taken on CA Kahan's work phone, which is a black iPhone 7.  No other person ever sent CA Kahan photos from the Willow Incident, and CA Kahan is not aware of anyone else who took photos of the incident.

SMRH:4812-3722-6427.1                                    -4-

CONFIDENTIAL                                                              COLA034993

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

I next asked CA Kahan if he ever shared the photos that he took with anyone else. CA Kahan replied that he texted all the photos he had taken to CA Tony Imbrenda's work phone the same day he took them. I asked CA Kahan why he did so, and he replied that CA Imbrenda is the Department PIO, and since CA Kahan heard the incident commander request the PIO on day one of the incident, CA Kahan was helping CA Imbrenda out. CA Kahan noted that colleagues "help each other out," and he was providing CA Imbrenda with "intel" on the crash site by sending him the photos. No one instructed CA Kahan to send the photos to CA Imbrenda.

I asked CA Kahan if CA Imbrenda communicated anything to him in response to receiving the photos. CA Kahan replied that there was no written message accompanying the photos he sent, and CA Imbrenda did not communicate anything in response. However, CA Imbrenda had CA Kahan's number, so he would have known that he was the one who sent the photos. CA Kahan does not recall if he and CA Imbrenda ever had any discussions about the photos. CA Kahan never sent the photos to anyone else, and does not know if CA Imbrenda ever shared the photos with anyone.

The photos that CA Kahan took at the Willow Incident site are no longer on his phone. Although CA Kahan did not identify the specific date that he deleted the photos, he did so once he realized that the incident was going to be wrapped up. He also deleted the text message CA Imbrenda (in which he sent the photos) because he tries to keep his phone clean and current. CA Kahan did this on his own, and no one ever told him to delete the photos from his phone.

Before we concluded the interview, I asked CA Kahan if there was anything else he thought would be helpful for me to know, in light of the nature of the investigation. CA Kahan stated that the reason he took the photos was for "intel" and also for another purpose, or a "double purpose." CA Kahan then explained that DC Marrone might have asked him to write a statement for him for a press conference that he may have had to provide, and noted again that he is DC Marrone's eyes and ears, and wants to make sure that DC Marrone does well if he has to do a press conference or provide information to the Fire Chief.

### C.   Battalion Chief Andrew Smith – Witness

Following the above interviews, the Department requested that I speak to additional witnesses. Thus, on June 8, 2020, I interviewed BC Andrew Smith. Also present at the interview was Thomas Ray, BC Smith's union representative from the Association of Chiefs (AOC). Julia Kim, the Fire Department Risk Manager, was also present. Due to the COVID-19 pandemic and the need for social distancing, I conducted the interview via remote Zoom video, which was also audio recorded.

BC Smith started working for the County in April 1988, as a Fire Suppression Aid. His current rank is Battalion Chief, which he has held for approximately 2-1/2 years. He has also been serving as an Acting Assistant Fire Chief since April 1, 2020.

CONFIDENTIAL

COLA034994

Defendants' Summary Judgment Exhibit 19
Page 106

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

I began the substantive portion of the interview by asking BC Smith about his role at the Willow Incident. BC Smith confirmed that the Willow Incident began on January 26, 2020. BC Smith was on duty that morning, and was the initial attack incident commander. The response came out initially as a brush fire, and he was one of the two BCs that were assigned to the incident as of the time of the initial alarm. BC Smith explained that as the engine companies did their initial size up, the incident started moving toward being a working incident, so he took over as the incident commander. As the incident commander, one of BC Smith's first responsibilities was to gather intel via radio and set up an Incident Command Post, which ended up being approximately three quarters of a mile west of the crash site, at the Las Virgenes Water District parking lot. BC Smith explained that from his location at the command post, looking east, he was at least half a mile from the crash site, in a secure location. BC Smith relinquished command at approximately 2:00 p.m., at which point he proceeded to Fire Station 89 for the Critical Incident Stress Debriefing ("CISD"). He subsequently returned to the command post in a supporting role for the new incident commander, Deputy Fire Chief (DC) Anthony Marrone, and helped with the incident until nearly midnight. BC Smith never visited the actual crash site.

I asked BC Smith if he was involved in the Willow Incident on any other day. He replied that he did check in at the command post the following day to see if there was anything they needed, and periodically checked in on his regular duty day to see if there was anything that was needed.

I next turned to the issue of photographs, and asked BC Smith if he was aware of any direction given during the Willow Incident with respect to the taking of photographs. BC Smith replied that when he took command, it was clear that a helicopter had crashed, so his priority was to determine if there were any survivors, and also to determine if the helicopter was an agency aircraft or a civilian aircraft. The air squad that was overseeing the incident had a video of the overall scene, which showed an overall view of what was burning (from a distance), which BC Smith requested so that he could come up with control objectives. BC Smith also advised that the helicopter had lowered a crew member to the ground, to do life safety for survivors, and BC Smith asked for a photo of the tail number or some sort of identification so that he could determine the origin of the aircraft and things of that nature. Based on intel provided and the video and a photograph, BC Smith was able to determine that the helicopter was either a private aircraft or a children's hospital aircraft. Following this narrative, BC Smith confirmed that the only video he received was from the air, and the only photograph he received was the plate number. BC Smith believes that both the video and the photograph were taken by Firefighter Paramedic Jeffrey Duran.

I again asked BC Smith if there was any direction given at the Willow Incident regarding the taking of photographs. BC Smith responded that after he brought his ground resources back to the command post around 12:00 p.m., he subsequently did a quick After Action Review (AAR) on the incident. His first area of focus was on the crew's mental health and well-being, which was addressed and briefed. The second area of focus was to make it very clear to all involved that this was a global event, and no photographs were to be taken whatsoever. BC Smith made it clear to everyone that if

SMRH:4812-3722-6427.1

-6-

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

any photos had been taken, they were to be deleted immediately.  According to BC Smith, his leader's intent was that there be no pictures of the incident.  BC Smith is confident that by the time the resources were at the crash site, they did not have time to take pictures, and if they did it was very clear when they came down the hill that no photographs were to be maintained.

BC Smith went on to explain that at 1400 hours on Day 1 of the Willow Incident, at Fire Station 89 during the CISD, he again went over the rules.  His narrative regarding photographs was, "don't be that person," and "don't keep any photos of the incident." Following the first part of the briefing, he kept the captains (Mike Rivera, Sonny Farrell, Sterling Callahan and Kevin Harmon) behind and told them two things.  First, they were to check the safety and welfare of their people.  Second, they were to make sure that if any photographs had been taken, they were not to be maintained, shared, sent, or anything else.  BC Smith reiterated that he delivered this message regarding the prohibition of photographs three times on the first day of the incident.  When asked if anyone else gave instructions about photographs, BC Smith replied that he does not know if anyone else gave any similar instructions.

Ms. Kim asked if BC Smith gave the instructions regarding photographs to either Mike Velasquez or Brian Jordan.  BC Smith replied that CA Velasquez was managing the camp crew and was still up on the hill during the debrief.  BC Smith did follow up with CA Velasquez on a welfare check to see how the crews were doing, but he does not remember if he mentioned the instruction regarding the photographs.  Similarly, BC Smith did not give instructions to CA Jordan because CA Jordan was the assigned safety officer and, as such, he remained up on the hill.

I then asked BC Smith if, to his knowledge, anyone had taken photographs of the crash site (other than the video and photograph discussed above).  BC Smith replied that he is not aware of anyone who took photographs of the incident, and he only heard what the news had reported about the LASD.  BC Smith added that he knows firefighters pretty well, and if someone had done something like that, he believes it would have come out by now.

I next asked BC Smith if there was a Safety Officer present at the Willow Incident.  BC Smith confirmed that there was.  I asked BC Smith to describe generally the duties of a Safety Officer on an incident such as the Willow Incident.  He replied that the Safety Officer on any incident is part of the command staff who reports directly to the incident commander.  The Safety Officer is assigned at the discretion of the incident commander, to look at the overall safety at the scene of an incident, such as whether hazards are present, and things of that nature.  I then asked BC Smith if a Safety Officer's job duties include taking photographs.  BC Smith explained that it depends.  For example, if there is a brush fire of an unknown origin, people are on the line, and the safety officer says "I found a bottle rocket," it would not be out of character for him or her to take a photo of something like that, which may have value to the incident later. BC Smith then provided another example, such as a wildland incident where a vehicle goes over the side of a hill – in this instance, a Safety Officer might take photos for a fact finding of cause.  BC Smith explained that another example would be where a

CONFIDENTIAL

COLA034996

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

portion of a structure has collapsed and the Safety Officer took photos related to the incident, again for fact finding purposes.

I next asked CA Smith if a Safety Officer might need to take graphic photos of an incident.  BC Smith replied that there could be reasons that such photos might need to be taken, and he has seen this done in the past where there was a safety issue and the photos were part of the process of piecing together what occurred and gathering intel on the incident.  When asked if there might be a reason for a Safety Officer to share such photos with others, BC Smith replied that it depends on who the Safety Officer would be sharing them with.  For example, if a photo is taken and time has passed and the opportunity to capture the image will not occur again, it would not be out of practice for the Safety Officer to send the photo to the Operations Chief or the incident commander for intel, a tactical plan, or the overall safety of an incident.

Ms. Kim then asked BC Smith what the Department's purpose might be for photographs of human remains at the Willow Incident.  BC Smith replied that from a "lessons learned" standpoint, there is value.  He went on to state that he has taken gruesome photos before, which, for example, have been used as part of the AAR.  Ms. Kim then asked BC Smith if he could identify any reason why such photos might need to be disseminated other than for AAR purposes or things of that nature.  BC Smith said that such reasons might exist, but any such dissemination would be for business reasons.

> *Investigator Note:  At this point during the interview, Mr. Ray interjected with a narrative regarding the use of such photos in the Arson Investigation Unit.  That discussion is not included here as the Willow Incident did not involve an arson investigation and, thus, this information is neither relevant, nor was it is provided by the witness as part of his account.*

I asked BC Smith how often photos are actually used for the purposes he described, such as training and debriefing.  He stated that it is very common for photos to be taken and used for these purposes.  Ms. Kim then clarified that BC Smith had stated "no photographs" for the Willow Incident due to the gravity of the incident, which he confirmed.  She then asked if, in light of the gravity of the incident and the instruction he had given, whether BC Smith expected people at the crash site to be taking photos for the AAR.  BC Smith replied that he did not even think about it, and was more concerned about giving his direction to the people who had been on the hill for their safety and welfare.  However, BC Smith added that he does not know what value photographs of the Willow Incident would play, since the Department was not going to go into the mechanical failure of the aircraft, was not going to look at trauma patients that had no chance of survival, and things like that.  For his purposes with the video and photo, he had liability over the fire burning and spreading to houses, so he needed those images.  As for using such photos in the future, BC Smith noted that he could use the video and photo for teaching purposes, including the risks with aircraft under certain weather conditions, fire behavior, and things of that nature.  BC Smith could not identify any business need for graphic photos of bodies from the Willow Incident, noting that first responders see graphic things all the time.

SMRH:4812-3722-6427.1                                    -8-

COLA034997
Defendants' Summary Judgment Exhibit 19
Page 109

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

Given that we were on the subject of "seeing graphic things," I asked BC Smith if he was aware of any Department personnel who he felt had been traumatized in some way by what they saw on the scene.  BC Smith identified one person, whose name he could not recall, who was on an engine company and was a big time Kobe Bryant fan.  The images apparently hit this particular individual very hard, so BC Smith made sure to address it with the person's Captain, Scott Ross.

Before we concluded the interview, I asked BC Smith if he could think of anything else that would be helpful for me to know.  BC Smith responded that the Willow Incident was a pretty straightforward incident until it became a global event.

D.      **Deputy Chief Anthony Marrone – Witness**

As part of the additional witness interviews requested by the Department, I interviewed DC Anthony Marrone on June 8, 2020.  Also present at the interview was Julia Kim, the Fire Department Risk Manager.  Due to the COVID-19 pandemic and the need for social distancing, I conducted the interview via remote Zoom video, which was also audio recorded.

DC Marrone started working for the County in June 1986, as a Firefighter.  DC Marrone has been a Deputy Chief since May 2013, and is currently assigned to the Central Region – an assignment he has held since February 2019.

I began the substantive portion of the interview by asking DC Marrone about the Willow Incident.  DC Marrone confirmed that the Willow Incident began on January 26, 2020.  He was on duty that day, working in the office.  He heard about the helicopter crash through dispatch, and originally thought it was a small helicopter with a couple of people on board, which had started a small brush fire.  DC Marrone had no intention of rolling out to the Calabasas area, as he was in his civilian clothes and CA Brian Jordan had already advised him that he (CA Jordan) would be going to the scene and would keep DC Marrone updated.  However, as time went on, it became clear that the incident involved a larger helicopter with 7-9 people on board, none of whom had survived the crash.  This made the situation far more significant, and DC Marrone also learned that TMZ was reporting that Kobe Bryant was on board and had been killed.  Thus, DC Marrone decided that he needed to go to the incident site.  He drove home, got into uniform and responded to the command post.  DC Marrone estimates that he arrived at the command post at between 11:30 a.m. and 12:00 p.m., not long after CA Jordan.

DC Marrone then went into a long narrative regarding his involvement at the Willow Incident.  When DC Marrone arrived at the scene, BC Drew Smith, CA Jordan, CA Tony Imbrenda (the Department's PIO), and others who he did not identify by name were at the command post.  DC Marrone noted that there was a small plume of white smoke coming from the burning metal in the engine, and confirmed that Elliot Simpson from the NTSB was en route to the scene.  DC Marrone advised me that the fire was basically out, that the crews had cut a line, and water had been taken to the accident scene.  He also advised me that a Fire Department helicopter had been the first on scene and had shot a video after inserting their paramedic into the crash site via hoist so that he could

SMRH:4812-3722-6427.1                                   -9-

**CONFIDENTIAL**                                                        **COLA034998**

Defendants' Summary Judgment Exhibit 19
Page 110

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

check to see if there were any survivors.  Unfortunately, the crash scene was very violent and everyone on board had perished.

DC Marrone also recalled that Chief Deputy (CD) David Richardson had also been calling and instructing that all measures be implemented to extinguish the magnesium fire, as news helicopters had arrived and were covering the incident.  DC Marrone noted that since it was a metal fire, a special extinguishing agent was required.  Additional resources were contacted for this purpose.

After these initial measures at the command post, DC Marrone proceeded to the Sheriff's station where he connected with Fire Chief (FC) Daryl Osby and briefed him on the situation up to that point.  There was also a press conference that took place that day.  DC Marrone also participated in a meeting the following morning with the NTSB, FAA and others at a nearby hotel.  During that meeting, DC Marrone shared with the NTSB two videos from the helicopter and one photo of the tail plate (which he had requested and received from BC Smith), and the group came up with a plan on how to cut a road to the crash site since it was not easily accessible.  DC Marrone never went up to the actual crash site on the first day of the Willow Incident.

DC Marrone also provided some information regarding photographs.  Specifically, on the first day of the incident, given the fact that an international sports celebrity and his family had been on board the helicopter, he expressly told BC Smith that there were not to be any photographs of the decedents, as taking such photographs would neither be right nor appropriate.  DC Marrone also reminded BC Smith that there was no business need for such photographs.  DC Marrone went on to instruct BC Smith that when BC Smith conducted the CISD, in addition to discussing the mental and emotional issues associated with an incident such as this, he was also to expressly instruct those who were involved in the incident that it was unacceptable to take any photographs of decedents or discernable human remains.  DC Marrone emphasized this instruction to BC Smith 2-3 times, and others were present and heard the instruction as well, including Assistant Chief (AC) Dennis Breshears and CA Jordan.  BC Smith later confirmed to DC Marrone that the message had been delivered and everyone understood the instruction loud and clear.  DC Marrone also advised FC Osby at the press conference that those involved in the incident all understood that such photos were not permitted.  DC Marrone does not recall giving any instructions to "delete" any such photos if they were taken, but felt that it was clearly implied by the express instruction he gave.

DC Marrone also noted that members of the Coroner's office came out to the site on Day 1 of the incident and removed the deceased from the site. According to DC Marrone, the Coroner's office was at the site all night long, into the following day when they completed the recovery of the remains of the nine people who had perished. However, even after that, the cadaver dogs found an additional 50 pounds of human remains that were not evident to the naked eye.  DC Marrone also noted that the aircraft salvage company came and picked up all of the large pieces of the helicopter.  DC Marrone then added that he draws a distinction between people taking photographs of things like the tail boom, rotor head, seat cushions, the line, etc. (which he does not

SMRH:4812-3722-6427.1                              -10-

CONFIDENTIAL

COLA034999

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

believe would be inappropriate) and pictures of the decedents, which would absolutely be inappropriate. He added that the Coroner, Sheriff's department, FBI and NTSB take pictures of dead bodies, not the Fire Department, and it is not a Fire Department function to take photos of anyone killed at the scene.

I asked DC Marrone what time he gave the instruction to BC Smith regarding not taking photographs at the scene. He responded that it was early on in the incident, before 1:00 p.m. I then asked DC Marrone why BC Smith was to give the instruction at the debriefing, as opposed to some earlier time, such as up on the hill. DC Marrone responded that he does not recall if he also told BC Smith that he should notify the people up on the hill – he only specifically recalls telling him that he should bring it up at the debriefing, although he certainly intended for the instruction to be transmitted to the people up on the hill. DC Marrone also clarified that he is not aware of anything in the Fire Department's manual that prohibits the taking of photographs of decedents, but such photographs were absolutely prohibited pursuant to his instruction.

I next asked DC Marrone what time he gave the instruction to CA Jordan and AC Breshears prohibiting photographs of decedents. DC Marrone replied that it was sometime between 11:00 a.m. and 2:00 p.m., noting that he gave the instruction more than once. DC Marrone has no knowledge regarding anyone else who may have given instructions regarding photographs. DC Marrone subsequently clarified that he was at the command post from 12:00 p.m. to 2:00 p.m. on Day 1.

I asked DC Marrone if he was involved with the Willow Incident on any other day, and he responded that he was also there on Day 2. According to DC Marrone, the bodies of the decedents were removed throughout Day 1 and also in the morning of Day 2 of the incident. DC Marrone advised me that he did not go up to the actual crash site on Day 1, because he knew it was going to be horrific and he did not want to witness that. He did, however, go to the crash site on Day 2. Specifically, at approximately 7:00 a.m. on Day 2 of the incident, DC Marrone and AC Breshears (who had been the night incident commander) went to the NTSB debriefing at a hotel in Calabasas, introduced themselves, asked if any support was needed, and shared the videos that DC Marrone had received from the helicopter. They also introduced the NTSB to the City Manager, Mayor, and others. Thereafter, DC Marrone and AC Breshears went to the command post and checked in with the daytime incident commander, Acting AC Mike Brown, after which DC Marrone was driven up to the actual crash site. DC Marrone stayed at the crash site for approximately 30 minutes. The majority of human remains had been cleared from the crash site by the time DC Marrone got there.

As we were speaking about the timing of the removal of human remains, DC Marrone noted that he had a text exchange with CA Jordan at approximately 9:30 p.m. on Day 1 of the incident. During the exchange, CA Jordan advised DC Marrone that he (CA Jordan) was the one who had covered up Kobe Bryant's body earlier in the day, and also advised DC Marrone that the Coroner had since taken part of Mr. Bryant's remains to the morgue. CA Jordan also advised DC Marrone that Mr. Bryant's daughter's remains were still in a drainage area.

**CONFIDENTIAL**                                              **COLA035000**

Defendants' Summary Judgment Exhibit 19
Page 112

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

I then turned back to the issue of photographs and asked DC Marrone if, to his
knowledge, anyone else had taken photographs of the crash site. DC Marrone replied
that other than the two videos from the helicopter and the one photo of the tail plate
(which he had requested and received from BC Smith), the only other person that he
knows for sure took photographs of the scene is himself. More specifically, DC Marrone
explained that when he went to the crash site, he took a picture of the impact area, the
burning fuselage, the rotor head and the line that had been cut, for a total of four
photographs – all taken on his work phone. I asked DC Marrone why he took the
photos, and he explained that he understood from CD Richardson that the Fire
Department would have to do an AAR, and in the past, CD Richardson had tasked DC
Marrone and his subordinates with putting together AAR s. It was not until weeks later
that DC Marrone realized that there would not be an AAR of this incident. DC Marrone
also made clear to me that there were absolutely no photos of decedents or discernable
human remains in the photos he took, as he would not violate his own direction to the
staff. The four photos that DC Marrone took have long since been deleted from his
phone and were never shared with anyone. DC Marrone never instructed CA Jordan,
CA Kahan or anyone else to take photos of the Willow Incident.

I then asked DC Marrone about CA Jordan, the Safety Officer at the Willow Incident. I
began by asking about CA Jordan's general duties as the Safety Officer. DC Marrone
explained that as the Safety Officer, CA Jordan was responsible for making sure that
everyone was following safety procedures as outlined in the Fire Department's
operations manual, such as wearing appropriate PPE, following the safe and approved
procedures for the extinguishment of the small brush fire, and operating in a hazardous
materials environment. DC Marrone added that CA Jordan was the eyes and ears of
the incident commander. I asked DC Marrone if a Safety Officer's job duties include
taking photographs. DC Marrone replied that although there could arguably be a
reason for taking photographs of the overall incident (e.g., for an AAR), there would be
no reason for CA Jordan to take pictures of any decedents or discernable human
remains. In fact, DC Marrone is confident that in the more than 100 AARs that have
been done in the last few years, none of them included photos of decedents or
discernable human remains. Rather, they contained photographs of things like a fire, a
building, a building after a fire has been extinguished, images of ingress and egress,
surrounding streets, apparatus placement, equipment, what mode of firefighting was
used (offensive versus defensive), and things of that nature. The purpose of the AAR is
to focus on lessons learned regarding what went right and what went wrong, and how
the things that went wrong can be addressed moving forward. DC Marrone then
reiterated that, in light of this, there simply would be no reason for CA Jordan or anyone
else from the Fire Department to take photographs of decedents or discernable body
parts.

I next asked DC Marrone about CA Kahan, DC Marrone's Staff Aide. Specifically, I
asked DC Marrone if CA Kahan was at the Willow Incident and had heard DC Marrone's
instruction prohibiting the taking of photographs. DC Marrone responded that CA
Kahan was not at the Willow Incident on Day 1, and DC Marrone does not believe he
gave CA Kahan the specific direction on Day 2. DC Marrone then noted that by the
time he got to the top of the hill on Day 2 of the incident, it would not be possible to take

SMRH:4812-3722-6427.1                         -12-

COLA035001

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

a photo of a decedent unless you lifted up a blanket or sheet, or went down into the gully.  DC Marrone emphasized that there was no opportunity to take such a photo on Day 2 without being extremely conspicuous, and he does not think the Coroner would have allowed it in any event.  DC Marrone then clarified that he does not think he even saw any covered remains or decedents on Day 2, and all that remained were small pieces of debris everywhere.  DC Marrone went on to state that, in his mind, there was not anything to see on Day 2 by the time he arrived, and the Coroner's office had already concluded their retrieval of the decedents.  DC Marrone never asked CA Kahan to take any photographs of the Willow Incident, and never received any photos from CA Kahan.

With respect to CA Kahan's duties as a Staff Aide, DC Marrone explained that, generally speaking, the Staff Aide accompanies DC Marrone, scribes any requests that he might have, gives directions on DC Marrone's behalf, and transmits information, photographs or videos to DC Marrone remotely if he is offsite.  However, DC Marrone went on to explain that, at the Willow Incident, CA Kahan was not his eyes and ears, but, rather, was with DC Marrone at the command post.

I asked DC Marrone if a Staff Aide's job duties include the actual taking of photographs.  DC Marrone replied that photographs might be needed for various purposes, but never photographs of decedents.  More specifically, DC Marrone explained that if the Staff Aide is serving as his "eyes and ears" on an incident, the photographs might be necessary to relay information to DC Marrone.  They also could be used for an after incident review.  DC Marrone went on to state that on the Willow Incident, CA Kahan may have shared DC Marrone's belief that there would be an after incident review, so CA Kahan may have believed there was a reason to take photographs for that purpose.  Ms. Kim then asked DC Marrone if an after incident review would include photographs of body parts, to which DC Marrone responded that there would absolutely be no reason for any such photos to be included in any after incident review.

I next turned to whether DC Marrone was aware, prior to the interview, of any allegations regarding Fire Department personnel sharing photographs of the Willow Incident.  DC Marrone stated that he was aware of such allegations.  Specifically, in early February 2020, DC Marrone received a call from a captain at the Lost Hills Sheriff's station and was advised that LASD deputies had been accused of taking and sharing photographs of the Willow Incident.  DC Marrone was also advised by the Lost Hills captain that two firefighters who were on the hill on Day 1 of the incident may have also been taking or sharing photographs.  This was the first time DC Marrone heard this allegation.  The Lost Hills captain advised DC Marrone that the two firefighters in question were at either the Captain or Chief Officer level, and that one was African American and the other was Hispanic.  The captain never disclosed to DC Marrone the identity of the deputy or deputies who had made the allegation regarding these firefighters, or what the specifics of their behavior were, other than they had purportedly taken and/or shared photographs of the Willow Incident.  Upon learning this information, DC Marrone called DC William McCloud (who oversees the LPSB) and also notified CD Richardson.

CONFIDENTIAL

COLA035002

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

DC Marrone also then recalled being separately and subsequently advised by BC
Stephen Cookus from Battalion 5 that a woman had come to him and lodged a
complaint regarding problematic behavior by members of the Fire Department at the
Golden Mike Awards.  Specifically, she complained that while she was at the event with
her husband Cody Weireter (who is an LA City fire captain), CA Imbrenda and his staff
were showing photos of the Willow Incident to others in attendance.  DC Marrone
contacted the woman directly and then handed the matter over to DC McCloud at the
LPSB.  DC Marrone recalled seeing CA Weireter at the Willow Incident.

At this point during the interview, Ms. Kim interjected and asked DC Marrone to confirm
that he used to work in the PIO's office. DC Marrone confirmed that this was the case,
and he worked in the PIO's office many years ago in 1998.  Ms. Kim then asked DC
Marrone if, in his experience, there would be a business need for the PIO to have
photographs of discernable human remains or decedents from something like the
Willow Incident.  DC Marrone replied that no such reason exists, and there is no part of
the PIO's job function that would require them to have such photos in their possession.
DC Marrone then reiterated his earlier statement that he has seen a lot of AARs and
there is no need for photos of decedents to be included.  DC Marrone added that it is
not within the Fire Department's charge to investigate how or why someone died.  He
noted, however, that he does not think a picture that happens to include an image of a
pinky finger or something like that would fall within this prohibition, because the taker of
the photograph may not have seen it.  DC Marrone similarly distinguished the aerial
video taken by the Fire Department, noting that even though it might include some
images that would otherwise be problematic, the video was an overview of the crash
scene from the first onsite responders, and it had a purpose and function, such as
helping the FAA.  DC Marrone then again reiterated that it would be completely
inappropriate to take photos of decedents, noting that doing so is inappropriate and
disgusting.  DC Marrone has not seen any such graphic photos, has no concrete
evidence that anyone requested them, took them, or shared them, and made clear that
if he was aware of such, he would have caused an investigation to be opened.

E.    Assistant Chief Dennis Breshears – Witness

As part of the additional witness interviews requested by the Department, I interviewed
AC Dennis Breshears on June 16, 2020.  Also present at the interview was Julia Kim,
the Fire Department Risk Manager.  Due to the COVID-19 pandemic and the need for
social distancing, I conducted the interview via remote Zoom video, which was also
audio recorded.

AC Breshears started working for the County in September 2000, as a Fire Fighter
Trainee.  AC Breshears currently serves as the Assistant Fire Chief of the Training
Services Division, and he has held this position for approximately two years.

I began the substantive portion of the interview by asking AC Breshears about the
Willow Incident.  On January 26, 2020, the first day of the incident, AC Breshears was
the duty AC and was at home.  He received a page from dispatch that there was a
helicopter crash, but was not initially advised of the severity of the crash or the victims

SMRH:4812-3722-6427.1                                -14-

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

involved.  After monitoring the situation on his phone for an hour or so, AC Breshears received a text from AC Anderson Mackey regarding "a helicopter crash involving Kobe Bryant," which had been announced by TMZ.  AC Breshears then called BC Smith (the Incident Commander on the Willow Incident), and asked him for a status update, asked if Kobe Bryant had been on board the helicopter, and asked if BC Smith needed AC Breshears at the site.  BC Smith was unable to confirm that Kobe Bryant had been on board, so AC Breshears contacted DC Marrone (the duty DC), and the two subsequently headed to the crash site in their respective vehicles.  At some point, AC Breshears talked to DC Marrone about establishing peer support, and also spoke to BC Smith about a debriefing at Fire Station 89.  AC Breshears arrived to the incident command post at approximately 1:00 or 1:30 p.m., and DC Marrone arrived shortly thereafter.  There were multiple agencies there.  AC Breshears noted that it was not really a Fire Department incident because the fire had mostly been contained (with the exception of one small area that was still smoking) and they were just trying to figure out next steps regarding the incident.  In fact, there were no longer any resources from the Fire Department at the incident except BC Smith and CA Jordan.  The rest were either at the debrief at Fire Station 89 or running calls in their areas.

AC Breshears ended up becoming the Incident Commander so that he could relieve BC Smith, who still had to run Battalion 5.  AC Breshears explained to me that he was more of an agency representative, rather than an Incident Commander, because it was no longer an agency event.  Rather, those on scene (the LASD, NTSB, FBI, etc.) needed logistical assistance for lighting, and things of that nature.  AC Breshears called Fire Station 125 to bring over portable battery powered lights, and the LASD was trying to set up security because people were still trying to climb the hills near the incident.  One of AC Breshears' primary concerns was getting the appropriate lighting in place before nightfall to assist with managing animals, hikers, and the like.  AC Breshears also needed to figure out how to extinguish the magnesium fire that was still burning, as the smoke from that fire was getting press coverage and making people angry.  And he coordinated getting a bulldozer on the hill to create an access road so that it would be easier for people to access the crash site in ATVs and other vehicles.  Beyond that, AC Breshears' involvement was somewhat limited, as he was waiting for the lead agencies to give direction on what to do.

The following morning, AC Breshears attended an NTSB briefing at a nearby hotel (DC Marrone and CA Mike Brown were also there).  The NTSB only wanted information regarding the incident released through the NTSB, so AC Breshears notified CA Imbrenda and possibly then-Acting AC Mike Brown that the Fire Department was not to discuss anything regarding the incident moving forward.  More specifically, the Fire Department could talk about anything that happened before the crash, but anything that happened after the crash had to go through NTSB for their approval.  AC Breshears then went back to his office, worked his typical day, and reported back for the evening briefing.  AC Breshears relieved then-Acting AC Brown as Incident Commander via telephone, at which point then-Acting AC Brown asked AC Breshears to coordinate cadaver dogs for the following day.  There was not much for AC Breshears to do during the second night of the incident, and only he and the LASD personnel were on site that night.  The next morning, there was another briefing at the hotel, during which the

SMRH:4812-3722-6427.1                                                    -15-

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

agencies outlined new information regarding potential causes of the crash and advised those in attendance that they were going to try and remove the engine from the hill later in the day.  AC Breshears then went back to the scene with DC Marrone and then-Acting AC Brown, and they took ATVs up to the crash site.  AC Breshears noted that the site consisted mainly of debris at that point, with roughly 15-20 people collecting debris and taking pictures.  AC Breshears and DC Marrone walked the site on the walking trail for approximately 20 minutes.  After that, AC Breshears returned to his office and had no further involvement in the incident.

I asked AC Breshears if there was any direction given on scene regarding the taking of photographs.  AC Breshears replied that he did not know, noting that he did not arrive until after the "first alarm assignment" had left the scene.  However, AC Breshears thinks it is highly unlikely that there would have been any need for Fire Department personnel to take photographs on a first alarm assignment because there was a brush fire and a crash, and everyone would be busy.  He added that sometimes personnel wear helmet cameras, but noted that this typically occurs only on structure fires.  Upon further questioning, AC Breshears clarified that he did not personally give any direction regarding the taking of photographs, since there were only two or three Fire Department personnel on the scene when he arrived.  He then reiterated that he does not know if anyone else gave any such direction.

I next asked AC Breshears if he is aware of anyone taking photographs at the crash site.  He replied that he is not aware of anyone doing so.  He added that the first he heard of any such alleged conduct was in the media reports regarding LASD personnel sharing photos with someone at a bar.  He has also heard allegations in the media that Fire Department personnel may have taken photos of the crash site, but he does not personally have knowledge of such conduct.  With respect to the receipt of any photos, AC Breshears stated that the only two texts he received that contained anything in that vein were a text message from BC Smith with a photograph of the data plate of the helicopter (AC Breshears does not know who took the photo), and text message from CA Jordan containing a link to a flight path tracker, both of which were for situational awareness on how the incident occurred.  However, this information did not make a lot of sense to AC Breshears, as he is not a pilot.  AC Breshears is not aware of any other photographs of the Willow Incident being taken or shared with anyone else.

AC Breshears was next asked if he ever heard DC Marrone instruct anyone at the scene to not take photographs, or to delete any such photographs if they had already been taken.  AC Breshears responded that he does not recall anything specifically, noting that there was no one for DC Marrone to give this instruction to by the time he and AC Breshears arrived on scene.  Ms. Kim then asked AC Breshears if there was a reason the Fire Department would need to take photos that contained images of human remains at a scene like the Willow Incident.  AC Breshears replied that photographs of the crash site might be relevant or necessary for an AAR, but there would not be any need for such photographs to contain images of human remains.  AC Breshears added that he has seen approximately 20-30 AARs, some of which were for incidents that involved fatalities, but does not recall any of them containing graphic photos.  AC Breshears went on to add that he recalls a crew bus rollover that resulted in 1-2

SMRH:4812-3722-6427.1                                      -16-

**CONFIDENTIAL**

**COLA035005**

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

fatalities, but there were no graphic photos needed for the investigation.  Similarly, during the time AC Breshears worked as a Safety Officer, he had occasion to take photographs of incidents, but never took photographs of decedents, and never shared the photographs he took with anyone outside of the investigation.

I next asked AC Breshears about the duties of a Safety Officer at a scene like the Willow Incident.  AC Breshears stated that duties depend on the incident, but on a typical incident, a Safety Officer's role is to ensure that people are wearing the proper protective equipment and prevent unsafe acts from occurring.  So, for example, on a brush fire, a Safety Officer will work directly for the IC, and basically handle any safety issues that arise.  AC Breshears went on to state that a Safety Officer might also conduct an investigation and prepare an investigation report for issues such as employee injuries that do not meet OSHA criteria, noting that during such investigations, the Safety Officer might need to take photographs, including photos of the injured employee.  If, following such an investigation, the DC determines that one is warranted, a preliminary investigation report known as a "blue sheet" will also be prepared by the Safety Officer.  The purpose of measures like these is for "lessons learned."

According to AC Breshears, on an incident such as the Willow Incident, the Safety Officer would look at the spread potential of the brush fire, and try to get ahead of any threats related to the fire.  AC Breshears noted that on the morning of the Willow Incident, the fog was heavy, so the spread potential was limited.  AC Breshears went on to state that at the Willow Incident, people were on the ground working underneath moving aircraft, so the Safety Officer would need to monitor the interaction between the aircraft and the ground resources.  In addition, since this was a crash and fuel sources were involved, the Safety Officer would need to initiate a decontamination procedure to ensure that anyone who came in contact with the fuel was properly decontaminated, along with their equipment, to prevent exposure.  With respect to the Willow Incident, AC Breshears initially stated that he does not believe there would be any reason or need for the Safety Officer to take photographs.  However, AC Breshears then discussed an example of why such photos might be justified at an incident like Willow.  According to AC Breshears, if the Safety Officer arrived on scene and had the opportunity and ability to take photographs of something that later on would be helpful for the investigators to have since the scene was changing, there might be a justification for such photographs.  That being said, AC Breshears could not identify any reason why a Safety Officer would need to take photos of the Willow Incident (other than a safety-related issue like personnel working near a helicopter rotor that was still moving, which did not exist here), since the Fire Department's mission was to put out the fire, not to document the incident.  With respect to photographs of decedents, AC Breshears stated there was no reason to take any photographs of this nature.

I asked AC Breshears to describe what CA Jordan did during the Willow Incident.  AC Breshears did not have much information in this regard, noting that when he arrived on scene, he did not know where CA Jordan was.  AC Breshears believes CA Jordan was monitoring safety issues and oversaw the application of the agent to extinguish the magnesium fire, but does not have personal knowledge of what else CA Jordan did at the Willow Incident.  AC Breshears never discussed the issue of photographs with CA

CONFIDENTIAL                                                          COLA035006

Defendants' Summary Judgment Exhibit 19
Page 118

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

Jordan, nor did CA Jordan ever speak with AC Breshears about the specifics of what he had seen up at the crash site. AC Breshears does not recall CA Jordan telling him that he was the one who covered up Kobe Bryant's body.

Although we had briefly touched on this subject already, I asked AC Breshears if he was aware of allegations that Fire Department personnel had taken or shared photographs of the Willow Incident. AC Breshears responded that he had assumed that was the reason for the interview when he was first advised of such, and again noted that he had heard some allegations in the media.

Before we concluded, I asked AC Breshears if there was any other information he felt would be helpful for me to know as part of this investigation. AC Breshears replied that he does not see any reason for people to share photos of an incident outside of the investigative unit, regardless of the nature of the incident.

**F.    Battalion Chief Michael Brown – Witness**

As part of the additional witness interviews requested by the Department, I interviewed BC Michael Brown on June 18, 2020. Also present at the interview was Julia Kim, the Fire Department Risk Manager. Due to the COVID-19 pandemic and the need for social distancing, I conducted the interview via remote Zoom video, which was also audio recorded.

BC Brown started working for the County in October 1990, as a Probationary Fire Fighter. BC Brown currently serves as the Battalion Chief for Battalion 2 in San Dimas, and has held this assignment since April 2020.

I began the substantive portion of the interview by asking BC Brown about the Willow Incident. BC Brown was on duty on January 26, 2020, which was the first day of the incident. He was assigned to Battalion 1 and working overtime. He first became aware of the Willow Incident through dispatch on an "aircraft down." BC Brown proceeded to the scene and checked in with BC Smith who was already there. BC Smith advised BC Brown that he could cancel his response, so BC Brown returned to his battalion and never even got out of his vehicle on that first day.

The following day, January 27, 2020, BC Brown ended his shift and then texted AC Breshears to find out where he was, since BC Brown would be relieving AC Breshears as the Incident Commander on the Willow Incident. At the time of the Willow Incident, BC Brown was an acting AC. AC Breshears advised BC Brown that he would be at a briefing and would meet BC Brown there. The briefing took place at a nearby hotel, and BC Brown was introduced to individuals from the FAA and NTSB. The briefing did not last long. Thereafter, AC Breshears, BC Brown and DC Marrone (who was also at the briefing) all drove to the incident command post, which had been set up at the water filtration company in Calabasas at the base of the hill. BC Brown checked in with the LASD incident commander and exchanged phone numbers. At some point thereafter, BC Brown left the command post and went to Fire Station 70 to sleep. BC Brown later returned to the incident, periodically checked in with the LASD incident commander, left

CONFIDENTIAL

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

to go get lunch, and generally monitored the incident throughout the day.  The LASD was involved in the incident the whole time, working in shifts at their own command post.  BC Brown eventually left again as there was no need for him to stay all night, but he advised the LASD that they should contact him if they needed him for any reason.

I asked BC Brown if he was at the command post the entire time he was at the incident site.  BC Brown responded that he was at the command post for the majority of the time, but did go up to the crash site on either the second or third day of the incident (he is fairly certain it was the second day), and was accompanied by DC Marrone, AC Breshears and CA Jordan.  BC Brown explained that they went to the crash site so that they could all get a visual as to what was going on.  According to BC Brown, the group walked to the furthest end of the crash site, looked around and generally assessed the situation.  They were at the actual crash site for approximately 20 minutes.

On January 28th, the third day of the incident, BC Brown again reported to the incident and checked in with the LASD incident commander.  BC Brown again advised the LASD that he was available for any assistance that might be needed.  BC Brown stated that he watched the operation take place throughout the day, but there was not really anything for him to do.  I asked BC Brown to clarify what he meant by the "operation."  BC Brown explained that the Coroner personnel were coming off the hill with various items, and he was observing their operations, as he was curious about their investigation methodology, including the collection of evidence and the transfer of materials.  However, upon seeing a number of body parts and things of that nature, BC Brown eventually removed himself and stopped observing.  I asked BC Brown if he took any photographs of the Coroner operations and he replied that he did not.  He noted that there was also a utility driver from the Fire Department who was observing with him, but the driver seemed bothered by what he was seeing so BC Brown told him to remove himself from the situation.  BC Brown is not aware of anyone taking photos of the Coroner's operations, and if he had observed anyone doing so, he would have stopped it at once.  In fact, BC Brown is not aware of anyone taking photographs of the Willow Incident at all, whether graphic in nature or not.  I asked BC Brown if he could think of any reason why someone at the Fire Department, such as the PIO, Safety Officer, Staff Aide, or other personnel, would need to take or possess photos of decedents, body parts, or other graphic images from the Willow Incident.  BC Brown replied that there is no reason that any of those individuals, or anyone from the Fire Department for that matter, would need graphic photos.

I asked BC Brown if any direction was given on scene at the Willow Incident regarding the taking of photographs.  BC Brown replied that he was aware of one instance on the first day, after he had briefly rolled out to the site and then returned to his station.  According to BC Brown, when he returned to his station he turned on the television and was watching the news coverage of the incident.  The news cameras were capturing the images of Fire Department personnel sitting down instead of actively working the incident.  BC Brown called BC Smith and asked him to tell everyone to stand up.  Shortly thereafter, BC Brown noticed the personnel stand up.  During that same call, and since BC Brown observed a fire burning in the news coverage, BC Brown asked BC Smith to have the helicopter crew capture a video of the scene just in case the Coroner or

SMRH:4812-3722-6427.1                                    -19-

Defendants' Summary Judgment Exhibit 19
Page 120

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

investigators needed it. BC Brown does not know if this was done, but it was an instruction regarding the taking of photographs (or video, in this instance).

I then asked BC Brown if he was aware of any instructions or directions not to take photos of the incident, or to delete photos that had been taken. BC Brown replied that when he called BC Smith on the first day of the incident when watching the news coverage, he told BC Smith, "just a reminder to make sure that no one is taking photos of the incident – be aware of folks with phones," or words to that effect. Given his prior experience as a PIO, BC Brown also emphasized to BC Smith that nothing should be posted on social media. Other than his own instructions, BC Brown is not aware of anyone giving instructions at the Willow Incident not to take photos, or to delete photos. However, he reiterated that he was not actually at the scene during the first day of the incident on January 26th.

Ms. Kim then asked BC Brown if he gave any instructions at the Willow Incident regarding not taking photos. BC Brown again stated that he reminded BC Smith that people should not be taking photographs and should not be posting to social media, and to "be aware of the policy." Ms. Kim then asked BC Brown what the Fire Department's policy was. BC Brown replied that photos taken of anything inappropriate can be subject to investigation, which is the policy that BC Brown mentioned to BC Smith. BC Brown also noted to BC Smith to be careful as the media was around, and to be aware of people using their phones, given the sensitivity of the incident.

Before we concluded the interview, I asked BC Brown if there was anything else he thought would be helpful for me to know, given the nature of the investigation. BC Brown replied that a lot happens on the first day of an incident, and that it would probably be helpful for me to interview BC Smith.

### III.     Allegations and Findings

The allegations in this investigation were driven by the investigation requested by the Department. With respect to findings, where admissions as to allegations were made by the subject, they were accepted as true. Where the evidence was circumstantial or conflicting, a preponderance of the evidence standard (i.e., whether the evidence "more likely than not" substantiates the allegation) was used. This is the industry standard for workplace investigations. It is also the same standard that is applied in most civil cases. Credibility determinations were also made where appropriate.

*Allegation #1*:

CA Arlan Kahan took photographs containing images of human remains at the Willow Incident site.

*Finding #1*:

Substantiated.

SMRH:4812-3722-6427.1                                    -20-

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

During our interview, CA Kahan admitted that while he was at the Willow Incident, he took approximately 10-15 photographs, for the purpose of gathering "intel" for the incident.  According to CA Kahan, the photographs depicted the fuselage of the helicopter, the tail rotor, the tail boom, the surrounding brush, Malibu search and rescue, and other agencies at the crash site.  CA Kahan also confirmed that the photographs contained images of red flags or markers indicative of human remains, as well as flesh on the ground, the insides of humans splattered on the brush on the hill, and tarps and blankets covering other human remains.  The photographs were taken on CA Kahan's work phone, and have since been deleted.

* * *

*Allegation #2*:

CA Arlan Kahan shared photographs containing images of human remains that he took at the Willow Incident site with others at the Department.

*Finding #2*

Substantiated.

During our interview, CA Kahan admitted that he texted the photographs he took to CA Imbrenda's work phone the same day he took them.  CA Kahan denied sending the photographs to anyone other than CA Imbrenda.  I found CA Kahan to be credible on this subject, particularly in light of the fact that he was forthcoming about the contents of the photographs and the fact that he sent them to CA Imbrenda.  CA Imbrenda corroborates that CA Kahan sent him photographs.  No conflicting reports were provided.

RDJ

CONFIDENTIAL

COLA035010

Defendants' Summary Judgment Exhibit 19
Page 122

CONFIDENTIAL

COLA035011