LUIS LI (State Bar No. 156081)
Luis.Li@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
633 West Fifth Street, Suite 1550
Los Angeles, California 90071
Telephone:  (323) 210-2900
Facsimile:   (866) 974-7329

CRAIG JENNINGS LAVOIE (State Bar No. 293079)
Craig.Lavoie@mto.com
JENNIFER L. BRYANT (State Bar No. 293371)
Jennifer.Bryant@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone:  (213) 683-9100
Facsimile:   (213) 687-3702

Attorneys for Plaintiff Vanessa Bryant

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| VANESSA BRYANT,<br><br>          Plaintiff,<br><br>     vs.<br><br>COUNTY OF LOS ANGELES, et al.,<br><br>          Defendants. | Case No. 2:20-cv-09582-JFW-E<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:   Hon. John F. Walter<br>Date:    December 27, 2021<br>Time:    1:30 p.m.<br>Crtrm.:  7A<br><br>Assigned to Hon. John F. Walter and Magistrate Judge Charles F. Eick<br><br>Pretrial Conference: February 4, 2022<br>Trial: February 22. 2022 |

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................. 1

II.   STATEMENT OF FACTS ..................................................... 3

    A.    LASD's Photos of the Victims ..................................... 3

        1.    Deputy Johnson Takes Photos of the Bryants' Remains ............. 3

        2.    LASD's Photos of the Bryants' Remains Spread ....................... 4

        3.    Defendant Cruz Shares Photos of the Bryants' Remains ............. 5

    B.    The Fire Department's Photos of the Victims ........................ 5

        1.    A Supervisor Obtains Photos of the Bryants' Remains .............. 6

        2.    Brian Jordan Takes Photos of the Bryants' Remains ................. 6

        3.    Arlin Kahan Takes Photos of the Victims' Remains ................. 6

        4.    After Taking and Sharing Photos of the Victims' Remains, Tony Imbrenda Shares Them Over Cocktails at a Gala ............. 7

    C.    Defendants' Destruction of Evidence .................................. 7

        1.    LASD Instructed Its Personnel to Delete Evidence ................. 7

        2.    Tony Imbrenda Orchestrated a Mass Deletion Campaign Within the Fire Department .......................................... 9

        3.    LASD Personnel Disposed of Their Devices ....................... 9

III.  DEFENDANTS' MOTION FAILS BECAUSE MATERIAL FACTS ON WHICH IT RESTS ARE INCORRECT OR GENUINELY DISPUTED ................................................................ 10

        1.    Defendants' Motion Contradicts Video Evidence and the Departments' Own Findings ....................................... 10

        2.    County Employees Have Made False Exculpatory Statements that Betray Consciousness of Guilt ..................... 11

        3.    Cell Records and Other Evidence Indicate Even Broader Dissemination Beyond What Defendants Admit ................... 12

        4.    A Jury May Infer That the Evidence Destroyed by Defendants Would Have Been Unfavorable ....................... 14

IV.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON ANY OF PLAINTIFF'S CLAIMS ................... 15

# <u>TABLE OF CONTENTS</u>
### (Continued)

**Page**

A. The Entity Defendants' Failure to Establish a Policy or Train Their Personnel Resulted in Violations of Plaintiff's Constitutional Right to Control the Death Images of Her Husband and Daughter ........................................................................ 15

    1. County Employees Violated Plaintiff's Right to Privacy .......... 15

    2. The Departments' Deliberate Indifference Caused These Constitutional Violations ............................................................ 18

B. Defendants Breached Their Duty to Use Ordinary Care in Handling the Bryants' Remains ........................................................ 20

C. Defendants Invaded Plaintiff's Privacy ................................................. 22

    1. The Evidence Gives Rise to Genuine Issues of Material Fact as to the Extent of Dissemination by the Deputy Defendants ................................................................................... 22

    2. Mrs. Bryant Had a Reasonable Expectation of Privacy Over Her Family's Death Images, and the Offensiveness of Defendants' Intrusion Presents a Triable Issue of Fact.......... 23

D. Plaintiff Has Already Been Harmed by Defendants' Conduct and Has Article III Standing ........................................................................... 24

V. CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Ambat v. City and Cnty. of S.F.*,
    757 F.3d 1017 (9th Cir. 2014) ............................................................. 10

*Berry v. Baca*,
    379 F.3d 764 (9th Cir. 2004) ............................................................... 18

*Brown. Moore v. Rodriguez*,
    2021 WL 2222590 (S.D. Cal. June 2, 2021) ........................................ 21

*Bryant v. Cnty. of L.A.*,
    2020 WL 8024857 (C.D. Cal. Dec. 28, 2020) ...................................... 20

*Canton v. Harris*,
    489 U.S. 378 (1989) ............................................................................ 18

*Castro v. Cnty. of L.A.*,
    833 F.3d 1060 (9th Cir. 2016) ............................................................. 15

*Chaudry v. City of L.A.*,
    751 F.3d 1096 (9th Cir. 2014) ............................................................. 24

*Connick v. Thompson*,
    563 U.S. 51 (2011) .............................................................................. 18

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006) ............................................................... 25

*Doe v. John F Kennedy Univ.*,
    2013 WL 4565061 (N.D. Cal. Aug. 27, 2013) .................................... 23

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) ............................................................................ 10

*Epicor Software Corp. v. Alternative Tech. Sols., Inc.*,
    2015 WL 12734011 (C.D. Cal. Dec. 17, 2015) .................................. 15

*Johnson v. Hawe*,
    388 F.3d 676 (9th Cir. 2004) ............................................................... 19

*Krottner v. Starbucks Corp.*,
    628 F.3d 1139 (9th Cir. 2010) ............................................................. 25

-iii-

1
2

# TABLE OF AUTHORITIES
(Continued)

**Page**

3
4
*Lamorie v. Davis,*
   485 F. Supp. 3d 1065 (D. Ariz. 2020) ................................................. 17

5
6
*Long v. Cnty. of L.A.,*
   442 F.3d 1178 (9th Cir. 2006) ............................................................. 19

7
8
*Marsh v. Cnty. of San Diego,*
   680 F.3d 1148 (9th Cir. 2012) ....................................................... passim

9
*Nat'l Archives & Recs. Admin. v. Favish,*
   541 U.S. 157 (2004) ........................................................ 3, 16, 24, 25

10
11
*Nayab v. Capital One Bank (USA), N.A.,*
   942 F.3d 480 (9th Cir. 2019) .............................................................. 23

12
13
*Nicholson v. City of L.A.,*
   935 F.3d 685 (9th Cir. 2019) ......................................................... 15, 16

14
15
*Olejnik v. England,*
   147 F. Supp. 3d 763 (W.D. Wis. 2015) .............................................. 18

16
17
*Opperman v. Path, Inc.,*
   87 F.Supp.3d 1018 (N.D. Cal. 2014) .................................................. 25

18
19
*Patel v. Facebook, Inc.,*
   290 F.Supp.3d 948 (N.D. Cal. Feb. 26, 2018) .................................... 25

20
*Reeves v. Sanderson Plumbing Prods., Inc.,*
   530 U.S. 133 (2000) ............................................................................ 12

21
22
*Rideau v. Keller Indep. Sch. Dist.,*
   819 F.3d 155 (5th Cir. 2016) .............................................................. 24

23
24
*Rochin v. California,*
   342 U.S. 165 (1952) ............................................................................ 15

25
26
*Ronnie Van Zant, Inc. v. Cleopatra Recs., Inc.,*
   906 F.3d 253 (2d Cir. 2018) ............................................................... 14

27
28
*Ronnie Van Zant, Inc. v. Pyle,*
   270 F. Supp. 3d 656, 670 (S.D.N.Y. 2017) ....................................... 14

# TABLE OF AUTHORITIES
### (Continued)

**Page**

*TransUnion LLC v. Ramirez,*
 141 S. Ct. 2190 (2021) ............................................................... 24, 25

*Wereb v. Maui Cnty.,*
 830 F. Supp. 2d 1026 (D. Haw. 2011) ................................................ 19

*Wilson v. City of L.A.,*
 2021 WL 192014 (C.D. Cal. Jan. 8, 2021), appeal filed, No. 21-
 55056 (9th Cir. Jan. 25, 2021) ......................................................... 20

**STATE CASES**

*Allen v. Jones,*
 104 Cal. App. 3d 207 (1980) ......................................................... 3, 4

*Brown v. USA Taekwondo,*
 11 Cal. 5th 204 (2021) .............................................................. 20, 21

*Catsouras v. Dep't of Cal. Highway Patrol,*
 181 Cal. App. 4th 856 (2010) ................................... 20, 21, 22, 25

*Christensen v. Superior Court,*
 54 Cal. 3d 868 (1991) .................................................................. 20

*Douglas v. Stokes,*
 149 S.W. 849 (Ky. 1912) .............................................................. 24

*Ignat v. Yum! Brands, Inc.,*
 214 Cal. App. 4th 808 (2013) ......................................................... 23

*Issakhani v. Shadow Glen Homeowners Ass'n,*
 63 Cal. App. 5th 917, 926 (2021), review denied (Aug. 18, 2021) .................... 21

*Kinsey v. Macur,*
 107 Cal. App. 3d 265 (1980) .......................................................... 22

*Shulman v. Grp. W. Prods., Inc.,*
 18 Cal. 4th 200 (1998) ................................................................ 23

*Taus v. Loftus,*
 40 Cal. 4th 683 (2007) ................................................................ 23

1

## TABLE OF AUTHORITIES
### (Continued)

**Page**

**FEDERAL STATUTES**

42 U.S.C. § 1983 ................................................................................................. 15, 18

**FEDERAL RULES**

Rule 37 .................................................................................................................. 14

**CONSTITUTIONAL PROVISIONS**

Fourteenth Amendment ......................................................................................... 15

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1  **I.**     <u>**INTRODUCTION**</u>

2          Contrary to the "long-standing tradition of respecting family members'

3  privacy in death images," *Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1154 (9th

4  Cir. 2012), personnel from the Los Angeles County Sheriff's Department ("LASD")

5  and Los Angeles County Fire Department ("LAFD") took and shared graphic close-

6  ups of the bodies of thirteen-year-old Gianna Bryant and her father Kobe.

7  Defendants have conceded that these photos "served no business necessity," were

8  "illicit," and "only served to appeal to baser instincts and desires for what amounted

9  to visual gossip." (¶¶ 177, 127, 188.)[1]  The "illicit" taking and sharing of these

10 photos violated Mrs. Bryant's privacy, and the manner in which this conduct was

11 carried out—described by the Sheriff as a "wildly inappropriate" and "disgusting"

12 effort to "take away a trophy" from the scene of the Bryants' deaths (¶¶ 128, 132)—

13 shocks the conscience.

14          Turning the summary judgment standard on its head, Defendants repeatedly

15 draw inferences in their own favor from disputed facts.  Such a motion cannot be

16 granted.  Mrs. Bryant has gathered ample evidence of Defendants' wrongdoing and

17 the harm it has caused her.  The close-up photos of Gianna and Kobe's remains were

18 passed around on at least twenty-eight LASD devices and by at least a dozen

19 firefighters.  And that was only the beginning.  The gratuitous sharing continued in

20 the following days and weeks and included such outrageous conduct as flaunting the

21 photos in a bar while pantomiming dismemberment and showing off the photos over

22 cocktails at an awards gala.  One deputy guffawed while sharing the photos; another

23 described the crash victims' remains as "hamburger" and "piles of meat."  (¶¶ 328-

24 30, 278-79.)  The callous and shocking behavior uncovered by Mrs. Bryant is more

25 than enough to survive summary judgment.

26          The inferences drawn from that evidence go farther still, because Defendants

27

28 [1] Standalone paragraph citations refer to the Genuine Disputes of Material Fact.

have taken steps that prevent Mrs. Bryant from learning the full truth about what happened. LASD deleted evidence that destroyed the forensic record, prompting one veteran commander to ask: "Are we violating laws?" and to warn that "the last time that our deputies got instructions from our executives in a federal case that they were arrested and tried for crimes." (¶ 370.) Even more evidence was destroyed after this litigation began, when Defendant Joey Cruz intentionally wiped all of the data from his phone and nine personnel known to have possessed the photos disposed of their phones before they could be forensically examined. On the Fire Department side, a fire captain orchestrated a mass-deletion campaign which the Department itself has characterized as a "primarily self-serving" "attempt to cover up [the captain's] role in the reported misuse of the photos." (¶¶ 252-57, 260.) A reasonable jury could and should infer that the destroyed evidence was incriminating—all the more so because County personnel have made at least **68** false exculpatory statements regarding their conduct with the photos. (¶¶ 591-659.)

Mrs. Bryant's evidence creates triable issues of material fact. The jury hearing her *Monell* claim must decide whether Defendants' improper sharing of the photos they took of the Bryants' remains "offend[s] the community's sense of fair play and decency" and shocks the conscience. *Marsh*, 680 F.3d at 1154 (citation omitted). As in *Marsh*, Defendants violated the respect owed to the dead and the privacy of the bereaved by sharing these gruesome photos. In *Marsh*, a lone prosecutor shared a single photo with two people, and the photo did not undergo "viral" spread, was not publicized, and did not reach the internet. Here, Defendants shared numerous photos with far more people, including with several reporters— conduct that Defendants have admitted "only served to appeal to baser instincts and desires for what amounted to visual gossip." (¶ 188.)

There is ample evidence to support a jury finding that this conduct resulted from the County's deliberate indifference to a well-known risk that it would occur. Sheriff Villanueva has admitted that "ever since they invented the Polaroid camera,

-2-

this has been a problem in law enforcement across the nation," including officers who keep "death books" with "photos from crime scenes throughout their careers." (¶ 574.)  Yet Defendants concededly had no policies or training whatsoever with respect to such conduct that violates constitutional rights.  (¶¶ 464-482.)

The "well-established cultural tradition acknowledging a family's control over the body and death images of the deceased" also "has long been recognized at common law."  *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 168 (2004). Defendants' arguments for summary judgment on Mrs. Bryant's California law claims ask the Court to endorse novel limitations on the well-established legal duty to respect the bodies and images of the deceased, and the right to protect private death images from intrusion.  The law has long recognized liability for such conduct because "insult and indignity" toward the dead "can visit agony akin to torture on the living."  *Allen v. Jones*, 104 Cal. App. 3d 207, 211 (1980).

## II.   STATEMENT OF FACTS

On Sunday, January 26, 2020, while travelling to a youth basketball tournament, Mrs. Bryant's husband, Kobe, and thirteen-year-old daughter, Gianna, died in a helicopter accident along with seven others.  (¶ 133.)  The crash was so violent that a search and rescue specialist described the scene as the most horrific he has seen in thirty-one years, and "it ended up taking [him] several months to stop having flashbacks of what [he] saw."  (¶ 135.)

### A.   LASD's Photos of the Victims

#### 1.   Deputy Johnson Takes Photos of the Bryants' Remains

According to Sheriff Villanueva: "[I]n this type of a scene, which is an accident, there's only two groups of people that should be taking photos.  That is the NTSB and then the Coroner's Office.  No one else has any—any reason to take any photos."  (¶ 127.)  Nonetheless, after learning that Kobe Bryant and his daughter may have been onboard, Deputy Doug Johnson began gratuitously taking photos of the victims' remains with his personal cell phone.  (¶¶ 139-152.)  Shortly thereafter,

Johnson told a colleague that he took "over a hundred" photos.  (¶ 154.)  Johnson
has admitted that many of the photos were "close ups of the body parts."  (¶ 155.)
Indeed, at least four of Johnson's photos closely focused on Kobe's and Gianna's
body parts.  (¶ 156.)  Johnson's descriptions of these photos are disturbingly graphic
and horrific, and we do not repeat them here to protect the victims and their
families, but they have been submitted under seal along with Coroner testimony
linking two of Johnson's photos to Kobe and another two to Gianna.  (*Id.*)

### 2.    LASD's Photos of the Bryants' Remains Spread

Johnson sent all of his photos from his personal cell phone to the personal cell
phone of his friend Deputy Raul Versales, who was working the radio at LASD's
command post.  (¶ 267.)  Johnson claims Versales asked him to take photos, but
Versales testified that he "did not need to have photographs" and was "surprised to
receive them."  (¶ 150-51, 269.)  Versales nevertheless passed the death images to
four other members of the Department without any legitimate reason.  (¶¶ 270-86.)
For example, that evening, Versales sent the death images to Detective Scott
Miller's personal cell phone.  (¶ 276.)  Miller overhead Versales saying he had the
photos, prompting Miller to ask: "Oh, can I see them?"  Versales replied: "Oh, I'll
just send them to you."  (¶ 277.)  At home that evening, Miller offered to show the
photos to his wife, telling her that they showed "piles of meat."  (¶ 279.)  In a later
interview, Miller likened the victims to "hamburger" and "a deer that got hit by a
Mack truck on the freeway."  (¶¶ 278.)  Miller has admitted there was no legitimate
reason for him to receive photos of the victims' remains.  (¶ 277.)

Versales also transmitted the photos to Deputy Rafael Mejia's personal cell
phone, despite Mejia having no reason to possess them.  (¶¶ 273-75.)  Mejia then
sent them to two trainees, Deputy Joey Cruz and Deputy Ruby Cable, who have
admitted they had no legitimate reason for possessing them.  (¶¶ 289-96.)  Later in
the evening, Cruz sent the photos to Deputy Michael Russell, who admits he
requested them simply because he was "curious."  (¶ 298-301.)  Russell saw

-4-

"grotesque" bodies in the photos and "couldn't believe how graphic they were."
(¶ 299.)  The following morning, Russell was at home playing an online video game
with a "good buddy," Deputy Benjamin Sanchez.  (¶ 307.)  Sanchez was assigned to
a different station and had no role in responding to the accident.  (¶ 314.)  As they
played *Call of Duty* and chatted on headsets, Russell sent photos of the victims'
remains to Sanchez's personal cell phone and identified a certain photo as depicting
Kobe Bryant.  (¶ 313.)  These are mere examples.  As illustrated by **Exhibit 85**,
within 24 hours, at least *eleven* LASD personnel took or obtained photos that the
Sheriff has acknowledged "[n]ever should have been taken in the first place."
(Lavoie Decl., Ex. 85; ¶ 127.)

### 3.   Defendant Cruz Shares Photos of the Bryants' Remains

Two days after the crash, Cruz spoke to his niece about it while visiting his
mother.  (¶ 315.)  According to the findings of LASD's internal investigation, "Cruz
proceeded to show [his niece] photographs of the crash site, including those
containing bodies/body parts."  (¶¶ 316-18.)  Cruz showed off the photos again that
same night over beers at a bar in Norwalk.  (¶¶ 319-335.)  Video footage shows
Cruz displaying his phone to a patron seated to his right, then handing his phone
across the bar to the bartender.  (¶¶ 321-23.)  After returning Cruz's phone, the
bartender grimaces, gestures toward his torso, and makes a slashing motion across
his neck, while Cruz makes similar hand motions pantomiming the condition of the
remains.  (¶ 324-26.)  Later in the evening, the video shows Cruz and the bartender
huddled over Cruz's phone for more than a minute.  (¶ 328.)  Cruz then says
something as the bartender walks away, and the two burst into laughter.  (¶¶ 329-
30.)  The bartender has testified in graphic detail about the "very gruesome" photos,
including one showing a male victim's dark-skinned body part that Cruz said
belonged to Kobe Bryant.  (¶¶ 332-35.)

### B.   The Fire Department's Photos of the Victims

The Fire Department responded to the crash scene on January 26 to

1    extinguish fires, not to document the incident.  (¶ 158.)  At no point did the incident

2    commander who was manning the LAFD's command post request photographs of

3    any part of the crash scene.  (¶ 159.)  Nonetheless, at least a dozen LAFD employees

4    took photos of the victims for no legitimate governmental purpose.

### 1.    A Supervisor Obtains Photos of the Bryants' Remains

6        One of the first Fire Department employees who reported to the crash, a

7    supervisor, took it upon himself to start taking photographs.  (¶ 162.)  While taking

8    photos of the area where the helicopter and Kobe Bryant's body came to rest, he

9    encountered Deputy Johnson.  (¶¶ 163, 497.)  Johnson told the supervisor that he

10   had already taken pictures of the entire scene.  (¶ 163.)  At the supervisor's request,

11   Deputy Johnson sent the supervisor all of the photographs he had taken, including

12   the close-ups of Kobe and Gianna's body parts.  (¶ 164.)

### 2.    Brian Jordan Takes Photos of the Bryants' Remains

14       Brian Jordan, a safety officer, dispatched himself to the scene on January 26.

15   (¶ 167.)  Minutes after the call came in regarding the crash, Jordan began texting a

16   group of reporters; he continued doing so throughout the day.  (¶¶ 168-70.)  After

17   news broke that Kobe and Gianna Bryant were among the victims, Jordan walked up

18   the trail to the crash scene and claimed to be a fire chief in charge of media

19   relations.  (¶¶ 172, 174.)  In reality, Jordan had no media relations responsibilities

20   whatsoever.  (¶ 173.)  As Jordan was escorted around the scene, he asked

21   specifically about the location of the bodies and took photos focused on Kobe and

22   Gianna Bryant's remains.  (¶ 176.)  In the following days, Jordan resumed his

23   communications with the reporters he was texting on January 26 and sent them

24   messages that attached pictures.  (¶ 516.)  Jordan also sent pictures via text message

25   to an additional reporter, two police officers, an LASD employee, his girlfriend, his

26   neighbor, and five firefighters (among others).  (¶¶ 510-521.)

### 3.    Arlin Kahan Takes Photos of the Victims' Remains

28       The day after the accident, Arlin Kahan, an LAFD staff aide, reported to the

crash site and took 10 to 20 photos, most if not all of which contained human remains.  (¶¶ 190-95.)  Gruesome images of body parts were readily visible in at least five of them.  (¶ 194.)  The photos were not used for LAFD business.  (¶ 198.)

### 4.  After Taking and Sharing Photos of the Victims' Remains, Tony Imbrenda Shares Them Over Cocktails at a Gala

Tony Imbrenda, a public information officer for the Fire Department, received a "flood" of photos of the crash scene on both his personal and work phones, including graphic photos of the victims.  (¶¶ 208-11.)  He received multiple photos on January 26 from Brian Jordan and at least four or five others Imbrenda says he cannot identify.  (¶ 212.)  More photos came in the next day—this time from Arlin Kahan and at least three other numbers Imbrenda says he cannot identify.  (¶¶ 217-18.)  While at the crash site on January 27, he also took photographs of his own that show human remains.  (¶ 215.)

About three weeks after the crash, Imbrenda attended a gala for members of the media at the Hilton Hotel in Universal City.  (¶ 222.)  He socialized with a work friend, two firefighters from a different agency, his girlfriend, and three others.  (¶¶ 225-226.)  During the cocktail hour, Imbrenda told this group he had been to the crash site and later showed off his personal collection of "Kobe pictures."  (¶¶ 231-38.)  The photos contained gruesome depictions of human remains.  (¶¶ 237, 240, 242.)  After studying the photos, the group headed to the dinner portion of the event, and one remarked: "I just saw Kobe's body all burnt up before I'm about to eat."  (¶ 244.)  A witness who complained to the Fire Department was "disgusted" and "disturbed" by Imbrenda's use of the photos as a "party trick."  (¶¶ 235, 245.)

### C.  Defendants' Destruction of Evidence

### 1.  LASD Instructed Its Personnel to Delete Evidence

Minutes after Joey Cruz left the Norwalk bar where he was captured on video, the bartender approached a table of patrons and described "in very graphic fashion" what he had seen.  (¶¶ 336-42.)  One patron, "extremely disturbed" and "shock[ed]"

1   by what he heard, submitted an online complaint to LASD that "[t]here was a

2   deputy at Baja California Bar and Grill in Norwalk who was at the Kobe Bryant

3   crash site showing pictures of his . . . body." (¶¶ 344-46.)  The complaint was

4   routed to the Lost Hills Station on January 29, and Captain Matthew Vander Horck

5   assigned his best lieutenant to do an initial fact-finding inquiry.  (¶¶ 347-48.)

6       But then Sheriff Villanueva and the head of his press office, Captain Jorge

7   Valdez, intervened.  (¶¶ 353-55.)  While Vander Horck was asleep, Valdez called

8   one of Vander Horck's subordinates, Lt. Hector Mancinas, to convey orders from

9   the Sheriff that Lost Hills personnel should be ordered to the station and told that

10  they would receive a performance log entry in lieu of discipline if they deleted the

11  photos.  (¶ 355.)  Upon learning of this order a few hours later, Vander Horck had "a

12  lot of concerns" and "immediately . . . told [Mancinas] to stop."  (¶ 359.)  Vander

13  Horck then called Chief Dennis Kneer and "bombard[ed] him with questions,"

14  including: "Do you know if these things have evidentiary value?  Do you know if

15  the NTSB are going to want to know about this?  What about the FBI?  Are we

16  violating laws?  Are people going to be in trouble?" (¶ 370.)  A short while later,

17  Chief Kneer called Vander Horck to say: "I discussed this with the Sheriff and he

18  assures me that this is the proper way that we're gonna go." (¶ 373.)

19      By January 31, several deputies represented that they had deleted their photos.

20  (¶ 378.)  But when deputies reported to the station as directed, Mancinas did not

21  review a single deputy's cell phone to determine whether they had shared the photos

22  with others.  (¶¶ 384-85.)  Three weeks later, Vander Horck's supervisors informed

23  him that the Sheriff "no longer had confidence in [him]" and that he would be

24  demoted from captain to lieutenant and stripped of his assignment leading the Lost

25  Hills Station.  (¶¶ 387-392.)  The Sheriff called Vander Horck to say he could

26  remain a captain but would be transferred to Men's Central Jail—a "dumping

27  ground" for captains who "fall out of favor with the Sheriff." (¶¶ 395-97.)

28

-8-

**2.    Tony Imbrenda Orchestrated a Mass Deletion Campaign Within the Fire Department**

Captain Vander Horck called the Fire Department on January 31, 2020 to advise that two LAFD employees had taken and obtained photos at the crash scene. (¶ 448.)  Yet LAFD took no serious steps to identify the employees involved. (¶¶ 449-55.)  This inaction enabled Tony Imbrenda to conduct what the Fire Department itself concluded was a "primarily self-serving" "attempt to cover up his role in the reported misuse of the photos" after the media began reporting on the misconduct in late February 2020.  (¶¶ 252-60.)  Imbrenda deleted approximately 50 photos and instructed eight to ten others, including Jordan and Kahan, to "get rid of" their graphic photos and pass on the deletion instruction "to everybody that they knew." (¶ 259.)  Imbrenda gave this instruction to "very connected people" within the Department who "extrapolate[d]" the deletion order to "many, many people." (¶¶ 253-57.)  By the time the Fire Department finally launched an internal investigation after a citizen complained about Imbrenda's conduct at the awards gala, highly relevant evidence on Imbrenda's, Kahan's, and Jordan's Department-issued cell phones had been destroyed, and the Department did not examine their personal devices at all.  (¶¶ 263-265, 460-463.)  As a result, it is no longer possible to determine how many people received photos of the victims from Imbrenda, Jordan, and Kahan.  (¶¶ 457-459, 699, 702-703.)

**3.    LASD Personnel Disposed of Their Devices**

Mrs. Bryant sent LASD a letter threatening legal action on March 2, 2020, submitted a notice of claim in May, filed suit in September, sought the Court's permission to publicly name the Deputy Defendants in February 2021, and amended her complaint to add the Deputy Defendants in March 2021.  (¶¶ 429-33.) Throughout this time—and continuing through November 2021—LASD never told the personnel known to have possessed photos of the victims' remains to preserve the cell phones on which they had received them.  (¶ 435.)  Nine of the personnel

testified that they never received (or do not recall receiving) any instruction to preserve evidence related to this lawsuit, and LASD never forensically imaged any devices to preserve data that was relevant to this lawsuit.  (¶¶ 434-46.)

As a result, after a duty to preserve evidence indisputably arose, nine of the eleven LASD personnel known to have possessed the photos lost or disposed of their phones, and a tenth (Joey Cruz) intentionally wiped his phone of all data. (¶¶ 436, 693-95.)  Two Defendants—Rafael Mejia and Michael Russell—disposed of their phones in 2021 after learning they would be added as individual defendants in this case.  (¶¶ 443-44.)  This destruction of evidence means that virtually all of the phones submitted for Defendants' highly-touted "forensic examination" were not the devices used to take, send, or receive the photos in early 2020, rendering that forensic examination worthless.  (¶¶ 436-37.)  And almost all of Defendants' personnel refused to provide the passwords to their cloud accounts to the forensic examiner.  (¶ 706.)  Nor has any other storage media been secured and searched.

## III.   DEFENDANTS' MOTION FAILS BECAUSE MATERIAL FACTS ON WHICH IT RESTS ARE INCORRECT OR GENUINELY DISPUTED

As the moving party, Defendants "bear[] the heavy burden of showing there are no genuine issues of material fact." *Ambat v. City and Cnty. of S.F.*, 757 F.3d 1017, 1031 (9th Cir. 2014).  "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

Inverting this standard, Defendants' motion rests on inferences drawn in *their* favor from disputed facts.  Mrs. Bryant has gathered ample evidence from which a reasonable jury can find that events did not go as Defendants contend.  Because Defendants' motion does not grapple with that evidence, it necessarily fails.

### 1.   Defendants' Motion Contradicts Video Evidence and the Departments' Own Findings

As an initial matter, Defendants' motion is simply wrong about three public

displays of the photos.  *First*, Defendants now claim that Cruz merely "*tr[ied]* to show scene photos to his niece, who refused to look at them." (Mot. 13 (emphasis added).)  But LASD's own investigation found that Cruz actually did "show [his niece] photographs of the crash site, including those containing bodies/body parts." (¶ 318.)  *Second*, Defendants assert that Cruz's phone "did not leave his hand" while showing remains photos to the bartender and that he "did not show the photos to anyone else at the bar." (Mot. 10, 13.)  But video shows Cruz handing his phone to the bartender moments after showing it to someone seated next to him.  (¶¶ 321-23.) *Third*, Defendants state that Imbrenda's display involved only firefighters (Mot. 15), but LAFD's own investigation found that Imbrenda spoke about the crash "while surrounded by [his] colleague *and their dates*" and then "showed *the group*" photos of human remains.  (¶ 615.)  Witnesses confirm that four people who were not County firefighters saw Imbrenda's photos.  (¶ 237.)

## 2. County Employees Have Made False Exculpatory Statements that Betray Consciousness of Guilt

In an interview, Sheriff Villanueva attempted to assure the public that LASD would not be the source of any photos of the victims' remains that appear online, but he added an important caveat: "Unless someone was lying all along, and then all bets are off."  (¶ 130.)  Sadly, all bets do appear to be off.  Personnel known to have possessed the photos have made **68** false exculpatory statements on material issues, including **21** such statements in their summary judgment declarations.  (¶¶ 591-659.) The extent of the dishonesty, fully detailed in the GDMF, is unsettling.  (*Id.*)

For example, Deputy Ruby Cable falsely avers in her declaration that she received the photos "because, as a trainee, I might be tasked with writing a report about the incident."  (¶ 592.)  But Cable repeatedly admitted in her interview with LASD investigators that she did not need the photos and "had no purpose [for] having them."  (*Id.*)  Similarly, Defendant Mejia testified at his deposition that he is "very confident" none of the photos he received and forwarded contained human

remains, but now admits in his declaration that the photos contained "unidentifiable human remains." (¶ 632.) The new assertion that the remains were "unidentifiable" is itself false: when Cruz showed off the photos he received from Mejia at the bar, he identified Kobe Bryant. (¶ 335.)

"[T]he factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 134, 147 (2000)* (citation omitted). A jury can and should infer from the County witnesses' false exculpatory statements that they shared the photos more broadly than they have admitted and that their conduct was completely improper.

### 3. Cell Records and Other Evidence Indicate Even Broader Dissemination Beyond What Defendants Admit

Cell phone records of County personnel provide additional evidence of dissemination. For example, Brian Jordan's cell records show that, in the days and weeks after posing as a media relations officer to take photos of Kobe's and Gianna's bodies, Jordan sent picture messages to six reporters and many others. (¶¶ 509-521.) When questioned under oath, Jordan could not explain these texts and did not affirmatively deny that he shared his graphic photos, but rather equivocated and claimed he did not remember. (¶¶ 181, 511, 513, 516-521.) Considering the false pretenses under which Jordan obtained the photos, a jury could infer from Jordan's evasive testimony that his unexplained picture texts disseminated photos of the Bryants' remains.

Another example is Deputy Michael Russell. In the days after the crash, Russell texted photos of the victims' remains to his video game buddy, Ben Sanchez. (¶¶ 307-313.) Both Russell and Sanchez have deleted the texts that contained the photos. (¶¶ 378, 650.) Russell's cell phone records reveal not only outgoing picture texts to Sanchez on the days immediately after the crash, but also outgoing picture texts to four other friends with whom Russell plays video games, including pictures sent in a group chat that included Sanchez. (¶¶ 505, 507-08.)

When Mrs. Bryant raised this issue, Defendants produced the group chat text thread from Sanchez's phone, which revealed that several of Russell's outgoing picture messages appear to have been surgically deleted by Sanchez, raising the inference that Russell sent the photos of the victims' remains to his entire video-game group, not just Sanchez.  (*See id.*, ¶ 709.)

Drawing from cell records and other evidence, **Exhibit 85** shows how widely photos of the victims were transmitted, as well as reasonable inferences of further spread that a jury could draw based on circumstantial evidence.  It also shows there are many copies of the photos that have not been secured or contained, undermining Defendants' unsupported refrain that "[t]he photos are gone."  (Mot. 8.)

*First*, the evidence shows the photos circulated even more broadly within LASD and LAFD than Defendants have admitted.  For example, an LASD dispatcher was shown photos depicting body parts late in the afternoon on the day of the crash by an unknown deputy for no apparent reason (¶ 502), and there are also at least *eight* firefighters who took or possessed graphic photos who cannot be identified as a result of Defendants' spoliation.  (¶¶ 212, 265.)  These employees' copies of the photos (and the copies of everyone who received the photos from those employees, and so on) remain entirely unsecured and at-risk of broader release at any moment.  *Second*, the evidence also shows that photos went far beyond LASD and LAFD almost immediately.  For example, in the days after the crash, an Orange County law enforcement officer displayed crash-scene photos at a bar in Cerritos, telling the bartender he received them from a colleague and "I'm not even supposed to have these."  (¶ 498.)  Around the same time, a man at a bar in Bellflower stated that he had been shown crash-scene photos on a deputy's phone and described the condition of Kobe's and Gianna's remains with graphic, precise details that were not public at the time but matched the actual condition of their bodies.  (¶¶ 501-502.)  *Third*, Mrs. Bryant has confronted a photo online that purports to depict her husband's uncovered remains near the blue-and-white helicopter, and the location of

-13-

the remains in the photo match where Kobe Bryant came to rest.  (¶ 497.)  Mrs. Bryant fears the risk of an inadvertent disclosure in an attempted under-seal filing, but will submit the photo for *in camera* review if the Court desires.

### 4. A Jury May Infer That the Evidence Destroyed by Defendants Would Have Been Unfavorable

It is undisputed that County employees deleted vast quantities of data that would have been relevant to this case, but their motivations for doing so are hotly disputed.  The Fire Department itself has admitted Imbrenda's deletion campaign was an attempted cover-up.  (¶ 260.)  With respect to LASD, Defendants say that the deletion was benevolent or innocuous, but Mrs. Bryant has adduced evidence that the goal was to destroy evidence of misconduct.

A law-enforcement expert testifying for Mrs. Bryant—a former LAPD lieutenant with extensive experience in internal investigations—has identified more than a dozen irregularities in LASD's response to the citizen complaint that could lead a reasonable jury to infer an improper purpose motivated the Sheriff's deletion order.  (¶¶ 569-90.)  As for Cruz, he intentionally wiped all data from his phone within weeks of Mrs. Bryant filing suit and shortly after declining a request by the County to examine his phone.  (¶ 681, 695.)  Because of Cruz's actions, the forensic examiner was unable to analyze his phone at all.  (¶ 693.)  The jury could fairly infer that Cruz destroyed evidence because he had something to hide; the same is true for the other three Deputy Defendants who disposed of their phones after Mrs. Bryant filed suit without taking steps to preserve relevant evidence before doing so.

Under Rule 37, this destruction of evidence during the pendency of this lawsuit warrants sanctions, and Mrs. Bryant intends to seek an adverse jury instruction at trial.  *See, e.g.*, *Ronnie Van Zant, Inc. v. Pyle*, 270 F. Supp. 3d 656, 670 (S.D.N.Y. 2017), *rev'd on other grounds sub nom. Ronnie Van Zant, Inc. v. Cleopatra Recs., Inc.*, 906 F.3d 253 (2d Cir. 2018) ("[G]etting a new phone after Plaintiffs brought the instant action" without preserving relevant data "evince[s] the

kind of deliberate behavior that sanctions are intended to prevent.").  At a minimum, Defendants' motive in destroying the evidence is a disputed fact for the jury to resolve.  *See, e.g.*, *Epicor Software Corp. v. Alternative Tech. Sols., Inc.*, 2015 WL 12734011, at *2 (C.D. Cal. Dec. 17, 2015) ("intent with regard to the destroyed evidence was an open question of fact . . . suitable for resolution by the jury").

## IV.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON ANY OF PLAINTIFF'S CLAIMS

### A.   The Entity Defendants' Failure to Establish a Policy or Train Their Personnel Resulted in Violations of Plaintiff's Constitutional Right to Control the Death Images of Her Husband and Daughter

Ample evidence supports Mrs. Bryant's *Monell* claim under section 1983 because the entities' failure to establish a policy or train their employees regarding the taking and sharing of gratuitous death images reflected deliberate indifference that led to a violation of her constitutional right to privacy.  *See Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1073 (9th Cir. 2016).  Defendants' two grounds for summary judgement misapprehend the law and misstate the facts, and both should be rejected.

#### 1.   County Employees Violated Plaintiff's Right to Privacy

Whether an officer's conduct is unconstitutional under the Fourteenth Amendment turns on the factual issue of whether the conduct "shocks the conscience."  *See Nicholson v. City of L.A.*, 935 F.3d 685, 692-93 (9th Cir. 2019). This standard is met where the challenged conduct "offend[s] the community's sense of fair play and decency."  *Rochin v. California*, 342 U.S. 165, 173 (1952).  A jury could fairly conclude Defendants' conduct here was conscience-shocking.

"Few things are more personal than the graphic details of a close family member's tragic death.  Images of the body usually reveal a great deal about the manner of death and the decedent's suffering during his final moments—all matters of private grief not generally shared with the world at large." *Marsh*, 680 F.3d at 1154.  Given the "long-standing tradition of respecting family members' privacy in

death images," the constitutional right to privacy "encompasses the power to control images of a dead family member." *Id.* at 1153. Drawing on *Favish*, 541 U.S. at 170-71, the Ninth Circuit held in *Marsh* that sharing death images without any legitimate governmental purpose violates this right and shocks the conscience when it deprives the bereaved of their right to control death images of family members. *See id.* at 1155.

Mrs. Bryant's evidence creates—at a minimum—a triable issue as to such wrongdoing here. The County employees intruded on Mrs. Bryant's grief by turning photos of her daughter and husband's private deaths into video-game group-text fodder, bar talk, and cocktail-hour entertainment. This case is remarkable in that members of the public provably *did* have their consciences shocked by Defendants' behavior (leading, for instance, to two citizen complaints), and the County entities themselves described their employees' conduct as "disgusting," "base[]," "illicit," and "wildly inappropriate." (¶¶ 127, 132, 188.) At a minimum, whether Defendants' conduct is conscience-shocking is a question for the jury. *See Nicholson*, 935 F.3d at 692-93. Defendants cannot dispute these points in general, and so offer two narrow legal arguments. Neither withstands scrutiny.

*First*, Defendants suggest that *Marsh* involved "publication of death images" in the press and on the internet. (Mot. 9 (citation omitted).) They are wrong. In *Marsh*, a district attorney kept a death photo and later sent a copy to two reporters. 680 F.3d at 1152. But neither reporter published the photo, and it never appeared on the internet. Appellees' Brief, *Marsh*, No. 11-55395, 2011 WL 3436959, at *1 (9th Cir. Aug. 1, 2011). Nevertheless, the mishandling of the death images shocked the conscience, and the district attorney's actions gave rise to the plaintiff's *fear* that she *might* one day "stumble upon photographs of her dead son," given the "viral nature of the Internet." *Marsh*, 680 F.3d at 1155. Just so here. A reasonable jury could conclude that Jordan sent death images to at least six reporters because, *inter alia*, he admitted sending reporters pictures (although his spoliation prevents

confirmation of the pictures' content).  (¶ 516.)  A reasonable jury also could

conclude that the image Mrs. Bryant confronted on Twitter depicted her husband

and that it originated from County personnel.  (¶ 497.)  Even setting that evidence

aside, given the evidence of dissemination illustrated in **Exhibit 85**, a jury could

fairly conclude photos of the Bryants' remains have escaped Defendants' efforts at

containment, and that she has a reasonable fear that the entire stash could go viral on

the internet at any moment.  That risk is greater here than in *Marsh* given Kobe

Bryant's celebrity.

        Moreover, Defendants' argument betrays a fundamental misunderstanding of

the privacy right recognized in *Marsh*.  The right rests on two pillars: the

government's duty to treat the dead with respect, and the bereaved's right to control

the death images of her loved ones.  *Marsh*, 680 F.3d at 1155-56.  The heartland of

the privacy right is a protection against the government gratuitously revealing "the

graphic details of a close family member's tragic death."  *Id.* at 1154.  Defendants

undisputedly did that here—flaunting these "gruesome" photos while pantomiming

dismemberment or referring to Kobe and Gianna Bryant in conscience-shocking

language, such as "piles of meat," "hamburger," and "a deer that got hit by a Mack

truck on the freeway."  (¶¶ 278-79.)  A reasonable jury could fairly find that this

conduct "degrades the respect accorded to families in their time of grief."  *Marsh*,

680 F.3d at 1155-56.  That Defendants' "unwarranted public exploitation of death

images" has not yet been featured in mass media does not make their conduct

permissible, *id.*, any more than the conduct in *Marsh* was excusable because the

news outlets never published the photo.

        *Second*, Defendants assert that two district court cases "negate[]" Mrs.

Bryant's claim.  They are wrong; the cases they cite are far afield, and neither one

helps Defendants.  In *Lamorie v. Davis*, 485 F. Supp. 3d 1065, 1072 (D. Ariz. 2020),

the Department of Child Services allegedly failed to notify the plaintiff of his son's

cremation.  The court held only that there was no constitutional right to such notice.

It did not address the privacy interest in death photos at all.  The Wisconsin district court in *Olejnik v. England*, 147 F. Supp. 3d 763, 777-78 (W.D. Wis. 2015), also did not address the *Marsh* privacy right both because the Seventh Circuit had not yet recognized it and because death scene images were not at issue in that case.

## 2.   The Departments' Deliberate Indifference Caused These Constitutional Violations

Substantial evidence supports a finding of deliberate indifference on the part of LASD and LAFD, precluding summary judgment on Plaintiff's *Monell* claim.  A municipality is liable under 42 U.S.C. § 1983 where its failure to establish a policy or adequately train its employees on a constitutional right "amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact." *Canton v. Harris*, 489 U.S. 378, 388 (1989).  The question of deliberate indifference is generally reserved for the jury.  *Berry v. Baca*, 379 F.3d 764, 769 (9th Cir. 2004).

Deliberate indifference is established where "the need for more or different training is so obvious" in light of the employees' duties, and the "inadequacy [is] likely to result in the violation of constitutional rights." *Canton*, 489 U.S. at 390. Thus, no pattern of prior constitutional violations is required to prove deliberate indifference through a failure to train.  *See Connick v. Thompson*, 563 U.S. 51, 63-64 (2011).  Liability can attach based on a single incident where, as here, there is (i) a complete failure to train; (ii) the constitutional duty is implicated in recurring situations; and (iii) the plaintiff's injury is a "highly predictable consequence" of the "fail[ure] to train." *Id.* at 64 (citation omitted).  This standard is satisfied where employees "have *no knowledge at all* of the constitutional limits" that apply in the recurring situation. *Id.* at 67 (emphasis added).

The jury could find these standards met here.  Sheriff Villanueva himself publicly acknowledged that the risk of personnel improperly sharing private death photos was well-known and foreseeable: "Ever since they invented the Polaroid, law enforcement, first responders, coroner's office, everybody's been taking Polaroids

-18-

of crime scenes and human remains.  And some people collect 'em . . . And this is something that's true across the nation.  It's not unique to Los Angeles." (¶¶ X, X.) Mrs. Bryant's expert will testify similarly.  (¶¶ 569-76.)  In the age of the smartphone the risk is even more heightened:  County personnel regularly take incident photographs—including on their personal cell phones—and regularly encounter human remains at those incidents.  (¶¶ 489-90.)  The sheer scale of wrongdoing at this single incident—involving eager participation of nearly two dozen County employees (and likely many more)—underscores the scope of the problem.  Despite the obviousness of the risk, as of January 26, 2020, neither LASD nor LAFD had any policies or training related to photographs of human remains or incident photography more generally.  (¶¶ 464-96.)  Not a single employee was familiar with the constitutional right articulated in *Marsh*.  (¶¶ 471, 475.)  That ignorance of *Marsh* and complete lack of training manifested itself in the callous, cavalier public display of the victims' death photos here.

Mrs. Bryant's claim does not implicate any concerns about "micromanaging local governments" in the "subtleties" of their training programs.  *See, e.g.*, *Wereb v. Maui Cnty.*, 830 F. Supp. 2d 1026, 1034 (D. Haw. 2011) (citation omitted).  No second-guessing of *how* the Departments chose to train their personnel on the relevant constitutional right will occur because Defendants failed to provide *any* training whatsoever.  *See id.* at 1035.  The Departments simply did not equip personnel with any "specific tools" they needed to handle the "recurring situation" of photography at scenes with human remains.  *See Long v. Cnty. of L.A.*, 442 F.3d 1178, 1186 (9th Cir. 2006).

Viewing the evidence in the light most favorable to Mrs. Bryant, a jury could fairly find that the lack of training left LASD and LAFD employees with "the utter lack of an ability to cope with constitutional situations," and that Mrs. Bryant's constitutional injury "'would have been avoided' had proper policies been implemented." *Id.* at 1190 (citation omitted); *see also, e.g.*, *Johnson v. Hawe*, 388

F.3d 676, 686 (9th Cir. 2004) (evidence that department failed to train officers about privacy statute created genuine issue as to deliberate indifference); *Wilson v. City of L.A.*, 2021 WL 192014, at *34 (C.D. Cal. Jan. 8, 2021), *appeal filed,* No. 21-55056 (9th Cir. Jan. 25, 2021) (officer's testimony that he had received no training on eyewitness identification techniques sufficient to create a triable issue of fact on deliberate indifference).  Indeed, LAFD employees expressly testified that they would not have taken or possessed photos of the victims' remains at the scene if a specific policy had been in place at the time.  (¶ 473.)  And it is hard to believe that properly trained personnel would have flaunted death photos at a party or bar.

## B.   Defendants Breached Their Duty to Use Ordinary Care in Handling the Bryants' Remains

California law has long recognized a duty to handle dead bodies with due care because such conduct "is likely to cause serious emotional distress to members of the decedent's immediate family regardless of whether they observe the actual negligent conduct or injury to the remains of their decedent."  *See Christensen v. Superior Court*, 54 Cal. 3d 868, 894-95 (1991).  For similar reasons, California law also specifically imposes a duty on law enforcement officers to "refrain from exploiting gruesome death images by disseminating them to friends and family members or others with no involvement in official [law enforcement] activities." *Catsouras v. Dep't of Cal. Highway Patrol*, 181 Cal. App. 4th 856, 884 (2010).  As this Court itself recognized in ruling on Defendants' motion to dismiss, "*Catsouras* strongly supports the existence of a duty in this case with respect to the LASD deputies who took the photos of the victims and shared them with others." *Bryant v. Cnty. of L.A.*, 2020 WL 8024857, at *7 (C.D. Cal. Dec. 28, 2020).  So, too, for the Fire Department employees who did the same.

*Brown v. USA Taekwondo*, 11 Cal. 5th 204 (2021), is not to the contrary. *Brown* did not overrule *Catsouras* or *Christensen* or even address the duties recognized by those cases.  Instead, *Brown* clarified "the applicable framework for

1    determining whether a defendant has a duty to protect a plaintiff from harm *caused*

2    *by a third party*," a duty that generally does not exist.  *Id.* at 213 (emphasis added).

3    *Brown* held that an exception to the general "no-duty-to-protect rule" can exist only

4    if the plaintiff proves a special relationship with the defendant.  *See id.* at 211, 219.

5        *Brown* has no application here because Defendants themselves, not a third

6    party, caused Mrs. Bryant's harm by gratuitously taking and sharing photos of the

7    Bryants' remains.  Thus, this case involves what *Brown* described as "active

8    misconduct working positive injury to others," rather than exceptional liability for

9    nonfeasance.  *Id.* at 214-15; *see, e.g.*, *Issakhani v. Shadow Glen Homeowners Ass'n*,

10   63 Cal. App. 5th 917, 926 (2021), *review denied* (Aug. 18, 2021) (noting that *Brown*

11   involved a "circumstance where, unlike here, there is no underlying duty running

12   between the parties that might apply").  In such cases, courts have continued to

13   apply *Catsouras* after *Brown*.  *Moore v. Rodriguez*, 2021 WL 2222590, at *21-22

14   (S.D. Cal. June 2, 2021) (relying on *Catsouras* to find a duty to refrain from

15   infringing on plaintiff's privacy interest in his psychiatric records).

16       Neither logic nor law warrants Defendants' efforts to limit *Catsouras* to a

17   duty to refrain from disseminating death photos on the internet.  The very same

18   policy considerations *Catsouras* relied upon to recognize a duty in that case apply

19   with equal force here.  "[I]t unquestionably was foreseeable" that taking and

20   disseminating gruesome photos of Kobe and Gianna Bryant's dead bodies would

21   cause Mrs. Bryant harm, *Catsouras*, 181 Cal. App. 4th at 882, and there is a close

22   connection between Defendants' conduct and that harm, *see id.* at 884-85.  The

23   conduct by the County's employees was morally blameworthy—in Defendants' own

24   words, it was "reprehensible" and "unconscionable."  *Id.* at 883; ¶¶ 132, 250.

25   "[C]oncepts of morals and justice clearly dictate that those upon whom we rely to

26   protect and serve ought not be permitted to make our deceased loved ones the

27   subjects of" lurid gossip or spectacle, *see Catsouras*, 181 Cal. App. 4th at 883—

28   regardless of where the spectacle-making occurs (whether a bar, a gala, in text

-21-

messages, or online).  As in *Catsouras*, recognizing a duty on these facts would not impose an "intolerable burden" on agencies and their officers to control their future conduct, *id.* at 884, as evidenced by LASD and LAFD having since adopted policy directives to protect these fundamental rights.  (¶ 88, 90, 470.)  Liability for the violations of those rights here would further those policy directives and help prevent future harm, which weighs strongly in favor of recognizing the duty.  *See Catsouras, 181 Cal. App. 4th at 885*.  Further, the conduct at issue is not a minor slip-up or technical infraction—it is hardly too much to ask that personnel not collect trophies of victims' remains and show them off while cracking jokes.

Defendants' arguments as to breach and harm are makeweight because they are premised on disputed facts.  By way of example, Mrs. Bryant's evidence shows that County employees did not share photos of the Bryants' damaged remains to "answer questions" at the scene or determine "what resources [were] needed." (Mot. 28.)  As explained above, Sheriff Villanueva himself stated publicly that deputies had no reason to take or share pictures and witness after witness admitted the same.  Likewise, contrary to Defendants' version of events, Mrs. Bryant's evidence proves the dissemination spread far beyond Cruz's single friend at the bar, as demonstrated in Exhibit 85.  Defendants also do not contend with other evidence of breaches of their duty to "refrain from exploiting gruesome death images," such as Johnson's and Jordan's close-up photos of the Bryants' body parts, Jordan's texting of pictures to six reporters, and Imbrenda's display at an awards gala.  On this record, a jury could fairly find in Mrs. Bryant's favor on her negligence claim.

## C.   **Defendants Invaded Plaintiff's Privacy**

### 1.   **The Evidence Gives Rise to Genuine Issues of Material Fact as to the Extent of Dissemination by the Deputy Defendants**

A claim based on public disclosure of private facts does not require publication on the internet or in the press.  Disclosure of private affairs to a "diverse group of people" who know the plaintiff suffices.  *See Kinsey v. Macur, 107 Cal.*

-22-

1   App. 3d 265, 271 (1980); *see also Doe v. John F Kennedy Univ.*, 2013 WL

2   4565061, at *11 (N.D. Cal. Aug. 27, 2013) (alleged disclosure to six classmates and

3   one professor stated a valid invasion of privacy claim).[2]   Nor does the tort require

4   disclosure through a written communication.  *See, e.g., Ignat v. Yum! Brands, Inc.,*

5   214 Cal. App. 4th 808, 819 (2013) (oral communications in workplace).

6        As set forth above, Mrs. Bryant has adduced substantial evidence of

7   Defendants' public dissemination and display to a "diverse group of people."

8   Further, a jury could reasonably conclude that Defendants caused the photos to

9   spread beyond those already identified.  A jury could also find that any evidentiary

10   gaps exist because Cruz intentionally wiped his phone to deprive Mrs. Bryant of

11   evidence in this lawsuit, and that the spoliated evidence would have been adverse to

12   Cruz.  A jury could draw the same inference about the lost content on the devices

13   the other three Deputy Defendants traded in after this litigation began.

14          **2.   Mrs. Bryant Had a Reasonable Expectation of Privacy Over
15   Her Family's Death Images, and the Offensiveness of
   Defendants' Intrusion Presents a Triable Issue of Fact**

16        Defendants also improperly narrow Mrs. Bryant's invasion of privacy claim

17   to public disclosure of private facts.  But the common law privacy right broadly

18   protects against any "[h]ighly offensive intentional intrusions upon another person's

19   private affairs or concerns."  *Taus v. Loftus*, 40 Cal. 4th 683, 725 (2007).  Such

20   intrusions are tortious even if no publicity is garnered by the intrusion.  *See Nayab v.*

21   *Capital One Bank (USA), N.A.*, 942 F.3d 480, 491 (9th Cir. 2019) ("Importantly,

22   '[t]he intrusion itself makes the defendant subject to liability, even though there is

23   no publication or other use of any kind of the photograph or information

24   outlined.'").  A privacy claim thus has only two necessary elements:  "(1) intrusion

25   into a private place, conversation, or matter, (2) in a manner highly offensive to a

26   reasonable person."  *Shulman v. Grp. W. Prods., Inc.*, 18 Cal. 4th 200, 231 (1998).

27   ───────────────

28   [2] *See* Pl.'s Opp'n to Def.'s Mot. to Dismiss at 10 n.7, *Doe v. John F Kennedy Univ.*,
   No. 4:13-cv-01137-DMR (N.D. Cal. June 28, 2013), ECF No. 28.

It is well-settled that Mrs. Bryant had a reasonable expectation of privacy in the death images of her deceased loved ones.  *See Favish*, 541 U.S. at 167-70.  As a Kentucky appellate court held more than a century ago, unauthorized photographs of dead children constitute an invasion of privacy akin to an intrusion on the sanctity of the bodies themselves.  *See Douglas v. Stokes*, 149 S.W. 849, 850 (Ky. 1912).  A jury could fairly conclude that LASD's photographic intrusion on her loved ones' remains was highly offensive, as was the subsequent sharing of those photos.

### D.   Plaintiff Has Already Been Harmed by Defendants' Conduct and Has Article III Standing

Defendants' argument that Mrs. Bryant lacks standing under *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), is meritless because *TransUnion* is inapposite.  That case addressed standing based on potential *future* harms to plaintiffs who did not allege any "current emotional or psychological harm."  *Id.* at 2211 n.7.  Mrs. Bryant, by contrast, has already suffered—and continues to suffer—injuries, which she has described in an accompanying declaration.  (¶¶ 660-79.)  Mrs. Bryant suffered immeasurable pain upon learning that Defendants texted and showed off images of her loved ones' remains, and she will carry the mental anguish caused by Defendants' disrespect of Kobe and Gianna Bryant for the rest of her life.  (*Id.*)

Her emotional harm is a concrete and particularized injury that supplies Article III standing.  *See, e.g.*, *Chaudry v. City of L.A.*, 751 F.3d 1096, 1109 (9th Cir. 2014) (plaintiffs' emotional harm from being unable to bury family member in accordance with their religion constituted injury in fact); *Rideau v. Keller Indep. Sch. Dist.*, 819 F.3d 155, 168-69 (5th Cir. 2016) ("[T]he number of causes of action in which a person may recover for emotional harm—from many common law claims . . . to section 1983 claims that rely on common law remedies—supports the notion that emotional harm satisfies the 'injury in fact' requirement of constitutional standing.").  The harm Defendants inflicted is well established in the most basic notions of decency in our society and the law—their misconduct assaulted the "[t]he

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

tenderest feelings of the human heart [that] center around the remains of the dead."
*Catsouras*, 181 Cal.App.4th at 882 (citation omitted).  "Family members have a
personal stake in honoring and mourning their dead and objecting to unwarranted
public exploitation that, by intruding upon their own grief, tends to degrade the rites
and respect they seek to accord to the deceased person who was once their own."
*Favish*, 541 U.S. at 168.  It is hard to imagine greater degradation than Defendants
exposing her loved ones' remains as "piles of meat" or a barroom punchline.[3]

Moreover, unlike in *TransUnion*, the risk of future harm has itself caused a
present emotional injury—fear and anxiety.  Because the photos were passed around
by a multitude of County employees and stored on dozens of devices, Mrs. Bryant
lives with the perpetual fear that she and her daughters will confront Defendants'
horrific photos online (¶ 665), and the Ninth Circuit has recognized this "fear is not
unreasonable given the viral nature of the Internet."  *Marsh*, 680 F.3d at 1155.  If
that was true in *Marsh* where just *two* people obtained death photos, *id.*, the fear is
certainly not unreasonable here where more than *20* people (at a minimum) received
copies of such photos.  (Lavoie Decl., Ex. 85.)  With the forensic trail destroyed—
and no ability to trace the path of the photos' electronic dissemination—Mrs. Bryant
has been left unable to determine the full extent of the photos' spread or identify
everyone who possess copies.  Her stress and anxiety that the photos could go viral
at any moment is a cognizable injury in fact.  *See, e.g.*, *Krottner v. Starbucks Corp.*,
628 F.3d 1139, 1142 (9th Cir. 2010) ("generalized anxiety and stress" confers
standing); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 265-65 (2d Cir. 2006)
(same).

## V.    <u>CONCLUSION</u>

Defendants' motion should be denied outright.

---

[3] The intrusion on her privacy is also a concrete injury in and of itself.  *See, e.g.*,
*Patel v. Facebook, Inc.*, 290 F.Supp.3d 948, 954 (N.D. Cal. Feb. 26, 2018);
*Opperman v. Path, Inc.*, 87 F.Supp.3d 1018, 1057-58 (N.D. Cal. 2014).

1  DATED:  December 6, 2021          WILSON SONSINI GOODRICH & ROSATI

2

3

4                                            By:  _____
                                                        */s/ Luis Li*
5                                                         LUIS LI

6                                            Attorneys for Plaintiff Vanessa Bryant

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28