1   LUIS LI (State Bar No. 156081)
    Luis.Li@wsgr.com
2   WILSON SONSINI GOODRICH & ROSATI
    633 West Fifth Street, Suite 1550
3   Los Angeles, California 90071
    Telephone:  (323) 210-2900
4   Facsimile:   (866) 974-7329

5   CRAIG JENNINGS LAVOIE (State Bar No. 293079)
    Craig.Lavoie@mto.com
6   JENNIFER L. BRYANT (State Bar No. 293371)
    Jennifer.Bryant@mto.com
7   MUNGER, TOLLES & OLSON LLP
    350 South Grand Avenue, Fiftieth Floor
8   Los Angeles, California 90071-3426
    Telephone:  (213) 683-9100
9   Facsimile:   (213) 687-3702

10  Attorneys for Plaintiff Vanessa Bryant

11              UNITED STATES DISTRICT COURT

12      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

13

| 14 | VANESSA BRYANT, | Case No. 2:20-cv-09582-JFW-E |
|----|----------------|------------------------------|
| 15 | Plaintiff, | **PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| 16 | vs. | |
| 17 | COUNTY OF LOS ANGELES, et al., | |
| 18 | Defendants. | Judge:  Hon. John F. Walter<br>Date:   December 27, 2021<br>Time:   1:30 p.m.<br>Crtrm.: 7A |
| 19 | | |
| 20 | | Assigned to Hon. John F. Walter and Magistrate Judge Charles F. Eick |
| 21 | | |
| 22 | | Discovery Cutoff: November 29, 2021<br>Pretrial Conference: February 4, 2022<br>Trial: February 22, 2022 |
| 23 | | |

24

25

26

27

28

Pursuant to Local Rule 56-2, Plaintiff Vanessa Bryant submits the following Genuine Disputes Of Material Fact In Opposition To Defendants' Motion For Partial Summary Judgment.

**RESPONSE TO STATEMENT OF UNCONTROVERTED FACTS**

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 1.  On the morning of Sunday, January 26, 2020, a helicopter crashed with nine individuals, including Plaintiff's husband and daughter, onboard. | **Defendants' Evidentiary Support:** <br> Declaration of Emily Rodriguez-Sanchirico ("Rodriguez-Sanchirico Decl.") Ex. 42. <br> **Plaintiff's Response:** <br> Undisputed. |
| 2.  The crash occurred in Calabasas, not far from hiking and mountain biking trails. | **Defendants' Evidentiary Support:** <br> Declaration of Commander William Jaeger ("Jaeger Decl.") Ex. 25; Rodriguez-Sanchirico Decl. Ex. 57 [Marrone Tr. 43:20-25]. <br> **Plaintiff's Response:** <br> Undisputed. |

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 3. Civilian cyclists called 911 and took photos of the scene. | **Defendants' Evidentiary Support**: Jaeger Decl. Ex. 25; Rodriguez-Sanchirico Decl. Exhs. 42 & 43. **Plaintiff's Response**: Disputed. The proffered evidence does not provide any admissible support regarding the identity of individuals who called 911 and whether civilian cyclists took photographs of the scene. Defendants cite to online articles and the summary of an internal investigation conducted by the Los Angeles County Sheriff's Department ("LASD"), which itself states the LASD investigators reviewed certain information on a website. |
| 4. Due to the dangerous terrain, only two deputies made it to the actual crash site that morning. | **Defendants' Evidentiary Support**: Declaration of Doug Johnson ("Johnson Decl.") ¶ 5; Rodriguez-Sanchirico Decl. Exhs. 75 [Johnson Tr. 60:15-61:6], 78 [Katz Tr. 68:20-69:22], 76 [Vargas Tr. 16:14-17:10], 51[McGuire Tr. 39:11-13, 42:1-23]. **Plaintiff's Response**: Disputed in part. Plaintiff does not dispute that Deputy Doug Johnson and Deputy Fabio Vargas reached the crash site at some point in the morning, but Reserve Deputy David Katz and Reserve Deputy Roxanna Morton also reached the crash site during the morning, arriving at approximately 11:50 a.m. or noon. Ex. 105 (Katz) at 43:15-44:25; 47:20-48:11. |

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 5.  After they secured the perimeter and directed hikers and cyclists away, one of them, Deputy Johnson, started his standard investigation process, as he had been trained to do. | **Defendants' Evidentiary Support:**<br><br>Johnson Decl. ¶¶ 7-9; Rodriguez-Sanchirico Decl. Exhs. 75 [Johnson Tr. 75:21-76:18, 79:4-12, 88:2-90:12, 92:13-25], 76 [Vargas Tr. 19:13-22:5, 25:19-26:14].<br><br>**Plaintiff's Response:**<br><br>Disputed in part.  The cited evidence does not mention "standard investigation" or training.  Further disputed as "standard investigation" is vague and ambiguous.  To the extent Defendants imply that taking close-up photos of human remains at the scene of an aircraft accident is part of a "standard investigation," Sherriff Villanueva has stated that only the NTSB and Coroner's Office are responsible for photographing accident scenes and that "[n]o one else has any – any reason to take any photos."  (AMF ¶ 127.) |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 6.    Deputy Johnson took photos of the crash to document the accident, identify the downed aircraft and victims, and to communicate to the command post what resources were needed. | **Defendants' Evidentiary Support**: <br><br> Johnson Decl. ¶¶ 9-10; Rodriguez-Sanchirico Decl. Exhs. 75 [Johnson Tr. 88:2-90:12, 93:11-20, 94:4-25; 110:4-18], 76 [Vargas Tr. 26:23-27:6, 28:1-24, 29:7-15]. <br><br> **Plaintiff's Response**: <br><br> Disputed as to Johnson's intent for taking the photos being to identify the victims. By the time Johnson began photographing, he had already been informed via a phone call with Versales that Kobe Bryant and his daughter had likely been onboard the helicopter.  (AMF ¶ 149.)  Johnson used his personal cell phone to take "six or seven" close-up photos of the victims' bodies, including four photos of Kobe and Gianna.  (AMF ¶ 155.)  LASD had no role in identifying aircraft accident victims using close-up photos on personal cell phones, as Sheriff Villanueva has acknowledged that only the NTSB and Coroner's Office are charged with photographing accident scenes and anyone else's photos would be "illicit."  (AMF ¶ 127.)  Sheriff Villanueva has further stated that the photos "[n]ever should have been taken," and he expressed dismay that someone would "go out of their way . . . to take away a trophy" of a tragic scene.  (AMF ¶ 127.) |

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 7.  When Deputy Johnson took photos of the scene, no one knew who the helicopter belonged to, who was on board, and what had happened. | **Defendants' Evidentiary Support:** Johnson Decl. ¶ 12; Declaration of Christopher Jauregui ("Jauregui Decl.") ¶¶ 9-11; Rodriguez-Sanchirico Decl. Exhs. 75 [Johnson Tr. 98:6-99:16, 117:10-118:13], 68 [Mejia Tr. 128:6-16], 76 [Vargas Tr. 26:16-27:6. 29:7-15], 69 [Versales Tr. 132:16-133:18, 137:25-138:13]. **Plaintiff's Response:** Disputed.  By the time Johnson began photographing, both Johnson and command post personnel had learned that Kobe Bryant and his daughter had likely been onboard the helicopter.  (AMF ¶¶ 139-145, 147, 149.) |
| 8.  Following standard procedure, Deputy Johnson sent the photos to the officer running the command post, Deputy Raul Versales. | **Defendants' Evidentiary Support:** Johnson Decl. ¶ 11; Declaration of Raul Versales ("Versales Decl.") ¶¶ 7-11; Rodriguez-Sanchirico Decl. Exhs. 75 [Johnson Tr. 144:21-146:22], 69 [Versales Tr. 100:4-11, 108:2-8]. **Plaintiff's Response:** Disputed in part.  The term "standard procedure" does not appear in Defendants' cited evidence, and it was not standard procedure for Johnson to send close-up photos of human remains to Versales, who did not ask for them, did not need them, and was surprised to receive them.  (AMF ¶¶ 151, 269.) Sheriff Villanueva has stated that his deputies' conduct with respect to the photos was "wildly inappropriate" and "disgusting."  (AMF ¶ 132.) |

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 9.   When Deputy Versales forwarded the photos to the other personnel at the command post, no one knew what had happened or who had been on board. | **Defendants' Evidentiary Support:** Versales Decl. ¶¶ 8, 12; Jauregui Decl. ¶ 9; Rodriguez-Sanchirico Decl. Exhs. 72 [Jauregui Tr. 42:9-14], 73 [Miller Tr. 46:12-17, 48:20-49:3], 68 [Mejia Tr. 128:6-129:14]. **Plaintiff's Response:** Disputed.  Versales and others at the command post learned at approximately 10:30 a.m. that Kobe Bryant had been onboard the helicopter.   (AMF ¶¶ 139-141.)  Versales learned this information nearly an hour-and-a-half before he received the photos from Johnson at approximately 11:53 a.m., meaning that Versales knew at the time he forwarded the photos to others that Kobe Bryant had likely been involved in the accident.  (AMF ¶ 267.)  Further disputed to the extent the proffered fact implies Versales forwarded the photos close in time to when he received them.  Versales had admitted sharing photos with Sergeant Travis Kelly, and cell records indicate that this occurred at 9:02 p.m. on the day of the accident, nearly ten hours after Kobe and Gianna's deaths had been publicly reported.  (AMF ¶ 283.)  A second individual, Detective Scott Miller, also received the photos from Versales in the "evening" on the day of the accident. (AMF ¶ 276.) |

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 10. By mid-morning, media outlets had reported that Kobe Bryant had been one of the passengers. | **Defendants' Evidentiary Support:** Rodriguez-Sanchirico Decl. Exhs. 75 [Johnson Tr. 99:23-101:10], 68 [Mejia Tr. 128:6-129:14], 67 [Russell Tr. 106:13-107:15], 70 [Cruz Tr. 76:10-25]; 69 [Versales Tr. 133:22-134:9], 76 [Vargas Tr. 22:25-23:12]. **Plaintiff's Response:** Undisputed. |
| 11. As reporters and fans started flocking to the site, deputies expanded the perimeter and started closing down the surrounding areas, restricting it only to authorized emergency personnel. | **Defendants' Evidentiary Support:** Rodriguez-Sanchirico Decl. Exhs. 75 [Johnson Tr. 116:7-117:9], 68 [Mejia Tr. 129:15-130:11], 70 [Cruz Tr. 66:5-68:5], 63 [Vander Horck Tr. 43:15-20], 66 [Kelly Tr. 74:22-75:12], 51 [McGuire Tr. 45:4-19], 79 [Diez Tr. 58:11-61:23]. **Plaintiff's Response:** Undisputed. |
| 12. By afternoon, multiple agencies were on scene: the National Transportation Safety Board ("NTSB"), Federal Aviation Administration ("FAA"), Federal Bureau of Investigation ("FBI"), County Department of Medical Examiner-Coroner ("DMEC"), Malibu Search & Rescue ("Malibu SAR"), LACFD, and LASD. | **Defendants' Evidentiary Support:** Rodriguez-Sanchirico Decl. Exhs. 47 [Bryant Tr. 20:14-21:5], 52 [Tauscher Tr. 39:22-40:21], 78 [Katz Tr. 69:23-70:11], 56 [Imbrenda Tr. 92:10-94:1], 57 [Marrone Tr. 110:14-111:19]. **Plaintiff's Response:** Disputed in part.  Defendants' proffered evidence establishes only that the FBI was on-scene on the day after the accident, not the day of. |

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 13.   Every agency took photos to document the crash site. | **Defendants' Evidentiary Support**:<br><br>Rodriguez-Sanchirico Decl. Exhs. 52 [Tauscher Tr. 55:4-10, 162:20-163:12], 56 [Imbrenda Tr. 92:10-19, 92:12-17], 55 [Kahan Tr. 83:7-15].<br><br>**Plaintiff's Response**:<br><br>Disputed.  The proffered fact is vague and ambiguous as to time, such as whether photos were taken at a time when the victims' bodies were at the scene and uncovered.  The cited testimony by Emily Taucher's states that she saw photos taken by other agencies, but does not specify regarding when Taucher believed the photos had been taken.  The cited testimony of Imbrenda and Kahan states that they saw the FBI taking photos the day after the accident.  The proffered fact is additionally vague and ambiguous as to "document the crash site."  None of the cited evidence speaks to the reasons other agencies took photos, and the cited testimony does not speak to photos taken by the witness themselves. |

| **PURPORTEDLY UNCONTROVERTED FACT** | **PLAINTIFF'S RESPONSE** |
|---|---|
| 14.    NTSB's crash site photos appeared in the L.A. Times on February 28, 2020 and October 23, 2021. | **Defendants' Evidentiary Support**: Rodriguez-Sanchirico Decl. Exhs. 45 & 46. <br><br> **Plaintiff's Response**: <br><br> Disputed in part.  Plaintiff does not dispute that photos of the crash site attributed to the NTSB appeared in the two *Los Angeles Times* articles, but the proffered fact is vague and ambiguous regarding which of the NTSB's crash site photos are being referred to and when they were taken.  The photos displayed in Defendants' exhibit do not depict burning wreckage, human remains, or first responder personnel, and there is no visible indication from the photos that they were taken on the day of the accident.  The *Los Angeles Times* articles in which the photos appears were published one month and twenty-one months after the crash, respectively, providing no reason to believe the photos were taken at a time when human remains were at the scene. |

-10-

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 15.   Plaintiff drove to LASD's Malibu/Lost Hills Station and asked to meet with Sheriff Villanueva. | **Defendants' Evidentiary Support**:<br>Rodriguez-Sanchirico Decl. Ex. 47 [Bryant Tr. 16:18-19:22].<br>**Plaintiff's Response**:<br>Disputed in part.  Plaintiff does not dispute that she drove to LASD's Malibu-Lost Hills Station ("Lost Hills Station"), but the cited testimony does not say or support that Mrs. Bryant "asked to meet with Sheriff Villanueva."  The proffered evidence instead shows that Mrs. Bryant appeared at the Lost Hills Station, where no one would confirm her husband's and daughter's deaths until Sheriff Villanueva arrived. |
| 16.   After learning her husband and daughter had died, she had one request: make sure the area is secure. | **Defendants' Evidentiary Support**:<br>Rodriguez-Sanchirico Decl. Ex. 47 [Bryant Tr. 18:25-19:22].<br>**Plaintiff's Response**:<br>Disputed in part.  Mrs. Bryant does not dispute that she asked Sheriff Villanueva to secure the area, but she disputes that this was her "one request."  Defendants' proffered testimony states that, upon being asked by Sheriff Villanueva if there was anything he could do, Mrs. Bryant responded: "If you can't bring my husband and baby back, *please make sure no one takes pictures of them*.  Please secure the area." |

-11-

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 17.  She testified in deposition that she asked Sheriff Villanueva to make sure there were no photos of her family: "If you can't bring my husband and baby back, please make sure no one takes photographs of them.  Please secure the area." | **Defendants' Evidentiary Support**:<br>Rodriguez-Sanchirico Decl. Ex. 47 [Bryant Tr. 18:25-19:22].<br>**Plaintiff's Response**:<br>Undisputed. |
| 18.  Sheriff Villanueva complied, declaring a no-fly zone and redoubling efforts to keep the media away. | **Defendants' Evidentiary Support**:<br>Rodriguez-Sanchirico Decl. Exhs. 59 [Villanueva Tr. 27:4-28:16], 47 [Bryant Tr. 20:4-13], 75 [Johnson Tr. 99:8-16, 110:23-14, 233:3-15], 78 [Katz Tr. 67:22-68:18], 70 [Cruz Tr. 165:10-166:4], 63 [Vander Horck Tr. 43:5-20], 69 [Versales Tr. 134:14-18], 76 [Vargas Tr. 21:19-22:5, 22:11-24].<br>**Plaintiff's Response:**<br>Disputed in part.  Plaintiff does not dispute that Sheriff Villanueva sought to put in place a no-fly zone and that LASD made efforts to keep the media away from the immediate crash site.  But Plaintiff disputes the characterization that Sheriff Villanueva "complied" with Mrs. Bryant's request to "make sure no one takes photographs" of her deceased husband and daughter.  Sheriff Villanueva has since acknowledged that members of his own organization took and shared photos of the crash victims' remains in a manner that was "wildly inappropriate" and "disgusting."  (AMF ¶ 132.) |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 19. DMEC's Special Operations Response Team arrived early the next morning and took photos of the victims before removing the remains. | **Defendants' Evidentiary Support:** <br><br> Rodriguez-Sanchirico Decl. Exhs. 52 [Tauscher Tr. 39:22-40:21], 51 [McGuire Tr. 77:24-78:17]. <br><br> **Plaintiff's Response:** <br><br> Disputed in part.  Tauscher's testimony merely describes what the Special Operations Response Team is, and McGuire's testimony states that the Team responded the following day to photograph "the remaining decedents" who hadn't been removed the day before. |
| 20. In the case of three of the victims, DMEC had to rappel into a ravine with the help of Malibu SAR volunteer deputies. | **Defendants' Evidentiary Support:** <br><br> Rodriguez-Sanchirico Decl. Exhs. 52 [Tauscher Tr. 26:2-20, 31:2-13, 133:14-134:18, 207:2-9, 222:5-10], 78 [Katz Tr. 78:3-79:24], 51 [McGuire Tr. 79:8-20, 80:6-17, 81:2-5, 81:13-18, 82:1-7]. <br><br> **Plaintiff's Response:** <br><br> Undisputed. |
| 21. LACFD firefighters stayed on site to make sure emergency personnel were safe, especially from the toxic fumes. | **Defendants' Evidentiary Support:** <br><br> Rodriguez-Sanchirico Decl. Exhs. 57 [Marrone Tr. 58:23-59:14], 53 [Smith Tr. 23:2-29:7], 51 [McGuire Tr. 41:17-25, 42:24-43:2, 44:3-15]. <br><br> **Plaintiff's Response:** <br><br> Undisputed. |

-13-

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 22.  On January 29, 2020, the Sheriff's Information Bureau ("SIB") received an email from a concerned citizen. | **Defendants' Evidentiary Support**: <br> Jaeger Decl. ¶ 3; Rodriguez-Sanchirico Decl. Ex. 48 [Mendez Tr. 19:20-20:8]. <br><br> **Plaintiff's Response**: <br> Disputed in part.  Plaintiff disputes the characterization of Ralph Mendez's complaint as an "email from a concerned citizen."  Mendez did not email LASD.  Rather, he submitted a complaint through an online form on the Sheriff's Department's website.  (AMF ¶ 344.) |
| 23.  The email stated that a young deputy had shown crash site photos on his phone to someone at the Baja California Bar and Grill in Norwalk. | **Defendants' Evidentiary Support**: <br> Jaeger Decl. ¶ 3; Rodriguez-Sanchirico Decl. Ex. 48 [Mendez Tr. 20:16-23:21]. <br><br> **Plaintiff's Response**: <br> Disputed in part.  Plaintiff disputes the characterization of Ralph Mendez's complaint as an "email."  Further disputed in that Mendez's complaint did not use the term "crash site photos."  Rather, it described "a deputy . . . who was at the Kobe Bryant crash site showing pictures of his . . . body."  (AMF ¶ 346.) |

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 24.   SIB shared the email with LASD command staff, who launched an immediate inquiry. | **Defendants' Evidentiary Support**: Jaeger Decl. ¶ 3; Rodriguez-Sanchirico Decl. Exhs. 61 [Valdez Tr. 57:1-25], 62 [Satterfield Tr. 76:7-77:18], 64 [Mancinas Tr. 31:25-32:22]. **Plaintiff's Response**: Disputed.  Mendez's complaint was first routed to the Lost Hills Station, where Captain Matthew Vander Horck (not the Sheriff's command staff) launched an immediate inquiry.  (AMF ¶ 347.) Vander Horck assigned his top investigation lieutenant to handle the inquiry.  (AMF ¶ 348.) |
| 25.   By January 30, 2020, LASD had identified Deputy Cruz as the deputy and learned that he had shown photos on his cellphone to one of his friends, Victor Gutierrez, the bartender in Norwalk. | **Defendants' Evidentiary Support**: Jaeger Decl. Ex. 25; Rodriguez-Sanchirico Decl. Exhs. 61 [Valdez Tr. 96:20-97:12, 99:23-100:14], 64 [Mancias Tr. 54:18-57:20], 65 [Phillips Tr. 49:1-24]. **Plaintiff's Response**: Undisputed. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 26.  Deputy Cruz was a young deputy trainee who had been at LASD for less than a year. | **Defendants' Evidentiary Support**: Declaration of Joey Cruz ("Cruz Decl.") ¶ 2; Rodriguez-Sanchirico Decl. Ex. 70 [Cruz Tr. 94:13-18].<br><br>**Plaintiff's Response**: Disputed in part.  Cruz was in training to be a patrol deputy, but his first day in the Academy was August 2, 2018.  (Ex. 133 (Cruz LASD Interview) at PINCITE COLA000149.)  Hence, at the time of the crash on January 26, 2020, Cruz had been with the Sheriff's Department for over 1 year and 5 months. |
| 27.  He was working the incident with his training officer, Deputy Mejia. | **Defendants' Evidentiary Support**: Cruz Decl. ¶ 3; Rodriguez-Sanchirico Decl. Exhs. 70 [Cruz Tr. 66:5-70:8], 68 [Mejia Tr. 108:11-25].<br><br>**Plaintiff's Response**: Disputed in part.  The proffered fact is vague and ambiguous with respect to the term "working the incident."  Plaintiff concedes that Deputy Cruz and his training officer, Deputy Rafael Mejia, responded to the radio call regarding the downed aircraft.  However, Cruz had no role in any investigation related to the accident.  (AMF ¶ 325.) |

| **PURPORTEDLY UNCONTROVERTED FACT** | **PLAINTIFF'S RESPONSE** |
|---|---|
| 28.  Gutierrez saw between one and three photos, which Deputy Cruz swiped through while holding his phone. | **Defendants' Evidentiary Support**: Jaeger Decl. Ex. 25; Rodriguez-Sanchirico Decl. Exhs. 49 [Gutierrez Tr. 20:24-21:8], 70 [Cruz Tr. 147:5-148:15]. **Plaintiff's Response**: Disputed.  Defendants' proffered evidence itself says Cruz showed Gutierrez "three to four photographs of the crash site."  (Jaeger Decl., Ex. 25.)  Further disputed in that Cruz handed his phone to Gutierrez while showing him photos of the victims' remains.  (AMF ¶¶ 323-326.) |
| 29.  Gutierrez recalled seeing various body parts in the debris field. | **Defendants' Evidentiary Support**: Jaeger Decl. Ex. 25; Rodriguez-Sanchirico Decl. Ex. 49 [Gutierrez Tr. 30:9-13]. **Plaintiff's Response**: Undisputed. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 30.   Deputy Cruz did not show the photos to anyone else at the bar. | **Defendants' Evidentiary Support:**<br><br>Jaeger Decl. Ex. 25; Cruz Decl. ¶ 14; Rodriguez-Sanchirico Decl. Exhs. 49 [Gutierrez Tr. 49:24-50:3], 70 [Cruz Tr. 148:19-149:5].<br><br>**Plaintiff's Response:**<br><br>Disputed.  Surveillance footage shows Cruz displaying his phone to a bar patron seated to his right before handing his phone across the bartender.  After the bartender returns Cruz's phone, Cruz can be seen making hand motions to his neck, torso, and right arm, in an apparent effort to illustrate the condition of the remains. The bartender then walks toward another patron, points toward Cruz, then gestures toward his torso and makes a slashing motion at his neck, which the bartender later testified likely related to what he viewed in the remains photos.  (AMF ¶¶ 321-326.) |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 31.   Deputy Cruz showed scene photos to his niece, who refused to look at them. | **Defendants' Evidentiary Support**: Cruz Decl. ¶ 13; Rodriguez-Sanchirico Decl. Ex. 70 [Cruz Tr. 138:15-24]. **Plaintiff's Response**: Disputed in part.  Cruz's niece did not "refuse to look at the photos."  According to LASD's own investigation, Cruz had a conversation with his niece regarding the accident scene, during which Cruz "proceeded to show [his] niece photographs of the crash site, including those containing bodies/body parts." Prior to displaying the photos, Cruz told his niece: "[T]hey wouldn't look like humans.  That's how gory they were." (AMF ¶¶ 315-18.) |

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 32.  When Sheriff Villanueva learned about the potential showing of crash site photos, he directed his personnel to launch an immediate inquiry and make sure *no* photos got outside the department. | **Defendants' Evidentiary Support**: Jaeger Decl. Ex. 25; Rodriguez-Sanchirico Decl. Exhs. 61 [Valdez Tr. 101:11-102:5, 103:16-22, 104:21-105:7, 109:6-15], 62 [Satterfield Tr. 130:20-25], 65 [Phillips Tr. 43:5-14, 43:24-44:6], 59[Villanueva Tr. 36:13-37:1, 54:4-18, 57:11-22, 63:2-10]. **Plaintiff's Response**: Disputed.  Sheriff Villanueva did not "launch an immediate inquiry," as a fact-finding inquiry had already been initiated at the direction of Captain Matthew Vander Horck, and was being run by Lieutenant Justin Diez of the Lost Hills Station.  Sheriff Villanueva terminated that inquiry and, working through Captain Jorge Valdez of the Sheriff's Information Bureau, ordered that Lost Hills personnel be ordered to the station and told that they would receive a performance log entry in lieu of discipline if they deleted the photos.  At this point, in Captain Vander Horck's view, the Lost Hills Station's fact-finding inquiry had been ended in favor of the direction given by Captain Valdez at the Sheriff's behest.  (AMF ¶¶ 347, 355, 368.) |

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 33.   Sheriff Villanueva said if everyone was honest, and did not publicly disseminate any photos, they would receive a performance log entry in their personnel file in lieu of discipline. | **Defendants' Evidentiary Support:**<br><br>Jaeger Decl. Ex. 25; Rodriguez-Sanchirico Decl. Exhs. 61 [Valdez Tr. 154:6-155:6, 155:12-156:8], 64 [Mancinas Tr. 53:12-54:1], 65 [Phillips Tr. 47:23-48:5], 59 [Villanueva Tr. 68:14-23, 72:21-73:16, 74:9-75:25, 77:14-78:1].<br><br>**Plaintiff's Response:**<br><br>Disputed in part.  Sheriff Villanueva ordered that all Lost Hills personnel be ordered to the station and told that they would receive a performance log entry in lieu of discipline if they deleted the photos.  (AMF ¶ 355.) |
| 34.   Lieutenant Hector Mancinas and Sergeant Marcus Phillips interviewed 28 deputies, reserve deputies, sergeants, and Malibu SAR civilian volunteers. | **Defendants' Evidentiary Support:**<br><br>Jaeger Decl. ¶ 5 & Ex. 25; Cruz Decl. ¶ 20; Jauregui Decl. ¶ 16; Rodriguez-Sanchirico Decl. Ex. 64 [Mancinas Tr. 58:2-20, 58:23-59:1].<br><br>**Plaintiff's Response:**<br><br>Undisputed. |

| | |
|---|---|
| 35. | By January 31, 2020, they determined that all LASD personnel who had taken, shared or received crash site photos had deleted them. | **Defendants' Evidentiary Support:** <br><br> Jaeger Decl. ¶ 7 & Ex. 25; Versales Decl. ¶ 17 & Ex. 5; Jauregui Decl. ¶ 16 & Ex. 7; Cruz Decl. ¶ 20; Johnson Decl. ¶¶ 13-16; Declaration of Ruby Cable ("Cable Decl.") ¶¶ 11-14; Declaration of Ben Sanchez ("Sanchez Decl.") ¶¶ 5-8; Declaration of Scott Miller ("Miller Decl.") ¶¶ 10-12; Declaration of Travis Kelly ("Kelly Decl.") ¶¶ 12-15; Rodriguez-Sanchirico Decl. Exhs. 69 [Versales Tr. 123:20-24], 72 [Jauregui Tr. 62:13-25], 70 [Cruz Tr. 128:21-129:5], 68 [Mejia Tr. 169:23-170:16, 174:20-175:12, 177:18-20, 201:1-3], 67 [Russell Tr. 210:2-211:16; 215:16-216:10], 71 [Cable Tr. 66:3-21], 75 [Johnson Tr. 171:1-11], 73 [Miller Tr. 77:24-78:3], 66 [Kelly Tr. 112:22-113:11], 61 [Valdez Tr. 172:3-174:4], 64 [Mancinas Tr. 68:6-21], 74 [Sanchez Tr. 84:24-85:23], 77 [Bonelli Tr. 49:17-22]. <br><br> **Plaintiff's Response:** <br><br> Disputed that Lt. Mancinas and Sgt. Phillips "determined" that all personnel had deleted the photos.  Mancinas and Phillips's interviews of the Lost Hills personnel, which ranged from "maybe a minute" to five minutes, were, according to Phillips, "real basic."  Mancinas led approximately 25 of the interviews and did not review a single deputy's cell phone.  For the vast majority of the individuals interviewed, Mancinas and Phillips did not take a single step to verify the deputies' statements regarding whether they shared and deleted the photos of the victims' remains.  As a result, when news of the improper photos was reported in the *LA Times* one month |

-22-

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
|  | later, Sheriff Villanueva expressed uncertainty regarding the status of the photos, saying: "Actions were taken the week of the incident. . . . But now we're assessing: Is there more that we don't know?  Which is what concerns me.  What we don't know."  (AMF ¶¶ 131, 379-380, 384.) |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| 36. | Only Deputy Cruz had shown a photo to anyone outside LASD. | **Defendants' Evidentiary Support:** |
|---|---|---|
| | | Jaeger Decl. ¶ 7 & Ex. 25; Russell Decl. ¶¶ 9-12; Mejia Decl. ¶¶ 17-20; Versales Decl. ¶¶ 13-16; Jauregui Decl. ¶¶ 13-15; Cable Decl. ¶¶ 11-14; Sanchez Decl. ¶¶ 5-8; Johnson Decl. ¶¶ 13-16; Miller Decl. ¶¶ 10-12; Kelly Decl. ¶¶ 12-15; Rodriguez-Sanchirico Decl. Exhs. 67 [Russell Tr. 177:4-178:2, 178:3-179:18], 68 [Mejia Tr. 158:2-13], 69 [Versales Tr. 123:20-24], 72 [Jauregui Tr. 62:13-25], 71 [Cable Tr. 66:3-21], 75 [Johnson Tr. 171:1-11], 73 [Miller Tr. 77:24-78:3], 66 [Kelly Tr. 112:22-113:11], 64 [Mancinas Tr. 111:14-19, 113:15-20, 114:11-14, 116:10-16]. |
| | | **Plaintiff's Response:** |
| | | Disputed.  Plaintiff has adduced significant evidence from which a jury could infer that dissemination and display of photos of the Bryants' remains goes far beyond a single showing at a bar.  This evidence is summarized in Plaintiff's Memorandum of Points and Authorities in Opposition to Summary Judgment.  It includes, *inter alia*: (1) LASD employees known to have possessed the photos have betrayed a consciousness of guilt through a series of false exculpatory statements; (2) cell phone records of LASD personnel indicate broader dissemination than Defendants have admitted; (3) photos of the crash-scene have been shown and/or shared with individuals unaccounted-for by LASD's investigation; and (4) LASD destroyed evidence in an effort to sweep the misconduct under the rug, and a jury may infer that the destroyed evidence would have been unfavorable.  (AMF ¶¶ 497-502; 503-08; 522-530; 538-568; |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| | 591-659.) |
| 37.   Sheriff Villanueva took this action to make sure no photos got out, as Plaintiff requested, and because he believed it was the right thing to do. | **Defendants' Evidentiary Support:** Rodriguez-Sanchirico Decl. Ex. 59 [Villanueva Tr. 67:18-68:12, 80:18-81:10, 82:21-83:10, 115:10-23]. **Plaintiff's Response:** Disputed as to the Sheriff's characterization regarding the motivation for his deletion order.  At least a dozen indications from the Sheriff's Department's handling of the citizen complaint suggest that the Department's response was a self-interested attempt to sweep misconduct under the rug.  Among them, a captain who spoke up against the deletion order was threatened with demotion and transferred, deputies were told to delete material before any effort was made to review their phones, and the Sheriff's Department did not launch an internal affairs investigation until one day after the *Los Angeles Times* reported on the misconduct.  (AMF ¶¶ 387-399, 569-590.) |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 38.   As the Sheriff testified:<br><br>**Q**: Is there—is it true that there was no order given to delete any photographs?  Is that true or untrue?<br><br>**A**: I said that no photograph is ever going to see the light of day.  Cannot.  Do not want to harm these families any further.<br><br><br>**Q**: Sheriff Villanueva, do you think it's fair to say that you encouraged—through your directions, that you encouraged members of the department to delete accident scene photos?<br><br>**A**: I can tell you I did exactly what was needed to be done to ensure there was no further harm to the family.  And . . . if I had to do it all over again, I'd probably make the exact same decision. | **Defendants' Evidentiary Support**:<br><br>Rodriguez-Sanchirico Decl. Ex. 59 [Villanueva Tr. 115:10-23].<br><br>**Plaintiff's Response**:<br><br> Disputed as to the Sheriff's characterization regarding the motivation for his deletion order.  At least a dozen indications from the Sheriff's Department's handling of the citizen complaint suggest that the Department's response was a self-interested attempt to sweep misconduct under the rug.  Among them, a captain who spoke up against the deletion order was threatened with demotion and transferred, deputies were told to delete material before any effort was made to review their phones, and the Sheriff's Department did not launch an internal affairs investigation until one day after the *Los Angeles Times* reported on the misconduct.  (AMF ¶¶ 387-399, 569-590.) |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 39.  Once the initial inquiry was complete, the Internal Affairs Bureau ("IAB") took over and conducted a comprehensive investigation. | **Defendants' Evidentiary Support**: Jaeger Decl. ¶ 4 & Ex. 25; Rodriguez-Sanchirico Decl. Ex. 61 [Valdez Tr. 94:11-15]; 81 [Jaeger Tr. 42:14-43:15]. **Plaintiff's Response**: Disputed that the IAB investigation occurred once the initial inquiry was complete.  Lt. Mancinas and Sgt. Phillips finished interviewing Lost Hills personnel on Friday, January 31, 2020.  In light of the Sheriff's direction to deputies to delete the photographs in exchange for amnesty, Chief Kneer informed Assistant Sheriff Gross that there would no longer be an internal investigation of the potential misconduct.  After that point, the Sheriff's Department took no further action in connection with potential misconduct involving photos of the victims' remains until the *Los Angeles Times* reported on the misconduct on February 27, 2020.  The following day, February 28, 2020, the Sheriff's Department initiated an IAB investigation of potential misconduct related to crash-scene photos.  (AMF ¶¶ 375, 386, 403.) |

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 40. That is the standard operating procedure at LASD. | **Defendants' Evidentiary Support:** Jaeger Decl. ¶¶ 4-5; Rodriguez-Sanchirico Decl. Exhs. 63 [Vander Horck Tr. 96:3-97:7], 59 [Villanueva Tr. 140:24-141:8, 190:10-24], 81 [Jaeger Tr. 17:12-22, 36:22-37:11, 38:8-39:11]. **Plaintiff's Response:** Disputed.  The proffered fact is vague and ambiguous regarding what "that" refers to.  But whatever it references, the cited evidence does not support that it is "standard operating procedure" for LASD to order or encourage employees to destroy evidence of their misconduct, take no further action for a month, then open an internal affairs investigation the day after the media reports on the misconduct.  The Sheriff's deletion order also was not "standard operating procedure."  Captain Matthew Vander Horck spoke out against the order and tried to stop it, believing it to be "extremely unorthodox and out of the ordinary."  (AMF ¶ 360.) |

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 41. IAB interviewed 41 witnesses and compiled a comprehensive 1,140 page report. | **Defendants' Evidentiary Support**:<br><br>Jaeger Decl. ¶ 6 & Ex. 25; Rodriguez-Sanchirico Decl. Ex. 81 [Jaeger Tr. 57:24-59:2].<br><br>**Plaintiff's Response**:<br><br>Disputed in part.  Plaintiff does not dispute the number of witnesses interviewed, but does dispute the characterization that the IAB investigation was "comprehensive."  At no point did LASD conduct a forensic examination of the employees' phones.  Rather, the investigators did a "cursory" review of witnesses' phones while in person with them.  Numerous deputies had applications on their phones in January 2020 such as Facebook Messenger and Snapchat, which are used to send pictures, but the Department never reviewed those accounts.  The Department also never reviewed the cloud storage or personal email accounts of deputies known to have possessed the photos.  The results of the investigation have proven unreliable, as Plaintiff has adduced evidence of additional instances of display and sharing that the IAB investigators did not find.  (AMF ¶¶ 405-423, 497-502.) |

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 42.   The investigation revealed that the photos came from the first deputy on scene, Deputy Johnson. | **Defendants' Evidentiary Support**: Jaeger Decl. Ex. 25; Versales Decl. ¶¶ 7-8; Rodriguez-Sanchirico Decl. Exhs. 69 [Versales Tr. 100:4-11], 75 [Johnson Tr. 143:1-6], 76 [Vargas Tr. 25:19-27:6]. **Plaintiff's Response**: Undisputed that IAB's conclusion was that photos distributed to LASD personnel originated from Deputy Johnson. |
| 43.   Johnson took crash site photos for the command post to know what he was seeing. | **Defendants' Evidentiary Support**: Johnson Decl. ¶¶ 9-10; Rodriguez-Sanchirico Decl. Ex. 75 [Johnson Tr. 110:4-18, 146:6-22]. **Plaintiff's Response**: Disputed.  By the time Johnson began photographing, he had already been informed via a phone call with Versales that Kobe Bryant and his daughter had likely been onboard the helicopter. Johnson used his personal cell phone to take "six or seven" close-up photos of the victims' bodies, including four photos of Kobe and Gianna.  After learning of his deputies' conduct, Sheriff Villanueva expressed dismay that someone would "go out of their way . . . to take away a trophy" of a tragic scene.  (AMF ¶¶ 127, 149, 155.) |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 44.   Johnson sent photos to Deputy Versales, who was handling communications at the command post. | **Defendants' Evidentiary Support**:<br><br>Jaeger Decl. ¶ 8 & Ex. 25; Johnson Decl. ¶¶ 10, 17; Versales Decl. ¶¶ 4, 9-10; Rodriguez-Sanchirico Decl. Exhs. 75 [Johnson Tr. 143:1-6], 69 [Versales Tr. 108:2-8].<br><br>**Plaintiff's Response**:<br><br>Undisputed that Johnson sent photos to his friend, Versales, and that Versales's role on the day of the accident was communications.  Disputed to the extent that the statement implies Johnson's motivation for sending his close-up photos of the victims' remains to Versales was to aid or assist in Versales's communications role.  Versales did not ask for them, did not need them, and was surprised to receive them.  (AMF ¶¶ 151, 269.) |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 45. Deputy Versales sent the photos to Deputy Mejia, who was working with dispatch to help identify the helicopter. | **Defendants' Evidentiary Support:** Jaeger Decl. ¶ 8 & Ex. 25; Versales Decl. ¶ 12; Mejia Decl. ¶ 10; Rodriguez-Sanchirico Decl. Exhs. 69 [Versales Tr. 108:9-23], 68 [Mejia Tr. 117:5-16; 133:8-134:3].<br><br>**Plaintiff's Response:**<br><br>Disputed to the extent the proffered fact implies that Versales sent or Mejia obtained close-up photos of the victims remains for purposes of identifying the helicopter. Johnson's close-up photos of the victims' remains did not contain the number of the helicopter and could not have aided any investigative effort by Mejia. Versales has testified that he sent the photos to Mejia for "investigative" purposes, but Versales was unable to specify what he understood Mejia to be investigating. (AMF ¶¶ 274-75.) |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 46.   Deputy Mejia sent the photos to two deputies who were also on scene, including his trainee, Deputy Cruz. | **Defendants' Evidentiary Support:** Jaeger Decl. Ex. 25; Mejia Decl. ¶ 14; Cruz Decl. ¶ 10; Cable Decl. ¶¶ 8-10; Rodriguez-Sanchirico Decl. Exhs. 68 [Mejia Tr. 138:22-139:17; 140:19-21; 150:17-25; 152:14-20], 70 [Cruz Tr. 204:5-19], 71 [Cable Tr. 42:14-20]. **Plaintiff's Response:** Disputed in part, as the term "on the scene" is vague and ambiguous.  Cable was manning a checkpoint at the entrance of the water district letting cars in and out, while Cruz spent his day guarding a trailhead that led to the crash scene. Deputy Mejia shared the photos with Cable in connection with a conversation with her at the checkpoint, and shared the photos with Cruz while the two were in their patrol car on the evening of the accident.  (¶¶ 289-297.) |

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 47. Deputy Cruz sent the photos to Deputy Michael Russell, who was at the bottom of the command post helping to keep unauthorized individuals and the media away. | **Defendants' Evidentiary Support:** Jaeger Decl. Ex. 25; Cruz Decl. ¶¶ 12, 17, 21-22; Russell Decl. ¶ 7; Rodriguez-Sanchirico Decl. Exhs. 70 [Cruz Tr. 111:23-112:2], 67 [Russell Tr. 96:1-7; 111:16-22].<br><br>**Plaintiff's Response:**<br>Disputed in part. Cruz did not send photos of the victims' remains to Russell while Russell "was at the bottom of the command post helping to keep unauthorized individuals and media away." Rather, while in the report-writing room of the Lost Hills Station at approximately 9:00 p.m. on the day of the accident, Cruz sent Russell the photos because Russel was "curious" about what the crash-scene looked like. Russell never had any investigative role with the incident and has admitted it was not appropriate for him to obtain the photos. (AMF ¶¶ 298, 300-01.) |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 48.  Deputy Russell sent the photos to a deputy who was working at another station but planned on responding to the scene the following day. | **Defendants' Evidentiary Support**: Jaeger Decl. Ex. 25; Russell Decl. ¶ 8; Sanchez Decl. ¶¶ 3-4; Rodriguez-Sanchirico Decl. Ex. 67 [Russell Tr. 179:23-181:2], 74 [Sanchez Tr. 30:20-23].  **Plaintiff's Response**: Disputed in part.  Plaintiff does not dispute that Russell sent photos of the victims' remains to Deputy Ben Sanchez, but the proffered fact is vague and ambiguous as to time.  Plaintiff also disputes that the reason Russell sent the photos was because Sanchez planned to respond to the crash site.  Rather, on the day after the accident—Monday, January 27, 2020—Russell was off-duty playing an online video game, *Call of Duty*, with Sanchez.  While playing the game, Russell and Sanchez discussed the fact that Kobe Bryant had died in the crash. Russell told Sanchez: "Hey, I have some photos of the crash site.  Do you want to see?"  Sanchez said, "Yeah."  Russell then texted the photos to Sanchez and identified one of the victims as Kobe Bryant.  (AMF ¶ 307-08, 313.) |

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 49.   IAB thoroughly investigated and concluded that some of the internal sharing of crash site photos could have been handled differently. | **Defendants' Evidentiary Support**: Jaeger Decl. ¶ 9 & Exhs. 21-24, 26-29; Declaration of Captain Mark Flores ("Flores Decl.") ¶ 14. <br><br> **Plaintiff's Response**: <br><br> Disputed as to the characterization that IAB investigated "thoroughly."  At no point did LASD conduct a forensic examination of the employees' phones.  Rather, the investigators did a "cursory" review of witnesses' phones while in person with them.  Numerous deputies had applications on their phones in January 2020 such as Facebook Messenger and Snapchat, which are used to send pictures, but the Department never reviewed those accounts.  The Department also never reviewed the cloud storage or personal email accounts of deputies known to have possessed the photos.  The results of the investigation have proven unreliable, as Plaintiff has adduced evidence of additional instances of display and sharing that the IAB investigators did not find.  (AMF ¶¶ 405-423, 497-502.) |

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 50.   Deputy Cruz was suspended for 10 days. | **Defendants' Evidentiary Support:**<br><br>Jaeger Decl. Ex. 29; Rodriguez-Sanchirico Decl. Exhs. 70 [Cruz Tr. 251:9-17, 252:3-253:3], 60 [Kneer Tr. 133:13-22].<br><br>**Plaintiff's Response:**<br><br>Following the internal investigation and Cruz's appeal of the initial decision regarding his discipline, Cruz served a two day suspension for his misconduct related to the photos.  He also participated in three days of paid, mandatory training. |
| 51.   On January 31, 2020, Lost Hills Captain Matthew Vander Horck called LACFD Deputy Fire Chief Anthony Marrone. | **Defendants' Evidentiary Support:**<br><br>Declaration of Interim Fire Chief Anthony Marrone ("Marrone Decl.") ¶ 4; Rodriguez-Sanchirico Decl. Ex. 57 [Marrone Tr. 154:12-19].<br><br>**Plaintiff's Response:**<br><br>Undisputed. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 52.    Captain Vander Horck's subsequent transfer to a new assignment had nothing to do with this incident. | **Defendants' Evidentiary Support:**<br><br>Rodriguez-Sanchirico Decl. Exhs. 63 [Vander Horck Tr. 231:21-232:4], 60 [Kneer Tr. 85:21-86:15].<br><br>**Plaintiff's Response:**<br><br>Disputed.  Captain Vander Horck expressed serious concerns regarding Sheriff Villanueva's deletion order, at one point even asking his subordinate to pause in executing it.  Vander Horck was concerned that the deletion order might violate federal law and expressed that concern to his Chief.  Vander Horck's Chief stated that he would speak to the Sheriff, then called Vander Horck back saying that the Sheriff assured him that he had the authority to proceed.  Three weeks later, Vander Horck was summoned into a meeting with his supervisors and told that—effective at midnight that night—he would be demoted from Captain to Lieutenant and stripped of his position leading the Lost Hills Station.  Vander Horck pressed for a rationale for the demotion, but was told only that the Sheriff had "lost confidence in him."  Later that week, the Sheriff called Vander Horck to tell him he would not be demoted, but would still be transferred away from Lost Hills Station to the Men's Central Jail, which is considered a "dumping ground" for captains who "fall out of favor with the sheriff."  (AMF ¶¶ 358-66, 387-99.) |

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 53.   Captain Vander Horck told Chief Marrone that there was a complaint about a deputy sharing crash site photos containing victim remains. | Marrone Decl. ¶ 4; Rodriguez-Sanchirico Decl. Ex. 57 [Marrone Tr. 154:12-22].<br><br>**Plaintiff's Response:**<br>Undisputed. |
| 54.   Captain Vander Horck advised Chief Marrone that there were two LACFD employees at the crash site on January 26, 2020 who might have taken or received photos. | Marrone Decl. ¶ 4; Rodriguez-Sanchirico Decl. Ex. 57 [Marrone Tr. 155:1-6].<br><br>**Plaintiff's Response:**<br>Undisputed. |
| 55.   Chief Marrone notified Deputy Fire Chief William McCloud, who oversaw the Leadership and Professional Standards Bureau at that time, about the complaint. | Marrone Decl. ¶ 4; Rodriguez-Sanchirico Decl. Exhs. 57 [Marrone Tr. 155:16-156:2], 58 [McCloud Tr. 58:6-15].<br><br>**Plaintiff's Response:**<br>Undisputed. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 56.  LACFD worked to identify the personnel who had been present on the first day of the crash site investigation. | Rodriguez-Sanchirico Decl. Ex. 58 [McCloud Tr. 77:12-79:22].<br><br>**Plaintiff's Response:**<br><br>Partially disputed.  Undisputed that the Fire Department took some steps to follow up on the information it received from Captain Vander Horck, but disputed that it was any significant "work."  Rather than conduct interviews or examine devices, LAFD conducted what it has admitted was only a "cursory assessment."  It did not even advise (or even email) all of its personnel who responded to the crash site to preserve relevant evidence.  Nor did it speak to the deputy who witnessed the conduct at issue.  (AMF ¶¶ 449-453.) |

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 57.   At that time, there were no allegations that LACFD personnel had shared photos improperly. | Marrone Decl. ¶ 4; Rodriguez-Sanchirico Decl. Exhs. 57 [Marrone Tr. 163:11-18], 58 [McCloud Tr. 57:6-10].<br><br>**Plaintiff's Response**:<br>Partially disputed.  While LAFD may not have received specific allegations regarding *sharing* of photos, it indisputably had obtained information that two of its personnel were in possession of photos that violated Chief Marrone's directive to exercise sensitivity at the crash scene.  Moreover, as of January 31, 2020, LAFD already knew an internal investigation was likely, and it had also begun to anticipate litigation. (AMF ¶¶ 161, 451; Ex. 119 (McCloud) 86:24-87:4; Ex. 160 at lines 13-14.) |
| 58.   On March 6, 2020, a civilian witness reported to LACFD that a LACFD employee had been showing crash site photos on his phone at a first responders awards event on February 15, 2020. | Marrone Decl. ¶ 5; Rodriguez-Sanchirico Decl. Exhs. 57 [Marrone Tr. 158:16-160:3], 50 [Weireter Tr. 45:4-10].<br><br>**Plaintiff's Response**:<br>Undisputed, except insofar as Defendants characterize the Golden Mike Awards as a "first responders" event, which is inaccurate.  It is an annual event for members of the media.  (AMF ¶¶ 222-224.) |

| 59. | LACFD hired an outside investigator and directed the three LACFD captains who took photos to turn over their cellphones and laptops to be forensically imaged. | Marrone Decl. ¶ 6 & Exs. 14-16; Declaration of Arlin Kahan ("Kahan Decl.") ¶ 19 & Ex. 12; Declaration of Tony Imbrenda ("Imbrenda Decl.") ¶ 22 & Ex. 13; Rodriguez-Sanchirico Decl. Exhs. 58 [McCloud Tr. 88:7-18], 55 [Kahan Tr. 104:16-107:9]. |
| --- | --- | --- |
|  |  | **Plaintiff's Response:** |
|  |  | Undisputed that the Fire Department hired an outside investigator and forensically imaged the Department-issued devices of Imbrenda, Kahan, and Jordan. Disputed that these steps were adequate. By the time the Department took any steps to preserve the relevant devices, Imbrenda had already carried out a mass deletion campaign within the Department. The data he deleted (and ordered to be deleted) could not be recovered in the forensic examination. Moreover, the Department never examined any of these three individuals' personal devices, notwithstanding Imbrenda's admission that he had photos depicting human remains on his personal phone. Nor did the Department examine their cloud accounts, social media, messaging applications, or personal email. Finally, the Department was unable to identify the supervisor who received close-up photos of the victims' remains from Deputy Johnson, or examine his device. Nor did it identify all of the various individuals who sent photos to Imbrenda. (AMF ¶¶ 252-265, 452-455, 457-463, 699, 702-703.) |
| 60. | Like LASD, LACFD determined that (i) all crash | Marrone Decl. ¶ 6; Imbrenda Decl. ¶¶ 17-21; Kahan Decl. ¶¶ 13-16; Rodriguez- |

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| site photos had been deleted; and (ii) no one had sent a photo to anyone outside LACFD. | Sanchirico Decl. Exhs. 56 [Imbrenda Tr. 192:17-192:21], 55 [Kahan Tr. 76:6-16, 91:7-92:9, 96:8-15], 83 [Scott Tr. 93:1-3].<br><br>**Plaintiff's Response:**<br><br>Disputed.  The Fire Department was unable to even identify all of its employees who had taken, received, and shared photos of the victims' remains, much less secure the photos in the possession of those unknown employees or determine where the photos spread from there.  Moreover, the Department could not reach any conclusion as to what transpired on the personal devices of Imbrenda, Jordan, and Kahan because it did not examine those devices.  The Department has acknowledged it was unable to determine how many people Imbrenda, Jordan, and Kahan sent photos to.  (AMF ¶¶ 457-463, 455, 699.) |

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 61.  The LACFD investigation revealed that then-PIO Captain Imbrenda had shown crash site photos on his phone to one LACFD employee and two Los Angeles Fire Department Captains. | Marrone Decl. ¶ 6 & Ex. 15; Imbrenda Decl. ¶¶ 12-16; Rodriguez-Sanchirico Decl. Exhs. 58 [McCloud Tr. 157:10-13], 56 [Imbrenda Tr. 137:3-22], 54 [Cornell Tr. 51:7-53:4, 62:15-63:9, 100:2-13], 83 [Scott Tr. 45:15-20].<br><br>**Plaintiff's Response:**<br><br>Disputed because the sentence omits at least three others who viewed the photos on Imbrenda's phone at the Golden Mike Awards:  his girlfriend, Sky Cornell's girlfriend, and Erik Scott's wife.  The Fire Department's own investigation also found that Imbrenda spoke about the incident "while surrounded by [his] colleagues *and their dates*" and was "aware that there were people nearby when [he] pulled out [his] phone and *showed the group* pictures from the crash site which depicted human remains." (AMF ¶¶ 235-238, 615.) |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 62. The LACFD employee and two Los Angeles Fire Department Captains had also been working the incident. | Marrone Decl. ¶ 6; Imbrenda Decl. ¶¶ 7-8; Rodriguez-Sanchirico Decl. Exhs. 56 [Imbrenda Tr. 92:10-19], 54 [Cornell Tr. 30:8-33:24], 50 [Weireter Tr. 15:10-19, 17:15-21].<br><br>**Plaintiff's Response:**<br>Partially disputed.  None of the other firefighters with whom Imbrenda socialized at the Golden Mike Awards had responded to the actual crash site location.  Two only briefly reported to the command post.  The third (Erik Scott) had no involvement in responding to the crash on January 26.  (AMF ¶¶ 228, 230; Ex. 114 (Cornell) 34:5-20, 35:17-36:15). |
| 63. Captain Imbrenda was disciplined for violating LACFD's Standards of Behavior and Code of Ethics. | Marrone Decl. ¶ 10 & Exs. 15, 18; Imbrenda Decl. ¶¶ 22-23 & Ex. 13.<br><br>**Plaintiff's Response:**<br>Undisputed that Imbrenda received some discipline, but he ultimately was able to maintain his employment with the Fire Department.  (AMF ¶ 266.) |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 64. Two other LACFD employees, who had sent photos to Captain Imbrenda, were also disciplined. | Marrone Decl. ¶¶ 9, 11 & Exs. 16, 19; Kahan Decl. ¶¶ 17-19 & Ex. 12; Rodriguez-Sanchirico Decl. Ex. 55 [Kahan Tr. 137:12-21].<br><br>**Plaintiff's Response:**<br>Partially disputed.  Undisputed that Kahan received a letter of reprimand.  But he has not served a suspension, been demoted, or lost any income or other benefits.  Rather, Kahan maintained his position as a staff aide and his rank as a fire captain.  Jordan was not terminated; he retired.  The eight (or more) other LAFD employees who sent photos to Imbrenda have not even been identified, much less disciplined.  Nor has the supervisor who received close-up photos of the victims via AirDrop.  (AMF ¶¶ 189, 206, 265, 455, 459.) |
| 65. After this lawsuit was filed, the parties agreed to have an independent forensic examiner, Kroll's Forensic Investigations and Intelligence team, examine the devices of over 20 LASD and LACFD employees. | Declaration of Justin Price ("Price Decl.") Ex. 35.<br><br>**Plaintiff's Response:**<br>Undisputed. |

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 66.  Because almost two years had passed, many of the individuals had upgraded their phones, but they made the devices they had available to Kroll. | Price Decl. Ex. 36; Rodriguez-Sanchirico Decl. Exhs. 75 [Johnson Tr. 212:14-17], 63 [Vander Horck Tr. 104:1-8], 69 [Versales Tr. 89:6-13, 291:15-292:12], 73[Miller Tr. 101:5-12], 72 [Jauregui Tr. 107:1-7, 124:10-125:9], 80 [Shue Tr. 13:13-14:6].<br><br>**Plaintiff's Response**:<br>Undisputed that virtually all of the LASD personnel who possessed photos of the victims no longer have their phones, or in the case of Cruz, wiped all of the data from his phone.  Disputed that this failure to preserve the relevant devices was justified.  The lost, wiped, and discarded phones have made it impossible to reconstruct the custodians' activities involving the photos.  (*See* AMF ¶¶ 680-685, 688-690, 692-696, 701.) |

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 67.   Kroll reached the same conclusion the County had: there were no photos on any of the devices. | **Defendants' Evidentiary Support:** Price Decl. Exhs. 36 & 37.<br><br>**Plaintiff's Response:**<br>Disputed.  Kroll was unable to analyze most of the devices that the relevant LASD personnel were using on January 26, 2020.  Nor could it analyze Cruz's phone, which was reset to its factory settings.  Other devices were inaccessible as well.   Kroll also did not analyze 23 cloud-based storage accounts it identified because Defendants did not provide its passwords to those accounts, and so Kroll was unable to confirm that even the specific custodians involved in the forensic examination no longer have copies of the photos saved in other locations.   Further disputed that the deletion resulted in containment of the photos.  Rather, with the forensic trail destroyed—and no ability to trace the path of the photos' electronic dissemination—Mrs. Bryant has been left unable to determine the full extent of the photos' spread or identify everyone who possesses copies.   (AMF ¶¶ 692-706.) |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 68.  No LASD or LACFD photos have been posted on the internet, released in the media, or otherwise publicly disseminated. | **Defendants' Evidentiary Support:**<br><br>Price Decl. Exhs. 36 & 37; Russell Decl. ¶¶ 9-12; Mejia Decl. ¶¶ 17-20; Versales Decl. ¶ 13-16; Jauregui Decl. ¶¶ 13-15; Cable Decl. ¶¶ 11-14; Sanchez Decl. ¶¶ 5-8; Johnson Decl. ¶¶ 13-16; Miller Decl. ¶¶ 10-12; Kelly Decl. ¶¶ 12-15; Rodriguez-Sanchirico Decl. Exhs. 47 [Bryant Tr. 9:7-18, 51:3-52:15, 61:1-11, 68:1-19], 40-41 [Bryant's discovery responses], 84 [Freskos Tr. 49:20-50:2].<br><br>**Plaintiff's Response:**<br><br>Disputed. The photos circulated even more broadly within LASD and LAFD than Defendants have admitted. For example, an LASD dispatcher was shown photos depicting body parts late in the afternoon on the day of the crash by an unknown deputy for no apparent reason (AMF ¶ 502), and there are also at least *eight* firefighters who took or possessed graphic photos who cannot be identified as a result of Defendants' spoliation. (AMF ¶¶ 212, 265.) These employees' copies of the photos (and the copies of everyone who received the photos from those employees, and so on) remain entirely unsecured and at-risk of broader release at any moment. The evidence also shows that photos went far beyond LASD and LAFD almost immediately. (AMF ¶¶ 498, 501-502.) Mrs. Bryant has confronted a photo online that purports to depict her husband's uncovered remains near the blue-and-white helicopter, and the location of the remains in the photo match where Kobe Bryant came to rest. (AMF ¶ 497.) Cell records provide |

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| | additional evidence of dissemination (AMF ¶¶ 503-568.) |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| 69. | The crash site photos cannot be recovered. | Price Decl. Exhs. 36 & 37; Rodriguez-Sanchirico Decl. Ex. 84 [Freskos Tr. 44:10-23, 63:7-64:10].<br><br>**Plaintiff's Response:**<br><br>Undisputed that the evidence Defendants deleted has been permanently destroyed. Disputed that the deletion resulted in containment of the photos, and disputed that all photos have been deleted.  Rather, with the forensic trail destroyed—and no ability to trace the path of the photos' electronic dissemination—Mrs. Bryant has been left unable to determine the full extent of the photos' spread or identify everyone who possesses copies.  Kroll was unable to analyze most of the devices that the relevant LASD personnel were using on January 26, 2020.  Nor could it analyze Cruz's phone, which was reset to its factory settings.  Other devices were inaccessible as well.  Destruction of evidence prevented the forensic examination from being able to reconstruct the custodians' activities involving the photos.  Kroll also did not analyze 23 cloud-based storage accounts it identified because Defendants did not provide its passwords to those accounts, and so Kroll was unable to confirm that even the specific custodians involved in the forensic examination no longer have copies of the photos saved in other locations.  (AMF ¶¶ 692-706.)<br><br>Further disputed because photos circulated even more broadly within LASD and LAFD than Defendants have admitted.  (AMF ¶¶ 212, 265, 498, 501-568.) |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 70. Plaintiff testified that this lawsuit is about her risk of future harm. | **Defendants' Evidentiary Support**: Rodriguez-Sanchirico Decl. Exhs. 47 [Bryant Tr. 7:14-8:9], 40-41 [Bryant's discovery responses]. |
| | **Plaintiff's Response**: Disputed to the extent the proffered fact suggests that Mrs. Bryant's distress exclusively or principally related to "future harm."  At deposition, Mrs. Bryant articulated *present* fear and anxiety, as well as anger regarding County employees taking and sharing gratuitous photos of her husband and daughter.  Specifically, in the testimony cited by Defendants, Mrs. Bryant stated: "Emotional distress means to that not only do I have to grieve to the loss of my husband and child, but *for the rest of my life I'm going to have to fear* these photographs of my husband and child will be leaked.  And I do not want my little girls or I to ever have to see their remains in that ma[nn]er. *Nor do I think it's right that the photographs were taken in the first place* because it's already tough enough that I have to experience this heart ache and loss.  But now to live the rest of my life having to fear those photographs surfacing is something that I, I have to deal with every single day." (Rodriguez-Sanchirico Decl., Ex. 47 at 7:23-8:9.)  Defendants did not ask Mrs. Bryant to offer an exhaustive accounting of every way in which the photos have been distressing, and Mrs. Bryant's answers regarding some certain aspect of her distress and pain cannot be read to the exclusion of other distress and pain. (AMF ¶ 307-08, 313.) |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 71.  Plaintiff testified that "[i]t's possible that one day these will surface." | **Defendants' Evidentiary Support**: Rodriguez-Sanchirico Decl. Ex. 47 [Bryant Tr. 50:3-10].<br><br>**Plaintiff's Response**: Disputed in part because, removed from context, the quotation is misleading.  At deposition, Plaintiff was asked: "Do you know whether any photographs of your husband's and your daughter's bodies have been actually publicly disclosed yet?"  Plaintiff responded: "There was one photograph which was online where someone said that it was my husband's body.  And when I – when I spoke to the Medical Examiner, that same photograph matched the location of where the Medical Examiner told me his body was found."  (Rodriguez-Sanchirico Decl., Ex. 47 (Bryant) at 7-18.) |
| 72.  When asked whether any photos had *actually* surfaced, she answered:  "Not to my knowledge.  Not to my knowledge." | **Defendants' Evidentiary Support**: Rodriguez-Sanchirico Decl. Ex. 47 [Bryant Tr. 52: 8-15].<br><br>**Plaintiff's Response**: Disputed in part because, removed from context, the quotation is misleading.  Mrs. Bryant testified: "There was one photograph which was online where someone said that it was my husband's body.  And when I – when I spoke to the Medical Examiner, that same photograph matched the location of where the Medical Examiner told me his body was found."  (Rodriguez-Sanchirico Decl., Ex. 47 (Bryant) at 7-18.) |

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 73. Plaintiff confirmed that she had never seen any photos of her husband or daughter. | **Defendants' Evidentiary Support**: Rodriguez-Sanchirico Decl. Exhs. 47 [Bryant Tr. 9:7-18, 51:3-52:15, 61:1-11, 68:1-19], 40-41[Bryant's discovery responses].<br><br>**Plaintiff's Response**: Disputed.  Mrs. Bryant testified: "There was one photograph which was online where someone said that it was my husband's body.  And when I – when I spoke to the Medical Examiner, that same photograph matched the location of where the Medical Examiner told me his body was found."  (Rodriguez-Sanchirico Decl., Ex. 47 (Bryant) at 7-18.) |
| 74. In response to the question "[s]o you have no knowledge one way or the other . . [o]f any photograph of the crash site taken by [LASD or LACFD] personnel being posted on the internet or given to the media.  Is that correct?", Plaintiff testified, "[y]eah, that's correct." | **Defendants' Evidentiary Support**: Rodriguez-Sanchirico Decl. Ex. 47 [Bryant Tr. 130:24-131:23].<br><br>**Plaintiff's Response**: Disputed in part because the quotation is misleading.  Elsewhere in the deposition, Mrs. Bryant testified: "I don't know who else would have access to that [area] besides someone from the County."  (Rodriguez-Sanchirico Decl., Ex. 47 (Bryant) at 129:14-15.)  Mrs. Bryant returned to the same point later in the deposition: "I was told that there was – again, as I testified – an umbrella and that area was secured and that only people from L.A. County had access to that." (*Id.* at 130:4-6.) |

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 75.   Plaintiff has never seen, nor is she aware of, any photos emanating from the County. | **Defendants' Evidentiary Support:** Rodriguez-Sanchirico Decl. Exhs. 47 [Bryant Tr. 8:25-9:23, 52:21-54:12, 61:1-17, 65:17-25, 68:1-19,  70:7-12, 109:5-16, 115:22-116:15, 128:25-129:4, 130:7-131:23], 40-41 [Bryant's discovery responses].  **Plaintiff's Response:** Disputed.  Plaintiff has seen a photograph online purporting to show her husband's remains, with the body in a location that matches the Medical Examiner's description to Mrs. Bryant of where the body was found.  (Rodriguez-Sanchirico Decl., Ex. 47 (Bryant) at 7-18.)  Although Mrs. Bryant cannot say with certainty who took the photos, her understanding is that only County personnel had access to the crash site at the time. *Id.* at 129:14-15. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 76. There are no County-disseminated photos. | **Defendants' Evidentiary Support**: Price Decl. Exs. 36 & 37. **Plaintiff's Response**: Disputed. The deletion did not result in containment of the photos.  Rather, with the forensic trail destroyed—and no ability to trace the path of the photos' electronic dissemination—Mrs. Bryant has been left unable to determine the full extent of the photos' spread or identify everyone who possesses copies.  (AMF ¶¶ 692-706.) Further disputed because the photos circulated even more broadly within and beyond LASD and LAFD than Defendants have admitted.  (AMF ¶¶ 212, 265, 498, 501-568.) |
| 77. Speculation about crash site photos started before there were any allegations about the County. | **Defendants' Evidentiary Support**: Rodriguez-Sanchirico Decl. Exs. 43 & 44. **Plaintiff's Response**: Disputed in part because the proffered fact proposition is ambiguous.  Plaintiff acknowledges that the Defendants' attached articles seem to involve members of the public posting fake images of Kobe Bryant's remains. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 78. Plaintiff does not have a problem with anything DMEC did, including taking photos of the bodies. | **Defendants' Evidentiary Support**:<br>Rodriguez-Sanchirico Decl. Ex. 47 [Bryant Tr. 20:14-22, 63:6-11].<br><br>**Plaintiff's Response**:<br>Undisputed that Plaintiff's lawsuit does not allege misconduct by Coroner's Office personnel. |
| 79. Autopsy photos (or any photos "taken by or for the coroner") were never copied, reproduced, faxed, or otherwise published. | **Defendants' Evidentiary Support**:<br>Rodriguez-Sanchirico Decl. Exhs. 52 [Tauscher Tr. 77:23-81:8], 51 [McGuire Tr. 101:4-9, 105:9-107:18, 109:20-110:10].<br><br>**Plaintiff's Response**:<br>Undisputed that Plaintiff's lawsuit does not alleged misconduct by Coroner's Officer personnel or mishandling of autopsy photos. |

-57-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| 80. | The photos were, as the County, Kroll, and Plaintiff's expert all confirmed, deleted. | **Defendants' Evidentiary Support:** |
|---|---|---|
| | | Jaeger Decl. Ex. 25; Price Decl. Exs. 36 & 37; Rodriguez-Sanchirico Decl. Ex. 84 [Freskos Tr. 44:10-23, 63:7-64:10]. |
| | | **Plaintiff's Response:** |
| | | Undisputed that the evidence Defendants deleted has been permanently destroyed. Disputed that the deletion resulted in containment of the photos, and disputed that all photos have been deleted. Rather, with the forensic trail destroyed—and no ability to trace the path of the photos' electronic dissemination—Mrs. Bryant has been left unable to determine the full extent of the photos' spread or identify everyone who possesses copies. Kroll was unable to analyze most of the devices that the relevant LASD personnel were using on January 26, 2020. Nor could it analyze Cruz's phone, which was reset to its factory settings. Other devices were inaccessible as well. Destruction of evidence prevented the forensic examination from being able to reconstruct the custodians' activities involving the photos. Kroll also did not analyze 23 cloud-based storage accounts it identified because Defendants did not provide its passwords to those accounts, and so Kroll was unable to confirm that even the specific custodians involved in the forensic examination no longer have copies of the photos saved in other locations. (AMF ¶¶ 692-706.) |
| | | Further disputed because the photos circulated even more broadly within and beyond LASD and LAFD than Defendants have admitted. (AMF ¶¶ 212, 265, 498, 501-568.) |

-58-

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 81. Plaintiff does not know what the photos third-parties send to her show or who they came from. | **Defendants' Evidentiary Support:** Rodriguez-Sanchirico Decl. Exhs. 47 [Bryant Tr. 79:18-81:4, 83:11-17, 84:22-24, 85:15-19, 85:25-86:3, 87:23-88:25, 96:11-25, 99:12-16, 103:8-15, 104:6-14], 40-41 [Bryant's discovery responses]. **Plaintiff's Response:** Disputed in part because the proffered fact proposition is ambiguous. Plaintiff acknowledges that at deposition she was shown a set of images and messages that have been directed to her on social media, and the parties stipulated that Mrs. Bryant does not know who created the particular images or whether the person was a County employee. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 82.    There has never before been a complaint about a LASD or LACFD employee sharing photos of victim remains. | **Defendants' Evidentiary Support:**<br><br>Flores Decl. ¶ 15; Rodriguez-Sanchirico Decl. Exhs. 57 [Marrone Tr. 162:25-163:4], 61 [Valdez Tr. 253:18-254:1, 254:4-255:5, 256:13-257:3], 62 [Satterfield Tr. 129:14-19, 176:4-18], 64 [Mancinas Tr. 20:23-21:4], 65 [Phillips Tr. 24:23-25:1], 55 [Kahan Tr. 141:14-142:8], 59 [Villanueva Tr. 172:23-173:14], 81 [Jaeger Tr. 125:6-21], 38-39 [County's interrogatory responses].<br><br>**Plaintiff's Response:**<br><br>Disputed.  Defendants' proffered evidence amounts to a collection of individuals saying that they themselves have never observed misconduct with death images.  The Sheriff's Department's 30(b)(6) witness, William Jaeger, testified that the only research he had done to evaluate this proffered fact was to search a database of internal affairs investigations.  (Ex. 104 (Jaeger 30(b)(6)) at 126:22-128:23.)  Jaeger "did not search the [Department's] complaint file."  (*Id.* at 128:14-15.)  In 2014, Fire Department employees were investigated for taking pictures at an emergency scene of a deceased victim whose "chest cavity was filleted open."  (AMF ¶ 495.) |

| **PURPORTEDLY UNCONTROVERTED FACT** | **PLAINTIFF'S RESPONSE** |
|---|---|
| 83. Both LASD and LACFD have codified policies governing standards of behavior for both on and off-duty conduct, confidentiality, and ethics. | **Defendants' Evidentiary Support:** Flores Decl. ¶¶ 7-14 & Ex. 31; Marrone Decl. ¶¶ 12-13; Rodriguez-Sanchirico Decl. Exhs. 38-39 [County's interrogatory responses], 82 [Flores Tr. 26:10-27:2, 62:23-63:11], 58 [McCloud Tr. 32:25-34:22]. **Plaintiff's Response:** Undisputed. |
| 84. DMEC has its own policies codifying California Code of Civil Procedure section 129, which applies to photos "taken by or for the coroner." | **Defendants' Evidentiary Support:** Rodriguez-Sanchirico Decl. Ex. 52 [Tauscher Tr. 77:23-80:22]. **Plaintiff's Response:** Undisputed that Plaintiff asserts no claims or allegations against the Coroner's Office or its personnel as part of this lawsuit. |
| 85. LASD also adheres to the requirements established by the California Commission on Peace Officer Standards and Training. | **Defendants' Evidentiary Support:** Flores Decl. ¶ 4; Rodriguez-Sanchirico Decl. Exhs. 38-39 [County's interrogatory responses], 82 [Flores Tr. 23:14-24:2]. **Plaintiff's Response:** Disputed in part, as "adheres to the requirements of" is ambiguous and unexplained by the cited evidence. Plaintiff does not dispute that LASD employs certain training materials and concepts of the California Commission on Peace Officer Standards. |

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 86.   The Entity Defendants cannot have policies and training addressing every situation employees might confront. | **Defendants' Evidentiary Support**: Marrone Decl. ¶ 12; Flores Decl. ¶ 7; Rodriguez-Sanchirico Decl. Exhs. 38-39, 58 [McCloud Tr. 182:6-183:22].<br><br>**Plaintiff's Response**:<br>Disputed in part.  Plaintiff does not dispute that, at the time of the accident, the Entity Defendants lacked policies regarding whether and under what circumstances County personnel could take or share photos of human remains. (AMF ¶¶ 129, 464-65, 477.)  Plaintiff disputes the proffered fact to the extent it implies that governmental entities "cannot have policies addressing" a recurring situation confronted by their employees that implicates constitutional rights.  As one indication, since the helicopter accident, LASD *has* enacted a specific policy related to photos of human remains.  Following this incident, LAFD also reviewed and reevaluated its current policies and procedures and concluded adjustments were necessary as part of a "corrective action" plan to address what happened at this incident.  (AMF ¶ 470.) |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 87.   Instead, the goal is to have codes of conduct that govern no matter the situation | **Defendants' Evidentiary Support**: Flores Decl. ¶ 7; Marrone Decl. ¶¶ 12-13; Rodriguez-Sanchirico Decl. Exhs. 38-39, 58 [McCloud Tr. 181:10-183:22]. **Plaintiff's Response**: Disputed in part.  Plaintiff does not dispute that, at the time of the accident, the Entity Defendants lacked policies regarding whether and under what circumstances County personnel could take or share photos of human remains. (AMF ¶¶ 129, 464-65, 477.)  Plaintiff disputes the proffered fact to the extent it implies that governmental entities may rely on high-level codes of conduct to guide employees in recurring situations where constitutional rights are at stake. With respect to LASD, its adoption of a specific policy related to photography of human remains contradicts the proffered fact that protection of constitutional rights is better left to high-level codes of conduct.  LAFD personnel have acknowledged the necessity of a specific policy in this area.  (AMF ¶¶ 473-74.) |
| 88.   LASD added an entirely new section to its Manual of Policies and Procedures, entitled "Photographs/Recordings at Scenes Where Human Remains Are Present." | **Defendants' Evidentiary Support**: Flores Decl. ¶¶ 15-16 & Ex. 33; Rodriguez-Sanchirico Decl. Ex. 82 [Flores Tr. 95:4-9]. **Plaintiff's Response**: Undisputed. |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 89.   LASD also supported new legislation making it a misdemeanor to take photos containing victims' remains if those photos are *not* part of an official investigation. | **Defendants' Evidentiary Support**: Flores Decl. ¶ 17 & Ex. 33. **Plaintiff's Response**: Undisputed. |
| 90.   LASD and LACFD notified their employees about the change in law. | **Defendants' Evidentiary Support**: Flores Decl. ¶ 17 & Ex. 34; Marrone Decl. ¶ 15 & Ex. 20; Rodriguez-Sanchirico Decl. Ex. 58 [McCloud Tr. 181:10-182:3]. **Plaintiff's Response**: Undisputed. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 91.   Sheriff Villanueva did not state that LASD had ever dealt with "death images" being shared with anyone, let alone publicly disseminated. | **Defendants' Evidentiary Support:** Rodriguez-Sanchirico Decl. Ex. 59 [Villanueva Tr. 165:15-24]. **Plaintiff's Response:** Disputed.  The proffered fact is ambiguous and not supported by the cited testimony.  Rather, the proffered testimony is the following question and response at Sheriff Villanueva's deposition: Counsel:   So as you sit here today, are you aware of any right under the United States Constitution for family to control the death images of their deceased family members? [Objection] Villanueva:   Yeah.  I'm not familiar at all with any of that area of – of law. Rodriguez-Sanchirico, Decl. Ex. 59 (Villanueva) at 165:15-24. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTEDLY UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 92. Sheriff Villanueva opined generally on "a problem in law enforcement across the nation" relating to law enforcement officers keeping "photos from crime scenes throughout their careers." | **Defendants' Evidentiary Support:** Rodriguez-Sanchirico Decl. Ex. 59 [Villanueva Tr. 109:22-110:25]. **Plaintiff's Response:** Disputed.  Sheriff Villanueva's public statements regarding a problem of "death books" in law enforcement clearly drew upon his experience in Los Angeles.  In an audio-recorded interview in early March 2020 with KNX1070 radio, Sheriff Villanueva was asked: "Ever since they invented the Polaroid, law enforcement, first responders, coroner's office, everybody's been taking polaroids of crime scenes and human remains.  And some people collect 'em.  They put death books.  It's like, this is my work for thirty years.  It's kind of macabre when you think of it, but that's what some people have done.  And this is something that's true across the nation.  *It's not unique to Los Angeles.*  We just happen to have a lot more things that the media is interested in than other parts of the country."  (AMF ¶ 128.) |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1    **PLAINTIFF'S RESPONSE TO DEFENDANTS' CONCLUSIONS OF LAW**

| PURPORTED CONCLUSION OF LAW | PLAINTIFF'S RESPONSE |
|---|---|
| 93.  A court grants summary judgment where the moving party shows there is no dispute as to any material fact and that it is entitled to judgment as a matter of law. | **Defendants' Support:** <br> Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). <br> **Plaintiff's Response:** <br> Undisputed. |
| 94.  Article III standing is a jurisdictional requirement.   A plaintiff must show (i) an injury in fact that is concrete and particularized; (ii) that the injury was caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief. The plaintiff bears the burden of establishing standing. | **Defendants' Support:** <br> *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). <br> **Plaintiff's Response:** <br> Undisputed. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| 95. | The "concrete-harm requirement" is "essential to the Constitution's separation of powers."  To satisfy the requirement, a plaintiff must show an injury that is "real and not abstract."  A hypothetical injury that *may* or *could* occur does not suffice, because the "mere risk of future harm" is not a *concrete* harm. | **Defendants' Support:** *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021). **Plaintiff's Response:** Disputed.  A risk of future harm may be a concrete harm where, as here, awareness of that risk has caused a present emotional injury:  fear and anxiety. *TransUnion* is inapposite, because it only addressed standing based on potential *future* harms.  Unlike this case, the plaintiffs in *TransUnion* did not allege any "current emotional or psychological harm" and "were not even aware" the risk of harm even existed.  141 S. Ct. at 2211 n.7.  *TransUnion* has no application to plaintiffs who *do* allege current emotion and psychological harm, which is a concrete injury for purposes of Article III standing.  *See, e.g.*, *Chaudry v. City of Los Angeles*, 751 F.3d 1096, 1109 (9th Cir. 2014) (plaintiffs' emotional harm from being unable to bury family member in accordance with their religion constituted Article III injury in fact); *Red River Freethinkers v. City of Fargo*, 679 F.3d 1015, 1024 (8th Cir. 2012) ("To the extent that emotional harms differ from other, more readily quantifiable harms, that difference lacks expression in Article III's case-or-controversy requirement."); *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1142 (9th Cir. 2010) ("generalized anxiety and stress" confers standing); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 265-65 (2d Cir. 2006) ("An injury-in-fact may simply be the fear or anxiety of future harm"; "aesthetic, emotional or |

| PURPORTED CONCLUSION OF LAW | PLAINTIFF'S RESPONSE |
|---|---|
| | psychological harms . . . suffice for standing purposes."). |
| 96.   Public entities cannot be held responsible for the actions of their employees based on *respondeat superior*. | **Defendants' Support:**<br><br>*Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978).<br><br>**Plaintiff's Response:**<br><br>Disputed in part.  While a local government may not be sued under Section 1983 for an injury inflicted solely by its employees or agents, the governmental entity is responsible "when execution of a government's policy or custom . . . may be fairly said to represent official policy." *Monell*, 438 U.S. at 694. The failure to train employees not to take inappropriate death photographs reflects a policy of deliberate indifference that led to a violation of Mrs. Bryant's constitutional right to privacy. *See Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1073 (9th Cir. 2016). |

| PURPORTED CONCLUSION OF LAW | PLAINTIFF'S RESPONSE |
|---|---|
| 97.   A plaintiff must establish that a constitutional violated occurred, and that the public entity had a "policy or custom": (i) that amounted to deliberate indifference of plaintiff's constitutional rights; and (ii) the policy was the moving force behind a constitutional violation. | **Defendants' Support:** <br><br> *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978); *see Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1146 (9th Cir. 2012) ("Under *Monell*, a plaintiff must also show that the policy at issue was the 'actionable cause' of the constitutional violation, which requires showing both but for and proximate causation.") (affirming order granting summary judgment). <br><br> **Plaintiff's Response:** <br><br> Undisputed that Defendants have correctly articulated the legal standard, but disputed that the deliberate-indifference question can be resolved at summary judgment on the evidentiary record in this case.  *See, e.g., Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004) ("Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues."); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor."). |

| **PURPORTED CONCLUSION OF LAW** | **PLAINTIFF'S RESPONSE** |
|---|---|
| 98.  Claims under Section 1983 are contingent on a violation of constitutional rights:  "[T]he touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution." | **Defendants' Support:** <br> *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978). <br> **Plaintiff's Response:** <br> Disputed in part.  The full sentence from *Monell* states:  "Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."  463 U.S. at 690-91. |

| **PURPORTED CONCLUSION OF LAW** | **PLAINTIFF'S RESPONSE** |
|---|---|
| 99.  Under *Marsh*, sending an autopsy photograph of a plaintiff's family member to the press can violate a plaintiff's substantive due process right to privacy. | **Defendants' Support:** <br><br> *Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1153 (9th Cir. 2012). <br><br> **Plaintiff's Response:** <br><br> Undisputed that "sending an autopsy photograph of a plaintiff's family member to the press" can be a violation of the constitutional right to privacy, but disputed that those are the only facts that would violate the privacy right articulated in *Marsh*.  *Marsh* articulates the privacy right as a right "to control images of a dead family member." 680 F.3d at 1153. The Ninth Circuit held that sharing death images without any legitimate governmental purposes violates this right and shocks the conscience when it deprives the bereaved of their right to control death images of family members. *Id.* at 1155. |

| | |
|---|---|
| 100.   The due process right is implicated when autopsy photos are publicly disseminated. | **Defendants' Support:** *Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1153 (9th Cir. 2012); *Lamorie v. Davis*, 485 F. Supp. 3d 1065, 1073 (D. Ariz. 2020) (holding that conduct failed to shock the conscience as there was "no publication of [the child's] autopsy photos"); *Olejnik v. England*, 147 F. Supp. 3d 763, 777-78 (W.D. Wis. 2015) (no substantive due process violation because medical examiner "made no public disclosure or display" of the decedent's "death or autopsy"). |
| | **Plaintiff's Response:** |
| | Undisputed that the constitutional right to privacy is implicated when autopsy photos are publicly disseminated, but disputed that publication in the press or on the internet is required to violate this right. *Marsh* did not involve publication of death images in the press or on the internet. In *Marsh*, a district attorney kept a death photo and later sent a copy to two reporters in an effort to argue that a defendants' conviction for child-murder had been wrongfully overturned. 680 F.3d at 1152, 1157. Neither of the reporters published the photo, and it never appeared on the internet. Appellees' Brief, *Marsh v. Cnty. of San Diego*, No. 11-55395, 2011 WL 3436959, at *1 (9th Cir. Aug. 1, 2011). The mishandling of the death images shocked the conscience nevertheless. *Marsh*, 680 F.3d at 1155. |
| | Neither of the cited district court cases are relevant. In *Lamorie*, 485 F. Supp. 3d at 1072, the Department of Child Services allegedly failed to notify the plaintiff of his son's cremation. The court held only |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTED CONCLUSION OF LAW | PLAINTIFF'S RESPONSE |
|---|---|
| | that there was no constitutional right to such notice.  It did not address the privacy interest in death photos at all.  The Wisconsin district court in *Olejnik*, 147 F. Supp. 3d at 777-78, also did not address the *Marsh* privacy right both because the Seventh Circuit had not yet recognized the constitutionally protected interest in death photos, and also because death scene images were not at issue in that case. |
| 101.   *Monell* normally requires an expressly adopted official policy, or a longstanding practice or custom.  It is only "[i]n limited circumstances" that "a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." | **Defendants' Support:** *Connick v. Thompson*, 563 U.S. 51, 61 (2011). **Plaintiff's Response:** Disputed in part.  Undisputed that *Monell v. Department of Social Services* establishes that actions can be based on both official policies and informal governmental customs, including those that have not received official approval.  Disputed as to the characterization that *Monell* requires policies be "expressly adopted."  436 U.S. 658, 700 n.65 (1978). Liability can attach based on a single incident where, as here, there is (i) a complete failure to train; (ii) the constitutional duty is implicated in recurring situations; and (iii) the plaintiff's injury is a "highly predictable consequence of the failure to train."  *See* *Connick*, 563 U.S. at 64. |

-74-

| PURPORTED CONCLUSION OF LAW | PLAINTIFF'S RESPONSE |
|---|---|
| 102. The inadequacy of training can serve as a basis for liability "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." | **Defendants' Support:**<br><br>*City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989); *Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.").<br><br>**Plaintiff's Response:**<br><br>Disputed in part.  Undisputed that the deliberate-indifference standard applies, but disputed that Mrs. Bryant does not meet it, or that the question can be resolved at summary judgment.  Deliberate indifference is established where, as here, "the need for more or different training is so obvious" in light of the employees' duties, and the "inadequacy [is] likely to result in the violation of constitutional rights.  *Canton*, 489 U.S. at 390.  The deliberate indifference question is generally reserved for the jury.  *Berry v. Baca*, 379 F.3d 764, 769 (9th Cir. 2004). |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTED CONCLUSION OF LAW | PLAINTIFF'S RESPONSE |
|---|---|
| 103. Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence to his action." | **Defendants' Support:**<br><br>*City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989); *Connick v. Thompson*, 563 U.S. 51, 61 (2011).<br><br>**Plaintiff's Response:**<br><br>Undisputed that deliberate indifference is shown where a municipality "disregard[s] a known or obvious consequence to his action," but disputed as to whether the entity defendants' complete lack of training on the *Marsh* privacy right establishes deliberate indifference given the obviousness of the risk of constitutional violations.  *See Canton,* 489 U.S. at 390 n.10. Further disputed that this issue can be properly resolved on summary judgment in light of the disputed facts and the inferences that can be fairly drawn from those facts.  *See, e.g.*, *Johnson v. Hawe*, 388 F.3d 676, 686 (9th Cir. 2004) (evidence that department failed to train officers about privacy statute created genuine issue as to deliberate indifference); *Wilson v. City of Los Angeles*, No. 2:18-CV-05775 KS, 2021 WL 192014, at *34 (C.D. Cal. Jan. 8, 2021) (officer's testimony that he had received no training on eyewitness identification techniques sufficient to create a triable issue of fact on deliberate indifference), *appeal filed*, No. 21-55056 (9th Cir. Jan. 25, 2021). |

| 104. | A *Monell* claim based on failure to train requires evidence of a "pattern of similar constitutional violations by untrained employees." | **Defendants' Support:**<br><br>*Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014).<br><br>**Plaintiff's Response:**<br><br>Disputed.  A plaintiff need not prove a pattern of prior constitutional violations to prevail on a failure-to-train theory.  *See Connick v. Thompson*, 563 U.S. 51, 63-64 (2011).  Liability can attach based on a single incident where, as here, there is (i) a complete failure to train; (ii) the constitutional duty is implicated in recurring situations; and (iii) the plaintiff's injury is a "highly predictable consequence of the failure to train."  *Id.* at 64.<br><br>In *Flores*, a case about sexual assault, the court reasoned there was "every reason to assume that police academy applicants are familiar with the criminal prohibition on sexual assault, as everyone is presumed to know the law.  758 F.3d at 1159-60.  The court then distinguished *City of Canton*, which posed a hypothetical involving deadly force.  *Id.* As the Supreme Court observed in *City of Canton*, unlike in *Flores*, "[t]here is no reason to assume that police academy applicants are familiar with the constitutional constraints of the use of deadly force."  *Id.*  This case is like the hypothetical in *City of Canton*, not *Flores*.  *Flores* involved a criminal prohibition familiar to everyone.  By contrast, not a County single employee was familiar with the constitutional right articulated in *Marsh*. The unconstitutional consequences of failing to have a policy or train officers on the constitutional |
|------|---|---|

| PURPORTED CONCLUSION OF LAW | PLAINTIFF'S RESPONSE |
|---|---|
|  | constraints surrounding death photos, like in *City of Canton*, are obvious enough that a jury could fairly find the total lack of policies or training on the subject to constitute deliberate indifference. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| 105. | The pattern of similar conduct is what puts an entity on notice of the need to provide training. | **Defendants' Support:**<br><br>*Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1159 (9th Cir. 2012); *Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014) ("The isolated incidents of criminal wrongdoing by one deputy other than Deputy Doe 1 do not suffice to put the County or [Sheriff] on 'notice . . . .'" (citation omitted)).<br><br>**Plaintiff's Response:**<br><br>Disputed.  A plaintiff need not prove a pattern of prior constitutional violations to prevail on a failure-to-train theory.  *See Connick v. Thompson*, 563 U.S. 51, 63-64 (2011).  Liability can attach based on a single incident where, as here, there is (i) a complete failure to train; (ii) the constitutional duty is implicated in recurring situations; and (iii) the plaintiff's injury is a "highly predictable consequence of the failure to train." *Id.* at 64.  Further disputed that the obviousness of the risk of constitutional violations can be properly resolved on summary judgment here in light of the disputed facts and the inferences that can be fairly drawn from those facts.  *See, e.g.*, *Johnson v. Hawe*, 388 F.3d 676, 686 (9th Cir. 2004) (evidence that department failed to train officers about privacy statute created genuine issue as to deliberate indifference); *Wilson v. City of Los Angeles*, No. 2:18-CV-05775 KS, 2021 WL 192014, at *34 (C.D. Cal. Jan. 8, 2021) (officer's testimony that he had received no training on eyewitness identification techniques sufficient to create a triable issue of fact on deliberate |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTED CONCLUSION OF LAW | PLAINTIFF'S RESPONSE |
|---|---|
| | indifference), *appeal filed*, No. 21-55056 (9th Cir. Jan. 25, 2021). |
| 106.   The public entity's policy or custom (or here, the alleged absence of a policy) must have *caused* the constitutional violation.  Plaintiff must show both "but for" and "proximate" causation. | **Defendants' Support:** *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1146 (9th Cir. 2012). **Plaintiff's Response:** Undisputed that Defendants correctly articulate the legal standard, but disputed that this causation issue can be properly resolved on summary judgment in light of the disputed facts and the inferences that can be fairly drawn from those facts.  The causal link between the entities' lack of training and the violation of Mrs. Bryant's privacy presents a question of fact for the jury.  *See, e.g.*, *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 797 (9th Cir. 2016). |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 107. A *Monell* claim cannot be based on "actions that a government entity took or failed to take *subsequent* to the alleged violations." | **Defendants' Support:**<br><br>*Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1146 (9th Cir. 2012); *McClain v. SBC Sheriff's Dept.*, No. EDCV1701178CJCPLA, 2018 WL 3105248, at *7 (C.D. Cal. June 21, 2018) (dismissing *Monell* claim based on actions taken after "the incident that gave rise to plaintiff's claim"); *Crabbs v. Pitts*, No. 2:16-cv-0387, 2018 WL 5262397, at *2 (S.D. Ohio Oct. 23, 2018) (subsequent actions "could not have been 'the "moving force" behind the alleged constitutional violation' because actions that occur 'after an event cannot logically be said to have caused the event that preceded it.'").<br><br>**Plaintiff's Response:**<br><br>Disputed.  An entity defendant's post-violation conduct can be "highly probative" because a municipality's deliberate indifference "may be inferred circumstantially" from the municipality's response to the constitutional violations. *See, e.g.*, *Henry v. Cnty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997).  While the violations of Mrs. Bryant's right to control the death images of her loved ones were *caused* by the lack of training, LASD's highly irregular response to the citizen complaint serves as additional evidence from which a jury could reasonably infer deliberate indifference. The Ninth Circuit has held that subsequent actions—like LASD's decision to forgo discipline on the deputies who took and shared the photos—can "set a tone which condone[s]" misconduct. *See Larez v. City of Los Angeles*, 946 F.2d 630, 645 |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTED CONCLUSION OF LAW | PLAINTIFF'S RESPONSE |
|---|---|
|  | (9th Cir. 1991) (citing cases); *Henry*, 132 F.3d at 519-20 ("a municipal defendant's failure to fire or reprimand officers evidences a policy of deliberate indifference to their misconduct"). |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| 108. | An investigation that postdates the alleged harm "does not dispense with the moving force requirement." | **Defendants' Support:**<br><br>*Crabbs v. Pitts*, No. 2:16-cv-0387, 2018 WL 5262397, at *2 (S.D. Ohio Oct. 23, 2018) (explaining that "proving ratification through inadequate investigation does not dispense with the moving force requirement"); *Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013) (Sheriff's "after-the-fact approval of the investigation, which did not itself cause or continue a harm against [Plaintiff] was insufficient to establish the *Monell* claim" because "the course of action must be shown to be the moving force behind or cause of the plaintiff's harm").<br><br>**Plaintiff's Response:**<br><br>Disputed.  An entity defendant's post-violation conduct can be "highly probative" because a municipality's deliberate indifference "may be inferred circumstantially" from the municipality's response to the constitutional violations.  *See, e.g.*, *Henry v. Cnty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997).  While the violations of Mrs. Bryant's right to control the death images of her loved ones were *caused* by the lack of training, LASD's highly irregular so-called "inquiry" in response to the citizen complaint serves as additional evidence from which a jury could reasonably infer deliberate indifference.  A jury could fairly find the Sheriff tried to sweep the constitutional violation under the rug and in so doing "set a tone which condoned" the misconduct.  *See* *Larez v. City of Los Angeles*, 946 F.2d 630, 645 (9th Cir. 1991) (citing cases). |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTED CONCLUSION OF LAW | PLAINTIFF'S RESPONSE |
|---|---|
| 109.  To plead a *Monell* claim through a "longstanding practice or custom," Plaintiff must establish that the Entity Defendants' practice or custom of "unnecessarily taking and sharing death images" is "so persistent and widespread as to practically have the force of law." | **Defendants' Support:** *Connick v. Thompson*, 563 U.S. 51, 61 (2011). **Plaintiff's Response:** Disputed in that Defendants' statement fails to acknowledge that "a local government's decision not to train employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick*, 563 U.S. at 61.  Given the frequency with which County personnel take incident photographs—including on their personal cell phones—and the frequency with which they encounter human remains at those incidents, the need to train County employees on the constitutional limitations surrounding death photos is "so obvious." *See, e.g., Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 796-97 (9th Cir. 2016).  At a minimum, it is a disputed question of material fact.  *See id.* |

| 110. | "Isolated or sporadic incidents" will not support *Monell* liability against local government. | **Defendants' Support:**<br><br>*Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (affirming summary judgment where undisputed evidence did not establish "persistent and widespread" practice that constituted "permanent and well settled" city policy); *Wettstein v. Cty. of Riverside*, No. EDCV-19-1298 JGB (KKx), 2020 WL 2199005, at *5 (C.D. Cal. Jan. 22, 2020) (dismissing *Monell* claim where plaintiff failed "to adequately allege a longstanding practice or custom of constitutional violations *on the part of the County*" (emphasis added)).<br><br>**Plaintiff's Response:**<br><br>Disputed.  "[A] single incident" can establish deliberate indifference where it is "coupled with evidence" that a municipality has failed to train its personnel regarding a clear constitutional duty implicated in recurring situations." *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 794 (9th Cir. 2016). "[O]bviousness" can "substitute for" a pattern of past violations. *Id.*  Summary judgment is inappropriate where, as here, there is evidence of a recurring situation in which personnel confront a constitutional duty and a complete lack of policies or training to equip personnel with the "specific tools" they need to handle that situation.  *See Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1186, 1190 (9th Cir. 2006) (citation omitted) (evidence created a triable issue regarding whether County's failure to implement a policy amounted to deliberate indifference). |
| --- | --- | --- |

| | |
|---|---|
| 111. | The "endless exercise of second-guessing municipal employee-training programs is an exercise we believe the federal courts are ill suited to undertake, as well as one that would implicate serious questions of federalism." | **Defendants' Support:**<br><br>*City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989); *Connick v. Thompson*, 563 U.S. 51, 68 (2011) (courts should not "micromanage local governments"); *Rizzo v. Goode*, 423 U.S. 362, 378-80 (1976) (federal courts do not have authority to supervise functioning of a police department).<br><br>**Plaintiff's Response:**<br><br>Disputed.  The Ninth Circuit "consistently has found that a county's lack of affirmative policies or procedures to guide employees can amount to deliberate indifference, even when the county has other general policies in place."  *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1189 (9th Cir. 2006).  Mrs. Bryant's failure-to-train claim does not implicate any concerns about "micromanaging local governments" in the "subtleties" of their training programs.  *See, e.g.*, *Wereb v. Maui Cnty.*, 830 F. Supp. 2d 1026, 1034 (D. Haw. 2011)  This is not a matter of second-guessing *how* the departments chose to train their personnel on the relevant constitutional right, it is a matter of *whether* departments that routinely process death scenes and engage in photography at those scenes should provide *any* training on this constitutional right, which is an appropriate basis for this claim.  *See id.* at 1035 (genuine issues of material fact precluded summary judgment where plaintiff challenged the "substance" of the training, not the "format"); *see also, e.g.*, *George v. Sonoma Cnty. Sheriff's Dept.*, No. C-08-2675 EDL, 2011 WL 2975850, at *8 |

| PURPORTED CONCLUSION OF LAW | PLAINTIFF'S RESPONSE |
|---|---|
| | (N.D. Cal. July 22, 2011) (reasonable jury could conclude single incident of a constitutional violation was a highly consequence of failure to train where there were *no* policies or training related to the constitutional right at issue, precluding summary judgment). |
| 112.  The threshold issue of duty "is a question of law to be resolved by the court." | **Defendants' Support:** *Brown v. USA Taekwondo*, 11 Cal. 5th 204, 213 (2021). **Plaintiff's Response:** Undisputed. |
| 113.  "Duty is not universal; not every defendant owes every plaintiff a duty of care."  A duty exists only if "the plaintiff's interests are entitled to legal protection against the defendant's conduct." | **Defendants' Support:** *Brown v. USA Taekwondo*, 11 Cal. 5th 204, 213 (2021). **Plaintiff's Response:** Undisputed, but disputed insofar as it fails to acknowledge that "[g]enerally speaking all persons have a duty to take reasonable care in their activities to avoid causing activity." *Brown*, 11 Cal. 5th at 209 (citing Cal. Civ. Code § 1714(a)). "In the absence of a statutory provision limiting this rule, exceptions to the general principle imposing liability for negligence are recognized only when clearly supported by public policy." *Christensen v. Super. Ct.*, 54 Cal. 3d 868, 885 (1991). |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| **PURPORTED CONCLUSION OF LAW** | **PLAINTIFF'S RESPONSE** |
|---|---|
| 114. Civil Code section 1714 is a general provision that does not confer a duty on every person in every situation. | **Defendants' Support:**<br><br>Cal. Civ. Code § 1714(a).<br><br>**Plaintiff's Response:**<br><br>Undisputed, but disputed insofar as it fails to acknowledge that "[g]enerally speaking all persons have a duty to take reasonable care in their activities to avoid causing activity." *Brown v. USA Taekwondo*, 11 Cal. 5th 204, 209 (2021). (citing Cal. Civ. Code § 1714(a)).  "In the absence of a statutory provision limiting this rule, exceptions to the general principle imposing liability for negligence are recognized only when clearly supported by public policy." *Christensen v. Super. Ct.*, 54 Cal. 3d 868, 885 (1991). |
| 115. "In assessing the question of duty in cases challenging the conduct of law enforcement personnel generally," courts must turn to the "special relationship" doctrine and *Rowland* factors. | **Defendants' Support:**<br><br>*Catsouras v. Dep't of Cal. Highway Patrol*, 181 Cal. App. 4th 856, 876 (2010).<br><br><br>**Plaintiff's Response:**<br><br>Undisputed. |

| PURPORTED CONCLUSION OF LAW | PLAINTIFF'S RESPONSE |
|---|---|
| 116.  "The interrelationship between the traditional duty analysis and the 'special relationship' doctrine has never been clearly defined." | **Defendants' Support:**<br><br>*Catsouras v. Dep't of Cal. Highway Patrol*, 181 Cal. App. 4th 856, 876 (2010).<br><br>**Plaintiff's Response:**<br><br>Undisputed that the quoted language appears in *Catsouras*, 181 Cal. App. 4th at 876.  Disputed to the extent Defendants rely on *Brown v. USA Taekwondo*, 11 Cal. 5th 204 (2021), in an effort to avoid their duty under *Catsouras*.  *Brown* is inapplicable outside the duty-to-protect context.  *See id.* at 214, 219. |

| PURPORTED CONCLUSION OF LAW | PLAINTIFF'S RESPONSE |
|---|---|
| 117.  Earlier this year, in *Brown v. USA Taekwondo*, the California Supreme Court addressed that issue by setting out the analytical framework courts are to use in determining whether a duty exists. | **Defendants' Support:**<br><br>*Brown v. USA Taekwondo*, 11 Cal. 5th 204, 213 (2021).<br><br>**Plaintiff's Response:**<br><br>Disputed. *Brown*, 11 Cal. 5th 204, clarified "the applicable framework for determining whether a defendant has a duty to protect a plaintiff from harm *caused by a third party*," a duty that generally does not exist. *Id.* at 213 (emphasis added). *Brown*'s analytical framework is inapplicable in cases of misfeasance—"active misconduct working positive injury to others"—as opposed to nonfeasance. *See id.* at 214; *see, e.g.*, *Issakhani v. Shadow Glen Homeowners Ass'n, Inc.*, 63 Cal. App. 5th 917, 926 (2021), *review denied* (Aug. 18, 2021) (noting that *Brown* held only that the "*Rowland* factors are 'not designed as a freestanding means of establishing duty' in a specific circumstance where, unlike here, there is no underlying duty running between the parties that might apply"); *Moore v. Rodriguez*, No. 20-cv-01481-BAS-BGS, 2021 WL 2222590, at *21-22 (S.D. Cal. June 2, 2021) (relying on *Catsouras* and finding a duty under the *Rowland* factors to not infringe plaintiff's privacy rights over his prison psychiatric records). |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| **PURPORTED CONCLUSION OF LAW** | **PLAINTIFF'S RESPONSE** |
|---|---|
| 118.  If there is no special relationship, a court cannot go on to determine that there is a duty based solely on the policy factors set out in *Rowland v. Christian*, 69 Cal. 2d 108 (1968). | **Defendants' Support:** *Brown v. USA Taekwondo*, 11 Cal. 5th 204, 213-22 (2021). **Plaintiff's Response:** Disputed. *Brown*, 11 Cal. 5th 204, addressed "the applicable framework for determining whether a defendant has a duty to protect a plaintiff from harm *caused by a third party*," a duty that generally does not exist. *Id.* at 213 (emphasis added). *Brown*'s analytical framework is inapplicable in cases of misfeasance—"active misconduct working positive injury to others"—as opposed to nonfeasance. *See id.* at 214; *see, e.g.*, *Issakhani v. Shadow Glen Homeowners Ass'n, Inc.*, 63 Cal. App. 5th 917, 926 (2021), *review denied* (Aug. 18, 2021) (noting that *Brown* held only that the "*Rowland* factors are 'not designed as a freestanding means of establishing duty' in a specific circumstance where, unlike here, there is no underlying duty running between the parties that might apply"); *Moore v. Rodriguez*, No. 20-cv-01481-BAS-BGS, 2021 WL 2222590, at *21-22 (S.D. Cal. June 2, 2021) (relying on *Catsouras* and finding a duty under the *Rowland* factors to not infringe plaintiff's privacy rights over his prison psychiatric records). |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| 119. | With respect to the threshold inquiry of whether a "special relationship" exists, law enforcement officers are governed by the same rules as other individual defendants. | **Defendants' Support:**<br><br>*Williams v. California*, 34 Cal. 3d 18, 24 n.3 (1983); *Gonzalez v. City of Desert Hot Springs*, No. CV 17-01397 TJH (SPx), 2017 WL 10562938, at *2 (C.D. Cal. Dec. 20, 2017) ("[n]o special relationship exists between police officers and private citizens."). |
| --- | --- | --- |
| | | **Plaintiff's Response:**<br><br>Disputed in part.  Undisputed that law enforcement officers are held to the same legal standard as other individuals given that "[a] person does not, by becoming a police officer, insulate himself from any of the basic duties which everyone owes to other people." *Williams*, 34 Cal. 3d at 24 n.3.<br><br>Disputed that the "special relationship" test is the "threshold inquiry" here.  California law specifically recognizes a duty owed by law enforcement officers to "refrain from exploiting gruesome death images by disseminating them to friends and family members or others with no involvement in official [law enforcement] activities." *Catsouras v. Dep't of Cal. Highway Patrol*, 181 Cal. App. 4th 856, 884 (2010).  As this Court itself recognized in ruling on Defendants' motion to dismiss, "*Catsouras* strongly supports the existence of a duty in this case with respect to the LASD deputies who took the photos of the victims and shared them with others." *Bryant v. Cnty. of Los Angeles*, No. CV 20-9582-JFW(Ex), 2020 WL 8024857, at *7 (C.D. Cal. Dec. 28, 2020).<br><br>*Gonzalez*, 2017 WL 10562938, on which Defendants rely, is inapposite.  In that |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTED CONCLUSION OF LAW | PLAINTIFF'S RESPONSE |
|---|---|
| | case, the plaintiff brought a negligent hiring, training, and supervision claim against the City and sought to impose an affirmative duty on the City to *prevent* a harm caused by a third party.  *See id.* at *2.  Here the harm was created by Defendants themselves, not a third party, and Plaintiff's negligence claim against the entity defendants is based on vicarious liability as opposed to negligent hiring, training, or supervision.  Public employees are liable for their injuries to the same extent as a private person, Cal. Gov't Code § 820(a), and public entities are vicariously liable for their employees' negligent acts within the scope of their employment, *id.* § 815.2(a).  "Thus, public entities are generally liable for the torts of their employees to the same extent as private employers." *State ex rel. Dep't of Cal. Highway Patrol v. Super. Ct.*, 60 Cal. 4th 1002, 1009 (2015). |
| 120.   There is no viable negligence claim unless "the breach was the proximate or legal cause of the resulting injury." | **Defendants' Support:** *Brown v. USA Taekwondo*, 11 Cal. 5th 204, 213 (2021). **Plaintiff's Response:** Undisputed. |

-93-

| PURPORTED CONCLUSION OF LAW | PLAINTIFF'S RESPONSE |
|---|---|
| 121.  Harm "cannot be based on mere speculation, conjecture and inferences drawn from other inferences to reach a conclusion unsupported by any real evidence." | **Defendants' Support:**<br><br>*Padilla v. Rodas*, 160 Cal. App. 4th 742, 752 (2008).<br><br>**Plaintiff's Response:**<br><br>Undisputed as a general principle, but disputed as to its application to this case. Mrs. Bryant's harm is not based on speculation or conjecture, but on emotional harm she has already suffered—and continues to suffer—as she has described in an accompanying declaration.  GDMF ¶¶ 660- 668; *see also id.* ¶¶ 669-670.<br><br>The harm Defendants inflicted is well established in the most basic notions of decency in our society and the law—their misconduct assaulted the "[t]he tenderest feelings of the human heart [that] center around the remains of the dead." *Catsouras v. Dep't of Cal. Highway Patrol*, 181 Cal. App. 4th 856, 884 (2010).  "Family members have a personal stake in honoring and mourning their dead and objecting to unwarranted public exploitation that, by intruding upon their own grief, tends to degrade the rites and respect they seek to accord to the deceased person who was once their own." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 168 (2004). |

| PURPORTED CONCLUSION OF LAW | PLAINTIFF'S RESPONSE |
|---|---|
| 122.  Invasion of privacy requires a plaintiff to establish: "(1) public disclosure (2) of a private fact (3) which would be offensive and objectionable to the reasonable person and (4) which is not of legitimate public concern." | **Defendants' Support:** *Catsouras v. Dep't of Cal. Highway Patrol*, 181 Cal. App. 4th 856, 868 (2010). **Plaintiff's Response:** Undisputed that the quoted language accurately recites the elements of a claim for public disclosure of private facts. Disputed insofar as Defendants suggest public disclosure of private facts is the only type of actionable invasion of privacy.  "[I]ntrusion into private places, conversations or matter is perhaps the [form of invasion of privacy] that best captures the common understanding of an 'invasion of privacy.'" *Shulman v. Grp. W. Prods., Inc.*, 18 Cal. 4th 200, 230, 231 (1998).  "It is in the intrusion cases that invasion of privacy is most clearly seen as an affront to individual dignity." *Id.*  An invasion of privacy claim has only two necessary elements:  "(1) intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person." *Id.* |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTED CONCLUSION OF LAW | PLAINTIFF'S RESPONSE |
|---|---|
| 123. "Actionable invasions of privacy must be sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right." | **Defendants' Support:**<br><br>*Mezger v. Bick*, 66 Cal. App. 5th 76, 86 (2021).<br><br>**Plaintiff's Response:**<br><br>Undisputed that the paragraph accurately quotes *Mezger*, 66 Cal. App. 5th 76. Disputed that the facts in *Mezger* are remotely similar to this case. *Mezger* involved the intrusion caused by security cameras that recorded mostly ambient noise. *Id.* at 87. Unlike in *Mezger*, a jury could fairly find that the "extent and gravity of the invasion" here was far from "slight or trivial." *Id.* As recognized by the Supreme Court, intrusion into "a family's control over the body and death images of the deceased" has long been recognized at common law as "tend[ing] to degrade the rites and respect [family members] seek to accord to the deceased person who was once their own." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 168 (2004). |

| 124. | The private facts must be "widely published and not confined to a few persons or limited circumstances." | **Defendants' Support:** |
|---|---|---|
| | | *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 27 (1994) (citing Restatement (Second) of Torts § 652D cmt. a). |
| | | **Plaintiff's Response:** |
| | | Disputed that publication is a necessary element for Mrs. Bryant's invasion of privacy claim.  A claim based on public disclosure of private facts does not require any such publication.  Disclosure of private affairs to a "diverse group of people" who know the plaintiff suffices. *See* Kinsey v. Macur, 107 Cal. App. 3d 265, 271 (1980) (to hold otherwise "would only emasculate the legal remedy available to individuals for the invasion of privacy"); *Doe v. John F Kennedy Univ.*, No. C-13-01137 DMR, 2013 WL 4565061, at *11 (N.D. Cal. Aug. 27, 2013); Pl's Opp'n to Def's Mot. to Dismiss at 10 n.7, *Doe v. John F Kennedy Univ.*, No. 4:13-cv-01137-DMR (N.D. Cal. June 28, 2013), ECF No. 28 (alleged disclosure to six classmates and one professor stated a valid invasion of privacy claim). |
| | | Moreover, a highly offensive intrusion into a private matter is tortious even if no publicity is garnered by the intrusion.  Restatement (Second) of Torts § 652(B) cmt. a; *see also* Nayab v. Capital One Bank (USA), N.A., 942 F.3d 480, 491 (9th Cir. 2019) ("Importantly, [t]he intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of the photograph or information outlined."). |
| 125. | "Publicity" means "that the | **Defendants' Support:** |

| | |
|---|---|
| matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. | Restatement (Second) of Torts § 652D cmt. a; *Hassan v. Facebook, Inc.*, No. 19-cv-01003-JST 2019 WL 3302721, at *3 (N.D. Cal. Jul. 23, 2019) ("Liability for the common-law tort of [public disclosure of private facts] requires publicity; disclosure to a few people in limited circumstances does not violate the right.") (citing *Ignat v. Yum! Brands, Inc.*, 214 Cal. App. 4th 808, 820 (2013)); *Orff v. City of Imperial*, No. 17-CV-0116 W (AGS) 2017 WL 5569843, at *9 (S.D. Cal. Nov. 17, 2017) (holding that disclosure limited in scope to two individuals is not "a communication that reaches, or is sure to reach, the public"). |
| | **Plaintiff's Response:**

Disputed.  Disclosure of private affairs to a "diverse group of people" who know the plaintiff suffices for purposes of a claim based on public disclosure of private facts.  *See Kinsey v. Macur*, 107 Cal. App. 3d 265, 271 (1980) ("The claim is not so much one of total secrecy as it is the right to *define* one's circle of intimacy."); *Doe v. John F Kennedy Univ.*, No. C-13-01137 DMR, 2013 WL 4565061, at *11 (N.D. Cal. Aug. 27, 2013); Pl's Opp'n to Def's Mot. to Dismiss at 10 n.7, *Doe v. John F Kennedy Univ.*, No. 4:13-cv-01137-DMR (N.D. Cal. June 28, 2013), ECF No. 28 (alleged disclosure to six classmates and one professor stated a valid invasion of privacy claim).

Moreover, a highly offensive intrusion into a private matter is tortious even if no publicity is garnered by the intrusion.  Restatement (Second) of Torts § 652(B) cmt. a; *see also Nayab v. Capital One* |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTED CONCLUSION OF LAW | PLAINTIFF'S RESPONSE |
|---|---|
| | *Bank (USA), N.A.*, 942 F.3d 480, 491 (9th Cir. 2019) ("Importantly, [t]he intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of the photograph or information outlined."). |
| | The right to privacy is ultimately grounded in "the individual's control of information concerning his or her person." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) (quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989)). |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| PURPORTED CONCLUSION OF LAW | PLAINTIFF'S RESPONSE |
|---|---|
| 126. It is not enough, as a matter of law, to speculate about what may or may not happen in the future. It must be "substantially certain" that the photos will "become public knowledge." | **Defendants' Support:**<br><br>*Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1062 (N.D. Cal. 2014).<br><br>**Plaintiff's Response:**<br><br>Disputed that Mrs. Bryant's claim rests on speculation. She has adduced ample evidence that Defendants' photos have already been widely shared and she reasonably fears even further public dissemination and display, especially "given the viral nature of the Internet." *Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1155 (9th Cir. 2012).<br><br>Moreover, a highly offensive intrusion into a private matter is tortious even if no publicity is garnered by the intrusion. Restatement (Second) of Torts § 652(B) cmt. a; *see also Nayab v. Capital One Bank (USA), N.A.*, 942 F.3d 480, 491 (9th Cir. 2019) ("Importantly, [t]he intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of the photograph or information outlined.").<br><br>The right to privacy is ultimately grounded in "the individual's control of information concerning his or her person." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) (quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989)). |

## PLAINTIFF'S ADDITIONAL MATERIAL FACTS

| Additional Material Fact: | Evidentiary Support |
|---|---|
| **I. Sheriff Villanueva's Public Statements.** | |
| 127. Sheriff Villanueva has publicly acknowledged that LASD personnel had no reason to take photographs of the crash scene.<br><br>• In a video-recorded press briefing on March 2, 2020, Sheriff Villanueva stated: "Well, in this type of a scene, which is an accident, there's only two groups of people that should be taking photos.  That is the NTSB and then the Coroner's Office.  No one else has any -- any reason to take any photos.  This is not a crime scene, so there is no evidence to be taken, per se, which is very different, like a homicide scene, for example.  So that is, uh, the only two groups of people.  So, that is uh, the only two groups of people.  Anybody outside of that would be unauthorized, they would be illicit photos."<br><br>• In a separate video-recorded interview with Fox 11 on March 2, 2020, Sheriff Villanueva stated: "They had no place to be taking any photographs of anything.  Only, in this case, it would have been NTSB investigators, Coroner's investigators, and that's about it.  Nobody else."<br><br>• In a video-recorded interview with ABC 7 in early March 2020, Sheriff Villanueva | Ex. 190[1] (Villanueva Press Briefing - COLA001200) at 00:00-00:28; Ex. 194 (Villanueva Fox 11 Interview - VB00003622) at 00:46-00:56; Ex. 191 (Villanueva ABC 7 Interview - COLA001182) at 01:40-01:46; Ex. 192 (Villanueva KNX1070 Interview - COLA006932) at 07:40-07:52; Ex. 193 (Villanueva NBC Interview - COLA030878) at 03:44-3:52. |

---

[1] Unless otherwise indicated, references to "Ex. XX" refer to exhibits to the Declaration of Mari T. Saigal in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment.

| | | | |
|---|---|---|---|
| | | stated: "Well, unfortunately, there were – there were first responders that took photos at the scene that they were not supposed to." <br><br>• In an audio-recorded interview in early March 2020 with KNX1070 radio, Sheriff Villanueva was asked: "In theory, who should have been the only persons out there taking photographs of that scene?" Sheriff Villanueva responded: "Only two people.  The NTSB, who were in charge of the accident investigation, and the Coroner's Office." <br><br>• In an audio-recorded interview with NBC on March 2, 2020, Sheriff Alex Villanueva stated: "So we wanted to make sure that those photos were destroyed because they were inappropriate.  Never should have been taken in the first place." | |
| | 128. | Sheriff Villanueva has publicly acknowledged knowing that improper behavior with death photographs has long been a problem in law enforcement. <br><br>• In an audio-recorded interview in early March 2020 with KNX1070 radio, Sheriff Villanueva was asked:  "Why do you think someone—a deputy—might have taken these pictures with their phone?" Sheriff Villanueva responded: "Well, it's the why individual,  someone would do that is hard to say, but I can tell you this: Ever since they invented the Polaroid, law enforcement, first responders, coroner's office, everybody's been taking polaroids of crime scenes and human remains.  And some people collect 'em.  They put death books.  It's like, this is my work for thirty years.  It's kind of macabre when you think of it, but that's what some people | Ex. 192 (COLA006932) at 06:55-07:37; Ex. 190 (COLA001200) at 00:28-01:08; Ex. 193 (COLA030878) at 05:32-05:48. |

-102-
PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

have done.  And this is something that's true across the nation.  It's not unique to Los Angeles.  We just happen to have a lot more things that the media is interested in than other parts of the country."

- In an audio-recorded interview with NBC on March 2, 2020, Sheriff Alex Villanueva stated: "It's a problem that goes back to since they invented the Polaroid, which makes taking photographs easy.  And cell phone that much easier, and then social media compounding the problem—the probability that things can get propagated unlawfully."  Later in the interview, Sheriff Villanueva added: "And, you know, I've dealt with tragedies.  I've had to do death notifications and it's one of the hardest things you can do in this line of work.  And I just can't, it's hard to fathom that someone would go out of their way then to take away a trophy or something from something like that.  And, but again it's been something that I've heard of in the past where law enforcement they keep, like, they call them death books.  They're just images of crimes that they handle, their crime scenes and stuff and kind of macabre and I think we just need to get out of that mentality totally.

- While addressing a group of media members on March 2, 2020, Sheriff Villanueva was stated: "Unfortunately, ever since they invented the Polaroid camera, this has been a problem in law enforcement across the nation, probably across the world, because it just makes it so much easier.  And then there's—

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | there's cops—they keep death books, for example, where they—they have photos from crime scenes throughout their careers.  That's a macabre idea, but some do that." | |
| | 129. | Sheriff Villanueva has publicly stated that LASD's policies with respect to photographs of accident scenes were "deficient" at the time of the crash. | Ex. 225 (Villanueva Ltr. to OIG - Mar. 4, 2020) at 3139-40; Ex. 191 (Villanueva ABC 7 Interview) at 01:58-02:01. |
| | | • In a publicly-released letter to the Los Angeles County Inspector General dated March 4, 2020, Sheriff Villanueva wrote: "It is evident our photograph police is deficient and this incident has identified a need for me to direct the creation of [a] new policy regarding the taking, possession, distribution of photographs and recordings, etc., by on-duty LASD personnel." | |
| | | • In an interview with ABC 7, Sheriff Villanueva stated: "We're going back and looking at our policies, and they were very deficient." | |
| | 130. | Sheriff Villanueva has publicly acknowledged that the efficacy of his response to the improper photos is reliant upon the honesty of the personnel who possessed the crash-scene photos.  In an audio-recorded interview in March 2020 with KNX1070 radio, the following exchange occurred: | Ex. 192 (Villanueva KNX1070 Interview - COLA006932) at 14:35-15:05. |
| | | Interviewer:  And as far as you know, these photos were the only ones taken by Sheriff's personnel. They were on their phones. They've not been shared, distributed in any way, shape, or form.  In fact, now, as of now they don't exist because | |

-104-

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | all those phones, all of them, those photos have been wiped. They're clear. | |
| | Villanueva: | Yes. | |
| | Interviewer: | Now as to if there's anything else out there, that's not you guys. | |
| | Villanueva: | That, yeah.  It's not going to be us from there.  Unless someone was lying all along, and then all bets are off. | |
| | Interviewer: | And distributed to somebody else, yeah. | |
| | Villanueva: | Yeah, then all bets are off on that. | |
| 131. | | On March 2, 2020—several weeks after the Sheriff's Department received the citizen's complaint—Sheriff Villanueva publicly acknowledged uncertainty regarding the efficacy of his Department's response.<br><br>• In addressing the media on March 2, 2020, Sheriff Villanueva stated: "Actions were taken the week of the incident.  Ya know, the accident happened January 26th.  Midweek, end of the week is when the activity took place. . . . But now we're assessing: Is there more that we don't know?  Which is what concerns me.  What we don't know."<br><br>• In an audio-recorded interview with NBC on March 2, 2020, Sheriff Villanueva stated: "There's nothing that we had in our possession that made its way into the public domain . . . So far it hasn't.  So knock on wood, it stays that way." | | Ex. 190 (Villanueva Press Briefing - COLA001200) at 04:08-04:31; Ex. 193 (COLA030878) at 14:49-15:00. |
| 132. | | Sheriff Villanueva has publicly acknowledged that the deputies' conduct harmed the victims' families. | | Ex. 190 (Villanueva Press Briefing - COLA001200) at 01:12-01:26; Ex. 196 |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| | • In a video-recorded press briefing on March 2, 2020, Sheriff Villanueva stated: "It's wildly inappropriate, it's disgusting, and it harms people that suffered a tragedy already on top of that to think that it could be expanded beyond that by having a public display of their loved ones' remains."<br><br>• In a video-recorded interview with CBS 2 on March 2, 2020, Sheriff Villanueva stated: "These families of the victims have suffered enough already.  To have, you know, any action of our deputies compile their suffering that – that breaks my heart."<br><br>• In an audio-recorded interview with NBC on March 2, 2020, Sheriff Villanueva stated: "The behavior is inexcusable, inappropriate, and, I mean, people that are grieving for the loss of their loved ones— to have that on top of what they've already gone through is just unconscionable."  Later in the interview, Sheriff Villanueva was asked: "Let's say [Vanessa Bryant] was standing right here. What would you say to her?"  Villanueva responded: "Oh, I'm, I'm just terribly sorry for this additional anguish that you don't need nor does anyone need who lost someone in this tragedy." | (Villanueva CBS Interview - VB00003620) at 00:38-00:47; Ex. 193 (Villanueva NBC Interview - COLA030878) at 05:18-05:29 & 11:21-11:35. |
| | **II.  The Crash and Crash Scene.** | |
| 133. | On the morning of Sunday, January 26, 2020, Plaintiff Vanessa Bryant's husband, Kobe Bryant, and thirteen-year-old daughter, Gianna Bryant, were flying by helicopter to Thousand Oaks, California, where Gianna Bryant was set to play in a youth basketball tournament on a team coached by Kobe. Kobe and Gianna were joined on the | Ex. 199 (ABC News article). |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | helicopter by (1) thirteen-year-old Alyssa Altobelli, a teammate of Gianna's, and Alyssa's parents, John Altobelli and Keri Altobelli; (2) thirteen-year-old Payton Chester, also a teammate of Gianna's, and Payton's mother, Sarah Chester; (3) thirty-eight-year-old Christina Mauser, an assistant coach for the girls' basketball team; and (4) the pilot, Ara Zobayan. | |
| | 134. | At approximately 9:45 a.m., the helicopter carrying Kobe and Gianna crashed into a hillside in the Santa Monica Mountains, killing everyone onboard.  Large portions of the helicopter came to rest near a mountain-biking trail on a hillside east of the Los Virgenes Municipal Water District in Calabasas, California ("Water District"). | Answer ¶ 2; Jaeger Decl. Ex. 25 (IAB Investigative Summary) at 15-16, 22. |
| | 135. | The violent impact of the helicopter striking the hillside created a horrific scene.  One long-tenured specialist in search and rescue operations for the Sheriff's Department testified: "I've been doing this 31 years at this point.  I've . . . been to a lot of horrific scenes of people that have died, people that have been decapitated, people that have burned up.  I've never personally experienced anything like this.  And it ended up taking me several months to stop having flashbacks of what I saw."  The search and rescue specialist further testified: "[I]f I was in the military and saw a bomb drop, that's probably what I would assume it would look like." | Ex. 105 (Katz) at 63:19-25; 82:23-83:18. |
| | | **III.  LASD Responds & Learns Kobe Bryant Is Among Passengers.** | |
| | 136. | At 9:47 a.m., a radio call requested that LASD personnel respond to "Lost Hills Road, Las Virgenes Road, Calabasas, south of 101" as a "helicopter went down, flames seen."  Shortly thereafter, several LASD | Jaeger Decl. Ex. 25 (IAB Investigative Summary) at 21; Saigal Decl. ¶ 157; Ex. 89 (Cable) at 17:20-19:2; Ex. 90 (Cruz) at 66:5- |

-107-

| | | | |
|---|---|---|---|
| | | personnel responded to the Water District in their patrol vehicles. | 69:19; Ex. 91 (Jauregui) at 17:10-13, 18:18-25; Ex. 92 (Johnson) at 58:11-59:8; Ex. 94 (Kelly) at 47:1-6; Ex. 91 (Mejia) at 108:11-22, 111:23-112:16; Ex. 93 (Miller) at 20:17-21:5, 21:9-20; Ex. 90 (Russell) at 83:22-84:15; Ex. 92 (Versales) at 94:24-95:13. |
| | 137. | Several LASD personnel parked their cars in the Water District parking lot and proceeded to the back of the Water District property. Around 10:00 a.m., LASD personnel began hiking up to the crash site on the hillside from the Water District.  During the hike, several personnel turned around and returned to the Water District to set up a command post for the Sheriff's Department's response to the incident.  Other personnel, including Deputy Doug Johnson, continued the hike to the crash site. | Ex. 92 (Johnson) at 59:1-8, 60:18-61:4, 65:17-24 (estimating he started to hike "five to ten minutes" after arriving at the Water District); Ex. 91 (Jauregui) at 20:9-17; Ex. 94 (Kelly) at 47:23-49:24; Ex. 91 (Mejia) at 112:5-16. |
| | 138. | Deputy Versales took responsibility for radio communications at the command post. | Ex. 92 (Versales) at 96:23-97:4. |
| | 139. | At 10:22 a.m., while certain LASD personnel were hiking to the crash site, an assistant for Kobe Bryant who had coordinated his helicopter flight called the Malibu-Lost Hills Sheriff's Station ("Lost Hills Station") and informed the Lost Hills dispatcher, Deputy Nicholas Bonelli, that Kobe Bryant may have been onboard the helicopter. | Jaeger Decl. Ex. 25 (IAB Investigative Summary) at 20; Ex. 112 (Bonelli) at 14:24-15:9, 16:15-24. |
| | 140. | Deputy Bonelli was in contact with Deputy Mejia, who was at the command post. | Ex. 132 (Mejia LASD Int.) at 2238-40. |
| | 141. | Around 10:30 a.m., word began to spread among LASD personnel at the command post that Kobe Bryant may have been onboard the helicopter.  Deputy Bonelli had | Ex. 91 (Jauregui) at 35:6-21, 38:22-39:2 (estimating that he learned of Kobe Bryant's involvement "45 |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | called Deputy Rafael Mejia, one of the LASD personnel who was setting up the command post at the Water District, and spoke to him about the call he received from Kobe Bryant's representative.  Deputy Mejia then whispered to another deputy at the command post: "Kobe Bryant may have been on that helicopter." | minutes after the crash" when the information was whispered to him by Deputy Mejia); Ex. 94 (Kelly) at 73:11-23; Ex. 132 (Mejia LASD Int.) at -2238-40; Ex. 91 (Mejia) at 130:22-131:5. |
| | 142. | At 10:41 a.m., while LASD personnel were still hiking to the crash site, Kobe Bryant's assistant called Deputy Bonelli again and expressed concern that Kobe Bryant may have been on the helicopter.  Deputy Bonelli asked the Bryant's assistant to send a representative to the command post. | Jaeger Decl. Ex. 25 (IAB Investigative Summary) at 20. |
| | 143. | At 11:00 a.m., a representative of the company that owned the helicopter arrived at the command post and informed LASD personnel that Kobe Bryant had likely been on board the helicopter. | Ex. 141 (Dalton LASD Int.) at 2406; Ex. 90 (Russell) at 103:1-105:18, 106:13-107:15. |
| | 144. | Between 11:00 and 11:20 a.m., Deputy Doug Johnson completed his hike and reached the crash site. | Ex. 130 (Johnson LASD Int.) at 2090 (estimating that the hike to the crash site was "a little bit over an hour" and "an hour to hour and 20 minute hike"). |
| | 145. | At 11:24 a.m., TMZ (an online tabloid) reported that Kobe Bryant had died in a helicopter crash in California.  Several LASD personnel working in response to the accident at the command post and Water District immediately became aware of TMZ's report via a push notification to their cell phones, and the report was talked about among LASD personnel. | Ex. 198 (TMZ article); Ex. 91 (Mejia) at 128:17-129:12; Ex. 90 (Russell) at 103:1-105:18, 106:13-107:15; Ex. 92 (Versales) at 132:16-24. |
| | | **IV.  Deputy Johnson Takes Close Up Photos of the Victims' Remains.** | |

-109-

| 146. | Upon arriving at the crash scene, Johnson searched for survivors.  After that, Johnson assisted in taping off the two main access points to the crash site. | Ex. 92 (Johnson) at 88:2-18, 90:13-91:2. |
|---|---|---|
| 147. | Johnson's and Versales' cell phone records reflect that, between 10:30 a.m.—when Versales and other command post personnel learned that Kobe Bryant may have been onboard the helicopter—and 11:38 a.m., Johnson and Versales had 14 telephone calls totaling 8 minutes and 32 seconds. | Ex. 213 (Versales Cell Records) at COLA036663-036665, rows 12-13, 15-16, 18-19, 21-22, 26-27, 30-31, 33-34, 36-37, 39-40, 43-44, 47-52, 55-56. |
| 148. | Deputy Johnson and Deputy Versales are friends.  They text frequently and spend time together outside of work. | Ex. 92 (Johnson) at 21:19-22:5; 22:16-23:8, 23:22-25, 24:5-12; 147:25-148:2. |
| 149. | After clearing out civilians, checking for survivors, and taping off access points, Johnson began walking around the crash scene taking photos on his personal cell phone.  By the time he began photographing, Johnson had been informed via a phone call with Versales that Kobe Bryant and his daughter had likely been onboard the helicopter. | Ex. 92 (Johnson) at 99:1-20-100:11; 109:5-21, 118:6-8. |
| 150. | Johnson has testified that he photographed the crash scene because he was asked to do so by Deputy Versales.  According to Johnson, Versales told him: "Hey, this could have been Kobe Bryant's helicopter.  Make sure you document everything and secure the scene."  In his interview with LASD investigators, Johnson stated that Versales told him: "[Y]ou need to take pictures of everything.  Send them to me so, you know, we could figure out what we need." | Ex. 92 (Johnson) at 98:7-20, 99:1-100:11; Ex. 130 (Johnson LASD Int.) at 2094. |
| 151. | By contrast, Deputy Versales has testified that he "did not ask" for photos, he "was sent photographs without requesting them," and he "did not need to have photographs." | Ex. 92 (Versales) at 100:4-21, 159:7-14. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| 152. | Johnson spent more than thirty minutes traversing the entire crash scene taking photos, including hard-to-reach areas. Johnson is not aware of any area of the crash scene that he did not photograph. | Ex. 92 (Johnson) at 118:14-119:1, 144:8-20. |
|---|---|---|
| 153. | Johnson has testified that he took approximately 20 to 30 photos of the crash scene. | Ex. 92 (Johnson) at 109:5-110:3. |
| 154. | Around mid-day, LASD search and rescue specialist David Katz arrived at the scene and briefly conversed with Johnson, during which  Johnson said he had "taken over a hundred pictures" of the crash scene. | Ex. 105 (Katz) 140:18-141:4; 53:2-6. |
| 155. | Johnson has testified that he took ten photos depicting victims' body parts, including six or seven photos that were "close ups of the body parts." | Ex. 92 (Johnson) at 126:4-11; Ex. 130 (Johnson LASD Int.) at 2104. |
| 156. | At least four of Johnson's photos closely focused on Kobe's and Gianna's body parts.  Johnson's descriptions of his photos are shockingly graphic and horrific, and Plaintiff does not recite them here to protect the victims and their families, but the sealed material listed in the right-hand column—testimony by Deputy Johnson describing his photos, on the one hand, and testimony by a member of the Coroner Department describing Kobe's and Gianna's remains, on the other—links two of Johnson's photos to Kobe and another two to Gianna. | *Compare* Ex. 96 (Johnson) at 126:22-127:1, 127:4-7, 129:23-130:7, 130:21-25, 131:1-4, 132:15-133:15, 229:14-230:3, 230:16-21, 230:22-231:4, *with* Ex. 195 (Tauscher) at 107:2-9, 117:5-120:6, 121:6-16, 122:10-123:19, 125:5-127:20, 128:18-129:20, 107:10-12, 107:23-108:20, 133:14-135:21, 138:20-140:24, 142:7-21. |

### V. The Fire Department's Role at the Scene.

| 157. | Approximately 60 Fire Department personnel responded to the crash-site location on January 26, 2020. | Ex. 118 (Marrone 30(b)(6)) at 66:9-16, 67:5-13. |
|---|---|---|
| 158. | The Fire Department's mission at the crash scene was to extinguish the fire, not to document the incident.  After the fire was | Ex. 118 (Marrone 30(b)(6)) at 85:10-22, 86:9-12, 20-25; Ex. 173 (Breshears |

| | | |
|---|---|---|
| | contained in the early afternoon on January 26, 2020, a smaller number of Fire Department personnel remained at the scene to provide logistical support to the other agencies. | LAFD Int.) at 27:21-28:44, 55:58-56:37. |
| 159. | The Fire Department never requested photographs of the crash scene from its own personnel or from the Sheriff's Department. | Ex. 120 (Smith) at 36:17-37:4; Ex. 173 (Breshears LAFD Int.) at 27:21-28:44; Ex. 118 (Marrone 30(b)(6)) at 120:18-121:2, 128:11-19, 153:18-21. |
| 160. | The Department had no need or use for photographs of the victims' remains. | Ex. 118 (Marrone 30(b)(6)) at 183:5-16; Ex. 120 (Smith) at 37:24-38:21; Ex. 118 (Marrone) at 52:15-17; Ex. 174 (Sprewell LAFD Int.) at 22:44-23:15, 23:31-23:47, 41:56-42:37; Ex. 173 (Breashears LAFD Int.) at 58:12-59:35 |
| 161. | On January 26, at approximately 1:00 p.m., Deputy Chief Marrone directed the Department's incident commander to convey an instruction to the Department's personnel to exercise sensitivity due to the media attention on the incident, but the Department did not give any specific guidance regarding photography of the victims' remains.  By 1:00, when the general directive regarding sensitivity was conveyed to the incident commander, roughly 40 to 50 Fire Department personnel had already been at the crash site. | Ex. 118 (Marrone 30(b)(6)) at 134:3-22, 139:13-23, 141:5-143:15, 182:12-183:4. |
| | **VI.  An Unidentified Fire Department Supervisor Receives Photos of the Victims' Remains from Deputy Johnson.** | |
| 162. | One of the first Fire Department employees who reported to the crash site, a supervisor | Ex. 96 (Johnson) at 151:7-152:8, 154:3-155:3, 156:5-14. |

-112-

| | | |
|---|---|---|
| | of one of the crews, took photos of the area where the helicopter came to rest. | |
| 163. | At some point after the fire supervisor started taking photos, he encountered Deputy Johnson, who informed the supervisor that he had already taken photos of the entire scene. | Ex. 96 (Johnson) at 149:1-6, 151:15-21, 157:3-6. |
| 164. | At the Fire Department supervisor's request, Deputy Johnson sent him all of the photographs he had taken, including close-ups of each of the victims, via AirDrop. | Ex. 96 (Johnson) at 148:18-149:11, 151:15-25 |
| 165. | Digital evidence on Deputy Johnson's phone that could have revealed the identity of the Fire Department supervisor who received Deputy Johnson's photos has been permanently destroyed. | Ex. 96 (Johnson) at 213:11-14; Ex. 206 (Price) at 54:9-25; Price Decl. Ex. 36 at 31, 34. |
| 166. | As a result, all of the Fire Department supervisor's crash-scene photos, including all of his copies of Johnson's close-up photos of the victims' bodies, remain unaccounted for and unsecured. | Ex. 96 (Johnson) at 224:5-16; Ex. 206 (Price) at 54:9-25; Price Decl. Ex. 36 at 31, 34. |
| | **VII. Brian Jordan Takes and Shares Photos of the Bryants' Remains.** | |
| 167. | After the Fire Department dispatched units to the crash at 9:50 a.m., Brian Jordan, a safety officer, added himself to the incident at 10:07 a.m., and he arrived at the scene at 11:05 a.m. | Ex. 118 (Marrone) at 18:5-21, 21:1-23:3; Ex. 157 (Call History) at 2531-34. |
| 168. | Many years before he served as a safety officer, Jordan worked in the Department's Public Information Office for two or three years.  In that role, he had handled media inquiries on behalf of the Department and developed relationships with members of the media. | Ex. 116 (Jordan) at 21:23-22:17, 43:2-6. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| 169. | On January 26, 2020, at around 10:00 a.m., Jordan sent a group text message to five reporters on his personal cell phone. | Pikor Decl. ¶¶ 4, 6-7, 14-15; Ex. 210 (Jordan Cell Records) at 2936, rows 2-10; Ex. 116 (Jordan) at 43:10-45:16, 48:21-52:12, 92:5-18, 94:7-98:11. |
| 170. | Jordan's text messages with those five reporters continued throughout the day.  He also called some of the same reporters on the phone.  At deposition, Jordan could not remember the content of the texts he sent to reporters on January 26, but he testified he generally texted with that group of reporters about Fire Department incidents. | Pikor Decl. ¶¶ 4, 6-7, 14-15; Ex. 210 (Jordan Cell Records) at VB00004054-56, VB00004032-36, rows 11-21, 23-34, 39-48, 74-83; Ex. 116 (Jordan) at 43:10-45:16, 48:21-52:12, 92:5-18, 94:7-100:25. |
| 171. | As a safety officer, Jordan's role at the scene was to monitor operations, assess hazards, ensure responders followed appropriate safety procedures, and identify any individuals with injuries in need of treatment.  He did not have any role in investigating the cause of the crash or identifying the victims. | Ex. 156 (Jordan Report) at 2495; Ex. 118 (Marrone) at 27:18-28:5; Ex. 181 (Marrone LAFD Int. [COLA035080]) at 1:08:52-1:10:42; Ex. 180 (Jordan LAFD Int. [COLA035078]) at 4:43-5:09; Ex. 116 (Jordan) at 139:7-16. |
| 172. | After the news broke that Kobe and Gianna Bryant were among the victims of the crash, Jordan walked up the trail to the crash site and claimed to be a fire chief in charge of media relations. | Ex. 96 (Johnson) at 161:2-162:23. |
| 173. | Jordan had no media relations role or responsibilities on January 26, 2020. | Ex. 118 (Marrone) at 30:12-22. |
| 174. | Deputy Johnson escorted Jordan around the entire crash scene.  Jordan claimed that he needed photographs of the scenes for media relations purposes. | Ex. 96 (Johnson) at 162:5-163:23. |
| 175. | Using a camera, Jordan photographed the entirety of the crash scene, including multiple photos focused on the victims' | Ex. 96 (Johnson) at 160:13-161:23, 163:14-17, 164:5-25, 165:12-16, |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | remains that resembled the photos taken by Deputy Johnson. | 166:3-23; Ex. 183 (Johnson LAFD Int. [COLA035118]) at 47:17-48:22. |
|---|---|---|---|
| | 176. | As Jordan walked around the scene, he asked specifically about the location of all the bodies and body parts.  After he inquired if there were more bodies, he was escorted to two victims that came to rest in a ravine. Jordan took photos of both of those bodies, as well as all of the other victims. | Ex. 96 (Johnson) at 163:24-164:25; Ex. 183 (Johnson LAFD Int. [COLA035118]) at 14:38-15:51, 16:23-17:17, 28:14-28:27. |
| | 177. | The photos Jordan took of the victims "served no business necessity," "had no intel or safety value," and "did not further the Department's mission." | Ex. 156 (Jordan Report) at 2495-96); Ex. 173 (Breshears LAFD Int.) 43:51-44:45. |
| | 178. | The graphic photos Jordan took of body parts and human remains violated core values of the Department and Chief Marrone's directive to exercise sensitivity at the scene. | Ex. 118 (Marrone 30(b)(6)) at 184:11-20; Ex. 156 (Jordan Report) at 2494-97. |
| | 179. | Jordan sent the photos he took of the victims' remains to Tony Imbrenda, the Department's Public Information Officer ("PIO"). | Ex. 156 (Jordan Report) at 2494; Ex. 119 (McCloud 30(b)(6)) at 147:22-148:2. |
| | 180. | There was no Department need for Jordan to send photos containing visible human remains to Imbrenda. | Ex. 119 (McCloud 30(b)(6)) at 148:3-16; Ex. 156 (Jordan Report) at 2495-96; Ex. 174 (Sprewell LAFD Int. [COLA035076]) at 33:54-34:33. |
| | 181. | At deposition, Jordan testified that he does not remember whether or not he shared the photos of the victims he took with anyone else. | Ex. 116 (Jordan) at 138:19-21. |

-115-

| | | |
|---|---|---|
| 182. | Jordan's personal cell phone records reflect numerous outgoing picture text messages in the days after the crash. | GDMF ¶¶ 509-521. |
| 183. | When asked by the Department's investigator if human remains were visible in the photos he took, Jordan was evasive.  He stated he was "trying to keep out of [his] head" what was in the photos because "what [he] saw isn't necessarily good for [his] mental health."  When specifically asked whether human remains were in his photos, he said, "I wouldn't care or want to remember that, if there were."  When asked again, he said: "You know what? The way it looked up there, you probably didn't really know what you were looking at."  He admitted that body parts "could have been" in his photos, but said the questioning was "messing with [his] brain" and causing him to remember images that he was "trying to get out of [his] brain." | Ex. 180 (Jordan LAFD Int. [COLA035078]) at 15:57-16:42, 19:36-22:38; Ex. 156 (Jordan Report) at 2528). |
| 184. | Eventually, Jordan admitted to the Department's investigator that photos of Kobe Bryant's remains were "probably in the pictures" he took. | Ex. 180 (Jordan LAFD Int. [COLA0035078]) at 23:49-23:57; ECF No. 110 at 5 ("he did state to the best of his recollection that graphic images as well as Kobe Bryant's remains, were probably in the photographs that he took"). |
| 185. | Jordan described the condition of Kobe Bryant's remains in graphic detail to his supervisor. | Ex. 181 (Marrone LAFD Int. No. 1 [COLA035080]) at 1:14:57-1:16:09, 1:38:06-1:38:41. |
| 186. | At the conclusion of its internal investigation, the Department found Jordan | Ex. 119 (McCloud 30(b)(6)) at 148:24-149:5; |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | to be evasive and not credible. The Department concluded it could not believe everything that Jordan said. | Ex. 156 (Jordan Report) at 2528. |
|---|---|---|---|
| | 187. | Following its internal investigation, the Department concluded that Jordan's photos showed a lack of regard for the dignity and privacy of the deceased and their families. | Ex. 119 (McCloud 30(b)(6)) at 151:22-152:11; Ex. 156 (Jordan Report) at 2496. |
| | 188. | Following its internal investigation, the Department concluded that Jordan's photos "only served to appeal to baser instincts and desires for what amounted to visual gossip." | Ex. 156 (Jordan Report) at 2495. |
| | 189. | Jordan retired from the Department on or around January 19, 2021, before receiving any discipline for taking and sharing photos of the victims' remains. | Ex. 116 (Jordan) at 20:20-22; Ex. 119 (McCloud 30(b)(6)) at 210:20-211:15. |
| | | **VIII.  Arlin Kahan Takes and Shares Photos of the Victims' Remains.** | |
| | 190. | On January 27, Arlin Kahan, a staff aide to Deputy Chief Marrone, reported to the crash scene. | Ex. 117 (Kahan) at 11:14-12:15, 42:21-25. |
| | 191. | At approximately 9:00 a.m., Kahan was driven up the hill to the crash site along with Imbrenda.  He saw his supervisor, Chief Marrone, already at the crash site when he arrived. | Ex. 117 (Kahan) at 43:22-25, 47:10-14 . |
| | 192. | Kahan remained at the crash site for a little more than an hour. | Ex. 117 (Kahan) at 44:19-23. |
| | 193. | While Kahan was at the top of the hill at the crash site, he walked around the scene and documented as much of it as he could using the camera on his work cell phone.  He took approximately 10 to 20 photos. | Ex. 117 (Kahan) at 48:15-49:5, 52:1-4, 52:11-53:5. |
| | 194. | At least five of the photos Kahan took of the main impact site and of the brush contained readily visible human remains. | Ex. 117 (Kahan) at 53:6-54:18, 55:5-8, 55:12-21, 55:24-57:5, 60:12-17; Ex. 226 (Kahan interview |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | | [COLA035069]) at 11:02-12:26. |
| 195. | The rest of Kahan's photos also contained human remains, but the body parts were not as readily visible in the other photos. | | Ex. 117 (Kahan) at 53:9-20. |
| 196. | Kahan's photos depicted "scattered body parts," and more than one victim may have been depicted in some of the photos. | | Ex. 117 (Kahan) at 67:13-16, 67:25-68:5. |
| 197. | No one directed Kahan to take photos at the crash site. | | Ex. 117 (Kahan) at 71:18-72:1, 150:22-151:3, 151:19-152:9, 152:15-153:1; Ex. 118 (Marrone) at 53:24-54:7. |
| 198. | The photos Kahan took of the crash scene were never used for any Department purpose. | | Ex. 117 (Kahan) at 72:5-15, 161:4-10. |
| 199. | Chief Marrone had no need for his staff aide to take photos of the crash site because Chief Marrone had visited the crash site himself and already knew what it looked like. | | Ex. 118 (Marrone) at 54:20-55:16. |
| 200. | Kahan sent all of the photos he took to Imbrenda, the Department's PIO, via text message. | | Ex. 117 (Kahan) at 76:6-8, 76:11-12, 77:1-9, 78:16-19, 78:25-79:3. |
| 201. | There was no Department need for Kahan to send photos containing visible human remains to Imbrenda. | | Ex. 158 (Kahan Intention to Suspend) at 2541; Ex. 119 (McCloud 30(b)(6)) at 165:24-166:8; Ex. 205 (Sprewell interview (COLA035067)) at 33:54-34:33. |
| 202. | The photos Kahan took of the victims served "served no business necessity," "had no intel value," and "did not further the Department's mission." | | Ex. 158 (Kahan Intention to Suspend) at 2541-42; Ex. 119 (McCloud 30(b)(6)) at 165:20-23. |
| 203. | The photos taken by Kahan violated core values of the Department and Chief | | Ex. 158 (Kahan Intention to Suspend) at 2540, 2542; |

| | | Marrone's directive to exercise sensitivity at the scene. | Ex. 118 (Marrone 30(b)(6)) at 184:11-20. |
|---|---|---|---|
| 204. | | Following its internal investigation, the Department concluded that Kahan's photos "only served to appeal to baser instincts and desires for what amounted to visual gossip." | Ex. 158 (Kahan Intention to Suspend) at 2541. |
| 205. | | Following its internal investigation, the Department concluded that Kahan's photos showed a lack of regard for the dignity and privacy of the deceased and their families. | Ex. 158 (Kahan Intention to Suspend) at 2542. |
| 206. | | Kahan has maintained his position as a staff aide and his rank as a fire captain.  He has not served a suspension, been demoted, or lost any income or other benefits. | Ex. 119 (McCloud) at 124:9-16; Ex. 117 (Kahan) at 166:24-168:5. |
| 207. | | Kahan was not instructed to preserve crash-scene photos in his possession before he deleted them, and he never received a written or oral instruction to preserve documents and communications related to the subject matter of this lawsuit. | Ex. 117 (Kahan) at 95:7-12, 148:13-20 |
| | | **IX.  Tony Imbrenda Takes, Receives, and Shares Photos of the Victims, and Then Tries to Cover Up His Involvement.** | |
| 208. | | Tony Imbrenda, the Department's PIO, reported to the scene on January 26. | Ex. 115 (Imbrenda) at 10:1-11:1, 62:14-18, 63:3-5. |
| 209. | | While at the scene, Imbrenda received a "flood" of photos of the crash scene from people he knew and people he did not know. | Ex. 176 (Imbrenda LAFD Int. [COLA035068]) at 11:55-12:18. |
| 210. | | Imbrenda received crash-scene photos on both his personal cell phone and his work cell phone. | Ex. 176 (Imbrenda LAFD Int. [COLA035068]) at 21:13-42. |
| 211. | | On January 26, Imbrenda received approximately 20 crash-scene photos via text message. | Ex. 115 (Imbrenda) at 72:15-17, 74:25-75:7. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| 212. | The photos Imbrenda received on January 26 were sent from Jordan and at least four or five other phone numbers Imbrenda did not recognize.  He has never identified who those four or five other phone numbers belonged to. | Ex. 115 (Imbrenda) at 72:18-74:6. |
|------|------|------|
| 213. | Imbrenda and Jordan had a close, 15-year working relationship at the time. | Ex. 115 (Imbrenda) at 79:20-23, 80:4-10. |
| 214. | Imbrenda returned to the scene on January 27 and went up the hill to the crash site while he was there. | Ex. 115 (Imbrenda) at 89:21-22, 91:14-19. |
| 215. | While Imbrenda was at the crash site location, he took roughly five photographs. Those five photos contained flags that indicated human remains.  The photos also contained "human remains that would be indicative of a high-impact accident," but because the photos were subsequently deleted, their precise content cannot be determined. | Ex. 115 (Imbrenda) at 94:21-24, 95:4-6, 95:15-96:6, 105:8-15, 106:1-3, 192:20-193:11. |
| 216. | Because the debris field and the victims' remains were widely disbursed, it is possible the photos Imbrenda took contained remains from more than one victim. | Ex. 115 (Imbrenda) at 97:19-98:4. |
| 217. | On January 27, Imbrenda received approximately 20-25 photos throughout the day from people who were at the crash site either that day or the day before. | Ex. 115 (Imbrenda) at 98:5-20. |
| 218. | Of the three or four different phone numbers who sent Imbrenda photos on January 27, he recognized only one of them:  Arlin Kahan's number.  Imbrenda did not identify the other individuals who sent him photos on January 27. | Ex. 115 (Imbrenda) at 99:12-100:1, 100:12-21. |
| 219. | Some of the photos Imbrenda received on January 26 and January 27, including the photos from the phone numbers Imbrenda | Ex. 115 (Imbrenda) at 104:2-8, 105:8-15, 106:4-7; Ex. 176 (Imbrenda LAFD |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | could not identify, contained graphic photos of the victims' remains. | Int. [COLA035068]) at 10:40-11:05, 17:05-18:08. |
| | 220. | Imbrenda has stated he would never want to let his child see graphic content of that nature. | Ex. 115 (Imbrenda) at 192:23-193:1; Ex. 176 (Imbrenda LAFD Int. [COLA035068]) at 21:43-22:01; Ex. 159 (Dep. Ex. 27) at 2573. |
| | 221. | The photos Imbrenda took and received containing human remains were never used for any Department purpose. | Ex. 115 (Imbrenda) at 107:25-108:10. |
| | 222. | About three weeks after the crash, on February 15, 2020, Imbrenda attended the Golden Mike Awards, an annual event for members of the media, with his girlfriend. The event took place at the Hilton hotel in Universal City. | Ex. 115 (Imbrenda) at 125:14-21, 126:10-11; Ex. 124 (Weireter) at 16:19-22, 18:12-14; Ex. 114 (Cornell) at 38:12-19. |
| | 223. | Imbrenda attended the Golden Mike Awards for the first time in 2020 because Southern California PIOs were being honored with an award. | Ex. 115 (Imbrenda) at 125:22-126:1; Ex. 124 (Weireter) at 16:23-17:3; Ex. 114 (Cornell) at 38:20-24, 70:4-71:5, 71:16-72:3; Ex. 201 (Dep. Ex. 64). |
| | 224. | Between 100 and 200 people attended the event, most of whom were members of the media. | Ex. 114 (Cornell) at 41:18-42:10; Ex. 125 (Scott) at 23:8-19. |
| | 225. | Throughout the evening Imbrenda and his girlfriend socialized with a group that included Sky Cornell and his girlfriend, Cody Weireter and his wife, and Erik Scott and his wife. | Ex. 115 (Imbrenda) at 126:17-25, 131:24-132:2; Ex. 124 (Weireter) at 19:11-20:6. |
| | 226. | At the time, Cornell worked in the Department's Public Information Office, and Imbrenda was his supervisor.  The two are close friends, text on occasion, and Imbrenda mentored Cornell.  Cornell "love[s] the guy." | Ex. 115 (Imbrenda) at 24:15-20, 27:5-10; Ex. 114 (Cornell) at 17:25-18:6; Ex. 178 (Cornell LAFD Int. [COLA035074]) at 17:04-18:36. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| 227. | Erik Scott is the PIO for the Los Angeles City Fire Department.  Imbrenda has known Scott for a few years; they are friends. | Ex. 115 (Imbrenda) at 128:16-129:2; Ex. 125 (Scott) at 13:8-14, 30:4-31:10. |
|------|------|------|
| 228. | Erik Scott had no involvement in responding to the crash on January 26. | Ex. 125 (Scott) at 21:3-5. |
| 229. | Cody Weireter also works for the Los Angeles City Fire Department.  Imbrenda has known him for a few years. | Ex. 115 (Imbrenda) at 130:7-21. |
| 230. | Cody Weireter briefly reported to the command post on January 26 but did not go to the crash site. | Ex. 124 (Weireter) at 17:15-18:4. |
| 231. | The Golden Mike Awards began with a cocktail hour.  Everybody in Imbrenda's group was drinking. | Ex. 115 (Imbrenda) at 131:12-132:2; Ex. 124 (Weireter) at 26:14-20; Ex. 114 (Cornell) at 45:5-10; Ex. 125 (Scott) at 34:21-35:8. |
| 232. | During the cocktail hour, the conversation amongst Imbrenda's group turned to the January 26 helicopter crash, and Imbrenda talked about having been at the scene. | Ex. 124 (Weireter) at 27:3-14, 28:14-29:2. |
| 233. | Then, as the group was ushered from the cocktail area to the larger room where the awards presentation and dinner would take place, they stopped in a hallway where a backdrop was set up for pictures.  Other people were gathered in the same area. | Ex. 124 (Weireter) at 32:5-13; Ex. 114 (Cornell) at 48:13-24, 49:3-15; Ex. 125 (Scott) at 48:12-16. |
| 234. | In the hallway, Imbrenda, Sky Cornell, Cornell's girlfriend, and Erik Scott were gathered right outside the doors of the cocktail area, while Ms. Weireter and Ms. Scott had stepped to the side. | Ex. 124 (Weireter) at 32:14-17, 37:13-22. |
| 235. | At one point, Imbrenda's girlfriend approached Ms. Weireter and Ms. Scott and excitedly said: "Oh, don't you guys want to see the Kobe pictures?  They're looking at | Ex. 124 (Weireter) at 32:17-21, 35:24-37:5, 65:24-66:7. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| | the Kobe pictures right now.  Go look at the Kobe pictures."  She was "giddy about showing the pictures" and was acting like the pictures were "a party trick."  It was the second time that night that Imbrenda's girlfriend had spoken about the photographs, and she acted as though she had seen them before. | |
| 236. | Ms. Scott then walked over to the rest of the group, along with Imbrenda's girlfriend. | Ex. 124 (Weireter) at 32:22-25; Ex. 125 (Scott) at 47:5-48:16, 49:23-50:5. |
| 237. | The group of five—Erik Scott, Ms. Scott, Imbrenda's girlfriend, Sky Cornell, and Cornell's girlfriend—all gathered around Imbrenda, who held his cell phone out in front of him while the rest of the group looked down at it.  The group looked at photos, including graphic photos that contained human remains, on Imbrenda's phone for about three minutes. | Ex. 124 (Weireter) at 33:1-25, 34:6-15, 35:1-5, 35:15-21; Ex. 115 (Imbrenda) at 140:20-22, 141:18-21. |
| 238. | The manner in which Imbrenda shared the photos with the group, which included three civilians, "seemed like gossip" or "almost showing it off or bragging" or like "a party trick." | Ex. 124 (Weireter) at 38:24-39:20, 66:16-67:6, 67:20-68:1. |
| 239. | Imbrenda's sharing of photos of the victims' remains at the Golden Mike Awards did not serve any legitimate Department purpose, and the images of the victims' remains had no training value.  "There was no business need for sharing those photos with anyone at the Golden Mike Awards." | Ex. 159 (Dep. Ex. 27) at 2572; Ex. 125 (Scott) at 73:2-5. |
| 240. | Erik Scott saw approximately five photos on Imbrenda's phone.  The photos he viewed contained markers identifying human remains as well as visible body parts. | Ex. 125 (Scott) at 50:8-17, 55:11-17, 65:13-66:11, 68:19-69:11; Ex. 177 (Scott LAFD Int. [COLA035071]) at 11:07-11:22. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| 241. | Scott was given the impression Imbrenda had received the photos from a safety officer. | Ex. 177 (Scott LAFD Int. [COLA035071]) at 14:54-15:38; Ex. 125 (Scott) at 65:13-66:11. |
|---|---|---|
| 242. | Cornell, who joined the group huddled around Imbrenda after the others, saw at least five photos on Imbrenda's phone.  The photos he viewed contained markers identifying human remains as well as visible body parts. | Ex. 178 (Cornell LAFD Int. [COLA035074]) at 8:56-10:12; 12:44-46, 13:2-14:33; Ex. 114 (Cornell) at 51:7-10, 55:8-56:1, 56:22-57:13, 85:1-8, 85:17-20, 105:9-17, 121:23-122:6, 123:14-24. |
| 243. | Sky Cornell wanted to see Kobe Bryant's body in the photographs. | Ex. 178 (Cornell LAFD Inf. [COLA035074]) at 12:44-13:04. |
| 244. | After viewing the photos on Imbrenda's phone, Cornell stated "I just saw Kobe's body all burnt up before I'm about to eat." | Ex. 124 (Weireter) at 31:1-19, 40:20-25, 59:11-60:2. |
| 245. | Hearing Cornell's comment was "like a shot" to Ms. Weireter, who had lost family members in the same crash that killed Kobe and Gianna Bryant.  She was hurt, disgusted, disturbed, and overwhelmed by Imbrenda's display of the photos at the awards show. | Ex. 124 (Weireter) at 12:17-22, 31:12-32:3, 38:5-13, 42:15-23, 43:4-11. |
| 246. | Every time Ms. Weireter heard reports about photos of the victims being shared, it was "traumatizing" for her and "just like reopening the wound." | Ex. 124 (Weireter) at 44:11-45:2. |
| 247. | On March 6, 2020, Ms. Weireter walked into a Los Angeles County Fire Station and reported what she had witnessed at the Golden Mike Awards, notwithstanding concerns that lodging a complaint might affect her husband's career. | Ex. 124 (Weireter) at 45:7-46:9, 48:18-24, 61:10-22. |
| 248. | The Department's Chief of Public Affairs has described Imbrenda's sharing of crash-scene photographs at the Golden Mike | Ex. 174 (Sprewell LAFD Int. [COLA035076]) at 44:17-50:43; Ex. 174 |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | Awards with civilians and employees of other agencies as "completely inappropriate," "disgusting," and "despicable." | (Sprewell LAFD Int. [COLA035076]) at 45:09-49:33 |
| | 249. | Following its internal investigation, the Department concluded that Imbrenda's conduct at the Golden Mike Awards showed a lack of regard for the dignity and privacy of the deceased and their families. | Ex. 159 (Dep. Ex. 27) at 2573. |
| | 250. | Following its internal investigation, the Department concluded that Imbrenda's conduct in connection with the photos of the victims was "reprehensible." | Ex. 159 (Dep. Ex. 27) at 2573. |
| | 251. | On February 27, 2020, the *Los Angeles Times* broke the news that several sheriff's deputies had taken and shared photos of the victims' remains.  Jordan called Imbrenda early the next morning, and they spoke on the phone for nearly eight minutes at 7:28 a.m.  Jordan "do[es] not remember" if the phone call related to the *Los Angeles Times* reports. | Rodriguez-Sanchirico Decl. Ex. 45 (LA Times article); Ex. 210 (Jordan Cell Records) at page 48, lines 764 & 771; Ex. 116 (Jordan) at 114:6-115:14. |
| | 252. | When the Department began receiving media inquiries about the Department's role in taking and sharing photos of the crash victims, Imbrenda participated in conference calls with the Fire Chief and other senior executives, as well as a one-on-one with the Fire Chief, about the allegations, and Imbrenda prepared a Department statement regarding the matter.  At no point did Imbrenda disclose to his superiors or chain of command that he had photos containing the victims' remains in his possession. | Ex. 115 (Imbrenda) at 184:10-185:2, 185:8-18, 192:12-16; Ex. 159 (Dep. Ex. 27) at 2573. |
| | 253. | Instead, Imbrenda instructed eight to ten of his subordinates, friends, and acquaintances within the Department to delete all graphic photos from the crash in their possession and | Ex. 115 (Imbrenda) at 162:10-163:23, 164:15-23. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | to pass along the deletion order "to everybody that they knew." | |
| | 254. | Imbrenda instructed Kahan to get rid of the photos in his possession. | Ex. 115 (Imbrenda) at 162:20-163:1. |
| | 255. | Imbrenda instructed Jordan to get rid of inappropriate photos of the crash-scene. | Ex. 115 (Imbrenda) at 165:11-166:14, 167:24-168:7. |
| | 256. | Imbrenda conveyed his deletion order to Sky Cornell as well. | Ex. 114 (Cornell) at 64:6-9; Ex. 115 (Imbrenda) at 162:10-19, 164:15-23. |
| | 257. | Imbrenda gave his deletion order to "very connected people" within the Department who "extrapolate[d]" it to "many, many people." | Ex. 115 (Imbrenda) at 163:8-23. |
| | 258. | Imbrenda issued the deletion order because he wanted to prevent the Department from being "exposed and embarrassed." | Ex. 176 (Imbrenda LAFD Int. [COLA035068]) at 20:31-21:01. |
| | 259. | Imbrenda personally deleted approximately 50 crash-scene photos from his personal cell phone and work cell phone.  He did not inform any of his supervisors or anyone higher in the chain of command that he was deleting the photos in his possession. | Ex. 115 (Imbrenda) at 116:15-117:3, 192:12-196:5, 198:21-199:5; Ex. 159 (Dep. Ex. 27) at 2573. |
| | 260. | The Fire Department concluded that Imbrenda's deletion was "primarily self-serving" and an "attempt to cover up [his] role in the reported misuse of the photos." | Ex. 159 (Dep. Ex. 27) at 2573; Ex. 119 (McCloud) at 159:14-160:21, 161:16-21. |
| | 261. | Imbrenda was never instructed to preserve crash-scene photos in his possession before he deleted them, and he never received a written or oral instruction to preserve documents and communications related to the subject matter of this lawsuit. | Ex. 115 (Imbrenda) at 199:2-10, 245:18-25. |
| | 262. | Imbrenda refused to let the Department inspect his personal cell phone, and the Department never examined it.  Imbrenda's | Ex. 119 (McCloud) at 105:9-13; Ex. 115 |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | personal cell phone was not forensically preserved or examined until it was provided to the Forensic Examiner during this litigation in September 2021. | (Imbrenda) at 207:11-208:20. |
| | 263. | By the time the Department forensically preserved and examined Imbrenda's work phone, the crash-scene photos and related communications Imbrenda had deleted could not be recovered. | Price Decl. Ex. 36 at 31, 33-34; Ex. 206 (Price) at 52:13-54:7; Freskos Decl. ¶ 25 |
| | 264. | By the time the Forensic Examiner inspected Imbrenda's personal devices, the crash-scene photos and related communications Imbrenda had deleted could not be recovered. | Price Decl. Ex. 36 at 31, 33-34; Ex. 206 (Price) at 52:13-54:7; Freskos Decl. ¶ 25. |
| | 265. | As a result of Imbrenda's destruction of evidence, there is no longer any forensic record of the at least eight unknown Fire Department personnel who sent crash-scene photos to Imbrenda, or of Imbrenda's activity with the crash-scene photos while they were on his devices. | Price Decl. Ex. 36 at 31, 33-34; Ex. 206 (Price) at 52:13-54:7; Ex. 119 (McCloud) at 157:1-9; Freskos Decl. ¶¶ 24-25; GDMF ¶¶ 212, 218. |
| | 266. | Imbrenda remains employed by the Fire Department. | Ex. 119 (McCloud) at 123:23-25. |
| | | **X. Raul Versales Obtains Photos of the Victims' Remains.** | |
| | 267. | At approximately 11:53 a.m., Deputy Doug Johnson used his personal cell phone to send all of the photos he took at the crash scene to Deputy Versales' personal cell phone. | Jaeger Decl. Ex. 25 (IAB Investigative Summary) at 21-22; Ex. 92 (Johnson) at 143:7-12, 144:21-24. |
| | 268. | At the time Johnson sent the photos to Versales, he had already been made aware via a phone call from Versales that Kobe Bryant and his daughter had likely been onboard.  The timing of Johnson's transmission of the photos at 11:53 a.m. was more than one-and-a-half hours after | Ex. 92 (Johnson) at 98:21-100:11; Ex. 213 (Versales Cell Records) at 2995-96, rows 12-13, 15-16, 18-19, 21-22, 26-27, 29-31, 33-34, 36-37, 39-40, 42-52, 55-56; |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| 1 | | Kobe Bryant's representative informed Lost Hills dispatch at 10:22 a.m. that Kobe may have been onboard, and approximately thirty minutes after TMZ reported at 11:24 a.m. that Kobe had passed away in a helicopter accident. | *see supra* ¶¶ 139, 145, 267. |
| 269. | | Johnson had no legitimate reason to send graphic photos of the victims' remains to Versales.  Versales has testified that he had no investigatory role, "did not need to have photographs," and was "surprised to receive them." | Ex. 92 (Versales) at 100:4-21, 159:7-14, 307:12-13. |

**XI.  Chris Jauregui Obtains Photos of the Victims' Remains.**

| 270. | At some point after receiving photos from Johnson, Versales sent them to Deputy Chris Jauregui, a friend of Versales' who was standing nearby at the command post.  Versales used his personal cell phone to send all of the photos he received from Johnson to Jauregui's personal cell phone. | Ex. 91 (Jauregui) at 39:17-19, 44:19-45:3; Ex. 92 (Versales) at 179:24-180:14, 190:4-6. |
|---|---|---|
| 271. | Deputy Versales had no legitimate reason to send graphic photos of the victims' remains to Jauregui.  Jauregui's declaration states that he "needed to see the photos to answer questions from dispatch about the number of the helicopter," but this does not explain why Versales would send Jauregui close-up photos of the victims' remains, which did not contain the number of the helicopter. | Ex. 92 (Johnson) at 126:22-127:1, 127:4-7, 129:23-130:7, 130:21-131:4, 132:15-133:15, 229:14-230:3; Jauregui Decl. ¶ 9. |
| 272. | Deputy Versales has testified that he sent the photos to Jauregui for "investigative" purposes, but Versales was unable to specify what he understood Jauregui to be investigating. | Ex. 92 (Versales) at 187:23-188:2, 188:18-23. |

**XII.  Rafael Mejia Obtains Photos of the Victims' Remains.**

-128-

| | | |
|---|---|---|
| 273. | At some point after receiving photos from Johnson, Versales sent them to Deputy Rafael Mejia, who was standing nearby at the command post.  Versales used his personal cell phone to send all of the photos he received from Johnson to Mejia's personal cell phone. | Ex. 91 (Mejia) at 133:8-10, 134:21-135:1; Ex. 92 (Versales) at 186:15-21. |
| 274. | Deputy Versales had no legitimate reason to send graphic photos of the victims' remains to Mejia.  Mejia's declaration states that he asked for the photos so that he could "respond to a request from the dispatch desk" regarding "the number on the helicopter," but this does not explain why Versales would send Mejia close-up photos of the victims' remains, which did not contain the number of the helicopter. | Mejia Decl. ¶ 10; Ex. 92 (Johnson) at 126:22-127:1, 127:4-7, 129:23-130:7, 130:21-25, 131:1-4, 132:15-133:15, 229:14-230:3. |
| 275. | Deputy Versales has testified that he sent the photos to Mejia for "investigative" purposes, but Versales was unable to specify what he understood Mejia to be investigating. | Ex. 92 (Versales) at 187:7-14, 188:18-23. |
| | **XIII.  Scott Miller Obtains Photos of the Victims' Remains.** | |
| 276. | During the "evening" on the day of the accident, Deputy Versales used his personal cell phone to send all of the photos he received from Johnson to Scott Miller's personal call phone. | Ex. 138 (Miller LASD Int. No. 1) at 2362 (received photos "sometime later in the evening"); Ex. 93 (Miller) at 46:12-15 (received photos in "evening"); Ex. 139 (Miller LASD Int. No. 2) at 2377-78 (Miller identifying his personal cell phone as the phone he received the photos on); Ex. 92 (Versales) at 179:24-180:14. |

| | | | |
|---|---|---|---|
| 277. | | Deputy Versales had no legitimate reason to send graphic photos of the victims' remains to Miller.  In an interview with LASD investigators, Miller described the circumstances under which Versales sent him the photos: | Ex. 138 (Miller LASD Int. No. 1) at 2362-64, 2371, 2374. |
| | Miller: | One of the deputies had said that they had photos from the crash site and I said, "Oh, can I see them?" And he said, "Oh, I'll just send them to you."  So, they showed up on my phone, my cell phone. And that's where they went. | |
| | | . . . | |
| | Investigator: | And was there any purpose or any reason why you received the photographs?  Were they used for anything? | |
| | Miller: | No. | |
| | | . . . | |
| | Investigator: | Those 12-ish photos that you did receive, did you use those photos at all while working the command post? | |
| | Miller: | No. | |
| | | . . . | |
| | Investigator: | Alright, do you recall anyone at the command post that day using the photographs for any particular reason?  As part of the investigation or duties at the command post, any – | |
| | Miller: | No. . . . | |
| 278. | | Detective Miller told Sheriff's Department investigators that a person would "have better luck identifying a deer that got hit by a Mack truck on the freeway" than they would | Ex. 138 (Miller LASD Int. No. 1) at 2364, 2366, 2372. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | identifying human beings in the photos. When asked whether he could discern certain characteristics of the victims based on the photos, Miller responded: "No.  Hamburger is hamburger." | |
| | 279. | At home that evening, Miller offered to show the photos to his wife, telling her that they showed "piles of meat." | Ex. 138 (Miller LASD Int. No. 1) at 2371. |
| | 280. | Deputy Versales has testified that he sent the photos to Miller for "investigative" purposes, but he was unable to specify what he understood Miller to be investigating. | Ex. 92 (Versales) at 187:15-22, 188:18-23. |
| | 281. | When Detective Miller requested the photos, he did not tell Versales that he needed the photos for a purpose, such as an investigation. | Ex. 93 (Miller) at 49:4-10. |
| | 282. | Detective Miller never used the photos for any purpose. | Ex. 93 (Miller) at 56:13-17. |
| | | **XIV.  Travis Kelly Obtains Photos of the Victims' Remains.** | |
| | 283. | As reflected in Versales' cell phone records, at 9:02 p.m. on the day of the accident, Versales used his personal cell phone to text all of the photos he had received from Johnson to Sergeant Travis Kelly's personal cell phone. | Ex. 94 (Kelly) at 78:11-21, 79:23-80:16, 93:12-94:6; Ex. 213 (Versales Cell Records) at 3004, lines 275-285; Ex. 220 (Kelly Consent Form). |
| | 284. | Sergeant Kelly has testified that some of the photos he received were "gruesome" and contained human remains.  Kelly added that he will "never forget" the photos, in light of the "violence" of the crash. | Ex. 94 (Kelly) at 83:13-16, 84:11-85:6, 93:12-15. |
| | 285. | Deputy Versales had no legitimate reason to send graphic photos of the victims' remains to Kelly.  There was no conceivable investigative purpose because, by the time Versales sent the photos—9:02 p.m. on the day of the accident—the helicopter had long been identified and Sheriff Villanueva had | Ex. 89 (Bryant) at 18:21-19:22; Ex. 213 (Versales Cell Records) at 3004, lines 275-285. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | already confirmed to Vanessa Bryant that Kobe and Gianna had passed away. | |
| | 286. | Versales has testified that, at the time he texted the photos to Kelly, he did not know whether Kelly was investigating anything. | Ex. 92 (Versales) at 308:18-20. |
| | | **XV.  Stephanie Shrout Obtains Photos of the Victims' Remains.** | |
| | 287. | On the morning of January 27, 2020—the day after the accident—Sergeant Kelly used his personal cell phone to text all of the photos he received from Deputy Versales to Detective Stephanie Shrout's cell phone. | Ex. 94 (Kelly) at 96:19-97:3, 97:10-13, 98:25-99:3; Kelly Decl. ¶ 10. |
| | 288. | Sergeant Kelly had no legitimate reason to send graphic photos of the victims' remains to Shrout.  Sergeant Kelly's declaration in support of summary judgment offers no rationale for why he sent the photos Shrout. Rather, it simply states: "The day after receiving the photos I sent them to Sergeant Stephanie Shrout, who works for Sheriff's Department Homicide Bureau."  Sheriff Villanueva himself has confirmed that the Sheriff's Department's homicide unit did not conduct any investigation of the crash site. | Ex. 94 (Kelly) at 98:18-23; Kelly Decl. ¶ 10; Ex. 113 (Villanueva) at 31:21-24, 32:18-33:17. |
| | | **XVI.  Ruby Cable Obtains Photos of the Victims' Remains.** | |
| | 289. | On the afternoon of the accident, Deputy Mejia walked approximately 100 feet from the command post to talk to Deputy Ruby Cable, a trainee who was manning a checkpoint at the entrance to the Water District.  During the conversation, Mejia AirDropped crash-scene photos from his personal cell phone to Cable's personal cell phone. | Ex. 91 (Mejia) at 150:17-151:19; 151:23-152:5, 152:14-18; Ex. 137 (Cable LASD Int.) at 2351; Ex. 132 (Mejia LASD Int.) at 2243-44. |
| | 290. | Mejia knew Kobe Bryant may have been one of the crash victims at the time he sent the photos to Cable. | Ex. 91 (Mejia) at 150:17-151:19, 151:23-152:5, 152:14-18. |

-132-

| 291. | The photos Mejia sent to Cable contained human remains. | Ex. 137 (Cable LASD Int.) at 2348-49. |
|---|---|---|
| 292. | Mejia had no legitimate reason to send graphic photos of the victims' remains to Cable.  In an interview with LASD investigators, Mejia admitted that Cable did not need the photos, that "curiosity got the best of us," and that such curiosity is "in our nature, I think, [as] deputies."  For her part, Cable told investigators she did not need the photos for any reason, did not request them, and did not think it was appropriate to obtain them because "I had no purpose [for] having them." | Ex. 132 (Mejia LASD Int.) at 2248; Ex. 137 (Cable LASD Int.) at 2351-55. |

### XVII.  Joey Cruz Obtains Photos of the Victims' Remains.

| 293. | On the night of January 26, 2020, Deputy Mejia sent multiple photos of the crash scene from his personal cell phone to Deputy Cruz's personal cell phone. | Ex. 90 (Cruz) at 78:7-79:15, 82:11-14, 20-24, 239:4-6; Ex. 91 (Mejia) at 138:22-24, 141:16-20. |
|---|---|---|
| 294. | The photos Mejia sent to Cruz contained human remains. | Ex. 133 (J. Cruz LASD Int.) at COLA000153-57. |
| 295. | Mejia had no legitimate reason to send graphic photos of the victims' remains to Cruz.  Cruz testified at deposition that he did not "use the[] accident scene photos for any purpose at any time," nor did the accident scene photos "assist [Cruz] in any way in any investigation."  Cruz acknowledge there was no legitimate reason for him to receive the photos. | Ex. 90 (Cruz) at 109:13-18, 111:12-22. |
| 296. | Mejia's summary judgment declaration avers that he sent the photos to Cruz because Cruz was a trainee and Mejia thought he might "need to write [a] report[]."  However, Deputy Cruz never wrote a report regarding the helicopter crash because he and his training officer, Deputy Mejia, were not the "handling unit" for the incident. | Mejia Decl. ¶ 14 ; Ex. 90 (Cruz) at 72:10-73:1, 91:21-92:10. |

-133-

| | | Accordingly, "[t]here was no need for [Cruz] to write a report." | |
|---|---|---|---|
| 297. | | After returning home from his shift on January 26, 2020, Deputy Mejia looked at the photos while alone in his bed. | Ex. 91 (Mejia) at 166:4-9, 13-21, 167:9-12. |
| | | **XVIII.  Michael Russell Obtains Photos of the Victims' Remains.** | |
| 298. | | While in the report-writing room of the Lost Hills Station at approximately 9:00 p.m. on the day of the accident, Deputy Joey Cruz and Deputy Michael Russell discussed the crash and the fact that Kobe and Gianna Bryant had been onboard the helicopter. During the conversation, Cruz used his personal cell phone to send crash-scene photos to the Russell's personal cell phone. | Ex. 90 (Russell) at 111:16-112:12; Ex. 90 (Cruz) at 111:23-112:9, 114:17-25, 123:24-124:5, 241:2-21. |
| 299. | | The photos Russell sent to Cruz contained human remains.  Russell saw "grotesque" bodies and "couldn't believe how graphic they were," and Cruz agreed with him that they were "pretty bad." | Ex. 90 (Russell) at 120:23-121:4, 121:24-122:10, 134:3-18; Ex. 134 (Russell LASD Int.) at 2290. |
| 300. | | Russell had manned a checkpoint at the entrance of the Water District earlier in the day, but he never had any investigatory role with respect to the accident. | Ex. 90 (Russell) at 99:2-9, 117:20-118:5, 310:17-19. |
| 301. | | Cruz had no legitimate reason to send graphic photos of the victims' remains to Russell.  Russell has acknowledged that the reason he asked for the photos is because he was "curious," and that it was not appropriate for him to obtain the photos. Russell has further acknowledged that it was also inappropriate for Cruz himself to have had the photos, as the photos had "no evidentiary value" and Cruz "didn't have any investigatory role." | Ex. 90 (Russell) at 115:15-116:5, 120:7-22, 196:6-20, 197:14-21, 310:25-311:4. |

| 302. | According to the findings of LASD's internal investigation, Russell had "no need" to obtain crash-scene photos. | Jaeger Decl. Ex. 18 (8/5/20 LASD Ltr. to Russell) at 78. |
|---|---|---|
| 303. | Deputy Russell testified that, on two or three occasions in the days after the crash, he sat alone in a recliner in his bedroom and viewed the photos he had received from Deputy Cruz. | Ex. 90 (Russell) at 170:25-172:20, 303:12-18. |
| | **XIX.  LASD Did Not Use Johnson's Close Up Remains Photos.** | |
| 304. | Deputy Johnson's close-up photos of the victims' remains were never used by the Sheriff Department for any purpose.  LASD personnel did not use the photos to identify any of the victims or to identity the helicopter. | Ex. 113 (Villanueva) at 19:15-20:2; Ex. 90 (Cruz) at 109:13-18; Ex. 92 (Johnson) at 224:22-225:8; Ex. 92 (Versales) at 167:19-168:1; Ex. 93 (Miller) at 56:13-17. |
| 305. | Not a single member of the Sheriff's Department who possessed Deputy Johnson's photos of the victims' bodies wrote a report related to their role in responding to the January 26, 2020 helicopter crash. | Ex. 89 (Cable) at 55:8-12; Ex. 92 (Versales) at 131:8-11, 170:18-171:1; Ex. 93 (Miller) at 32:17-19; Ex. 91 (Jauregui) at 32:11-16; Ex. 94 (Kelly) at 62:25-63:3; Ex. 91 (Mejia) at 127:18-128:5, 142:24-5; Ex. 90 (Russell) at 108:23-109:7; Ex. 92 (Johnson) at 95:13-16; |
| 306. | Not a single member of the Sheriff's Department who possessed Deputy Johnson's photos of the victims' bodies booked any of the photos into evidence. | Ex. 89 (Cable) at 65:20-21; Ex. 91 (Jauregui) at 61:18-20; Ex. 94 (Kelly) at 96:2-3; Ex. 92 (Johnson) at 142:6-13; Ex. 92 (Versales) at 171:2-4. |
| | **XX.  Ben Sanchez Obtains Photos of the Victims' Remains.** | |
| 307. | On the day after the accident—Monday, January 27, 2020—Deputy Michael Russell was off-duty playing an online video game, | Ex. 90 (Russell) at 179:23-181:11, 184:5-18, 185:1-4; Ex. 95 (Sanchez) at 40:9- |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| | | *Call of Duty*, with his "good buddy," Deputy Benjamin Sanchez.  At the time, Russell and Sanchez played video games together nightly. | 25; Ex. 134 (Russell LASD Int.) at 2289. |
| 308. | While talking over headsets and playing *Call of Duty*, Deputy Russell and Sanchez discussed the fact that Kobe Bryant had died in the crash.  Russell told Sanchez: "Hey, I have some photos of the crash site.  Do you want to see?"  Sanchez said, "Yeah." | Ex. 90 (Russell) at 179:23-181:18, 187:1-11, 192:17-24; Ex. 136 (Sanchez LASD Int.) at 2336. |
| 309. | Russell has described the exchange with Sanchez as "casual." | Ex. 90 (Russell) at 192:17-24. |
| 310. | Before sending photos to Sanchez, Russell warned that "some of them were pretty graphic." | Ex. 136 (Sanchez LASD Int.) at 2336. |
| 311. | Deputy Russell then used his personal cell phone to text crash-scene photos to Sanchez's personal cell phone, including photos that contained the victims' remains.  Sanchez described the photos Deputy Russell texted him as "grotesque."  The bodies in the photos "were severely mutilated and injured." | Ex. 90 (Russell) at 179:23-181:2, 187:9-23, 189:14-16; Ex. 95 (Sanchez) 43:12-21, 93:12-15; Ex. 136 (Sanchez LASD Int.) at 2333. |
| 312. | At the time he texted photos of the victims' remains to Sanchez, Deputy Russell was aware that Kobe Bryant's thirteen-year-old-daughter, Gianna Bryant, along with two other middle school girls, had died in the helicopter crash. | Ex. 90 (Russell) at 199:12-20. |
| 313. | Russell told Sanchez that he believed one of the victims in the photos was Kobe Bryant. | Ex. 136 (Sanchez LASD Int.) at 2336. |
| 314. | Russell had no legitimate reason to send graphic photos of the victims' remains to Sanchez.  At the time, Sanchez was assigned to the Santa Clarita Station, which is approximately a 45-minute drive from Calabasas, where the helicopter crash | Ex. 90 (Russell) at 185:5-21; 186:1-3; 186:16-21. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | occurred, and Russell did not know of anyone of anyone from the Santa Clarita to have had a role in investigating the crash. | |
| | | **XXI.  Joey Cruz Shows Remains Photos to His Niece.** | |
| | 315. | While off-duty on January 28, 2020—two days after the accident—Deputy Joey Cruz visited his mother's house in Sante Fe Springs.  Cruz's niece, Cynthia Cruz, was present, and the two were sitting on a couch together. | Cruz Decl. Ex. 1 (Cruz Memo to Vander Horck); Ex. 142 (C. Cruz LASD Int.) at 2411; Jaeger Decl. Ex. 29 (Cruz Disposition Sheet) at 89; Ex. 90 (Cruz) at 138:15-18. |
| | 316. | Cruz and his niece discussed the helicopter crash.  During the conversation, according to Cruz, "I just ended up taking my phone out, described to her the things we see[.]" | Ex. 133 (J. Cruz LASD Int.) at COLA000168. |
| | 317. | Prior to displaying photos, Cruz told his niece: "[T]hey wouldn't look like humans. That that's how gory they were." | Ex. 133 (J. Cruz LASD Int.) at COLA000649. |
| | 318. | During the conversation with his niece, Cruz "proceeded to show [her] photographs of the crash site, including those containing bodies/body parts." | Jaeger Decl. Ex. 29 (Cruz Disposition Sheet) at 89. |
| | | **XXII.  Joey Cruz Shows Remains Photos to a Bartender and Bar Patron.** | |
| | 319. | At 8:25 p.m. on the evening of January 28, 2020, Deputy Cruz entered the Baja California Bar & Grill in Norwalk, California. | Saigal Decl. ¶ 131; Ex. 184 (Surveillance Footage – COLA001424) at 20:25:46. |
| | 320. | Over the course of approximately one hour and 44 minutes at the bar, Deputy Cruz was served five drinks. | Saigal Decl. ¶ 132. |
| | 321. | At 9:28 p.m., Cruz showed his phone to a patron seated to his right at the bar—a dark-haired male wearing a black sweatshirt. | Saigal Decl. ¶ 134; Ex. 187 (Surveillance Footage – COLA001430) at Channel 8 & 15, 21:28:19; Ex. 122 |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | 

As explained below, what follows in the surveillance footage strongly indicates that a photo of human remains was displayed on Cruz's phone when he showed it to the bar patron. | | (Gutierrez) at 133:1-134:12. |
| 322. | Approximately 30 seconds later, Cruz appears to call out to the bartender to get his attention. | | Saigal Decl. ¶ 136. |
| 323. | Surveillance footage from the bar shows Cruz handing his phone to the bartender. The bartender looked at the phone for six seconds, then swiftly turned his head to the side and handed the phone back to Cruz. | | Saigal Decl. ¶¶ 137-138; Ex. 187 (Surveillance Footage – COLA001430) at Channel 15, 21:28:56-21:29:02. |

-138-



| 324. | After the bartender returned Cruz's cell phone, Cruz made a hand motion towards his neck and torso, and the bartender grimaced. | Saigal Decl. ¶ 139; Ex. 187 (Surveillance Footage – COLA001430) at Channel 15, 21:29:28, 21:29:30; Ex. 122 (Gutierrez) at 121:9-13, 123:6-19. |





PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| 325. | Cruz then held out his right arm (the arm on which Kobe Bryant had tattoos of his daughters' names) and motioned down the arm with his left hand. | Saigal Decl. ¶ 141; Ex. 187 (Surveillance Footage – COLA001430) at Channel 15, 21:29:33. |
|---|---|---|
| |  | |
| 326. | The bartender walked toward a patron seated to Cruz's left.  The bartender gestured toward Cruz, then made hand motions appearing to illustrate the condition of a victim's remains.  The bartender gestured toward his torso and made a swiping motion | Saigal Decl. ¶¶ 142-43; Ex. 187 (Surveillance Footage –COLA001430) at Channel 8, 21:29:47, Channel 15, 21:29:54; Ex. 122 |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| | at his neck. The bartender has testified that, in this portion of the surveillance footage, his hand motions appear to have related to the condition of human remains.<br><br><br><br> | (Gutierrez) at 136:21-137:13, 141:25-142:19. |
| 327. | Around 9:40 p.m., Ralph Mendez entered the Baja California Bar & Grill. He sat with three of his softball teammates in a corner booth facing the bar. | Saigal Decl. ¶ 144; Ex. 123 (Mendez) at 25:13-26:23, 37:11-22. |
| 328. | At 9:42 p.m., the bartender walked around the bar to view photos on Deputy Cruz's phone while standing next to Cruz. The bartender looked at the photos on Cruz's phone for approximately one minute and ten seconds. | Saigal Decl. ¶¶ 145-46; Ex. 188 (Surveillance Footage –COLA001432) at Channel 8, 21:42:31-21:43:44; Ex. 122 (Gutierrez) at 162:23-165:2. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| 329. | The Sheriff's Department's internal investigation found that, as Cruz was showing the bartender photos of the crash site, "he directed [the bartender] to zoom in and out, as if to focus on specific focal points in some of the pictures, including bodies/body parts, and what he believed to be the [body part] of Mr. Bryant." | Jaeger Decl. Ex. 29 at (Cruz Disposition Sheet) at 89. |
|---|---|---|
| 330. | After viewing the photos, the bartender walked back behind the bar and Cruz "said something funny."  The two then burst into laughter.  | Saigal Decl. ¶ 147; Ex. 188 (Surveillance Footage – COLA001432) at Channel 15, 21:43:50; Ex. 122 (Gutierrez) at 164:10-14, 165:15-166:24. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| 331. | When asked at deposition how it had come up in conversation that Cruz had photos of the accident scene, the bartender testified that Cruz asked: "Hey, have you heard about Kobe?"  The bartender responded: "Yeah. It's sad."  Cruz then said: "Well, I have a few pictures.  Want to see them?"  The bartender responded: "Okay." | Ex. 122 (Gutierrez) at 51:23-52:7. |
|---|---|---|
| 332. | The photos Cruz showed the bartender contained human remains, including distinct body parts. | Ex. 122 (Gutierrez) at 22:19-20, 25:6-26:1, 28:3-17, 30:17-22, 31:20-25, 33:5-17. |
| 333. | The photos Cruz showed the bartender were "very gruesome."  When asked to describe the human remains depicted in the photos, the bartender testified:  "It was just shocking." | Ex. 122 (Gutierrez) at 22:13-18, 25:14-21, 54:12-17, 179:23-181:9. |
| 334. | Cruz showed the bartender a photo containing the remains of a dark-skinned individual who, based on the characteristics of the body, the bartender perceived to be male. | Ex. 122 (Gutierrez) at 22:13-23:1, 32:5-22, 249:16-250:2. |
| 335. | Cruz told the bartender that the remains in the photo belonged to Kobe Bryant.  When asked at deposition how he knew the photos | Ex. 122 (Gutierrez) at 20:20-23, 21:9-23:1, 28:25-29:7, 33:5-9, 51:22-52:7, |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| | he saw contained Kobe Bryant's remains, Gutierrez responded: "That's what [Cruz] told me" and "[t]hat's what [Cruz] said." Gutierrez further testified that "the only [photo] I really paid attention to was the one with the [body part] because [Cruz] said it was Kobe." | 52:19-22; 169:2-170:5; 174:21-175:17, 250:14-251:9; Ex. 129 (Gutierrez LASD Int.) at 2078. |
| 336. | At approximately 10:09 p.m., Deputy Cruz left the restaurant. | Saigal Decl. ¶ 148; Ex. 189 (Surveillance Footage – COLA001434) at Channel 8, 22:09:42. |
| 337. | At approximately 10:12 p.m., three minutes after Deputy Cruz departed, the bartender approached Mendez's table and asked Mendez and his teammates if they saw the man who just left the restaurant. The bartender stated that the man was a sheriff's deputy who had worked "a long day" at the site of the helicopter crash in which Kobe Bryant died. | Saigal Decl. ¶ 149; Ex. 189 (Surveillance Footage – COLA001434) at Channel 8, 22:12:45; Ex. 123 (Mendez) at 29:9-30:5, 31:1-33:13, 52:11-15. |
| 338. | The bartender told Mendez that the deputy had shown him photos from the crash scene. | Ex. 123 (Mendez) at 20:16-23:21; 31:24-32:1. |
| 339. | The bartender appeared "excited" to tell Mendez and his teammates about the photos Cruz had shown him. | Ex. 123 (Mendez) at 46:13-22. |
| 340. | The bartender stated that Kobe Bryant could be identified in the photos based on his tattoos and skin tone. | Ex. 123 (Mendez) at 31:24-32:19. |
| 341. | The bartender described the photos to Mr. Mendez "in very graphic fashion." The bartender said that the photos were "extremely gruesome." | Ex. 123 (Mendez) at 31:24-32:7, 34:18-24. |
| 342. | While speaking to Mendez's table, the bartender made numerous hand motions to demonstrate the condition of the remains he saw. These hand motions were captured on surveillance footage. | Ex. 123 (Mendez) at 71:13-74:20; Saigal Decl. ¶ 149; Ex. 189 (Surveillance Footage –COLA001434) at Channel 8, 22:12:45- |

| | | | 22:13:14; Ex. 197 (Surveillance Footage – COLA001435) at Channel 8, 22:13:17-22:17:40. |
|---|---|---|---|
| | 343. | The bartender told Mendez and his teammates that Cruz found the crash-scene photos to be "humorous" and "funny." | Ex. 123 (Mendez) at 47:11-19, 143:14-18. |
| | | **XXIII.  A Citizen Notifies the Sheriff's Department of Cruz's Conduct.** | |
| | 344. | Mendez was "extremely disturbed" and "in shock" regarding what the bartender described, and the idea that a deputy had shown graphic crash-scene photos to a bartender "did not sit well" with him. | Ex. 123 (Mendez) at 20:9-15, 37:2-10, 75:2-9. |
| | 345. | After leaving the restaurant and returning to his house, Mendez sat in his driveway for 15 minutes wondering whether he should report the incident.  The possibility that a deputy had actually shared photos with the bartender "overtook" him, and he decided to submit a complaint through the Los Angeles County Sheriff's Department's website. | Ex. 123 (Mendez) at 38:7-20. |
| | 346. | At 12:21 a.m. on Wednesday, January 29, 2020, Mendez used an online form to write the Los Angeles County Sheriff's Department the following complaint:  Subject: Kobe  There was a deputy at Baja California Bar and Grill in Norwalk who was at the Kobe Bryant crash site showing pictures of his . . . body.  He was working the day the helicopter went down and took pictures of the crash site and bodies.  He is a young deputy, shaved head with tatoos [sic] on his arm.  From what I know.  He's been on [sic] the field for 4 months. | Ex. 161 (Schrader Email); Ex. 123 (Mendez) at 37:11-38:20. |
| | | **XXIV.  LASD's Handling of the Citizen Complaint.** | |

| | | |
|---|---|---|
| 347. | The Sheriff's Information Bureau forwarded Mendez's complaint to Lieutenant Justin Diez, the Watch Commander at the Lost Hills Station.  Lt. Diez quickly forwarded it to Captain Matthew Vander Horck, the highest ranking day-to-day officer in the Lost Hills Station, and Lt. Hector Mancinas, the Operations Lieutenant for the Lost Hills Station. | Ex. 162 (Kneer Email). |
| 348. | Captain Vander Horck responded to the email by assigning his most qualified lieutenant, Justin Diez, to perform an initial fact-gathering inquiry.  In Vander Horck's view, Lt. Diez was highly qualified to handle this initial fact-gathering because he had previously worked in the Sheriff's Department's Internal Affairs Bureau as a sergeant and lieutenant prior to being assigned to the Lost Hills Station. | Ex. 162 (COLA007135); Ex. 111 (Vander Horck) at 66:10-67:13; Ex. 100 (Kneer) at 26:10-17; Ex. 102 (Diez) at 15:16-16:4, 16:12-17:11, 22:22-23:20. |
| 349. | At 9:45 a.m. on January 29, 2020, approximately 80 minutes after the Lost Hills Station received notice of Mr. Mendez's complaint, Deputy Mejia called Deputy Cruz and told him a complaint had been filed.  Cruz understood the complaint to be regarding his behavior at the Baja California Bar and Grill. | Ex. 90 (Cruz) at 167:10-22, 172:24-173:7, 174:9-22, 215:5-9, 216:3-16. |
| 350. | On Thursday, January 30, Deputy Joey Cruz was identified as the individual who had shown crash-scene photos at the bar. | Ex. 111 (Vander Horck) at 86:14-87:7, 87:23-88:10. |
| 351. | Once Captain Vander Horck learned that the deputy who had been identified as the individual who showed photos at the bar in Norwalk was assigned to his station, he instructed Lt. Justin Diez, who was in charge of the fact-finding inquiry, to take a handful of follow-up steps, then submit a Watch Commander Service Comment Report | Ex. 111 (Vander Hock) at 93:13-97:7. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | recommending a full internal affairs investigation of the alleged misconduct. | |
|---|---|---|---|
| | 352. | After providing instructions to Lieutenant Diez, Captain Vander Horck drove home to take a nap because he had been awake the entire evening prior attending to a personal tragedy involving one of his personnel. | Ex. (Vander Horck) at 89:7-90:24, 102:4-103:9. |
| | 353. | In January 2020, Captain Jorge Valdez was the highest-ranking officer in the Sheriff's Information Bureau.  The Sheriff's Information Bureau is a division within the Sheriff's Department whose principle function is "media relations."  The Sheriff's Information Bureau handles press releases, the Department's social media accounts, and related responsibilities. | Ex. 110 (Valdez) at 19:10-24; Ex. 111 (Vander Horck) at 78:24-79:5. |
| | 354. | It is highly unusual for the Sheriff's Information Bureau to be involved in investigating the alleged misconduct of personnel assigned to a particular station. | Ex. 111 (Vander Horck) at 129:15-130:8; Ex. 101 (Mancinas) at 45:21-46:12; Ex. 110 (Valdez) at 41:18-23. |
| | 355. | While Vander Horck was asleep, Valdez called one of Vander Horck's subordinates, Lt. Hector Mancinas, to convey orders from the Sheriff that Lost Hills personnel should be ordered to the station and told that they would receive a performance log entry in lieu of discipline if they deleted the photos. | Ex. 101 (Mancinas) at 48:4-49:19, 52:6-9, 53:19-54:1; Ex. 153 (Mancinas LASD Int.) at 2462; Ex. 113 (Villanueva) at 55:25-56:12, 65:16-66:14, 75:9-23. |
| | 356. | Sheriff Villanueva testified that, at the time he instructed that LASD personnel be offered amnesty for misconduct if they deleted any photos they possessed of the victims' remains, the Department had no knowledge regarding how many photos were involved, what the photos depicted, why the deputies had the photos, or the number of people to whom photos had been transferred. | Ex. 113 (Villanueva) at 211:22-212:7, 212:16-22. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| 357. | After his conversation with Captain Valdez and Lt. Satterfield, Lt. Mancinas called Captain Vander Horck to relay what he had been told by Valdez and Satterfield.  Vander Horck was sleeping and did not answer the call. | Ex. 111 (Vander Horck) at 102:4-21, 103:21-25. |
| 358. | Upon waking up, Vander Horck spoke to Lt. Mancinas.  Mancinas informed Vander Horck that Sheriff Villanueva's directions were to call in "every Lost Hills person who responded to the scene on the day of the crash" to the station, "ask them if they took photographs," and, if they had photographs, "to delete them."  If "nobody found out . . . nobody would get in trouble."  The worst discipline anyone with photos would receive would be a performance log entry. | Ex. 111 (Vander Horck) at 102:22-103:9, 104:18-106:18, 126:1-22. |
| 359. | Upon hearing Lieutenant Mancinas recount what he had been instructed by Captain Valdez and Lieutenant Satterfield, Captain Vander Horck had "a lot of concerns" and "immediately . . . told [Mancinas] to stop."  told Mancinas to stop everything he was doing until Vander Horck had an opportunity to speak with Chief Dennis Kneer.  In response, Mancinas informed Vander Horck that it was "too late" because he had already interviewed roughly half of the Lost Hills personnel who had been at the crash scene. | Ex. 111 (Vander Horck) at 104:18-106:18, 107:25-108:17; Ex. 163 (Vander Horck LASD Int.) at 2620. |
| 360. | Captain Vander Horck was concerned that Captain Valdez and Lieutenant Satterfield, who were officers in "a totally different unit," were giving directions "outside of the chain of command" to Vander Horck's subordinate.  Overall, Vander Horck believed the direction given by Valdez and Satterfield was "extremely unorthodox, out of the ordinary, [and] outside the chain of command." | Ex. 111 (Vander Horck) at 109:14-25, 111:24-112:25. |

| | | |
|---|---|---|
| 361. | Captain Vander Horck was also concerned that Captain Valdez and Lieutenant Satterfield told Lieutenant Mancinas that their directions were "coming from the sheriff," but Mancinas "didn't hear it exactly from the sheriff." | Ex. 111 (Vander Horck) at 109:14-25. |
| 362. | Captain Vander Horck was also concerned that the interviews of the Lost Hills personnel were violating their rights under the Police Officer Bill of Rights as they were "asking them direct questions about conduct that – that's probably against our policies and our procedures." | Ex. 111 (Vander Horck) at 110:1-4, 123:13-125:19, 126:1-22. |
| 363. | Captain Vander Horck also found it "alarming" that the direction to delete photographs was "outside of [the Sheriff's Department's] normal procedures." | Ex. 111 (Vander Horck) at 110:14-15, 115:14-118:10. |
| 364. | Captain Vander Horck was also concerned that, by deleting the photos, the Sheriff's Department might be "violating some obscure federal law" and Captain Vander Horck was concerned that his subordinates might be "on the hook for giving those directions" to the deputies. | Ex. 111 (Vander Horck) at 110:5-13, 115:14-118:10. |
| 365. | Captain Vander Horck was also concerned that the photos being deleted may have had "evidentiary value to either the NTSB or the FBI" because "they were both federal agencies that were out there conducting investigations." | Ex. 111 (Vander Horck) at 113:13-20, 115:14-118:10. |
| 366. | Captain Vander Horck has testified: "[I]t wasn't long ago that, you know, we got in trouble with the FBI -- when I say 'we,' my organization, Los Angeles County Sheriff's Department -- which ultimately resulted in Sheriff Baca and Undersheriff Tanaka going to prison.  And they didn't go after them first. . . . They went after the deputies and the | Ex. 111 (Vander Horck) at 113:21-114:24. |

-149-

| | | |
|---|---|---|
| | sergeants and the lieutenants first because they were given orders that at the time the sheriff and whoever gave them the orders thought that they had the authority to do so, which they didn't.  They actually were in violation of federal laws, and they ended up getting in trouble and going to prison.  And so my biggest concern was this is – I don't know if these photos have evidentiary value to the feds.  We're telling them to destroy these – these photos, and these orders are coming from a captain not of this unit.  I'm not aware of it.  My commander is not aware of it.  My chief is not aware of it.  And who's to say later on that the sheriff might say, Hey, that's not what I meant.  Jorge, why did you tell them that?  And now my lieutenant and my sergeant are on the hook.  That's what my concern was, was my people.  I didn't want them getting in trouble for doing something similar to what we'd already got in trouble to." | |
| 367. | Lieutenant Mancinas corroborates that Captain Vander Horck expressed concerns about directing deputies to delete photos of the crash scene. | Ex. 101 (Mancinas) at 89:14-91:17. |
| 368. | At this point, in Captain Vander Horck's view, the Lost Hills Station's fact-finding inquiry had been ended in favor of the direction given by Captain Valdez at the Sheriff's behest. | Ex. 111 (Vander Horck) at 128:4-129:13, 98:4-22, 100:7-101:1. |
| 369. | Immediately after speaking with Lieutenant Mancinas about the order he received from Captain Valdez, Captain Vander Horck called and spoke to Chief Dennis Kneer. | Ex. 111 (Vander Horck) at 131:17-133:10. |
| 370. | During the call, Captain Vander Horck "bombarded" Chief Kneer with questions.  Vander Horck asked Kneer: "Do you know if these things have evidentiary value?  Do you | Ex. 111 (Vander Horck) at 134:11-22; Ex. 163 (Vander Horck LASD Int.) at 2620. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | know if the NTSB are going to want to know about this?  What about the FBI?  Are we violating laws?  Are people going to be in trouble?  Is Hector [Mancinas] going to be in trouble?  Is Marcus [Phillips] going to be in trouble?"  Vander Horck reminded Chief Kneer that "the last time that our deputies got instructions from our executives in a federal case that they were arrested and tried for crimes." | |
| | 371. | Captain Vander Horck testified that this was the first time in his 30-year career that he ever called a supervisor to question an order he understood to have come from the Sheriff. | Ex. 111 (Vander Horck) at 11:23-25, 136:19-138:1. |
| | 372. | At the end of the call, Chief Kneer told Captain Vander Horck that he would call the Sheriff and call Vander Horck back. | Ex. 111 (Vander Horck) at 139:16-23. |
| | 373. | A short while later, Chief Kneer called Vander Horck to say: "I discussed this with the Sheriff and he assures me that this is the proper way that we're gonna go." | Ex. 163 (Vander Horck LASD Int.) at 2621. |
| | 374. | Sheriff Villanueva denies ever learning that Captain Vander Horck expressed concerns or that anyone pointed out that deleting the photos might violate federal law or constitute destruction of evidence.  Sheriff Villanueva testified that he did not recall any conversation with Chief Kneer in which concerns about the Sheriff's order were raised. | Ex. 113 (Villanueva) at 84:12-25, 85:20-87:16, 89:4-25, 206:24-207:9. |
| | 375. | After the Sheriff directed deputies to delete the photographs in exchange for amnesty, Chief Kneer informed Assistant Sheriff Gross that there would no longer be an internal investigation of the potential misconduct in light of the Sheriff's directive. | Ex. 100 (Kneer) at 56:15-57:21. |
| | 376. | Following his call with Chief Kneer, Captain Vander Horck called Lieutenant Mancinas. | Ex. 111 (Vander Horck) at 146:11-22. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | Vander Horck told Mancinas that he had voiced concerns to Chief Kneer, and that Kneer had spoken to Sheriff Villanueva. Sheriff Villanueva had assured Kneer that he has the authority to proceed as directed, that "this is an administrative incident only," and that "this is the direction we're going in." Vander Horck told Mancinas to resume the interviews and to keep him posted. | |
| | 377. | Following the call with Captain Vander Horck, Lieutenant Mancinas and Sergeant Phillips continued executing the amnesty deal dictated by the Sheriff. | Ex. 111 (Vander Horck) at 147:21-148:3. |
| | 378. | By January 31, several deputies represented that they had deleted their photos. | Cruz Decl. Ex. 1 (Cruz Memo to Vander Horck); Jauregui Decl. Ex. 7 (Jauregui Memo to Vander Horck); Cable Decl. Ex. 8 (Cable Memo to Vander Horck); Russell Decl. Ex. 2 (Russell Memo to Vander Horck); Mejia Decl. Ex. 3 (Mejia Memo to Vander Horck). |
| | 379. | Lieutenant Mancinas' and Sergeant Phillips' interviews with Lost Hills personnel were "real basic."  They asked individuals if they responded to the crash site, if they took photos of the crash site, and if anyone had sent them photos of the crash site.  They told the individuals that "if they deleted any photos they had of the crash site, they would not be disciplined." | Ex. 106 (Phillips) at 59:12-22, 61:12-19. |
| | 380. | The interviews with Lost Hills personnel ranged from "maybe a minute" to five minutes. | Ex. 95 (Jauregui) at 80:5-15 (Jauregui's conversation with Mancinas lasted "[m]aybe a minute, if that"); Ex. 106 (Phillips) at 85:13-18. |

| | | |
|---|---|---|
| 381. | The interviews with the Lost Hills personnel were not recorded. | Ex. 101 (Mancinas) at 126:25-127:8; Ex. 106 (Phillips) at 88:5-13. |
| 382. | Neither Lieutenant Mancinas nor Sergeant Phillips prepared a memo or other document memorializing what was said in the interviews they conducted until weeks later, after the *Los Angeles Times* reported on the alleged misconduct. | Ex. 106 (Phillips) at 88:14-21; Ex. 147 (Mancinas Memo dated March 3, 2020) at 2434-39. |
| 383. | Neither Captain Satterfield nor Lieutenant Satterfield prepared a memo or other document memorializing their role in responding to the citizen complaint until after the *Los Angeles Times* reported on the alleged misconduct. | Ex. 143 (Valdez Memo dated March 4, 2020) at 2417; Ex. 144 (Satterfield Memo dated March 4, 2020) at 2432. |
| 384. | For the vast majority of the individuals interviewed, Lt. Mancinas and Sgt. Phillips did not take a single step to verify the deputies' statements regarding whether they shared and deleted the photos of the victims' remains.  Instead, Mancinas and Phillips "took them at their word" that they deleted the photos and did not share them.  As a result, Phillips testified that he "cannot be certain that the personnel who denied having shared photos of the crash site or of the . . . human remains at the crash site, in fact, did not share those kinds of photos with other people." | Ex. 153 (Mancinas LASD Int.) at 2471; Ex. 101 (Mancinas) at 79:9-19, 80:11-22, 83:14-23, 85:12-14, 157:22-158:8, 173:12-174:12; Ex. 106 (Phillips) at 80:4-6, 80:25-81:7, 83:1-16; Ex. 91 (Jauregui) at 81:17-23, 83:21-84:3; Ex. 94 (Kelly) at 120:1-7, 122:23-123:2, 129:25-131:12; Ex. 92 (Johnson) at 178:2-179:14. |
| 385. | Mancinas interviewed approximately 25 personnel in connection with the Sheriff's amnesty offer, and he did not review a single deputy's cell phone to verify whether they shared the photos with others. | Ex. 101 (Mancinas) at 173:12-25; Ex. 147 (Mancinas Memo to Becerra) at 2438-39. |
| 386. | Lieutenant Mancinas and Sergeant Phillips finished interviewing Lost Hills personnel on Friday, January 31, 2020.  After that point, the Sheriff's Department took no further | Ex. 111 (Vander Horck) at 154:4-23; Ex. 164 (Email of LA Times Report A. Tchekmedyian to Capt. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| | action in connection with potential misconduct involving photos of the victims' remains until February 26, 2020, when a *Los Angeles Times* reporter reached out to the Sheriff's Department for comment on an impending story regarding the matter. | Valdez & Sheriff Villanueva dated Feb. 26, 2020) at 2627. |
| | **XXV.  Sheriff Villanueva Demotes & Transfers Captain Vander Horck.** | |
| 387. | In mid-February 2020, Chief Kneer was summoned to the Sheriff's Office and informed in the presence of the Sheriff that Captain Vander Horck would be demoted from captain to lieutenant.  The only reason offered for the demotion during the meeting was that Captain Vander Horck was a probationary captain who was not meeting expectations. | Ex. 100 (Kneer) at 94:7-96:2, 99:11-21. |
| 388. | On Tuesday, February 18, 2020—approximately two-and-a-half weeks after he voiced concerns about the Sheriff's deletion order—Captain Vander Horck was summoned to a meeting in Chief Dennis Kneer's office.  Along with Kneer and Vander Horck, Vander Horck's immediate supervisor, Command Chris Reed, was present. | Ex. 111 (Vander Horck) at 220:15-221:24, 222:3-7; Ex. 165 (Vander Hock Email). |
| 389. | Chief Kneer told Captain Vander Horck that Sheriff Villanueva had lost confidence in him to lead the Malibu-Lost Hills station and—effective at midnight that night—Vander Horck would be demoted from Captain to Lieutenant and transferred from the Lost Hills Station to an assignment in court services. | Ex. 111 (Vander Horck) at 222:3-22. |
| 390. | Captain Vander Horck was surprised by the demotion because, in the months leading up to the demotion, Commander Reed had repeatedly told him that he was doing a | Ex. 111 (Vander Horck) at 251:10-253:22; Ex. 100 (Kneer) at 108:5-6. |

| | | | |
|---|---|---|---|
| | | "fantastic" job as the station captain at Lost Hills. | |
| | 391. | Captain Vander Horck asked why Sheriff Villanueva had lost confidence in him, but Chief Kneer and Commander Reed did not provide an explanation. | Ex. 111 (Vander Horck) at 223:3-21, 228:25-229:23. |
| | 392. | Captain Vander Horck asked Chief Kneer and Commander Reed whether they agreed with the decision.  Kneer responded: "Matt, you know I can't answer that."  Reed gave no response at all.  Kneer then said: "Matt, I feel sick about this." | Ex. 111 (Vander Horck) at 224:1-23, 224:24-225:5. |
| | 393. | Captain Vander Horck described the day of his demotion as the "worst day of my life."  That evening, Vander Horck was forced to visit urgent care to seek treatment for abnormally high blood pressure that wouldn't come down. | Ex. 111 (Vander Horck) at 226:2-15, 227:16-228:17, 232:13-6, 234:23-236:20; Ex. 100 (Kneer) at 20:4-24, 97:15-98:10; Ex. 113 (Villanueva) at 38:13-39:8, 39:17-42:2. |
| | 394. | Two days after the conversation with Chief Kneer and Commander Reed in which they informed him he was being demoted, Captain Vander Horck forwarded the email in which he had sent the citizen's complaint to his supervisors (Kneer and Reed) from his Sheriff's Department email account to his personal Gmail account. | Ex. 165 (Vander Horck Email); Ex. 111 (Vander Horck) at 218:24-219:16. |
| | 395. | Three days later, on Friday, February 21, 2020, Sheriff Villanueva called Captain Vander Horck and told him that he would not be demoted and that he would "get to keep [his] bars."  After the Sheriff gave this news, he joked that Vander Horck no longer needed to "rush out and get those blood pressure meds." | Ex. 111 (Vander Horck) at 233:12-234:22, 246:19-22. |
| | 396. | Sheriff Villanueva then informed Vander Horck that he would be transferred to a custody-based position.  Sheriff Villanueva | Ex. 111 (Vander Horck) at 234:11-22. |

| | | | |
|---|---|---|---|
| | | then asked Vander Horck how much time he had with the Sheriff's Department, and Vander Horck stated that he had been with the Department for 30 years. Sheriff Villanueva then told Vander Horck that he "still got some miles left in the tank" and that he would "survive this." | |
| | 397. | Being a captain in a custody-based assignment, such as the Men's Central Jail, is considered a less desirable position within the Sheriff's Department than being a station captain. And custody assignments have developed a stigma of being a "dumping ground." Vander Horck testified that "a lot of captains that [sic] fall out of favor with the Sheriff get put in custody." | Ex. 111 (Vander Horck) at 234:23-236:20. |
| | 398. | In contrast to the accounts of Vander Horck, Kneer, and Reed, Sheriff Villanueva testified that he never intended to demote Captain Vander Horck from captain to lieutenant, and that any conversation in which Chief Kneer informed Captain Vander Horck that he would be demoted would be "surprising" and "against his wishes." Sheriff Villanueva testified that demoting someone from captain to lieutenant is "a serious thing." | Ex. 113 (Villanueva) at 193:19-197:8. |
| | 399. | Vander Horck's supervisor, Commander Reed, testified: "You don't get demoted from captain to lieutenant unless it's at the [S]heriff's direction." | Ex. 107 (Reed) at 67:16-68:20. |
| | | **XXVI. The *LA Times* Breaks the News & LASD Opens an Investigation.** | |
| | 400. | On February 26, 2020, in response to questions from a *Los Angeles Times* reporter about a complaint submitted regarding photos of the crash site, Captain Valdez stated that he was "unaware of any | Rodriguez-Sanchirico Decl. Ex. 45 (LA Times article) at 426-32; Ex. 110 (Valdez) at 208:6-209:8, 214:23-215:20, 219:21-220:9. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | complaint" and that "there was no order given to delete any photographs." | |
| | 401. | Later that day, the *Los Angeles Times* reporter emailed Captain Valdez and Sheriff Villanueva seeking comment on a forthcoming story about alleged misconduct with accident scene photos. | Ex. 164 (Email of LA Times Report A. Tchekmedyian to Capt. Valdez & Sheriff Villanueva dated Feb. 26, 2020). |
| | 402. | On February 27, 2020—the day after a reporter for the Los Angeles Times reached out to the Sheriff's Department regarding the photos—Lt. Hector Mancinas of the Lost Hills Sheriff's Department issued performance log entries to Deputies Doug Johnson, Rafael Mejia, Joey Cruz, Michael Russell, and Raul Versales. The text of the performance log entries were identical and did not mention the words "photo" or "photograph." The log entries stated: This performance log entry is to document our conversation regarding the helicopter crash that occurred on January 26, 2020. You are reminded – All Department members shall be held accountable for their utterances, writings, conduct, and visual representations, including electronic and web-based communications, when they conflict with our Core Values, our Mission, or our Creed and personnel can reasonably be identified as Department members. | Exs. 148-152 (Performance Log Entries); Ex. 154 (Kneer LASD Int.) at 2483; Ex. 100 (Kneer) at 67:17-70:18, 73:23-75:25, 77:12-19. |
| | 403. | On February 28, 2020—the same day that the Los Angeles Times published a story regarding a deputy sharing photos of the crash scene at a bar—the Sheriff's Department initiated an internal affairs investigation of potential misconduct involving deputies who "responded to the | Ex. 166 (Request for IAB Investigation dated February 28, 2020) at 2633-34. |

-157-

| | | |
|---|---|---|
| | site of a helicopter crash, took photographs of deceased victims, and shared them with other individuals without permission." | |
| 404. | When asked why the Sheriff's Department launched the internal investigation, Commander Reed told Sheriff's Department investigators: "I think because it went to the media and people freaked out." | Ex. 155 (Reed LASD Int.) at 2489. |
| | **XXVII.  LASD Conducts Cursory Review of Deputies' Phones.** | |
| 405. | The officer in charge of the Sheriff's Department's internal affairs investigation related to the photos, Captain William Jaeger, testified that the Department's review of employees' cell phones during the investigation was a "cursory review . . . of the device in front of the employee that allowed us access into that device."  Captain Jaeger further testified that the Department did not see anything within those cellular phones in a "cursory search." | Ex. 104 (Jaeger) at 62:22-63:14, 87:21-88:4. |
| 406. | In January 2020, photos and text messages on Deputy Cruz's personal cell phone were automatically backed up to Cruz's iCloud account. | Ex. 90 (Cruz) at 57:8-58:6, 59:8-11, 59:19-60:1. |
| 407. | Neither Deputy Cruz nor anyone from the Sheriff's Department has checked to confirm whether photos of the victims' remains were saved or continue to be housed on Cruz's iCloud account, and Cruz's cloud storage account was not made available for the Forensic Examiner in this litigation. | Ex. 90 (Cruz) at 60:7-61:13, 248:16-20; *see* Ex. 133 (J. Cruz LASD Int.) at 2261; Price Decl. Ex. 36 at 38-39. |
| 408. | In January 2020, the phone on which Deputy Cruz received photos of the victims' remains had several social media applications installed on it, including Facebook, Facebook Messenger, Instagram, and Snapchat.  Cruz's personal e-mail account was also linked to his cell phone. | Ex. 90 (Cruz) at 62:11-13, 62:18-20, 62:24-63:2, 64:5-7, 64:24-65:2. |

| 409. | The Sheriff's Department has never asked Deputy Cruz for his username or password for his social media accounts or personal e-mail account to conduct a search for photos of victims' remains. | Ex. 90 (Cruz) at 248:5-13. |
|---|---|---|
| 410. | In January 2020, Deputy Russell had a cloud storage account associated with his personal cell phone. | Ex. 90 (Russell) at 72:1-8. |
| 411. | The Sheriff's Department has never asked Deputy Russell for his username or password for his cloud storage account to check to confirm whether photos of the victims' remains were saved or continue to be housed on Russell's cloud storage account, and Russell's cloud storage account was not made available for the Forensic Examiner in this litigation. | Ex. 90 (Russell) at 285:21-286:2; *see* Ex. 134 (Russell LASD Int.) at 2281; Price Decl. Ex. 36 at 38-39. |
| 412. | In January 2020, the phone on which Deputy Russell received photos of the victims' remains had several social media applications installed on it, including Facebook Messenger and Snapchat.  Russell also used his personal cell phone to access his personal email through Hotmail. | Ex. 90 (Russell) at 67:12-15, 67:24-68:2, 68:17-22. |
| 413. | The Sheriff's Department has never asked Deputy Russell for his username or password for his social media accounts or personal e-mail account to conduct a search for photos of victims' remains. | Ex. 90 (Russell) at 286:15-287:18. |
| 414. | In January 2020, the phone on which Deputy Mejia received photos of the victims' remains had several social media applications installed on it, including Facebook Messenger and Snapchat.  Mejia also used his personal cell phone to access his personal email through Yahoo. | Ex. 91 (Mejia) at 98:13-99:4, 99:21-25; 101:4-21. |

-159-

| 415. | The Sheriff's Department has never asked Deputy Mejia for his username or password for his social media accounts or personal e-mail account to conduct a search for photos of victims' remains. | Ex. 91 (Mejia) at 212:1-7, 212:12-14, 212:18-213:1. |
|------|------|------|
| 416. | In January 2020, the phone on which Deputy Versales received photos of the victims' remains had several social media applications installed on it, including Facebook Messenger, Facebook, TikTok, and Instagram.  Versales also used his personal cell phone to access his personal emails through Gmail and Yahoo. | Ex. 92 (Versales) at 89:20-22, 90:25-91:5, 93:8-18. |
| 417. | The Sheriff's Department has never asked Deputy Mejia for his username or password for his social media accounts or personal e-mail account to conduct a search for photos of victims' remains. | Ex. 92 (Versales) at 263:22-264:21. |
| 418. | In January 2020, the phone on which Deputy Sanchez received photos of the victims' remains had social media applications installed on it, including Facebook Messenger. | Ex. 95 (Sanchez) at 107:9-24. |
| 419. | The Sheriff's Department has never asked Deputy Sanchez for his username or password for his social media accounts to conduct a search for photos of victims' remains. | Ex. 95 (Sanchez) at 106:5-19. |
| 420. | In January 2020, the phone on which Deputy Cable received photos of the victims' remains had several social media applications installed on it, including WhatsApp and Snapchat.  Cable also used her personal cell phone to access her personal email. | Ex. 89 (Cable) at 146:13-15, 147:18-25, 150:23-25. |
| 421. | The Sheriff's Department has never checked Deputy Cable's social media accounts or | Ex. 89 (Cable) at 112:20-113:12. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | personal email to conduct a search for photos of victims' remains. | |
|---|---|---|---|
| | 422. | In January 2020, the phone on which Deputy Jauregui received photos of the victims' remains had social media applications installed on it, including Instagram.  Jauregui also used his personal cell phone to access his personal email account. | Ex. 91 (Jauregui) at 128: 10-20, 129:19-130:9. |
| | 423. | The Sheriff's Department has never asked Deputy Jauregui for his username or password for his social media accounts or personal e-mail account to conduct a search for photos of victims' remains. | Ex. 91 (Jauregui) at 101:4-12. |
| | 424. | In August of 2020, the Sheriff's Department completed its internal affairs investigation and concluded that the following personnel possessed photos of the victims' remains on their cell phones at some point:<br>• Deputy Doug Johnson<br>• Deputy Raul Versales<br>• Detective Scott Miller<br>• Deputy Chris Jauregui<br>• Deputy Rafael Mejia<br>• Sergeant Travis Kelly<br>• Sergeant Stephanie Shrout<br>• Deputy Joey Cruz<br>• Deputy Michael Russell<br>• Deputy Benjamin Sanchez | Jaeger Decl. Ex. 25 at 23. |
| | 425. | Following the internal investigation, the Sheriff's Department "determined not to take any disciplinary action against" Raul Versales, Rafael Mejia, and Michael Russell. | Jaeger Decl. Ex. 26 (Versales Notice of Completion of Investigation) at 58; Jaeger Decl. Ex. 27 (Mejia Notice of Completion of Investigation) at 67; Jaeger Decl. Ex. 28 (Russell |

| | | | |
|---|---|---|---|
| | | | Notice of Completion of Investigation) at 77. |
| | 426. | Versales, Mejia, and Russell have maintained their rank as deputy sheriffs and have not served any suspensions, been demoted, or lost any income or other benefits. | Ex. 92 (Versales) at 18:4-8, 269:5-9; Ex. 91 (Mejia) at 14:9-16, 267:7-16; Ex. 90 (Russell) at 13:19-20, 268:4-20. |
| | 427. | Following the internal investigation and Cruz's appeal of the initial decision regarding his discipline, Cruz served a two day suspension for his misconduct related to the photos.  He also participated in three days of paid, mandatory training. | Jaeger Decl. Ex. 29 (Cruz Disposition Sheet) at 87; Ex. 90 (Cruz) at 251:9-22. |
| | 428. | Aside from Deputy Cruz, no member of the Sheriff's Department has received any discipline related to the taking or sharing photos of the victims' remains. | Ex. 100 (Kneer) at 142:1-5. |
| | | **XXVIII. Plaintiff Notifies the Sheriff's Department of Her Claims.** | |
| | 429. | On March 2 and 8, 2020, Mrs. Bryant's attorneys sent letters to the Sheriff's Department requesting that the Department "take immediate action to secure all photos and videos of the January 26, 2020 crash scene in the Sheriff's Department's possession," including "any photos or videos in the possession of or disseminated by Sheriff's Department personnel."  Citing *Catsouras v. Dept. of Cal. Highway Patrol*, 181 Cal. App. 4th 856 (2010), the letters further noted that the unauthorized dissemination of photos of victims' remains "could give rise to liability for, among other things, invasion of privacy, negligence, negligent or intentional infliction of emotional distress, and negligent supervision or retention." | Ex. 203 (3/2 letter); Ex. 204 (3/8 letter). |

| 430. | On May 8, 2020, Plaintiff filed a Notice of Claims with the County notifying the County of her claims against the Sheriff's Department. | Saigal Decl. ¶ 161. |
|---|---|---|
| 431. | On September 17, 2020, Plaintiff filed her initial complaint in this case in California State Court. | Saigal Decl. ¶ 163. |
| 432. | On March 17, 2021, Plaintiff filed her First Amended Complaint adding the Los Angeles County Fire Department and Deputies Cruz, Mejia, Russell, and Versales as defendants. | ECF. No. 54. |
| 433. | On March 22, 2021, Defendants Cruz, Mejia, Russell, and Versales were served through their counsel with their summons in this case. | Ex. 200 (Summons Email). |
| 434. | Of the ten LASD personnel whom the Department knew to have possessed photos of the victims' remains, nine never received a written or oral instruction to preserve documents and communications related to this lawsuit. | Ex. 89 (Cable) at 132:23-133:5; Ex. 99 (Sanchez) at 122:22-123:5, 134:10-15; Ex. 91 (Mejia) at 240:22-241:4; Ex. 90 (Russell) at 266:15-22; Ex. 90 (Cruz) at 191:21-192:6, 281:24-282:6; Ex. 92 (Johnson) at 222:19-223:1; Ex. 93 (Miller) at 128:14-21; Ex. 94 (Kelly) at 142:16-23; Ex. 92 (Versales) at 298:2-10. |
| 435. | Between March 2, 2020—when Mrs. Bryant sent her letter to the Sheriff's Department threatening legal action—and continuing through November 2021—the Sheriff's Department never instructed personnel known to have possessed photos of the victims' remains to preserve the cell phones on which they had received them. | Ex. 104 (Jaeger) at 120:14-121:25. |
| | **XXIX. LASD Personnel Lose Possession of Their Cell Phones.** | |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| 436. | Of the eleven LASD personnel known to have possessed crash-scene photos on their cell phones (Joey Cruz, Ruby Cable, Chris Jauregui, Doug Johnson, Travis Kelly, Rafael Mejia, Scott Miller, Michael Russell, Ben Sanchez, Stephanie Shrout, Raul Versales), nine lost or disposed of their phones in the period between March 2, 2020 and November 2021. | Bryant Decl., Ex. XX (Email by Defendants' Counsel (Jason Tokoro dated Oct. 4, 2021 ("Tokoro Email")) at 1 (summarizing cell phones of LASD personnel that had been "[r]eplaced/upgraded"); Ex. 104 (Jaeger 30(b)(6)) at 121:21-25. |
|---|---|---|
| 437. | As a result of nine LASD personnel losing or disposing of the phones on which they had previously received the photos, those phones were not examined by the Forensic Examiner to determine whether the photos were disseminated.  This is confirmed by the forensic examiner's list for forensic images provided to the Examiner by Defendants. The list included Travis Kelly's device, but not the devices of Joey Cruz, Ruby Cable, Chris Jauregui, Doug Johnson, Rafael Mejia, Scott Miller, Michael Russell, Ben Sanchez, Stephanie Shrout, or Raul Versales. | Bryant Decl. Ex. XX (List of Forensic Images Provided to Examiner) at 1; Ex. 206 (Price) at 22:16-23:16; Bryant Decl., Ex. XX (Tokoro Email) at 1. |
| 438. | In April 2020, just over a month after the Los Angeles Times reported that deputies had shared photos of the victims' remains and after the Sheriff's Department began its internal investigation of the photos, Deputy Benjamin Sanchez lost possession of the cell phone he used to send and receive photos of the victims' remains.  Neither Sanchez nor the County imaged Sanchez's phone to preserve its data before he lost possession. | Ex. 95 (Sanchez) at 91:15-92:7; Bryant Ex. XX (List of Forensic Images Provided to Examiner) at 1; Bryant Decl., Ex. XX (Tokoro Email) at 1; Ex. 104 (Jaeger 30(b)(6)) at 121:21-25 (Q: "[D]id the department ever take a forensic image of any devices that were used to take, received, or share accident scene photos?" A: "We did not do a forensic search of any of those personal cell phones, no."); |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | | Ex. 207 (COLA's Response to Pl.'s 3rd Set of ROGS) at 2874-75 (not describing any forensic imaging efforts in response to ROG asking COLA to detail all measures taken to preserve mobile devices). |
| 439. | | In October 2020, a month after Plaintiff filed this lawsuit, Deputy Raul Versales lost possession of the cell phone he used to send and receive photos of the victims' remains. Neither Versales nor the County imaged Versales' phone to preserve its data before he lost possession. | Bryant Decl. Ex. XX (List of Forensic Images Provided to Examiner) at 1; Lavoie Decl. Ex. XX (Tokoro Email) at 1; Ex. 104 (Jaeger 30(b)(6)) at 121:21-25; Ex. 207 (COLA's Response to Pl.'s 3rd Set of ROGS) at 2874-75. |
| 440. | | In November 2020, two months after Plaintiff filed this lawsuit, Deputy Ruby Cable lost possession of the cell phone she used to send and receive photos of the victims' remains.  Neither Cable nor the County imaged Cable's phone to preserve its data before she lost possession. | Ex. 89 (Cable) at 123:4-10, 123:20-124:3; Bryant Decl. Ex. XX (List of Forensic Images Provided to Examiner) at 1; Lavoie Decl. Ex. XX (Tokoro Email) at 1; Ex. 104 (Jaeger 30(b)(6)) at 121:21-25; Ex. 207 (COLA's Response to Pl.'s 3rd Set of ROGS) at 2874-75. |
| 441. | | In January 2021, Deputy Doug Johnson lost possession of the cell phone he used to send and receive photos of the victims' remains. Neither Johnson nor the County imaged Johnson's phone to preserve its data before he lost possession. | Ex. 92 (Johnson) at 212:14-214:15; Bryant Decl. Ex. XX (List of Forensic Images Provided to Examiner) at 1; Lavoie Decl. Ex. XX (Tokoro Email) at 1; Ex. 104 (Jaeger 30(b)(6)) at 121:21-25; Ex. 207 (COLA's Response to Pl.'s |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| | | 3rd Set of ROGS) at 2874-75. |
| 442. | In February 2021, Detective Scott Miller wiped the cell phone he used to receive photos of the victims' remains. Neither Miller nor the County imaged Miller's phone to preserve its data before he wiped the phone. | Ex. 93 (Miller) at 130:25-131:14; Ex. XX (List of Forensic Images Provided to Examiner) at 1; Lavoie Decl. Ex. XX (Tokoro Email) at 1; Ex. 104 (Jaeger 30(b)(6)) at 121:21-25; Ex. 207 (COLA's Response to Pl.'s 3rd Set of ROGS) at 2874-75. |
| 443. | In March 2021, the same month in which Plaintiff named Deputy Rafael Mejia as a defendant, Mejia lost possession of the cell phone he used to send and receive photos of the victims' remains. Neither Mejia nor the County imaged Mejia's phone to preserve its data before he lost possession. | Ex. 91 (Mejia) at 235:5-236:13; Bryant Decl. Ex. XX (List of Forensic Images Provided to Examiner) at 1; Lavoie Decl. Ex. XX (Tokoro Email) at 1; Ex. 104 (Jaeger 30(b)(6)) at 121:21-25; Ex. 207 (COLA's Response to Pl.'s 3rd Set of ROGS) at 2874-75. |
| 444. | In April 2021, one month after he was served with a summons in this case, Deputy Michael Russell lost possession of the cell phone he used to send and receive photos of the victims' remains. Neither Russell nor the County imaged Russell's phone to preserve its data before he lost possession. | Ex. 90 (Russell) at 72:23-73:10; Bryant Decl. Ex. XX (List of Forensic Images Provided to Examiner) at 1; Lavoie Decl. Ex. XX (Tokoro Email) at 1; Ex. 104 (Jaeger 30(b)(6)) at 121:21-25; Ex. 207 (COLA's Response to Pl.'s 3rd Set of ROGS) at 2874-75. |
| 445. | In July 2021, Deputy Chris Jauregui performed a factory reset of the cell phone | Ex. 91 (Jauregui) at 124:19-125:9; Bryant Decl. |

| | | he used to send photos of the victims' remains.  Neither Jauregui nor the County imaged Jauregui's phone to preserve its data before he reset the phone. | Ex. XX (List of Forensic Images Provided to Examiner) at 1; Lavoie Decl. Ex. XX (Tokoro Email) at 1; Ex. 104 (Jaeger 30(b)(6)) at 121:21-25; Ex. 207 (COLA's Response to Pl.'s 3rd Set of ROGS) at 2874-75. |
| 446. | | In August 2021, Stephanie Shrout lost possession of the cell phone she used to receive photos of the victims' remains.  Neither Shrout nor the County imaged Shrout's phone to preserve its data before she lost possession. | Bryant Decl. Ex. XX (List of Forensic Images Provided to Examiner) at 1; Lavoie Decl. Ex. XX (Tokoro Email) at 1; Ex. 104 (Jaeger 30(b)(6)) at 121:21-25; Ex. 207 (COLA's Response to Pl.'s 3rd Set of ROGS) at 2874-75. |
| | | **XXX.  The Fire Department's Internal Investigation.** | |
| 447. | | The Department recognizes that all relevant evidence must be preserved to conduct an internal investigation. | Ex. 119 (McCloud 30(b)(6)) at 54:23-56:5. |
| 448. | | The Department received a phone call on January 31, 2020, from Captain Vander Horck of the Los Angeles County Sheriff's Department.  Captain Vander Horck informed the Department that a sheriff's deputy had witnessed a Fire Department employee taking photos of the crash scene and a second Fire Department employee receiving crash-scene photos.  During the call, Captain Vander Horck provided a general description of the Fire Department employees involved.  Fire Chief Osby had a conversation with Sheriff Villanueva about the situation that same day. | Ex. 119 (McCloud 30(b)(6)) at 58:7-59:16, 64:4-67:1, 67:18-68:1, 200:12-201:4. |

-167-

| | |
|---|---|
| 449. | After receiving this information from Captain Vander Horck on January 31, 2020, the Fire Department made an admittedly "cursory assessment" to try to identify the two Fire Department employees who took and received crash-scene photos. | Ex. 119 (McCloud) at 72:19-73:3, 73:19-24. |
| 450. | The Department's "cursory assessment" consisted of a brief phone call with two Department employees who matched the general description provided by Captain Vander Horck.  The Department did not contact anyone else who had responded to the crash scene.  The Department ultimately concluded that neither of the two employees it contacted were the personnel described by the Sheriff's Department. | Ex. 119 (McCloud) at 73:3-18, 76:8-77:11, 82:17-83:7, 83:19-84:1, 205:12-206:16. |
| 451. | When the Department contacted the two employees who matched the general description provided by Captain Vander Horck soon after January 31, it instructed them to preserve any crash-scene photos they had in their possession because it "was anticipating that there might be an investigation," and it understood that "it's important to preserve evidence that might be related to the investigation."  The Department did not instruct anyone else who responded to the crash to preserve relevant evidence at that time. | Ex. 119 (McCloud 30(b)(6)) at 74:23-75:6, 76:24-77:4, 205:12-206:10. |
| 452. | After receiving the information from Captain Vander Horck, the Department did not interview anyone who responded to the crash scene on January 26.  It also did not make any effort to examine the devices of any of those personnel. | Ex. 119 (McCloud) at 80:14-81:23, 201:17-202:18. |
| 453. | After receiving information from Captain Vander Horck on January 31, 2020, regarding a deputy who had witnessed two Fire Department taking and receiving crash- | Ex. 119 (McCloud 30(b)(6)) at 140:22-141:3. |

-168-

| | | |
|---|---|---|
| | scene photos, the Department did not speak to the deputy who witnessed the conduct—Deputy Johnson—until July 24, 2020. | |
| 454. | While his memory had faded by the time the Fire Department questioned him, Deputy Johnson identified several employees who he thought resembled the on-scene Fire Department supervisor to whom Johnson Airdropped photos of the victims' remains. | Ex. 96 (Johnson) at 194:22-195:3, 198:18-199:5. |
| 455. | After interviewing Deputy Johnson, the Fire Department did not take any further steps to identify the on-scene supervisor who had received photos of the victims' remains.  It did not, for example, interview or examine the devices of any of the individuals whom Deputy Johnson had identified as potential suspects. | Ex. 119 (McCloud 30(b)(6) at 144:16-145:12. |
| 456. | During his interview with the Fire Department on July 24, 2020, Deputy Johnson immediately identified Brian Jordan as the Fire Department employee who he had escorted around the scene and observed taking photos. | Ex. 183 (Johnson LAFD Int. [COLA035118]) at 22:23-23:04; Ex. 156 (Jordan Report) 2527-28; Ex. 96 (Johnson) at 195:24-197:17; Ex. 167 (Photo of Jordan). |
| 457. | The Department was unable to determine the total number of photos Jordan took that depicted the victims' remains, or how many people Jordan sent such photos to. | Ex. 119 (McCloud 30(b)(6) at 147:12-21, 149:11-18. |
| 458. | The Department was unable to determine the total number of photos Kahan took that depicted the victims' remains, or how many people Kahan sent such photos to. | Ex. 119 (McCloud 30(b)(6) at 164:14-17, 166:9-16. |
| 459. | The Department was unable to determine the total number of photos Imbrenda received that contained victims' remains, and it was also unable to identify everyone who sent Imbrenda such photos. | Ex. 119 (McCloud 30(b)(6) at 156:18-157:9. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| 460. | The Department did not take any steps to verify that Jordan, Kahan, and Imbrenda did not possess crash-scene photos on their personal cell phones. | Ex. 116 (Jordan) at 146:21-25; Ex. 117 (Kahan) at 107:10-109:12, 110:21-111:2; Ex. 115 (Imbrenda) at 208:6-17, 210:5-7, 212:25-213:13; Ex. 118 (Marrone) at 73:10-18. |
| 461. | The Department did not check whether Jordan sent or stored crash-scene photos in his cloud account, social media, personal email, or text message on his personal cell phone. | Ex. 116 (Jordan) at 40:1-42:12, 147:1-12. |
| 462. | The Department did not check Kahan's cloud-storage account or verify whether Kahan sent or stored crash-scene photos via his personal email or cloud account. | Ex. 117 (Kahan) at 31:23-32:12, 109:21-110:8. |
| 463. | The Department did not verify whether Imbrenda sent or stored crash-scene photos via his personal email, his cloud account, or the messaging applications on his personal phone. | Ex. 115 (Imbrenda) at 48:15-24, 49:7-15, 50:1-10, 208:3-209:15, 213:9-13. |
| | **XXXI.  The Fire Department's Lack of Policy or Training Regarding the Constitutional Right to Control Death Images of Family Members.** | |
| 464. | As of January 26, 2020, the Department did not have any policies in place regarding photography of accident or emergency scenes. | Ex. 119 (McCloud 30(b)(6)) at 42:24-43:2. |
| 465. | As of January 26, 2020, the Department did not have any policies in place regarding photographs of human remains. | Ex. 119 (McCloud 30(b)(6)) at 43:3-10; Ex. 118 (Marrone) at 77:19-22 |
| 466. | The Department also did not provide any specific training relating to photography at accident or emergency scenes, or training relating to photography of human remains. | Ex. 119 (McCloud 30(b)(6)) at 181:6-12. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| 467. | As of January 26, 2020, the Department did not have any policies in place regarding the use of personal cell phones by on-duty Department personnel. | Ex. 119 (McCloud 30(b)(6)) at 45:17-23. |
| 468. | As of January 26, 2020, the Department did not have any policies in place regarding the handling or confidentiality of information or other materials involving celebrities. | Ex. 119 (McCloud 30(b)(6)) at 45:24-46:6. |
| 469. | The Department's "pretty weak" social media policy that was in place as of January 26, 2020 was directed to the Department's social media administrators and addressed content that could and could not be posted on social media.  It did not provide any guidance to personnel in the field about appropriate and inappropriate incident photography. | Ex. 119 (McCloud 30(b)(6)) at 187:18-188:13l; Ex. 205 (Sprewell Interview Audio, COLA035067) at 38:25-39:51. |
| 470. | Following this incident, the Department reviewed and reevaluated its current policies and procedures.  As a result of that reevaluation process, the Department drafted a new policy that provides guidance to its rank and file on appropriate and inappropriate incident photography.  The Department concluded that a new policy that provided such guidance was necessary as part of the "corrective action plan" it owes to the communities that it serves and to its employees because what happened in connection with this incident was "not [the Department's] best moment." | Ex. 119 (McCloud 30(b)(6)) at 187:11-188:25; Ex. 168 (Dep. Ex. 30). |
| 471. | Fire Department employees deposed in this litigation were unfamiliar with the constitutional right to control death images of family members. | Ex. 120 (Smith) at 104:16-22; Ex. 116 (Jordan) at 79:10-80:3; Ex. 117 (Kahan) at 139:20-140:4; Ex. 118 (Marrone) at 79:2-80:2; Ex. 115 (Imbrenda) at 239:4-15. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| 472. | Prior to January 26, 2020, Imbrenda and Kahan had never received any training that suggested it would be impermissible to take photos of human remains at an accident scene. | Ex. 117 (Kahan) at 133:8-19, 135:4-10; Ex. 115 (Imbrenda) at 66:23-67:11. |
| 473. | If the Department had a specific policy in place as of January 26, 2020 that prohibited photography of decedents, Kahan would have not taken and shared photos of the victims' remains, and Imbrenda would not have possessed such photos. | Ex. 117 (Kahan) at 140:5-141:12; Ex. 115 (Imbrenda) at 239:24-241:1. |
| 474. | Imbrenda told the Department's investigator that the Department was "in need of a strong policy" for "future people who do this work," because the Department did not have any policy about photography of emergency incidents at the time. | Ex. 176 (Imbrenda Interview Audio, COLA035068) at 41:29-41:36. |
| | **XXXII.  LASD's Lack of Policy or Training.** | |
| 475. | LASD employees deposed in this litigation, including Sheriff Villanueva, were unfamiliar with the constitutional right to control death images of family members. | Ex. 90 (Cruz) at 256:24-258:6; Ex. 92 (Johnson) at 205:12-19; Ex. 91 (Mejia) at 218:16-219:15; Ex. 92 (Versales) at 265:14-17; Ex. 90 (Russell) at 267:9-268:2; Ex. 89 (Cable) at 113:13-20; Ex. 93 (Miller) at 102:3-103:11; Ex. 95 (Sanchez) at 111:8-112:1; Ex. 91 (Jauregui) at 102:4-103:6; Ex. 94 (Kelly) at 131:15-22; Ex. 111 (Vander Horck) at 122:3-12; Ex. 100 (Kneer) at 59:13-61:5; Ex. 102 (Diez) at 82:4-22; Ex. 110 (Valdez) at 203:5-22; Ex. 108 (Satterfield) at 126:8-127:1; Ex. 113 (Villanueva) at 164:12- |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | | 165:24; Ex. 107 (Reed) at 55:16-56:14. |
| 476. | | LASD designated a 30(b)(6) witness on "whether and how the Sheriff's Department was aware on or before January 31, 2020 that taking and/or sharing of photos of human remains might implicate federal Constitutional rights." The witness gave the following testimony: | Ex. 103 (Flores) at 61:13-23, 71:4-14. |
| | Counsel: | So I'm going to put this – so to be very specific, in January 2020 did the [S]heriff's [D]epartment know, one way or another, whether citizens have a Constitutional right to control the death images of a deceased loved one[?] Did the [S]heriff's [D]epartment know that in January of 2020 or did it not know that? | |
| | | [Objection.] | |
| | 30(b)(6): | You know, I really don't know. I really don't know. | |
| 477. | | LASD's 30(b)(6) witness gave the following testimony: | Ex. 103 (Flores 30(b)(6)) at 124:5-13. |
| | Counsel: | Between January 26 and January 31, 2020[,] were there any policies, practices or procedures in effect by the sheriff's department relating to any federal Constitutional rights that are implicated or potentially implicated by taking, sharing and/or dissemination photos of accident scenes or human remains? | |
| | 30(b)(6): | No. | |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| 478. | LASD personnel who took, obtained, and/or shared photos of the victims' remains testified that they did not understand themselves to be violating any Sheriff's Department policies or training when they did so.  Most personnel testified they understood their conduct to be affirmatively allowed by or consistent with Department policies and training. | Ex. 89 (Cable) at 75:16-20, 75:25-77:5, 77:23-78:7; Ex. 90 (Cruz) at 93:7-96:5, 120:17-121:20; Ex. 91 (Jauregui) at 72:5-74:6; Ex. 92 (Johnson) at 159:4-23, 223:16-21; Ex. 94 (Kelly) at 60:23-61:21, 79:5-11, 100:10-15, 101:14-22; Ex. 91 (Mejia) at 149:13-19, 271:1-272:6; Ex. 93 (Miller) at 103:25-104:5; Ex. 90 (Russell) at 282:11-15, 282:23-283:17; Ex. 95 (Sanchez) at 76:14-78:19, 79:7-80:24; Ex. 92 (Versales) at 204:4-13, 206:7-207:7, 276:20-277:7. |
| --- | --- | --- |
| 479. | The Sheriff's Department does not know whether the Deputy Defendants (Joey Cruz, Rafael Mejia, Michael Russell, and Raul Versales) have received training regarding "whether and under what circumstances it would be permissible to share a photo of human remains with a member of the public." | Ex. 103 (Flores 30(b)(6)) at 88:20-89:4. |
| 480. | LASD's unit commander for the Department's training bureau estimated at deposition that, over his thirty-one-year career, he has spent the equivalent of two full years receiving or conducting trainings with the Sheriff's Department, and in none of that time has he ever heard about a federal constitutional right to control the death images of deceased family members. | Ex. 103 (Flores - personal capacity) at 72:24-73:19. |
| 481. | LASD's 30(b)(6) witness testified that he has seen a single sentence in workbook for academy trainees stating that taking unofficial crime scene photographs is | Ex. 103 (Flores 30(b)(6)) at 80:16-84:13. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| | unprofessional and erodes public trust. However, the witness repeatedly testified that the Department does not know whether the Deputy Defendants were ever exposed to the particular version of the workbook described by the witness.  The witness testified that the organization that publishes the workbook regularly updates it, and the Department does not know which version the Deputy Defendants were exposed to. | |
| 482. | As of January 26, 2020, Sheriff Department personnel routinely used their personal cell phones for work related tasks such as making work related phone calls, sending and receiving work-related text messages and e-mails, and taking work related photos. | Ex. 103 (Flores 30(b)(6)) at 34:10-35:14, 36:10-37:6, 37:13-25, 38:17-23, 40:8-15, 55:18-56:25; Ex. 90 (Cruz) at 42:21-43:1, 44:21-45:1, 43:10-15, 43:16-23; Ex. 91 (Mejia) at 38:18-39:5, 69:12-71:4, 71:22-73:8, 74:21-75:8. |
| | **XXXIII.  The Obvious Risk of Constitutional Violations.** | |
| 483. | Fire Department personnel regularly take photographs and video of emergency incidents and accident scenes.  Incident photography is commonplace. | Ex. 120 (Smith) 17:1-7, 17:19-18:2; Ex. 117 (Kahan) at 21:7-10, 71:21-72:4, 100:5-13; Ex. 118 (Marrone 30(b)(6)) at 119:8-22, 143:8-15; Ex. 116 (Jordan) at 82:25-84:7; Ex. 205 (Sprewell Interview Audio, COLA035067) at 25:22-28:16; Ex. 180 (Jordan Interview Audio, COLA035078) at 13:42-13:59, 41:17-41:41. |
| 484. | Likewise, in January 2020, LASD personnel used their personal cell phones to take photos at crime and accident scenes, and such personal cell phone use for work purposes was authorized by the Department when a | Ex. 103 (Flores 30(b)(6)) at 42:23-43:23, 51:6-23, 54:25-55:4; *e.g.*, Ex. 90 (Cruz) at 45:7-46:1, 47:16- |

-175-

| | | |
|---|---|---|
| | | personal cell phone was the only photography device the deputies had available. | 48:3, 48:22-4; Ex. 91 (Mejia) at 75:9-18. |
| 485. | As of January 26, 2020, the Sheriff's Department had not issued cell phones to most patrol deputies.  Digital cameras were only issued to sergeants.  Accordingly, as of January 26, 2020, the Sheriff's Department estimates that "98 [or] 99 percent" of patrol-based personnel carried personal cell phones while on duty. | Ex. 103 (Flores 30(b)(6)) at 59:9-13, 48:23-49:8, 60:21-61:4. |
| 486. | Fire Department personnel use their personal cell phones to take photos at incidents, and such personal cell phone use for work purposes is sanctioned by the Department. | Ex. 120 (Smith) at 20:24-21:20; Ex. 116 (Jordan) at 63:7-23, 65:5-20, 67:5-7; Ex. 115 (Imbrenda) at 52:25-53:19, 55:7-56:5, 57:9-58:5, 60:6-16, 61:11-17; Ex. 114 (Cornell) at 97:25-98:3. |
| 487. | Likewise, in January 2020, Sheriff Department personnel routinely used their personal cell phones for work related tasks, such as making work related phone calls, sending and receiving work-related text messages and e-mails, and taking work related photos. | Ex. 103 (Flores 30(b)(6)) at 34:10-35:14, 36:10-37:6, 37:13-25, 38:17-23, 40:8-15, 55:18-56:25; Ex. 90 (Cruz) at 42:21-43:1, 44:21-45:1, 43:10-15, 43:16-23; Ex. 91 (Mejia) at 38:18-39:5, 69:12-71:4, 71:22-73:8, 74:21-75:8. |
| 488. | Fire Department personnel regularly share incident photographs within the Department and with other agencies, including the Sheriff's Department. | Ex. 118 (Marrone 30(b)(6)) at 119:8-22; Ex. 120 (Smith) at 20:8-12; Ex. 117 (Kahan) at 21:11-22:6; Ex. 205 (Sprewell Interview Audio, COLA035067) at 32:11-33:54; Ex. 115 (Imbrenda) at 40:17-41:3. |
| 489. | Fire Department personnel encounter human remains with regularity. | Ex. 120 (Smith) at 21:24-22:7, 22:13-23:1; Ex. 117 |

-176-

| | | | |
|---|---|---|---|
| | | | (Kahan) at 17:23-19:8, 21:3-6; Ex. 115 (Imbrenda) at 34:5-15, 35:15-23; Ex. 114 (Cornell) at 26:9-13. |
| 490. | | Likewise, LASD personnel encounter human remains with regularity. For example, Deputy Mejia testified that he has encountered human remains while on duty on over 100 occasions during his nine years with the Lost Hills Station. | Ex. 91 (Mejia) at 37:12-38:14; Ex. 92 (Versales) at 34:2-5. |
| 491. | | In January 2020, LASD personnel regularly used personal devices to take photos of human remains on the job. For example, Deputy Johnson estimated that he has used his personal cell phone to take photos of dead bodies "a hundred times" when responding to "natural disasters, accidents, traffic collisions", "murders," and "suicides" | Ex. 92 (Johnson) at 52:2-55:4. |
| 492. | | Incident photographs taken and shared within the Fire Department sometimes contain human remains. | Ex. 117 (Kahan) at 75:22-76:5; Ex. 120 (Smith) at 105:7-18, 105:24-106:4; Ex. 115 (Imbrenda) at 42:5-7; Ex. 114 (Cornell) at 26:14-18. |
| 493. | | It is "standard operating procedure" for Fire Department personnel to send incident photographs, including graphic photographs, to PIOs. At any notable incident, the PIO might receive "sometimes hundreds of photographs." | Ex. 115 (Imbrenda) at 38:4-39:1, 101:9-15; Ex. 176 (Imbrenda Interview Audio, COLA035068) at 11:52-12:10, 22:45-23:05; Ex. 179 (Cornell Interview Audio, COLA035077) at 4:47-6:01; Ex. 114 (Cornell) at 24:5-17, 24:24-25:8, 29:3-6. |
| 494. | | Erik Scott, of the Los Angeles City Fire Department, testified that his "predecessors that have since retired would take photos and keep books of dead bodies," and sometimes | Ex. 125 (Scott) at 78:24-80:19. |

| | | those photos would be "graphic" and "gruesome." | |
|---|---|---|---|
| | 495. | In 2014, Fire Department employees were investigated for taking pictures at an emergency scene of a deceased victim whose "chest cavity was filleted open."  In an investigation report arising from that incident, the Fire Department acknowledged its lack of policy or procedure with respect to incident photography. | Ex. 169 (2015 LAFD Suspension Letter) at COLA035404; Ex. 170 (2015 LAFD Investigation Report) at 2653; Ex. 171 (LAFD Supp. Investigation Report) at 2668. |
| | 496. | The Fire Department's Chief of Public Affairs recognized that photography was "not a big leap" at an accident involving a major public figure. | Ex. 205 (Sprewell Interview Audio, COLA035067) at 20:43-22:44. |
| | | **XXXIV.  Unaccounted-for Dissemination.** | |
| | 497. | Mrs. Bryant has confronted a photo online that purports to depict her husband's uncovered remains near the blue-and-white helicopter.  The location of the remains in the photograph match where Kobe's remains came to rest. | Bryant Decl. ¶ 11; Ex. 105 (Katz) at 50:23-52:8. |
| | 498. | On January 29, 2020, an Orange County law enforcement officer displayed close-range photos of the crash-scene at a bar in Cerritos, telling the bartender that he had received the photos from a colleague.  While showing the photos to the bartender, the officer said: "I'm not even supposed to have these." | Wells Decl. ¶¶ 2-4. |
| | 499. | The bartender was shocked and unsettled by the experience of being shown the photos from the crash scene. | Wells Decl. ¶ 6. |
| | 500. | A few days following the crash, a man at a bar in Bellflower, California—a city that is approximately a one-hour drive from the crash site—claimed to have seen photos of the crash victims on the phone of a friend in law enforcement.  The man then described | Bolden Decl. ¶¶ 3-5. |

| | | |
|---|---|---|
| | the photographs in vivid and gruesome details to the bartender and others who had been discussing the tragic crash. | |
| 501. | The man's description of the Bryants' bodies in the photographs he claimed to have seen precisely matched the actual condition of Kobe's and Gianna's remains at the scene—information that was not publicly known.<br><br>The bartender was horrified and profoundly upset by the man's description of the photos | Bolden Decl. ¶¶ 5-6; Ex. 195 (Tauscher) at 117:5-119:3, 121:6-16, 122:10-123:19, 126:20-127:3, 128:18-129:20, 133:14-135:21, 138:20-140:24, 142:7-21. |
| 502. | In the afternoon on January 26, 2020, Deputy Nicholas Bonelli saw a photo of victims' remains on the cell phone of another member of the Sheriff's Department while he was in the dispatch room in the Lost Hills Station. | Ex. 112 (Bonelli) at 29:8-30:2, 30:5-31:4, 32:21-24, 33:16-34:1, 59:12-14. |
| | **XXXV.  Defendant Michael Russell's Outgoing Picture Messages.** | |
| 503. | On January 27, 2020, at approximately 2:12 p.m. and 2:33 p.m., Russell sent text messages containing pictures or videos to Benjamin Sanchez, a deputy at the Santa Clarita Station.  Defendants did not produce, and apparently no longer have, the content of these text messages.  While Defendants produced to Plaintiff the content of other text messages between Sanchez and Russell that were collected from Sanchez's phone from January 27, 2020, these messages were omitted from that production. | Ex. 94 (Russell) at 276:8-10; Ex. 99 (Sanchez) at 42:5-7; Ex. 217 (Russell Cell Records) at COLA035652; J. Bryant Decl. Ex. XX (Sanchez Text Records) at 152; *see supra* ¶¶ 436-38, 444. |
| 504. | On January 28, 2020, at approximately 9:25 a.m., 1:00 p.m., 1:02 p.m., 1:03 p.m. and 1:05 p.m., Russell sent text messages containing pictures or videos to Benjamin Sanchez, a deputy at the Santa Clarita Station.  Defendants did not produce, and apparently no longer have, the content of these text messages.  While Defendants produced to Plaintiff the content of other text messages between Sanchez and Russell from | Ex. 94 (Russell) at 276:8-10; Ex. 99 (Sanchez) at 42:5-7; Ex. 217 (Russell Cell Records) at COLA035652; J. Bryant Decl. Ex. XX (Sanchez Text Records) at 156-57; *see supra* ¶¶ 436-38, 444. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | January 28, 2020 that were collected from Sanchez's phone, these messages were omitted from that production. | |
|---|---|---|---|
| | 505. | On January 28, 2020, at approximately 12:59 p.m. and 7:32 p.m., Russell sent text messages containing pictures or videos to a group chat of friends with whom he plays online video games (the "video-game group chat"). The group consists of Russell, Sanchez, Sanchez's wife (J.S.), and three friends from Louisiana (D.H., V.H. and D.G.). Defendants did not produce, and apparently no longer have, the content of these text messages. While Defendants produced to Plaintiff the content of other text messages between this group from January 28, 2020 that were collected from Sanchez's phone, these messages were omitted from that production. | Ex. 94 (Russell) at 137:12-19, 138:4-21, 143:6-144:22, 274:9-276:21, 278:9-279:10; Pikor Decl. ¶ 19; Ex. 217 (Russell Cell Records) at COLA035652; J. Bryant Decl. Ex. XX (Sanchez Text Records) at 155-156; *see supra* ¶¶ 436-38, 444. |
| | 506. | On January 28, 2020, at approximately 6:57 p.m., Russell sent a text message containing pictures or videos to a friend who is a parking officer with the City of Burbank (M.A.). Russell deleted this message. Defendants did not produce, and apparently no longer have, the content of this text message. | Ex. 217 (Russell Cell Records) at COLA035652; Ex. 94 (Russell) at 276:19-21, 278:9-279:10; *see supra* ¶¶ 436-38, 444. |
| | 507. | On January 29, 2020, at approximately 2:42 p.m., Russell sent a text message containing pictures or videos to the members of the video-game group chat (Sanchez, J.S., D.H., V.H. and D.G.) and his friend who is a parking officer in Burbank (M.A.), with whom Russell also plays video games. Defendants did not produce, and apparently no longer have, the content of this text message. While Defendants produced to Plaintiff the content of other text messages between the video-game group chat that were collected from Sanchez's phone, | Ex. 217 (Russell Cell Records) at COLA035652; Pikor Decl. ¶ 19; Ex. 94 (Russell) at 139:8-141:5, 274:9-276:21, 279:16-280:4; J. Bryant Decl. Ex. XX (Sanchez Text Records) at 157-159; *see supra* ¶¶ 436-38, 444. |

| | | |
|---|---|---|
| | including other messages from January 29, 2020, this message was omitted from that production. | |
| 508. | On January 29, 2020, at approximately 3:50 p.m., Russell sent text messages containing pictures or videos to Sanchez and his other friends from the video-game group chat (J.S., D.H. V.H. and D.G).  Defendants did not produce, and apparently no longer have, the content of these text messages.  While Defendants produced to Plaintiff the content of other text messages between the video-game group chat that were collected from Sanchez's phone, including other messages from January 29, 2020, these messages were omitted from that production. | Ex. 94 (Russell) at 274:9-276:21; Pikor Decl. ¶19; Ex. 217 (Russell Cell Records) at COLA035652; J. Bryant Decl. Ex. XX (Sanchez Text Records) at 157-159; *see supra* ¶¶ 436-38, 444. |
| | **XXXVI.  Brian Jordan's Outgoing Picture Messages.** | |
| 509. | Brian Jordan did not search his cell phone for text messages containing crash scene photos. | Ex. 116 (Jordan) at 40:1-6; Ex. 223 (Jordan Deposition Subpoena) at 11-14. |
| 510. | On January 27, 2020, at approximately 8:01 p.m., Jordan sent two text messages containing pictures to a former girlfriend (A.G.).  Jordan did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Ex. 210 (Jordan Text Records) at COLA00004056, rows 98-99; Pikor Decl. ¶ 9; Ex. 116 (Jordan) at 88:20-24; *see supra* ¶ 509. |
| 511. | On February 1, 2020, at approximately 9:23 a.m. and 10:16 a.m., Jordan sent two text messages containing pictures to an LAPD officer and stand-up comedian (K.L.).  Jordan did not produce, and apparently did not attempt to collect or review, the content of these text messages.  The day before texting the pictures, Jordan had two lengthy phone calls with the LAPD officer, and he had another 40-minute phone call with the officer on February 1 after he sent the LAPD officer the pictures.  At deposition, Jordan | Pikor Decl. ¶ 18; Ex. 210 (Jordan Cell Records) at COLA00003644, row 199; COLA00003645, row 208; COLA00003646, row 225; COLA00004062, rows 311-312, 321-322; Ex. 116 (Jordan) at 56:20-57:22, 103:18-105:9, 106:18-21; *see supra* ¶ 509. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| | said he does not know what pictures he sent to the LAPD officer on February 1, 2020, or what he discussed with the officer on the phone. | |
| 512. | On February 1, 2020, at approximately 10:19 a.m., Jordan sent two text messages containing pictures to R.M.  Jordan did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 17; Ex. 210 (Jordan Cell Records) at COLA00004063, rows 323-324; *see supra* ¶ 509. |
| 513. | On February 1, 2020, at approximately 10:20 a.m., Jordan sent two text messages containing pictures to a reporter for a Southern California news organization who Jordan came to know when he was in the Department's Public Information Office (T.G.).  At deposition, Jordan said he does not know what picture he sent T.G. that day, but he testified that he generally texts that reporter about his work.  Jordan did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 5; Ex. 210 (Jordan Cell Records) at COLA00004063, rows 325-326; Ex. 116 (Jordan) at 50:25-52:12, 106:22-107:14; *see supra* ¶ 509. |
| 514. | On February 1, 2020, at approximately 10:23 a.m., Jordan sent two text messages containing pictures to his former neighbor (L.S.).  Jordan did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 16; Ex. 210 (Jordan Cell Records) at COLA00004063, rows 333-334; Ex. 116 (Jordan) at 89:18-23; *see supra* ¶ 509. |
| 515. | On February 2, 2020, at approximately 3:22 p.m., Jordan sent two text messages containing pictures to an LASD employee who he used to date (D.H.).  Jordan did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Ex. 210 (Jordan Cell Records) at COLA00004076, rows 812-813; Ex. 116 (Jordan) at 59:23-60:14; *see supra* ¶ 509. |
| 516. | On February 10, 2020, at approximately 7:02 p.m., Jordan sent two text messages | Pikor Decl. ¶¶ 4, 6-7, 14-15; Ex. 210 (Jordan Cell |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | containing pictures to a group of five reporters he was texting on the day of the crash, and with whom he generally texted about Fire Department incidents (A.C., R.D., T.B., S.M., K.T.). Jordan did not produce, and apparently did not attempt to collect or review, the content of these text messages. At deposition, Jordan testified he does not know what picture he sent to those reporters on that day, and he was unwilling to check his phone. | Records) at COLA00004082-83, rows 1027-1036; Ex. 116 (Jordan) at 43:10-45:8, 48:21-52:12, 100:21-101:24; *see supra* ¶ 509. |
|---|---|---|---|
| | 517. | On February 10, 2020, at approximately 7:32 p.m., Jordan sent two text messages containing videos to N.Q., an LAFD fire captain. Jordan did not produce, and apparently did not attempt to collect or review, the content of these text messages. At deposition, Jordan said he does not know the content of those video messages. | Pikor Decl. ¶ 13; Ex. 210 (Jordan Cell Records) at COLA00004084, rows 1081-1082; Ex. 116 (Jordan) at 108:7-17; *see supra* ¶ 509. |
| | 518. | On February 23, 2020 at approximately 8:31 a.m., Jordan sent two text messages containing pictures to D.L., an LAFD fire captain. Jordan did not produce, and apparently did not attempt to collect or review, the content of these text messages. At deposition, Jordan said he does not know the content of those picture messages. | Pikor Decl. ¶ 12; Ex. 210 (Jordan Cell Records) at COLA00004091, rows 1330-1331; Ex. 116 (Jordan) at 108:18-109:8; *see supra* ¶ 509. |
| | 519. | On February 23, 2020 at approximately 8:45 a.m., Jordan sent two text messages containing pictures to an LAFD dispatcher (A.J.). Jordan did not produce, and apparently did not attempt to collect or review, the content of these text messages. At deposition, Jordan said he does not know the content of those picture messages. | Pikor Decl. ¶ 11; Ex. 210 (Jordan Cell Records) at COLA00004091, rows 1332-1333; Ex. 116 (Jordan) at 109:18-110:3, 110:15-20; *see supra* ¶ 509. |
| | 520. | On February 23, 2020 at approximately 9:52 a.m., Jordan sent two text messages containing pictures to an LAPD officer (S.F.). Jordan did not produce, and | Pikor Decl. ¶ 10; Ex. 210 (Jordan Cell Records) at COLA00004091, rows 1334-1335; Ex. 116 |

-183-

| | | |
|---|---|---|
| | apparently did not attempt to collect or review, the content of these text messages. | (Jordan) at 110:4-14; *see supra* ¶ 509. |
| 521. | On February 25, 2020 at approximately 1:57 p.m., Jordan sent four text containing pictures to an LAFD firefighter and paramedic (A.K.).  Jordan sent her two additional text messages at 2:17 p.m.  Jordan did not produce, and apparently did not attempt to collect or review, the content of these text messages.  At deposition, Jordan said he does not know the content of those picture messages. | Pikor Decl. ¶ 8; Ex. 210 (Jordan Cell Records) at COLA00004093, rows 1406-1411; Ex. 116 (Jordan) at 110:25-111:8; *see supra* ¶ 509. |
| | **XXXVII. Defendant Rafael Mejia's Outgoing Picture Messages.** | |
| 522. | On January 26, 2020, at approximately 10:38 a.m., Mejia sent three text messages containing images to R.A., an LASD sergeant.    Defendants did not produce, and apparently no longer have, the content of these text messages. | Pikor Decl. ¶ 22; Ex. 212 (Mejia Cell Records) at COLA036598, rows 25-27; *see supra* ¶¶ 436-37, 443. |
| 523. | On January 26, 2020 at approximately 11:44 a.m., Mejia sent two text messages containing images to O.N., an LASD employee.  Defendants did not produce, and apparently no longer have, the content of these text messages. | Pikor Decl. ¶ 23; Ex. 212 (Mejia Cell Records) at COLA036599, rows 39-40; *see supra* ¶¶ 436-37, 443. |
| 524. | On January 26, 2020 at approximately 2:23 p.m., Mejia sent two text messages containing pictures or videos to C.H.C., the owner of a dry cleaning business in Buena Park, California.  Defendants did not produce, and apparently no longer have, the content of these text messages. | Pikor Decl. ¶ 20; Ex. 212 (Mejia Cell Records) at COLA036599, rows 64-65; *see supra* ¶¶ 436-37, 443. |
| 525. | Between January 27 and 30, 2020, Mejia sent sixteen messages containing pictures or videos to S.K., an LASD fingerprint technician who has worked at the Lost Hills Station.  Defendants did not produce, and | Pikor Decl. ¶ 21; Ex. 212 (Mejia Cell Records) at COLA036601, rows 120-121; COLA036604, rows 249-250; COLA036605, rows 259-260; |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | apparently no longer have, the content of these text messages. | COLA036606, rows 294-299, 305-306, 313-314; Ex. 91 (Mejia) at 55:20-25; *see supra* ¶¶ 436-37, 443. |
|---|---|---|---|
| 526. | | On January 27, 2020, at approximately 6:22 p.m., Mejia sent two image texts to J.G., an LASD deputy.  He texted J.G. six additional messages containing pictures or video over the course of the evening.  Defendants did not produce, and apparently no longer have, the content of these text messages. | Pikor Decl. ¶ 24; Ex. 212 (Mejia Cell Records) at COLA036602-04, rows 149-150, 205-208, 232-233; Ex. 91 (Mejia) at 54:18-24; *see supra* ¶¶ 436-37, 443. |
| 527. | | On January 29, 2020, at approximately 1:54 p.m., Mejia sent two texts messages containing pictures or videos to J.G., an LASD deputy.  Defendants did not produce, and apparently no longer have, the content of these text messages. | Pikor Decl. ¶ 24; Ex. 212 (Mejia Cell Records) at COLA036604, rows 249-250; Ex. 91 (Mejia) at 54:18-24; *see supra* ¶¶ 436-37, 443. |
| | | **XXXVIII. Defendant Raul Versales' Outgoing Picture Messages.** | |
| 528. | | On January 26, 2020, at approximately 9:02 p.m., Versales sent Travis Kelly eleven text messages containing images.  Defendants did not produce, and apparently no longer have, the content of these text messages. | Ex. 213 (Versales Cell Records) at COLA037469, rows 275-285; *see supra* ¶¶ 436-37, 439. |
| 529. | | On January 29, 2020, at approximately 6:57 a.m., Versales sent J.G.2 twelve text messages containing images.  J.G.2 is the spouse of an LASD deputy.  Defendants did not produce, and apparently no longer have, the content of these text messages. | Pikor Decl. ¶ 25; Ex. 213 (Versales Cell Records) at COLA037471-72, rows 357-368 (COLA037472); *see supra* ¶¶ 436-37, 439. |
| 530. | | On January 30, 2020, at approximately 6:24 p.m., Versales sent Travis Kelly two text messages containing images.  Defendants did not produce, and apparently no longer have, the content of these text messages. | Ex. 213 (Versales Cell Records) at COLA037475, rows 471-472; *see supra* ¶¶ 436-37, 439. |
| | | **XXXIX. Tony Imbrenda's Outgoing Text Messages.** | |

-185-

| 531. | Imbrenda testified that he periodically deletes text messages from his personal phone. | Ex. 115 (Imbrenda) at 194:2-19. |
|---|---|---|
| 532. | On January 26, 2020, at approximately 9:05 p.m. Imbrenda sent D.H., an LAFD employee, two text messages.  At 9:50 p.m., Imbrenda sent D.H. two additional messages. Defendants did not produce, and apparently no longer have, the content of these text messages. | Pikor Decl. ¶ 43; Ex. 219 (Imbrenda Text Records) at COLA035898; Ex. 115 (Imbrenda) at 115:17-22; *see supra* ¶¶ 447-63, 699. |
| 533. | On January 27, 2020, at approximately 11:30 a.m. and 11:39 a.m., Imbrenda sent text messages to L.A., a music conductor. Defendants did not produce, and apparently no longer have, the content of these text messages. | Pikor Decl. ¶ 40; Ex. 219 (Imbrenda Cell Records) at COLA035898; *see supra* ¶¶ 447-63, 699. |
| 534. | Between January 28, 2020, and February 25, 2020, Imbrenda sent D.G. multiple texts on seven separate occasions.  D.G. is a musician who is in a band with Imbrenda.  Defendants did not produce, and apparently no longer have, the content of these text messages. | Pikor Decl. ¶ 41; Ex. 115 (Imbrenda)  at 113:3-21; Ex. 219 (Imbrenda Cell Records)  at COLA035899-900, COLA035902-4; *see supra* ¶¶ 447-63, 699. |
| 535. | On January 29, 2020, at approximately 9:11 and 9:12 p.m., Imbrenda sent two text messages to B.S., an LAFD firefighter. Defendants did not produce, and apparently no longer have, the content of these text messages. | Pikor Decl. ¶ 44; Ex. 115 (Imbrenda)  at 11:14-21; Ex. 219 (Imbrenda Cell Records)  at COLA035899; *see supra* ¶¶ 447-63, 699. |
| 536. | On February 10, 2020, at approximately 4:34 p.m., Imbrenda sent a text message to K.G., a police records specialist with the City of Southgate.  Defendants did not produce, and apparently no longer have, the content of this text message. | Pikor Decl. ¶ 42; Ex. 219 (Imbrenda Cell Records) at COLA035902; *see supra* ¶¶ 447-63, 699. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| 537. | Imbrenda's text records do not indicate whether or not these text messages contained photos or videos. | Ex. 219 (Imbrenda Cell Records) *passim*. |
|---|---|---|
| | **XXXX.  Ruby Cable's Outgoing Text Messages.** | |
| 538. | Ruby Cable did not search for text messages in connection with this lawsuit. | Ex. 93 (Cable) at 144:13-19. |
| 539. | On January 26, 2020, between approximately 1:04 and 1:06 p.m., Ruby Cable sent twelve text messages to a number ending in 6832. Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 30; Ex. 208 (Cable Cell Records) at 12; *see supra* ¶¶ 436-37, 440, 538. |
| 540. | On January 26, 2020, at approximately 1:06 p.m., Ruby Cable sent four text messages to L.C. Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 28; Ex. 208 (Cable Cell Records) at 13; *see supra* ¶¶ 436-37, 440, 538. |
| 541. | On January 26, 2020, at approximately 7:15 p.m., Ruby Cable sent four text messages to L.C.  Cable sent another four messages to this number at 7:16 p.m.  Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 28; Ex. 208 (Cable Cell Records) at 19; *see supra* ¶¶ 436-37, 440, 538. |
| 542. | On January 26, 2020, Ruby Cable sent 119 text messages to her spouse, C.C. Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 31; Ex. 208 (Cable Cell Records) at 1-22; Ex. 93 (Cable) at 137:1-7; *see supra* ¶¶ 436-37, 440, 538. |
| 543. | On January 27, 2020, Ruby Cable sent 12 text messages to her spouse, C.C. Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 31; Ex. 208 (Cable Cell Records) at 22-25; Ex. 93 (Cable) at 137:1-7; *see supra* ¶¶ 436-37, 440, 538. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| 544. | On January 26, 2020, at 8:34 a.m., Ruby Cable sent two text messages to E.G., who formerly worked in the financial services industry.  Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 27; Ex. 208 (Cable Cell Records) at 44; *see supra* ¶¶ 436-37, 440, 538. |
| 545. | On January 26, 2020, between 1:04 p.m. and 1:06 p.m., Ruby Cable sent several text messages to a number ending in 6832.  The person to whom this number belongs is unknown.  Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 30; Ex. 208 (Cable Cell Records) at 12-13; *see supra* ¶¶ 436-37, 440, 538. |
| 546. | On January 26, 2020, between 11:17 a.m. and 9:13 p.m., Ruby Cable sent many text messages to K.M.P., who is an LASD deputy.  Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 36; Ex. 208 (Cable Cell Records) at 7-21; *see supra* ¶¶ 436-37, 440, 538. |
| 547. | On January 26, 2020, between 1:02 p.m. and 4:48 p.m., Ruby Cable sent several text messages to T.I., who is an LASD employee.  Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 37; Ex. 208 (Cable Cell Records) at 7-21; *see supra* ¶¶ 436-37, 440, 538. |
| 548. | On January 26, 2020, between 9:21 p.m. and 9:23 p.m., Ruby Cable sent several text messages to M.N., who is an LASD employee.  Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 33; Ex. 208 (Cable Cell Records) at 21-22; *see supra* ¶¶ 436-37, 440, 538. |
| 549. | On January 27, 2020, between 9:13 a.m. and 10:22 a.m., Ruby Cable sent many text messages to F.E., who is an LASD deputy.  Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 32; Ex. 208 (Cable Cell Records) at 23-24; *see supra* ¶¶ 436-37, 440, 538. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| 550. | On January 28, 2020, between 1:16 p.m. and 4:57 p.m., Ruby Cable sent many text messages to F.E., who is an LASD deputy. Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 32; Ex. 208 (Cable Cell Records) at 25-27; *see supra* ¶¶ 436-37, 440, 538. |
| 551. | On January 28, 2020, at 2:17 p.m., Ruby Cable sent a text message to G.G., who is employed by an educational organization called the Global Education Collaborative. Cable sent another message to this number at 2:33 p.m.  Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 26; Ex. 208 (Cable Cell Records) at 26; *see supra* ¶¶ 436-37, 440, 538. |
| 552. | On January 28, 2020, at 2:17 p.m., Ruby Cable sent a text message to A.B. or R.B. Cable sent another message to this number at 2:33 p.m.  Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 38; Ex. 208 (Cable Cell Records) at 26; *see supra* ¶¶ 436-37, 440, 538. |
| 553. | On January 28, 2020, at 2:17 p.m., Ruby Cable sent a text message to A.B. or R.B. Cable sent another message to A.B. or R.B. at 2:33 p.m.  Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 38; Ex. 208 (Cable Cell Records) at 26, 27; *see supra* ¶¶ 436-37, 440, 538. |
| 554. | On January 28, 2020, at 2:17 p.m., Ruby Cable sent a text message to A.B. or R.B. Cable sent another message to A.B. or R.B. at 2:33 p.m.  Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 38; Ex. 208 (Cable Cell Records) at 26, 27; *see supra* ¶¶ 436-37, 440, 538. |
| 555. | On January 28, 2020 at 2:17 p.m., Ruby Cable sent a text message to A.B.2.  Cable sent another message to this number at 2:33 p.m.  Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 39; Ex. 208 (Cable Cell Records) at 26, 27; *see supra* ¶¶ 436-37, 440, 538. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| 556. | On January 28, 2020 at 2:17 p.m., Ruby Cable sent a text message to S.G., who is employed by a healthcare management firm. Cable sent another message to this number at 2:33 p.m. Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 29; Pikor Decl. Ex. 208 (Cable Cell Records) at 26-27; *see supra* ¶¶ 436-37, 440, 538. |
| 557. | On January 28, 2020, at 2:17 p.m., Ruby Cable sent a text message to her spouse, C.C. Ruby Cable sent another message to C.C. at 2:33 p.m.  Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 31; Ex. 208 (Cable Cell Records) at 26; Ex. 93 (Cable) at 137:1-7; *see supra* ¶¶ 436-37, 440, 538. |
| 558. | On January 28, 2020, Ruby Cable sent 12 additional text messages to her spouse, C.C. Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 31; Ex. 208 (Cable Cell Records) at 25-32; Ex. 93 (Cable) at 137:1-7; *see supra* ¶¶ 436-37, 440, 538. |
| 559. | On January 28, 2020, between 5:55 p.m. and 8:45 p.m., Ruby Cable sent many text messages to K.M.P., who is an LASD deputy.  Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 36; Ex. 208 (Cable Cell Records) at 27-32; *see supra* ¶¶ 436-37, 440, 538. |
| 560. | On January 29, 2020, between 9:42 a.m. and 9:51 a.m., Ruby Cable sent many text messages to K.M.P., who is an LASD deputy.  Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 36; Ex. 208 (Cable Cell Records) at 27-41; *see supra* ¶¶ 436-37, 440, 538. |
| 561. | On January 29, 2020, between 9:22 a.m. and 10:38 a.m., Ruby Cable sent four text messages to C.S.  Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 34; Ex. 208 (Cable Cell Records) at 34-43; *see supra* ¶¶ 436-37, 440, 538. |
| 562. | On January 29, 2020, between 9:00 p.m. and 10:33 p.m., Ruby Cable sent many text | Pikor Decl. ¶ 35; Ex. 208 (Cable Cell Records) at 33- |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | messages to M.F., who is an LASD deputy. Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | 42; *see supra* ¶¶ 436-37, 440, 538. |
|---|---|---|---|
| | 563. | On January 29, 2020, Ruby Cable sent 14 text messages to her spouse, C.C. Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 31; Ex. 208 (Cable Cell Records) at 32-44; Ex. 93 (Cable) at 137:1-7; *see supra* ¶¶ 436-37, 440, 538. |
| | 564. | On January 30, 2020, at 7:29 p.m., Ruby Cable sent three text messages to F.E., who is an LASD deputy.  Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 32; Ex. 208 (Cable Cell Records) at 49; *see supra* ¶¶ 436-37, 440, 538. |
| | 565. | On January 30, 2020, Ruby Cable sent 46 text messages to C.C.  Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 31; Ex. 208 (Cable Cell Records) at 44-49; Ex. 93 (Cable) at 137:1-7; *see supra* ¶¶ 436-37, 440, 538. |
| | 566. | On January 30, 2020, between 3:30 p.m. and 3:50 p.m., Ruby Cable sent several text messages to M.N., who is an LASD employee.  Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Pikor Decl. ¶ 33; Ex. 208 (Cable Cell Records) at 45-46; *see supra* ¶¶ 436-37, 440, 538. |
| | 567. | Cable's text records do not indicate whether or not these text messages contained photos or videos. | Ex. 208 (Cable Cell Records) *passim.* |
| | | **XXXXI.  Doug Johnson's Outgoing Text Messages.** | |
| | 568. | On January 31, 2020, at 12:04 p.m., Doug Johnson sent two text messages containing images to Chris Jauregui, who is an LASD deputy.  Defendants did not produce, and apparently did not attempt to collect or review, the content of these text messages. | Ex. 215 (Johnson Cell Records) at COLA038520, rows 115-116; Ex. 224 (Jauregui Signed Consent to Production Form) at VB00004153-54. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | XXXXII. Expert Opinion of Adam Bercovici. | |
|---|---|---|---|
| | 569. | Plaintiff's retained expert, Adam Bercovici, was a member of the Los Angeles Police Department ("LAPD") for 30 years. During his career with the LAPD, he served as a Patrol Officer, Police Officer, K9 Handler, Supervisor, Sergeant, and Lieutenant. Throughout his career, he frequently collaborated with other law enforcement units, including the Los Angeles County Sherriff's Department. For example, in 2003, Bercovici assumed leadership of the Special Investigation Section, which is an investigative, surveillance, and apprehension team that oversees investigations only of major felony crimes. In Bercovici's seven years as the officer-in-charge of the Special Investigation Section, his unit collaborated with multiple other law enforcement organizations, including the Los Angeles County Sherriff's Department, the FBI, and the DEA. | Bercovici Decl. ¶¶ 1-2. |
| | 570. | Mr. Bercovici has extensive experience in the practices of internal investigations from start to finish. As a Sergeant, he was assigned to the Internal Affairs Division, where he investigated complaints against fellow members of LAPD, reviewed the final work product of subordinate supervisors, and recommended discipline. During that time, he became extremely familiar with basic standards for internal investigations, including the preservation of evidence, identification of witnesses, and interviewing of officers who were the subjects of the investigation. After being promoted to Lieutenant, Bercovici also investigated and adjudicated complaints against LAPD officers and recommended discipline. Bercovici maintained that responsibility in | Bercovici Decl. ¶¶ 3-4. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | his other management assignments from 1999 onward.  In Bercovici's nineteen years as a law enforcement supervisor and manager, he personally investigated over one hundred personnel complaints, supervised subordinates investigating personnel complaints, adjudicated complaints and recommended discipline, and presented misconduct cases to department tribunals. | |
|---|---|---|---|
| | 571. | Mr. Bercovici has averred: "It is well known and recognized in the Southern California law enforcement community that officers and deputies frequently take, view, keep, and share photos of human remains.  It also is well known in the Southern California law enforcement community that a number of officers and deputies keep photographic journals of death images taken or acquired by virtue of the access afforded to them by their roles in law enforcement.  I became aware of these practices almost immediately after I became a law enforcement officer in Los Angeles.  In the early part of 1983, I witnessed several officers using their personal Polaroid cameras to take photographs of human remains at an accident scene where a pedestrian had been struck by a train in the area of San Fernando Road and Pierce Avenue.  These photos were taken in the presence of supervisors and prior to the arrival of the investigative resources that handled rail incidents.  The officers did not book these photographs into evidence but instead retained them as personal souvenirs." | Bercovici Decl. ¶¶ 5-6. |
| | 572. | Mr. Bercovici has also averred: "Over the course of my early years on the force, I observed officers displaying photos of human remains to one another in locker rooms and witnessed with some regularity that many senior officers kept "death books" | Bercovici Decl. ¶¶ 7-8. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15 | | as ghoulish souvenirs and would display the photos on their own initiative or at the request of other officers.  These showings typically took place in the locker room, at the back of roll call, or in the police car. Photographs of suicides, often showing that the skull of a victim had been compromised and brain matter exposed, were a favorite among officers engaged in these practices. Photographs of traffic collisions involving dismembered and/or decapitated victims were also popular. Some officers collected such a large volume of human remains photos that viewing them was a small event, with accompanying (distasteful) humor. Based on this knowledge, my opinion is that Sheriff Villanueva spoke accurately when he publicly stated that 'there's—there's, uh, cops—they keep death books, for example, where they—they have, uh, photos from crime scenes throughout their careers. That's a macabre idea, but some do that.'" | |
| 16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>26<br>27<br>28 | 573. | Mr. Bercovici has also averred: "I continued to observe improper behavior related to death images as I began to be promoted to the lower supervisory ranks of the LAPD. One particularly memorable example of this conduct came in 1994, when I was assigned as a supervisor at Operations West Bureau CRASH, in which I was shown a Polaroid of a deceased Nicole Brown Simpson.  When I was promoted to Sergeant II, and later to Lieutenant, I established my own policy with those under my command that personal devices such as digital cameras were never to be used to photograph human remains and that the job of the police at a catastrophic scene was to secure the location until the proper investigative resources were able to respond.  However, I remained aware that improper taking and sharing of graphic | Bercovici Decl. ¶¶ 9-10. |

-194-

| | | | |
|---|---|---|---|
| | | photographs continued to occur in other parts of the department and the law enforcement community in Southern California. For example, in 2009, a LAPD officer improperly took and disclosed a photo depicting the condition of the singer Rihanna following a domestic violence incident.  This was widely reported in the local and national press, including the *Los Angeles Times*, for years following the incident and the investigation into it." | |
| | 574. | Mr. Bercovici has also averred: "In my experience, some individuals appear to enjoy improper death images because they allow the officer to show off that he is "in the know" or in possession of something exclusive that others do not have.  I have reviewed an internal investigation report by the Los Angeles County Fire Department, which concluded that Fire Captain Tony Imbrenda displayed photos of human remains from the scene of the helicopter crash to colleagues and members of the public during a cocktail hour at an awards banquet.  Based on my observations throughout my thirty-year career, Mr. Imbrenda's conduct is a textbook example of an individual showing off shocking imagery in an attempt to impress others with his exclusive access to a crime or accident scene.  The conduct described in the Fire Department's report was grossly inappropriate, but it was also unsurprising and predictable in the absence of clear policies and training.  My observations in over thirty years in law enforcement are in accord with Sheriff Villanueva's statement that 'ever since they invented the polaroid,' the improper taking and sharing of photos of human remains 'has been a problem in law enforcement across the nation.'  It is my | Bercovici Decl. ¶¶ 11-12. |

-195-

| | | | |
|---|---|---|---|
| | | opinion that the practice of unnecessarily taking, sharing, and/or keeping photos of human remains was so pervasive and embedded in law enforcement culture by January of 2020 that no law enforcement leader in the Los Angeles area—and certainly not anyone with the length of experience of Sheriff Villanueva and his leadership team—could have been unaware of it." | |
| | 575. | Mr. Bercovici has also averred: "In addition, it is my opinion that it would have been obvious to any law enforcement leader in the months and years leading up to the helicopter accident in January 2020 that the widespread practice of unnecessarily taking, sharing, and keeping photos of human remains would continue, absent express policies prohibiting the practice and systemic training devoted to the issue.  As evidenced by the pervasiveness of improper behavior involving photos of human remains, high-level or generic rules that officers must behave appropriately have never been sufficiently clear or effective to address the issue.  Rather, only specific policies—like the one adopted by the Sheriff's Department after the events at issue in this case—backed by meaningful threats of disciplinary consequences could potentially correct the problem, provided they are supported by clear training.  Absent clear direction on the subject, it would have been obvious to any law enforcement leader in January 2020 that a sizeable portion of personnel would improperly take and share images of human remains." | Bercovici Decl. ¶ 13. |
| | 576. | Mr. Bercovici has also averred: "I understand that LASD has stated that it did not receive any complaints regarding the improper taking or sharing of photos of | Bercovici Decl. ¶¶ 14-15. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | human remains before it received a complaint related to some of the improper sharing of photos at issue in this case.  Even if that were true, based on my experience, one could not infer from that fact that LASD officers had never before improperly taken or shared photos of human remains or that LASD officers were not aware of that practice or the risk that it would occur without proper training or supervision.  Not only would that be contrary to my experience in the Los Angeles law enforcement community and Sherriff Villanueva's comments, it also would be contrary to the way that improper sharing of photos of human remains occurs based on my experience.  It would not be entirely surprising that a law enforcement agency would receive few complaints about improperly sharing or retaining photos of human remains because those photos are usually shared with other members of the law enforcement community or their family or friends, who are reluctant to report the misconduct. When I was involved in internal affairs investigations, we did not receive complaints about improper sharing or retaining photos of human remains, but it was abundantly clear that this practice was widespread. In this case, the misconduct happened to come to light because one of the deceased individuals was a celebrity, and a courageous citizen chose to step forward with information." | |
| 577. | | Mr. Bercovici has averred that, based on his extensive experience with internal investigations, "the Sheriff's Department 'inquiry' in response to the citizen complaint about a deputy displaying human remains photos at a bar deviated dramatically from standard professional investigative | Bercovici Decl. ¶¶ 16-17. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| | protocols." Mr. Bercovici has identified thirteen (13) "irregularities and/or deviations from investigative protocols." Mr. Bercovici has averred that these irregularities and/or deviations from investigative protocols "rendered LASD's initial 'inquiry' investigation deficient and unreliable. In my thirty years of police work, I have never encountered a more well-documented case of widespread deviations from basic internal investigation protocols." | |
| 578. | Mr. Bercovici has described the <u>first</u> irregularity and/or deviation from investigative protocols as follows: "The citizen complaint was not immediately routed to the Internal Affairs Investigative Bureau. LASD knew at the time it conducted the 'inquiry' that serious misconduct had likely occurred and a full, proper investigation was clearly warranted." | Bercovici Decl. ¶ 16(a). |
| 579. | Mr. Bercovici has described the <u>second</u> irregularity and/or deviation from investigative protocols as follows: "Sheriff Villanueva and members of the Sheriff's Information Bureau ('SIB') took control of the investigation within a very short time, conveying instructions from the leader of the Department before any interviews of Department personnel were conducted or cell phones evaluated. SIB serves a public relations function and is not practiced in internal investigations. The leadership role played by SIB personnel (Captain Jorge Valdez and Lieutenant John Satterfield) was therefore problematic." | Bercovici Decl. ¶ 16(b). |
| 580. | Mr. Bercovici has described the <u>third</u> irregularity and/or deviation from investigative protocols as follows: "LASD | Bercovici Decl. ¶ 16(c). |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| | personnel were never told to preserve evidence." | |
| 581. | Mr. Bercovici has described the <u>fourth</u> irregularity and/or deviation from investigative protocols as follows: "The leader of the 'inquiry,' Lieutenant Hector Mancinas, testified that he interviewed approximately 25 deputies but did not review a single one of their cell phones—not even for one minute." | Bercovici Decl. ¶ 16(d). |
| 582. | Mr. Bercovici has described the <u>fifth</u> irregularity and/or deviation from investigative protocols as follows: "The interviews of crash-site personnel done by Lieutenant Mancinas and Sergeant Marcus Phillips during LASD's 'inquiry' lasted for only one to ten minutes apiece." | Bercovici Decl. ¶ 16(e). |
| 583. | Mr. Bercovici has described the <u>sixth</u> irregularity and/or deviation from investigative protocols as follows: "Lieutenant Mancinas and Sergeant Phillips did not use video or audio recording for the interviews, nor were any transcripts of the interviews prepared." | Bercovici Decl. ¶ 16(f). |
| 584. | Mr. Bercovici has described the <u>seventh</u> irregularity and/or deviation from investigative protocols as follows: "Despite conducting the 'inquiry,' neither Lieutenant Mancinas nor Sergeant Phillips documented anything about their involvement until more than a month later, after the *Los Angeles Times* broke the news." | Bercovici Decl. ¶ 16(g). |
| 585. | Mr. Bercovici has described the <u>eighth</u> irregularity and/or deviation from investigative protocols as follows: "Despite their leadership role in the 'inquiry,' neither Captain Valdez nor Lieutenant Satterfield documented anything about their | Bercovici Decl. ¶ 16(h). |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | involvement until more than a month later, after the *Los Angeles Times* broke the news." | |
| | 586. | Mr. Bercovici has described the <u>ninth</u> irregularity and/or deviation from investigative protocols as follows: "There is barely a trace of email correspondence related to the 'inquiry.'" | Bercovici Decl. ¶ 16(i). |
| | 587. | Mr. Bercovici has described the <u>tenth</u> irregularity and/or deviation from investigative protocols as follows: "The memoranda from the personnel who had been at the crash scene were strikingly similar in their wording, suggesting that they followed a template or coordinated on what language to use." | Bercovici Decl. ¶ 16(j). |
| | 588. | Mr. Bercovici has described the <u>eleventh</u> irregularity and/or deviation from investigative protocols as follows: "The performance log entries related to the improper photos do not describe the offending deputies' conduct or mention the word 'photo.'  Rather, they say, 'This performance log entry is to document our conversation regarding the helicopter crash that occurred on January 26, 2020.  You are reminded – All Department members shall be held accountable for their utterances, writings, conduct, and visual representations, including electronic and web-based communications, when they conflict with our Core Values, our Mission, or our Creed and personnel can reasonably be identified as Department members.'" | Bercovici Decl. ¶ 16(k). |
| | 589. | Mr. Bercovici has described the <u>twelfth</u> irregularity and/or deviation from investigative protocols as follows: "LASD did not issue any performance log entries for several weeks after the 'inquiry' concluded on January 31, 2020.  On February 26, 2020, | Bercovici Decl. ¶ 16(l). |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | the *Los Angeles Times* reached out to LASD for comment on its forthcoming story regarding accident scene photos, and then on February 27, 2020, LASD issued performance log entries to the deputies." | |
| | 590. | Mr. Bercovici has described the <u>thirteenth</u> irregularity and/or deviation from investigative protocols as follows: "The Sheriff's Department did not initiate an Internal Affairs Bureau Investigation until February 28, 2020, the day after the *Los Angeles Times* reporting on alleged misconduct related to accident-scene photos." | Bercovici Decl. ¶ 16(m). |
| | | **XXXXIII.  False Exculpatory Statements.** | |
| | 591. | In a declaration submitted to this Court in support of Defendants' motion for summary judgment, Deputy Ruby Cable avers that "[t]he victim remains were not the focal point of the photos."<br><br>This is a false exculpatory statement.  At deposition, Cable was asked: "Were there any photos in which a body part, or body parts, appeared to be a primary focus of the photo?"  Cable responded: "I don't recall." | Cable Decl. ¶ 9; Ex. 93 (Cable) at 65:8-10. |
| | 592. | Ruby Cable's summary judgment declaration avers that she "understood that Deputy Mejia was sending me [crash-scene] photos because, as a trainee, I might be tasked with writing a report about the incident."  Similarly, Cable testified at deposition that she received the photos from Mejia because she "needed to know as much as possible just in case at end of the day I had to write the report for it."<br><br>These are false exculpatory statements.  During her interview with Sheriff's | Cable Decl. ¶ 10; Ex. 93 (Cable) at 20:3-12; Ex. 137 (Cable LASD Int.) at COLA000380-84. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| 1<br>2 | | Department investigators, Cable repeatedly admitted she had no need for the photos: | |
| 3 | | Investigator: Did you need [the photos] for any reason? | |
| 4 | | Cable: No. | |
| 5 | | Investigator: Did you request them? | |
| 6 | | Cable: No. | |
| 7<br>8<br>9 | | . . .<br>Investigator: Any other reason why you may have had those pictures that I haven't asked you? | |
| 10 | | Cable: No. | |
| 11<br>12<br>13<br>14 | | . . .<br>Investigator: I think I already asked you this, but did you need this for your investigation of what you were doing in your assignment? | |
| 15 | | Cable: No. | |
| 16<br>17<br>18<br>19 | | . . .<br>Investigator: Do you believe it was appropriate to obtain these photographs from Deputy Mejia? | |
| 19 | | Cable: No. | |
| 20 | | Investigator: Why not? | |
| 21<br>22 | | Cable: Like you said earlier, I had no purpose of having them. | |
| 23<br>24<br>25<br>26<br>27 | 593. | Deputy Ruby Cable's summary judgment declaration avers that Sheriff's Department investigators "reviewed my text messages."<br>This is a false exculpatory statement. The transcript of Cable's interview with Department investigators indicates that the investigators did *not* review Cable's text | Cable Decl. ¶ 17; Ex. 137 (Cable LASD Int.) at 2355-2356; Ex. 93 (Cable) at 111:10-20, 112:8-14. |

28

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| | messages.  Cable also gave the following testimony at deposition:<br><br>Counsel:  Did you go through your text messages [during the IA interview] as well?<br><br>Cable:  I don't recall.<br><br>. . .<br><br>Counsel:  Internal Affairs investigators looked at your phone. They looked at the photo gallery.  They looked at deleted messages. You don't recall whether they looked at your text messages; is that accurate?<br><br>Cable:  Correct. | |
| 594. | Deputy Ruby Cable testified at deposition that she did not compare notes or coordinate her story with other deputies when writing a memo to her supervisor regarding her involvement with the photos. Cable testified that her memo was "entirely [her] own words without any influence from any other person."<br><br>These were false exculpatory statements.  In her memo to Captain Vander Horck, Cable stated that the photographs "were immediately erased after the incident from my cellphone."  This statement is identical to a statement included in memos authored by Rafael Mejia, Raul Versales, and Michael Russell. | Ex. 93 (Cable) at 99:6-13, 100:2-101:25, 103:3-14; Cable Decl. Ex. 8 (Cable Memo to Captain Matthew Vander Horck); Versales Decl. Ex. 5 (Versales Memo to Captain Matthew Vander Horck); Mejia Decl. Ex. 3 (Mejia Memo to Captain Matthew Vander Horck); Russell Decl. Ex. 2 (Russell Memo to Captain Matthew Vander Horck dated January 30, 2020). |
| 595. | At deposition, Cable testified that she did not recall ever crying, feeling upset or emotional, or feeling guilty about telling Lt. Mancinas she had gotten the photos from Deputy Mejia.  Cable further testified that she does not recall speaking to Deputy Mejia about the fact that she identified him | Ex. 91 (Mejia) at 186:12-188:19, 252:11-253:8, 254:3-11; Ex. 93 (Cable) at 89:10-90:3, 96:12-97:3. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | to her supervisors as the source of her photos.<br><br>These were false exculpatory statements. Deputy Rafael Mejia has testified that, as he was driving to the Lost Hills Station to talk to Lt. Mancinas about the crash-scene photos, he received a call from Deputy Ruby Cable.  According to Mejia, Cable was crying and extremely upset, and told Mejia she felt guilty about giving his name to Lt. Mancinas as the individual who had shared the photos with her. | |
| | 596. | At deposition, Deputy Ruby Cable was asked: "As you sit here today, do you think it was appropriate for you to receive these photos of the accident scene from Rafael Mejia?"  Cable testified: "Yes."  Cable was then asked why it was appropriate, to which she responded: "It was for – like I said, once again, for the purpose of writing the report.  It was needed in order to be able to write what happened.  And like I said, if we needed to write the number of the helicopter number, it was in the picture.  So yes."<br><br>These were false exculpatory statements. In her interview with LASD investigators, Cable stated:<br><br>Investigator: Do you believe it was appropriate to obtain these photographs from Deputy Mejia?<br><br>Cable: No.<br><br>Investigator: Why not?<br><br>Cable: Like you said earlier, I had no purpose of having them. | Ex. 93 (Cable) at 54:7-20; Ex. 137 (Cable LASD Int.) at 2355. |
| | 597. | Deputy Joey Cruz's summary judgment declaration avers that the crash-scene photos he displayed to his niece "only | Cruz Decl. ¶ 13; Jaeger Decl. Ex. 29 (Cruz Disposition Sheet) at 89; |

| | | | |
|---|---|---|---|
| | | showed helicopter wreckage" and "did not contain victim remains."<br><br>This is a false exculpatory statement.  The Sheriff's Department's disposition sheet regarding discipline for Joey Cruz stated: "Subject Cruz, while off-duty and at his parent's home, had a discussion with his niece, Cynthia Alexis Cruz, in regards to the tragic death of Kobe Bryant.  During the conversation, Subject Cruz proceeded to show Ms. Cruz photographs of the crash site, including those containing bodies/body parts."  Also, when asked at deposition whether he showed his niece a photo containing human remains, Cruz testified: "I don't remember."  Finally, when Cruz's niece was interviewed by Department investigators, she recalled Cruz previewing the photos to her by saying that the victims "wouldn't look like humans. . . . that's how gory they were." | Ex. 90 (Cruz) at 139:16-140:10; Ex. 142 (C. Cruz LASD Int.) at COLA000649. |
| | 598. | Joey Cruz's summary judgment declaration avers that he displayed crash-scene photos at the bar only to the bartender and "did not show them to anyone else at the restaurant."<br><br>This is a false exculpatory statement.  Surveillance footage shows that, at 9:28 p.m., Cruz displayed his phone to a person seated to his right at the bar—a dark-haired male wearing a black sweatshirt.<br><br> | Cruz Decl. ¶ 14; Saigal Decl. ¶¶ 134-35; Ex. 187 (Surveillance Footage – COLA001430) at 21:28:19; Ex. 122 (Gutierrez) at 133:1-134:4. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

As explained in *supra* ¶¶ 324-26 what follows in the surveillance footage makes clear that Cruz was showing photos of the victims' remains when he showed his cell phone to the bar patron and Gutierrez.

| | | |
|---|---|---|
| 599. | Joey Cruz's summary judgment declaration avers that, when showing crash-scene photos to Victor Gutierrez (the bartender), "[m]y phone did not leave my hand."  Cruz similarly testified at deposition that he "had ahold of my phone the whole time" and "there was never a time where the bartender had [the] phone completely in his hands."<br><br>These are false exculpatory statements. Surveillance footage shows Cruz handing his phone to the bartender to look at.  The bartender held and looked at Cruz's phone for six seconds, then swiftly turned his head to the side and handed the phone back to Cruz. | Cruz Decl. ¶ 14; Ex. 90 (Cruz) at 147:5-24; Saigal Decl. ¶¶ 137-38; Ex. 187 (Surveillance Footage – COLA001430) at Channel 15, 21:28:56-21:29:02; Ex. 122 (Gutierrez) at 118:24-119:5, 136:5-8. |

| 600. | At deposition, Joey Cruz was asked if he was able to "decipher the skin color of any of the victims in the photos, that being whether they were black or Caucasian?" Cruz responded: "I do not remember."<br><br>This was a false exculpatory statements. In his interview with Sheriff's Department investigators, Cruz made the following statements: | Ex. 90 (Cruz) at 100:9-17, 104:18-24; Ex. 133 (J. Cruz LASD Int.) at 2271, 2274; Ex. 122 (Gutierrez) at 250:14-251:9; Ex. 172 (Mendez LASD Int.) at 2672. |
|---|---|---|

Investigator:   Going back to the first picture, you said that there was darker skin, correct?

Cruz:   Yes.

Investigator:   Could you tell what ethnicity? Could you make out by chance if you had to guess?

Cruz:   Possibly black.

Investigator:   Based on the skin tone?

Cruz:   Yes.

The bartender's testimony (corroborated by the complaining citizen) that Cruz identified a particular set of remains as Kobe Bryant, the only dark-skinned Black passenger onboard the helicopter, further undermines the notion that Cruz had a simple failure of recollection at deposition.

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| 601. | At deposition, Cruz was asked: "At any point during your conversation with your niece, did you tell her that you had photos of the accident scene that were so gory that the victims basically wouldn't look like humans?  Did you say that?"  Cruz responded: "I remember the pictures being crash sites, but I do not remember them being gory."<br><br>This was a false exculpatory statement.  In an interview with Sheriff's Department investigators, Cruz's niece explained that, before Cruz showed her crash-scene photos, Cruz stated that the victims "wouldn't look like humans. . . . that's how gory they were." | Ex. 90 (Cruz) at 142:16-25; Ex. 142 (C. Cruz LASD Int.) at 2412. |
| 602. | At deposition, Cruz was asked: "How confident are you that you only showed [your niece] one picture and that you didn't show her two or more pictures?"  Cruz responded: "I'm confident I only showed her one picture."<br><br>This was a false exculpatory statement.  Cruz's niece told Sheriff's Department investigators that Cruz showed her "three or four" photos of the crash site and that Cruz "swiped" on his phone "to show me . . . one after the other." | Ex. 90 (Cruz) at 137:3-7; Ex. 142 (C. Cruz LASD Int.) at 2412. |
| 603. | At deposition, Defendant Joey Cruz was asked: "At any point during the night that you visited the bar, did you indicate to the bartender that you believed certain body parts in a photo belonged to Kobe Bryant?"  Cruz testified: "I don't remember – I don't remember the conversation I had with him while that was happening."  Cruz was further asked: "So your testimony is that from the time that you received these photos to the time that you deleted them, you don't recall whether it ever – you ever | Ex. 90 (Cruz) at 107:3-108:9, 157:5-20; Ex. 122 (Gutierrez) at 21:18-19, 22:5-7, 29:4-5, 169:2-170:8, 174:21-175:17. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| | had a thought, 'Hey, that body part might be Kobe'?"  Cruz testified: "No, I don't recall."<br><br>These were false exculpatory statements.  At his deposition, the bartender testified that Cruz told him: "Oh, like, I have a picture of, like, Kobe Bryant passed away."  When the bartender was asked how he knew the photos he saw contained Kobe Bryant's remains, the bartender responded: "That's what [Cruz] told me" and "[t]hat's what [Cruz] said."  The bartender further testified that "the only [photo] I really paid attention to was the one with the [body part] because [Cruz] said it was Kobe." | |
| 604. | Joey Cruz testified at deposition:<br><br><u>Counsel:</u>   What was depicted in the accident scene photos that you showed the bartender?<br><br><u>Cruz:</u>   I don't remember what was on the photos.<br><br><u>Counsel:</u>   Specifically, were any body parts or human remains contained in any of the photos that you showed the bartender?<br><br><u>Cruz:</u>   I don't remember which ones I showed him.<br><br>      . . .<br><br><u>Counsel:</u>   So as you sit here today, do you know one way or another whether the photos you showed to Victor Gutierrez, the bartender, contained human body parts? Do you know that one way or another?<br><br>      [Objections]<br><br><u>Cruz:</u>   No, I don't.  I don't know. | Ex. 90 (Cruz) at 151:4-152:11, 152:20-153:3; Saigal Decl. ¶¶ 137-43; Ex. 187 (Surveillance Footage – COLA001430) at 21:29:28-21:29:54; Ex. 122 (Gutierrez) at 21:9-23:1, 25:6-26:1, 26:17-27:3, 30:17-22, 31:20-25, 32:5-22, 33:5-17, 121:9-13, 123:6-11, 126:8-18, 135:4-138:20, 141:25-142:19, 150:3-15. |

| | | |
|---|---|---|
| | These were false exculpatory statements. Surveillance footage depicts Cruz pantomiming the victims' injuries after showing the bartender his phone.  In the footage, Cruz motions his hand downward from his neck, and the bartender grimaces. Cruz then holds out his right arm (the arm on which Kobe Bryant had tattoos of his daughters' names) and motions down the arm with his left hand.  As Cruz appears to make another explanatory hand motion, the bartender begins talking to a patron seated to Cruz's left, wearing a black hat. Gutierrez points toward Cruz, makes a hand motion to indicate his torso, then makes a swiping motion across his throat.  In addition, the bartender testified in graphic detail about the "very gruesome" photos, including one showing a male victim's dark-skinned body part that Cruz told the bartender belonged to Kobe Bryant. | |
| 605. | At deposition, Defendant Joey Cruz was asked: "Did you say anything to the bartender about anything related to the victims' bodies?"  Cruz testified: "I don't remember the conversation I had with him." Cruz was then asked: "So you don't remember whether you did or did not talk to the bartender about the victim's bodies?" Cruz testified: "I don't remember what we talked about."<br><br>These were false exculpatory statements. Surveillance footage shows Cruz conversing with the bartender with both Cruz and the bartender pantomiming the condition of the victims' remains after Cruz showed the bartender his phone. | Ex. 90 (Cruz) at 146:2-9; Saigal Decl. ¶¶ 137-41; Ex. 187 (Surveillance Footage –COLA001430) at Channel 15, 21:29:28-21:29:54; Ex. 122 (Gutierrez) at 121:9-13. |
| 606. | Joey Cruz testified at deposition that he did not remember "anyone else being around when [he] showed [the bartender] the | Ex. 90 (Cruz) at 153:5-154:9; Saigal Decl. ¶¶ 134-38; Ex. 187 (Surveillance |

| | | |
|---|---|---|
| | photos." Cruz was asked: "There was nobody around? There was no one seated on your left or right?" Cruz responded: "No." Cruz was further asked: "So to be clear, it's your testimony that you showed the accident scene photos to the bartender only once at a time when no one else was close by?" Cruz responded: "Yes."<br><br>These were false exculpatory statements. Surveillance footage shows a bar patron seated immediately to Cruz's right when Cruz handed his phone to the bartender.<br><br> | Footage – COLA001430) at Channel 8, 21:29:04; Ex. 122 (Gutierrez) at 133:1-134:2. |
| 607. | At deposition, Defendant Joey Cruz was asked: "Did you talk to anyone other than the bartender that night at the restaurant about your experience working near the crash scene on January 26?" Cruz testified: "No. I just talked to Victor about the crash scene."<br><br>This was a false exculpatory statement. Surveillance footage shows that, immediately after the bartender returned Cruz's, Cruz conversed with the bar patron to his right and made demonstrative hand motions pantomiming the condition of the victims remains. | Ex. 90 (Cruz) at 145:2-12; Saigal Decl. ¶¶ 134-42; Ex. 187 (Surveillance Footage –COLA001430) at 21:29:47; Ex. 122 (Gutierrez) at 133:1-134:4, 142:20-144:4. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| 608. | At deposition, Defendant Joey Cruz testified that Victor Gutierrez "quickly saw the photos and then had to go back to work."  Cruz later added: "It was a matter of seconds."<br><br>This was a false exculpatory statement. Surveillance footage shows that, on the second occasion Cruz showed victims' remains photos to the bartender, Cruz and the bartender spent over a minute viewing Cruz's phone. | Ex. 90 (Cruz) at 146:18-147:2, 150:14-20; Saigal Decl. ¶¶ 145-46; Ex. 188 (Surveillance Footage–COLA001432) at 21:42:34-21:43:44; Ex. 122 (Gutierrez) at 163:19-164:9. |
|---|---|---|
| 609. | Joey Cruz had the following exchange with Sheriff's Department investigators:<br><br>Investigator:  Did you ever zoom into the photographs?<br><br>Cruz:  No.<br><br>. . .<br><br>Investigator:  Nowadays with these cell phones when you receive a picture it's – would you agree it's easy to go through a scene by zooming in and out to view certain areas of a picture?<br><br>Cruz:  Yes, sir.<br><br>Investigator:  But you don't recall doing that?<br><br>Cruz:  No, sir.<br><br>Investigator:  You never did? | Ex. 133 (J. Cruz LASD Int.) at 2276-2277, 2279.017-2279.019; Saigal Decl. ¶ 146; Ex. 188 (Surveillance Footage – COLA001432) at Channel 15, 21:42:33-21:43:43. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | Cruz:   No, sir.<br><br>These were false exculpatory statements. Surveillance footage from the bar shows Joey Cruz using both thumbs on the screen at the same time to zoom in and out of the photos as the bartender huddle over his phone with him.  When Sheriff's Department investigators showed Cruz the surveillance footage during a latter portion of his interview, Cruz acknowledged that the video shows him zooming in and out of the photos. | |
| | 610. | At deposition, Defendant Joey Cruz testified:<br><br>Counsel:   So does that mean that the totality of the time that you had these photos pulled up on your phone at the bar that night was also seconds?<br><br>Cruz:   Yes.  The only time I pulled up the photo was to show Victor.<br><br>Counsel:   So you didn't view those photos yourself that night.  The only time you had them pulled up on your phone was when you showed the bartender?<br><br>Cruz:   Yes.<br><br>This was a false exculpatory statement. Surveillance footage shows Cruz studying his phone for six minutes immediately before displaying the victims' remains photos to the bartender and a bar patron seated next to him. | Ex. 90 (Cruz) at 288:7-17; Saigal Decl. ¶ 133; Ex. 187 (Surveillance Footage – COLA001430) at Channel 15, 21:22:10-21:28:14. |
| | 611. | Cruz testified at deposition that he did not speak to any of his colleagues on the day he was called into the station by Lt. Mancinas to discuss crash-scene photos.  Cruz also testified that he did not recall Deputy Mejia being in the report-writing room at any time while Cruz was writing his memo to his | Ex. 90 (Cruz) at 189:20-24, 193:6-13, 194:7-23, 195:11-14, 198:24-199:3, 199:16-21; Ex. 91 (Mejia) at 190:19-191:2, 191:15-17, 192:11-20, 194:3-5. |

-213-

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | supervisor regarding the photos.  When asked whether he collaborated or compared notes with anyone while drafting his memo, to which Cruz responded: "I'm confident I didn't."  Similarly, Cruz testified: | |
| --- | --- | --- | --- |
| | | Counsel: | Did anyone look at a draft of your memo before you turned it in? | |
| | | Cruz: | No.  I wrote it, and I turned it in straight to Lieutenant Mancinas. | |
| | | | . . . | |
| | | Counsel: | Is it fair to say that the memo that you wrote was entirely your own words? | |
| | | | [Objection] | |
| | | Cruz: | Yes, I wrote it. | |
| | | | . . . | |
| | | Counsel: | Was the memo that you delivered to Lieutenant Mancinas entirely your own words, yes or no? | |
| | | | [Objection] | |
| | | Cruz: | Yes, I wrote the memo. | |
| | | These were false exculpatory statements.  Deputy Rafael Mejia—Cruz's training on the day of the crash and the person who sent the photos to him—testified at deposition that he saw Cruz in the report-writing room on the day both of them were summoned by supervisors to discuss the photos.  Mejia further testified that he provided feedback to Cruz on Cruz's memo. | |
| 612. | At deposition, Defendant Joey Cruz was asked: "How many times while you were at the bar that night did you show the bartender photos of the accident scene?"  Cruz responded: "I just showed him once."  This was a false exculpatory statement.  As discussed *supra* ¶¶ 323, 328, Cruz displayed | Ex. 90 (Cruz) at 146:14-25; Saigal Decl. ¶¶ 137, 145-46; Ex. 187 (Surveillance Footage –COLA001430) at Channel 8, 21:28:59; Ex. 188 (Surveillance Footage –COLA001432) at |

-214-

| | | | |
|---|---|---|---|
| | | photos to the bartender twice—once at 9:29 p.m. and again at 9:42 p.m. | 21:42:34-21:43:44; Ex. 122 (Gutierrez) at 162:3-165:2. |
| | 613. | At deposition, Imbrenda averred that he did not see any identifiable body parts in the photos he received.<br><br>This was a false exculpatory statement. Kahan has admitted he sent photos to Imbrenda that contained readily visible human remains. | Ex. 115 (Imbrenda) at 106:14-19; Ex. 117 (Kahan) at 54:11-18, 55:5-8, 55:12-21, 55:24-57:5, 60:12-17, 78:6-8, 11-12. |
| | 614. | At deposition, Imbrenda claimed "identification of the aircraft" was the "crux of the conversation" while he was sharing photos of the victims' remains at the Golden Mike Awards.<br><br>These were false exculpatory statements. Erik Scott testified that the group was not looking to identify the aircraft when reviewing the photos, and Scott did not remember the identification of the aircraft being part of the group's conversation that night. | Ex. 115 (Imbrenda) at 139:18-140:4, 142:14-143:3, 152:10-20; Ex. 125 (Scott) at 63:19-64:1, 64:9-22. |
| | 615. | At deposition, Imbrenda claimed "[t]he women were not in close proximity" when he was showing the photos to the group.<br><br>This was a false exculpatory statement.  Erik Scott testified that the entire group was "in fairly close proximity" and Ms. Weireter testified that three of the women were huddled close to Imbrenda and looking at his cell phone.  Imbrenda's deposition testimony is also inconsistent with a statement he made in his interview with the Department's investigator, where he acknowledged that "there was a clear attempt by the gals that were with these guys to come over and | Ex. 115 (Imbrenda) at 143:13-25; Ex. 125 (Scott) at 47:5-48:11; Ex. 124 (Weireter) at 33:1-25, 34:6-15, 35:15-21; Ex. 159 (Dep. Ex. 27) at 2571; Ex. 176 (Imbrenda LAFD Int. [COLA035068]) at 12:56-14:27. |

-215-

| | | | |
|---|---|---|---|
| | | look." The Fire Department's own investigation also found that Imbrenda spoke about the incident "while surrounded by [his] colleagues *and their dates*," then pulled out his phone and "showed *the group* pictures from the crash site which depicted human remains." | |
| | 616. | Chris Jauregui avers in his summary judgment declaration that "victim remains were not the focal point of the photos."<br><br>This is a false exculpatory statement. Deputy Doug Johnson took "six or seven" close-up photos of human remains and sent all of them to Versales, who in turn sent all of them to Jauregui. Hence, Jauregui possessed several close-up photos of the victims' remains. In addition, during his interview with Sheriff's Department investigators, Jauregui stated:<br><br>Investigator: What was the focal point on the picture? Was it the [body part] –<br><br>Jauregui:    Probably the [body part]. | Jauregui Decl. ¶ 10; Ex. 96 (Johnson) at 126:4-11, 144:21-24; Ex. 92 (Versales) at 180:1-14; Ex. 135 (Jauregui LASD Int.) at 2313. |
| | 617. | At deposition, Chris Jauregui testified:<br><br>Counsel:    How many photographs did you receive from Deputy Versales?<br><br>Jauregui:    I don't recall a number.<br><br>Counsel:    Wait. Can you – if you had to estimate, would you say more than 50? more than 25? More than 10? More than 5? More than 2?<br><br>Jauregui:    More than 2. Probably not more than 5.<br><br>Counsel:    Okay. So 2 to 5 is your best estimate?<br><br>Jauregui:    Yes. | Ex. 95 (Jauregui) at 48:3-11; Jauregui Decl. ¶ 9; Ex. 92 (Versales) at 179:24-180:14. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| 1 2 3 4 | | These were false exculpatory statements. Deputy Versales has testified that he sent Jauregui 15 to 30 crash-scene photos, and Jauregui's summary judgment declaration now states that he received "six to eight" photos. | |
| 5 6 7 8 9 10 11 12 13 14 15 16 17 | 618. | In a memo written to Captain Vander Horck regarding his involvement with the photos, Deputy Christopher Jauregui stated that he deleted the crash-scene photos "[a]t the conclusion of my investigation." This was a false exculpatory statement.  In his summary judgment declaration, Jauregui acknowledges that he deleted the photos on January 30, 2020—four days *after* the accident, at which point any investigation he had performed had long since concluded.  Jauregui confirmed this at deposition, when he was asked: "And any investigatory role that you might have had concluded at that time, when you drove away from the water district at around 9:00 p.m. on January 26th; is that right?" Jauregui testified: "Correct." | Jauregui Decl. Ex. 7 (Jaurgeui Memo to Vander Horck); Jauregui Decl. ¶¶ 7, 13; Ex. 95 (Jauregui) at 78:10-25. |
| 18 19 20 21 22 23 24 25 | 619. | In an interview with LASD investigators, Doug Johnson stated he did not know whether Kobe was captured in any of his photos and that none of his photos "could identify Kobe Bryant." These were false exculpatory statements. Search and rescue specialist David Katz has testified that the first thing Johnson said to him upon his arrival at the scene was that, of the two victims located near the fuselage, "one of them was likely Kobe Bryant." | Ex. 130 (Johnson LASD Int.) at COLA000079; Ex. 105 (Katz) at 52:3-8. |
| 26 27 28 | 620. | At deposition, Doug Johnson testified that the memo he wrote to Captain Vander Horck regarding his involvement with the photos was entirely in his own words, that | Ex. 96 (Johnson) at 181:9-182:13; Johnson Decl. Ex. 9 (Johnson Memo to Captain Matthew Vander |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| | he did not consult with anyone while drafting it, and that he had not seen any of the memos prepared by the other deputies. Johnson was further asked: "Did you talk with Deputy Versales at all in connection with preparing the memo?"  Johnson testified: "No, ma'am." | Horck); Versales Decl. Ex. 5 (Versales Memo to Vander Horck). |
| | These were false exculpatory statements.  In his memo, Johnson stated that the photographs "were immediately erased after the incident from my cellphone."  This statement is identical to a statement included in memos authored by Raul Versales, Rafael Mejia, Ruby Cable, and Michael Russell.  Johnson's memo states that the purpose of the photographs was to provide information regarding "the color, numbers, and identifying features on the aircraft as well as crash scene details," which mirrors language in the memos of both Versales and Mejia. | |
| 621. | In an interview with the Fire Department's investigator, in a letter to the Department, and at deposition, Brian Jordan claimed he was instructed to take photos of the crash scene.  At his interview with the Department's investigator, he initially stated, "I don't remember if somebody asked me to take them."  By the end of the interview, he said: "I thought somebody did, I don't remember who."  Months later, Jordan asserted he received an instruction to take photos from his supervisor, Chief Marrone. | Ex. 180 (Jordan interview) at 13:34-13:59, 37:46-40:12; Ex. 116 (Jordan) at 115:21-120:2; Ex. 118 (Marrone) at 25:2-5, 30:19-31:9, 35:20-36:1; Ex. 120 (Smith) at 37:21-23. |
| | These were false exculpatory statements.  Chief Marrone testified that he did not give Jordan any such instruction.  Neither did the incident commander or anyone else at the command post. | |
| 622. | When asked by the Fire Department's investigator if he took photos of Gianna | Ex. 180 (Jordan interview) at 24:12-24:32; Ex. 118 |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| 1 | | Bryant's remains, Jordan stated he "couldn't really tell who was who." <br><br> This was a false exculpatory statement. On the evening of January 26, 2020, Jordan texted his supervisor that Gianna Bryant's remains were located in a ravine, leading his supervisor to conclude that Jordan had identified Gianna Bryant at the scene and "had eyes on her." | (Marrone) at 42:15-44:3; Ex. 181 (Marrone interview, COLA035080) at 54:23-59:13, 1:15:04-1:15:24. |
|---|---|---|---|
| 623. | | In an interview with the Fire Department's investigator, Jordan denied sending any crash-scene photos to Tony Imbrenda. At his deposition, he testified he did not remember if he texted crash-scene photos to Imbrenda. <br><br> These were false exculpatory statements. Imbrenda has admitted he received photos from Jordan, and the Department has itself concluded Jordan sent photos of the victims to Imbrenda. | Ex. 180 (Jordan interview) at 31:50-32:54; Ex. 116 (Jordan) at 138:22-24; Ex. 176 (Imbrenda interview) at 10:41 ; Ex. 115 (Imbrenda) at 72:22-73:7; Ex. 156 (Dep. Ex. 26 at COLA001343). |
| 624. | | After he was questioned about his involvement in taking and sharing photos of the victims, Jordan began claiming that he covered Kobe Bryant's body at the scene "by the order of somebody." <br><br> This was a false exculpatory statement. The victims were covered by search and rescue volunteers. | Ex. 180 (Jordan interview) at 22:56-23:49; Ex. 118 (Marrone) at 71:24-72:9; Ex. 105 (Katz) at 66:23-67:1, 67:19-21. |
| 625. | | Sergeant Travis Kelly's summary judgment declaration avers that "victim remains were not the focal point of the photos." <br><br> This is a false exculpatory statement. Doug Johnson has testified that he took "six or seven" close-up photos of the victims' remains and sent "all" of them to Versales, who in turn sent all of them to Kelly. Hence, Kelly possessed several close-up photos of the victims' remains. In addition, Kelly | Kelly Decl. at ¶ 8; Ex. 96 (Johnson) at 126:4-11, 144:21-24; Ex. 92 (Versales) at 179:24-180:14; Ex. 98 (Kelly) at 90:13-21; Ex. 140 (Kelly LASD Int.) at COLA000425-26. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | testified regarding numerous graphic details of the photos he received. | |
|---|---|---|---|
| | 626. | Sergeant Travis Kelly's summary judgment declaration states that internal investigators "reviewed my phone's . . . recently deleted folder" and "my text messages."<br><br>This is a false exculpatory statement.  The transcript of Kelly's interview with the Sheriff's Department indicates that investigators did not review his text messages or recently deleted folder.  Kelly confirmed this at his deposition:<br><br>Counsel:  Anyone at the sheriff's department ever inspected your cell phone?<br><br>Kelly:  No.<br><br>Counsel:  Anyone ever checked your photo – photo gallery or your deleted photos?<br><br>Kelly:  No.<br><br>. . .<br><br>Counsel:  Anyone from the sheriff's department ever checked your text messages?<br><br>Kelly:  No. | Kelly Decl. ¶ 19; Ex. 140 (Kelly LASD Int.) at COLA000433-35; Ex. 98 (Kelly) at 130:22-131:2, 131:7-9. |
| | 627. | At deposition, Sergeant Travis Kelly was asked: "To your recollection, was your memo written entirely in your own words without any influence from any other person?"  Kelly testified: "Yes."<br><br>This was a false exculpatory statement.  Kelly's memo to Captain Vander Horck states that he "immediately erased" the photos, which are the identical words used in memos authored by Raul Versales, Ruby Cable, Michael Russell, and Rafael Mejia. | Ex. 98 (Kelly) at 124:9-12; Kelly Decl. Ex. 10 (Kelly Memo to Captain Matthew Vander Horck). |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| 628. | Travis Kelly's memo to Captain Vander Horck regarding his involvement in the photos states: "I immediately erased the crash scene photos from my cell phone." This was a false exculpatory statement. Kelly's summary judgment declaration states that he deleted the photos "two or three days after the crash." | Kelly Decl. Ex. 10 (Kelly Memo to Captain Matthew Vander Horck); Kelly Decl. ¶ 12; Ex. 98 (Kelly) at 113:5-11, 125:13-18. | |
| 629. | Rafael Mejia's summary judgment declaration states that he sent photos to Deputy Ruby Cable because he thought she "might need to write [a] report[]" and "was going to take supplies up to the crash site itself, including lighting equipment for the night, so I thought she might need the photos." This is a false exculpatory statement. When Mejia spoke to LASD investigators, he stated: | Mejia Decl. ¶ 14; Ex. 132 (Mejia LASD Int.) at 2248, 2256; Ex. 91 (Mejia) at 152:24-153:11, 154:22-25, 155:1-8. | |

Investigator:  And just to be clear, sir, you sent her the pictures. She didn't request them. Was there a conversation in lieu of you sending them?  Can you explain that portion of it?

Mejia:  Yeah, there was.  Talking about the scene, how you can, it was wreckage, you could see the helicopter and we'll say maybe curiosity got the best of us, too.  It's just, I had the photos, I asked her if she wanted them.  She said sure.

Investigator:  Did she need them at that time?

Mejia:  I don't think she did, no.

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | Investigator: And you said curiosity got the best of you or both of you? Is that what you said?<br><br>Mejia: I would say both of us.<br><br>Investigator: Okay.<br><br>Mejia: That's what – in our nature, I think, deputies. | |
| | 630. | Rafael Mejia's summary judgment declaration avers that internal affairs investigators "reviewed my phone's . . . recently deleted folder" and "text messages."<br><br>This is a false exculpatory statement. The transcript of Mejia's interview with Sheriff's Department investigators indicates that the investigators did not review his recently deleted folder or text messages. Mejia confirmed this at his deposition:<br><br>Counsel: Did they take a look at your deleted items folders for your phone – for your pictures?<br><br>Mejia: No.<br><br>Counsel: Did they look at your text messages?<br><br>Mejia: No. | Mejia Decl. ¶ 25; Ex. 132 (Mejia LASD Int.) at 2257-2259; Ex. 91 (Mejia) at 211:6-10, 211:13-17. |
| | 631. | Rafael Mejia testified at deposition, while in the report-writing room drafting his memo on January 30, 2020, the deputies who were present did not coordinate or compare notes with one another about the words or language they were using in their memos.<br><br>These were false exculpatory statements. In his memo to Captain Vander Horck, Mejia stated that the photographs "were immediately erased after the incident from my cellphone." This statement is identical to a statement included in memos authored | Ex. 91 (Mejia) at 193:12-23, 196:1-4; Mejia Decl. Ex. 3 (Mejia Memo to Vander Horck dated January 30, 2020); Versales Decl. Ex. 5 (Versales Memo to Vander Horck dated January 30, 2020); Ex. 92 (Versales) at 198:3-11, 244:10-16, 246:13-247:9, 249:13-25, 250:13-16, 251:1-6; Cable Decl. Ex. 8 (Cable Memo |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| | by Raul Versales, Ruby Cable, and Michael Russell.  Mejia's memo also includes the following statement: "The purpose of me sending/receiving the photographs was to answer some questions regarding the color, numbers and identifying features on the aircraft as well as crash scene details."  This statement is identical to a statement in the memo authored by Versales.  Mejia's memo also includes the following statement: "On 1/26/2020, While working as unit 103/D, I shared photographs of the helicopter crash scene with other law enforcement personnel."  The memos authored by Versales and Russell contain identical statements, albeit with different unit numbers. | to Captain Matthew Vander Horck); Russell Decl. Ex. 2 (Russell Memo to Captain Matthew Vander Horck). |
| 632. | Deputy Rafael Mejia testified repeatedly and forcefully at deposition that none of the photos he received contained human remains:<br><br>Counsel:    Was there ever a point on January 26 when you obtained photos of the crash site that included victims' remains?<br><br>Mejia:    No.<br><br>Counsel:    Why do you say "no"?<br><br>Mejia:    I don't recall seeing victim remains on the photos that I received.<br><br>. . .<br><br>Counsel:    Did any of the photos that you received from Deputy Versales contain dead bodies or pieces of dead bodies?<br><br>[Objection]<br><br>Mejia:    I -- I -- no.<br><br>. . . | Ex. 91 (Mejia) at 133:1-7, 135:9-13, 144:24-145:4, 152:21-23, 156:2-10, 160:18-161:13; Mejia Decl. ¶ 11; Ex. 132 (Mejia LASD Int.) at 2236. |

-223-

| | | | |
|---|---|---|---|
| 1 | Counsel: | How confident are you that none of the photos you sent to Joey Cruz contained bodies or body parts? | |
| 2 | | | |
| 3 | | | |
| 4 | Mejia: | Very confident. | |
| 5 | Counsel: | Why are you very confident? | |
| 6 | Mejia: | Because I don't recall seeing that in the photos. | |
| 7 | | . . . | |
| 8 | Counsel: | Did any of the photos that you sent Deputy Cable contain bodies or pieces of bodies? | |
| 9 | | | |
| 10 | Mejia: | No. | |
| 11 | | . . . | |
| 12 | Counsel: | [Y]ou think that's something you would remember as you sit here today, if -- if, in fact, body parts had been in these photos? | |
| 13 | | | |
| 14 | | | |
| 15 | Mejia: | Yes. | |
| 16 | | . . . | |
| | Counsel: | [A]t the time that you texted these photos of the accident scene to Joey Cruz and Ruby Cable, did it occur to you that Kobe Bryant's remains or a portion of Kobe Bryant's remains might be in these photos that you texted them? | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | Mejia: | No. | |
| 23 | Counsel: | Why not? | |
| | Mejia: | Because I knew there weren't any body parts or human remains in the photos. | |
| 24 | | | |
| 25 | | | |

These were false exculpatory statements, as Mejia's summary judgment declaration now admits: "Due to the nature of the crash, the photos also contained unidentifiable human

| | | |
|---|---|---|
| | remains." However, this itself is false in representing that the remains were "unidentifiable." Mejia was the source of the photos Joey Cruz showed off at the bar, where Cruz told the bartender that Kobe Bryant was one of the victims depicted in the photos. | |
| 633. | At deposition, Defendant Rafael Mejia testified:<br><br>Counsel:  Isn't it true that part of the reason you sent these photos to Deputy Cable is because you were – you were curious about what the crash site looked like and you thought she might be curious too?<br><br>Mejia:  No.<br><br>This was a false exculpatory statement. When interviewed by LASD investigators regarding his reason for sharing the photos with Cable, Mejia stated that "maybe curiosity got the best of us." The investigators followed up: "And you said curiosity got the best of you or both of you? Is that what you said?" Mejia responded: "I would say both of us. . . . That's what – in our nature, I think, [as] deputies." | Ex. 91 (Mejia) at 152:24-153:11; Ex. 132 (Mejia LASD Int.) at 2248. |
| 634. | Mejia testified at deposition that, "other than the instances where [he] texted the accident scene photos to Ruby Cable and Joey Cruz . . . [he] never sent photos of the accident scene to anyone via text message, AirDrop, e-mail, or other mechanism."<br><br>This was a false exculpatory statement. On the evening of the accident, Mejia used Facebook Messenger to send two crash-scene photos to a friend in a different division of the Sheriff's Department, Deputy Henry Shue. The photos, both taken at close range by Doug Johnson, depicted burning | Ex. 91 (Mejia) at 158:6-13; Ex. 109 (Shue) at 33:20-34:17, 46:21-48:9, 60:23-61:6. |

| | | |
|---|---|---|
| | helicopter wreckage and the tail of the helicopter.  There was no investigatory purpose for Mejia to send the photos to Shue, as Shue's assignment in the Sheriff's Department was driving buses of inmates to and from court dates.  Shue had no role in investigating the helicopter accident, and no legitimate reason to possess crash-scene photos. | |
| 635. | In his memo to Captain Vander Horck regarding his involvement with the photos, Rafael Mejia wrote: "The photographs were immediately erased after the incident from my cell phone." <br><br> This was a false exculpatory statement.  At deposition, Mejia admitted that he deleted the photos "four days after the accident." Mejia confirms this timing in his summary judgment declaration, which avers that he deleted the photos on January 30, 2020, four days after the accident. | Mejia Decl. Ex. 3 (Mejia Memo to Vander Horck dated January 30, 2020); Ex. 91 (Mejia) at 198:21-201:3, 206:12-208:5; Mejia Decl. ¶ 17. |
| 636. | In his memo to Captain Vander Horck regarding his involvement with the photos, Rafael Mejia wrote: "The purpose of me sending/receiving the photographs was to answer some questions regarding the color, numbers and identifying features on the aircraft, as well as crash scene details." <br><br> This was a false exculpatory statement.  At deposition, when asked whether he sent photos to Cruz "to answer some questions regarding the color, numbers, and identifying features on the aircraft" and "crash scene details," Mejia responded: "No."  Similarly, when asked whether he sent photos to Cable "to answer some questions regarding the color, numbers, and identifying features on the aircraft" and "crash scene details," Mejia responded: "No.  I don't – I don't recall." | Mejia Decl. Ex. 3 (Mejia Memo to Vander Horck dated January 30, 2020); Ex. 91 (Mejia) at 203:9-24. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| 637. | Scott Miller's summary judgment declaration avers: "I received the photos because, in running the command post, everything needed to go through me, and any of the other agencies responding to the crash—the NTSB, FBI, FAA, and Coroner's Office—who needed the information." | | Miller Decl. ¶ 7; Ex. 138 (Miller LASD Int. No. 1) at 2362-2364, 2371, 2374. |

This is a false exculpatory statement. During his interview with Sheriff's Department investigators, Miller made the following statements:

Miller: One of the deputies had said that they had photos from the crash site and I said, "Oh, can I see them?" And he said, "Oh, I'll just send them to you." So, they showed up on my phone, my cell phone. And that's where they went.

. . .

Investigator: And was there any purpose or any reason why you received the photographs? Were they used for anything?

Miller: No.

. . .

Investigator: Those 12-ish photos that you did receive, did you use those photos at all while working the command post?

Miller: No.

. . .

Investigator: Alright, do you recall anyone at the command post that day using the photographs for any particular reason? As part of

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | the investigation or duties at the command post, any – <br> <u>Miller</u>:     No. | |
|---|---|---|---|
| | 638. | Scott Miller's summary judgment declaration avers that "victim remains were not the focal point of the photos." <br><br> This is a false exculpatory statement. Johnson has testified that he took "six or seven" close-up photos of the victims' remains and sent "all" of them to Versales, who in turn sent all of them to Miller. Hence, Miller possessed several close-up photos of the victims' remains. | Miller Decl. ¶ 8; Ex. 96 (Johnson) at 126:4-11, 144:21-24; Ex. 92 (Versales) at 179:24-180:14. |
| | 639. | Deputy Michael Russell's summary judgment declaration states internal investigators for the Sheriff's Department "reviewed my text messages." <br><br> This is a false exculpatory statement. The transcript of Russell's interview with the Sheriff's Department indicates that investigators did not review his text messages. At deposition, Russell was asked: "Did you show [the investigators] any – anything related to text messages on your phone?" Russell responded: "I don't remember." | Russell Decl. ¶ 16; Ex. 134 (Russell LASD Int.) at 2297-2299; Ex. 94 (Russell) at 284:22-285:3, 285:18-20. |
| | 640. | Michael Russell's summary judgment declaration avers that he texted "two photos" to Deputy Ben Sanchez. <br><br> This is a false exculpatory statement. At deposition, Russell was asked: "Is it accurate to say that you sent two photos via text of the aircraft crash to Deputy Benjamin Sanchez?" Russell responded: "No." Russell further explained: "At the time of writing [the memo to Vander Horck on January 30, 2020], I believed it was only two photos I sent him. Later on it – it came to my recollection that I sent him more. So if I was writing this over | Russell Decl. ¶ 8; Russell Decl. Ex. 2 (Russell Memo to Captain Matthew Vander Horck); Ex. 94 (Russell) at 237:3-21, 240:10-241:11. |

| | | |
|---|---|---|
| | again, knowing that, I would have said, I sent three to four photos via text." Russell was then asked: "What was it that made you remember at some later point that rather than sending two photos, you sent three or four?" Russell responded: "Just a clearer mind." | |
| 641. | Michael Russell's summary judgment declaration avers that the victims' remains "were not the focal point of the photos." This is a false exculpatory statement. At deposition, Russell was asked: "Do you recall whether the – whether it appeared that the primary focus of the photo was on the body?" Russell responded: "Yes." Russell then went on to explain that a body occupied approximately 60 percent of one of the photos. | Russell Decl. ¶ 7; Ex. 94 (Russell) at 153:2-19. |
| 642. | Michael Russell's summary judgment declaration states that he asked Cruz to send him the photos "so that I could understand the magnitude of what we were dealing with and what the scene was like at the crash site." This is a false exculpatory statement. At the time Russell received the crash-scene photos from Cruz, Russell was at the Lost Hills Station at the end of his shift, so he was not part of a group "dealing with" the accident scene. In addition, Russell acknowledged at deposition that the reason he asked Cruz for the photos is because he was "curious" and his curiosity "kind of got . . . the upper hand on me." | Russell Decl. ¶ 6; Ex. 94 (Russell) at 115:15-20; Ex. 134 (Russell LASD Int.) at 2296. |
| 643. | At deposition, Defendant Michael Russell was asked: "Did you ever look at the photos to determine whether any of the remains depicted in the photos belonged or potentially belonged to Kobe Bryant?" Russell testified: "No." | Ex. 94 (Russell) at 174:11-14, 175:4-25; Ex. 136 (Sanchez LASD Int.) at 2336. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| | This was a false exculpatory statement. During his interview with Sheriff's Department investigators, Deputy Benjamin Sanchez stated that, when Russell sent him the photos, "[Russell] said he believed one of them was Kobe Bryant." | |
| 644. | Michael Russell testified at deposition that he did not consult anyone else's memo while drafting his own memo to Captain Vander Horck regarding his involvement with the photos.<br><br>This was a false exculpatory statement. In his memo to Captain Vander Horck, Russell stated that the photographs "were immediately erased after the incident from my cell phone." This statement is identical to a statement included in memos authored by Raul Versales, Ruby Cable, and Rafael Mejia. Russell's memo also includes the following statement: "On 1-26-2020, while working as unit 224T1, I shared photographs of the helicopter crash scene with other law enforcement personnel." Aside from the unit numbers, the memos authored by Versales and Mejia contain identical statements. | Ex. 94 (Russell) at 232:5-8; Russell Decl. Ex. 2 (Russell Memo to Captain Matthew Vander Horck); Mejia Decl. Ex. 3 (Mejia Memo to Vander Horck dated January 30, 2020); Versales Decl. Ex. 5 (Versales Memo to Captain Matthew Vander Horck dated January 30, 2020); Cable Decl. Ex. 8 (Cable Memo to Captain Matthew Vander Horck). |
| 645. | Michael Russell's memo to Captain Vander Horck stated: "On 01-26-2020, while working as Unit 224T1, I shared photographs of the helicopter crash crime scene with other law enforcement personnel." | Russell Decl. Ex. 2 (Russell Memo to Captain Matthew Vander Horck); Ex. 94 (Russell) at 179:23-181:11, 233:14-234:15, 235:1-19, 240:10-241:11. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | This sentence contained two false exculpatory statements.  At deposition, Russell testified that he sent photos to Sanchez while *off duty* the day *after* the accident, as Russell sat in his bedroom at home playing an online video game and chatting with Russell on his headset.  When questioned regarding the above statement in his memo at deposition, Russell testified: "[I]t's unfortunate that I wrote it that way." | |
| | 646. | Russell's memo to Vander Horck also states: "I received the photographs from Deputy Joey Cruz #648563 (unit 103/D) who was also working this incident via text." | Russell Decl. Ex. 2 (Russell Memo to Captain Matthew Vander Horck); Ex. 94 (Russell) at 235:20-237:2, 240:10-241:11. |
| | | This was a false exculpatory statement.  At deposition, Russell testified: | |
| | | Counsel:  Would it be accurate to say that Joey Cruz was working the incident at the time that he sent you these crash scene photos? | |
| | | Russell:   That's not correct. | |
| | | Counsel:  In what respect is it not correct? | |
| | | Russell:   Because we were relieved already and we were in the report writing room since being relieved from the incident.  So we're – we're no longer on duty at that point, is what I'm getting at. | |
| | 647. | Russell's memo to Vander Horck states that he sent "two photos" to Ben Sanchez via text.  Similarly, Michael Russell's summary judgment declaration states: "On January 27, 2020, I texted two photos to Deputy Ben Sanchez, who works at the Santa Clarita Station and was possibly going to respond to the incident in the days following January 26, 2020." | Russell Decl. Ex. 2 (Russell Memo to Captain Matthew Vander Horck); Russell Decl. ¶ 8; Ex. 94 (Russell) at 186:1-3; 197:16-199:6; 307:24-308:11. |

-231-

| | | | |
|---|---|---|---|
| | | These were false exculpatory statements. At deposition, Russell was asked: "In your opinion, as you sit here today, was there any valid reason for you to send photos of the victims' remains to Ben Sanchez?" Russell testified: "No." Russell was also asked: "Did you understand Benjamin Sanchez to have any role in investigating the helicopter accident?" Russell testified: "No. He did not." Russell further testified that sending the photos to Sanchez did not serve any training or educational function. | |
| | 648. | Russell's memo to Vander Horck states that he "[t]he photos were immediately erased after the incident from my cell phone." Russell's summary judgment declaration differs, stating: "I deleted the photos on January 28, 2020." January 28 would have been two days *after* the accident on January 26 and two days *before* being summoned to the Lost Hills Station on January 30.<br><br>Both of the above are false exculpatory statements. The Sheriff's Department's disposition sheet regarding discipline for Russell stated that Russell deleted the photos "[o]n the morning of January 30, 2020 . . . after having stored them for approximately four (4) days." The disposition sheet also states that Russell did not delete the photos "until being directed to delete them." | Russell Decl. Ex. 2 (Russell Memo to Vander Horck); Russell Decl. ¶ 9; Jaeger Decl. Ex. 28 (Notice of Completion of Investigation to Russell) at 81-82. |
| | 649. | The entirety of Russell's memo to Vander Horck was five sentences. It stated:<br><br>    On 01-26-2020, while working as unit 224T1, I shared photographs of the helicopter crash crime scene with other law enforcement personnel.<br><br>    I received the photographs from Deputy Joey Cruz #648563 (unit | Russell Decl. Ex. 2 (Russell Memo to Vander Horck); Ex. 94 (Russell) at 239:23-241:11. |

| | | | |
|---|---|---|---|
| | | 103/D) who was also working this incident via text.  I sent two photos via text of the aircraft crash to Deputy Benjamin Sanchez #519036 (Santa Clarita Station).  Deputy Sanchez can be reached at phone number (661) 618-1880.<br><br>The photos were immediately erased after the incident from my cell phone.<br><br>Hence, as demonstrated above, Russell's five-sentence memo contained five false exculpatory statements.  At deposition, Russell admitted that his five-sentence memo contained "four things that were inaccurate."  However, Russell stood behind his statement in the memo that the photos were "immediately erased after the incident." | |
| 650. | | Deputy Ben Sanchez's summary judgment declaration states that he "deleted the photos within one day of receiving them."<br><br>This is a false exculpatory statement.  At deposition, Sanchez testified that "within weeks" after he received the photos, a deputy reached out asking if he had photos of the crash scene.  Sanchez "explained to them I did," but told the deputy he would not be sharing them.  Sanchez further testified that, at the time of the outreach from the deputy, he was "getting ready to get rid of [the photos]." | Sanchez Decl. ¶ 5; Ex. 99 (Sanchez) at 85:3-23, 86:7-90:14. |
| 651. | | At deposition, Deputy Benjamin Sanchez was asked: "[I]t's your recollection that you received photographs of the accident scene on the day of the accident itself?"  Sanchez responded: "Yes." | Ex. 99 (Sanchez) at 30:1-11, 31:20-23; Ex. 136 (Sanchez LASD Int.) at 2332. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | This was a false exculpatory statement.  At his interview with Sheriff's Department investigators, Sanchez stated that he received the pictures "within a day or two of the crash." | |
| | 652. | At deposition, Deputy Benjamin Sanchez testified:<br><br>Counsel:   As you sit here today, do you know whether Michael Russell worked in response to the accident on January 26th?<br><br>Sanchez:   I don't remember.<br><br>Counsel:   So to your understanding, Michael Russell could have had the day off on January 26th. That's possible?<br><br>Sanchez:   I don't know.<br><br>This was a false exculpatory statements. Sanchez's summary judgment declaration stated: "Within a day or two of January 26, 2020 helicopter crash, Deputy Michael Russell, who had been working at the command post on the day of the crash, asked me whether I wanted to see photos of the crash.  I told him I did because I thought I was going to get deployed to the site and wanted to know what was going on before I arrived." | Ex. 99 (Sanchez) at 54:4-10; Sanchez Decl. ¶ 3. |
| | 653. | At deposition, Defendant Raul Versales testified: "The only personnel I can recall sending photographs to were Detective Miller, Deputy Jauregui, Deputy Mejia." Versales was then asked: "Is it possible that you sent photos of the accident scene to Sergeant Kelly?" Versales testified: "No." He further testified: "I didn't send [the photos] to Sergeant Kelly." | Ex. 92 (Versales) at 111:1-14, 184:13-185:16, 203:17-23; Versales Decl. ¶ 12. |

-234-

|  |  | These were false exculpatory statements. In his declaration in support of summary judgment, Versales now avers: "When I received the photos, I sent them to other LASD personnel at the command post: <u>Sergeant Travis Kelly</u>, Deputy Chris Jauregui, Deputy Rafael Mejia, and Detective Scott Miller." |  |
|---|---|---|---|
| 654. | | At deposition, Defendant Raul Versales was asked about why he sent photos to Detective Scott Miller. Versales testified that "Detective Miller's was investigating" and Versales sent him the photos "for investigative purposes only." | Ex. 92 (Versales) at 187:15-18, 188:18-23, 192:1-4; Ex. 138 (Miller LASD Int. No. 1) at 2362, 2364, 2371, 2374. |
| | | These were false exculpatory statements. In his interview LASD investigators, Detective Miller stated: | |
| | | <u>Miller</u>: One of the deputies had said that they had photos from the crash site and I said, "Oh, can I see them?" And he said, "Oh, I'll just send them to you." So, they showed up on my phone, my cell phone. And that's where they went. | |
| | | . . . | |
| | | <u>Investigator</u>: And was there any purpose or any reason why you received the photographs? Were they used for anything? | |
| | | <u>Miller</u>: No. | |
| | | . . . | |
| | | <u>Investigator</u>: Those 12-ish photos that you did receive, did you use those photos at all while working the command post? | |
| | | <u>Miller</u>: No. | |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| 655. | At deposition, Defendant Raul Versales testified that his memo to Captain Vander Horck was written without any collaboration or input from others. Versales was asked: "Is it fair to say that the memo that you wrote regarding the accident scene photos was entirely your own words and no one else's?"  Versales testified: "I wrote the memo, and they were my words." | Ex. 92 (Versales) at 198:3-11, 244:10-16, 246:13-247:9, 249:13-25, 250:13-16, 251:1-6; Versales Decl. Ex. 5 (Versales Memo to Vander Horck dated January 30, 2020); Mejia Decl. Ex. 3 (Mejia Memo to Vander Horck dated January 30, 2020); Cable Decl. Ex. 8 (Cable Memo to Vander Horck); Russell Decl. Ex. 2 (Russell Memo to Vander Horck dated January 30, 2020). |
| --- | --- | --- |
| | These were false exculpatory statements.  In his memo to Captain Vander Horck, Versales stated that the photographs "were immediately erased after the incident from my cellphone."  This statement is identical to a statement included in memos authored by Rafael Mejia, Ruby Cable, and Michael Russell.  Versales's memo also includes the following statement: "The purpose of me sending/receiving the photographs was to answer some questions regarding the color, numbers, and identifying features on the aircraft as well as crash scene details."  This statement is identical to a statement in the memo authored by Mejia.  Versales's memo also includes the following statement: "On 1-26-2020, [w]hile working as unit 224T1/D, I shared photographs of the helicopter crash scene with other law enforcement personnel."  Aside from the unit numbers, the memos authored by Mejia and Russell contain identical statements. | |
| 656. | In his memo to Captain Vander Horck, Defendant Raul Versales stated that the photographs were "immediately erased after the incident from my cellphone."  At deposition, Versales testified repeatedly that he deleted the photos "prior to getting home" from the Lost Hills station.  Versales was asked: "A hundred percent confident | Versales Decl. Ex. 5 (Versales Memo to Vander Horck dated January 30, 2020); Ex. 92 (Versales) at 123:15-125:1, 254:21-255:5; Ex. 131 (Verales LASD Int.) at COLA000108. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | that by the time you got home that night, that the photos were gone from your phone. Is that your testimony?"  Versales testified: "Yes."<br><br>These were false exculpatory statements. During his interview with Sheriff's Department investigators, Versales stated that "it was the following day [that] I deleted [the photos]." | |
| | 657. | Raul Versales's summary judgment declaration states that LASD internal investigators reviewed his "recently deleted folder" and "text messages."<br><br>The transcript of Versales's interview with the LASD investigators indicates that the investigators did not review his text messages or recently deleted folder, and Versales' deposition testimony aligns with that:<br><br>Counsel:  During your IA interview, did you show those investigators your text messages at all?<br><br>Versales:  Not that I can remember.<br><br>Counsel:  Did you show the IA investigators your deleted items on your phone at all?<br><br>Versales:  No. I don't remember. | Versales Decl. ¶ 20; Ex. 131 (Versales LASD Int.) at COLA000116; Ex. 92 (Versales) at 261:3-17, 262:14-263:4. |
| | 658. | Raul Versales's summary judgment declaration avers that, of the photos he received from Johnson, he recalls only one that contained a body part and that the body part was "not the focal point of the photo."<br><br>This is a false exculpatory statement. According to Johnson's testimony, he took "six or seven" close-up photos of the victims' remains and sent "all" of them to Versales. | Versales Decl. ¶ 11; Ex. 92 (Versales) at 142:10-143:14, 144:9-146:12, 152:17-153:17; Ex. 96 (Johnson) at 126:4-11, 144:21-24. |

| | | |
|---|---|---|
| 659. | Raul Versales's summary judgment declaration states: "When I received the photos, I sent them to other LASD personnel at the command post: Sergeant Travis Kelly, Deputy Chris Jauregui, Deputy Rafael Mejia, and Detective Scott Miller." Similarly, Versales testified at deposition that he sent the photos to Miller "[l]ess than three minutes" after he received them from Johnson, while Versales and Miller were at the command post together.<br><br>These were false exculpatory statements, as Versales send photos to Miller and Kelly close in time to when he received them from Johnson. In reality, Versales did not forward the photos to Miller and Kelly until the *evening* of the accident. Miller testified that Versales sent him the photos in the "evening," and Versales's cell records indicate he sent the photos to Kelly at 9:02 p.m. | Versales Decl. ¶ 12; Ex. 92 (Versales) at 173:1-15, 178:11-23, 179:8-11, 180:19-181:17, 184:13-185:16; Ex. 138 (Miller LASD Int.) at COLA000391; Ex. 97 (Miller) at 46:12-15; Ex. 213 (Versales Cell Records) at COLA037469. |
| | **XXXXIV.  Mrs. Bryant's Emotional Distress.** | |
| 660. | Mrs. Bryant has stated in written testimony: "Sheriff Villanueva arrived [at the Lost Hill Station on January 26, 2020] and confirmed to me that there were no survivors in the crash, meaning that Kobe and Gianna had passed away. I was devastated and distraught. Sheriff Villanueva asked whether there was anything he could do, and I responded: 'If you can't bring my husband and baby back, please make sure no one takes photographs of them. Please secure the area.' Having lived in the public eye for twenty years and knowing the interest people have in my husband and family, I was extremely fearful that people would want to take photographs and footage of the crash site. I have always been protective of my family's privacy, especially my children, and | Bryant Decl. ¶ 3. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | it was important to me to protect their privacy and dignity." | |
| | 661. | Mrs. Bryant has also stated: "In late February 2020, shortly following a large public memorial service for Kobe and Gianna that was highly emotional, I learned through reports by the Los Angeles Times that members of the Sheriff's Department had taken and shared improper photos of the crash victims' remains, and that these photos became a source of gossip within the Department.  Soon thereafter, I learned that firefighters engaged in similar behavior.  This conduct has caused me tremendous pain and distress.  It infuriates me that the people I trusted to protect the dignity of my husband and daughter abused their positions to obtain souvenirs of their deaths, as though possessing pictures of their remains somehow makes them special.  I imagine Kobe watching over what occurred at that crash scene, and I am overcome with anger and emotion.  Had Kobe been alive at that crash scene, he never would have let this happen and the wrongdoers never would have dared doing what they did, and I feel it's now my job to protect them by demanding accountability for the people who violated him and our little girl." | Bryant Decl. ¶¶ 4-5. |
| | 662. | Mrs. Bryant has also stated: "I feel sick at the thought that deputies and firefighters have gawked at photos of my husband's and child's bodies without any reason.  I also feel extreme sadness and anger knowing that photos of my husband's and daughter's bodies were laughed about while shown at a bar and an awards banquet.  Given how many people had the photos, I am confident these were not the only times the photos were shown off.  Had it not been for the *Los* | Bryant Decl. ¶ 6. |

-239-

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| 1<br>2<br>3<br>4<br>5 | | *Angeles Times* reporting and the courageous good Samaritans who came forward when they saw something that wasn't right, I believe these public showings of the photos by the deputies and firefighters would have never come to light and would have continued going on for a long time." | |
| 6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20 | 663. | Mrs. Bryant has also stated: "Knowing that deputies and firefighters casually texted one another photos of my dead husband and daughter is extremely distressing and infuriating.  In this lawsuit, the County seems to argue that a deputy texting photos of my husband and daughter's bodies to a video game buddy who works for the Sheriff's Department, even if that deputy had no role related to the accident, is somehow less bad than sharing photos with a member of the public.  To me, the pain is the same.  It makes no difference to me whether a person who needlessly gawks at photos of my loved ones' remains is a police officer or a construction worker.  My loss of privacy is the same.  Regardless of profession, it is deeply distressing to me that at least twenty people—and likely many, many more—obtained photos of Kobe and Gianna's bodies for no reason at all." | Bryant Decl. ¶ 7. |
| 21<br>22<br>23<br>24<br>25<br>26<br>27<br>28 | 664. | Mrs. Bryant has also stated: "I often cannot avoid thinking about the deputies' and firefighters' wrongdoing.  When typing 'Kobe' into search functions to look for something related to my husband online, search features sometimes auto-suggest 'Kobe Bryant crash pictures' and 'Kobe Bryant body.'  Seeing this drags me back into thinking about the deputies' and firefighters' violation of my husband. . . . I have also been taunted online by people threatening to leak the photos or posting fake | Bryant Decl. ¶ 8. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| | images of my husband's dead body. Confronting these taunts forces me to think about the County employees' wrongdoing and how I wouldn't have to think this, or worry whether purported images actually depict my husband's body, if the deputies and firefighters hadn't violated the public trust. | |
| 665. | Mrs. Bryant has also stated: "I have pervasive and unshakable fear that I and my daughters will one day be confronted online with the deputies' or firefighters' stash of photos.  If this happens and my daughters (currently ages two, four, and eighteen) are exposed to photos of their father's and sister's bodies, I don't know how I would cope.  One day, such as when my girls are assigned to research their family tree for a school project, I do not want them searching my husband's and daughter's names to discover photos of their remains." | Bryant Decl. ¶ 9. |
| 666. | Mrs. Bryant has also stated: "My fear and anxiety is informed by my understanding that the Sheriff's and Fire Departments did not preserve or meaningfully search the wrongdoers' phones.  Because of that, I do not believe all copies of the photos have been secured.  Anyone familiar with digital photos knows that they can be stored, backed up, and shared in countless ways— sometimes even inadvertently—such as through iCloud, Snapchat, Google Photos, Snapchat, WhatsApp, Facebook Messenger, Telegram, Signal and other encrypted messaging programs, AirDrop, personal computers, printing, downloading to other devices, direct messages on social media applications, and numerous other ways." | Bryant Decl. ¶ 10. |
| 667. | Mrs. Bryant has also stated: "I have already seen one photo purporting to show my | Bryant Decl. ¶ 11. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | husband's remains that matches the location where he was found in relation to the helicopter.  Since viewing the photo, I've been tormented with thoughts of who took it and whether it depicts my husband.  To my understanding, most of the people with access to the scene at the time my husband's remains were uncovered were County employees, which leads me to suspect the photo may have been taken and distributed by a deputy or firefighter.  Sheriff Villanueva told me that he had secured the scene, so to my knowledge only County employees and the NTSB would have had access." | |
| | 668. | Mrs. Bryant has also stated: "These deputies and firefighters took the worst thing that has ever happened to me—the worst thing that could happen to *any* mother or spouse—and made it worse.  I will be never be able to shake the anguish from knowing that the officials who are supposed to keep us safe treated Kobe and Gianna with such callous disrespect.  For the rest of my life, one of two things will happen: either close-up photos of my husband's and daughter's bodies will go viral online, or I will continue to live in fear of that happening." | Bryant Decl. ¶ 12. |
| | 669. | Mrs. Bryant's sister-in-law, Sharia Washington, testified that County employees' taking and sharing of photos of her husband's and daughter's remains has impacted Mrs. Bryant's ability to get through the grieving process because "[o]n top of the loss, you have to process the violation . . . of someone taking advantage of a tragic situation, of people looking for entertainment or content. "  Ms. Washington further testified that Mrs. Bryant fears that her young daughters will one day come across | Ex. 126 (Washington) at 30:19-31:6, 44:9-45:15. |

| | | "pictures of their father and sister in that field." | |
|---|---|---|---|
| | 670. | Mrs. Bryant's close friend, Rob Pelinka, testified that "the irresponsible actions of the public servants" with respect to crash-scene photography is "definitely a trigger of angst and anxiety and grief and distress" for Mrs. Bryant. | Ex. 127 (R. Pelinka) at 68:10-69:9. |
| | 671. | Sheriff Villanueva has testified that a deputy showing off photos of a crash victim at a bar would be "invad[ed] the privacy of the . . . loved ones of the deceased."  The Sheriff added that it would be "distressing to anybody" to hear that a member of law enforcement was showing photos of their loved one's remains at a bar to a member of the public. | Ex. 113 (Villanueva) at 46:25-47:20; 48:13-22. |
| | 672. | Deputy Doug Johnson and Deputy Michael Russell have testified that they wouldn't want their own children viewing the crash-scene  photos they possessed. | Ex. 92 (Johnson) at 240:12-20; Ex. 90 (Russell) at 202:23-203:10. |
| | 673. | Deputy Rafael Mejia testified that, if his wife or child died in an accident and he learned that a member of law enforcement texted photos of their bodies to another law enforcement officer who did not have any role in investigating the accident, he would feel "terrible" and "would definitely not like it" because it would be "disrespectful." | Ex. 91 (Mejia) at 217:22-218:14. |
| | 674. | Sergeant Kelly testified that, if one of his family members had perished in a helicopter accident, he would not look at photos of their remains as he "wouldn't want to remember [his] family members in that condition." | Ex. 94 (Kelly) at 86:18-88:5. |
| | 675. | Lieutenant Mancinas has testified that passing around graphic photos of victims' remains as it would "tarnish the dignity" of the people who had died in the crash. | Ex. 101 (Mancinas) at 171:8-172:24. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| 676. | Lieutenant Satterfield has testified that he expects it would be painful for a family member to learn that a deputy showed a photo of their loved one's remains to a bartender.  "[I]f it was me," Satterfield testified, "I would be angry." | Ex. 108 (Satterfield) at 102:25-103:11. |
|---|---|---|
| 677. | Joey Cruz has testified that he understands why it could be painful for someone who lost their husband and child in a tragic accident to hear that a law enforcement officer was at a bar showing photos of the accident scene to a bartender. | Ex. 90 (Cruz) at 162:18-163:11. |
| 678. | The good Samaritan who submitted a complaint to the Sheriff's Department after Cruz displayed photos in the bar testified that he decided to submit the complaint because no one would "want to see pictures of their loved ones in that condition." | Ex. 123 (Mendez) at 40:19-41:3. |
| 679. | The bartender to whom Cruz showed photos testified that he understands why Mrs. Bryant would be upset about a member of law enforcement showing photos of her husband's dead body to a bartender in a bar. The bartender further testified that, if someone did the same with regard to one of his deceased family members, he would be mad. | Ex. 122 (Gutierrez) at 38:2-10, 74:2-20 |
| | **XXXXV. The Forensic Examination.** | |
| 680. | In any investigation involving suspected wrongdoing that occurred on mobile devices, prompt preservation of the devices is critically important to minimize the permanent loss of relevant digital evidence. Prompt preservation is a basic, baseline standard for conducting an investigation involving digital evidence. | Freskos Decl. ¶¶ 8-13; Ex. 206 (Price) at 37:21-40:20, 44:12-45:11. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| 681. | On September 29, 2020, shortly after Mrs. Bryant filed her lawsuit, Plaintiff's counsel participated in a conference call with counsel for the County.  During the call, the County's counsel expressed that the County wanted to forensically examine the deputies' phones, but when the County's prior counsel tried to obtain the relevant phones, the County "was told to buzz off by the deputies." | Lavoie Decl. ¶ 3, Ex. 86. |
| 682. | Beginning on March 10, 2021, Mrs. Bryant served a series of inspection demands on the Sheriff's Department, Fire Department, and the four individual Deputy Defendants to inspect all mobile devices, computing devices, and cloud-based storage accounts on which crash scene photos had been downloaded, received, saved, opened, viewed, accessed, stored, shared, or used. | J. Bryant Decl. ¶ 2, Ex. 227. |
| 683. | Mrs. Bryant's inspection demands instructed Defendants to make a forensic image of the responsive devices and cloud-based storage accounts that had downloaded, received, saved, opened, viewed, accessed, stored, shared, or used the photos. | J. Bryant Decl. ¶ 5, Ex. 227 at 13. |
| 684. | Even after receiving Mrs. Bryant's inspection demands, Defendants did not image any LASD devices until July 28, 2021, at which time it imaged one lone device (belonging to Travis Kelly).  LASD ultimately never itself imaged any of the other relevant custodians' phones. | J. Bryant Decl. ¶ 13; Ex. 230; Ex. 206 (Price) at 22:16-23:16. |
| 685. | Each set of inspection demands contained the following instruction:  "If any MOBILE DEVICE or COMPUTING DEVICE responsive to these Demands has been lost, discarded, or is otherwise no longer in YOUR possession, custody, or control, such MOBILE DEVICE or COMPUTING | J. Bryant Decl. ¶ 3, Ex. 227 at 12. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | DEVICE shall be identified as follows: device make and model, device serial number, dates of usage, date of disposal, manner of disposal, reason for disposal, person authorizing the disposal, and the person disposing of the device."  When Defendants served their responses, they did not indicate that any responsive devices were no longer in the custodians' possession. | |
| | 686. | The parties' counsel had a protracted negotiation regarding the protocol for an independent third-party forensic expert to examine the devices and accounts on which photos of the crash site had been downloaded, saved, opened, viewed, received, stored, or shared. | J. Bryant Decl. ¶ 4. |
| | 687. | On April 22, 2021, Plaintiff served subpoenas on the seven LASD personnel known to have possessed copies of victims'-remains photos.  Those subpoenas contained the very same inspection demands previously served on LASD. | J. Bryant Decl. ¶ 6. |
| | 688. | The LASD personnel's objections to the inspection demands in the subpoenas raised a concern that they may no longer have possession of the relevant devices.  After Plaintiff's counsel raised this concern in an email dated May 18, 2021, Defendants' counsel (who also represent the individual LASD personnel) reassured Plaintiff's counsel that the LASD personnel still had their phones. | J. Bryant Decl. ¶ 6, Ex. 228 at 43-48. |
| | 689. | Months later, during a further meet and confer related to the forensic exam, Defendants' counsel finally admitted that some LASD personnel were no longer in possession of the phones they were using in early 2020. | J. Bryant Decl. ¶ 7. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| 690. | Defendants' counsel did not provide a complete list of LASD personnel who had lost or discarded responsive devices until October 4, 2021, when the forensic examination was already underway. | J. Bryant Decl. ¶ 7, Ex. 228 at 18. |
| 691. | Justin Price of Kroll Inc. was jointly retained by Plaintiff and Defendants on August 18, 2021 as a third-party neutral forensic examiner (the "Forensic Examiner"). | Price Decl. Ex. 36 at 30; J. Bryant Decl. ¶ 11. |
| 692. | The Forensic Examiner was not able to examine the cell phones that any of the following LASD personnel were using on January 26, 2020:<br>• Joey Cruz<br>• Rafael Mejia<br>• Michael Russell<br>• Raul Versales<br>• Doug Johnson<br>• Ben Sanchez<br>• Scott Miller<br>• Ruby Cable<br>• Christopher Jauregui<br>• Stephanie Shrout<br>By the time the forensic examination commenced, each of these personnel had wiped, lost, or otherwise disposed of their relevant phone. | *See* J. Bryant Decl. Ex. 228 at 19; Price Decl. Ex. 36 at 36. |
| 693. | The Forensic Examiner's report revealed that Joey Cruz's iPhone had been reset to its factory default settings. The Forensic Examiner explained: "When an iPhone is factory reset, all user information, data and media is permanently deleted such that the information is forensically unrecoverable." | Price Decl. Ex. 36 at 36. |
| 694. | Because Cruz had reset his device, the Forensic Examiner could not conduct any analysis and could not form any opinion with respect to the device's possession of photos | Ex. 206 (Price) at 54:18-25; Freskos Decl. ¶ 21. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| | of the victims' remains.  With no active files, deleted files, or forensic artifacts available on the phone, Plaintiff was unable to learn anything about Cruz's activity with the photos on the phone. | |
| 695. | Cruz intentionally reset his phone to its factory default settings at the end of 2020 or the beginning of 2021. | *See* Freskos Decl. ¶¶ 22-23; Ex. 206 (Price) at 55:1-6; ECF No. 151-57 ¶ 25. |
| 696. | Despite the fact that the parties spent months negotiating a protocol for a forensic examination, at no point did Cruz or his counsel disclose that he had wiped all data from his phone, rendering it forensically unrecoverable. | J. Bryant Decl. at ¶¶ 4, 7. |
| 697. | The Forensic Examiner was unable to examine Brian Jordan's mobile workstation laptop (RR02) because it did not contain an internal hard drive.  As a result, he could not form any opinion as to whether the device ever possessed photos of the victims' remains. | Price Decl. Ex. 36 at 31, 33; Ex. 206 (Price) at 51:23-52:7. |
| 698. | The Forensic Examiner was also unable to examine the Lenovo ThinkPad laptop Brian Jordan used in LAFD's Training & Safety Office (RR04).  As a result, he could not form any opinion as to whether the device ever possessed photos of the victims' remains. | Price Decl. Ex. 36 at 31, 33; Ex. 206 (Price) at 52:8-12. |
| 699. | The Forensic Examiner was unable to detect any evidence related to victims' remains photos on the cell phones on which Tony Imbrenda had possessed photos.  As a result, he could not determine which phone numbers had texted crash photos to Imbrenda, or what Imbrenda did with those photos after receiving them.  This confirms that the Fire Department did not adequately | Price Decl. Ex. 36 at 31, 33, 36; Ex. 206 (Price) at 52:13-54:7; Freskos. Decl. ¶¶ 24-25. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | | |
|---|---|---|---|
| | | preserve his devices and that evidence was permanently lost as a result. | |
| 700. | | Unsurprisingly given that Johnson was no longer in possession of the phone he used on January 26, 2020, the Forensic Examiner was unable to detect any evidence related to victims' remains photos on Doug Johnson's new phone.  As a result, the Forensic Examiner could not determine the LAFD employee to whom Johnson AirDropped photos of the victims on January 26, 2020.  This confirms that LASD's failure to preserve Johnson's device resulted in permanent data loss. | Price Decl. Ex. 36 at 31, 36; Ex. 206 (Price) at 54:9-17; Freskos. Decl. ¶¶ 20-21; J. Bryant Decl. Ex. XX. |
| 701. | | The Forensic Examiner was unable to detect any evidence related to the victims' remains photos on the devices of any of the LASD custodians known to have possessed such photos.  This is not surprising given that nine personnel no longer even had the phones they were using on January 26, 2020.  The results of the forensic examination confirm that LASD's failure to preserve the relevant devices resulted in permanent data loss that make it impossible to reconstruct the custodians' activities involving the photos (e.g. how the photos were received, where they were stored, how they were used, and the nature and extent of any dissemination). | Price Decl. Ex. 36; Ex. 206 (Price) at 47:8-48:3; Freskos. Decl. ¶¶ 15, 17-21. |
| 702. | | The Forensic Examiner was unable to detect any evidence related to the victims' remains photos that Arlin Kahan possessed on his work cell phone.  This confirms that the Fire Department did not adequately preserve his device and that evidence was permanently lost as a result. | Price Decl. Ex. 36 at 31, 34; Freskos. Decl. ¶¶ 24-25. |
| 703. | | The Forensic Examiner was unable to detect any evidence related to the victims' remains photos that Brian Jordan possessed on his | Price Decl. Ex. 36 at 31-33; Freskos. Decl. ¶¶ 24-25. |

PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| | work cell phone.  This confirms that the Fire Department did not adequately preserve his device and that evidence was permanently lost as a result. | |
| 704. | After a lengthy negotiation on the issue, the parties stipulated that the Forensic Examiner would collect and examine cloud-based storage accounts and mobile device backups associated with the devices examined by the Forensic Examiner if they satisfied certain agreed-upon parameters. | J. Bryant Decl. ¶¶ 8-10; Price Decl. Ex. 35 ¶¶ 6, 12(d). |
| 705. | At no point over the course of the forensic examination did either Defendants' counsel or the Forensic Examiner convey that the parties' agreed-upon parameters were not being applied to assess and analyze cloud-based storage accounts and mobile device backups. | J. Bryant Decl. ¶¶ 8-12. |
| 706. | The Forensic Examiner did not collect or analyze 23 cloud-based storage accounts that had mobile-to-cloud synchronization enabled on the relevant LAFD and LASD custodians' phones.  Nor did he assess whether those cloud-based storage accounts satisfied the parameters for collection and examination under the parties' stipulated protocol. Defendants did not give the Forensic Examiner the passwords to those 23 cloud accounts. | *See* Price Decl. Ex. 36 at 38; Ex. 206 (Price) at 55:7-18, 61:17-62:4; 110:19-111:2. |
| 707. | To ensure the Forensic Examiner's neutrality and independence, the parties stipulated that there would be no *ex parte* communications with the Forensic Examiner, agreeing:<br><br>"All communications between the Forensic Examiner and either of the Parties during the forensic examination must be conducted by email to counsel for both Parties." | Price Decl. Ex. 35 at ¶ 25. |

| 708. | On several occasions, Defendants' counsel communicated with the Forensic Examiner without alerting or including Plaintiff's counsel. | Ex. 206 (Price) at 28:3-30:12, 62:18-64:18, 65:10-66:24, 73:9-74:6, 74:17-75:14, 75:21-76:4, 77:21-78:18; 78:20-79:9, 82:14-21, 86:10-87:21. |
|---|---|---|
| 709. | In Plaintiff's motion for spoliation sanctions filed before Judge Eick, she raised concerns about cell phone records that showed Defendant Michael Russell texting picture messages to a group of his video game buddies, including Ben Sanchez, in the days after the crash.  In response, Defendants produced an extraction report reflecting text messages amongst Russell's video game buddies.  The Forensic Examiner collected these texts from Ben Sanchez's phone on behalf of Defendants' counsel.  Plaintiff's counsel was not consulted or advised that the Forensic Examiner was performing this work for Defendants. | J. Bryant Decl. ¶ 15; Ex. 206 (Price) at 80:19-82:25, 83:20-85:20; 114:8-15. |
| 710. | The Forensic Examiner, Justin Price, has never previously served as a neutral third-party forensic examiner.  His prior experience has predominately been in law enforcement. | Ex. 206 (Price) at 12:16-19. |

DATED:  December 6, 2021            WILSON SONSINI GOODRICH & ROSATI


By: _____
              */s/ Luis Li*
                LUIS LI

Attorneys for Plaintiff Vanessa Bryant