# Exhibit 237

**CERTIFIED COPY**

```
1              UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4    VANESSA BRYANT, a California )
     Resident,                    )
5                                 )
                 Plaintiff,       )
6                                 )
          vs.                     )  No. 2:20-cv-09582-JFW-E
7                                 )
     COUNTY OF LOS ANGELES, a     )
8    Public entity, et al.,       )
                                  )
9                Defendants.      )
     _____)
10

11

12               C O N F I D E N T I A L

13      VIDEO-RECORDED DEPOSITION OF ALEX VILLANUEVA

14                  November 10, 2021

15

16

17

18

19

20

21

22

23

24   Theresa JoAnn Phillips-Blackwell, CSR 12700.
     477592
25
```

BARKLEY
Court Reporters
barkley.com
SINCE 1972

(310) 207-8000 Los Angeles  (415) 433-5777 San Francisco  (949) 955-0400 Irvine     (858) 455-5444 San Diego
(310) 207-8000 Century City (408) 885-0550 San Jose       (760) 322-2240 Palm Springs (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento   (800) 222-1231 Martinez       (702) 366-0500 Las Vegas   (800) 222-1231 Monterey
(951) 686-0606 Riverside    (818) 702-0202 Woodland Hills (702) 366-0500 Henderson   (516) 277-9494 Garden City
(212) 808-8500 New York City (347) 821-4611 Brooklyn      (518) 490-1910 Albany      (914) 510-9110 White Plains
(312) 379-5566 Chicago      00+1+800 222 1231 Paris       00+1+800 222 1231 Dubai   001+1+800 222 1231 Hong Kong

```
12:00  1   appearing on behalf of -- in Los Angeles appearing on
12:00  2   behalf of Plaintiff Vanessa Bryant.
12:00  3          MR. JACKSON:  Jerry Jackson, appearing on
12:00  4   behalf of Plaintiff Chris Chester.  I'm in my office in
12:00  5   El Segundo.
12:00  6          MS. SAVITT:  Linda Savitt, appearing on behalf
12:00  7   of the sheriff and the sheriff's office.
12:00  8          MS. HASHMALL:  Mira Hashmall for the county
12:00  9   defendants, also in Los Angeles.
12:00 10          MS. RODRIGUEZ-SANCHIRICO:  Emily
12:00 11   Rodriguez-Sanchirico for defendants, also in the
12:00 12   sheriff's office in Los Angeles, California.
12:00 13          THE VIDEOGRAPHER:  Thank you.
12:00 14          The court reporter may swear in the witness
12:00 15   remotely.
12:00 16          DEPOSITION OFFICER:  Raise your right hand,
12:00 17   please.
12:00 18          You do solemnly state that the evidence you
12:00 19   shall give in this matter shall be the truth, the whole
12:01 20   truth, and nothing but the truth, so help you God?
12:01 21          THE WITNESS:  Yes.
12:01 22                        EXAMINATION
12:01 23
12:01 24   BY MR. LAVOIE:
12:01 25       Q.  Sheriff Villanueva, thank you for being here.
```

```
12:30  1    that develops if they need to be involved, but they took
12:30  2    no active role.
12:30  3    BY MR. LAVOIE:
12:30  4        Q.  Can you think of any reason why, in response it
12:30  5    a helicopter accident like this, anyone from the
12:30  6    homicide department would have a reason to take
12:30  7    photographs?
12:30  8            MS. RODRIGUEZ-SANCHIRICO:  Objection.  Lacks
12:30  9    foundation.
12:30 10            MS. SAVITT:  Join.  Calls for speculation.
12:30 11            THE WITNESS:  I -- we -- the sheriff's
12:30 12    department -- we do some investigations.  And our Aero
12:30 13    Bureau, I believe, has some responsibility when it comes
12:30 14    to small aircraft.  A crash is -- a lot of this has to
12:31 15    do with -- for example, if the pilot's drunk, things
12:31 16    like that, there's -- there are certain areas where they
12:31 17    would have an involvement.  But not in this case.
12:31 18    BY MR. LAVOIE:
12:31 19        Q.  Isn't it true that the -- the only groups of
12:31 20    people who should be taking photographs at a helicopter
12:31 21    accident scene are the F -- sorry -- are the NTSB and
12:31 22    the coroner's office?
12:31 23            MS. SAVITT:  Over -- overbroad.  Incomplete
12:31 24    hypothetical.
12:31 25            MS. RODRIGUEZ-SANCHIRICO:  Calls for
```

33

```
12:31  1      speculation.
12:31  2              THE WITNESS:  I can tell you no, that is not
12:31  3      true.
12:31  4      BY MR. LAVOIE:
12:31  5          Q.  That's not accurate?
12:31  6          A.  Not accurate.
12:31  7          Q.  Would it be fair to say that, to your
12:31  8      understanding, the investigation related to the
12:31  9      helicopter crash was a federal investigation, not a
12:31 10      sheriff's department investigation?
12:31 11              MS. SAVITT:  Objection.  Vague and -- vague as
12:31 12      to time.
12:32 13              THE WITNESS:  A passenger -- I believe a
12:32 14      passenger aircraft downed is a -- an NTSB investigation.
12:32 15      BY MR. LAVOIE:
12:32 16          Q.  So based on that, would it be fair to say that
12:32 17      the investigation of the helicopter accident was a
12:32 18      federal investigation and not a sheriff's department
12:32 19      investigation?
12:32 20              MS. RODRIGUEZ-SANCHIRICO:  Objection.  Vague as
12:32 21      to time.
12:32 22              MS. SAVITT:  Join.
12:32 23              THE WITNESS:  Yeah.  In the onset there is
12:32 24      obviously going -- always going to be a response from
12:32 25      the federal -- from the NTSB, from the FAA.  However, at
```

```
12:32  1   the onset, when you have to do an inquiry as what would
12:32  2   be the cause of the -- of the aircraft downing, if it's
12:32  3   a criminal act, well, then it changes the entire nature
12:32  4   of it.  And so there you have it.
12:32  5   BY MR. LAVOIE:
12:32  6        Q.   Based on your training and experience and
12:32  7   understanding of sheriff's department policies and
12:32  8   procedures, what people would be authorized to take
12:33  9   photos of a helicopter accident scene?
12:33 10             MS. SAVITT:  Objection.  Incomplete
12:33 11   hypothetical.  Calls for speculation.  And vague.
12:33 12             MS. RODRIGUEZ-SANCHIRICO:  Join.
12:33 13             THE WITNESS:  I can tell you that for practical
12:33 14   purposes, whoever the -- that has the handle, the
12:33 15   incident commander who is the first responder on the
12:33 16   scene, they may take whatever measures they need to, to
12:33 17   secure the area, to assist in establishing a command
12:33 18   post, to gathering and marshalling all the resources
12:33 19   necessary.
12:33 20             Basically, you have to size the dog.  You know,
12:33 21   how big is the problem?  And then if they use
12:33 22   photographs to do that, well, that would be a very
12:33 23   legitimate purpose.
12:33 24   BY MR. LAVOIE:
12:33 25        Q.   And if a member of the department had used a
```

35

ALEX VILLANUEVA - CONFIDENTIAL

BARKLEY
Court Reporters

Defendants' Summary Judgmet Exhibit No. 237
Page 95

```
01:10  1    foundation.  Calls for speculation.
01:10  2             THE WITNESS:  It's a simple math equation.
01:10  3    Exponential.  Every single day, every single person is
01:10  4    that much more -- they can be exposed for -- 2 people
01:10  5    share just once becomes 4 people, which becomes 8, which
01:10  6    becomes 16.  And the more time goes on, that number gets
01:10  7    bigger and bigger.  And as it is, what we're able to do,
01:10  8    we're able to cut it off and put all the horses back in
01:10  9    the barn and ensure that none of those photos ever saw
01:10 10    the light of day, which was exactly my intention,
01:10 11    because I didn't want to have these people harmed any
01:10 12    further.
01:10 13    BY MR. LAVOIE:
01:10 14         Q.  In particular, what -- what form did this
01:10 15    amnesty that you described -- in what form did you
01:11 16    expect that to take?
01:11 17         A.  If they came clean with who they shared the
01:11 18    photos with and then the photos that they themselves had
01:11 19    in their possession were properly disposed of, well,
01:11 20    then they satisfied the conditions of the amnesty.  If
01:11 21    they held anything back, then that was outside the
01:11 22    amnesty; and they were subject to -- obviously, to
01:11 23    discipline.
01:11 24         Q.  Were you aware of any steps that your
01:11 25    department took to verify whether particular personnel
```

```
01:11  1    had been truthful and honest or instead had held back,
01:11  2    as you say?
01:11  3              MS. RODRIGUEZ-SANCHIRICO:  Objection.  Lacks
01:11  4    personal knowledge.
01:11  5              MS. SAVITT:  Calls for speculation.
01:11  6              THE WITNESS:  My understanding from the time
01:11  7    was that when they met at the station, they had
01:11  8    supervisors revise each device and ensure that they were
01:11  9    not -- they did not contain the images.  And they gave
01:11 10    all the information of everyone that the images went to.
01:12 11    BY MR. LAVOIE:
01:12 12         Q.  Yeah.  My question is, Are you aware of any
01:12 13    steps that the department took to check or verify that
01:12 14    the individuals who -- personnel identified as having
01:12 15    sent the photos to were the only individuals to whom
01:12 16    they sent the photos?
01:12 17         A.  That's --
01:12 18              MS. RODRIGUEZ-SANCHIRICO:  Objection.  Calls
01:12 19    for speculation.
01:12 20              THE WITNESS:  Those are line-level details that
01:12 21    I would not be involved in.  I just ensure that they get
01:12 22    the job done.
01:12 23    BY MR. LAVOIE:
01:12 24         Q.  And when you said that you thought that the
01:12 25    line-level personnel were -- were checking or looking at
```

ALEX VILLANUEVA - CONFIDENTIAL

BARKLEY
Court Reporters

Defendants' Summary Judgmet Exhibit No. 237
Page 97

```
01:22  1    would continue investigating the situation to verify
01:22  2    their representations as to whether they deleted the
01:22  3    photos and who they shared them with; is that accurate?
01:22  4         A.  Yes.
01:22  5         Q.  Did it occur to you that it might hinder that
01:22  6    subsequent investigation for the photos to have been
01:22  7    deleted?
01:22  8             MS. SAVITT:  Objection.  Vague and ambiguous.
01:22  9    Calls for --
01:22 10    BY MR. LAVOIE:
01:22 11         Q.  In other words --
01:22 12             MS. SAVITT:  -- speculation.
01:22 13    BY MR. LAVOIE:
01:22 14         Q.  In other words, isn't it challenging to verify
01:23 15    statements about whether photos -- about where photos
01:23 16    were sent if the photos or the text messages have been
01:23 17    deleted?
01:23 18             MS. SAVITT:  Calls for speculation.  Lacks
01:23 19    foundation.
01:23 20             THE WITNESS:  Actually, no.  Not at all.
01:23 21    Because you can go to the actual device itself and see
01:23 22    if the images exist or not exist.  You can go to the
01:23 23    different features on the phone itself to see.  For
01:23 24    example, e-mails, any type of sharing is available.
01:23 25    Those things are -- they're definitely available.  And
```

```
01:23  1    if they don't exist, well, then they don't exist.  So
01:23  2    that means it was successful.
01:23  3    BY MR. LAVOIE:
01:23  4        Q.  Was it your expectation that members of your --
01:23  5    members of your department would look at the cell phones
01:23  6    of personnel to look at all the text messages that they
01:23  7    received -- or sorry -- that they sent in the days after
01:23  8    the accident to see if any of them contained photos of
01:24  9    human remains?
01:24 10            MS. SAVITT:  Objection.  Argumentative.  Calls
01:24 11    for speculation.  Lacks foundation.
01:24 12            MS. RODRIGUEZ-SANCHIRICO:  Join.
01:24 13            THE WITNESS:  My expectation, though, they were
01:24 14    going to make sure they got the job done.  How they
01:24 15    decided to do it individually, I -- we don't get -- I
01:24 16    don't get into that weeds as a sheriff.
01:24 17    BY MR. LAVOIE:
01:24 18        Q.  Did it occur to you when you issued this
01:24 19    direction that the photos not see the light of day,
01:24 20    which you intended to result in deletion of the
01:24 21    photos -- did it occur to you that deleting material
01:24 22    relevant to a potential civil lawsuit or claim for
01:24 23    invasion of privacy or negligence might be problematic?
01:24 24            MS. SAVITT:  Objection.  Unintelligible.
01:24 25    Assumes a fact not established.  Requires him to adopt
```

```
03:24   1   place regarding whether and under what circumstances
03:24   2   deputies could text or transmit photos of an accident
03:24   3   scene that contained human remains to other members of
03:25   4   the department?
03:25   5        A.   There was no specific policy that addressed
03:25   6   exactly what you just said.
03:25   7        Q.   On the day of the accident, January 26, 2020,
03:25   8   what policies did the sheriff's department have in place
03:25   9   regarding whether and under what circumstances deputies
03:25  10   could display an accident scene photo that contained
03:25  11   human remains to a member of the public?
03:25  12        A.   There was no policy that addressed that.
03:25  13        Q.   On the day of the crash, January 26, 2020, what
03:25  14   policies did the sheriff's department have in place
03:25  15   regarding whether and under what circumstances deputies
03:25  16   could text or transmit a photo of an accident scene that
03:25  17   contained human remains to a member of the public?
03:25  18             MS. RODRIGUEZ-SANCHIRICO:   Object -- objection.
03:25  19   Vague and ambiguous.
03:25  20             MS. SAVITT:   Join.
03:25  21             THE WITNESS:   That policy never existed.
03:25  22   BY MR. LAVOIE:
03:25  23        Q.   Have you ever said that the sheriff's
03:25  24   department policies related to photos of human remains
03:26  25   were very deficient?
```

                                    172

ALEX VILLANUEVA - CONFIDENTIAL

BARKLEY Court Reporters

**Defendants' Summary Judgmet Exhibit No. 237**
**Page 100**

```
03:26  1          A.  Yes.  I think we just talked about that, where
03:26  2     it was geared towards live people in our custody:  Paris
03:26  3     Hilton, Mel Gibson, and the huge paparazzi swarming,
03:26  4     trying to get images of that.  And our policy
03:26  5     addressed -- and like all policies, they address a
03:26  6     problem.  And the policy addresses the problem.  It
03:26  7     fixes it or holds people accountable for breaking that.
03:26  8              And, you know, hindsight is 20/20; but at that
03:26  9     point in time this was not an issue.
03:26 10          Q.  When you say "this was not an issue," you did
03:26 11     not expect on or before the day of this accident that
03:26 12     deputies would ever take or share unnecessary photos of
03:26 13     human remains?
03:26 14          A.  That's correct.
03:27 15          Q.  I'm going to show you a document that's
03:27 16     previously been marked as Exhibit 109.
03:27 17              Do you recognize this, Sheriff Villanueva?
03:27 18          A.  I've seen this before.
03:27 19          Q.  What is it?
03:27 20          A.  It's a policy, and it's -- and it's part of the
03:27 21     manual of policies and procedures.  And Volume 5,
03:27 22     Chapter 9, I believe, is Miscellaneous Line Procedures.
03:27 23          Q.  Were you involved in drafting this policy?
03:27 24          A.  Could you go all the way down to the bottom?
03:27 25          Q.  Sure.
```

173

ALEX VILLANUEVA - CONFIDENTIAL

BARKLEY
Court Reporters

Defendants' Summary Judgmet Exhibit No. 237
Page 101

```
04:02  1   transferred out of his position at Lost Hills, yes.
04:02  2          MR. LAVOIE:  I'm going to pull up an exhibit
04:02  3   that's previously been marked as 129.  Just take a look
04:03  4   at that.  Let me know once you've had a chance.
04:03  5          John, can you interrupt me when we have ten
04:03  6   minutes left on the record?
04:03  7          THE VIDEOGRAPHER:  I sure will.
04:03  8          MR. LAVOIE:  Okay.  Thanks, John.
04:03  9          THE WITNESS:  Okay.
04:03 10   BY MR. LAVOIE:
04:03 11      Q.  February -- it says that the transfer will
04:03 12   occur on February 23rd, 2020.
04:03 13          Does that sound about right to you, or do you
04:03 14   have any reason to doubt that timing?
04:03 15      A.  It's almost two years ago.  It sounds about
04:03 16   right.  Or at least in the general --
04:03 17      Q.  Okay.  And did you make a decision to transfer
04:03 18   Captain Matthew Vander Horck from an assignment of being
04:03 19   in charge of the Malibu/Lost Hills Station to an
04:03 20   assignment at the Men's Central Jail?
04:03 21      A.  Yes.
04:03 22      Q.  Why did you make that decision?
04:04 23      A.  Because there was an incident that happened in
04:04 24   Lost Hills where there was a sexual assault in a college
04:04 25   dorm, and the investigation was botched.  The
```

198

ALEX VILLANUEVA - CONFIDENTIAL

BARKLEY
Court Reporters

Defendants' Summary Judgmet Exhibit No. 237
Page 102

```
04:04  1    communications, the alerts to the public was botched.
04:04  2    The whole thing was just a comedy of errors from start
04:04  3    to finish.  So that gave a black eye to the department,
04:04  4    to Lost Hills Station.  So we lost confidence in the
04:04  5    ability to do his job there at the station.
04:04  6         Q.  I want to go back to the issue of a potential
04:04  7    demotion.
04:04  8             Have you ever personally spoken one-on-one
04:04  9    either in person or on the phone with
04:04 10    Captain Vander Horck related to either a potential
04:04 11    demotion in rank or a transfer from Lost Hills to
04:04 12    another assignment?
04:04 13         A.  I do recall at some point when that whole
04:05 14    fracas with the sexual assault happened that I did have
04:05 15    a conversation with him.  Basically wanted to know why
04:05 16    were a bunch of things not happening that should have
04:05 17    happened.
04:05 18         Q.  So you had a conversation with him in which
04:05 19    you -- what? -- were expressing frustration with his
04:05 20    performance in connection with this investigation?
04:05 21         A.  Yes.  Why was it not taken seriously?  Why
04:05 22    wasn't the public alerted?  Why was wasn't there a
04:05 23    follow-up done?  And why did -- I think the -- the
04:05 24    handling deputy made, you know, wildly inappropriate
04:05 25    questions of the victim of the sexual assault that
```

199

ALEX VILLANUEVA - CONFIDENTIAL

BARKLEY
Court Reporters

Defendants' Summary Judgmet Exhibit No. 237
Page 103

```
04:07  1   that.
04:07  2            I just want to be really clear as to your
04:07  3   testimony regarding your communications with
04:07  4   Captain Vander Horck.
04:07  5            Did you ever have a conversation with
04:07  6   Captain Matthew Vander Horck in which you informed him
04:07  7   that he would not be demoted from captain to lieutenant
04:07  8   and that he could keep his rank of captain?
04:07  9       A.   I do recall at some point I think he expressed
04:07 10   a concern like that, and I -- I told him I was not --
04:07 11   had any interest in demoting him.
04:07 12       Q.   Did you ever have a conversation with
04:07 13   Captain Vander Horck -- did you ever -- have you ever
04:07 14   called Captain Vander Horck on his cell phone?
04:08 15       A.   When he was a captain of Lost Hills, yeah,
04:08 16   several times.
04:08 17       Q.   Did you ever have a conversation with
04:08 18   Captain Matthew Vander Horck in which you stated that
04:08 19   you had changed your position in whether to demote him
04:08 20   from captain to lieutenant?
04:08 21            MS. RODRIGUEZ-SANCHIRICO:  Objection.  Asked
04:08 22   and answered.
04:08 23            MS. SAVITT:  Vague and ambiguous.
04:08 24            THE WITNESS:  I think a -- I already answered
04:08 25   that; but to reiterate, I think he was the one that
```

201

ALEX VILLANUEVA - CONFIDENTIAL

BARKLEY
Court Reporters

Defendants' Summary Judgmet Exhibit No. 237
Page 104

```
04:08  1    expressed to me a concern about being demoted.  I
04:08  2    believe I reassured him that he was not being demoted.
04:08  3    BY MR. LAVOIE:
04:08  4         Q.  At any point have you ever had a conversation
04:08  5    with Captain Matthew Vander Horck in which you told him
04:08  6    that he got to keep his bars?
04:08  7         A.  I don't recall that -- using those words.
04:08  8         Q.  Have you ever had a conversation with
04:08  9    Captain Matthew Vander Horck in which you asked him how
04:08  10   old he was or how long he wanted -- how long he had been
04:09  11   with the department?
04:09  12              MS. SAVITT:  Overbroad.  Vague.
04:09  13              THE WITNESS:  I recall having that -- that
04:09  14   conversation with him when he was a lieutenant.
04:09  15   BY MR. LAVOIE:
04:09  16        Q.  Have you -- but not -- but not more recently
04:09  17   than that when he was a captain?
04:09  18        A.  No.
04:09  19        Q.  Have you ever had a conversation with
04:09  20   Captain Matthew Vander Horck in which you informed him
04:09  21   that he would be transferred to a custody assignment?
04:09  22        A.  I don't recall.  I believe that message was
04:09  23   delivered by the undersheriff or the assistant sheriff.
04:09  24        Q.  So to the best of your knowledge, you never had
04:09  25   such a conversation with him in which you informed him
```

                                  202

```
04:09  1    that he would be transferred to a custody-based
04:09  2    assignment?
04:09  3         A.  Yeah.  I don't recall me being the one that
04:09  4    broke that news to him.
04:09  5         Q.  Did you ever tell Captain Matthew Vander Horck
04:09  6    that he would, quote, survive the transfer to a
04:09  7    custody-based assignment?
04:09  8         A.  I don't recall that.
04:10  9         Q.  Do you ever recall hearing in or around the
04:10 10    time that Captain Vander Horck was transferred to the
04:10 11    Men's County Jail that he had to visit -- he had to seek
04:10 12    urgent care because of high blood pressure?  Do you ever
04:10 13    recall hearing that?
04:10 14         A.  I don't recall that at all.
04:10 15         Q.  Have you ever had a conversation with
04:10 16    Captain Matthew Vander Horck in which you stated that
04:10 17    because he wasn't getting demoted, he didn't need to
04:10 18    rush out and get blood pressure medications?
04:10 19         A.  I don't recall that at all, no.
04:10 20         Q.  Would you agree that the prevailing view within
04:10 21    the sheriff's department that being assigned to a
04:10 22    custody facility as a captain is a less desirable
04:10 23    position than being a station captain?
04:10 24             MS. SAVITT:  Calls for rank speculation as to
04:10 25    the view of others.
```

203

ALEX VILLANUEVA - CONFIDENTIAL

BARKLEY
Court Reporters

Defendants' Summary Judgmet Exhibit No. 237
Page 106

```
04:10  1                    MS. RODRIGUEZ-SANCHIRICO:  Join.
04:11  2                    THE WITNESS:  There is 23 patrol station
04:11  3       captains.  There's -- 4, 7, 5, 4 -- there is 9, I
04:11  4       believe, custody captains.  Actually, probably 12.  So
04:11  5       roughly half of custody -- twice as much are in patrol.
04:11  6       And they're both desirable assignments.  They pay the --
04:11  7       exactly the same.  So it's a question of individual
04:11  8       preference.
04:11  9       BY MR. LAVOIE:
04:11 10            Q.  So you've been with the sheriff's department
04:11 11       for 35 years.  Are you saying that there is no
04:11 12       prevailing view as to whether being a station captain is
04:11 13       more desirable than being a custody captain?
04:11 14                    MS. SAVITT:  Argumentative.  And vague as to
04:11 15       "prevailing view."
04:11 16                    MS. RODRIGUEZ-SANCHIRICO:  And continuing my
04:11 17       standing objection as to relevance.
04:11 18                    THE WITNESS:  It's really depending on what --
04:11 19       what promotional, I guess, emphasis you're looking for.
04:12 20       If you're looking to be an executive in custody
04:12 21       division, well, being a patrol station captain doesn't
04:12 22       help you.  If you're patrol station captain, you
04:12 23       typically have to serve three or four years in a -- in
04:12 24       that assignment before you can advance because you can't
04:12 25       be replacing patrol station captains quickly.  That does
```

204

ALEX VILLANUEVA - CONFIDENTIAL

BARKLEY
Court Reporters

Defendants' Summary Judgmet Exhibit No. 237
Page 107

```
 1            DEPOSITION OFFICER'S CERTIFICATE

 2

 3   STATE OF CALIFORNIA     }
                             }  ss.
 4   COUNTY OF LOS ANGELES   }

 5

 6          I, THERESA JOANN PHILLIPS-BLACKWELL, hereby

 7   certify:

 8          I am a duly qualified Certified Shorthand

 9   Reporter in the State of California, holder of

10   Certificate Number CSR 12700 issued by the Court

11   Reporters Board of California and which is in full force

12   and effect.  (Fed. R Civ. P. 28(a)).

13          I am authorized to administer oaths or

14   affirmations pursuant to California Code of Civil

15   Procedure, Section 2093(b) and prior to being examined,

16   the witness was first duly sworn by me.  (Fed. R. Civ.

17   P. 28(a), 30(f)(1)).

18          I am not a relative or employee or attorney or

19   counsel of any of the parties, nor am I a relative or of

20   such attorney or counsel, nor am I financially

21   interested in this action.  (Fed. R. Civ. P. 28).

22          I am the deposition officer that

23   stenographically recorded the testimony in the foregoing

24   deposition and the foregoing transcript is a true record

25                            ///


                              222
```

ALEX VILLANUEVA - CONFIDENTIAL                    BARKLEY Court Reporters

```
 1    of the testimony given by the witness.  (Fed. R. Civ. P.
 2    30(f)(1)).
 3           Before Completion of the deposition, review of
 4    the transcript {  } was {xx} was not requested.  If
 5    requested, any changes made by the deponent (and
 6    provided to the reporter) during the period allowed, are
 7    appended hereto.  (Fed. R. Civ. P. 30(e)).
 8
 9    Dated: November 12, 2021
10
11
12                            Theresa Phillips-Blackwell
13                    _____
14
15
16
17
18
19
20
21
22
23
24
25

                              223
```

ALEX VILLANUEVA - CONFIDENTIAL

BARKLEY Court Reporters

Defendants' Summary Judgmet Exhibit No. 237
Page 109