# EXHIBIT 100

EXHIBIT 100
993

**CERTIFIED COPY**

```
 1                UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4   VANESSA BRYANT, a California )
     Resident,                    )
 5                                )
                   Plaintiff,     )
 6                                )
         vs.                      )   No. 2:20-cv-09582-JFW-E
 7                                )
     COUNTY OF LOS ANGELES, a     )
 8   Public entity, et al.,       )
                                  )
 9                 Defendants.    )
     _____)
10

11

12

13

14              C O N F I D E N T I A L

15       VIDEO-RECORDED DEPOSITION OF DENNIS KNEER

16                 November 9, 2021

17

18

19

20

21

22

23

24   Theresa JoAnn Phillips-Blackwell, CSR 12700.
     477121
25
```

**BARKLEY**
Court Reporters
barkley.com

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine           (858) 455-5444 San Diego
(310) 207-8000 Century City    (408) 885-0550 San Jose          (760) 322-2240 Palm Springs    (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento      (800) 222-1231 Martinez          (702) 366-0500 Las Vegas       (800) 222-1231 Monterey
(951) 686-0606 Riverside       (818) 702-0202 Woodland Hills    (702) 366-0500 Henderson       (516) 277-9494 Garden City
(212) 808-8500 New York City   (347) 821-4611 Brooklyn          (518) 490-1910 Albany          (914) 510-9110 White Plains
(312) 379-5566 Chicago         00+1+800 222 1231 Paris          00+1+800 222 1231 Dubai        001+1+800 222 1231 Hong Kong

EXHIBIT 100
994

10:10   1      Q.   When he promoted you to a division chief?

10:10   2      A.   Correct.  Yeah.  It would have been December of

10:10   3   2018.

10:10   4      Q.   Not long after he was elected, I guess; right?

10:10   5      A.   Correct.

10:10   6      Q.   Okay.  And then you spent a four-month period

10:10   7   in 2019 as the sheriff's chief of staff.

10:10   8           Can you tell me about that.

10:10   9      A.   Yes.  I spent four months as his chief of

10:10  10   staff.  I think it was from July of 2019 until right

10:10  11   around November of 2019.

10:11  12      Q.   And what does that role entail?

10:11  13      A.   It just entails keeping the -- keeping the

10:11  14   sheriff informed of -- of the more high-priority issues

10:11  15   and also just monitoring the day-to-day operation of the

10:11  16   department, monitoring some of the significant changes

10:11  17   within the department as well.

10:11  18      Q.   Is it --

10:11  19      A.   Reporting -- go ahead.

10:11  20      Q.   Oh, is it fair to say colloquially that the

10:11  21   sheriff's chief of staff is kind of like their

10:11  22   right-hand man or their right-hand person?

10:11  23      A.   I -- I don't know.  I guess it just depends

10:11  24   on -- on one's opinion.  I guess that could be said,

10:11  25   yes.

DENNIS KNEER - CONFIDENTIAL

BARKLEY
Court Reporters

**EXHIBIT 100**
**995**

10:11  1      Q.  And whenever you were chief of staff, in

10:11  2  particular, how frequently would you communicate with

10:11  3  the sheriff?  Would it be, you know, multiple times a

10:11  4  day, on average? daily? you know, weekly?

10:11  5      A.  Probably once a day.

10:12  6      Q.  Okay.  And you were seeing him in person

10:12  7  approximately once a day?

10:12  8      A.  Yes.

10:12  9      Q.  And did you ever text with the sheriff?

10:12 10      A.  I don't recall whether or not I've ever texted.

10:12 11  I've spoken to him on the phone.

10:12 12      Q.  You have his cell phone number?

10:12 13      A.  I believe I do.

10:12 14      Q.  And is that his personal cell phone number or

10:12 15  his -- like, a county-issued phone? department-issued

10:12 16  phone?

10:12 17      A.  I'm not sure.

10:12 18      Q.  Okay.  And if you -- if you were to call him,

10:12 19  would you use your personal cell phone to call him; or

10:12 20  would you use, like, a department-issued device?

10:12 21      A.  Department-issued.

10:12 22      Q.  You have a department-issued cell phone?

10:12 23      A.  Yes.

10:12 24      Q.  And that's been true for a long time?

10:12 25      A.  Yes.

13

**BARKLEY**
**Court Reporters**

**EXHIBIT 100**
**996**

10:21 1    Q.   And how many captains are there in the

10:21 2    sheriff's department?

10:21 3    A.   Approximately 72.

10:21 4    Q.   Is attaining the rank of captain culturally

10:21 5    considered within the sheriff's department to be a

10:21 6    prestigious position?

10:21 7    A.   Yes.

10:21 8    Q.   Why is that?

10:21 9    A.   Within Patrol Operations, attaining the rank of

10:21 10   captain, that's the equivalent to being the chief of

10:21 11   police.  For example, in Palmdale, the population of

10:21 12   that city is 170,000; and the unincorporated area is

10:22 13   about 40,000.  So over 200,000 people.  And you are

10:22 14   considered the chief of police.  So it is considered to

10:22 15   be a prestigious position on the sheriff's department to

10:22 16   be a captain of a patrol station.  And really, that is

10:22 17   why, because you are essentially the chief of police.

10:22 18   Q.   So it's considered quite prestigious to be the

10:22 19   captain of a patrol station.

10:22 20        How many captains -- among the approximately 72

10:22 21   captains within the sheriff's department, how many of

10:22 22   them are captains of patrol stations?

10:22 23   A.   We have 23 stations, and each station has a

10:22 24   captain, so 23.

10:22 25   Q.   So is being the captain of a patrol station

20

DENNIS KNEER - CONFIDENTIAL

**EXHIBIT 100**
**997**

BARKLEY
Court Reporters

10:29  1      Q.  And when did that conversation occur?  Was that

10:29  2  on this Wednesday when the -- when the complaint was

10:29  3  received and funneled up to you?

10:29  4      A.  Yes.

10:29  5      Q.  Morning, afternoon, evening that day?

10:30  6      A.  I don't recall the time of day.

10:30  7      Q.  Was -- is it your recollection that it was near

10:30  8  in time to when the complaint was received?

10:30  9      A.  I believe so.

10:30 10      Q.  What do you recall about that conversation with

10:30 11  Captain Vander Horck?

10:30 12      A.  I recall that we determined we would have

10:30 13  Lieutenant, now Captain Justin Diez conduct a

10:30 14  supervisory inquiry into the allegation.  And then we

10:30 15  were going to move forward with the recommendation once

10:30 16  we communicated what he had gathered during his

10:30 17  supervisory inquiry.

10:30 18      Q.  What do you mean "and move forward with" -- I

10:30 19  believe you said investigation?

10:31 20      A.  I -- I recall that we were going to move

10:31 21  forward with the recommendation once -- whatever that

10:31 22  recommendation would entail once I communicated with

10:31 23  Captain Vander Horck.

10:31 24      Q.  And what do you mean by "recommendation"?

10:31 25      A.  Once the supervisory inquiry was conducted,

26

**EXHIBIT 100**
**998**

BARKLEY
Court Reporters

10:48  1    A.  There was no misconduct by Captain Vander Horck

10:48  2  himself.

10:48  3    Q.  My question is, Were there concerns at the time

10:48  4  that Captain Vander Horck was not appropriately handling

10:48  5  personnel issues other than the Pepperdine incident that

10:48  6  you described?

10:48  7    A.  There were some other concerns.

10:48  8    Q.  What were those?

10:48  9    A.  I -- I consulted with county counsel, so I

10:48  10  don't feel comfortable discussing some of those other

10:48  11  concerns.

10:48  12    Q.  So it sounds like you had an initial call with

10:49  13  Captain Vander Horck in which it was discussed that

10:49  14  Lieutenant Diez would be conducting a supervisory

10:49  15  inquiry.  You then spoke to Assistant Sheriff Gross, and

10:49  16  he asked for an update.

10:49  17    What happened next?

10:49  18    A.  I called Captain Vander Horck and left a

10:49  19  voicemail.

10:49  20    Q.  Then what happened?

10:49  21    A.  He called back later that evening.  He called

10:49  22  me back.

10:49  23    Q.  And then what happened?

10:49  24    A.  He advised me that the sheriff had directed a

10:49  25  supervisory inquiry at the Malibu/Lost Hills Station and

39

BARKLEY
Court Reporters

**EXHIBIT 100**
**999**

10:49 1    directed all of the deputies who had either taken --

10:49 2    taken pictures or had exchanged pictures to report to

10:49 3    the Malibu/Lost Hills Station.

10:50 4        Q.  Did he say anything else?

10:50 5        A.  I believe he said that it was Captain, now

10:50 6    Commander Valdez who was directing this inquiry on

10:50 7    behalf of the sheriff.

10:50 8        Q.  Was the word "delete" mentioned at any point

10:50 9    during your conversation with Captain Vander Horck?

10:50 10       A.  Yes.

10:50 11       Q.  In what way was it mentioned?

10:50 12       A.  From what I recall, Captain Vander Horck

10:50 13   mentioned that Captain, now Commander Valdez had

10:50 14   directed -- on behalf of the sheriff directed deputies

10:50 15   who had received, taken the pictures, or shared any of

10:50 16   these pictures to report to the station and to delete

10:50 17   those photographs immediately because the sheriff did

10:50 18   not ever want those -- any of those photographs to be

10:50 19   circulated within any public domain.

10:51 20       Q.  Did Captain Vander Horck express any concerns

10:51 21   about that order?

10:51 22       A.  He mentioned that the deputies were at the

10:51 23   station with their union representatives and with their

10:51 24   attorneys.  And I remember establishing a three-way call

10:51 25   with both Captain Vander Horck and Captain Valdez.

40

DENNIS KNEER - CONFIDENTIAL

BARKLEY
Court Reporters

**EXHIBIT 100**
**1000**

10:51  1    Q.  So going back to my last question, based on

10:51  2  your perception, did Captain Vander Horck express any

10:51  3  concerns about the sheriff's direction during your call

10:51  4  with him?

10:51  5    A.  I recall not being sure if he understood the

10:51  6  communication.  And that is why I established a three --

10:52  7  three-way phone call with Captain Vander Horck and

10:52  8  Captain Valdez.  That's what I recall.

10:52  9    Q.  At the time that you got this call from

10:52 10  Captain Vander Horck or that you spoke to him, had you

10:52 11  heard anything about an order to delete accident scene

10:52 12  photographs?

10:52 13    A.  The first I had heard about any deletion of any

10:52 14  photographs was from Captain Vander Horck --

10:52 15    Q.  Okay.

10:52 16    A.  -- when he -- when -- he had called me and left

10:52 17  a message to call him back.  And then I -- I called him

10:52 18  back once I was in the Antelope Valley.  I remember

10:52 19  driving home that night, and I called him back.

10:52 20    Q.  Okay.  So you called him.  And you say that you

10:52 21  recall that you weren't sure that he understood what had

10:52 22  been ordered.

10:52 23    A.  Yes.

10:52 24    Q.  Did you perceive him to be expressing any

10:53 25  concerns about what he thought the order was?

41

BARKLEY
Court Reporters

**EXHIBIT 100**
**1001**

10:53 1    A.  I remember thinking he -- he told me he was

10:53 2  very tired, that he took a 3-hour nap after not sleeping

10:53 3  for over 30 hours.  And so I thought maybe he

10:53 4  misunderstood the communication, and that is why I

10:53 5  established a three-way phone call with Captains

10:53 6  Vander Horck and Valdez.

10:53 7    Q.  Did -- I just want to give you an opportunity

10:53 8  to -- to answer the question.

10:53 9        Did Captain Vander Horck say anything during

10:53 10  the call that you understood or perceived to be

10:53 11  expressing concerns about the order to delete

10:53 12  photographs?

10:53 13        MR. TOKORO:  Craig, I'm going to object to that

10:53 14  question and request that you keep your commentary to

10:53 15  yourself.  You can ask the questions.  Captain Kneer --

10:53 16  sorry.

10:53 17        Chief Kneer is doing his best to answer the

10:53 18  question.  You've asked this question a few times now.

10:53 19  He's answered it.

10:53 20        You can answer it again.

10:54 21        THE WITNESS:  I don't recall any specific

10:54 22  concern other than I thought he was very fatigued and

10:54 23  very tired and may have misunderstood the communication

10:54 24  he had with Captain Valdez.

10:54 25  ///

42

**EXHIBIT 100**
**1002**

BARKLEY
Court Reporters

BY MR. LAVOIE:

Q.  Did Captain Vander Horck say at any point during your interaction with him that he believed that the procedure that was being used to handle this situation was violating the Peace Officer Bill of Rights, you know, rights of the deputies?

A.  I do not recall him ever mentioning anything about violating procedural rights of deputies.

Q.  Did Captain Vander Horck say anything during your communication with him about that -- that his staff were receiving instructions outside the chain of command -- that being from Captain Valdez -- and that these orders were coming outside of the chain of command?  Did he say anything like that?

A.  I don't recall him mentioning anything about receiving directions from outside the chain of command.

Q.  Do you think that would have been memorable to you if he had expressed a concern like that?

A.  I don't know.

Q.  Did Captain Vander Horck ever express that the department might be violating some federal law by ordering people to delete the photos?

A.  I don't recall him ever mentioning anything like that.

Q.  Did Captain Vander Horck say anything to you to

43

BARKLEY
Court Reporters

**EXHIBIT 100**
**1003**

10:55  1    the effect of, The last time our deputies got

10:55  2    instructions from our executives in a federal case, they

10:55  3    were arrested and tried for crimes?

10:56  4         Did he say anything like that?

10:56  5    A.  No.  I don't recall him ever mentioning

10:56  6    anything about people going to prison or another

10:56  7    incident.

10:56  8    Q.  You're confident in that?

10:56  9    A.  I'm -- I'm confident, yes.

10:56  10   Q.  Did Captain Vander Horck say -- express to you

10:56  11   that he found these orders to be very out of the

10:56  12   ordinary and concerning?

10:56  13   A.  I don't recall him making any statement like

10:56  14   that.

10:56  15   Q.  Did Captain Vander Horck express to you that he

10:56  16   had concerns for his people, for his lieutenant, and for

10:56  17   his sergeant and whether they would later get into

10:56  18   trouble for following these orders?

10:56  19   A.  I don't ever recall him making any such

10:56  20   statement.

10:56  21   Q.  Did Captain Vander Horck tell you that he had

10:56  22   asked his lieutenant to stop with asking people to

10:57  23   delete photos until he consulted with you?

10:57  24   A.  No.  I don't recall him ever making that

10:57  25   statement.

                                44

10:57  1     Q.  So to your understanding, you don't have any

10:57  2  basis to believe that there was any inter -- any

10:57  3  interruption or pause in carrying out the order to

10:57  4  delete photographs while this conversation with you took

10:57  5  place?

10:57  6     A.  No.

10:57  7     Q.  No, you don't have any reason to believe that?

10:57  8     A.  I don't have any reason to believe that at all.

10:57  9     Q.  What was Captain Vander Horck's tone like

10:57 10  during the conversation?  Did he seem alarmed?

10:57 11     A.  I don't recall him being alarmed at all.

10:57 12     Q.  When you had this call with

10:57 13  Captain Vander Horck, did anything that he said during

10:57 14  the call concern you?

10:57 15     A.  Yes.

10:57 16     Q.  What concerned you?

10:57 17     A.  When he mentioned that deputies were at the

10:58 18  station with union representatives or their attorneys

10:58 19  and they were deleting photos, I felt that was

10:58 20  unconventional; and that did concern me.  That's why I

10:58 21  established the communication with Captain, now

10:58 22  Commander Valdez, to ensure that was the sheriff's

10:58 23  directive.

10:58 24     Q.  Was -- was there anything about deputies

10:58 25  deleting photographs -- was that part of what concerned

45

BARKLEY
Court Reporters

**EXHIBIT 100**
**1005**

10:58  1    you?  I just want to be sure I'm not misunderstanding

10:58  2    you.

10:58  3         A.  From what I recall, the photographs were given

10:58  4    to the NTSB at the onset of the investigation.  And so

10:58  5    the deletion of the photographs at the station I felt

10:59  6    was -- was unconventional because we were initiating a

10:59  7    supervisory inquiry.

10:59  8         Q.  And in what sense would it -- was that

10:59  9    unconventional?  Why did you think it was

10:59 10    unconventional?

10:59 11         A.  Because in -- in the past we would normally do

10:59 12    a supervisory inquiry to take a look at potential

10:59 13    misconduct and then move forward with -- in this case it

10:59 14    would have likely been an administrative investigation.

10:59 15         Q.  Any photos, I guess, would have been material

10:59 16    that would be -- you'd want to consult in such an

10:59 17    investigation; is that right?

10:59 18         A.  I think that in this case any photos could be

10:59 19    looked at in terms of the purpose of why the photos were

10:59 20    taken and then whether or not they were inappropriately

10:59 21    shared with others.

11:00 22         Q.  And were you concerned at all that by deputies

11:00 23    deleting photographs, that you would be losing evidence

11:00 24    of whether the photographs had been shared with anyone?

11:00 25         A.  No.

                                    46

BARKLEY
Court Reporters

**EXHIBIT 100**
**1006**

11:04  1    during the call, other than what you've already told me,

11:04  2    before Jorge Valdez was added?

11:04  3        A.  No, I don't.

11:04  4        Q.  What happened -- what was said once Jorge

11:04  5    Valdez was added and you made this a three-way call?

11:04  6        A.  I asked Jorge -- Jorge Valdez to explain what

11:04  7    the sheriff had directed.  I wanted to make sure that

11:05  8    Captain Vander Horck understood what the sheriff had

11:05  9    directed and that there was no confusion.

11:05 10        Q.  And what did Jorge Valdez say on that call?

11:05 11        A.  From what I recall, it was consistent with what

11:05 12    Captain Vander Horck had described, that the sheriff

11:05 13    ordered a supervisory inquiry and that the deputies were

11:05 14    instructed to delete the photos at the station.

11:05 15        Q.  And your understanding from what -- from what

11:05 16    Jorge Valdez told you was that there had been an order

11:05 17    from the sheriff that deputies should delete accident

11:05 18    scene photos; is that fair?

11:05 19        A.  Yes.

11:05 20        Q.  When you heard this from Jorge Valdez that the

11:06 21    order that Captain Vander Horck had effectively con --

11:06 22    conveyed the situation accurately to you, did it -- did

11:06 23    the order concern you at all?

11:06 24        A.  I thought it was unconventional.

11:06 25        Q.  Did it concern you that there was an

                                50

BARKLEY
Court Reporters

**EXHIBIT 100**
**1007**

11:06  1   unconventional order?

11:06  2           MR. TOKORO:  Objection.  Asked and answered.

11:06  3   And again, his personal opinion is not relevant.

11:06  4           THE WITNESS:  I felt it was unconventional.

11:06  5   BY MR. LAVOIE:

11:06  6       Q.  Right.  But something can be unconventional and

11:06  7   good or unconventional and concerning.

11:06  8           So did you find it concerning?

11:06  9           MR. TOKORO:  Objection.  Asked and answered

11:06 10   twice now.

11:06 11           THE WITNESS:  I -- like I said, I felt it was

11:06 12   unconventional and that the sheriff had made that

11:06 13   decision.  And I wasn't consulted as part of that

11:06 14   decision; so I don't really have any further opinion on

11:07 15   the matter, other than I did explain to you that I felt

11:07 16   it was unconventional because I'm accustomed to what I

11:07 17   had explained to you previously about a supervisory

11:07 18   inquiry and then moving forward with an investigation.

11:07 19   BY MR. LAVOIE:

11:07 20       Q.  So what you're saying is that at the time you

11:07 21   had no opinion one way or another as to whether this was

11:07 22   an appropriate way to proceed, by ordering deputies to

11:07 23   delete accident scene photos?

11:07 24           MR. TOKORO:  Objection.  Misstates his

11:07 25   testimony.  He's repeatedly testified that he felt it

51

DENNIS KNEER - CONFIDENTIAL

**EXHIBIT 100**
**1008**

BARKLEY
Court Reporters

11:08 1    as I've described to you and you've questioned me about

11:08 2    that normal procedure, was the normal process that I was

11:08 3    accustomed to.  And I did feel this was unconventional

11:08 4    and that it was extraordinary due to the circumstances.

11:08 5    The sheriff made it very clear he did not want these

11:08 6    pictures to ever be circulated in the public domain.

11:08 7    BY MR. LAVOIE:

11:08 8         Q.  When you say the sheriff made that clear, he

11:08 9    made that clear to you.  How -- how did you --

11:08 10        A.  No.  He made that clear to Jorge Valdez, and

11:09 11   Jorge Valdez made that clear to me.

11:09 12        Q.  So during the time period in which deputies

11:09 13   were being told to delete accident scene photos, you

11:09 14   never had a conversation with the sheriff.  That's your

11:09 15   testimony?

11:09 16        A.  No.  That is my testimony.

11:09 17        Q.  At any point did you tell Captain Vander Horck

11:09 18   that you had spoken with the sheriff and that the

11:09 19   sheriff had assured you that ordering the deputies to

11:09 20   delete the photos was the proper way to go about

11:09 21   handling this?

11:09 22        A.  No.  I did not speak to the sheriff during that

11:09 23   time period at all.

11:09 24        Q.  You would not have said that to

11:09 25   Captain Vander Horck?

51

DENNIS KNEER - CONFIDENTIAL

**EXHIBIT 100**
**1009**

11:09  1        A.  I don't recall ever saying that to

11:09  2  Captain Vander Horck, but I can tell you I never spoke

11:09  3  to the sheriff until the following month about this

11:09  4  order.

11:09  5        Q.  Did you ever tell Captain Vander Horck that

11:10  6  this situation was not a criminal matter but rather an

11:10  7  administrative matter and the sheriff has the final

11:10  8  say-so in all administrative matters?  Did you say

11:10  9  anything to that effect?

11:10  10       A.  No.  I don't recall ever saying anything to

11:10  11  that effect.

11:10  12       Q.  Did you ever say anything to

11:10  13  Captain Vander Horck about a reference to an incident

11:10  14  involving Lennox deputies in the '90s who were shooting

11:10  15  their guns in the park and how that situation was

11:10  16  handled?

11:10  17       A.  I recall mentioning to Jorge Valdez and

11:10  18  Captain Vander Horck that there was an incident in the

11:10  19  1990s involving deputies on duty shooting their guns

11:10  20  at -- I believe it was Alondra Park and that those

11:10  21  deputies were promised they would keep their jobs as

11:10  22  long as they were truthful in the investigation.

11:10  23           And I asked Jorge Valdez if the sheriff

11:11  24  considered doing that.  And he made it very clear to me

11:11  25  that the sheriff was directing the deletion of the

54

BARKLEY
Court Reporters

11:11  1    photos and as long -- from what I recall, as long as the

11:11  2    photos were not circulated in any public domain, there

11:11  3    would be no discipline.

11:11  4          Q.  I'm going to show you a -- going to mark as

11:11  5    Exhibit 153 the transcript of your IA interview.

11:11  6          Can you see this okay, or would it be helpful

11:11  7    to zoom in? zoom out?

11:11  8          (Whereupon the document referred to is marked

11:11  9    by the reporter as Plaintiff Exhibit 153 for

11:11 10    identification.)

11:11 11          A.  Yeah, I can see it okay.

11:11 12          MR. TOKORO:  Craig, could you just zoom in one

11:11 13    time for me.  I'm having a little bit of difficulty.

11:12 14          MR. LAVOIE:  Sure.

11:12 15          MR. TOKORO:  Perfect.  Thank you.

11:12 16    BY MR. LAVOIE:

11:12 17          Q.  This says, "Today's date is June 24th, 2020."

11:12 18          This appears to be a transcript of your IA

11:12 19    interview; is that right?

11:12 20          A.  Yes.

11:12 21          Q.  And did you endeavor to tell the truth during

11:12 22    your IA interview?

11:12 23          A.  Yes.

11:12 24          Q.  As you sit here today, are you aware of

11:12 25    anything that you said in your IA interview that was

56

DENNIS KNEER - CONFIDENTIAL

BARKLEY
Court Reporters

EXHIBIT 100
1011

11:12  1    false?

11:12  2         A.  I am not aware if there are any discrepancies.

11:12  3    I would need to look at the interview.

11:12  4         Q.  I'm going to navigate to the bottom of Page 3

11:12  5    and direct your attention to this answer right here.

11:12  6    And so just let me know once you've read this.  I'll

11:12  7    scroll to the next page --

11:12  8         A.  Okay.

11:12  9         Q.  -- so you can read the rest of the answer.

11:13 10         A.  Okay.  I read that.

11:13 11         Q.  Okay.  And then just go ahead and finish

11:13 12    reading the answer here to yourself.  Let me know once

11:13 13    you're ready.

11:13 14         A.  Okay.  I read that.

11:13 15         Q.  So is it true that after you spoke to

11:13 16    Captain Vander Horck and Captain Valdez, that you called

11:14 17    Assistant Sheriff Steven Gross and told him that there

11:14 18    would no longer be an inquiry by Lieutenant Diez because

11:14 19    the sheriff had directed the deputies to delete the

11:14 20    photos?

11:14 21         A.  According to my interview, yes.  And --

11:14 22         Q.  And you don't have any reason to doubt that

11:14 23    that -- that -- that that is correct?

11:14 24         A.  I -- yeah.  I don't have any reason to doubt

11:14 25    that's correct.

                                   56

BARKLEY
Court Reporters

**EXHIBIT 100**
**1012**

11:14  1     Q.  Why did you -- why did you tell Assistant

11:14  2  Sheriff Gross that there would no longer be an inquiry

11:14  3  by Lieutenant Diez?

11:14  4     A.  Because the sheriff had directed Jorge Valdez

11:14  5  to order the deputies into the station to delete the

11:14  6  photographs and that there would be no discipline as

11:15  7  long as none of those photographs circulated into any

11:15  8  public domain.

11:15  9     Q.  And so why in response to that information did

11:15 10  you want to inform Sheriff Gross that Lieutenant Diez

11:15 11  wouldn't be conducting an inquiry anymore?

11:15 12     A.  As I mentioned, the sheriff had directed

11:15 13  deputies into the station to delete the photographs

11:15 14  as -- and as long as the photographs were not circulated

11:15 15  in the public domain, there would be no discipline.  And

11:15 16  at that point, although I was not involved in that

11:15 17  decision to order the deputies into the station, the

11:15 18  sheriff, who was the highest-ranking official, made that

11:15 19  decision; and there was not going to -- initially, there

11:15 20  was not going to be any discipline.  That was the

11:15 21  communication, as I understood it, from Jorge Valdez.

11:16 22     Q.  So after this call with -- or in response to

11:16 23  receiving this information from Captain Vander Horck

11:16 24  about what he understood to be the sheriff's order, did

11:16 25  you ever consider calling the sheriff and asking him if

DENNIS KNEER - CONFIDENTIAL

BARKLEY
Court Reporters

EXHIBIT 100

1013

11:16  1   he had issued such an order?

11:16  2       A.  I don't recall whether or not I considered

11:16  3   that.

11:16  4       Q.  As you sit here today, can you think of any

11:16  5   reason why you wouldn't have just called the sheriff?

11:16  6   You had access to his cell phone; right?  Why didn't you

11:16  7   just call him?

11:16  8       MR. TOKORO:  Objection.  Calls for speculation.

11:16  9   Hypothetical.  And irrelevant.  Something that didn't

11:16  10  happen.

11:16  11      THE WITNESS:  I had communicated with Assistant

11:16  12  Sheriff Steve Gross on that evening, and I was

11:16  13  communicating with Assistant Sheriff Steve Gross because

11:16  14  he is my direct supervisor, and I did not see a need to

11:17  15  communicate with the undersheriff or the sheriff.

11:17  16  BY MR. LAVOIE:

11:17  17      Q.  So did you have any further conversation with

11:17  18  Captain Vander Horck after your conversation with

11:17  19  Assistant Sheriff Gross?

11:17  20      A.  I don't recall whether or not I did.

11:17  21      Q.  So what was your understanding for why

11:17  22  Captain Vander Horck was calling you with this

11:17  23  information?

11:17  24      MR. TOKORO:  Objection.  Lacks foundation and

11:17  25  calls for speculation regarding the motivation for why

58

11:17  1    Captain Vander Horck was calling Chief Kneer.

11:17  2         THE WITNESS:  He was calling me at my request

11:17  3    because I was obtaining an update for Assistant Sheriff

11:18  4    Steve Gross.

11:18  5    BY MR. LAVOIE:

11:18  6         Q.  So according to your recollection, the

11:18  7    situation wasn't that Captain Vander Horck called you

11:18  8    and said, I have a bunch of concerns with this

11:18  9    situation.  It was that you had reached out to him for

11:18 10    an update, and he was just calling you back to give you

11:18 11    that update?

11:18 12         A.  Yes.

11:18 13         Q.  In January -- as of January 2020, had you ever

11:18 14    heard about any right that's protected by the United

11:18 15    States Constitution related to photographs of deceased

11:18 16    people?

11:18 17         A.  No.  I don't recall of any right.

11:18 18         Q.  As you sit here today, are you aware of any

11:18 19    right protected by the United States Constitution that

11:18 20    relates to photographs of deceased individuals?

11:18 21         A.  I believe there is a state law that was

11:18 22    recently enacted.

11:18 23         Q.  So I think you're referring to a law that was

11:19 24    enacted after the accident in California; right?

11:19 25         A.  Yes.  Yes.

59

DENNIS KNEER - CONFIDENTIAL

BARKLEY
Court Reporters

**EXHIBIT 100**
**1015**

11:19  1     Q.  Okay.  So my question is different.  I'm asking

11:19  2  about any right under the United States Constitution

11:19  3  akin to, like, Fourth Amendment, Fifth Amendment rights.

11:19  4        So on your understanding -- to your

11:19  5  understanding as you sit here today, is there any right

11:19  6  under the United States Constitution that relates to

11:19  7  photographs of human remains?

11:19  8     A.  None that I recall.

11:19  9     Q.  None that you're aware of as you sit here

11:19 10  today.  Fair to say?

11:19 11        MR. TOKORO:  Objection.  Misstates his

11:19 12  testimony.  Question was just asked and just answered.

11:19 13        THE WITNESS:  None that I recall.

11:19 14  BY MR. LAVOIE:

11:19 15     Q.  Do you have any understanding as to whether it

11:19 16  might violate federal constitutional rights to -- for a

11:19 17  sheriff's deputy to share a photo of a dead person with

11:19 18  another person without a legitimate reason?

11:19 19        MR. TOKORO:  Objection.  Incomplete

11:19 20  hypothetical.  Again, not a 30(b)(6) witness.  His

11:20 21  personal testimony is irrelevant.  And that may call for

11:20 22  a legal conclusion.

11:20 23        THE WITNESS:  I -- I don't have any knowledge

11:20 24  regarding that matter.

11:20 25  ///

                                  60

BARKLEY
Court Reporters

**EXHIBIT 100**
**1016**

BY MR. LAVOIE:

Q.  Have you -- oh, I'm sorry.  I didn't mean to cut you off.

A.  I don't have any knowledge regarding that matter.

Q.  Have you ever had a supervisor, over the course of your 30 years with the sheriff's department, tell you to delete something from your personal cell phone?

A.  No.

Q.  Have you ever had a supervisor tell you to destroy or -- a document or an electronic file of some type?

A.  No.  Not that I recall.

Q.  You mentioned earlier that over the course of your 30-year career you've been involved at one level or another with approximately 200 investigations -- potential misconduct by department personnel.

Do you recall that testimony?

A.  Yes.

Q.  In all of the investigations of potential misconduct by members of the sheriff's department that you've been involved in over your 30-year career, can you recall a single time, other than the incident we've been talking about today, where the subject or a witness in the investigation was ordered to destroy or delete

61

BARKLEY
Court Reporters

11:21 1    material that related to that investigation?

11:21 2        A.  No, I can't recall.

11:21 3        Q.  Separate from -- well, let me be clear.

11:21 4        You have never issued an order to anyone who

11:21 5    was being investigated for misconduct to delete or

11:21 6    destroy material related to that potential misconduct;

11:21 7    is that correct?

11:21 8        MR. TOKORO:  Just going to interpose an

11:21 9    objection to this entire line of questioning regarding

11:21 10    your suggestion that it's material relevant to any

11:21 11    investigation per the witness's prior testimony.

11:21 12        THE WITNESS:  Can you ask the question again.

11:21 13    BY MR. LAVOIE:

11:21 14        Q.  We can move on.

11:21 15        Do you think it's true that when investigating

11:21 16    potential misconduct by a member of the sheriff's

11:22 17    department, that it's important to preserve as much

11:22 18    evidence as possible related to that potential

11:22 19    misconduct?

11:22 20        MR. TOKORO:  Objection.  Incomplete

11:22 21    hypothetical.  Again, not a 30(b)(6) witness.  His

11:22 22    personal opinion is irrelevant.  And he was also asked

11:22 23    and answered about the importance, or lack thereof, of

11:22 24    the pictures in this investigation or inquiry.

11:22 25        THE WITNESS:  Can you ask the question again.

62

BARKLEY
Court Reporters

11:25  1    entry?

11:25  2        A.  Yes.  However, I have seen performance log

11:25  3    entries given to deputies where I felt there should have

11:25  4    been much -- much more significant discipline.  So

11:25  5    again, it is an opinion that I have.

11:25  6            MR. TOKORO:  Craig, let us know when is a good

11:25  7    time to take a break.  We've been going for almost an

11:25  8    hour and a half.

11:25  9            MR. LAVOIE:  Yeah.  That's fine.  We can take a

11:25 10    break.

11:25 11            THE VIDEOGRAPHER:  We're off the record at

11:26 12    11:25.

11:26 13            (A recess is taken.)

11:35 14            THE VIDEOGRAPHER:  We're back on the record at

11:35 15    11:35.

11:35 16    BY MR. LAVOIE:

11:35 17        Q.  I want to circle back to your conversation with

11:35 18    Captain Vander Horck in which he relayed to you what he

11:35 19    understood to be the sheriff's order to delete the

11:35 20    photographs.

11:35 21            At any point during that conversation with

11:35 22    Captain Vander Horck, did he ask you whether any of the

11:35 23    photos that were being deleted might have evidentiary

11:35 24    value?

11:35 25        A.  I don't recall him ever asking me that.

65

BARKLEY
Court Reporters

**EXHIBIT 100**
**1019**

11:35  1       Q.  Did he ask you whether the NTSB might want to

11:35  2   know about these photographs?

11:35  3       A.  I don't recall.

11:35  4       Q.  Did he ask you whether the FBI might be

11:35  5   interested in any of these photographs?

11:35  6       A.  I don't recall.

11:35  7       Q.  Did he ask you whether the department might be

11:35  8   violating any laws of any sort in ordering the deletion

11:36  9   of these photographs?

11:36 10       A.  I don't recall him ever making that type of

11:36 11   statement.

11:36 12       Q.  And it's the best of your recollection, he did

11:36 13   not say that?

11:36 14       A.  No, he did not say that.

11:36 15       Q.  Did Captain Vander Horck ask you whether anyone

11:36 16   was going to get in trouble for following these orders?

11:36 17       A.  I don't recall him making that statement.

11:36 18       Q.  At any point -- at any point from that

11:36 19   conversation to today, have you had any conversations

11:36 20   with Matthew Vander Horck in which you discussed the

11:36 21   sheriff's order to delete accident scene photos?

11:36 22       A.  I don't recall having any discussions with him

11:37 23   regarding this matter.

11:37 24       Q.  So to the best of your recollection, that phone

11:37 25   call that you had with him in which he informed you of

66

DENNIS KNEER - CONFIDENTIAL

**EXHIBIT 100**
**1020**

BARKLEY
Court Reporters

11:37  1   the sheriff's order to delete photographs -- that's the

11:37  2   one and only time that you've ever spoken to

11:37  3   Captain Vander Horck about anything related to an order

11:37  4   by the sheriff to delete photographs?

11:37  5       A.  I believe we spoke once afterwards -- it may

11:37  6   have been later that evening or the following day --

11:37  7   when he told me that the sheriff's order, as directed by

11:37  8   Jorge Valdez, was carried out.  And I don't recall if it

11:37  9   was later that evening or the following day.

11:37 10       Q.  I want to direct your attention back to

11:38 11   Exhibit 153, which is your IA interview transcript.  Why

11:38 12   don't you just review this answer here and let me know

11:38 13   once you've had a chance.

11:38 14       A.  Okay.  Okay.  I've read that question and my

11:39 15   answer.

11:39 16       Q.  Do you see anything in -- well, sorry.

11:39 17           So in this answer during your IA interview, you

11:39 18   state that at the city managers' seminar sometime in

11:39 19   February of 2020, that you spoke to Captain Valdez and

11:39 20   the sheriff about performance log entries related to

11:39 21   these accident scene photographs?

11:39 22       A.  Yes.  I -- I spoke to Captain Valdez; and the

11:39 23   sheriff was present, yes.

11:39 24       Q.  Was anyone else present or participating in

11:39 25   that conversation?

                              67

DENNIS KNEER - CONFIDENTIAL

**EXHIBIT 100**
**1021**

11:39  1      A.  I don't recall anyone else being present.

11:39  2      Q.  Where were you physically located?  Were you,

11:39  3  like, standing around a table?  Were you, you know --

11:39  4      A.  I think we were --

11:39  5      Q.  -- what was the setting?

11:39  6      A.  I believe we were located -- it may have been

11:40  7  close to the lobby area of the Universal Sheraton just

11:40  8  outside of one of the large banquet rooms where the city

11:40  9  managers' meeting was being conducted.

11:40 10      Q.  Tell me everything that you remember about that

11:40 11  conversation.

11:40 12      A.  I recall either the sheriff or Jorge Valdez

11:40 13  calling me and asking to speak to me.  And then I

11:40 14  stepped out -- out of the large banquet room; and I

11:40 15  spoke, I believe, to Jorge Valdez with the sheriff

11:40 16  present.  And Jorge had asked me if the deputies who had

11:40 17  either taken photographs or shared those photographs of

11:40 18  the crash site -- if those deputies had received

11:40 19  performance log entries.  And I said I did not know.  I

11:41 20  would need to check.

11:41 21          And I did check with Lieutenant Hector

11:41 22  Mancinas, who was at this event; and he confirmed that

11:41 23  deputies did not receive performance log entries.  And

11:41 24  so I directed either Lieutenant Mancinas or Captain

11:41 25  Becerra to ensure that deputies received the performance

                               68

11:41  1    log entries, as it was being directed by the sheriff.

11:41  2    And that was in -- within my conversation with Jorge

11:41  3    Valdez and the sheriff being present.

11:41  4        Q.   And in your IA interview you stated that, to

11:41  5    the best of your recollection, that day those

11:41  6    performance log entries were issued.

11:41  7            Do you have any reason to doubt that testimony

11:41  8    now?  I can show it to you again, if it would be

11:42  9    helpful.

11:42  10       A.   No.  You don't need to show it to me again.  I

11:42  11   believe those performance log entries were issued on

11:42  12   that day, if not within a day thereafter.

11:42  13       Q.   And do you recall whether this conversation

11:42  14   took place in the morning, afternoon, or evening?

11:42  15       A.   I think it was late morning.

11:42  16       Q.   Yeah.  So left enough time in the day, I guess,

11:42  17   for the PLEs to potentially be issued that same day?

11:42  18       A.   Yes.

11:42  19       Q.   I want to break this down just a bit, go step

11:42  20   by step.  So the first thing you said was that the

11:42  21   sheriff or Jorge Valdez called you, and you stepped out

11:42  22   of the large banquet room.

11:42  23           Do you mean called, like, on your phone or just

11:42  24   said, Hey, you know, we want to talk to you --

11:42  25       A.   I believe it was on my phone.

69

**EXHIBIT 100**
**1023**

11:42  1      Q.   I see.

11:43  2      A.   I believe -- I believe I was called on my

11:43  3   phone.

11:43  4      Q.   Okay.  And they said --

11:43  5      A.   I believe -- go ahead.

11:43  6      Q.   No.  You go ahead.

11:43  7      A.   I believe it was Jorge Valdez, but I'm not

11:43  8   certain.  It was either Jorge Valdez or the sheriff who

11:43  9   called me and just asked me if I could step outside and

11:43 10   speak to them.

11:43 11      Q.   Okay.  And so you walk up.  And to the best of

11:43 12   your recollection, it's only Jorge Valdez and the

11:43 13   sheriff; nobody else?

11:43 14      A.   I'm trying to recall.  Because the sheriff

11:43 15   usually has different people with him, and I just can't

11:43 16   recall if there was anyone else present, but I know that

11:43 17   it was Jorge Valdez and the sheriff that I was speaking

11:43 18   to.

11:43 19      Q.   Do you know why you transitioned from being the

11:43 20   sheriff's -- the sheriff's chief of staff back to being

11:43 21   the chief of North Patrol?

11:43 22      A.   Yes.

11:43 23      Q.   Why is that?

11:44 24      A.   Because the previous chief of staff, Larry

11:44 25   Del Mese, was removed as the chief of staff until he

                                70

DENNIS KNEER - CONFIDENTIAL

**EXHIBIT 100**
**1024**

**BARKLEY**
Court Reporters

11:47  1   four more years.  That will bring me to age 55, but I

11:47  2   could retire sooner.  I -- or even later.  I haven't

11:47  3   quite decided yet.  I like my job.  I like what I'm

11:47  4   doing.  And I have not given that much thought at this

11:47  5   point.

11:47  6   BY MR. LAVOIE:

11:47  7       Q.  Have you ever thought about whether a promotion

11:47  8   to assistant sheriff or some other position would be

11:47  9   desirable or something you'd be interested in?

11:47 10           MR. TOKORO:  Objection.  Entirely irrelevant to

11:47 11   this case.

11:47 12           THE WITNESS:  I truly enjoy my current

11:47 13   position, and I don't have any desire to transfer to

11:47 14   another position at this point.

11:47 15   BY MR. LAVOIE:

11:47 16       Q.  Or to be promoted to assistant sheriff, for

11:47 17   example?

11:47 18       A.  Again, I really enjoy the job I have; and if I

11:48 19   stay there for the remainder of my career, that would be

11:48 20   very self-fulfilling.  And I don't have any other desire

11:48 21   at this point to transfer to another position, whether

11:48 22   it's a lateral transfer or a promotion.

11:48 23       Q.  So let's go back to this interaction at the

11:48 24   city managers' meeting.  If you wanted to -- you have

11:48 25   detective experience; so I'm going to ask you, If you

                                  73

BARKLEY
Court Reporters

11:48 1    wanted to pinpoint the date of that meeting -- the

11:48 2    precise date, what would you do?

11:48 3        A.  I would look up the date at which -- I would

11:48 4    look it up on my calendar -- the date at which the city

11:48 5    managers had that meeting with the sheriff's department.

11:48 6        Q.  Would you be able to consult -- you have your

11:48 7    calendar on your -- on your cell phone; right?

11:48 8        A.  Yes.

11:49 9        Q.  Could you go back to February -- late February

11:49 10   of 2020 and see if you can pinpoint for me when that

11:49 11   city managers' meeting was?

11:49 12           MR. TOKORO:  If you're comfortable with it.

11:49 13           THE WITNESS:  I'm comfortable.  Sure.

11:51 14   BY MR. LAVOIE:

11:51 15       Q.  I don't know if this is helpful, but the

11:51 16   performance log entries are dated -- or signed on

11:51 17   February 27, 2020.

11:51 18       A.  Of 2020.  Okay.

11:51 19       Q.  Yeah.

11:51 20       A.  Okay.  It looks like it was February 25th of

11:53 21   2020.  I'm sorry.  I take that back.  It -- it was

11:53 22   Thursday, February 27th of 2020, is what I see on my

11:53 23   calendar.

11:53 24       Q.  As you sit here today, do you have any reason

11:53 25   to believe that the city managers' meeting at which this

74

BARKLEY
Court Reporters

11:53  1    conversation about the performance log entry occurs did

11:53  2    not -- did not happen on that Thursday, February 27?

11:54  3         A.   No.   In fact, it makes sense because you

11:54  4    mentioned the performance log entries were issued that

11:54  5    same date.

11:54  6         Q.   Okay.   So let me just state the question

11:54  7    clearly.   To the best of your knowledge as you sit here

11:54  8    today, you had a conversation at the city managers'

11:54  9    meeting on Thursday, February 27, 2020, with Jorge

11:54 10    Valdez and Sheriff Villanueva in which performance log

11:54 11    entries related to these accident scene photos was

11:54 12    discussed?

11:54 13         A.   I recall Jorge Valdez -- from what I recall, he

11:54 14    stated the deputies were supposed to be issued

11:54 15    performance log entries by Captain Vander Horck.   And he

11:54 16    required -- he inquired whether or not the deputies

11:54 17    received performance log entries.   I did not know.   And

11:54 18    that's when I contacted either Lieutenant Mancinas or

11:55 19    Captain Becerra and confirmed they were not issued.   And

11:55 20    so those performance log entries were issued thereafter.

11:55 21         Q.   And to the best of your knowledge as you sit

11:55 22    here today, the conversation that you had with Jorge

11:55 23    Valdez you just described occurred in the late morning

11:55 24    on Thursday, February 27, 2020?

11:55 25         A.   Yes.

                                   75

**EXHIBIT 100**
**1027**

BARKLEY
Court Reporters

11:56  1      Q.  So --

11:56  2      A.  -- regarding --

11:56  3      Q.  Go ahead.

11:56  4      A.  -- regarding that matter.

11:56  5      Q.  Okay.  So to the best of your recollection, you

11:56  6  didn't have any advanced notice that there was going to

11:56  7  be media coverage related to accident scene photos?

11:57  8      A.  I -- I don't recall because the incident

11:57  9  occurred almost two years ago and -- and I can't recall

11:57 10  quite from a chronological order when I first knew about

11:57 11  media coverage or potential media coverage.

11:57 12      Q.  So how quickly did you speak to

11:57 13  Lieutenant Mancinas after your conversation with Jorge

11:57 14  Valdez?

11:57 15      A.  I believe it was within 5 to 30 minutes.

11:57 16      Q.  You sought him out.  Almost immediately, you

11:57 17  tried to find him?

11:57 18      A.  I believe so.  I believe he was at the -- the

11:57 19  event -- the city managers' symposium event.

11:57 20      Q.  And when you spoke to Mancinas, you said that

11:58 21  he and Captain Becerra were supposed to issue

11:58 22  performance log entries and this was a direction from

11:58 23  the sheriff himself; is that accurate?

11:58 24      A.  I believe I had received that direction from

11:58 25  Jorge Valdez on behalf of the sheriff.  That is what I

                                 77

12:01 1      A.  It's about between 25 and 30 percent.  It's --

12:01 2  the population is just under a million.  It's in between

12:01 3  900,000 and 1 million.

12:01 4      Q.  Okay.  And my -- there are 10 million people

12:01 5  who live in L.A. County; right?

12:01 6      A.  Yes.

12:01 7      Q.  Does the sheriff's department have jurisdiction

12:01 8  over all those folks, or is it kind of interspersed and

12:02 9  spotty throughout L.A. County?

12:02 10      A.  We have jurisdiction over the unincorporated

12:02 11  areas of Los Angeles County and then with the 46

12:02 12  contract cities -- I think currently we have 46 contract

12:02 13  cities -- but any contract city within Los Angeles

12:02 14  County that contracts with the L.A. County Sheriff's

12:02 15  Department.  And then there's also the Metro line,

12:02 16  community colleges, and a few other outlying contracts.

12:02 17      Q.  Do you know approximately how many people live

12:02 18  within the areas that are within the sheriff's

12:02 19  department's current jurisdiction?

12:02 20      A.  For patrol services, police services, I believe

12:02 21  it is right around 3.2 to 3.4 million.  It's been some

12:02 22  time since I looked at that number, but I believe it's

12:02 23  right around that number.

12:02 24      Q.  Okay.  I just want to make a -- close off a

12:03 25  couple more points about your conversation with

80

DENNIS KNEER - CONFIDENTIAL

**BARKLEY**
Court Reporters

**EXHIBIT 100**
**1029**

| | |
|---|---|
| 12:03 | 1 |
| 12:03 | 2 |
| 12:03 | 3 |

Captain Vander Horck in which he relayed to you what he
understood to be the sheriff's orders to delete -- to
instruct people to delete photographs.

12:03  4          At any point during that conversation, did you

12:03  5    express to Captain Vander Horck that you shared any

12:03  6    concerns he expressed related to this order?  And I

12:03  7    understand your testimony is that you're not saying he

12:03  8    expressed concerns.  But I'm just asking you, At any

12:03  9    point during this conversation, did you indicate to

12:03  10   Captain Vander Horck, I share your concerns about the

12:03  11   order?

12:03  12         MR. TOKORO:  I'm going -- I'm going to object

12:03  13   to that question as misleading given the fact that you

12:03  14   just acknowledged this witness testified that

12:03  15   Captain Vander Horck did not express concerns.

12:04  16   Therefore, it is also vague and ambiguous.

12:04  17         THE WITNESS:  I don't recall any such

12:04  18   conversation.  As I mentioned, I thought it was

12:04  19   unconventional.  However, the sheriff directed that

12:04  20   these deputies receive performance log entries.  And I

12:04  21   looked at it from the standpoint of whether or not it

12:04  22   was legal.  I know it's legal.

12:04  23         And so that's why when Captain Vander Horck

12:04  24   advised me of the sheriff's directive, most of that

12:04  25   directive had already been carried out and I just

81

12:04  1    updated my boss, as I mentioned earlier, Assistant

12:04  2    Sheriff Steve Gross, regarding the sheriff's directive.

12:04  3    BY MR. LAVOIE:

12:04  4        Q.  Did you have any discussion with

12:04  5    Captain Vander Horck on this call as to whether these

12:04  6    photos had evidentiary value?

12:04  7        A.  I don't recall ever having that type of

12:05  8    conversation with Captain Vander Horck.

12:05  9        Q.  Would you say that at the time, that you had a

12:05 10    good working relationship with Captain Vander Horck?

12:05 11        A.  Yes.

12:05 12        Q.  Why would you say that?

12:05 13        A.  I just communicated well with him.  I -- I get

12:05 14    along with Captain Vander Horck.  And I think we had,

12:05 15    based on that, a good working relationship.

12:05 16        Q.  In your dealings with him have you found him to

12:05 17    be honest and trustworthy?

12:05 18        A.  Yes.

12:05 19        Q.  At any point during your conversation with

12:05 20    Captain Vander Horck, did you tell him, I'm going to

12:05 21    talk to the sheriff, and I'll call you back?

12:05 22        A.  I don't recall ever making that statement

12:05 23    because I did not talk to the sheriff.  I spoke to my

12:05 24    immediate supervisor, Assistant Sheriff Gross.

12:06 25        Q.  So as you sit here today, you think you did not

82

BARKLEY
Court Reporters

**EXHIBIT 100**
**1031**

12:06  1   make that statement -- you did not tell

12:06  2   Captain Vander Horck, I'm going to call the sheriff, and

12:06  3   I'll call you back?

12:06  4       A.   I do not ever believe I made that statement

12:06  5   because that would not have been my intention.  My

12:06  6   intention would have been to call my direct supervisor

12:06  7   and update my direct supervisor, who was asking for an

12:06  8   update.

12:07  9       Q.   Have you -- well, strike that.

12:07  10          Do you recall a meeting involving yourself,

12:07  11  Captain Vander Horck, and Commander Reed in

12:07  12  February 2020 -- this is being a few weeks after the

12:07  13  helicopter crash -- in which you informed

12:07  14  Captain Vander Horck that he would be demoted from

12:07  15  captain to lieutenant?

12:07  16      A.   Yes.

12:07  17      Q.   Tell me everything you remember about that

12:07  18  meeting.

12:07  19      A.   That both Commander Reed and I had met with

12:07  20  Captain Vander Horck.  And initially, he was receiving a

12:07  21  performance log entry; and then I was directed

12:07  22  thereafter that he would be demoted.  And that both

12:08  23  Commander Reed and I had been in constant consultation

12:08  24  with county counsel regarding the matter.

12:08  25          MR. TOKORO:  Craig, rather than interrupt you

83

**EXHIBIT 100**
**1032**

BARKLEY
Court Reporters

12:23 1    entry in stride?

12:23 2         A.   Yes.

12:23 3         Q.   Anything else that you remember about that

12:23 4    conversation related to the performance log entry other

12:23 5    than what you testified?

12:23 6         A.   No.

12:23 7         Q.   Okay.  So tell me about -- what -- what

12:23 8    happened in between that conversation and the

12:23 9    conversation in which Captain Vander Horck was informed

12:23 10   that he would be demoted.

12:23 11        A.   I was informed by Assistant Sheriff Gross and

12:23 12   by Sheriff Villanueva that Captain Vander Horck would be

12:23 13   demoted.

12:24 14        Q.   Okay.  How were you informed of that?

12:24 15        A.   I believe that I received a phone call from

12:24 16   Assistant Sheriff Gross, and he asked me to report to

12:24 17   the sheriff's office.  And at that time I did report to

12:24 18   the sheriff's office.

12:24 19        Q.   -- you recall being said during that

12:24 20   conversation in which Gross told you to go to the

12:24 21   sheriff's office?

12:24 22        A.   No.

12:24 23        Q.   As the chief of the North Patrol Division,

12:24 24   during your period of time in that job -- not when you

12:24 25   were chief of staff.  But how often do you have occasion

                                94

12:24  1      to go to the sheriff's office?

12:24  2          A.  Not often.  Maybe once every three months.

12:24  3          Q.  Okay.  So Gross calls you and tells to go to

12:25  4      the sheriff's office.  What happens next?

12:25  5          A.  I was advised either by Assistant Sheriff Gross

12:25  6      or -- or by the sheriff that Captain Vander Horck would

12:25  7      be demoted.  And he was currently on probation.  He was

12:25  8      a probationary captain.

12:25  9          Q.  How long was the conversation with Gross and

12:25  10     Villanueva?

12:25  11         A.  Between one to two minutes.

12:25  12         Q.  Tell me everything that you remember Sheriff

12:25  13     Villanueva saying during that meeting.

12:25  14         A.  I don't recall exactly who said what during

12:25  15     that meeting except that Captain Vander Horck was a

12:25  16     probationary employee who was not meeting the

12:26  17     expectations of the department and he was going to be

12:26  18     demoted as a result.

12:26  19         Q.  Separate from any particular words that the

12:26  20     sheriff used, do you recall any general sentiments that

12:26  21     the sheriff expressed himself during that meeting,

12:26  22     separate from anything that you recall Assistant

12:26  23     Sheriff --

12:26  24         A.  No.

12:26  25         Q.  -- Gross saying?

95

DENNIS KNEER - CONFIDENTIAL

BARKLEY
Court Reporters

**EXHIBIT 100**
**1034**

12:26  1     A.  No.  I don't recall anything specific other

12:26  2  than Captain Vander Horck was going to be demoted.

12:26  3     Q.  And just that piece of information -- do you

12:26  4  know whether that came from the sheriff's mouth or it

12:26  5  came from Gross's mouth?

12:26  6     A.  I don't recall who --

12:26  7     Q.  Did the sheriff -- sorry.

12:26  8         You don't recall which?

12:26  9     A.  No.

12:26 10     Q.  Did the sheriff speak at all during the one or

12:26 11  two minutes?

12:27 12     A.  I don't recall whether or not he spoke.

12:27 13     Q.  And the only three people in the room were

12:27 14  yourself, Gross, and the sheriff; or were there other

12:27 15  people present?

12:27 16     A.  I'm trying to recall who was in there.  I

12:27 17  think -- I think John Burcher may have been in there,

12:27 18  but I'm not certain.

12:27 19     Q.  And at the time was Burcher the chief of staff?

12:27 20     A.  I believe so.

12:27 21     Q.  Did it surprise you -- the decision?

12:27 22     A.  Yes.

12:27 23     Q.  Why?

12:27 24     A.  Because we had transitioned from a performance

12:27 25  log entry to a demotion.

96

DENNIS KNEER - CONFIDENTIAL

BARKLEY
Court Reporters

**EXHIBIT 100**
**1035**

12:27 1        Q.  And what about that surprised you?

12:27 2        A.  Because, again, we had transitioned from a

12:27 3   performance log entry, which I would not consider

12:27 4   discipline, to a demotion of a probationary captain.

12:28 5        Q.  So that's a dramatic jump in the significance

12:28 6   of a consequence?

12:28 7        A.  I would say that going from issuing a

12:28 8   performance log entry to a demotion is a significant

12:28 9   shift.

12:28 10       Q.  Why is it a significant shift?

12:28 11       A.  Because, as I mentioned, a performance log

12:28 12  entry is not discipline; but a demotion of a

12:28 13  probationary employee would certainly be much more

12:28 14  significant.

12:28 15       Q.  How many lieutenants are there in the

12:28 16  department?

12:28 17       A.  Approximately 352.

12:28 18       Q.  That's a -- you have a very precise

12:28 19  recollection, 72 captains, 352 lieutenants.

12:28 20            So do you know what the approximate difference

12:29 21  in pay is between a lieutenant and a captain?

12:29 22       A.  I believe it's probably -- if you're talking

12:29 23  top-step captain versus a top-step lieutenant, you're

12:29 24  probably looking at a 15 to 20 percent pay differential.

12:29 25  I would have to look up their -- their pay scales.

97

12:29  1       Q.  What would an average captain earn annually?

12:29  2       A.  I -- I don't know what the average pay is.  I

12:29  3  could look at the scale.  I believe it's probably

12:29  4  anywhere from eighteen to twenty thousand a month.  I'm

12:29  5  not sure.

12:29  6       Q.  Okay.  So a captain might make, you know,

12:29  7  somewhere north of $200,000 a year, whereas your average

12:29  8  lieutenant would make, you know, somewhere in the high

12:29  9  $100,000 a year, something like that?

12:29  10       A.  Yes.  Yes.

12:30  11       Q.  Did you -- did you say anything during this

12:30  12  meeting with the sheriff and Gross and potentially

12:30  13  Burcher about this demotion?

12:30  14       A.  I don't recall if I said anything.

12:30  15       Q.  Did you express any disagreement or concern or

12:30  16  pushback, anything like that?

12:30  17       A.  I -- I don't recall the -- whether or not I

12:30  18  expressed any disagreement.  I know that I -- as I

12:30  19  mentioned, we had gone from a performance log entry to a

12:30  20  demotion.  But I don't recall what I communicated at

12:30  21  that time.

12:30  22       Q.  So it's possible you said nothing at all?

12:30  23       A.  I don't know.

12:30  24       Q.  -- mentioned that it was stated that

12:31  25  Captain Vander Horck was a probationary employee not

98

DENNIS KNEER - CONFIDENTIAL

**EXHIBIT 100**
**1037**

BARKLEY
Court Reporters

```
12:31  1    meeting expectations.

12:31  2             Did I get that right?

12:31  3        A.  Yes.

12:31  4        Q.  Aside from that, was there any other rationale

12:31  5    or reason mentioned during this conversation to explain

12:31  6    the demotion?

12:31  7        A.  Which conversation are you talking about?

12:31  8        Q.  The conversation with Assistant Sheriff Gross

12:31  9    and Sheriff Villanueva.  Any --

12:31 10        A.  Go ahead.

12:31 11        Q.  Yeah.  So you had mentioned that it was

12:31 12    discussed during the meeting that -- or during the

12:31 13    conversation that it had been expressed that

12:31 14    Captain Vander Horck was a probationary employee not

12:31 15    meeting expectations?

12:31 16        A.  Yes.

12:31 17        Q.  Aside from that, was there any other --

12:31 18    anything else expressed during the meeting that

12:31 19    explained or justified the decision to demote

12:31 20    Captain Vander Horck?

12:32 21        A.  I don't recall.

12:32 22        Q.  Was anything related to this sexual assault

12:32 23    incident mentioned during that conversation?

12:32 24        A.  I don't recall.

12:32 25        Q.  At the time did you think that demoting
```

99

BARKLEY
Court Reporters

12:32  1    Captain Vander Horck was fair?

12:32  2         A.  I did not have much of an opinion other than,

12:32  3    as I mentioned, I was concerned that we went from a

12:32  4    performance log entry to a demotion.  But I was just

12:32  5    carrying out the orders of -- of my superiors of a

12:32  6    probationary employee.

12:32  7         Q.  Was it discussed during this conversation who

12:32  8    would take over for Captain Vander Horck at Lost Hills?

12:32  9         A.  No.  I don't recall any discussion at all.

12:33 10         Q.  Do you recall John Burcher saying anything

12:33 11    during this meeting?

12:33 12         A.  I don't recall him saying anything.

12:33 13         Q.  So what was the next thing that happened

12:33 14    related to this potential demotion after you left the

12:33 15    sheriff's office that day?

12:33 16         A.  Both Commander Reed and I carried out that

12:33 17    direction from Assistant Sheriff Gross and the sheriff.

12:33 18    And we called Captain Vander Horck back to my office or

12:33 19    to Commander Reed's office, and we explained to him that

12:33 20    he was being demoted.

12:33 21         Q.  So as you sit here today, beyond -- do you know

12:34 22    anything about -- strike that.

12:34 23              As you sit here today, do you have any basis to

12:34 24    know the rationale behind this potential demotion of

12:34 25    Captain Vander Horck other than what was said during

                                  100

DENNIS KNEER - CONFIDENTIAL

**EXHIBIT 100**
**1039**

12:37 1    North Patrol Division with oversight of the Malibu/Lost

12:37 2    Hills Station.

12:37 3         Q.  So tell me everything that you remember about

12:37 4    the conversation with Captain Vander Horck in which you

12:37 5    informed him of the demotion from captain to lieutenant.

12:37 6         A.  Both Commander Reed and I spoke to

12:37 7    Captain Vander Horck.  And I explained to him that the

12:37 8    way the issue was being handled at his station was no

12:38 9    longer going to be a performance log entry; it was going

12:38 10   to be a demotion.

12:38 11        Q.  Did you tell Captain Vander Horck that,

12:38 12   Effective at midnight tonight, you will no longer be the

12:38 13   captain at Lost Hills; and you will be demoted from

12:38 14   captain to lieutenant?

12:38 15        A.  I -- I don't recall.

12:38 16        Q.  Do you think that would be memorable to you if

12:38 17   you had made a statement like that, that effective at

12:38 18   midnight tonight, you're going to be demoted from

12:38 19   captain to lieutenant?  Does that sound like something

12:38 20   you would say?

12:38 21             MR. TOKORO:  Objection.  Vague and ambiguous.

12:38 22             THE WITNESS:  I don't know.

12:38 23   BY MR. LAVOIE:

12:38 24        Q.  Did you articulate any reason to

12:38 25   Captain Vander Horck why the situation was being

                                103

12:38  1    escalated from a performance log entry to a demotion?

12:39  2         A.  I don't recall if I expressed to him that the

12:39  3    decision was made above my level.  I -- I just don't

12:39  4    recall.

12:39  5         Q.  At any point did you tell Captain Vander Horck

12:39  6    that the sheriff had lost confidence in him to lead the

12:39  7    Lost Hills station?

12:39  8         A.  I don't recall.

12:39  9         Q.  Possible you said that?

12:39 10         A.  That may have been occurred during that

12:39 11    conversation.  I just -- at this point I don't recall.

12:39 12         Q.  You tell Captain Vander Horck who would be

12:39 13    replacing him as captain at Lost Hills?

12:39 14         A.  I don't believe the decision was made at that

12:39 15    point in time.  So I -- I just don't recall when the

12:39 16    decision was made to replace him with Captain Becerra.

12:39 17         Q.  Who made the decision to select Captain Becerra

12:39 18    specifically?

12:39 19         A.  I believe it was the sheriff.

12:39 20         Q.  The sheriff?

12:39 21         A.  That is -- yes.  That is within his -- his

12:40 22    authority and his right to appoint his captains.

12:40 23         Q.  So he chooses who gets elevated to the rank of

12:40 24    captain?  Because my understanding was that --

12:40 25         A.  No.

                                 104

**EXHIBIT 100**
**1041**

BARKLEY
Court Reporters

| | | |
|---|---|---|
| 12:44 | 1 | A. I believe he felt it was unfair that he was |
| 12:44 | 2 | being demoted. |
| 12:44 | 3 | Q. Did he seem angry at all? |
| 12:44 | 4 | A. I don't recall. |
| 12:44 | 5 | Q. Did the news seem to take him by surprise? |
| 12:44 | 6 | A. I believe he was surprised. |
| 12:44 | 7 | Q. Why do you say that? |
| 12:44 | 8 | A. Because, as I mentioned, he received a |
| 12:44 | 9 | performance log entry and then approximately three hours |
| 12:44 | 10 | later he was told that he was being demoted. |
| 12:44 | 11 | Q. Would you say that it's quite hard to attain |
| 12:44 | 12 | the rank of captain within the sheriff's department? |
| 12:44 | 13 | A. Yes. |
| 12:45 | 14 | Q. Why do you say that? |
| 12:45 | 15 | A. Well, within the patrol stations, when |
| 12:45 | 16 | Captain Vander Horck interviewed for that position, he |
| 12:45 | 17 | interviewed with nine other candidates. So there were a |
| 12:45 | 18 | total of ten candidates interviewed by five contract |
| 12:45 | 19 | cities and a county representative, and there may have |
| 12:45 | 20 | been one or two other representatives. And of all of |
| 12:45 | 21 | those ten candidates, he was chosen as top candidate. |
| 12:45 | 22 | So that's, I think, a great accomplishment. |
| 12:45 | 23 | Q. How many -- during your time as division chief, |
| 12:45 | 24 | which is approximately three years, I guess -- two and a |
| 12:45 | 25 | half years -- |

108

DENNIS KNEER - CONFIDENTIAL

**EXHIBIT 100**
**1042**

BARKLEY
Court Reporters

12:45  1        A.  It will be -- it will be three years next

12:45  2    month.

12:45  3        Q.  Okay.  So in your roughly three -- three years

12:46  4    as a division chief, how many captains have you demoted

12:46  5    to lieutenant?

12:46  6        A.  Zero.

12:46  7        Q.  So this was uncommon?

12:46  8        A.  Yes.

12:46  9        Q.  Did you pass along the rationale -- well,

12:46  10   strike that.

12:46  11       At any point during the conversation, did

12:46  12   Captain Vander Horck ask for the reasoning behind the

12:46  13   demotion?

12:46  14       A.  I don't recall whether he asked for the

12:46  15   reasoning.

12:46  16       MR. TOKORO:  Craig, I assume, based upon your

12:46  17   question earlier about whether this is a half day or

12:46  18   not, that you're trying to use the whole time, so --

12:46  19       MR. LAVOIE:  Yeah, let's take a break.

12:47  20       MR. TOKORO:  I'm thinking we should probably

12:47  21   take the lunch break now.  Maybe come back at 1:15.  And

12:47  22   then we can -- I think you've got about 45 minutes left

12:47  23   of the 3 and a half hours.  John can correct me if I'm

12:47  24   wrong, but I think we're around that time.

12:47  25       MR. LAVOIE:  Sounds good.

109

DENNIS KNEER - CONFIDENTIAL

BARKLEY
Court Reporters

**EXHIBIT 100**
**1043**

01:20 1   the first time that you had ever informed someone that

01:20 2   they would be demoted in rank?

01:20 3        A.  No.  I have discharged people before, so I

01:20 4   would say the answer to that question would be no.

01:20 5        Q.  So separate from discharging people, have

01:20 6   you -- have you told people, You're going to be demoted

01:20 7   from sergeant -- or from lieutenant to sergeant or

01:20 8   lieutenant -- or sergeant to deputy or -- have you ever

01:20 9   done that?

01:20 10       A.  I don't recall at this point.

01:20 11       Q.  So as you sit here today, the only time that

01:20 12  you can ever -- is it accurate to say that, as you sit

01:21 13  here today, the only time that you can ever recall

01:21 14  telling someone that they were demoted in rank --

01:21 15  separate from being discharged from the department,

01:21 16  being demoted in rank, this conversation with

01:21 17  Captain Vander Horck is the only one you can remember,

01:21 18  as you sit here today?

01:21 19       A.  Yes.

01:21 20       Q.  Was that a difficult conversation to have?

01:21 21       A.  Yes.

01:21 22       Q.  Why?

01:21 23       A.  Because, as I mentioned, we were transitioning

01:21 24  from a performance log entry to a demotion.  So

01:21 25  that's -- that's a pretty significant shift.

112

BARKLEY
Court Reporters

01:24  1          Q.  Do you recall who you --

01:24  2              MR. TOKORO:  Objection --

01:24  3              THE WITNESS:  Pardon me?

01:24  4      BY MR. LAVOIE:

01:24  5          Q.  Do you recall who you had heard it from that he

01:24  6      had received treatment?

01:24  7          A.  I don't recall.

01:24  8          Q.  Did you worry about him when you heard that?

01:24  9          A.  Yes.

01:24 10          Q.  Why is that?

01:25 11          A.  I think he's a very good person.  And anytime

01:25 12      somebody has a medical condition -- I'm always worried

01:25 13      about any of our employees that have a medical

01:25 14      condition, such as high blood pressure, where they have

01:25 15      to seek medical treatment.

01:25 16          Q.  Do you know whether Captain Vander Horck was

01:25 17      ever officially demoted in rank from captain to

01:25 18      lieutenant?

01:25 19          A.  I don't believe he was ever demoted officially.

01:25 20          Q.  So what happened after your conversation

01:25 21      with -- what transpired after your conversation with him

01:25 22      that resulted in him not actually being demoted?

01:25 23          A.  I recall probably three days -- three to

01:25 24      five days later being told that he was going to be

01:25 25      transferred to, I believe, one of the jail facilities or

                                    115

01:26  1    Court Services.  I can't remember.  But he was going to

01:26  2    be transferred from Malibu/Lost Hills to another

01:26  3    assignment -- a lateral transfer.

01:26  4        Q.  A lateral transfer, meaning one in which he

01:26  5    would have a different day-to-day assignment but would

01:26  6    maintain the rank of captain?

01:26  7        A.  Yes.  Maintain the rank, the pay, the prestige

01:26  8    of that position, yes.

01:26  9        Q.  Were you pleased when you heard about that

01:26  10   decision?

01:26  11       A.  I don't think I would describe it as pleased,

01:26  12   but I was -- I felt that it was the right decision to

01:26  13   maintain his position as a captain.

01:26  14       Q.  Why did you feel it was the right decision?

01:26  15       A.  Because although he had failed to communicate

01:26  16   his expectations to his personnel to ensure that

01:27  17   information would go up his chain of command, I felt

01:27  18   that the transfer was more appropriate than a demotion.

01:27  19       Q.  With respect to this incident of

01:27  20   Captain Vander Horck not being aware of something

01:27  21   significant that happened in his jurisdiction, how does

01:27  22   that rate kind of on a scale of performance lapses

01:27  23   amongst captains that you've supervised?  Is that, you

01:27  24   know, a pretty serious thing; or is that kind of on the

01:27  25   other end of the spectrum?

116

DENNIS KNEER - CONFIDENTIAL

**EXHIBIT 100**
**1046**

BARKLEY
Court Reporters

01:41 1  along with input from -- I believe from Commander Reed.

01:42 2  Q. I'm going to show you another part of your IA

01:42 3  interview transcript. This was marked as Exhibit 153.

01:42 4  Take you to the bottom of Page 4 and -- and the top of

01:42 5  Page 5. So this section right here. Just take a look

01:42 6  at that. Oh, sorry. This and then your response.

01:42 7  A. Okay. So the question at the bottom of Page 4

01:42 8  and then the answer at the top of Page 5?

01:42 9  Q. Yeah. Just review that, and let me know once

01:42 10  you've had a chance.

01:43 11  A. Okay. I've read it.

01:43 12  Q. You mention here in your department interview

01:43 13  that you were initially going to open up an

01:43 14  administrative investigation pursuant to the inquiry

01:43 15  conducted by Justin Diez.

01:43 16    Do you see that?

01:43 17  A. Yes.

01:43 18  Q. Is that true?

01:43 19  A. Yes.

01:43 20  Q. Why is that true?

01:43 21  A. Well, typically, once the supervisory inquiry

01:43 22  is completed, then based on the information that's

01:43 23  gathered, a decision is made to move forward with an

01:43 24  administrative investigation. And in this case I was

01:43 25  awaiting for that initial supervisory inquiry to make

126

DENNIS KNEER - CONFIDENTIAL

**EXHIBIT 100**
**1047**

BARKLEY
Court Reporters

01:43   1    that decision.

01:43   2         Q.  When you say "we were initially going to open

01:43   3    up an administrative investigation," was it -- was it

01:43   4    your expect -- did you form an expectation at some point

01:43   5    in time that the inquiry would yield a recommendation to

01:44   6    open an administrative investigation?

01:44   7         A.  Yes.

01:44   8         Q.  Why is that?

01:44   9         A.  Although -- I -- I was not certain because the

01:44  10    supervisory inquiry would reveal additional facts to

01:44  11    make that decision; but just based on what I knew about

01:44  12    the circumstances initially, I thought that it would

01:44  13    likely lead to an administrative investigation.

01:44  14         Q.  What about the circumstances made you think

01:44  15    that it would likely lead to an administrative

01:44  16    investigation?

01:44  17         A.  Because we had a young deputy who was showing a

01:44  18    member of the public pictures of a -- a crash scene --

01:44  19    of a helicopter crash scene.  Even if there are no dead

01:44  20    bodies revealed in the pictures, it would still be, in

01:44  21    my mind, appropriate to open up an administration --

01:44  22    administrative investigation.  But again, we are all

01:45  23    different.

01:45  24              And I think, as I mentioned before, in this

01:45  25    case the sheriff -- his -- his objective was to ensure

                                127

BARKLEY
Court Reporters

01:45 1    that these pictures had never circulated in the public

01:45 2    domain.  He was -- it was very clear to me in talking to

01:45 3    Jorge Valdez that the sheriff did not want these family

01:45 4    members to have to suffer any further grief than they

01:45 5    were already suffering.

01:45 6        Q.  And did you understand at the time -- well,

01:45 7    strike that.

01:45 8            So in this response you state, "We initially

01:45 9    were going to open up an administrative investigation

01:45 10   pursuant to the inquiry conducted by Lieutenant Diez.

01:45 11   And then approximately one month later, I had further

01:45 12   discussion with -- I believe it was Assistant Sheriff

01:45 13   Gross.  And -- and we determined that we were going to

01:45 14   move forward with an administrative investigation."

01:46 15           Is that a true statement?

01:46 16       A.  Yes, it -- it is a true statement.  I don't

01:46 17   have a specific recollection of that conversation, but

01:46 18   it would seem logical that I would have a conversation

01:46 19   with my boss regarding -- regarding this incident and

01:46 20   moving forward with an investigation.

01:46 21       Q.  The rough timeline is:  Accident happens on

01:46 22   January 26th; complaint is received from the citizen in

01:46 23   the early morning hours of Wednesday, January 29th; in

01:46 24   the next one, two, three days, there is this activity

01:46 25   related to the order to delete the photos.  Right?

128

01:46 1        Am I accurate up till this point?

01:46 2    A.  Yes.

01:46 3    Q.  Okay.  And then approximately -- so that takes

01:46 4  us through January 30th or 31st.  And then we

01:46 5  fast-forward almost a whole month to February 28th,

01:46 6  2020, when the Los Angles Times reports about things

01:46 7  related to the sheriff's department and accident scene

01:46 8  photos; right?

01:47 9    A.  Yes.

01:47 10   Q.  Was the Internal Affairs inquiry that you're

01:47 11 discussing here that you decided to open up after a

01:47 12 conversation with Assistant Sheriff Gross -- was that

01:47 13 decision made before or after the Los Angles Times

01:47 14 reported on potential misconduct by deputies related to

01:47 15 accident scene photos?

01:47 16   A.  I'm not sure if it was before or after, but it

01:47 17 was right around that time.

01:47 18   Q.  Why -- what's your understanding for why an

01:47 19 administrative investigation was opened related to

01:47 20 accident scene photos at that particular time?

01:47 21   A.  From what I can recall, I had spoken to Jorge

01:47 22 Valdez at the city managers' meeting in Universal City;

01:47 23 and he had inquired about the performance log entries

01:47 24 that were supposed to have been issued.  And I did not

01:48 25 know at that point in time if there was miscommunication

129

01:52 1    forward and deleted, there would be no discipline?  Why

01:52 2    was -- why was he disciplined, then?

01:52 3         MR. TOKORO:  Objection.  Argumentative.  Vague

01:52 4    and ambiguous.  And again, not here with a 30(b)(6)

01:52 5    witness.  His personal opinion is not relevant.

01:52 6         THE WITNESS:  There were -- there was some

01:52 7    information that was brought to the department's

01:52 8    attention after the investigation began that we were not

01:52 9    aware of.  So I consulted with county counsel to ensure

01:52 10   that I was making the right decision and ensuring that

01:53 11   Joey Cruz was held accountable for his actions.

01:53 12   BY MR. LAVOIE:

01:53 13        Q.  So you're saying there was information that the

01:53 14   reason that Joey Cruz was disciplined after the

01:53 15   administrative investigation, but not before, was

01:53 16   because the department learned things in its

01:53 17   investigation that made the conduct more serious or

01:53 18   deserving of discipline?

01:53 19        A.  I wouldn't say necessarily more serious, but

01:53 20   there was additional information.  I consulted with

01:53 21   county counsel, and I felt the best decision was to

01:53 22   impose a ten-day suspension.

01:53 23        Q.  So I'm not asking for anything about what

01:53 24   county counsel told you or the questions that you asked

01:53 25   them.

133

DENNIS KNEER - CONFIDENTIAL

**EXHIBIT 100**
**1051**

BARKLEY
Court Reporters

01:53  1          But what was the additional information that

01:53  2   you're referring to?

01:53  3      A.   There was additional information that we

01:54  4   initially were not aware of regarding the actions of

01:54  5   Joey Cruz, and it is in the investigation, and it is

01:54  6   related to -- from what I can recall, it is related to

01:54  7   showing pictures to his niece.  I believe it was his

01:54  8   niece.  And we didn't know any of that information

01:54  9   initially.

01:54 10      Q.   When you say "initially," what do you mean?

01:54 11      A.   At the onset of the supervisory inquiry when we

01:54 12   first knew about the misconduct at the bar and grill in

01:54 13   Norwalk.

01:54 14      Q.   Going to show you something that is marked as

01:54 15   exhibit -- so it's your testimony -- did you -- did you

01:55 16   consult with the sheriff at all prior to deciding to

01:55 17   open an administrative investigation in late February or

01:55 18   early March of 2020?

01:55 19      A.   No.  And if I did, I have no recollection.  But

01:55 20   no, I -- I don't believe I ever consulted with him.

01:55 21      Q.   Did you consult with Assistant Sheriff Steven

01:55 22   Gross about your decision to open an administrative

01:55 23   investigation?

01:55 24      A.   Yes.  Based on my interview with IAB, yes.  I

01:55 25   don't have that specific recollection; but I must have,

                                134

BARKLEY
Court Reporters

**EXHIBIT 100**
**1052**

02:05  1      Q.   Are you -- did any personnel other than Joey
02:06  2   Cruz receive discipline?
02:06  3      A.   No.   But there are personnel who had founded
02:06  4   charges with no discipline.   And again, that was in
02:06  5   consultation with county counsel.
02:06  6      Q.   So why in those instance -- for those
02:06  7   individuals who had founded allegations, why was there
02:06  8   no discipline?
02:06  9      A.   I consulted with county counsel when I made
02:06  10  that decision, and there are some legal concerns that we
02:06  11  had.   And I -- I don't feel comfortable speaking any
02:06  12  further about those legal concerns that we had.
02:06  13     Q.   You feel that those individuals who had
02:06  14  founded -- well, strike that.
02:06  15          What did Joey Cruz do different than the other
02:07  16  individuals who did not receive discipline that merited
02:07  17  discipline?
02:07  18     A.   He displayed the photos to a member of the
02:07  19  public.   From what I recall, another member of the
02:07  20  public either overheard or was told by the bartender.
02:07  21  And then additionally, I believe he showed his niece
02:07  22  these photos.   And I felt that was much different than
02:07  23  the other deputies.
02:07  24          From what I can recall, the other deputies'
02:07  25  actions were not as egregious.   I believe one of the

                              142

**EXHIBIT 100**
**1053**

BARKLEY
Court Reporters

```
 1              DEPOSITION OFFICER'S CERTIFICATE

 2

 3   STATE OF CALIFORNIA      }
                              }   ss.
 4   COUNTY OF LOS ANGELES    }

 5

 6          I, THERESA JOANN PHILLIPS-BLACKWELL, hereby

 7   certify:

 8          I am a duly qualified Certified Shorthand

 9   Reporter in the State of California, holder of

10   Certificate Number CSR 12700 issued by the Court

11   Reporters Board of California and which is in full force

12   and effect.  (Fed. R Civ. P. 28(a)).

13          I am authorized to administer oaths or

14   affirmations pursuant to California Code of Civil

15   Procedure, Section 2093(b) and prior to being examined,

16   the witness was first duly sworn by me.  (Fed. R. Civ.

17   P. 28(a), 30(f)(1)).

18          I am not a relative or employee or attorney or

19   counsel of any of the parties, nor am I a relative or of

20   such attorney or counsel, nor am I financially

21   interested in this action.  (Fed. R. Civ. P. 28).

22          I am the deposition officer that

23   stenographically recorded the testimony in the foregoing

24   deposition and the foregoing transcript is a true record

25                        ///
```

145

DENNIS KNEER - CONFIDENTIAL

BARKLEY
Court Reporters

**EXHIBIT 100**
**1054**

1  of the testimony given by the witness.  (Fed. R. Civ. P.

2  30(f)(1)).

3        Before Completion of the deposition, review of

4  the transcript {  } was {xx} was not requested.  If

5  requested, any changes made by the deponent (and

6  provided to the reporter) during the period allowed, are

7  appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9  Dated: November 17, 2021

10

11

12  _____

13

14

15

16

17

18

19

20

21

22

23

24

25

146

DENNIS KNEER - CONFIDENTIAL



**EXHIBIT 100**
**1055**