1  JONATHAN C. McCAVERTY (State Bar No. 210922)
   Principal Deputy County Counsel
2  jmccaverty@counsel.lacounty.gov
   OFFICE OF COUNTY COUNSEL
3  General Litigation Division
   500 West Temple Street, Suite 468
4  Los Angeles, California 90012
   Telephone:  (213) 974-1828
5  Facsimile:   (213) 626-7446
6
7  Attorneys for Defendant
   LOS ANGELES COUNTY SHERIFF'S DEPARTMENT
8
   [*Additional counsel continued on next page*.]
9

10              **UNITED STATES DISTRICT COURT**

11       **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

12

13  VANESSA BRYANT,                    | **CASE NO. 2:20-cv-09582-JFW-E**

14           Plaintiff,                | **DECLARATION OF MARC A.**
                                       | **COHEN, M.D. IN SUPPORT OF**
15      v.                             | **DEFENDANTS' OPPOSITION TO**
                                       | **PLAINTIFF'S MOTION IN LIMINE**
16  COUNTY OF LOS ANGELES, et al.,     | **NO. 2**

17           Defendants.              | Hearing Date: February 11, 2022
                                       | Time:            8:00 a.m.
18                                     | Place:           Courtroom 7A

19                                     | Assigned to Hon. John F. Walter and
20                                     | Magistrate Judge Charles F. Eick

21

22

23

24

25

26

27

28

550909.1

1   LOUIS R. MILLER (State Bar No. 54141)
    smiller@millerbarondess.com
2   MIRA HASHMALL (State Bar No. 216842)
    JASON H. TOKORO (State Bar No. 252345)
3   CASEY B. SYPEK (State Bar No. 291214)
4   MILLER BARONDESS, LLP
    1999 Avenue of the Stars, Suite 1000
5   Los Angeles, California 90067
    Telephone:   (310) 552-4400
6   Facsimile:   (310) 552-8400

7
    Attorneys for Defendants
8   COUNTY OF LOS ANGELES, LOS ANGELES COUNTY FIRE DEPARTMENT,
    JOEY CRUZ, RAFAEL MEJIA, MICHAEL RUSSELL, and RAUL VERSALES
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

550909.1

2

1          <u>DECLARATION OF MARC A. COHEN, M.D.</u>

2          I, MARC A. COHEN, M.D., declare as follows:

3     1.    I have been retained by defense counsel to conduct

4 forensic psychiatric evaluation of the Plaintiff in connection with

5 <u>Vanessa Bryant v. County of Los Angeles et al.</u>

6     2.    I have personal knowledge of the information set forth

7 herein, and if called as a witness could and would testify

8 competently thereto under oath.

9     3.    I am a physician duly licensed to practice medicine in the

10 States of California and Washington. I received an M.D. degree from

11 the University of Southern California School of Medicine in 2003. I

12 completed my psychiatric residency at the University of California,

13 Los Angeles-San Fernando Valley Psychiatry Residency Training

14 Program, and thereafter completed a fellowship in forensic psychiatry

15 at the University of California, Los Angeles-Department of Veterans

16 Affairs. I am board certified in psychiatry and forensic psychiatry

17 by the American Board of Psychiatry and Neurology. I am the Senior

18 Advisor to the Vice Dean for Education and an Associate Clinical

19 Professor of Psychiatry and Biobehavioral Sciences at the UCLA School

20 of Medicine. I am also approved by the Superior Court of California

21 in Los Angeles County as a psychiatric expert, and serve as an expert

22 and consultant to the Mental Health Court in Los Angeles County on a

23 weekly basis.  I have lectured and given presentations on multiple

24 occasions and on a variety of subjects in the field of psychiatry,

25 and have performed over 250 IMEs assessing mental damage. I have

26 testified as an expert witness on psychiatric matters in criminal and

27 civil cases in both state and federal court.  In addition to these

28 activities, I also maintain a private clinical practice in Beverly

1

1   Hills, California.  I have attached a copy of my curriculum vitae

2   attesting to my qualifications in this matter (See Exhibit 1;

3   Curriculum Vitae of Marc A. Cohen, M.D., M.S.).

4       4.    Through Ms. Casey Sypek, I requested an opportunity to

5   perform a face-to-face forensic examination of Vanessa Bryant and am

6   informed that this request was conveyed to her attorneys but was

7   declined. Although the absence of a face-to-face evaluation of

8   Vanessa Bryant limits my ability to determine whether she may have a

9   pre-existing mental condition that could help explain her response to

10  the sudden violent death of her husband and daughter, it does not

11  compromise my ability to reach the conclusions set forth in my

12  initial and supplemental reports, which are based on the kinds of

13  evidence on which forensic psychiatrists customarily rely.

14      5.    In providing the basis for Plaintiff's Motion *In Limine* to

15  exclude my expert testimony, Plaintiff's attorney states, "Dr.

16  Cohen's purported forensic psychiatric evaluation of a person he has

17  never met is both unreliable and speculative. . .his medical

18  profession expressly prohibits as unethical the practice he has

19  engaged in:  offering professional opinions about public figures

20  without personally examining them.  Rule 7.3 of American Psychiatric

21  Association's ("APA") Principles of Medical Ethics, also known as the

22  "Goldwater Rule," states:  "[I]t is unethical for a psychiatrist to

23  offer a professional opinion unless he or she has conducted an

24  examination and has been granted proper authorization for such a

25  statement."  APA, The Principles of Medical Ethics § 7.3 (See

26  Plaintiff's Motion *In Limine* #2, at pp. 8 and 9).

27      6.    Section 7.3 of the American Psychiatric Association's

28  Principles of Medical Ethics with Annotations Specific to Psychiatry

1  (the so-called Goldwater Rule) is an ethical guideline concerning

2  psychiatric comments on public figures who have not been interviewed

3  and who have not given consent.  The complete text of Section 7.3 of

4  the Principles of Medical Ethics with Annotations Especially

5  Applicable to Psychiatry states:

> On occasion psychiatrists are asked for an opinion about an
> individual who is in the light of public attention or who
> has disclosed information about himself/herself through
> public media. In such circumstances, a psychiatrist may
> share with the public his or her expertise about
> psychiatric issues in general. However, it is unethical for
> a psychiatrist to offer a professional opinion unless he or
> she has conducted an examination and has been granted
> proper authorization for such a statement (See American
> Psychiatric Association: The Principles of Medical Ethics
> With Annotations Especially Applicable to Psychiatry: 2013
> Edition. Available at:
> https://www.psychiatry.org/psychiatrists/practice/ethics/).

14  7.    The Goldwater Rule is so named because of the controversy

15  that emerged during the 1964 presidential election, when Fact

16  magazine published the results of a survey in which 12,356

17  psychiatrists were asked whether Sen. Barry Goldwater, the GOP

18  nominee, was psychologically fit for the presidency. Out of 2,417

19  total responses to the survey, 1,189 said that Goldwater was unfit

20  for office.  Goldwater eventually won a defamation suit against Fact

21  (See APA Remains Committed to Supporting Goldwater Rule; available

22  at: https://www.psychiatry.org/news-room/apa-blogs/apa-

23  blog/2017/03/apa-remains-committed-to-supporting-goldwater-rule).

24  8.    Among the most explicit of the APA's interpretations of the

25  Goldwater Rule is a 1983 entry in the *Opinions of the Ethics*

26  *Committee*.  The committee specifically took up the topic raised by

27  Plaintiff's attorney: that psychiatrists in many settings are called

28  upon to render an opinion based solely on a review of records,

1    without a personal interview (See Kroll J, Pouncey C: The ethics of

2    APA's Goldwater Rule. J Am Acad Psychiatry Law, 2016; 44: 226-235).

3    As in most of its opinions, the Ethics Committee stated its view in

4    the form of an answer to a question posed by an APA member:

5    
6    
7    
> Question: A psychiatrist testifies for the state in a
> criminal case about the competency of the defendant.  The
> psychiatrist based the testimony on medical records and did
> not examine the defendant nor have the defendant's approval
> to render an opinion.  Was this ethical?

8    
9    
10   
11   
12   
13   
14   
15   
16   
17   
18   
19   
20   
21   
22   
> Answer:  Yes. See Section 7, Annotation 3 (APA):  On
> occasion psychiatrists are asked for an opinion about an
> individual who is in the light of public attention or who
> has disclosed information about himself/herself through
> public media. In such circumstances, a psychiatrist may
> share with the public his/her expertise about psychiatric
> issues in general. However, it is unethical for a
> psychiatrist to offer a professional opinion unless he/she
> has conducted an examination and has been granted proper
> authorization for such a statement. Confusion has arisen by
> taking the second sentence above and not connecting it to
> the first sentence as was intended. It is common for
> forensic experts to offer opinions as was done according to
> the question.  Further, it would be too great an extension
> of the Goldwater Rule to say that a person, by being a
> defendant in court, has entered into "the light of public
> attention."  This annotation was developed to protect
> public figures from psychiatric speculation that harms the
> reputation of the profession of psychiatry and of the
> unsuspecting public figure (See American Psychiatric
> Association: Opinions of the Ethics Committee on The
> Principles of Medical Ethics with Annotations Especially
> Applicable to Psychiatry: 2016 Edition. Available at:
> https://www.psychiatry.org/psychiatrists/practice/ethics/).

23   
24   
        9.    The APA Ethics Committee reaffirmed this view in detail as

recently as March 2017.  For example:

25   
26   
27   
28   
> Psychiatrists have also argued that the "Goldwater Rule" is
> not sound because psychiatrists are sometimes asked to
> render opinions without conducting an examination of an
> individual. Examples occur, in particular, in certain
> forensic cases and consultative roles. This objection
> attempts to subsume the rule with its exceptions. What this
> objection misses, however, is that the rendering of

expertise and/or an opinion in these contexts is permissible because there is a court authorization for the examination (or an opinion without examination), and this work is conducted within an evaluative framework including parameters for how and where the information may be used or disseminated. In addition, any evaluation conducted or opinion rendered based on methodology that departs from the established practice of an in-person evaluation must clearly identify the methods used and the limitations of those methods, such as the absence of an in-person examination (See American Psychiatric Association: American Psychiatric Association Ethics Committee Opinion, 2017; issued 3/15/17. Available at: https://www.psychiatry.org/news-room/apa-blogs/ apa-blog/2017/03/apa-remains-committed-to-supportinggoldwater-rule/).

10.   Founded in 1969, the American Academy of Psychiatry and the Law (AAPL) is the professional organization that oversees the practice of forensic psychiatry, a medical subspecialty that includes areas in which psychiatry is applied to legal issues.  Recognizing the unique aspects of this practice, which is at the interface of the professions of psychiatry and the law, the Academy presents guidelines for the ethical practice of forensic psychiatry, including the following general rule regarding face-to-face examinations:

. . . For certain evaluations (such as record reviews for malpractice cases), a personal examination is not required. In all other forensic evaluations, if, after appropriate effort, it is not feasible to conduct a personal examination, an opinion may nonetheless be rendered on the basis of other information. Under these circumstances, it is the responsibility of psychiatrists to make earnest efforts to ensure that their statements, opinions and any reports or testimony based on those opinions, clearly state that there was no personal examination and note any resulting limitations to their opinions (See American Academy of Psychiatry and the Law Ethical Guidelines for the Practice of Forensic Psychiatry, Adopted May 2005; Available at: https://www.aapl.org/ethics-guidelines).

11.   For the reasons given above, it is entirely ethical and appropriate for a forensic psychiatrist to rely upon other sources of

5

1  information when he or she is unable to perform a face-to-face

2  examination.

3       12.   In my own experience, I have never been prevented from

4  testifying as an expert witness on psychiatric matters in criminal or

5  civil cases in both state and federal court when I have been unable

6  to perform a face-to-face examination for reasons beyond my control.

7       13.   In forming my opinions in this case, I reviewed

8  approximately 8,402 pages of material and watched over 4.5 hours of

9  video recorded testimony.  In addition, I also reviewed roughly 23

10 scientific articles and three book chapters.

11      14.   The sources of information that I reviewed and considered

12 are enumerated below:

13 Litigation-related Material

14   • Complaint For Damages, 9/17/20 (21 pgs.)

15   • Complaint re Island Express Helicopters, 6/9/21 (63 pgs.)

16   • Responses to Interrogatories (25 pgs.)

17   • Vanessa Bryant's Amended Responses, 10/5/21 (9 pgs.)

18   • Motion to Compel Independent Medical Examinations of Plaintiffs,

19     10/15/21 (31 pgs.)

20 Declaration

21   • Vanessa Bryant, 12/6/21 (5 pgs.)

22   • Christopher Chester, 12/27/21 (10 pgs.)

23 County of Los Angeles Sheriff's Department

24   • Manual of Policy and Procedures re Photographs/Recordings at

25     Scenes Where Human Remains are Present (2 pgs.)

26   • Major Incident Log, Exh. 32 (1 pg.)

27   • Response Log, Exh. 87 (26 pgs.)

28   • Incident and Supplemental Reports, Redacted, Exh. 85 (65 pgs.)

- Supplementary Report, St. Mark Marbach and Investigator Michael Valento, 1/26/20 (4 pgs.)
- Correspondence, Rafael Mejia, 1/30/20, Exh. 101 (1 pg.)
- Correspondence, Joey Cruz, 1/30/20, Exh. 117 (2 pgs.)
- Correspondence, Raul Versales, 1/31/20, Exh. 110 (1 pg.)
- Correspondence, David Katz, 1/31/20, Exh. 37 (1 pg.)
- Correspondence, Christopher Jauregui, 1/31/20, Exh. 57 (1 pg.)
- Correspondence, Michael Russell, 1/31/20, Exh. 97 (1 pg.)
- Correspondence, Lt. Hector Mancinas, 3/3/20, Exh. 56 (13 pgs.)
- Correspondence, Lt. John Satterfield, 3/4/20, Exh. 76 (1 pgs.)
- Chief's Memo, 3/4/20, Exh. 79 (14 pgs.)
- Memorandum re Douglas Johnson, 2/27/20, Exh. 58 (1 pg.)
- Memorandum re Joey Cruz, 2/27/20, Exh. 59 (1 pg.)
- Memorandum re Michael Russell, 2/27/20, Exh. 60 (1 pg.)
- Memorandum re Rafael Mejia, 2/27/20, Exh. 61 (1 pg.)
- Memorandum re Raul Versales, 2/27/20, Exh. 62 (1 pg.)
- Disposition Sheet re Joey Cruz, 7/24/20, Exh. 124 (6 pgs.)
- Notice of Completion of Investigation, 8/5/20, Exh. 63 (9 pgs.)
- Notification Letter re Sgt. Travis Kelly, 8/8/20 (8 pgs.)

County of Los Angeles Sheriff's Department: Transcribed Interviews

- Rafael Mendez, 3/10/20 (12 pgs.)
- Douglas Johnson, 3/16/20 (32 pgs.)
- David Katz, 3/18/20 (33 pgs.)
- Michael Russell, 3/30/20 (19 pgs.)
- Raul Versales, 3/30/20 (21 pgs.)
- Joey Cruz, 3/30/20 (47 pgs.)
- Christopher Jauregui, 3/31/20 (29 pgs.)
- Benjamin Sanchez, 3/31/20 (9 pgs.)

7

1    • Nicholas Bonelli, 3/31/20 (7 pgs.)

2    • Sgt. Travis Kelly, 4/7/20 (22 pgs.)

3    • Detective Scott Miller, 4/14/20 (18 pgs.)

4    • Victor Gutierrez, 4/14/20 (15 pgs.)

5    • Detective Scott Miller, 5/5/20 (2 pgs.)

6    • Lt. Hector Mancinas, 6/16/20 (22 pgs.)

7    • Cpt. Justin Diez, 6/16/20 (15 pgs.)

8    • Chief Dennis Kneer, 6/24/20 (5 pgs.)

9    • Lt. John Satterfield, 6/30/20 (10 pgs.)

10   • Cpt. Matthew Vanderhorck, 6/30/20 (10 pgs.)

11   • Sgt. Travis Kelly, 6/30/20 (14 pgs.)

12   County of Los Angeles Fire Department

13   • Internal Investigation Reports, 3/6/20, 3/17/20 (3 pgs.)

14   • Direct Order, 5/29/20, Exh. 120 (1 pg.)

15   • Intention to Suspend, 12/2/20, Exh. 121 (29 pgs.)

16   • Intention to Discharge, 12/2/20, Exh. 26 (38 pgs.)

17   • Letter re Cpt. Brian Jordan, 1/29/21 (54 pgs.)

18   Autopsy Reports

19   • Sarah Chester, 1/28/20 (20 pgs.)

20   • Payton Chester, 1/28/20 (20 pgs.)

21   • Kobe Bryant, 1/28/20 (17 pgs.)

22   • Gianna Bryant, 1/28/20 (23 pgs.)

23   • Alyssa Altobelli, 1/28/20 (21 pgs.)

24   • Keri Altobelli, 1/28/20 (20 pgs.)

25   • John Altobelli, 1/28/20 (21 pgs.)

26   • Christina Mauser, 1/28/20 (15 pgs.)

27   Miscellaneous Material

28   • AT&T Billing Statements, Exh. 99, Redacted (90 pgs.)

8

1     •   Text Messages, Partially Redacted (43 pgs.)

2     •   Social Media Posts, Exhs. 93 and 95 (49 pgs.)

3     •   Email Messages (78 pgs.)

4     •   Surveillance Video Recordings

5     •   *Lost Hills Captain Allegedly Clashed With Villanueva Over Bryant*

6         *Crash Photos*, Malibu Times, 5/11/21, Exh. 130 (3 pgs.)

7     •   *Family's Nightmare: Daughter's Accident Photos Go Viral*, ABC

8         News, 8/8/08 (4 pgs.)

9 <u>Los Angeles Times Articles</u>

10     •   *L.A. County deputies shared graphic photos of Kobe Bryant crash*

11         *scene, sources say*, 2/27/20 (2 pgs.)

12     •   *Deputies were ordered to delete Kobe Bryant crash photos to*

13         *avoid discipline, sources say*, 2/28/20 (4 pgs.)

14     •   *Vanessa Bryant sues L.A. County sheriff, alleging 'cover-up' of*

15         *Kobe Bryant crash photos*, 9/22/20 (4 pgs.)

16     •   *Vanessa Bryant wants to make public names of deputies accused of*

17         *sharing Kobe crash photos,* 2/27/21 (5 pgs.)

18 <u>Deposition Testimony: Transcripts and Exhibits</u>

19     •   Rafael Mendez, Jr., 4/13/21 (155 pgs.)

20     •   Victor Gutierrez, 4/26/21 (253 pgs.)

21     •   Anthony Marrone, 5/20/21 (201 pgs.)

22     •   William McCloud, 6/3/21 (215 pgs.)

23     •   David Katz, 9/13/21 (151 pgs.)

24     •   Marcus Phillips, 9/14/21 (96 pgs.)

25     •   Emily Tauscher, 9/15/21 (237 pgs.)

26     •   Hector Mancinas, 9/27/21 (175 pgs.)

27     •   Sky Cornell, 9/30/21 (137 pgs.)

28     •   Luella Weireter, 10/1/21 (84 pgs.)

1     • John Satterfield, 10/5/21 (204 pgs.)

2     • Jorge Valdez, 10/7/21 (286 pgs.)

3     • James Andrew Smith, 10/11/21 (128 pgs.)

4     • Vanessa Bryant, 10/12/21 (133 pgs.)

5     • Michael Russell, 10/13/21 (319 pgs.)

6     • Rafael Mejia, 10/15/21 (281 pgs.)

7     • Raul Versales, 10/18/21 (322 pgs.)

8     • Anthony Imbrenda, 10/21/21 (262 pgs.)

9     • Joey Cruz, 10/22/21 (292 pgs.)

10    • Matthew Vander Horck, 10/26/21 (258 pgs.)

11    • Christopher Jauregui, 10/27/21 (142 pgs.)

12    • Ruby Cable, 10/27/21 (157 pgs.)

13    • Benjamin Sanchez, 10/28/21 (135 pgs.)

14    • Scott Miller, 10/28/21 (140 pgs.)

15    • Christopher Chester, 10/29/21 (78 pgs.)

16    • Douglas Johnson, 11/3/21 (268 pgs.)

17    • Paul Westhead, 11/4/21 (51 pgs.)

18    • Fabio Vargas, 11/4/21 (56 pgs.)

19    • Travis Kelly, 11/4/21 (170 pgs.)

20    • Kristina McGuire, 11/8/21 (124 pgs.)

21    • Nicholas Bonelli, 11/8/21 (75 pgs.)

22    • Dennis Kneer, 11/9/21 (143 pgs.)

23    • Alex Villanueva, 11/10/21 (221 pgs.)

24    • Monica Arnold, 11/10/21 (185 pgs.)

25    • Brian Jordan, 11/11/21 (174 pgs.)

26    • David Freskos, 11/11/21 (88 pgs.)

27    • Sharia Washington, 11/12/21 (49 pgs.)

28    • Henry Shue, 11/12/21 (70 pgs.)

10

- William Jaeger, 11/15/21 (139 pgs.)
- Catherine Gasol, 11/15/21 (84 pgs.)
- Justin Diez, 11/16/21 (113 pgs.)
- Captain Erik Scott, 11/17/21 (97 pgs.)
- Mark Flores, 11/17/21 (127 pgs.)
- Rob Pelinka, 11/18/21 (76 pgs.)

Deposition Testimony: Video Recording

- Vanessa Bryant, 10/12/21 (187 minutes)
- Christopher Chester, 10/29/21 (97 minutes)

Investigative Reports

- Report, Kroll, 10/25/21 (20 pgs.)
- Supplemental Report, 11/3/21 (4 pgs.)

Scientific Literature

- Asaro M. Working with Adult Homicide Survivors, Part II: Helping Family Members Cope with Murder. *Perspectives in Psychiatric Care*, 2001; 37(4): 115-124
- Auchter J. On Viewing: The Politics of Looking at the Corpse. *Global Discourse*, 2017; 7(2): 223-238
- Bacon A, et al. Investigating the Association Between Fantasy Proneness and Emotional Distress: The Mediating Role of Cognitive Coping Strategies. *Personality and Individual Differences*, 2018; 135: 157-165
- Barrera M, et al. Patterns of Parental Bereavement Following the Loss of a Child and Related Factors. *Omega*, 2007; 55(2): 145-167
- Beck A, et al. Anxiety Disorders and Phobias: A Cognitive Perspective, 6th Ed. New York, NY: Library of Congress, 1985; at pp. 288-312

- Chapple A, et al. Viewing the Body After Bereavement Due to a Traumatic Death: Qualitative Study in the UK. *BMJ*, 2010; 340: 2032-2043

- Dyregrov K, et al. Predictors of Psychosocial Distress After Suicide, SIDS, and Accidents. *Death Studies*, 2003; 27: 143-165

- Faschingbaner T, et al. In S. Zisook (Ed)., Biopsychological aspects of bereavement. Washington, D.C.: American Psychiatric Press, 1989; at pp. 11-124

- Feigelman W, et al. How They Died, Time Since Loss, and Bereavement Outcomes. *Omega*, 2009; 58(4): 251-273

- Galea S, et al. Psychological Sequelae of the September 11 Terrorist Attacks in New York City. *The New England Journal of Medicine*, 2002; 346(13): 982-987

- Ginzburg K, et al. Patterns of Complicated Grief Among Bereaved Parents. *Omega*, 2002; 45(2): 119-132

- Hanusch F. The Visibility of Disaster Deaths in News Images: A Comparison of Newspapers From 15 Countries. *The International Communication Gazette*, 2012; 74(7): 655-672

- Harrington C, et al. Family Members' Experiences with Viewing in the Wake of Sudden Death. *Omega*, 2012; 64(1): 65-82

- Hibberd R, et al. Risk and Protective Factors for Posttraumatic Stress Disorder, Prolonged Grief, and Depression in Survivors of the Violent Death of a Loved One. *Journal of Loss and Trauma*, 2010; 15: 426-447

- Hodgkinson PE, et al. Viewing Human Remains Following Disaster: Helpful or Harmful? *Medicine, Science and the Law*, 1993; 33(3): 197-202

- Horowitz M. A model of mourning: Changes in schemes of self and other. Journal of the American Psychoanalytic Association, 1990; 38, 297-324

- Horowitz M: Stress Response Syndromes: Personality Styles and Interventions. Northvale, N.J.: Jason Aronson, Inc.; 4TH Edition 2001; at pp. 155-179

- Kaltman S, et al. Trauma and Bereavement: Examining the Impact of Sudden and Violent Deaths. *Anxiety Disorders*, 2003; 17: 131-147

- Kristensen P, et al. Parental Mental Health After the Accidental Death of a Disease During Military Service. *Journal of Nervous Mental Disorders*, 2012; 200: 63-68

- Kristensen P, et al. Bereavement and Mental Health after Sudden and Violent Losses: A Review. *Psychiatry Interpersonal and Biological Processes*, 2012; 75(1): 76-97

- Merlevede E, et al. Perceptions, Needs and Mourning Reactions of Bereaved Relatives Confronted with a Sudden Unexpected Death. *Resuscitation*, 2004; 61: 341-348

- Mowll J. Reality and regret: Viewing or not viewing the body after a sudden death. *Bereavement Care*, 2007; 26(1): 3-6

- Salerno J. Seeing Red: Disgust Reactions to Gruesome Photographs in Color (but not in Black and White) Increase Convictions. *Psychology, Public Policy, and Law*, 2017; 23(3): 336-350

- Shirley A, et al. Changes in Parents' Mental Distress After the Violent Death of an Adolescent or Young Adult Child: A Longitudinal Prospective Analysis. *Death Studies*, 1999; 23(2): 129-159

13

1    • Singh B, et al. Post-disaster morbidity of the bereaved: a

2       possible role for preventative psychiatry? *Journal of Nervous &*

3       *Mental Disease*, 1981; 169(4): 203-212

4    • Zabelina D, et al. The Association between Imagination and

5       Anxiety in the Times of the COVID-19 Pandemic. *Creativity*

6       *Research Journal,* 2021; 33(3): 264-274

7       15.   Plaintiff asserts that I "sidestep[ed]" the ethical

8  guidelines by using the heading "Preliminary Diagnostic Impressions."

9  In actuality, I used the heading "Preliminary Analysis" in my report

10 solely because I anticipated that additional material, such as mental

11 health treatment records, would be forthcoming and I did not want to

12 give the reader the impression that my opinions could not change in

13 light of new information. For that reason, I wrote in my report, "My

14 intention is to then supplement this report with details from my

15 face-to-face psychiatric evaluation of Vanessa Bryant and/or my

16 review of any available medical records. As always, my opinions are

17 subject to change in the event that I learn of additional evidence or

18 learn that any of the important factual bases of my opinions are

19 incorrect."

20      16.   As stated above, while the absence of a face-to-face

21 evaluation of Vanessa Bryant limits my ability to determine whether

22 Vanessa Bryant may have a pre-existing mental condition that could

23 help explain her response to the sudden violent death of her husband

24 and daughter, it does not compromise my ability to reach the

25 conclusions set forth in both my initial and supplemental reports,

26 which are based on the kinds of evidence on which forensic

27 psychiatrists customarily rely.

28

14

1    I declare under the penalty of perjury under the laws of the

2    State of California that the foregoing is true and correct to my own

3    personal knowledge except as to matters stated to be based upon

4    information and belief, and as to such matters I am informed and

5    believe that they are true and correct.

6

7    Executed this 17 <u>TH</u> day of January, 2022, in Beverly Hills,

8    California.

9

10   MARC A. COHEN, M.D., M.S.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15