LUIS LI (State Bar No. 156081)
Luis.Li@wsgr.com
ERIC TUTTLE (State Bar No. 248440)
Eric.Tuttle@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
633 West Fifth Street, Suite 1550
Los Angeles, California 90071
Telephone:  (323) 210-2900
Facsimile:   (866) 974-7329

CRAIG JENNINGS LAVOIE (State Bar No. 293079)
Craig.Lavoie@mto.com
JENNIFER L. BRYANT (State Bar No. 293371)
Jennifer.Bryant@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone:  (213) 683-9100
Facsimile:   (213) 687-3702

Attorneys for Plaintiff Vanessa Bryant

[*Additional counsel continued on next page.*]

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| VANESSA BRYANT,<br><br>              Plaintiff,<br><br>       v.<br><br>COUNTY OF LOS ANGELES, et al.,<br><br>              Defendants. | **CASE NO. 2:20-cv-09582-JFW-E**<br><br>**SUPPLEMENTAL JOINT STATEMENT RE: OBJECTIONS TO EXHIBITS**<br><br>Assigned to Hon. John F. Walter and Magistrate Judge Charles F. Eick<br><br>Pretrial Conf.: July 8, 2022<br>Time:              8:00 a.m.<br><br>Trial Date:     July 26, 2022<br>Time:              8:30 a.m. |

1  [*Additional counsel, continued from previous page*]

2

3  LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com

4  MIRA HASHMALL (State Bar No. 216842)
JASON H. TOKORO (State Bar No. 252345)

5  CASEY B. SYPEK (State Bar No. 291214)
MILLER BARONDESS, LLP

6  1999 Avenue of the Stars, Suite 1000

7  Los Angeles, California 90067
Tel.: (310) 552-4400 | Fax: (310) 552-8400

8

9  Attorneys for Defendants

10  County of Los Angeles, Los Angeles County Fire Department, Joey Cruz, Rafael
Mejia, Michael Russell, and Raul Versales

11

12  JONATHAN C. McCAVERTY (State Bar No. 210922)

13  *Principal Deputy County Counsel*
jmccaverty@counsel.lacounty.gov

14  OFFICE OF THE COUNTY COUNSEL

15  General Litigation Division
500 West Temple Street, Suite 468

16  Los Angeles, California 90012

17  Tel.: (213) 974-1828 | Fax: (213) 626-7446

18  Attorneys for Defendant Los Angeles County Sheriff's Department

19

20

21

22

23

24

25

26

27

28

570774.1

At the prior pre-trial conference on July 8, 2022, the Court ordered the parties to meet and confer to narrow disputes regarding trial exhibits.  Having met and conferred, Defendants have withdrawn their objections to the following exhibits: 25, 35, 36, 38, 39, 53, 54, 55, 58, 59, 60, 61, 62, 64, 65, 55, 70, 71, 72, 75, 82, 84, 88, 96, 97, 101, 110, 111, 117, 118, 119, 120, 121, 122, 123, 128, 132, 133, 134, 135, 136, 137, 138, 139, 143, 144, 145, 146, 149, 154, 155, 300, 301, 302, 303, 304, 305, 306, 307, 330, 331, 332, 333, 334, 335, 336, 337, 338, 339, 340, 341, 342, 343, 344, 345, 346, 347, 348, 349, 350, 351, 352, 353, 354, 355, 357, 38, 359, 360, 361, 362, 363, 364, 365, 366. 367, 368, 369, 370, 371, 373, 374, 375, 376, 377, 378, 379, 380, 381, 382, 383, 384, 385, 386, 387, 447, 448, 452, 454, 455, 456, 457, 458, 459, 460, 461, 462, 463, 464,470, 471.

Plaintiff has withdrawn the following exhibits:  20, 21, 22, 30, 32, 37, 43, 65, 66, 69, 71, 75, 84 109, 115, 116, 140, 141, 150, 159, 161, 163, 190, 191, 192, 194, 301, 332, 333, 334, 335, 337, 339, 341, 344, 346, 351, 353, 354, 355, 359, 360, 361, 363, 365, 366, 367, 368, 369, 370, 371, 373, 376, 378, 379, 380, 381, 382, 383, 384, 385, 386, 404, 407, 410, 413, 414, 419, 423, 426, 427, 429, 431, 433, 440, 441, 442, 445, 452, 454, 456, 457, 458, 459, 460, 461, 462, 463, 468, 469, 472, 473, 474, 475, 476, 477, 481, 482, 483, 484, 485, 486, 487, 488, 489, 490, 491, 492, 493, 494, 495, 496, 497, 498, 499, 500, 505,506, 507, 508, 509, 511, 512, 513, 514, 515, 516,517, 518, 519, 520, 521, 522, 523, 524, 525, 526, 527, 528, 529, 530, 531, 532, 533, 534, 535, 536.

The parties were not able to resolve the objections as to the exhibits discussed herein.

## PLAINTIFF'S EXHIBITS

### I.   Transcripts and Audio Recordings of Internal Investigation Interviews.

Fifty-four (54) of Plaintiff's exhibits to which Defendants object are transcripts and audio recordings of excerpts of internal investigation interviews related to the photos.

❖ <u>Plaintiff's Exhibits 38A & 38B:</u> Transcript Excerpts and Audio Excerpts of David Katz LASD Interview – Witnesses: David Katz, Doug Johnson

❖ <u>Plaintiff's Exhibits 39A & 39B:</u> Transcript Excerpts and Audio Excerpts of Marcus Phillips LASD Interview – Witnesses: Marcus Phillips, Hector Mancinas, William Jaeger, Adam Bercovici

❖ <u>Plaintiff's Exhibits 55A & 55B:</u> Transcript Excerpts and Audio Excerpts of Hector Mancinas LASD Interview – Witnesses: Marcus Phillips, Hector Mancinas, William Jaeger, Adam Bercovici

❖ <u>Plaintiff's Exhibits 88A & 88B:</u> Transcript Excerpts and Audio Excerpts of Andrew Smith Fire Department Interview – Witnesses: Andrew Smith

❖ <u>Plaintiff's Exhibits 96A & 96B:</u> Transcript Excerpts and Audio Excerpts of Michael Russell LASD Interview – Witnesses: Michael Russell, Ben Sanchez, William Jaeger, Scott Johnson, Adam Bercovici

❖ <u>Plaintiff's Exhibits 111A & 111B:</u> Transcript Excerpts and Audio Excerpts of Raul Versales LASD Interview – Witnesses: Raul Versales, Doug Johnson, Rafael Mejia, Travis Kelly, Christopher Jaurequi, William Jaeger, Scott Johnson, Adam Bercovici

❖ <u>Plaintiff's Exhibits 123A & 123B:</u> Transcript Excerpts and Audio Excerpts of Joey Cruz LASD Interview – Witnesses: Joey Cruz, Rafael Mejia, William Jaeger, Scott Johnson, Adam Bercovici

❖ <u>Plaintiff's Exhibits 128A & 128B:</u> Transcript Excerpts and Audio Excerpts of Matthew Vander Horck LASD Interview – Witnesses: Matthew Vander Horck, Hector Mancinas, Dennis Kneer, Alex Villanueva, William Jaeger, Adam Bercovici

❖ <u>Plaintiff's Exhibits 134A & 134B:</u> Transcript Excerpts and Audio Excerpts of Christopher Jaurequi LASD Interview – Witnesses: Christopher Jaurequi, Rafael Mejia, Raul Versales, William Jaeger, Scott Johnson, Adam Bercovici

❖ <u>Plaintiff's Exhibits 135A & 135B:</u> Transcript Excerpts and Audio Excerpts of Scott Miller LASD Interview No. 1 (Apr. 14, 2020) – Witnesses: Scott Miller, Raul Versales, William Jaeger, Adam Bercovici

❖ <u>Plaintiff's Exhibits 136A & 136B:</u> Transcript Excerpts and Audio Excerpts of Scott Miller LASD Interview No. 2 (May 5, 2020) – Witnesses: Scott Miller, William Jaeger, Scott Johnson, Adam Bercovici

❖ <u>Plaintiff's Exhibits 138A & 138B:</u> Transcript Excerpts and Audio Excerpts of Ben Sanchez LASD Interview No. 1 (Mar. 31, 2020) – Witnesses: Ben Sanchez, William Jaeger, Adam Bercovici

❖ <u>Plaintiff's Exhibits 143A & 143B:</u> Transcript Excerpts and Audio Excerpts of Doug Johnson LASD Interview No. 1 (Mar. 16, 2020) – Witnesses: Doug Johnson, William Jaeger, Raul Versales, Fabio Vargas, Adam Bercovici

❖ <u>Plaintiff's Exhibits 144A & 144B:</u> Transcript Excerpts and Audio Excerpts of Travis Kelly LASD Interview No. 2 (June 30, 2020) – Witnesses: Travis Kelly, Mark Flores, Adam Bercovici

❖ <u>Plaintiff's Exhibits 145A & 145B:</u> Transcript Excerpts and Audio Excerpts of Travis Kelly LASD Interview No. 1 (Apr. 7, 2020) – Witnesses: Travis Kelly, Mark Flores, Adam Bercovici

❖ <u>Plaintiff's Exhibits 149A & 149B:</u> Transcript Excerpts and Audio Excerpts of Nicholas Bonelli LASD Interview – Witnesses: Nicholas Bonelli, William Jaeger, Adam Bercovici

❖ <u>Plaintiff's Exhibits 332A & 332B:</u> Transcript Excerpts and Audio Excerpts of Ruby Cable LASD Interview – Witnesses: Ruby Cable, Rafael Mejia, Adam Bercovici

❖ <u>Plaintiff's Exhibits 336A & 336B:</u> Transcript Excerpts and Audio Excerpts of Tony Imbrenda Fire Department Interview – Witnesses: Tony Imbrenda, William McCloud, Anthony Marrone, Adam Bercovici

❖ <u>Plaintiff's Exhibits 345A & 345B:</u> Transcript Excerpts and Audio Excerpts of Doug Johnson LASD Interview No. 2 (May 5, 2020) – Witnesses: Doug Johnson, Jaeger, Scott Johnson, Adam Bercovici

❖ <u>Plaintiff's Exhibits 346A & 346B:</u> Transcript Excerpts and Audio Excerpts of Doug Johnson Fire Department Interview No. 1 (July 24, 2020) – Witnesses: Doug Johnson, Brian Jordan, Anthony Marrone, Adam Bercovici

❖ <u>Plaintiff's Exhibits 348A & 348B:</u> Transcript Excerpts and Audio Excerpts of Brian Jordan Fire Department Interview No. 1 (Apr. 6, 2020) – Witnesses: Brian Jordan, Anthony Marrone, William McCloud, Adam Bercovici

❖ <u>Plaintiff's Exhibits 350A & 350B:</u> Transcript Excerpts and Audio Excerpts of Arlin Kahan Fire Department Interview – Witnesses: Arlin Kahan, William McCloud, Anthony Marrone, Adam Bercovici

❖ <u>Plaintiff's Exhibits 357A & 357B:</u> Transcript Excerpts and Audio Excerpts of Anthony Marrone Fire Department Interview – Witnesses: Arlin Kahan, William McCloud, Anthony Marrone, Brian Jordan, Adam Bercovici

❖ <u>Plaintiff's Exhibits 361A & 361B:</u> Transcript Excerpts and Audio Excerpts of Rafael Mejia LASD Interview – Witnesses: Rafael Mejia, Ruby Cable, Joey Cruz, William Jaeger, Scott Johnson, Adam Bercovici

❖ <u>Plaintiff's Exhibits 376A & 376B:</u> Transcript Excerpts and Audio Excerpts of Ben Sanchez LASD Interview No. 2 (May 5, 2020) – Witnesses: Ben Sanchez

❖ <u>Plaintiff's Exhibits 377A & 377B:</u> Transcript Excerpts and Audio Excerpts of Erik Scott Fire Department Interview – Witnesses: Erik Scott, Tony Imbrenda, Sky Cornell, Luella Weireter

❖ <u>Plaintiff's Exhibits 465A & 465B:</u> Transcript Excerpts and Audio Excerpts of Dennis Breshears Fire Department Interview – Witnesses: Dennis Breshears, William McCloud, Anthony Marrone

**Defendants' Grounds for Objection:** Completeness. (FRE 106.)

**Plaintiff's Response to the Objection:**  As discussed at the last pretrial conference, Plaintiff reserves the right to use the complete audio recordings (and associated transcripts) as impeachment for all witnesses.  But she also seeks to offer as affirmative evidence a very limited portion of these recordings, for certain witnesses, consisting of key admissions.  At the pretrial conference, the Court directed Plaintiff to identify just those portions she seeks affirmatively to admit, prepare excerpts, and provide them to Defendants.  That would allow Defendants, in turn to (1) make any objections to those specific portions, and (2) identify any other portions that Defendants believe must be included under the Rule of Completeness (Rule 106).  As the Court noted, this process would help the parties streamline the case for trial.

Plaintiff followed the Court's guidance and provided Defendants with the limited portions she seeks to admit affirmatively.  These excerpts are attached as **Exhibit B** to the Lavoie Declaration.  As the Court also suggested, Plaintiff will prepare new versions of the exhibits (both audio and transcripts) containing just those excerpts.  A table setting forth the numbering schemes for the excerpted audio and transcripts, as well as the full audio and transcripts (which will be used for impeachment only), is attached as **Exhibit A** to the Lavoie Declaration.

Defendants responded by counter-designating a massive amount of material, purportedly under Rule 106.  Defendants' counter-designated are reflected in **Exhibit C** to the Lavoie Declaration.  In some instances, to reduce disputes, Plaintiff agreed that the information could be added under Rule 106.  Plaintiff has accepted those portions as additions to her excerpts (indicated in yellow highlighting in **Exhibit C**).  But in many instances, the counter-designations have nothing to do with the Rule of Completeness and simply involve Defendants designating other, self-serving parts of the recordings on other topics that they like.  These improper counter-designations are highlighted in blue in **Exhibit C**.

For example, Plaintiff designated a 45-second portion of Reserve Deputy

David Katz's interview in which he testified that he told Deputy Johnson not to take any pictures of the site and Deputy Johnson responded that it was too late because he'd already taken over 100 pictures (having been directed to do so, he claimed, by the command post).  This passage is highly relevant because it establishes that Johnson took over 100 photos of the scene, something Johnson himself now denies. In response to Plaintiff's 45-second designation, Defendants counter-designated 6 minutes and 14 seconds of Katz's interview—*i.e.*, more than 8 times the length of Plaintiff's targeted designation.  Defendants' counter-designations do not involve this topic of what Johnson told Katz regarding the number of photos he took, let alone something that would prevent Plaintiff's clip from being misleading (as the Rule of Completeness addresses).  Rather, Defendants' portions relate to entirely different topics that Defendants apparently believe are helpful to them, including: (i) whether Katz himself took photos of the crash scene; (ii) whether Sergeant Ray Armstrong was ever at the crash scene; (iii) whether David Katz subsequently told Sergeant Armstrong about the statement Johnson had made to him; and (iv) whether Katz's search and rescue team would have taken photos of the crash scene had it not been for Sergeant Armstrong's order not to do so.

As another example, for firefighter Andrew Smith, Plaintiff included a single 15-second clip in which Mr. Smith said that the Fire Department had no need for graphic photos of bodies at this incident, as well as approximately 45 seconds of material setting forth Smith's basic background and role at the crash site. Defendants then counter-designated nearly 8 minutes of material on numerous unrelated topics—*i.e.*, more than 30 times the length of Plaintiff's targeted designation.

These are not proper completeness designations.  They are self-serving hearsay not subject to any exception, and Defendants may not use the Rule of Completeness to play them for the jury.  If Defendants wish to elicit these points from their witnesses, they can call them as witnesses and do so.

The purpose of the Rule of Completeness is to prevent the introduction of "a misleadingly-tailored snippet" from a prior statement or record. *United States v. Collicott*, 92 F.3d 973, 983 (9th Cir. 1996). "The Rule does not, however, require the introduction of *any* unedited writing or statement merely because an adverse party has introduced an edited version." *United States v. Vallejos*, 742 F.3d 902, 905 (9th Cir. 2014). Rather, it is "perfectly proper" to admit only segments of a prior statement, and "adverse parties are not entitled to offer additional segments just because they are there." *Id.* (quoting *Collicott*, 92 F.3d at 983). Additional material proposed by the adverse side should not be admitted under the Rule unless admission would "serve to correct a misleading impression in the edited statement that is created by taking something out of context." *Id.* (internal quotation omitted).

This is particularly important where a party is seeking to admit its opponent's inculpatory admissions. Such admissions are not hearsay when offered against the opponent because they are party opponent statements under Rule 801(d)(2). But other statements made by the party (e.g., self-serving or exculpatory statements) are inadmissible hearsay if offered by the opponent "even if they were made contemporaneously with [the] self-inculpatory statements." *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000).

The Rule of Completeness is not a vehicle for making an end-run around the hearsay rule and dropping in self-serving party statements. *Id.*; *Collicott*, 92 F.3d at 983. On the contrary, "Rule 106 'does not compel admission of otherwise inadmissible hearsay evidence.'" *Collicott*, 92 F.3d at 983. Unless the additional material sought to be added under Rule 106 will "[s]erve to correct a misleading impression of a prior statement created by taking [the party's] comments out of context," then the additional hearsay material is "inadmissible, regardless of Rule 106." *Id.*

Thus, in *Vallejos*, the Ninth Circuit affirmed the admission of a redacted portion of the defendant's confession and rejected the defendant's arguments that

other parts should have been admitted to show the jury the "flavor of the interview" and to show him in a good light.  742 F.3d at 905.  Whatever the relevance of that information, "the redacted statement was not misleading and therefore . . . the Rule of Completeness did not require admission" of the other portions.  *Id.*  Similarly, the Ninth Circuit affirmed rejection of a defendant's additional material under Rule 106 because there was no evidence that the excerpts were "'misleadingly-tailored snippet[s]' taken out of context."  *United States v. Smith*, 659 F. App'x 908, 914 (9th Cir. 2016).  The defendant was not permitted to admit "several somewhat-exculpatory statements" under Rule 106 simply because he alleged that they would make the excerpts less "misleading as a whole." *Id.*

Numerous other courts have held that the Rule of Completeness does not allow a party to introduce its own self-serving hearsay under the guise of providing context with Rule 106.  *See, e.g.*, *Ortega*, 203 F.3d at 682; *United States v. Sine*, 493 F.3d 1021, 1037 n.17 (9th Cir. 2007) ("The Federal Rules of Evidence's 'principle of completeness' also does not allow the admission of otherwise inadmissible statements."); *United States v. Mitchell*, 502 F.3d 931, 965 n.9 (9th Cir. 2007) ("Rule 106 does not render admissible otherwise inadmissible hearsay."); *United States v. Ford*, 761 F.3d 641, 652 (6th Cir. 2014) ("[T]he rule of completeness is not designed to make something admissible that should be excluded. . . . [E]xculpatory hearsay may not come in solely on the basis of completeness.") (quotation omitted); *United States v. Lentz*, 524 F.3d 501, 526 (4th Cir. 2008) ("Rule 106 does not, however, 'render admissible the evidence which is otherwise inadmissible under the hearsay rules.'") (quotation omitted); *United States v. Lopez-Figueroa*, 316 F. App'x 548, 549–50 (9th Cir. 2008) ("[A]ny exculpatory statements by [defendant] were hearsay and were therefore not admissible, notwithstanding Rule 106."); *United States v. Tomlin*, 64 F.3d 667, at *2 (9th Cir. 1995) (table opinion); *United States v. Meraz*, 663 F. App'x 580, 581–82 (9th Cir. 2016).

1    After Plaintiff pointed out that many of Defendants' counter-designations

2  were improper, Defendants reversed course.  Even though Plaintiff has undertaken

3  the effort to identify the limited portion of the recordings she seeks to admit

4  affirmatively, as the Court rightly directed her to do, Defendants now contend there

5  is no need for such designations.  They now argue for the first time that the entire

6  recordings should be pre-admitted for either party's use, and they speciously claim

7  they are adopting Plaintiff's view.  But Plaintiff has never advocated for blanket pre-

8  admission of the interviews for Defendants' use.  The interviews are plainly

9  "inadmissible hearsay if offered by Defendants (FRE 802)," and Plaintiff has

10  consistently maintained this position.  (*See, e.g.*, Dkt. 303 at ¶¶ 38, 55, 88, 134, 138,

11  143-144; Dkt. 232 [same].)[1]

12    **Defendants' Response:** Defendants have agreed to withdraw their objections

13  to the entire interview transcripts and recordings.  This issue should be resolved, and

14  the Court should not have to rule on it.  Nonetheless, Plaintiff insisted on raising this

15  issue once again with the Court.

16

17  ─────────────────────

18  [1] One of Plaintiff's purposes for the internal investigation materials is to show (i) the
    interviews occurred long after the crash; (ii) the interviews were (in many instances)

19  very brief; and (iii) the investigators' review of the deputies' phones was short and
    cursory.  For example, Stephanie Shrout was known at the time to have received

20  photos from Sgt. Travis Kelly, but she was interviewed for only 14 minutes and
    more than three months after Ralph Mendez's complaint to the Sheriff's

21  Department.  Similarly, Department investigators visually inspected Chris
    Jauregui's cell phone for only 1 minute and 34 seconds.  These objective,

22  undisputed facts are known from the transcripts and recordings of the Sheriff's
    Department interviews.  To obviate the need to designate these portions, however,

23  Plaintiff proposed a summary chart that sets forth this objective information.  *See*

24  Lavoie Declaration, **Exhibit G**.  Plaintiff further provided citations for each piece of
    data in the chart to enable Defendants to verify it themselves.  Without disputing the

25  accuracy of any information in the chart, Defendants refused to stipulate to the
    chart, necessitating significant designations of the interview materials to capture: (i)

26  the interview date and start time; (ii) the period that investigators visually inspected

27  phones; and (iii) the end time of the interview.

28

1    Here is what happened:

2    Initially, Plaintiff sought to introduce voluminous records of the Internal

3    Affairs Bureau interviews in both transcript and audio form.  Defendants objected

4    on the grounds that the entire transcripts would be needlessly time-consuming,

5    confusing and irrelevant, as Plaintiff concedes the sufficiency of the County's

6    investigation cannot be a basis for her *Monell* claim.  Defendants further objected to

7    admission of the entire interview transcripts on the grounds that they are ripe with

8    hearsay.  Defendants do not believe that every statement by any County employee is

9    a party admission.

10   At the July 8 pretrial conference, the Court admonished the parties to try and

11   reach agreement and to minimize the disputes with respect to these (and all other)

12   trial exhibits.  The Court suggested that Plaintiff provide Defendants with interview

13   excerpts that she would seek to introduce as party admissions so that Defendants

14   could more specifically respond and raise appropriate objections.

15   Plaintiff provided Defendants with her selected excerpts.  Defendants

16   provided counter-designations to ensure the exhibits were complete and not

17   misleading, consistent with Rule 106.  Defendants' counter-designations were

18   reasonable and appropriate.  For example:

19   • Plaintiff designated a misleading snippet from Deputy Cruz's interview in

20      which Cruz said that Kobe Bryant was depicted in one of the crash site

21      photos.  Defendants counter-designated the question-and-answer immediately

22      following this snippet, in which Deputy Cruz explained that he only learned

23      Kobe Bryant was involved in the crash from the media; and that it was *not*

24      apparent from the photo that it depicted Kobe Bryant.  Without these counter-

25      designations, Plaintiff's edited statement creates a misleading impression that

26      Kobe Bryant could be identified by simply looking at the photo.

27   • Plaintiff provided a misleadingly-tailored snippet from Deputy Russell's

28      interview about Deputy Russell sending crash site photos to Deputy

Sanchez.  Defendants counter-designated the portion immediately following Plaintiff's excerpt, in which Deputy Russell described the content of the photos he sent.  These counter-designations are critical to correct an otherwise misleading impression that the photos were focused on gory imagery.

- Plaintiff provided an excerpt from Deputy Versales' interview about the contents of the photos he received from Deputy Johnson.  Defendants counter-designated the portion immediately following Plaintiff's excerpt, in which Deputy Versales proceeded to describe the content of the photos and why the content was helpful for his investigation and identifying the helicopter.  Without the counter-designations, Plaintiff's edited excerpt is incomplete and creates a misleading impression that Deputy Versales had no official purpose for receiving crash site photos.

- Plaintiff provided an excerpt of Deputy Katz's interview in which he described telling Deputy Johnson not to take any photos of the crash site; and hearing from Deputy Johnson that it was too late—he had already taken photos.  Defendants counter-designated the portions immediately preceding and immediately after Plaintiff's excerpt, in which Deputy Katz explained where the order not to take photos came from (Sergeant Armstrong); why he relayed Sergeant Armstrong's order to Deputy Johnson; and his reaction to Deputy Johnson taking photos of the site.  These counter-designations are critical to correct the misleading impression from Plaintiff's edited statement that Deputy Johnson had improperly taken photos of the scene.

Plaintiff then responded with objections to the same portions of the transcripts that she had previously sought to introduce in their entirety.  To avoid burdening the Court with unnecessary disputes, Defendants agreed to withdraw their objections and admit the transcripts in their entirety, as Plaintiff had wanted all along.  Defendants took the Court's statements at the July 8 pretrial conference to heart.

1    Now, Plaintiff has changed her position.  Defendants backed off their

2  objections to eliminate all disputes over the transcripts.  Still, Plaintiff insists that

3  the Court should rule on the propriety of Defendants' counter-designations.  From

4  Defendants' perspective, this issue is moot.  The entire transcripts can be pre-

5  admitted, and Plaintiff can highlight whichever portions she chooses with the

6  jury.  She should not, however, be permitted to admit only select portions that are

7  misleading out of context.

8  **II.    <u>Autopsy Reports.</u>**

9    Six (6) of Plaintiff's exhibits to which Defendants object are autopsy reports

10  for individuals who passed away in the helicopter crash but are not related to

11  Plaintiff:

12    ❖ <u>Plaintiff's Exhibit 41:</u>  Sarah Ellen Chester Autopsy Report (COLA029922-

13      COLA029941) – Witnesses: Emily Tauscher, Kristina McGuire

14    ❖ <u>Plaintiff's Exhibit 42:</u>  Payton Chester Autopsy Report (COLA029802-

15      COLA029821) – Witnesses: Emily Tauscher, Kristina McGuire

16    ❖ <u>Plaintiff's Exhibit 49:</u>  Alyssa Altobelli autopsy report – Witnesses: Emily

17      Tauscher, Kristina McGuire

18    ❖ <u>Plaintiff's Exhibit 50:</u>  Christina Mauser autopsy report – Witnesses: Emily

19      Tauscher, Kristina McGuire

20    ❖ <u>Plaintiff's Exhibit 51:</u>  Keri Altobelli autopsy report – Witnesses: Emily

21      Tauscher, Kristina McGuire

22    ❖ <u>Plaintiff's Exhibit 52:</u>  John Altobelli autopsy report – Witnesses: Emily

23      Tauscher, Kristina McGuire

24    **Defendants' Grounds for Objection:**  Irrelevant (FRE 104(b), 401, 402);

25  More prejudicial than probative (FRE 403).

26    **Joint Statement of the Parties:**  To preserve the dignity of the other victims

27  and their families, the parties propose that the autopsy reports of Christina Mauser,

28  the Altobellis, and (if the cases are not consolidated) the Chesters not be pre-

admitted into evidence, but rather Plaintiff shall retain the option to seek admission of these exhibits to the extent they deem it necessary during trial, and Defendants shall reserve the right to object to admission at such time.

### III.   Fire Department Letters to Brian Jordan, Tony Imbrenda, and Arlin Kahan (Exs. 26-28).

Three (3) of Plaintiff's exhibits to which Defendants object are letters from the Los Angeles County Fire Department to Brian Jordan, Tony Imbrenda, and Arlin Kahan, informing them that the Department intended to discharge or suspend them:

❖ Plaintiff's Exhibit 26:  Letter from McCloud (LACFD) to Jordan re Intention to Discharge – Witnesses: William McCloud, Brian Jordan, Anthony Marrone, Adam Bercovici.

❖ Plaintiff's Exhibit 27:  Letter from McCloud (LACFD) to Imbrenda re Intention to Discharge – Witnesses: William McCloud, Tony Imbrenda, Anthony Marrone, Adam Bercovici.

❖ Plaintiff's Exhibit 28:  Letter from McCloud (LACFD) to Kahan re Intention to Suspend – Witnesses: William McCloud, Arlin Kahan, Anthony Marrone, Adam Bercovici.

**Defendants' Grounds for Objection:**  Irrelevant (FRE 104(b), 401, 402); More prejudicial than probative (FRE 403); Subsequent remedial measures (FRE 407).

**Plaintiff's Response to the Objections:**  Exhibits 26-28 are letters from Deputy Fire Chief William McCloud to former Fire Captain Brian Jordan, Firefighter Specialist (then-Captain) Tony Imbrenda, and Fire Captain Arlin Kahan setting forth the Fire Department's official conclusions as to its three employees' misconduct involving the photos at issue in this case.  Plaintiff's rationale for the admissibility of these letters is fully set forth in Plaintiff's motion *in limine* #5.

The Department's letter to Jordan (Ex. 26) states that "[t]here was no legitimate business need for [Jordan] to take photographs of human remains" at the

crash site; that Jordan's "photographs . . . of the fuselage and human remains at the [site] did not further the [Fire] Department's mission" and "had no intel value or legitimate business purpose"; and that Jordan's taking and distribution of the photos "only served to appeal to baser instincts and desires for what amounted to visual gossip."

Similarly, the Department's letter to Imbrenda (Ex. 27) states that Imbrenda "failed to show commitment to [his] job as the Department's PIO" when he "shared sensitive photos [he] obtained through the course of regular business in a public setting with no apparent business need for doing so." According to the letter, Imbrenda showed pictures "depict[ing] feet, shoes, a torso, a person bent in half, and human organs," which was "wholly inappropriate" and showed no "regard for the public trust, or the dignity and privacy of the deceased or their families." The Department further determined that Imbrenda engaged in a "primarily self-serving" "attempt to cover up [his] role in the reported misuse of the photos" by deleting the photos and instructing others to do so.

Finally, the Department's letter to Kahan states that "[t]here was no legitimate business need for [Kahan] to take photographs of human remains" at the site; that Kahan's "photographs . . . of the fuselage and human remains at the [site] did not further the [Fire] Department's mission" and "had no intel value or legitimate business purpose"; and that Kahan's taking and distribution of the photos "only served to appeal to baser instincts and desires for what amounted to visual gossip."

These findings by the Fire Department are squarely relevant and not unfairly prejudicial because numerous elements of Plaintiff's claims turn on whether Defendants' taking and sharing of photos of her loved ones' remains was warranted and legitimate. The letter to Imbrenda also tends to show Imbrenda's culpable state of mind when he directed widespread spoliation within the Department—spoliation for which the Department itself is ultimately responsible.

For this highly probative evidence, Defendants continue to recycle their "abandonment" objection, claiming the letters should be excluded because they are supposedly only relevant to a *Monell* theory that is no longer part of the case.  Once again, they are wrong on both fronts.  Defendants' post-violation conduct does not relate to any independent theory of *Monell* liability.  It is instead evidence that tends to establish Defendants' *Monell* liability under two alternative theories, including the failure to train theory, because it is probative of Defendants' deliberate indifference and pre-existing custom.  *See, e.g.*, *Rodriguez*, 891 F.3d at 802-03 ("We have recognized that a § 1983 plaintiff may prove the second type of *Monell* liability"—i.e., "fail[ure] to train employees in a manner that amounts to 'deliberate indifference' to a constitutional right"—"through evidence of a 'failure to investigate and discipline employees in the face of widespread constitutional violations.'").  More to the point, these letters are not mere evidence related to the adequacy of the Fire Department's investigation and the discipline it intended to impose.  Rather, these letters contain official Department findings and admissions about the underlying facts that go to the heart of *all* of Plaintiff's claims and theories of liability—the content of the photos, the sharing by Department personnel, the lack of any legitimate business need for the photos, the reprehensible nature of the misconduct, and the Fire Department's spoliation.

Defendants' objection that the letters should be excluded in their entirety under Rule 407 as subsequent remedial measures also lacks merit.  Courts have consistently drawn a distinction between the *retrospective findings* of internal investigations, like the Fire Department letters, and a party's *actual remedial actions*—i.e., actions taken after the event that were designed to make "an earlier injury or harm less likely to occur."  Fed. R. Evid. 407.  As these courts have repeatedly held, Rule 407 protects only the actual remedial measures themselves, such as the actual disciplining of officers; Rule 407 does *not* protect admissions made in an investigation or analysis of an incident—even if those admissions lead to

- 17 -

or support the discipline or other remedial measure, and even if those admissions appear in the same document alongside discussion of discipline or other remedial action.  *See, e.g.*, *Hansen v. Werner Enterprises Inc.*, 2016 WL 7479349, at *4 (C.D. Cal. May 18, 2016) ("Rule 407 applies only to remedial measures actually taken by Defendants; it does not apply to Defendants' internal investigations or reports created in the process of determining the appropriate remedial actions."); *Rigsbee v. City & Cnty. of Honolulu*, 2019 WL 1064106, at *2 (D. Haw. Mar. 6, 2019) ("The doctrine of subsequent remedial measures does not extend to internal investigations. Subsequent remedial measures include only the actual remedial measures themselves and not the initial steps toward ascertaining if a remedial measure is required."); *Aranda v. City of McMinnville*, 942 F. Supp. 2d 1096, 1103 (D. Or. Apr. 29, 2013) ("By its terms, [Rule 407] is limited to measure that would have made the harm less likely to occur; it does not extend to post-incident investigations into what *did* occur."); *see also Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 430–31 (5th Cir. 2006) ("[B]y themselves, post-accident investigations would not make the event 'less likely to occur;' only the actual implemented changes make it so."); *J.M. v. City of Milwaukee*, 249 F. Supp. 3d 920, 932 (E.D. Wis. 2017) ("The remedial act—firing [the police officer]—is not inextricably intertwined with the investigation leading to that act, namely the determination in the Discharge Proceedings that his search was unreasonable"); *In re Chicago Flood Litig.*, 1995 WL 437501, at *5 (N.D. Ill. July 21, 1995) ("City statements regarding the actions of its employees are not themselves remedial; instead, they merely explain why the city elected to pursue disciplinary action.").

For example, in *Bonds v. Dautovic*, 725 F. Supp. 2d 841 (S.D. Iowa 2010), a city attempted to exclude a chief of police's statements about an officer's inappropriate use of force that were made after an internal investigation.  The court rejected the city's position, explaining that "Rule 407 only applies to instances when 'measures are taken that, if taken previously, would have made the injury or harm

less likely to occur,'" and the chief's statements about the officer's improper use of force were not "'measures' that could have been taken prior to the incident such that they could 'have made the injury or harm less likely to occur.'"  *Id.* at 848–49 (quoting FRE 407).

Similarly, in *Aguilar v. City of Los Angeles*, 853 F. App'x 92 (9th Cir. 2021) (unpublished), the Ninth Circuit held that a district court erred in excluding findings of police department investigation of an arrestee's death.  "If the LAPD Findings had prompted disciplinary action, policy changes, or the like, then evidence of *those subsequent remedial actions* would have been inadmissible to prove culpable conduct. in a wrongful death action."  *Id.* at 95 (unpublished).  "But the LAPD Findings themselves were retrospective, not remedial; they assessed what happened and whether the officers' actions were consistent with LAPD policy, without meting out discipline or changing LAPD policy."

Numerous other courts have affirmed the admissibility of post-incident investigation findings, even when they appear in the same document that discusses discipline or other remedial measures.  *See, e.g.*, *Rigsbee*, 2019 WL 1064106, at *2 (excluding "Recommendations" section of report as describing remedial measures, but admitting remaining sections that "provide factual background, opinions, and analysis as to what happened during the actual events at issue in the case" as opposed to "describ[ing] subsequent remedial measures that the [municipalities] implemented as a result"); *In re Chicago Flood Litig.*, 1995 WL 437501, at *5 (admitting city's statements regarding actions of its employees, which "explain why the city elected to pursue disciplinary action," but stating court would "consider a request by the city to redact references to disciplinary actions taken against particular employees from any statement offered by plaintiffs").

Defendants cite *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1417 (9th Cir. 1986), but the Ninth Circuit recently characterized that decision as standing for the unremarkable proposition "that a 'disciplinary proceeding [against a police officer]

constituted a remedial measure.'" *Aguilar*, 853 F. App'x at 95.  Like *Aguilar*, other courts applying *Maddox* have observed "a distinction . . . between the actual disciplining of officers for their conduct, which could constitute a remedial measure, and the investigation that precedes a disciplinary process." *Aranda*, 942 F. Supp. 2d at 1104; *J.M. v. City of Milwaukee*, 249 F. Supp. 3d 920, 932 (E.D. Wis. 2017) ("The remedial act—firing [the police officer]—is not inextricably intertwined with the investigation leading to that act, namely the determination in the Discharge Proceedings that his search was unreasonable. . . . Per the text of FRE 407, [the officer's] firing 'would have made [plaintiff's] injury . . . less likely to occur,' but the individual determination that he lacked reasonable suspicion in this case would not." (quoting FRE 407)).  In other words, "Rule 407 bars evidence only of remedial action; Rule 407 does not bar evidence of a party's own analysis of events, even if those events result in the party taking remedial action." *In re Chicago Flood Litig.*, 1995 WL 437501, at *5.

To the extent the letters here reference contemplated disciplinary action that could be deemed a subsequent remedial action, the appropriate response would be to redact the letters to remove reference to the proposed disciplinary actions.  To that end, Plaintiff proposed redacting the letters to exclude all references to employee discipline in exchange for Defendants withdrawing their objection.  (Lavoie Decl. ¶ 7a & **Exhibit F**.)  Plaintiff gave Defendants redacted copies of the letters for consideration and offered to consider any counterproposal Defendants wished to make involving different or additional redactions.  (*Id.*)  Courts have used similar redactions to solve the very concerns that Defendants have articulated in support of Rule 407 objections.  *See Rigsbee*, 2019 WL 1064106, at *2; *In re Chicago Flood Litig.*, 1995 WL 437501, at *5.  Defendants rejected Plaintiff's offer, refusing either to accept Plaintiff's proposed redactions or counter with a redaction proposal of their own.  (Lavoie Decl. ¶ 7a.)

1    The upshot is clear:  Even if the Fire Department's act of *disciplining* Jordan,
2    Imbrenda, and Kahan after the investigation was a subsequent remedial measure,
3    statements made by the Fire Department about its investigation findings are
4    admissible.  Excluding the letters in their entirety is unwarranted, unsupported by
5    Rule 407, and would unfairly deprive Plaintiff of key admissions relevant to her
6    claims.  It would permit Defendants to flatly contradict in this trial the very
7    conclusions that they drew after their investigation, and argue to the jury that Jordan
8    and others acted appropriately when they took photos of remains when Defendants
9    know very well that is false.  *See Rigsbee*, 2019 WL 1064106, at *2 (permitting
10   introduction of letters with redactions over portions describing subsequent remedial
11   measures taken as a result of investigation).

12   **Defendants' Response:**  Exhibits 26-28 are letters from LACFD notifying
13   personnel of discipline.  The letters should be excluded as set forth in Defendants'
14   opposition to Plaintiff's motion *in limine* no. 5.  (*See* Dkt. 240 at 247-27.)

15   *First*, Plaintiff waived her failure to investigate and discipline and her custom
16   or practice theories under *Monell*.  (*See* Dkt. 284.)  The Court stated at the February
17   4, 2022 pretrial conference that it agreed.  (*See* Feb. 4, 2020 Final Pretrial
18   Conference Hearing Tr. at 7:11-8:4.)  Assuming the Court keeps its tentative ruling,
19   these disciplinary notices are irrelevant and inadmissible.

20   Plaintiff previously argued that these notices were relevant to her waived
21   "custom or practice" theory.  Plaintiff has now changed her argument and contends
22   these notices are also relevant to her "failure to train" theory.  That is
23   incorrect.  Plaintiff provides no case law for her argument.  No case holds that a
24   government agency's failure to investigate or discipline is relevant to proving a
25   "failure to train."

26   *Second*, Exhibits 26-28 are also inadmissible because they reflect subsequent
27   remedial measures taken by LACFD.  These letters are disciplinary notices, and the
28   purpose of discipline is to make sure that conduct does not reoccur.  Rule 407 thus

precludes the admission of Exhibits 26-28: "[w]hen measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove . . . culpable conduct."  The Ninth Circuit has recognized that disciplinary proceedings are subsequent remedial measures in civil rights cases.  *See Maddox v. City of Los Angeles*, 792 F.2d 1408, 1417 (9th Cir. 1986) (in section 1983 case based on police use-of-force, Court properly excluded evidence from Internal Affairs investigation because "[t]he Internal Affairs investigation and measures taken by the defendant City were remedial measures taken after the incident").

Plaintiff contends that there is a distinction between "actual disciplining" and the "investigation that precedes a disciplinary process."  This contention is beside the point.  Each letter at issue explicitly states that its purpose is to inform the relevant employee of LACFD's plan to discipline them.  Plaintiff's suggestion that the letters can be "redacted" to excluded references to discipline is improper.  The Ninth Circuit in *Maddox* did not allow the plaintiff to cut bits and pieces out of the disciplinary proceedings and admit them.  To the contrary, the Ninth Circuit excluded evidence of a defendant's specific admission because it was made *during* disciplinary proceedings.  792 F.2d at 1417.  The disciplinary notices here are part of LACFD's remedial process and are thus inadmissible in their entirety.

*Finally*, the unfair prejudice to Defendants from the admission of Exhibits 26-28 far outweighs any probative value.  Exhibits 26 and 27 are Intention to Discharge letters sent to Fire Captains Tony Imbrenda and Brian Jordan.  Exhibit 28 is an Intention to Suspend letter sent to Captain Arlin Kahan.  Such evidence poses a significant risk of prejudice because it could cause the jury to conclude that employees were guilty of wrongdoing merely because their employer disciplined them.  *See, e.g., Maddox v. City of Los Angeles*, 792 F.2d 1408, 1417 (9th Cir. 1986) ("The prejudicial effect of this evidence was also arguably great. The jury might have inferred that Officer Harris was guilty of wrongdoing merely because the

Police Department conducted disciplinary proceedings.  The jury might have given unfair or undue weight to this evidence or they might have been confused as to the relevance of this evidence.").

## IV.   Correspondence Between Mrs. Bryant's Counsel and the Sheriff's and Fire Departments.

Four (4) of Plaintiff's exhibits to which Defendants object are letters between Plaintiff's counsel, on the one hand, and the Sheriff's and Fire Departments, on the other hand, in March 2020:

- ❖ <u>Plaintiff's Exhibit 31:</u>  Luis Li Letter to Fire Chief Osby (Redacted) dated March 2, 2020 – Witnesses: Anthony Marrone, William McCloud, Julia Kim, Scott Johnson

- ❖ <u>Plaintiff's Exhibit 156:</u>  Letter from Luis Li to Sheriff Villanueva (Redacted) dated March 2, 2020 – Witnesses: Alex Villanueva, Scott Johnson, William Jaeger

- ❖ <u>Plaintiff's Exhibit 310:</u>  Jack Altura Ltr. (Redacted) to Luis Li re "Response to March 2, 2020 Letter to Chief Osby," dated March 26, 2020 (VB00000004) – Witnesses: William McCloud, Anthony Marrone, Julia Kim

- ❖ <u>Plaintiff's Exhibit 315:</u>  Jack Altura Ltr. (Redacted) to Luis Li re "Response to March 2, 2020 Letter to Sheriff Villanueva," dated March 26, 2020 (VB00000039) – Witnesses: Alex Villanueva, Scott Johnson, William Jaeger

**Defendants' Grounds for Objection:**  Irrelevant (FRE 104(b), 401, 402); More prejudicial than probative (FRE 403).

**Joint Statement of the Parties:**  The above exhibits are (i) letters dated March 2, 2020, from Plaintiff Vanessa Bryant's attorney to Sheriff Villanueva and Fire Chief Osby; and (ii) the County's responses to the letters.  Plaintiff has prepared redacted versions of Mr. Li's letters in response to Defendants' objections. In addition, the parties have stipulated that if the Court grants any part of Plaintiff's motion *in limine* #1 regarding Defendants' spoliation, Defendants will withdraw

their objections to these exhibits and the redacted versions will be admitted.  In contrast, if the Court denies Plaintiff's motion *in limine* #1 in full, Plaintiff will withdraw the exhibits.

## V.    <u>Cell Phone Records of County Employees.</u>

Sixteen (16) of Plaintiff's exhibits to which Defendants object are the cell phone records of Sheriff's and Fire Department employees who have acknowledged possessing photos of the crash scene.  Some employees have two sets of records because they used both personal and Department-issued cell phones.

- ❖ <u>Plaintiff's Exhibit 99:</u>  (Redacted) Cell Records of Michael Russell (COLA035636) – Witnesses: Michael Russell, Tom Pikor

- ❖ <u>Plaintiff's Exhibit 158:</u>  Brian Jordan Cell Phone Records (VB00000104-575) – Witnesses: Brian Jordan, Tom Pikor

- ❖ <u>Plaintiff's Exhibit 401:</u>  Joey Cruz Cell Records, January 1 – March 6, 2020 (Bates COLA035763- COLA035822) – Witnesses: Joey Cruz, Tom Pikor

- ❖ <u>Plaintiff's Exhibit 402:</u>  Rafael Mejia Cell Records, January 26 – March 4, 2020 (Bates COLA036079-COLA036662) – Witnesses: Rafael Mejia, Tom Pikor

- ❖ <u>Plaintiff's Exhibit 405:</u>  Michael Russell Cell Records, January 2 – March 31, 2020 (Bates COLA035626-COLA035746) – Witnesses: Michael Russell, Tom Pikor

- ❖ <u>Plaintiff's Exhibit 406:</u>  Raul Versales Cell Records, January 26 – March 4, 2020 (Bates COLA036079-COLA036094, COLA036663-COLA037559) – Witnesses: Raul Versales, Tom Pikor

- ❖ <u>Plaintiff's Exhibit 408:</u>  Douglas Johnson Cell Records, January 26 – March 4, 2020 (Bates COLA038063-COLA038538) – Witnesses: Doug Johnson, Tom Pikor

- ❖ <u>Plaintiff's Exhibit 411:</u>  Tony Imbrenda, Brian Jordan, & Arlin Kahan LAFD Cell Records, January 26 – March 3, 2020 (Bates COLA037937-

COLA037969) – Witnesses: Tony Imbrenda, Brian Jordan, Arlin Kahan, Tom Pikor

❖ Plaintiff's Exhibit 415: Tony Imbrenda Personal Cell Records, January 25 – March 3, 2020 (Bates C0LA035893-C0LA035906) – Witnesses: Tom Pikor, Tony Imbrenda, Brian Jordan, Arlin Kahan

❖ Plaintiff's Exhibit 417: Brian Jordan Personal Cell Records, January 26 – March 4, 2020 (Bates VB00003632-VB00004129) – Witnesses: Tom Pikor, Brian Jordan

❖ Plaintiff's Exhibit 420: Arlin Kahan Personal Cell Records, December 27 – March 26, 2020 (Bates COLA035861-COLA035880) – Witnesses: Tom Pikor, Arlin Kahan, Tony Imbrenda

❖ Plaintiff's Exhibit 421: Benjamin Sanchez Cell Records, January 26 – March 3, 2020 (Bates COLA035910-COLA035933) – Witnesses: Tom Pikor, Michael Russell, Ben Sanchez

❖ Plaintiff's Exhibit 424: Ruby Cable Cell Records, January 26 – March 3, 2020 (Beg Bates COLA037970) – Witnesses: Tom Pikor, Ruby Cable

❖ Plaintiff's Exhibit 428: Stephanie Shrout & Scott Miller LASD Cell Records, January 26 – March 3, 2020 (Bates COLA037921-C0LA037936) – Witnesses: Tom Pikor, Scott Miller, Raul Versales

❖ Plaintiff's Exhibit 430: Travis Kelly Cell Records, January 26 – March 3, 2020 (Bates COLA038004-COLA038030) – Witnesses: Tom Pikor, Scott Miller, Raul Versales

❖ Plaintiff's Exhibit 432: Christopher Jauregui Cell Records, January 26 – March 3, 2020 (Bates COLA038031-COLA038058) – Witnesses: Tom Pikor, Chris Jauregui, Raul Versales

**Defendants' Grounds for Objection:** Irrelevant (FRE 104(b), 401, 402); More prejudicial than probative (FRE 403); Speculation.

**Plaintiff's Response to the Objections:** Defendants' cell records, which show telephone and text messaging activity in the days and weeks after the crash, are one of the backbones of Plaintiff's case. Among other things, the records contain (i) compelling circumstantial evidence of Defendants' sharing of the photos; (ii) text-messaging activity that contradicts Defendants' employees' statements regarding the timing of when they transmitted the photos to other members of their Departments; (iii) call log activity reflecting suspicious communications following the citizen complaint and *LA Times* report; and (iv) reflections of text messages Defendants have spoliated. At trial, Plaintiff intends to: (i) have a summary witness (Tom Pikor) testify regarding the records and provide information about outgoing text messages in the days and weeks following the crash, phone call activity, and other information evident on the face of the records; and (ii) present a demonstrative that relies on the cell records (along with other evidence) that illustrates Defendants' dissemination of the photos.

It is essential that the cell records of County employees known to have possessed the photos be admitted. In many instances, the County employees' cell records show outgoing picture messages in the days and weeks following the accident. Plaintiff will argue that, based on the totality of the facts and circumstances (including Defendants' spoliation), the jury should infer that many such picture messages contained photos of the victims' remains. In other instances, an employee's cell records do not contain text activity because text records were simply not available for the relevant timeframe (early 2020) or are not included in the carrier's records. It is important for the jury to have this context to avoid the misimpression that the employees with unavailable texting records did not send such messages. In reality, the lack of text messages in the record is due to Defendants' spoliation, and the silence of the cell records for a particular employee is not exculpatory in any way.

The cell records are also central to demonstrating Defendants' spoliation and the prejudice flowing therefrom.  The cell records of numerous County employees reflect text messaging activity for texts that Defendants have destroyed or failed to preserve, depriving Plaintiff of direct evidence of dissemination.  The jury deserves to know that, despite the ample text-messaging activity reflected in the cell records, Defendants have produced only a tiny number of text messages in this case, and none from the devices of the Deputy Defendants, Tony Imbrenda, Brian Jordan, or Arlin Kahan.

The cell records also show relevant phone call activity.  For example, Johnson's and Versales's cell phone records reflect that, between 10:30 a.m. on the day of the crash—when Versales and others at the command post personnel learned that Kobe Bryant may have been onboard the helicopter—and 11:38 a.m., Johnson and Versales had 14 telephone calls totaling 8 minutes and 32 seconds.  Following these calls, Johnson took close-up photos of the victims and sent them to Versales.  The timing and volume of the calls between Johnson and Versales give rise to a strong inference that Johnson knew Kobe Bryant had perished in the crash when he took and shared the photos, contrary to Johnson's under-oath statements denying that he knew Kobe Bryant had been onboard at the time he snapped his photos.  Other relevant phone calls include a flurry of activity shortly after Ralph Mendez's complaint was received by the Sheriff's Department.

Defendants' objection of "speculation" is unintelligible.  Although the cell records do not themselves directly establish the content of the messages, they are compelling circumstantial evidence of dissemination.  For example, Michael Russell's cell records show outgoing picture messages in the days after the crash to a group chat with his video game buddies, and Russell has admitted to sharing photos of the victims remains with one member of the group chat, Ben Sanchez.  Although Russell denies sharing the photos with other members of the group, the

1  simultaneous picture messages to the entire chat suggests otherwise.  This is a fact

2  question for the jury to decide.

3       Similarly, Brian Jordan's cell records show that he sent pictures via text

4  message to numerous members of the media, police officers, a Sheriff's Department

5  employee, his girlfriend, his neighbor, and five firefighters during a time when

6  Jordan is known to have possessed close-up photos of the victims' remains.  When

7  questioned under oath, Jordan could not explain these texts and did not affirmatively

8  deny that he shared his graphic photos, but rather equivocated and claimed he did

9  not remember.  Considering the false pretenses under which Jordan obtained the

10  photos and his equivocal, evasive testimony under oath, the text records are strong

11  circumstantial evidence that Jordan shared the photos with members of the media.

12       Defendants essentially argue that because the cell records do not *by*

13  *themselves* show that specific individuals shared photos of the victims' remains on

14  specific occasions, the records are irrelevant and any consideration of them is

15  "speculative."  By this reasoning, only direct evidence would be admissible and all

16  circumstantial evidence would be barred.  But that is not how evidence works.  The

17  jury will consider the fact that certain County employees sent outgoing picture

18  messages to particular people at particular times and, taking into account other

19  evidence in the case, make a determination by a preponderance of the evidence

20  regarding the employees' conduct.  Depriving Mrs. Bryant of this critical evidence

21  would be grossly unfair and prejudicial under any circumstances, but particularly

22  here, where Mrs. Bryant's reliance on circumstantial evidence is due to Defendants

23  either intentionally destroying and failing to responsibly preserve the direct evidence

24  of their misconduct.

25       Defendants responses below are without merit.  *First*, Defendants offer a

26  variety of arguments for why the jury *shouldn't* conclude that certain picture

27  messages on the County employees' cell records involved human remains.

28  Defendants are free to make those arguments to the jury, but they are no basis to

exclude a central component of Mrs. Bryant's evidence. *Second*, Defendants imply that Mrs. Bryant should have taken more discovery directed at the recipients of the records. That was impossible. Defendants dragged their feet for months in producing the records—withholding required consent forms from their employees and taking long periods to pre-review the records after they were provided by the cell carriers but before they were passed on to Plaintiff. As a result, Plaintiff received nearly all of the records in the final five weeks of the discovery period. What's more, due to the number of deputies and firefighters implicated in the misconduct, Plaintiff took approximately 40 depositions in this case. The notion that she should have taken yet more depositions is ridiculous.

*Third*, Defendants contend that Mrs. Bryant "deposed LASD and LAFD personnel about the picture messages." With respect to all but a handful of County employees, that statement is false, as Defendants did not release the cell records to Plaintiff until *after* the relevant individuals' depositions, in most instances.

*Fourth*, Defendants argue that the cell records will occupy time at trial. However, each party will decide how to spend the time allotted by the Court. To the extent Defendants wish to spend their trial time attempting to demonstrate that the picture messages in the County employees' cell records did not involve human remains photos, that will be their choice.

*Finally*, Defendants offer what appears to be a disguised *in limine* motion, arguing that Tom Pikor should be excluded from testifying at trial. If Defendants wished to exclude Pikor, they should have addressed the issue in one of their five motions *in limine*, but they did not, and this joint statement is not the place for such argument.

**Defendants' Response:** Exhibits 99, 158, 401, 402, 405, 406, 408, 411, 415, 417, 420, 421, 424, 428, 430, and 432 should not be admitted at trial because Plaintiff's use of these cell phone records will be based entirely on speculation. To the extent that these cell phone records contain any relevant information at all (they

do not), the probative value arising therefrom is substantially outweighed by a danger of unfair prejudice, confusing the issues in this case, misleading the jury, undue delay, and wasting time.

Plaintiff intends to introduce these cellphone records at trial, point out that picture messages and texts were sent in the January through March 2020 time period, and argue to the jury that it should conclude that those messages and texts included crash site photos depicting the remains of Plaintiff's husband and daughter. Plaintiff repeatedly concedes her intention, referring to these cellphone records as "compelling circumstantial evidence of Defendants' widespread sharing of the photos." Plaintiff has no evidence that the picture messages and texts included crash site photos.

Plaintiff readily admits that "[t]he cell phone records do not contain any information about the *content* of any communications." Plaintiff did not depose the third parties who received the pictures messages or texts listed in the cellphone records. Plaintiff did not request documents from those third parties either. Plaintiff is not permitted to avoid taking discovery and then tell the jury to do the work for her on public dissemination. If Plaintiff could prove that these picture messages contained crash site photos, that would have come from these third parties, and not by speculating about what was contained in the messages. Plaintiff did not conduct this discovery because when she deposed LASD and LACFD personnel about the picture messages and texts, they testified that none of them included crash site photos depicting human remains. There is no legal basis for the admission of these phone records into evidence.

These picture messages could be anything. Plaintiff has no basis for arguing they contain crash site photos. It is pure speculation. The "picture messages" reflected in these cellphone records could be emojis, GIFs, screenshots, pictures of someone's child, and numerous other possible image files. There is no evidence any of them contained crash site photos. In fact, the evidence is to the contrary—every

1   person asked about these messages testified they did not include crash site photos.

2   If Plaintiff is permitted to introduce this evidence, Defendants will be forced to call

3   the provider custodian (e.g., AT&T, Verizon, T-Mobile, etc.) to testify at trial about

4   the records, what counts as a "picture message," and how sending any type of image

5   file would be reflected as a "picture message."  And Defendants would need to do

6   that for each of the providers and have them go through every one of these exhibits

7   so that the jury would not be misled by Plaintiff's arguments.

8          Rather than provide any evidence that pictures of the crash site were sent,

9   Plaintiff is attempting to rely on the content of out-of-court statements, Defendants'

10   employees' cell phone records, to establish that crash site photos were publicly

11   disseminated.  Depending on how Plaintiff proffers these records at trial, these

12   records, and any associated testimony by Plaintiff's investigator, may be hearsay

13   because they are being offered for their truth.  *See* FRE 801-803.

14          Plaintiff cannot rely on speculation to meet her burden to show public

15   dissemination of crash site photos by the County.  *See e.g.*, FRE 403.  That is not

16   how it works.  Plaintiff is not permitted to tell the jury that it can infer crash site

17   photos were included in the picture messages and texts when no evidence supports

18   that claim.

19          These exhibits should also be excluded because they will necessitate undue

20   consumption of limited trial time, which far outweighs any minimal probative value.

21   Plaintiff will need to examine the personnel about the many picture and text

22   messages sent in the January through March 2020 time period, and establish

23   whether any of them included crash site photos.  To the extent Plaintiff tells the jury

24   it should infer such photos were included (despite not having any evidence that they

25   were), Defendants will need to examine the personnel about their texting habits,

26   similar picture messages and texts sent to the same third party recipients in the

27   months before and after January-March 2020 to show that nothing out of the

28

1  ordinary happened during that time, and that no crash site photos were sent to any of
2  the third party recipients.

3      Defendants would also be forced to call each and every third party recipient
4  of a "picture message" to testify at trial about the messages at issue and to confirm
5  that none of them included crash site photos.  Based on the messages reflected in
6  these exhibits, Defendants would need to call dozens and dozens of third party
7  witnesses.  That would be the only way to counter Plaintiff's argument that the jury
8  should "infer" that these third parties were sent crash site photos.  This would
9  significantly increase the time needed for trial.

10     Plaintiff states that she intends to call a "summary witness" to testify about
11  the cellphone records and state that certain phone numbers belong to certain people.
12  That witness—Thomas Pikor—is not a percipient witness and was not disclosed by
13  Plaintiff as an expert witness.  The County has never been provided with Pikor's
14  qualifications, his methodology, the source for his information, or an expert report
15  (or any other type of report).  Pikor is not qualified as an expert and to the extent
16  Plaintiff intends to elicit testimony from him about running the phone numbers
17  across a database to identify the purported owners of those numbers, it would be
18  inadmissible hearsay not subject to an exception or exemption.  It would also be
19  unreliable and based purely on speculation.  For example, just because a phone
20  number may be identified as belonging to someone in 2021—when Pikor did his
21  purported analysis—does not mean that was the same person in January 2020 when
22  the helicopter crash occurred.

23     Lastly, Plaintiff argues that the records bear on the veracity of Deputy
24  Johnson's testimony that he was unaware that Kobe Bryant was a passenger when
25  he photographed the crash site.  This claim is baseless.  Both Deputy Johnson and
26  Deputy Versales testified that they spoke by phone multiple times that morning due
27  to poor radio reception.  Deputy Johnson has made clear—under oath—that when he
28  took photographs of the scene that morning he did not know who any of the

passengers were.  The fact that phone records confirm that Deputy Johnson and Deputy Versales were in communication that morning does not have any bearing on the veracity of Deputy Johnson's testimony.

## VI.  Images, Social Media Posts, and Taunts Plaintiff Has Encountered Online.

Ten (10) of Plaintiff's exhibits to which Defendants object relate to images, social media posts, and messages Mrs. Bryant has encountered online:

❖ Plaintiff's Exhibit 317:  Instagram Message to Plaintiff from bhbb7231: "Ima leak Kobe's body" (VB00000048) – Vanessa Bryant

❖ Plaintiff's Exhibit 318:  Annotated Photo Posted on Social Media ("Both legs with knees in air") (VB00000049) – Witnesses: Vanessa Bryant, Emily Tauscher, Kristina McGuire

❖ Plaintiff's Exhibit 319:  Photo of Wreckage and Pink Blanket (VB00000050) – Witnesses: Vanessa Bryant, Emily Tauscher, Kristina McGuire

❖ Plaintiff's Exhibit 320:  Taunting Message to Mrs. Bryant on Social Media (VB00000051) – Vanessa Bryant

❖ Plaintiff's Exhibit 321:  Twitter Post with Photos of Accident Scene, dated January 29, 2020 (VB00000052) – Witnesses: Vanessa Bryant, Emily Tauscher, Kristina McGuire

❖ Plaintiff's Exhibit 322:  Instagram Comments Viewed by Plaintiff (VB00000071) – Witness: Vanessa Bryant

❖ Plaintiff's Exhibit 323: Twitter Post & Profile of "baby boo," dated January 31, 2020 (VB00000096-97) – Witness: Vanessa Bryant

❖ Plaintiff's Exhibit 324: Twitter Post & Profile of "AmericanAnswers.org/Facebook," dated February 7, 2020 (VB00000098-99) – Witness: Vanessa Bryant

❖ Plaintiff's Exhibit 325:  Twitter Post & Profile of "DRYX," dated March 24, 2020 (VB00000100-01) – Witness: Vanessa Bryant

1    ❖ <u>Plaintiff's Exhibit 326:</u> Twitter Post & Profile of "Princess Young," dated

2        May 20, 2020 (VB00000102-03) – Witness: Vanessa Bryant

3       **Defendants' Grounds for Objection:** Hearsay (FRE 801, 802); Irrelevant

4 (FRE 104(b), 401, 402); More prejudicial than probative (FRE 403); Authentication

5 (FRE 901).

6       **Joint Statement of the Parties:** The admissibility of these exhibits are

7 addressed in Defendants' motion *in limine* #1 and Plaintiff's response thereto. (*See*

8 Dkt. 245.) The parties agree that the Court's resolution of that motion will

9 determine whether any or all of the exhibits are admitted at trial.

10 **VII.**    <u>**Video and Audio Recordings of Sheriff Villanueva.**</u>

11       Six (6) of Plaintiff's exhibits to which Defendants object are video or audio

12 recordings of statements made by Sheriff Alex Villanueva (and also, in one instance,

13 Captain Jorge Valdez) to members of the media:

14    ❖ <u>Plaintiff's Exhibits 300A & 300B:</u> Transcript Excerpts and Video Excerpts of

15        Villanueva Press Briefing - COLA001200 – Witnesses: Alex Villanueva,

16        Mark Flores, Adam Bercovici

17    ❖ <u>Plaintiff's Exhibit 302A & 302B:</u> Transcript Excerpts and Video Excerpts of

18        Villanueva Fox 11 Interview - VB00003622 – Witnesses: Alex Villanueva,

19        Mark Flores, Adam Bercovici

20    ❖ <u>Plaintiff's Exhibit 303A & 303B:</u> Transcript Excerpts & Video Excerpts of

21        Villanueva ABC 7 Interview - COLA001182 – Witnesses: Alex Villanueva,

22        Mark Flores, William Jaeger, Adam Bercovici

23    ❖ <u>Plaintiff's Exhibit 304A & 304B:</u> Transcript Excerpts & Audio Excerpts of

24        Villanueva KNX1070 Interview - COLA006932 – Witnesses: Alex

25        Villanueva, Mark Flores, William Jaeger, Adam Bercovici

26    ❖ <u>Plaintiff's Exhibit 305A & 305B:</u> Transcript Excerpts and Audio Excerpts of

27        Villanueva NBC Interview - COLA030878 – Witnesses: Alex Villanueva,

28        Mark Flores, William Jaeger, Adam Bercovici

❖ <u>Plaintiff's Exhibit 306A & 306B:</u>  Transcript Excerpts & Audio Excerpts of Villanueva & Other LASD Statements to LA Times Audio Recording - https://www.latimes.com/california/story/2021-12-21/vanessa-bryant-kobe-bryant-death-photos-lawsuit-la-county-sheriff – Witnesses: Alex Villanueva, Mark Flores, Jorge Valdez, John Satterfield, Adam Bercovici

**Defendants' Grounds for Objection:**  Irrelevant (FRE 104(b), 401, 402); More prejudicial than probative (FRE 403).

**Plaintiff's Response to the Objections:**  Based on the Court's guidance with respect the recordings of the internal investigation interviews, Plaintiff took a similar approach with respect to the video and audio recordings of Sheriff Villanueva and Commander Valdez.  These recordings are the subject of Plaintiff's MIL No. 5.  But, as reflected in the parties' summary of those MILs (ECF No. 318 at 9-10), Defendants have now dropped their general objections to the admission of these recordings and agree that they should be excerpted, though they dispute the particular excerpts that Plaintiff seeks to admit.

Plaintiff provided Defendants with the limited portions she seeks to admit affirmatively.  These excerpts are attached as **Exhibit E** to the Lavoie Declaration. As the Court also suggested, Plaintiff also plans to prepare new versions of the exhibits containing just those excerpts, as follows:

|  | Transcript Excerpts | Video/Audio Excerpts |
|---|---|---|
| Villanueva Press Briefing - COLA001200 | 300A | 300B |
| Villanueva Fox 11 Interview | 302A | 302B |
| Villanueva ABC 7 Interview | 303A | 303B |
| Villanueva KNX1070 Interview - COLA006932 | 304A | 304B |

| | | |
|---|---|---|
| Villanueva NBC Interview - COLA030878 | 305A | 305B |
| Villanueva & Other LASD Statements to LA Times | 306A | 306B |

As with the internal investigation interviews, Defendants responded by counter-designating a large amount of material, purportedly under Rule 106. Defendants' counter-designated are reflected in **Exhibit E** to the Lavoie Declaration, where they are shown in blue. Once again, Defendants' counter-designations have nothing to do with the Rule of Completeness and simply involve Defendants designating other, self-serving parts of the recordings on other topics that they like.

For example, in one Fox 11 news segment (Exhibit 302) Plaintiff excerpted a single clip in which Sheriff Villanueva said: "They have no place to be taking any photographs of anything. Only, in this case, it would have been NTSB investigators coroner's investigators and that's about it, nobody else." Defendants purported to add another portion of the interview where the Sheriff discusses deputies deleting the pictures. That has nothing to do with the Sheriff's statement that there was no legitimate purpose for the deputies to take the photos, and Plaintiff's excerpt is not in any way misleading. Defendants did something very similar with an ABC 7 interview (Exhibit 303). Plaintiff designated a clip in which the Sheriff admits that first responders took photos at the scene and shouldn't have, and that the County's policies "were very deficient." Defendants again came back with another portion of the interview where the Sheriff says that the photos have been deleted.

As Plaintiff explained with respect to the internal investigation interviews above, these are not proper completeness designations. They are self-serving hearsay not subject to any exception, and Defendants may not use the Rule of

Completeness to play them for the jury.  If Defendants wish to elicit these points from their witnesses, they can call them.

**Defendants' Response:**  Based on the Court's comments at the July 8 pretrial conference, Defendants have agreed to withdraw their general objections to these recordings.  However, many of the recordings contain news reporting on the crash and its aftermath or include questions and answers about other irrelevant LASD matters, which should be excised.

Plaintiff provided Defendants with her selected excerpts.  Defendants provided counter-designations to ensure the exhibits were complete and not misleading, consistent with Rule 106.  Defendants' counter-designations were minimal and appropriate.  For example:

- Plaintiff designated a snippet from a press briefing (Tr. Ex. 300) in which a CNN reporter asked the Sheriff what LASD was doing to contain its photos of the crash site; and the Sheriff answered that the photos were deleted but he was still concerned about "[w]hat we don't know."  Defendants counter-designated the question-and-answer immediately following this snippet, in which the Sheriff explained that LASD was doing "everything we can humanly do…we don't want to extend or increase anybody's anguish in this tragedy."  Without this counter-designation, Plaintiff's edited statement from the Sheriff creates a misleading impression about LASD's motives, intentions, and containment of the photos.

- Plaintiff designated a statement by the Sheriff that LASD was conducting a thorough internal investigation "to determine if they [crash site photos] were disseminated and if they were destroyed or not."  (Tr. Ex. 303.)  Defendants counter-designated the Sheriff's statement a moment later, explaining that any photos in his deputies' possession have been contained and destroyed; and that LASD was in the process of verifying that.  This counter-designation is

1    critical to complete the Sheriff's response to a reporter and to correct an

2    otherwise misleading impression that the photos had not been contained.

3    Defendants' counter-designations are narrowly tailored to provide an accurate

4    and complete record from which the jury can make its decision on Plaintiff's

5    claims.  Plaintiff should not be permitted to admit only select portions of the

6    Sheriff's press statements that are misleading out of context.  Doing so would be

7    unfairly prejudicial to Defendants.

8    Defendants also continue to oppose these recordings being pre-admitted and,

9    instead, believe they should be introduced at trial (if at all) during the Sheriff's

10   examination. It would be prejudicial to Defendants if these recordings were admitted

11   without a sponsoring witness because the Sheriff would not be given the opportunity

12   to explain the context and his answers.  The Sheriff was deposed about his

13   statements and explained them.  Plaintiff should not be permitted to use these

14   Exhibits without first questioning the Sheriff about his statements.  If his testimony

15   is inconsistent with his prior statements, then Plaintiff can impeach him using these

16   Exhibits.

17   **VIII.  Mrs. Bryant's Screenshot of a Search Engine.**

18   One (1) of Plaintiff's exhibits to which Defendants object is a screenshot Mrs.

19   Bryant has taken while using a search engine:

20   ❖ Plaintiff's Exhibit 329:  Search Auto-Populating "Kobe Bryant crash pictures"

21   (VB00004197) – Witness: Vanessa Bryant

22   **Defendants' Grounds for Objection:**  Hearsay (FRE 801, 802); Irrelevant

23   (FRE 104(b), 401, 402); More prejudicial than probative (FRE 403); Authentication

24   (FRE 901).

25   **Plaintiff's Response to the Objections:**  Exhibit 329 is a screenshot of what

26   Plaintiff Vanessa Bryant has seen when searching "Kobe Bryant" online—the term

27   "Kobe Bryant crash pictures" automatically populates.  Plaintiff can authenticate the

28   screenshot as one that she herself took on her own phone while conducting a search

online.  The exhibit does not contain hearsay because there is no "truth" displayed in the auto-populating of the search field.  Rather, the exhibit is offered to demonstrate the painful reminder of Defendants' conduct that Plaintiff experiences when searching her husband's name online.  The exhibit is relevant to Plaintiff's emotional distress, as Defendants' conduct has caused "crash pictures" to be associated with Kobe Bryant's name, which naturally causes Plaintiff recurring distress.

**Defendants' Response:**  Exhibit 329 is plainly hearsay not subject to an exception.  While Plaintiff says she is not offering it for the truth of the matter, that is false.  She wants the jury to see that when she allegedly Googles "kobe," that "kobe bryant crash pictures" auto-populates.  That is for the truth of the matter.  And there is no exception.

There is also the issue of authentication.  Plaintiff now claims that this is a screenshot she took of a search she ran on her cellphone.  Defendants do not think that is true.  Plaintiff did not make that claim when she first submitted this exhibit with her declaration in opposition to Defendants' summary judgment motion.  (*See* Dkt. 190 -6.)  It also would surprise Defendants if it were true since the Google auto-populate function runs on an algorithm based on prior searches.  Which would mean that Plaintiff must have Googled "kobe bryant crash photos" herself.  Defendants are also not responsible for what Google results come back when Plaintiff runs a search on her phone.

Exhibit 329 should also be excluded because it would necessitate an undue consumption of limited trial time.  If Plaintiff is permitted to introduce Exhibit 329, Defendants will be forced to introduce witnesses and evidence to show Plaintiff's claims are false.  For example, when Defendants' counsel ran the same search, his device did not return the auto-suggest topics Plaintiff says she got.  Instead, the search returned Kobe Steak House & Lounge in Seal Beach, and auto-suggested

"kobe," "kobe bryant," "kobe shoes," and "kobe bryant net worth." (*See* Dkt. 207 ¶ 3 & Ex. 232.)  This would be a complete sideshow and unnecessary.

## IX.  Letters & Memoranda Regarding LASD's Findings in Investigations of the Deputy Defendants, Sgt. Kelly, and Deputy Johnson

Six (6) of Plaintiff's exhibits to which Defendants object are notices and letters relating to LASD's investigation and discipline of its personnel:

❖ Plaintiff's Exhibit 63:  LASD Notice of Completion of Investigation of Michael Russell, dated August 5, 2020 (COLA035253-61) – Witnesses: Michael Russell, Hector Mancinas, William Jaeger, Christopher Reed, Dennis Kneer, Adam Bercovici

❖ Plaintiff's Exhibit 108:  LASD Letter to Rafael Mejia re Notice of Completion of Investigation, dated August 5, 2020 (COLA035244) – Witness: Rafael Mejia, Adam Bercovici

❖ Plaintiff's Exhibit 112:  LASD Letter to Raul Versales re Notice of Completion of Investigation, dated August 5, 2020 (COLA035262-69) – Witnesses: Raul Versales, Hector Mancinas, Christopher Reed, William Jaeger, Dennis Kneer, Adam Bercovici

❖ Plaintiff's Exhibit 124:  Memo from Salvador Becerra to William Jaeger dated July 24, 2020 (COLA035214-19) – Witnesses: Joey Cruz, William Jaeger, Christopher Reed, Dennis Kneer, Adam Bercovici

❖ Plaintiff's Exhibit 147:  LASD Letter to Travis Kelly dated August 8, 2020, titled: "Notification Letter" (COLA035225-32) – Witnesses: William Jaeger, Christopher Reed, Dennis Kneer, Travis Kelly, Adam Bercovici

❖ Plaintiff's Exhibit 439:  LASD Letter to Doug Johnson dated August 8, 2020, titled: "NOTIFICATION LETTER" (COLA035220-24) – Witnesses: Doug Johnson, Alex Villanueva, William Jaeger, Christopher Reed, Dennis Kneer, Adam Bercovici

**Defendants' Grounds for Objection:**  Irrelevant (FRE 104(b), 401, 402); More prejudicial than probative (FRE 403).

**Plaintiff's Response to the Objections:**  The above exhibits are letters and/or memoranda in which LASD leadership summarize the Department's findings regarding (i) the conduct of Deputy Joey Cruz, Deputy Michael Russell, Deputy Rafael Mejia, Deputy Raul Versales, Deputy Doug Johnson, and Sgt. Travis Kelly with respect to taking, obtaining, and/or sharing photos of the victims' remains; and (ii) the Department's decision to impose no discipline on any of the personnel, with the exception of Cruz, who received a short suspension.

The letters and memoranda are relevant and not unfairly prejudicial because they contain admissions by LASD regarding their employees' conduct.  Specifically, the Department concluded (among other things) that (i) Deputy Michael Russell had no reason to obtain the photos; (ii) Deputy Russell transmitted the photos to a video game buddy while off-duty without any legitimate purpose; (iii) Deputy Rafael Mejia transmitted photos of the victims' remains to two trainee deputies, Joey Cruz and Ruby Cable; (iv) Deputy Raul Versales transmitted photos of the victims' remains to Travis Kelly, Chris Jauregui, Scott Miller, and Rafael Mejia; (v) Deputy Joey Cruz displayed photos of the victims' remains to his niece and a bartender; (vi) Sgt. Travis Kelly transmitted photos of the victims' remains to Sgt. Stephanie Shrout; and (vii) Deputy Doug Johnson took photos of the victims' remains and texted them to Raul Versales.

The exhibits are also relevant and not unfairly prejudicial because LASD's decision not to discipline its personnel bears on its liability under *Monell*.  *See, e.g.*, *Conn v. City of Reno*, 591 F.3d 1081, 1105 (9th Cir. 2010) ("Failure to discipline is not a separate ground for establishing municipal liability.  Rather, it is evidence that tends to establish the absence of or failure to enforce a policy . . . ."), *cert. granted, judgment vacated sub nom. City of Reno, Nev. v. Conn*, 563 U.S. 915 (2011), *opinion reinstated in relevant part*, 658 F.3d 897 (9th Cir. 2011).  Plaintiff has

repeatedly explained that post-violation conduct, including evidence of a failure to investigate or discipline, is relevant to her failure-to-train theory.  (*See, e.g.,* Dkt. 191 ¶¶ 107-108 [explaining "LASD's highly irregular so-called 'inquiry' in response to the citizen complaint serves as additional evidence from which a jury could reasonably infer deliberate indifference"]; Dkt. 281 at 7-8 [same, collecting authorities].)  And she has repeatedly pointed Defendants to the case law that supports this settled proposition.  *See, e.g.*, *Larez v. City of L.A.*, 946 F.2d 630, 645, 647 (9th Cir. 1991) (evidence of improper procedures and "'holes' and inconsistencies" in city's post-incident investigation of plaintiffs' complaint supported conclusion that "LAPD's disciplinary and complaint processes, executed by policy or custom, contributed to the police excesses"); *McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986) ("Policy or custom may be inferred if, after the [particular constitutional violation at issue], the prison officials took no steps to reprimand or discharge the [relevant employees] ….").  Defendants' repeated refrain that Plaintiff somehow "abandoned" such evidence fails for the reasons stated in Plaintiff's supplemental briefing regarding the *Monell* claim.  (Dkt. 281, 287.)

Finally, Defendants have renewed their FRE 407 objection to Exhibit 124. The Court has already ruled that this objection was waived when Defendants failed to raise it in the original pre-trial exhibit stipulation.  (Dkt. 325-1 (Hearing Tr.) at 6:4-7:1 (concluding that Defendants have "waived those newly raised objections that are identified by counsel in Docket No. 305"); Dkt. 305 ¶ 2; Dkt. 305-1 at 78, ¶ 124 (identifying FRE 407 as a newly raised objection to Exhibit 124).)

**Defendants' Response:**  Exhibits 63, 108, 112, 124, 147, and 439 are letters and memorandums relating to LASD's investigation into the taking and sharing of crash scene photos.  As these letters and memorandums involve LASD's internal investigation and the discipline of personnel, they are not relevant to any of the claims or issues in this case and should be excluded.  Additionally, Exhibit 124 is a Disposition Sheet informing Deputy Joey Cruz of the discipline he is to

1  receive.  Therefore, Exhibit 124 must also be excluded as a subsequent remedial

2  measure under Rule 407.

3      Plaintiff waived her failure to investigate and discipline and her custom or

4  practice theories under *Monell*.  (*See* Dkt. 284.)  The Court stated at the February 4,

5  2022 pretrial conference that it agreed.  (*See* Feb. 4, 2020 Final Pretrial Conference

6  Hearing Tr. at 7:11-8:4.)  Assuming the Court keeps its tentative ruling, these

7  disciplinary notices are irrelevant and inadmissible.

8      Plaintiff previously argued that these notices were relevant to her waived

9  "custom or practice" theory.  Plaintiff has now changed her argument and contends

10 these notices are also relevant to her "failure to train" theory.  That is

11 incorrect.  Plaintiff provides no case law for her argument.  No case holds that a

12 government agency's failure to investigate or discipline is relevant to proving a

13 "failure to train."

14     Plaintiff's contention that a failure to discipline for the conduct at issue can

15 demonstrate a policy or custom under *Monell* is also wrong.  In *Nadell v. Las Vegas*

16 *Metro. Police Dep't*, a jury found that the Las Vegas Police Department had

17 violated the plaintiff's rights by failing to discipline an officer for using excessive

18 force on the plaintiff and by failing to investigate the incident.  268 F.3d 924, 927

19 (9th Cir. 2001).  However, the Ninth Circuit reversed the trial court's denial of a

20 motion of judgment as a matter of law on this claim because "[t]here was no

21 evidence introduced at trial to establish . . . that *previous constitutional violations*

22 had occurred *for which the offending officers were not discharged or*

23 *reprimanded*."  *Id*. at 929 (emphasis added).

24     In the cases Plaintiff cites, unlike here, there was significant evidence of other

25 complaints or incidents that were *not the subject of the current lawsuit*, which the

26 defendants were failing to address:

27     In *Rodriguez v. Cty. of Los Angeles*, 891 F.3d 776 (9th Cir. 2018), inmates

28 filed a section 1984 claim against the County contending that they were excessively

beaten and otherwise subject to excessive force with tasers, concussion grenades, block guns, and other weapons during "cell extractions." *Id*. at 786-87. The Ninth Circuit affirmed a verdict against the County under *Monell* because there was evidence of a "custom of ignoring or condoning excessive force" which "perpetuated a culture where excessive force was encouraged." This evidence included a report of the Men's Central Jail detailing how senior jail officials failed to investigate 100 use-of-force allegations, testimonial evidence, and the fact that the department had not used their "force-tracking system to monitor force against many prisoners." *Id*. at 789-80, 803.

In *Henry v. Cnty. of Shasta*, 132 F.3d 512 (9th Cir. 1997), the plaintiff was stopped by highway patrol officers for a broken tail light, and when he refused to sign the ticket and demanded an appearance before a magistrate, he was ignored and placed naked in a "safety cell" covered in dry urine for almost 10 hours. *Id*. at 516-17. The plaintiff submitted declarations from two others describing how they were subjected to virtually identical treatment after they were stopped for minor traffic violations. *Id*. at 518. The court found that these declarations were probative of the existence of the city's policy or custom. *Id*. at 519.

In *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001), the magistrate judge found that the Idaho Department of corrections violated inmates' constitutional rights by retaliating against inmates who filed lawsuits or otherwise availed themselves of grievance procedures. *Id*. at 1123-25. There were numerous complaints of retaliation that top administrators failed to investigate or correct. *Id*. at 1127.

The facts of this case are very different. There has never before been a complaint about a LASD or LACFD employee sharing photos of victim remains. This was an isolated, sporadic incident that occurred during the investigation of an unprecedented fatal helicopter crash. In these circumstances, Exhibits 63, 108, 112, 124, 147, and 439 are irrelevant and would be highly

1  prejudicial.

2  **X.      Documents Regarding Incident Involving Firefighter in 2014.**

3          Five (5) of Plaintiff's exhibits to which Defendants object relate to

4  disciplinary proceedings in connection with a 2014 incident in which a Fire

5  Department employee was alleged to have taken an improper photo of a deceased

6  accident victim:

7      ❖ Plaintiff's Exhibit 434:  LAFD Letter dated June 22, 2015, titled: "Intention

8          to Suspend" (COLA035403-08) – Witnesses: Anthony Marrone, William

9          McCloud, Adam Bercovici

10     ❖ Plaintiff's Exhibit 435:  LAFD Letter dated March 1, 2018 re Suspension

11         (COLA035409-16) – Witnesses: Anthony Marrone, William McCloud, Adam

12         Bercovici

13     ❖ Plaintiff's Exhibit 436: LAFD Investigation Report dated May 29, 2015

14         (COLA035417-28) – Witnesses: Anthony Marrone, William McCloud, Adam

15         Bercovici

16     ❖ Plaintiff's Exhibit 437: LAFD Supplemental Investigation Report dated

17         November 1, 2017 (COLA035429-37) – Witnesses: Anthony Marrone,

18         William McCloud, Adam Bercovici

19     ❖ Plaintiff's Exhibit 438:  LAFD Letter of Reprimand dated March 27, 2019

20         (COLA035438-41) – Witnesses: Anthony Marrone, William McCloud, Adam

21         Bercovici

22         **Defendants' Grounds for Objection:**  Irrelevant (FRE 104(b), 401, 402);

23  More prejudicial than probative (FRE 403).

24         **Plaintiff's Response to the Objections:**  Exhibits 434 through 438 involve

25  disciplinary proceedings related to a 2015 incident in which a supervisor for the Fire

26  Department took gratuitous photos of a victim's body.  The incident involved a

27  traffic accident between a dump truck and a motorcycle that resulted in a victim's

28  chest cavity being "filleted open."  According to the Fire Department's investigation

findings, a supervisor for the Fire Department lifted a sheet that was covering the victim and, in front of 20 to 30 nearby members of the public, snapped a photo of the victim's body on his cell phone.  A member of the public complained to the Department about the firefighter taking the photo, the Department investigated, and the firefighter was initially informed that he would be suspended for 30 days.  However, as shown in the above exhibits, this discipline was later reduced to a 12-day suspension, and then to a mere written reprimand.  In the discipline letters, the Fire Department acknowledged: "Although the Penalty Guide provides a range of penalties for failing to exercise good judgment and bringing discredit or embarrassment upon the Department through on- or off-duty behavior, no policy expressly addresses the circumstances of this matter."  (Emphasis added.)

These exhibits demonstrate that after the Ninth Circuit recognized the privacy right in *Marsh*, the Fire Department became aware that one of its firefighters had snapped photographs of a deceased person's open chest cavity for no legitimate purpose.  Rather than take steps to prevent such incidents in the future, the Department sat on its hands and never implemented any policies or training related to death images.  This inaction is highly probative of the Department's deliberate indifference.  These exhibits are therefore relevant and not unfairly prejudicial because they show the Fire Department's actual or constructive notice of the risk that its personnel would take unnecessary photos of victims' remains and that, absent a clear policy backed by training and discipline, its personnel would inevitably violate citizens' constitutional right to control their deceased family members' remains and images of those remains.

In arguing that the exhibits are irrelevant and prejudicial, Defendants continue to misunderstand the *Marsh* privacy right and misstate the law.  The constitutional right at issue is not a narrow right to prevent "public dissemination" of photographs of deceased family members.  Rather, the right rests on two pillars:  the government's duty to treat the dead with respect, and the bereaved's right to control

the body and death images of their loved ones.  *See Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1154-56 (9th Cir. 2012).  The heartland of the right is a protection against the government's gratuitous exploitation of a family member's tragic death—a right that the Supreme Court has recognized is rooted in our history and traditions and which "flows from the well-established substantive due process right to family integrity." *Id.* at 1154.  *Marsh* does not purport to define the entire universe of ways in which this right to control death images of family members may be violated.

Relying on unpersuasive authority from outside the Ninth Circuit, Defendants repeatedly reference the "clearly established" standard that is inapplicable in *Monell* cases.  Requiring Plaintiff to prove that the right at issue was clearly established would "create a *de facto* qualified immunity for municipalities that is contrary to Ninth Circuit law." *Azevedo v. City of Fresno*, 2011 WL 284637, at *15 (E.D. Cal. Jan. 25, 2011).  "A municipality is not entitled to assert the defense of qualified immunity." *Huskey v. City of San Jose*, 204 F.3d 893, 902 (9th Cir. 2000) (citing *Owen v. City of Indep.*, 445 U.S. 622, 638 (1989)).

**Defendants' Response:**  Exhibits 434-438 all relate to the same incident—an LACFD firefighter who took unnecessary photos of a deceased patient while responding to a fatal traffic collision in July 2014.  There were *no* allegations that the LACFD member ever displayed, shared or publicly disseminated the photos in connection with that incident eight years ago.  Exhibits 434-438 have nothing to do with public dissemination and are not relevant to this case.

This case is about whether Defendants' policies and training were insufficient such that they caused a violation of Plaintiff's substantive due process rights under *Marsh*—specifically, public dissemination of crash site photos depicting Plaintiff's relatives.  To constitute a substantive due process violation for purposes of *Monell* and *Marsh*, conduct must "shock the conscience." *Schwartz v. Lassen Cnty. ex rel. Lassen Cnty. Jail*, No. 2:10-CV-03048-MCE, 2013 WL 5375588, at *8 (E.D. Cal.

1   Sept. 24, 2013).  In *Marsh*, the Ninth Circuit said that "[o]nly [the prosecutor's]

2   attempt to publish the autopsy photograph is sufficiently shocking to violate Marsh's

3   substantive due process right."  *Marsh v. County of San Diego*, 680 F.3d 1148 fn.3

4   (9th Cir. 2012).   The former prosecutor's other acts—including photocopying the

5   autopsy photos—were not sufficiently "shocking" to constitute a substantive due

6   process violation.  *Id*.

7          Neither *Marsh* nor any other case establishes a constitutional violation for

8   *taking* photos of a deceased person.  Whether Defendants were on notice of a

9   firefighter taking unnecessary photos of a crash victim in 2014 has nothing to do

10  with the *Monell* claim in this case, which can only be based on public dissemination

11  of photos.  An isolated incident in 2014 about taking photos could not possibly have

12  put Defendants on notice of a need to amend its policies or trainings with respect to

13  *sharing* photos.

14         For these same reasons, Exhibits 434-438 have no bearing on the issue of

15  "deliberate indifference."  For Defendants to be liable under a failure to train *Monell*

16  theory (which requires "deliberate indifference"), the underlying constitutional right

17  must be "clearly established."  *Sumpter v. Wayne Cnty.*, 868 F.3d 473, 490 (6th Cir.

18  2017) ("Because Sumpter has not shown that the group Registry searches violated

19  clearly established law, Wayne County cannot be liable for failing to train its

20  officers to avoid them. Municipalities are liable for a failure to train when the failure

21  amounts to a deliberate indifference to the rights of persons with whom its officers

22  come into contact."); *Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385, 393

23  (8th Cir. 2007) ("[A] municipal policymaker cannot exhibit fault rising to the level

24  of *deliberate* indifference to a constitutional right when that right has not yet been

25  clearly established.").  There is no case law holding that taking photos violates a

26  substantive due process right to control family member's death images.  The 2014

27  picture-taking incident has no bearing on any constitutional right—let alone a

28  "clearly" established" one.

1    Prior to the incident at issue in this lawsuit, LACFD had never received a

2    complaint—internal or external—about a member sharing photos of a deceased

3    person.  Exhibits 434-438 do not show this, either.  They will only confuse and

4    mislead the jury, which will unfairly prejudice Defendants.

5    Even if Exhibits 434-438 were relevant, they will necessitate undue

6    consumption of limited trial time, which far outweighs any minimal probative

7    value.  If Plaintiff is permitted to introduce Exhibits 434-438, Defendants will have

8    to introduce witnesses and evidence to explain to the jury that the complaint did not

9    involve sharing of crash site photos, how the complaint was received, the

10   investigation that was conducted, and the discipline that was imposed.  None of that

11   is relevant to Plaintiff's claims at trial, but Defendants would be forced to put on this

12   evidence so that the jury understands what really happened.

13   **XI.   <u>Document Regarding Incident Involving Sheriff's Deputy in 2016.</u>**

14   One (1) of Plaintiff's exhibits to which Defendants object is a packet of

15   Sheriff's Department materials related to an alleged incident involving a deputy in

16   2016:

17   ❖  <u>Plaintiff's Exhibit 85:</u>  LASD Watch Commander's Service Comment Report

18       dated July 31, 2016 (COLA035335) – Witnesses: Alex Villanueva, William

19       Jaeger, Adam Bercovici

20   **Defendants' Grounds for Objection:**  Irrelevant (FRE 104(b), 401, 402);

21   More prejudicial than probative (FRE 403).

22   **Plaintiff's Response to the Objections:**  Exhibit 85 is a report detailing an

23   LASD deputy using his personal cell phone to take a photo of a deceased gunshot

24   victim in the presence of a member of the public.  The Department received a

25   complaint from a member of the public, conducted an investigation, and concluded

26   that the deputy had in fact used his personal cell phone to photograph a deceased

27   homicide victim.  The LASD official conducting the investigation recommended

28   that the complaint be filed as, "Employee Conduct Should Have Been Different,"

1   and two performance log entries were issued in connection with the incident.

2       Defendants' contention that the incident did not involve improper photo-

3   taking is incorrect.  One of the performance log entries issued to the offending

4   deputy in Exhibit 85 state: "During the call for service, you took photographs of the

5   victims of a crime, using a cellular communications device.  This is not an

6   acceptable form of document the scene of a crime."

7       This exhibit is relevant and not unfairly prejudicial because it shows that

8   LASD was on actual or constructive notice that, absent a clear policy backed by

9   training and discipline, improper photos of human remains would be inevitable,

10  which pertains to Defendants' liability under *Monell*.

11      In arguing that the exhibits are irrelevant and prejudicial, Defendants again

12  misconstrue the *Marsh* privacy right.  The constitutional right at issue is not a

13  narrow right to prevent "public dissemination" of photographs of deceased family

14  members, but a right for family members to control the body and death images of

15  their loved ones.  *See Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1154-56 (9th

16  Cir. 2012).  *Marsh* does not purport to define the entire universe of ways in which

17  this right to control death images of family members may be violated.

18      Defendants also again improperly attempt to inject the "clearly established"

19  standard into this case.  Requiring Plaintiff to prove that the right at issue was

20  clearly established would "create a *de facto* qualified immunity for municipalities

21  that is contrary to Ninth Circuit law."  *Azevedo v. City of Fresno*, 2011 WL 284637,

22  at *15 (E.D. Cal. Jan. 25, 2011).  "A municipality is not entitled to assert the defense

23  of qualified immunity."  *Huskey v. City of San Jose*, 204 F.3d 893, 902 (9th Cir.

24  2000) (citing *Owen v. City of Indep.*, 445 U.S. 622, 638 (1989)).

25      **Defendants' Response:**  Exhibit 85 is a packet of materials from 2016

26  relating to an internal LASD investigation of a deputy who made an inappropriate

27  comment about a deceased victim while on scene.  There is nothing in Exhibit 85

28  about "improper photos of human remains," as Plaintiff contends.  There was no

1   allegation that the photo taken by the deputy in that case was improper or

2   unnecessary.  That was not an issue in the investigation.  The only conduct that

3   "should have been different" were the deputy's inappropriate comments.  Moreover,

4   there was no allegation that the deputy improperly shared or publicly disseminated

5   any photos.  Exhibit 85 has nothing to do with public dissemination and is not

6   relevant to this case.

7          This case is about whether Defendants' policies and training were insufficient

8   such that they caused a violation of Plaintiff's substantive due process rights under

9   *Marsh*—specifically, public dissemination of crash site photos depicting Plaintiff's

10  relatives.  To constitute a substantive due process violation for purposes of *Monell*

11  and *Marsh*, conduct must "shock the conscience."  *Schwartz*, 2013 WL 5375588, at

12  *8.  In *Marsh*, the Ninth Circuit said that "[o]nly [the prosecutor's] attempt to

13  publish the autopsy photograph is sufficiently shocking to violate Marsh's

14  substantive due process right."  *Marsh*, 680 F.3d at fn.3.  The former prosecutor's

15  other acts—including photocopying the autopsy photos—were not sufficiently

16  "shocking" to constitute a substantive due process violation.  *Id*.

17         Neither *Marsh* nor any other case establishes a constitutional violation for

18  *taking* photos of a deceased person.  Nor is there any case establishing a

19  constitutional violation for making inappropriate comments about a deceased

20  person.  Whether Defendants were on notice of deputy making an inappropriate

21  comment while responding to a fatal accident in 2016 has nothing to do with the

22  *Monell* claim in this case, which can only be based on public dissemination of

23  photos.  Even if Exhibit 85 involved a deputy taking an improper photo (it does not),

24  an incident about taking an improper photo could not possibly have put Defendants

25  on notice of a need to amend its policies or trainings with respect to *sharing* photos.

26         For these same reasons, Exhibit 85 has no bearing on the issue of "deliberate

27  indifference."  For Defendants to be liable under a failure to train *Monell* theory

28  (which requires "deliberate indifference"), the underlying constitutional right must

be "clearly established."  *Sumpter*, 868 F.3d at 490 ("Because Sumpter has not shown that the group Registry searches violated clearly established law, Wayne County cannot be liable for failing to train its officers to avoid them. Municipalities are liable for a failure to train when the failure amounts to a deliberate indifference to the rights of persons with whom its officers come into contact."); *Szabla*, 486 F.3d at 393 ("[A] municipal policymaker cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established.").  There is no case law holding that making inappropriate comments about a victim (or taking photos of a deceased victim) violates a substantive due process right to control family member's death images.  The 2016 deputy incident has no bearing on any constitutional right—let alone a "clearly" established" one.

Prior to the incident at issue in this lawsuit, LASD had never received a complaint—internal or external—about a member sharing photos of a deceased person.  Exhibit 85 does not show this, either.  It will only confuse and mislead the jury, which will unfairly prejudice Defendants.

Even if Exhibit 85 were relevant, it will necessitate undue consumption of limited trial time, which far outweighs any minimal probative value.  If Plaintiff is permitted to introduce this packet of materials, Defendants will have to introduce witnesses and evidence to explain to the jury that the complaint did not involve improper taking or sharing of crash site photos, how the complaint was received, the investigation that was conducted, and the discipline that was imposed.  None of that is relevant to Plaintiff's claims at trial, but Defendants would be forced to put on this evidence so that the jury understands what really happened.

## XII.   <u>Documents Related to Captain Vander Horck's Transfer.</u>

Two (2) of Plaintiff's exhibits to which Defendants object relate to Captain Matthew Vander Horck's removal as Captain of the Lost Hills Sheriff's Station in February 2020:

1    ❖ Plaintiff's Exhibit 129:  Announcement of Vander Horck Transfer

2    (COLA0035860) – Witness: Matthew Vander Horck, Adam Bercovici

3    ❖ Plaintiff's Exhibit 131:  Email dated February 20, 2020 Involving Matthew

4    Vander Horck, titled: "Fw: Contact US - LASD.org 'Kobe'" (COLA007303-

5    04) – Witness: Matthew Vander Horck, Adam Bercovici

6        **Defendants' Grounds for Objection:**  Irrelevant (FRE 104(b), 401, 402);

7    More prejudicial than probative (FRE 403).

8        **Plaintiff's Response to the Objections:**  Exhibit 129 is a notification

9    announcing Captain Matthew Vander Horck's transfer from the Malibu – Lost Hills

10   Station to the Men's Central Jail.  Exhibit 131 reflects Captain Vander Horck

11   forwarding a chain email with his supervisors related to the citizen complaint about

12   the photos from his work account to his personal Gmail account.  Vander Horck

13   testified at deposition that he forwarded the email to his personal Gmail account

14   because he thought he may need to pursue legal action related to his unwanted

15   transfer from the Lost Hills Station to the Men's Central Jail—a transfer that

16   occurred just three weeks after he voiced concerns about Sheriff Villanueva's

17   instruction that deputies delete photos in exchange for amnesty.

18        As explained in Plaintiff's opposition to Defendants' motion *in limine* #3,

19   evidence regarding Sheriff Villanueva's retaliation against Captain Vander Horck is

20   relevant and not unfairly prejudicial for several reasons, including: (i) it evidences

21   LASD's custom and practice and deliberate indifference with respect to photos of

22   human remains, as the Sheriff elected to discipline only the individual who voiced

23   concern and refrained from disciplining individuals who took and shared photos of

24   the victims' remains; and (ii) it strongly suggests that the Sheriff's deletion orders

25   were part of a self-interested cover-up rather than an altruistic effort to protect the

26   victims' families.

27        **Defendants' Response:**  In an effort to reduce the number of trial exhibits

28   and objections the Court has to rule on, Defendants proposed to Plaintiff that if the

1  Court denies Defendants' Motion in *Limine* No. 3, Defendants would withdraw their

2  objections to Exhibit 129 and agree that it could be pre-admitted as an exhibit.  In

3  exchange, Defendants requested that Plaintiff withdraw Exhibit 131, which is an

4  email from Captain Vander Horck to himself and is not relevant to any of the issues

5  or claims in this case.  Plaintiff refused to accept this compromise.

6      Neither exhibit is relevant to any of Plaintiff's claims in this case.  While

7  Plaintiff seeks to tell the jury her conspiracy theory about Captain Vander Horck's

8  transfer, it had nothing to do with photos of the crash site or LASD's investigation

9  into the photos.  Sheriff Villanueva, who made the decision, testified that it was

10  entirely unrelated to this issue.  Captain Vander Horck, who Plaintiff paints as a

11  victim, agrees with Sheriff Villanueva.  In fact, Vaptain Vander Horck testified at

12  deposition and submitted a declaration in this case making this clear: "I don't

13  believe that my temporary -- whatever -- demotion, whatever you want to call it, or

14  my transfer had anything to do with this crash or the photos." (Oct. 26, 2021 Depo

15  Tr. at 231:21-232:4.)  (*See also* Dkt. 159-61.)  Plaintiff's conspiracy theory is

16  wrong.

17      Exhibit 129 should be excluded for the reasons set forth in Defendants'

18  Motion in *Limine* No. 3.  (*See* Dkt. 252.)  Even if Plaintiff's

19  whistleblower/retaliation theory were true (it's not), evidence of Captain Vander

20  Horck's job transfer has no bearing on whether photos depicting Plaintiff's relatives

21  were publicly disseminated in violation of Plaintiff's constitutional rights.

22      In the event the Court denies Defendants' Motion in *Limine* No. 3, Exhibit

23  131 is still not relevant and should not be admitted at trial.  Exhibit 131 is an email

24  from Captain Vander Horck to himself forwarding the initial citizen complaint about

25  the events at the Baja Bar & Grill in Norwalk.  The initial citizen complaint is

26  already a trial exhibit that is being pre-admitted.  (*See* Trial Ex. 126.)  Exhibit 131

27  does not contain any additional information other than Captain Vander Horck

28  forwarding it to himself.  The email has no bearing on whether Plaintiff's

constitutional rights were violated through the public dissemination of crash site photos depicting Plaintiff's relatives.

### DEFENDANTS' EXHIBITS

### XIII.  Documents Relating to Wrongful Death Lawsuit.

Four (4) of Defendants' exhibits to which Plaintiff objects relate to Plaintiff Vanessa Bryant's wrongful death lawsuit against the operators of the helicopter:

- ❖ Defendants' Exhibit 91:  Consolidated Complaint for Damages (Wrongful Death/Survival/ Negligence / Helicopter Crash).  Witnesses: Plaintiff
- ❖ Defendants' Exhibit 672:  Joint Stipulation of Dismissal with Prejudice, *Bryant, et al. v. Island Express Helicopters, Inc., et al*., United States District Court, Central District of California, Case No. 2:20-cv-08953 FMO (PVCx) [Dkt. 121.].  Witnesses: Plaintiff
- ❖ Defendants' Exhibit 673:  Order Dismissing Action with Prejudice re Bryant Plaintiffs, *Bryant, et al. v. Island Express Helicopters, Inc., et al.*, United States District Court, Central District of California, Case No. 2:20-cv-08953 FMO (PVCx) [Dkt. 124.].  Witnesses: Plaintiff
- ❖ Defendants' Exhibit 674:  Joint Stipulation of Dismissal with Prejudice, *Bryant, et al. v. Island Express Helicopters, Inc., et al.*, United States District Court, Central District of California, Case No. 2:20-cv-08953 FMO (PVCx) [Dkt. 125.].  Witnesses:  Plaintiff
- ❖ Defendants' Exhibit 675:  Order Dismissing Action, *Bryant, et al. v. Island Express Helicopters, Inc., et al*., United States District Court, Central District of California, Case No. 2:20-cv-08953 FMO (PVCx) [Dkt. 139.].  Witnesses: Plaintiff

**Plaintiff's Grounds for the Objection:**  Relevance (FRE 402); unfair prejudice, confusion, and/or waste of time (FRE 403); inadmissible hearsay (FRE 802); subject to Plaintiff's MIL #3 to exclude evidence of Plaintiff's financial condition, including references to settlement of prior lawsuit; for Exhibits 672, 673,

1  and 675 only: foundation (FRE 104(a)).

2       **Defendants' Response to the Objection:**  As more fully briefed in

3  Defendants' Opposition to Plaintiff's Motion in *Limine* No. 3, Exhibits 91 and 672-

4  675 are relevant and admissible.  [*See* Dkt. 237 at 13-19.]

5       Plaintiff intends to introduce evidence about the crash that killed her husband

6  and daughter.  (*See* FAC ¶¶ 23-25.)  Defendants are entitled to tell the jury that any

7  emotional distress Plaintiff suffered as a result of the crash is not Defendants'

8  fault.  Defendants are also entitled to tell the jury that Plaintiff sued the helicopter

9  operators and settled her claims.  It would be prejudicial to Defendants and

10  confusing for jurors if Defendants were precluded from telling the jury

11  this.  Plaintiff cannot recover for emotional distress caused by the loss of her

12  husband and daughter.  The jury may also be confused about why Plaintiff is suing

13  Defendants but did not sue the helicopter company.  It is critical to the Defendants

14  that jurors be told what happened.

15       There are no FRE 403 concerns implicated here.  Defendants do not intend to

16  argue to the jury that Plaintiff has already been compensated for the harm she

17  alleges in this case.  The introduction of this evidence will not require the parties to

18  conduct a mini-trial about the helicopter lawsuit.  Defendants only intend to tell the

19  jury that Plaintiff sued the helicopter company and settled that lawsuit.  There will

20  be no need to talk about the negotiation or bases for the settlement.

21       These Exhibits are not hearsay.  The Exhibits are court records offered to

22  show that Plaintiff sued the helicopter operators and settled her claims for the

23  helicopter crash itself.  Exhibit 91 is Plaintiff's own complaint in that lawsuit—

24  indisputably constituting a party admission.  Exhibits 672, 673, and 675 are simply

25  stipulations and orders of dismissal, evidencing the resolution of the action.

26       **Plaintiff's Response:**  As the Court suggested at the Pretrial Conference, the

27  jury can be instructed that this case is not about what caused the crash, Defendants

28  are not responsible for the crash, and Plaintiff's damages do not include grief from

the deaths of her loved ones that would have occurred regardless of Defendants' misconduct. Plaintiff has submitted an appropriate instruction. (*See* Dkt. 318, Ex. A.) With that, there is no reason for Defendants to discuss Plaintiff's lawsuit against the helicopter operator or its settlement other than to improperly (and falsely) cast Plaintiff as litigious or suggest that she already has been compensated for her injury through other litigation. As more fully briefed in Plaintiff's MIL No. 3, whether there was a suit against the operator and whether it was settled are simply irrelevant to the jury's task here, including because it involves different conduct and harm; emotional distress was not recoverable in that lawsuit. (*See* Dkt. 237 at 9-12).

**XIV.** **Documents Relating to Lawsuit Against Mrs. Bryant by Her Mother.**

Three (3) of Defendants' exhibits to which Plaintiff objects relate to a lawsuit brought against Vanessa Bryant by her mother:

❖ Defendants' Exhibit 669: Complaint for Damages, *Urbieta v. Bryant, et al.*, Orange County Superior Court, Case No. 30-2020-01174715-U-FR-CJC. Witnesses: Plaintiff

❖ Defendants' Exhibit 670: Notice of Settlement of Entire Case, *Urbieta v. Bryant, et al.*, Orange County Superior Court, Case No. 30-2020-01174715-U-FR-CJC. Witnesses: Plaintiff

❖ Defendants' Exhibit 671: Request for Dismissal, *Urbieta v. Bryant, et al.*, Orange County Superior Court, Case No. 30-2020-01174715-U-FR-CJC. Witnesses: Plaintiff

**Plaintiff's Grounds for the Objection:** Relevance (FRE 402); unfair prejudice, confusion, and/or waste of time (FRE 403); inadmissible hearsay (FRE 802); subject to Plaintiff's MIL #3 to exclude evidence of Plaintiff's financial condition, including references to settlement of prior lawsuit; foundation (FRE 104(a)).

**Defendants' Response to the Objection:** Exhibit 669-671 are highly probative of Plaintiff's mental state. Plaintiff intends to ask the jury to award her

tens of millions in emotional distress damages.  Defendants are entitled to show that Plaintiff's emotional state was affected by stressors other than Defendants' alleged actions.  *See, e.g., E.E.O.C. v. California Psychiatric Transitions*, 258 F.R.D. 391, 400 (E.D. Cal. 2009).  A separate and contentious lawsuit brought by Plaintiff's own mother—following on the heels of the tragic loss of family members—is highly relevant to Plaintiff's emotional state.  Exhibit 669-671 are indisputable court records (subject to judicial notice) that are probative of this critical issue.

The complaint filed by Plaintiff's mother (Exhibit 669) is not hearsay because it is not being offered for its truth.  It does not matter whether the allegations are true or false—what matters is that Plaintiff's mother made these allegations, which is a highly plausible reason for Plaintiff to be upset.  Plaintiff's argument that the complaint's probative value is substantially outweighed by unfair prejudice is incorrect.  For the jury to understand why the lawsuit would be a significant source of stress to Plaintiff, the jury needs to see the nature of the accusations Plaintiff's mother was making against her.  Defendants will not be arguing the truth of the allegations, so the risk of prejudice to Plaintiff is limited.

Plaintiff's involvement in this lawsuit with her mother does not relate to her wealth or financial condition.  Any allegations in the complaint that tangentially touch on Plaintiff's financial condition are not being offered for their truth.  Plaintiff does not even identify this lawsuit among the evidence she sought to exclude in filing MIL No. 3 regarding evidence of financial condition.  [*See* Dkt. 237.]

Plaintiff's objections to Exhibit 670 (the notice of settlement) and Exhibit 671 (the request for dismissal) are also misplaced.  How the litigation was resolved is part of assessing its impact on Plaintiff's emotional state.  These are simply court records of a relevant proceeding.

**Plaintiff's Response:**  Exhibit 669 is the complaint in a lawsuit filed against Vanessa Bryant by her mother alleging entitlement to compensation as a nanny for time spent with her grandchildren over many years.  Setting aside whether the fact

of the lawsuit itself is admissible, the *precise allegations* and *legal claims* asserted in the complaint are irrelevant and, at a minimum, more time-wasting, confusing, and prejudicial than they are probative.  If Defendants wish to establish that Mrs. Bryant was sued by her mother, they can ask her that question at trial and she will answer truthfully, as she did at deposition.  (*See* Bryant Dep. at 25:22 [Q: By the way, have you ever been in litigation before this lawsuit that you filed?  A: Yes. . . . Q: And what was that?  A: My mother filed a lawsuit against me. . . .  Q: Okay. And what was your mother's lawsuit about?  A: She felt that she was entitled to money because she's my husband's mother-in-law.].)

Airing the details of the allegations in the lawsuit brought by Mrs. Bryant's mother is an improper attempt to smear Mrs. Bryant and make her unsympathetic to the jury.  For example, the complaint falsely alleges that "[o]n a daily basis, for nearly eighteen (18) years, Vanessa Bryant gave [her mother] a grueling schedule and detailed instructions on taking care of the Bryants' children" and "forced [her] to work over twelve (12) hours per day with no meal or rest breaks."  The complaint further falsely alleges that Mrs. Bryant "instructed [her mother] to sell all of her belonging because she was only to move into Vanessa Bryant's house with just her clothes."  These hearsay statements are inflammatory and false, and could only be offered by Defendants in a bad-faith attempt to cast Mrs. Bryant in a negative light.

The complaint also contains numerous statements referencing the Bryants' financial status, including the amount of money they have spent on houses.  For the reasons articulated in Plaintiff's motion *in limine* #3 to exclude evidence of Plaintiff's financial condition, these facts are prejudicial and inadmissible.

Exhibits 670 and 671 are court documents indicating that Mrs. Bryant settled the lawsuit involving her mother.  Setting aside whether Defendants should be allowed to ask Mrs. Bryant whether she was sued by her mother, *resolving* a legal dispute with one's mother has no relevance to Mrs. Bryant's emotional distress, and introducing evidence of the settlement would falsely imply that Mrs. Bryant

1  somehow wronged her mother.  She did not, and she should not be forced to

2  introduce external evidence on that point to rebut Defendants' irrelevant mud-

3  slinging.

4  **XV.   Mrs. Bryant's Instagram Posts.**

5      One (1) of Defendants' exhibits to which Plaintiff objects is a collection of

6  posts from Mrs. Bryant's Instagram account:

7  ❖ Defendants' Exhibit 668:  Vanessa Bryant Instagram Account and Posts -

8      @vanessabryant (https://www.instagram.com/vanessabryant).  Witnesses:

9      Plaintiff

10     **Plaintiff's Grounds for the Objection:**  Composite / not a single document;

11  relevance (FRE 402); unfair prejudice, confusion, and/or waste of time (FRE 403);

12  inadmissible hearsay (FRE 802); subject to Plaintiff's MIL #3 to exclude evidence

13  of Plaintiff's financial condition, including references to settlement of prior lawsuit;

14  foundation (FRE 104(a))

15     **Defendants' Response to the Objection:**  Plaintiff's Instagram consists of

16  Plaintiff's own words (i.e., party admissions) and is critical evidence probative of

17  Plaintiff's claim of emotional distress.  Plaintiff contends she has suffered from

18  severe emotional distress because of Defendants' conduct.   Defendants are entitled

19  to ask the jury to assess this claim by looking at Plaintiff's prior statements—What

20  was Plaintiff posting about the loss of her family members, the helicopter crash, and

21  the issues in this lawsuit?  What was she saying about what and how she was

22  doing?  Plaintiff's position is that the jury can only assess her emotional distress by

23  what she says after preparation with her lawyers in deposition and at trial.  That is

24  not how it works.

25     Plaintiff objects that Exhibit 668 is a "composite," but this was done at

26  Plaintiff's request.  Defendants initially captured and submitted Plaintiff's

27  Instagram, exactly as it is found online, as an exhibit.  Plaintiff objected to the

28  admission of her Instagram as a whole, and so Defendants trimmed the exhibit to

only those portions of her Instagram that Defendants expect to use at trial.  Plaintiff cannot have it both ways—if Plaintiff objects to the admission of Plaintiff's Instagram as it actually exists online, then Exhibit 668 is a reasonable alternative.

Plaintiff also objects that her public Instagram posts are more prejudicial than probative because they "associate Mrs. Bryant with an upper-class lifestyle" and "a party's wealth is irrelevant and unfairly prejudicial."  However, the Rule 403 analysis is not in Plaintiff's favor.  The probative value of Plaintiff's Instagram is significant.  Plaintiff's emotional state is at the center of this case, and there is little more revealing of Plaintiff's emotional state than her own words about her life, sadness, the targets of her anger, her activities, and other stressors that could contribute to any emotional distress.  *See, e.g., E.E.O.C. v. California Psychiatric Transitions*, 258 F.R.D. 391, 400 (E.D. Cal. 2009) (a party may investigate other causes of claimed emotional distress).

The risk of prejudice does not "substantially" outweigh the significant probative value of Plaintiff's Instagram.  By Plaintiff's argument, almost anything touching on Plaintiff's lifestyle must be excluded as evidence of "wealth or financial condition," no matter how probative.  That is not correct.  Defendants are not seeking to admit Plaintiff's net worth or salary—only her own statements probative of her claim of emotional distress.  Plaintiff did not even mention her Instagram in filing her MIL No. 3 regarding evidence of her financial condition.  [*See* Dkt. 237.]

Emotional distress cannot be objectively assessed in the same ways as a physical injury.  The jury must evaluate Plaintiff's claim of emotional distress largely by her words and actions.  It would be profoundly unfair if all the jury heard about Plaintiff's claimed distress was what Plaintiff presents at trial.  Plaintiff's prior out-of-court statements are critical, irreplaceable evidence, especially because Plaintiff refused to sit for an independent medical examination.

**Plaintiff's Response:**  Defendants' Exhibit 668 is a mashup of 89 Instagram posts by Mrs. Bryant.  For the most part, they are photos of Mrs. Bryant and her

1   family, accompanied by short written messages by Mrs. Bryant.

2        As detailed below, the overwhelming majority of the posts are irrelevant and

3   unduly prejudicial.  A quick glance through the material is sufficient to prove this

4   point, and Plaintiff has attached Defendants' proposed Instagram posts as **Exhibit H**

5   to the Lavoie Declaration.  As the Court can observe, most of the disputed photos

6   depict Mrs. Bryant spending time with celebrities, traveling in Europe, wearing

7   designer clothing, eating at nice restaurants, attending galas, and visiting Disneyland

8   with her young children.  A sequence of seventeen photos in **Exhibit H** depict Mrs.

9   Bryant walking down an alleyway in Italy wearing a bright-colored dress.

10  Defendants' improper purpose is obvious.

11       Nonetheless, in an effort to avoid burdening the Court, Plaintiff offered to

12  consent to the admission of five pages of Defendants' 89-page packet (pages 3, 7,

13  15, 16, and 18), which reflect posts by Mrs. Bryant about media coverage of the loss

14  of her family members.  (Lavoie Decl., ¶ 8.)  Defendants rejected this compromise

15  and insist that their entire proposed set of posts—all 89 pages of them—must be

16  argued and ruled upon in a single chunk.  (*Id.*)  Defendants' 89-page compilation is

17  improper and inadmissible for several reasons.

18       *First,* Defendants may not designate as a single trial exhibit a large

19  compilation of posts from Plaintiff's Instagram account.  This would be equivalent

20  to Plaintiff designating 89 of Sheriff Villanueva's emails as a single exhibit.  This

21  impedes the parties' ability to brief—and the Court's ability to rule on—each

22  individual post.  At the parties' meet and confer, counsel for Plaintiff shared their

23  computer screen during the video conference and asked Defendants to articulate the

24  relevance of several individual posts.  (Lavoie Decl. ¶ 8.)  Defendants refused to

25  provide individualized rationales, stating that Defendants need not disclose how

26  they intend to conduct Mrs. Bryant's cross-examination at trial.  (*Id.*)  By combining

27  numerous posts into a single trial exhibit and then refusing to provide individualized

28  relevance arguments, Defendants have hamstrung Plaintiff's efforts to tailor their

1   objections and provide responsive briefing.

2       *Second*, with the exception of the five pages identified in Plaintiff's proposed

3   compromise, all the photos and posts in Exhibit 668 are irrelevant and unfairly

4   prejudicial.  Defendants' apparent purpose in putting these photos before the jury is

5   to make Mrs. Bryant appear un-relatable as a person of celebrity and personal

6   wealth.  Defendants previously stated that they "do not intend to reference

7   Plaintiff's wealth or income at trial" (Dkt. 237 at 13), but that is precisely what they

8   set out to do here.

9       As briefed in connection with Plaintiff's motion *in limine* no. 3 (Dkt. 237),

10   evidence of a party's wealth is irrelevant and unfairly prejudicial.  *See, e.g.*,

11   *Hoffman v. Brandt*, 65 Cal. 2d 549, 552–553 (1966) ("Justice is to be accorded to

12   rich and poor alike, and a deliberate attempt by counsel to appeal to social or

13   economic prejudices of the jury, including the wealth or poverty of the litigants, is

14   misconduct where the asserted wealth or poverty is not relevant to the issues of the

15   case."); *In re Homestore.com, Inc*., 2011 WL 291176, at *1 (C.D. Cal. Jan. 25,

16   2011) ("[e]vidence of a party's financial condition is generally not relevant and can

17   be unduly prejudicial, as it can distract the jury from the real issues in the case").

18   Indeed, one of the parties' agreed-upon jury instructions is CACI No. 117, which

19   states that the jury "may not consider the wealth or poverty of any party in reaching

20   [its] verdict" and that "the parties' wealth or poverty is not relevant to any of the

21   issues that [it] must decide."  CACI No. 117.

22       Photos that associate Mrs. Bryant with an upper-class lifestyle encourage

23   jurors to ignore this instruction and consider her financial status in their evaluation

24   of the case.  This carries a high risk of unfair prejudice.  Such information may be

25   used to insinuate that Mrs. Bryant's financial status meant her injury was

26   inconsequential, that her financial status may have mitigated any damages she

27   endured and will continue to endure, or that Mrs. Bryant's pursuit of this lawsuit is a

28   so-called "money grab" (as Defendants have alleged in statements to the press).

None of these interpretations has any grounding in reality, but they would inevitably prejudice the jurors' ability to make reasoned decisions based on the facts and the law. *See United States v. Ellis*, 147 F.3d 1131, 1135 (9th. Cir. 1998) (Rule 403 is intended to preclude evidence with an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one" or "evidence designed to elicit a response from the jurors that is not justified by the evidence"). The risk is magnified by the fact that many of the photos in Defendants' compilation are duplicative, bombarding jurors with the same images of wealth and celebrity. Defendants have no legitimate purpose for admitting any of these images into evidence, much less seventeen images with near-identical content and no substantive basis for their inclusion.

Defendants previously argued that they are entitled to show "other stressors" in Mrs. Bryant's life. But Defendants fail to explain how photos that show Mrs. Bryant wearing expensive clothing or traveling or attending events are evidence of stressors that might in any way mitigate or explain away her severe emotional distress. In any event, any purported relevance of these photos is outweighed by the risk of undue prejudice and biasing the jury against Mrs. Bryant based on her lifestyle and celebrity. Fed. R. Evid. 403.

In an apparent pivot, Defendants' most recent briefing in this filing (which Defendants did not provide to Plaintiff until after midnight on the morning of July 16) argues that the Instagram posts are relevant because they include statements from her about the loss of her family members, the helicopter crash, and her emotional distress. But Defendants fail to identify a single post within the exhibit that they consider admissible for this purpose. As explained, Plaintiff offered to consent to the admission of five Instagram posts that contain captions describing the loss of Plaintiff's family members. Of the remaining posts, the vast majority contain no caption at all (and, hence, no statement by Plaintiff) or a caption that concerns matters that have nothing to do with this lawsuit such as a product

endorsement.  If Defendants believe there are specific posts beyond those Plaintiff offered to admit that contain relevant statements by Mrs. Bryant, they must identify and seek to admit those posts individually.  What they cannot do—but have attempted to do anyway—is introduce an entire compilation of posts based on a vague assertion that certain, unspecified posts within the collection contain statements with a damages connection.

*Third*, Defendants asserted in the parties' prior joint statements that Mrs. Bryant's Instagram posts are relevant to compare Mrs. Bryant's behavior before and after the crash.  However, *none* of the posts in the 89-page exhibit pre-date the helicopter crash.

*Fourth*, several of the photos in Defendants' compilation do not portray Vanessa Bryant at all, but instead show only her nineteen-year-old daughter, Natalia.  One set of photos shows Natalia, standing alone, in a designer outfit at the Met Gala.  In the parties' meet and confer, Defendants have not articulated any justification for presenting these posts to the jury.

*Fifth*, several of the posts insert Mrs. Bryant's small children, ages two and four, into the lawsuit by showing photos of Mrs. Bryant smiling with them.  These photos are completely irrelevant and a waste of time.  To the extent Defendants wish to show that Mrs. Bryant's children constitute a "stressor" in her life, they can easily elicit testimony from Mrs. Bryant that she is the parent of small children.  Mrs. Bryant's Instagram posts do not support Defendants' argument and should not be presented to the jury.

## XVI.    <u>Documents Regarding the Sheriff's and Fire Departments' Policies, Trainings, and Procedures.</u>

Seven (7) of Defendants' exhibits to which Plaintiff objects relate to policies, trainings, and standards of conduct for LASD and LAFD personnel:

❖ <u>Defendants' Exhibit 676</u> - Los Angeles County Code of Ordinances Title 5, Appendix 1 Civil Service Rules § 18.031 Discipline

❖ <u>Defendants' Exhibit 677</u> - LACFD Code of Ethics and Oath of Office – V2-C1-S1 10/28/21 Rules and Regulations

❖ <u>Defendants' Exhibit 681</u> - California Commission on Peace Officer Standards and Training – Learning Domain 29: Traffic Collision Investigation

❖ <u>Defendants' Exhibit 682</u> - California Commission on Peace Officer Standards and Training – Learning Domain 1: Leadership, Professionalism, and Ethics

❖ <u>Defendants' Exhibit 683</u> - California Commission on Peace Officer Standards and Training – Learning Domain 00: Becoming an Exemplary Peace Officer

❖ <u>Defendants' Exhibit 686</u> - International Civil Aviation Organization, Annex 13 to the Convention on International Civil Aviation – Aircraft Accident and Incident Investigation

❖ <u>Defendants' Exhibit 687</u> - LASD Emergency Operating Procedure 2-2 Air Disaster (Ground and/or Sea)

**Plaintiff's Grounds for the Objection:**  Documents are barred from admission by FRCP 37(c)(1) because they were never disclosed in Defendants' Rule 26 disclosures and were produced for the first time on June 9, 2022—seven months after fact discovery cutoff of November 29, 2021, despite being responsive to several of Plaintiff's RFPs.

**Defendants' Response to the Objection:**  Plaintiff's claim that Exhibits 676, 677, 681, 682, 683, 686, and 687 are barred from admission because they were produced after the discovery cutoff is wrong.  All of these Exhibits are publicly available documents that Plaintiff has had access to throughout the course of this litigation.  Moreover, the entire basis for Plaintiff's case is that the County lacked adequate policies and trainings. Defendants are entitled to rebut these claims by presenting the relevant policies and training materials to the jury.  Plaintiff should not be permitted to argue that the County lacks adequate trainings and policies by preventing jurors from seeing the trainings and policies that are directly related to Plaintiff's claims.

All of the documents at issue are publicly available and/or have already been disclosed to Plaintiff.  Exhibit 676 is a section of the Los Angeles County Code of Ordinances.  *See* Los Angeles, Cal. County Code tit. 5, apx. 1, § 18.031.  Exhibit 676 is quoted in full in Exhibits 26-28, which were produced in discovery, used at deposition, and Plaintiff has sought to admit through motion *in limine* #5.  The pertinent portion of Exhibit 677 is likewise quoted in Exhibits 26-28.[2]  Exhibits 681-83 are portions of the publicly-available California Commission on Peace Officer Standards and Training.  (*See* https://post.ca.gov/Download-Student-Workbooks/CAv5POSTACC-Workbooks-1 (Exhibits 681-83 constitute, respectively, Learning Domains 29, 1, and 00).)  The Peace Officer Standards and Training learning domains were described during the deposition testimony of Captain Mark Flores, Defendant's Rule 30(b)(6) witness regarding LASD policies and trainings.  Exhibit 686 is a publicly-available production from the International Civil Aviation Organization regarding the investigation of aviation accidents.  (*See* https://archive.org/details/icao-an13-2016/page/n1/mode/2up).  Exhibit 687 is the LASD Emergency Operation Procedure 2-2 for air disasters; it was identified by LASD Captain Justin Diez during his deposition.

All of these documents are public records which are readily available to anyone.  Documents are only subject to the duty to disclose under Rule 26(a)(1)(A)(ii) and the duty to produce under Rule 34(a)(1) if they are in the producing party's "possession, custody, or control."  Fed. R. Civ. P. 26(a)(1)(A)(ii); 34(a)(1).  "[A] party is not in 'control' of records that the requesting party has equal ability to obtain from public sources."  *Diaz v. Cnty. of Ventura*, 512 F. Supp. 3d 1030, 1035 (C.D. Cal. 2021) (alteration in original) (quoting Rutter Group Prac. Guide, Fed. Civ. Pro. Before Trial, Ch. 11(IV)-C).  Accordingly, publicly available

---

[2]  In addition, Exhibit 677 is an updated version of a policy which was produced in discovery as COLA030147.

1    documents are not subject to exclusion under Rule 37.  *See* Fed. R. Civ. P. 37(c)(1)

2    (automatic exclusion applies where "a party fails to provide information or identify

3    a witness as required by Rule 26(a) or (e)").

4            In addition, even if public records were the subject of mandatory disclosure,

5    their public nature makes the failure to disclose them "harmless" and thus not

6    subject to exclusion.  Fed. R. Civ. P. 37(c)(1); *see Cmtys. Actively Living Indep. &*

7    *Free v. City of Los Angeles*, Case No. CV 09–0287 CBM, 2011 WL 4595993 (C.D.

8    Cal. Feb. 10, 2011 ("The Court finds that the City's failure to disclose the Federal

9    Emergency Management Agency ("FEMA") Comprehensive Preparedness Guide

10   101 is harmless because it is a publicly available planning document."); *Diaz*, 512 F.

11   Supp. 3d at 1035 (failure to disclose harmless "because the videos are publicly

12   available").

13           In its objection, Plaintiff fails to grapple with the distinction between

14   publicly-available documents and private documents.  Not a single case cited by

15   Plaintiff involved the exclusion of publicly-available documents.  *See Goodman v.*

16   *Staples The Office Superstore, LLC*, 644 F.3d 817, 827 (9th Cir. 2011) (report from

17   treating physician); *James Stewart Ent., LLC v. L&M Racing, LLC*, 2013 WL

18   12248146, *5 (C.D. Cal. June 28, 2013) (records from defendant's computers);

19   *Trinidad Lopez v. Liberty Mut. Ins. Co.*, 2019 WL 10303744, *1 (C.D. Cal. Oct. 8,

20   2019) (insurance claims data); *Rago v. Select Comfort Retail Corp.*, 2021 WL

21   3621890, at *9 (C.D. Cal. June 11, 2021) (pay stub records); *Haitayan v. 7-Eleven,*

22   *Inc.*, 2021 WL 1034152, at *3 (C.D. Cal. Mar. 8, 2021) (communications between

23   the parties); *Zadoian v. Target Corp.*, 2020 WL 3203145, at *2 (C.D. Cal. Apr. 14,

24   2020) (photographs and video of plaintiff); *Disney Enterprises, Inc. v. VidAngel*

25   *Inc.*, 2019 WL 4544428, at *3 (C.D. Cal. May 29, 2019) (300 documents from

26   defendant); *Yanikian v. Allstate Ins. Co.*, 2017 WL 2999035, at *3 (C.D. Cal. June

27   7, 2017) (plaintiff-prepared list valuing property); *Hakim v. Murano, Inc.*, 2017 WL

28   11632290, at *3 (C.D. Cal. Mar. 6, 2017), on reconsideration in part, 2017 WL

11632278 (C.D. Cal. May 2, 2017) (transaction data, party communications, and contracts); *Cosmos Jewelry, Ltd. v. Po Sun Hon Co.*, 2006 WL 5105219, at *1 (C.D. Cal. Apr. 5, 2006) (documents and jewelry samples).

Because Plaintiff has already received notice about these publicly-available records and they are relevant to this action, Plaintiff's objection to them should be overruled.

**Plaintiff's Response:**  Plaintiff propounded numerous discovery requests regarding Defendants' policies and training, but Defendants never produced the above materials before adding them to the exhibit list on June 9, 2022—more than six months after the discovery cutoff.  Defendants also never listed the above documents (either by name or category) in their Rule 26 disclosures as documents in their possession that they would use in support of their defenses.

Specifically, Plaintiff's requests for production included requests for all documents relating to (1) any training of Sheriff's Department or Fire Department personnel regarding treatment or handling of human remains, including the taking or sharing of photos of human remains; and (2) any federal constitutional right of individuals to control the death images and/or physical remains of deceased family members.  In addition, Plaintiff requested documents sufficient to show all Fire Department policies, procedures, and rules addressing whether and under what circumstances Fire Department personnel may take and share photos of human remains.  Defendants agreed to produce documents responsive to these requests.

In addition, Plaintiff served an interrogatory requiring Defendants to "identify and describe all training that Sheriff's Department personnel were required to receive between May 29, 2012 and January 26, 2020 relating to the taking or sharing of photos of human remains."  The County offered a four-page response and attached four policy and training documents, but none of the above exhibits were included.

Finally, Defendants' Rule 26 disclosures—which purported to capture (as required by rule) "categories of documents in their possession, custody or control that they may use in support of their defenses, excluding documents that would be used solely for impeachment"—did not reference any of the above documents, either specifically or by category.  Rather, Defendants listed only the following five specific categories of documents: (1) the Internal Affairs Bureau Investigative report; (2) citizens' complaint(s) regarding potential sharing of accident site photographs; (3) transcripts of interviews in connection with Internal Affairs Bureau Investigation; (4) accident site photographs; and (5) autopsy reports and photographs.  (*Id.*)

In meet and confer, Defendants conceded that they did not produce the above documents during discovery.  Hence, the federal rules provide that they should be automatically excluded.

Federal Rule of Civil Procedure 26(e) requires that a party "who has responded to an interrogatory, request for production, or request for admission . . . must supplement or correct its disclosure or response: in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  When a party "fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  This exclusion sanction is "self-executing" and "automatic" unless the party seeking to avoid exclusion demonstrates that the failure was substantially justified or harmless.  *See Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 827 (9th Cir. 2011).

Utilizing this framework, courts in this Circuit regularly exclude late-produced documents from use at trial.  For example, in *James Stewart Ent., LLC v.*

*L&M Racing, LLC*, 2013 WL 12248146 (C.D. Cal. June 28, 2013), the defendants produced responsive documents two months after the close of fact discovery.  The court excluded these late-produced documents, noting that although there was no bad faith, the defendants' failure to timely search its files was not justified and the late production harmed plaintiffs because it forced plaintiffs to "review documents well after the discovery cutoff . . . [and] prepare for defendants' use of this late-produced document." *Id*. at 5.

Similarly, in *Trinidad Lopez v. Liberty Mut. Ins. Co.*, 2019 WL 10303744 (C.D. Cal. Oct. 8, 2019), the defendants produced responsive documents after the close of fact discovery, approximately one month before the scheduled trial date. The court excluded these late-produced documents, rejecting defendants' argument that the delay was substantially justified by the effort required to compile the responsive documents and finding that permitting introduction of the documents "would substantially delay this action and impose significant burdens on Plaintiffs, and thus is not harmless." *Id*. at *2.  This is the routine result in the Central District, as evidenced by myriad cases.[3]

Even if the above materials were not responsive to Mrs. Bryant's discovery requests, Defendants are barred from using them at trial because they failed to disclose them as documents in their possession that they may use to support their defenses.  Rule 26(a)(1)(A)(ii) requires that, "without awaiting a discovery request,"

---

[3] *See, e.g.*, *Rago v. Select Comfort Retail Corp.*, 2021 WL 3621890, at *9 (C.D. Cal. June 11, 2021) (excluding late-produced documents); *Haitayan v. 7-Eleven, Inc.*, 2021 WL 1034152, at *3 (C.D. Cal. Mar. 8, 2021) (same); *Zadoian v. Target Corp.*, 2020 WL 3203145, at *2 (C.D. Cal. Apr. 14, 2020) (same); *Disney Enterprises, Inc. v. VidAngel Inc.,* 2019 WL 4544428, at *3 (C.D. Cal. May 29, 2019) (same); *Yanikian v. Allstate Ins. Co.*, 2017 WL 2999035, at *3 (C.D. Cal. June 7, 2017) (same); *Hakim v. Murano, Inc.*, 2017 WL 11632290, at *3 (C.D. Cal. Mar. 6, 2017), on reconsideration in part, 2017 WL 11632278 (C.D. Cal. May 2, 2017) (same); *Cosmos Jewelry, Ltd. v. Po Sun Hon Co.*, 2006 WL 5105219, at *1 (C.D. Cal. Apr. 5, 2006) (same).

the disclosure of "a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment."  Courts regularly enforce this requirement by excluding late-disclosed documents that a party may use to support its claims or defenses.  *See, e.g., Ear Charms, Inc. v. Bling Jewelry, Inc.*, 2019 WL 2902507, at *5 (C.D. Cal. May 23, 2019) (excluding late-disclosed documents party may use to support claims and defenses); *Yanikian v. Allstate Ins. Co.*, 2017 WL 2999035, at *3 (C.D. Cal. June 7, 2017) (same); *Estakhrian v. Obenstine*, 2016 WL 6868178, at *12 (C.D. Cal. Feb. 29, 2016), *report and recommendation adopted*, 2016 WL 6275599 (C.D. Cal. May 17, 2016) (same); *City of Inglewood v. Time Warner NY Cable LLC*, 2015 WL 12803767, at *3 (C.D. Cal. June 9, 2015) (same).

"Under Rule 37, the burden of establishing substantial justification and harmlessness is on the party that failed to make the required disclosure."  *Rodriguez v. JLG Indus., Inc.*, 2012 WL 12883784, at *18 n.12 (C.D. Cal. Aug. 3, 2012).  Defendants cannot carry this burden.

*First*, Defendants offer no substantial justification.  Their lone argument— that the late-produced documents have been publicly available—has been rejected by several courts.  In *Deutsche Bank Nat'l Tr. Co. v. Seven Hills Master Cmty. Ass'n*, 2016 WL 1639885, at *2 (D. Nev. Apr. 25, 2016), the court explained: "[Defendant's] argument that these documents were publicly available is misguided, as the public availability of the documents did not place Plaintiff on notice that [Defendant] would seek to use them in the instant case. . . . The documents' public availability is inapposite."  Similarly, in *Low v. Trump Univ., LLC*, 2016 WL 6732110, at *8 (S.D. Cal. Nov. 15, 2016), the court held: "Although a number of these [untimely disclosed] exhibits were identified as publicly available by

1  Defendants, the fact that exhibits were publicly available does not justify

2  Defendants' untimely disclosure."

3      *Second*, Defendants cannot show harmlessness, as their untimely disclosure

4  and production has harmed Plaintiff.  As just one example, Plaintiff took 30(b)(6)

5  depositions of the Sheriff's and Fire Departments about their policies and trainings

6  but was unable to inquire about these documents because they were not produced or

7  disclosed.  (Lavoie Decl., Ex. E [30(b)(6) notices to Sheriff's and Fire

8  Departments].).  Courts have previously found harm under this exact scenario.  *See*

9  *Van Daele Dev. Corp. v. Steadfast Ins. Co.*, 2014 WL 12564277, at *4 (C.D. Cal.

10 Oct. 9, 2014) (finding that late disclosure was not harmless where disclosure was

11 made after close of discovery and therefore party could not question rule 30(b)(6)

12 witness about document).

13     Many of the new training and policy documents are undated, and it is unclear

14 when the policies and trainings were instituted and whether they were used with (or

15 taught to) any of the deputies or firefighters involved in this case.  Given that

16 discovery has closed, Plaintiff has no tools to obtain answers to these questions.

17 Presumably, Defendants intend their witnesses to tout the newly-produced policies

18 and training materials at trial in defense of Plaintiff's *Monell* claim.  If they are not

19 excluded, Plaintiff would be forced to cross-examine these witnesses completely

20 blind, having never had the opportunity to depose them regarding the materials.

21     In meet and confer correspondence, Defendants conceded that "these LASD

22 and LACFD policies and trainings are directly implicated by [Plaintiff's]

23 allegations," but argued that "these publicly available documents did not need to be

24 produced by Defendants."  Defendants further argued: "[G]iven that Plaintiff is

25 alleging LASD's and LACFD's policies and trainings are deficient, those

26 allegations assume that Plaintiff is aware of what policies and trainings exist."  (*Id.*)

27 Finally, Defendants have attempted to justify the late production by saying that the

28

1   newly-produced documents were referenced (but not included) in other documents
2   Defendants produced in discovery or in deposition testimony.  (*Id.*)

3   　　These defenses are ridiculous.  First and foremost, Plaintiff agrees
4   Defendants' policies and training materials are central to her case, which is why she
5   sought documents and information related to them in her requests for production and
6   interrogatories, and looked for information about them in Defendants' Rule 26
7   disclosures.  Those are the mechanisms through which information is obtained in
8   civil litigation.  Parties are not expected to scour online sources for documents and
9   information in their opponent's possession that they have sought through discovery
10  requests and that the opponent itself plans to rely upon at trial.  It was incumbent on
11  *Defendants* to produce responsive documents and information, not on *Plaintiff* to
12  follow breadcrumbs to find responsive documents Defendants did not produce.

13  　　On a final, specific note, Defendants contend that their interrogatory response
14  and 30(b)(6) deponent referenced materials produced by the California Commission
15  on Peace Officer Standards and Training.  However, Defendants produced only *one*
16  section of those materials—Learning Domain 30, titled "Crime Scenes, Evidence,
17  and Forensics"—during discovery.  Defendants now attempt to use three additional
18  sections—Learning Domain 29 regarding traffic collision investigations, Learning
19  Domain 1 regarding leadership, professionalism, and ethics, and Learning Domain
20  00 regarding how to become an exemplary peace officer—that they never produced
21  in discovery.  These materials must be excluded.

22
23
24
25
26
27
28

**- 74 -**

1   DATED:  July 15, 2022          WILSON SONSINI GOODRICH & ROSATI

2

3

4                                  By:  _____
                                              */s/ Luis Li*
5                                        LUIS LI

6

7   DATED:  July 15, 2022          OFFICE OF COUNTY COUNSEL

8

9

10                                 By:  _____
                                          */s/ Jonathan C. McCaverty*
11                                       JONATHAN C. MCCAVERTY

12                                 Attorneys for Defendant
                                   LOS ANGELES COUNTY SHERIFF'S
13                                 DEPARTMENT

14

15

16  DATED:  July 15, 2022          MILLER BARONDESS, LLP

17

18

19                                 By:  _____
                                            */s/ Mira Hashmall*
20                                       MIRA HASHMALL

21                                 Attorneys for Defendants
                                   COUNTY OF LOS ANGELES, LOS
22                                 ANGELES COUNTY FIRE
                                   DEPARTMENT, JOEY CRUZ, RAFAEL
23                                 MEJIA, MICHAEL RUSSELL, and
                                   RAUL VERSALES
24

25

26                              ECF CERTIFICATION

27       The filing attorney attests that Defendants' counsel concurs in the content of,

28  and has authorized, this filing.