LUIS LI (State Bar No. 156081)
Luis.Li@wsgr.com
ERIC TUTTLE (State Bar No. 248440)
Eric.Tuttle@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
633 West Fifth Street, Suite 1550
Los Angeles, California 90071
Telephone:  (323) 210-2900
Facsimile:   (866) 974-7329

CRAIG JENNINGS LAVOIE (State Bar No. 293079)
Craig.Lavoie@mto.com
JENNIFER L. BRYANT (State Bar No. 293371)
Jennifer.Bryant@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone:  (213) 683-9100
Facsimile:   (213) 687-3702

Attorneys for Plaintiff Vanessa Bryant

[*Additional counsel continued on next page.*]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| VANESSA BRYANT,<br><br>        Plaintiff,<br><br>    vs.<br><br>COUNTY OF LOS ANGELES, et al.,<br><br>        Defendants. | Case No. 2:20-cv-09582-JFW-E (Consolidated with 2:20-cv-10844-JFW-E)<br><br>**PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF ANTHONY MARRONE**<br><br>Trial Date:      None Set<br><br>The Hon. John F. Walter |
| CHRISTOPHER L. CHESTER,<br><br>        Plaintiff,<br><br>    vs.<br><br>COUNTY OF LOS ANGELES, et al.,<br><br>        Defendants. | |

1  [*Additional counsel, continued from previous page*]

2  JEROME M. JACKSON (State Bar No. 64238)

3  jmjlaw@aol.com

4  JEROME M. JACKSON LAW OFFICES
   880 Apollo Street, Suite 238

5  El Segundo, California 90245
   Telephone: (310) 726-4199

6  Facsimile: (310) 414-0486

7

8  Attorneys for Plaintiff Christopher L. Chester

9  LOUIS R. MILLER (State Bar No. 54141)

10  smiller@millerbarondess.com
    MIRA HASHMALL (State Bar No. 216842)

11  JASON H. TOKORO (State Bar No. 252345)
    CASEY B. SYPEK (State Bar No. 291214)

12  MILLER BARONDESS, LLP

13  1999 Avenue of the Stars, Suite 1000
    Los Angeles, California 90067

14  Tel.: (310) 552-4400 | Fax: (310) 552-8400

15

16  Attorneys for Defendants County of Los Angeles, Los Angeles County Fire
    Department, Joey Cruz, Rafael Mejia, Michael Russell, Raul Versales, Tony

17  Imbrenda and Arlin Kahan

18

19  JONATHAN C. McCAVERTY (State Bar No. 210922)
    *Principal Deputy County Counsel*

20  jmccaverty@counsel.lacounty.gov
    OFFICE OF THE COUNTY COUNSEL

21  General Litigation Division

22  500 West Temple Street, Suite 468
    Los Angeles, California 90012

23  Tel.: (213) 974-1828 | Fax: (213) 626-7446

24

25  Attorneys for Defendant Los Angeles County Sheriff's Department

26

27

28

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF ANTHONY MARRONE

Pursuant to the Court's Civil Trial Order of February 7, 2022 (Dkt. 280), Plaintiffs Vanessa Bryant and Christopher L. Chester ("Plaintiffs") and Defendants submit the following notice of designated deposition testimony of Anthony Marrone.

Plaintiffs' current intention is to call Marrone to testify live regarding matters to which he testified at deposition as a 30(b)(6) representative for the Los Angeles Sheriff's Department as well as matters within his personal knowledge.  In the event Marrone testifies live on both topics, as anticipated, these designations will be unnecessary.  Plaintiffs submit them in an abundance of caution to identify deposition testimony that Plaintiffs will seek to introduce if time constraints at trial make live testimony impracticable.  In light of the foregoing, it may be most efficient for the Court to reserve rulings on these designations until such time as the parties seek to introduce them at trial.

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| 7:12-7:24<br>DEPOSITION OFFICER: Raise your right hand, please.<br>  You do solemnly state that the evidence you shall give in this matter shall be the truth, the whole truth, and nothing but the truth, so help you God?<br>A. I do.<br>Q. Good morning, Chief. Can you please state your full name for the record.<br>A. Yes. Anthony Charles Marrone, Junior. | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| <u>22:4-26:12</u><br>Q.  So, Chief Marrone, you have been designated this morning to testify about seven topics, Topics Numbers 1 through 3, 8 through 9, 12 and 15.  I'm assuming you probably haven't memorized those numbers. And so I want to just quickly look at them here together one by one.<br>    So Topic No. 1 is, "The location of the accident scene and any fire department command post related to the accident that occurred on January 26, 2020, including, but not limited to, the location of the accident scene and command post in relation to roads and trails."<br>    And so here in this topic, Chief Marrone, "accident scene" refers to the helicopter crash in Calabasas on January 26, 2020.  Again, to keep us moving throughout the day, I" I'll probably use a similar shorthand referring to it as – as the – "the accident scene" or "the crash site."  If I do that, will you – will you | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| understand what I'm referring to?<br>A. Yes.<br>Q. And I believe internally the department referred to – to the accident as – as "the Willow incident"; is that right?<br>A. Yes.<br>Q. So if either one of us today use that terminology, we'll – we'll be referencing the January 26 crash.  Is that – does that work?<br>A. Yes.<br>Q. All right.  So that's Topic 1.<br>  The second topic you've been designated to testify regarding on behalf of the fire department is Topic 2, which is, "Assistance provided to the fire department by the sheriff's department personnel at the accident scene on January 26, 27, and 28, 2020."<br>  Topic 3 right below that, "All facts and details regarding the fire department's participation, if any, in an effort to identify the helicopter that crashed in Calabasas on January 26, 2020, including any | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| communications with Island Express on January 26, 2020." <br><br> So I'll stop with – after those three before we move on to the next set. <br><br> Do you understand all of those three topics and that you have been designated on those three? <br> A. Yes. <br> Q. And you are generally knowledge [sic] about those three – knowledgeable about those three topics? <br> A. Yes. <br> Q. And did you obtain all of the information reasonably available to the fire department regarding those three topics? <br> A. Yes. <br> Q. And are you prepared to testify about them? <br> A. Yes. <br> Q. All right.  So now let's go to the next topic that you have been designated to testify regarding.  And that's Topic No. 8 here, which reads, "Any request or instructions provided by fire department personnel to other fire department personnel on January 26, 27, or 28, 2020, regarding | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF ANTHONY MARRONE

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| the taking, obtaining, possession, use, or sharing of photos of the accident scene or victims' remains."<br><br>    And then you've also been designated for the topic immediately below that one, Topic No. 9, which is, "The fire department's knowledge of any request or instructions by sheriff's department personnel to fire department personnel or sheriff's department personnel regarding the taking, obtaining possession, use, or sharing of photos of the accident scene or victims' remains."<br><br>    So, Chief Marrone, do you understand those two topics?<br>A. Yes.<br>Q. And are you generally knowledgeable about those two topics?<br>A. Yes.<br>Q. And did you obtain all information reasonably available to the fire department about those two topics?<br>A. Yes.<br>Q. And are you prepared to testify about those two topics? | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| A. Yes.<br>Q. All right.  There are just a couple more to go through.<br>  The next up is Topic No. 12, which is, "Formal and informal efforts taken by the fire department and fire department personnel to identify, confine, secure, control or prevent the sharing, dissemination, transmission, or spread of photos of the accident scene or victims' remains."<br>  And then last on our list for you is Topic No. 15, which is, "Any complaints received or heard by the fire department, whether from members of the fire department or members of the public, regarding fire department personnel taking, obtaining, possessing, using, or sharing photos of the accident scene and/or victims' remains and all actions taken by the fire department in response to such complaints."<br>  So, Chief Marrone, do you understand those last two topics, Topics 12 and 15? | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| A. Yes.<br>Q. And are you generally knowledgeable about those two topics?<br>A. Yes.<br>Q. And did you obtain all information reasonably available to the fire department regarding those two topics?<br>A. Yes.<br>Q. And are you prepared to testify about them?<br>A. Yes. | | |
| <u>37:8-10; 37:12-38:2</u><br>Q. How long have you worked for the department?<br>A. I've worked for the County of Los Angeles Fire Department for approximately 35 years.<br>. . .<br>Q. So whenabouts did – did you start?  That's – that's the late '80s; is that right?<br><br>A. My hire date with the County of Los Angeles was January 17th, 1986.<br>Q. And what was your position when you first started?<br>A. Firefighter.<br>Q. And what is your current job title and assignment? | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| A. Deputy fire chief.  And my current assignment is the Special Services Bureau.<br>Q. And how long have you held that position and had that assignment?<br>A. I've held the position of deputy fire chief since 2013, and I've been assigned to the Special Services Bureau since April 1st of 2021. | | |
| 39:21-40:19<br>Q. So we talked about you starting at the department some 35-odd years ago in 1986.  We talked briefly about your current position.<br>  Did you serve in any other positions or roles between those – those time periods?<br>A. Yes.<br>Q. Can you briefly walk me through the positions that you held over the years and the duration of those – those positions.<br>A. Yes.  I was a firefighter and a firefighter paramedic for approximately the first 6 years of my career with L.A. County.  I then promoted to fire captain and held various | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| assignments for approximately the next 6 years.  Then I promoted to battalion chief in 1998, where I served approximately 16 years.  And then I was an acting assistant fire chief at various times.  While I was a battalion chief in rank, I was acting in a higher level role.  And then I became deputy fire chief in 2013.  My assignments as a deputy fire chief were the Leadership and Professional Standards Bureau, the Special Services Bureau, the Emergency Medical Services Bureau, the East Regional Operations Bureau, the Central Regional Operations Bureau, and now I am back at the Special Services Bureau. | | |
| 43:9-11<br>Q. More specifically, the crash occurred on a hillside near Las Virgenes Road; correct?<br>A. Yes. | | |
| 43:20-25<br>Q. Are there any landmarks in the | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF ANTHONY MARRONE

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| immediate vicinity of the – the crash site?<br>A. There is a walking trail network that can also be used by mountain bikers. Adjacent three-quarter miles to the west there is the Las Virgenes Water District building and parking lot. | | |
| <u>44:18-45:12</u><br>Q. So let's circle back to the mountain bike trail or hiking trail that you mentioned.  How would you describe that – that trail in terms of – is it well marked?<br>A. People walking on it and the bikes traversing the trail caused it to be mineral earth.  No grass is growing on them.  No brush on them.  It was almost like a game trail where you see the – where animals walk through hilly terrain. They take the same route each time, and they break down the brush.  So you can see where that game trail is.  That was similar to this mountain bike/hiking trail.  There are several trails throughout this moderately hilly area east | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| of Las Virgenes in the city of Calabasas that people utilize.  It's maybe two-and-a-half-to-three-feet-wide dirt. Nothing growing on it because it's been trampled continuously by people and bicycle tires.  So you can see where it is quite clearly.<br>Q. So hard to miss the trail.  Fair to say?<br>A. Correct. | | |
| <u>46:2-14</u><br>Q. How far of a hike or a walk would it be from the beginning of the trail to the crash site?<br>A. Depending on how fast you walked, I would estimate 20 minutes.<br>Q. So is that 20-minute estimate what you would estimate for, say, your average firefighter to get from the opening of the trail to the crash site?<br>A. Yes.<br>Q. Fair to say that walking along that – that hiking trail is a modest hike?<br>A. Yes.  A climb in elevation.<br>Q. Not too arduous?<br>A. Not too arduous. | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| <u>47:2-8</u><br>Q. So, Chief Marrone, do you recognize this general area depicted in the map that's been marked as Exhibit 16?<br>A. Yes.<br>Q. It's the area that you were just describing; correct?<br>A. Yes. | | |
| <u>50:17-51:8</u><br>Q. So instead of marking it, let's just see if you can describe generally the location orally, Chief Marrone.<br>A. Yeah.  So the way your photograph is oriented right now, north is in the upper left-hand corner, south is in the lower right-hand corner. If we take the debris/reservoir basin location that's in the center of the photo, I would say that the crash site is up and to the right, basically halfway between the debris basin and the top of the screen. And it would be just above the mountain bike trail on a triangular point that comes down.  So map orientation-wise it would be east of the | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| debris basin approximately on-half to three-quarter miles.  And it would be above that mountain bike trail located in the gray brushy area.<br>　That's my best description.  I hope everybody can follow it. | | |
| 53:17-25; 54:2-8<br>Q. So, Chief Marrone, is it correct that this green circle roughly approximates the location of the crash site?<br>A. I believe so, yes.<br>Q. All right.  So I'm going to stop sharing my screen – or actually, before I do that – because I'm not sure how this works, I'm going to take a screen cap of this that has your annotation on it and save that and mark that as Exhibit 17.<br>. . .<br>I'm going to turn off screen share, and I will save this screen cap and Exhibit – is it 17?<br>DEPOSITION OFFICER: Yes.<br>Q. Okay.  Thank you.<br>　(Whereupon the document referred to is marked by the reporter as | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| Plaintiff Exhibit 17 for identification.) | | |
| <u>55:9-56:2</u><br>Q. So you see on your screen now what we've been – what we've marked as Exhibit 18 with a file name "Google Earth View 2."<br>   And this also depicts the general vicinity of the crash site just from a different angle and zoomed in a bit; correct?<br>A. Correct.<br>Q. And you see here in the center right of the screen the reservoir and below that on the bottom right corner the water district parking lot; is that right?<br>A. Yes.<br>Q. And is the general location of the crash site visible from this perspective?<br>A. I believe so.<br>Q. And can I ask you again to direct your assistant there in the room to try to do what we just did with the prior map and mark the general location of the crash site on this map.<br>A. Yes. | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| 56:9-57:3<br>Q. Great.  I once again see a green circle.  And that green circle on the map represents the general vicinity of the crash site.  Is that right, Chief Marrone?<br>A. To the best of my ability, yes.  I've never gone to Google Earth to try to identify exactly where it is along that trail.<br>Q. Sure. That's – that's fair enough.  So I am going to try to do the same thing.  I'm going to stop sharing my screen.  I am going to – or before I stop sharing I'm going to take a screen cap of the Google Earth View 2 with your green circle on it.<br>  And I will save the annotated screen cap as Exhibit 19.  So it will be in the record as Exhibit 19.  So I have taken that screen cap.  Now I will stop sharing.<br>/ / /<br>  (Whereupon the document referred to is marked by the reporter as Plaintiff Exhibit 19 for identification.) | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| 57:18-58:12<br>Q. So, Chief Marrone, did the fire department have a command post at the scene?<br>A. Yes.<br>Q. What was the function of the command post?<br>A. The command post contained the communications equipment and the personnel necessary to supervise and command the department's response to this emergency.<br>Q. Who set up the – the command post?<br>A. Battalion Chief Drew Smith was the first arriving chief officer; and he used his vehicle, a Battalion 5 vehicle, to set up the command post location to run the Willow incident.<br>Q. At approximately what time did Battalion Chief Smith arrive and setup the command post?<br>A. Approximately 15 minutes after the dispatch of the incident at 9:47.<br>Q. So approximately 15 minutes after 9:47 the department set up the command post.  So around 10:00 a.m.? | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| A. Yeah, around 10:00 a.m. | | |
| <u>59:16-60:20</u><br>Q. So can you describe for me, Chief Marrone, where the command post was in relation to the – the crash site.<br>A. I would describe it as one-half to three-quarter miles to the west of the helicopter crash site and lower in elevation because we were adjacent to and off of Las Virgenes Road north of Willow Glen Street.<br>Q. Was the crash site accessible by foot from the command post?<br>A. Yes.<br>Q. If a average firefighter were to walk directly from Point A to Point B, with Point A being the command post and Point B being the crash site, on the morning of January 26th, how long would you estimate that – that walk to be?<br>A. Twenty minutes.<br>Q. That – sorry. Go ahead.<br>A. Fifteen to twenty minutes.<br>Q. And what was the terrain like on that direct | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| A-to-B route from the command post to the crash site?<br>A. You would start on asphalt.  You would negotiate or climb a chain-link fence.  You would begin ascent in a brush covered area – grass and brush covered area.  We describe it as hilly, steep, uneven.  And I don't think that you could take a direct route A to B – a straight line.  You would have to move and navigate to have good footing on your climb up to the helicopter crash site from the incident command post location. | | |
| <u>66:9-16</u><br>Q. Can you estimate for me, of those 70 fire department – over 70 fire department personnel who responded to the Willow incident, how many of those 70 went up the hill to the – the crash site itself on January 26?<br>A. The majority of the first responders who had a tactical assignment made it to the incident – the crash site scene,  . . . | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF ANTHONY MARRONE

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| *66:16-67:5 (Counter-designation)*<br>*. . . and they would have walked on a portion of that trail. The majority of the personnel that responded that day did not take the leisurely hike from Bark Park, gain access to the trailhead, and then walk up. They took the shorter, most direct route because our primary concern was trying to save anybody who could have survived, do an assessment, and extinguish the brush fire that ensued in the hills. So we took the most direct route, but it was a more arduous route. But it's what we expect our firefighters to do.*<br>*Q. Of course.*<br>*So kind of setting aside the more leisurely hiking trail route and the direct route from the command post, putting all of it together, no matter how you made it there, . . .* | | |
| 67:5-13<br>Q. . . . could you give me a ballpark figure of how many total fire department personnel made it up the hill to the crash site itself. | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| A. Sixty.<br>Q. Sixty?<br>  And I might have had it in my question; but just to clarify, would that 60 estimate – would that all have been on January 26?<br>A. Yes, ma'am.<br><br>_67:14-68:16 (Counter-designation)_<br>_A. One point of clarification.  The units that responded did not respond from the command post to the incident.  The chief officers who were commanding and running the incident and communicating with our dispatch center were not the people that were going up on the hill on January 26th.  We would reference the area where the engines congregate and then the crews exit the engines and bring their hose packs and develop that progressive hose lay that I spoke about earlier as a staging location._<br>_So the incident staging location was north of the incident command post location.  So I did not want you to think that fire_ | | |

| | Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|---|
| 1 | | | |
| 2 | *responders would come to the command post, check in, and then leave from there. They would get as close as possible to the incident through the various road networks, stop the engines, have the crews get off the engines, put on their hose packs, put on their safety gear, get their medical supplies and tools because we had to bring everything up to the incident because it wasn't adjacent to a road network.* | | |
| | *So just to give you an idea of what the incident was like, very dynamic incident, we had a helicopter crash, a brush fire. We needed to – Number 1 was try to protect or save anybody that was injured. We had to bring medical equipment. We had to bring firefighting tools all up what we call a P-line – P as in Paul – a P-line that was cut from down below to the hiking trail to access the crash site scene.* | | |
| 26 | 85:10-22 | | |
| 27 | Q. And upon the first | | |
| 28 | arrival around 10:00 a.m. | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| with the accident scene in the state that you just described, fair to say the fire department's primary mission was extinguishing the fire?  Is that what you were there to do?<br>A. Primary mission was life safety.  So it was a search for any victims that might need medical attention.  Unfortunately, that was not the case.<br>Q. And upon learning that sad circumstance, then was the second priority item for the fire department extinguishing the – the fire?<br>A. Correct.  And we characterize that as incident stabilization through fire control.<br><br>*85:23-86:8 (Counter-designation)*<br>*Q. Got it.  And can you estimate for me how long that process took, extinguishing the fire or – is that, to use the correct terminology, incident stabilization through fire control – how long that took.*<br>*A. The brush fire was extinguished first.  The Class D metal fire that* | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| *was burning in the exotic metals in the engines of the helicopter, that took longer to extinguish. And it took special extinguishing agents, which had to be brought to the scene to extinguish that – what we characterize as a Class D metal fire. That was a more stubborn fire to put out.* | | |
| 86:9-12<br>Q. And so could you estimate approximately what time was the – the taking them one at a time, the brush fire stabilized and extinguished.<br>A. 10:15 they had knockdown of the brush fire. | | |
| 86:20-25<br>Q. So approximately how long did it take to put out this more stubborn Class D metal fire? Approximately what time was that situation taken care of?<br>A. Maybe about 2:00 p.m. it was finally extinguished. | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| <u>119:2-120:11</u><br>Q. Is the fire department aware of any informal communication form the sheriff's department regarding photos of the accident scene?<br>A. No.  The fire department's not aware of any formal or informal requests or direction form the sheriff's department to fire department personnel regarding photos.  However, I think to state that in the normal course and scope of our employment, fire department members take photographs of incidents and at times share those photos with the sheriff's department.<br>  One example would be any still photography or video photography that we have of a fire.  If it turns out that that fire was caused by arson, the sheriff's Arson/Explosive Detail would investigate it to try to find the perpetrator; and we would share our incident photography of that fire with sheriff's personnel. That's not uncommon.<br>  So there is a history of the fire department taking | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| – not only taking photographs and video of emergency incidents but also of sharing it with the sheriff's department for a business need.<br>Q. Were there any communications between the two departments, fire department, sheriff's department, about photos of this particular accident scene?<br>A. The fire department's not aware of any formal or informal requests or direction from the sheriffs regarding our personnel as it relates to incident photography.<br>Q. Is the fire department aware of any instructions or requests that the sheriff's department gave to its own personnel regarding photos at this accident scene?<br>A. The department's not aware of what the sheriff's department – what the sheriff's department's direction was to their employees. | | |
| 120:18-121:10<br>Q. Did any of the sheriff department's assistance to the fire department at the crash site involve either | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| the taking or sharing of photos of the accident scene?<br>A. Not that the fire department's aware of.<br>Q. On any of those three days that we've been talking about, January 26th, January 27th, and January 28th, did the fire department ever ask the sheriff's department to take or share photos of the accident scene?<br>A. No.<br>Q. And let me just ask the reverse of that question as well for completeness.<br>  On any of those days, January 26th through January 28th, did the sheriff's department ever ask the fire department to take or share any photos of the accident scene?<br>A. Not that the department is aware of – not that the fire department is aware of. | | |
| 128:11-19<br>Q. So the fire department never specifically instructed any fire department personnel to take photos to assist with identifying the helicopter; is that correct?<br>A. Correct. | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| Q. Did the fire department ever ask any sheriff's department personnel to take photos to assist with identification of the helicopter?<br>A. No. | | |
| <u>134:3-22</u><br>Q. So did any fire department personnel provide any instructions to any other fire department personnel regarding the taking, obtaining, or sharing of photos of the accident scene on January 26th, 27th or 28th?<br>A. Yes.  I, as the agency representative, did give a direction to Battalion Chief Drew Smith early on after my arrival at the scene regarding incident photography and asking that all of our personnel exercise sensitivity and be sensitive when documenting the accident scene.<br>Q. So you personally, Chief Marrone, provided an instruction to Battalion Chief Drew Smith; and the substance of that instruction was to exercise sensitivity in | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| connection with photos at the accident scene.  Is that correct?<br>A. That is correct.<br>Q. And approximately what time did you convey that instruction to exercise sensitivity to Battalion Chief Drew Smith?<br>A. 1:00 p.m.<br><br>*134:23-135:14 (Counter-designation)*<br>*Q. Did you instruct – I'm sorry.  Go ahead.*<br>*A. I'm trying to think if I gave him that direction on the telephone prior.  I know that I said it at the command post.  I'm trying to think back because I had numerous conversations with Chief Smith prior to my physical arrival at the incident command post location.  Maybe before 1 p.m.  I was giving – I gave instruction at the ICP.  I can't recall if I did it on the telephone as well.  But I wanted to make sure that based on the unique nature of this incident, the rumor that Kobe Bryant was on the helicopter, the spontaneous gathering of* | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| *fans outside on Las Virgenes, the television news helicopter coverage – I wanted our personnel to exercise sensitivity when documenting the scene because I – I believe it's the right thing to do.  You need to be sensitive.  Given all of this media attention, we needed to exercise additional sensitivity.* | | |
| <u>139:13-23</u><br>Q. Was there any instruction given specific to photos of victims' remains?<br>A. Not to victims' remains.<br>Q. Was there any other instruction given related to photos beyond what we've talked about and we've described as a instruction to show sensitivity?<br>A. No.<br>Q. Could you approximate how many fire department personnel had been at the crash site itself prior to one o'clock p.m.?<br>A. Maybe 40 or 50.<br><br><u>*139:8-12*</u> *(Counter-designation)* | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| *Q. So you've mentioned – or you described the instruction that – that you conveyed – that it was conveyed by Battalion Chief Smith to others along the line as being instruction to – to show sensitivity when it comes to documenting the scene.* | | |
| 141:5-143:15<br>Q. And you've spoken to us a little bit -- but let me just ask the question to get a clean response from you.  Why did the fire department give an instruction with respect to showing sensitivity in documenting the scene?<br>MS. HASHMALL: Asked and answered.  Chief, go ahead and answer it again.<br>A. Well, as the agency administrator, because of the external factors that I saw at this unique incident, tragic incident, like I said, the news media coverage, the television news helicopters, the spontaneous gathering of fans on Las Virgenes, the rumor initially shortly after the helicopter crash that Kobe Bryant was on | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| the helicopter, I thought it was prudent to issue a directive to the personnel on scene to be sensitive when it comes to incident photography.  I wanted to make sure that we gave our personnel a heads-up that this is different. This isn't your normal incident. This isn't, you know, structure fire.  It's not a HazMat incident.  This is – this is a – there is a lot of attention being given to this incident, so exercise sensitivity in all that you do.    Just like when we were covering up the remains of the victims, the bodies of the victims, knowing that there's helicopters scanning off to the west with very high-definition cameras, we want to protect the dignity of those people.  So that's why I gave the direction. But nothing in writing.    And I followed up.  It was important enough to follow up with Chief Smith after the critical incident stress management debriefing to make sure that that directive had been transmitted and | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF ANTHONY MARRONE

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| understood by our personnel -- all -- all fire department personnel operating.<br>BY MS. BRYANT:<br>Q. Any other reason that the fire department thought that instruction would be necessary or important beyond what you've told me?<br>A. No.  I mean, we have core values on the fire department.  One of them is caring.  And I think this falls under our core value of caring.  You know, we treat everybody – everybody that we assist with the minimum respect.  You know, day in and day out we answer a thousand calls a day; and we have to care about the people that – that we respond on.  And this was a unique incident.<br>Q. If the instruction had not been conveyed, is there any reason why fire department personnel would have known that taking photos was not permitted?<br>MS. HASHMALL:<br>Objection.  Misstates the testimony.<br>   Answer to the best of your ability. | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| A. Incident photography is commonplace, whether it be a structure fire, a hazardous materials incident, an aircraft emergency, an aircraft crash.  In this particular incident, the department has no prohibition against incident photography.  But in order to fulfill our core value of caring, I wanted our personnel to be sensitive to documenting the incident when it comes to photography. *143:16-146:6 (Counter-designation)* *BY MS. BRYANT:* *Q. So you mentioned you phone call – you called Battalion Chief Smith on the phone shortly after his debrief to reiterate the instruction that you had conveyed to him around one o'clock.* *  Did the fire department take any other steps to ensure that the instruction was communicated to all fire department personnel who were at the crash site?* *A. Well, I – as I testified – I told Chief Smith face-to-face.  I expect him, as an* | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| *incident commander – a seasoned incident commander, to carry out my lawful direction. I checked in with him later, and he did. The department's aware that he transmitted that message over the radio to all unit supervisors, who then could talk to their subordinate personnel. I have no reason to believe – the department doesn't believe that nobody was noticed – or that nobody was not noticed with that important message from me; that everybody on the incident understood.*<br>*Q. If any individual fire department personnel were to say they did not receive any such instruction, would they be misstating the facts; or would they have simply not received the instruction?*<br>*MS. HASHMALL: Objection. Calls for speculation.*<br>*BY MS. BRYANT:*<br>*Q. You can answer.*<br>*Let me – let me – I'll – I'll come back to that one and ask as a – the fire department has no way to confirm that every single* | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| *member of the fire department who was at the crash site received the instruction; correct?* | | |
| *A. The department has not interviewed everybody who was at the scene of the Willow incident. I mean, I understand your question; but the department has not interviewed everybody that was at the scene to find out, Did you get this information?  I had full confidence, you know.  We require our personnel to exercise good judgment.  It's one of our standards of behavior.  And we always expect our personnel to do the right thing, and we trust them to do the right.* | | |
| *  I gave a very specific direction regarding incident photography and the need for sensitivity based on some external factors that I was seeing.  I was not the incident commander.  My head wasn't down on the command board talking on the radio, trying to abate the emergency at hand.  I was the agency administrator.  I was the* | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF ANTHONY MARRONE

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| *duty deputy that day. So that's why I responded out to the incident. It was my responsibility. I had the luxury of taking a step back, looking around, and seeing some things that not everybody realized. You know, I was listening to the news radio as I was driving to the scene. I heard the rumor that Kobe Bryant was possibly on the helicopter. I saw the news helicopters. Not to continue to tell my story over and over, but those external factors are what caused me to give that direction.* <br><br> *It's the department's belief and it's my belief that that direction was transmitted to everybody on scene; however, we have not interviewed everybody. If somebody was to say, "I didn't hear it," okay. Maybe they didn't. But I was happy I gave it. I would give it again. It was the right thing to do because, like I said, we have seven core values – or excuse me – six core values, and one of them is caring, and this is about caring.* | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF ANTHONY MARRONE

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| 146:15-18<br>Q. So my question is, did the fire department give any instruction to fire department personnel on January 26th, 27th or 28th to delete photos of the accident scene? | | |
| 147:14-19<br>A. No. The department did not issue any directive to its members to delete photographs that were taken of the incident.<br>Q. On January 26, 27th,or 28th specifically?<br>A. And there was no verbal or written direction to delete photographs. | | |
| 148:2-5<br>Q. Did the fire department have any internal communications among its members requesting photos of the accident scene on January 26th, 27th, or 28th?<br>A. The department's not aware of any requests. | | |
| 153:18-21<br>Q. Is the fire department aware of express requests in any other fashion for photos specifically?<br>A. No.  The department's not aware of that. | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF ANTHONY MARRONE

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| *153:7-18 (Counter-designation)* <br> *Q. . . . But were the requests that were being circulated amongst fire department personnel for information about the identification and identity of the helicopter generally and implicit within that would include perhaps photos, or were there express requests for photos to help identify the helicopter?* <br> *A. The department's not aware of expressed requests for photos sent via text to assist in determine – to assist in an effort to identify the helicopter.* <br> *Q. I guess one little thing in there. You said request by text.* | | |
| 154:12-155:6 <br> Q. When did the fire department first become aware that fire department personnel may have taken, received, or shared photos of victim's remains at the accident scene? <br> A. On January 31st I received a call from Captain Matt Vander Horck of the Lost Hills | | |

| | Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|---|
| 1 | | | |
| 2 | Sheriff's Station notifying me of an allegation that two fire department personnel had taken photos at the accident scene. | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | Q. And this communication from Captain Vander Horck, it was by phone; is that right? | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | A. Correct. | | |
| 11 | Q. How long was your conversation with Captain Vander Horck on January 31st regarding the photos? | | |
| 12 | | | |
| 13 | | | |
| 14 | A. A short conversation. Less than five minutes. | | |
| 15 | Q. Can you tell me everything you remember about the substance of that conversation. | | |
| 16 | | | |
| 17 | | | |
| 18 | A. Yes.  He called me. He advised me that his deputy had advised him – or there had been an advisement from a sheriff's deputy that two of our members had engaged in incident photography on Day 1. | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | 182:12-183:16 Q. And when you said later that day to Battalion Chief Drew Smith "exercise sensitivity" documenting the accident | | |
| 26 | | | |
| 27 | | | |
| 28 | | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| scene, was that also out of respect for the dignity of the victims?<br>A. Yes.<br>Q. And it was your intent that the advice or that admonishment would trickle down to everyone on the incident; correct?<br>A. Yes.<br>Q. That included Brian Jordan, didn't it?<br>A. Yes.<br>Q. That included Arlin Kahan, didn't it?<br>A. Yes.<br>Q. That included Tony Imbrenda as well, didn't it?<br>A. Yes.<br>Q. Do you have any reason to believe whatsoever that that admonishment did not reach those individuals?<br>A. No.<br>Q. Now, tell me, if you would, is there any legitimate purpose for a firefighter to take pictures of the internal organs of a decedent?<br>A. Not that I'm aware of.<br>Q. Would you agree with me that pictures of the internal organs of a decedent weren't necessary for | | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF ANTHONY MARRONE

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| identification of the aircraft?<br>A. I would agree with you.<br>Q. Would you agree with me that pictures of any decedent's body parts were not essential for the identification of the aircraft?<br>A. That is correct. | | |
| 184:11-20<br>Q. . . . . I want to know if a member of the Los Angeles County Fire Department –<br>A. Oh.<br>Q. – took pictures of a decedent's internal organs – scene of this crash, that conduct violate the core values of your department?<br>A. Yes.<br>Q. Would that conduct also had been in violation of your specific directive that day?<br>A. Yes. | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF ANTHONY MARRONE

1    DATED:  July 28, 2022          WILSON SONSINI GOODRICH & ROSATI

2

3
                                    By:  _____
4                                              */s/ Luis Li*
                                             LUIS LI
5

6

7    DATED:  July 28, 2022          JEROME M. JACKSON LAW OFFICES

8

9
                                    By:  _____
10                                            */s/ Jerome M. Jackson*
                                           JEROME M. JACKSON
11

12                                  JEROME M. JACKSON
                                    jmjlaw@aol.com
13                                  JEROME M. JACKSON LAW OFFICES
                                    880 Apollo Street, Suite 238
14                                  El Segundo, California 90245
                                    Telephone: (310) 726-4199
15                                  Facsimile: (310) 414-0486
16

17                                  *Attorneys for Plaintiff Christopher Chester*

18

19   DATED:  July 28, 2022          OFFICE OF COUNTY COUNSEL

20

21

22                                  By:  _____
                                           */s/ Jonathan C. McCaverty*
23                                         JONATHAN C. MCCAVERTY

24                                  Attorneys for Defendant
                                    LOS ANGELES COUNTY SHERIFF'S
25                                  DEPARTMENT

26

27

28

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF ANTHONY MARRONE

1  DATED:  July 28, 2022                    MILLER BARONDESS, LLP

2

3

4                                           By:        */s/ Mira Hashmall*
                                                       MIRA HASHMALL
5

6                                           Attorneys for Defendants
                                            COUNTY OF LOS ANGELES, LOS
7                                           ANGELES COUNTY FIRE
                                            DEPARTMENT, JOEY CRUZ, RAFAEL
8                                           MEJIA, MICHAEL RUSSELL, RAUL
                                            VERSALES, TONY IMBRENDA and
9                                           ARLIN KAHAN
10

11

12                          **ECF CERTIFICATION**

13          The filing attorney attests that Defendants' counsel concurs in the content of,

14  and has authorized, this filing.

15

16

17

18

19

20

21

22

23

24

25

26

27

28