1   LUIS LI (State Bar No. 156081)
    Luis.Li@wsgr.com
2   ERIC P. TUTTLE (State Bar No. 248440)
    Eric.Tuttle@wsgr.com
3   WILSON SONSINI GOODRICH & ROSATI, P.C.
    633 West Fifth Street, Suite 1550
4   Los Angeles, California 90071
    Telephone:   (323) 210-2900
5   Facsimile:   (866) 974-7329

6   CRAIG JENNINGS LAVOIE (State Bar No. 293079)
    Craig.Lavoie@mto.com
7   JENNIFER L. BRYANT (State Bar No. 293371)
    Jennifer.Bryant@mto.com
8   MUNGER, TOLLES & OLSON LLP
    350 South Grand Avenue, Fiftieth Floor
9   Los Angeles, California 90071-3426
    Telephone:   (213) 683-9100
10  Facsimile:   (213) 687-3702

11  Attorneys for Plaintiff Vanessa Bryant

12  [*Additional counsel continued on next page.*]

13              **UNITED STATES DISTRICT COURT**

14      **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

15

16  VANESSA BRYANT,                   | Case No. 2:20-cv-09582-JFW-E
                                      | (Consolidated with 2:20-cv-10844-
17          Plaintiff,                | JFW-E)

18      vs.                          | **PLAINTIFF'S NOTICE OF**
                                      | **DESIGNATED DEPOSITION**
19  COUNTY OF LOS ANGELES, et al.,   | **TESTIMONY OF MARK FLORES**

20          Defendants.               | Trial Date:    None Set

21                                    | The Hon. John F. Walter

22  _____

23  CHRISTOPHER L. CHESTER,

24          Plaintiff,

25      vs.

26  COUNTY OF LOS ANGELES, et al.,

27          Defendants.

28

1 | [*Additional counsel, continued from previous page*]

2

3 | JEROME M. JACKSON (State Bar No. 64238)
jmjlaw@aol.com

4 | JEROME M. JACKSON LAW OFFICES
880 Apollo Street, Suite 238

5 | El Segundo, California 90245
Telephone: (310) 726-4199

6 | Facsimile: (310) 414-0486

7

8 | Attorneys for Plaintiff Christopher L. Chester

9 | LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com

10 | MIRA HASHMALL (State Bar No. 216842)
JASON H. TOKORO (State Bar No. 252345)

11 | CASEY B. SYPEK (State Bar No. 291214)

12 | MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000

13 | Los Angeles, California 90067
Tel.: (310) 552-4400 | Fax: (310) 552-8400

14

15

16 | Attorneys for Defendants County of Los Angeles, Los Angeles County Fire
Department, Joey Cruz, Rafael Mejia, Michael Russell, Raul Versales, Tony

17 | Imbrenda and Arlin Kahan

18

19 | JONATHAN C. McCAVERTY (State Bar No. 210922)
*Principal Deputy County Counsel*

20 | jmccaverty@counsel.lacounty.gov
OFFICE OF THE COUNTY COUNSEL

21 | General Litigation Division
500 West Temple Street, Suite 468

22 | Los Angeles, California 90012
Tel.: (213) 974-1828 | Fax: (213) 626-7446

23

24 | Attorneys for Defendant Los Angeles County Sheriff's Department

25

26

27

28

1    Pursuant to the Court's Civil Trial Order of February 7, 2022 (Dkt. 280),

2   Plaintiffs Vanessa Bryant and Christopher L. Chester ("Plaintiffs") and Defendants

3   submit the following notice of designated deposition testimony of Mark Flores.

4    Plaintiffs' current intention is to call Flores to testify live regarding matters to

5   which he testified at his deposition as a 30(b)(6) representative for the Los Angeles

6   Sheriff's Department as well as matters within his personal knowledge.  In the event

7   Flores testifies live on both topics, as anticipated, these designations will be

8   unnecessary.  Plaintiffs submit them in an abundance of caution to identify

9   deposition testimony that Plaintiffs will seek to introduce if time constraints at trial

10  make live testimony impracticable.  In light of the foregoing, it may be most

11  efficient for the Court to reserve rulings on these designations until such time as the

12  parties seek to introduce them at trial.

13

14

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| <u>6:14-17</u><br>Q. Captain Flores, good morning.<br>A. Good morning, sir.<br>Q. How long have you been a captain?<br>A. For approximately six months. | | |
| <u>6:23-9:3</u><br>Q. So what is your current position? What's your day-to-day assignment?<br>A. I work -- I'm the unit commander captain over training bureau.<br>Q. I see. So what does that entail? What do you | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| do on a day-to-day basically?<br>A. So basically I oversee numerous different units which includes our advanced officer unit, our center armory, our recruit training unit, our civilian training unit, professional development unit, tactics and survival unit.   Our PDC or Pitchess detention center range. As well as other small video production unit and then we have a host of other little small items or units within there.<br>Q. And has this been your responsibility only since becoming a captain or did you have a similar role prior to becoming a captain?<br>A. This has been my responsibility since becoming a captain over I was a lieutenant over our advanced officer training unit for a short period of time.<br>Q. What is advanced training officer?<br>A. It's basically our in-service training that we provide to our officers that are deputy sergeants and so forth, sworn officers that have gone | | |

571994.1

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF MARK FLORES

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| through the academy and now they need yearly or biannual training.<br>Q. Oh, I see, so it could even be deputies. It's not necessarily just sergeants and above. It's really anybody who is a year or more removed from their academy training?<br>A. Absolutely. Anybody that has graduated from the academy now falls into what we call in-service training and basically there's requirements by the state and by our department that we receive training -- training during -- during the year.<br>Q. Okay. Before we get too far I guess let me ask you a couple of preliminary questions. You've given testimony under oath many times I imagine; right?<br>A. Yes.<br>Q. Criminal cases?<br>A. Yes.<br>Q. And you understand you're under the same oath to tell the truth in this deposition today as if you were testifying in a court before a judge and jury?<br>A. Yes, I do. | | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- 5 -

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF MARK FLORES

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| Q. Any reason why you can't give your best and most accurate testimony today?<br>A. No.<br>Q. And you understand that we've noticed your deposition I guess both in your individual capacity and as a representative for the sheriff's department?<br>A. Yes. | | |
| <u>9:24-12:1</u><br>Q. How long have you been with the sheriff's department?<br>A. Since December of 1990.<br>Q. Wow. You've been with the department over 30 years?<br>A. Going on 31 in December.<br>Q. Wow. Did you join when you were 12 years old?<br>A. Thank you and no. I'm feeling it and I'm getting old.<br>Q. Okay. Okay. So can you just give me a brief walk through of the assignments and ranks that you've held over the last I guess 31 years starting with the academy taking yourself all the way up to present day? | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| A. I'll even back it up a little bit before that. So back in 1986 I actually started with the department as an explorer and I did that for a couple of years. In 1990 I eventually joined the academy class 270, went through the academy, graduated. From here I went on to working at men's central jail. I was there for approximately six years. From men's central jail I left in 1997 where I went to Temple station where I worked four years, working various assignments within patrol. I then in 2001 went to major crimes bureau where I was a detective. I did that for approximately five years. I then was promoted to sergeant and went back out to patrol. That happened in 2006. I went back to Temple station and was a supervisor there from 2006 to 2010. In 2010 I moved on to our emergency operations bureau. I worked there for approximately five years. At that point I left and became an operations | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| lieutenant for one of our divisions, special operations division. I worked there for approximately two years before I was promoted again in 2017. I went back to custody and went to men's central jail for approximately a year and a half. In late 2018 I actually transferred to our custody support services bureau. I worked there until 2020 when I was asked to go to our training bureau and I got -- I was specifically assigned to our recruit training unit which basically oversees the academies there. I was there from May 2020 until about November of 2020 and then I transferred to our advanced officer training unit. I was only there for a short time all the way until about March of where I was asked to take over the unit commander's position and in April of 2021 I was -- came out with the intent to promote and I was promoted in April of 2021. | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| 15:8-14; 15:20-21<br>Q. So for an accident involving a civilian helicopter like the one that's at issue in this case like in the helicopter crash of January 26 that killed Kobe Bryant and these eight other people, based on your understanding would the sheriff's department's aero bureau have any role in investigating an accident like that?<br>. . .<br>A: From my personal knowledge I don't believe so. | Defendants' Objection<br>Lacks personal knowledge (FRE 602) | Plaintiff's Response<br>FRE 602 does not render this testimony inadmissible because the witness explicitly states that he is answering based on his personal knowledge. As reflected in the immediately preceding designation, the witness has been employed by the Sheriff's Department for over 30 years and has held a number of investigative and supervisory positions. (Dep. Tr. 9::24-12:1.) That experience provides foundation for the witness to testify from personal knowledge about the Department's role in accident investigations. |
| 16:17-17:6<br>Q. You got it. And then 2006 to 2010 you were a sergeant then?<br>A. Yes, I promoted, I became a sergeant and I went to the same exact station which was Temple station.<br>Q. And when you were a sergeant fair to say that you supervised deputy sheriffs who had patrol responsibilities?<br>A. Yes. | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| Q. And trainees as well, trainee deputies?<br>A. Correct.<br>Q. In 2006 to 2010, that was during the smartphone era, where smartphones was ubiquitous, people had smartphones and things like that?<br>A. Yes, that's correct. | | |
| 17:9-19:16<br>Q. Have you conducted trainings of sheriff's personnel personally as in like either being in front of a classroom or conference room or at a conference table, things like that where you're actually delivering instruction to sheriff's department personnel?<br>A. Yes, absolutely.<br>Q. Can you describe the situations in which you've done that and the extent of your experience doing that?<br>A. Sure. So I'll start off with I used to be part of the sheriff's catastrophic earthquake team. I used to do trainings and presentations for our local bureaus and go throughout the county and give training regarding | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF MARK FLORES

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| that. I also for our recruit academy classes I -- let me go back to the major crimes bureau days. As a detective he used to go in and used to give training to our recruits regarding vice laws and so forth and then when I came back as a lieutenant I actually gave the ethics class to the recruits. I've also trained in our supervisory school with regards to role transitioning and mentoring, evaluations, critical incident management as well as our sergeant field operations school. I would also teach critical incident management. Q. What does that mean, critical incident management? A. So basically that means that how do you handle a critical incident and what are the parameters, what exactly do you -- what should you be thinking about. What should your considerations be. Q. What's a critical incident? A. Anything that is bigger than a couple of resources | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF MARK FLORES

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| there and what I mean by resources a couple of officers. So if you had numerous resources officers, people, agencies coming to an incident that would, in my opinion would be a critical incident.<br>Q. So the helicopter crash on January 26 that the sheriff's department responded to, that would be an example of a critical incident, multiple agencies responding, multiple sheriff's department personnel responding.<br>A. Absolutely, yes.<br>Q. So in what sense have you given trainings on critical incident response? Is that like you're standing in front of a classroom of sergeants or just kind of particularize that for me a little bit.<br>A. So we have something called our sergeants field -- field operations school and it typically has anywhere from 20 to 25, 30 students and I'm in front of the classroom. I'm with a PowerPoint and so forth and talking about critical incidents. | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| Q. How long is that training?<br>A. It's approximately one hour, sometimes two depending on the situation. | | |
| 30:22-31:15<br>Q. So in a county that has in excess of 10,000,000 people, people are dying in traffic accidents, homicides suicides, accidental deaths, you name it, every day; right?<br>A. Yes.<br>Q. And on a daily basis would you expect at least some members of the very large sheriff's department to encounter human remains?<br>A. Yes.<br>Q. Why do you say that?<br>A. Just like you said, we have people dying somewhere in LA County every day so we do -- and we are an investigating agency that must -- we're typically the first one on scene even before the fire department or anybody else gets there. So whenever there's a traffic accident where somebody passed away or whatever it might be we're typically called out and | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| asked to handle and investigate that particular incident. | | |
| <u>32:5-11; 32:14-17</u><br>Q. Okay. But you can say with confidence that literally every day some members of the sheriff's department are coming into contact with human remains in connection with their work?<br>A. I couldn't say with confidence every day, however, I would say probably on most days or – so I'd say most days. I couldn't say every day.<br>Q. But it's certainly not uncommon for on a given day for at least one member of the sheriff's department to encounter human remains?<br>A. I would say that statement is correct. | | |
| <u>34:10-35:14</u><br>Q. Yeah, in January 2020 to what extent about sheriff's department personnel use personal cell phones to send work-related e-mails?<br>A. I would say it probably definitely happened that, yeah, the department actually gave us access to | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| our e-mail accounts via an app, so yes, I know that some of us have used our personal phones to use for e-mails. | | |

Q. Yeah, when you say that the department has given people access to an application what do you mean by that?

A. So I think it's called -- there's a few applications and I'm no expert on this, however, the Office 365 app along with the Entrust app and maybe a couple of others for security reasons were given the option if you want to be able to check your e-mails from home or from away from the office you have that particular option and you could download that app.

Q. And how long has that been the case for? I don't need you to pinpoint -- let me put it this way. Was that the case in January 2020 that those apps were made available to sheriff's department personnel?

A. Yes.

Q. Okay. And so these are applications that are made available by the sheriff's department to facilitate

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| it's personnel checking and sending e-mails on their department accounts using their personal cell phones; is that correct? A. Yes, that is an option. | | |
| 36:10-37:25 Q. So the situation here principally resolved around patrol personnel, patrol deputies, sergeants in the Malibu Lost Hills station. So would you expect that at least a fair percentage of patrol-based deputies and personnel would use their personal cell phones to check their work e-mail via one of these applications you talked about? A. I would guess or believe that some would. I don't know the exact amounts. I never worked that station and I haven't been out to patrol for -- since 2010, but yeah, I would expect that some would. Q. And the department doesn't tell people that they can't use their personal cell phones to check their sheriff's department e-mail account; right? | | |

571994.1

- 16 -

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| A. That is correct.<br>Q. In fact, it facilitates them doing so by providing these applications?<br>MR. TOKORO: Objection. Vague and ambiguous.<br>THE WITNESS: I would say yes, it helps them out.<br>BY MR. LAVOIE:<br>Q. Yeah. The sheriff's department makes it possible by providing some technology support essentially to -- for deputies to use personal cell phones to check their work e-mail; is that fair?<br>A. Yes.<br>Q. And in the January 2020 time period to what extent did sheriff's department personnel use personal cell phones to place work-related telephone calls?<br>A. You're saying to what extent. I would say there was probably a good portion of them that are using their personal cell phones to make calls to either back to work or to their supervisors, to their partners and so forth.<br>Q. Would you expect patrol-based personnel deputies and sergeants to | | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| have used personal cell phones in the January 2020 time period to place and receive work-related phone calls?<br>A. I would expect that that would happen.<br><br>_38:1-10 (Counter-designation)_<br>_Q. Why is that?_<br>_A. Probably for communication, to advise their supervisors of what's going on in a particular incident. Obviously I think – and I don't know too much about the case but in the January 26 incident I would imagine the crash site was probably in a remote area. I don't know for sure but since everybody cannot get to a particular area then notification to a supervisor when it's less than formal would be an option to do._ | Plaintiff's Objection<br>This is not a proper counter-designation for fairness completeness under FRCP 32(a)(6). Defendants may introduce this testimony on their own, but it must count toward their trial time. | Defendants' Response<br>Without this testimony, the preceding designation creates a misleading impression that LASD personnel use personal cell phones without any basis. It is unfair to include Captain Flores' testimony about his expectations on this topic without the reason for those expectations. |
| 38:17-23<br>Q. No. I'm not even talking about just that day. I'm saying in general patrol-based personnel if you want to limit it to that. To what extent did patrol-based personnel in | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| the January 2020 time period use personal cell phones to send and receive work-related text messages?<br>A. I would say it's probably prevalent. | | |
| <u>40:8-15</u><br>Q. Yeah, and in January 2020 would it have been the case that deputies and sergeants on patrol sometimes use their personal cell phones to send one another text messages that related to their work?<br>A. I would say yes.<br>Q. Why do you say yes?<br>A. Because that's just the new way of communicating for people nowadays, text messaging. | | |
| <u>41:23-42:4</u><br>Q. Is it the sheriff's department's position that other than this incident that in the January 2020 time period sheriff's department personnel were never using their personal cell phones to take photos of crime or accident scenes?<br>A. It is the sheriff's department position that | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| one should not be doing it. | | |
| <u>42:18-43:23</u><br>Q. So I'll just ask my question again. In January 2020 to what extent were sheriff's department personnel using personal cell phones to take photos of crime or accident scenes?<br>A. They should not have been.<br>Q. My question isn't whether they should have been or should not have been. You know, there are rules and then there's the way that people behave; right? So my question is in practice in the January 2020 time period were sheriff's department personnel using personal cell phones at least sometimes to photograph crime and accident scenes?<br>A. I would say yes, that was -- again, I can't say what exactly somebody is doing but I would say yes, that is a very good possibility given the fact that that has happened because if you have a situation where you have say a fire, you have a | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| rainstorm, you have a wind-driven event where evidence is going to get moved or dislodged or something to that fact, you would be justified to take a photograph of that particular incident so you could preserve the evidence as best as you can and then you should obviously turn that over to the lead investigator and/or his supervisor. So yes, possibly.<br>Q. And you said they would be justified and to be clear you're saying that they would be justified in doing so on a personal cell phone if a department-issued device wasn't available in a timely manner; is that fair?<br>A. That's fair. | | |
| 46:5-47:1<br>Q. So I want to just make sure I have an accurate understanding of the extent to which personnel in January 2020 time period used personal cell phones to take photos of crime and accident scenes. Is it your testimony that that | | |

571994.1

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF MARK FLORES

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| definitely occurred sometimes?<br>A. I know it happened during that incident, yes.<br>Q. Well, yeah, and I think we got to expand beyond that incident; right? Because what we're trying to understand is how prevalent was that conduct. Was that just the one and only time that that ever happened in the entire sheriff's department or was that something using a personal cell phone to photograph a crime or accident scene was that something that occurred beyond this particular occasion?<br>A. I'm going to guess it's not the one and only time that anybody has ever taken a photo of a crime scene or a human remain like that.<br>Q. On a personal cell phone?<br>A. On a personal cell phone.<br><br>_47:2-48:4 (Counter-designations)_<br>_Q. Why is that your instinct?_<br>_A. So like I said, if you have a situation where_ | | |
| | Plaintiff's Objection<br>Not a proper counter-designation for fairness under FRCP 32(a)(6). Defendants may introduce this testimony | Defendants' Response<br>Without this testimony, the preceding designation creates a misleading impression that LASD personnel use personal |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| *evidence is going to get disturbed, in that situation that I talked about it started to pour rain evidence was definitely going to get disturbed and they had to move that car door – the deputy had to touch that door, he had to touch the windows.  It might have been rolled up tight windows at the time or not, I'm not a hundred percent sure but that decision was made.  So yes, we would expect somebody to take photographs of that particular scene with their personal cell phone and turn those into the investigating officer.*<br>*Q. I see.  Okay. So fair to say that it's your expectation that sheriff's department personnel sometimes encounter crime or accident scenes where it's important to photograph to preserve and capture the state of that scene with some urgency; is it fair?*<br>*A. Not always but in certain circumstances, yes.*<br>*Q. Right.  There are some times where that happens.* | on their own, but it must count toward their trial time | cell phones without any basis.  It is unfair to include Captain Flores' testimony about his expectations on this topic without the reason for those expectations. |

571994.1

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF MARK FLORES

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| *Somebody encounters a crime or accident – strike that.  It happens sometimes where sheriff's department personnel encounter crime or accident scenes where there's an urgent need to photograph the scene to capture what it looked like before it was disturbed.  Is it fair?*<br>*A. That is fair.* | | |
| <u>48:20-50:10</u><br>Q. What about photographing? Would it be expected that someone would photograph the body before moving it?<br>A. You know what? So it would be expected that they call the sergeant over if they didn't have -- and get the sergeant's digital camera in order to take a photograph of that situation. That would be the most appropriate thing to do, would be to call the sergeant over. They typically have digital cameras in their car and they would be the ones that would be required to get that photograph. Now, with body worn cameras it's a little different. Now we have video footage of | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| a particular scene so it makes it a little bit easier. Q. So if there was a need to photograph a dead body and a sergeant's camera wasn't available in a timely manner, would the department's expectation prior to the body camera era, would the department's expectation have been that somebody used their personal cell phone to photograph that body before moving it or would it have been just don't photograph it if you can't get the sergeant's camera in time? A. So the department's expectation would be to, and it's in policy basically to contact the investigating officer of -- yeah, basically the investigating officer and advise them of the situation of what's going on and ask them for their advice on how exactly they should go about this. If they can't get ahold of them then they're to call the watch commander and advise them of the situation. And if the watch commander ordered them, yes, please | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| take photographs of it for evidence then they would be expected to do that.<br>Q. And you're talking about the current policy related to photos of human remains?<br>A. No. I'm actually talking about our communication policy, also moving of a dead body policy.<br>Q. And when did that come into effect?<br>A. Those particular policies were before January 2020. I'd have to research it. | | |
| <u>51:6-23</u><br>Q. There are at least some sheriff's deputies who have testified in this case in their depositions that in the months or years prior to the helicopter accident that they sometimes --<br>that there were occasions where they used their personal cell phone to photographer a crime scene, an accident scene including even sometimes photographing dead bodies, suicide victim, traffic car accident victim. Based on experience in your preparation for your | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| testimony today does that surprise you?<br>A. No. Like I said, if it's obviously authorized for them to do that then no. Depending on the situation there are parameters where you can take a photograph of a crime scene in order to preserve the evidence.<br>Q. On a personal cell phone?<br>A. If that may -- if it may be on a personal cell -- if that's all you had then yes. | | |
| 52:10-25<br>Q. Yeah, well, everyone has testified that, you know, it's not that they were just doing it just to do it but they were taking a photo because they thought the fire department was going to come in and disrupt the scene. Assuming that they had an appropriate purpose for using their personal cell phone to take a photo of a dead body to preserve the scene before fire department interruption but didn't seek the approval of a supervisor for doing that, would that | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| surprise you? Do you think that type of conduct occurred?<br>A. I could see that occurring and yes, they should have gotten approval prior to, however, obviously if you do it then you should advise your supervisor, the investigating officer of those photos that you have in order to turn them in for evidence. | | |
| 54:25-55:4<br>Q. But in the January 2020 time period it was the case that members of the sheriff's department would sometimes use personal cell phones to photograph accident scenes such as traffic accident scenes?<br>A. Yes. | | |
| 55:18-56:25<br>Q. Let's get to some easier ones. To what extent in the January 2020 time period did sheriff's department personnel use personal cell phones to navigate roadways via GPS such as using like Google maps? | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| A. I would probably say a lot, however, it's really difficult for me to say because number one, I wasn't out there as a watch commander or working patrol in January of 2020. I know that they have now mobile digital computers where they have GPS on their actual computer system, so I can't really tell you what the guys and gals are using nowadays. My assumption would be that they would be using GPS to get around but I'm not a hundred percent sure.<br>Q. And by "they would be using GPS to get around," you mean GPS like a Google maps app on a personal cell phone?<br>A. Yes.<br>Q. To what extent in the January 2020 time period did sheriff's department personnel use personal cell phones to conduct work-related Internet searches or looking up vehicle codes or other information that pertains to their job responsibilities? Was that common or uncommon? | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| A. I would probably say - - I would assume that would be common.<br>Q. Why?<br>A. Because most people nowadays have cell phones. I don't know too many people that do not. Whenever you need an answer Google or whatever else you're using is right there, Siri is right there to provide an answer on any topic you really need to know. | | |
| <u>59:9-13</u><br>Q. Okay. Let's look at topic number 8. And in the January 2020 time period did sheriff's deputies who were on patrol, were they issued cell phones by the sheriff's department?<br>A. I would say most if not all were not. | | |
| <u>60:21-61:4</u><br>Q. To what extent did sheriff's department personnel carry personal cell phones while on duty in January 2020?<br>A. I would say it was very prevalent. I'm going to guarantee you it wasn't throughout the department. Some of | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| them are not allowed to carry them on duty, however, I'm going to say patrol you're probably talking about 98, 99 percent of the people in patrol probably carry cell phones. | | |
| 62:2-15<br>Q. What did you do to prepare outside of any conversations with your lawyers?<br>A. I actually reviewed our use of communication devices as well as our human remains policy regarding the topic.<br>Q. The new human remains policy?<br>A. That is correct.<br>Q. So in terms of policies that were in existence at the time of the helicopter accident on January 26, 2020, only one of the two policies that you just described were in place. It was just the communications policy, not the human remains policy; is that accurate?<br>A. That is accurate. | | |
| 64:20-65:11<br>Q. Let me make this clear. So I am excluding from my question any | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| kind of memos or e-mails from lawyers, anything like that. As Jason said, I'm not talking about privileged documents and communications. What I'm saying is have you reviewed any other types of documents at the sheriff's department, whether it be policies, training materials, et cetera, in which it was discussed that taking or sharing photographs of human remains might implicate federal Constitutional rights?<br>A. No.<br>Q. So you don't recall seeing any training materials to that effect specifically?<br>A. No. And I don't think it specifically said Constitutional rights. Basically it's -- it's the public's trust is -- and is bringing us discredit. | | |
| <u>66:1-67:7</u><br>BY MR. LAVOIE:<br>Q. So this is Exhibit 168. I just want to say at the outset, there are a handful of highlights on here. Those are my highlights. They're not original to the document. And it's a | | |

- 32 -

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| court decision titled "Marsh v. County of San Diego" and it was decided as it says on the document May 29, 2012. Have you ever seen a document -- I'll preface this question by saying that I'm not asking you for anything related to legal memoranda or e-mails from lawyers or anything like that. So outside of those types of materials, have you ever seen any documents in the sheriff's department that mention this case, Marsh v. County of San Diego? MR. TOKORO: And just so we're clear, when Mr. Lavoie is referring to counsel, it's our firm, county counsel as well as lawyers within the county fire department. THE WITNESS: No, I have not seen that document. BY MR. LAVOIE: Q. My question is a little different. I think that your -- from your answer it sounded like you've never seen this case before; is that right? A. That's correct. | | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| Q. Yeah, my question is a little different. So outside of documents that were written by lawyers, including all the lawyers that Jason mentioned, have you ever seen a sheriff's department document, whether it be a policy or training materials that mention this case, Marsh v. County of San Diego? A. No. | | |
| 67:16-68:22<br>Q. So I'm reading at the bottom of this highlighted portion here. So Exhibit 168 on the bottom of the left-hand column on page 3 says, "The Favish Court considered our history and traditions and found that, quote, the well-established cultural tradition acknowledging a family's control over the body and death images of the deceased has long been recognized at common law," and then it gives a citation to Favish. "For precisely the same reasons, we conclude that this right is also protected by substantive due process." Do you see that? | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| A. I do.<br>Q. Outside of documents that were written by lawyers, have you ever seen a sheriff's department document whether it be a policy, training material or any other kind of document that mentioned a family's right to control the death images of a deceased family member?<br>A. I have not.<br>Q. In here it says at a different part of Marsh it says, "We find the Constitution protects a parent's right to control the physical remains, memory and images of a deceased child against unwarranted public exploitation by the government." Do you see that?<br>A. I do.<br>Q. Other than documents prepared by lawyers, have you ever seen a sheriff's department document, including a policy or training material or other type of document, that mentions a parent's right to control the images of a deceased child against unwarranted public | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF MARK FLORES

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| exploitation by the government?<br>A. No. | | |
| <u>71:4-14: 71:16-25</u><br>Q. So I'm going to put this -- so to be very specific, in January 2020 did the sheriff's department know, one way or another, whether citizens have a Constitutional right to control the death images of a deceased loved one. Did the sheriff's department know that in January of 2020 or did it not know that?<br>MR. TOKORO: I'm going to object that that's not a 30(b)6 topic that was identified as number 14. You can answer it.<br>THE WITNESS: You know, I really don't know. I really don't know.<br>. . .<br>Q. Why do you not know? | <u>Defendants' Objections</u><br>Not 30(b)(6) topic identified in Plaintiff's deposition notice. Plaintiff's counsel's questioning was based on a specific document (the Ninth Circuit's written decision in *Marsh*), which the witness had not reviewed and which was not identified as part of Topic #14.[1]<br><br>Lacks personal knowledge (FRE 602). | <u>Plaintiff's Response</u><br>This testimony was within the scope of the topic, as the witness was offered to testify as a 30(b)(6) witness on Topic #14: "[w]hether and how the Sheriff's Department was aware on or before January 31, 2020 that taking and/or sharing of photos of human remains might implicate federal constitutional rights." Defendants' lack of personal knowledge objection fails because the witness was designated under Rule 30(b)(6) on this topic.<br><br>As reflected in the concurrently-filed Declaration of Craig Lavoie, Defendants' objection exceeds the scope of the objections Defendants served at the |

---

[1] Defendants have strictly adhered to the Court's Civil Trial Order in preparing their portions of this Notice. They have not added or supplemented any of their prior objections. Nor have they added any "new material" to their previous designations. Where appropriate, to assist the Court in ruling on their objections and to respond to Plaintiffs' arguments articulated for the first time in this Notice, Defendants have explained the factual bases for their prior objections.

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| A. Because I think this is the first time I'm seeing this document and I've never -- I don't know much about this document. I've read it. I don't know where it's coming from. And so I don't know what our department knows about this particular document. Q. Or this particular court case? A. I'm sorry, yes, this particular court case. | | time of the Local Rule mandated deposition designation exchange. (*See* Lavoie Decl. Ex. A at 3 (identifying Defendants' original objections to Plaintiff's designation).) Defendants' original objections to this designation did not include the sentence that begins "Plaintiff's counsel's questioning." Defendants' effort to supplement their prior objection at the eleventh hour violates the Court's Civil Trial Order, which expressly states that "[t]he middle column shall contain only those objections which were previously made in accordance with the Local Rules" and that "the only new material the parties are permitted to add to their previous designations are the responses to the objections." (Dkt. 280 at 4:10-15.) Defendants' supplemental objection should be disregarded for that reason alone. In any event, the Sheriff's Department's awareness of the *Marsh* decision, |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF MARK FLORES

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| | | which articulates a constitutional right related to the "taking and/or sharing of photos of human remains," falls squarely within Topic #14. |
| <u>72:1-73:19</u><br>Q. Sorry, just one moment. Switching from your corporate capacity testifying on behalf of the sheriff's department to your personal capacity, just you, Mark Flores, prior to preparing for this deposition have you ever heard of anything -- strike that. I'll try and ask the question a better way. Let's go back to the time of the helicopter accident, January of 2020, long before you knew you'd be deposed in this case. If I asked you in January 2020, have you ever heard about a right protected by the United States Constitution to control the images of your deceased loved ones, what would you have said at the time if I'd asked you if you had ever heard of a right like that?<br>A. I would have said I never have heard of that. | <u>Defendants' Objection</u><br>Improper designation; deponent not testifying as 30(b)(6) witness.  <i>See</i> Fed. R. Civ. P. 32(a)(3). Plaintiff's counsel made it clear he was asking Captain Flores these questions in his "personal capacity, just you, Mark Flores."<br><br>Moreover, there are no allegations that Captain Flores improperly took or shared photos in this case. His personal knowledge of a constitutional right is irrelevant. | <u>Plaintiff's Response</u><br>This testimony was within the scope of the topic, as the witness was offered to testify as a 30(b)(6) witness on Topic #14: "[w]hether and how the Sheriff's Department was aware on or before January 31, 2020 that taking and/or sharing of photos of human remains might implicate federal constitutional rights."<br><br>Regardless, the testimony is admissible under FRCP 32(a)(3) and/or FRE 801(d)(2). As the Unit Commander Captain for the LASD Training Bureau, Flores qualified as a "managing agent" in addition to being LASD's 30(b)(6) designee for purposes of FRCP 32(a)(3). He was also an agent or employee of LASD for purposes of FRE 801(d)(2), which provides an independent |

| | Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|---|
| 1 | | | |
| 2 | Q. And is that a right that, again, testifying in your personal capacity that you ever heard discussed in any of the trainings you participated in or conducted for the sheriff's department at any point prior to January of 2020? | | basis for admission. *See* FRCP 32(a)(2) ("Any party may use a deposition … for any other purpose allowed by the Federal Rules of Evidence").  As a high-ranking officer in the Los |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | Angeles Sheriffs' Department, Flores' ignorance of the corresponding constitutional right is relevant to (among other things) the Department's knowledge of that right, to the existence of the custom or practice of unnecessarily taking or sharing death photos, and to the Department's failure to create policies and provide training on the subject. |
| 8 | A. Not that I can recall. | | |
| 9 | Q. And how many years of your 31-year career would you say that you spent either in receiving training or in giving training, where that was kind of a big part of your job? I assume that you would kind of exclude, you know, that the patrol years for example wouldn't count, but for many years of your years training was a big element of what you did such as when you had responsibilities at the academy. So I'm just kind of looking for how many years of your career would you say you were highly engaged in either receiving or giving training? | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | As reflected in the concurrently-filed Declaration of Craig Lavoie, Defendants' objection exceeds the scope of the objections Defendants served at the time of the Local Rule mandated deposition designation exchange. (*See* Lavoie Decl. Ex. A at 3 (identifying Defendants' original objections to Plaintiff's |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |
| 26 | A. In totality of it all I'm going to consider eight hours being one day, I'm going to say about two | | |
| 27 | | | |
| 28 | | | |

| | Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|---|
| 1 | | | |
| 2 | years of training I would guess. | | designation).) Defendants' original |
| 3 | Q. That you've either received or conducted? | | objections to this designation included only |
| 4 | A. Correct. | | the first sentence, not the three additional sentences |
| 5 | Q. And in none of that time in those two years of | | that follow. Defendants' effort to supplement their |
| 6 | training did you ever hear discussed anything about | | prior objection at the eleventh hour violates the |
| 7 | a federal Constitutional right to control the death | | Court's Civil Trial Order, which expressly states |
| 8 | images of a deceased family member? | | that "[t]he middle column shall contain only those |
| 9 | A. That is correct. | | objections which were previously made in |
| 10 | | | accordance with the Local Rules" and that "the only |
| 11 | | | new material the parties are permitted to add to |
| 12 | | | their previous designations are the |
| 13 | | | responses to the objections." (Dkt. 280 at |
| 14 | | | 4:10-15.) Defendants' supplemental objection |
| 15 | | | should be disregarded for that reason alone. In any |
| 16 | | | event, Defendants' objections fail for the |
| 17 | | | reasons discussed above. |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | <u>79:5-20</u> | | |
| 25 | Q. Okay. So in what respect were the four | | |
| 26 | deputies trained in the academy specifically | | |
| 27 | regarding human remains photographs and whether | | |
| 28 | | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| and under what circumstances they're allowed to be taken?<br>A. Yeah, so they're basically trained in those four areas that I talked about, those four learning domains that I did talk about. They are trained to basically -- especially with human remains, obviously here what we're talking about is to preserve the scene, wait until our homicide bureau gets out to the location and have our scientific services bureau come out and photograph the scene. Except for unusual circumstances they're told that taking personal photographs is not allowed and would harm the public's trust with the department.<br><br>*79:21-80:15 (Counter-designation)*<br>*Q. When you say they are taught that taking personal photographs of remains are not allowed, is that something you've seen in a PowerPoint presentation, in written training materials? Have you seen that in any tangible form?* | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF MARK FLORES

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| *A. I have.*<br>*Q. Okay, where have you seen that?*<br>*A. In the expanded course outline for LD30 and as well the student manual, it says something to that effect under LD30.*<br>*Q. LD what?*<br>*A. Learning domain 30.*<br>*Q. And that's something that is delivered in the academy?*<br>*A. That is correct.  They get 12 hours of that.*<br>*Q. And you've seen something in writing related to LD30 about taking personal photographs of human remains?*<br>*A. Yes.* | | |
| 80:16-84:13<br>Q. What form was that? Was that like a training book? Was that a PowerPoint? What was it?<br>A. So one is a student workbook. They get a student workbook. And I can't tell you the exact number of pages but I'm going to guess it's about 60 pages long and it talks about crime scene preservation and so forth and somewhere in that | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF MARK FLORES

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| document it talks about taking personal photographs in there. There's also an expanded course outline. It's something that we give to POST and tell them this is what we're going to teach on. I believe in there is also basically some verbiage in there that talks about personal pictures and then with our PowerPoint there was a bullet point where it does talk about taking personal photographs of human remains. Q. And what is the date of these materials starting with the PowerPoint? A. You know what, I don't know. I'd have to check. Q. Are these -- can you say with certainty whether the four deputies here at the time that they went through the academy that they received this PowerPoint presentation? A. I can't say with certainty, no. Q. Why not? A. Because I don't know exactly when they went through the academy. I don't know exactly when | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| the last time the post updated the information, so that would all have to be researched. Q. And with respect to the expanded course outline and the verbiage related to personal photographs of human remains, is that -- are you able to say with certainty whether each of these four deputies was presented with that specific course outline with the content that you described? A. I couldn't say with certainty. Q. Why not? A. Because I don't know when these four deputies went through the academy and I don't know when POST last updated their learning domain. Q. You mentioned also LD30 and a student workbook that's 60 pages long that has a reference to personal photos. Can you say with certainty whether each of these four deputies was presented with that workbook? A. I cannot. Q. Why not? | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| A. Because I don't know when the deputies went through the academy and I don't know when POST last updated the workbook. Q. So these are materials that you've seen yourself in preparation for your testimony today? A. That is correct. Q. But you don't know one way or the other whether the four deputies have seen these same materials? A. I don't know whether they in fact saw that -- well, I'm almost positive they did not see the expanded course outline because it's really only for the instructor. As far as the workbooks go, every single student gets a workbook, a recruit gets a workbook, however, they are constantly being updated by POST on a typically yearly basis so I don't know -- I would have to figure out when exactly the deputy went through and what exactly the workbook version was back then. Q. And the PowerPoint, what's the -- is the PowerPoint that you | | |

571994.1

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF MARK FLORES

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| mentioned, is that -- in what context is it your understanding that the PowerPoint is used? I mean, like for example, the outline you mentioned is more for the instructor's consumption and for the deputies, what about the PowerPoint? <br> A. So the PowerPoint is typically created by the instructor. They use the expanded course outline to base what their PowerPoint is going to be off of and they have to teach off of what specific items are in the expanded course outline. They use that PowerPoint typically for the students or recruits in order to deliver their message and their teachings. <br> Q. In any of these three courses, the LD30, the expanded course outline or the PowerPoint, did you see any reference to there being any right under the United States Constitution related to photos of deceased individuals? <br> A. I can't recall that. <br> Q. You don't know whether you saw that in any of the materials? | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| A. I don't believe I saw it. It's quite a big book with quite a lot of pages so I don't remember coming across that.<br>Q. Do you recall any training materials in which deputies are -- information is passed on to deputies that members of the public have a Constitutional right to control images of their loved ones?<br>A. No. I don't recall ever seeing that.<br><br>*79:21-80:15 (Counter-designation)*<br>*Q. When you say they are taught that taking personal photographs of remains are not allowed, is that something you've seen in a PowerPoint presentation, in written training materials? Have you seen that in any tangible form?*<br>*A. I have.*<br>*Q. Okay, where have you seen that?*<br>*A. In the expanded course outline for LD30 and as well the student manual, it says something to that effect under LD30.*<br>*Q. LD what?*<br>*A. Learning domain 30.* | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| *Q. And that's something that is delivered in the academy?*<br>*A. That is correct. They get 12 hours of that.*<br>*Q. And you've seen something in writing related to LD30 about taking personal photographs of human remains?*<br>*A. Yes.* | | |
| <u>85:14-86:6</u><br>Q. So based on your preparation, your understanding is that photos of human remains that are taken on a personal cell phone of a member of the department are the property of the department?<br>A. Absolutely.<br>Q. Okay. And is that something new or was that true in January 2020 as well?<br>A. I believe that's true in 2020.<br>Q. Okay. And is the same true if someone were to receive a photo of human remains that was taken by a colleague on their personal cell phone? Would that be department property? So person A -- | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| deputy A takes a photo of a body at a crime scene and transmits it to the personal cell phone of deputy B, is that photo the property of the department on both of those deputies' devices? A. Yes, it would be the department's property. | | |
| 86:15-17 Q. Yeah, and your understanding that's true today, it was true back in January 2020? A. Yes. | | |
| 88:20-89:4 Q. Okay. During the academy did any of these four deputies receive training on whether and under what circumstances it would be permissible to share a photo of human remains with a member of the public? A. I don't know if they did or not because I wasn't in any of their trainings or at least I don't believe I was. Q. So yeah, so you're not able to say one way or the other? A. Correct. | | |

571994.1

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF MARK FLORES

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| **92:12-18**<br>Q. And is it your expectation -- sorry. Does the department -- does the department know whether Joey Cruz, Rafael Mejia, Michael Russell and Raul Versales were specifically told during their training program that they could not share photographs of human remains photographs with members of the public?<br>A. I don't know. | | |
| **100:8-101:11**<br>Q. Captain Flores, one clean up question I want to ask you. Do you recall me asking you about the new policy and what training has been given outside of academy training regarding the new policy. I believe you answered there was a global e-mail that contained a newsletter. There's the intranet website and that it's been heavily briefed. Those three sources?<br>A. That's correct.<br>Q. Do you know any other sources of training besides those three that sworn personnel in the sheriff's department have | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| received regarding the new policy and outside of the academy based training?<br>A. The only other one I would know about is in our advanced officer training patrol school specifically, they now discuss the human remains policy.<br>Q. In what respect?<br>A. In the fact that it's briefed and basically we tell the officers that you know, you shouldn't be taking any photographs of human remains and sharing them or anything like that.<br>Q. And was that true prior to the accident as well or is that something new with the new policy?<br>A. That is something new with the new policy.<br>Q. Okay. Outside of those four sources of training plus I guess potentially the academy, any other sources of training with respect to the new policy?<br>A. No. | | |
| 107:7-109:2<br>Q. And so I'm seeing here it says, "When digital photography is used images should be | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF MARK FLORES

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| preserved and their storage location clearly noted in the officer's documentation." Do you see that? A. Yes. Q. So is it correct to say that deputies are instructed that digital photographic images should be preserved A. Yes. Q. And it says, "Note, it's unprofessional and creates a loss of public trust when officers take unofficial photographs." Do you see that? A. I do. Q. Do you know when that note was added to this workbook? A. I don't know when it was added to the workbook. And this is something that is not a sheriff's department workbook. It's a POST workbook so POST is the one that develops this and gives it to -- basically allows us to print it up and give it to our recruits. So it actually might have a date on it, a revised date of some sort. Q. Okay. A. I just saw it. 2018 I thought. | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| Q. Yes, it says published '97 and revised, corrected, revised, corrected. A. Yeah, they consistently revise these things as we move along and learn new things. Q. Now, do you know with respect to the four deputies who have been named in the topics, that being Rafael Mejia, Joey Cruz, Raul Versales and Michael Russell, you mentioned that the workbook has been revised several times. That's consistent with what we see here. Do you know which version of the POST workbook they received? A. I do not. Q. And so do we know whether this note that appears -- does the department know whether -specifically whether Raul Versales, Deputy Cruz --strike that. Does the department know with certainty whether Joey Cruz, Raul Versales, Rafael Mejia and Michael Russell were ever presented with a workbook that contained this note about how it is | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| unprofessional and creates a loss of public trust when officers take unofficial photographs? A. No. | | |
| <u>114:24-116:3</u><br>Q. Between January 26 and January 31, 2020, what sheriff's department policies, practices and procedures were in place related to photos of accident scenes? I'll just leave it at that, photos of accident scenes.<br>A. We have our communication devices policy. That would be the most specific policy that we have for photographs.<br>Q. The communication devices policy in this time period, January 2020, what did that communication policy establish or provide for with respect to photographs of accident scenes?<br>A. It basically stated that any type of information you gathered on a communication device, i.e., cell phone, laptop, anything like that is department -- is now considered department property and it should not | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| be shared or disseminated anywhere and should be used for evidentiary -- if it's in fact evidence for evidentiary purposes as well as stating that you can in fact use your personal cell phone or such or recording device to interact with the public in an official department capacity.<br>Q. So if a member of the sheriff's department approached the helicopter crash scene on January 26, 2020 and had their personal cell phone on them and was thinking about taking photographs of the helicopter crash scene, what policies would have touched upon that conduct or governed that conduct?<br>A. The communication devices policy as well as confidential information policy. | | |
| 116:13-117:2<br>Q. I was distracted by your answer, you said the communication policy and what else?<br>A. The confidential information policy.<br>Q. Okay. And a fair summary I think you said | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| of the communication's policy was that any information gathered on a communication device is department property; is that right?<br>A. That's correct.<br>Q. So if let's say a sheriff's deputy approached a helicopter crash scene while on duty, used their personal cell phone to photograph a piece of the wreckage or some of the victims' remains, those photographs would be the department's property under that policy?<br>A. That is correct. | | |
| 120:7-17; 120:22-121:4<br>Q. So let me pivot to this right here where it says: The use of personal cell phones to take, share and/or disseminate photos of accident scenes, do you see that?<br>A. Yes.<br>Q. According to department policy in January 26 -- on January 26 through January 31, 2020were members of the sheriff's department permitted to use personal cell phones to take, share | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| and/or disseminate photos of accident scenes?<br>A. No.<br>. . .<br>Q. You stated no, they were not. Why were they not?<br>A. Because it falls outside of our policy. Or it violates our policy.<br>Q. Which policy specifically did it violate, would that behavior have violated?<br>A. Communication -- the communication devices and as well confidential information. | | |
| <u>122:3-11</u><br>Q. What's an example of the latter? A situation in which it would have been impermissible under the policies in place in January of 2020 to use a personal cell phone to share or disseminate a photo of an accident scene?<br>A. If you were to take a picture of say a dead body, a human remain and you were to share it outside the scope of the particular investigation, then I think that would be impermissible. | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF MARK FLORES

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| *121:21-122:2 (Counter-designation)*<br>*Q. So do you think there are some scenarios under the policies in place in January of 2020 under which it would have been permissible to use a personal cell phone to share a photo of an accident scene and other scenarios under which it would have been impermissible to do so?*<br>*A. Yes.* | | |
| 123:4-13<br>Q. You just gave the example of why it would be impermissible to take a photo of a dead body in an accident scene and do what with it did you say?<br>A. So if you were going to share it for personal gain that would be one example, let's say for example I'm going to try to make money off of this, that would definitely be not permissible.<br>Q. Or if you were to share it with like a friend outside of the department for no reason?<br>A. Correct. | | |

| Plaintiff's Designations | Objection | Response to Objection |
|---|---|---|
| <u>124:5-13</u><br>Q. Let's go to this topic here. Between January 26 and January 31, 2020 were there any policies, practices or procedures in effect by the sheriff's department relating to any federal Constitutional rights that are implicated or potentially implicated by taking, sharing and/or disseminating photos of accident scenes or human remains?<br>A. No. | | |
| <u>124:20-125:1</u><br>Q. Between January 26 and January 31, 2020, were there any sheriff's department policies, practices or procedures in place related to the preservation of records and materials relating to potential violations of law or Constitutional rights by sheriff's department personnel?<br>A. No. | | |

571994.1

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF MARK FLORES

1  DATED:  July 28, 2022

2

3

4

5

6

7

8  DATED:  July 28, 2022

9

10

11

12

13

14

15

16

17

18

19

20  DATED:  July 28, 2022

21

22

23

24

25

26

27

28

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation


By:  _____/s/ Luis Li_____
                    LUIS LI



JEROME M. JACKSON LAW OFFICES



By:  _____/s/ Jerome M. Jackson_____
                JEROME M. JACKSON

JEROME M. JACKSON
jmjlaw@aol.com
JEROME M. JACKSON LAW OFFICES
880 Apollo Street, Suite 238
El Segundo, California 90245
Telephone: (310) 726-4199
Facsimile: (310) 414-0486

*Attorneys for Plaintiff Christopher Chester*


OFFICE OF COUNTY COUNSEL



By:  _____/s/ Jonathan C. McCaverty_____
                JONATHAN C. MCCAVERTY

Attorneys for Defendant
LOS ANGELES COUNTY SHERIFF'S
DEPARTMENT

DATED:  July 28, 2022          MILLER BARONDESS, LLP


By:  _____
          */s/ Mira Hashmall*
          MIRA HASHMALL

Attorneys for Defendants
COUNTY OF LOS ANGELES, LOS
ANGELES COUNTY FIRE
DEPARTMENT, JOEY CRUZ, RAFAEL
MEJIA, MICHAEL RUSSELL, RAUL
VERSALES, TONY IMBRENDA  and
ARLIN KAHAN

## ECF CERTIFICATION

The filing attorney attests that Defendants' counsel concurs in the content of, and has authorized, this filing.