LUIS LI (State Bar No. 156081)
Luis.Li@wsgr.com
ERIC TUTTLE (State Bar No. 248440)
Eric.Tuttle@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
633 West Fifth Street, Suite 1550
Los Angeles, California 90071
Telephone:   (323) 210-2900
Facsimile:    (866) 974-7329

CRAIG JENNINGS LAVOIE (State Bar No. 293079)
Craig.Lavoie@mto.com
JENNIFER L. BRYANT (State Bar No. 293371)
Jennifer.Bryant@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone:   (213) 683-9100
Facsimile:    (213) 687-3702

Attorneys for Plaintiff Vanessa Bryant

[*Additional counsel continued on next page.*]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| VANESSA BRYANT,<br><br>      Plaintiff,<br><br>      vs.<br><br>COUNTY OF LOS ANGELES, et al.,<br><br>      Defendants. | Case No. 2:20-cv-09582-JFW-E (Consolidated with 2:20-cv-10844-JFW-E)<br><br>**PLAINTIFFS' NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF WILLIAM JAEGER**<br><br>Trial Date:     None Set<br><br>The Hon. John F. Walter |
| CHRISTOPHER L. CHESTER,<br><br>      Plaintiff,<br><br>      vs.<br><br>COUNTY OF LOS ANGELES, et al.,<br><br>      Defendants | |

- 1 -

1 | [*Additional counsel, continued from previous page*]

2

3 | JEROME M. JACKSON (State Bar No. 64238)
jmjlaw@aol.com

4 | JEROME M. JACKSON LAW OFFICES
880 Apollo Street, Suite 238

5 | El Segundo, California 90245
Telephone: (310) 726-4199

6 | Facsimile: (310) 414-0486

7

8 | Attorneys for Plaintiff Christopher L. Chester

9 | LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com

10 | MIRA HASHMALL (State Bar No. 216842)

11 | JASON H. TOKORO (State Bar No. 252345)
CASEY B. SYPEK (State Bar No. 291214)

12 | MILLER BARONDESS, LLP

13 | 1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067

14 | Tel.: (310) 552-4400 | Fax: (310) 552-8400

15

16 | Attorneys for Defendants County of Los Angeles, Los Angeles County Fire
Department, Joey Cruz, Rafael Mejia, Michael Russell, Raul Versales, Arlin Kahan

17 | and Tony Imbrenda

18

19 | JONATHAN C. McCAVERTY (State Bar No. 210922)
*Principal Deputy County Counsel*

20 | jmccaverty@counsel.lacounty.gov
OFFICE OF THE COUNTY COUNSEL

21 | General Litigation Division

22 | 500 West Temple Street, Suite 468
Los Angeles, California 90012

23 | Tel.: (213) 974-1828 | Fax: (213) 626-7446

24

25 | Attorneys for Defendant Los Angeles County Sheriff's Department

26

27

28

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF WILLIAM JAEGER

Pursuant to the Court's Civil Trial Order of February 7, 2022 (Dkt. 280), Plaintiffs Vanessa Bryant and Christopher L. Chester ("Plaintiffs") and Defendants submit the following notice of designated deposition testimony of William Jaeger.

| Plaintiffs' Designations | Objection | Response to Objection |
| --- | --- | --- |
| 8:9-14<br>DEPOSITION OFFICER: Raise your right hand, please. You do solemnly state that the evidence you shall give in this matter shall be the truth, the whole truth, and nothing but the truth, so help you God?<br>THE WITNESS: I do. | | |
| 11:17-24<br>Q. So you understand that you are here testifying not only in your personal capacity but also as a -- what we call a 30(b)(6) witness, someone who is testifying on behalf of the sheriff's department regarding the sheriff's department's knowledge?<br>A. Yes. | | |
| 13:6-15:9<br>Q. And you understand that even though we're not in court today -- we're on a videoconference with a court reporter taking down all my questions and your | | |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| answers -- that you have the same legal obligation to tell the truth in this videoconference deposition today as you would if we were sitting in a court before a judge and jury? Do you understand that?<br>A. I do.<br>Q. How long have you been with the L.A. County Sheriff's Department?<br>A. It will be 31 years this month.<br>Q. So you joined in 1990?<br>A. I did.<br>Q. And could you please just walk me through the positions and ranks that you've held starting from the academy up through the present day.<br>A. I can. Hopefully, you have a lot of notes.<br>Q. Go for it.<br>A. I graduated the academy, and then I was assigned to Men's Central Jail. I did the first five years of my career at Men's Central Jail. I then went to patrol at Norwalk Sheriff's Station. I was at Norwalk Sheriff's Station for a little over four years. I then transferred and went to our training | | |

- 4 -

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| academy, where I was a drill instructor. That was -- I was there about 18 months. I then went back to field operations at Lakewood Station, where I did patrol again. From there I promoted to the rank of sergeant, and I went back to Men's Central Jail. After that, I did -- transferred from Men's Central Jail as a sergeant and went to Industry Station. Then to San Dimas Station. Then I started a bureau, Countywide Services. From there I went to Training Bureau again, all as a sergeant. Ultimately, I wound up at personnel. I then promoted to the rank of lieutenant. I went to a couple of different field commands: Pico Rivera and Crescenta Valley. I then went back to personnel administration. Let's see. I then became the aide to South Patrol Division, working for a chief. I then…<br>Q. Go ahead. Just let it go.<br>A. I then became the -- I -- sheriff's assistant, aide. And then I promoted to the rank of captain, and I | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF WILLIAM JAEGER

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| went to Internal Affairs Bureau as a captain. After that, I then became -- promoted to the rank of commander about six months ago. And I now oversee Internal Affairs Bureau, Advocacy and Internal Criminal.<br>Q. When were you promoted to captain?<br>A. I promoted to captain in December of 2019.<br>Q. And was your first assignment as captain in Internal Affairs?<br>A. Yes, it was. | | |
| <u>15:15-17</u><br>Q. So you were in charge, effectively, of Internal Affairs?<br>A. Yes. | | |
| <u>16:15-17:2</u><br>Q. So you were in charge of -- you were the captain in charge of the sheriff's department's Internal Affairs Bureau beginning in December 2019 up through what date?<br>A. Through June of 2021. So approximately 18 or 19 months.<br>Q. I see. Okay. So you were the captain of the sheriff's department's | | |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| Internal Affairs Bureau both when the January 26, 2020, helicopter accident occurred and when the sheriff's department's Internal Affairs investigation into accident scene photos occurred and concluded; is that correct? A. That is correct. | | |
| <u>17:23-18:13</u> Q. And at the time that you were the captain in charge of the Internal Affairs Bureau, what were the steps in the reporting relationship between yourself and Sheriff Villanueva? In other words, so you reported to so-and-so. That person reported to so-and-so. Could you trace that out for me. A. Yes. Above my rank is a commander, which is my current position. So that commander would oversee Internal Affairs and Internal Criminal, along with our Advocacy. So that would be -- my immediate supervisor at the time was Commander Scott Gage. From there you have a chief of the | | |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| Professional Standards Division, which at the time was Chief Matt Burson. Above that, the next in the formal chain of command is the undersheriff. And then through the undersheriff is to the sheriff. | | |
| 18:19-20:2<br>Q. And to your knowledge, who made the decision -- who made the final decision to promote you from captain to commander?<br>A. Well, the final decision always rests with the sheriff.<br>Q. And so it's your understanding that Sheriff Villanueva made the final decision to promote you captain to commander?<br>A. Well, I believe -- yes. I mean, the final decision rests with the sheriff.<br>Q. And you said that in your current position, that you are in charge -- that you oversee Internal Affairs, Advocacy and Internal Criminal; is that right?<br>A. That is correct.<br>Q. What is the Advocacy piece of that? What does that entail? | | |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| A. That unit actually handles the -- from the division, they do the review of the case file. So if Internal Affairs Bureau produces a case file, Advocacy would then work with the division based on the findings that the division comes up with. They would then be tasked with authoring the letters and writing the dispositions to the employees as far as what charges were being formally founded against that employee or not. Q. And what is the Internal Criminal aspect that you described? A. Well, our Internal Criminal investigative unit actually is triggered when a division finds in their inquiry that there was a possible crime committed by the employee as opposed to just a policy violation. If it is criminal in nature, then that investigative unit actually does the criminal investigation into our employee. | | |
| 20:10-22:16 Q. Okay. And prior to becoming the captain of | | |

- 9 -

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF WILLIAM JAEGER

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| the Internal Affairs Bureau, did you ever personally conduct investigations of potential misconduct by department personnel? A. I did. Q. Can you describe the roles that you had when you conducted those investigations. In other words, what -- what -- what ranks and assignments did you have when you conducted investigations of potential misconduct by department personnel prior to becoming a captain of the Internal Affairs Bureau? A. Sure. So one of the triggers for Internal Affairs has to be a request for Internal Affairs Bureau to actually conduct the investigation. Another trigger that can happen is the case is handed back to the unit of assignment that oversees the employee. And that would be considered a -- a -- a station-level investigation. And that would be handled by your watch commander. So when I was the rank of the lieutenant, I had done | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF WILLIAM JAEGER

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| a -- a number of station-level investigations as a watch commander, where I was the investigator and -- and completing that investigation. Q. Approximately how many times as a lieutenant did you conduct investigations of potential misconduct by department personnel? Just your best estimate. A. Probably a half dozen. Q. And then in the role as captain of the Internal Affairs Bureau, how many investigations of potential misconduct by department personnel did you supervise or oversee during your year and a half in that position? A. Well, that's a difficult question to answer because as the captain I'm not doing any actual investigative work. What I'm doing is reviewing the case files for completion, timeliness, and then I do an overall review of the case at the -- at the -- at its conclusion. So at any given time Internal Affairs Bureau would have had a -- probably 300 active case files moving forward. So when | | |

| | Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|---|
| 1 | | | |
| 2 | you ask me in a year and a half how many case files did I review, I -- I -- I would say in excess of three to four hundred over the eighteen months. Q. And these are -- you would review them at the level of often reviewing the summary of -- of findings, for instance? A. Yes. My role is to review the summaries and the case file, in general, to make sure that we did not need to go back and do any kind of further investigation. And there is multiple layers of that review that takes place. Q. Based on your year and a half experience leading the Internal Affairs Bureau, would you say that you are quite familiar with sheriff's department's policies and procedures for how to conduct internal investigations of potential misconduct by department personnel? A. Yes. I think I'm very versed in that. | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |
| 26 | <u>22:23-26:11</u> [objections omitted] Q. Yeah. Just at a very high level, what is a -- | | |
| 27 | | | |
| 28 | | | |

| | Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|---|
| 1 | | | |
| 2 | what is a typical -- what | | |
| 3 | are the steps taken in | | |
| | atypical investigation? | | |
| 4 | For example, are there | | |
| 5 | witness interviews? | | |
| | Is there the collection of | | |
| 6 | materials that might be | | |
| 7 | relevant? You know, | | |
| | things -- things of that | | |
| 8 | nature. Just at a very high | | |
| 9 | level, you know, what is - | | |
| 10 | - what's the process for a | | |
| | typical investigation? | | |
| 11 | THE WITNESS: Well, I | | |
| 12 | mean, I would have to | | |
| | start that -- that answer by | | |
| 13 | stating that the inquiry | | |
| 14 | phase is very important to | | |
| | the beginning of any | | |
| 15 | investigation. That | | |
| 16 | inquiry stage oftentimes | | |
| 17 | does develop leads or | | |
| | material investigation for | | |
| 18 | the investigator before | | |
| 19 | they ever get the case -- | | |
| | or before Internal Affairs | | |
| 20 | would get the case. So | | |
| 21 | once the inquiry is | | |
| | conducted by the unit | | |
| 22 | overseeing the employee | | |
| 23 | or the misconduct or | | |
| 24 | potential misconduct, that | | |
| | inquiry oftentimes | | |
| 25 | develops a packet of | | |
| 26 | information. That would | | |
| | then be given to the | | |
| 27 | investigator. At Internal | | |
| | Affairs, if it's assigned to | | |
| 28 | Internal Affairs who are | | |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| asked to do the investigation, that investigator would start their process by reviewing that package of information received from the unit during the inquiry. That would then develop a witness list that would develop a subject or focus of the investigation. And then they would develop a line of questioning that would be pertinent to the possible policy violations that were presented by the division. So it goes to the scope of the investigation. And then from there they would develop their line of questioning to make sure that they were staying within the scope of the investigation. From there, if it was further document retrieval that they needed, certainly the investigator would proceed by obtaining those documents. Sometimes that can be a lengthy process depending on what type of documents we're looking for. If there were video, body cam footage, stuff like that, they would obviously have to review | | |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| that. All in part to try and develop a proper line of questioning for the employee. And generally, the subjects of the investigation are the final people that are interviewed as part of that investigation so that we can hopefully clear up any loose or -- or unknown areas in the investigation.<br>Q. When witnesses or subjects in an Internal Affairs investigation are interviewed by investigators for the Internal Affairs Bureau, are those -- is it customary for the department to audio-record those interviews?<br>A. We do audio-record the interview, yes.<br>Q. To your understanding, why is that?<br>A. Why do we audio-record it? We actually have all of our interviews transcribed. That way we have an exact recording of question and answer.<br>Q. And why is that -- why is that helpful or beneficial, in your experience, to have an official recording or | | |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| record of what was said during the interview? <br> A. Well, as -- as part of the investigation process, we want to make sure that the decision-maker is presented with the absolutes, as best we know them, of what the investigation came forward with. So if a question is directly asked of someone and they give a -- an answer, we want to make sure that the decision-maker is provided that absolute, if you will. Now, there also is context in conversation. So when you flow through an interview, oftentimes there's a moment that a particular question might be asked; however, there might have been 14 other questions prior to that that is the context of that conversation that they were having. So that's important for the decision-maker to be able to go back and reread. <br> Q. Whether you were say -- when you're referring to "the decision-maker," what do you mean? <br> A. Well, Internal Affairs Bureau does the | | |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| investigation into the allegation; however, we're not the decision-maker into the -- the discipline as to whether it's founded or unfounded or the days off that the employee will receive. That goes to the division chief that oversees that employee.<br>Q. I see. So someone at, like, Dennis Kneer's level -- that's a typical duty that they handle. They review the findings of the investigation. They make a decision to as to what level of discipline, if any, is assigned to the subject?<br>A. That is correct. | | |
| <u>30:2-12</u><br>Q. Okay. Do you recall where you were when you heard that there had been a helicopter accident in which Kobe Bryant had potentially passed away?<br>A. I believe I was in my living room at my house.<br>Q. Did you work at all that day in responding to anything related to the helicopter accident?<br>A. I did not.<br>Q. Okay. And in the days that followed, did you | | |

- 17 -

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| have any professional responsibilities that touched upon the helicopter accident in any way?<br>A. No. We were not triggered for quite some time. | | |
| 30:21-32:21<br>Q. Okay. So as you'll see, this is -- Exhibit 154 is an e-mail that ultimately gets forward by John Burcher to Sheriff Alex Villanueva. But the relevant portion is at the bottom, so I'm going to just scroll down to the root message here. And it's an e-mail from Ralph Mendez to SIBmedia24 on January 29, 2020, at 12:21 a.m. So this is just past midnight, effectively, very late Tuesday night. In layman's terms, it's very early morning hours of Wednesday, January 29. Do you see that?<br>A. Yes. | Defendants' Objections<br>Irrelevant. (FRE 104(b), 401, 402).<br>Lacks personal knowledge. (FRE 602). Commander Jaeger was asked about two different emails that he neither sent nor received, and that he had no familiarity with. His reaction to these documents is irrelevant and has no bearing on whether Plaintiffs' constitutional rights were violated.[1] | Plaintiffs' Response<br>Commander Jaeger displays personal knowledge regarding when he learned of the allegation that a deputy displayed crash-scene photos at a bar in Norwalk. The testimony indicates that Commander Jaeger became aware of the allegation several weeks before Internal Affairs opened an investigation.  During this time, the remains photos were largely uncontrolled, without serious investigation by the Department, which is relevant to the likelihood that crash-scene photos remain in circulation and |

---

[1] Defendants have strictly adhered to the Court's Civil Trial Order in preparing their portions of this Notice.  They have not added or supplemented any of their prior objections.  Nor have they added any "new material" to their previous designations. Where appropriate, to assist the Court in ruling on their objections and to respond to Plaintiffs' arguments articulated for the first time in this Notice, Defendants have explained the factual bases for their prior objections.

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF WILLIAM JAEGER

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| Q. Okay. Have you ever seen this e-mail before? A. If I have, I don't remember it. Q. Okay. So this is -- it states, "There was a deputy at Baja California Bar & Grill in Norwalk who was at the Kobe Bryant crash site showing pictures of his decapitated body." Do you see that? A. I do. Q. As you sit here today, you know, is that something that you have heard before, that at some point there was an allegation made by a member of the public that there was a Los Angeles County Sheriff's Deputy at a bar in Norwalk showing photos of victims' remains? Do you recall that -- there being an allegation to that effect at some point? A. Yes. Q. Do you recall when you first learned of this allegation relative to the helicopter crash itself? A. The exact timing, I do not remember. I would say it was probably within a week of the actual crash. |  | the Department's deliberate indifference to, and/or toleration of, the practice of taking and sharing photos with human remains.<br><br>Defendants did not include any legal argument for this objection until July 28, 2022, *after* Plaintiffs provided written responses to Defendants' original objections.  (*See* Lavoie Decl. Ex. A at 5.)  Defendants' untimely objections violate the Court's Civil Trial Order, which expressly states that "[t]he middle column shall contain only those objections which were previously made in accordance with the Local Rules" and that "the only new material the parties are permitted to add to their previous designations are the responses to the objections." (Dkt. 280 at 4:10-15.)  They also prejudice Plaintiffs by denying Plaintiffs a meaningful opportunity to respond.  Defendants' untimely arguments |

| | Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|---|
| 1 | | | |
| 2 | Q. Okay. The next document I'm going to show you, again, just to try and -- I know it can be difficult to remember dates and time periods when you're talking about something that happened a year and a half ago, so -- this next e-mail has previously been marked as Exhibit 72. As you see, it ends with John Satterfield of the Sheriff's Information Bureau e-mailing something to John Burcher, who at the time was the sheriff's chief of staff, on February 26, 2020. But if you scroll down to the bottom, this is an e-mail from a Los Angeles Times reporter, LATimes.com, to then-Captain Valdez of the Sheriff's Information Bureau and Sheriff Alex Villanueva on February 26, 2020. And it says, "I'm getting close to publishing a story about a report to the sheriff's department that a deputy trainee showed graphic photos of Kobe Bryant's helicopter crash site to a bartender in Norwalk." Do you see that? A. I do. | | should be deemed waived. |

- 20 -

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| <u>34:20-22</u><br>Q. Was there a time where you became aware that the media was reporting on that subject?<br>A. Yes, there -- there was a time. | <u>Defendants' Objection</u><br>Irrelevant. (FRE 104(b), 401, 402).  Commander Jaeger's familiarity with media reports has no bearing on the issues in this case.<br><br>Moreover, there is no *Monell* theory of liability for failure to take reasonable steps to investigate.  Nor does this testimony have any bearing on that issue. | <u>Plaintiffs' Response</u><br>Commander Jaeger demonstrates personal knowledge of the media coverage surrounding the allegations that the Sheriff's Department had behaved improperly with respect to accident scene photographs.  This testimony is relevant because internal affairs did not open an investigation until the date the LA Times published a report on the allegations, suggesting the investigation was opened due to media scrutiny, not concern for the victims or the misconduct, which contradicts Defendants' position in this litigation; the failure to investigate and discipline supports deliberate indifference and custom/practice theories.<br><br>Defendants did not include any legal argument for this objection until July 28, 2022, *after* Plaintiffs provided written responses to Defendants' original objections.  (*See* Lavoie Decl. Ex. A at |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| | | 5.)  Defendants' untimely objections violate the Court's Civil Trial Order, which expressly states that "[t]he middle column shall contain only those objections which were previously made in accordance with the Local Rules" and that "the only new material the parties are permitted to add to their previous designations are the responses to the objections." (Dkt. 280 at 4:10-15.)  They also prejudice Plaintiffs by denying Plaintiffs a meaningful opportunity to respond.  Defendants' untimely arguments should be deemed waived. |
| <u>34:25-36:10</u><br>Q. Do you have a sense of how long after the accident itself you became aware that the media was reporting on allegations of potential misconduct involving accident scene photos?<br>A. Again, I don't remember specific media that was being broadcast. I think my interest was | <u>Defendants' Objection</u><br>Irrelevant. (FRE 104(b), 401, 402).  Commander Jaeger's recollection of the Sheriff's media statements has no bearing on Plaintiffs' *Monell* theories or any other issues in this case.<br><br>Moreover, there is no *Monell* theory of liability for failure to take | <u>Plaintiffs' Response</u><br>Commander Jaeger demonstrates personal knowledge of the media coverage surrounding the allegations that the Sheriff's Department had behaved improperly with respect to accident scene photographs.  This testimony is relevant because internal affairs did not open an |

- 22 -

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| probably mediawise piqued when I did overhear the sheriff give a re -- a news conference, if you will, for lack of a better -- or a news statement wherein he mentioned about photos being shared. That's what -- <br> Q. What do you recall -- <br> A. That's the first -- <br> Q. Go ahead. <br> A. -- media coverage that I remember hearing about the sharing of photographs. <br> Q. Okay. What do you recall about that – about the sheriff giving some sort of statement? <br> A. Again, the sheriff -- I -- I want to say it was on a radio broadcast, if I'm remembering correctly. And he stated that he was aware that deputies had taken photographs and that he had, in fact, told them to delete the photographs from that incident. <br> Q. You mentioned before that you learned sometime, you know, within approximately a week after the accident about an allegation that a deputy had behaved | reasonable steps to investigate.  Nor does this testimony have any bearing on that issue. | investigation until the date the LA Times published a report on the allegations, suggesting the investigation was opened due to media scrutiny, not concern for the victims or stopping the misconduct, which contradicts Defendants' position in this litigation; the failure to investigate and discipline supports deliberate indifference and custom/practice theories. <br><br> Defendants did not include any legal argument for this objection until July 28, 2022, *after* Plaintiffs provided written responses to Defendants' original objections.  (*See* Lavoie Decl. Ex. A at 5.)  Defendants' untimely objections violate the Court's Civil Trial Order, which expressly states that "[t]he middle column shall contain only those objections which were previously made in accordance with the Local Rules" and that "the only new material the parties are permitted to add to their previous |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| inappropriately with respect to accident scene photographs. Is that -- is that fair?<br>A. Yes.<br>Q. Okay. How did you learn that? How did you hear about that?<br>A. I -- if I'm remembering correctly, I believe it was my chief. At the time he called me to ask about procedurally what would be the correct procedure to go about this.<br>Q. Who was your chief at the time?<br>A. Matthew Burson. | | designations are the responses to the objections." (Dkt. 280 at 4:10-15.)  They also prejudice Plaintiffs by denying Plaintiffs a meaningful opportunity to respond.  Defendants' untimely arguments should be deemed waived. |
| <u>36:13-21</u><br>Q. And what's his -- what was his title? Chief of what?<br>A. Professional Standards Division.<br>Q. Well, tell me everything that you recall about that. Was it a telephone conversation? in person?<br>A. I believe it was a telephone conversation. And the question was raised as to procedurally what should be the next step, and I reiterated to him that an inquiry needed to be done by the station. | <u>Defendants' Objection</u><br>Irrelevant. (FRE 104(b), 401, 402).  Commander Jaeger's conversations with his chief about their initial reactions to the Sheriff's media statements have no bearing on Plaintiffs' *Monell* claims or any other issues in this case.<br><br>Moreover, there is no *Monell* theory of liability for failure to take reasonable steps to investigate.  Nor does this testimony have any bearing on that issue. | <u>Plaintiffs' Response</u><br>This testimony is relevant because it indicates that the Chief of the Internal Affairs Bureau asked about starting an investigation weeks before the investigation was finally opened.  The absence of involvement by Internal Affairs—i.e., the failure to undertake a regular investigation—until one month following the citizen complaint and only after media scrutiny is relevant to, *inter alia*: (1) the likelihood that crash-scene photos remain in circulation; (2) |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| | | the Sheriff's Department's false implied statements that an internal affairs investigation started much earlier; (3) the motivation for the Sheriff's Department to launch the internal affairs investigation; and (4) the Sheriff Department's deliberate indifference to, and/or toleration of, the practice of taking and sharing photos with human remains.

Defendants did not include any legal argument for this objection until July 28, 2022, *after* Plaintiffs provided written responses to Defendants' original objections.  (*See* Lavoie Decl. Ex. A at 5.)  Defendants' untimely objections violate the Court's Civil Trial Order, which expressly states that "[t]he middle column shall contain only those objections which were previously made in accordance with the Local Rules" and that "the only new material the parties are permitted to add to their previous |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| | | designations are the responses to the objections." (Dkt. 280 at 4:10-15.)  They also prejudice Plaintiffs by denying Plaintiffs a meaningful opportunity to respond.  Defendants' untimely arguments should be deemed waived. |
| 36:25-37:11<br>Tell me everything that you recall Matthew Burson saying during this initial conversation.<br>A. It was pretty simple, as I remember it. It was a conversation about, again, procedurally -- I think the conversation was we needed to begin the -- the internal investigation or the review of this. And I made certain that he understood that Internal Affairs Bureau does not start investigations. It runs through the division. And then an inquiry would need to be done by the unit of command for the division to then see if they had enough information to trigger an investigation. | Defendants' Objection<br>Irrelevant. (FRE 104(b), 401, 402).  Commander Jaeger's conversations with his chief about their initial reactions to the Sheriff's media statements have no bearing on Plaintiffs' *Monell* claims or any other issues in this case.<br><br>Moreover, there is no *Monell* theory of liability for failure to take reasonable steps to investigate.  Nor does this testimony have any bearing on that issue. | Plaintiffs' Response<br>This testimony is relevant because it indicates that the Chief of the Internal Affairs Bureau asked about starting an investigation weeks before the investigation was finally opened.  The absence of involvement by Internal Affairs—i.e., the failure to undertake a regular investigation— until one month following the citizen complaint and only after media scrutiny is relevant to, *inter alia*: (1) the likelihood that crash-scene photos remain in circulation; (2) the Sheriff's Department's false implied statements that an internal affairs investigation started much earlier; (3) the motivation for the Sheriff's Department to |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| | | launch the internal affairs investigation; and (4) the Sheriff Department's deliberate indifference to, and/or toleration of, the practice of taking and sharing photos with human remains.<br><br>Defendants did not include any legal argument for this objection until July 28, 2022, *after* Plaintiffs provided written responses to Defendants' original objections. (*See* Lavoie Decl. Ex. A at 5.) Defendants' untimely objections violate the Court's Civil Trial Order, which expressly states that "[t]he middle column shall contain only those objections which were previously made in accordance with the Local Rules" and that "the only new material the parties are permitted to add to their previous designations are the responses to the objections." (Dkt. 280 at 4:10-15.) They also prejudice Plaintiffs by denying Plaintiffs a meaningful opportunity to respond. Defendants' |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| | | untimely arguments should be deemed waived. |
| 37:21-39:11<br>And the chief said -- did the chief, during this conversation, give you any indication as to whether any investigation activity had already occurred at the station level at the time that you had this conversation?<br>A. I don't think I knew that at this point.<br>Q. You don't -- at this point you don't think you knew whether anything had occurred?<br>A. Correct. I don't -- I was not directly involved in that moment in time, if you will. I really didn't become involved until the investigation was given to Internal Affairs Bureau.<br>Q. At the time of the conversation with the chief, was it your impression during the conversation that the allegation had just recently come -- you know, that the department had just recently become aware of the allegation; or was it your impression that the department had been aware of the | Defendants' Objection<br>Irrelevant. (FRE 104(b), 401, 402).  Commander Jaeger's conversations with his chief about their initial reactions to the Sheriff's media statements have no bearing on Plaintiffs' *Monell* claims or any other issues in this case.<br><br>Moreover, there is no *Monell* theory of liability for failure to take reasonable steps to investigate.  Nor does this testimony have any bearing on that issue. | Plaintiffs' Response<br>This testimony is relevant because it indicates that the Chief of the Internal Affairs Bureau asked about starting an investigation weeks before the investigation was finally opened.  The absence of involvement by Internal Affairs—i.e., the failure to undertake a regular investigation—until one month following the citizen complaint and only after media scrutiny is relevant to, *inter alia*: (1) the likelihood that crash-scene photos remain in circulation; (2) the Sheriff's Department's false implied statements that an internal affairs investigation started much earlier; (3) the motivation for the Sheriff's Department to launch the internal affairs investigation; and (4) the Sheriff Department's deliberate indifference to, and/or toleration of, the practice of taking and sharing photos with human remains. |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF WILLIAM JAEGER

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| allegation for a few days at the time that you had this conversation?<br>A. Honestly, I don't -- I don't have a good memory of the timing of that. I know that the department was already aware of the possibility that -- that photos were taken and possibly shared. And the question was asked of me, "How do we begin the Internal Affairs investigation?" I said, "After the inquiry is done through the station, then it will go back to the division. The division will do a formal request of Internal Affairs." That's what I remember of that conversation.<br>Q. Why was it that you stated that you needed o - - that what should happen is that the station should do an initial inquiry before Internal Affairs became involved?<br>A. Well, should or -- I guess a better term would be they must because Internal Affairs Bureau does not open investigations. The division opens the investigation. So the division should -- or I'll | | Defendants did not include any legal argument for this objection until July 28, 2022, *after* Plaintiffs provided written responses to Defendants' original objections. (*See* Lavoie Decl. Ex. A at 5.)  Defendants' untimely objections violate the Court's Civil Trial Order, which expressly states that "[t]he middle column shall contain only those objections which were previously made in accordance with the Local Rules" and that "the only new material the parties are permitted to add to their previous designations are the responses to the objections." (Dkt. 280 at 4:10-15.)  They also prejudice Plaintiffs by denying Plaintiffs a meaningful opportunity to respond.  Defendants' untimely arguments should be deemed waived. |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| say absolutely must receive some type of information to do the formality of opening an internal investigation against the employee. That would come by them doing a proper inquiry into the event. | | |
| 41:17-43:15<br>Q. You recall a conversation with Matthew Burson that you described in which you indicated that there should be a supervisory inquiry prior to Internal Affairs getting involved. In the course of describing that, you said that there were many conversations going on at the time. What did you mean by that -- that there were many conversations going on at the time?<br>A. Well, I think there -- it is not -- I'm -- I'm lacking a word to describe it. But there was a lot of information -- there was a lot of conversation that was happening. And I was maintaining a course of action that Internal Affairs Bureau must be triggered to begin our investigation into the | Defendants' Objection<br>Irrelevant. (FRE 104(b), 401, 402). There is no *Monell* theory of liability for failure to take reasonable steps to investigate. Nor does this testimony have any bearing on that issue. | Plaintiffs' Response<br>This testimony demonstrates that the Sheriff's Department did not open an internal investigation until February 28, 2020. This is relevant because: (1) it was one month following the citizen complaint but only two days following outreach from the LA Times, suggesting the investigation was opened due to media scrutiny, not concern for the victims or the misconduct, which contradicts Defendants' position in this litigation and supports Monell liability; (2) the Sheriff's Department's public statements in response to the Times story implied an internal investigation had already been underway, which was false; (3) for more than a month, the remains |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| process. Part of that process is doing an inquiry to see if we even have policies that have been violated. So that conversation I had probably with my commander at the time. I probably had it with -- I might have even had it with Chief Kneer. I -- I don't recall it specifically, however.<br>Q. Who was your commander at the time?<br>A. Commander Scott Gage, G-a-g-e.<br>Q. Was there a time when there was a referral to Internal Investigation Bureau to conduct a investigation related to accident scene photos?<br>A. Was there a time?<br>Q. Yeah. Was there a time when that happened? I guess at some point, to your knowledge, was there a referral made by the division to the Internal Affairs Bureau to conduct an investigation related to accident scene photos?<br>A. You're saying specific to this helicopter crash?<br>Q. Yeah.<br>A. Yes.Q. Okay. And tell me what -- what you | | photos were largely uncontrolled, without serious investigation by the Department; and (4) the Sheriff's Department's delay in opening an internal investigation indicates deliberate indifference to, and/or a toleration of, the practice of taking and sharing photos with human remains.<br><br>Defendants did not include any legal argument for this objection until July 28, 2022, *after* Plaintiffs provided written responses to Defendants' original objections.  (*See* Lavoie Decl. Ex. A at 5.)  Defendants' untimely objections violate the Court's Civil Trial Order, which expressly states that "[t]he middle column shall contain only those objections which were previously made in accordance with the Local Rules" and that "the only new material the parties are permitted to add to their previous designations are the responses to the objections." (Dkt. 280 at |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF WILLIAM JAEGER

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| remember about that referral.<br>A. Well, Internal Affairs Bureau requires the division to fill out a request for an administrative investigation form. It's a two-page form. It identifies the potential subjects or employees that are subjects of that investigation. It would also identify the policy sections that those employees may have violated. And that form was filled out by the division, and then it is forwarded to Internal Affairs Bureau. In this case I believe that form was received February 28th –<br>Q. Why --<br>A. -- of 2020. | | 4:10-15.)  They also prejudice Plaintiffs by denying Plaintiffs a meaningful opportunity to respond.  Defendants' untimely arguments should be deemed waived. |
| <u>44:11-22</u><br>Q. Do you recall who authored the -- what's the name of the form?<br>A. It's a request for administrative investigation.<br>Q. Do you recall who completed or signed that form with respect to an investigation of accident | <u>Defendants' Objection</u><br>Irrelevant. (FRE 104(b), 401, 402).  There is no *Monell* theory of liability for post-incident failure to investigate.  Nor does this testimony have any bearing on that issue. | <u>Plaintiffs' Response</u><br>This testimony lays foundation for the form that initiated the investigation.<br><br>Defendants did not include any legal argument for this objection until July 28, 2022, *after* Plaintiffs provided written |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF WILLIAM JAEGER

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| scene photos from the helicopter crash?<br>A. Well, this is a standard form that is required of every division chief to request Internal Affairs Bureau to conduct the investigation. So it is signed by the division chief. In this case it would have been signed by Chief Kneer. | | responses to Defendants' original objections. (*See* Lavoie Decl. Ex. A at 5.) Defendants' untimely objections violate the Court's Civil Trial Order, which expressly states that "[t]he middle column shall contain only those objections which were previously made in accordance with the Local Rules" and that "the only new material the parties are permitted to add to their previous designations are the responses to the objections." (Dkt. 280 at 4:10-15.) They also prejudice Plaintiffs by denying Plaintiffs a meaningful opportunity to respond. Defendants' untimely arguments should be deemed waived. |
| 44:25-45:15<br>To your understanding, who made the decision to initiate an Internal Affairs investigation related to potential misconduct in connection with accident scene photos from the helicopter crash?<br>A. Again, that request came from Chief Kneer. So he is the division chief | Defendants' Objection<br>Irrelevant. (FRE 104(b), 401, 402). There is no *Monell* theory of liability for post-incident failure to investigate (let alone failure to investigate sincerely. Nor does this testimony have any bearing on that issue. | Plaintiffs' Response<br>This testimony is relevant because it contradicts Sheriff Villanueva's testimony regarding who directed the internal affairs investigation. Defendants' conflicting accounts on the origin of the IA investigation after the misconduct was uncovered by the media |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| that oversees that personnel. So it is his decision to initiate or not initiate an investigation. Q. All right. So just to be specific, then, it's your understanding that Chief Dennis Kneer made the decision to request an administrative investigation to be conducted by the Internal Affairs Bureau regarding accident scene photos from the helicopter crash site; is that correct? A. That is the form that I received. And yes, that is my understanding. | | casts doubt on the sincerity, regularity, and conclusions of that investigation, supporting Monell liability and undermining Defendants' position that they uncovered and contained all misconduct.<br><br>Defendants did not include any legal argument for this objection until July 28, 2022, *after* Plaintiffs provided written responses to Defendants' original objections.  (*See* Lavoie Decl. Ex. A at 5.)  Defendants' untimely objections violate the Court's Civil Trial Order, which expressly states that "[t]he middle column shall contain only those objections which were previously made in accordance with the Local Rules" and that "the only new material the parties are permitted to add to their previous designations are the responses to the objections." (Dkt. 280 at 4:10-15.)  They also prejudice Plaintiffs by denying Plaintiffs a meaningful opportunity to |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| | | respond.  Defendants' untimely arguments should be deemed waived. |
| 45:24-47:22<br>Q. Prior to getting a referral for an administrative affairs investigation to be conducted on or around February 28, 2020, what else do you recall about any conversations that you had related to potential misconduct involving accident scene photos from the helicopter crash site?<br>A. Again, I didn't have a lot of conversation about anything more than the surface level of if that took place, we would ask for an inquiry to be conducted prior to so that we have something to work with once we were assigned that case, if we were to be assigned that case.<br>Q. So in terms of your personal involvement in investigating allegations of potential misconduct involving crash scene photographs, would it be fair to say that your personal involvement in - - in any investigation | Defendants' Objection<br>Irrelevant. (FRE 104(b), 401, 402).  There is no *Monell* theory of liability for post-incident failure to investigate.  Nor does this testimony have any bearing on that issue. | Plaintiffs' Response<br>The absence of involvement by Internal Affairs—i.e., the failure to undertake a regular investigation— until one month following the citizen complaint and only after media scrutiny is relevant to, *inter alia*: (1) the likelihood that crash-scene photos remain in circulation; (2) the Sheriff's Department's false implied statements that an internal affairs investigation started much earlier; (3) the motivation for the Sheriff's Department to launch the internal affairs investigation; and (4) the Sheriff Department's deliberate indifference to, and/or toleration of, the practice of taking and sharing photos with human remains.<br><br>Defendants did not include any legal argument for this objection until July 28, 2022, *after* Plaintiffs |

- 35 -
PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF WILLIAM JAEGER

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| about potential misconduct began on February 28, 2020?<br>A. Certainly. I think that February 28th became -- becomes an important date because then my bureau is responsible for the investigation. So then I start to take a very -- a close look at the material and the information that we have received so that I can work with my investigators to make sure that we proceed and develop a proper plan for the investigation.<br>Q. To your knowledge, did any -- did you yourself or any of the Internal Affairs Bureau employees under your command conduct any investigation related to crash site photographs prior to February 28th, 2020?<br>A. No.<br>Q. They did not?<br>A. No.<br>Q. And you're confident in that?<br>A. That my staff conducted an investigation into that crash prior to February 28th? | | provided written responses to Defendants' original objections.  (*See* Lavoie Decl. Ex. A at 5.)  Defendants' untimely objections violate the Court's Civil Trial Order, which expressly states that "[t]he middle column shall contain only those objections which were previously made in accordance with the Local Rules" and that "the only new material the parties are permitted to add to their previous designations are the responses to the objections." (Dkt. 280 at 4:10-15.)  They also prejudice Plaintiffs by denying Plaintiffs a meaningful opportunity to respond.  Defendants' untimely arguments should be deemed waived. |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| Q. Well, I guess that they did not; correct?<br>A. Correct. To my knowledge, they did not do any type of an investigation prior to the 28th of February.<br>Q. Okay. Why are you -- why are you confident in that?<br>A. We would have no means nor access or reason to conduct any investigation at that point.<br>Q. Because it had not been referred to you by the division?<br>A. Correct. We are not -- we do not trigger our own independent investigations. As a result, it requires us to be triggered from the -- from the division to -- to start a case. Until February 28th, we did not. | | |
| 50:11-56:6<br>Q. Who from your department conducted the investigation of the accident scene photos?<br>A. The lead investigator -- and we utilize sergeants as investigators within Internal Affairs. His name is Sergeant Victor Puebla. | Defendants' Objection Irrelevant. (FRE 104(b), 401, 402).  There is no *Monell* theory of liability for post-incident failure to investigate.  Nor does this testimony have any bearing on that issue. | Plaintiffs' Response Defendants are attempting to downplay damages by arguing that the Department's internal investigation findings suggest that distribution was limited and there are no photos left to be distributed or published; hence, the quality of the investigation (including |

| | Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|---|
| | Q. Anyone else who was involved in the investigation? A. Well, we always utilize an assist sergeant in the interviews; so we will send two sergeants into an interview as kind of an ability so that that lead investigator -- if they need additional help or questions that they may have forgotten to ask, we usually bring in a second investigator. In this case I believe we used a couple of different seconds. I don't remember who they were. Q. Okay. A. And then there is a team lieutenant that also monitors the actions of those investigators, and that team lieutenant was a gentleman by the name of Eric Smitson. Q. Yeah. I've seen his name in some transcripts. So in terms of the reporting relationship of the individuals involved, Sergeant Victor Puebla was the lead investigator. He reported to Eric Smitson. Eric Smitson reported to you; is that correct? A. Yes. | | the LASD's refusal to allow OIG oversight) is relevant to the credibility of the investigation's findings. The quality of the internal investigation is also relevant to the Sheriff Department's deliberate indifference to, and/or toleration of, the practice of taking and sharing photos with human remains. Defendants did not include any legal argument for this objection until July 28, 2022, *after* Plaintiffs provided written responses to Defendants' original objections. (*See* Lavoie Decl. Ex. A at 5.) Defendants' untimely objections violate the Court's Civil Trial Order, which expressly states that "[t]he middle column shall contain only those objections which were previously made in accordance with the Local Rules" and that "the only new material the parties are permitted to add to their previous designations are the responses to the objections." (Dkt. 280 at |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| Q. Other than the logistical challenges in dealing with the pandemic and how that might affect how you could try and get this investigation done during the pandemic, do you recall any other discussions or communications that you were involved in related to the investigation of accident scene photos? A. Well, we were also under quite a bit of scrutiny with the office -- Office of Inspector General. Mr. Max Huntsman obviously wanted to have a very heavy role in oversight into this particular case. We had ongoing discussions about the access and their – they were wanting all of our source documents. And we were struggling with maintaining kind of confidentiality of the investigation. So we had many conversations about that. Q. Was there ever discussion about whether anyone from the OIG's office would participate | | 4:10-15.)  They also prejudice Plaintiffs by denying Plaintiffs a meaningful opportunity to respond.  Defendants' untimely arguments should be deemed waived. |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| in the witness interviews, for instance?<br>A. They had asked for that access, and we did not approve that access.<br>Q. Why is that?<br>A. Well, the Office of Inspector General is seen as an oversight to the case files. They are not as part of the investigative team.<br>Q. Who made that decision to ultimately deny their request for access to the witness interviews?<br>A. Well, the ultimate decision rests with the division chief -- my division chief, which would be Matthew Burson. Most of my communication was going through my commander, Scott Gage. And we allowed them to be briefed about the case; but we did not believe that it appropriate that they have any oversight during the actual interviews within the interview room, if you will. That could also be a breach of the Peace Officers Bill of Rights, which limits the amount of investigators that are allowed into a room | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF WILLIAM JAEGER

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| during a subject interview.<br>Q. So fair to say that, to your understanding, the decision to deny the Inspector General's office's request to be present for witness interviews – that decision was made by yourself, your division chief, and your commander?<br>A. Yes. We had the conversation. We discussed how allowing access into that room can be seen as witness intimidation. If you have too many investigators, if you will, in a room questioning an employee, POBR regulates that -- how many investigators can be part of that. We had that discussion; and we realized that the Office of Inspector General is oversight, not an investigative body conducting that investigation.<br>Q. Did the Office of Inspector General, to your knowledge, ever make a request to review or receive source material that was relevant to the investigation? | | |

- 41 -

| | Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|---|
| 1 | | | |
| 2 | A. They made that request several times. | | |
| 3 | Q. Okay. And how did the department respond to | | |
| 4 | that request, to your knowledge? | | |
| 5 | A. In this particular case? | | |
| 6 | Q. Yes. Yeah. | | |
| 7 | A. In this case we actually did a weekly | | |
| 8 | briefing, if you will, with the staff of the Inspector | | |
| 9 | General's -- the Inspector General's staff. We | | |
| 10 | conducted a briefing where we would let them | | |
| 11 | know what we had done as far as the past week of | | |
| 12 | interviews. Again, we were allowing them to | | |
| 13 | have redacted copies of certain reports, certain | | |
| 14 | memorandum. But that would be the extent of | | |
| 15 | what they had access to. | | |
| 16 | Q. Who participated in the weekly briefings, to | | |
| 17 | your knowledge? | | |
| 18 | A. Those were set up by Commander Scott Gage. | | |
| 19 | And they -- I was present, as was the lieutenant, Eric | | |
| 20 | Smitson. And the lead investigator, Vic Puebla, | | |
| 21 | was at, I believe, the majority of them.Q. Were | | |
| 22 | these by Zoom or in person or by conference | | |
| 23 | call? | | |
| 24 | | | |
| 25 | | | |
| 26 | | | |
| 27 | | | |
| 28 | | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF WILLIAM JAEGER

| | Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|---|
| 1 | | | |
| 2 | A. No. These were in | | |
| 3 | person. And they were | | |
| | held within Professional | | |
| 4 | Standards Division | | |
| 5 | conference room. | | |
| | Q. And approximately | | |
| 6 | what -- how -- how many | | |
| 7 | -- how long did this carry | | |
| | on? How many of these | | |
| 8 | weekly meetings were | | |
| 9 | there in total? | | |
| | A. I'm going to say I was | | |
| 10 | present for probably four | | |
| 11 | or five of these meetings. | | |
| | I think Commander Scott | | |
| 12 | Gage may have also had | | |
| 13 | additional meetings with | | |
| | the OIG staff, but I -- I'm | | |
| 14 | not certain. | | |
| 15 | Q. Were there any written | | |
| | materials that were | | |
| 16 | displayed or distributed | | |
| 17 | during these weekly | | |
| | meetings? | | |
| 18 | A. Well, again, there was | | |
| 19 | requests from the OIG | | |
| | staff that they wanted all | | |
| 20 | of our material so they | | |
| 21 | could review all of it. I | | |
| | know that Commander | | |
| 22 | Gage allowed them some | | |
| 23 | access to some of it; | | |
| | meaning, I do believe that | | |
| 24 | there was some material | | |
| 25 | that they were allowed to | | |
| | view, yes. | | |
| 26 | Q. Do you -- do you | | |
| 27 | recall there being | | |
| | surveillance footage from | | |
| 28 | | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF WILLIAM JAEGER

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| the bar in Norwalk at which it was alleged that one of the deputies showed accident scene photos? Do you recall there being surveillance footage that was collected? A. I do remember there was surveillance footage, yes. Q. Have you seen that? Have you ever viewed any of it? A. I think I viewed it a long time ago. I don't remember any particulars of it. Q. Do you know whether the OIG's office was ever shown any of that surveillance footage? A. At the time of these discussions? Q. Yeah. Like, let's say in these weekly meetings or, you know, in and around this time. A. No. We were not showing any video footage. We were not showing any -- any of that. It would have been source documents -- when I say "exhibits," like, maybe memorandum that was written. We might have redacted some of that and allowed them to | | |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| view some of that. But there was no other video, no.<br>Q. Did you allow the OIG's office to view 1 transcript -- transcripts of witness or subject interviews?<br>A. I do not -- I don't believe I ever did; but again, I would have to lean on my commander, Gage. I think he was more heavily invested in those communications. | | |
| <u>59:15-62:3</u><br>Q. Was the sheriff himself interviewed as part of the Internal Affairs investigation?<br>A. He was not.<br>Q. Why not?<br>A. His statements were very clear as to what his direction was. He -- we had the -- again, I think it was a news reporting -- I believe it was on a radio station, if not a news outlet, where he was interviewed. And he specifically acknowledged the fact that he directed through his channel what actions he expected. There was nothing else to be gained from that interview. | <u>Defendants' Objection</u><br>Irrelevant. (FRE 104(b), 401, 402). There is no *Monell* theory of liability for post-incident failure to investigate. Nor does this testimony have any bearing on that issue. | <u>Plaintiffs' Response</u><br>Defendants are touting the findings of their internal investigation as evidence that distribution was limited and there are no photos left to be distributed or published; hence, the quality of the investigation (including the failure to interview Sheriff Villanueva, a key witness who ordered the deletion of the photos) is relevant to the credibility of the investigation's findings. The quality of the internal investigation is also relevant to the Sheriff Department's deliberate indifference to, and/or toleration of, the practice of taking and |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| Q. Was there ever a request made of the sheriff or the sheriff's office for him to sit for an interview? A. No. Q. So to summarize, it was -- who made the decision not to interview the sheriff? A. Well, ultimately, it's part of our case file. We have to look at it from a standpoint of, Is there something to be gained from doing that interview? And there really was nothing from the top of the organization once he had already acknowledged that, in fact, he did provide that information. We then interviewed everybody below him in that chain of command to make sure of what their knowledge was and what their understanding of that direction was. And we felt like we had a very clear picture of that. Q. I think what I wanted to know is just who, to your understanding, made the decision not to interview the sheriff. In other words, who made the evaluation that the | | sharing photos with human remains. Defendants did not include any legal argument for this objection until July 28, 2022, *after* Plaintiffs provided written responses to Defendants' original objections.  (*See* Lavoie Decl. Ex. A at 5.)  Defendants' untimely objections violate the Court's Civil Trial Order, which expressly states that "[t]he middle column shall contain only those objections which were previously made in accordance with the Local Rules" and that "the only new material the parties are permitted to add to their previous designations are the responses to the objections." (Dkt. 280 at 4:10-15.)  They also prejudice Plaintiffs by denying Plaintiffs a meaningful opportunity to respond.  Defendants' untimely arguments should be deemed waived. |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| existing knowledge from the sheriff's public statements was sufficient and that nothing would be gained from an interview of the sheriff? Was that you, or was that your commander? Somebody else?<br>A. Well, certainly, I meet with my investigative team, meaning, the sergeant and lieutenant, that are actively working the case. They try and decipher in that case whether or not there is a need to follow a particular lead. In this case we felt like the interview was sufficient. I was then questioned by my division, and that includes the commander and my chief. And ultimately, the decision was we didn't feel we needed to interview the sheriff. We felt his statements were clear.<br>Q. When you said "the interview," you meant the radio interview; is that right?<br>A. I believe it was on the radio, if I'm remembering correctly. Yes. I think it was a radio interview. | | |

- 47 -

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| Q. During the course of the sheriff's department's investigation related to the accident scene photos, did Internal Affairs investigators ever take possession of anyone's cell phone? MR. TOKORO: Objection. Vague and ambiguous as to what you mean by "take possession." BY MR. LAVOIE: Q. You can answer. A. Well, I agree. That's a little unclear to me. We -- investigators did ask the employees to view their cellular phones. They possessed those phones and then were granted access into the phone to go through the deleted areas within the phone or any active areas within the phone. So they had possession of it in front of the employee, yes. | | |
| 62:10-18 Q: To clear up any ambiguity around possession, was there ever a time during the investigation when your investigators held on to a employee's phone for a | Defendants' Objection Irrelevant. (FRE 104(b), 401, 402).  There is no *Monell* theory of liability for post-incident failure to investigate.  Nor does this testimony have any bearing on that issue. The internal investigation | Plaintiffs' Response The failure to properly review or preserve relevant cell devices is relevant to the seriousness and trustworthiness of the Department's investigation findings and to whether the |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| period of time without the employee present?<br>A. To my knowledge, no. No. That did not happen.<br>Q. During the course of the investigation, did the department take a forensic image or copy of any employees' cell phones?<br>A. No. | also has nothing to do with any alleged destruction of relevant evidence. | Department spoliated evidence by failing to take proper preservation measures.  The quality of the internal investigation is also relevant to the Sheriff Department's deliberate indifference to, and/or toleration of, the practice of taking and sharing photos with human remains.<br><br>Defendants did not include any legal argument for this objection until July 28, 2022, *after* Plaintiffs provided written responses to Defendants' original objections.  (*See* Lavoie Decl. Ex. A at 5.)  Defendants' untimely objections violate the Court's Civil Trial Order, which expressly states that "[t]he middle column shall contain only those objections which were previously made in accordance with the Local Rules" and that "the only new material the parties are permitted to add to their previous designations are the responses to the objections." (Dkt. 280 at 4:10-15.)  They also |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| | | prejudice Plaintiffs by denying Plaintiffs a meaningful opportunity to respond.  Defendants' untimely arguments should be deemed waived. |
| 62:22-63:14<br>Q. Yeah. Just -- I want to -- I just want to make sure that we kind of have a meeting of the minds in terms of what it means to take a forensic image or copy. You're saying that the department did not take a forensic image or copy of anyone's cell phone during the investigation. What does that mean to you?<br>A. Well, I think we would typically say that that would have to be -- a forensic review is basically a retrieval of all data within the cell phone, which means you take the contents of the cell phone and electronically extract that. We did not do that. We did a cursory review, if you will, of the device in front of the employee that allowed us access into that device. I think a forensic review is a much -- a much deeper dive, if | Defendants' Objection<br>Irrelevant. (FRE 104(b), 401, 402).  There is no *Monell* theory of liability for post-incident failure to investigate.  Nor does this testimony have any bearing on that issue. The internal investigation also has nothing to do with any alleged destruction of relevant evidence. | Plaintiffs' Response<br>The failure to properly review or preserve relevant cell devices is relevant to the seriousness and trustworthiness of the Department's investigation findings and to whether the Department spoliated evidence by failing to take proper preservation measures.  The quality of the internal investigation is also relevant to the Sheriff Department's deliberate indifference to, and/or toleration of, the practice of taking and sharing photos with human remains.<br><br>Defendants did not include any legal argument for this objection until July 28, 2022, *after* Plaintiffs provided written responses to Defendants' original objections.  (*See* Lavoie Decl. Ex. A at 5.)  Defendants' untimely |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| you will, or an extraction of that information. | | objections violate the Court's Civil Trial Order, which expressly states that "[t]he middle column shall contain only those objections which were previously made in accordance with the Local Rules" and that "the only new material the parties are permitted to add to their previous designations are the responses to the objections." (Dkt. 280 at 4:10-15.)  They also prejudice Plaintiffs by denying Plaintiffs a meaningful opportunity to respond.  Defendants' untimely arguments should be deemed waived. |
| <u>68:19-69:3</u><br>Q. With respect to the investigation of accident scene photographs that's at issue in this case, to your knowledge, did any Internal Affairs investigators ask any witnesses or subjects in the investigation to consent to having a forensic image or copy of their cell phone collected?<br>A. I do not know if that specific wording was used 1 as far as a | <u>Defendants' Objections</u><br>Irrelevant. (FRE 104(b), 401, 402).<br>Lacks personal knowledge. (FRE 602).<br><br>There is no *Monell* theory of liability for post-incident failure to investigate.  Nor does this testimony have any bearing on that issue.  The internal investigation also has nothing to do with any alleged | <u>Plaintiffs' Response</u><br>Commander Jaeger has sufficient personal knowledge as the person who supervised the LASD internal investigation.  The answer is relevant because the Department's failure to properly review or preserve relevant cell devices is relevant to the seriousness and trustworthiness of the Department's investigation findings and |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| "forensic" inspection. I know they asked for consent to review these cell phones. I don't know if they ever used that specific term. | destruction of relevant evidence.<br><br>Moreover, Commander Jaeger testified that he does not know certain details about the inspection of witnesses' phones.  His lack of knowledge on this topic is not relevant. | to whether the Department spoliated evidence by failing to take proper preservation measures.  The quality of the internal investigation is also relevant to the Sheriff Department's deliberate indifference to, and/or toleration of, the practice of taking and sharing photos with human remains.<br><br>Defendants did not include any legal argument for this objection until July 28, 2022, *after* Plaintiffs provided written responses to Defendants' original objections.  (*See* Lavoie Decl. Ex. A at 5.)  Defendants' untimely objections violate the Court's Civil Trial Order, which expressly states that "[t]he middle column shall contain only those objections which were previously made in accordance with the Local Rules" and that "the only new material the parties are permitted to add to their previous designations are the responses to the objections." (Dkt. 280 at |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| | | 4:10-15.)  They also prejudice Plaintiffs by denying Plaintiffs a meaningful opportunity to respond.  Defendants' untimely arguments should be deemed waived. |
| _69:4-15_ (Counter-designation)<br>_Q. To you knowledge, did any Internal Affairs investigators request consent from any witness or subject in the investigation to consent to some form of forensic search of their cell phones beyond just a facial review of the cell phone?_<br>_Tokoro: Objection.  Just asked; just answered._<br>_Witness: Again, I don't know the answer if they used that specific term.  I know they asked for consent to review the cell phone.  Not specific – I don't know if they used the specific term of a forensic analysis of that phone._ | | |
| 71:20-73:16<br>Q. Did department investigators ask for any witnesses' or subjects' | Defendants' Objections<br>Irrelevant. (FRE 104(b), 401, 402). | Plaintiffs' Response<br>Commander Jaeger demonstrates personal knowledge in his answer |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| consent to disclosing cell phone records that were generated by their wireless providers?<br>A. Again, I don't know the exact questions that were asked and answered during the interview. I – I don't know, sitting here today, what the exact terminology was.<br>Q. To your knowledge, did department investigators review any cloud storage, such as iCloud, that was associated with the cell phones of any subjects or witnesses in the investigation?<br>A. I know there were some records of the photos being AirDropped maybe. I don't know if that's a crowd sourcing -- I'm not hugely tech – technologically advanced in my own personal life. So I understand that they -- the statement was made about AirDropping, but I don't believe there is actually a record of where those go. I think you have to be within proximity to accept that. So I don't know that there was even a record of that. But there | Lacks personal knowledge. (FRE 602).<br><br>There is no *Monell* theory of liability for post-incident failure to investigate.  Nor does this testimony have any bearing on that issue.  The internal investigation also has nothing to do with any alleged destruction of relevant evidence.<br><br>Moreover, Commander Jaeger testified that he does not know all the questions asked and answered during the interviews, nor does he know what data the interviewers were able to access.  His lack of knowledge on these topics is not relevant. | regarding the scope of the investigation, which if relevant to the quality of the investigation's findings.  Further, the lack of understanding of basic technology relevant to the investigation by the person in charge of it is relevant to the seriousness and trustworthiness of the investigation and its findings, which is directly relevant to the scope of distribution of the photos and risk of future distribution, and also circumstantial evidence of deliberate indifference and tolerance of custom and practice.<br><br>Defendants did not include any legal argument for this objection until July 28, 2022, *after* Plaintiffs provided written responses to Defendants' original objections.  (*See* Lavoie Decl. Ex. A at 6.)  Defendants' untimely objections violate the Court's Civil Trial Order, which expressly states that "[t]he middle column shall contain only those objections which were previously made in |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| was a statement about AirDropping.<br>Q. Are you familiar with iCloud? Do you know what that is?<br>A. Very basic. I'm -- I'm -- again, I'm not the most technically savvy person.<br>Q. What's your -- what's your basic understanding of what iCloud is?<br>A. Well, I believe that any information that is sent or received can be electronically stored, if you will, on servers that is considered the cloud. And then that could be retrieved after -- after the device -- personal device, if you will, no longer housed that information.<br>Q. And do you have any understanding as to whether department investigators searched any data or information that was stored on the cloud related to any -- any employees' devices?<br>A. Again, that would have to go back to the investigator to clarify that. I don't know, as I sit here today, what specific information they were allowed access to by the employee. If that included the personal device being | | accordance with the Local Rules" and that "the only new material the parties are permitted to add to their previous designations are the responses to the objections." (Dkt. 280 at 4:10-15.) They also prejudice Plaintiffs by denying Plaintiffs a meaningful opportunity to respond. Defendants' untimely arguments should be deemed waived. |

| | Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|---|
| 1 | | | |
| 2 | able to showcase the | | |
| 3 | cloud – I don't know if | | |
| | that's possible. I -- I -- I | | |
| 4 | don't know. | | |
| 5 | Q. Did department | | |
| | investigators search the | | |
| 6 | personal e-mail accounts | | |
| 7 | of any department | | |
| | personnel as part of this | | |
| 8 | internal investigation of | | |
| 9 | the accident scene | | |
| | photos? | | |
| 10 | A. I don't know as I sit | | |
| 11 | here today. | | |
| 12 | 73:25-74:18 | | |
| 13 | Q: Commander Jaeger, | | |
| | Exhibit 164 is a set of | | |
| 14 | discovery responses, | | |
| 15 | specifically, responses to | | |
| | interrogatories, which are | | |
| 16 | written questions in civil | | |
| 17 | lawsuits. And it's titled | | |
| | "Defendant County of | | |
| 18 | Los Angeles' Third | | |
| 19 | Supplemental Responses | | |
| | to First Set of | | |
| 20 | Interrogatories." Do you | | |
| 21 | see that? | | |
| 22 | A. I do. | | |
| | Q. And if we scroll down | | |
| 23 | to Page 14 of Exhibit 164, | | |
| 24 | there is a verification that | | |
| | is signed by you on | | |
| 25 | March 31st, 2021. Do you | | |
| 26 | see that? | | |
| | A. I do. | | |
| 27 | Q. Do you recall | | |
| 28 | verifying -- signing a | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF WILLIAM JAEGER

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| verification for some interrogatory responses in this lawsuit?<br>A. Sir, I sign a lot of things. I'm certain that I reviewed this if I signed it and I'm -- that does appear to be my signature. | | |
| 74:21-82:6 [objections omitted]<br>Q. Interrogatory No. 1 here -- I'm highlighting it. It states, "State the full name, home address, residential and cellular telephone numbers, rank, and job title of all current and former agents or employees of the Los Angeles County Sheriff's Department and the Los Angeles County Fire Department whom you have reason to believe may have taken and/or shared one or more photos of the accident scene, including, but not limited to, photos of human remains at the accident scene." Do you see that?<br>A. I do.<br>Q. We'll scroll down -- there are many objections here. And we'll scroll down to a list of | | |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| individuals. And it says, "Los Angeles County" -- there is a heading that states, "Los Angeles County Sheriff's Department"; and there are five names listed here: Deputy Joey Cruz, Deputy Rafael Mejia, Deputy Michael Russell, Deputy Raul Versales, Deputy Doug – Douglas Johnson. Do you see that? A. I do. Q. So to your knowledge at the time, these were individuals who the department understood to have taken or shared accident scene photos; is that correct? A. Yes. Q. Did you conduct a reasonable inquiry to ensure that this was a comprehensive list of individuals in the sheriff's department who had taken or shared accident scene photos? A. Yes. These were derived from the Internal Affairs investigation that we conducted. Q. Okay. And so you relied on information and findings from the Internal Affairs investigation to | | |

| | Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|---|
| 1 | | | |
| 2 | derive this list; is that fair? | | |
| 3 | A. Yes. These were | | |
| 4 | included in that Internal | | |
| 5 | Affairs investigation. | | |
| 6 | Q. Are you confident that these are the only five | | |
| 7 | individuals from the | | |
| 8 | sheriff's department who took or shared photos of | | |
| 9 | the accident scene? | | |
| 10 | A. Am I confident that these are the only | | |
| 11 | members of the sheriff | | |
| 12 | department that took or received? | | |
| 13 | Q. It's shared. And I can | | |
| 14 | take you back up to the wording of the request. | | |
| 15 | So it's asking for | | |
| 16 | information about current and former agents or | | |
| 17 | employees of the county | | |
| 18 | sheriff's department whom you, that being the | | |
| 19 | -- the county, has reason | | |
| 20 | to believe may have taken and/or shared one or more | | |
| 21 | photos of the accident | | |
| 22 | scene, including, but not limited to, photos of | | |
| 23 | human remains at the | | |
| 24 | accident scene. Do you see that? | | |
| 25 | A. I do. | | |
| 26 | Q. So my question is, Is the list of five individuals | | |
| 27 | here -- is that a | | |
| 28 | comprehensive list, to | | |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| your knowledge, of members of the sheriff's department who the county has reason to believe may have taken and/or shared one or more photos of the accident scene?<br>A. Yes. I believe that is a comprehensive list.<br>Q. Okay. So to your knowledge, there are no individuals from the sheriff's department who are not -- other than the five individuals listed there, who may have taken or shared one or more photos of the accident scene?<br>A. Yes. I believe those are the only individuals that either took or shared the photos, yes.<br>Q. So previously read the names of the individuals who are listed here. One individual who is not listed here is Sergeant Travis Kelly. Do you see his name listed among those beneath the sheriff's department heading?<br>A. I do not.<br>Q. Okay. To your knowledge, did Sergeant Kelly take or share photos of the accident scene? | | |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| A. As I sit here today, I believe he received photographs. I don't believe he -- well, I know he did not take any photographs. I'm -- I don't remember if he would have been someone that shared -- I don't believe he did, but I don't remember at this tame. Q. The name Ruby Cable is not listed here. Do you agree? A. There is no Ruby Cable here. Q. To your knowledge, did Deputy Ruby Cable take or share any photos of the accident scene? A. Again, as I sit here today, I would have to go back and review that case file. I don't -- that name does not stand out to me. Q. I'm going to show you another documents that's previously been -- or sorry -- that I'm going to mark as Exhibit 165. This is a different set of interrogatory responses, titled "Defendant County of Los Angeles' Response to Plaintiff Vanessa Bryant's Second Set of Interrogatories." Do you see that? A. I do. | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF WILLIAM JAEGER

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| Q. Okay. Scroll down here. We'll see a ver -- another verification from you. Do you see that? A. I do. Q. So we'll scroll up to the text of Interrogatory No. 3, which states, "Identify all members of the public to whom sheriff's department personnel or fire department personnel sent or showed a photo that included the physical remains of one or more of the individuals who perished in the helicopter crash near Calabasas, California, on January 26, 2020." Do you see that? A. Yes. Q. So the list here -- there is two bullet points, and one of them is Victor Gutierrez. The other is Fire Captain Erik Scott. As you'll note, there are two verifications here. There is one from someone who works for the fire department, and then there is one from you. So I assume you don't have any knowledge with respect to Fire Captain Erik Scott; is that correct? A. Correct. | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF WILLIAM JAEGER

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| Q. Okay. Who is Victor Gutierrez?<br>A. Offhand, I couldn't tell you.<br>Q. Okay. So do you have an understanding as to whether Victor Gutierrez was someone who -- that he was someone who was shown a photo that contained victim remains by a member of the sheriff's department, a member of the fire department, or you don't know?<br>A. Well, the name doesn't sound familiar to me as I sit here. So I -- I would be guessing if I tried to answer that.<br>Q. As you sit here today, based on your knowledge of the Internal Affairs investigation and its findings, did the department conclude -- make a conclusion as to whether any members of the public had been shown photos that contained human remains by any member of the sheriff's department?<br>A. Did we make a finding as to whether or not someone had shown a picture to a member of the public? | | |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| Q. Yes.<br>A. We -- we did, yes.<br>Q. What was the finding?<br>A. I believe Deputy Cruz was directly shown to have displayed from his phone pictures from the crash site.<br>Q. That included human remains?<br>A. I would have to go back and look at his specific wording. I -- I -- I don't know what those pictures actually showed.<br>Q. Okay. So as you sit here today, do you have -- do you know whether any members of the sheriff's department ever showed a photograph from the crash site that contained human remains to a member of the public?<br>A. Again, I don't know what exactly was depicted in those photographs, nor -- I know they were pictures from the crash site. I don't know exactly what was depicted in those photographs.<br>Q. Okay. So -- and the incident that you're referring to of Deputy Cruz showing some photographs, are you referring to the incident at the bar? | | |

- 64 -

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| A. Yes.<br>Q. Okay. And so to your knowledge, as you sit here today, you know that deputy -- your understanding is, is that Deputy Cruz showed some accident scene photographs at a bar; but you do not know whether those photographs contained human remains. Is that -- is that your understanding?<br>A. Correct. I don't -- I don't -- as I sit here today, I don't remember what was actually within the photographs as described by either the person who saw the photograph or by the person who showed the photograph. I don't remember exactly what was depicted.<br>Q. Do you recall anything about Joey Cruz saying that he had shown accident scene photographs to his niece?<br>A. I believe he made mention of that. However, if my memory is serving correct, I believe the niece did not want to see the photograph. So I don't know that she ever did see the photograph. I -- I – something tells me that | | |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| there was a conversation about her not wanting to see the photograph.<br>Q. Do you have any understanding as to whether Deputy Joey Cruz displayed accident scene photographs to anyone at the bar other than the bartender?<br>A. As my knowledge is, I believe the bartender was the only person who was displayed the photographs from the crime scene -- or from the accident scene, I should say. | | |
| 82:7 - 85:19 [objection omitted]<br>Q. In all of the investigations of potential misconduct by members of the department that you yourself have conducted, which I think you said was approximately a half -- between a half dozen and a dozen; is that right?<br>A. Yeah -- yeah. Somewhere around a half dozen. I don't remember exactly.<br>Q. Okay. In any of the approximately half-dozen investigations of potential misconduct by members of the sheriff's department | Defendants' Objection<br>82:7-85:19 - Irrelevant. (FRE 104(b), 401, 402). Commander Jaeger's other, unelated investigations have no bearing on the issues in this case. | Plaintiffs' Response<br>Commander Jaeger's testimony as head of Internal Affairs that he has never seen or heard of witnesses or subjects of investigations being told to destroy evidence is relevant to extreme irregularity of the Department's response to the citizen complaint and evidence of improper motives are relevant to spoliation, a topic on which Plaintiff is permitted to introduce evidence under the Court's ruling on Plaintiff's Motion in Limine No. 1.  The |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| that you yourself have conducted, can you recall a single instance in which you instructed the subject or a witness in the investigation to destroy or delete material that may be relevant to the investigation?<br>MR. TOKORO: Objection. Incomplete hypothetical. Not relevant to this case. Also vague and ambiguous.<br>THE WITNESS: Do you want me to answer?<br>MR. TOKORO: Yes.<br>THE WITNESS: Okay. I -- I -- I cannot recall any moment when I would have told someone to destroy something, no.<br>Q. Do you recall ever having an awareness, whether that be from reading a case file or some other interaction with members of the Internal Affairs Bureau, that in any of the cases that were handled by the – by the Internal Affairs Bureau while you were captain, whether there was ever a time in which in the course of the investigation investigators told a subject or witness in the investigation to | | quality of the internal investigation is also relevant to whether the jury should believe the investigations' findings and also to the Sheriff Department's deliberate indifference to, and/or toleration of, the practice of taking and sharing photos with human remains.<br><br>Defendants did not include any legal argument for this objection until July 28, 2022, *after* Plaintiffs provided written responses to Defendants' original objections. (*See* Lavoie Decl. Ex. A at 6.) Defendants' untimely objections violate the Court's Civil Trial Order, which expressly states that "[t]he middle column shall contain only those objections which were previously made in accordance with the Local Rules" and that "the only new material the parties are permitted to add to their previous designations are the responses to the objections." (Dkt. 280 at 4:10-15.) They also |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| destroy or delete material that may be relevant to the investigation? Do you recall ever learning or hearing about that while you were captain of the Internal Affairs Bureau? A. Related to Internal Affairs Bureau investigators, no. To my knowledge, we would not have ever asked someone or told someone to destroy any information. Q. Why, to your knowledge, has it been the practice to not make a request like that? A. We are -- we, as an investigative body, seek to find as much information as we can to make it part of the case file. So it's not our business as an investigative body to request that people get rid of something. Q. Have you ever encountered instances while you were running the Internal Affairs Bureau in which a witness's or subject's deletion of some material has impacted the investigation in some way? | | prejudice Plaintiffs by denying Plaintiffs a meaningful opportunity to respond.  Defendants' untimely arguments should be deemed waived. |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| A. Well, we don't know what we don't know. So my answer is to say, If someone asserts that they have information that would clear them in the investigation and then we ask them to please provide that information, like text messages or something like that, and they do not, then I think it's a point to go inside the case. But I don't know that as an investigative body we can go any further with that. Q. Would you agree that when investigating potential misconduct by sheriff's department personnel, that it's important to preserve source material that might be relevant to that potential misconduct? A. Yes. Generally speaking, we would -- we would rather have accessible as much information as we can. Q. Why is that? A. Well, again, we're fact finders. We're trying to find out the facts of the case. So generally speaking, the more information that we would have accessible | | |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| would be to our advantage as far as finding out facts.<br>Q. So if individuals destroy or delete source material related to an investigation, can that hinder the fact-finding process in any way?<br>A. Well, again, I -- I don't -- I -- I don't know what I don't know, so my answer is that generally we would rather have accessible all information as opposed to not. | | |
| 87:14-90:20<br>Q. "At some point in time members of the sheriff's department possessed photos that included human remains on their cell phones." Is that an accurate statement, based on your review of the investigative summary and other materials?<br>A. Yes. At some point they did possess photographs of the crash site.<br>Q. Does the department believe that any members of the sheriff's department presently possess, on their cell phones or otherwise, crash site photographs | | |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| that include human remains? A. Well, the sheriff department believes that those are no longer in existence as the investigation -- we were allowed access to those cellular phones, and we did not see anything within those cellular phones in a cursory search. Q. So there is a point in time when some members of the department had photos of the accident scene on their cell phones that contained human remains. Today the department believes that no longer do any members of the department have photos of human remains from the accident scene. Is that a fair summary? A. Yes. It is the department's stance that we do not believe those photographs exist any longer. Q. Okay. And how did it come to be that those photos no longer exist? A. The employees, to our knowledge, deleted those photographs voluntarily -- | | |

- 71 -

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| or -- well, they deleted those photographs. Q. Can you describe the circumstances to me, as you understand them as a representative of the department, as to that deletion. A. Well, following knowledge gained by the department that photographs were in existence or taken by members of the department, the sheriff himself acted quickly and, once provided that knowledge, instructed personnel to remove and delete any photographic photos that were taken at that crash site so that there was no possibility that those photos would be shared or continue to be shared to someone else. Q. To your understanding as a representative of the sheriff's department, is it fair to say that the sheriff's department encouraged members of the department to delete photographs in their possession of the accident scene that contained human remains? | | |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| MR. TOKORO: Objection. Vague and ambiguous as to use of the term "encouraged." And this question was just asked and just answered. THE WITNESS: Yes. The sheriff gave a very clear order to personnel that they should delete any images, photographs from their devices that contained scenes of that crash site. So that order was given by the sheriff through channels and I think was very clear. Q. And is it -- and is it the case that – that sheriff's department personnel who were in possession of the photos deleted their photos in response to that direction from the sheriff? A. I don't think we know -- I think there were some employees that took initiative upon themselves to delete photographs prior to receiving that information from the sheriff -- or that order from the sheriff. So I think every case was a -- a case-by-case basis when it involved an employee that may have had those photographs. | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF WILLIAM JAEGER

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| Q. So to the department's understanding, is it fair to say that there are some individuals who deleted human remains photographs from the accident scene before being ordered by the sheriff and some who deleted such photographs after being ordered by the sheriff? Is that a fair statement?<br>A. Again, if memory serves correct, I believe that each was called in; and they were asked if they had photographs. I believe certain statements were received that the employee took initiative upon the situation without ever being directed to do so -- that they decided to delete the photographs. I don't remember what every single person's response was. I would have to go back and look. | | |
| 91:11-18<br>Q. Okay. So to the department's understanding, there were at least some individuals who deleted the photographs after having received an order or direction from the | | |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| sheriff's department to delete the photographs; is that accurate?<br>A. Again, I would have to go back and check for accuracy on that; but I do believe there may have been a couple. | | |
| 93:19-24<br>Q. It's your understanding that the sheriff ordered that employees delete the photographs and that if they deleted the photographs, they wouldn't be disciplined; is that correct?<br>A. Yes. They would receive a performance log entry. | | |
| 94:2-97:4<br>Q. At the time that the department told individuals who possessed accident scene photographs that if they deleted the photographs, that their – that any discipline would be limited to a performance log entry, did the department know at that time how many sheriff's department personnel had taken photos at the accident scene? | Defendants' Objection<br>Irrelevant. (FRE 104(b), 401, 402).  The Court ruled that were was no duty to preserve evidence prior to March 2, 2020. This testimony concerns events prior to that date and has no bearing on the spoliation issues raised by Plaintiffs.  Moreover, disciplinary decisions are not relevant to Plaintiffs' *Monell* theories (failure to train or custom/practice). | Plaintiffs' Response<br>Defendants have argued that LASD's response to the citizen allegation assured that no photos would reach the public, so testimony regarding the Sheriff's deletion order is relevant to test that argument and aid the jury in understanding why the Department has produced no photos in this litigation and why no photos will be presented at trial.  The Sheriff's deletion order is also relevant to |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| A. Well, I don't know exactly what the sheriff knew at the time that he gave that direction. But I will say that the department's stance on that was that we did not know, and it was given so that there was -- it was to limit any possible further action by the employee to share those photographs. Q. At the time that the department informed individuals who had photographs of the accident scene on their cell phones that if they deleted them, any discipline would be limited to a performance log entry, did the department know at that time how many sheriff's department personnel had texted accident scene photos to other members of the department? A. Again, I don't believe at that moment that that direction was given by the sheriff. I don't believe that we did know how much exposure we had. Q. At the time that the department gave an instruction to department personnel that if they deleted photos of the | There is also no *Monell* theory of liability for post-incident failure to investigate. Nor does this testimony have any bearing on that issue. | spoliation, a topic on which Plaintiff is permitted to introduce evidence under the Court's ruling on Plaintiff's Motion in Limine No. 1.  The decision to forgo discipline without any investigation is also relevant to the Sheriff Department's deliberate indifference to, and/or toleration of, the practice of taking and sharing photos with human remains.<br><br>Defendants did not include any legal argument for this objection until July 28, 2022, *after* Plaintiffs provided written responses to Defendants' original objections.  (*See* Lavoie Decl. Ex. A at 5.)  Defendants' untimely objections violate the Court's Civil Trial Order, which expressly states that "[t]he middle column shall contain only those objections which were previously made in accordance with the Local Rules" and that "the only new material the parties are permitted to add to |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| accident scene, that any discipline would be limited to a performance log entry, did the department know at that time whether any sheriff's department personnel had texted a photo of the accident scene to a member of the public? A. Again, I don't believe the department knew that at that moment. Q. At the time the department informed personnel that if they deleted photos of the accident scene, that any discipline would be limited to a performance log entry, did the department know whether any members of the sheriff's department had displayed an accident scene photo to a member of the public? A. Well, the department knew of a -- the trigger point, which was Deputy Cruz, displaying what was believed to be a photograph to the bartender. So the department was aware of that. I don't believe the department knew of any other instances, which is | | their previous designations are the responses to the objections." (Dkt. 280 at 4:10-15.)  They also prejudice Plaintiffs by denying Plaintiffs a meaningful opportunity to respond.  Defendants' untimely arguments should be deemed waived. |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| why they were trying to limit that exposure.<br>Q. So you've used the term, did the department know about the extent of exposure. What do you mean by that?<br>A. Well, exposure being how many people may have shared or had access to those photographs. We – I don't believe that there was a -- a knowledge at the time that direction was given by the sheriff of exactly how many people might have had photographs or information. And that order was to limit that. Any further possibility of photos being shared needed to stop right then and there.<br>Q. At the time that the department informed personnel that if they deleted the accident scene photographs, that any discipline would be limited to a performance log entry, did the department know how many photos of the accident scene existed that depicted human remains?<br>A. No. | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF WILLIAM JAEGER

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| Q. At the time that the department informed personnel that if they deleted accident scene photographs, that any discipline would be limited to a performance log entry, did the department know whether or how broadly any photos of the accident scene that contained human remains had been shared outside the department?<br>A. No, they did not know that.<br>Q. At the time that the department informed the personnel that if they deleted photos of the accident scene, that any discipline would be limited to a performance log entry, did the department know whether or how broadly photos of the accident scene that contained human remains had been shared within the sheriff's department?<br>A. No. I do not believe we knew that. | | |
| 97:22-99:4<br>Q. Did any members of the department receive discipline related to taking, possessing, or | Defendants' Objection<br>Irrelevant. (FRE 104(b), 401, 402). Defendants' disciplinary decisions are not relevant to Plaintiffs' | Plaintiffs' Response<br>The absence of discipline for LASD employees is relevant to Monell liability:  whether the |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| sharing photos of the helicopter crash scene or victims' remains from the crash scene?<br>A. Yes. There were four members that received a founded investigation.<br>Q. And is that considered discipline, a founded investigation -- you say "a founded investigation." Is that the term?<br>A. Yes. If the investigation finds that you are in violation of certain policies or procedures, it is deemed a founded investigation. And -- and then there's discipline from a written reprimand up and through termination that can be assessed to that employee depending on the violation.<br>Q. So let's run through the four members of the department that you're -- that you just described. Who were those individuals?<br>A. The deputy that was running the command post I believe was named Versales. There is Deputy Cruz, who shared the photographs at the bar. I believe there was Deputy Mejia and Deputy | *Monell* theories (failure to train or custom/practice). They are also part of LASD's remedial process and are thus inadmissible. *See Maddox v. City of Los Angeles*, 792 F.2d 1408, 1417 (9th Cir. 1986). | Department had or enforced policies at the time of the accident regarding photos of human remains or provided training to its employees on the subject; whether the Department had and tolerated a custom or practice of taking and sharing unnecessary photos of human remains; and whether the Department was deliberately indifferent to the risk of that practice.  The testimony also rebuts Defendants' contention that its employees' conduct was legitimate and proper.<br><br>Defendants' objection that testimony regarding LASD's remedial process is inadmissible is a new objection that Defendants first made on July 28, 2022.  (*See* Lavoie Decl. Ex. A at 6.)   This untimely objection violates the Court's Civil Trial Order, which expressly states that "[t]he middle column shall contain only those objections which were previously made in |

| | Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|---|
| 1 | | | |
| 2 | Russell, who were both -- well, they were at the -- one was at the command post. They were both training officers at the station. | | accordance with the Local Rules" and that "the only new material the parties are permitted to add to their previous designations are the responses to the objections." (Dkt. 280 at 4:10-15.)  As such, Defendants have waived this objection, and it should not be considered by the Court. |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | Q. Specifically, what form of discipline did Deputy Versales receive? | | |
| 7 | | | |
| 8 | A. Well, he received a founded investigation with no associative punitive discipline attached to it. Meaning, it's a founded investigation that goes on his record that shows he was in violation of the policies and procedures of the department for specific sections; but there was no additional discipline, meaning, days off, assigned to that. | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | *99:5-100:3 (Counter-designations)* | Plaintiff's Objection | Defendants' Response |
| 21 | *Q. Is a founded – does the sheriff's department consider a founded investigation with no associated discipline to be a form of discipline?* | Not a proper counter-designation for fairness completeness under FRCP 32(a)(6). Defendants' may introduce on their own, but it must count toward their trial time. | This testimony is necessary to explain what the previous designation means for a deputy with a founded investigation on his/her permanent record.  Without it, the designated portions create a misleading impression that there was no discipline. |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | *A. Well, certainly, a founded investigation is on that employee's permanent record throughout their career.* | | |
| 26 | | | |
| 27 | | | |
| 28 | | | |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| *So anytime they would apply for any kind of promotions or movement in the department, their record would reflect the fact tha they had been founded on an investigation. So from that angle, yes, it is certainly something that is tracked by the department. It is viewed at every step in that employee's process as long as they remain with the organization. So from that standpoint, yes, a founded investigation is still founded.*<br>*Q. Well, I guess what you just described makes me think that receiving a founded investigation is a negative consequence of the conduct. Is that fair to say?*<br>*A. Well, it's certainly a noteworthy – it can be negative, yes. So anytime that you apply for another position on the department or promotion, there is a review done of your performance on the department. In that particular case having a founded investigation is not what you want.* | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF WILLIAM JAEGER

| | Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|---|
| | 101:9-102:18 | Defendants' Objection | Plaintiffs' Response |
| | Q. So from the department's perspective, was Deputy Cruz disciplined with -- in response to any of his conduct related to accident scene photos? A. Was he -- he was disciplined by the department and -- and -- as were all four individuals, but he specifically was given days off without pay. Q. How many days off? A. He was assessed by the department initially at a ten-day suspension. And after his allowable grievance period with his division command staff, that was reduced to five days. Q. Reduced to five days. My understanding from Deputy Cruz's deposition, that he had two days of suspension without pay and three days of paid mandatory training. Is that accurate? A. Well, as part of the discipline process, if you -- a division chief has the -- it's allowable for a division chief to offer them education-based discipline. Meaning, on | Irrelevant. (FRE 104(b), 401, 402).  Defendants' disciplinary decisions are not relevant to Plaintiffs' *Monell* theories (failure to train or custom/practice). They are also part of LASD's remedial process and are thus inadmissible. *See Maddox v. City of Los Angeles*, 792 F.2d 1408, 1417 (9th Cir. 1986). | The absence of discipline for LASD employees is relevant to Monell liability:  whether the Department had or enforced policies at the time of the accident regarding photos of human remains or provided training to its employees on the subject; whether the Department had and tolerated a custom or practice of taking and sharing unnecessary photos of human remains; and whether the Department was deliberately indifferent to the risk of that practice.  The testimony also rebuts Defendants' contention that its employees' conduct was legitimate and proper.

Defendants' objection that testimony regarding LASD's remedial process is inadmissible is a new objection that Defendants first made on July 28, 2022.  (*See* Lavoie Decl. Ex. A at 6.)   This untimely objection violates the Court's Civil Trial Order, which |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF WILLIAM JAEGER

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| your record it will show a five-day suspension; but in Deputy Cruz's case three of those days will be seen as not served without pay but, rather, you will receive mandatory training for 24 hours. Two days, sixteen hours -- your pay will be docked sixteen hours of pay, but on your record it still shows a five-day suspension.<br>Q. I see. And so for Deputy Cruz, for the training that he received, did he receive pay for that training?<br>A. It is -- yeah. He is -- his pay is not docked for the 24 hours or 3 days of training. He goes to that training and receives training.<br>Q. So in terms of a reduction in pay, the discipline -- the final level of discipline with respect to Deputy Cruz was a loss of two days' worth of pay?<br>A. Yes. | | expressly states that "[t]he middle column shall contain only those objections which were previously made in accordance with the Local Rules" and that "the only new material the parties are permitted to add to their previous designations are the responses to the objections." (Dkt. 280 at 4:10-15.)  As such, Defendants have waived this objection, and it should not be considered by the Court. |
| 103:9-105:1<br>Q. So let me know if this summary is correct. The department assigned a ten-day suspension | Defendants' Objection<br>Irrelevant. (FRE 104(b), 401, 402).  Defendants' disciplinary decisions are not relevant to Plaintiffs' | Plaintiffs' Response<br>The absence of discipline for LASD employees is relevant to Monell liability:  whether the |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| without pay to Deputy Cruz related to his conduct with accident scene photographs. Deputy Cruz pursued a grievance to challenge that ten-day suspension without pay. It was reviewed by Dennis Kneer, and the discipline was reduced to a suspension of two days without pay and three days of mandatory training with pay. Is that accurate? A. Yes. That grievance that is brought through the process is centered around the employee providing information that the decision-maker may not have known at the time that they initiated the initial discipline. And that could be from actions maybe that the employee has taken on their own accord to better themselves. So oftentimes that grievance will go to the decision -- same decision-maker that initially gave them the ten-day suspension in this case, and they will reduce it because the employee's already shown that they are trying to better | *Monell* theories (failure to train or custom/practice). They are also part of LASD's remedial process and are thus inadmissible. *See Maddox v. City of Los Angeles*, 792 F.2d 1408, 1417 (9th Cir. 1986). | Department had or enforced policies at the time of the accident regarding photos of human remains or provided training to its employees on the subject; whether the Department had and tolerated a custom or practice of taking and sharing unnecessary photos of human remains; and whether the Department was deliberately indifferent to the risk of that practice.  The testimony also rebuts Defendants' contention that its employees' conduct was legitimate and proper.

Defendants' objection that testimony regarding LASD's remedial process is inadmissible is a new objection that Defendants first made on July 28, 2022.  (*See* Lavoie Decl. Ex. A at 6.)   This untimely objection violates the Court's Civil Trial Order, which expressly states that "[t]he middle column shall contain only those objections which were previously made in |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| themselves and took responsibility for their action.<br>Q. You started that answer with "yes," and I just want to be sure I gave a summary of what I understood your testimony to be regarding the discipline and the process for the discipline and the grievance and all that. Did I get anything wrong in that summary?<br>A. You did not. That was me talking too much.<br>Q. Okay. No. I -- I appreciate it. I appreciate it.<br>But I just want to have that --<br>A. The answer -- the answer to your summary is yes, that is what took place.<br>Q. Okay. What new information, if any, did Joey Cruz provide to the department that resulted in his level of discipline being reduced from a ten-day suspension without pay to his ultimate punishment that he received?<br>A. I do not know. That is a hearing that is held with, again, the station captain and/or the | | accordance with the Local Rules" and that "the only new material the parties are permitted to add to their previous designations are the responses to the objections." (Dkt. 280 at 4:10-15.)  As such, Defendants have waived this objection, and it should not be considered by the Court. |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| division chief, ultimately the division chief reducing that discipline sentence. So what specific information was presented, I don't know. | | |
| 106:1-10<br>Q. Did Deputy Versales receive any education-based discipline?<br>A. No.<br>Q. Why not?<br>A. Well, as a formality of actually receiving days off, that you can serve a portion of your days off without pay as education-based discipline. He did not receive any days off that could be utilized in that fashion. So any training that he would have attended would have been beyond that. | Defendants' Objections<br>Irrelevant. (FRE 104(b), 401, 402). Defendants' disciplinary decisions are not relevant to Plaintiffs' *Monell* theories (failure to train or custom/practice). They are also part of LASD's remedial process and are thus inadmissible. *See Maddox v. City of Los Angeles*, 792 F.2d 1408, 1417 (9th Cir. 1986). | Plaintiffs' Response<br>The absence of discipline for LASD employees is relevant to Monell liability: whether the Department had or enforced policies at the time of the accident regarding photos of human remains or provided training to its employees on the subject; whether the Department had and tolerated a custom or practice of taking and sharing unnecessary photos of human remains; and whether the Department was deliberately indifferent to the risk of that practice. The testimony also rebuts Defendants' contention that its employees' conduct was legitimate and proper.<br><br>Defendants' objection that testimony regarding LASD's remedial process is a new objection that |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| | | Defendants first made on July 28, 2022.  (*See* Lavoie Decl. Ex. A at 6.)  This untimely objection violates the Court's Civil Trial Order, which expressly states that "[t]he middle column shall contain only those objections which were previously made in accordance with the Local Rules" and that "the only new material the parties are permitted to add to their previous designations are the responses to the objections." (Dkt. 280 at 4:10-15.)  As such, Defendants have waived this objection, and it should not be considered by the Court. |
| 106:11 – 107:7 (*Counter-designations*) *Q. Why did Deputy Versales receive no associated discipline despite there being a founded investigation? A. Well, again, that is a decision-maker's call on that.  That would have been Chief Kneer that had that decision.  I will say that the order from the sheriff was clear that* | Plaintiffs' Objection Not a proper counter-designation for fairness completeness under FRCP 32(a)(6).  Defendants' may introduce on their own, but it must count toward their trial time. | Defendants' Response This testimony is critical to explain the immediately preceding testimony about LASD's discipline decisions.  Without it, the designation portions create a misleading impression that there was an "absence of discipline," as set forth in Plaintiff's response to Defendants' objection. |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| *if employees remove those photographs and were not found to have violated other aspects of the department or its policies, then they would not receive discipline.  Now, that founded investigation is still on their record – on that record.*<br>*Q. From the department's perspective, why was it appropriate to assign discipline in addition to the founded investigation to Deputy Cruz but not Deputy Versales?*<br>*A. Well, I think because his actions – if you look at the sections that he actually were founded on, a lot of it being general, it's an embarrassment to the department that his decision-making was not to the performance standard that we would expect of a deputy sheriff and that it was embarrassing to the department.* | | |
| 107:14-24<br>Q. Let's talk about Deputy Rafael Mejia. What discipline, if any, did he receive from the department related to | Defendants' Objection<br>Irrelevant. (FRE 104(b), 401, 402).  Defendants' disciplinary decisions are not relevant to Plaintiffs' *Monell* theories (failure to train or custom/practice). | Plaintiffs' Response<br>The absence of discipline for LASD employees is relevant to Monell liability:  whether the Department had or enforced policies at the |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| accident scene photographs? A. Again, he was given a founded investigation with no dedicated discipline days. Q. And did he receive any educational-based discipline? A. Again, he did not receive any actionable days off without pay; so that can't be applied. You have to be given at least a day off -- day suspension for that to kick in. | They are also part of LASD's remedial process and are thus inadmissible. *See Maddox v. City of Los Angeles*, 792 F.2d 1408, 1417 (9th Cir. 1986). | time of the accident regarding photos of human remains or provided training to its employees on the subject; whether the Department had and tolerated a custom or practice of taking and sharing unnecessary photos of human remains; and whether the Department was deliberately indifferent to the risk of that practice.  The testimony also rebuts Defendants' contention that its employees' conduct was legitimate and proper.  Defendants' objection that testimony regarding LASD's remedial process is inadmissible is a new objection that Defendants first made on July 28, 2022.  (*See* Lavoie Decl. Ex. A at 6.)   This untimely objection violates the Court's Civil Trial Order, which expressly states that "[t]he middle column shall contain only those objections which were previously made in accordance with the Local Rules" and that "the only |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| | | new material the parties are permitted to add to their previous designations are the responses to the objections." (Dkt. 280 at 4:10-15.)  As such, Defendants have waived this objection, and it should not be considered by the Court. |
| 117:12-119:1<br>Q. Yeah. So if the department was able to get possession of a smartphone, whether that's through someone's consent or through a warrant or whatever it is - - if the department is in the possession of a smartphone and there are pictures and text messages on that smartphone, does the department have the capacity to take a forensic image of the phone that would contain those photos and text messages?<br>A. Yes.<br>Q. Can you describe that. How would -- how would that happen?<br>A. Well, again, if the information's contained within the, if you will, | Defendants' Objection<br>Irrelevant. (FRE 104(b), 401, 402).  There is no *Monell* theory of liability for post-incident failure to investigate.  Nor does this testimony have any bearing on that issue. The Data Systems Bureau's technological capabilities also have nothing to do with whether Defendants failed to preserve relevant evidence after a duty to preserve was triggered. | Plaintiffs' Response<br>Commander Jaeger's testimony that LASD had the technological capacity to search its employees' phones, but did not, is relevant to the effectiveness of the Department's response to an investigation of the photos, which Defendants have placed at issue by asserting that the results of their investigation show that distribution was limited and there are no remaining photos to be distributed.  The testimony is also relevant to spoliation and to show that LASD is aware and capable of the steps necessary to preserve relevant evidence, as opposed to failing to preserve it and affirmatively destroying it |

| | Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|---|
| 1 | | | |
| 2 | personal device, the cell phone that the employee has -- if it's still contained within that phone, then we have the ability to, in essence, scrub the data that's still within that phone. So as long as it's within that phone or -- or it was – in some cases I think some of the deleted things could be extracted out depending on -- I think there is a timing issue in there; but again, I'm not real -- I'm not technically savvy in exactly what can and cannot be extracted but -- but I do know that it would -- we would have the ability to take that data and hold on to what's there; but if it went beyond that, then it would require additional warrants to be issued. Q. Yeah. And so the department -- if it – if it's able to come into possession of a smartphone, it has the technological capacity to basically create an external copy of the content of that cell phone; is that right? A. Yes. I think that's a fair assessment of it. | | before creating a copy. The seriousness and trustworthiness of the internal investigation is also relevant to the Sheriff Department's deliberate indifference to, and/or toleration of, the practice of taking and sharing photos with human remains.

Defendants did not include any legal argument for this objection until July 28, 2022, *after* Plaintiffs provided written responses to Defendants' original objections. (*See* Lavoie Decl. Ex. A at 6.) Defendants' untimely objections violate the Court's Civil Trial Order, which expressly states that "[t]he middle column shall contain only those objections which were previously made in accordance with the Local Rules" and that "the only new material the parties are permitted to add to their previous designations are the responses to the objections." (Dkt. 280 at 4:10-15.) They also prejudice Plaintiffs by |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| Q. Okay. And you mentioned the division or branch or something of the sheriff's department that does that type of work. Could you -- could you explain that.<br>A. Yeah. Our -- our technology division – we have a unit that's called Data Systems Bureau, and they would be the primary that we would work – our detectives would work with them as they have employees with the skill set to be able to navigate that. | | denying Plaintiffs a meaningful opportunity to respond.  Defendants' untimely arguments should be deemed waived. |
| <u>120:14-121:25</u><br>Q. I'll just display the topic again because I know it can be hard to hold the exact wording in your head. So the topic is "All steps taken by the sheriff's department to preserve the electronic devices that sheriff's department personnel used to take, obtain, receive, possess, and/or share photos of the accident scene or victims' remains." So the one step that you've identified that you believe to be responsive to this is that department investigators, | | |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| during the Internal Affairs investigation, asked witnesses during their Internal Affairs interviews for permission to review their cell phones. And your understanding is that everyone granted such request to have their cell phones reviewed during their interviews. Is that a fair summary? A. Yes. I believe that's a fair summary. I'm not entirely a hundred percent sure if everyone granted access, but I believe they did. Q. Okay. And as you -- and are you aware of any other steps beyond that that the sheriff's department took to preserve the electronic devices that were used to take, obtain, receive, possess, and/or share photos of the accident scene or victims' remains? A. No. I'm not aware of any other steps that we took. Q. Did the sheriff's department ever tell its personnel to preserve and not get rid of the cell phones on which they | | |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| took or received accident scene photos?<br>A. No. I don't believe we -- I don't believe specifically that was ever stated.<br>Q. Just to be clear, did the department ever take a forensic image of any devices that were used to take, receive, or share accident scene photos?<br>A. We did not do a forensic search of any of those personal cell phones, no. | | |
| 123:9-24<br>Q. So here is my question. Aside from reviewing certain employees' cell phones during their Internal Affairs interviews, would it be accurate to say the sheriff's department took no other steps to preserve the electronic devices that sheriff's department personnel used to take, obtain, receive, possess, and/or share photos of the accident scene or victims' remains?<br>MR. TOKORO: Again, I'm going to object. That question's been asked and answered a few times | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF WILLIAM JAEGER

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| now, and his testimony stands for what it is.<br>THE WITNESS: Did you want me to answer again?<br>BY MR. LAVOIE:<br>Q. Yes.<br>A. Yes. To my knowledge, that is the only action that the department took, was for that voluntary consent. | | |
| <u>129:17-132:21</u><br>[objections omitted]<br>Q. Is it the department's belief that over the past approximately 12 years, since January 1st, 2010, that members of its department have never once taken, obtained, used, possessed, or shared photos that contained human remains without a valid law enforcement need or objective?<br>A. Well, again, my only statement can be that I could not find any formal investigation into that.<br>Q. So the department -- does the department have a -- a view as to whether or not over the past 12 years, since January 2010, any members of its department have taken, obtained, used, possessed, or shared photos that | | |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| contained human remains without a valid law enforcement need or objective?<br>A. Again, sir, you -- you -- you show me a complaint that was initiated from a citizen. That is going to have a review done of that complaint. If during that inquiry the supervisor conducting the inquiry found that there, in fact, was credible information, meaning, a cell phone that was able to be viewed and seen that depicted those actions, we certainly would have expected that supervisor to initiate a formal investigation into that action. The fact that it wasn't tells me there may be something else in that complaint that removed someone's allegation from it actually rising to the level of starting an investigation. I don't know that case. I don't know anything about that case. But I can tell you that in a review of our administration investigations, we did not find any cases where there was credible information that was | | |

| | Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|---|
| 1 | | | |
| 2 | brought forward during | | |
| 3 | the inquiry phase to | | |
| | trigger an administrative | | |
| 4 | investigation. Someone | | |
| 5 | alleging that action is | | |
| | reviewed in an inquiry. | | |
| 6 | Q. So I understand your | | |
| 7 | testimony as to the review | | |
| 8 | that you did and what you | | |
| | found. And you're -- | | |
| 9 | you're telling me, I have | | |
| 10 | knowledge that based on | | |
| | a review of the database | | |
| 11 | that there hasn't been any | | |
| 12 | type of misconduct that's | | |
| | arisen in the course of an | | |
| 13 | administrative | | |
| 14 | investigation since | | |
| | January of 2010; is that | | |
| 15 | accurate? | | |
| 16 | A. Yes. | | |
| 17 | Q. Okay. So my question | | |
| | is -- is different, is, | | |
| 18 | Separate from what is or | | |
| 19 | what is not in any | | |
| | database, does the | | |
| 20 | department know whether | | |
| 21 | -- whether any of its | | |
| 22 | personnel over the past | | |
| | approximately 12 years | | |
| 23 | has ever taken, obtained, | | |
| 24 | used, possessed, or shared | | |
| | photos that contained | | |
| 25 | human remains without a | | |
| 26 | valid law enforcement | | |
| | need or objective? | | |
| 27 | THE WITNESS: Again, | | |
| 28 | the complaint process is | | |
| | one that we do require an | | |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| inquiry to vet out what that instance was all about. So if the supervisor has done an appropriate inquiry into that matter and has made a determination as to whether or not it rose to the level of requiring a further investigation, meaning, an administrative investigation, that's what that Watch Commander Service Comment form is designed to do. But oftentimes when we -- and the reason for the vetting is because we will find that an allegation made by the public doesn't always come with any kind of credible information to be able to start an administrative investigation against an employee, which in and of itself can be deemed an adverse impact upon the employee because their career can be suspended during that investigation.<br><br>132:22 - 134:19<br>[objection omitted]<br>Q. I want to be clear about what I'm asking. I'm not asking whether the department has | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF WILLIAM JAEGER

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| conducted any investigations over the past 10 -- 10 or 12 years related to this type of conduct. I'm asking more broadly whether, to the department's knowledge, anyone within the department over the last 12 years has ever taken a photo of human remains without a valid law enforcement objective.<br>MR. TOKORO: So same objections. Again, this question's been asked and answered.<br>THE WITNESS: Sir, I can't say any other way but -- my knowledge is that unless there is a formal investigation, I would not know of a complaint per se because that's the reason that we do inquiries, is to make sure that there is some kind of credible information. Certainly, if this case in the one that you showed me were true and correct, meaning, there was cell phone footage of this and it rose to an investigation --and then they have to decide what is to be investigated. And that's the reason we do inquiries. So I don't | | |

PLAINTIFF'S NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF WILLIAM JAEGER

| | Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|---|
| 1 | | | |
| 2 | know how to better answer your question. | | |
| 3 | BY MR. LAVOIE: | | |
| 4 | Q. Is it possible that a member of the | | |
| 5 | department over the past | | |
| 6 | 12 years may have taken | | |
| 7 | a photo of human remains that they did not have a | | |
| 8 | valid law enforcement | | |
| 9 | reason to take but that that never resulted in a | | |
| 10 | complaint made to the | | |
| 11 | department or any type of investigation?  Is that | | |
| 12 | possible? | | |
| 13 | THE WITNESS: Sir, there is a lot of things that | | |
| 14 | I will never say is | | |
| 15 | impossible. So part of my 31 years has been I am | | |
| 16 | not going to sit here and | | |
| 17 | give you an absolute. Anything could be | | |
| 18 | possible. I don't know. | | |
| 19 | Q. Did -- outside of any complaint or | | |
| 20 | investigation, does the | | |
| 21 | sheriff's department have knowledge of any | | |
| 22 | instances in which | | |
| 23 | members of the department have taken or | | |
| 24 | shared photos of human | | |
| 25 | remains without a valid law enforcement | | |
| 26 | purpose? | | |
| 27 | A. Again, the only way I | | |
| 28 | can answer that is if we | | |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| had knowledge and it was initiated into an administrative investigation, then that is what I have searched. | | |
| 136:7-9<br>Q. Have you ever heard the term "death book" before?<br>A. I think I've heard the term. | <u>Defendants' Objections</u><br>Irrelevant. (FRE 104(b), 401, 402).<br>Not 30(b)(6) topic identified in Plaintiff's deposition notice. Improper designation; deponent not testifying as 30(b)(6) witness. *See* Fed. R. Civ. P. 32(a)(3).<br><br>Whether Commander Jaeger has personally heard the term "death book" has nothing to do with the Department's historical taking or sharing of photos containing human remains. | <u>Plaintiffs' Response</u><br>Defendants' lack of personal knowledge objection fails because the witness was designated under Rule 30(b)(6) on this topic. Commander Jaeger was designated by LASD to testify on the following topic: "All facts and details regarding the extent to which Sheriff's Department personnel have, since January 1, 2010, taken, obtained, used, possessed, or shared photos that contained human remains without a valid law enforcement purpose," and the testimony in this passage is squarely within the topic.<br><br>The testimony is relevant to Sheriff Villanueva's statement regarding "death books" of remains photos, a term which Captain Jaeger said he was familiar with. It is also relevant to whether |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| | | the Sheriff's Department was aware of the practice of keeping death books and the Department's deliberate indifference to the need for clear policies and training on the subject.<br><br>Defendants did not include any legal argument for this objection until July 28, 2022, *after* Plaintiffs provided written responses to Defendants' original objections. (*See* Lavoie Decl. Ex. A at 6.) Defendants' untimely objections violate the Court's Civil Trial Order, which expressly states that "[t]he middle column shall contain only those objections which were previously made in accordance with the Local Rules" and that "the only new material the parties are permitted to add to their previous designations are the responses to the objections." (Dkt. 280 at 4:10-15.) They also prejudice Plaintiffs by denying Plaintiffs a meaningful opportunity to respond. Defendants' |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| | | untimely arguments should be deemed waived. |
| <u>137:7-139:5</u> [objections omitted]<br>Q. So from -- to the department's knowledge, have any members of the sheriff's department, since January 1st, 2010, maintained a death book that contained photos of crime scenes from throughout their careers?<br>THE WITNESS: Yes. I know of no departmental action that has been taken against an employee related to them taking pictures of deceased individuals and that resulting in an administrative investigation. I have found nothing.<br>Q. Yeah. So that's a narrower subset of what I'm asking. I'm not asking whether or not there have been investigations. I'm saying, Does the department have any knowledge of whether or not any members of its department, since January 1st, 2010, have ever maintained a death book containing photos of | <u>Defendants' Objections</u><br>Irrelevant. (FRE 104(b), 401, 402)<br>Not 30(b)(6) topic identified in Plaintiff's deposition notice. Improper designation; deponent not testifying as 30(b)(6) witness. *See* Fed. R. Civ. P. 32(a)(3).<br><br>Plaintiffs did not identify "death books" as a topic of examination. Commander Jaeger's knowledge about previous internal investigations into "death books" has no bearing on Plaintiffs' *Monell* claims. | <u>Plaintiffs' Response</u><br>Defendants' lack of personal knowledge objection fails because the witness was designated under Rule 30(b)(6) on this topic. Commander Jaeger was designated by LASD to testify on the following topic: "All facts and details regarding the extent to which Sheriff's Department personnel have, since January 1, 2010, taken, obtained, used, possessed, or shared photos that contained human remains without a valid law enforcement purpose," and the testimony in this passage is squarely within the topic.<br><br>The testimony is relevant to Sheriff Villanueva's statement regarding "death books" of remains photos, a term which Captain Jaeger said he was familiar with. It is also relevant to whether the Sheriff's Department was aware of the practice of keeping death books |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| crime scenes from throughout their careers? THE WITNESS: Again, the department, to my knowledge, has no recorded history of that type of an investigation. And you're not asking me about my personal knowledge, so the only thing I could do was search our investigation. Q. Did you make any effort to interview other members of the department regarding whether they have any knowledge about members the department having taken, shared, possessed photos of human remains without a valid law enforcement purpose? Did you do that to prepare for this deposition? A. No. I did no other interviews of -- related to that topic. | | and the Department's deliberate indifference to the need for clear policies and training on the subject; to the Department's knowledge of constitutional rights violations; to the existence of the custom or practice of unnecessarily taking or sharing death photos; and the Department's failure to create policies and provide training on the subject.

Defendants did not include any legal argument for this objection until July 28, 2022, *after* Plaintiffs provided written responses to Defendants' original objections. (*See* Lavoie Decl. Ex. A at 7.) Defendants' untimely objections violate the Court's Civil Trial Order, which expressly states that "[t]he middle column shall contain only those objections which were previously made in accordance with the Local Rules" and that "the only new material the parties are permitted to add to their previous |

| Plaintiffs' Designations | Objection | Response to Objection |
|---|---|---|
| | | designations are the responses to the objections." (Dkt. 280 at 4:10-15.)  They also prejudice Plaintiffs by denying Plaintiffs a meaningful opportunity to respond.  Defendants' untimely arguments should be deemed waived. |

DATED:  July 28, 2022                    WILSON SONSINI GOODRICH & ROSATI


By: _____
                          */s/ Luis Li*
                          LUIS LI

1   DATED:  July 28, 2022      JEROME M. JACKSON LAW OFFICES

2

3

4                           By:       */s/ Jerome M. Jackson*

5                                  JEROME M. JACKSON

6                         JEROME M. JACKSON

jmjlaw@aol.com

7                         JEROME M. JACKSON LAW OFFICES

8                         880 Apollo Street, Suite 238

El Segundo, California 90245

9                         Telephone: (310) 726-4199

10                       Facsimile: (310) 414-0486

11                       *Attorneys for Plaintiff Christopher Chester*

12

13  DATED:  July 28, 2022      OFFICE OF COUNTY COUNSEL

14

15

16                           By:       */s/ Jonathan C. McCaverty*

17                              JONATHAN C. MCCAVERTY

18                       Attorneys for Defendant

19                     LOS ANGELES COUNTY SHERIFF'S

DEPARTMENT

20

21

22

23

24

25

26

27

28

1  DATED:  July 28, 2022            MILLER BARONDESS, LLP

2

3

4                                        By:  _____
                                                /s/ Mira Hashmall
5                                              MIRA HASHMALL

6                                        Attorneys for Defendants
                                         COUNTY OF LOS ANGELES, LOS
7                                        ANGELES COUNTY FIRE
                                         DEPARTMENT, JOEY CRUZ, RAFAEL
8                                        MEJIA, MICHAEL RUSSELL, and
9                                        RAUL VERSALES

10

11                          **ECF CERTIFICATION**

12        The filing attorney attests that Defendants' counsel concurs in the content of,

13  and has authorized, this filing.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28