# EXHIBIT A

CONFIDENTIAL

# Richard J. Shaw, M.D.

Division of Child Psychiatry
Stanford University School of Medicine
401 Quarry Road, Suite 1122
Palo Alto
CA 94305

## REBUTTAL REPORT

## IDENTIFYING INFORMATION

Case: Vanessa Bryant vs County of Los Angeles
Referring Attorney: Eric Tuttle, Esq. (Wilson Sonsini Goodrich & Rosati)
Date of Report: 8/1/22

## BACKGROUND

I have been asked to provide my response to the opinions expressed by Marc Cohen, MD, in this case. Dr. Cohen has produced two reports and two declarations in which he outlines opinions based on what he calls a forensic psychiatric evaluation of Vanessa Bryant. Specifically, Dr. Cohen's report addresses the "mental health of Vanessa Bryant and the nature and extent of any adverse impact that can be attributed to the unauthorized taking or sharing of crash scene photographs of her late husband and daughter." Details of the case in which Mrs. Bryant's husband and daughter were killed in a helicopter accident on 1/26/20 have been well documented and I will not repeat them in this report.

## QUALIFICATIONS

I am a Professor of Psychiatry in the Department of Psychiatry and Behavioral Sciences at Stanford University School of Medicine where I have worked since 1996. I received my Pre-clinical Training in Basic Medical Sciences from the University of London and my Medical Degree at the Middlesex Hospital Medical School from the University of London. I completed General Psychiatry residency training at the Albert Einstein College of Medicine in New York in 1989, and my fellowship in Child and Adolescent Psychiatry at Stanford University in 1993. I am the Medical Director for Consultation-Liaison Services at the Lucile Packard Children's Hospital at Stanford University and Psychiatric Consultant for the Pediatric Emergency Room at Standard University Medical Center. Much of my clinical work involves working with children and family members of children with chronic physical conditions and terminal illnesses. This work includes evaluating and treating bereaved parents whose children have passed away.

I am board certified in Psychiatry and Child and Adolescent Psychiatry. I currently serve on various professional organizations including as a member of the Committee for the Physically Ill Child for the American Academy of Child and Adolescent Psychiatry. I have authored 80 peer reviewed manuscripts, 28 book chapters and 3 textbooks. My research includes intervention studies in adults with PTSD. I serve on the editorial board for Academic Psychiatry. I have been performing forensic

EXHIBIT A
Page 8

psychiatric work for the past 18 years, have been retained as an expert in almost 200 cases, and have provided trial or deposition testimony in nearly 50 cases, including on the Goldwater Rule.

A copy of my current CV, which includes all publications that I have authored in the past 10 years, is attached to this report as **Exhibit A**. A list of all other cases which, during the past 4 years, I testified as an Expert at trial or by deposition, is attached to this report as **Exhibit B**.

For my work on this matter, I am being compensated at my standard hourly rate of $800 per hour for record review, examinations, medical reports, conferences, travel time and depositions, and $700 per hour for trial testimony.

EXHIBIT A

**SOURCES OF INFORMATION**

*Marc Cohen, MD*

- Reports by Marc Cohen, MD dated 11/11/21 and 12/14/21.
- Declaration of Marc Cohen, MD dated 10/5/21.
- Declaration of Marc Cohen, MD dated 1/17/22.
- Joint Statement for Defendants Expert Dr. Marc Cohen.

*Deposition Testimony*

- Videotaped deposition and deposition transcript Vanessa Bryant, dated 10/12/21.
- Exhibits to Vanessa Bryant Deposition.
- Deposition of Catherine McDonnell Gasol, dated 11/15/21.
- Deposition of Monica Arnold, dated 11/10/21.
- Deposition of Rob Pelinka, dated 11/18/21.
- Deposition of Kristin Pelinka, dated 11/22/21.
- Deposition of Sharia Washington, dated 11/12/21.
- Deposition of Marc Cohen, M.D., dated 8/1/22.

*Legal Documents*

- First Amended Complaint, filed 9/17/20.
- Declaration of Vanessa Bryant.
- Vanessa Bryant Responses to Interrogatories re: Damages.
- Kroll Supplemental Investigative Report, dated 11-3-2021.
- 2021-04-27 Plaintiff Response to COLA 1st ROGs.
- 2021-09-01 Plaintiff Response to County 1st Amended ROGs.
- 2021-09-17 Bryant Response to county 2nd ROGs.
- 2021-09-18 Plaintiff Amended Response to County 1st Amended ROGs.
- 2021-10-12 Bryant v. COLA – Plaintiff's ROGs to 3rd Set of Interrogatories.
- 2021-10-25 Plaintiff Amended Response to COLA 2nd ROGs.
- 2021-10-25 Plaintiff 2nd Amended Response to COLA 1st ROGs.
- 2021-11-08 Notice of Motion and Joint Stipulation re Plaintiffs' Motion for Spoliation Sanctions.
- 2021-11-15 Plaintiffs' Supplemental Brief ISO Motion for Spoliation Sanctions.
- 2021-12-06 Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment.
- 2022-01-20 Joint Statement regarding Plaintiff's motion *in limine* to preclude Defendants from proffering exculpatory testimony and argument regarding spoliation related evidence and to admit evidence of Defendants' destruction of evidence.
- United States District Court, Central District of California-Western Division. Case number CV 20-9582-JFW, reporters transcript of motions *in limine* dated 7/26/22.
- Exhibit 85 – Material Issue of Fact / Dissemination of Photos. Instances of Sharing Unaccounted for in Defendants' Investigation Findings.

*Miscellaneous Documents*

- Text message exchanges between Vanessa Bryant and David Rice.
- Vanessa Bryant's Instagram Account: @vanessabryant

*Press Coverage*

- Kobe Bryant died an inspiration to many – but not all.
- Kobe Bryant allegedly had affairs with more than 100 women.
- Kobe Bryant crash_ Sheriff says 8 deputies involved in taking unauthorized photos of scene.
- Family's Nightmare_ Daughter's Accident Photos Go Viral.

EXHIBIT A

Page 11

## OPINION AND CONCLUSIONS

**Opinions of Marc Cohen, MD**

Dr. Cohen writes that he conducted a forensic psychiatric evaluation of Vanessa Bryant in order to determine whether she suffered any mental damage or emotional harm as a result of the unauthorized taking or sharing of crash-scene photographs of her late husband and daughter. A review of Dr. Cohen's two expert reports and two declarations indicates that he is proposing to render the following opinions at trial:

1. Dr. Cohen maintains that he has not violated the Goldwater Rule in providing a psychiatric opinion about Vanessa Bryant. Related to this opinion, Dr. Cohen claims that the absence of a face-to-face evaluation did not compromise his ability to reach the conclusions set forth in his evaluations which "are based on the kinds of evidence on which forensic psychiatrists customarily rely."

2. Based on the available information that he reviewed, Dr. Cohen found no evidence that Vanessa Bryant has been mentally harmed or emotionally damaged from crash-scene photographs of her late husband and daughter being shared.

3. Dr. Cohen writes that Vanessa Bryant has never seen any authentic photographs of the remains of her husband and/or daughter nor have any such photographs ever been determined to be disseminated or posted on the internet. In light of this finding, it is his opinion that Vanessa Bryant cannot be distressed by photographs she has never seen.

4. Dr. Cohen writes that the source of Vanessa Bryant's distress lies in what she imagines the photographs depict and the malicious intent she assigns to the people she imagines have shown and seen such photographs.

5. Dr. Cohen writes that Vanessa Bryant's prominent public presence has contributed to her fear of such photographs being revealed in the future despite any reliable evidence that they in fact continue to exist.

6. Dr. Cohen comments on information obtained from Vanessa Bryant's deposition testimony regarding her life experiences which he proposes could affect her trust in others. This information includes the following statements: Vanessa Bryant has never had a relationship with her father since she was a "little girl;" Vanessa Bryant was sued by her mother; and Vanessa Bryant filed for divorce after her husband was alleged to have had affairs and committed sexual assault. Dr. Cohen opines that Vanessa Bryant's imagination, informed by her life experiences and a variety of outside sources, including media accounts of the reported misuse of crash-site photographs, have led her to develop a sense of vulnerability and fear about crash-site images being publicly disclosed despite any reliable evidence indicating that such photographs even continue to exist.

7. Dr. Cohen writes that adults who have had a family member or loved one die from a sudden violent cause often display a need for control in an effort to restore predictability to their life and offset feeling profoundly vulnerable, violated, and powerless. Dr. Cohen opines that Vanessa Bryant's account of her emotional distress appears to fit this response pattern.

**The Goldwater Rule**

*American Psychiatric Association*

In 1973, the American Psychiatric Association (APA) developed a policy commonly known as the Goldwater Rule following a controversy that emerged during the 1964 presidential election when Fact Magazine published the results of a large survey of psychiatrists who were asked whether Senator Barry Goldwater was psychologically fit to run for the presidency. Many respondents described the senator as "paranoid," "grossly psychotic" and a "megalomaniac" while others provided diagnoses that included schizophrenia and narcissistic personality disorder.[1] After Senator Goldwater successfully sued the magazine for defamation of character, the APA asserted that psychiatrists should not give professional opinions about the mental state of individuals they have not personally and thoroughly evaluated.[2]

The Goldwater Rule has subsequently been published as an annotation in Section 7.3 of the Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry: "On occasion psychiatrists are asked for an opinion about an individual who is in the light of public attention or who has disclosed information about himself/herself through public media. In such circumstances, a psychiatrist may share with the public his or her expertise about psychiatric issues in general. However, it is unethical for a psychiatrist to offer a professional opinion unless he or she has conducted an examination and has been granted proper authorization for such a statement."[3] The APA Ethical Guidelines further caution that "a psychiatrist should avoid cloaking their public statements with the authority of the profession."[4]

In 2008, Richard Friedman, MD, a Professor of Psychiatry at Weill Cornell Medical College, similarly opined that "for a mental health professional – or any physician – to publicly offer a diagnosis at a distance of a non-patient not only invites public distrust of these professionals but also is intellectually dishonest and is damaging to the profession."[5] He also wrote that "a professional opinion should reflect a thorough and rigorous examination of a patient, the clinical history, and all relevant clinical data and protection of strict confidentiality, none of which is possible by casual observation of a public figure. To do so otherwise is unethical because it violates this fundamental principle and thereby misleads the public about what constitutes accepted medical and nonmedical professional practice."[6]

In 2016, Ronald Pies, MD, a Professor of Psychiatry, also at Weill Cornell Medical College, writing in the Psychiatric Times, supported the premise of the Goldwater Rule, including that it is unethical to offer publicly the putative clinical diagnosis of any living person unless the psychiatrist has conducted a thorough clinical examination of the person, evaluated appropriate ancillary data such as the person's family history or psychometric testing, and has been granted proper authorization for

---

[1]   Fact Magazine. 1,189 Psychiatrists Say Goldwater Is Psychologically Unfit to be President! Vol 1, No. 5. New York, NY: Fact Publishing; September-October 1964.
[2] American Psychiatric Association. The Principles of Medical Ethics: Principles With Annotations Especially Applicable to Psychiatry. Arlington, VA: American Psychiatric Press Inc; 2008.
[3] Ibid.
[4] Ibid.
[5] Friedman RA. Role of Physicians and Mental Health Professionals in Discussions of Public Figures, Journal of the American Medical Association, September 17, 2008.
[6] Ibid.

stating the person's diagnosis publicly.[7] However, he argued for greater clarity and specificity in interpreting the Goldwater Rule. While Dr. Pies asserted that comments made by a psychiatrist that amount to a clinical diagnosis of a living person in the absence of a clinical evaluation was a breach of the Goldwater Rule, he wrote that there were circumstances in which a psychiatrist might give a professional opinion. These included: (1) historical inferences as to a likely diagnosis applied to a person who was no longer living, often a historical figure of interest; (2) non-diagnostic professional opinions regarding living persons when a psychiatrist might comment broadly about the clinical significance of a pattern of behavior without offering a specific clinical diagnosis; and (3) professional comments that offer a differential diagnosis of a symptomatic or behavioral pattern in a living person, without providing a clinical diagnosis of that person. Dr. Pies also clarified that a clinical diagnosis can only be made on the basis of a direct personal examination of a patient.

In 2017, the APA Ethics Committee reasserted its support for the Goldwater Rule in an opinion in which it was stated that while it was reasonable for psychiatrists to share their expertise about psychiatric issues in general, it was unethical to offer a professional opinion about an individual without conducting a psychiatric evaluation.[8] The Ethics Committee clarified that the rule applied to all professional opinions offered by a psychiatrist, not merely those limited to affirming the presence or absence of a psychiatric diagnosis. In explaining this position, the Ethics Committee gave three justifications in support of their opinion:

1.  When a psychiatrist renders an opinion about the behavior, symptoms, or diagnosis of a public person without consent, the psychiatrist is violating the principle that all psychiatric evaluations should be conducted with consent or other authorization. In some circumstances, such as forensic evaluations, psychiatrists may evaluate individuals based on other legal authorization such as a court order. Psychiatrists are ethically prohibited from evaluating individuals without permission or other authorization (such as a court order).

2.  When a psychiatrist offers a professional opinion about an individual who has not been examined, the psychiatrist is departing from the established and accepted community standard of care which requires a careful review of the individual's medical history and first-hand examination. Practicing in this manner compromises the integrity of the psychiatrist and the psychiatric profession.

3.  When psychiatrists offer medical opinions about an individual whom they have not examined, there is the potential to stigmatize those with mental illness and cause the public to lose confidence in the profession and the confidentiality of their own treatment.

The Committee addressed the argument that the Goldwater Rule "is not sound because psychiatrists are sometimes asked to render opinions without conducting an examination of an individual," such as "in certain forensic cases and consultative roles."  The Committee explained:[9]

> What this objection misses, however, is that the rendering of expertise and/or an opinion in these contexts is permissible because there is a court authorization for the examination

---

[7] Pies RW: Deconstructing and Reconstructing the "Goldwater Rule," Psychiatric Times, Vol 33 No 10, October 7, 2016.
[8] Oquendo M (2017). "APA Remains Committed to Supporting Goldwater Rule." www.psychiatry.org Accessed August 1, 2022.
[9] https://www.psychiatry.org/File%20Library/Psychiatrists/Practice/Ethics/APA-Ethics-Committee-Goldwater-Opinion.pdf.

(or an opinion without examination), and this work is conducted within an evaluative framework including parameters for how and where the information may be used or disseminated. In addition, any evaluation conducted or opinion rendered based on methodology that departs from the established practice of an in-person evaluation must clearly identify the methods used and the limitations of those methods, such as the absence of an in-person examination.

Also in 2017, the Ethics Committee revised one of its published opinions concerning application of the Goldwater Rule to forensic psychiatry, which now states as follows:[10]

**G.7**
**Question:** A psychiatrist testifies for the state in a criminal case about the competency of the defendant. The psychiatrist based the testimony on medical records and did not examine the defendant nor have the defendant's approval to render an opinion. Was this ethical?

**Answer:** It depends. In criminal cases, a personal examination generally is necessary. However, if reasonable efforts to perform a personal examination of the criminal defendant are made, a personal examination is not performed, an opinion may be given if the limitations of the exam are stated and the ensuing weakness of the conclusion is acknowledged. In regard to the defendant's approval, in general, a defendant's consent should be obtained prior to an evaluation. In instances where that is not legally required such as when the assessment is court ordered, that issue should be worked out between the psychiatrist, the attorneys and the court. (Section 7) (1983; Rev. 2017)

In his declaration in this case, Dr. Cohen cited an older version of this opinion, which was issued in 1983. That is no longer valid in light of the Committee's decision in 2017 to reassert and strengthen the Goldwater Rule.

Another opinion of the Ethics Committee concerning the Goldwater Rule emphasizes the need for psychiatrists to base their conclusions on information gleaned in a clinical setting. This opinion reinforces the original premise of the Goldwater Rule:

**O.5**
**Question:** Is it ethical for a psychiatrist to offer his or her professional services to a public figure based on data from the media?

**Answer:** No. Section 7, Annotation 3 (APA) cautions against drawing clinical conclusions based on information gleaned outside the clinical setting. Furthermore, it would seem unwise for a physician to solicit patients by such means. (Section 7) (1994)

In a 2017 commentary on the APA Ethics Committee opinion, Maria Oquendo, MD, PhD, the President of the APA, came out strongly in support of this position, including that adherence to the Goldwater Rule should supersede concerns commonly expressed against the Rule, including those related to freedom of speech, civic duty, and "professional opinions or psychological profiles solicited by courts or law officials for forensic cases."[11] Dr. Oquendo concluded her commentary by speaking

---

[10] https://www.psychiatry.org/File%20Library/Psychiatrists/Practice/Ethics/Opinions-of-the-Ethics-Committee.pdf.
[11] Oquendo M (2017). "APA Remains Committed to Supporting Goldwater Rule." www.psychiatry.org Accessed August 1, 2022.

to the damage to the professional integrity and trust of psychiatry by the community and wrote that
breaking the Goldwater Rule was "irresponsible, potentially stigmatizing, and definitely unethical."[12]
The presidency of Donald Trump has brought fresh attention to the premise of the Goldwater Rule. In
December 2016, a Huffington Post article featured a letter written by three professors of psychiatry
citing President Trump's "grandiosity, impulsivity, hypersensitivity to dislikes or criticism, and an
apparent inability to distinguish between fantasy and reality" as evidence of his mental instability.[13]
John D. Gartner, a practicing psychotherapist and author who teaches at Johns Hopkins University
Medical School, and quoted in the U.S. News & World Report, described President Trump as having
"malignant narcissism, which is characterized by grandiosity, sadism, and antisocial behavior."[14]  It
has been argued that while the validity of psychiatric profiling is not established, it might reasonably
be defended if it was deemed vital to public safety or national security.[15] However, this argument has
little bearing with respect to private citizens involved in civil litigation, and no bearing in this case.

*American Psychological Association*

In 2016, Susan H McDaniel, PhD, President of the American Psychological Association, in response
to press coverage regarding whether or not therapists should analyze presidential candidates, came
out strongly with the opinion that neither psychiatrists nor psychologists should offer diagnoses of
candidates or any other living public figure they have never examined.[16] Dr. McDaniel wrote that the
code of ethics of the American Psychological Association promotes the view that psychologists
should "'take precautions' that any statements they make to the media 'are based on their professional
knowledge, training, or experience in accord with appropriate psychological literature and practice'
and 'do not indicate that a professional relationship has been established' with people in the public
eye, including political candidates."[17] She also concluded when providing opinions of psychological
characteristics, psychologists must conduct an examination adequate to support their statements or
conclusions and should not offer psychiatric diagnoses of a living public figure they have not
examined.

*American Medical Association*

In 2017, the American Medical Association wrote new guidelines into the AMA Code of Medical
Ethics stating that physicians should "refrain from making clinical diagnoses about individuals (e.g.,
public officials, celebrities, persons in the news) they have not had the opportunity to personally
examine."[18]  In a 2017 commentary on these guidelines, Mark Moran wrote that physicians should
understand that they will be taken as authorities when they engage with the media and therefore
should ensure that the medical information they provide is "accurate, inclusive of known risks and

---

[12] Ibid.

[13] Greene R (2016). Is Donald Trump Mentally Ill? 3 Professors Of Psychiatry Ask President Obama To
Conduct 'A Full Medical And Neuropsychiatric Evaluation' The Huffington Post.
https://www.huffpost.com/entry/is-donald-trump-mentally_b_13693174. Accessed August 1, 2022.

[14] Milligan S (2017). Temper Tantrum, US News & World Report. http://www.usnews.com/news/the-
report/articles/2017-01-27/does-donald-trumps-personality-make-him-dangerous. Accessed August 1, 2022.

[15] Kroll J, Pouncey C (2016). The ethics of APA's Goldwater Rule. Journal of the American Academy of
Psychiatry and the Law, 44, 226-235.

[16] McDaniel, SH. "Response to Article on Whether Therapists Should Analyze Presidential Candidates."
American Psychological Association, March 14, 2016.

[17] Ibid.

[18] American Medical Association (2017). "Reference Committee on Amendments to Constitution and
Bylaws."  Accessed August 1, 2022.

benefits, commensurate with their medical expertise, and based on valid scientific evidence and insight gained from professional experience."[19]

*American Academy of Psychiatry and the Law*

In 2015, the American Academy of Psychiatry and the Law (AAPL) published a Practice Guideline for the Forensic Assessment based on the work of an AAPL Task Force that consisted of many of the acknowledged experts in the field of forensic psychiatry.[20] The Practice Guideline was the product of a consensus based on the available literature and knowledge in a broad range of forensic assessments. The Practice Guideline was intended to address the variable standards and inconsistencies in forensic practice, to ensure integrity in the course of a forensic evaluation, and to ensure adherence to the American Medical Association's Code of Ethics. These ethical guidelines call for adherence to honesty, objectivity, and respect for persons.

The Practice Guideline specifically addresses the importance of informed consent in the course of a forensic assessment. The guidelines state that the evaluee should be given an opportunity to ask questions regarding the process, contact counsel regarding questions about the assessment process, and give proper informed consent. With respect to collateral information, the Practice Guideline addresses the importance of a thorough review of collateral information including past psychiatric and mental health treatment records. With respect to the topic of conducting an assessment without an interview, the AAPL ethics guidelines state: "For certain assessments (such as record reviews for malpractice cases), a personal examination is not required. In all other forensic evaluations, if, after appropriate effort, it is not feasible to conduct a personal examination, an opinion may nonetheless be rendered on the basis of other information. Under these circumstances, it is the responsibility of psychiatrists to make earnest efforts to ensure that their statements, opinions, and reports or testimony based on these opinions, clearly state that there was no personal examination and note any resulting limitations to their opinions."[21]

The Practice Guideline specifically comments on the need for a thorough mental status examination to elicit information about the frequency and severity of psychiatric symptoms including mood, anxiety, trauma-related symptoms, thought content, thought form, delusional beliefs, perceptual disturbances, cognition, and concentration and relevant comments, insights, and judgment. With respect to rendering opinions, the Practice Guideline notes that the scientific foundation for the opinion may have to withstand a *Daubert* challenge in court and that the evaluator should ensure that the scientific technique used is reliable and generally accepted among other factors.[22] When an opinion cannot be rendered to a reasonable degree of medical certainty, the referral source should be notified before the evaluator writes a report. In cases in which further information or testing is required to render a final opinion, the Practice Guideline states that "**these opinions can be problematic and are not generally recommended**" and that if a preliminary opinion is given, "its limitation should be explained and the need for further information described."[23]

---

[19] Moran M (2017). AMA Goes Beyond 'Goldwater Rule' In Ethics Guidelines on Media Interaction. Psychiatric News. 52 (24): 1. doi:10.1176/appi.pn.2017.12b6.  Accessed August 1, 2022.

[20] American Academy of Psychiatry and the Law. AAPL Practice Guideline for the Forensic Assessment, J Am Acad Psychiatry Law, 43, 2, 2015.

[21] American Academy of Psychiatry and the Law. AAPL Practice Guideline for the Forensic Assessment, J Am Acad Psychiatry Law, 43, 2, 2015.

[22] Daubert v. Merrell Dow Pharmaceuticals, 509 US 579 (1993).

[23] American Academy of Psychiatry and the Law. AAPL Practice Guideline for the Forensic Assessment, J Am Acad Psychiatry Law, 43, 2, 2015.

*American Board of Forensic Psychology*

The American Psychological Association has also published practice guidelines for the specialty of Forensic Psychology.[24] These guidelines contain specific text regarding the rendering of professional forensic opinions about persons who have not been examined: "Forensic practitioners recognize their obligations to only provide written or oral evidence about the psychological characteristics of particular individuals when they have sufficient information or data to form an adequate foundation for those opinions or to substantiate their findings (EPPCC Standard 9.01). Forensic practitioners seek to make reasonable efforts to obtain such information or data, and they document their efforts to obtain it. When it is not possible or feasible to examine individuals about whom they are offering an opinion, forensic practitioners strive to make clear the impact of such limitations on the reliability and validity of their professional products, opinions, or testimony."[25]

**Rebuttal**

As a rebuttal to the opinions of Dr. Marc Cohen, I have the following opinions:

*Violation of the Goldwater Rule*

In giving certain of his opinions, Dr. Cohen violates the Goldwater Rule.

1. Some of the opinions expressed by Dr. Cohen are psychiatric opinions concerning the mental health of Mrs. Bryant. This includes Dr. Cohen's opinion that he finds no evidence that Mrs. Bryant has been mentally harmed or emotionally damaged by the potential release of crash-scene photographs; that the source of Mrs. Bryant's distress lies in what she imagines the photographs depict, the fear she has about such images being publicly disclosed, and the malicious intent she assigns to the people she imagines have shown and seen such photographs; that Mrs. Bryant's imagination, informed by her life experiences and a variety of outside sources, including media accounts of the reported misuse of crash-site photographs, has led her to develop a sense of vulnerability and fear about crash-site images being publicly disclosed; that Mrs. Bryant was exposed to several situational factors which have affected how she has adapted to the loss of her husband and daughter; and that Mrs. Bryant appears to fit the response pattern of adults who lose a loved one to sudden and violent death and display a need for control

2. Dr. Cohen violated the Goldwater Rule by doing all of the following:

   a. providing a psychiatric opinion regarding the mental health of Mrs. Bryant without her consent or other authorization, such as a court order. The fact that Dr. Cohen asked for an opportunity to conduct a psychiatric evaluation of Mrs. Bryant, a request I understand was rejected by the court, does not circumvent the Goldwater Rule.

---

[24] American Psychological Association. Specialty Guidelines For Forensic Psychology (2013). American Psychologist 68, 1, 7-19 https://www.apa.org/practice/guidelines/forensic-psychology. Accessed August 1, 2022
[25] American Psychological Association. Specialty Guidelines For Forensic Psychology (2013). American Psychologist 68, 1, 7-19 https://www.apa.org/practice/guidelines/forensic-psychology. Accessed August 1, 2022

    b.   providing a psychiatric opinion without a face-to-face evaluation of Mrs. Bryant and without reviewing supporting medical records. While Dr. Cohen claims that it is entirely ethical for a psychiatrist to rely upon other sources of information when he or she is unable to perform a face-to-face evaluation, and that these sources of information should be adequate to support the expert's opinion, in this case, Dr. Cohen's sources of information provide insufficient data to confirm or deny the presence of a psychiatric diagnosis, as discussed further below.

    c.   providing a psychiatric opinion about a public figure in this case, Vanessa Bryant.

    d.   incompletely and inaccurately describing the limitations of his opinion, as discussed further below.

*Violation of Accepted Standards of Psychiatric Care*

In giving a psychiatric opinion about Mrs. Bryant, which in this case includes the absence of a psychiatric diagnosis, Dr. Cohen departs from the established and accepted community standard of care.

1.   In his deposition, Dr. Cohen makes a distinction between APA ethical standards relevant to the clinical practice of psychiatry from that of forensic psychiatric evaluations and opinions. However, the APA, in their opinions clarifying their position about the Goldwater Rule, make specific reference to how this rule is applied and interpreted in the context of forensic psychiatry. In the 2017 amendment to the Goldwater Rule, it is stated that, "Psychiatric diagnosis occurs in the context of an evaluation, based on thorough history taking, examination, and, where applicable, collateral information. It is a departure from the methods of the profession to render an opinion without an examination and without conducting an evaluation in accordance with the standards of psychiatric practice. Such behavior compromises both the integrity of the psychiatrist and of the profession itself." The APA does not make an exception about the need to conduct evaluations in accordance with recognized standards of psychiatric practice based on whether this occurs in a specific clinical (or forensic) setting.

2.   In my experience and opinion, the accepted standard of psychiatric care for offering a professional opinion about an individual requires a personal evaluation that should include a review of the patient's past psychiatric and substance abuse history, past medical history, family psychiatric history, list of current and past psychiatric medication history, and a detailed review of current psychiatric symptoms so as to be able to make or exclude any relevant DSM-5 mental health diagnoses. The personal evaluation should also include a detailed mental status examination. Under this standard of care, a psychiatrist should also, as supplemental information, review prior mental health and treatment records as well as relevant past medical records. Additional collateral information that a psychiatrist might reasonably rely upon might include interviews with spouses or family members. Under this standard of care psychiatrists do *not* rely on, for example, public statements in the media by or about the individual, deposition testimony provided outside the context of psychiatric evaluation, or text messages.

3.   In his Declaration to compel an independent medical examination of Mrs. Bryant, dated 10/5/21, Dr. Cohen makes reference to the APA Practice Guidelines for the Treatment of Psychiatric Disorders in which he describes the minimum data required in order for a psychiatrist to make an accurate and reliable psychiatric diagnosis. Dr. Cohen states that the failure to perform a full examination of an individual's life history is not in keeping with standard psychiatric practice and

is likely to result in an inaccurate and unreliable psychiatric diagnosis. He further states that *the
failure to consider the plaintiff's entire life history greatly increases the risk of both a forensic
examiner and any factfinder drawing incorrect conclusions about the nature, degree and true
source of any emotional harm.*

4.  The AAPL Practice Guideline for the Forensic Assessment specifically comments on the need for
    a thorough mental status examination to elicit information about the frequency and severity of
    psychiatric symptoms including mood, anxiety, trauma-related symptoms, thought content,
    thought form, delusional beliefs, perceptual disturbances, cognition, and concentration and
    relevant comments, insights, and judgment. The Practice Guideline also addresses the importance
    of a thorough review of collateral information including past psychiatric and mental health
    treatment records. Dr. Cohen does not have any such information to support his psychiatric
    opinions.

5.  In the absence of a face-to-face evaluation or review of mental health records, Dr. Cohen has no
    evidence to support his psychiatric opinions concerning the mental health of Mrs. Bryant. For
    example, Dr. Cohen writes that "adults who have had a family member or loved one die from a
    sudden violent cause often display a need for control in an effort to restore predictability to their
    life and offset feeling profoundly vulnerable, violated and powerless." He writes that Mrs.
    Bryant's account of her emotional distress "appears to fit that response pattern." However, Dr.
    Cohen has no medical basis to support that professional opinion. The same argument applies to
    the other psychiatric opinions of Dr. Cohen that I have listed above. In offering these psychiatric
    opinions without sufficient evidence or basis, Dr. Cohen departs from accepted standards of
    psychiatric care.

6.  Dr. Cohen claims that the absence of a face-to-face evaluation did not compromise his ability to
    reach the conclusions set forth in his evaluations which "are based on the kinds of evidence on
    which forensic psychiatrists customarily rely." But the evidence considered by Dr. Cohen does
    not support his conclusions in accordance with accepted standards of psychiatric care.
    Specifically, Dr. Cohen states that the absence of a face-to-face evaluation of Mrs. Bryant does
    not compromise his ability to reach the conclusions set forth in his initial and supplemental
    reports because he reviewed 8,402 pages of material and watched 4.5 hours of video recorded
    testimony. But this material—which includes public statements and media reports, text messages
    between Mrs. Bryant and her therapist, and litigation documents from this case and other cases—
    does not compensate for not conducting a face-to-face evaluation or reviewing mental health
    records. Dr. Cohen's methodology of assessing Mrs. Bryant, which relies on watching a
    videotaped deposition and text message exchanges between her and her therapist, in no way
    meets the established and accepted community standard of psychiatric care. The information that
    Dr. Cohen reviewed is not sufficient, consistent with the standard of care, to make a
    determination about the presence or absence of an individual's level of psychological distress. In
    such situations, a careful and thorough psychiatric assessment is the standard of care. In offering
    these psychiatric opinions based solely on such materials, Dr. Cohen departs from accepted
    standards of psychiatric care.

7.  Dr. Cohen bases many of his opinions of the videotaped deposition of Mrs. Bryant. As already
    stated, this is not a substitute for a personal examination. Depositions are by nature stressful
    encounters in which the deponent is aware that the purpose of obtaining the deposition includes obtaining
    information and statements that may used against them in court. The deposition environment,
    which includes the presence of a court reporter, camera and multiple attorneys who may
    frequently interrupt the process or engage in argumentative exchanges with each other, is also not

conducive to expressing personal and distressing information. In addition, the professional training of an attorney is no substitute for the expertise upon which a psychiatrist relies when taking a psychiatric history.

8.  Dr. Cohen bases his opinions in part on text message exchanges between Mrs. Bryant and a family therapist, David Rice. In general, text messages provide unreliable data on which to assess an individual's mental status. Text messages do not allow the recipient to observe facial expressions or tone of voice and thus limit the conclusions that can be drawn. In the specific case of the text message exchanges between Mrs. Bryant and David Rice, there is insufficient information on which to make or exclude any psychiatric diagnosis. There is no basis to conclude, for example, that simply because something was not mentioned in these text messages it was not a significant issue for Mrs. Bryant. For example, we do not know the details of the professional relationship between Mrs. Bryant and David Rice or what they discussed outside of the text messages.

9.  In his deposition, Dr. Cohen states that Mrs. Bryant has not suffered any mental damage or emotional harm since her symptoms are of insufficient duration or severity and have not affected her ability to function in important areas of her life. However, Dr. Cohen did not examine Mrs. Bryant and so has no basis to opine on the severity of her current symptoms or the impact they may have had on her life. His opinion is based on inferences he has apparently drawn from secondhand information rather than direct examination or mental health records. In addition, a person can suffer significant emotional harm and still be able to function in life. In his deposition, Dr. Cohen also describes Mrs. Bryant's fears about the release of the photographs as irrational. He instead attributes these fears to events in Mrs. Bryant's past history despite acknowledging that he was not able to conduct a thorough evaluation of this history. In my opinion, Mr. Cohen does not have a basis to conclude that Mrs. Bryant's fears are irrational. But in any event, the nature of mental or emotional injury is often not rational; for example, a person with PTSD may not react rationally to events or triggers that remind them of a traumatic event. That does not mean the mental or emotional injury is any less or real or difficult for the person experiencing it.

10. In his deposition, Dr. Cohen states that contemporaneous information in the form of emails or audiovisual evidence is more reliable than information obtained from a direct evaluation which can be corrupted by repeated questioning. However, when making a determination about an individual's degree of psychological distress or presence or absence of a psychiatric diagnosis, the Practice Guidelines referred to by Dr. Cohen state clearly that a careful and thorough psychiatric evaluation is the standard of care.

*Incomplete Description of the Limitations of Opinion*

Dr. Cohen acknowledges that the opinions in his first report are preliminary, that he did not personally conduct a psychiatric examination of Mrs. Bryant, and that he intends to supplement his first report after a face-to-face evaluation or review of medical records. However, his subsequent opinions do not fully describe the limitations that should be considered when interpreting his opinions.

1.  To begin with, this type of preliminary assessment is exactly the kind that the AAPL's Practice Guideline says, "can be problematic and are not generally recommended."

2.  Dr. Cohen is careful to use the wording that he "found no evidence" of mental harm. However, while there may be a semantic difference between "finding no evidence" and "making no

diagnosis," it is clear that the point of his opinion is to indicate that he believes that Mrs. Bryant has suffered no emotional distress or harm related to the photographs. That is certainly how the Defendants are characterizing Dr. Cohen's opinion: Their offer of proof states that Dr. Cohen's first opinion is that "Plaintiff *has not been* mentally harmed or emotionally damaged from crash-scene photographs of her late husband and daughter being taken or shared by Defendants." Dr. Cohen does not make it clear that he has no data with which to render *any opinion* about Mrs. Bryant's mental status.

3.  Dr. Cohen does not in his report state that he has found no evidence that Mrs. Bryant has *not* suffered mental harm or emotional damage.

4.  The AMA, AAPL and American Psychological Association in their interpretation of the Goldwater Rule state that in certain situations it is permissible to give a psychiatric opinion without a face-to-face evaluation. However, this should only be done while explicitly mentioning the limitations inherent in these situations. Dr. Cohen does not explicitly acknowledge that his opinion is limited by the absence of a face-to-face evaluation. In his first report, dated 11/11/21, he states that his intention is to supplement his report with an evaluation, but he does not state that the absence of this evaluation compromises the validity of his opinions. In his second report, dated 12/14/21, Dr. Cohen says in a footnote that incomplete data creates an unreliable evaluation and a risk of drawing incorrect conclusions, and that an assessment of mental state or impairment or its causation in a forensic evaluation cannot be reliably accomplished without considering "the entire life history, wherein lies the true origins and causes of any impairment, whether discernible or not." However, Dr. Cohen makes these statements not as an express limitation on the reliability of his opinions, but rather as a criticism of the fact that text messages between Mrs. Bryant and her therapist were redacted. Dr. Cohen nowhere expressly acknowledges in his reports that the absence of a face-to-face evaluation compromises the validity of his opinions, as does the absence of medical records and complete personal and medical history.[26]

*Failure to Consider Evidence Presented*

Dr. Cohen states that, in the information he reviewed, he found "no evidence" of mental harm to Mrs. Bryant from the taking and sharing of photographs. Among the materials he reviewed was a declaration by Mrs. Bryant, which states in various ways that she has suffered mental suffering and emotional distress because of the incident. Dr. Cohen also says that he reviewed Mrs. Bryant's videotaped deposition, in which there are various moments suggestive of, or consistent with, potential emotional distress. While this evidence is not conclusive, I do not agree that there is "no evidence" of mental harm to Mrs. Bryant from the taking and sharing of photos in the materials that Dr. Cohen reviewed. In my opinion, it would in general be surprising for someone in Mrs. Bryant's position *not* to have suffered emotional distress as a result of the taking and sharing of photographs of his or her loved ones' remains.

---

[26] It is helpful that Dr. Cohen, in his Declaration in support of Defendants' Motion to Compel Independent Medical Examinations of Plaintiff's, dated 10/5/21, describes how the failure to perform a full explanation of an individual's life history is not in keeping with standard psychiatric practice and is likely to result in an inaccurate and unreliable psychiatric diagnosis. Dr. Cohen also makes reference to the APA Practice Guidelines for the Treatment of Psychiatric Disorders that further describe the necessary components of a psychiatric examination to come to an accurate and reliable diagnosis.

*Failure to Consider Alternate Sources of Emotional Harm*

Dr. Cohen provides a comprehensive account of the DSM-5 criteria for grief, discusses the difference between grief and major depressive episode, describes the criteria for prolonged, chronic and unresolved grief[27] and lists the proposed DSM-5 criteria for persistent complex bereavement disorder.[28] He also describes risk factors for negative outcomes following the sudden violent death of a family member. However, Dr. Cohen's focus on grief over the deaths of her loved ones as a model to explain Mrs. Bryant's reaction fails to take into consideration other potentially relevant explanations for her emotional distress.

1. Dr. Cohen describes at length the DSM-5 criteria for grief and complicated grief and suggests that all or the bulk of Mrs. Bryant's emotional distress is the result of the loss of her husband and daughter. However, in his report, Dr. Cohen acknowledges that Mrs. Bryant's deposition testimony sheds little light on whether she is experiencing a complicated grief reaction.

2. Dr. Cohen fails to consider or mention alternate explanations for Mrs. Bryant's emotional distress which a psychiatrist practicing to the standard of care would want and need to consider. In particular, he makes no reference to the possibility of Posttraumatic Stress Disorder (PTSD) as a way to explain the potential psychological impact of the release of crash-scene photographs.[29] This is somewhat surprising given that in his review of longitudinal studies of adults who lose a family member, he lists PTSD as one potential outcome. In her videotaped deposition, the images of crash-related material, including photoshopped images of her husband, were so distressing to Mrs. Bryant that she was unable to view them. Mrs. Bryant's testimony also indicates that she may have been traumatized by the photographs in particular. These observations clearly raise the possibility of a PTSD diagnosis. Other statements from Mrs. Bryant's deposition that raise the possibility of this diagnosis include her repeated reference to her intense fear of the photographs being further released and of being "taunted" about the photographs or the possibility of the photographs being released, her avoidance of going back into psychotherapy because she does not want to "bring those feelings up to the surface," and her avoidance of looking at the coroner's report. Mrs. Bryant also avoids engaging in social media since people have claimed that they have seen pictures of her husband and daughter.

---

[27] While the DSM-5 does not use the terms absent grief, delayed grief, or prolonged/chronic/unresolved grief as part of a clinical diagnosis, these terms are frequently used in the literature. Absent grief refers to a situation where a person does not acknowledge the loss and shows no sign of grief. Delayed grief refers to the situation when an individual's response to a death is postponed until a later time. Complicated or prolonged grief generally refers to normal grief that becomes severe in longevity and significantly affects the individual's ability to function. The term traumatic grief when the loss occurs in the context of a traumatic event such as a suicide or homicide.

[28] The DSM-5 has proposed criteria for persistent complex bereavement disorder that includes a pattern of prolonged symptoms of grief lasting at least 12 months following the death that interfere with the ability of the individual to function in important areas of their life. Symptoms may include preoccupation with the deceased, preoccupation with the circumstances of the death, as well as symptoms categorized as reactive distress to the death and social/identity disruption as described in Dr. Cohen's report.

[29] PTSD is a mental disorder that can develop in response to exposure to a traumatic event either directly experiencing the event, witnessing the event as it occurs or learning that it has occurred to a close family member or friend. The DSM-5 describes 4 primary categories of symptoms that include recurrent, intrusive and distressing memories, flashbacks or dreams; avoidance of stimuli associated with the traumatic event; changes in cognitions and mood, for example, difficulties with trust, self-blame or feelings of guilt/shame; and alterations in arousal and reactivity associated with the traumatic event, for example, difficulties with concentration or sleep disturbance.

3.  While we have insufficient evidence to say one way or another whether Mrs. Bryant has symptoms of PTSD that may be caused by or related to the knowledge that images of her husband and daughter have been circulated, the potential that this may occur at a future date would for many individuals act as a trigger that would lead to increased symptoms of psychological distress. It is an obvious factor that a psychiatrist purporting to offer an opinion about Mrs. Bryant's emotional distress and its cause would want and need to consider. Yet Dr. Cohen failed to do so.

4.  Dr. Cohen makes no reference to the potential impact on Mrs. Bryant from the fact that photographs were taken and shared after her explicit request and the reassurance of Sheriff Villanueva that the crash site be secured to protect her family's privacy. This would reasonably be expected to increase her level of anger and distrust and complicate her bereavement.

5.  It is helpful that Dr. Cohen acknowledges that, while there is no scientific literature examining the impact of viewing unwanted graphic photographs of deceased family members on the internet, common sense dictates that this would be deeply upsetting if not more harmful.

*Inappropriate Speculation about Prior Mental Health History*

Dr. Cohen inappropriately speculates about Mrs. Bryant's prior psychiatric history and uses incomplete information to suggest that this history has caused her to develop a sense of vulnerability and fear about crash-site photographs.

1.  Dr. Cohen, by his own admission, states that a forensic psychiatric evaluation is incomplete without considering the entire life history of the plaintiff. However, Dr. Cohen has not reviewed any mental health records of Mrs. Bryant and has not had the opportunity to consider her entire life history. Nonetheless, he inappropriately speculates about such factors.

2.  Dr. Cohen uses the information that Mrs. Bryant "participated in therapy sessions at various points in her life" to suggest that she may have pre-existing mental health-related problems. Dr. Cohen has no data about whether or not Mrs. Bryant had pre-existing mental health issues and specifically no knowledge about whether or not she had a pre-existing mental health diagnosis. Participation in therapy does not itself mean that a person has a mental health problem.  In addition, even should participation in therapy sessions indicate prior mental health-related problems, Dr. Cohen has no information about whether or not such problems were present immediately prior to the death of her husband and daughter. Mrs. Bryant in her deposition stated she had not seen her therapist for many years prior to the accident. Dr. Cohen appears to acknowledge this possibility in his second report where he states that it "remains unknown to what extent, if any, Vanessa Bryant's pre-existing mental health problems have affected her response to the sudden violent death of her husband and daughter."

3.  Dr. Cohen references comments made by Mrs. Bryant in her deposition regarding her past history. These include that she has never had a relationship with her father since she was a "little girl," that she was sued by her mother, and that she filed for divorce after her husband was alleged to have had affairs and committed sexual assault. Dr. Cohen argues that Vanessa Bryant's imagination, informed by her life experiences and a variety of outside sources, including media accounts of the reported misuse of crash-site photographs, have led her to develop a sense of vulnerability. However, Dr. Cohen did not question Mrs. Bryant and has no basis to give an opinion about her sense of vulnerability and any relationship with her current emotional distress.

4.  Dr. Cohen lists three categories of risk factors for negative outcomes following the sudden violent death of a family member. He writes that Mrs. Bryant was exposed to several situational factors which have "undoubtedly affected how she has adapted to the loss of her husband and daughter." In the absence of a face-to-face evaluation or adequate mental health records, Dr. Cohen has no basis on which to make this statement. In addition, the presence or absence of risk factors in an individual provides no reliable or specific information about that person's emotions or behavior.

*Insistence on the Need to View the Crash Site Photographs*

Dr. Cohen repeatedly states that Mrs. Bryant cannot be distressed by the existence of photographs that she has not seen and that her distress lies solely in what she imagines these images depict.

1.  In his review of the topic of viewing the body of the deceased, Dr. Cohen states that, "No amount of disfigurement could be as bad as my fantasies of how he looked." He also comments that some survivors describe the stress and anxiety associated with their "imagination" to be worse than viewing the decedent. This data is not consistent with Dr. Cohen's opinion that Mrs. Bryant cannot be distressed by the existence of photographs she has not seen. It is well established that a person's thoughts and imagination about what occurred, upon learning of some distressing event, can be distressing, traumatic, and anxiety-inducing.

2.  Dr. Cohen does not comment on statements in Mrs. Bryant's deposition regarding her feeling that she and her family were disrespected by the photographs being displayed in a bar. It is reasonable to expect that the *knowledge* that photographs of her family's human remains were taken for personal pleasure and then shared and treated as a source of entertainment would cause emotional distress, anxiety, and anger on the part of an individual in a similar position to Mrs. Bryant. Such experiences would reasonably be expected to increase feelings of anger, anxiety, and distress. Similarly, although Dr. Cohen discusses the need for some people who have gone through a traumatic loss to assert control over their lives, Dr. Cohen fails to consider how Defendants' actions may have taken away Mrs. Bryant's feelings of control, causing her added distress, anger, and anxiety.

3.  Dr. Cohen writes that Mrs. Bryant is not reacting to seeing photographs of her late husband and daughter. However, Mrs. Bryant reported in a deposition that she has seen a photograph that purports to show human remains at the crash site. In her declaration, she describes being tormented by thoughts of who took this photograph and whether or not it depicts her husband. Whether or not these are authentic images (something I and Dr. Cohen are not in a position to evaluate), Mrs. Bryant indicates in her deposition that this photograph has been distressing to her. And because the Defendants' employees are known to have taken photographs of the remains in an uncontrolled manner that were shared individuals having no reason to see them, including members of the public, and as I understand are the only individuals known to have taken such photographs that were shared, it would be natural for Mrs. Bryant to associate this photograph with Defendants' conduct.

4.  Dr. Cohen writes that one source of Mrs. Bryant's distress is the fear that she has of images of her family being publicly disclosed despite what he claims to be no reliable evidence indicating that such photographs continue to exist. Neither Dr. Cohen nor I are in a position to evaluate the probability that the photographs exist or could be further disseminated in the future. However, Dr. Cohen does not dispute that Mrs. Bryant has a real fear of such future dissemination. Moreover, the evidence in this case demonstrates that photographs were taken and shared with unauthorized individuals, and I understand that evidence also indicates that insufficient efforts were made to

secure the devices to ensure that all photos were accounted for. The knowledge that these
photographs have existed and may still exist is sufficient to cause psychological distress and
anxiety in an individual who has gone through an experience similar in nature to that of Mrs.
Bryant.

5.  In my opinion, it is possible that a person could suffer significant distress and anxiety, potentially
    for the rest of his or her life, from learning that his or her loved ones' mutilated remains were
    photographed by multiple first responders for personal use, shared among those responders'
    acquaintances, including being shared with unknown individuals who could potentially continue
    to possess them and further distribute them in the future, whether or not that person ever sees the
    photographs himself or herself. I disagree that Mrs. Bryant cannot be distressed by the existence
    of photographs she has not seen.

*Making an Inappropriate Dichotomy between Grief and Distress Related to the Photographs*

Dr. Cohen maintains that the emotional distress from the death of Mrs. Bryant's husband and
daughter is distinct from the emotional distress caused by the taking and sharing of the photographs
of her loved ones' remains and from her anxiety about the potential further release of those
photographs. He further suggests that grief over the deaths is the true or overwhelming cause of Mrs.
Bryant's emotional distress. This is inappropriate for a number of reasons.

1.  Dr. Cohen makes an artificial distinction between emotional distress related to the death of Mrs.
    Bryant's husband and daughter and the emotional distress related to the taking, past sharing and
    potential future sharing of the remains photographs.

2.  Dr. Cohen ignores the fact that learning that these photographs were taken and shared for
    personal pleasure, and fear that those photographs may be further disseminated in the future, has
    the potential to aggravate her grief.  For example, it is reasonable to expect that this knowledge
    could complicate Mrs. Bryant's ability to resolve the loss of her husband and daughter. Her desire
    to bury and lay to rest the remains of her family may have been delayed, and may still be delayed,
    by Defendants' conduct and her fear that images of their bodies may surface at any moment. It is
    reasonable to expect that this anxiety might affect Mrs. Bryant's ability to come to terms with the
    death of her husband and daughter. As noted above, Dr. Cohen does not comment on statements
    in Mrs. Bryant's deposition regarding her feeling that she and her family were disrespected by the
    photographs being displayed in a bar. Such experiences could also make it more difficult to
    resolve feelings of anger during the grieving process.

3.  Dr. Cohen discusses the possibility that Mrs. Bryant suffers from complicated grief but does not
    consider the possibility that Defendants' conduct triggered or contributed to a complicated grief
    reaction. To the extent that Mrs. Bryant is suffering from complicated grief, which is unknown, it
    would be important to investigate whether Mrs. Bryant's reaction to learning of the taking and
    sharing of photographs of her loved ones' remains (including anxiety over the potential for
    further distribution in the future) contributed to that complicated grief reaction.

4.  Dr. Cohen writes that adults who have had a family member or loved one die from a sudden
    violent cause often display a need for control in an effort to restore predictability to their life and
    offset feeling profoundly vulnerable, violated, and powerless. Mrs. Bryant's only request to
    Sheriff Villanueva at the time of the crash was that he secure the crash scene and prevent the
    unauthorized taking of photographs. This represents one way in which she may have been trying
    to reduce the harm to herself and her family. The fact that these photographs were taken and

shared, and the potential further release of these photographs could reasonably be expected to have taken away Mrs. Bryant's ability to control and restore predictability to her life.

5. Dr. Cohen does not comment on the fact that the existence, past sharing, and potential future release of these photographs could potentially trigger the re-emergence of traumatic memories or other symptoms of any potential PTSD and make it difficult for Mrs. Bryant to deal with the traumatic nature of her loss.

6. It is reasonable to expect that Mrs. Bryant's knowledge that these photographs were gratuitously taken and shared, and her fear over their potential further release in the future, may have amplified and perpetuated any emotional distress on the part of Mrs. Bryant related to the death of her husband and daughter. In fact, in her deposition, Mrs. Bryant acknowledges that although the death of her husband and daughter was the greatest cause of her heartache, the ongoing stress and fear is a result of her anxiety about the potential release of the photographs.

7. Not having examined Mrs. Bryant or reviewed her medical history, neither Dr. Cohen nor myself are in any position to assess the extent to which Mrs. Bryant has suffered and is suffering emotional distress from the deaths of her loved ones unrelated to the photographs that were taken and shared, compared to the extent she is suffering emotional distress from knowledge of the photographs' existence and past sharing and fear of further future sharing—which could include aggravation of the grief she suffered over the loss of her loved ones.

For all of these reasons, it is my opinion that the opinions expressed by Dr. Cohen in his reports are unreliable. He had no basis to come to a psychiatric opinion that Mrs. Bryant has not been harmed from the actions of the Defendants, or that other factors caused the emotional distress she is suffering and attributes to the photos. Dr. Cohen is not in a position to offer such opinions, and it is inconsistent with the ethical standards of the psychiatric profession, and accepted standards of psychiatric care, for him to have done so.

Respectfully submitted

*Richard Shaw.*

Richard J. Shaw, M.D.
Professor of Psychiatry and Pediatrics