LUIS LI (State Bar No. 156081)
Luis.Li@wsgr.com
ERIC P. TUTTLE (State Bar No. 248440)
Eric.Tuttle@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
633 West Fifth Street, Suite 1550
Los Angeles, California 90071
Telephone:  (323) 210-2900
Facsimile:   (866) 974-7329

CRAIG JENNINGS LAVOIE (State Bar No. 293079)
Craig.Lavoie@mto.com
JENNIFER L. BRYANT (State Bar No. 293371)
Jennifer.Bryant@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone:  (213) 683-9100
Facsimile:   (213) 687-3702

Attorneys for Plaintiff Vanessa Bryant

[*Additional counsel continued on next page*]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| VANESSA BRYANT,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF LOS ANGELES, et al.,<br><br>Defendants.<br><br>_____<br><br>CHRISTOPHER L. CHESTER,<br><br>PLAINTIFF,<br><br>vs.<br><br>COUNTY OF LOS ANGELES, et al.,<br><br>Defendants. | Case No. 2:20-cv-09582-JFW-E (Consolidated with 2:20-cv-10844-JFW-E)<br><br>**PLAINTIFFS' TRIAL BRIEF**<br><br>Pre-Trial Conference: August 5, 2020<br><br>Trial Date:  August 10, 2020<br><br>The Honorable John F. Walter |

[*Additional counsel, continued from previous page*]

JEROME M. JACKSON (State Bar No. 64238)
jmjlaw@aol.com
JEROME M. JACKSON LAW OFFICES
880 Apollo Street, Suite 238
El Segundo, California 90245
Telephone: (310) 726-4199
Facsimile: (310) 414-0486

Attorneys for Plaintiff
CHRISTOPHER L. CHESTER

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

I.   <u>INTRODUCTION</u> ............................................................................ 3

II.   <u>ADMISSIBILITY OF COVER-UP OF JAIL INCIDENT</u> ............................ 3

   A.   <u>The March 2021 Jail Incident and Cover-Up by LASD.</u> ....................... 3

   B.   <u>Evidence of the Cover-Up is Admissible Evidence of LASD's Deliberate Indifference to the Violations in this Case.</u> ........................... 4

III.   <u>KELLI BEARD</u> ............................................................................. 8

   A.   <u>Testimony about Jordan's Taking and Dissemination of Photos of Human Remains Bears Directly on Plaintiffs' <i>Monell</i> Claims.</u> ......... 9

   B.   <u>Plaintiffs Disclosed Beard As Soon As They Were Able And Defendants Were Not Prejudiced By the Timing.</u> ............................... 10

   C.   <u>There Has Been No Showing that the Marital Privilege Prevents Beard from Testifying in this Matter.</u> ................................................. 12

1       Pursuant to Local Rule 16-10 and the Court's Amended Scheduling and Case

2   Management Order (ECF No. 86), Plaintiffs, by and through their undersigned

3   counsel of record, hereby submit their Trial Brief in the above-captioned case.

4   **I.**     **<u>INTRODUCTION</u>**

5       Plaintiffs submit this Trial Brief to address evidentiary issues that could

6   conceivably arise at trial so that the Court has the benefit of legal authority on

7   argument on Plaintiffs' position.  Specifically, this Brief addresses the admissibility

8   of: (1) evidence concerning a March 2021 altercation involving Deputy Doug

9   Johnson and subsequent coverup by Sheriff Villanueva and LASD, and (2) the

10  anticipated trial testimony of Kelli Beard, the ex-dating partner and wife of former

11  LAFD Fire Captain Brian Jordan.  As described herein, both categories of evidence

12  are admissible notwithstanding arguments raised by Defendants and Jordan.

13  **II.**     **<u>ADMISSIBILITY OF COVER-UP OF JAIL INCIDENT</u>**

14      Defendants have previously tried to exclude evidence of a March 2021

15  altercation involving Deputy Doug Johnson, a key witness in this case.  LASD's

16  response to that altercation—including Sheriff Villanueva's direct, personal

17  intervention to prevent its public disclosure—bears striking resemblances to its

18  conduct in this case.  The evidence is admissible to prove that LASD's post-incident

19  response to the photos in this case was animated by an intent to conceal rather than

20  to correct misconduct by its personnel, and thus evinced deliberate indifference to

21  the risk of constitutional violations.  The evidence could also be admissible to

22  address other arguments Defendants might raise at trial.

23      **A.**     **The March 2021 Jail Incident and Cover-Up by LASD.**

24      The facts of the altercation are straightforward.  In March 2021, Deputy

25  Johnson was videorecorded kneeling on the head of a jail inmate in the San

26  Fernando Courthouse jail for approximately three minutes.  The inmate was

27  handcuffed and lying prostrate on the jail floor.  The altercation occurred during the

28

criminal trial of Minneapolis Police Officer Derek Chauvin, who was convicted of murdering George Floyd by employing a similar restraint.

According to a complaint filed by an LASD Commander, Sheriff Villanueva was shown video of the altercation shortly after it occurred.[1]  Sheriff Villanueva allegedly told a group of LASD officers that LASD did not "need bad media at this time" and that he would "handle the matter" personally.[2]  The video of Deputy Johnson was not made public; an LASD Commander contends that LASD delayed criminal charges against the inmate out of concern that disclosing the altercation would "shed negative light on the Department given its nature and similarities to the widely publicized George Floyd use of force."

One year later, in March 2022, the *Los Angeles Times* published a story containing video footage of the altercation obtained by a Times reporter.  Sheriff Villanueva responded with a press conference, where he announced that the video was "stolen property" and that he was launching a "criminal" investigation covering, among others, the Times reporter who broke the story.[3]  Sheriff Villanueva claimed publicly that he did not learn about the Deputy Johnson altercation until November 2021.  But other LASD senior officers contradicted his account, arguing that they

---

[1] *See* Alene Tchekmedyian, "Fearing bad publicity, LASD covered up case of deputy who knelt on inmate's head," Mar. 25, 2022, L.A. Times, https://www.latimes.com/california/story/2022-03-25/sheriff-deputy-force-coverup.

[2] *See* Alene Tchekmedyian, "Claim alleges Sheriff Villanueva directed cover-up of deputy kneeling on inmate," Apr. 25, 2022, L.A. Times, https://www.latimes.com/california/story/2022-04-25/deputy-force-kneeling-cover-up-claim.

[3] *See* Harriet Ryan & Brittny Mejia, "Villanueva backs off investigation of Times reporter who revealed cover-up," Apr. 26, 2022, L.A. Times, https://www.latimes.com/california/story/2022-04-26/los-angeles-sheriff-villanueva-times-reporter-under-investigation-coverup.

personally watched the Deputy Johnson video with the Sheriff within days of the incident and that the Sheriff covered up the event.[4]

**B.      Evidence of the Cover-Up is Admissible Evidence of LASD's Deliberate Indifference to the Violations in this Case.**

Evidence of Sheriff Villanueva's direct, personal intervention in the March 2021 jail incident to prevent public disclosure of deputy misconduct is admissible under Federal Rule of Evidence 404(b) as proof of LASD's deliberate indifference to the constitutional violations in this case.

Rule 404(b)(2) states that evidence of a "crime, wrong or other act" can be admissible to prove "motive, opportunity, intent, preparation, plan, [and] knowledge[.]" Fed. R. Evid. 404(b)(2).  Evidence of other acts may be admitted under the rule if "(1) the evidence tends to prove a material point; (2) the prior act is not too remote in time; (3) the evidence is sufficient to support a finding that the defendant committed the other act; and (4) (in cases where knowledge and intent are at issue) the act is similar to the offense charged." *U.S. v. Flores–Blanco*, 623 F.3d 912, 919 (9th Cir. 2010); Fed. R. Evid. 404(b).  If these prongs are satisfied, "other act" evidence should be admitted so long as the potential prejudice of the evidence does not substantially outweigh its probative value. *See U.S. v. King*, 200 F.3d 1207, 1215 (9th Cir. 1999).  LASD's cover-up of the March 2021 jail incident at Sheriff Villanueva's direction satisfies these requirements.

***First***, LASD's concealment of the March 2021 incident tends to prove the intent that animated LASD's handling of the misconduct in this case, which bears

---

[4] *See* Alene Tchekmedyian, "First eyewitness account of Sheriff Villanueva lying in a cover-up revealed in filing," Apr. 28, 2022, L.A. Times, https://www.latimes.com/california/story/2022-04-28/deputy-kneeling-video-cover-up-claim; Alene Tchekmedyian, "Third top official disputes Sheriff Villanueva's account in cover-up," May 4, 2022, L.A. Times, https://www.latimes.com/california/story/2022-05-04/third-top-sheriff-official-claim-cover-up.

directly on Plaintiffs' *Monell* claims.  Plaintiffs' theory that LASD failed to train its employees or implement a policy requires proof that LASD acted with "deliberate indifference" to—*i.e.*, made the conscious choice to disregard—the consequences of its failure to train and adopt policies with respect to photos of human remains.  The Court has ruled that Defendants' post-incident failure to adequately investigate or discipline the misconduct at issue in this case is relevant and admissible to that question.  (July 26, 2022 Hearing Tr. at 22:6-12 ("In addition, the Court agrees with plaintiffs that defendants' post-incident failure to adequately investigate or discipline is relevant to plaintiffs' unabandoned Monell theories of liability.  Such evidence tends to demonstrate either a pre-existing affirmative custom or practice or a pre-existing policy of deliberate indifference in the form of a failure to train or implement policy.").)

Plaintiffs intend to show that when Sheriff Villanueva and other LASD leadership learned of the improper photos in this case, they responded by stopping an internal investigation and offering amnesty to the wrongdoers in exchange for destroying the evidence of what they had done.  Only after the *Los Angeles Times* reported on the issue did LASD begin to take half-hearted steps to investigate and document its employees' wrongdoing.  Plaintiffs will argue that this conduct shows that LASD was not interested in rooting this problem out, investigating what happened, strongly communicating to its personnel that this misconduct is unacceptable, or stopping it with adequate training.  Rather, LASD was focused on sweeping this issue under the rug—consistent with a pre-existing deliberate indifference to the risk of the kinds of constitutional violations at issue in this case.

Defendants will defend Sheriff Villanueva's amnesty approach by arguing that it was a quick and decisive action to protect the victims.  They will argue that the Sheriff's orders were intended to reverse the missteps taken by deputies who took and shared photos, while shielding Plaintiffs from any resulting harm.  Plaintiffs should be permitted to rebut that contention by presenting evidence that

Sheriff Villanueva intervened in similar investigations in a similar timeframe for the stated purpose of avoiding media scrutiny—where there is no argument that the victim would benefit from the intervention.  This was clearly the case in March 2021, when (according to LASD officers who discussed the issue with him) the Sheriff decided to personally "handle the matter" involving Deputy Johnson's dangerous restraint of an inmate and took steps to prevent the public from learning of the incident.  The Sheriff's intervention in the March 2021 investigation for the stated purpose of avoiding "bad media" supports a strong inference that the Sheriff was similarly motivated when he personally halted an investigation of the crash site photos and offered amnesty to the offenders in exchange for deletion.  *See*, *e.g.*, *United States v. Bruder*, 2000 WL 290269, at *5 (E.D.N.Y. Feb. 5, 2000) ("Evidence of prior obstructive or fraudulent behavior is generally admissible to show intent to commit subsequent similar offenses."); *see also United States v. Hornsby*, 666 F.3d 296, 307 (4th Cir. 2012) (holding that past attempts to conceal evidence was relevant as to defendant's intent in separate, subsequent investigation for evidence tampering).

**Second**, the Sheriff-directed cover-up of the jail incident was roughly contemporaneous to his intervention in the crash site photo investigation.  Media reports indicate that the Sheriff learned of and suppressed video of the jail incident shortly after it occurred in March 2021, which is just over one year after the helicopter crash in January 2020.  Courts have found "other acts" to be sufficiently close in time when separated by far longer periods.  *See, e.g.*, *U.S. v. Rude*, 88 F.3d 1538, 1550 (9th Cir. 1996) (holding that acts seven or eight years apart were sufficiently proximate in time to be admissible under Rule 404(b)); *U.S. v. Ross*, 886 F.2d 264, 267 (9th Cir. 1989) (12 years).

**Third**, the record contains sufficient evidence for jurors to find that the Sheriff in fact directed a cover up of the March 2021 jail incident, as has been widely reported.  Multiple high-ranking LASD officers are on record stating that the

Sheriff told them he would "handle the matter" personally to avoid "bad media." These comments furnish a good faith basis for Plaintiffs to ask the Sheriff to admit that he made those statements. Alternatively, the Sheriff's own actions following the *Los Angeles Times* reports on the March 2021 jail incident—calling a press conference and ordering a criminal investigation of the journalist who reported on it—strongly suggest a deliberate (if unsuccessful) effort to prevent disclosure.

**Fourth**, there are many close parallels between the Sheriff's response to the March 2021 jail incident and his actions in the photo investigation. In both cases the Sheriff became personally aware of evidence of misconduct by LASD personnel. In both cases, the Sheriff inserted himself into the investigatory and disciplinary process. In both cases, the Sheriff devised an ad hoc response to the misconduct outside the chain of command. And in both cases, the Sheriff's actions (instructing subordinates to delete evidence in the photo investigation in lieu of an investigation and discipline, and suppressing video while delaying criminal charges in the jail investigation) had the natural and foreseeable effect of inhibiting public access to evidence of the underlying misconduct. These similarities support a strong inference that the Sheriff's intervention in the photo investigation was motivated by the same opposition to outside scrutiny that motivated his actions in the jail investigation.

**Finally**, "other act" evidence of Sheriff Villanueva's cavalier approach to a similar investigation does not violate Rule 403 because it is highly probative of the adequacy of LASD's post-incident investigatory and disciplinary response. The mere fact that the evidence tends to undermine LASD's defense is no reason for it to be excluded. *See U.S. v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000) ("[r]elevant evidence is inherently prejudicial"). Nor, contrary to Defendants' assertions, would presenting this evidence require a trial-within-a-trial. The witnesses whose testimony is relevant to the March 2021 incident and cover-up—Sheriff Villanueva

and Doug Johnson—have already been identified as witnesses for this trial. Asking them about a single "other act" will not cause undue delay.

In addition to the foregoing, evidence of LASD's cover-up of the March 2021 investigation could become relevant to numerous other issues, depending on what evidence and argument Defendants present at trial. For example, if Defendants argue at trial that an aspect of LASD's response to the crash site photos (*e.g.*, personnel deleting photos from their phones) was a mistake, Sheriff Villanueva's efforts to prevent public reporting on LASD misconduct in the March 2021 incident would be relevant to rebutting that testimony as well.

## III. <u>KELLI BEARD</u>

A second issue that might arise at trial concerns the testimony of Plaintiffs' witness Kelli Beard, who is a former dating partner and ex-wife of former LAFD Fire Captain Brian Jordan. Beard will testify about her knowledge of Jordan's possessing and sharing a photo of human remains without legitimate purpose. Among other things, she will recount an incident prior to the helicopter crash in which Jordan showed her a photo of a deceased victim for no legitimate reason. She will testify that Jordan kept this photo for himself in a folder. As discussed below, this testimony is highly relevant to Plaintiffs' *Monell* claims because—among other things—it demonstrates the existence of a prior practice of taking and disseminating photos of human remains and the need for policies to address them. Neither Defendants' argument that the testimony should be stricken as untimely disclosed, nor Jordan's unsupported assertion of marital privilege, precludes the testimony.

### A. Testimony About Jordan's Taking and Dissemination of Photos of Human Remains Bears Directly on Plaintiffs' *Monell* Claims.

Beard's testimony about Jordan possessing and showing her photos of remains without a legitimate purpose is plainly relevant.

Courts have held that evidence of past misconduct by municipal employees is admissible in *Monell* cases to prove the existence of a municipal custom and

1  practice or deliberate indifference to the need for better policies.  *See, e.g.*, *Beck v.*
2  *City of Pittsburgh*, 89 F.3d 966, 973 (3d Cir.1996) (evidence of officers' prior acts
3  was admissible to prove department "knew, or should have known" of pattern of
4  constitutional violations); *Miller v. Pancucci*, 141 F.R.D. 292, 296 (C.D. Cal. 1992)
5  (police officers' complaint files admissible to prove *Monell* liability); *Aguilera v.*
6  *Ramos*, 2021 WL 6427925, at *2 (C.D. Cal. Aug. 25, 2021) (evidence of officers'
7  prior misconduct is admissible where the purpose is "to show a pattern or practice,
8  or municipal liability"); *Parra v. City of Santa Ana*, 2012 WL 13018578, at *1 (C.D.
9  Cal. Aug. 6, 2012) (police officers' "prior acts would [be] admissible on plaintiff's
10  *Monell* claim where plaintiff must show a custom or practice of Constitutional
11  violations.").

12         For example, in *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1027 (9th
13  Cir. 2015), the plaintiff alleged that a police department had a policy or custom of
14  failing to investigate officers who used excessive force.  The court held that the
15  district court abused its discretion by excluding evidence of officers' prior use of
16  excessive force.  The court explained that the evidence was "critical" to "prove that
17  the [department] was aware" that the officer had used excessive force in the past, yet
18  the department "had taken no steps to curb his propensity." *Id.* at 1028.

19         Beard's testimony is highly relevant for precisely these purposes.  Jordan's
20  gratuitous possession and display of photos of human remains bears directly on
21  Plaintiff's failure-to-train theory.  It tends to show that Defendants knew or should
22  have known that the actions of its employees would lead to constitutional
23  injuries.  *See City of Canton v. Harris*, 489 U.S. 378, 389 (1989); *see Velazquez*, 793
24  F.3d at 1027 (quoting *Henry v. County of Shasta*, 132 F.3d 512, 519 (9th Cir.1997)
25  (past acts "put [municipal defendant] on notice of its agents' unconstitutional
26  actions").  It also provides evidence of prior actions that were not adequately
27  investigated or punished, which supports an inference that Defendants had a custom
28  of taking and sharing photos of accident victims.

### B.   Plaintiffs Disclosed Beard As Soon As They Were Able And Defendants Were Not Prejudiced By the Timing.

Weeks after the prior pre-trial conference in February, Beard reached out to Plaintiff's counsel through an intermediary to say that she had information regarding Brian Jordan.  Plaintiff's counsel followed up with Beard, learned that she had information relevant to this lawsuit, and promptly disclosed her name and contact information to Defendants through a supplemental Rule 26 disclosure on March 15, 2022 (i.e., nearly five months ago).  This is precisely the procedure that Rule 26 contemplates.  *See* Fed. R. Civ. P. 26(e)(1)(a) (requiring only that party supplement initial disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect").

In their pre-trial briefing, however, Defendants have complained that Plaintiff's disclosure of Beard was "late" and necessitates Beard's exclusion at trial.  That is, Defendants apparently seek exclusion of Beard under Rule 37(c), which provides for exclusion of witnesses disclosed after the deadline unless that disclosure is "substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1); *see also Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,* 259 F.3d 1101, 1106 (9th Cir. 2001) (noting that Rule 37 sanctions for non-compliance with Rule 26 disclosure requirements do not apply if the parties' failure to disclose the required information is substantially justified or harmless).  But Plaintiff's March 15, 2022 disclosure of Beard was both substantially justified and harmless.

Plaintiff's disclosure was substantially justified because Plaintiffs could not have disclosed Beard before learning of her existence, which did not happen until after the disclosure deadlines had already passed.  Until Beard reached out to Plaintiff in late February, Plaintiff did not know who Beard was—much less that she had highly probative testimony to offer.  After learning of Beard and the relevant information she possessed, Plaintiff promptly supplemented her Rule 26 disclosures to include Beard as a witness.  Courts routinely hold that such disclosures are

PLAINTIFFS' TRIAL BRIEF

1  substantially justified and not cause for excluding the witness's testimony.  *See Ford*

2  *v. Pike Elec., LLC,* 2021 WL 952403, at *1 (M.D. Ala. Mar. 12, 2021) (finding late

3  disclosure substantially justified where party was "unaware that [the witness] had

4  information relevant to the case 'until shortly before she amended her

5  disclosures'"); *McGowan v. Murphy-Brown, LLC,* 2018 WL 10323048, at *2

6  (E.D.N.C. Dec. 18, 2018) (finding late disclosure substantially justified where late-

7  disclosed witnesses were "newly discovered" and "requested to be witnesses"); *Red*

8  *Rock Commc'ns, Inc. v. Am. Telecasting, Inc.,* 2006 WL 2432628, at *2 (D. Nev.

9  Aug. 21, 2006) (late disclosure substantially justified where "witnesses' relevance

10  became apparent due to events which occurred after the discovery cutoff").

11          Plaintiff's disclosure was also harmless.  Plaintiff disclosed Beard in March,

12  four months before trial was scheduled to begin.  In the intervening four months,

13  Defendants could have reached out to Beard to investigate the information Plaintiff

14  disclosed or could have deposed Beard.  As the Court recently ruled with respect to

15  Defendants' late-produced expert, Dr. Cohen, the late production of Dr. Cohen's

16  report "would have been harmless had the plaintiff accepted defendants' offer to

17  take Dr. Cohen's deposition."  (July 26 Hearing Tr. at 73:11-14).  Here, Beard is a

18  third-party witness beyond Plaintiff's control and therefore Plaintiff could not offer

19  Beard up for Defendants' deposition, but the reasoning applies with equal force.

20  Defendants had four months in which they could have requested to depose Beard—a

21  single witness[5]—but they did not.  Plaintiffs have made clear to Defendants that

22

23  _____

    [5] This case stands in stark contrast to *Ollier v. Sweetwater Union High School*

24  *District*, 768 F.3d 843 (9th Cir. 2014), a case that Defendants have cited in their pre-
    trial briefing in support of their exclusion argument. In *Ollier*, the defendant

25  disclosed *thirty-eight* witnesses after the disclosure deadline. 768 F.3d at 862. Thus,
    as the court noted, plaintiff would have had to depose all of these witnesses to

26  prepare to question them at trial. *Id.* at 863. Of course, this would have "disrupted
    the court's and the parties' schedules." *Id.* Unlike *Ollier*, this case would have

27  required only one additional deposition, and that deposition could have taken place

28

they would not oppose a deposition and that they understand Beard is willing to sit for one.  This vitiates Defendants' argument that they have somehow been harmed by Plaintiffs' disclosure.  *See*, *e.g.*, *Neurovision Med. Prod., Inc. v. NuVasive, Inc.*, 2013 WL 12111590, at *2 (C.D. Cal. Oct. 22, 2013) (finding late disclosure harmless where trial remained "months away," leaving "ample time for Defendant to conduct additional discovery").  And in any event, there is still time for Defendants to depose Beard (like Plaintiffs did Cohen), and Plaintiff has indicated to Defendants Beard's willingness to participate in such a deposition.

**C.    There Has Been No Showing that the Marital Privilege Prevents Beard from Testifying in this Matter.**

The marital communications privilege protects "statements or actions that are intended as confidential communications between spouses, made during the existence of a valid marriage."  *United States v. Fomichev*, 899 F.3d 766, 771 (9th Cir. 2018).  The privilege may be invoked by either spouse to prevent the other from testifying.  *United States v. Montgomery*, 384 F.3d 1050, 1058-59 (9th Cir. 2004).  But it applies only to matters that satisfy three essential elements: (1) a statement or communicative act, (2) made during a valid marriage, (3) that is confidential.  *United States v. Marashi*, 913 F.2d 724, 729-30 (9th Cir. 1990).

The party asserting the privilege bears the burden of establishing each element.  *Weil v. Inv./Indicators, Rsch. & Mgmt., Inc.*, 647 F.2d 18, 25 (9th Cir. 1981); *United States v. Acker*, 52 F.3d 509 (4th Cir. 1995) ("The party asserting an evidentiary privilege, such as the marital communications privilege, bears the burden of establishing all of the essential elements involved.").  This requires actual proof that the privilege applies to the specific communication at issue: unsubstantiated or conclusory assertions of privilege are insufficient.  *See United*

---

during the four-month dead period between Plaintiff's disclosure and the July trial date.

*States v. Mohsen*, 587 F.3d 1028, 1032-33 (9th Cir. 2009) (rejecting defendant's marital privilege claim over a note with his wife's name at the top where he "presented no evidence whatsoever" that he intended to deliver it as a "communication"); *United States v. Murphy*, 65 F.3d 758, 761 (9th Cir. 1995) (holding that privilege did not apply because defendant failed to show that the communications were made before the couple separated).

Jordan has presented no evidence that these elements are met—much less evidence sufficient to carry his heavy burden of proof. *See Marashi*, 913 F.2d at 730 (marital communications privilege "narrowly construe[d]"); *United States v. Zolin*, 809 F.2d 1411, 1415 (9th Cir. 1987), *overruled on other grounds by United States v. Jose*, 131 F.3d 1325 (9th Cir. 1997) (privilege should be "strictly confined within the narrowest possible limits").

With respect to the existence of a marital relationship, case law is clear that the privilege reaches only communications that occur *during* a valid marriage. It is inapplicable to communications that come before a marriage or after its termination. *Garcia-Jaramillo v. Immigr. & Naturalization Serv.*, 604 F.2d 1236, 1238 (9th Cir. 1979). Jordan has presented no evidence that Jordan's display of photos of human remains to Beard occurred during the couple's marriage, as opposed to the lengthy period they dated before being married. Jordan has not, for instance, submitted a declaration acknowledging that he showed Beard photos of human remains during the time they were married (as opposed to before or after the marriage). Nor has Jordan pointed to other evidence that could support that conclusion. The mere fact that Jordan and Beard were married *at one point* is not sufficient. As Beard will testify, she and Jordan have known each other for years but were married for only two, leaving long periods for communications that cannot possibly be privileged.

Even if Jordan could establish that he showed Beard the relevant photos during the couple's marriage, Beard's testimony would still be admissible over his objection because it concerns only Jordan's actions and possessions, not marital

communications.  The marital privilege "extends only to utterances, and not to acts."
*Pereira v. United States*, 347 U.S. 1, 6 (1954).  A spouse's actions are not privileged
"communications" because they do not "convey a message" between spouses.
*United States v. Lefkowitz*, 618 F.2d 1313, 1318 (9th Cir. 1980).  Thus, witnesses
are free to testify about their observations of a spouse's actions or their possessions
without implicating the privilege.  *See United States v. Lustig*, 555 F.2d 737, 748
(9th Cir. 1977) ("Most of [the spouse's] testimony related to her observations of [the
defendant] engaging in drug transactions with third parties.  These are not
communications."); *United States v. Lewis*, 433 F.2d 1146, 1151 (D.C. Cir. 1970)
(holding that privilege did not bar wife's testimony that spouse "came back to the
apartment at 3:00 or 3:30 a.m., and that he then had a sawed-off shotgun").

For example, in *United States v. Ferris*, 719 F.2d 1405, 1408 (9th Cir. 1983),
the defendant's wife was permitted to testify that she observed drugs in the trunk of
her husband's car.  In *United States v. Bolzer*, 556 F.2d 948, 951 (9th Cir. 1977), the
defendant's wife was permitted to testify about the size and style of her spouse's
pants.  And in *United States v. Hook*, 781 F.2d 1166, 1173 n.11 (6th Cir. 1986), the
court held that the defendant's "acts of giving his wife money" were not
"communicative" and therefore not privileged.

Like the witnesses in these cases, the subject of Beard's testimony will
concern only non-communicative actions and possessions.  Beard will testify that
Jordan showed her a picture of an accident victim when she had no legitimate need
to see it.  She will further testify that Jordan printed a copy of the picture and kept it
among his private possessions.  Testimony on these issues will not divulge the
substance of communications between Beard and Jordan but "only her knowledge
about and observations of" Beard's conduct.  *Bolzer*, 556 F.2d at 951.  The privilege
is inapplicable.

1    DATED:  August 3, 2022          WILSON SONSINI GOODRICH & ROSATI

2

3

4                                    By:  _____/s/ Luis Li_____
                                              LUIS LI
5

6                                    Attorneys for Plaintiff
                                     VANESSA BRYANT
7

8    DATED:  August 3, 2022          JEROME M. JACKSON LAW OFFICES

9

10                                   By:  ____/s/ Jerome M. Jackson____
                                            JEROME M. JACKSON
11

12                                   JEROME M. JACKSON
13                                   jmjlaw@aol.com
                                     JEROME M. JACKSON LAW OFFICES
14                                   880 Apollo Street, Suite 238
15                                   El Segundo, California 90245
                                     Telephone: (310) 726-4199
16                                   Facsimile: (310) 414-0486
17
                                     Attorneys for Plaintiff
18                                   CHRISTOPHER L. CHESTER

19
                             **FILER ATTESTATION**
20
              I, Luis Li, attest under Local Rule 5-4.3.4(a)(2)(i) that all other signatories
21
       listed, and on whose behalf the filing is submitted, concur in the filing's content and
22
       have authorized this filing.
23

24

25       Dated:  August 3, 2022                    ___/s/ Luis Li___
                                                       Luis Li
26

27

28