LUIS LI (State Bar No. 156081)
Luis.Li@wsgr.com
ERIC TUTTLE (State Bar No. 248440)
Eric.Tuttle@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
633 West Fifth Street, Suite 1550
Los Angeles, California 90071
Telephone: (323) 210-2900
Facsimile: (866) 974-7329

CRAIG JENNINGS LAVOIE (State Bar No. 293079)
Craig.Lavoie@mto.com
JENNIFER L. BRYANT (State Bar No. 293371)
Jennifer.Bryant@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

Attorneys for Plaintiff Vanessa Bryant

[*Counsel continued on next page*]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| VANESSA BRYANT,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF LOS ANGELES, et al.,<br><br>Defendants.<br><hr>CHRISTOPHER L. CHESTER,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF LOS ANGELES, et al.,<br><br>Defendants. | Case No. 2:20-cv-09582-JFW-E<br>(Consolidated with 2:20-cv-10844-JFW-E)<br><br>**PLAINTIFFS' OPPOSITION TO BRIAN JORDAN'S MOTION FOR PROTECTIVE ORDER**<br><br>Trial Date: August 10, 2022<br><br>The Honorable John F. Walter |

[*Additional counsel*]
JEROME M. JACKSON (State Bar No. 64238)
jmjlaw@aol.com
JEROME M. JACKSON LAW OFFICES
880 Apollo Street, Suite 238
El Segundo, California 90245
Telephone: (310) 726-4199
Facsimile: (310) 414-0486

Attorneys for Plaintiff Christopher L. Chester

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................ 1

II. BACKGROUND ................................................................................................. 1

III. ARGUMENT ...................................................................................................... 6

    A. Mr. Jordan Bears a Heavy Burden to Quash His Trial Subpoena .......... 6

    B. Mr. Jordan Is An Important Witness, Now More Than Ever ................ 7

    C. Mr. Jordan's Evidence that He Will Suffer Emotional Harm Does Not Meet the High Bar to Deprive Plaintiffs of His Evidence ............................................................................................... 7

IV. CONCLUSION ................................................................................................. 10

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Anhing Corp. v. Thuan Phong Co.*,
   2015 WL 12747605 (C.D. Cal. Apr. 23, 2015)................................................. 8

*Boca Investerings P'ship v. United States*,
   197 F.R.D. 18 (D.D.C. Oct. 24, 2000) ............................................................ 8

*Burns v. Clusen*,
   798 F.2d 931 (7th Cir. 1986)........................................................................... 8

*Covey v. Wal-Mart Stores E.,L.P.*,
   2018 WL 703286 (W.D. Mo. Feb. 2, 2018)..................................................... 8

*Delgado v. Pawtucket Pol. Dep't*,
   668 F.3d 42 (1st Cir. 2012) ............................................................................. 8

*Ferrell v. IBP, Inc.*,
   2000 WL 34032907 (N.D. Iowa Apr. 28, 2000).............................................. 9

*Flanagan v. Wyndham Int'l, Inc.*,
   231 F.R.D. 98 (D.D.C. 2005) .......................................................................... 7

*Soto v. Castlerock Farming & Transp., Inc.*,
   282 F.R.D. 492 (E.D. Cal. 2012)..................................................................... 7

*Tyler v. Rahe*,
   2014 WL 1875257 (W.D. Mo. May 9, 2014) ............................................. 7, 9

*Vondersaar v. Starbucks Corp.*,
   2013 WL 1915746 (N.D. Cal. May 8, 2013) .............................................. 6, 7

## I. INTRODUCTION

Mr. Jordan has not carried his heavy burden of showing the extraordinary circumstances that would warrant overriding Plaintiffs' right to present Mr. Jordan's live testimony to the jury. On the contrary, he is an important witness who has recently changed his testimony, issued a press release about his conduct with respect to crash scene photographs, purported to produce new evidence, alleged that the County "purposefully with[held] from Plaintiff's counsel" information about his involvement, and suggested that "if called as a witness, [he] could and would competently testify" to a series of assertions about what he did with respect to photos of the helicopter crash scene. The jury needs to hear from him. Mr. Jordan's motion should be denied.

## II. BACKGROUND

Mr. Jordan is a former captain and safety officer of the Los Angeles County Fire Department. He dispatched himself to the scene of the helicopter crash where Mrs. Bryant's husband and daughter were killed on January 26, 2020. (Bryant Decl. Ex. 1 at 18:5-25.) After news broke that Kobe and Gianna Bryant were among the victims, Mr. Jordan walked up the trail to the crash scene and claimed to be a fire chief in charge of media relations. (*Id.* Ex. 2 at 160:6-161:23.) In reality, Mr. Jordan had no media relations responsibilities whatsoever. (*Id.* Ex. 1.) As Mr. Jordan was escorted around the scene, he asked specifically about the location of the bodies and took photos focused on human remains. (*Id.* Ex. 2 at 161:24-166:23; *id.* Ex. 3 at 3, 5.) Mr. Jordan's cell phone records indicate that, in the following days, Mr. Jordan sent pictures via text message to a number of individuals, including reporters, police officers, an LASD employee, his ex-girlfriend, his former neighbor, and firefighters. (*Id.* Ex. 12 ¶¶ 2-18; Ex. 18; Ex. 9 at 92:5-8.) One of the firefighters to whom Mr. Jordan sent photos on January 26 is Tony Imbrenda. (*Id.* Ex. 16 at 72:18-74:6.) Although Mr. Imbrenda admits that he received photos from Mr. Jordan, no text message with images from Mr. Jordan to Mr. Imbrenda appears

on Mr. Jordan's cell records, presumably because they were sent by means other than a text message.  (*Id.* Ex. 18; Ex. 17; Ex. 9 at 92:5-8.)  Mr. Imbrenda later displayed photos of the remains of at least one of Mrs. Bryant's loved ones during the cocktail hour at a gala.  (*Id.* Ex. 4 at 3-4.)

Following an internal investigation, the Fire Department notified Mr. Jordan of its intent to terminate him from the Department for taking and distributing multiple photos of human remains from the site of the helicopter crash.  (*See id.* Ex. 5 (also available at Dkt. 129-8, Bryant Decl., Ex. G, at 120-28).)  In a letter signed by Deputy Fire Chief William McCloud Jr., the Department found that "[t]here was no legitimate business need for [Mr. Jordan] to take photographs of human remains" at the site; that Mr. Jordan's "photographs … of the fuselage and human remains at the [site] did not further the [Fire] Department's mission" and "had no intel value or legitimate business purpose"; and that Mr. Jordan's taking and distribution of the photos "only served to appeal to [his] baser instincts and desires for what amounted to visual gossip."  (*See id.* Ex. 5 (also available at Dkt. 129-8, Bryant Decl., Ex. G, at 123-24).)  Ultimately, however, the Fire Department allowed Mr. Jordan to retire without receiving any discipline for his violations of Plaintiffs' rights.  (*Id.* Ex. 6 at 210:20-211:15.)

Mr. Jordan has consistently tried to avoid answering questions and providing information about his conduct at the crash site and in the aftermath of the accident.  Before his misconduct came to light, however, Mr. Jordan had no trouble sharing information about his experience at the crash site.  For example, he specifically identified the remains of Kobe Bryant and described them in graphic detail to his supervisor, Deputy Fire Chief Anthony Marrone, telling Marrone that "you could tell that it was [Kobe]."  (*Id.* Ex. 7 at 27.)  During his conversations with Chief Marrone about the incident, Mr. Jordan did not say or do anything to suggest that he was particularly affected by the accident.  (*Id.* at 34.)  Rather, he told Chief Marrone "that he was good at work" and "everything [was] fine."  (*Id.* at 29-30.)

Mr. Jordan began to profess having difficulty speaking about the crash when his wrongdoing became the subject of scrutiny during the Fire Department's internal investigation. On April 6, 2020, Mr. Jordan was interviewed by the Department's investigator. While he offered many specific details about the events of January 26, 2020 during that interview (Bryant Decl. Ex. 8), the Department's investigator found that Mr. Jordan was "generally evasive." (*Id.* Ex. 5 at 27.) When asked whether the victims' remains were depicted in any of his photos, for example, Mr. Jordan avoided the question, telling the investigator that he "wouldn't care or want to remember" those facts. (*Id.* Ex. 8 at 7-8.) Similarly, when asked whether he sent crash photos to Mr. Imbrenda, he became defensive, responding "Why? Did somebody say I did?" (*Id.* at 12.) As the Department's investigator summarized: "His repeated statements that he did not 'care to remember' what he saw, and that discussing the incident was distressing for him, came across as a tactic designed to avoid answering my questions, particularly when measured against [his] sharp memory as to other aspects of the incident." (Bryant Decl. Ex. 5 at 27.) Mr. Jordan did not make his personal cell phone available to the Department's investigators, and the Department never checked his text messages, cloud storage, or social media messages. (*Id.* Ex. 9 at 146:3-147:3.)

On October 19, 2021, Mr. Jordan filed a motion for a protective order to avoid sitting for a deposition in this case, contending that his health would not permit it. (Dkt. 117.) Magistrate Judge Eick denied that motion. (Dkt. 131.) Mr. Jordan then filed objections to Judge Eick's ruling, which this Court denied for failure to comply with the Court's standing order and the local rules. (Dkt. 152.)

Mr. Jordan sat for a remote deposition on November 11, 2021. In his deposition, Mr. Jordan testified that he did not know or remember what images he had texted to particular phone numbers reflected in his cell phone records (*see, e.g.*, Bryant Decl. Ex. 9 at 100:8-101:6, 107:12-14, 111:9-16), and that he did not know whether or not he had shared photos of remains with anyone else (*id.* at 138:19-

139:3). He also testified that he had made no effort to look for text messages responsive to the subpoena served on him, and he refused to consult his phone during the deposition to answer questions about texts he professed to have no memory of sending. (*Id.* at 38:18-40:6, 76:18-77:10, 98:13-21, 99:20-100:1, 100:8-101:6, 101:1-103:3.) Mr. Jordan also purported to be unable to answer basic questions about his work for the Department or provide any information about the events of January 26, 2020 (*see, e.g., id.* at 78:1-23, 86:4-21, 121:10-12, 136:1-139:3), other than vague exculpatory statements about an order he purportedly received from his supervisor to take photographs of the crash scene (*id.* at 117:19-21, 118:3-120:5). And when asked about a statement his counsel had recently made in a filing about Mr. Jordan's purported empathy for Mrs. Bryant (*see* Dkt. 110 at 19:8-10), he testified: "I don't think anybody has suffered as much as I have." (Bryant Decl. Ex. 9 at 131:10-133:5.)

On July 1, 2022, Mr. Jordan attempted to file a new motion for a protective order—this time to avoid testifying at trial. (Dkt. 306.) Mr. Jordan's ex parte application was denied without prejudice, as was a second one. (Dkt. 312, 332.) On August 1, 2022, Mr. Jordan filed a third ex parte application (Dkt. 352), and after it was granted on August 2 (Dkt. 361), he filed the instant motion for protective order (Dkt. 355-2, 362). In his motion, Mr. Jordan contends that he should not be forced to testify at trial "in light of the fact that all parties can use his videotaped deposition" and on the ground that he "will suffer harm." (Dkt. 355-2 at 2:8-9, 5:15-16.) Mr. Jordan's current motion relies on evidence similar to the evidence he presented in connection with his motion to avoid sitting for a deposition.

Mr. Jordan's counsel recently put out a press release. (Bryant Decl. Ex. 10.) The press release asserts the following:

- "A high ranking official in the County of Los Angeles Fire Department ordered … [Mr.] Jordan to 'take lots of pictures'" of the crash, which is "a common practice for planning and intelligence on any major incident."

- • "In December 2021, [Mr. Jordan] produced a report to the attorney for the County of Los Angeles that identifies the text messages and images sent," which showed "no crash photos were sent."

- • "Inexplicably, the county lawyer decided not to use the report" and "the County [is] purposefully withholding from Plaintiff's counsel that Jordan never texted any photographs to the media …."

- • "Despite the misinformation, . . . [Mr.] Jordan has so far maintained professional silence out of respect for administrative and legal processes, family, friends, and fans of everyone on the helicopter, and for the well-being for first responders that will likely be affected by this incident for life." (*Id.*)

Shortly after 5pm last night, August 2, 2022, Mr. Jordan's counsel sent a letter to the parties in this case enclosing a "document production" consisting of 17 pages of what the letter calls "personal texts" that Mr. Jordan searched for and located at his counsel's request. (Bryant Decl. Ex. 11 at 1.) The letter states: "Please note that these documents were previously produced to Counsel for the County." (*Id.*) The letter also encloses an unexecuted copy of a declaration from Mr. Jordan dated December 2021. The declaration states that "if called as a witness, [Mr. Jordan] could and would competently testify" to a series of assertions about photos of the crash scene. (*Id.* at 15:3-5.) In particular, the declaration asserts that Mr. Jordan "did not send any crash scene photos depicting human remains" to any of the individuals he was asked about in his deposition (*id.* at 15:16-17, 15:21-22, 15:26-27, 16:3-4, 16:9-10, 16:15-16, 16:20-21, 16:26-27, 17:5-6, 17:10-11, 17:15-16, 17:20-21, 17: 25-26), despite having testified in his deposition that he did not know or could not remember whether he had sent them remains photos. (*See, e.g.*, Bryant Decl. Ex. 9 at 100:8-101:6, 107:12-14, 111:9-16.) The screenshots produced by Mr. Jordan do not include all the text messages with pictures shown on Mr. Jordan's cell phone records. They also do not include transmissions of images sent by other means besides text message.

A little over an hour after Mr. Jordan's letter, counsel for Defendants stated that they would be adding Mr. Jordan's production to the trial exhibit list as Exhibit 688. (*Id.* Ex. 13.)

At around 7:00 pm on August 2, 2022, Counsel for Mrs. Bryant asked counsel for Defendants if Mr. Jordan's letter was accurate when it stated that these documents "were previously produced to Counsel for the County." (*Id.* Ex. 14.) Counsel for Mr. Jordan responded that they had been produced in the form of a report, with redactions, that "fell within the attorney client privilege." (*Id.*) Counsel for Mrs. Bryant again asked Defendants if this was accurate. At 12:25 pm today, counsel for the County stated:

> [It] is accurate that after the close of discovery, Mr. Haney provided us with a memo that Captain Jordan prepared at his direction. Mr. Haney invoked the joint interest in providing us with the memo. The memo addressed allegations you were making against Captain Jordan in this case and in your summary judgment opposition. The memo included screenshots of certain text messages that Captain Jordan sent, but the names of the recipients and messages were redacted. In some instances, no text message was included, just a screenshot of an image. We were never provided the standalone unredacted text messages. Yesterday, when Captain Jordan made his production, was the first time we had received the unredacted complete texts.

(*Id.*) Counsel for Plaintiffs have asked Defendants to produce what Mr. Jordan previously provided to them. Defendants have refused. (Bryant Decl. ¶16)

Mr. Jordan has been served with a subpoena by Plaintiffs to appear at trial. (Bryant Decl. Ex. 15.) Plaintiffs are also serving a subpoena on Mr. Jordan to produce the missing text messages and other messages.

### III.  ARGUMENT

#### A.  Mr. Jordan Bears a Heavy Burden to Quash His Trial Subpoena

Mr. Jordan bears the heavy burden of proving that a trial subpoena would pose an undue burden. *Vondersaar v. Starbucks Corp.*, 2013 WL 1915746, at *2 (N.D. Cal. May 8, 2013); *Tyler v. Rahe*, 2014 WL1875257, at *1 (W.D. Mo. May 9,

- 6 -
PLAINTIFFS' OPPOSITION TO BRIAN JORDAN'S MOTION FOR PROTECTIVE ORDER

2014). "In determining whether a subpoena poses an undue burden, courts 'weigh the burden to the subpoenaed party against the value of the information to the serving party.'" *Soto v. Castlerock Farming & Transp., Inc.*, 282 F.R.D. 492, 504 (E.D. Cal. 2012) (citation omitted). "The quashing of a subpoena is an extraordinary measure, and is usually inappropriate absent extraordinary circumstances." *Flanagan v. Wyndham Int'l, Inc.*, 231 F.R.D. 98, 102 (D.D.C. 2005).

### B. Mr. Jordan Is An Important Witness, Now More Than Ever

Mr. Jordan has failed to offer evidence sufficient to carry his heavy burden, particularly given the central role he played in the conduct at issue in this case and the added importance of his testimony in light of recent developments.

Mr. Jordan does not dispute that he is an important witness in this case. On the contrary, through his attorney he issued a press release less than two weeks ago claiming that he had done nothing wrong and accusing both Plaintiffs and Defendants of "misinformation." (Bryant Decl. Ex. 10.) Yesterday, he produced an unsigned declaration dated eight months ago which is inconsistent with his sworn deposition testimony, and produced copies of what he claims are text messages showing that he did not send remains photos.

Plaintiffs need the opportunity to question Mr. Jordan about his new-found knowledge, the texts he has produced, and his allegations that Defendants ordered him to take the photos and then suppressed the evidence of his innocence. And the jury needs to hear this.

### C. Mr. Jordan's Evidence that He Will Suffer Emotional Harm Does Not Meet the High Bar to Deprive Plaintiffs of His Evidence

Mr. Jordan contends that he should not be forced to testify because "he will suffer harm." (Dkt. 355-2 at 2:8-9.) His evidence, which is similar to what he included with his unsuccessful October 2021 motion to avoid deposition, remains insufficient to meet his burden to "convince the Court that the illness or infirmity is

a genuine obstacle to attendance or to testifying." *Boca Investerings P'ship v. United States*, 197 F.R.D. 18, 20 (D.D.C. 2000); *see also Delgado v. Pawtucket Pol. Dep't*, 668 F.3d 42, 49 (1st Cir. 2012) (must show that "illness presented a genuine barrier to live testimony"); *Burns v. Clusen*, 798 F.2d 931, 938 (7th Cir. 1986) (where witness claims to be unavailable, judge must consider the severity of the illness, symptoms, and "what tasks a witness is then capable of").

      The Court previously denied Mr. Jordan's attempt to avoid a deposition based on the same arguments. His recent activity only further confirms that Mr. Jordan is able to testify. That activity—issuing a press release and producing new documents and an unsigned declaration about his conduct at and after the crash scene—undercuts Mr. Jordan's assertion that he is unable to give evidence because of the emotional harm it would cause. It is noteworthy that in his July 21 press release, Mr. Jordan makes no mention of a medical condition as the reason he has not come forward with his evidence. Instead, he claims to have "maintained professional silence out of respect for administrative and legal processes, family, friends, and fans of everyone on the helicopter, and for the well-being for first responders that will likely be affected by this incident for life." (Bryant Decl. Ex. 10.)

      In such circumstances, the Court should reject Mr. Jordan's attempt to evade testifying at trial. *See, e.g.*, *Anhing Corp. v. Thuan Phong Co.*, 2015 WL 12747605, at *3 (C.D. Cal. Apr. 23, 2015) (denying nonparty's motion to quash trial subpoena based on finding that "Mr. Ly, who is not a party to this litigation, possesses material and unique information of such importance that its value to Defendant outweighs the burden imposed upon Mr. Ly by requiring him to testify during trial," even though Mr. Ly was "currently eighty-one years old and in poor health"); *Covey v. Wal-Mart Stores E., L.P.*, 2018 WL 703286, at *1 (W.D. Mo. Feb. 2, 2018) (denying employee's motion to quash trial subpoena despite employee's "medical conditions" that included "a reduced cognitive ability, 'stress-induced seizures' and Bell's palsy" and despite testimony from the employee's former physician that the

employee "could suffer a seizure if called to testify at a deposition or trial, and . . . that "testifying could be a danger"); *see also, Ferrell v. IBP, Inc.*, 2000 WL 34032907, at *1 (N.D. Iowa Apr. 28, 2000) (denying motion to quash subpoenas requiring attendance at trial because moving party did not meet its burden, even though "the subpoenaed individuals have testified in two depositions, at least one of which was videotaped").

The court's decision in *Tyler v. Rahe* is instructive. 2014 WL 1875257, at *1. There, a nonparty sought to avoid testifying at trial by alleging that she had "multiple disabling medical conditions that outweigh[ed] the need for her testimony." *Id*. She also claimed that "the stress of appearing and testifying in person" would "aggravate her health problems." *Id*. She supported her contentions with a doctor's note recommending that she not be required to testify in court. Nonetheless, the court was not persuaded, denying her motion to quash the trial subpoena, and requiring her to appear and testify at trial. *Id.* (finding compliance with the trial subpoena would not subject the witness to an undue burden considering both the relevance and necessity of the nonparty's testimony). The court also denied the witness's alternative request to sit for a videotaped deposition in lieu of testifying in person, finding that a video deposition was not an effective substitute for live trial testimony. *Id.*

This Court should conclude the same here, particularly given Mr. Jordan's recent conduct. Mr. Jordan and—he claims—the County have sandbagged Plaintiffs with a last-minute change in evidence. Mr. Jordan is apparently capable of communicating with his attorney about a press strategy regarding his conduct in this case, and in searching for and turning over related documents that he believes are beneficial to him. In claiming that he is nevertheless incapable of answering questions about what he has done, Mr. Jordan seeks the ability to inject this information into the trial without having to explain himself. Such a result would be unjustified and unfair.

## IV. CONCLUSION

Plaintiffs Bryant and Chester are open to reasonable accommodations to reduce any genuine burden related to Mr. Jordan's live testimony in this case. But given the importance of his testimony, especially in light of recent developments, Mr. Jordan has not carried his heavy burden to avoid testifying altogether. Mr. Jordan's motion should be denied.

DATED: August 3, 2022                    WILSON SONSINI GOODRICH & ROSATI

By: _____/s/ *Luis Li*_____
LUIS LI

Attorneys for Plaintiff Vanessa Bryant

DATED: August 3, 2022                    JEROME M. JACKSON LAW OFFICES

By: _____/s/ *Jerome M. Jackson*_____
JEROME M. JACKSON

Attorneys for Plaintiff Christopher L. Chester

...

...

**FILER ATTESTATION**

I, Luis Li, attest under Local Rule 5-4.3.4(a)(2)(i) that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized this filing.

Dated: August 3, 2022
                                                              /s/ *Luis Li*
                                                              LUIS LI