JONATHAN C. McCAVERTY (State Bar No. 210922)
Principal Deputy County Counsel
jmccaverty@counsel.lacounty.gov
OFFICE OF COUNTY COUNSEL
500 West Temple Street, Suite 468
Los Angeles, California 90012
Telephone:   (213) 974-1828
Facsimile:    (213) 626-7446

Attorneys for Defendant
LOS ANGELES COUNTY SHERIFF'S DEPARTMENT


MIRA HASHMALL (State Bar No. 216842)
mhashmall@millerbarondess.com
JASON H. TOKORO (State Bar No. 252345)
CASEY B. SYPEK (State Bar No. 291214)
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Telephone:   (310) 552-4400
Facsimile:    (310) 552-8400

Attorneys for Defendants
COUNTY OF LOS ANGELES, LOS ANGELES COUNTY FIRE DEPARTMENT,
JOEY CRUZ, RAFAEL MEJIA, MICHAEL RUSSELL and RAUL VERSALES

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| VANESSA BRYANT,<br><br>              Plaintiff,<br><br>       v.<br><br>COUNTY OF LOS ANGELES, et al.,<br><br>              Defendants. | **CASE NO. 2:20-cv-09582-JFW-E**<br>Consolidated with 2:20-cv-10844-JFW-E)<br><br>**DEFENDANTS' TRIAL BRIEF**<br><br>Assigned to Hon. John F. Walter and Magistrate Judge Charles F. Eick |

570887.2

1

2

3

4

5

6

| CHRISTOPHER L. CHESTER,<br><br>              Plaintiff,<br><br>        v.<br><br>COUNTY OF LOS ANGELES, et al.,<br><br>              Defendants. |

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

570887.2

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ........................................................................... 1

II.   SUMMARY OF THE FACTS ....................................................... 3

    A.   The Accident ....................................................................... 3

    B.   The LASD Crash Site Photos .............................................. 4

    C.   The LACFD Crash Site Photos............................................ 5

    D.   The Forensic Examination ................................................... 6

III.  PLAINTIFFS' *MONELL* CLAIM FAILS AND IS NOT SUPPORTED BY THE EVIDENCE............................................... 6

    A.   Plaintiffs Cannot Prove An Underlying Constitutional Violation .......... 6

        1.   The Applicable Substantive Due Process Right Is Not Well-Established............................................................. 6

        2.   Imbrenda and Cruz Did Not Act under Color of Law................. 8

        3.   There Is No *Marsh* Violation without Public Dissemination ................................................................. 9

        4.   The Officers' Conduct Does Not Shock the Conscience .......... 10

    B.   The County Did Not *Cause* A Constitutional Violation....................... 13

        1.   There Was No Widespread Custom and Practice at LASD or LACFD of Misusing Death Images ......................... 13

        2.   The County Was Not on Notice That Specific Policies Regarding Death Images Were Needed...................... 14

    C.   Plaintiffs' Harm Is Too Speculative ..................................... 15

IV.   CONCLUSION ............................................................................ 16

570887.2

DEFENDANTS' TRIAL BRIEF

1

## TABLE OF AUTHORITIES

2
**Page**

3

### FEDERAL CASES

*Baker v. County of San Diego*,
  No. 09-CV-1194 BEN (WMc), 2012 WL 1903899 (S.D. Cal. May 24,
  2012) ................................................................................................................13

*City of Canton, Ohio v. Harris*,
  489 U.S. 378 (1989) ..............................................................................14, 15

*Conn. Ry. & Lighting Co. v. Palmer*,
  305 U.S. 493 (1939) ......................................................................................15

*Connick v. Thompson*,
  563 U.S. 51 (2011) ................................................................................13, 14

*Flores v. County of Los Angeles*,
  758 F.3d 1154 (9th Cir. 2014) ..............................................................14, 15

*Huling v. City of Los Banos*,
  869 F. Supp. 2d 1139 (E.D. Cal. 2012) .........................................................7

*Jones v. Jinparn*,
  No. C 19-02817 SBA, 2020 WL 999806 (N.D. Cal. Mar. 2, 2020) ..............11

*Joyce v. Town of Tewksbury, Mass.*,
  112 F.3d 19 (1st Cir. 1997) ............................................................................7

*Lamorie v. Davis*,
  485 F. Supp. 3d 1065 (D. Ariz. 2020) ..........................................................10

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ......................................................................................16

*Marsh v. County of San Diego*,
  680 F.3d 1148 (9th Cir. 2012) ..............................................................passim

*Monell v. Dep't of Soc. Servs. of City of N.Y.*,
  436 U.S. 658 (1978) ......................................................................................passim

*Naffe v. Frey*,
  789 F.3d 1030 (9th Cir. 2015) ........................................................................8

*Olejnik v. England*,
  147 F. Supp. 3d. 763 (W.D. Wis. 2015) .......................................................10

*Peña Arita v. United States*,
  470 F. Supp. 3d 663 (S.D. Tex. 2020) ...........................................................7

*Porter v. Osborn*,
  546 F.3d 1131 (9th Cir. 2008) ................................................................10, 11

*Roe v. Wade*, 410 U.S. 113 (1973),
    *overruled by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228
    (2022) ............................................................................................................ 8

*Shelley v. County of San Joaquin*,
    996 F. Supp. 2d 921 (E.D. Cal. 2014) ..................................................... 11

*Szabla v. City of Brooklyn Park, Minn.*,
    486 F.3d 385 (8th Cir. 2007) ..................................................................... 7

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ............................................................................ 16

*Trevino v. Gates*,
    99 F.3d 911 (9th Cir. 1996) ..................................................................... 13

*Tsao v. Desert Palace, Inc.*,
    698 F.3d 1128 (9th Cir. 2012) ................................................................... 6

*Watson v. Sexton*,
    755 F. Supp. 583 (S.D.N.Y. 1991) ............................................................ 7

*West v. Atkins*,
    487 U.S. 42 (1988) ..................................................................................... 8

*Wettstein v. County of Riverside*,
    No. EDCV 19-1298 JGB (KKx), 2020 WL 2199005 (C.D. Cal. Jan. 22,
    2020) ................................................................................................... 13, 14

## STATE CASES

*Padilla v. Rodas*,
    160 Cal. App. 4th 742 (2008) .................................................................. 15

*Scognamillo v. Herrick*,
    106 Cal. App. 4th 1139 (2003) ................................................................ 15

## FEDERAL STATUTES

42 U.S.C. § 1983 ....................................................................................... 1, 6, 15

## FEDERAL RULES

Fed. R. Evid. 404(b)(1) ..................................................................................... 12

1   **I.   <u>INTRODUCTION</u>**

2         The County of Los Angeles (the "County") and its governing Board of

3   Supervisors have great sympathy for Plaintiffs Vanessa Bryant and Christopher

4   Chester's tragic losses.  They reiterate their condolences.  It was a horrific accident

5   that took nine innocent lives.  But the County did not cause it.  County personnel

6   worked tirelessly to protect the crash site, identify the victims, and notify the

7   families.  As for this lawsuit, it is without legal merit.

8         In this trial, Plaintiffs are presenting claims for municipal liability under 42

9   U.S.C. section 1983.  Plaintiffs contends that the County, through the Los Angeles

10  County Sheriff's Department ("LASD") and Los Angeles County Fire Department

11  ("LACFD"), violated their substantive due process rights by taking and sharing

12  photos of the January 26, 2020 helicopter crash site.

13        Plaintiffs offer a single case to support the existence of the claimed

14  constitutional right: *Marsh v. County of San Diego*, <u>680 F.3d 1148</u> (9th Cir. 2012).

15  In *Marsh*, the Ninth Circuit found—despite recognizing that no Court had ever

16  before recognized such a right—a constitutional right to prevent the public

17  dissemination of images of a deceased loved one.  The right created by *Marsh* is not

18  implicated by the facts here.  There, a former prosecutor sent autopsy photos of the

19  remains of a young child to a newspaper and a television station so they would be

20  released publicly.  <u>*Id*. at 1152</u>.  The Ninth Circuit determined that sending an

21  "autopsy photograph to the press" shocked the conscience because, "given the viral

22  nature of the Internet," the victim's mother "might easily stumble upon photographs

23  of her dead son on news websites, blogs or social media websites." <u>*Id*. at 1155</u>.

24        Nothing like this happened here.  Instead, Plaintiffs are suing based on:

25  (i) sharing of photos internally among first responders who were working the

26  command post the day of the crash; (ii) one LASD deputy showing a friend photos

27  on his phone; and (iii) one LACFD employee showing other firefighters, who were

28  also at the crash site, photos on his phone.

The facts do not support the public dissemination required by *Marsh*. There is no evidence that any photos of Plaintiff Bryant's or Plaintiff Chester's family members were disseminated publicly. Moreover, no witness has testified that he or she ever saw a photo depicting one of Plaintiff Chester's family members.

There has been no public dissemination, at least in part, because County personnel deleted all crash site photos from their phones. When Plaintiffs questioned the deletions, the County sought a neutral forensic examination by an independent examiner. Plaintiffs agreed. The parties selected Kroll's Forensic Investigations and Intelligence team. After reviewing over 20 LASD and LACFD devices, Kroll confirmed that there are *no* photos containing victims' remains and *no* evidence of public dissemination. The photos are gone and, according to Kroll and Plaintiffs' own expert, cannot be recovered. There is no violation of the right recognized for the first time in *Marsh*, nor will there ever be.

Even if there were a constitutional violation, Plaintiffs could not satisfy the remaining *Monell* elements. There is no evidence that County employees have a "persistent and widespread" practice of sharing "death images" within LASD or LACFD. This was the first time LASD or LACFD confronted allegations of improper photo sharing, and they took appropriate action. Every action was aimed at preventing harm, not causing it.

Plaintiffs' case suffers from another fundamental defect. Because the photos have never been in the media, on the Internet, or otherwise publicly disseminated, Plaintiffs' case is about their fear that photos could resurface in the future. But a preemptive, speculative lawsuit about what "may" or "could" happen fails as a matter of law. A plaintiff cannot recover damages for hypothetical harm. Plaintiffs' *Monell* claim fails and is not supported by the evidence.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.   SUMMARY OF THE FACTS

### A.   The Accident

On the morning of Sunday, January 26, 2020, a helicopter crashed with nine individuals onboard, including Plaintiff Bryant's husband and daughter and Plaintiff Chester's wife and daughter.  The crash occurred in a mountainous portion of Calabasas.  Civilian cyclists called 911 and took photos of the scene.

Due to the dangerous terrain, only two LASD deputies made it to the actual crash site that morning.  After they secured the perimeter and directed hikers and cyclists away, one of them, Deputy Johnson, started his standard investigation process, as he had been trained to do.  He took photos of the crash to document the accident, identify the downed aircraft, and communicate to the command post what resources were needed.  At that time, no one knew that Kobe Bryant was a passenger on the helicopter.

Following standard procedure, Deputy Johnson sent the photos to the officer running the command post, Deputy Versales.  Deputy Versales forwarded the photos to the other personnel at the command post; none of them knew what had happened or who had been on board the aircraft.

By mid-morning, media outlets started reporting that Kobe Bryant had been one of the passengers.  As reporters and fans flocked to the site, deputies expanded the perimeter and started closing down the surrounding areas, restricting it only to authorized emergency personnel.

By afternoon, multiple agencies were on scene: the National Transportation Safety Board ("NTSB"), Federal Aviation Administration ("FAA"), Federal Bureau of Investigation, County Department of Medical Examiner-Coroner ("DMEC"), Malibu Search & Rescue ("Malibu SAR"), LACFD, and LASD.  Every agency took photos to document the crash site.  NTSB's crash site photos appeared in the L.A. TIMES on February 28, 2020 and October 23, 2021.

1    Meanwhile, Plaintiff Bryant drove to LASD's Malibu/Lost Hills Station and
2    asked to meet with Sheriff Villanueva.  After learning her husband and daughter had
3    died, she had one request: make sure the area is secure and that no one took
4    unauthorized photographs of her loved ones' remains.  That is exactly what the
5    Sheriff did.  LASD personnel worked with the FAA to establish a no-fly zone, and
6    they redoubled efforts to keep the media and paparazzi away.

7    DMEC's Special Operations Response Team arrived early the next morning
8    and took photos of the victims before removing the remains.  In the case of three of
9    them, DMEC had to rappel into a ravine with the help of Malibu SAR volunteer
10   deputies.  LACFD firefighters stayed on site to make sure emergency personnel
11   were safe, especially from the toxic fumes.

12   **B.    The LASD Crash Site Photos**

13   On January 29, 2020, the Sheriff's Information Bureau ("SIB") received an
14   email from a concerned citizen.  The email said that a deputy had shown crash site
15   photos on his phone to someone at a bar in Norwalk.  SIB shared the email with
16   LASD command staff, who launched an immediate inquiry.

17   The next day, LASD identified Deputy Cruz as the deputy and learned that he
18   had shown photos on his cellphone to one of his friends, Victor Gutierrez, the
19   bartender.  Deputy Cruz was a young deputy trainee who had been at LASD for less
20   than a year.  He was working the incident with his training officer, Deputy Mejia.

21   According to Gutierrez, he saw between one and three photos, which Deputy
22   Cruz swiped through while holding his phone.  He recalled seeing various body
23   parts in the debris field.  Deputy Cruz did not show the photos to anyone else at the
24   bar; but he did try to show scene photos to his niece, who refused to look at them.

25   When Sheriff Villanueva learned about the potential showing of crash site
26   photos, he directed his personnel to launch an immediate inquiry and make sure *no*
27   photos got outside the department.  He said if everyone was honest, did not publicly

28

disseminate any photos, and deleted them, they would receive a performance log entry in their personnel file in lieu of harsh discipline.

Lost Hills Station Lieutenant Hector Mancinas and Sergeant Marcus Phillips interviewed 28 deputies, reserve deputies, sergeants, and civilian volunteers. By January 31, 2020, they determined that all LASD personnel who had taken, shared or received crash site photos had deleted them. Only Deputy Cruz had shown a photo to anyone outside LASD, and no one had shared them outside of LACFD.

**C.  The LACFD Crash Site Photos**

On January 31, 2020, LASD Captain Matthew Vander Horck called LACFD Deputy Fire Chief Anthony Marrone. He told Chief Marrone that there was a complaint about a deputy sharing crash site photos containing victim remains. He advised Chief Marrone that there were two LACFD employees at the crash site on January 26, 2020 who might have taken or received photos.

Chief Marrone notified Deputy Fire Chief William McCloud, who oversaw the Leadership and Professional Standards Bureau at that time. LACFD worked to identify the personnel who had been present on the first day of the crash site investigation. At that time, there were no allegations that any LACFD personnel had improperly shared photos.

On March 6, 2020, a civilian witness reported to LACFD that an LACFD employee had been showing crash site photos on his phone at a first responders' awards event on February 15, 2020.

LACFD hired an outside investigator and directed LACFD captains who took photos to turn over their cellphones and laptops for forensic imaging. Like LASD, LACFD determined that (i) all crash site photos had been deleted; and (ii) no one had sent a photo to anyone outside LACFD.

The investigation revealed that then-PIO Captain Imbrenda had shown crash site photos on his phone to one LACFD employee and two City of Los Angeles firefighters who also responded to the crash. Captain Imbrenda was disciplined for

1  violating LACFD's Standards of Behavior and Code of Ethics.  Two other LACFD
2  employees, who had sent photos to Captain Imbrenda, were also disciplined.

3       **D.     The Forensic Examination**

4       After this lawsuit was filed, the parties agreed to have an independent forensic
5  examiner, Kroll, examine the devices of over 20 LASD and LACFD employees.
6  Because almost two years had passed, many of them had upgraded their phones, but
7  they made the devices they had available.  Kroll reached the same conclusion the
8  County had almost two years earlier: there were no photos on any of the devices.

9       To date, two-and-a-half years after the crash, it is undisputed that no LASD or
10 LACFD photos have been posted on the Internet, released in the media, or otherwise
11 publicly disseminated.  The photos cannot be recovered.

12 **III.  PLAINTIFFS' *MONELL* CLAIM FAILS AND IS NOT SUPPORTED**
13      **BY THE EVIDENCE**

14      To succeed on a *Monell* claim, a plaintiff must establish that 1) a government
15 employee caused a constitutional violation while acting under color of law and
16 2) that a government entity official policy, practice or custom was the moving force
17 behind the constitutional violation.  *Monell v. Dep't of Soc. Servs. of City of N.Y.*,
18 436 U.S. 658, 694 (1978); *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1146 (9th
19 Cir. 2012) ("Under *Monell*, a plaintiff must also show that the policy at issue was
20 the 'actionable cause' of the constitutional violation, which requires showing both
21 but for and proximate causation." (citation omitted)) (affirming order granting
22 summary judgment).  Both requirements must be established; Section 1983 does not
23 impose vicarious liability on public entities.  *Tsao*, 698 F.3d at 1139.

24      **A.     Plaintiffs Cannot Prove An Underlying Constitutional Violation**

25            **1.     The Applicable Substantive Due Process Right Is Not Well-**
26                   **Established**

27      Plaintiffs' entire lawsuit is premised on the narrow substantive due process
28 right articulated in *Marsh*.  There, a former prosecutor sent autopsy photos of the

1   remains of a young child to a newspaper and a television station with the goal of

2   having them released publicly.  *Marsh*, 680 F.3d at 1152.  The Ninth Circuit

3   determined that sending an "autopsy photograph to the press" shocked the

4   conscience because, "given the viral nature of the Internet," the victim's mother

5   "might easily stumble upon photographs of her dead son on news websites, blogs or

6   social media websites." *Id.* at 1155.  The decision was based on the "publication of

7   death images." *Id.* at 1154.  The relevant constitutional right was the "federal

8   privacy right to control *public dissemination* of a family member's death images."

9   *Id.* at 1152 (emphasis added).

10       *Marsh* was the first time the Ninth Circuit addressed and recognized this

11  substantive due process right.  However, a government cannot be liable under

12  *Monell* if the constitutional right at issue was not "clearly established" at the time of

13  the conduct.  *See Huling v. City of Los Banos*, 869 F. Supp. 2d 1139, 1157-58 (E.D.

14  Cal. 2012) ("Several district courts have held, that 'to be "deliberately indifferent"

15  to rights requires that those rights be clearly established.'" (quoting *Watson v.

16  Sexton*, 755 F. Supp. 583, 588 (S.D.N.Y. 1991))); *Szabla v. City of Brooklyn Park,

17  Minn.*, 486 F.3d 385, 393-94 (8th Cir. 2007) ("While a municipality does not enjoy

18  qualified immunity from damages liability that results from a policy that is itself

19  unconstitutional or from an unconstitutional decision by municipal

20  policymakers, . . . a municipal policymaker cannot exhibit fault rising to the level of

21  *deliberate* indifference to a constitutional right when that right has not yet been

22  clearly established." (citation omitted)); *Joyce v. Town of Tewksbury, Mass.*, 112

23  F.3d 19, 23 (1st Cir. 1997) ("[O]ur rationale here for granting qualified immunity to

24  the officers—that the unsettled state of the law made it reasonable to believe the

25  conduct in this case constitutional—also precludes municipal liability."); *Peña Arita

26  v. United States*, 470 F. Supp. 3d 663, 706-07 (S.D. Tex. 2020) (to establish

27  municipal liability, plaintiff must show that the municipal officers violated "clearly

28  established constitutional rights" (citation omitted)).

1    Here, Plaintiffs seek to hold Defendants liable under *Monell* for both the

2  taking and sharing of crash scene photos depicting human remains.  Plaintiffs also

3  seek to hold Defendants liable under *Monell* for internal sharing among County

4  personnel.  But *Marsh* did not address any constitutional right with respect to the

5  *taking* of photos, nor did it address the *internal* (non-public) sharing of photos

6  within the public entity.  The only conduct that the Ninth Circuit found "shocks the

7  conscience" was the "attempt to publish the autopsy photograph"—not taking the

8  photo, making a photocopy of it, using it for training, or even keeping the photo as a

9  "memento."  680 F.3d at 1152, 1155 & n.3.

10    Moreover, whether *Marsh* is still good law is now in question given the

11  opinion's reliance on *Roe v. Wade*.  *See Marsh*, 680 F.3d at 1153 (citing *Roe v.*

12  *Wade*, 410 U.S. 113 (1973), *overruled by Dobbs v. Jackson Women's Health Org.*,

13  142 S. Ct. 2228 (2022)).

14              **2.    Imbrenda and Cruz Did Not Act under Color of Law**

15    Plaintiffs' claims fail because the County employees were not acting under

16  color of state law during any of the alleged acts of photo sharing.  A public

17  employee only acts under color of state law when "(1) the employee 'purport[s] to

18  or pretend[s] to act under color of law,' (2) his 'pretense of acting in the

19  performance of his duties . . . had the purpose and effect of influencing the behavior

20  of others,' and (3) the harm inflicted on plaintiff '"related in some meaningful way

21  either to the officer's governmental status or to the performance of his

22  duties."'"  *Naffe v. Frey*, 789 F.3d 1030, 1037 (9th Cir. 2015) (alterations in

23  original) (citations omitted); *see also West v. Atkins*, 487 U.S. 42, 50 (1988) ("[A]

24  public employee acts under color of state law while acting in his [or her] official

25  capacity or while exercising his [or her] responsibilities pursuant to state law."). "On

26  the other hand, a government employee does not act under color of state law when

27  he pursues private goals via private actions." *Naffe*, 789 F.3d at 1037.

28

1    Here, the evidence will show that Deputy Cruz was not acting under color of
2    law when he displayed photos from the crash site at the Norwalk bar. He was off-
3    duty and not in uniform. He was at the bar visiting a personal friend on his personal
4    time. At no point did he make any representation that he was there in any official
5    capacity or in the performance of his duties as a deputy sheriff.

6    Similarly, Captain Imbrenda was attending a non-County media awards event
7    that was attended by members of the general public. He received a personal
8    invitation to attend with his girlfriend. LACFD did not require him to attend, and he
9    was not paid to attend. Although he attended in uniform because the awards show
10   was related to his media responsibilities as a PIO, his uniform was neither intended
11   nor perceived as an indication that he was on-duty at the event or there to perform
12   his duties as a firefighter.

### 3.    There Is No *Marsh* Violation without Public Dissemination

14   The evidence here cannot establish a substantive due process claim. In
15   *Marsh*, a prosecutor made a photocopy of an autopsy image of a young child. 680
16   F.3d at 1152. When the prosecutor retired, he kept the photograph as a "memento"
17   from his work as a prosecutor. *Id*. He also used the photograph as "part of his
18   training materials for child abuse detection seminars." *Id.* at 1157. When a man's
19   conviction for murdering the child was overturned, the prosecutor subsequently
20   gave a copy of the photograph to the press. *Id.* at 1152.

21   Out of all of these uses of the photograph, the Ninth Circuit determined that
22   *only* the "attempt to publish the autopsy photograph is sufficiently shocking to
23   violate [plaintiff's] substantive due process right." 680 F.3d at 1155 n.3. This is
24   because, "given the viral nature of the Internet," the victim's mother "might easily
25   stumble upon photographs of her dead son on news websites, blogs or social media
26   websites." *Id.* at 1155. The Court held that "[m]utilation of a deceased family
27   member's body, desecration of the burial site and public display of death images"
28   was the sort of conduct that could support a substantive due process claim. *Id*.

1    Here, there is no real and concrete possibility that Plaintiffs might "stumble
2    upon" the photos, because the photos were deleted (as the County, Kroll and
3    Plaintiffs' own expert all confirmed).  At best, Plaintiffs' evidence shows that
4    certain LASD and LACFD personnel temporarily maintained copies of the
5    photographs in the days following the crash.  While improper and against County
6    policies, it is akin to the conduct in *Marsh* that did not rise to the level of a
7    constitutional violation.

8        Plaintiffs' theory is also at odds with the other cases finding that there is no
9    constitutional violation absent public dissemination.  S*ee, e.g.*, *Lamorie v. Davis*,
10   485 F. Supp. 3d 1065, 1073 (D. Ariz. 2020) (holding that conduct failed to shock the
11   conscience as there was "no publication of [the child's] autopsy photos"); *Olejnik v.*
12   *England*, 147 F. Supp. 3d. 763, 777-78 (W.D. Wis. 2015) (no substantive due
13   process violation because medical examiner made no public disclosure of the
14   decedent's autopsy).

15                  **4.      The Officers' Conduct Does Not Shock the Conscience**

16       *Marsh* requires that the officer's conduct at issue must "shock[] the
17   conscience" for there to be a substantive due process violation.  680 F.3d at
18   1155.  This is true for *any* due process violation—not just the right articulated in
19   *Marsh*.  *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) ("The Supreme
20   Court has made it clear . . . that only official conduct that 'shocks the conscience' is
21   cognizable as a due process violation." (citation omitted)).

22       The Ninth Circuit in *Porter* explained that there are two tests to establish
23   whether conduct shocks the conscience—(1) whether the officer "acted with
24   *deliberate indifference*"; or (2) whether the officer "acted with a *purpose to harm*
25   [plaintiff] for reasons unrelated to legitimate law enforcement objectives." 546 F.3d
26   at 1137.  Where "actual deliberation is practical" and there is "ample time to
27   correct" the conduct," the standard is "deliberate indifference." *Id.* at 1137-39
28   (citation omitted).  In urgent situations where actual deliberation is not practical—

1    such as "high speed police chases"—the more demanding "purpose to harm"

2    standard applies. *Id.* at 1137.

3        When the officer's conduct is more akin to negligence, courts have found

4    such conduct insufficient to "shock the conscience."  For example, in *Jones v.*

5    *Jinparn*, No. C 19-02817 SBA, 2020 WL 999806, at *4 (N.D. Cal. Mar. 2, 2020),

6    the plaintiffs alleged that a police officer failed to make reasonable efforts to contact

7    the decedent's heirs before releasing the body for cremation.  The court there

8    reasoned that the officer's conduct "sounds, at most, in negligence." *Id.* at *5. "The

9    Due Process Clause serves to protect the individual from the abuse of governmental

10   power" and thus is not implicated by a negligent act.  *Id.*

11       By contrast, in *Shelley v. County of San Joaquin*, 996 F. Supp. 2d 921 (E.D.

12   Cal. 2014), plaintiffs, who were the decedent's family members, alleged that

13   defendants violated their right to privacy by engaging in large-scale digging to

14   exhume the decedent's remains, which caused the remains to be "chewed up,

15   pulverized, destroyed, crushed and commingled with other unknown murder

16   victims" in the presence of the decedent's mother and before news media. *Id.* at

17   931.  The court concluded such conduct was likely to cause the family "profound

18   grief" and therefore shocks the conscience.  *Id.* (citation omitted).

19       Here, the officers' conduct at issue is more akin to that in *Jones* than in

20   *Shelley*.  First, with respect to the taking and internal sharing of photos among

21   County personnel, the evidence will show that site photography at an incident is

22   both appropriate and common practice in both the Fire and Sheriff's

23   Departments.  Such photos are used, among other things, to provide intel, to assess

24   the progress of an incident response, and to facilitate training post-incident.  Indeed,

25   some of the photos taken by County personnel here were shared with the NTSB to

26   assist them in their investigation of the crash.

27       With respect to Plaintiffs' allegations that photos were shared with people

28   outside the County or outside the confines of County business, Plaintiffs' case is

1    focused largely on the conduct of Captain Imbrenda and Deputy Cruz.  The

2    evidence at trial will show that both officers made efforts to correct their conduct by

3    deleting the photos to prevent any possibility that they could be publicly

4    disseminated.  These efforts worked—no County photos have ever emerged.  The

5    evidence will also show that Imbrenda and Cruz admit to making these (isolated)

6    mistakes during temporary lapses of judgment, not out of any ill-will or intent to

7    harm the Plaintiffs.

8         To get around this defect, Plaintiffs intend to offer at trial—over Defendants'

9    objection—testimony from the Coroner's office about the graphic nature of its

10   photos of the crash victims.  Plaintiffs want to inflame the jury and improperly

11   suggest that the photos taken by Brian Jordan and other officers were close-up,

12   graphic photos just like those from the Coroner.  This false equivalency should not

13   be permitted at trial as irrelevant and unfairly prejudicial to the County.

14        Plaintiffs also intend to offer at trial—over Defendants' objection—irrelevant

15   and inadmissible character evidence involving Deputy Johnson in an attempt to

16   characterize him as someone who regularly disregards the rights of others.  In March

17   2021—over a year after the crash—Deputy Johnson was escorting an inmate to a

18   County jail when the inmate began resisting, punching Deputy Johnson several

19   times before being restrained.  Deputy Johnson has been criticized for restraining

20   the inmate by kneeling on his neck for approximately three minutes.  The incident

21   was investigated, and Deputy Johnson was placed on leave.  THE L.A. TIMES

22   published an article claiming that the Sheriff's Department attempted to cover up the

23   incident, which Defendants deny.

24        Evidence relating to this jail incident is irrelevant, inadmissible, and highly

25   prejudicial to Defendants, and should not be admitted.  This County jail incident

26   involving allegations of excessive force has nothing to do with the alleged

27   wrongdoing in this case.  It is impermissible character evidence.  Fed. R. Evid.

28   404(b)(1).  Plaintiffs cannot offer Deputy Johnson's or Sheriff Villanueva's

subsequent conduct into evidence to purportedly show they acted in accordance with that character in this matter.  *See Baker v. County of San Diego*, No. 09-CV-1194 BEN (WMc), 2012 WL 1903899, at *2 (S.D. Cal. May 24, 2012).

### B.   The County Did Not *Cause* A Constitutional Violation

Even if any County employees violated Plaintiffs' constitutional rights (they did not), Plaintiffs cannot show that "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Monell*, 436 U.S. at 690.  Plaintiffs cannot make this critical showing.

### 1.   There Was No Widespread Custom and Practice at LASD or LACFD of Misusing Death Images

To prove a *Monell* claim through a "longstanding practice or custom," *Wettstein v. County of Riverside*, No. EDCV 19-1298 JGB (KKx), 2020 WL 2199005, at *4 (C.D. Cal. Jan. 22, 2020) (citation omitted), Plaintiffs must establish that LASD's or LACFD's practice or custom of "unnecessarily taking and sharing death images" (FAC ¶ 86) is "so persistent and widespread as to practically have the force of law," *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  "[I]solated or sporadic incidents" will not support *Monell* liability against local government.  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (affirming summary judgment where undisputed evidence did not establish "persistent and widespread" practice that constituted "permanent and well settled" city policy (citation omitted)).

There is no evidence of a "persistent and widespread" practice of sharing death images that has risen to the level of a "permanent and well settled" County policy.  There are no other complaints of LASD or LACFD personnel doing anything similar, ever.[1]  The evidence will show that the alleged wrongdoing were

---

[1]  Plaintiffs rely on Sheriff Villanueva's public comments that there has been "a problem in law enforcement across the nation" relating to law enforcement officers

13

acts taken in the wake of a crash of unprecedented public interest and had never occurred before in the County.

### 2.  The County Was Not on Notice That Specific Policies Regarding Death Images Were Needed

*Monell* normally requires an expressly adopted official policy, or a longstanding practice or custom.  *Connick*, 563 U.S. at 61.  It is only "[i]n limited circumstances" that "a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Id*.  The inadequacy of training can serve as a basis for liability "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989); *Connick*, 563 U.S. at 61 ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.").

Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (citation omitted).  There must be evidence of a "deliberate" or "conscious" choice by a municipality to ignore the consequences of not adequately training its employees, and the municipality must have made that conscious choice even though the risk of constitutional violations was "obvious." *Canton*, 489 U.S. at 389-90.

This showing requires evidence of a "pattern of similar constitutional violations by untrained employees." *Flores v. County of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014) (citation omitted); *Wettstein*, 2020 WL 2199005, at *5

_____

keeping "photos from crime scenes throughout their careers."  (FAC ¶ 51.)  Even assuming this were true, the *Marsh* Court held that such private memento-keeping did not rise to the level of a constitutional violation, so this statement does not establish any unconstitutional custom or practice.  *Marsh*, 680 F.3d at 1155 n.3.

1  (dismissing *Monell* claim and holding that two violations are insufficient to
2  "establish a custom or policy" or to infer "more common and frequent
3  unconstitutional behavior" (citation omitted)); *see Flores*, 758 F.3d at 1159 ("The
4  isolated incidents of criminal wrongdoing by one deputy other than Deputy Doe 1
5  do not suffice to put the County or [Sheriff] on 'notice . . . .'" (citation omitted)).

6       Here, there is no evidence of other similar instances that would put the
7  County on notice that a specific policy regarding the handling of death images was
8  necessary.  This is especially true because the misuse of the photographs of
9  Plaintiffs' loved ones violated existing County policies regarding keeping official
10  information confidential.  Plaintiffs' theory assumes that the County should have
11  known that employees would violate the existing policies regarding misuse of
12  official information but would comply with other, more specific policies regarding
13  death images.  This is exactly the sort of "endless exercise of second-guessing
14  municipal employee-training programs" that Courts are instructed not to engage in
15  in the course of deciding Section 1983 claims.  *Canton*, 489 U.S. at 392.

16      **C.**    **Plaintiffs' Harm Is Too Speculative**

17       Plaintiffs' claims also fail because their harm is too speculative.  It is well-
18  established law that a plaintiff may not be awarded damages for harm that is too
19  speculative, which includes future harm that, although possible, is not reasonably
20  certain to occur.  *See Conn. Ry. & Lighting Co. v. Palmer*, 305 U.S. 493, 505 (1939)
21  ("It is well understood that such evidence must show damages to reasonable
22  certainty.  Mere 'plausible anticipation' does not merit consideration . . . ." (citation
23  omitted)); *Scognamillo v. Herrick*, 106 Cal. App. 4th 1139, 1151 (2003) ("Do not
24  award a party speculative damages, which means compensation for future loss or
25  harm which, although possible, is conjectural or not reasonably certain." (citation
26  omitted)); *Padilla v. Rodas*, 160 Cal. App. 4th 742, 752 (2008) ("[P]roof of
27  causation cannot be based on mere speculation, conjecture and inferences drawn

28

from other inferences to reach a conclusion unsupported by any real evidence . . . ." (citation omitted)).

Here, Plaintiffs' alleged harm is based solely on their fear that photos of their deceased relatives taken by the County *might* one day be publicly disseminated on the Internet or otherwise.  It is undisputed that neither Chester nor Bryant have ever seen any of the County photos at issue.  Having never seen the photos, Plaintiffs' fear stems from their imagination about what the photos *might* look like if they ever appear.  But it has been over two and half years, and no County photos have ever been leaked.

Plaintiffs' speculative harm dovetails with the concern that Defendants have repeatedly raised throughout litigation—that Plaintiffs lack standing without a concrete and particularized harm.  The "mere risk of future harm" is not sufficient to establish an injury in fact that is concrete and particularized for standing. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210-11 (2021); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61, 578 (1992) (holding that respondents lacked standing).

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs face significant hurdles in proving *Monell* liability and will not be able to establish any requisite harm.  Defendants also respectfully request that the Court address the anticipated evidentiary issues in advance of trial, which will streamline and expedite trial.

1   DATED:  August 3, 2022                    Respectfully Submitted,

2                                             MILLER BARONDESS, LLP

3

4

5                                             By:        /s/ Mira Hashmall

6                                                   MIRA HASHMALL
                                                    Attorneys for Defendants
7                                                   COUNTY OF LOS ANGELES, LOS
                                                    ANGELES COUNTY FIRE
8                                                   DEPARTMENT, JOEY CRUZ, RAFAEL
                                                    MEJIA, MICHAEL RUSSELL and
9                                                   RAUL VERSALES

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

570887.2

DEFENDANTS' TRIAL BRIEF