# EXHIBIT 2

EXHIBIT 2

- 41 -

# **Sheppard**Mullin

Sheppard, Mullin, Richter & Hampton LLP
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
310.228.3700 main
310.228.3701 fax
www.sheppardmullin.com

## M E M O R A N D U M

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

To:  Deputy Chief William McCloud                Date:  August 31, 2020

From:  Ronda Jamgotchian                  File Number:  0100-922253

Re:  Investigation Report – Alleged Taking and Sharing of Photographs from Willow Incident by Fire Captain Brian Jordan

---

## I.  Description of Project

On March 5, 2020, Sheppard Mullin was retained by the Los Angeles County Fire Department (the "Department") to conduct an investigation into media reports that Department personnel reportedly shared photographs of a January 26, 2020 helicopter crash ("Willow Incident"). These news stories first broke in late February 2020, regarding deputies from the Los Angeles County Sheriff's Department reportedly sharing photos of the Willow Incident, and subsequent news stories in early March 2020, making similar allegations against members of the Department. Following those news stories, the Department received intel suggesting that one of the individuals who may have taken the photographs was Fire Captain (CA) Brian Jordan.

Given the nature and seriousness of the allegations, combined with the urgency of the matter, the decision was made to outsource the investigation to Sheppard Mullin to ensure that it would commence immediately.

## II.  Summary of Interviews

The following individuals were interviewed as part of this investigation. The summaries for each reflect the information that has been deemed relevant to this investigation. Unless otherwise indicated, all interviews were audio recorded, and the recordings have been provided to the Department so that they may be reviewed in conjunction with this report.

### A.  Fire Captain Tony Imbrenda – Witness

One of the individuals identified as potentially having relevant information was CA Tony Imbrenda. I interviewed CA Imbrenda on March 12, 2020. Also present at the interview was Lew Currier, CA Imbrenda's union representative from Local 1014. The interview

SMRH:4837-4729-2617.1                    -1-

Bryant v. County of
Los Angeles et al.
**Ex. 26A**
Case No. 2:20-cv-09582-JFW-Ex

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

took place at the Department's facility on Corporate Center Drive and was audio recorded.

CA Imbrenda began working for the County in April 1996, as an Environmental Health specialist. He currently works as a Fire Captain, and served as the Department's PIO from September 2018 to March 2020.

I asked CA Imbrenda about his involvement in responding to the Willow Incident on January 26, 2020. CA Imbrenda was at home, but was contacted by dispatch to go to the scene. He believes this was around noon or the early afternoon. He reported to the incident and checked in with the incident commander at the staging area, about a mile away from the crash site. He also gave a statement to the media. At that point, CA Imbrenda was not yet aware that Kobe Bryant had been on board. CA Imbrenda was not at the staging area for long, as he had to deal with the media elsewhere. Eventually, he received a call from the LAPD that there may have been a celebrity on the aircraft. In total, he was at the staging area less than 10 minutes, and then spent about 6-7 hours at other locations, including a press conference at the Sheriff's station. CA Imbrenda did not go to the actual crash site that first day.

I next asked Captain Imbrenda about his involvement the following day, January 27, 2020. CA Imbrenda was on duty that day and reported to the incident command post. There were messages coming to him, stating that there would be a briefing in the morning about what was to occur that day, and he was to go to the briefing. He advised me that he was at the briefing in the morning, dealing with the media and different chiefs that were coming in, as well as helping the NTSB and the FBI photographer. Ultimately, he and CA Kahan went in a vehicle to the crash site, to assist an FBI photographer and help her hike around the hill and manage her equipment. CA Imbrenda was at the crash site for approximately 15 minutes, assessing the site as he would with any incident, since he knew he would be interviewed extensively by the media. While he was there, he took a few photos of the debris field, which were not graphic in nature, which he later sent to CA Kahan.

I asked CA Imbrenda if he is aware of anyone else who took photos at the crash site. He responded that he heard there were numerous people who had taken photos at the Willow Incident site, but had no personal knowledge of such. I asked CA Imbrenda if he was ever in possession of any photos of the Willow Incident (other than those he had taken). He replied that he had previously been in possession of several photos, which were sent to him by CA Arlin Kahan and CA Brian Jordan. CA Imbrenda does not know if CA Kahan and CA Jordan took the photos themselves or if they had received them from someone else. The majority of the photos were not graphic in nature, and most of them were of the debris, but there were some that were graphic in nature and showed human remains. CA Imbrenda also noted that as the PIO, he regularly receives photos of incidents, sometimes of a graphic nature. He added that it is his job to advise people on how to handle photos of a graphic nature, and to never use them or post them on social media.

CONFIDENTIAL                                                                COLA001352

TREX 26A.0002

**EXHIBIT 2**

**- 43 -**

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

I pressed CA Imbrenda for more details on the contents of the photos he had received from CA Jordan and CA Kahan, including whether they depicted a foot, torso, appendix and things of that nature (I had been advised by other witnesses in a related investigation that these were among the images contained in graphic photos of the Willow Incident). CA Imbrenda stated that it was possible that these images were in the photos sent to him by CA Kahan and CA Jordan, but he could not recall specifics and had not spent much time studying the photos. He also advised me that after he received the photos, he got rid of them in pretty short order because he had no use for them, and told others to get rid of them as well, because he had concerns that they could be misused. CA Imbrenda went on to state that it is standard operating procedure for him to receive photos, and he receives hundreds of photos (some from people he does not even know) for any notable incident. For the Willow Incident, the fact that CA Kahan and CA Jordan sent him photographs was not surprising and was professionally something they would do, given his role as PIO. He also noted that as a former PIO, CA Jordan understood that sending graphic images electronically was not a good practice, so CA Imbrenda thinks that the photographs from CA Jordan depicted only debris.

With respect to the phone, the photos were on CA Imbrenda's work iPhone. However, they have since been deleted. Specifically, CA Imbrenda deleted the photos over the course of about a week, within a few weeks of the incident itself. He added that within the last 10 days from the prior Friday (March 6th), they were already gone from his phone. I asked CA Imbrenda why he deleted the photos, and he noted that press reports had started to come out, so he made a concerted effort to get rid of the photos. He added that he had no use for the graphic photos, so he got rid of the photos that depicted "patients," since such photos would not be appropriate to post to social media. CA Imbrenda specifically recalls that photos had become an issue in the media, as some such photos had been misused by certain individuals, so he went back into his phone to make sure that all such photos were gone. The process of deletion took some time, because the photos were in various places in CA Imbrenda's phone (Google drive and several other spots). CA Imbrenda again stated that he was very concerned that such photos could be misused, so he deleted them. He also instructed everyone he knew that had been on the incident to do the same. I asked CA Imbrenda when he gave this instruction about deleting the photos, and he responded that he did so every time he spoke to the individuals who had been involved, including CA Kahan and CA Jordan, and also told those individuals to give the same instruction to their own people. CA Imbrenda emphatically stated that he never allowed, and would never allow, photos to go out of his possession where they could end up in hands that would misuse them.

### B.  Fire Captain Brian Jordan – Subject of Investigation

On April 6, 2020, I interviewed CA Brian Jordan, the Subject of Investigation. Also present at the interview was Lew Currier, CA Jordan's union representative from Local 1014, and Kurt Kobler, who was present as an observer. Due to the COVID-19 pandemic and the need for social distancing, the interview took place via remote Zoom video and was audio recorded.

-3-

CONFIDENTIAL                                                      COLA001353

**TREX 26A.0003**

**EXHIBIT 2**
**- 44 -**

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

CA Jordan started working for the County in 1985, as a Firefighter. He is currently a Captain in the Central Regional Operations Bureau, and serves as the Regional Training and Safety Officer. CA Jordan has been in this assignment since 2012.

I advised CA Jordan of the allegations in this investigation and informed him that I wanted to ask him some questions about the Willow Incident. I then asked CA Jordan if he was on duty on the first day of the Willow Incident. He confirmed that he was on duty that day, and was the incident safety officer. CA Jordan explained that his job was to arrive on scene and make sure that everyone was safe, adding that if he saw any danger, he was to bring it to the appropriate person's attention and mitigate it. CA Jordan does not recall exactly when he arrived to the incident, but estimates that it was within 30 minutes of the dispatch time. Once he arrived at the command post, CA Jordan hiked into the crash site. I asked CA Jordan how long he was at the crash site, and he said that he was there "forever," and had spent "many hours" and "spent the night" there. After I questioned him further on this issue, CA Jordan stated that he was at the site for a couple of days, and then clarified that he was at the site "overnight" the first day, then left to get some rest and then returned to the incident. I continued to press CA Jordan for clarification, not understanding if he had actually spent the night at the physical crash site. He then stated that he was initially at the incident site for 4-5 hours (which felt like "years"), subsequently went to the command post, and eventually was shuttling people back and forth to a trail that led to crash site. He further clarified that he arrived at the crash site when it was still smoking, and then was there for an additional 4-6 hours after that before returning to the command post. CA Jordan does not recall if he returned to the actual crash site after that, noting that he was up and down the hill a lot. Generally speaking, CA Jordan was at the incident until it concluded. He could not recall the specific date and time that the incident was closed, but whatever that date and time was, that was when he left.

I asked CA Jordan what he did while he was at the actual crash site. CA Jordan replied that at one point he was up there and the other crews were pulled out. When he had been there for approximately two hours, he wanted to come off the hill but was told to stay up there. I again asked CA Jordan what activities he was involved in while he was at the actual crash site. CA Jordan stated that he walked most of the scene along the trail, and at one point he just stayed in one spot, noting that it wasn't a pleasant scene. I continued to press CA Jordan for more specific answers, and he stated that at one point he was standing and observing the scene, as the aircraft was still burning. He added that it was burning to a point where it was clear that it was not going to spread. CA Jordan further stated that his job was to stay at the crash site and be the Department representative until more crews arrived to extinguish what was still burning.

I next asked CA Jordan if he took any photos of the crash site at any point while he was at the incident. CA Jordan responded that he took approximately 10-20 photos on the first day of the incident, on his work phone – a black iPhone 8. I asked CA Jordan why he took the photos, and he replied that as the regional training and safety officer, he is to provide "intel" to the incident commander when he arrives on scene. CA Jordan noted that one thing incident commanders or others not at the scene can use are photos, so that they can see what others are talking about with respect to the site. The

CONFIDENTIAL

TREX 26A.0004

EXHIBIT 2

- 45 -

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

Willow Incident was also not easily accessible, as it occurred in a location with only a narrow trail up to the site. Thus, since personnel could not just drive fire trucks up to the scene, CA Jordan took photos.

I asked CA Jordan if anyone asked him to take the photos. He responded that he believes someone asked him to take them, but he could not recall who that was, and asked that we come back to this question so that he would have time to think about it. CA Jordan then noted that he automatically takes photos on most incidents and, in fact, did so at a recent incident.

I next asked CA Jordan what was depicted in the Willow Incident photos that he took. He replied that some of them had a picture of the hose lay (which was over 4400 feet), and others were of the trail that was used for access, with the crash site in the background. CA Jordan then stated that as far as anything else that may have been depicted, he is trying to keep what he saw out of his head, and to ask him to repeat what he saw is not good for his mental health.

I then explained to CA Jordan that the issue of photos being taken at the Willow Incident crash site, and the issue of what such photos depicted, is central to this investigation, and as such, I needed to get that information from him. Having said this, I again asked CA Jordan what was depicted in the photos, and after silence from him, I offered to ask him about specific images. He replied that I was welcome to do so, but that his mental health is very important. I told CA Jordan that if, at any time, he felt that we needed to stop the interview and resume at a different time, we could certainly do so. I then asked CA Jordan if the photos showed the fuselage, or the brush burning. In response, CA Jordan acknowledged that there were a couple of photos that showed the fuselage, but there were no photos of the brush burning. I then asked if orange cones or red flags were visible in the photos, and CA Jordan noted that orange cones would not have been in any of his photos, as they would have been placed later in the incident, after he took the photos. He also does not recall any red flags in any of the pictures.

I asked CA Jordan if there were human remains depicted in any of the photos, and he replied that he "wouldn't care or want to remember that, if there were." I asked CA Jordan if he knows one way or the other, and he said that "the way it looked up there, you probably didn't really know what you were looking at." Being of the opinion that CA Jordan was evading my questions and had more information than he was sharing, I advised him that I had received some reports of photos that depicted flesh on the ground, insides of bodies, a torso bent over, a foot, and things of that nature, and that I needed to know if he recalled these images being depicted in the photos that he took. CA Jordan replied that he recalls seeing all of those things at the scene, but does not remember if they were in the photos or not. I then attempted to confirm that CA Jordan's statement was that he does not recall one way or the other if any of those images were depicted in the photos. CA Jordan then replied that he was being respectful, but that I had just brought all of those things back to his head, and he is trying to get them out of his head. I gently explained that my job is to investigate, and that I regretted having to ask these questions, but that I needed to know what CA Jordan recalled. CA Jordan said that he really does not recall what was in the photos

SMRH:4837-4729-2617.1                                                -5-

COLA001355

**TREX 26A.0005**

**EXHIBIT 2**
**- 46 -**

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

he took because he "has been trying to get rid of all of that." I then asked CA Jordan if he believes the images I described were in the photos. CA Jordan stated that they could have been, especially since he took pictures of the helicopter, but that those images were in the "news pictures" as well, and people just did not know what they were looking at. CA Jordan noted that he deleted the pictures pretty quickly, and stated that the questions were "messing with [his] brain," because he was now remembering everything he saw, which he was trying to get out of his head.

Before we left this topic, I asked CA Jordan if he took any pictures of Kobe Bryant's body while he was at the crash site. He asked me why I was asking about Kobe Bryant in particular, and why I was not asking about the other nine people. I replied that I had not gotten to them yet. CA Jordan then said that he is the one who covered Kobe Bryant's body up. I again asked CA Jordan if he took any photos of Kobe Bryant's remains, and he replied that Mr. Bryant's remains were probably in the photos that he took, but that he had deleted them from his phone. When I asked him about the other passengers, CA Jordan replied that you couldn't tell who was who. He added that those images were also in the news photos, but people just did not know what they were looking at.

I next asked CA Jordan if anyone had ever sent him photos of the Willow Incident. CA Jordan replied that one of the canine handlers sent him pictures of their dogs resting. Other than that, no one else sent photos of the Willow Incident to CA Jordan. I asked CA Jordan if he ever shared the photos that he took of the Willow Incident with anyone else. He replied that he showed a picture of the hose lay to many people while he was driving people up to the crash site, so that they could see how far they had to walk, and likewise showed the hose lay photo to people at the command post. However, there was nothing of substance visible in the photo. CA Jordan also sent one of the LA Times or Daily News photos to a photographer friend and some family members, because CA Jordan could be seen in the photo. I then asked CA Jordan if he sent any of the photos that he took of the Willow Incident to CA Imbrenda. CA Jordan said no, and quickly asked if someone said that he had. I replied that I had been given the impression that he may have sent some of the photos to CA Imbrenda. He then asked who led me to believe that. I advised CA Jordan that I could not discuss that with him, and again asked if he had sent photos of the Willow Incident to CA Imbrenda. CA Jordan responded that he did not recall sending any pictures to CA Imbrenda or anyone else, and that it is not possible that he did.

I returned to the issue of CA Jordan deleting the photographs from his phone and he confirmed that they had all been deleted. I asked CA Jordan why he deleted the photos and he responded that while at the crash site, he heard someone yell "no more pictures!" "Delete pictures!" So he started to delete the close-up photos from his phone right away. However, he kept the hose lay photo and anything else that was taken from a distance. I asked CA Jordan if the more remote photos were still on his phone. He told me that the photos should not be on his phone any longer, and then checked his phone and confirmed that they were gone.

SMRH:4837-4729-2617.1

-6-

CONFIDENTIAL

COLA001356

TREX 26A.0006

EXHIBIT 2

- 47 -

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

Next, I asked CA Jordan if he is aware of anyone else who took photos of the Willow Incident. CA Jordan is not aware of anyone from the Department who took photos, but he noted that the FBI and NTSB probably took photos at the site. CA Jordan is likewise not aware of anyone at the Department who sent photos of the Willow Incident to anyone.

At this point during the interview, I asked CA Jordan if anyone asked him to take photos of the incident (this was the question that he had asked me to come back to). CA Jordan responded that he does not recall anyone specifically asking him to take the photos, but that there was a lot of discussion regarding what the scene looked like and whose helicopter it was. However, he does not recall specifically if anyone told him to take the photos. In an attempt to job CA Jordan's memory, I asked him if any chief officers asked him to take pictures of the Willow Incident. Again, CA Jordan replied that there may have been someone who instructed him to do so, but he does not recall specifically.

Before we concluded, I asked CA Jordan if there was anything else he thought would be helpful for me to know, now knowing what I was investigating. CA Jordan stated that there was nothing specific, other than "the memory jog hurt."

Mr. Currier then asked CA Jordan if he felt that taking the photos of the Willow Incident was part of his job duties as a safety officer. CA Jordan responded that he did. Mr. Currier then noted that CA Jordan previously stated that he took the photos in order to provide "intel," and asked CA Jordan if he has done so on other incidents. CA Jordan responded that he has taken photos on every major incident. Mr. Currier asked CA Jordan if he has ever been investigated for taking photos before, and CA Jordan replied that he has not. Mr. Currier then asked if this was the first incident in which he has seen graphic images like he saw at the Willow Incident. CA Jordan responded that it was not the first, but it was definitely the worst. Mr. Currier went on to ask CA Jordan if the photos he took were widespan or narrow, and CA Jordan replied that most were wide, but some were narrow. Finally, Mr. Currier asked if CA Jordan is aware of any Department policy that prohibits taking photos at incidents, and CA Jordan replied that no such policy exists.

\* \* \*

On April 10, 2020, I received a call from Lew Currier, CA Jordan's union representative from Local 1014. Mr. Currier advised me that CA Jordan had requested a follow-up discussion in order to clarify something from our first conversation. To that end, on April 13, 2020, I had a follow-up discussion with CA Jordan. Lew Currier was also present as CA Jordan's representative. When we began the discussion, CA Jordan stated that he wanted to clarify his answer to my question regarding whether he discussed the Willow Incident with any chief officers, noting that he previously said "no," but actually recalled speaking with several people about the incident. I advised CA Jordan that I never asked him if he discussed the Willow Incident with anyone, but, rather, had asked him questions about taking and/or sharing photographs of the Willow Incident. With this clarification, CA Jordan advised me that there was nothing further he wished to add.

SMRH:4837-4729-2617.1                                      -7-

CONFIDENTIAL                                                              COLA001357

**TREX 26A.0007**

**EXHIBIT 2**

**- 48 -**

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

### C.  Battalion Chief Andrew Smith – Witness

Following the above interviews, the Department requested that I speak to additional witnesses. Thus, on June 8, 2020, I interviewed BC Andrew Smith. Also present at the interview was Thomas Ray, BC Smith's union representative from the Association of Chiefs. Julia Kim, the Department's Risk Manager, was also present. Due to the COVID-19 pandemic and the need for social distancing, I conducted the interview via remote Zoom video, which was also audio recorded.

BC Smith started working for the County in April 1988, as a Fire Suppression Aid. His current rank is Battalion Chief, which he has held for approximately 2-1/2 years. He has also been serving as an Acting Assistant Fire Chief since April 1, 2020.

I began the substantive portion of the interview by asking BC Smith about his role at the Willow Incident. BC Smith confirmed that the Willow Incident began on January 26, 2020. BC Smith was on duty that morning, and was the initial attack incident commander. The response came out initially as a brush fire, and he was one of the two BCs that were assigned to the incident as of the time of the initial alarm. BC Smith explained that as the engine companies did their initial size up, the incident started moving toward being a working incident, so he took over as the incident commander. As the incident commander, one of BC Smith's first responsibilities was to gather intel via radio and set up an Incident Command Post, which ended up being approximately three quarters of a mile west of the crash site, at the Las Virgenes Water District parking lot. BC Smith explained that from his location at the command post, looking east, he was at least half a mile from the crash site, in a secure location. BC Smith relinquished command at approximately 2:00 p.m., at which point he proceeded to Fire Station 89 for the Critical Incident Stress Debriefing ("CISD"). He subsequently returned to the command post in a supporting role for the new incident commander, Deputy Fire Chief (DC) Anthony Marrone, and helped with the incident until nearly midnight. BC Smith never visited the actual crash site.

I asked BC Smith if he was involved in the Willow Incident on any other day. He replied that he did check in at the command post the following day to see if there was anything they needed, and periodically checked in on his regular duty day to see if there was anything that was needed.

I next turned to the issue of photographs, and asked BC Smith if he was aware of any direction given during the Willow Incident with respect to the taking of photographs. BC Smith replied that when he took command, it was clear that a helicopter had crashed, so his priority was to determine if there were any survivors, and also to determine if the helicopter was an agency aircraft or a civilian aircraft. The air squad that was overseeing the incident had a video of the overall scene, which showed an overall view of what was burning (from a distance), which BC Smith requested so that he could come up with control objectives. BC Smith also advised that the helicopter had lowered a crew member to the ground, to do life safety for survivors, and BC Smith asked for a photo of the tail number or some sort of identification so that he could determine the origin of the aircraft and things of that nature. Based on intel provided and the video

SMRH:4837-4729-2617.1 -8-

**TREX 26A.0008**

## EXHIBIT 2

### - 49 -

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

and a photograph, BC Smith was able to determine that the helicopter was either a private aircraft or a children's hospital aircraft. Following this narrative, BC Smith confirmed that the only video he received was from the air, and the only photograph he received was the plate number. BC Smith believes that both the video and the photograph were taken by Firefighter Paramedic Jeffrey Duran.

I again asked BC Smith if there was any direction given at the Willow Incident regarding the taking of photographs. BC Smith responded that after he brought his ground resources back to the command post around 12:00 p.m., he subsequently did a quick After Action Review (AAR) on the incident. His first area of focus was on the crew's mental health and well-being, which was addressed and briefed. The second area of focus was to make it very clear to all involved that this was a global event, and no photographs were to be taken whatsoever. BC Smith made it clear to everyone that if any photos had been taken, they were to be deleted immediately. According to BC Smith, his leader's intent was that there be no pictures of the incident. BC Smith is confident that by the time the resources were at the crash site, they did not have time to take pictures, and if they did it was very clear when they came down the hill that no photographs were to be maintained.

BC Smith went on to explain that at 1400 hours on Day 1 of the Willow Incident, at Fire Station 89 during the CISD, he again went over the rules. His narrative regarding photographs was, "don't be that person," and "don't keep any photos of the incident." Following the first part of the briefing, he kept the captains (Mike Rivera, Sonny Farrell, Sterling Callahan and Kevin Harmon) behind and told them two things. First, they were to check the safety and welfare of their people. Second, they were to make sure that if any photographs had been taken, they were not to be maintained, shared, sent, or anything else. BC Smith reiterated that he delivered this message regarding the prohibition of photographs three times on the first day of the incident. When asked if anyone else gave instructions about photographs, BC Smith replied that he does not know if anyone else gave any similar instructions.

Ms. Kim asked if BC Smith gave the instructions regarding photographs to either Mike Velasquez or Brian Jordan. BC Smith replied that CA Velasquez was managing the camp crew and was still up on the hill during the debrief. BC Smith did follow up with CA Velasquez on a welfare check to see how the crews were doing, but he does not remember if he mentioned the instruction regarding the photographs. Similarly, BC Smith did not give instructions to CA Jordan because CA Jordan was the assigned safety officer and, as such, he remained up on the hill.

I then asked BC Smith if, to his knowledge, anyone had taken photographs of the crash site (other than the video and photograph discussed above). BC Smith replied that he is not aware of anyone who took photographs of the incident, and he only heard what the news had reported about the LASD. BC Smith added that he knows firefighters pretty well, and if someone had done something like that, he believes it would have come out by now.

CONFIDENTIAL                                                                                    COLA001359

**TREX 26A.0009**

**EXHIBIT 2**

**- 50 -**

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

I next asked BC Smith if there was a Safety Officer present at the Willow Incident. BC Smith confirmed that there was. I asked BC Smith to describe generally the duties of a Safety Officer on an incident such as the Willow Incident. He replied that the Safety Officer on any incident is part of the command staff who reports directly to the incident commander. The Safety Officer is assigned at the discretion of the incident commander, to look at the overall safety at the scene of an incident, such as whether hazards are present, and things of that nature. I then asked BC Smith if a Safety Officer's job duties include taking photographs. BC Smith explained that it depends. For example, if there is a brush fire of an unknown origin, people are on the line, and the safety officer says "I found a bottle rocket," it would not be out of character for him or her to take a photo of something like that, which may have value to the incident later. BC Smith then provided another example, such as a wildland incident where a vehicle goes over the side of a hill – in this instance, a Safety Officer might take photos for a fact finding of cause. BC Smith explained that another example would be where a portion of a structure has collapsed and the Safety Officer took photos related to the incident, again for fact finding purposes.

I next asked CA Smith if a Safety Officer might need to take graphic photos of an incident. BC Smith replied that there could be reasons that such photos might need to be taken, and he has seen this done in the past where there was a safety issue and the photos were part of the process of piecing together what occurred and gathering intel on the incident. When asked if there might be a reason for a Safety Officer to share such photos with others, BC Smith replied that it depends on who the Safety Officer would be sharing them with. For example, if a photo is taken and time has passed and the opportunity to capture the image will not occur again, it would not be out of practice for the Safety Officer to send the photo to the Operations Chief or the incident commander for intel, a tactical plan, or the overall safety of an incident.

Ms. Kim then asked BC Smith what the Department's purpose might be for photographs of human remains at the Willow Incident. BC Smith replied that from a "lessons learned" standpoint, there is value. He went on to state that he has taken gruesome photos before, which, for example, have been used as part of the AAR. Ms. Kim then asked BC Smith if he could identify any reason why such photos might need to be disseminated other than for AAR purposes or things of that nature. BC Smith said that such reasons might exist, but any such dissemination would be for business reasons.

> *Investigator Note: At this point during the interview, Mr. Ray interjected with a narrative regarding the use of such photos in the Arson Investigation Unit. That discussion is not included here as the Willow Incident did not involve an arson investigation and, thus, this information is neither relevant, nor was it is provided by the witness as part of his account.*

I asked BC Smith how often photos are actually used for the purposes he described, such as training and debriefing. He stated that it is very common for photos to be taken and used for these purposes. Ms. Kim then clarified that BC Smith had stated "no photographs" for the Willow Incident due to the gravity of the incident, which he

SMRH 4837-4729-2617.1                    -10-

**CONFIDENTIAL**                                                                   COLA001360

**TREX 26A.0010**

**EXHIBIT 2**

**- 51 -**

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

confirmed. She then asked if, in light of the gravity of the incident and the instruction he had given, whether BC Smith expected people at the crash site to be taking photos for the AAR. BC Smith replied that he did not even think about it, and was more concerned about giving his direction to the people who had been on the hill for their safety and welfare. However, BC Smith added that he does not know what value photographs of the Willow Incident would play, since the Department was not going to go into the mechanical failure of the aircraft, was not going to look at trauma patients that had no chance of survival, and things like that. For his purposes with the video and photo, he had liability over the fire burning and spreading to houses, since he needed those images. As for using such photos in the future, BC Smith noted that he could use the video and photo for teaching purposes, including the risks with aircraft under certain weather conditions, fire behavior, and things of that nature. BC Smith could not identify any business need for graphic photos of bodies from the Willow Incident, noting that first responders see graphic things all the time.

Given that we were on the subject of "seeing graphic things," I asked BC Smith if he was aware of any Department personnel who he felt had been traumatized in some way by what they saw on the scene. BC Smith identified one person, whose name he could not recall, who was on an engine company and was a big time Kobe Bryant fan. The images apparently hit this particular individual very hard, so BC Smith made sure to address it with the person's Captain, Scott Ross.

Before we concluded the interview, I asked BC Smith if he could think of anything else that would be helpful for me to know. BC Smith responded that the Willow Incident was a pretty straightforward incident until it became a global event.

### D.   Deputy Chief Anthony Marrone – Witness

As part of the additional witness interviews requested by the Department, I interviewed DC Anthony Marrone on June 8, 2020. Also present at the interview was Julia Kim, the Department's Risk Manager. Due to the COVID-19 pandemic and the need for social distancing, I conducted the interview via remote Zoom video, which was also audio recorded.

DC Marrone started working for the County in June 1986, as a Firefighter. DC Marrone has been a Deputy Chief since May 2013, and is currently assigned to the Central Region – an assignment he has held since February 2019.

I began the substantive portion of the interview by asking DC Marrone about the Willow Incident. DC Marrone confirmed that the Willow Incident began on January 26, 2020. He was on duty that day, working in the office. He heard about the helicopter crash through dispatch, and originally thought it was a small helicopter with a couple of people on board, which had started a small brush fire. DC Marrone had no intention of rolling out to the Calabasas area, as he was in his civilian clothes and CA Brian Jordan had already advised him that he (CA Jordan) would be going to the scene and would keep DC Marrone updated. However, as time went on, it became clear that the incident involved a larger helicopter with 7-9 people on board, none of whom had survived the

SMRH:4837-4729-2817.1                                   -11-

COLA001361

**TREX 26A.0011**

**EXHIBIT 2**

**- 52 -**

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

crash. This made the situation far more significant, and DC Marrone also learned that TMZ was reporting that Kobe Bryant was on board and had been killed. Thus, DC Marrone decided that he needed to go to the incident site. He drove home, got into uniform and responded to the command post. DC Marrone estimates that he arrived at the command post at between 11:30 a.m. and 12:00 p.m., not long after CA Jordan.

DC Marrone then went into a long narrative regarding his involvement at the Willow Incident. When DC Marrone arrived at the scene, BC Drew Smith, CA Jordan, CA Tony Imbrenda (the Department's PIO), and others who he did not identify by name were at the command post. DC Marrone noted that there was a small plume of white smoke coming from the burning metal in the engine, and confirmed that Elliot Simpson from the NTSB was en route to the scene. DC Marrone advised me that the fire was basically out, that the crews had cut a line, and water had been taken to the accident scene. He also advised me that a Department helicopter had been the first on scene and had shot a video after inserting their paramedic into the crash site via hoist so that he could check to see if there were any survivors. Unfortunately, the crash scene was very violent and everyone on board had perished.

DC Marrone also recalled that Chief Deputy (CD) David Richardson had also been calling and instructing that all measures be implemented to extinguish the magnesium fire, as news helicopters had arrived and were covering the incident. DC Marrone noted that since it was a metal fire, a special extinguishing agent was required. Additional resources were contacted for this purpose.

After these initial measures at the command post, DC Marrone proceeded to the Sheriff's station where he connected with Fire Chief (FC) Daryl Osby and briefed him on the situation up to that point. There was also a press conference that took place that day. DC Marrone also participated in a meeting the following morning with the NTSB, FAA and others at a nearby hotel. During that meeting, DC Marrone shared with the NTSB two videos from the helicopter and one photo of the tail plate (which he had requested and received from BC Smith), and the group came up with a plan on how to cut a road to the crash site since it was not easily accessible. DC Marrone never went up to the actual crash site on the first day of the Willow Incident.

DC Marrone also provided some information regarding photographs. Specifically, on the first day of the incident, given the fact that an international sports celebrity and his family had been on board the helicopter, he expressly told BC Smith that there were not to be any photographs of the decedents, as taking such photographs would neither be right nor appropriate. DC Marrone also reminded BC Smith that there was no business need for such photographs. DC Marrone went on to instruct BC Smith that when BC Smith conducted the CISD, in addition to discussing the mental and emotional issues associated with an incident such as this, he was also to expressly instruct those who were involved in the incident that it was unacceptable to take any photographs of decedents or discernable human remains. DC Marrone emphasized this instruction to BC Smith 2-3 times, and others were present and heard the instruction as well, including Assistant Chief (AC) Dennis Breshears and CA Jordan. BC Smith later confirmed to DC Marrone that the message had been delivered and everyone

SMRH:4837-4729-2617.1

-12-

CONFIDENTIAL

COLA001362

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

understood the instruction loud and clear. DC Marrone also advised FC Osby at the press conference that those involved in the incident all understood that such photos were not permitted. DC Marrone does not recall giving any instructions to "delete" any such photos if they were taken, but felt that it was clearly implied by the express instruction he gave.

DC Marrone also noted that members of the Coroner's office came out to the site on Day 1 of the incident and removed the deceased from the site. According to DC Marrone, the Coroner's office was at the site all night long, into the following day when they completed the recovery of the remains of the nine people who had perished. However, even after that, the cadaver dogs found an additional 50 pounds of human remains that were not evident to the naked eye. DC Marrone also noted that the aircraft salvage company came and picked up all of the large pieces of the helicopter. DC Marrone then added that he draws a distinction between people taking photographs of things like the tail boom, rotor head, seat cushions, the line, etc. (which he does not believe would be inappropriate) and pictures of the decedents, which would absolutely be inappropriate. He added that the Coroner, Sheriff's department, FBI and NTSB take pictures of dead bodies, not the Department, and it is not a Department function to take photos of anyone killed at the scene.

I asked DC Marrone what time he gave the instruction to BC Smith regarding not taking photographs at the scene. He responded that it was early on in the incident, before 1:00 p.m. I then asked DC Marrone why BC Smith was to give the instruction at the debriefing, as opposed to some earlier time, such as up on the hill. DC Marrone responded that he does not recall if he also told BC Smith that he should notify the people up on the hill – he only specifically recalls telling him that he should bring it up at the debriefing, although he certainly intended for the instruction to be transmitted to the people up on the hill. DC Marrone also clarified that he is not aware of anything in the Department's manual that prohibits the taking of photographs of decedents, but such photographs were absolutely prohibited pursuant to his instruction.

I next asked DC Marrone what time he gave the instruction to CA Jordan and AC Breshears prohibiting photographs of decedents. DC Marrone replied that it was sometime between 11:00 a.m. and 2:00 p.m., noting that he gave the instruction more than once. DC Marrone has no knowledge regarding anyone else who may have given instructions regarding photographs. DC Marrone subsequently clarified that he was at the command post from 12:00 p.m. to 2:00 p.m. on Day 1.

I asked DC Marrone if he was involved with the Willow Incident on any other day, and he responded that he was also there on Day 2. According to DC Marrone, the bodies of the decedents were removed throughout Day 1 and also in the morning of Day 2 of the incident. DC Marrone advised me that he did not go up to the actual crash site on Day 1, because he knew it was going to be horrific and he did not want to witness this. He did, however, go to the crash site on Day 2. Specifically, at approximately 7:00 a.m. on Day 2 of the incident, DC Marrone and AC Breshears (who had been the night incident commander) went to the NTSB debriefing at a hotel in Calabasas, introduced themselves, asked if any support was needed, and shared the videos that DC Marrone

CONFIDENTIAL

COLA001363

**TREX 26A.0013**
**EXHIBIT 2**
**- 54 -**

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

had received from the helicopter. They also introduced the NTSB to the City Manager, Mayor, and others. Thereafter, DC Marrone and AC Breshears went to the command post and checked in with the daytime incident commander, Acting AC Mike Brown, after which DC Marrone was driven up to the actual crash site. DC Marrone stayed at the crash site for approximately 30 minutes. The majority of human remains had been cleared from the crash site by the time DC Marrone got there.

As we were speaking about the timing of the removal of human remains, DC Marrone noted that he had a text exchange with CA Jordan at approximately 9:30 p.m. on Day 1 of the incident. During the exchange, CA Jordan advised DC Marrone that he (CA Jordan) was the one who had covered up Kobe Bryant's body earlier in the day, and also advised DC Marrone that the Coroner had since taken part of Mr. Bryant's remains to the morgue. CA Jordan also advised DC Marrone that Mr. Bryant's daughter's remains were still in a drainage area.

I then turned back to the issue of photographs and asked DC Marrone if, to his knowledge, anyone else had taken photographs of the crash site. DC Marrone replied that other than the two videos from the helicopter and the one photo of the tail plate (which he had requested and received from BC Smith), the only other person that he knows for sure took photographs of the scene is himself. More specifically, DC Marrone explained that when he went to the crash site, he took a picture of the impact area, the burning fuselage, the rotor head and the line that had been cut, for a total of four photographs – all taken on his work phone. I asked DC Marrone why he took the photos, and he explained that he understood from CD Richardson that the Department would have to do an AAR, and in the past, CD Richardson had tasked DC Marrone and his subordinates with putting together AARs. It was not until weeks later that DC Marrone realized that there would not be an AAR of this incident. DC Marrone also made clear to me that there were absolutely no photos of decedents or discernable human remains in the photos he took, as he would not violate his own direction to the staff. The four photos that DC Marrone took have long since been deleted from his phone and were never shared with anyone. DC Marrone never instructed CA Jordan, CA Kahan or anyone else to take photos of the Willow Incident.

I then asked DC Marrone about CA Jordan, the Safety Officer at the Willow Incident. I began by asking about CA Jordan's general duties as the Safety Officer. DC Marrone explained that as the Safety Officer, CA Jordan was responsible for making sure that everyone was following safety procedures as outlined in the Department's operations manual, such as wearing appropriate PPE, following the safe and approved procedures for the extinguishment of the small brush fire, and operating in a hazardous materials environment. DC Marrone added that CA Jordan was the eyes and ears of the incident commander. I asked DC Marrone if a Safety Officer's job duties include taking photographs. DC Marrone replied that although there could arguably be a reason for taking photographs of the overall incident (e.g., for an AAR), there would be no reason for CA Jordan to take pictures of any decedents or discernable human remains. In fact, DC Marrone is confident that in the more than 100 AARs that have been done in the last few years, none of them included photos of decedents or discernable human remains. Rather, they contained photographs of things like a fire, a building, a building after a fire

SMRH:4837-4729-2617.1                    -14-

CONFIDENTIAL

COLA001364

**TREX 26A.0014**

**EXHIBIT 2**

**- 55 -**

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

has been extinguished, images of ingress and egress, surrounding streets, apparatus placement, equipment, what mode of firefighting was used (offensive versus defensive), and things of that nature. The purpose of the AAR is to focus on lessons learned regarding what went right and what went wrong, and how the things that went wrong can be addressed moving forward. DC Marrone then reiterated that, in light of this, there simply would be no reason for CA Jordan or anyone else from the Department to take photographs of decedents or discernable body parts.

I next asked DC Marrone about CA Kahan, DC Marrone's Staff Aide. Specifically, I asked DC Marrone if CA Kahan was at the Willow Incident and had heard DC Marrone's instruction prohibiting the taking of photographs. DC Marrone responded that CA Kahan was not at the Willow Incident on Day 1, and DC Marrone does not believe he gave CA Kahan the specific direction on Day 2. DC Marrone then noted that by the time he got to the top of the hill on Day 2 of the incident, it would not be possible to take a photo of a decedent unless you lifted up a blanket or sheet, or went down into the gully. DC Marrone emphasized that there was no opportunity to take such a photo on Day 2 without being extremely conspicuous, and he does not think the Coroner would have allowed it in any event. DC Marrone then clarified that he does not think he even saw any covered remains or decedents on Day 2, and all that remained were small pieces of debris everywhere. DC Marrone went on to state that, in his mind, there was not anything to see on Day 2 by the time he arrived, and the Coroner's office had already concluded their retrieval of the decedents. DC Marrone never asked CA Kahan to take any photographs of the Willow Incident, and never received any photos from CA Kahan.

With respect to CA Kahan's duties as a Staff Aide, DC Marrone explained that, generally speaking, the Staff Aide accompanies DC Marrone, scribes any requests that he might have, gives directions on DC Marrone's behalf, and transmits information, photographs or videos to DC Marrone remotely if he is offsite. However, DC Marrone went on to explain that, at the Willow Incident, CA Kahan was not his eyes and ears, but, rather, was with DC Marrone at the command post.

I asked DC Marrone if a Staff Aide's job duties include the actual taking of photographs. DC Marrone replied that photographs might be needed for various purposes, but never photographs of decedents. More specifically, DC Marrone explained that if the Staff Aide is serving as his "eyes and ears" on an incident, the photographs might be necessary to relay information to DC Marrone. They also could be used for an after incident review. DC Marrone went on to state that on the Willow Incident, CA Kahan may have shared DC Marrone's belief that there would be an after incident review, so CA Kahan may have believed there was a reason to take photographs for that purpose. Ms. Kim then asked DC Marrone if an after incident review would include photographs of body parts, to which DC Marrone responded that there would absolutely be no reason for any such photos to be included in any after incident review.

I next turned to whether DC Marrone was aware, prior to the interview, of any allegations regarding Department personnel sharing photographs of the Willow Incident. DC Marrone stated that he was aware of such allegations. Specifically, in early

CONFIDENTIAL                    COLA001365

**TREX 26A.0015**

**EXHIBIT 2**

**- 56 -**

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

February 2020, DC Marrone received a call from a captain at the Lost Hills Sheriff's
station and was advised that LASD deputies had been accused of taking and sharing
photographs of the Willow Incident. DC Marrone was also advised by the Lost Hills
captain that two firefighters who were on the hill on Day 1 of the incident may have also
been taking or sharing photographs. This was the first time DC Marrone heard this
allegation. The Lost Hills captain advised DC Marrone that the two firefighters in
question were at either the Captain or Chief Officer level, and that one was African
American and the other was Hispanic. The captain never disclosed to DC Marrone the
identity of the deputy or deputies who had made the allegation regarding these
firefighters, or what the specifics of their behavior were, other than they had purportedly
taken and/or shared photographs of the Willow Incident. Upon learning this information,
DC Marrone called DC William McCloud (who oversees the LPSB) and also notified CD
Richardson.

DC Marrone also then recalled being separately and subsequently advised by BC
Stephen Cookus from Battalion 5 that a woman had come to him and lodged a
complaint regarding problematic behavior by members of the Department at the Golden
Mike Awards. Specifically, she complained that while she was at the event with her
husband Cody Weireter (who is an LA City fire captain), CA Imbrenda and his staff were
showing photos of the Willow Incident to others in attendance. DC Marrone contacted
the woman directly and then handed the matter over to DC McCloud at the LPSB. DC
Marrone recalled seeing CA Weireter at the Willow Incident.

At this point during the interview, Ms. Kim interjected and asked DC Marrone to confirm
that he used to work in the PIO's office. DC Marrone confirmed that this was the case,
and he worked in the PIO's office many years ago in 1998. Ms. Kim then asked DC
Marrone if, in his experience, there would be a business need for the PIO to have
photographs of discernable human remains or decedents from something like the
Willow Incident. DC Marrone replied that no such reason exists, and there is no part of
the PIO's job function that would require them to have such photos in their possession.
DC Marrone then reiterated his earlier statement that he has seen a lot of AARs and
there is no need for photos of decedents to be included. DC Marrone added that it is
not within the Department's charge to investigate how or why someone died. He noted,
however, that he does not think a picture that happens to include an image of a pinky
finger or something like that would fall within this prohibition, because the taker of the
photograph may not have seen it. DC Marrone similarly distinguished the aerial video
taken by the Department, noting that even though it might include some images that
would otherwise be problematic, the video was an overview of the crash scene from the
first onsite responders, and it had a purpose and function, such as helping the FAA. DC
Marrone then again reiterated that it would be completely inappropriate to take photos
of decedents, noting that doing so is inappropriate and disgusting. DC Marrone has not
seen any such graphic photos, has no concrete evidence that anyone requested them,
took them, or shared them, and made clear that if he was aware of such, he would have
caused an investigation to be opened.

SMRH:4837-4729-2517.1                          -16-

CONFIDENTIAL                                                    COLA001366

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

### E. Assistant Chief Dennis Breshears – Witness

As part of the additional witness interviews requested by the Department, I interviewed AC Dennis Breshears on June 16, 2020. Also present at the interview was Julia Kim, the Department's Risk Manager. Due to the COVID-19 pandemic and the need for social distancing, I conducted the interview via remote Zoom video, which was also audio recorded.

AC Breshears started working for the County in September 2000, as a Fire Fighter Trainee. AC Breshears currently serves as the Assistant Fire Chief of the Training Services Division, and he has held this position for approximately two years.

I began the substantive portion of the interview by asking AC Breshears about the Willow Incident. On January 26, 2020, the first day of the incident, AC Breshears was the duty AC and was at home. He received a page from dispatch that there was a helicopter crash, but was not initially advised of the severity of the crash or the victims involved. After monitoring the situation on his phone for an hour or so, AC Breshears received a text from AC Anderson Mackey regarding "a helicopter crash involving Kobe Bryant," which had been announced by TMZ. AC Breshears then called BC Smith (the Incident Commander on the Willow Incident), and asked him for a status update, asked if Kobe Bryant had been on board the helicopter, and asked if BC Smith needed AC Breshears at the site. BC Smith was unable to confirm that Kobe Bryant had been on board, so AC Breshears contacted DC Marrone (the duty DC), and the two subsequently headed to the crash site in their respective vehicles. At some point, AC Breshears talked to DC Marrone about establishing peer support, and also spoke to BC Smith about a debriefing at Fire Station 89. AC Breshears arrived to the incident command post at approximately 1:00 or 1:30 p.m., and DC Marrone arrived shortly thereafter. There were multiple agencies there. AC Breshears noted that it was not really a Department incident because the fire had mostly been contained (with the exception of one small area that was still smoking) and they were just trying to figure out next steps regarding the incident. In fact, there were no longer any resources from the Department at the incident except BC Smith and CA Jordan. The rest were either at the debrief at Fire Station 89 or running calls in their areas.

AC Breshears ended up becoming the Incident Commander so that he could relieve BC Smith, who still had to run Battalion 5. AC Breshears explained to me that he was more of an agency representative, rather than an Incident Commander, because it was no longer an agency event. Rather, those on scene (the LASD, NTSB, FBI, etc.) needed logistical assistance for lighting, and things of that nature. AC Breshears called Fire Station 125 to bring over portable battery powered lights, and the LASD was trying to set up security because people were still trying to climb the hills near the incident. One of AC Breshears' primary concerns was getting the appropriate lighting in place before nightfall to assist with managing animals, hikers, and the like. AC Breshears also needed to figure out how to extinguish the magnesium fire that was still burning, as the smoke from that fire was getting press coverage and making people uneasy. And he coordinated getting a bulldozer on the hill to create an access road so that it would be easier for people to access the crash site in ATVs and other vehicles. Beyond that, AC

SMRH:4837-4729-2617.1                    -17-

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

Breshears' involvement was somewhat limited, as he was waiting for the lead agencies to give direction on what to do.

The following morning, AC Breshears attended an NTSB briefing at a nearby hotel (DC Marrone and CA Mike Brown were also there). The NTSB only wanted information regarding the incident released through the NTSB, so AC Breshears notified CA Imbrenda and possibly then-Acting AC Mike Brown that the Department was not to discuss anything regarding the incident moving forward. More specifically, the Department could talk about anything that happened before the crash, but anything that happened after the crash had to go through NTSB for their approval. AC Breshears then went back to his office, worked his typical day, and reported back for the evening briefing. AC Breshears relieved then-Acting AC Brown as Incident Commander via telephone, at which point then-Acting AC Brown asked AC Breshears to coordinate cadaver dogs for the following day. There was not much for AC Breshears to do during the second night of the incident, and only he and the LASD personnel were on site that night. The next morning, there was another briefing at the hotel, during which the agencies outlined new information regarding potential causes of the crash and advised those in attendance that they were going to try and remove the engine from the hill later in the day. AC Breshears then went back to the scene with DC Marrone and then-Acting AC Brown, and they took ATVs up to the crash site. AC Breshears noted that the site consisted mainly of debris at that point, with roughly 15-20 people collecting debris and taking pictures. AC Breshears and DC Marrone walked the site on the walking trail for approximately 20 minutes. After that, AC Breshears returned to his office and had no further involvement in the incident.

I asked AC Breshears if there was any direction given on scene regarding the taking of photographs. AC Breshears replied that he did not know, noting that he did not arrive until after the "first alarm assignment" had left the scene. However, AC Breshears thinks it is highly unlikely that there would have been any need for Department personnel to take photographs on a first alarm assignment because there was a brush fire and a crash, and everyone would be busy. He added that sometimes personnel wear helmet cameras, but noted that this typically occurs only on structure fires. Upon further questioning, AC Breshears clarified that he did not personally give any direction regarding the taking of photographs, since there were only two or three Department personnel on the scene when he arrived. He then reiterated that he does not know if anyone else gave any such direction.

I next asked AC Breshears if he is aware of anyone taking photographs at the crash site. He replied that he is not aware of anyone doing so. He added that the first he heard of any such alleged conduct was in the media reports regarding LASD personnel sharing photos with someone at a bar. He has also heard allegations in the media that Department personnel may have taken photos of the crash site, but he does not personally have knowledge of such conduct. With respect to the receipt of any photos, AC Breshears stated that the only two texts he received that contained anything in that vein were a text message from BC Smith with a photograph of the data plate of the helicopter (AC Breshears does not know who took the photo), and text message from CA Jordan containing a link to a flight path tracker, both of which were for situational

CONFIDENTIAL                                                      COLA001368

**TREX 26A.0018**

**EXHIBIT 2**

**- 59 -**

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

awareness on how the incident occurred. However, this information did not make a lot
of sense to AC Breshears, as he is not a pilot. AC Breshears is not aware of any other
photographs of the Willow Incident being taken or shared with anyone else.

AC Breshears was next asked if he ever heard DC Marrone instruct anyone at the
scene to not take photographs, or to delete any such photographs if they had already
been taken. AC Breshears responded that he does not recall anything specifically,
noting that there was no one for DC Marrone to give this instruction to by the time he
and AC Breshears arrived on scene. Ms. Kim then asked AC Breshears if there was a
reason the Department would need to take photos that contained images of human
remains at a scene like the Willow Incident. AC Breshears replied that photographs of
the crash site might be relevant or necessary for an AAR, but there would not be any
need for such photographs to contain images of human remains. AC Breshears added
that he has seen approximately 20-30 AARs, some of which were for incidents that
involved fatalities, but does not recall any of them containing graphic photos. AC
Breshears went on to add that he recalls a crew bus rollover that resulted in 1-2
fatalities, but there were no graphic photos needed for the investigation. Similarly,
during the time AC Breshears worked as a Safety Officer, he had occasion to take
photographs of incidents, but never took photographs of decedents, and never shared
the photographs he took with anyone outside of the investigation.

I next asked AC Breshears about the duties of a Safety Officer at a scene like the
Willow Incident. AC Breshears stated that duties depend on the incident, but on a
typical incident, a Safety Officer's role is to ensure that people are wearing the proper
protective equipment and prevent unsafe acts from occurring. So, for example, on a
brush fire, a Safety Officer will work directly for the IC, and basically handle any safety
issues that arise. AC Breshears went on to state that a Safety Officer might also
conduct an investigation and prepare an investigation report for issues such as
employee injuries that do not meet OSHA criteria, noting that during such investigations,
the Safety Officer might need to take photographs, including photos of the injured
employee. If, following such an investigation, the DC determines that one is warranted,
a preliminary investigation report known as a "blue sheet" will also be prepared by the
Safety Officer. The purpose of measures like these is for "lessons learned."

According to AC Breshears, on an incident such as the Willow Incident, the Safety
Officer would look at the spread potential of the brush fire, and try to get ahead of any
threats related to the fire. AC Breshears noted that on the morning of the Willow
Incident, the fog was heavy, so the spread potential was limited. AC Breshears went on
to state that at the Willow Incident, people were on the ground working underneath
moving aircraft, so the Safety Officer would need to monitor the interaction between the
aircraft and the ground resources. In addition, since this was a crash and fuel sources
were involved, the Safety Officer would need to initiate a decontamination procedure to
ensure that anyone who came in contact with the fuel was properly decontaminated,
along with their equipment, to prevent exposure. With respect to the Willow Incident,
AC Breshears initially stated that he does not believe there would be any reason or
need for the Safety Officer to take photographs. However, AC Breshears then
discussed an example of why such photos might be justified at an incident like Willow.

-19-

CONFIDENTIAL                                                                      COLA001369

**TREX 26A.0019**

**EXHIBIT 2**
**- 60 -**

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

According to AC Breshears, if the Safety Officer arrived on scene and had the opportunity and ability to take photographs of something that later on would be helpful for the investigators to have since the scene was changing, there might be a justification for such photographs. That being said, AC Breshears could not identify any reason why a Safety Officer would need to take photos of the Willow Incident (other than a safety-related issue like personnel working near a helicopter rotor that was still moving, which did not exist here), since the Department's mission was to put out the fire, not to document the incident. With respect to photographs of decedents, AC Breshears stated there was no reason to take any photographs of this nature.

I asked AC Breshears to describe what CA Jordan did during the Willow Incident. AC Breshears did not have much information in this regard, noting that when he arrived on scene, he did not know where CA Jordan was. AC Breshears believes CA Jordan was monitoring safety issues and oversaw the application of the agent to extinguish the magnesium fire, but does not have personal knowledge of what else CA Jordan did at the Willow Incident. AC Breshears never discussed the issue of photographs with CA Jordan, nor did CA Jordan ever speak with AC Breshears about the specifics of what he had seen up at the crash site. AC Breshears does not recall CA Jordan telling him that he was the one who covered up Kobe Bryant's body.

Although we had briefly touched on this subject already, I asked AC Breshears if he was aware of allegations that Department personnel had taken or shared photographs of the Willow Incident. AC Breshears responded that he had assumed that was the reason for the interview when he was first advised of such, and again noted that he had heard some allegations in the media.

Before we concluded, I asked AC Breshears if there was any other information he felt would be helpful for me to know as part of this investigation. AC Breshears replied that he does not see any reason for people to share photos of an incident outside of the investigative unit, regardless of the nature of the incident.

F.   **Battalion Chief Michael Brown – Witness**

As part of the additional witness interviews requested by the Department, I interviewed BC Michael Brown on June 18, 2020. Also present at the interview was Julia Kim, the Department's Risk Manager. Due to the COVID-19 pandemic and the need for social distancing, I conducted the interview via remote Zoom video, which was also audio recorded.

BC Brown started working for the County in October 1990, as a Probationary Fire Fighter. BC Brown currently serves as the Battalion Chief for Battalion 2 in San Dimas, and has held this assignment since April 2020.

I began the substantive portion of the interview by asking BC Brown about the Willow Incident. BC Brown was on duty on January 26, 2020, which was the first day of the incident. He was assigned to Battalion 1 and working overtime. He first became aware of the Willow Incident through dispatch on an "aircraft down." BC Brown proceeded to

SMRH:4837-4729-2617.1                    -20-

CONFIDENTIAL

COLA001370

TREX 26A.0020

EXHIBIT 2

- 61 -

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

the scene and checked in with BC Smith who was already there. BC Smith advised BC
Brown that he could cancel his response, so BC Brown returned to his battalion and
never even got out of his vehicle on that first day.

The following day, January 27, 2020, BC Brown ended his shift and then texted AC
Breshears to find out where he was, since BC Brown would be relieving AC Breshears
as the Incident Commander on the Willow Incident. At the time of the Willow Incident,
BC Brown was an acting AC. AC Breshears advised BC Brown that he would be at a
briefing and would meet BC Brown there. The briefing took place at a nearby hotel, and
BC Brown was introduced to individuals from the FAA and NTSB. The briefing did not
last long. Thereafter, AC Breshears, BC Brown and DC Marrone (who was also at the
briefing) all drove to the incident command post, which had been set up at the water
filtration company in Calabasas at the base of the hill. BC Brown checked in with the
LASD incident commander and exchanged phone numbers. At some point thereafter,
BC Brown left the command post and went to Fire Station 70 to sleep. BC Brown later
returned to the incident, periodically checked in with the LASD incident commander, left
to go get lunch, and generally monitored the incident throughout the day. The LASD
was involved in the incident the whole time, working in shifts at their own command
post. BC Brown eventually left again as there was no need for him to stay all night, but
he advised the LASD that they should contact him if they needed him for any reason.

I asked BC Brown if he was at the command post the entire time he was at the incident
site. BC Brown responded that he was at the command post for the majority of the
time, but did go up to the crash site on either the second or third day of the incident (he
is fairly certain it was the second day), and was accompanied by DC Marrone, AC
Breshears and CA Jordan. BC Brown explained that they went to the crash site so that
they could all get a visual as to what was going on. According to BC Brown, the group
walked to the furthest end of the crash site, looked around and generally assessed the
situation. They were at the actual crash site for approximately 20 minutes.

On January 28th, the third day of the incident, BC Brown again reported to the incident
and checked in with the LASD incident commander. BC Brown again advised the LASD
that he was available for any assistance that might be needed. BC Brown stated that
he watched the operation take place throughout the day, but there was not really
anything for him to do. I asked BC Brown to clarify what he meant by the "operation."
BC Brown explained that the Coroner personnel were coming off the hill with various
items, and he was observing their operations, as he was curious about their
investigation methodology, including the collection of evidence and the transfer of
materials. However, upon seeing a number of body parts and things of that nature, BC
Brown eventually removed himself and stopped observing. I asked BC Brown if he took
any photographs of the Coroner operations and he replied that he did not. He noted
that there was also a utility driver from the Department who was observing with him, but
the driver seemed bothered by what he was seeing so BC Brown told him to remove
himself from the situation. BC Brown is not aware of anyone taking photos of the
Coroner's operations, and if he had observed anyone doing so, he would have stopped
it at once. In fact, BC Brown is not aware of anyone taking photographs of the Willow
Incident at all, whether graphic in nature or not. I asked BC Brown if he could think of

SMRH 4837-4729-2617.1                                  -21-

CONFIDENTIAL                                                              COLA001371

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

any reason why someone at the Department, such as the PIO, Safety Officer, Staff Aide, or other personnel, would need to take or possess photos of decedents, body parts, or other graphic images from the Willow Incident. BC Brown replied that there is no reason that any of those individuals, or anyone from the Department for that matter, would need graphic photos.

I asked BC Brown if any direction was given on scene at the Willow Incident regarding the taking of photographs. BC Brown replied that he was aware of one instance on the first day, after he had briefly rolled out to the site and then returned to his station. According to BC Brown, when he returned to his station he turned on the television and was watching the news coverage of the incident. The news cameras were capturing the images of Department personnel sitting down instead of actively working the incident. BC Brown called BC Smith and asked him to tell everyone to stand up. Shortly thereafter, BC Brown noticed the personnel stand up. During that same call, and since BC Brown observed a fire burning in the news coverage, BC Brown asked BC Smith to have the helicopter crew capture a video of the scene just in case the Coroner or investigators needed it. BC Brown does not know if this was done, but it was an instruction regarding the taking of photographs (or video, in this instance).

I then asked BC Brown if he was aware of any instructions or directions not to take photos of the incident, or to delete photos that had been taken. BC Brown replied that when he called BC Smith on the first day of the incident when watching the news coverage, he told BC Smith, "just a reminder to make sure that no one is taking photos of the incident – be aware of folks with phones," or words to that effect. Given his prior experience as a PIO, BC Brown also emphasized to BC Smith that nothing should be posted on social media. Other than his own instructions, BC Brown is not aware of anyone giving instructions at the Willow Incident not to take photos, or to delete photos. However, he reiterated that he was not actually at the scene during the first day of the incident on January 26th.

Ms. Kim then asked BC Brown if he gave any instructions at the Willow Incident regarding not taking photos. BC Brown again stated that he reminded BC Smith that people should not be taking photographs and should not be posting to social media, and to "be aware of the policy." Ms. Kim then asked BC Brown what the Department's policy was. BC Brown replied that photos taken of anything inappropriate can be subject to investigation, which is the policy that BC Brown mentioned to BC Smith. BC Brown also noted to BC Smith to be careful as the media was around, and to be aware of people using their phones, given the sensitivity of the incident.

Before we concluded the interview, I asked BC Brown if there was anything else he thought would be helpful for me to know, given the nature of the investigation. BC Brown replied that a lot happens on the first day of an incident, and that it would probably be helpful for me to interview BC Smith.

CONFIDENTIAL

COLA001372

TREX 26A.0022

EXHIBIT 2

- 63 -

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

## G.    Deputy Douglas Johnson, LASD – Witness

The final witness interviewed in this investigation was Deputy Doug Johnson from the LASD – a deputy accused of improperly taking or receiving photos of the Willow Incident and sharing them with individuals outside of the LASD. As I had been advised that Deputy Johnson may have received the Willow Incident photographs he once possessed from someone at the Department, I requested the opportunity to interview him. After several communications between the Department and the LASD, the interview was arranged, and I spoke with Deputy Johnson on July 24, 2020. Deputy Johnson was represented during the interview by his attorney, Amy Johnson. Also present at the interview was Julia Kim, the Department's Risk Manager. Due to the COVID-19 pandemic and the need for social distancing, I conducted the interview via remote Zoom video, which was also audio recorded.

I began the interview by asking Deputy Johnson about his County background. Deputy Johnson began the LASD training academy as a deputy sheriff trainee in October 2008, and graduated in March 2009. He currently serves as a deputy sheriff at the LASD.

I then turned to the subject of the Willow Incident. Deputy Johnson confirmed that he was on duty during the first day of the Incident, January 26, 2020. I asked Deputy Johnson about his involvement in the Incident, which prompted a long narrative from him. According to Deputy Johnson, he had just finished up another call in Calabasas and was heading back to Agoura Hills. He then received a code 3 alert regarding a helicopter crash, so he headed to the incident, where he encountered several fire trucks and several other LASD units at the Las Virgenes Water District parking lot. When he arrived, the gates were opened and the group proceeded as far back toward the back of the property as possible, where they encountered a chain link fence near the hillside. The Department cut the chain link fence, and seven deputies, including Deputy Johnson, started to hike up to the crash site. Eventually, five of the deputies turned back, but Deputy Johnson and another deputy, Adrian Vargas, kept going. They eventually reached the crash site, and about a minute later, approximately ten members of the Department arrived. At that point, everyone was trying to figure out what was going on and if there were any survivors. They also had to clear out hikers and cyclists, and the Department personnel were fighting the magnesium fire. Deputy Johnson's command post had directed him to get pictures of the scene, so he proceeded to do so, as the Department was handling everything else. It took an extensive amount of time to take all of the photographs because the scene was so spread out, with many areas being difficult to access. While at the crash site, Deputy Johnson also taped off some of the trails, so that hikers could not access the site. Deputy Johnson was at the actual crash site for approximately six hours, arriving at approximately 10:30 a.m. and leaving at approximately 4:30 p.m.

I asked Deputy Johnson if he interacted with any Department personnel while he was at the crash site. Deputy Johnson replied that he interacted with approximately 15-20 firefighters, as well as some of the inmates from the camps, who were helping clear the brush. The interactions with the Department personnel were mostly business-related, as everyone was trying to access the different locations at the crash site. There was

CONFIDENTIAL                                                                    COLA001373

**TREX 26A.0023**

**EXHIBIT 2**

**- 64 -**

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

also a magnesium fire that was emitting a lot of smoke and giving the Department some problems.

Deputy Johnson advised me that he also interacted with two higher ranking, male Department employees – at the level of captain or possibly higher – at the crash site. One was Hispanic and the other was African American. The Hispanic male was attempting to climb down into an area where one of the decedents was, and advised Deputy Johnson that he needed to access the area to take some photographs for the Department command post. As it was obvious that the Hispanic male was struggling to access the area, Deputy Johnson advised him that he had already taken photographs of the entire crash site and would be happy to air drop them to him. The Hispanic male thanked Deputy Johnson and Deputy Johnson air dropped to him all of the photos he had taken at the crash site. The exchange lasted only a few minutes and Deputy Johnson does not recall seeing the individual there for the entire length of time Deputy Johnson was onsite. As to the African-American male, he was also taking pictures of the crash site with the camera on his phone, and asked Deputy Johnson where the decedents were. Deputy Johnson then walked him around the site to show him where all of the decedents and body parts were, and the man took photographs of all of these human remains as they were walking the crash site. Neither Deputy Johnson nor the African-American male opined on which body belonged to whom, nor was this issue discussed at all. Deputy Johnson thinks that one or both of these higher-ranking individuals were wearing either an orange or red helmet.

> **Investigator Note:** *From prior conversations with the Department, I was already aware that Deputy Johnson had identified two higher ranking males – one Hispanic and one African-American – as people who he knew possessed photos of the Willow Incident. Thus, prior to the interview, Ms. Kim gathered some photographs of individuals at the rank of captain or above who were at the Willow Incident and fit this description.*

At this point during the interview, Ms. Kim and I advised Deputy Johnson that Ms. Kim had gathered some photographs of individuals who were at the crash site on the first day of the Willow Incident, and asked if he would be willing to look at them and let us know if any of them looked like the Hispanic or African-American males that he had described. He agreed to do so. Ms. Kim then shared her screen on the videoconference and scrolled through the photographs. When Ms. Kim displayed the photograph of CA Brian Jordan, Deputy Johnson immediately identified him as the African-American male who had taken extensive photographs of decedents and body parts as the two of them walked around the crash site. With respect to the Hispanic male, Deputy Johnson felt that a couple of the individuals in the photographs looked familiar, but he could not definitively identify the person to whom he had air dropped the photos of the incident. He did, however, describe the Hispanic male to the best of his recollection, estimating that he was approximately 5'11" or 6'0", clean shaven with darker Hispanic features, approximately 210 pounds with an average build with a little bit of muscle, and likely in his mid-40's. Deputy Johnson commented that he seemed like a supervisor because he was not actively on the fire.

SMRH 4837-4729-2617.1

-24-

COLA001374

TREX 26A.0024

EXHIBIT 2

- 65 -

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

I then asked Deputy Johnson some follow-up questions about the photographs that he took at the Willow Incident. Deputy Johnson confirmed that he took approximately 25 photos of the scene, which included pieces of the helicopter, bodies and body parts, the terrain, the trail, and even the weather. He took the photos on his personal cell phone, and deleted them that same evening before he went to his parents' house for dinner. No one ever sent Deputy Johnson photos of the Willow Incident. In other words, the only photos he ever had of the incident were the ones he took himself. Deputy Johnson again confirmed that he took the photos because his LASD command post instructed him to send photos down the hill to them. Deputy Johnson explained that, without the photos, it would have been difficult for his command post to understand what was going on at the scene, what resources were needed, and things of that nature.

I asked Deputy Johnson what the graphic photographs depicted, and whether there were actual human remains or body parts visible in the photos. Deputy Johnson confirmed that the photos he took and air dropped to the Hispanic male, as well as the photos he assisted and observed the African-American male taking, all contained the same images. Among other things, there was one body that was decapitated and cut off just above the knees, two bodies down in the creek (one cut off at the knees and missing the arms, and the other cut in half from the waist down, consisting of only the head and torso), a few piles that appeared to be bodies, another pile with an arm and hand coming out from it, some severed feet in shoes, intestines and other organs spread out over the terrain, and other gruesome images. Deputy Johnson noted that it was the most gruesome thing he has ever experienced. With respect to ascertaining whether remains were identifiable as a specific person, Deputy Johnson recalled that in one of the piles of bodies, a pair of pants were visible, and the wallet in the pocket contained identification. He also noted that another decedent was more intact, with her hair over her face, but her face was badly injured and "torn up." Deputy Johnson noted that he did not recognize Kobe Bryant specifically among the remains.

On the issue of Kobe Bryant, Deputy Johnson noted that he had been at the scene for approximately 45 minutes when he learned that Kobe Bryant had been onboard. He also noted that there was a body right next to the helicopter that appeared to be a tall African American male, based on the color and size of the person's hand and arm. However, Deputy Johnson did not see any other identifying or intact features that would have enabled him to positively identify the decedent as Kobe Bryant.

I next asked Deputy Johnson if he ever sent, shared or showed any of the photographs he took at the Willow Incident to, or with, anyone at the Department. Deputy Johnson replied that other than the Hispanic male to whom he had air dropped the photos, he had not. He added that he did send the photos to the LASD deputy in charge of the command post, but no one else. Other than the African-American male and himself, Deputy Johnson is not aware of anyone else who took photos at the Willow Incident.

On July 31, 2020, and again on September 4, 2020, Ms. Kim and I had brief follow-up discussions with Deputy Johnson, during which we showed him additional photos of Department personnel in a further attempt to identify the Hispanic male to whom Deputy

CONFIDENTIAL

COLA001375

**TREX 26A.0025**

**EXHIBIT 2**

**- 66 -**

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

Johnson air dropped the photos of the Willow Incident. However, Deputy Johnson was unable to identify the individual.

## III.   Allegations and Findings

The allegations in this investigation were driven by the investigation requested by the Department. With respect to findings, where admissions as to allegations were made by the subject, they were accepted as true. Where the evidence was circumstantial or conflicting, a preponderance of the evidence standard (i.e., whether the evidence "more likely than not" substantiates the allegation) was used. This is the industry standard for workplace investigations. It is also the same standard that is applied in most civil cases. Credibility determinations were also made where appropriate.

### *Allegation #1*:

CA Brian Jordan took photographs containing images of human remains at the Willow Incident site.

### *Finding #1*:

Substantiated.

During our interview, CA Jordan admitted that he took approximately 10-20 photographs on the first day of the Willow Incident, in order to provide "intel" to the incident commander, since the site was not easily accessible. CA Jordan confirmed that some of the photographs depicted the hose lay, and others were of the trail that was used for access, with the crash site in the background. I pressed CA Jordan for further details, and he initially avoided my questions by replying that he was trying to keep what he saw out of his head, and that repeating what he saw was not good for his mental health. After further questioning, CA Jordan again avoided the questions, but eventually acknowledged that the photographs also depicted the fuselage. When I asked about images of human remains, CA Jordan again avoided the question, stating that he did not care or want to remember. However, after I advised CA Jordan that I had already received information regarding photographs, he acknowledged that he recalled seeing flesh on the ground, the insides of bodies, a torso bent over, a foot, and things of that nature at the crash site, but does not recall if those images were in the photographs that he took. Ultimately, he stated that those graphic images, as well as Kobe Bryant's remains, were probably in the photographs that he took.

CA Jordan's admissions were corroborated by Deputy Johnson from the LASD. Specifically, Deputy Johnson identified CA Jordan as the individual whom he accompanied throughout the crash site. As the two walked the site, Deputy Johnson personally observed CA Jordan taking graphic photographs of decedents, including bodies that were either decapitated, severed in half, and/or missing limbs. Deputy Johnson was unequivocal in his identification of CA Jordan when shown photos of various individuals from the Department, and recognized him immediately. Deputy

SMRH:4837-4729-2617.1                    -26-

CONFIDENTIAL

COLA001376

TREX 26A.0026

EXHIBIT 2

- 67 -

ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE

Johnson was very forthcoming during my interview with him, and I found him to be highly credible, with no apparent reason to lie about CA Jordan's identity or conduct.

* * *

### Allegation #2:

CA Brian Jordan shared photographs containing images of human remains that he took at the Willow Incident site with others at the Department.

### Finding #2:

Substantiated.

During the interview, CA Jordan acknowledged that he showed a picture of the hose lay to people whom he was driving up to the crash site and also to individuals at the command post, and likewise acknowledged that he sent one of the LA Times or Daily News photographs to a photographer friend and some family members. However, when I asked CA Jordan if he shared photographs of the Willow Incident with CA Imbrenda, CA Jordan denied doing so. Notably, when I asked CA Jordan this question, he immediately pressed me for information, wanting to know if someone said he had done so. When I declined to answer, CA Jordan again denied sharing the photographs with CA Imbrenda.

I did not find CA Jordan's denial regarding sharing the photographs with CA Imbrenda to be credible for several reasons. First, on the issue of photographs, CA Jordan was generally evasive during our interview. His repeated statements that he did not "care to remember" what he saw, and that discussing the incident was distressing for him, came across as a tactic designed to avoid answering my questions, particularly when measured against CA Jordan's sharp memory as to other aspects of the incident. Notably, throughout this investigation and the related investigations, no other witness behaved in what I perceived to be such an evasive manner. Second, when speaking to CA Imbrenda in a related investigation, I found his account regarding who sent him photographs of the Willow Incident (CA Kahan and CA Jordan) to be credible, and I am not aware of any facts that would indicate a motive for CA Imbrenda to lie about this issue, particularly when he was forthcoming on other issues that implicated him personally. Third, another witness in that related investigation – who works for a different agency – stated that he believes the graphic photos from the Willow Incident were sent to CA Imbrenda by a Safety Officer, which corroborates CA Imbrenda's statement to me regarding the source of the photos. Thus, I find it more likely than not that CA Jordan shared photographs of the Willow Incident with CA Imbrenda.

With respect to the contents of the photos, as noted above, CA Jordan admitted that the photographs he took at the Willow Incident "probably" contained images of human remains, including those of Kobe Bryant. Likewise, Deputy Johnson credibly reported that he personally observed CA Jordan taking graphic photographs of the decedents at the scene, including bodies that were either decapitated, severed in half, and/or missing limbs. Finally, as noted above, CA Imbrenda credibly stated that the two individuals

CONFIDENTIAL      COLA001377

**TREX 26A.0027**

**EXHIBIT 2**

**- 68 -**

**ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGE**

who sent him photographs of the Willow Incident were CA Jordan and CA Kahan, and multiple witnesses in a related investigation reported that the photos in CA Imbrenda's possession contained images of discernable human remains such as a foot, a torso, and possibly Kobe Bryant's remains, which fit within the description of the photographs CA Jordan took.  In contrast, CA Kahan did not go to the crash site until Day 2 of the incident, when the discernable human remains had either been removed from the site or were covered in blankets.  Importantly, DC Marrone (who was at the crash site on the same day as CA Kahan) noted that there was no opportunity to take such photos on Day 2 without being extremely conspicuous, the Coroner would likely not have allowed it, and he does not believe he saw any covered remains or decedents on Day 2 in any event.  Accordingly, and based on a preponderance of the evidence standard, I find it more likely than not that CA Brian Jordan shared photographs of the Willow Incident, which contained images of human remains, with CA Imbrenda.

RDJ

**CONFIDENTIAL**                                                                 COLA001378

TREX 26A.0028

**EXHIBIT 2**

**- 69 -**