1  MIRA HASHMALL (State Bar No. 216842)
2  mhashmall@millerbarondess.com
   JASON H. TOKORO (State Bar No. 252345)
3  CASEY B. SYPEK (State Bar No. 291214)
4  MILLER BARONDESS, LLP
   1999 Avenue of the Stars, Suite 1000
5  Los Angeles, California 90067
6  Tel.: (310) 552-4400 | Fax: (310) 552-8400

7  Attorneys for Defendants
8  COUNTY OF LOS ANGELES, LOS ANGELES COUNTY FIRE DEPARTMENT,
   JOEY CRUZ, RAFAEL MEJIA, MICHAEL RUSSELL, RAUL VERSALES,
9  ARLIN KAHAN, and TONY IMBRENDA

10
11 [*Additional counsel continued on next page*]

12          **UNITED STATES DISTRICT COURT**

13     **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

14

15 VANESSA BRYANT,                    **Case No. 2:20-cv-09582-JFW-E**
                                      (Consolidated with 2:20-cv-10844-
16          Plaintiff,                JFW-E)

17     vs.                            **DEFENDANTS' NOTICE OF
                                      MOTION AND MOTION FOR
18 COUNTY OF LOS ANGELES, et al.,     JUDGMENT AS A MATTER OF
                                      LAW; MEMORANDUM OF
19          Defendants.               POINTS AND AUTHORITIES**

20
                                      [Filed concurrently with Declaration of
21 CHRISTOPHER L. CHESTER,            Mira Hashmall; [Proposed] Order]
22          PLAINTIFF,
                                      Trial Date:  August 10, 2022
23     vs.
                                      The Honorable John F. Walter
24
25 COUNTY OF LOS ANGELES, et al.,
26          Defendants.
27
28

1 | [*Additional counsel, continued from previous page*]

2

3 | JONATHAN C. McCAVERTY (State Bar No. 210922)
*Principal Deputy County Counsel*

4 | jmccaverty@counsel.lacounty.gov
OFFICE OF THE COUNTY COUNSEL

5 | General Litigation Division

6 | 500 West Temple Street, Suite 468
Los Angeles, California 90012

7 | Tel.: (213) 974-1828 | Fax: (213) 626-7446

8

9 | Attorneys for Defendant Los Angeles County Sheriff's Department

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

564243.14

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW

1   **TO THE COURT, ALL PARTIES AND THEIR RESPECTIVE**

2   **COUNSEL OF RECORD:**

3       **PLEASE TAKE NOTICE** that on the soonest date that this matter may be

4   heard, in Courtroom 7A of the above-captioned Court, located at 350 W. 1st Street,

5   Los Angeles, California 90012, Defendants County of Los Angeles ("County"), Los

6   Angeles County Sheriff's Department ("LASD"), and Los Angeles County Fire

7   Department ("LACFD") (collectively, "Defendants") will and hereby do

8   respectfully move this Court for an order granting Defendants' Motion for Judgment

9   as a Matter of Law on the ground that there is a legally insufficient evidentiary basis

10  to support Plaintiffs' claims against Defendants for violation of their constitutional

11  rights pursuant to 42 U.S.C. section 1983.

12      The Motion is based upon this Notice of Motion; the concurrently filed

13  Memorandum of Points and Authorities; the supporting Declaration of Mira

14  Hashmall; the trial transcripts and exhibits; the pleadings and records on file in this

15  action; and any further evidence or argument received by the Court in connection

16  with the Motion.

17

18  DATED:  August 21, 2022          OFFICE OF COUNTY COUNSEL

19

20                                   By:   */s/ Jonathan C. McCaverty*

21                                       JONATHAN C. McCAVERTY
                                         Attorneys for Defendant
22                                       LOS ANGELES COUNTY SHERIFF'S
                                         DEPARTMENT
23

24

25

26

27

28

1  DATED:  August 21, 2022          MILLER BARONDESS, LLP

2

3                                             By: _/s/ Mira Hashmall_____

4                                                    MIRA HASHMALL
                                                     Attorneys for Defendants
5                                                    COUNTY OF LOS ANGELES, LOS
                                                     ANGELES COUNTY FIRE
6                                                    DEPARTMENT, JOEY CRUZ, RAFAEL
                                                     MEJIA, MICHAEL RUSSELL, RAUL
7                                                    VERSALES, ARLIN KAHAN, and
                                                     TONY IMBRENDA
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW

# **TABLE OF CONTENTS**

Page

I.      INTRODUCTION ..........................................................................................10

II.     THE EVIDENCE AT TRIAL ......................................................................11

    A.      LASD And LACFD Respond To The January 26, 2020 Crash ..........11

    B.      Deputy Joey Cruz Breaks Policy And Shows Photos To A Friend......13

    C.      LASD Receives A Complaint And Takes Action ................................14

    D.      LACFD Receives A Call From LASD And Takes Action...................15

    E.      Fire Captain Tony Imbrenda Breaks Policy And Shows Photos
        At An Event With Other First Responders .............................................16

    F.      LACFD Receives A Complaint And Takes Immediate Action............16

    G.      No County Photos Are On The Internet Or In The Media ..................17

III.    JUDGMENT AS A MATTER OF LAW UNDER RULE 50 .......................18

IV.     PLAINTIFFS' *MONELL* CLAIM FAILS BECAUSE THERE IS NO
       PREDICATE CONSTITUTIONAL VIOLATION .........................................18

    A.      The Evidence Does Not Support A Substantive Due Process
        Violation By "Public Dissemination" Of Death Images ......................19

    B.      There Is No Constitutional Right To Preclude Internal
        Government Photo Taking ......................................................................20

    C.      Imbrenda and Cruz Did Not Act Under Color Of Law .......................23

    D.      The Officers' Conduct Does Not Shock The Conscience ...................24

V.      PLAINTIFFS' *MONELL* CLAIM FAILS BECAUSE DEFENDANTS
       DID NOT HAVE A LONGSTANDING PRACTICE OR CUSTOM
       OF SHARING PHOTOS DEPICTING HUMAN REMAINS.....................25

    A.      Sheriff Villanueva's Testimony............................................................26

    B.      Luella Weireter's Testimony ................................................................27

    C.      Adam Bercovici's Testimony ...............................................................27

VI.     PLAINTIFFS' *MONELL* CLAIM FAILS BECAUSE THE
       COUNTY'S POLICIES AND TRAINING WERE NOT
       DELIBERATELY INDIFFERENT .............................................................30

    A.      Defendants' Policies Were Not Facially Deficient...............................30

    B.      There Is No "Pattern of Similar Constitutional Violations".................33

1      C.    The County's Training Was Not Deliberately Indifferent.....................33

2  VII.  CONCLUSION .................................................................................34

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Chavez v. Las Vegas Metro. Police Dep't*,
648 F. App'x 657 (9th Cir. 2016)................................................................32

*Collins v. City of Harker Heights, Tex.*,
503 U.S. 115 (1992) .................................................................................18

*Connick v. Thompson*,
563 U.S. 51 (2011) .............................................................................22, 26

*County of Sacramento v. Lewis*,
523 U.S. 833 (1998) .................................................................................18

*Dobbs v. Jackson Women's Health Organization*,
142 S. Ct. 2228 (2022) .............................................................................21

*Estate of Jones by Jones v. City of Martinsburg, W. Va.*,
961 F.3d 661 (4th Cir. 2020)......................................................................34

*First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*,
988 F.3d 978 (7th Cir. 2021).......................................................................24

*Flores v. County of Los Angeles*,
758 F.3d 1154 (9th Cir. 2014).....................................................................33

*Galban v. City of Fontana*,
2021 WL 1307722 (C.D. Cal. Apr. 7, 2021)...........................................27, 29

*Garber v. Mohammadi*,
2013 WL 4012633 (C.D. Cal. Aug. 6, 2013)...................................................28

*Gordon v. County of Orange*,
6 F.4th 961 (9th Cir. 2021).........................................................................32

*Hall v. City & County of Honolulu*,
2022 WL 1229965 (D. Haw. Apr. 26, 2022) ................................................31

*Hernandez v. Garland*,
38 F.4th 805 (9th Cir. 2022).......................................................................21

*Huffman v. County of Los Angeles*,
147 F.3d 1054 (9th Cir. 1998)...............................................................23, 24

*Huling v. City of Los Banos*,
869 F. Supp. 2d 1139 (E.D. Cal. 2012).........................................................23

*Hyer v. City & County of Honolulu*,
2021 WL 2172816 (D. Haw. May 27, 2021) ............................................27, 28

*Hyun Ju Park v. City & County of Honolulu*,
    952 F.3d 1136 (9th Cir. 2020) ...................................................................... passim

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ............................................................................ 18

*Jones v. Jinparn*,
    2020 WL 999806 (N.D. Cal. Mar. 2, 2020) ...................................................... 25

*Joyce v. Town of Tewksbury, Mass.*,
    112 F.3d 19 (1st Cir. 1997) ................................................................................ 23

*Lamorie v. Davis*,
    485 F. Supp. 3d 1065 (D. Ariz. 2020) ............................................................... 21

*Marsh v. County of San Diego*,
    680 F.3d 1148 (9th Cir. 2012) ..................................................................... passim

*Miller v. Gammie*,
    335 F.3d 889 (9th Cir. 2003) .............................................................................. 21

*Monell v. Dep't of Soc. Servs. of City of N.Y.*,
    436 U.S. 658 (1978) ..................................................................................... passim

*Nadell v. Las Vegas Metro. Police Dep't*,
    268 F.3d 924 (9th Cir. 2001) .............................................................................. 26

*Naffe v. Frey*,
    789 F.3d 1030 (9th Cir. 2015) ...................................................................... 23, 24

*Olejnik v. England*,
    147 F. Supp. 3d. 763 (W.D. Wis. 2015) ............................................................ 21

*Porter v. Osborn*,
    546 F.3d 1131 (9th Cir. 2008) ........................................................................... 24

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000) ........................................................................................... 18

*Shelley v. County of San Joaquin*,
    996 F. Supp. 2d 921 (E.D. Cal. 2014) ............................................................... 25

*Sinks v. County of Fresno*,
    2012 WL 174969 (E.D. Cal. Jan. 20, 2012) ...................................................... 24

*Skop v. City of Atlanta, GA*,
    485 F.3d 1130 (11th Cir. 2007) ......................................................................... 30

*Szabla v. City of Brooklyn Park, Minn.*,
    486 F.3d 385 (8th Cir. 2007) ............................................................................. 23

*Tompkins v. Frost*,
    655 F. Supp. 468 (E.D. Mich. 1987) ................................................................. 34

8

*Trevino v. Gates,*
    99 F.3d 911 (9th Cir. 1996)..................................................................26

*Waller v. City & County of Denver,*
    932 F.3d 1277 (10th Cir. 2019)......................................................28, 29

*Watts v. City of Port St. Lucie, Fla.,*
    2015 WL 7736532 (S.D. Fla. Nov. 30, 2015)........................................26

*Wettstein v. County of Riverside,*
    No. EDCV 19-1298 JGB (KKx), 2020 WL 2199005 (C.D. Cal. Jan. 22,
    2020)..............................................................................................25, 29

**FEDERAL STATUTES**

42 U.S.C. § 1983...............................................................................10, 18, 34

**FEDERAL RULES**

Fed. R. Civ. P. 50...................................................................................18

Fed. R. Civ. P. 50(a)(1)..........................................................................18

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW

# I.   **INTRODUCTION**

In trial, Plaintiffs presented their claim for *Monell* liability under 42 U.S.C. section 1983.  Plaintiffs contend that the County's Sheriff's Department ("LASD") and Fire Department ("LACFD") violated their substantive due process rights by taking and sharing photos of the January 26, 2020 helicopter crash site.

One case supports the existence of Plaintiffs' claimed constitutional right: *Marsh v. County of San Diego*, 680 F.3d 1148 (9th Cir. 2012).  In *Marsh*, the Ninth Circuit found a constitutional right to prevent "public dissemination of a family member's death images." *Id.* at 1152.  The Ninth Circuit held that a prosecutor sending an "autopsy photograph to the press" shocked the conscience because, "given the viral nature of the Internet," the victim's mother "might easily stumble upon photographs of her dead son on news websites, blogs or social media websites." *Id.* at 1155.

This did not happen here.  Instead, Plaintiffs' case rests upon: (i) sharing of photos internally among personnel who responded to the crash; (ii) one deputy showing a friend photos on his phone; and (iii) one LACFD employee showing other fire officers photos on his phone at an awards event.  These facts do not support the public dissemination required by *Marsh*.  There is no real possibility that Plaintiffs "might easily stumble" on photos of their deceased family members.

After eight days of trial, there is no evidence of County photos online or in the press.  This crash was one of the most publicized air disasters in recent history.  The crash generated intense and lasting public interest.  If County photos had become public—like the many photos taken by other agencies, private parties, and the press—Plaintiffs would have found them.  They did not.

In fact, the County photos were deleted to protect Plaintiffs.  A neutral forensic examination by Kroll confirmed that there are no photos containing victims' remains.  The photos are gone.  Plaintiffs question what *might* have been on personal cell phones replaced or reset by County personnel.  But devices that no

longer exist cannot spread County photos.  There was no violation of the right recognized for the first time in *Marsh*.

What happened is that County personnel made mistakes by sharing County photos while off duty and in violation of County policies and training.  They were not acting "under color of state law"; and their lapses of judgment do not "shock the conscience," precluding any due process violation.  Nor do these mistakes comprise a custom, policy, or practice for purposes of municipal liability under *Monell*.

There is no evidence that the County has a "long-standing" custom of publicly disseminating photos of the deceased.  Nor is there evidence that County officials were "deliberately indifferent" to the need to adopt policies or training to prevent violations of Plaintiffs' rights.  The County already has explicit confidentiality policies and trained its employees on these policies.  Plaintiffs contend that more specific policies or training should have been implemented.  But a *Monell* claim cannot be predicated on after-the-fact, armchair quarterbacking.  This was the first incident like this in the long history of LASD and LACFD.

## II.  THE EVIDENCE AT TRIAL

### A.   LASD And LACFD Respond To The January 26, 2020 Crash

On the morning of Sunday, January 26, 2020, a helicopter crashed with nine people onboard, including Plaintiff Bryant's husband and daughter and Plaintiff Chester's wife and daughter.  (Declaration of Mira Hashmall ("Hashmall Decl."), Ex. 2 [8/12 Tr.] at 655:24-656:16.)  The crash occurred in the Santa Monica Mountains, not far from hiking and mountain biking trails.  (*Id*. Ex. 11 [Tr. Ex. 16]; *id*. Ex. 13 [Tr. Ex. 47]; *id*. Ex. 1 [8/11 Tr.] at 283:13-285:3.)  Civilian cyclists called 911 and took video and photos of the scene.  (*Id*. Ex. 2 [8/12 Tr.] at 714:17-715:19; *id*. Ex. 3 [8/15 Tr.] at 852:17-853:18; *id*. Ex. 41 [Tr. Ex. 647]; *id*. Ex. 43 [Tr. Ex. 651].)

LASD and LACFD responded to the crash to aid any survivors, secure the scene, and prevent brush fires from spreading.  (*Id*. Ex. 2 [8/12 Tr.] at 655:24-

656:16.)  The crash site was approximately one mile and one-thousand vertical feet up from the Las Virgenes Water District.  (*Id.* at 714:21-715:3.)  The terrain was dangerous, and there was heavy fog.  (*Id.* at 705:3-706:15.)  LASD and LACFD set up a command post at the Water District.  (*Id.* Ex. 3 [8/15 Tr.] at 790:3-20.)

LASD Deputies Johnson and Vargas hiked about an hour to the crash site.  (*Id.* Ex. 2 [8/12 Tr.] at 657:23-658:16.)  The crash created a large debris field and ignited brush fires and a magnesium fire.  (*Id.* Ex. 41 [Tr. Ex. 647]; *id.* Ex. 2 [8/12 Tr.] at 712:7-20.)

Based on initial 911 calls, LACFD dispatched crews to respond to an aircraft crash.  (*Id.* Ex. 6 [8/18 Tr.] at 1654:14-1655:22.)  LACFD had to add additional resources once a brush fire was reported.  (*Id.* at 1657:23-1658:18.)  Firefighters laid down a hose that was almost one mile long to reach the crash site.  (*Id.* Ex. 4 [8/16 Tr.] at 1529:23-1531:3; *Id.* Ex. 6 [8/18 Tr.] at 1657:23-1658:18.)  They worked to identify the helicopter and to put out the toxic magnesium fire.  (*Id.* Ex. 2 [8/12 Tr.] at 671:1-7, 712:7-20.)

Deputies Johnson and Vargas looked for survivors, but there were none.  (*Id.* Ex. 2 [8/12 Tr.] at 660:7-15.)  They removed hikers and cyclists and taped off nearby trails to keep civilians away.  (*Id.* at 658:17- 661:2, 707:22-708:5, 714:17-715:19; *id.* Ex. 3 [8/15 Tr.] at 939:20-940:9.)  After the perimeter was secured, Deputy Johnson started his standard investigation process.  (*Id.* Ex. 2 [8/12 Tr.] at 703:11-24, 708:6-20.)  LAPD Policy 5-05/060.10 provides:

> Traffic collision scenes *shall be photographed* when the collision involves a fatality, serious injury which may become a fatality or when a Department vehicle is involved.
>
> A photograph of the face of a deceased party *shall be taken* for identification purposes.  (Hashmall Decl. Ex. 44 [Tr. Ex. 678] (emphasis added).)

As he had been trained, Deputy Johnson took photos of the entire accident scene, including helicopter parts and human remains.  (*Id.* Ex. 2 [8/12 Tr.] at

664:17-665:14, 671:1-7, 683:7-23.)  Deputy Johnson sent the photos to the officer running the command post, Deputy Versales, and to a firefighter on the scene.  (*Id*. at 670:4-9, 671:17-672:7, 709:16-20.)  Deputy Versales forwarded the photos to other personnel responding to the crash.  (*Id*. Ex. 3 [8/15 Tr.] at 806:4-20.)  LACFD Captain Brian Jordan (now retired) was also on scene and took site photos that he sent to Captain Tony Imbrenda, LACFD's Public Information Officer ("PIO").  (*Id*. Ex. 5 [8/17 Tr.] at 1463:20-1464:2.)

Around 11:30 a.m., media outlets reported that Kobe Bryant had been one of the passengers.  (*Id*. Ex. 1 [8/11 Tr.] at 234:11-235:2.)  As reporters and fans started flocking to the site, deputies expanded the perimeter and started closing down the surrounding area, restricting it only to authorized emergency personnel.  (*Id*. Ex. 2 [8/12 Tr.] at 714:17-715:19; *id*. Ex. 3 [8/15 Tr.] at 852:17-853:18.)

By 2 to 3 p.m., multiple other agencies were on scene: the National Transportation Safety Board ("NTSB"), Federal Aviation Administration, Federal Bureau of Investigation, Department of Medical Examiner-Coroner ("DMEC"), and Malibu Search & Rescue.  (*Id*. Ex. 1 [8/11 Tr.] at 335:13-336:7; *id*. Ex. 3 [8/15 Tr.] at 938:17-939:15; *id*. Ex. 4 [8/16 Tr.] at 1139:16-1140, 1252:2-16.)  Many agency took photos to document the crash site.  (*Id*. Ex. 1 [8/11 Tr.] at 291:10-19, 333:3-8; ; *id*. Ex. 5 [8/17 Tr.] 1539:18-1540:4; *id*. Ex. 6 [8/18 Tr.] at 1667:23-1668:15.)  NTSB's crash site photos included human remains.  (*Id*. Ex. 1 [8/11 Tr.] at 333:3-8.)  DMEC's Special Operations Response Team arrived early the next morning and took photos of the victims before removing the remains.  (*Id.* at 289:17-291:9.)

**B.    Deputy Joey Cruz Breaks Policy And Shows Photos To A Friend**

Deputy Joey Cruz was a deputy trainee on site at the crash scene.  (Hashmall Decl. Ex. 3 [8/15 Tr.] at 983:19-23.)  He was working the incident with his training officer, Deputy Mejia, who sent him photos of the crash taken by Deputy Johnson. (*Id*. at 984:20-985:3.)  Deputy Cruz had been at LASD for less than a year and was disturbed by the crash.  (*Id*. at 983:19-23, 1010:21-1011:12.)

On January 28, 2022, Deputy Cruz went to visit his mother.  (*Id*. at 997:12-15.)  He stopped to talk to his friend, Victor Gutierrez, a bartender at the Baja California Bar and Grill in Norwalk.  (*Id*. at 1002:17-23, 1010:21-1011:12.)  Deputy Cruz spoke with Gutierrez about the crash and showed him between one and three photos, which Deputy Cruz swiped through while holding his phone.  (*Id*. Ex. 1 [8/11 Tr.] at 347:22-348:2, 357:18-358:7; Ex. 3 [8/15 Tr.] at 1010:4-9.)

Deputy Cruz regrets his actions and acknowledges he breached LASD's confidentiality policy.  (*Id*. Ex. 4 [8/16 Tr.] at 1079:18-1080:3.)  LASD's confidentiality policy, Policy 5-05/060.10, provides:

> The official business of the Department *is confidential*.  Members shall only discuss or give official information:
> - *to persons for whom the information is intended*;
> - as directed by their superior officers; and/or
> - as required by law.  (Hashmall Decl. Ex. 46 [Tr. Ex. 685] (emphasis added).)

**C.    LASD Receives A Complaint And Takes Action**

On January 29, 2020, the Sheriff's Information Bureau ("SIB") received an email from Rafael Mendez.  (Hashmall Decl. Ex. 8 [Tr. Ex. 1].)  The email stated that a deputy had shown crash site photos on his phone to someone at the Baja California Bar and Grill.  (*Id*.; Hashmall Decl. Ex. 1 [8/11 Tr.] 403:24-405:3.)  SIB shared the email with LASD command staff, who launched an immediate inquiry.  (*Id*. Ex. 4 [8/16 Tr.] at 1208:15-23; *id*. Ex. 14 [Tr. Ex. 53].)  LASD investigators visited the bar and obtained surveillance footage that same day.  (Hashmall Decl. Ex. 5 [8/17 Tr.] at 1318:8-1320:6; *id*. Ex. 1 [8/11 Tr.] at 398:17-399:12.)

When Sheriff Villanueva learned what had happened at the bar, he immediately directed his personnel to launch an inquiry and make sure no photos got outside the department.  (*Id*. Ex. 7 [8/19 Tr.] at 2005:20-2008:9.)  He said if everyone was honest, did not publicly disseminate any photos, and deleted them, they would receive a performance log entry in their personnel file in lieu of more

14

severe discipline.  (*Id.* at 2011:15-2013:15.)

Lost Hills Station Lieutenant Hector Mancinas and Sergeant Marcus Phillips interviewed 28 deputies, reserve deputies, sergeants, and civilian volunteers. (Hashmall Decl. Ex. 7 [8/19 Tr.] at 2007:22-2009:19; *id.* Ex. 5 [8/17 Tr.] at 1322:5-1323:8.)  By January 31, 2020, they determined that all LASD personnel who had taken, shared, or received crash site photos had deleted them.  (*Id.* Ex. 7 [8/19 Tr.] at 2036:22-2037:17; *id.* Ex. 21 [Tr. Ex. 97]; *id.* Ex. 22 [Tr. Ex. 101]; *id.* Ex. 24 [Tr. Ex. 110]; *id.* Ex. 26 [Tr. Ex. 122]; *id.* Ex. 28 [Tr. Ex. 139].)  Only Deputy Cruz had shown a photo to anyone outside LASD.  (*Id.* Ex. 7 [8/19 Tr.] at 2036:22-2037:17; *id.* Ex. 2 [8/15 Tr.] at 854:15-855:4, 857:19-858:18, 921:18-22; *id.* Ex. 4 [8/16 Tr.] at 1080:4-22, 1147:17-1149:5.)

Once this initial inquiry was complete, the Internal Affairs Bureau ("IAB") took over and conducted a comprehensive investigation.  (*Id.* Ex. 34 [Tr. Ex. 307]; *id.* Ex. 7 [8/19 Tr.] at 2028:1-8, 2032:12-16.  That is the standard operating procedure at LASD.  (*Id.* Ex. 7 [8/19 Tr.] at 2014:5-19.)  IAB interviewed 41 witnesses and compiled a comprehensive 1,140-page report.  (*Id.* Ex. 17 [Tr. Ex. 63]; *id.* Ex. 23 [Tr. Ex. 108]; *id.* Ex. 25 [Tr. Ex. 112]; *id.* Ex. 27 [Tr. Ex. 124]; *id.* Ex. 38 [Tr. Ex. 439]; *id.* Ex. 7 [8/19 Tr.] at. 2028:1-8, 2032:12-16; *id.* Ex. 2 [8/12 Tr.] at 612:3-5.)

### D.   LACFD Receives A Call From LASD And Takes Action

On January 31, 2020, LASD Captain Matthew Vander Horck called LACFD Deputy Fire Chief Anthony Marrone.  (Hashmall Decl. Ex. 4 [8/16 Tr.] at 1239:5-1240:6.)  He told Chief Marrone that there was a complaint about a deputy sharing crash site photos.  (*Id*; *id.* Ex. 6 [8/18 Tr.] at 1686:16-1687:18.)  He advised Chief Marrone that there were two LACFD employees at the crash site on January 26, 2020 who might have taken or received photos.  (*Id.* Ex. 6 [8/18 Tr.] at 1686:16-1687:18.)

Chief Marrone notified Deputy Fire Chief William McCloud, who oversaw

1   the Leadership and Professional Standards Bureau at that time.  (*Id.* at 1670:8-16,
2   1687:25-1688:8.)  LACFD worked to identify the personnel who had been present
3   on the first day of the crash site investigation.  (*Id.* at 1724:25-1727:1.)  At that time,
4   there were no allegations that LACFD personnel had shared photos of human
5   remains improperly.  (*Id.* at 1729:20-1730:10.)

6       **E.    Fire Captain Tony Imbrenda Breaks Policy And Shows Photos At**
7              **An Event With Other First Responders**

8       On February 15, 2020, Captain Imbrenda attended the Golden Mike Awards,
9   a media awards event.  (*Id.* Ex. 5 [8/17 Tr.] at 1480:9-23.)  He attended with Captain
10  Sky Cornell and two firefighters from the Los Angeles City Fire Department, Cody
11  Weireter and Erik Scott.  (*Id.* at 1481:6-1482:5.)  Captain Imbrenda had a brief
12  conversation with Captains Cornell, Scott, and Weireter about the challenges they
13  faced during the Willow incident, including identifying the aircraft.  (*Id.* at 1484:7-
14  10, 1486:24-1488:2, 1558:7-18.)

15      Captain Imbrenda showed these other firefighters photos on his phone.  (*Id.* at
16  1484:11-16.)  The entire conversation lasted less than five minutes.  (*Id.* Ex. 2 [8/12
17  Tr.] at 490:20-22; *id.* Ex. 5 [8/17 Tr.] at 1485:10-12.)

18      Captain Imbrenda regrets his actions and acknowledges he breached LACFD
19  policy.  (*Id.* Ex. 5 [8/17 Tr.] at 1513:7-20, 1519:16-1520:1.)  He testified that while
20  the conversation was appropriate to have among fellow firefighters, it was not
21  appropriate at a public event.  (*Id.*)

22      **F.    LACFD Receives A Complaint And Takes Immediate Action**

23      On March 6, 2020, Captain Weireter's wife, Luella Weireter, reported to
24  LACFD that an employee had been showing crash site photos on his phone at the
25  awards event.  (Hashmall Decl. Ex. 2 [8/12 Tr.] at 474:10-475:15, 479:20-480:9; *id.*
26  Ex. 6 [8/18 Tr.] at 1730:4-10.)  LACFD hired an outside investigator and directed
27  the three LACFD captains who took photos to turn over their cell phones and
28  laptops to be forensically imaged.  (*id.* Ex. 6 [8/18 Tr.] at 1730:11-1731:6.)  LACFD

determined that (i) all crash site photos had been deleted, and (ii) no one had sent a photo to anyone outside LACFD.  (*Id.* at 1731:7-12.)

The investigation determined that Captain Imbrenda breached LACFD policy. (*Id.* at 1707:1-1708:6.)  LACFD policy provides that its personnel shall abide by its Code of Ethics and:

> 15.  Not make public statements or provide information to citizens, community groups or the press regarding Department matters, other than those affecting public policy, without specific authorization. . . . .

> 22.  Not bring discredit or embarrassment upon the Department through on- or off-duty behavior.  (Hashmall Decl. Ex. 12 [Tr. Ex. 24].)

### G.    No County Photos Are On The Internet Or In The Media

No County photos of the crash site have been posted on the Internet or released in the media.  (Hashmall Decl. Ex. 2 [8/12 Tr.] at 619:3-9; *id*. Ex. 3 [8/15 Tr.] at 784:20-785:6, 854:15-25, 857:15-858:18, 957:1-15; *id*. Ex. 6 [8/18 Tr.] at 1833:18-1834:19; *id*. Ex. 7 [8/19 Tr.] at 1869:3-23, 1959:24-1960:14; *id*. Ex. 29 [Tr. Ex. 175];  *id*. Ex. 39 [Tr. Ex. 611].)  NTSB's crash site photos appeared in the LOS ANGELES TIMES on February 28, 2020.  (*Id*. Ex. 19 [Tr. Ex. 73].)  Numerous press photos and live video footage taken before the crash site was secured have appeared in the press and on the Internet.  (*Id*. Ex. 40 [Tr. Ex. 641];  *id*. Ex. 47 [Tr. Ex. 647 ]; *id*. Ex. 42 [Tr. Ex. 650];  *id*. Ex. 43 [Tr. Ex. 651].)

After this lawsuit was filed, the parties agreed to have an independent forensic examiner, Kroll, examine the devices of over 20 LASD and LACFD employees. (*Id*. Ex. 29 [Tr. Ex. 175].)  Some of the individuals had upgraded their phones, but they made the devices they had available.  (*Id*. Ex. 2 [8/12 Tr.] at 687:12-688:1; *id*. Ex. 3 [8/15 Tr.] at 861:23-862:20; *id*. Ex. 29 [Tr. Ex. 175].)

Kroll concluded that there were no County photos of the crash site on any of the devices.  (*Id*. Ex. 29 [Tr. Ex. 175]; *id*. Ex. 38 [Tr. Ex. 611].)  And there are none anywhere.

III.   **JUDGMENT AS A MATTER OF LAW UNDER RULE 50**

The Court may grant judgment as a matter of law where it finds that a reasonable jury "would not have a legally sufficient evidentiary basis" to find for that party on a controlling issue.  Fed. R. Civ. P. 50(a)(1).  "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  The prior denial of summary judgment does not preclude a motion for judgment as a matter of law.  *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1212 (9th Cir. 1997).

IV.   **PLAINTIFFS' *MONELL* CLAIM FAILS BECAUSE THERE IS NO PREDICATE CONSTITUTIONAL VIOLATION**

Public entities cannot be held responsible for the actions of their employees based on *respondeat superior* under Section 1983.  *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).  Instead, a plaintiff must prove both (1) a predicate constitutional violation by an employee acting under color of state law; and (2) that the public entity had a "policy or custom" that amounted to deliberate indifference of plaintiff's constitutional rights and was the moving force behind the constitutional violation.  *Id.*

Plaintiffs cannot satisfy the first element.  The Due Process Clause "does not purport to supplant traditional tort law in laying down rules of conduct."  *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 128 (1992) (citation omitted).  Nor does it "guarantee due care on the part of state officials."  *County of Sacramento v. Lewis*, 523 U.S. 833, 848-49 (1998).  "[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'"  *Id.* at 846 (citation omitted).  Plaintiffs' evidence is not sufficient to show that any LASD or LACFD employee violated the Constitution under color of law.

A.   **The Evidence Does Not Support A Substantive Due Process Violation By "Public Dissemination" Of Death Images**

In *Marsh*, a prosecutor made a photocopy of an autopsy image of a young child.  680 F.3d at 1152.  When the prosecutor retired, he kept the photo as a "memento" from his work as a prosecutor.  *Id.*  He also used the photo as "part of his training materials for child abuse detection seminars." *Id.* at 1157.  When a man's conviction for murdering the child was overturned, the prosecutor gave a copy of the photo to a newspaper and a television station.  *Id.* at 1152.

Out of all of these uses of the photo, only the "attempt to publish the autopsy photograph [wa]s sufficiently shocking to violate [plaintiff's] substantive due process right."  680 F.3d at 1155 n.3.  This is because, "given the viral nature of the Internet," the victim's mother "might easily stumble upon photographs of her dead son on news websites, blogs or social media websites." *Id.* at 1155.  The court defined the relevant constitutional right as the "right to control *public dissemination of a family member's death images*." *Id.* at 1152 (emphasis added).

Here, there is no public dissemination under *Marsh*.  The brief displays of photos by Deputy Cruz and Captain Imbrenda were improper and against policy. But these displays did not create any risk that Plaintiffs might "stumble upon" the County photos.  Plaintiffs have never seen any County crash site photos.  (*Id*. Ex. 2 [8/12 Tr.] at 619:3-9; *id*. Ex. 6 [8/18 Tr.] at 1833:18-1834:19; *id*. Ex. 7 [8/19 Tr.] at 1869:3-23, 1959:24-1960:14.)  There is no evidence photos were sent to the press. (*Id*. Ex. 2 [8/12 Tr.] at 619:3-9; *id*. Ex. 3 [8/15 Tr.] at 784:20-785:6, 854:15-25, 857:15-858:18, 957:1-15; *id*. Ex. 5 [8/17 Tr.] at 1526:12-1527:14; *id*. Ex. 29 [Tr. Ex. 175]; *id*. Ex. 38 [Tr. Ex. 611].)  There is no evidence photos were posted on the internet.  (*Id*.)

LASD and LACFD investigations found that all County photos had been deleted.  (*Id*. Ex. 2 [8/12 Tr.] at 619:3-9; *id*. Ex. 3 [8/15 Tr.] at 784:20-785:6, 854:15-25, 857:15-858:18, 957:1-15; *id*. Ex. 5 [8/17 Tr.] at 1526:12-1527:14; *id*. Ex.

29 [Tr. Ex. 175]; *id*. Ex. 38 [Tr. Ex. 611].)  Kroll's forensic examination found no County photos remain.  (*Id*. Ex. 29 [Tr. Ex. 175]; *id*. Ex. 38 [Tr. Ex. 611].)  It has been over two-and-a-half years since the crash, and no photos are on the Internet or in the press.  (*Id*. Ex. 2 [8/12 Tr.] at 619:3-9; *id*. Ex. 3 [8/15 Tr.] at 784:20-785:6, 854:15-25, 857:15-858:18, 957:1-15; *id*. Ex. 5 [8/17 Tr.] at 1526:12-1527:14; *id*. Ex. 29 [Tr. Ex. 175]; *id*. Ex. 38 [Tr. Ex. 611].)  There was no public dissemination under *Marsh*.

As for Plaintiff Chester specifically, there is no evidence that any image showing his relatives was ever displayed to anyone.  Neither Deputy Cruz nor Gutierrez identified any of Chester's family members in the photos displayed at the Norwalk bar.  (*Id*. Ex. 1 [8/11 Tr.] at 349:19-350:20, 353:14-354:22; )  None of Captains Imbrenda, Scott, and Cornell identified any of Chester's family members in the photos displayed at the Golden Mike Awards.  (*Id*. Ex. 5 [8/17 Tr.] at 1525:19-1526:6, 1561:5-10; *id*. Ex. 6 [8/18 Tr.] at 1618:21-1619:3.)  There is no evidence identifying the Chester victims in any of the photo displays at issue.  The same is true of Gianna Bryant.

## B. There Is No Constitutional Right To Preclude Internal Government Photo Taking

Plaintiffs have focused on which particular County personnel should take photos of human remains, what devices should be used, and which personnel should receive photos.  This focus is misplaced.  There is no constitutional right implicated by internal governmental photo taking or sharing of accident scenes.

*Marsh* did not find any constitutional right with respect to the *taking* of photos or the *internal* sharing of photos by a public entity.  The only conduct that the Ninth Circuit found "shocks the conscience" was the "attempt to publish the autopsy photograph."  680 F.3d at 1155 & n.3.  The plaintiff's constitutional rights in *Marsh* were not violated by taking the photo, making a photocopy of it, using it for training, or even keeping the photo as a "memento."  *Id*. at 1152, 1155 n.3

20

("Only Coulter's attempt to publish the autopsy photograph is sufficiently shocking to violate Marsh's substantive due process right.").

Other cases confirm that there is no constitutional violation absent public dissemination. *See, e.g.*, *Lamorie v. Davis*, 485 F. Supp. 3d 1065, 1073 (D. Ariz. 2020) (holding that conduct failed to shock the conscience as there was "no publication of [the child's] autopsy photos"); *Olejnik v. England*, 147 F. Supp. 3d. 763, 777-78 (W.D. Wis. 2015) (no substantive due process violation because medical examiner made no public disclosure of the decedent's autopsy).

Plaintiffs' attempt to expand *Marsh* is particularly inappropriate because *Marsh* itself cannot be reconciled with the Supreme Court's recent opinion in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022). In *Dobbs*, the Supreme Court held that unenumerated constitutional rights cannot be recognized without a rigorous, searching historical inquiry showing that the right was recognized as of the ratification of the Fourteenth Amendment. *Id.* at 2260. The *Marsh* opinion recognized a constitutional right without conducting this necessary inquiry. *See* 680 F.3d at 1153-54.[1] No constitutional right to control the taking or internal sharing of photos can be recognized after *Dobbs*. No such right is set forth in the Constitution, and no such right "is 'deeply rooted in [our] history and tradition'" and "essential to our Nation's 'scheme of ordered liberty.'" *Dobbs*, 142 S. Ct. at 2246 (alteration in original) (citation omitted).

Indeed, Plaintiffs do not dispute that agencies may properly take and internally share death images. Plaintiffs have never challenged DMEC's photos or

---

[1] *Dobbs* has "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (implied overruling on another point recognized in *Hernandez v. Garland*, 38 F.4th 805, 806-07 (9th Cir. 2022)); *see id.* ("[D]istrict courts should consider themselves bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled.").

the internal distribution of death images within DMEC.  As Captain Emily Tauscher of DMEC testified, "We do share images with each other. . . . . [W]e have used our personal cell phones to exchange photos for an investigative purpose."  (Hashmall Decl. Ex. 1 [8/11 Tr.] at 319:20-23.)  NTSB's crash site photos also included human remains.  (*Id.* at 333:3-8.)

Nor have Plaintiffs challenged the need for first responders to take photos for some investigative purposes.  In fact, Plaintiffs' expert, Adam Bercovici, admitted that photos may be taken and sent to a command post to assess a situation:

> I will concede this - - I could see sending a deputy or an officer and getting some photographs if I needed to understand what was happening.  (*Id*. Ex. 2 [8/12 Tr.] at 617:8-10.)

Rather, Plaintiffs' case rests on arguing why LASD and LACFD's taking and internal exchange of photos in *this* instance was supposedly inappropriate.  (*E.g., id*. at 544:20-25, 552:19-23; 563:14-564:1.)  For example, Mr. Bercovici claims that LASD Policy 5-05/060.1—which *requires* photography—only applies to "vehicle collisions," and "an air crash" is "different."  (*Id.* at 549:22-550:13.)  He testified that site photography was not part of the "job of responding officers and deputies" "[i]n this particular case," and there was no "reason" for photos to be sent to other first responders at the scene.  (*Id.* at 545:1-10, 552:19-23.)

These are not constitutional matters.  Bercovici—who worked at the Los Angeles Police Department ("LAPD"), not LASD—may have opinions about site photography.  But neither *Marsh* nor any other authority allows Plaintiffs to claim a constitutional right based on first responders taking and using photography within their own agencies.  "[Section 1983] does not provide plaintiffs or courts *carte blanche* to micromanage local governments throughout the United States."  *Connick v. Thompson*, 563 U.S. 51, 68 (2011).

Lastly, assuming *arguendo Marsh* applies to the taking or internal sharing of death images (it does not), such a right was not clearly established in 2020.  LASD

and LACFD thus could not have been "deliberately indifferent" to such a right, as required for *Monell* liability.  *See, e.g., Huling v. City of Los Banos*, 869 F. Supp. 2d 1139, 1157-58 (E.D. Cal. 2012) ("'[T]o be "deliberately indifferent" to rights requires that those rights be clearly established.'" (citation omitted)); *Szabla v. City of Brooklyn Park, Minn.*, 486 F.3d 385, 393-94 (8th Cir. 2007) (same)); *Joyce v. Town of Tewksbury, Mass.*, 112 F.3d 1919, 23 (1st Cir. 1997) (same).

### C.   Imbrenda and Cruz Did Not Act Under Color Of Law

"[A] government employee does not act under color of state law when he pursues private goals via private actions." *Naffe v. Frey*, 789 F.3d 1030, 1037 (9th Cir. 2015).  While off duty, a public employee acts under color of law only when "(1) the employee 'purport[s] to or pretend[s] to act under color of law,' (2) his 'pretense of acting in the performance of his duties . . . had the purpose and effect of influencing the behavior of others,' and (3) the harm inflicted on plaintiff "'related in some meaningful way either to the officer's governmental status or to the performance of his duties.""  *Id.* (alternations in original) (citations omitted.)

**Deputy Cruz**:  Deputy Cruz was off duty when he showed photos to Gutierrez.  (*Id*. Ex. 3 [8/15 Tr.] at 997-12-15, 1002:17-23.)  Deputy Cruz was not in uniform.  (*Id*. Ex. 9 [Tr. Ex. 003F].)  He was at a bar, drinking and talking to a friend to decompress.  (*Id*. Ex. 1 [8/11 Tr.] 348:9-11; *id*. Ex. 4 [8/16 Tr.] at 1072:20-1073:14, 1075:7-11.)  He was not there on County business; he "just needed to talk to somebody." (*Id*. Ex. 1 [8/11 Tr.] at 382:17-21.)  Deputy Cruz was not acting under color of law as a matter of law.  *See Hyun Ju Park v. City & County of Honolulu*, 952 F.3d 1136, 1140 (9th Cir. 2020) (officers not acting under color of law where they "were off-duty and dressed in plain clothes, drinking and socializing at the bar in their capacity as private citizens"); *Huffman v. County of Los Angeles*, 147 F.3d 1054, 1058 (9th Cir. 1998) (officer not acting under color of law while off duty at a bar).

**Captain Imbrenda**:  Captain Imbrenda was also off duty when he showed

crash site photos at the awards event during a cocktail hour.  (*Id.* Ex, 5 [8/17 Tr.] at 1480:10-1481:7, 1484:7-16.)  The event was a non-County event put on by the radio and television community and was hosted at a hotel in Universal City.  (*Id.* Ex. 2 [8/12 Tr.] 469:18-23; *id*. Ex. 5 [8/17 Tr.] at 1549:4-17.)  Captain Imbrenda attended the event because he was going to receive an award.  (*Id*. Ex. 5 [8/17 Tr.] at 1480:10-1481:7.)  Captain Imbrenda did not attend in his uniform.  (*Id*. Ex. 18 [Tr. Ex. 64].)  No reasonable jury could find that Captain Imbrenda was acting under color of law.  *See Hyun Ju Park*, 952 F.3d at 1140; *Huffman*, 147 F.3d at 1058.[2]

Plaintiffs cannot maintain a *Monell* claim based on Cruz and Imbrenda's off-duty conduct that was not under color of state law.  *See First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021) (*Monell* claim failed where act was not under color of law); *Sinks v. County of Fresno*, 2012 WL 174969, at \*5 (E.D. Cal. Jan. 20, 2012) (same).

### D.   The Officers' Conduct Does Not Shock The Conscience

"[O]nly official conduct that 'shocks the conscience' is cognizable as a due process violation."  *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (citation omitted).  There are two tests to establish whether conduct shocks the conscience—(1) whether the officer "acted with *deliberate indifference*"; or (2) whether the officer "acted with a *purpose to harm* [plaintiff] for reasons unrelated to legitimate law enforcement objectives."  *Id*.  Where "actual deliberation is practical," the standard is "deliberate indifference."  *Id*. at 1137-39 (citation omitted).  In urgent situations, the "purpose to harm" standard applies.  *Id*.

Conduct akin to negligence is insufficient to "shock the conscience."

---

[2] *Marsh* does not apply to internal sharing and thus does not apply to the conduct of Deputy Russell, who shared photos with Deputy Sanchez while they were off-duty playing video games.  (*Id*. Ex. 4 [8/16 Tr.] at 1107:22-1108:1.)  Additionally, Deputy Russell was not acting in an official capacity.  No reasonable jury could find that Deputy Russell was acting under color of law.  *See Naffe*, 789 F.3d at 1037.

*Compare Jones v. Jinparn*, 2020 WL 999806, at *4 (N.D. Cal. Mar. 2, 2020) (negligent conduct did not shock the conscience) *with Shelley v. County of San Joaquin*, 996 F. Supp. 2d 921, 931 (E.D. Cal. 2014) (conduct shocked the conscience where defendant "chewed up, pulverized, destroyed, crushed and commingled with other unknown murder victims" in the presence of the decedent's mother and before news media).

Here, it is undisputed that site photography is generally appropriate as part of an accident response.  (Hashmall Decl. Ex. 1 [8/11 Tr.] at 269:23-270:20, 343:19-25; *id.* Ex. 2 [8/12 Tr.] at 601:19-602:10, 617:8-10, 703:11-24; *id.* Ex. 3 [8/15 Tr.] at 846:4-22, 932:20-933:14; *id.* Ex. 44 [Tr. Ex. 678].)  Any deviation from best practices for site photography in the midst of this unprecedented disaster was not "deliberate indifference."  As to the off-duty sharing incidents, Plaintiffs' evidence shows at most that a few personnel had lapses of judgment; this does not show "deliberate indifference."  (*See id.* Ex. 11 [8/16 Tr.] 1079:18-1080:3; *id.* Ex. 5 [8/17 Tr.] at 1519:5-1520:1.)

# V.   PLAINTIFFS' *MONELL* CLAIM FAILS BECAUSE DEFENDANTS DID NOT HAVE A LONGSTANDING PRACTICE OR CUSTOM OF SHARING PHOTOS DEPICTING HUMAN REMAINS

Even if one or more County employees violated Plaintiffs' constitutional rights, that does not mean that Plaintiffs would prevail.  Plaintiffs must still meet the exacting requirements of *Monell* liability—a "policy or custom" that amounted to "deliberate indifference" of Plaintiffs' constitutional rights and was the moving force behind the constitutional violation.  *Monell*, 436 U.S. at 694; *see also Marsh*, 680 F.3d at 1159-60 (rejecting *Monell* claim based on publication of death images).

To prove a *Monell* claim through a "longstanding practice or custom," *Wettstein v. County of Riverside*, 2020 WL 2199005, at *4 (C.D. Cal. Jan. 22, 2020) (citation omitted), Plaintiffs must establish that LASD or LACFD had a practice of sharing death images "so persistent and widespread as to practically have the force

1   of law," *Connick*, 563 U.S. at 61.  "[I]solated or sporadic incidents" are not

2   sufficient.  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (affirming summary

3   judgment where evidence did not establish "persistent and widespread" practice that

4   constituted "permanent and well settled" policy (citation omitted)).

5       There is no evidence of a "persistent and widespread" practice of sharing

6   death images that has risen to the level of a County policy.  There are no other

7   complaints of LASD or LACFD personnel doing anything similar in the 100+ year

8   history of each department.  (Hashmall Decl. Ex. 2 [8/12 Tr.] at 602:24-604:11,

9   604:23-605:8, 605:16-19, 605:25-606:7; *id*. Ex. 20 [Tr. Ex. 85]; *id*. Ex. 36 [Tr. Ex.

10  434]; Tr. Ex. 436.)  Plaintiffs elicited testimony from LASD deputies regarding the

11  fact that they were not disciplined for their conduct other than receiving

12  performance log entries.  (*See, e.g.*, *Id*. Ex. 3 [8/15 Tr.] at 972:21-973:4, *id*. Ex. 4

13  [8/16 Tr.] at 1061:9-19, 1083:22-1084:5, 1158:13-1159:1, 1169:15-24; *id*. Ex. 5

14  [8/17 Tr]. at 1328:24-1329:5.)  But such evidence is irrelevant under *Monell* because

15  the County's response to the incident at issue alone cannot evidence a custom or

16  practice.  *See Nadell v. Las Vegas Metro. Police Dep't*, 268 F.3d 924, 927, 929-30

17  (9th Cir. 2001) (reversing denial of judgment as a matter of law on *Monell* claim

18  where jury found department violated plaintiff's rights by failing to issue discipline

19  for or investigate incident).

20      **A.    Sheriff Villanueva's Testimony**

21      Plaintiffs rely on Sheriff Villanueva's public comments that there has been "a

22  problem in law enforcement across the nation" of officers keeping "photos from

23  crime scenes throughout their careers."  (Hashmall Decl. Ex. 30 [Tr. Ex 300A]; *see*

24  *also id*. Ex. 32 [Tr. Ex. 305A]; *id*. Ex. 33 [Tr. Ex. 306A].)  But Sheriff Villanueva's

25  comments about law enforcement generally cannot establish any long-standing

26  practice at LASD specifically.  *See Watts v. City of Port St. Lucie, Fla*., 2015 WL

27  7736532, at *19 (S.D. Fla. Nov. 30, 2015) (dismissing *Monell* claim where, "[w]hile

28  this seems like a widespread problem in the aggregate, [the plaintiff] can attribute

1   only four incidents . . . to this particular City").  Plaintiffs adduced no evidence of

2   so-called "death books" at LASD.  Numerous witnesses testified they have never

3   seen a death book.  (Hashmall Decl. Ex. 2 [8/12 Tr.] at 652:15-23; *id.* Ex. 3 [8/15

4   Tr.] at 863:12-17, 965:7-11; *id.* Ex. 5 [8/17 Tr.] at 1561:17-24.)

5       Sheriff Villanueva's comments are also not tied to the constitutional right at

6   issue—the right against "public dissemination" of death images.  *Marsh*, 680 F.3d at

7   1152.  *Marsh* held that the kind of memento-keeping described by Sheriff

8   Villanueva does not rise to the level of a constitutional violation.  *Id.* at 1152, 1155

9   n.3 ("memento" keeping not sufficiently shocking to violate plaintiff's right).

10      **B.    Luella Weireter's Testimony**

11      Plaintiffs elicited testimony from Ms. Weireter, a former EMT, of a single

12  incident she witnessed of LASD and LACFD deputies taking pictures of a self-

13  inflicted gunshot victim.  (Hashmall Decl. Ex. 2 [8/12 Tr.] at 483:2-485:1.)  But Ms.

14  Weireter admitted she had never undergone any LACFD or LASD training and was

15  never trained on how to document a suicide.  (*Id.* at 491:19-23.)  This occurred

16  when she worked for a private ambulance company, at least ten years ago.  (*Id.* at

17  491:24-492:1, 492:2-3.)  Ms. Weireter did not testify to any improper sharing of

18  these photos, and Ms. Weireter did not report the incident.  (*Id.* at 493:2-7.)  This

19  incident is irrelevant.  *See Hyun Ju Park*, 952 F.3d at 1142-44 (dismissing *Monell*

20  claim where prior incidents not reported); *Galban v. City of Fontana*, 2021 WL

21  1307722, at *2 (C.D. Cal. Apr. 7, 2021) (rejecting *Monell* theory where prior

22  incidents did not pertain to "the constitutional right at issue"); *Hyer v. City &*

23  *County of Honolulu*, 2021 WL 2172816, at *10 (D. Haw. May 27, 2021) ("nine

24  years prior" "too far removed in time to be relevant").

25      **C.    Adam Bercovici's Testimony**

26      Plaintiffs offered expert testimony from former LAPD officer Adam

27  Bercovici that "the problem of taking photos of human remains, keeping those as

28  scrapbooks, or death books, as we call them, has been a widespread problem

throughout my career." (Hashmall Decl. Ex. 2 [8/12 Tr.] at 504:9-15.) This opinion is irrelevant for the same reason as Sheriff Villanueva's comments—this kind of memento-keeping is not a constitutional violation. *Marsh*, 680 F.3d at 1152, 1155 n.3. Nor would Mr. Bercovici have any competent basis to opine to a widespread problem at LASD or LACFD:

**LAPD Conduct**: Mr. Bercovici's opinion was primarily based on his "own personal experience" with LAPD. (Hashmall Decl. Ex. 2 [8/12 Tr.] at 510:20-23.) Mr. Bercovici testified that in the early 1980s, he saw officers taking photos of a pedestrian hit by a train. (*Id.* at 511:1-512:6.) He also testified to "officers who kept these scrapbooks in their locker room" and would show them "in the locker room" or "sometimes at roll call." (*Id.* at 512:18-513:7.) Mr. Bercovici further testified to seeing a crime-scene Polaroid of Nicole Brown Simpson around 1994. (*Id.* at 517:7-518:15.)

None of this testimony establishes a long-standing LASD custom of publicly sharing death images. These incidents occurred long ago, did not involve any public sharing, and occurred at LAPD rather than LASD. *See Waller v. City & County of Denver*, 932 F.3d 1277, 1286 (10th Cir. 2019) (disregarding allegations as to "Denver Police Department rather than the separate Denver Sheriff Department"); *Garber v. Mohammadi*, 2013 WL 4012633, at *17 (C.D. Cal. Aug. 6, 2013) ("Liability against the LAPD or the City may not be premised on isolated or sporadic incidents by different agencies . . . ."); *Hyer*, 2021 WL 2172816, at *10 (incident "nine years prior" was "too far removed in time to be relevant"). In fact, Mr. Bercovici conceded he has never seen a death book held by an LASD deputy nor a fire personnel. (Hashmall Decl. Ex. 2 [8/12 Tr.] at 652:12-653:1.)

**Highway Patrol Conduct**: Mr. Bercovici testified about a magazine put out by the Highway Patrol "years ago" called "The Highway Patrolman." (*Id.* at 514:15-515:7.) Mr. Bercovici states that he once saw a copy of the magazine that included pictures of people with traumatic injuries. (*Id.*) This is also irrelevant.

1  The Highway Patrol is not LASD.  *See Waller*, 932 F.3d at 1286.

2      **LASD Improper Comment Incident**:  Mr. Bercovici relied on a single 2016

3  incident to opine that LASD "is on notice that people take pictures for no

4  appropriate reason."  (Hashmall Ex. 2 [8/12 Tr.] at 527:6-529:8; *id*. Ex. 20 [Tr. Ex.

5  85].)  Specifically, LASD documented an incident where a deputy photographed a

6  victim with a cell phone and said, "That's why they shot him, because he is a Green

7  Bay Packers fan." (*Id*. Ex. 20 [Tr. Ex. 85] at 4.)  The deputy was disciplined for the

8  inappropriate comment; there was no finding the picture itself was inappropriate.

9  (*Id*. Ex. 2 [8/12 Tr.] at 603:16-604:11, 604:23-605:3.)  Mr. Bercovici admitted there

10  was nothing in the document that references any sharing of photos.  (*Id*. at 603:25-

11  604:5.)  This was the only incident since LASD was founded in 1850 that Mr.

12  Bercovici relied upon:

13      Q.  So since 1850, you found one incident in 2016.  Any other
        documented incident that you think is relevant to the issues in this case
14      involving the sheriff's department?

15

16      A.  I didn't review any.  (*Id.* at 605:4-8.)

17      This single incident, which did not involve public sharing of death images, is

18  insufficient to show a long-standing custom or practice under *Monell*.  *See Galban*,

19  2021 WL 1307722, at *2 (rejecting *Monell* theory where prior incidents did not

20  pertain to "the constitutional right at issue"); *Wettstein*, 2020 WL 2199005, at *5

21  (two violations insufficient to "establish a custom or policy" or to infer "more

22  common and frequent unconstitutional behavior" (citation omitted)).

23      **LACFD Photo Incident**:  Mr. Bercovici also relied on a letter from LACFD

24  regarding a single incident in 2015 to claim that "there's a prevailing problem in

25  public safety, that individuals take photographs at scene when there is no reason to

26  take a photograph."  (Hashmall Decl. Ex. 2 [8/12 Tr.] at 529:25-532:11; *id*. Ex. 36

27  [Tr. Ex. 434].)  The letter notified an LACFD employee of the department's

28  intention to suspend him for taking an inappropriate picture.  (*Id*. at 404-405.)  Mr.

Bercovici admitted there was no public dissemination of the photo, that the incident was investigated, and that discipline was issued.  (*Id.* Ex. 2 [8/12 Tr.] at 606:5-7, 605:25-606:4.)  This was the only incident since LACFD was founded in 1923 that Mr. Bercovici relied upon:

> Q.  When we went through your evidence where you said it was widespread and customary, you only pointed to one incident in the fire department; right?
>
> A.  That's correct.  (*Id.* at 605:9-19.)

This single incident did not involve public sharing of death images, and the fact that discipline was imposed demonstrates that LACFD does not tolerate inappropriate conduct involving scene photography.  *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1145 (11th Cir. 2007) (fact that an officer was disciplined showed that his actions were inconsistent with official policy).

## VI.   PLAINTIFFS' *MONELL* CLAIM FAILS BECAUSE THE COUNTY'S POLICIES AND TRAINING WERE NOT DELIBERATELY INDIFFERENT

### A.   Defendants' Policies Were Not Facially Deficient

Plaintiffs contend that Defendants failed to adopt policies to prevent violations of Plaintiffs' rights.  To prove a *Monell* claim based on a failure to implement adequate policies, Plaintiffs must show that the defendant's inaction amounted to "deliberate indifference."  *Hyun Ju Park*, 952 F.3d at 1141.  A plaintiff may satisfy this stringent standard if the defendant's policies were "so facially deficient that any reasonable policymaker would recognize the need to take action."  *Id.*  "Alternatively, if the policy is not obviously, facially deficient, a plaintiff must ordinarily point to a pattern of prior, similar violations of federally protected rights, of which the relevant policymakers had actual or constructive notice."  *Id.* at 1142.

LASD and LACFD's policies were not "facially deficient."  Both LASD and LACFD have policies governing standards of conduct, confidentiality, and ethics

that govern the public dissemination of photos depicting human remains.  (Hashmall Decl. Ex. 1 [8/11 Tr.] at 265:9-20, 265:23-266:10; *id*. Ex. 6 [8/18 Tr.] at 1716:12-1720:2; *id*. Ex. 12 [Tr. Ex. 24]; *id*. Ex. 46 [Tr. Ex. 685].)  LASD also adheres to the requirements established by the California Commission on Peace Officer Standards and Training.  (*Id*. Ex. 3 [8/15 Tr.] at 929:15-931:11; *id*. Ex. 45 [Tr. Ex. 684].)

In particular, LASD's confidentiality policy, Policy 5-05/060.10, provides:

The official business of the Department is confidential.  Members shall only discuss or give official information:
- to persons for whom the information is intended;
- as directed by their superior officers; and/or
- as required by law.  (*Id*. Ex. 46 [Tr. Ex. 685].)

And LACFD policy provides that fire personnel shall:

8.b. Not lend, give away, or appropriate for personal use any Department property. . . without property authority. . . .

15.  Not make public statements or provide information to citizens, community groups or the press regarding Department matters, other than those affecting public policy, without specific authorization. . . .

22.  Not bring discredit or embarrassment upon the Department through on- or off-duty behavior.  (*Id*. Ex. 12 [Tr. Ex. 24].)

Plaintiffs have not adduced and cannot adduce any evidence that these policies were so facially deficient that policymakers "had actual or constructive notice that" not reforming the policies would "likely result in the deprivation of [their] federally protected rights."  *Hyun Ju Park*, 952 F.3d at 1142; *see Hall v. City & County of Honolulu*, 2022 WL 1229965, at *4 (D. Haw. Apr. 26, 2022) (holding policies were not "facially deficient" (citation omitted)).  Indeed, the improper sharing incidents at issue were all contrary to these policies.  (Hashmall Decl. Ex. 4 [8/16 Tr.] at 1077:10-1078, 1144:18-1145:7, 1147:2-16; *id*. Ex. 6 [8/18 Tr.] at 1709:10-18; *id*. Ex. 12 [Tr. Ex. 24]; *id*. Ex. 27 [Tr. Ex. 124].)

Plaintiffs may believe that policymakers should have foreseen and developed a policy just to deal with the circumstances raised by this lawsuit.  But that is the

exact type of "second-guessing" that cannot form the basis of a *Monell* claim. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 392 (1989).  "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *Id.*  This is an exercise that "federal courts are ill suited to undertake." *Id.*; *see Collins*, 503 U.S. at 128-29 ("[T]raining . . . of employees . . . involve[s] a host of policy choices that must be made by locally elected representatives, rather than by federal judges . . . .").

Plaintiffs rely on a March 4, 2020 letter from Sheriff Villanueva to the Sheriff Civilian Oversight Commission in which he committed to notifying the commission "during the creation of a new policy" and stated, "it is evident that our photograph policy is deficient." (Hashmall Decl. Ex. 35 [Tr. Ex. 328].)  Sheriff Villanueva wrote this letter *after* learning of improper sharing of photos. (*Id.*)  The same is true of the comments by Sheriff Villanueva during post-incident interviews. (*Id.* Ex. 31 [Tr. Ex. 300B].)  As Mr. Bercovici admitted, "[t]his is the sheriff asking for . . . input in how they could improve and increase the specificity of their policies" because "policies should be adaptive." (*Id.* Ex. 2 [8/12 Tr.] at 619:22-620:10.)

LASD's reassessment of its policies with the benefit of hindsight is, by law, not evidence that its policies were deliberately indifferent beforehand. *See Gordon v. County of Orange*, 6 F.4th 961, 974 (9th Cir. 2021) (holding "reference to the subsequent changes to operating procedures is insufficient"); *Chavez v. Las Vegas Metro. Police Dep't*, 648 F. App'x 657, 658 (9th Cir. 2016) ("Chavez's assertion that LVMPD revamped its use of force policy subsequent to the shooting of Olivas, even if true, is insufficient to raise a triable issue that at the time of the shooting LVMPD had a policy or practice of tolerating constitutional violations.").

Plaintiffs' attempt to rely on purported deficiencies in LASD and LACFD policies on the taking of photos is also mistaken.  The County had adequate policies on the taking of scene photography. (*E.g.,* Hashmall Ex. 44 [Tr. Ex. 678]; *id.* Ex. 45

[Tr. Ex. 684] at TREX 684.0033-TREX 684.0037.)  Regardless, there is no constitutional right as to the taking or internal sharing of photos of death images by government personnel.  (*See supra* Section IV.B.)  *See also Canton*, 489 U.S. at 391 ("[T]he identified deficiency in a city's training program must be closely related to the ultimate injury.").

### B.    There Is No "Pattern of Similar Constitutional Violations"

Because the County's policies were not "facially deficient," Plaintiffs must adduce evidence of a "pattern of prior, similar violations of federally protected rights, of which the relevant policymakers had actual or constructive notice." *Hyun Ju Park*, 952 F.3d at 1142.  But as set forth above, there has never before been a complaint about an LASD or LACFD employee improperly sharing photos of decedents.  (*See supra* Section V.)  *See also Connick*, 563 U.S. at 63 ("Because those incidents are not similar to the violation at issue here, they could not have put Connick on notice that specific training was necessary to avoid this constitutional violation.").

Plaintiffs have not established that Defendants made a "deliberate" or "conscious" choice to ignore the "obvious" consequences of not having a specific policy addressing this situation.  *Canton*, 489 U.S. at 389-90.  Indeed, the misuse of photos violated valid existing County policies.  (Hashmall Ex. 3 [8/15 Tr.] at 859:3-860:15; *id*. Ex. 4 [8/16 Tr.] at 1085:1-23, 1144:18-1145:7, 1147:2-16; *id*. Ex. 6 [8/18 Tr.] at 1709:10-18; *id*. Ex. 15 [Tr. Ex. 59]; *id*. Ex. 12 [Tr. Ex. 24]; *id*. Ex. 27 [Tr. Ex. 124].)

### C.    The County's Training Was Not Deliberately Indifferent

A *Monell* claim based on a failure to train similarly requires evidence of a "pattern of similar constitutional violations by untrained employees." *Flores v. County of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014) (citation omitted)

1  (granting motion to dismiss failure to train claim).[3]  The pattern of similar conduct is
2  what puts an entity on notice of the need for training.  *Marsh*, 680 F.3d at 1159.
3       LASD and LACFD trained their personnel on confidentiality and ethical
4  conduct.  (Hashmall Decl. Ex. 3 [8/15 Tr.] at 844:16-845:17, 929:15-931:11; *id.* Ex.
5  4 [8/16 Tr.] at 1263:19-1265:9; *id.* Ex. 45 [Tr. Ex. 684].)  As set forth above, there
6  has never before been a complaint about an LASD or LACFD employee sharing
7  photos of victim remains.  (*See supra* Section V.)  *See also Connick*, 563 U.S. at 63.
8  Plaintiffs' claim that the County was "deliberately indifferent" not to implement
9  *more* training invites exactly the sort of "endless exercise of second-guessing
10  municipal employee-training programs" that Courts are instructed not to allow in
11  deciding Section 1983 claims.  *Canton*, 489 U.S. at 392.
12       Plaintiffs questioned deputies about whether they were trained in a
13  "constitutional right."  (*E.g.*, Hashmall Decl. Ex. 1 [8/11 Tr.] at 257:20-258:5; *id.*
14  Ex. 3 [8/15 Tr.] at 745:20-24, 813:22-25, 967:19-968:4.)  This is irrelevant.
15  Deputies and firefighters out in the real world every day responding to emergencies
16  need practical policies and training, not law school classes.  *See Tompkins v. Frost*,
17  655 F. Supp. 468, 471 (E.D. Mich. 1987) ("Civil rights is within the expertise of
18  lawyers; policework is the expertise of policemen and policewomen.").

19  **VII.  CONCLUSION**
20       LASD and LACFD did not violate Plaintiffs' constitutional rights.
21  Defendants respectfully request that the Court grant judgment as a matter of law.
22
23  _____
   [3] This case does not implicate the "single-incident" exception theorized in *Canton*,
24  where the Supreme Court's hypothetical example was a city giving its officers
   firearms but failing to train them in the constitutional limitation on the use of deadly
25  force.  *Canton*, 489 U.S. at 390 n.10.  It was far from obvious that employees would
   violate departmental confidentiality policies.  *See Estate of Jones by Jones v. City of*
26  *Martinsburg, W. Va.*, 961 F.3d 661, 672 (4th Cir. 2020) (holding *Canton* exception
27  not applicable where the defendant "*did* have an aggression policy").
28

1

DATED:  August 21, 2022

Respectfully Submitted,

2

OFFICE OF COUNTY COUNSEL

3

4

5

By:   */s/ Jonathan C. McCaverty*

6

JONATHAN C. McCAVERTY
Attorneys for Defendant

7

LOS ANGELES COUNTY SHERIFF'S
DEPARTMENT

8

9

DATED:  August 21, 2022

MILLER BARONDESS, LLP

10

11

12

By:      */s/ Mira Hashmall*

13

MIRA HASHMALL
Attorneys for Defendants

14

COUNTY OF LOS ANGELES, LOS
ANGELES COUNTY FIRE

15

DEPARTMENT, JOEY CRUZ,
RAFAEL MEJIA, MICHAEL

16

RUSSELL, RAUL VERSALES, ARLIN

17

KAHAN and TONY IMBRENDA

18

19

20

21

22

23

24

25

26

27

28

## <u>FILER ATTESTATION</u>

I, Mira Hashmall, attest under Local Rule 5-4.3.4(a)(2)(i) that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized this filing.


Dated:  August 21, 2022                              */s/ Mira Hashmall*
                                                              Mira Hashmall

36

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW